Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine Street, No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Tanya Pellegrini*
LAWYERING PROJECT
584 Castro St., No. 2062
San Francisco, CA 98114
Phone: (646) 480-8973
tpellegrini@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | ) Case No.: 1:24-cv-00244-BLW |
| | ) |
| Plaintiff, | ) |
| | ) **PLAINTIFF'S** |
| v. | ) **CONSOLIDATED** |
| | ) **RESPONSE IN OPPOSITION** |
| MEMBERS OF THE IDAHO BOARD OF | ) **TO DEFENDANTS'** |
| MEDICINE, in their official capacities; *et al*., | ) **MOTIONS TO DISMISS** |
| | ) **[Dkt. # 25 & 26]** |
| Defendants. | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................ 2

I.     Idaho's Abortion Bans ............................................................................................. 2

II.    Dr. Seyb's Provision of Abortion Care ................................................................... 3

III.   Medical Indications for Abortion ............................................................................ 4

ARGUMENT ...................................................................................................................... 4

I.     Standard of Review .................................................................................................. 4

II.    All Defendants Have Statutory Authority to Enforce the Abortion Bans ............... 5

       A.    The County Prosecutors Are Proper Defendants ........................................... 5

       B.    The Members of the Idaho Board of Medicine Are Proper Defendants .......... 7

III.   Dr. Seyb Has Standing to Challenge the Abortion Bans ......................................... 8

       A.    Dr. Seyb Satisfies the Test for Standing in a Pre-Enforcement Challenge ...... 8

             1.    Dr. Seyb Intends to Engage in a Course of Conduct Arguably Affected with a
                   Constitutional Interest ............................................................................. 9

             2.    Dr. Seyb's Intended Conduct is Arguably Proscribed by the Abortion Bans ............ 9

             3.    Dr. Seyb Faces a Credible Threat of Enforcement ..................................... 10

       B.    Dr. Seyb Has Third-Party Standing to Assert His Patients' Rights ................. 12

IV.    There Are No Special Pleading Requirements for As-Applied Challenges ........................ 13

V.     Dr. Seyb States a Plausible Substantive Due Process Claim ................................... 15

       A.    Defendants' Reliance on *Dobbs* is Misplaced ................................................. 15

       B.    *Dobbs*' History-and-Tradition Standard Requires Recognition of a Fundamental
             Right to Medically Indicated Abortion in Cases of Serious Medical Need ................... 15

             1.    *Dobbs*' Application of the Standard ........................................................ 15

             2.    Historical Evidence Demonstrates a Deeply Rooted Right to Medically
                   Indicated Abortion in Cases of Serious Medical Need ............................. 16

             3.    The Right to Medically Indicated Abortion is an Integral Part of a Broader
                   Entrenched Right to Obtain Treatment for Serious Medical Needs ........................ 23

       C.    The Abortion Bans Violate the Right to Medically Indicated Abortion by Prohibiting
             Abortion in Many Cases of Serious Medical Need ........................................... 25

       D.    Alternatively, the Abortion Bans' Application to Medically Indicated Abortion
             Lacks a Rational Basis ................................................................................ 26

VI.    Dr. Seyb States a Plausible Equal Protection Claim. ............................................. 27

A.   *Planned Parenthood* and *Adkins* Are Inapposite. ........................................................ 27

B.   Both Groups of Pregnant People Are Similarly Situated. ............................................... 28

C.   The Statutory Classification Cannot Survive Any Level of Scrutiny. ........................... 29

CONCLUSION ............................................................................................................................... 30

CERTIFICATE OF SERVICE ........................................................................................................ 32

# TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Adkins v. State,*
No. CV01-23-14744, slip op. (Idaho 4th Jud. Dist. Dec. 29, 2023) ........................................... 8

*Anderson v. Commonwealth,*
58 S.E.2d 72 (Va. 1950) ........................................................................................................ 23

*Ariz. Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) ................................................................................................ 29

*Ariz. Dream Act Coal. v. Brewer,*
855 F.3d 957 (9th Cir. 2017) .................................................................................................. 28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................................ 5

*Barrows v. Jackson,*
346 U.S. 249 (1953) .............................................................................................................. 12

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................................ 5

*California v. Texas,*
593 U.S. 659 (2021) ................................................................................................................ 6

*Carey v. Pop. Servs. Int'l,*
431 U.S. 678 (1977) .............................................................................................................. 12

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) .............................................................................................................. 14

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ................................................................................................... 27, 29, 30

*Commonwealth v. Brunelle,*
171 N.E.2d 850 (Mass. 1961) ................................................................................................ 22

*Commonwealth v. Wheeler,*
53 N.E.2d 4 (Mass. 1944) ...................................................................................................... 19

*Conn v. City of Reno,*
572 F.3d 1047 (9th Cir. 2009) ................................................................................................ 24

*Craig v. Boren,*
429 U.S. 190 (1976) .............................................................................................................. 12

*Disability Rts. Mont., Inc. v. Batista,*
930 F.3d 1090 (9th Cir. 2019) ................................................................................................ 24

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................................................... 20, 29

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................................................ *passim*

*Doty v. County of Lassen*,
  37 F.3d 540 (9th Cir. 1994) .................................................................................... 24

*Estelle v. Gamble*,
  429 U.S. 97 (1976) .................................................................................................. 24

*Ex parte Young*,
  209 U.S. 123 (1908) .................................................................................................. 7

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,
  569 F. Supp. 2d 929 (N.D. Cal. 2008) ...................................................................... 7

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ........................................................................................... 11, 12

*Gallinger v. Becerra*,
  898 F.3d 1012 (9th Cir. 2018) ................................................................................. 27

*Gleitman v. Cosgrove*,
  227 A.2d 689 (N.J. 1967) ........................................................................................ 19

*Gordon v. County of Orange*,
  888 F.3d 1118 (9th Cir. 2018) ................................................................................ 24

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ................................................................................................ 12

*Harris v. Amgen, Inc.*,
  573 F.3d 728 (9th Cir. 2009) .................................................................................... 6

*Idaho Federation of Teachers. v. Labrador*,
  No. 1:23-cv-00353-DCN, 2024 WL 3276835 (D. Idaho July 2, 2024) .................... 10

*Isaacson v. Horne*,
  716 F.3d 1213 (9th Cir. 2013) ................................................................................ 13

*Isaacson v. Mayes*,
  84 F.4th 1089 (9th Cir. 2023) ....................................................................... 9, 10, 11

*June Med. Servs. L.L.C. v. Russo*,
  591 U.S. 299 (2020) ................................................................................................ 13

*Lee v. State of Oregon*,
  107 F.3d 1382 (9th Cir. 1997) ................................................................................ 13

*Los Angeles Cnty. Bar Ass'n v. Eu*,
  979 F.2d 697 (9th Cir. 1992) .................................................................................... 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................. 4, 6

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................................... 20, 21

*M'Culloch v. Maryland,*
  17 U.S. 316 (1819) ............................................................................................... 20

*Navarro v. Block,*
  72 F.3d 712 (9th Cir. 1995) ................................................................................ 30

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992) ........................................................................................... 27, 29

*Olson v. California,*
  104 F.4th 66 (9th Cir. 2024) ............................................................................... 28

*Peace Ranch, LLC v. Bonta,*
  93 F.4th 482 (9th Cir. 2024) ...................................................................... 8, 9, 10

*People v. Abarbanel,*
  48 Cal. Rptr. 336 (Cal. Dist. Ct. App. 1965) .................................................. 20

*People v. Darrow,*
  298 P. 1 (Cal. 1931) .............................................................................................. 23

*People v. Lee,*
  32 Cal. Rptr. 3d 745 (Cal. Ct. App. 2005) ....................................................... 21

*Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron,*
  624 F. Supp. 3d 739 (W.D. Ken. 2002) ............................................................ 15

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. State,*
  522 P.3d 1132 (Idaho 2023) ......................................................................... 11, 28

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
  505 U.S. 833 (1992) .............................................................................................. 15

*Powers v. Ohio,*
  499 U.S. 400 (1991) .............................................................................................. 12

*Raidoo v. Moylan,*
  75 F.4th 1115 (9th Cir. 2023) ............................................................................. 28

*Rex v. Bourne,*
  (1938) 3 All E.R. 615 (Eng.) ......................................................................... 17, 18

*Roe v. Wade,*
  410 U.S. 113 (1973) ..................................................................... 11, 15, 16, 18

*Silveira v. Lockyer,*
  312 F.3d 1052 (9th Cir. 2002) ............................................................................ 29

*Skinner v. Switzer,*
  562 U.S. 521 (2011) ................................................................................. 5, 26, 27

*Smith v. Garland,*
  103 F.4th 663 (9th Cir. 2024) .............................................................................. 7

*State v. Boozer,*
  291 P.2d 786 (Ariz. 1955) ................................................................................... 23

*State v. Dunklebarger*,
  221 N.W. 592 (Iowa 1928) ........................................................................ 20

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................... 9

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) ........................................................................ 5, 26, 27

*Thomas v. Anchorage Equal Rts. Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) ................................................................ 10

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ................................................................................. 29

*Union Pac. Ry. Co. v. Botsford*,
  141 U.S. 250 (1891) ................................................................................. 25

*United States v. Baily*,
  444 U.S. 394 (1980) ................................................................................. 21

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................. 12

*Young v. Hawaii*,
  992 F.3d 765 (9th Cir. 2021) .................................................................. 14

*Young v. Hawaii*,
  45 F.4th 1087 (2022) ............................................................................... 14

*Zobel v. Williams*,
  457 U.S. 55 (1982) ................................................................................... 29

**<u>Statutes</u>**

16 U.S.C. § 1540(b)(3) ................................................................................. 21

42 U.S.C. § 1395dd ...................................................................................... 11

Idaho Code § 18-622 ............................................................................. *passim*

Idaho Code § 18-1701 ................................................................................... 6

Idaho Code § 18-8801 ........................................................................... 3, 9, 26

Idaho Code § 18-8804 ................................................................................... 2

Idaho Code § 18-8805 ........................................................................ 3, 5, 7, 8

Idaho Code § 18-8807 ................................................................................... 3

Idaho Code § 31-2227 ................................................................................... 5

Idaho Code § 54-1806 ................................................................................... 8

Idaho Code § 54-1814 ................................................................................... 7

## Rules

Fed. R. Civ. P. 8 .................................................................................................. 5

Fed. R. Civ. P. 12 ............................................................................................ 4, 5

Fed. R. Civ. P. 54 ............................................................................................... 14

## Other Authorities

1 William Blackstone, Commentaries *126 .............................................. 21

4 William Blackstone, Commentaries *186 .............................................. 21

Brief for Petitioner, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (No. 23-727) .................... 11

Paul Benjamin Linton, *Abortion Convictions Before Roe*, 36 Issues L. & Med. 77 (2021) ......... 22

John A. Robertson, *Embryo Culture and the "Culture of Life": Constitutional Issues in the Embryonic Stem Cell Debate*, 2006 U. Chi. Legal. F. 1 (2006) ................................................. 25

Paul H. Robinson et al., *The American Criminal Code: General Defenses*, 7 J. Legal Analysis 37 (2015) ..................................................................... 21

**INTRODUCTION**

Plaintiff Stacy Seyb, M.D., respectfully files this consolidated response in opposition to the motions to dismiss filed by the Members of the Idaho Board of Medicine and 41 County Prosecutors [Dkt. # 25] and Bonneville County Prosecuting Attorney [Dkt. # 26].

Dr. Seyb is an Idaho physician who specializes in treating patients with high-risk pregnancies. He challenges the application of Idaho laws banning abortion to medically indicated abortion care on the grounds that denying such care to patients with serious medical needs violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

Defendants fail to identify any valid basis for dismissal. First, their standing arguments ignore key facts and precedents. Defendants have statutory authority to enforce the abortion bans at issue, and Dr. Seyb reasonably fears prosecution or professional discipline should he provide abortions in violation of those laws. Further, the Supreme Court has consistently held that abortion providers like Dr. Seyb have third-party standing to assert the constitutional rights of their patients.

Second, Defendants' merits arguments are unavailing. Although the Supreme Court recently held that the Due Process Clause does not protect the right to abortion in all circumstances, an analysis of the historical record demonstrates that the right to abortion in cases of serious medical need is deeply rooted in the nation's history, tradition, and scheme of ordered liberty. Moreover, many—if not all—applications of the challenged laws to medically indicated abortion care are arbitrary and irrational. So is the distinction one of the statutes draws between pregnant people suffering from life-threatening physical conditions and pregnant people suffering from life-threatening mental illnesses.

Accordingly, the Court should deny each motion to dismiss in its entirety.

1

**FACTS**

**I.    Idaho's Abortion Bans.**

Two Idaho abortion bans are currently in effect: a ban on abortion throughout pregnancy, Idaho Code § 18-622 ("Ban Throughout Pregnancy"), and a ban on abortion beginning at approximately six weeks of pregnancy, Idaho Code §§ 18-8801 to 18-8808 ("Six-Week Ban"), (collectively, the "Abortion Bans").  The Ban Throughout Pregnancy states that: "[E]very person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion."  *Id.* § 18-622(1).  As relevant here, the statute contains a narrow life exception that exempts from liability a physician who "determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman" provided that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith judgment, termination of the pregnancy would have posed a greater risk of the death of the pregnant woman."  *Id.* § 18-622(2)(a).  This exception does not apply when the pregnant person faces a risk of death from self-harm.  *Id.* § 18-622(2)(a)(i).  Criminal abortion constitutes a felony punishable by imprisonment.  *Id.* § 18-622(1).  Further, state licensing boards are required to suspend or revoke the license of any healthcare provider who performs, attempts, or assists with a criminal abortion.  *Id.* § 18-622(1).

The Six-Week Ban provides that: "A person may not perform an abortion on a pregnant woman when a fetal heartbeat has been detected . . . ."  *Id.* § 18-8804(1).  Cardiac activity typically becomes detectable at around six weeks of pregnancy.  Compl. ¶ 70.  As relevant here, the statute contains an exception for cases of "medical emergency," Idaho Code § 18-8804(1), defined as "a condition that, in reasonable medical judgment, so complicates the medical

condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function," *id.* § 18-8801(5).  The Six-Week Ban contains both a criminal enforcement provision, *id.* § 18-8805, and a private right of action for specified individuals, *id.* § 18-8807(1).  In addition, state licensing boards are required to suspend or revoke the license of any healthcare provider who performs, attempts, or assists with a prohibited abortion.  *Id.* § 18-8805(3).

## II.   Dr. Seyb's Provision of Abortion Care.

A physician licensed to practice medicine in Idaho, Dr. Seyb is board-certified in maternal-fetal medicine, a sub-specialty of obstetrics and gynecology that focuses on providing care to people with high-risk or complicated pregnancies.  Compl. ¶ 15.  From 2019 to 2023, Dr. Seyb served on Idaho's Maternal Mortality Review Committee ("MMRC").  *Id.*  Since April 2000, Dr. Seyb has served as an Attending Physician in maternal-fetal medicine at St. Luke's, a hospital in Boise.  *Id.*  In recent years, before the Abortion Bans took effect, Dr. Seyb provided two to three abortions per month, on average, for patients with serious medical conditions, and he also assisted other doctors with medically indicated abortions.  Decl. of Stacy Seyb, M.D. ("Seyb Decl.") ¶ 8.  Although most of Dr. Seyb's abortion patients resided in southwest Idaho, he occasionally provided abortion care to patients who traveled to St. Luke's from other parts of the state, including northern Idaho and eastern Idaho.  *Id.* ¶ 9.  Since the Abortion Bans have been in effect, Dr. Seyb has had to refer approximately six patients per month with serious medical conditions to out-of-state abortion providers.  *Id.* ¶ 10.  But for the bans, Dr. Seyb would provide abortion care to such patients himself rather than refer them to out-of-state abortion providers.  *Id.* ¶ 11.

### III.    Medical Indications for Abortion.

In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of action advisable.  Compl. ¶ 80.  Medical indications for abortion may be present in many circumstances, including where pregnancy-related complications jeopardize the pregnant person's health; continuing the pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition; continuing the pregnancy would put the pregnant person at risk of death from self-harm; the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable; or a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses.  *Id.* ¶¶ 80-106.  Preventing Dr. Seyb from providing abortion care in circumstances where medical indications are present exposes his patients to risks of serious injury and death. *Id.* ¶ 107.  Notably, suicide and overdose are among the leading causes of death for pregnant and post-partum people in the United States.  *Id.* ¶ 95.  Idaho's MMRC determined that, in recent years, the most common underlying cause of pregnancy-related death in Idaho was mental health conditions, encompassing deaths related to suicide, substance use disorder, and other types of self-harm.  *Id.* ¶¶ 95, 112-16.

## ARGUMENT

### I.   Standard of Review.

To defeat a motion to dismiss for lack of standing, a complaint must contain "general factual allegations of injury resulting from the defendant's conduct" because "on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).  Nevertheless, a court may consider matters outside the pleadings without converting the motion to dismiss to a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d) (providing that only

motions to dismiss under Rule 12(b)(6) or 12(c) require conversion).

To defeat a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. *See Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011). Further, a complaint "need not pin plaintiff's claim for relief to a precise legal theory" or contain "an exposition of his legal argument." *Id.*; *accord Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002).

In all cases, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

## II.    All Defendants Have Statutory Authority to Enforce the Abortion Bans.

### A.  *The County Prosecutors Are Proper Defendants.*

The County Prosecuting Attorneys have primary responsibility for "enforcing all the penal provisions of any and all statutes of [Idaho]," Idaho Code § 31-2227(1), including the Abortion Bans, *id.* §§ 18-622, 18-8805. Defendants concede that the Ada County Prosecuting Attorney has authority to prosecute Dr. Seyb for violations of the Abortion Bans. *See* Defs. Members of the Idaho Bd. of Med. & 41 Cnty. Prosecutors' Mem. in Supp. of Mot. to Dismiss [Dkt. # 25-1] ("Defs.' Mem.") at 4. They argue that the remaining County Prosecuting Attorneys moving to dismiss lack such authority because Dr. Seyb provides abortions exclusively at a hospital in Ada County. *Id.* at 4-5; Mem. in Supp. of Bonneville Cnty. Prosecuting Atty.'s Mot. to Dismiss [Dkt. # 26-1] at 3-4. But Dr. Seyb's abortion patients travel

to Ada County from all over the state.  *See* Seyb Decl. ¶ 9.[1]  Defendants have not disavowed the authority of the Prosecuting Attorneys in other counties to prosecute Dr. Seyb for providing prohibited abortions to patients who reside in their jurisdictions—or for entering into agreements with such patients to do so.[2]  Unless and until Defendants are willing to disavow such authority in a manner that is legally binding, the Prosecuting Attorneys outside Ada County are properly named as Defendants in this action.[3]

Defendants' reliance on *California v. Texas*, 593 U.S. 659 (2021), is misplaced.  There, two individuals and several states challenged a provision of the Patient Protection and Affordable Care Act ("ACA") that required most Americans to obtain minimum essential health insurance coverage.  *Id.* at 664-66.  Although the ACA imposed a "penalty" on individuals who failed to obtain the required coverage, Congress effectively nullified the "penalty" by setting its amount to $0.  *Id.* at 665.  The Supreme Court held that the plaintiffs lacked standing to sue the government defendants because, without the ability to impose a penalty, those defendants no longer had the power to enforce the coverage mandate in any meaningful way.  *Id.* at 669-73.

Here, the County Prosecuting Attorneys want to have their cake and eat it, too.  They ask the Court to dismiss them from the case on the ground that they lack "jurisdiction over a place

---

[1] The Court should presume that the complaint's "general allegations" about Dr. Seyb's provision of care "embrace those specific facts that are necessary" to establish his standing. *Lujan*, 504 U.S. at 561.  Nevertheless, in an excess of caution, Dr. Seyb has provided a declaration attesting to facts that Defendants argue are not sufficiently alleged in the complaint. Should the Court find both the complaint and declaration insufficient to establish standing, it should give Plaintiff the opportunity to amend the complaint. *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) ("Dismissal without leave to amend is improper unless it is 'clear' that 'the complaint could not be saved by any amendment.'" (citations omitted)).

[2] Idaho law recognizes conspiracy as an independent crime.  *See* Idaho Code § 18-1701.

[3] Plaintiff has offered to voluntarily dismiss the prosecutors outside Ada County in exchange for a stipulation that they will not prosecute Dr. Seyb for abortions provided in Ada County to residents of their counties.  As of this filing, Defendants have not accepted this offer.

where abortions are performed by Dr. Seyb," Defs.' Mem. at 4, but they are unwilling to disclaim their authority to prosecute Dr. Seyb based on the place where his patients reside. Absent such a disclaimer, the Court should not dismiss them from the case.[4]

### B. The Members of the Idaho Board of Medicine Are Proper Defendants.

The Members of the Idaho Board of Medicine ("Board") are proper defendants because they are expressly charged with enforcing the Abortion Bans against physicians like Dr. Seyb. *See* Idaho Code §§ 18-622(1) ("The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of [the Ban Throughout Pregnancy] shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense."), 18-8805(3) ("The professional license of any health care professional who performs or induces an abortion or who assists in performing or inducing an abortion in violation of [the Six-Week Ban] shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense."); *see also id.* § 54-1814(6) ("Every person licensed to

---

[4] Defendants' cursory Eleventh Amendment argument, comprised solely of a two-sentence footnote, Defs.' Mem. at 4 n.2, does not require the Court's consideration. *See Smith v. Garland*, 103 F.4th 663, 671 (9th Cir. 2024) ("'[A] cursory mention of an issue in a footnote' is insufficient for appellate consideration."); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal. 2008) ("A footnote is the wrong place for substantive arguments on the merits of a motion, particularly where such arguments provide independent bases for dismissing a claim not otherwise addressed in the motion."). In any event, the argument lacks merit. "[T]he Eleventh Amendment does not bar actions," like this one, "seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). Moreover, all Defendants in this case "have a specific connection to the challenged statute[s]," *id.*, because they all have the authority to initiate enforcement proceedings against individuals who violate the Abortion Bans. *See* Compl. ¶¶ 16, 61. Nothing more is required to satisfy the *Ex parte Young* exception to Eleventh Amendment immunity. *Eu*, 979 F.2d at 704 (citing *Ex parte Young*, 209 U.S. 123 (1908)).

practice medicine . . . in this state is subject to discipline by the board . . . upon any of the following grounds: (6) Performing or procuring an unlawful abortion or aiding or abetting the performing or procuring of an unlawful abortion.").[5]

Defendants contend that the Board may not take action against a physician for violating the Abortion Bans unless the physician has first been convicted in a criminal proceeding, Defs.' Mem. at 5, but their position is belied by the plain text of the statutes, which grants independent enforcement authority to the Board with no suggestion that such authority is contingent on a criminal conviction, Idaho Code §§ 18-622(1), 18-8805(3).  Indeed, the Board has its own committee to investigate whether grounds for professional discipline exist; it is not dependent on the criminal authorities to conduct such investigations.  *Id.* § 54-1806A.

*Adkins v. State*, No. CV01-23-14744, slip op. (Idaho 4th Jud. Dist. Dec. 29, 2023), cited by Defendants, is inapposite.  There, a state trial court held that, because the plaintiffs had sued the State of Idaho, any relief against the State would bind the Board, preventing it from enforcing the Abortion Bans.  *Id.* at 9-13.  Therefore, the Board was a "redundant defendant" in that case. *Id.*  Here, the Board is not a redundant defendant because Dr. Seyb has sued neither the State itself nor any state official with the power to bind the Board.

## III.    Dr. Seyb Has Standing to Challenge the Abortion Bans.

### A.  *Dr. Seyb Satisfies the Test for Standing in a Pre-Enforcement Challenge.*

"One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality."  *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).  A plaintiff in a pre-enforcement challenge has standing if (1) the plaintiff has alleged "an intention to engage

---

[5] The Idaho Board of Medicine is the licensing board with jurisdiction to license, regulate, and discipline physicians practicing medicine in Idaho.  Idaho Code § 54-1806.

in a course of conduct arguably affected with a constitutional interest;" (2) the conduct is "arguably proscribed by statute;" and (3) "there exists a credible threat of prosecution."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-63 (2014).  Dr. Seyb satisfies this test.

### 1. Dr. Seyb intends to engage in a course of conduct arguably affected with a constitutional interest.

When analyzing the first prong of the *Driehaus* test, "courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Peace Ranch*, 93 F.4th at 488.  Here, Dr. Seyb has clearly stated that he would provide medically indicated abortions for patients with serious medical needs, as he has done throughout his career, but for the threat of enforcement of the Abortion Bans.  Seyb Decl. ¶¶ 7, 10-11; *see also* Compl. ¶¶ 15, 107.  This conduct arguably enjoys constitutional protection under the Fourteenth Amendment's Due Process and Equal Protection Clauses, *see* Compl. ¶¶ 8, 123-32; *infra* at 15-30, so the first prong of the test is satisfied, *see Peace Ranch*, 93 F.4th at 488 (explaining that the inquiry into constitutional interest "does not require [a court] to engage in a mini litigation of the claims" or determine that the plaintiff's claims are meritorious); *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) (holding that the plaintiff physicians satisfied the first *Driehaus* prong in a challenge to abortion restrictions because their claim was rooted in the Due Process Clause).

### 2. Dr. Seyb's intended conduct is arguably proscribed by the Abortion Bans.

The Abortion Bans prohibit medically indicated abortion care in many circumstances, including when a patient faces a risk of death from self-harm and when a pregnancy is medically futile but not necessarily life-threatening.  Idaho Code §§ 18-622(2)(a), 18-8801(5); Compl. ¶¶ 62, 67, 70, 73.  Thus, Dr. Seyb's intended conduct (providing medically indicated abortions in circumstances not encompassed by the Abortion Bans' exceptions) is proscribed by the statutes at issue.  The second *Driehaus* prong is therefore satisfied.  *Cf. Isaacson*, 84 F.4th at 1099

9

(finding the second *Driehaus* factor met when "many abortions [the plaintiff physicians] would otherwise perform could be deemed violations of the statute").

### 3. Dr. Seyb faces a credible threat of enforcement.

The third *Driehaus* prong is met because Dr. Seyb faces a credible threat of enforcement if he resumes providing medically indicated abortions not covered by the Abortion Bans' exceptions. "This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peach Ranch*, 93 F.4th at 490. Here, Defendants have not disavowed enforcement against Dr. Seyb should he resume providing abortions that are prohibited by the Abortion Bans. This case is therefore distinguishable from *Idaho Federation of Teachers. v. Labrador*, No. 1:23-cv-00353-DCN, 2024 WL 3276835, at *1 (D. Idaho July 2, 2024), where the State had "*specifically and emphatically*" disavowed enforcement of the challenged statute against the plaintiffs for the activities they wished to pursue.

When evaluating whether a plaintiff faces a credible threat of enforcement, the Ninth Circuit has also considered: (1) whether the plaintiff has a "concrete plan" to violate the law; (2) whether the enforcement authorities have "communicated a specific warning or threat to initiate proceedings;" and (3) whether there is a "history of past prosecution or enforcement." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). These factors support the conclusion that Dr. Seyb faces a credible threat of enforcement. First, Dr. Seyb has alleged a concrete plan to violate the law because he would like to provide abortions that are prohibited by the Abortion Bans. Seyb Decl. ¶ 11. His "choice to eliminate the threat of enforcement by not doing what [he] want[s] to do should not bar [his] suit." *Isaacson*, 84 F.4th at 1099.

Second, "a plaintiff may reasonably fear prosecution even if enforcement authorities have not communicated an explicit warning to the plaintiff." *Id.* at 1100. Here, the State of Idaho has expressed a general intention to enforce the Ban Throughout Pregnancy against physicians

providing medically indicated abortions in ongoing litigation concerning whether the ban is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd.  *See* Br. for Pet'r at 39-40, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (No. 23-727) (arguing that Idaho would be irreparably harmed if it could not enforce the Ban Throughout Pregnancy); *id.* at 3, 5 (discussing Idaho's 150-year commitment to prohibiting abortion).  In *Isaacson*, a vagueness challenge to Arizona abortion regulations, the Ninth Circuit pointed to statements that Arizona officials had made in other litigation as evidence of a credible threat of enforcement.  *See, e.g.*, 84 F.4th. at 1100 ("Although this was a general statement . . ., Plaintiffs could reasonably interpret it as a threat to investigate physicians who run afoul of those Regulations.").

Third, the history of past enforcement carries little weight where the relevant provisions of the Abortion Bans have been in effect for less than two years.  *See Isaacson*, 84 F.4th at 1099 ("There is little need to show a 'history of past prosecution or enforcement,' because the Regulations were only recently enacted and then enjoined." (citations omitted)).  This is especially true given that the provision of abortion care has all but ceased in Idaho, so prosecutors have not had occasion to enforce the bans.  *See* Compl. ¶¶ 118-22.  But as the Idaho Supreme Court recently noted, Idaho had a documented history of prosecuting people for alleged violations of its abortion laws before *Roe v. Wade*, 410 U.S. 113 (1973), recognized a constitutional right to abortion.  *See Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. State*, 522 P.3d 1132, 1180-82 (Idaho 2023).

Finally, *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not support Defendants' standing arguments.  There, the plaintiff physicians challenged the Food and Drug Administration's ("FDA's") approval and regulation of the abortion pill, mifepristone.  But the plaintiffs themselves did not prescribe or use mifepristone,

and the agency actions they challenged did not require them to do or refrain from doing anything. *Id.* at 374. The opposite is true here: Dr. Seyb wants to provide abortion care to his patients, but the Abortion Bans prohibit him from doing so. *See* Compl. ¶¶ 9, 15, 62-79; Seyb Decl. ¶¶ 10-11. There can be no question that Dr. Seyb is directly regulated by the Abortion Bans, which subject physicians to felony criminal liability and suspension or revocation of their medical licenses. *See supra* at 2-3.

In sum, Dr. Seyb has standing to bring this pre-enforcement challenge.

### B. Dr. Seyb Has Third-Party Standing to Assert His Patients' Rights.

It is well-settled that a plaintiff has "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975). The Court has allowed third-party standing in cases involving a variety of fact patterns and interests. *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that a criminal defendant had third-party standing to assert the rights of potential jurors excluded from jury service); *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (holding that a company selling non-medical contraceptives had third-party standing to assert the rights of potential customers, including minors); *Craig v. Boren*, 429 U.S. 190 (1976) (holding that a beer vendor had third-party standing to assert the rights of potential customers where the statute prohibited vendors from distributing beer to young men rather than directly prohibiting young men from drinking beer); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (holding that healthcare providers had third-party standing to assert the rights of patients seeking to use contraception); *Barrows v. Jackson*, 346 U.S. 249, 258 (1953) (holding that white property owners had third-party standing to assert the rights of potential black purchasers).

Consistent with these precedents, the Supreme Court has always held that abortion providers have third-party standing to assert the rights of their patients in cases challenging

abortion restrictions. *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318-20 (2020) (plurality

opinion) (collecting cases) ("We have long permitted abortion providers to invoke the rights of

their actual or potential patients in challenges to abortion-related regulations."), *abrogated on*

*other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *accord id.* at

354 n.4 (Roberts, C.J., concurring); *see also Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir.

2013) ("Recognizing the confidential nature of the physician-patient relationship and the

difficulty for patients of directly vindicating their rights without compromising their privacy, the

Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied

challenges to abortion laws brought by physicians on behalf of their patients."). Defendants fail

to even acknowledge this caselaw, much less distinguish it. And they identify nothing about this

case that warrants a different result from the legions of cases in which the Supreme Court and

Ninth Circuit have held that abortion providers have third-party standing to assert their patients'

constitutional rights.[6]

## IV.    There Are No Special Pleading Requirements for As-Applied Challenges.

Defendants' contention that Plaintiff fails to make a proper as-applied challenge, Defs.'

Mem. at 14, reflects an erroneous view of the law. There are no special pleading requirements

for as-applied challenges. As the Supreme Court has explained: "The distinction between facial

and as-applied challenges is not so well defined that it has some automatic effect . . . . [It] goes to

---

[6] *Lee v. State of Oregon*, 107 F.3d 1382 (9th Cir. 1997), is inapposite. In that case, doctors,
patients, and residential care facilities challenged Oregon's Death with Dignity Act. The court
explained that a patient plaintiff did not have Article III standing because her alleged injury
depended on a speculative chain of events. *Id.* at 1388 (describing at least seven steps in
the chain of events that would have to occur before the plaintiff could potentially be injured). It also
noted that the alleged injuries of the patients of the doctors and residential care facilities were
similarly speculative. *Id.* at 1390. Here, in contrast, the Abortion Bans directly harm Dr. Seyb's
patients by preventing them from obtaining abortion care in Idaho. *See* Compl. ¶¶ 121-22.

the breadth of the remedy employed by the Court, not to what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Moreover, when entering final judgment, a court "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

Defendants cite *Young v. Hawaii* in support of their argument without disclosing that the decision was vacated. 992 F.3d 765 (9th Cir. 2021) (*en banc*), *certiorari granted, judgment vacated, and case remanded by* 142 S. Ct. 2895 (2022); *see also Young v. Hawaii*, 45 F.4th 1087 (2022) (remanding the case to the district court for further proceedings). In any event, the vacated decision in *Young* does not support Defendants' position. The court explained that "a facial challenge to a statute is more difficult to prove than an as-applied challenge," *id.* at 779, and held that the plaintiff failed to plead sufficient facts to establish a plausible claim of entitlement to even as-applied relief, *see id.* at 779-80. Additionally, the *en banc* court held that the plaintiff had forfeited the argument that the more lenient standard for as-applied challenges applied to his claim by failing to raise it to the panel that initially heard his appeal. *Id.* at 780-81.

Here, although the complaint's request for relief in no way limits the Court's ability to craft an appropriate remedy at final judgment, Fed. R. Civ. P. 54(c), the complaint clearly indicates that Dr. Seyb is seeking relief from the Abortion Bans as applied to medically indicated abortions. Compl. ¶ 7, pp. 24-26. (He is not, as Defendants seem to suggest, seeking relief from the statutes as applied to himself or specific patients.) The complaint explains what the term "medically indicated" abortions encompasses, *id.* ¶¶ 7, 80-106, and it explains how the Abortion Bans' application to medically indicated abortions harms Dr. Seyb and his patients, *id.* ¶¶ 107-22. As discussed in more detail below, the complaint therefore states plausible claims for relief from application of the Abortions Bans to medically indicated abortions.

14

**V.    Dr. Seyb States a Plausible Substantive Due Process Claim.**

    **A.    *Defendants' Reliance on* Dobbs *is Misplaced.***

Contrary to Defendants' argument, the Supreme Court's decision in *Dobbs* does not foreclose Dr. Seyb's substantive due process claim.  *Dobbs* held that the Constitution does not confer a "broad right" to obtain a pre-viability abortion in all circumstances.  *Id.* at 225, 231; *see id.* at 234 (noting that the Court granted certiorari "to resolve the question whether 'all pre-viability prohibitions on elective abortions are unconstitutional'").  The Court did not address whether the Due Process Clause of the Fourteenth Amendment confers a right to abortion in cases of serious medical need.  *See id.* at 380 (Breyer, Sotomayor & Kagan, JJ., dissenting) ("The majority does not say . . . whether a State may prevent a woman from obtaining an abortion when she and her doctor have determined it is a needed medical treatment."); *see also Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 624 F. Supp. 3d 739, 748 (W.D. Ken. 2002) (holding, after *Dobbs*, that the plaintiffs' substantive due process claim against a Kentucky statute restricting abortion access "remains likely to succeed based on the right to a nonelective, emergency abortion, for the life and health of the pregnant woman"), *vacated as moot by* No. 22-5832, 2023 WL 3620977 (6th Cir. May 24, 2023).  As explained below, the history-and-tradition standard applied in *Dobbs* requires recognition of such a right. *See infra* at 15-25.

    **B.    Dobbs' *History-and-Tradition Standard Requires Recognition of a Fundamental Right to Medically Indicated Abortion in Cases of Serious Medical Need.***

        **1.    *Dobbs'* application of the standard.**

Overturning *Roe*, 410 U.S. 113, and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), *Dobbs*, 597 U.S. at 231, *Dobbs* held that substantive due process rights must be "deeply rooted in [our] history and tradition" and "essential to our Nation's

'scheme of ordered liberty,'" *id.* at 237 (citations omitted).  Although the Court did not identify a precise test or methodology to determine whether this standard is satisfied, it concluded that the broad right to pre-viability abortion recognized in *Roe* and *Casey* did not qualify because abortion had been a crime in certain circumstances under early English and American common law, and there was a trend toward increased criminalization of abortion in the nineteenth and early twentieth centuries.  *See id.* at 242-50.  In making this historical assessment, the Court relied principally on treatises on the common law from the thirteenth through nineteenth centuries; a 1732 article from *Gentleman's Magazine* describing a woman's conviction for destroying the fetus of another woman; nineteenth century caselaw stating that the murder of a fetus after quickening, which typically occurs at 16 to 18 weeks of pregnancy, was a crime; an 1803 act by the British Parliament making abortion a crime at all stages of pregnancy; statutes enacted by U.S. states and territories during the nineteenth and early twentieth centuries criminalizing abortion to varying degrees; and published works by contemporary historians examining the history of U.S. abortion laws.  *Id.*

### 2. Historical evidence demonstrates a deeply rooted right to medically indicated abortion in cases of serious medical need.

Similar sources of historical evidence demonstrate that, until recently, abortion in cases of serious medical need was rarely, if ever, criminalized in Anglo-American law, and the right to abortion in such circumstances is deeply rooted in the nation's history, tradition, and scheme of ordered liberty.  When the Fourteenth Amendment was ratified in 1868, twenty-eight out of thirty-seven states had enacted statutes criminalizing abortion in at least some circumstances. *Dobbs*, 597 U.S. at 248; *see id.* at 302-17 app. A.  Eighteen of these statutes contained express exceptions for abortions necessary to preserve the pregnant person's life.  *See id.* at 302-17 app. A (New York; Ohio; Indiana; Maine; Alabama; Michigan; Virginia; New Hampshire; California;

16

Iowa; Wisconsin; Kansas; Connecticut; Rhode Island; Nevada; West Virginia; Oregon; and

Florida).  None of these statutes distinguished self-harm from other threats to a pregnant person's

life.  *Id.*  A nineteenth statute, Maryland's, contained an express exception for cases of

incomplete miscarriage and cases in which abortion is necessary to "secure the safety" of the

pregnant person.  *Id.* at 316-17 app. A.  Of the remaining nine statutes, five expressly applied

only to abortions that were "unlawful," lacked "lawful justification," or were administered

"feloniously."  *Id.* at 306-13 app. A (Massachusetts; Vermont; New Jersey; Louisiana; and

Pennsylvania).  These five statutes are best understood as transforming affirmative defenses to

criminal liability recognized by common law, such as self-defense and necessity, into elements

of the statutory offense.  *See infra* at 20-21.[7]

Significant historical evidence demonstrates that the foregoing statutes were generally

understood to contain implied exceptions for all cases of serious medical need, including serious

threats to both physical and mental health.[8]  *Rex v. Bourne*, (1938) 3 All E.R. 615 (Eng.), is

particularly noteworthy.  An English case, it concerns a doctor charged with violating an 1861

Act of Parliament prohibiting "unlawful" abortions, which contained no express exceptions, by

providing an abortion to a fourteen-year-old girl who had been raped.  The English statute is a

---

[7] In 1868, only six of the thirteen territories that would eventually become states had statutes that criminalized abortion in at least some circumstances.  *See Dobbs*, 597 U.S. at 324-27 app. B (Hawaii; Washington; Colorado; Idaho; Montana; and Arizona).  Five of these statutes contained express life exceptions that did not distinguish between the threat of self-harm and other threats to a pregnant person's life.  *Id.* (Hawaii; Washington; Idaho; Montana; and Arizona).

[8] All of the abortion bans enacted after 1868 contained express life exceptions.  *See Dobbs*, 597 U.S. at 317-23 app. A (Minnesota; Arkansas; Georgia; North Carolina; Delaware; Tennessee; South Carolina; Kentucky; and Mississippi); *id.* at 327-30 app. B (Wyoming; Utah; North Dakota; South Dakota; Oklahoma; Alaska; New Mexico; and District of Columbia).  The Wyoming, New Mexico, and District of Columbia statutes also contained express health exceptions.  *Id.* at 327-30 app. B.  None of these statutes excluded the risk of death or injury from self-harm  *Id.* at 302-30 apps. A-B.

contemporary of the American statutes cited in the *Dobbs* appendices. The reported opinion is comprised of the judge's instructions to the jury, which ultimately acquitted the doctor. *See id.*; *Roe*, 410 U.S. at 137. The judge characterizes the case as a matter of first impression insofar as it concerns a doctor, rather than a non-medical person, being prosecuted for performing an abortion. *Rex v. Bourne*, 3 All E.R. at 616. The judge held that the statute at issue contained an implied exception for acts "done in good faith for the purpose only of preserving the life of the mother." *Id.* at 617 ("Those words express what, in my view, has always been the law with regard to the procuring of an abortion, and, although not expressed in s. 58 of the Act of 1861, they are implied by the word 'unlawful' in that section. No person ought to be convicted under s. 58 of the Act of 1861 unless the jury are satisfied the act was not done in good faith for the purpose only of preserving the life of the mother."). The judge further instructs the jury that there is not a firm boundary between preserving a person's life and preserving a person's health. *Id.* ("Life depends upon health, and it may be that health is so gravely impaired that death results."). He says that, when a patient faces a risk of death, a physician need not wait until death is imminent to provide an abortion. *Id.* at 618.

The judge then goes a step further and instructs the jury that, if continuing the pregnancy would cause serious harm to the pregnant person's physical or mental health, the implied life exception is satisfied. *Id.* at 619 ("As I have said, I think that those words ought to be construed in a reasonable sense, and, if the doctor is of opinion, on reasonable grounds and with adequate knowledge, that the probable consequence of the continuance of the pregnancy will be to make the woman a physical or mental wreck, the jury are quite entitled to take the view that the doctor, who, in those circumstances, and in that honest belief, operates, is operating for the purpose of preserving the life of the woman."). The judge also instructs the jury to take the risk of suicidal

ideation into account. *Id.* at 619-20 ("Here you have the evidence of Dr. Rees, a gentleman of eminence in the profession, that, from his experience and his knowledge, the mental effect produced by pregnancy brought about by the terrible rape which Dr. Gorsky described to you must be most prejudicial. . . . So far as danger to life is concerned, you cannot, of course, be certain of the result unless you wait until a person is dead. Nobody suggests that the operation only becomes legal when a patient is dead."). Thus, *Rex v. Bourne* holds that an abortion ban enacted by the British Parliament in 1861, seven years before ratification of the Fourteenth Amendment, contained an implied exception for abortions provided in good faith to preserve the life or physical or mental health of the pregnant person, including to mitigate the risk of suicide.

American caselaw likewise indicates that nineteenth and early twentieth century abortion bans were commonly understood to contain implied, if not express, exceptions for abortions in cases of serious medical need. In *Commonwealth v. Wheeler*, for example, the Supreme Judicial Court of Massachusetts held that, as a general matter, "a physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary *to save her life or to prevent serious impairment of her health, mental or physical*, and if his judgment corresponds with the general opinion of competent practitioners in the community in which he practises."[9] 53 N.E.2d 4, 5 (Mass. 1944) (emphasis added). *See also Planned Parenthood*, 522 P.3d at 1218 (Zahn, J., dissenting) ("Idaho's history and traditions demonstrate that Idaho has historically permitted pregnant women to obtain an abortion to preserve their life or health."); *Gleitman v. Cosgrove*, 227 A.2d 689, 694 (N.J. 1967) (declining to reach the issue but noting that "[i]t may well be that when a physician performs an abortion because of a good faith determination in accordance with

---

[9] The relevant Massachusetts statute prohibited abortions provided "maliciously or without lawful justification" but did not contain express exceptions for acts done to preserve the pregnant person's life or health. *Dobbs*, 597 U.S. at 306 app. A.

accepted medical standards that an abortion is medically indicated, the physician has acted with

lawful justification within the meaning of our statute and has not committed a crime"); *People v.*

*Abarbanel*, 48 Cal. Rptr. 336, 337-38 (Cal. Dist. Ct. App. 1965) (reversing a conviction for

abortion) (holding that the prosecution failed to establish that the defendant physician possessed

the requisite criminal intent where credible evidence established that the patient faced a risk of

death from suicide); *State v. Dunklebarger*, 221 N.W. 592, 596 (Iowa 1928) (reversing a

conviction for procuring a miscarriage) ("In order to justify the act of Dr. Wallace, it was not

essential that the peril to life should be imminent. It was enough that it be potentially present,

even though its full development might be delayed to a greater or less extent. Nor was it essential

that the doctor should believe that the death of the patient would be otherwise *certain* in order to

justify him in affording present relief.").[10]

In addition, the defenses of self-defense and necessity were available to those charged

with providing abortions in cases of serious medical need—both under nineteenth and twentieth

century abortion statutes and their common law antecedents. Self-defense is indisputably a

fundamental right in Anglo-American law. *See McDonald v. City of Chicago*, 561 U.S. 742, 767

(2010) ("Self-defense is a basic right, recognized by many legal systems from ancient times to

the present day . . . ."). The Supreme Court has repeatedly explained that "individual self-

---

[10] In *M'Culloch v. Maryland*, Chief Justice Marshall famously explained that the word
"necessary" in the Constitution's Necessary and Proper Clause, does not require "absolute
physical necessity," but instead requires a reasonable fit between means and ends. 17 U.S. 316,
413-24 (1819) ("If reference be had to [use of the word necessary] in the common affairs of the
world, or in approved authors, we find that it frequently imports no more than that one thing is
convenient, or useful, or essential to another. To employ the means necessary to an end, is
generally understood as employing any means calculated to produce the end, and not as being
confined to those single means, without which the end would be entirely unattainable."). This
early American understanding of the term "necessary" supports a broad reading of nineteenth
and early-twentieth century statutes authorizing abortions that are "necessary to preserve" a
person's life as encompassing all abortions performed in cases of serious medical need.

defense is 'the *central component*' of the Second Amendment right" to bear arms.  *Id.* (quoting

*District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)); *accord Heller*, 554 U.S. at 628

("[T]he inherent right of self-defense has been central to the Second Amendment right.").  For

centuries, the common law authorized use of deadly force when it was reasonably believed

necessary to mitigate threats of death or serious bodily harm.  *See, e.g.*, 1 William Blackstone,

Commentaries *126 ("Both the life and limbs of a man are of such high value, in the estimation

of the law of England, that it pardons even homicide if committed *se defendendo*, or in order to

preserve them.").  Today, every state allows use of deadly force against threats of death or

serious bodily injury to oneself or a third party.  Paul H. Robinson et al., *The American Criminal

Code: General Defenses*, 7 J. Legal Analysis 37, 49-50, 53 (2015).  Many also allow use of

deadly force against threats of rape, robbery, kidnapping, and other felonies.[11]  *Id.* at 52-53.

   Similarly, the defense of necessity has a long history in English and American law.  *See* 4

William Blackstone, Commentaries *186 (discussing the defense of necessity).  At common law,

"the defense of necessity, or choice of evils, . . . covered the situation where physical forces

beyond the actor's control rendered illegal conduct the lesser of two evils."  *United States v.*

---

[11] Self-defense is not limited to threats posed by persons.  "[I]t appears that courts have
uniformly recognized that a person has a right to use reasonable self-defense when confronted
with an aggressive dog."  *People v. Lee*, 32 Cal. Rptr. 3d 745, 756 (Cal. Ct. App. 2005)
(reversing a conviction for discharging a firearm with gross negligence because the trial court
denied the defendant's request for a jury instruction on self-defense).  As the *Lee* court
explained: "Conceptually, there is nothing in the elements of self-defense . . . that requires the
threat to come from a human agency. . . . It serves no public policy, and it is neither logical nor
fair, to deprive appellant of the defense of self-defense because the threat of imminent harm
came from a dog and not from a person.  The use of force in defense of oneself should be
legitimate, whether or not the source of the threat is not a human being."  *Id.* at 755.  *See also* 16
U.S.C. § 1540(b)(3) (providing a defense to criminal liability under the Endangered Species Act
"if the defendant committed the offense based on a good faith belief that he was acting to protect
himself or herself, a member of his or her family, or any other individual, from bodily harm from
any endangered or threatened species").

*Baily*, 444 U.S. 394, 410 (1980).

Both defenses would have been available to a physician charged with performing an abortion at common law or in the nineteenth or early twentieth centuries if the abortion addressed a patient's serious medical need. The doctrine of self-defense plainly justifies abortions provided to mitigate a threat of death or serious bodily harm to a pregnant person. The doctrine of necessity, at a minimum, justifies abortions in cases where continued pregnancy puts the patient at risk of death because the patient's death will typically result in the death of the embryo or fetus, as well; cases of medically futile pregnancy because pregnancy carries serious health risks that are gratuitous when it cannot result in the birth of a living child; and cases of multifetal pregnancy reduction because the procedure increases the likelihood of survival of the remaining embryos or fetuses. *See* Compl. ¶¶ 97-104, 108.

It is not surprising, then, that the historical record in the United States is devoid of evidence that physicians were punished for providing medically indicated abortions. Professor Linton has published a "comprehensive list of *pre-Roe* abortion (and abortion-related) convictions that were affirmed on appeal." Paul Benjamin Linton, *Abortion Convictions Before Roe*, 36 Issues L. & Med. 77, 77 (2021) (footnote omitted). The appellate decisions he catalogs range in time from the 1840s to the 1970s. *Id.* The list includes a total of 693 convictions. *Id.* at 78. Fewer than one-third of these involve physicians. *Id.* Plaintiff's review of the cases where physicians' convictions were affirmed found that few, if any, involved circumstances in which abortion was indicated to preserve a pregnant person's health.[12] To the contrary, many suggest that a conviction could not be sustained in such circumstances. *See, e.g.*, *Commonwealth v. Brunelle*, 171 N.E.2d 850, 852 (Mass. 1961) ("It required the Commonwealth not only to

---

[12] Plaintiff's counsel was unable to locate and review five of these cases.

prove the facts of the abortion but also to disprove either an honest belief on the part of the

defendant that he acted to preserve the life or health of the woman or that his judgment

conformed to that of competent fellow practitioners.  Where the defendant is not a physician the

mere proof of his act ordinarily would be sufficient to establish its unlawfulness . . . but in the

case of a licensed physician the proof of these negatives would depend on the circumstances in

which the abortion was performed." (citations omitted));  *State v. Boozer*, 291 P.2d 786, 787

(Ariz. 1955) ("Taking the evidence as a whole, construed in a light most favorable to the state,

the jury was fully justified in finding that Dora Jean Williams, accompanied by her husband,

came to defendant for the purpose of procuring a criminal abortion, this without any regard to

whether she needed it for the sake of her health."); *Anderson v. Commonwealth*, 58 S.E.2d 72, 75

(Va. 1950) ("By his own testimony it is disclosed that he administered a medicine by

hypodermic needle for the express purpose of causing the expulsion of the fetus. It is true he said

he did this as a protection to her health, but the jury were well warranted in not accepting that

statement."); *People v. Darrow*, 298 P. 1, 6 (Cal. 1931) ("The question would not, in the first

instance, necessarily incriminate the appellant if, as a matter of fact, acting in good faith,

appellant attempted to empty the uterus in the interest of the health or for the preservation of the

life of the patient.").

In sum, the foregoing evidence demonstrates that the right to abortion in cases of serious

medical need has a long history and tradition in Anglo-American law.

### 3. The right to medically indicated abortion is an integral part of a broader entrenched right to obtain treatment for serious medical needs.

The right to medically indicated abortion is "an integral part of a broader entrenched

right," *Dobbs*, 597 U.S. at 255: namely, the right to obtain treatment for serious medical needs.

It is well settled that the Eighth Amendment's prohibition on cruel and unusual punishment

creates a governmental obligation "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).[13]  Deliberate indifference to the "serious medical needs of prisoners" therefore violates the Eighth Amendment.  *Id.* at 104. Prisoners' Eighth Amendment right to obtain treatment for serious medical needs encompasses needs related to both physical and mental health, including suicidal ideation.  *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("In accordance with the other courts of appeals that have examined this issue, we now hold that the requirements for mental health care are the same as those for physical health care needs."); *see also Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019) ("[A]n Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm, and this is met with deliberate indifference to their condition."); *Conn v. City of Reno*, 572 F.3d 1047, 1055 (9th Cir. 2009) ("A heightened suicide risk or an attempted suicide is a serious medical need."), *amended by* 591 F.3d 1081 (9th Cir. 2010), *cert. granted, judgment vacated, and case remanded by* 563 U.S. 915 (2011), *reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011).

The existence of an Eighth Amendment right for prisoners to obtain treatment from the government for serious medical needs necessarily implies a pre-existing, fundamental right for people who are not in governmental custody to obtain treatment for serious medical needs without undue governmental interference.  It could not constitute cruel and unusual punishment for the government to fail to provide medical care to prisoners that it could prohibit them from obtaining were they not incarcerated.

Further legal and historical evidence confirms the fundamental right to obtain treatment

---

[13] The Due Process Clause is likewise a source of governmental obligation to provide medical care to individuals who are in governmental custody for reasons other than a criminal conviction. *See Gordon v. County of Orange*, 888 F.3d 1118, 1122-23 (9th Cir. 2018).

for serious medical needs.  The right to bodily integrity, which is closely related to the right to

obtain treatment for serious medical needs, has long been recognized as a fundamental right.  *See*

*Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is

more carefully guarded by the common law, than the right of every individual to the possession

and control of his own person, free from all restrain or interference of others, unless by clear and

unquestionable authority of law.").  Moreover, prior to the twentieth century, American law

imposed little restriction on medical practice.  As Professor Robertson explains:

> Medical practice was not regulated by the states in 1789 and not much more so in
> 1868.  Medical licensure began in the 1830s, spurred by the drive to oust itinerant
> and irregular healers.  But persons licensed to practice medicine had no
> restrictions placed on clinical judgment or on the products that they could use.
> The first federal drug law passed in 1914 to control non-medical drug abuse left
> physicians free to prescribe cocaine and opiates for legitimate medical purposes.
> The Food and Drug Administration, founded in 1906, did not begin to exercise
> pre-market approval of the safety and efficacy of drugs and biologics until the
> thalidomide scandal in 1962.

John A. Robertson, *Embryo Culture and the "Culture of Life": Constitutional Issues in the*

*Embryonic Stem Cell Debate*, 2006 U. Chi. Legal. F. 1, 11 (2006) (footnotes omitted).

### C. The Abortion Bans Violate the Right to Medically Indicated Abortion by Prohibiting Abortion in Many Cases of Serious Medical Need.

On its face, the Ban Throughout Pregnancy's narrow life exception does not apply to

cases when a pregnant person faces a risk of death from self-harm, such as suicide or overdose.

*See* Idaho Code § 18-622(2)(a)(i).  This is so even though suicide and overdose are among the

leading causes of death for pregnant and post-partum people in the United States, and Idaho's

own MMRC determined that, in recent years, the most common underlying cause of pregnancy-

related death in Idaho was mental health conditions, a category encompassing suicide, substance

use disorder, and other types of self-harm.  Compl. ¶¶ 95, 112-16.  The Six-Week Ban prohibits

abortion care after six weeks of pregnancy unless death or serious bodily harm is imminent.  *See*

Idaho Code § 18-8801(5).  Both Abortion Bans prohibit Dr. Seyb from providing abortion care in a wide range of circumstances in which medical indications are present, putting his patients at risk of serious injury or death.  *See* Compl. ¶¶ 80-107.  Accordingly, Dr. Seyb has stated a plausible claim that the Abortion Bans violate the right to obtain abortion care in cases of serious medical need, which is protected by the Due Process Clause of the Fourteenth Amendment, and he is entitled to present evidence in support of that claim.  *See generally Skinner*, 562 U.S. at 529-30; *Swierkiewicz*, 534 U.S. at 512-14.

### D. Alternatively, the Abortion Bans' Application to Medically Indicated Abortion Lacks a Rational Basis.

Alternatively, Dr. Seyb states a plausible substantive due process claim because, as applied to some or all medically indicated abortion care, the Abortion Bans lack a rational basis. *See Dobbs*, 597 U.S. at 300 (explaining that state abortion regulations must satisfy rational basis scrutiny even if they do not infringe on a fundamental right).  Defendants argue that the Abortion Bans are rationally related to the state's interest in protecting potential life.  *See* Defs.' Mem. at 16.  That may be true as a facial matter, but not every application of the statutes is rationally related to that interest.

For example, prohibiting abortions in cases of medical futility—*i.e.*, when the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable, Compl. ¶¶ 96-99, is not rationally related to the state's interest in potential life—or any other legitimate state interest. Similarly, prohibiting multifetal pregnancy reductions is not rationally related to the state's interest in potential life because those procedures make it more likely that one or more embryos or fetuses will survive the pregnancy.  Compl. ¶¶ 100-04.  Likewise, prohibiting abortion in cases where a pregnant person faces a serious risk of death from self-harm is not rationally related to the state's interest in potential life because the death of the pregnant person will

generally result in the death of the embryo or fetus.  Compl. ¶¶ 94-95.  Notably, the State cannot

turn a blind eye to the fact that suicide and overdose are leading causes of pregnancy-related

death nationwide and in Idaho.  Compl. ¶ 95; *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)

(explaining that a statute may withstand rational basis scrutiny only if the legislative facts on

which it is based "rationally may have been considered to be true by the governmental

decisionmaker").  This non-exhaustive list of irrational statutory applications demonstrates that

Dr. Seyb has stated a plausible substantive due process claim and is entitled to present evidence

in support of it.  *See generally Skinner*, 562 U.S. at 529-30; *Swierkiewicz*, 534 U.S. at 512-14.

## VI.    Dr. Seyb States a Plausible Equal Protection Claim.

The Equal Protection Clause provides that "all persons similarly situated should be

treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Ban

Throughout Pregnancy treats pregnant people experiencing a life-threatening condition related to

their mental health differently than pregnant patients experiencing a life-threatening condition

related to their physical health.  Compl. ¶¶ 128-32.  Those in the first group cannot obtain lawful

abortion care in Idaho, but those in the second group can.  Idaho Code § 18-622(2)(a)(i).  Despite

the similarities between these groups, Idaho law imposes an arbitrary distinction that jeopardizes

some pregnant people's lives.  It cannot survive even rational basis scrutiny.

### A.  Planned Parenthood *and* Adkins *Are Inapposite.*

An equal protection claim requires a "classification" and a similarly situated "control"

group.  *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018); *Ariz. Dream Act Coal. v.*

*Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) ("ADAC II").  Defendants wrongly claim that Idaho

Code § 18-622 does not create the classification and control groups alleged by Plaintiff.  Defs.'

Mem. at 17.  Defendants rely exclusively on *Planned Parenthood*, 522 P.3d at 1132, and *Adkins*,

No. CV01-23-14744, slip op. at 1, which are inapposite for two reasons.  First, *Planned*

*Parenthood* and *Adkins* are state court cases examining Idaho's distinct Equal Protection Clause. Therefore, neither case is controlling precedent.  Second, neither case considered whether pregnant people with life-threatening mental illnesses are similarly situated to pregnant people with life-threatening physical conditions.  *See Planned Parenthood*, 522 P.3d at 1198-99 (considering whether the Ban Throughout Pregnancy classifies people based on gender or sex stereotypes, or treats abortion providers differently than other healthcare providers); *see Adkins*, slip op. at 18 ("Plaintiffs attack an alleged statutory classification between pregnant women and people who aren't pregnant.").[14]  That state courts rejected three other theories of classification under Idaho's version of the Equal Protection Clause is not relevant to Dr. Seyb's equal protection claim in this case.

### B.  Both Groups of Pregnant People Are Similarly Situated.

Defendants wrongly argue that pregnant people with life-threatening mental illnesses are not similarly situated to pregnant people with other life-threatening conditions.  Defs.' Mem. at 17.  The groups "need not be similar in all respects, but they must be similar in those respects relevant to the [state's] policy."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("ADAC I") (finding DACA recipients similarly situated to groups of noncitizens). Deciding whether groups are "'similar in those respects relevant to the Defendants' policy' may be a fact-specific inquiry."  *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (citing *ADAC I*, 757 F.3d at 1063).

Last year, Idaho legislators amended the Ban Throughout Pregnancy and the statutory definition of abortion applicable to it.  Compl. ¶ 64.  Dr. Seyb's equal protection claim relates to

---

[14] *Raidoo v. Moylan*, 75 F.4th 1115, 1125 (9th Cir. 2023), is likewise inapposite because the court had no occasion to consider the classification at issue here.

the narrow life exception created by those amendments.  *Id.* ¶ 67.  Assuming the exception is intended to serve an interest in maternal and/or fetal life, those with life-threatening mental health conditions and those with other life-threatening health conditions are similarly situated. People in both the classification and control groups are in a situation where abortion is medically indicated.  *Id.* ¶¶ 82, 86-87, 92.  Both face death if they are not able to access medical care.  For people in both the classification and the control group, their life-threatening conditions necessarily threaten the life of the embryo or fetus.  The classification and control groups are undeniably similar in all respects relevant to the State's policy—the life exception.  *See ADAC I*, 757 F.3d at 1064.

### C.  The Statutory Classification Cannot Survive Any Level of Scrutiny.

As explained above, the Ban Throughout Pregnancy infringes on the fundamental right to obtain treatment for serious medical needs, which includes a right to medically indicated abortion care.  *See supra* at 15-26.  Accordingly, the statute's classification is subject to heightened scrutiny.  However, it cannot survive even rational basis scrutiny.

Under this standard, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446; *see also Zobel v. Williams*, 457 U.S. 55, 61-64 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973).  And while rational basis review is deferential, "deference is not abdication and 'rational-basis scrutiny' is still scrutiny."  *Silveira v. Lockyer*, 312 F.3d 1052, 1088-89 (9th Cir. 2002) (quoting *Nordlinger*, 505 U.S. at 31 (Stevens, J., dissenting)), *as amended* (Jan. 27, 2003), *abrogated on other grounds by Heller*, 554 U.S. at 570; *id.* at 1089 ("Although the government is relieved of providing a justification for a statute challenged under the rational-basis test, such a justification must nevertheless exist, or the standard of review would have no meaning at all.").  Notably, in *Navarro v. Block*, 72 F.3d 712,

717 (9th Cir. 1995), the Ninth Circuit held that an equal protection claim survived summary judgment because the plaintiffs could prove that the differential treatment of 911 callers reporting domestic violence and 911 callers reporting other crimes fails rational basis scrutiny.

Defendants do not explain how the statutory classification at issue here rationally furthers a legitimate state interest.  Critically, disdain for people with mental illness is not a rational basis for state action.  *See City of Cleburne*, 473 U.S. at 450 (finding an Equal Protection Clause violation where "requiring the permit in this case appears to us to rest on an irrational prejudice against" people with developmental disabilities).  Nor is refusal to accept that treatment of mental illness, including suicidal ideation, is a legitimate branch of medicine.  *See supra* at 24 (discussing a state's Eighth Amendment obligation to provide treatment to mentally ill prisoners).

As the complaint alleges, "[s]uicide and overdose are among the leading causes of death for pregnant and post-partum people in the United States."  Compl. ¶ 95.  And Idaho's own MMRC determined that, in recent years, "the most common underlying cause of maternal death in Idaho was mental health conditions, encompassing deaths related to suicide, substance use disorder, and other types of self-harm."  *Id.*  In light of these facts, it is simply irrational for Idaho to authorize life-saving abortions for people suffering from physical illness but prohibit them for people suffering from mental illness.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motions to dismiss.

Dated:  August 6, 2024

Respectfully submitted,

*/s/ Stephanie Toti*
Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Jamila Johnson*
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Tanya Pellegrini*
LAWYERING PROJECT
584 Castro St., No. 2062
San Francisco, CA 98114
Phone: (646) 480-8973
tpellegrini@lawyeringproject.org

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine Street, No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Paige Suelzle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on August 6, 2024, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served upon all counsel of record.

In addition, a copy of the foregoing document was sent via first-class mail to the following Defendants at the address listed below:

Justin Oleson
Custer County Prosecutor
521 E. Maine Ave.
P.O. Box 630
Challis, ID 83226

Shondi K. Lott
Elmore County Prosecutor
190 South 4th East
Mountain Home, Idaho 83647

/s/ Stephanie Toti
Stephanie Toti