Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine Street, No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Tanya Pellegrini*
LAWYERING PROJECT
584 Castro St., No. 2062
San Francisco, CA 98114
Phone: (646) 480-8973
tpellegrini@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | ) Case No.: 1:24-cv-00244-BLW |
| | ) |
| Plaintiff, | ) |
| | ) **DECLARATION OF** |
| v. | ) **STEPHANIE TOTI** |
| | ) |
| MEMBERS OF THE IDAHO BOARD OF | ) |
| MEDICINE, in their official capacities; *et al.*, | ) |
| | ) |
| Defendants. | ) |

STEPHANIE TOTI, hereby declares under penalty of perjury that the following

statements are true and correct:

1.    I am an attorney for the Plaintiff in this case.

2.    Annexed hereto as **Exhibit A** is a true and correct copy of book 1, chapter 1, of Blackstone's Commentaries on the Laws of England as reproduced by the Avalon Project of the Yale Law School Lillian Goldman Law Library.  It has been downloaded from https://avalon.law.yale.edu/18th_century/blackstone_bk1ch1.asp.

3.    Annexed hereto as **Exhibit B** is a true and correct copy of book 4, chapter 14, of Blackstone's Commentaries on the Laws of England as reproduced by the Avalon Project of the Yale Law School Lillian Goldman Law Library.  It has been downloaded from https://avalon.law.yale.edu/18th_century/blackstone_bk4ch14.asp.

4.    Annexed hereto as **Exhibit C** is a true and correct copy of *Rex v. Bourne*, 3 All E. R. 615 (1938) (Eng.).  It has been downloaded from https://www.law.utoronto.ca/sites/default/files/documents/reprohealth/united_kingdom_1938_bourne.pdf, and the bracketed page numbers indicating pagination in volume 3 of All England Law Reports have been highlighted in yellow.

5.    Annexed hereto as **Exhibit D** is a true and correct copy of the Petitioner's Brief filed by the State of Idaho in *Moyle v. United States*, 144 S. Ct. 2015 (2024).  It has been downloaded from https://www.supremecourt.gov/DocketPDF/23/23-726/301167/20240222152045736_Main%20Document%2023-727.pdf.


Dated:  August 6, 2024

*/s/ Stephanie Toti*
Stephanie Toti

# Exhibit A

### Blackstone's Commentaries on the Laws of England
### Book the First - Chapter the First : Of the Absolute Rights of Individuals

Blackstone Contents

.P 116

.P 117

COMMENTARIES

ON THE

LAWS OF ENGLAND.

BOOK THE FIRST.

OF THE RIGHTS OF PERSONS.

CHAPTER THE FIRST.

OF THE ABSOLUTE RIGHTS OF INDIVIDUALS.

THE objects of the laws of England are fo very numerous and extenfive, that, in order to confider them with any tolerable eafe and perfpicuity, it will be neceffary to diftribute them methodically, under proper and diftinct heads ; avoiding as much as poffible divifions too large and comprehenfive on the one hand, and too trifling and minute on the other ; both of which are equally productive of confufion.

NOW.

.P 118

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

NOW, as municipal law is a rule of civil conduct, commanding what is right, and prohibiting what is wrong ; or, as Cicero [d], and after him our Bracton [b], has expreffed it, fanctio jufta, jubens honefta et prohibens contraria ; it follows, that the primary and principal objects of the law are RIGHTS, and WRONGS. In the profecution therefore of thefe commentaries, I fhall follow this very fimple and obvious divifion ; and fhall in the firft place confider the rights that are commanded, and fecondly the wrongs that are forbidden by the laws of England.

RIGHTS are however liable to another fubdivifion ; being either, firft, thofe which concern, and are annexed to the perfons of men, and are then called jura perfonarum or the rights of perfons ; or they are, fecondly, fuch as a man may acquire over external objects, or things unconnected with his perfon, which are ftiled jura rerum or the rights of things. Wrongs alfo are divifible into, firft, prvate wrongs, which, being an infringement merely of particular rights, concern individuals only, and are called civil injuries ; and fecondly, public wrongs, which, being a breach of general and public rights, affect the whole community, and are called crimes and mifdemefnors.

THE objects of the laws of England falling into this fourfold divifion, the prefent commentaries will therefore confift of the four following parts : 1. The rights of perfons ; with the means whereby fuch rights may be either acquired or loft. 2. The rights of things ; with the means alfo of acquiring and lofing them. 3. Private wrongs, or civil injuries ; with the means of redreffing them by law. 4. Public wrongs, or crimes and mifdemefnors ; with the means of prevention and punifhment.

WE are now, firft, to confider the rights of perfons ; with the means of acquiring and lofing them.

.{FS}

11 Philipp. 12.

[b] I. 1. c. 3.

.{FE}

NOW

.P 119

The RIGHTS OF PERSONS.

BOOK I.

1.

the rights of perfons that are commanded to be obferved by the municipal law are of two forts ; firft, fuch as are due from every citizen, which are ufually called civil duties ; and, fecondly, fuch as belong to him, which is the more popular acceptation of rights or jura. Both may indeed be comprized in this latter divifion ; for, as all focial duties are of a relative nature, at the fame time that they are due from one man, or fet of men, they muft alfo be due to another. But I apprehend it will be more

clear and eafy, to confider many of them as duties required from, rather than as rights belonging to, particular perfons. Thus, for inftance, allegiance is ufually, and therefore as the duty of the magiftrate ; and yet they are, reciprocally, the rights as well as duties of each other. Allegiance is the right of the magiftrate, and protection the right of the people.

PERSONS alfo are divided by the law into either natural perfons, or artificial. Natural perfons are fuch as God of nature formed us : artificial are fuch as created and devifed by human laws for the purpofes of fociety and government ; which are called corporations or bodies politic.

THE rights of perfons confidered in their natural capacities are alfo of two forts, abfolute, and relative. Abfolue, which are fuch as appertain and belong to particular men, merely as individuals or fingle perfons : relative, which are incident to them as members of fociety, and ftanding in various relations to each other. The firft, that is, abfolute rights, will be the fubject of the prefent chapter.

BY the abfolute rights of individuals we mean thofe which are fo in their primary and ftricteft fenfe ; fuch as would belong to their perfons merely in a ftate of nature, and which every man is intitled to enjoy whether out of fociety or in it. But with regard to the abfolute duties, which man is bound to perform con-

fidered

.P 120

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

fidered as a mere individual, it is not to be expected that any human municipal laws fhould at all explain or enforce them. For the end and intent of fuch laws being only to regulate the behaviour of mankind, as they are members of fociety, and ftand in various relations to each other, they have confequently no bufinefs or concern with any but focial or relative duties. Let a man therefore be ever fo abandoned in his principles, or vitious in his practice, provided he keeps his wickednefs to himfelf, and does not offend againft the rules of public decency, he is out of the reach of human laws. But if he makes his vices public, though they be fuch as feem principally to affect himfelf, (as drunkennefs, or the like) they then become, by the bad example they fet, of pernicious effects to fociety ; and therefore it is then the bufinefs of human laws to correct them. Here the circumftance of publication is what alters the nature of the café. Public fobriety is a relative duty, and therefore enjoined by our laws : private fobriety is an abfolute duty, which, whether it be performed or not, human tribunals can never know; and therefore they can never enforce it by any civil fanction. But, with refpect to rights, the café is different. Human laws define and enforce as well thofe rights which belong to a man confidered as an individual, as thofe which belong to him confidered as related to others.

FOR the principal aim of fociety is to protect individuals in the enjoyment of thofe abfolute rights, which were vefted in them by the immutable laws of nature ; but which could not be preferved in peace without that mutual affiftance and intercourfe, which is gained by the inftitution of friendly and focial communities. Hence it follows, that the firft and primary end of human laws is to formation of ftates and focieties : fo that to maintain and regulate thefe, is clearly a fubfequent confideration. And therefore the principal view of human laws is, or ought always to be, to explain, protect, and enforce fuch rights as are

abfolute,

.P 121

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

abfolute, which in themfelves are few and fimple ; and, then, fuch rights as are relative, which arifing from a variety of connexions, will be far more numerous and more complicated. Thefe will take up a greater fpace in any code of laws, and hence may appear to be more attended to, though in reality they are not, than the rights of the former kind. Let us therefore proceed to examine how far all laws ought, and how far the laws of England actually do, take notice of thefe abfolute rights, and provide for their lafting fecurity.

THE abfolute righs of man, confidered as a free agent, endowed with difcernment to known good from evil, and with power of choofing thofe meafures which appear to him to be moft defirable, are ufually fumed up on one general appellation, and denominated the natural liberty of mankind. This natural liberty confifts properly in a power of acting as one thinks fit, without any reftraint or control, unlefs by the law of nature : being a right inherent in a us by birth, and one of the gifts of God to man at his creation, when he endued him with the faculty of freewill. But every man, when he enters into fociety, gives, up a part of his natural liberty, as the price of fo valuable a purchafe ; and, in confideration of receiving the advantages of mutual commerce, obliges himfelf to conform to thofe laws, which the community has tough proper to eftablifh. And this fpecies of legal obedience and conformity is infinitely more defirable, than that wild and favage liberty which is facrificed to obtain it. For no man, that confiders a moment, would wifh to retain the abfolute and uncontrolled power of doing whatever he pleafes; the confequence of which is, that every other man would alfo have the fame power ; and then there would be no fecurity to individuals in any of the enjoyments of life. Political therefore, or civil, liberty, which is that of a member of fociety, is no other than natural liberty fo far reftrained by human laws (and no farther) as is neceffary and expedient for the general advantage of the publick [c]. Hence we may collect that the law, which reftrains a

{FS}

[c] Facultas ejus, quod cuique facere libet, nifi quid jure prohibetur. Inft. 1. 3. 1.

{FE}

Q

man

.P 122

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

man from doing mifchief to his fellow citizens, though it diminifhes the natural, increafes the civil liberty of mankind : but every wanton and caufelefs reftraint of the will of the fubject, whether practiced by a monarch, a nobility, or a popular affembly, is a degree of tyranny. Nay, that even laws themfelves, whether made with or without our confent, if they regulate and conftrain our conduct in matters of mere indifference, without any good end in view, are laws deftructive of liberty : whereas if any public advantage can arife from obferving fuch precepts, the control of our private inclinations, in one or two particular points, will conduce to preferve our general freedom in others of more importance ; by fupporting that ftate, of fociety, which alone can fecure our independence. Thus the ftatute of king Edward IV [d], which forbad

the fine gentlemen of thofe times (under the degree of a lord) to wear pikes upon their fhoes or boots of more than two inches in length, was a law that favoured of opprefſion ; becauſe, however ridiculous the faſhion then in uſe might appear, the reſtraining it by pecuniary penalties could ſerve no purpoſe of common utility. But the ſtatute of king Charles II [e], which prefcribes a thing feemingly as indifferent ; viz. a dreſs for the dead, who are all ordered to be buried in woollen; is a law confitent with public liberty, for it encourages the ſtaple trade, on which in great meaſure depends the univerſal good of the nation. So that laws, wen prudently framed, are by no means fubverfive but rather introductive of liberty ; for (as Mr Locke has well obſerved [f]) where there is no law, there is no freedom. But then, on the other hand, that conſtitution or frame of government, that ſyſtem of laws, is alone calculated to maintain civil liberty, which leaves the ſubject entire maſter of his own conduct, except in thoſe points wherein the public good requires ſome direction or reſtraint.

THE idea and practice of this political or civil liberty flouriſh in their higheſt vigour in theſe kingdoms, where it falls little

.{FS}

[d] 3 Edw. IV. c. 5.

[e] 30 Car. II. ſt. 1. c. 3.

[f] on Gov. p. 2. § 57.

.{FE}

fhort

.P 123

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

fhort of perfection, and can only be loft or deſtroyed by the folly or demerits of it's owner : the legiſlature, and of courſe the laws of England, being peculiarly adapted to the preſervation of this ineſtimable bluſſing even in the meaneſt fubject. Very different from the modern conſtitutions of other ſtates, on the continent of Europe, and from the genius of the imperial law ; which in general are calculated to veſt an arbitrary and defpotic power of controlling the actions of the fubject in the prince, or in a few grandees. And this fpirit of liberty is fo deeply implanted in our conftitution, and rooted even in our very foil, that a flave or a negro, the moment he lands in England, falls under the protection of the laws, and with regard to all natural rights becomes eo infanti a freeman [g].

THE abfolute rights of every Engliſhman (which, taken in a political and extenfive fenſe, are uſually called their liberties) as they are founded on nature and reafon, fo they are coeval with our form of government ; though fubject at times to fluctuate and change : their eſtabliſhment (excellent as it is) being ſtill human. At ſome times we have been them depreffed by overbearing and tyrannical princes; at others fo luxuriant as even to tend to anarchy, a worfe ſtate than tyranny itſelf, as any government is better than none at all. But the vigour of our free conſtitution has always delivered the nation from theſe embaraffments, and, as foon as the convulſions confequent on the ſtruggle have been over, the balance of our rights and liberties has fettled to it's proper level; and their fundamental articles have been from time to time afferted in parliament, as often as they were thought to be in danger.

FIRST, by the great charter of liberties, which was obtained, fword in hand, from king John ; and afterwards, with fome alterations, confirmed in parliament by king Henry the third, his fon. Which charter contained very few new grants ; but, as fir Edward Coke [h] obſerves, was for the moft part declaratory of the

.{FS}

[s] Salk. 666.

[h] 2 Inft. proem.

.{FE}

Q 2

principal

.P 124

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

principal grounds of the fundamental laws of England. Afterwards by the ſtatute called confirmatio cartarum [i], whereby the great charter is directed to be allowed as the common law ; all judgments contrary to it are declared void ; copies of it are ordered to be fent to all cathedral churches, and read twice a year to the people ; and fentence of excommunication is directed to be as conſtantly denounced againſt all thofe that by word, deed, or counfel act contrary thereto, or in any degree infringe it. Next by a multitude of fubfequent corroborating ſtatutes, (fir Edward Coke, I think, reckons thirty two [k],) from the firſt Edward to Henry the fourth. Then, after a long interval, by the petition of right ; which was a parliamentary declaration of the liberties of the people , afferted to by king Charles the firſt in the beginning of his reign. Which was clofely followed by the ſtill more ample conceffions made by that unhappy prince to his parliament, before the fatal rupture between them ; and by the many falutary laws, particularly the habeas corpus act, paffed under Charles the fecund. To thefe fucceeded the bill of rights, or declaration delivered by the lords and commons to the prince and princefs of Orange 13 February 1688 ; and afterwards enacted in parliament, when they became king and queen : which declaration concludes in thefe remarkable words ; "and they do claim, "demand, and infift upon all and fingular the premifes, as their "undoubted rights and liberties." And the act of parliament itfelf [l] recognizes "all and fingular the rights and liberties afferted "and claimed in the faid declaration to be the true, antient, and "indubitable rights of the people of this kingdom." Laſtly, thefe liberties wee again afferted at the commencement of the prefent century, in the act of fettlement [m], whereby the crown is limited to his prefent majeft's illuftrious houfe, and fome new provifions were added at the fame fortunate aera for better fecuring our religion, laws, and liberties ; which the ſtatute declares to be "the birthright of the people of England," according to the antient doctrine of the common law [n].

.{FS}

[i] 25 Edw. I.

[k] 2 Inft. proem.

[l] 1 W. and M. ft. 2. c. 2.

[m] 12 & 13 W. III. c. 2.

[n] Plowd. 55.

.{FE}

THUS

.P 125

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

THUS much for the declaration of our rights and liberties. The rights themfelves thus defined by thefe feveral ftatutes , confift in a number of private immunities ; which will appear, from what has been premifed, to be indeed no other, than either that refiduum of natural liberty, which is not required by the laws of fociety to be facrificed to public convenience ; or elfe thofe civil privileges, which fociety hath engaged to provide, in lieu of the natural liberties fo given up by individuals. Thefe therefore were formerly, either by inheritance or purchafe, the rights of all mankind ; but, in moft other countries of the world being now more or lefs debafed and deftroyed, they at prefent may be faid to remain, in a peculiar and emphatical manner, the rights of the people of England. And thefe may be reduced to three principal or primary articles ; the right of perfonal fecurity, the right of perfonal liberty ; and the right of private property : becaufe as there is no other known method of compulfion, or of abridging man's natural free will, but by an infringment or diminution of one or other of thefe important righs, the prefervation of thefe, inviolate, may juftly be faid to include the prefervation of our civil immunities in their largeft and moft extenfive fenfe.

I. THE right of perfonal fecurity confifts in a perfon's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation.

1. LIFE is the immediate gift of God, a right inherent by nature in every individual ; and it begins in contemplation of law as foon as an infant is able to ftir in the mother's womb. For if a woman is quick with child, and by a potion, or otherwife, killeth it in her womb ; or if any one beat her, whereby the child dieth in her body, and fhe is delivered of a dead child ; this, though not murder, was by the antient law homicide or manflaughter [o]. But at prefent it is not looked upon in quite fo

.{FS}

[o] Si aliquis mulierem praegnantem percufferit, vel ei venenum dederit, per quod fecerit abortivam ; fi puerperium jam formatum fuerit, et maxime fi fuerit animatum, facit bomicidium. Bracton. l. 3. c. 21.

.{FE}

atrocious

.P 126

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

atrocious a light, though it remains a very heinous mifdemefnor [p].

AN infant in ventre ftatute mere, or in the mother's womb, is fuppofed in law to be born for many purpofes. It is capable of having a legacy, or a furrender of a copyhold eftate made to it. It may have a guardian affigned to it [q] ; and it is enabled to have an eftate limited to it's ufe, and to take afterwards by fuch limitation, as if it were then actually born [r]. And in this point the civil law agrees with ours [s].

2. A MAN'S limbs, (by which for the prefent we only underftand thofe members which may be ufeful to him in fight, and the lofs of which only amounts to mayhem by the common law) are alfo the gift of the wife creator ; to enable man to protect himfelf from external injuries in a ftate of nature. To thefe therefore he has a natural inherent right ; and they cannot be wantonly deftroyed or difabled without a manifeft breach of civil liberty.

BOTH the life and limbs of a man are of fuch high value, in the eftimation of the law of England, that it pardons even homicide if committed .{FE} defendendo, or in order to preferve them. For whatever is done by a man, to fave either life or member, is looked upon as done upon the higheft neceffity and compulfion. Therefore if a man through fear of death or mayhem is prevailed upon to execute a deed, or do any other legal act ; thefe, though accompanied with all other the requifite folemnities, are totally void in law, if forced upon him by a well-grounded apprehenfion of lofing his life, or even his limbs, in café of his non-compliance [t]. And the fame is alfo a fufficient excufe for the commiffion of many mifdemefnors, as will appear in the fourth book.

.{FS}

[p] 3. Inft. 90.

[q] Stat. 12 Car II c. 24.

[r] Stat. 10 & 11 W. III. c. 16.

[s] 2id in imtelliguntur in rervum natura effe, cum de eorum commode agatur. Ff. 1. 5. 26.

[t] 2 Inft. 483.

.{FE}

The

.P 127

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

The conſtraint a man is under in theſe circumſtances is called in law dureſs, from the Latin durities, of which there are two ſorts ; dureſs of impriſonment, where a man actually loſes his liberty, fo which we ſhall preſently ſpeak ; and dureſs per minas, where the hardſhip is only threatened and impending, which is that we are now diſcourſing of. Dureſs per minas is either for fear of loſs of life, or elſe for fear of mayhem, or loſs of limb. And this fear muſt be upon ſufficient reaſon ; "non," as Bracton expreſſes it, "ſuſpicio cujuſlibet vani et meticuloſi bominis, fed talis qui poſſit "cadere in cirum conſtantem ; talis enim debet eſſe metus, qui in .ſe "contineat vitae periculum, aut corporis cruciatum [u]." A fear of battery, or being beaten, though never ſo well grounded, is no dureſs ; neither is the fear of having one's houſe burnt, or one's goods taken away and deſtroyed ; becauſe in theſe caſes, ſhould the threat be performed, a man may have ſatiſfaction by recovering equivalent damages [w]: but no ſuitable atonement can be made for the loſs of life, or limb. And the indulgence ſhewn to a man under this, the principal, for of dureſs, he fear of loſing his life or limbs, agrees alfo with that maxim of the civil law ; ignoſcitur ei qui fanguinem ſuum qualiter redemptum voluit [x].

THE law not only regards life and member, and protecs every man in the enjoyment of them, but alfo furniſhes him with every thing neceſſary for their ſupport. For there is no man ſo indigent or wretched, but he may demand a ſupply ſufficient for all the neceſſities of life, from the more opulent part of the community, by means of the ſeveral ſtatutes enacted for the relief of the poor, of which in their proper places. A humane proviſion ; yet, though dictated by the principles of ſociety, diſcountenanced by the Roman laws. For the edicts of the emperor Conſtantine, commanding the public to maintain the children of thoſe who were unable to provide for them, in order to prevent the murder and expoſure of infants, an inſtitution founded on the fame principle as our

.{FS}

[u] l. 2. c. 5.

[w] 2 inſt. 483.

[z] Ff. 48. 21. 1.

.{FE}

founding

.P 128

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

founding hofpitals, though comprized in the Theodoſian code [y], were rejected in Juſtinian's collection.

THESE rights, of life and member, can only be determined by the death of the perfon ; which is either a civil or natural death. The civil death commences if any man be baniſhed the realm [z] by the proceſs of the common law, or enters into religion ; that is, goes into a monaſtery, and becomes there a monk profeſſed : in which caſes he is abſolutely dead in law, and his next heir ſhall have his eſtate. For, ſuch baniſhed man is entirely cut off from ſociety; and ſuch a monk, upon his profeſſion, renounces ſolemnly all ſecular concerns : and beſides, as the popiſh clergy claimed an exemption from the duties of civil life, and the commands of the temporal magiſtrate, the genius of the Engliſh law would not ſuffer thoſe perſons to enjoy the benefits of ſociety, who ſecluded themſelves from it, and refuſed to ſubmit to it's regulations [a]. A monk is therefore accounted civiliter mortuus, and when he enters into religion may, like other dying men, make his teſtament and executors ; or, if he makes none, the ordinary may grant adminiſtration to his next of kin, as if he were actually dead inteſtate. And ſuch executors and adminiſtrators ſhall have the fame power, and may bring the fame actions for debts due to the religious, and are liable to the fame actions for thoſe due from him, as if he were naturally deceaſed [b]. Nay, ſo far has this principle been carried, that when one was bound in a bond to an abbot and his ſucceſſors, and afterwards made his executors and profeſſed himſelf a monk of the fame abbey, and in proceſs of time was himſelf made abbot thereof ; here the law gave him, in the capacity of abbot, an action of debt againſt his own executors to recover the money due [c]. In ſhort, a monk or religious is ſo effectually dead in law, that a leaſe made even to a third perfon, during the life (generally) of one who afterwards becomes a monk, determines by ſuch his entry into religion : for

.{FS}

[y] l. 11. t. 27.

[z] Co. Litt. 133.

[a] This was alfo a rv'e in the feudal law, l. 2. t. 21. defat eſſe miles feculi, qui factus eſt miles Chriſti ; nec beneficium pertinet ad cum qui non debet gerere officium.

[b] Litt. §. 200.

[c] Co. Litt. 133 b.

.{FE}

which

.P 129

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

which reaſon leaſes, and other conveyances, for life, are uſually made to have and to hold for the term of one's natural life [d].

THIS natural life being, as was before obſerved, the immediate donation of the great creator, cannot legally be diſpoſed of or deſtroyed by any individual, neither by the perfon himſelf nor by any other of his fellow creatures, merely upon their own authority. Yet nevertheleſs it may, by the divine permiſſion, be frequently forfeited for

the breach of thofe laws of fociety, which are enforced by the fanction of capital punifhments ; of the nature, reftrictions, expedience, and legality of which, we may hereafter more conveniently enquire in the concluding book of thefe commentaries. At prefent, I fhall only obferve, that whenever the conftitution of a ftate vefts in any man, or body of men, a power of deftroying at pleafure, without the direction of laws, the lives or members of the fubject, fuch conftitution is in the higheft degree tyrannical : and that whenever any laws direct fuch deftruction for light and trivial caufes, fuch laws are likewife tyrannical, though in an inferior degree ; becaufe here the fubject is aware of the danger he is expofed to, and may by prudent caution provide againft it. The ftatute law of England does therefore very feldom, and the common law does never, inflict any punifhment extending to life or limb, unlefs upon the higheft neceffity : and the conftitution is an utter ftranger to any arbitrary power of killing or maiming the fubject without the exprefs warrant of law. "Nullus liber homo, fays the great charter [e], ali- " quo modo deftruatur, nifi per legale judicium parium fuorum aut "per legem terrae." Which words, "aliquo modo deftruatur," according to fir Edward Coke [f], include a prohibition not only of killing, and maiming, but alfo of torturing (to which our laws are ftrangers) and of every oppreffion by colour of an illegal authority. And it is enacted by the ftatute 5 Edw. III. c. 9. that no man fhall be forejudged of life or limb, contrary to the great charter and the law of the land : and again, by ftatute 28 Ed. III.

.{FS}

[d] 2 Rep. 48. Co. Litt. 132.

[e] c. 29.

[f] 2 Inft. 48.

.{FE}

R

c. 3.

.P 130

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

c. 3. that no man fhall be put to death, without being brought to anfwer by due procefs of law.

3. BESIDES thofe limbs and members that may be neceffary to man, in order to defend himfelf or annoy his enemy, the reft of his perfon or body is alfo entitled by the fame natural right to fecurity from the corporal infults of menaces, affaults, beating, and wounding ; though fuch infults amount not to deftruction of life or member.

4.THE prefervation of a man's health from fuch practices as may prejudice or annoy it, and

5. THE fecurity of his reputation or good name from the arts of detraction and flander, are rights to which every man is intitled, by reafon and natural juftice ; fince without thefe it is impoffible to have the perfect enjoyment of any other advantage or right. But thefe three laft articles (being of much lefs importance than thofe which have gone before, and thofe which are yet to come ) it will fuffice to have barely mentioned among the rights of perfons ; referring the more minute difcuffion of their feveral branches, to thofe parts of our commentaries which treat of the infringement of thefe rights, under the head of perfonal wrongs.

II. NEXT to perfonal fecurity, the law of England regards, afferts, and preferves the perfonal liberty of individuals. This perfonal liberty confifts in the power of loco-motion, of changing fituation, or removing one's perfon to whatfoever place one's own inclination may direct ; without imprifonment or reftraint, unlefs by due courfe of law. Concerning which we may make the fame obfervations as upon the preceding article ; that it is a right ftrictly natural ; that the laws of England have never abridged it without fufficient caufe ; and , that in this kingdom it cannot ever be abridged at the mere difcretion of the magiftrate, without the explicit permiffion of the laws. Here again the language of the great charter [g] is, that no freeman fhall be taken or imprifoned

.{FS}

[g] c. 29.

.{FE}

but

.P 131

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

but by the lawful judgment of his equals, or by the law of the land. And many fubfequent old ftatutes [h] exprefsly direct, that no man fhall be taken or imprifoned or detained without caufe fhewn, to which he may make anfwer according to law. By 16 Car. I. c. 10. if any perfon be reftrained of his liberty by order or decree of any illegal court, or by command of the king's majefty in perfon, or by warrant of the council board, or of any of the privy council ; he fhall, upon demand of his counfel, have a writ of habeas corpus, to bring his body before the court of king's bench or common pleas ; who fhall determine whether the caufe of his commitment be juft, and thereupon do as to juftice fhall appertain. And by 31 Car. II. c. 2. commonly called the babcas corpus act, the methods of obtaining this writ are fo plainly pointed out and enforced, that, fo long as this ftatute remains unimpeached, no fubject of England can be long detained in prifon, except in thofe cafes in which the law requires and juftifies fuch detainer. And, left this act fhould be evaded by demanding unreafonable bail, or fureties for the prifoner's appearance, it is declared by 1 W. & M. ft. 2. c. 2. that exceffive bail ought not to be required.

OF great importance to the public is the prefervation of this perfonal liberty : for if once it were left in the power of any, the higheft, magiftrate to imprifon arbitrarily whomever he or his officers thought proper, (as in France it is daily practiced by the crown ) there would foon be an end of all other rights and immunities. Some have thought, that unjuft attacks, even upon life, or property, at the arbitrary will of the magiftrate, are lefs dangerous to the commonwealth, than fuch as are made upon the perfonal liberty of the fubject. To bereave a man of life, or by violence to confifcate his eftate, without accufation or trial, would be fo grofs and notorious an act of defpotifm, as muft at once

.{FS}

[h] 5 Edw. III. c. 9. 25. Edw. III. Ft. 5. c. 4. and 28 Edw. III. 4. 3.

.{FE}

R 2

convey

.P 132

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

convey the alarm of tyranny throughout the whole kingdom. But confinement of the perfon, by fecretly hurrying him to gaol, where his fufferings are unknown or forgotten ; is a lefs public, a lefs ftriking, and therefore a more dangerous engine of arbitrary government. And yet fometimes, when the ftate is in real danger, even this may be a neceffary meafure. But the happinefs of our conftitution is, that it is not left to the executive power to determine when the danger of the ftate is fo great, as to render this meafure expedient. For the parliament only, or legiflative power, whenever it fees prper, can authorize the crown, by fufpending the babeas corpus act for a fhort and limited time, to imprifon fufpected perfons without giving any reafon for fo doing. As the fenate of Rome was wont to have recourfe to a dictator, a magiftrate of abfolute authority, when they judged the republic in any imminent danger. The decree of the fenate, which ufually preceded the nomination of this magiftrate, "dent operam confu- "les, nequid refpublica detrimenti capiat," was called the fenatus confultum ultimate neceffitatis. In like manner this experiment ought only to be tried in cafe of extreme emergency ; and in thefe the nation parts with it's liberty for a while, in order to preferve it for ever.

THE confinement of the perfon, in any wife, is an imprifonment. So that the keeping a man againft his will in a private houfe, putting him in the ftocks, arrefting or forcibly detaining him in the ftreet, is an imprifonment [i]. And the law fo much difcourages unlawful confinement, that if a man is under durefs of imprifonment, which we before explained to mean a compulfion by an illegal reftraint of liberty, until he feals a bond or the like ; he may alledge this durefs, and avoid the extorted bond. But if a man be lawfully imprifoned, and either to procure his difcharge, or on any other fair account, feals a bond or a deed, this is not by durefs of imprifonment, and he is not at liberty to avoid it [k]. To make imprifonment lawful, it muft either be, by procefs from the courts of judicature, or by warrant from fome

.{FS}

[i] 2. Inft. 5 9.

[k] 2 Inft. 482.

.{FE}

legal

.P 133

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

legal officer, having authority to commit to prifon ; which warrant muft be in writing, under the hand and feal of the magiftrate, and exprefs the caufes of the commitment, in order to be examined into (if neceffary) upon a babeas corpus. If there be no caufe expreffed, the goaler is not bound to detain the prifoner [l]. For the law judges in this refpect, faith fir Edward Coke, like Feftus the Roman governor ; that it is unreafonable to fend a prifoner, and not to fignify withal the crimes alleged againft him.

A NATURAL and regular confequence of this perfonal liberty, is that every Englifhman may claim a right to abide in his own country fo long as he pleafes ; and not to be driven from it unlefs by the fentence of the law. The king indeed, by his royal prerogative, may iffue out his writ ne exeat regnum, and prohibit any of his fubjects from going into foreign parts without licence [m]. This may be neceffary for the public fervice, and fafeguard of the commonwealth. But no power on earth, except the authority of parliament, can fend any fubject of England out of the land againft his will ; no not even a criminal. For exile, or tranfportation, is a punifhment unknown to the common law ; and, wherever it is now inflicted, it is either by the choice of the criminal himfelf, to efcape a capital punifhment, or elfe by the exprefs direction of fome modern act of parliament. To this purpofe the great charter [n] declares that no freeman fhall be banifhed, unlefs by the judgment of his peers, or by the law of the land. And by the babeas corpus act, 31 Car. II. c. 2. (that fecund magna carta, and ftable bulwark of our liberties) it is enacted, that no fubject of this realm, who is an inhabitant of England, Wales, or Berwick , fhall be fent prifoner into Scotland, Ireland, Jerfey, Guernfey, or places beyond the feas ; (where they cannot have the benefit and protection of the common law ) but that all fuch imprifonments fhall be illegal ; that the perfon, who fhall dare to commit another contrary to this law, fhall be difabled from bearing any office, fhall incur the penalty of a praemunire, and be incapable of receiving the king's pardon :

.{FS}

[l] 2 Inft. 52. 53.

[m] F. N. B. 85.

[n] cap. 29.

.{FE}

and

.P 134

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

and the party fuffering fhall alfo have his private action againft the perfon committing, and all his aiders, advifers and abettors, and fhall recover treble cofts ; befides his damages, which no jury fhall affefs at lefs than five hundred pounds.

THE law is in this refpect fo benignly and liberally conftrued for the benefit of the fubject, that, though within the realm the king may command the attendance and fervice, of all his liegemen, yet he cannot fend any man out of the realm, even upon the public fervice : he cannot even conftitute a man lord deputy or lieutenant of Ireland againft his will, nor make him a foreign embaffador [o]. For this might in reality be no more than an honorable exile.

III. THE third abfolute right, inherent in every Englifhman, is that of property : which confifts in the free ufe, enjoyment, and difpofal of all his acquifitions, without any control or diminution, fave only by the laws of the land. The original of private property is probably founded in nature, as will be more fully explained in the fecund book of the enfuing commentaries : but certainly the modifications under which we at prefent find it, the method of conferving it in the prefent owner, and of tranflating it from man to man, are entirely derived from fociety ; and are fome of thofe civil advantages, in exchange for which every individual has refigned a part of his natural liberty. The laws of England are therefore, in point of honor and juftice, extremely watchful in afcertaining and protecting this right. Upon this principle the great charter [p] has declared that no freeman fhall be diffeifed, or divefted, of his freehold, or of his liberties, or free cuftoms, but by the judgment of his peers, or by the law of the land. And by a variety of antient ftatutes [q] it is enacted, that no man's lands or goods fhall be feifed into the king's hands, againft the great charter, and the law of the land ; and that no man fhall be difinherited, nor put out of his franchifes or freehold,

.{FS}

[o] 2 Inft. 47.

[p] c. 29.

[q] 5 Edw. III. c. 9. 25 Edw. III. ft. 5. c. 4. 28 Edw. III. c. 3.

.{FE}

unlefs

.P 135

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

unlefs he be duly brought to anfwer, and be forejudged by courfe of law ; and if any thing be done to the contrary, it fhall be redreffed, and holden for none.

SO great moreover is the regard of the law for private property, that it will not authorize the leaft violation of it ; no, not even for the general good of the whole community. If a new road, for inftance, were to be made through the grounds of a private perfon, it might perhaps be extenfively beneficial to the public ; but the law permits no man, or fet of men, to do this without confent of the owner of the land. In vain may it be urged, that the good of the individual ought to yield to that of the community ; for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Befides, the public good is in nothing more effentially interefted, than in the protection of every individual's private rights, as modelled by the municipal law. In this, and fimilar cafes the legiflature alone, can, and indeed frequently does, interpofe, and compel the individual to acquiefce. But how does it interpofe and compel ? Not by abfolutely ftripping the fubject of his property in an arbitrary manner ; but by giving him a full indemnification and equivalent for the injury thereby fuftained. The public is now confidered as an individual, treating with an individual for an exchange. All that the legiflature does is to oblige the owner to alienate his poffeffions for a reafonable price ; and even this is an exertion of power, which the legiflature indulges with caution, and which nothing but the legiflature can perform.

NOR is this the only inftance in which the law of the land has poftponed even private neceffity to the facred and inviolable rights of private property. For no fubject of England can be conftrained to pay any aids or taxes, even for the defence of the realm or the fupport of government, but fuch as are impofed by his own confent, or that of his reprefenatives in parliament. By the ftatute 25 Edw. I. c. 5 and 6, it is provided, that the king

fhall

.P 136

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

fhall not take any aids or tafks, but by the common affent of the realm. And what that common affent is, is more fully explained by 34 Edw. I. ft. 4. cap. 1. which enacts, that no talliage or aid fhall be taken without affent of the arch-bifhops, bifhops, earls, barons, knights, burgeffes, and other freemen of the land [r] : and again by 14 Edw. III. ft. 2. c. 1. the prelates, earls, barons, and commons, citizens, burgeffes, and merchants fhall not be charged to make any aid, if it be not by the common affent of the great men and commons in parliament. And as this fundamental law had been fhamefully evaded under many fucceeding princes, by compulfive loans, and benevolences extorted without a real and voluntary confent, it was made an article in the petition of right 3 Car. I, that no man fhall be compelled to yield any gift, loan, or benevolence, tax, or fuch like charge, without common confent by act of parliament. And, laftly, by the ftatute 1 W. & M. ft. 2. c. 2. it is declared, that levying money for or to the ufe of the crown, by pretence of prerogative, without grant of parliament ; or for longer time, or in other manner, than the fame is or fhall be granted, is illegal.

IN the three preceding articles we have taken a fhort view of the principal abfolute rights which appertain to every Englifhman. But in vain would thefe rights be declared, afcertained, and protected by the dead letter of the laws, if the conftitution had provided no other method to fecure their actual enjoyment. It has therefore eftablifhed certain other auxiliary fubordinate rights of the fubject, which ferve principally as barriers to protect and maintain inviolate the three great and primary rights, of perfonal fecurity, perfonal liberty, and private property. Thefe are,

1. THE conftitution, powers, and privileges of parliament, of which I fhall treat at large in the enfuing chapter.

.{FS}

[r] See the hiftorical introduction to the great charter, & c. fub anno 1297 ; wherein it is fhewn that this ftatute de talliagio non concedendo, fuppo ed to have been made in 34 Edw. I, is in reality nothing more than a fort of tranflation into Latin of the confirmatio cartarum, 25 Edw. I, which was originally publifhed in the Norman language.

.{FE}

2. THE

.P 137

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

2. THE limitation of the king's prerogative, by bounds fo certain and notorious, that it is impoffible he fhould exceed them without the confent of the people. Of this alfo I fhall treat in it's proper place. The former of thefe keeps the lcgiflative power in due health and vigour, fo as to make it improbable that laws fhould be enacted deftructive of general liberty : the latter is a guard upon the executive power, by reftraining it from acting either beyond or in contradiction to the laws, that are framed and eftablifhed by the other.

3. A THIRD fubordinate right of every Englifhman is that of applying to the courts of juftice for redrefs of injuries. Since the law is in England the fupreme arbiter of every man's life, liberty, and property, courts of juftice muft at all times be open to the fubject, and the law be duly adminiftred therein. The emphatical words of magna carta [s], fpoken in the perfon of the king, who in judgment of law (fays fir Edward Coke [t]) is ever prefent and repeating them in all his courts, are thefe ; "nulli "vendemus, nulli negabimus, aut differemus rectum vel juftitiam : "and therefore every fubject," continues the fame learned author, "for injury done to him in bonis, in terries, vel perfona, by "any other fubject, be he ecclefiaftical or temporal without any "exception, may take his remedy by the courfe of the law, and "have juftice and right for the injury done to him, freely with- "out fale, fully without any denial, and fpeedily without delay." It were endlefs to enumerate all the affirmative acts of parliament wherein juftice is directed to be done according to the law of the land : and what that law is, every fubject knows ; or may know if he pleafes : for it depends not upon the arbitrary will of any judge ; but is permanent, fixed, and unchangeable, unlefs by authority of parliament. I fhall however juft mention a few negative ftatutes , whereby abufes, perverfions, or delays of juftice, efpecially by the prerogative, are reftrained. It is ordained by

.{FS}

[s] c. 29.

[t] 2 Inft. 55.

.{FE}

S

magna

.P 138

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

magna carta [u], that no freeman fhall be outlawed, that is, put out of the protection and benefit of the laws, but according to the law of the land. By 2 Edw. III. c. 8. and 11 Ric. II. c. 10. it is enacted, that no commands or letters fhall be fent under the great feal, or the little feal, the fignet, or privy feal, in difturbance of the law ; or to difturb or delay common right : and, though fuch commandments fhould come, the judges fhall not ceafe to do right. And by 1 W. & M. ft. 2 : c. 2. it is declared, that the pretended power of fufpending, or difpenfing with laws, or the execution of laws, by regal authority without confent of parliament, is illegal.

NOT only the fubftantial part, or judicial decifions, of the law, but alfo the formal part, or method of proceeding, cannot be altered but by parliament ; for if once thofe outworks were demolifhed, there would be no inlet to all manner of innovation in the body of the law itfelf. The king, it is true, may erect new courts of juftice ; but then they muft proceed according to the old eftablifhed forms of the common law. For which reafon it is declared in the ftatute 16 Car. I. c. 10. upon the diffolution of the court of ftarchamber, that neither his majefty, nor his privy council, have any jurifdiction, power, or authority by Englifh bill, petition, articles, libel (which were the courfe of proceeding in the ftarchamber, borrowed from the civil law) or by any other arbitrary way whatfoever, to examine, or draw into queftion, determine or difpofe of the lands or goods of any fubjects of this kingdom ; but that the fame ought to be tried and determined in the ordinary courts of juftice, and by courfe of law.

4. IF there fhould happen any uncommon injury, or infringement of the rights beforementioned, which the ordinary courfe of law is too defective to reach, there ftill remains a fourth fubordinate right appertaining to every individual, namely, the right of petitioning the king, or either houfe of parliament, for the

.{FS}

[u] c. 29.

.{FE}

redrefs

.P 139

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

redrefs of grievances. In Ruffia we are told [w] that the czar Peter eftablifhed a law, that no fubject might petition the throne, till he had firft petitioned two different minifters of ftate. In café he obtained juftice from neither, he might then prefent a third petition to the prince ; but upon pain of death, if found to be in the wrong. The confequence of which was, that no one dared to offer fuch third petition ; and grievances feldom falling under the notice of the fovereign, he had little opportunity to redrefs them. The reftrictions, for fome there are, which are laid upon petitioning in England, are of a nature extremely different ; and while they promote the fpirit of peace, they are no check upon that of liberty. Care only muft be taken, left, under the pretence of petitioning, the fubject be guilty of any riot or tumult ; as happened in the opening of the memorable parliament in 1640 : and, to prevent this, it is provided by the ftatute 13 Car. II. ft. 1. c. 5. that no petition to the king, or either houfe of parliament, for any alterations in church or ftate, fhall be figned by above twenty perfons, unlefs the matter thereof be approved by three juftices of the peace or the major part of the grand jury, in the country ; and in London by the lord mayor, aldermen, and common council ; nor fhall any petition be prefented by more than two perfons at a time. But under thefe regulations , it is declared by the ftatute 1 W. & M. ft. 2. c. 2. that the fubject hath a right to petition ; and that all commitments and profecutions for fuch petitioning are illegal.

5. THE fifth and laft auxiliary right of the fubject, that I fhall at prefent mention, is that of having arms for their defence, fuitable to their condition and degree, and fuch as are allowed by law. Which is alfo declared by the fame ftatute 1 W. & M. ft. 2. c. 2. and is indeed a public allowance, under due reftrictions, of the natural right of refiftance and felf-prefervation, when the fanctions of fociety and laws are found infufficient to reftrain the violence of oppreffion.

.{FS}

ᵂ Montefq. Sp. L. 12. 26.

.{FE}

S 2

IN

.P 140

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

IN thefe feveral articles confift the rights, or, as they are frequently termed, the liberties of Englifhmen : liberties more generally talked of, than thoroughly underftood ; and yet highly neceffary to be perfectly known and confidered by every man of rank or property, left his ignorance of the points whereon it is founded fhould hurry him into faction and licentioufnefs on the one hand, or a pufillanimous indifference and criminal fubmiffion on the other. And we have feen that thefe rights confift, primarily, in the free enjoyment of perfonal fecurity, of perfonal liberty, and of private property. So long as thefe remain inviolate, the fubject is perfectly free ; for every fpecies of compulfive tyranny and oppreffion muft act in oppofition to one or other of thefe rights, having no other object upon which it can poffibly be employed. To preferve thefe from violation, it is neceffary that the conftitution of parliaments be fupported in it's full vigor ; and limits certainly known, be fet to the royal prerogative. And, laftly, to vindicate thefe rights, when actually violated or attacked, the fubjects of England are entitled, in the firft place, to the regular adminiftration and free courfe of juftice in the courts of law ; next to the right of petitioning the king and parliament for redrefs of grievances ; and laftly to the right of having and ufing arms for felf-prefervation and defence. And all thefe rights and liberties it is our birthright to enjoy entire ; unlefs where the laws of our country have laid them under neceffary reftraints. Reftraints in themfelves fo gentle and moderate, 23 will appear upon farther enquiry, that no man of fenfe or probity would wifh to fee them flackened. For all of us have it in our choice to do every thing that a good man would defire to do ; and are reftrained from nothing, but what would be pernicious either to ourfelves or our fellow citizens. So that this review of our fituation may fully juftify the obfervation of a learned French author, who indeed generally both thought and wrote in the fpirit of genuine freedom ˣ; and who hath not fcrupled to profefs, even

.{FS}

ᶻ Montefq. Sp. L. 11. 5.

.{FE}

in

.P 141

The RIGHTS OF PERSONS.

BOOK I.

Ch. 1.

in the very bofom of his native coglifh is the only nation in the world, where political or civil liberty is the direct end of it's conftitution. Recommending therefore to the ftudent in our laws a farther and more accurate feach into this extenfive and important title, I fhall clofe my remarks upon it with the expiring wifh of the famous father Paul to his country,

"ESTO PERPETUA !"

Blackstone Contents

Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 -

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose | Accessibility at Yale | Contact Us | Yale Law Library | University Library | Yale Law School | Search Morris | Search Orbis

# Exhibit B

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |
|---|---|---|---|---|---|---|---|---|---|---|

## Blackstone's Commentaries on the Laws of England
### Book the Fourth - Chapter the Fourteenth : Of Homicide

Blackstone Contents

CHAPTER THE FOURTEENTH.

OF HOMICIDE.

IN the ten preceding chapters we have confidered, firft, fuch crimes and mifdemefnors as are more immediately injurious to God and his holy religion; fecondly, fuch as violate or tranfgrefs the law of nations; thirdly, fuch as more efpecially affect the king, the father and reprefentative of his people; fourthly, fuch as more directly infringe the rights of the public or commonwealth, taken in it's collective capacity; and are now, laftly, to take into confideration thofe which in a more peculiar manner affect and injure individuals or private fubjects.

WERE thefe injuries indeed confined to individuals only, and did they affect none but their immediate objects, they would abfolutely under the notion of private wrongs; for which a fatisfaction would be due only to the party injured: the manner of obtaining which was the fubject of our enquiries in the preceding volume. But the wrongs, which we are now to treat of, are of a much more extenfive confequence; 1. Becaufe it is impoffible they can be committed without a violation of the laws of nature; of the moral as well as political rules of right: 2. Becaufe they include in them almoft always a breach of the public peace: 3. Becaufe by their example and evil tendency they threaten and endanger the fubverfion of all civil fo-

ciety.

.P 177
PUBLIC WRONGS.
Book IV.
Ch. 14.
ciety. Upon thefe accounts it is, that, befides the private fatisfaction due and given in may cafes to the individual, by action for the private wrong, the government alfo calls upon the offender to fubmit to public punifhment for the public crime. And the profecution of thefe offences is always at the fuit and in the name of the king, in whom by the texture of our conftitution the jus gladii, or executory power of the law, entirely refides. Thus too, in the old Gothic conftitution, there was a threefold punifhment inflicted on all delinquents: firft, for the private wrong to the party injured; fecondly, for the offence againft the king by difobedience to the laws; and thirdly, for the crime againft the public by their evil example [a]. Of which we may trace the groundwork, in what Tacitus tells us of his Germans [b]; that, whenever offenders were fined, "pars mulctae regi, vel civitati, "pars pfi qui vindicatur vel propinquis ejus, exfolvitur."

THESE crimes and mifdemefnors againft private fubjects are principally of three kinds; againft their perfons, their habitations, and their property.

OF crimes injurious to the perfons of private fubjects, the moft principal and important is the offence of taking away that life, which is the immediate gift of the great creator; and which therefore no man can be entitled to deprive himfelf or another of, but in fome manner either expreffly commanded in, or evidently deducible from, thofe laws which the creator has given us; the divine laws, I mean, of either nature or revelation. The fubject therefore of the prefent chapter will be, the offence of homicide or deftroying the life of man, in it's feveral ftages of guilt, arifing from the particular circumftances of mitigation or aggravation which attend it.

NOW homicide, or the killing of any human creature, is of three kinds; juftifiable, excufable, and felonious. The firft has no fhare of guilt at all; the fecond very little; but the third is

.{FS}
[a] Stiernhook. l. 1. c. 5.
[b] de mor. Germ. c. 12.
.{FE}

| VOL. IV. | | | | Y | | | the | |
|---|---|---|---|---|---|---|---|---|

.P 178
PUBLIC WRONGS.
Book IV.
Ch. 14.
the higheft crime againft the law of nature, that man is capable of committing.

I. JUSTIFIABLE homicide is of divers kinds.

1. SUCH as is owing to fome unavoidable neceffity, without any will, intention, or defire, and without any inadvertence or negligence, in the party killing, and therefore without any fhadow of blame. As, for inftance, by virtue of fuch an office as obliges one, in the execution of public juftice, to put a malefactor to death, who hath forfeited his life by the laws and verdict of his country. This is an act of neceffity, and even of civil duty; and therefore not only juftifiable, but commendable, where the law requires it. But the law muft require it, otherwife it is not juftifiable : therefore wantonly to kill the greateft of malefactors, a felon or a traitor, attainted or outlawed, deliberately, uncompelled, and extrajudicially, is murder [c]. For as Bracton [d] very juftly obferves, "iftud homicidium fi fit ex livore, "vel delectatione eftundendi humannum fanguinem, licet jufte occidatur "ifte, tamen occifor peccat mortaliter, propter intentionem corruptam." And farther, if judgment of death be given by a judge not authorized by lawful commiffion, and execution is done accordingly, the judge is guilty of murder [e]. and upon this account fir Matthew Hale himfelf, though he accepted the place of a judge of the common pleas under Cromwell's government (fince it is neceffary to decide the difputes of civil property in the worft of times) yet declined to fit on the crown fide at the affifes, and try prifoners; having very ftrong objections to the legality of the ufurper's commiffion [f]: a diftinction perhaps rather too refined; fince the unlawful of crimes is at leaft as neceffary to fociety, as maintaining the boundaries of property. Alfo fuch judgment, when legal, muft be executed by the proper officer, or his appointed deputy; for no one elfe is required by law to do it, that juftifies

.{FS}
[c] 1 Hal. P. C. 497.
[d] fel. 120.

[e] 1 Hawk. P. C. 70. 1 Hal. P. C. 497.

[f] Burnet in his life.

.{FE}
the
.P 179
PUBLIC WRONGS.
Book IV.
Ch. 14.

the homicide. If another perſon doth it of his own head, it is held to be murder [g]: even though it be the judge himſelf [h]. It muſt farther be executed, ſervato juris ordine; it muſt purſue the ſentence of the court. If an officer beheads one who is adjudged to be hanged, or vice verſa, it is murder [i]: for he is merely miniſterial, and therefore only juſtified when he acts under the authority and compulſion of the law; but, if a ſheriff changes one kind of death for another, he then acts by his own authority, which extends not to the commiſſion of homicide: and, beſides, this licence might occaſion a very groſs abuſe of his power. The king indeed may remit part of a ſentence; as, in the caſe of treaſon, all but the beheading: but this is no change, no introduction of a new puniſhment; and in the caſe of felony, where the judgment is to be hanged, the king (it hath been ſaid) cannot legally order even a peer to be beheaded [k]. But this doctrine will be more fully conſidered in a ſubſequent chapter.

AGAIN: in ſome caſes homicide is juſtifiable, rather by the permiſſion, than by the abſolute command of the law: either for the advancement of public juſtice, which without ſuch indemnification would never be carried on with proper vigour; or, in ſuch inſtances where it is committed for the prevention of ſome atrocious crime, which cannot otherwiſe avoided.

2. HOMICIDES, committed for the advancement of public juſtice, are; 1. Where an officer, in the execution of his office, either in a civil or criminal caſe, kills a perſon that aſſaults and refiſts him [l]. 2. If an officer, or any private perſon, attempts to take a man charged with felony, and is refiſted; and, in the endeavour to take him, kills him [m]. This is of a piece with the old Gothic conſtitutions, which (Stiernhook informs us [n]) "furem, ſi aliter capi non poſſet, occidere permittunt." 3. In caſe

.{FS}
[g] 1 Hal. P. C. 501. 1 Hawk. P. C. 70.

[h] Dalt. Juſt. c. 150.

[i] Finch. L. 31. 3 Inſt. 52. 1 Hal. P. C. 501.

[k] 3 Inſt. 52. 212.

[l] 1 Hal. P. C. 494. 1 Hawk. P. C. 71.

[m] 1 Hal. P. C. 494.

[n] de jure Goth. l. 3. c. 5.

.{FE}
                                                    Y 2
of
.P 180
PUBLIC WRONGS.
Book IV.
Ch. 14.

of a riot, or rebellious aſſembly, the officers endeavouring to diſperſe the mob are juſtifiable in killing them, both at common law [o], and by the riot act, 1 Geo. I. c. 5. 4. Where the priſoners in a gaol, or going to gaol, aſſault the gaoler or officer, and he in his defence kills any of them, it is juſtifiable, for the ſake of preventing an eſcape [p]. 5. If treſpaſſers in foreſts, parks, chaſes, or warrens, will not ſurrender themſelves to the keepers, they may be ſlain; by virtue of the ſtatute 21 Edw. I. ſt. 2. de malefaotoribus in parcis, and 3 & 4 W. & M. c. 10. But, in all theſe caſes, there muſt be an apparent neceſſity on the officer's ſide; viz. that the party could not be arreſted or apprehended, the riot could not be ſuppreſſed, the priſoners could not be kept in hold, the deer-ſtealers could not but eſcape, unleſs ſuch homicide were committed: otherwiſe, without ſuch abſolute neceſſity, it is not juſtifiable. 6. If the champions in a trial by battel killed either of them the other, ſuch homicide was juſtifiable, and was imputed to the juſt judgment of God, who was thereby perſumed to have decided in favour of the truth [q].

3. IN the next place, ſuch homicide, as is committed for the prevention of any forcible and atrocious crime, is juſtifiable by the law of nature [r]; and alſo by the law of England, as it ſtood ſo early as the time of Bracton [s], and as it is ſince declared by ſtatute 24 Hen. VIII. c. 5. If any perſon attempt to burn it [t,] and ſhall be killed in ſuch attempt, the ſlayer ſhall be acquitted and diſcharged. This reaches not to any crime unaccompanied with force, as picking of pockets, or to the breaking open of any houſe in the day time, unleſs it carries with it an attempt of robbery alſo. So the Jewiſh law, which puniſhed no theft with death, makes homicide only juſtifiable, in caſe of nocturnal houſe-breaking: "if a thief be found breaking up, and he be ſmitten

.{FS}
[o] 1 Hal. P. C. 495. 1 Hawk. P. C. 161.

[p] 1 Hal. P. C. 496.

[q] 1 Hawk. P. C. 71.

[r] Puff. L. of N. l. 2. c. 5.

[s] fol. 155.

[t] 1 Hal. P. C. 488.

.{FE}
"that
.P 181
PUBLIC WRONGS.
Book IV.
Ch. 14.

"that he die, no blood ſhall be ſhed for him: but if the ſun "be riſen upon him, there ſhall blood be ſhed for him; for he "ſhould have made full reſtitution [u]." At Athens, if any theft was committed by night, it was lawful to kill the criminal, if taken in the fact [w]: and, by the Roman law of the twelve tables, a thief might be ſlain by night with impunity; or even by day, if he armed himſelf with any dangerous weapon [x]: which amounts very nearly to the ſame as is permitted by our own conſtitutions.

THE Roman law alſo juſtifies homicide, when committed in defence of the chaſtity either of oneſelf or relations [y]: and ſo alſo, according to Selden [z], ſtood the law in the Jewiſh republic. The Engliſh law likewiſe juſtifies a woman, killing one who attempts to raviſh her [a]: and ſo too the huſband or father may juſtify killing a man, who attempts a rape upon his wife or daughter; but not if he takes them in adultery by conſent, for the one is forcible and felonious, but not the other [b]. And I make no doubt but the forcibly attempting a crime, of a ſtill more deteſtable nature, may be equally reſiſted by the death of the unnatural aggreſſor. For the one uniform principle that runs through our own, and all other laws, ſeems to be this: that where a crime, in itſelf capital, is endeavoured to be committed by force, it is lawful to repel that force by the death of the party attempting. But we muſt not carry this doctrine to the ſame viſionary length that Mr. Locke does; who holds [c], "that all manner of force without right upon a man's perſon, puts him in a "ſtate of war with the aggreſſor; and, of conſequence, that, "being in ſuch a ſtate of war, he may lawfully kill him that "concluſion may be in a ſtate of uncivilized nature, yet the law

.{FS}
[u] Exod. Xxii. 2.
[w] Potter. Antiqu. b. 1. c. 24.

[x] Cic. pro Milone. 3. Ff. 9. 2. 4.
[y] "Divus Hadrianus rejcripfit, eum qui "ftuprum fibi vel fuis infcrentem occidie,dimittendum." (Ff. 48. 88. 1.)
[z] de legib. Hebrrer. l. 4. c. 3.
[a] Bac. Elem. 34. 1 Hawk. P. C. 71.
[b] 1 Hal. P. C. 485, 486.
[c] Eff. on gov. p. 2. c. 3.
.{FE}
of
.P 182
PUBLIC WRONGS.
Book IV.
Ch. 14.
of England, like that of every other well-regulated community, is too tender of the public peace, too careful of the lives of the fubjects, to adopt fo contentious a fyftem; nor will fuffer with impunity any crime to be prevented by death, unlefs the fame, if committed, would alfo be punifhed by death.

IN thefe inftances of juftifiable homicide, you will obferve that the flayer is in no kind of fault whatfoever, not even in the minuteft degree; and is therefore to be totally acquitted and difcharged, with commendation rather than blame. But that is not quite the cafe in excufable homicide, the very name whereof imports fome fault, fome error, or omiffion; fo trivial however, that the law excufes it from the guilt of felony, though in ftrictnefs it judges it deferving of fome little degree of punifhment.

II. EXCUSABLE homicide is of two forts; either per infortunium, by mifadventure; or fe defendendo, upon a principle of felf-prefervation. We will firft fee wherein thefe two fpecies of homicide are diftinct, and then wherein they agree.

1. HOMICIDE per infortunium, or mifadventure, is where a man, doing a lawful act, without any intention of hurt, unfortunately kills another: as where a man is at work with a hatchet, and the head thereof flies off and kills a ftander by; or, where a perfon, qualified to keep a gun, is fhooting at a mark, and undefignedly kills a man [d]: for the act is lawful, and the effect is merely accidental. So where a parent is moderately correcting his child, a mafter his fervant or fcholar, or an officer punifhing a criminal, and happens to occafion his death, it is only mifadventure; for the act of correction was lawful: but if he exceeds the bounds of moderation, either in the manner, the inftrument, or the quantity of punifhment, and death enfues, it is manflaughter at leaft, and in fome cafes (according to the circumftances) murder [e]; for the act of immoderate correction is un-

.{FS}
[d] 1 Hawk. P. C. 73, 74.
[e] 1 Hal. P. C. 473, 474.
.{FE}
lawful.
.P 183
PUBLIC WRONGS.
Book IV.
Ch. 14.

lawful. Thus by an edict of the emperor Conftantine [f], when the rigor of the Roman law with regard to flaves began to relax and foften, a mafter was allowed to chaftife his flave with rods and imprifonment, and, if death accidentally enfued, he was guilty of no crime: but if he ftruck him with a club or a ftone, and thereby occafioned his death; or if in any other yet groffer manner "immoderate fuo jure utatur, tunc reus homicidii fit."

BUT to proceed. A tilt or tournament, the martial diverfion of our anceftors, was however an unlawful act; and fo are boxing and fwordplaying, the fucceeding amufement of their pofterity: and therefore if a knight in the former cafe, or a gladiator in the latter, be killed, fuch killing is felony of manflaughter. But, if the king command or permit fuch diverfion, it is faid to be only mifadventure, for then the act is lawful [g]. In like manner as, by the laws both of Athens and Rome, he who killed another in the pancratium, or public games, authorized or permitted by the ftate, was not held to be guilty of homicide [h]. Likewife to whip another's horfe, whereby he runs over a child and kills him, is held to be accidental in the rider, for he has done nothing unlawful; but manflaughter in the perfon who whipped him, for the act was a trefpafs, and at beft a piece of idlenefs, of inevitably dangerous confequence [i]. And in general, if death enfues in confequence of any idle, dangerous, and unlawful fport, as fhooting or cafting ftones in a town, or the barbarous diverfion of cock-throwing, in thefe and fimilar cafes, the flayer is guilty of manflaughter, and not mifadventure only, for thefe are unlawful acts [k].

2. HOMICIDE in felf-defence, or fe defendendo, upon a fudden affray, is alfo excufable rather than juftifiable, by the Englifh law. This fpecies of felf-defence muft be diftinguifhed from that juft now mentioned, as calculated to hinder the perpetra-

.{FS}
[f] Cod. L. 9. t. 14.
[g] 1 Hal. P. C. 473. 1 Hawk. P. C. 74.
[h] Plato de LL. lib. 7. Ff. 9. 2. 7.
[i] Hawk. P. C. 73.
[k] Ibid. 74. 1 Hal. P. C. 472. Foft. 261.
.{FE}
tion
.P 184
PUBLIC WRONGS.
Book IV.
Ch. 14.

tion of a capital crime; which is not only a matter of excufe, but of juftification. But the felf-defence, which we are now fpeaking of, is that whereby a man may protect himfelf from an affault, or the like, in the courfe of a fudden brawl or quarrel, by killing him who affaults him. And this is what the law expreffes by the word chance-medley, or (as fome rather chufe to write it) chaud-medley; the former of which in it's etymology fignifies a cafual affray, the latter an affray in the heat of blood or paffion: both of them pretty much the fame import; but the former is in common fpeech too often erronceoufly applied to any manner of homicide by mifadventure; whereas it appears by the ftatute 24 Hen. VIII. c. 5. and our antient books [l], that it is properly applied to fuch killing, as happens in felf-defence upon a fudden reencounter [m]. This right of natural defence does not imply a right of attacking: for, inftead of attacking one another for injuries paft or impending, men need only have recourfe to the proper tribunals of juftice. They cannot therefore legally exercife this right of preventive defence, but in fudden and violent cafes; when certain and immediate fuffering would be the confequence of waiting for the affiftance of the law. Wherefore, to excufe homicide by the plea of felf-defence, it muft appear that the flayer had no other poffible means of efcaping from his affailant.

IN fome cafes this fpecies of homicide (upon chance-medley in felf-defence) differs but little from manflaughter, which alfo happens frequently upon chance-medley in the proper legal fenfe of the word [n]. But the true criterion between them feems to be this: when both parties are actually combating at the time when the mortal ftroke is given, the flayer is then guilty of manflaughter; but if the flayer hath not begun to fight, or (having begun) endeavours to decline any farther ftruggle, and afterwards, being clofely preffed by his antagonift, kills him to avoid his own deftruction, this is homicide excufable by felf-defence [o]. For which reafon the law requires, that the perfon, who kills another

.{FS}
[i] Staundf. P. C. 16.

[m] 3 Inft. 55. 57. Foft. 275. 276.

[n] 3 Inft. 55.

[o] Foft. 277.
.{FE}
in
.P 185
PUBLIC WRONGS.
Book IV.
Ch. 14.

in his own defence, fhould have retreated as far as he conveniently or fafely can, to avoid the violence of the affault, before he turns upon his affailant; and that, no fictitioufly, or in order to watch his opportunity, but from a real tendernefs of fhedding his brother's blood. And though it may he cowardice, in time of war between two independent nations, to flee from an enemy; yet between two fellow fubjects the law countenances no fuch point of honour: becaufe the king and his courts are the vindices injuriarum, and will give too the party wronged all the fatisfaction he deferves [p]. In this the civil law alfo agrees with ours, or perhaps goes rather farther; "qui cum aliter tueri fe non poffunt, "damni culpam dederint, innoxii funt [q]. The party affaulted muft therefore flee as far as he conveniently can, either by reafon of fome wall, ditch, or other impediment; or as far as the fiercenefs of the affault will permit him [r]: for it may be fo fierce as not to allow him to yield a ftep, without manifeft danger of his life, or enormous bodily harm; and then in his defence he may kill his affailant inftantly. And this is the doctrine of univerfal juftice [s], as well as of the municipal law.

AND, as the manner of the defence, fo is alfo the time to be confidered: for if the perfon affaulted does not fall upon the aggreffor till the affray is over, or when he is running away, this is revenge and not defence. Neither, under the colour of felf defence, will the law permit a man to fcreen himfelf from the guilt of deliberate murder: for if two perfons, A and B, agree to fight a duel, and A gives the firft onfet, and B retreats as far as he fafely can, and then kills A, this is murder; becaufe of the previous malice and concerted defign [t]. But if A upon a fudden quarrel affaults B firft, and upon B's returning the affault, A really and bona fide flees; and, being driven to the wall, turns again upon B and kills him; this may be fe defendendo according to fome of our writers [u]:

.{FS}
[p] 1 Hal. P. C. 481. 483.

[q] Ff. 9. 2. 45.

[r] 1 Hal. P. C. 483.

[s] Puff. b. 2. c. 5. §. 13.

[t] 1 Hal. P. C. 479.

[u] 1 Hal. P. C. 482.
.{FE}

| VOL. IV. | | | | | Z | | though | |
|---|---|---|---|---|---|---|---|---|

.P 186
PUBLIC WRONGS.
Book IV.
Ch. 14.

though others [w] have thought this opinion too favourable; inafmuch as the neceffity, to which he is at laft reduced, originally arofe from his own fault. Under this excufe of felf-defence, the principal civil and natural relations are comprehended; therefore mafter and fervant, parent and child, hufband and wife, killing an affailant in the neceffary defence of each other refpectively, are excufed; the act of the relation affifting being conftrued the fame as the act of the party himfelf [x].

THERE is one fpecies of homicide fe defendendo, where the party flain is equally innocent as he who occafions his death: and yet this homicide is alfo excufable from the great univerfal principle of felf-prefervation, which prompts every man to fave his own life preferably to that of another, where one of them muft inevitably perifh. As, among others, in that cafe mentioned by lord Bacon [y], where two perfons, being fhipwrecked, and getting on the fame plank, but finding it not able to fave them both, one of them thrufts the other from it, whereby he is drowned. He who thus preferves his own life at the expence of another man's, is excufable though unavoidable neceffity, and the principle of felf-defence; fince their both remaining on the fame weak plank is a mutual, though innocent, attempt upon, and an endangering of, each other's life.

LET us next take a view of thofe circumftances wherein thefe two fpecies of homicide, by mifadventure and felf-defence, agree; and thofe are in their blame and punifhment. For the law fets fo high a value upon the life of a man, that it always intends fome mifbehaviour, it perfumes negligence, or at leaft a want of fufficient caution in him who was fo unfortunate as to commit it; who therefore is not altogether faultlefs [z]. And as to the neceffity which excufes a man who kills another fe defendendo,

.{FS}
[w] 1 Hawk. P. C. 75.

[x] 1 Hal. P. C. 484.

[y] Elem. c. 5. See alfo 1 Hawk. P. C. 73.

[z] 1 Hawk. P. C. 72.
.{FE}
lord
.P 187
PUBLIC WRONGS.
Book IV.
Ch. 14.

lord Bacon [a] entitles it neceffitas culpabilis, and thereby diftinguifhes it from the former neceffity of killing a thief or a malefactor. For the law intends that the quarrel or affault arofe from fome unknown wrong, or fome provocation, either in word or deed: and fince in quarrels both parties may be, and ufually are, in fome fault; and it fcarce can be tried who was originally in the wrong; the law will not hold the furvivor intirely guiltlefs. But it is clear, in the other cafe, that where I kill a thief that breaks into my houfe, the original default can never be upon my fide. The law befides may have a farther view, to make the crime of homicide more odious, and to caution men how they venture to kill another upon their own private judgment; by ordaining, that he who flays his neighbour, without an exprefs warrant from the law fo to do, fhall in no cafe be abfolutely free from guilt.

NOR is the law of England fingular in this refpect. Even the flaughter of enemies required a folemn purgation among the Jews; which implies that the death of a man, however it happens, will leave fome ftain behind it. And the mofaical law [b] appointed certain cities of refuge for him "who killed his neighbour unawares; as if a man goeth into the wood with his "neighbour to hew wood, and his hand fetcheth a ftroke with "the ax to cut down a tree, and the head flippeth from the "helve, and lighteth upon his neighbour that he die, he fhall "flee unto one of thefe cities and live." But it feems he was not held wholly blamelefs, any more than in the Englifh law; fince the avenger of blood might fly him before he reached his afylum, or if he afterwards ftirred out of it till the death of the high prieft. In the imperial law likewife [c] cafual homicide was excufed, by the indulgence of the emperor figned with his own fign manual, "adnotatione principis:" otherwife the death of a man, however committed, was in fome degree punifhable. Among the Greeks [d] homicide by misfortune was expiated by

.{FS}
[a] Elem. c. 5.
[b] Numb. c. 35. and Dcut. c. 19.
[c] Cod. 9. 16. 5.
[d] Plato de Leg. lib. 9.
.{FE}

voluntary

PUBLIC WRONGS.
BOOK IV.
Ch. 14.

voluntary banifment for a year[e]. In Saxony a fine is paid to the kindred of the flain; which alfo among the weftern Goths, was little inferior to that of voluntary homicide[f]: and in France[g] no perfon is ever abfolved in cafes of this nature, without a largefs to the poor, and the charge of certain maffes for the foul of the party killed.

THE penalty inflicted by our laws is faid by fir Edward Coke to have been antiently no lefs than death[h]; which however is with reafon denied by later and more accurate writers[i]. It feems rather to have confifted in a forfeiture, fome fay of all the goods and chattels, others of only part of them, by way of fine or weregild[k]: which was probably difpofed of, as in France, in pios ufus, according to the humane fuperftition of the times, for the benefit of his foul, who was thus fuddenly fent to his account, with all his imperfections on his head. But that reafon having long ceafed, and the penalty (efpecially if a total forfeiture) growing more fevere than was intended, in proportion as perfonal property has become more confiderable, the delinquent has now, and has had as early as our records will reach[l], a pardon and writ of reftitution of his goods as a matter of courfe and right, only paying for fuing out the fame[m]. And indeed, to prevent this expenfe, in cafes where the death has notorioufly happened by mifadventure or in felf-defence, the judges will ufually permit (if not direct) a general verdict of acquittal[n].

III. FELONIOUS homicide is an act of a very different nature from the former, being the killing of a human creature, of any

.{FS}
[e] To this expiation by banifhment the fpirit of Patroclus in Homer may be thought to allude, when he reminds Achilles, in the twenty third Iliad, that, when a child, he was obliged to flee his country for caufaully killing his playfellow; "???."
[f] Stiernh. de jure Goth. l. 3. c. 4.
[g] De. Mornay on the digeft.
[h] 2 Inft. 148. 315.
[i] 1 Hal. P. C. 425. 1. Hawk. P. C. 75. Foft. 282, & c.
[k] foft. 287.
[l] Foft. 283.
[m] 2 Hawk. P. C. 381.
[n] Foft. 288.
.{FE}

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | age | |

PUBLIC WRONGS.
BOOK IV.
Ch. 14.

age or fex, without juftification or excufe. This may be done, either by killing one's felf, or another man.

SELF-MURDER, the pretended heroifm, but real cowardice, of the Stoic philofophers, who deftroyed themfelves to avoid thofe ills which they had not the fortitude to endure, though the attempting it feems to be countenanced by the civil law[o], yet was punifhed by the Athenian law with cutting off the hand, which committed the defperate deed[p]. And alfo the law of England wifely and religioufly confiders, that no man hath a power to deftroy life, but by commiffion from God, the author of it: and, as the fuicide is guilty of a double offence; one fpiritual, in invading the prerogative of the Almighty, and rufhing into his immediate prefence uncalled for; the other temporal, againft the king, who hath an intereft in the prefervation of all his fubjects; the law has therefore ranked this among the higheft, crimes, making it a peculiar fpecies of felony, a felony committed on onefelf. a felo de fe therefore is he that deliberately puts an end to his own exiftence, or commits any unlawful malicious act, the confequence of which is his own death: as if, attempting to kill another, he runs upon his antagonift's fword; or, fhooting at another, the gun burfts and kills himfelf[q] . The party muft be of years of difcretion, and in his fenfes, elfe it is no crime. But this excufe ought not to be ftrained to that length, to which our coroners' juries are apt to carry it, viz. that the very act of fuicide is an evidence of infanity; as if every man who acts contrary to reafon, had no reafon at all: for the fame argument would prove every other criminal non compos, as well as the felf-murderer. The law very rationally judges, that every melancholy or hypochondriac fit does not deprive a man of the capacity of difcerning right from wrong; which is neceffary, as was obferved in a former chapter[r], to form a legal excufe. And

.{FS}
[o] "Si quis impatientia doloris, aut taedio "vitae, aut morbo, aut furore, aut pudore, "mori maluit, non animadvertatur in eum." Ff. 49. 16. 6.
[p] Pott. Antiqu. b. 1. c. 26.
[q] 1 Hawk. P. c. 68. 1 Hal. P. C. 413.
[r] See pag. 24.
.{FE}

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | there- | |

PUBLIC WRONGS.
BOOK IV.
Ch. 14.

therefore, if a real lunatic kills himfelf in a lucid interval, he is a felo de fe as much as another man[s].

BUT now the queſtion follows, what puniſhment can human laws inflict on one who hath withdrawn himſelf from their reach? They can only act upon what he has left behind him, his reputation and fortune: on the former, by an ignominious burial in the highway, with a ſtake driven through his body; on the latter, by a forfeiture of all his goods and chattels to the king: hoping that his care for either his own reputation, or the welfare of his family, would be ſome motive to reſtrain him from ſo deſperate and wicked an act. And it is obſervable, that this forfeiture has relation to the time of the act done in the felon's lifetime, which was the cauſe of his death. As if huſband and wife be poſſeſſed jointly of a term of years in land, and the huſband drowns himſelf; the land ſhall be forfeited to the king, and the wife ſhall not have it by ſurvivorſhip. For by the act of caſting himſelf into the water he forfeits the term; which gives a title to the king, prior to the wife's title by ſurvivorſhip, which could not accrue till the inſtant of her huſband's death[t] . And, though it muſt be owned that the letter of the law herein borders a little upon ſeverity, yet it is ſome alleviation that the power of mitigation is left in the breaſt of the ſovereign, who upon this (as on all other occaſions) is reminded by the oath of his office to execute judgment in mercy.

THE other ſpecies of criminal homicide is that of killing another man. But in this there are alſo degrees of guilt, which divide the offence into manſlaughter, and murder. The difference between which may be partly collected from what has been incidentally mentioned in the preceding articles, and principally conſiſts in this, that manſlaughter ariſes from the ſudden heat of the paſſions, murder from the wickendneſs of the heart.

.{FS}
[s] Hal. P. C. 412.
[t] Finch. L. 216.
.{FE}

| | | | | | | | I. MAN | |

I. MANSLAUGHTER is therefore thus defined[u]. the unlawful killing of another, without malice either expreſs or implied: which may be either voluntarily, upon a ſudden heat; or involuntarily, but in the commiſſion of ſome unlawful act. Theſe were called in the Gothic conſtitutions "homicidia vulgaria; quae "aut caſu, aut etiam ſponte committuntur, ſed in ſubitaneo quodam "iracundiae calore et impetu[u] ." And hence it follows, that in manſlaughter there can be no acceſſories before the fact; becauſe it muſt be done without premeditation.

AS to the firſt, or voluntary branch: if upon a ſudden quarrel two perſons fight, and one of them kills the other, this is manſlaughter: and ſo it is, if they upon ſuch an occaſion go out and fight in a field; for this is one continued act of paſſion[x] : and the law pays that regard to human frailty, as not to put a haſty and a deliberate act upon the ſame footing with regard to guilt. So alſo if a man be greatly provoked, as by pulling his noſe, or other great indignity, and immediately kills the aggreſſor, though this is not excuſable ſe defendendo, ſince there is no abſolute neceſſity for doing it to preſerve himſelf; yet neither is it murder, for there is no previous malice; but it is manſlaughter[y] . But in this, and in every other caſe of homicide upon provocation, if there be a ſufficient cooling-time for paſſion to ſubſide and reaſon to interpoſe, and the perſon ſo provoked afterwards kills the other, this is deliberate revenge and not heat of blood, and accordingly amounts to murder[z] . So, if a man takes another in the act of adultery with his wife, and kills him directly upon the ſpot; though this was allowed by the laws of Solon[a] , as likewiſe by the Roman civil law, (if the adulterer was found in the huſband's own houſe[b] ) and alſo among the antient Goths[c] ; yet in England it is not abſolutely ranked in the claſs

.{FS}
[u] 1 Hal. P. C. 466.
[w] Stiernh. de jure Goth. l. 3. c. 4.
[x] 1 Hawk. P. C. 82.
[y] Kelyng. 135.
[z] Foſt. 296.
[a] Piutarch. in vit. Solon.
[b] Ff. 48. 5. 24.
[c] Stiernh. de jure Goth. l. 3. c. 2.
.{FE}

| | | | | | | | | of | |

of juſtifiable homicide, as in caſe of a forcible rape, but it is manſlaughter[d] . It is however the loweſt degree of it: and therefore in ſuch a caſe the court directed the burning in the hand to be gently inflicted, becauſe there could not be a greater provocation[c] . Manſlaughter therefore on a ſudden provocation differs from excuſable homicide ſe defendendo in this: that in one caſe there is an apparent neceſſity, for ſelf-preſervation, to kill the aggreſſor; in the other no neceſſity at all, being only a ſudden act of revenge.

THE ſecond branch, or involuntary manſlaughter, differs alſo from homicide excuſable by miſadventure, in this; that miſadventure always happens in conſequence of a lawful act, but this ſpecies of manſlaughter in conſequence of an unlawful one. As if two perſons play at ſword and buckler, unleſs by the king's command, and one of them kills the other: this is manſlaugher, becauſe the original act was unlawful; but it is not murder, for the one had no intent to do the other any perſonal miſchief[f] . So where a perſon does an act, lawful in itſelf, but in an unlawful manner, and without due caution and circumſpection: as when a workman flings down a ſtone orpiece of timber into the ſtreet, and kills a man; this may be either miſadventure, manſlauthter, or murder, according to the circumſtances under which the original act was done: if it were in a country village, where few paſſengers are, and he calls out to all people to have a care, it is miſadventure only: but if it were in London, or other populous town, where people are continually paſſing, it is manſlaughter, though he gives loud warning[g] ; and murder, if he knows of their paſſing and gives no warning at all, for then it is malice againſt all mankind[h] . And, in general, when an involuntary killing happens in conſequence of an unlawful act, it will be either murder or manſlaughter according to the nature of the act which occaſioned it. If it be in proſecution of a felonious

.{FS}
[d] 1 Hal. P. C. 486.
[e] Sir. T. Raym. 212.
[f] 3 Inſt. 56.
[g] Kel. 40.
[h] 3 Inſt. 57.
.{FE}

| | | | | | | | intent, | |

intent, it will be murder; but if no more was intended than a mere trefpafs, it will only amount to manflaughter[i] .

NEXT, as to the punifhment of this degree of homicide: the crime of manflaughter amounts to felony, but within the benefit of clergy; and the offender fhall be burnt in the hand, and forfeit all his goods and chattels.

BUT there is one fpecies of manflaughter, which is punifhed as murder, the benefit of clergy being taken away from it by ftatute; namely, the offence of mortally ftabbing another, though done upon fudden provocation. For by ftatute 1 Jac. I. c. 8. when one thrufts or ftabs another, not then having a weapon drawn, or who hath not then firft ftricken the party ftabbing, fo that he dies thereof within fix months after, the offender fhall not have the benefit of clergy, though he did it not of malice aforethought. This ftatute was made on account of the frequent quarrels and ftabbings with fhort daggers, between the Scotch and the Englifh, at the acceffion of James the firft[k] ; and, being therefore of a temporary nature, ought to have expired with the mifchief, which it meant to remedy. For, in point of folid and fubftantial juftice, it cannot be faid that the mode of killing, whether by ftabbing, ftrangling or fhooting, can either extenuate or enhance the guilt: unlefs where, as in the cafe of poifoning, it carries with it an internal evidence of cool and deliberate malice. But the benignity of the law hath conftrued the ftatute fo favourably in behalf of the fubject, and fo ftrictly when againft him, that the offence of ftabbing ftands almoft upon the fame footing, as it did at the common law[l] . thus, (not to repeat the cafes before-mentioned, of ftabbing an adulterefs, & c. which are barely manflaughter, as at common law) in the conftruction of this ftatute it hath been doubted, whether, if the deceafed had ftruck at all before the mortal blow given, this takes it out of the ftatute, though in the preceding quarrel the

{FS}
[i] Fofter. 258.

[k] 1 Lord Raym. 140.

[l] Foft. 299, 300.

{FE}

| VOL. IV. | | | | | | A a | | | ftabber | |
|---|---|---|---|---|---|---|---|---|---|---|

.P 194
PUBLIC WRONGS.
BOOK IV.
Ch. 14.

ftabber had given the firft blow; and it feems to be the better opinion, that this is not within the ftatute[m] · Alfo it hath been refolved, that the killing a man by throwing a hammer or other weapon is not within the ftatute; and whether a fhot with a piftol be fo or not, is doubted[n] · But if the party flain had a cudgel in his hand, or had thrown a pot or a bottle or difcharged a piftol at the party ftabbing, this is a fuffcient having a weapon drawn on his fide within the words of the ftatute[o] .

2. WE are next ot confider the crime of deliberate and wilful murder; a crime at which human nature ftarts, and which is I believe punifhed almoft univerfally throughout the world with death. The words of the mofacial law (over and above the general precept to Noah[p] , that "whofo fheddeth man's blood, by "man fhall his blood be fhed") are very emphatical in prohibiting the pardon of murderers[q] . "Moreover ye fhall take no fatisfaction for the life of a murderer, who is guilty of death, "but he fhall furely be put to death; for the land cannot be " cleanfed of the blood that is fhed therein, but by the blood "of him that fhed it." And therefore out law has provided one courfe of profecution, (that by appeal, of which hereafter) wherein the king himfelf is excluded the power of pardoning murder: fo that, were the king of England fo inclined, he could not imitate that Polifh monarch mentioned by Puffendorf[r] ; who thought proper to remit the penalties of murder to all the nobility, in an edict with this arrogant preamble, "nos, divini "juris rigorem moderantes, & c. " But let us now confider the definition of this great offence.

THE name of murder was antiently applied only to the fecret killing of another[s] ; (which the word, moerda, fignifies in the Teutonic language[t] ) and it was defined "homicidium quod nullo

{FS}
[m] Foft. 301. 1 Hawk. P. C. 77.

[n] 1 Hal. P. C. 470.

[o] 1 Hawk. P. C. 77.

[p] Gen. ix. 6.

[q] Numb. xxxv. 31.

[r] L. of N. b. 8. c. 3.

[s] Dialog. de Scacch. l. 1. c. 10.

[t] Stiernh. de jure Sueon. l. 3. c. 3.

{FE}

| | | | | | | | "vidente, | | |
|---|---|---|---|---|---|---|---|---|---|

.P 195
PUBLIC WRONGS.
BOOK IV.
Ch. 14.

"vidente, nullo fciente, clam perpetratur[u] :" for which the will wherein it was committed, or (if that were too poor) the whole hundred, was liable to a heavy amercement; which amercement itfelf was alfo denominated murdrum[w] . This was an antient ufage among the Goths in Sweden and Denmark; who fuppofed the neighbourhood, unlefs they produced the murderer, to have perpetrated or at leaft connived at the murder[x] : and, according to Bracton[y] , was introduced into this kingdom by king Canute, to prevent his countrymen the Danes from being privily murdered by the Englifh; and was afterwards continued by William the conqueror, for the like fecurity to his own Normans[z] . And therefore if, upon inquifition had, it appeared that the perfon found flain was an Englifhman, (the prefentment whereof was denominated englefcherie[a] ) the country feems to have been excufed from this burthen. But, this difference being totally abolifhed by ftatute 14 Edw. III. c. 4. we muft now (as is obferved by Staundforde[b] ) define murder in quite another manner, without regarding whether the party flain was killed openly or fecretly, or whether he was of Englifh or foreign extraction.

MURDER is therefore now thus defined, or rather defcribed, by fir Edward Coke[c] ; "when a perfon, of found memory and "difcretion, unlawfully killeth any reafonable creature in being "and under the king's peace, with malice aforethought, either "exprefs or implied." The beft way of examining the nature of this crime will be by confidering the feveral branches of this definition.

FIRST, it muft be committed by a perfon of found memory and difcretion: for a lunatic or infant, as was formerly obferved, are incapable of committing any crime; unlefs in fuch cafes where

{FS}
[u] Glanv. l. 14. c. 3.

[w] Bract. l. 3. tr. 2. c. 15. §. 7. Stat. Marlbr. c. 26 Foft. 281.

[x] Stiernh. l. 3. c. 4.

[y] l. 3. tr. 2. c. 15.

[z] 1 Hal. P. C. 447.

[a] Bract. ubi fupr.

[b] P. C. I. 1. c. 10.

[c] 3 Inft. 47.

.{FE}

| | | | | | A a a | | | | | they | |
|---|---|---|---|---|---|---|---|---|---|---|---|

.P 196
PUBLIC WRONGS.
BOOK IV.
Ch. 14.
they fhew a confcioufnefs of doing wrong, and of courfe a difcretion, between good and evil.

NEXT, it happens when a perfon of fuch found difcretion unlawfully killeth. The unlawfulnefs arifes from the killing without warrant or excufe: and there muft alfo be an actual killing to conftitute murder; for a bare affault, with intent to kill, is only a great mifdemefnor, though formerly it was held to be murder[d]. The killing may be by poifoning, ftriking, ftarving, drowning, and a thoufand other forms of death, by which human nature may be overcome. Of thefe the moft deteftable of all is poifon; becaufe it can of all others be the leaft prevented either by manhood or forethought[e]. And therefore by the ftatute 22 Hen. VIII. c. 9. it was made treafon, and a more grievous and lingering kind of death was inflicted on it than the common law allowed; namely, boiling to death; but this act did not live long, being repealed by 1 Edw. VI. c. 12. There was alfo, by the antient common law, one fpecies of killing held to be murder, which is hardly fo at this day, nor has there been an inftance wherein it has been held to be murder for many ages paft[f]: I mean by bearing falfe witnefs againft another, with an exprefs premeditated defign to take away his life, fo as the innocent perfon be condemned and executed[g]. The Gothic laws punifhed in this cafe, both the judge, the witneffes, and the profecutor; "peculiari poena judicem puniunt; peculiari "teftes, quorum fides judicem feduxit; peculiari denique et maxima "auctorem, ut homicidam[h]." And, among the Romans, the lex Cornelia, de ficariis, punifhed the falfe witnefs with death, as being guilty of a fpecies of affaffination[i]. And there is no doubt

.{FS}

[d] 1 Hal. P. C. 425.

[e] 3 Inft. 48.

[f] Foft. 132. In the cafe of Macdaniel and Berry, reported by fir Michael Fofter, though the attorney general declined to argue this point of law, I have grounds to believe it was not from any apprchenfion that the point was not maintainable, but from other pudential reafons. Nothing therefore fhould be concluded from the waiving of that profecution.

[g] Mirror. c. 1. §. 9. Britt. c. 5. Bracton. I. 3. c. 4.

[h] Stiernh. de jure Goth. I. 3. c. 3.

[i] Ff. 48. 8. 1.

.{FE}

| | | | | | | | | | but | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

.P 197
PUBLIC WRONGS.
BOOK IV.
Ch. 14.
but this is equally murder in foro confcientiae as killing with a fword; though the modern law (to avoid the danger of deterring witneffes from giving evidence upon capital profecutions, if it muft be at the peril of their own lives) has not yet punifhed it as fuch. If a man however does fuch an act, of which the probable confequence may be, and eventually is, death; fuch killing may be murder, although no ftroke be ftruck by himfelf: as was the cafe of the unnatural fon, who expofed his fick father to the air, againft his will, by reafon whereof he died[k]; and, of the harlot, who laid her child in an orchard, where a ricke ftruck it and killed it[l]. So too, if a man hath a beaft that is ufed to do mifchief; and he, knowing it, fuffers it to go abroad, and it kills a man; even this is manflaughter in the owner: but if he had purpofey turned it loofe, though barely to frighten people and make what is called fport, it is with us (as in the Jewith law) as much murder, as if he had incited a bear of a dog to worry them[m]. If a phyfician or furgeon gives his patient a potion or plaifter to cure him, which contrary to expectation kills him, this is neither murder, nor manflaughter, but mifaventure; and he fhall not be punifhed criminally, however laible he might formerly have been to a civil action for neglect or ignorace[n]: but it hath been holden, that if it be not a regular phyfician or furgeon, who adminifters the medicine or performs the operation, it is manflaughter at the leaft[o]. Yet fir Matthew Hale very juftly queftions the law of this determination; fince phylic and falves were in ufe before licenfed phyficians and furgeons: wherefore he treats this doctrine as apocryphal, and fitted only to gratify and flatter licentiates and doctors in phyfic; though it may be of ufe to make people cautious and wary, how they meddle too much in fo dangerous an employment[p]. In order alfo to make the killing murder, it is requifite that the party die within a year and a day after the ftroke received, or caufe of death adminiftred;

.{FS}

[k] 1 Hawk. P. C. 78.

[l] 1 Hal. P. C. 432.

[m] Ibid., 431.

[n] Mirr. c. 4. §. 16. See Vol. III. pag. 122.

[o] Britt. c. 5. 4. Inft. 251.

[p] 1 Hal. P. C. 430.

.{FE}

| | | | | | | | | | in | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

.P 198
PUBLIC WRONGS.
BOOK IV.
Ch. 14.
in the computation of which, the whole day upon which the the hurt was done fhall be reckoned the firft[q].

FARTHER; the perfon killed muft be "a reafonable creature "in being, and under the king's peace," at the time of the killing. Therefore to kill an alien, a Jew, or an outlaw, who are all under the king's peace or protection, is as much murder as to kill the moft regular born Englifhman; except he be an alienenemy, in time of war. To kill a child in it's mother's womb, is now no murder, but a great mifprifion: but if the child be born alive, and dieth by reafon of the potion or bruifes it received in the womb, it is murder in fuch as adminiftred or gave them[s]. But, as there is one cafe where it is difficult to prove the child's being born alive, namely, in the cafe of the murder of baftard children by the unnatural mother, it is enacted by ftatute 21 Jac. I. c. 27. that if any woman be delivered of a child, which if born alive fhould by law be a baftard; and endeavours privately to conceal it's death, by burying the child or the like; the mother fo offending fhall fuffer death as in the cafe of murder, unlefs fhe can prove by one witnefs at leaft that the child was actually born dead. This law, which favours pretty ftrongly of feverity, in making the concealment of the death almoft conclufive evidence of the child's being murdered by the mother, is neverthelefs to be alfo met with in the criminal codes of many other nations of Europe; as the Danes, the Swedes, and the French[t]: but I apprehend it has of late years been ufual with us in England, upon trials for this offence to require fome fort of prefumptive evidence that the child was born alive, before the other conftrained prefumption (that the child, whofe death is concealed, was therefore killed by it's parent) is admitted to convict the prifoner.

LASTLY, the killing muft be committed with malice aforethought, to make it the crime of murder. This is the grand cri-

.{FS}
[q] 1 Hawk. P. C. 79.
[r] 3 Inft. 50. 1 Hal. P. C. 433.
[s] 3 Inft. 50. 1 Hawk. P. C. 80.
[t] See Barrington on the ftatutes. 425.
.{FE}

| | | | | | | | | terion, | | |
|---|---|---|---|---|---|---|---|---|---|---|

.P 199
PUBLIC WRONGS.
BOOK IV.
Ch. 14.

terion, which now diftinguifhes murder from other killing: and this malice prepenfe, malitia praecogitata, is not fo properly fpite or malevolence to the deceafed in particular, as any evil defign in general; the dictate of a wicked, depraved, and malignant heart[u] ; un difpofition a faire un male chofe[w] . and it may be either exprefs, or implied in law. Exprefs malice is when one, with a fedate deliberate mind and formed defign, doth kill another: which formed defign is evidenced by external circumftances difcovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted fchemes to do him fome bodily harm[x] . This takes in the cafe of deliberate duelling, where both parties meet avowedly with an intent to murder: thinking it their duty, as gentlemen, and claiming it as their right, to wanton with their won lives and thofe of their fellow creatures; without any warrant or authority from any power either divine or human, but in direct contradiction to the laws both of God and man: and therefore the law has juftly fixed the crime and punifhment of murder, on them, and on their feconds alfo[y] . Yet it requires fuch a degree of paffive valour, to combat the dread of even underferved contempt, arifing from the falfe notions of honour too generally received in Europe, that the ftrongeft prohibitions and penalties of the law will never be intirely effectual to eradicate this unhappy cuftom; till a method be found out of compelling the original aggreffor to make fome other fatisfaction to the affronted party, which the world fhall efteem equally reputable, as that which is now given at the hazard of the life and fortune, as well of the perfon infulted, as of him who hath given the infult. Alfo, if even upon a fudden provocation one beats another in a cruel and unufual manner, fo that he dies, though he did not intend his death, yet he is guilty of murder by exprefs malice; that is, by an exprefs evil defign, the genuine fenfe of malitia. As when a park-keeper tied a boy, that was ftealing wood, to a horfe's tail, and dragged him along the park; when a mafter corrected his

.{FS}
[u] Fofter. 256.
[w] 2 Roll. Rep. 461.
[x] 1 Hal. P. C. 451.
[y] 1 Hawk. P. C. 82.
{Fe}

| | | | | | | | | fervant | | |
|---|---|---|---|---|---|---|---|---|---|---|

.P 200
PUBLIC WRONGS.
BOOK IV.
Ch. 14.

fervant with an iron bar, and a fchoolmafter ftamped on his fcholar's belly; fo that each of the fufferers died; thefe were juftly held to be murders, becaufe the correction being exceffive, and fuch as could not proceed but from a bad heart, it was equivalent to a deliberate act of flaughter[z] . Neither fhall he be guilty of a lefs crime, who kills another in confequence of fuch a wilful act, as fhews him to be an enemy to all mankind in general; as going deliberately with a horfe ufed to ftrike, or difcharging a gun, among a multitude of people[a] . so if a man refolves to kill the next man he meets, and does kill him, it is murder, although he knew him not; for this is univerfal malice. And, if two or more come together to do an unlawful act againft the king's peace, of which the probable confequence might be bloodhed; as to beat a man, to commit a riot, or to rob a park; and one of them kills a man; it is murder in them all, becaufe of the unlawful act, the malitia praecogitata, or evil intended beforehand [b].

ALSO in many cafes where no malice is expreffed, the law will imply it: as, where a man wilfully poifons another, in fuch a deliberate act the law prefumes malice, though no particular emnity can be proved[c] . And if a man kills another fuddenly, without any; or without a confiderable provocation, the law implies malice; for no perfon, unlefs of an abandoned heart, would be guilty of fuch an act, upon a flight or no apparent caufe. No affront, by words, or geftures only, is a fufficient provocation, fo as to excufe or extenuate fuch acts of violence as manifeftly endanger the life of another[ds] . But if the perfon fo provoked had unfortunately killed the other, by beating him in fuch a manner as fhewed only an intent to chaftife and not to kill him, the law fo far confiders the provocatoin of contumelious behaviour, as adjudge it only manflaughter, and not murder[e] . In like manner if one kills an officer of juftice, either

.{FS}
[z] 1 Hal. P. C. 454. 47. 4.
[a] 1 Hawk. P. C. 74.
[b] Ibid. 84.

1. Hal. P. C. 455.

[d] 1 Hawk. P. C. 82. 1 Hal. P. C. 455, 456.
[e] Foft. 291.
civil
.P 201
PUBLIC WRONGS.
BOOK IV.
Ch. 14.

civil or criminal, in the execution of his duty, or any of his affiftants endeavouring to conferve the peace, or any private perfon endeavouring to fupppfres an affray or apprehend a felon, knowing his authority or the intention with which he interpofes, the law will imply malice, and the killer fhall be guilty of murder[f] . And if one intends to do another felony, and undefignedly kills a man, this is alfo murder[g] . Thus if one fhoots at A and miffes him, but kills B, this is murder; becaufe of the previous felonious intent, which the law transfers from one to the other. The fame is the cafe, where one lays poifon for A; and B, againft whom the prifoner had no malicious intent, takes it, and it kills him; this is likewife murder[h] . It were endlefs to go through all the cafes of homicide, which have been adjudged either expreffly, or impliedly, malicious: thefe therefore may fuffice as a fpecimen; and we may take it for a general rule, that all homicide is malicious, and of courfe amounts to murder, unlefs where juftified by the command or permiffion of the law; excufed on a principle of accident or felf-prefervation; or alleviated into manflaughter, by being either the involuntary confequence of fome act, not ftrictly lawful or (if voluntary) occafioned by fome fudden and fufficiently violent provocation. And all thefe circumftances of juftification, excufe, or alleviation, it is incumbent upon the prifoner to make out, to the fatisfaction of the court and jury: the latter of whom are to decide whether the circumftances alleged be proved to have actually exifted; the former, how far they extend to take away or mitigate the guilt. For all homicide is prefumed to be malicious, until the contrary appeareth upon evidence[i] .

THE punifhment of murder, and that of manlaughter, were formerly one and the fame; both having the benefit of clergy: fo that none but unlearned perfons, who leaft knew the guilt of

{FS}

[f] 1 Hal. P. C. 457. Fofter. 308, & c.

[g] 1 Hal. P. C. 465.

[h] 1 Hal. P. C. 466.

[i] Foft. 255.

{FE}

| VOL. IV. | | | | B b | | | | it, |

.P 202

PUBLIC WRONGS.

BOOK IV.

Ch. 14.

it, were put to death for this enormous crime[k] . But now, by ftatute 23 Hen. VIII. c. 1. and 1 Edw. VI. c. 12. the benefit of clergy is taken away from murder though malice prefenfe. In atrocious cafes it was frequently ufual for the court to direct the murderer, after execution, to be hung upon a gibbet in chains, near the place where the fact was committed: but this was no part of the legal judgment; and the like is ftill fometimes practiced in the cafe of notorious thieves. This, being quite contrary to the exprefs command of the mofacial law[l] , feems to have been borrowed from the civil law; which, befides the terror of the example, gives alfo another reafon for this practice, viz. that it is a comfortable fight to the relations and friends of the deceafed[m] . But now in England, it is enacted by ftatute 25 Geo II. c. 37. that the judge, before whom a murderer is convicted, fhall in paffing fentence direct him to be executed on the next day but one, (unlefs the fame fhall be funday, and then on the monday following) and that his body be delivered to the furgeons to be diffected and anatomized[n] ; and that the judge may direct his body to be afterwards hung in chains, but in no wife to be buried without diffection. And, during the fhort but awful interval between fentence and execution, he prifoner fhall be kept alone, and fuftained with only bread and water. But a power is allowed to the judge, upon good and fufficient caufe, to refpite the execution, and relax the other reftraints of this act.

BY the Roman law, parricide, or the murder of one's parents or children, was punifhed in a much feverer manner than any other king of homicide. After being fcourged, the delinquents were fewed up in a leathern fack, with a live dog, a cock, a vi-

{FS}

[k] 1 Hal. P. C. 450.

[l] "The body of a malefactor fhall not "remain all night upon the tree; but thou "fhalt in any wife bury him in that day, "that the land be not defiled." Deut. xxi. 23.

[m] "Famofos latrones, in his locis, ubi graffati funt, furca figendos placuit; ut, et confpectu deterreantur alii, et folatio fit cognatis interemptorum, codem loco poena reddita, "in quo latrones bomicidia feciffent." Ff. 48. 19 28. §. 15.

[n] Foft. 107.

{FE}

per

.P 203

PUBLIC WRONGS.

BOOK IV.

Ch. 14.

per, and an ape, and fo caft into the fea[o] . Solon, it is true, in his laws, made none againft parricide; apprehending it mpoffble that any one fhould be guilty of fo unnatural a barbarity[p] . And the Perfinas, according to Herodotus, entertained the fame notion, when they adjudged all perfons who killed their reputed parents to be baftards. And, upon fome fuch reafon as this, muft we account for the omiffion of a exemplary punifhment for this crime in our Englifh laws; which treat it no otherwife than as fimple murder, unlefs the child was alfo the fervant of his parent[q] .

FOR, though the breach of natural relation is unobferved, yet the breach of civil or ecclefiaftical connexious, when coupled with murder, denominates it a new offence; no lefs than a fpecies of treafon, called parva proditio, or petit treafon: which however is nothing elfe but an aggravated degree of murder[r] ; although, on account of the violation of private allegiance, it is ftigmatized as an inferior fpecies of treafon[s] . And thus, in the antient Gothic conftitution, we find the breach both of natural and civil relations ranked in the fame clafs with crimes againft the fate and the fovereign[t] .

PETIT treafon, according to the ftatute 25 Edw. III. c. 2. may happen three ways: by a fervant killing his mafter, a wife her hufband, or an ecclefiaftical perfon (either fecular, or regular) his fuperior, to whom he owes faith and obedience. A fervant who kills his mafter whom he has left, upon a grudge conceived againft him during his fervice, is guilty of petit treafon: for the traiterous intention was hatched while the relation fubfifted between them; and this is only an execution of that intention [u] . So if a wife is divorced a menfa et thoro, ftill the vinculum ma-

{FE}

[o] Ff. 48. 9. 9.

[p] Cic. Pro. S. Rofcio. §. 25.

[q] 1 Hal. P. C. 380.

[r] Fofter. 107. 324. 336.

[s] See pag. 75.

[t] "Omnium graviffima cenfetur vie facta "at incolis in patriam, fubbitis in regem, "liberis in parentes, maritis in uxores, (et "vice verfa) fervis in dominos, aut etiam "at bomine in femet ipfum." Stierhn. de jure Goth. l. 3. c. 3.

[u] 1 Hawk. P. C. 89. 1 Hal. P. C. 380.

{FE}

| B b 2 | | | | trimonii | |

.P 204

PUBLIC WRONGS.

BOOK IV.

Ch. 14.

trimonii fubfifts; and if the kills fuch divorced hufband, fhe is a traitrefs[w] . And a clergyman is underftood to owe canonical obedience, to the hifhop who ordained him, to him in whofe diocefe he is beneficed, and alfo to the metropolitan of fuch fuffragan or diocefan bifhop: and therefore to kill any of thefe is petit treafon[x] . As to the reft, whatever has been faid, or remains to be obferved hereafter, with refpect to wilful murder, is alfo applicable to the crime of petit treafon, which is no other than murder in it's moft odious degree: except that the trial fhall be as in cafes of high treafon, before the improvements therein made by the ftatutes of William III[y] ; and alfo except in it's punifhment.

THE punifhment of petit treafon, in a man, is to be drawn and hanged, and, in a woman, to be drawn and burned[z] : the idea of which latter punifhment feems to have been handed down to us from the laws of the antient Druids, which condemned a woman to be burned for murdering her hufband[a] ; and it is now the ufual punifhment for all forts of treafons committed by thofe of the female fex[b] . Perfons guilty of petit treafon were firft debarred the benefit of clergy by ftatute 12 Hen. VII. C. 7.

{FS}

[w] 1 Hal. P. C. 381.
[x] Ibid.
[y] Foft. 337.
[z] 1 Hal. P. C. 382. 3. Inft. 311.
[a] Cacfar de bell. Gall. l. 6. c. 18.
[b] See pag. 93.
.{FE}
.P 205
PUBLIC WRONGS.
BOOK IV.
Ch. 15.



© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose    Accessibility at Yale    Contact Us    Yale Law Library    University Library    Yale Law School    Search Morris    Search Orbis

# Exhibit C

[1939] 1 K. B. 687
**3 All E. R. 615 (1938)**

# REX *v.* BOURNE

CENTRAL CRIMINAL COURT

Macnaghten, J.

18-19 July 1938.

*Syllabus:* A young girl, not quite 15 years of age, was pregnant as the result of rape. A surgeon, of the highest skill, openly, in one of the London hospitals, without fee performed the operation of abortion. He was charged under the Offences against the Person Act 1861, s. 58, with unlawfully procuring the abortion of the girl.

The jury were directed that it was for the prosecution to prove beyond reasonable doubt that the operation was not performed in good faith for the purpose only of preserving the life of the girl. The surgeon had not got to wait until the patient was in peril of immediate death, but it was his duty to perform the operation if, on reasonable grounds and with adequate knowledge, he was of opinion that the probable consequence of the continuance of the pregnancy would be to make the patient a physical and mental wreck.

[**Editorial Note:** As the accused was found not guilty, the statement as to the law in this matter is in the form of the direction to the jury. The judge carefully distinguishes between danger to life and danger to health, and between the act of the professional abortionist and an operation openly performed by a qualified surgeon. The case is one of first impression, and is, therefore, the only statement of the law as to the duties of a surgeon in such cases. As to Abortion, see HALSBURY (Hailsham Edn.), Vol. 9, pp. 458-460, paras. 783-785; and for Cases, see Digest, Vol. 15, pp. 836-838, Nos. 9190-9205.]

TRIAL OF AN INDICTMENT WITH A JURY. The defendant was charged under the Offences against the Person Act 1861, s. 58, that he unlawfully procured the abortion of a girl aged about 15 years. The facts are fully stated in the summing up.

*The Attorney-General (Sir Donald Sumervell K.C.), L. A. Byrne* and *H. Elam for the Crown;*

*Roland Oliver K.C.,* and *Gerald Thesiger* for the defendant.

MACNAGHTEN J. Members of the jury, now that you have heard all the evidence and the speeches of counsel, it becomes my duty to sum up the case to you and to give you the necessary directions in law, and then it will be for you to consider the facts in relation to the law as laid down by me, and, after consideration, to deliver your verdict. You no doubt are aware that, under our system for the administration of justice, in a trial by jury it is for the judge to give directions to the jury upon matters of law, and it is for the jury to determine the facts. The jury, and the jury alone, are the judges of the facts in the case.

The charge against Mr. Bourne is the very grave charge under the Offences against the Person Act 1861, s. 58, that he unlawfully procured the abortion of the girl who was the first witness in the case. It is so grave a crime that the punishment may be penal servitude for life. It is one of those crimes, like murder, which is only triable by the judges of the High Court, and, judging by the cases that come before the court, [3 All E. R. 616] it is a crime by no means uncommon. This is the second case at these July sessions at this court where a charge of an offence against that section has been preferred, and I mention that case only to show you how different the case now before you is from the type of case which usually comes before a criminal court. In that case, a woman without any medical skill or any medical qualifications did what is alleged against Mr. Bourne here: she unlawfully used an instrument for the purpose of procuring the miscarriage of a pregnant girl. She did it for money. £2 5s. was her fee, and she came from a distance to a place in London to do it. £1 had to be paid to make the appointment. She came, she used her instrument, and, within an interval of time measured not by minutes but by seconds, the victim of her malpractice was dead on the floor. She was paid the rest of her fee and she went away. That is the class of case that usually comes before the court. The case here is very different. A man of the highest skill, openly, in one of our great hospitals, performs the operation. Whether it was legal or illegal you will have to determine, but he performs the operation as an act of charity, without fee or reward, and unquestionably believing that he was doing the right thing, and that he ought, in the performance of his duty as a member of a profession devoted to the alleviation of human suffering, to do it. That is the case that you have to try today.

It is, I think, true that it is a case of first instance, first impression. So far as I know, the matter has never arisen before a jury for them to determine in circumstances such as these, and there was, it seems, even amongst counsel some doubt as to what was the proper expression of the law in such a case as this. So, yesterday, in response to a request by Mr. Oliver, I indicated to you my view of the law. You will take the law from me. If I err in stating to you what the law is, and if you find the accused guilty, there is a Court of Criminal Appeal which will put the matter right. I have had an opportunity of reading the direction that I gave you yesterday, and I see no reason to alter or to modify it at all. The question that you have got to determine is whether the Crown has proved to your satisfaction beyond reasonable doubt that the act which Mr. Bourne admittedly did was not done in good faith for the purpose only of preserving the life of the girl. If the Crown has failed to satisfy you of that, Mr. Bourne is entitled, by the law of this land, to a verdict of acquittal. On the other hand, if you are satisfied beyond all real doubt that Mr. Bourne did not do it in good faith for the purpose only of preserving the life of the girl, your verdict should be a verdict of guilty.

There has been much discussion before you as to the meaning of the words "preserving the life of the mother." I will deal with that in a moment, but, before doing so, I desire to say that I fully

2

agree with the criticism of Mr. Oliver that the Infant Life (Preservation) Act 1929, is dealing with the case--indeed, I think I explained it to you yesterday--where the child is killed while it is being delivered from the body of [617] the mother. It provides that no one is to be found guilty of the offence created by the Act--namely, "child destruction"--unless it is proved that:

> ' the act which caused the death of the child was not done in good faith for the purpose only of preserving the life of the mother.'

Those words express what, in my view, has always been the law with regard to the procuring of an abortion, and, although not expressed in s. 58 of the Act of 1861, they are implied by the word "unlawful" in that section. No person ought to be convicted under s. 58 of the Act of 1861 unless the jury are satisfied the act was not done in good faith for the purpose only of preserving the life of the mother. My view is that it has always been the law that the Crown have got to prove the offence beyond reasonable doubt, and it has always been the law that, on a charge of procuring abortion, the Crown have got to prove that the act was not done in good faith for the purpose of preserving the life of the mother. It is said--and, I think, rightly--that this is a case of great importance to the public, and more especially to the medical profession, but you will observe that it has nothing to do with the ordinary cases of procuring abortion to which I have already referred. In those cases, the operation is performed by a person of no skill, with no medical qualifications, and there is no pretence that it is done for the preservation of the mother's life. Cases of that sort are in no way affected by the consideration of the question that is put before you. In the ordinary cases, no question of that sort can arise. It is obvious that that defence could not be available to the professional abortionist. As I say, you have heard a great deal of discussion as to the difference between danger to life and danger to health. It may be that you are more fortunate than I am, but I confess that I have felt great difficulty in understanding what the discussion really meant. Life depends upon health, and it may be that health is so gravely impaired that death results. There was one question that was asked by the Attorney-General in the course of his cross-examination of Mr. Bourne, where the matter was put thus:

> 'I suggest to you, Mr. Bourne, that there is a perfectly clear line--there may be border-line cases--there is a clear line of distinction between danger to health and danger to life?'

That is the question that the Attorney-General put, and he assumes that it is so. Is it? Of course there are maladies that are a danger to health without being a danger to life. Rheumatism, I suppose, is not a danger to life, but a danger to health. Cancer is plainly a danger to life. But is there a perfectly clear line of distinction between danger to life and danger to health? I should have thought not. I should have thought that impairment of health might reach a stage where it was a danger to life. The answer of Mr. Bourne was:

> 'I cannot agree without qualifying it. I cannot say just yes or no. I can say there is a large group whose health may be damaged, but whose life almost certainly [618] will not be sacrificed. There is another group at the other end whose life will be definitely in very great danger.'

Then he added:

3

'There is a large body of material between those two extremes in which it is not really possible to say how far life will be in danger, but we find, of course, that the health is depressed to such an extent that their life is shortened, such as in cardiac cases, so that you may say that their life is in danger, because death might occur within measurable distance of the time of their labour.'

He is speaking of a case such as this. If that is a view which commends itself to you, so that you cannot say that there is this division into two separate classes with a dividing line between them, then it may be that you will accept the view that Mr. Oliver put forward when he invited you to give to the words "for the purpose of preserving the life of the mother" a wide and liberal view of their meaning. I would prefer the word "reasonable" to the words "wide and liberal." Take a reasonable view of the words "for the preservation of the life of the mother." I do not think that it is contended that those words mean merely for the preservation of the life of the mother from instant death. There are cases, we were told--and indeed I expect you know cases from your own experience--where it is reasonably certain that a woman will not be able to deliver the child with which she is pregnant. In such a case, where the doctor expects, basing his opinion upon the experience and knowledge of the profession, that the child cannot be delivered without the death of the mother, in those circumstances the doctor is entitled--and, indeed, it is his duty--to perform this operation with a view to saving the life of the mother, and in such a case it is obvious that the sooner the operation is performed the better. The law is not that the doctor has got to wait until the unfortunate woman is in peril of immediate death and then at the last moment snatch her from the jaws of death. He is not only entitled, but it is his duty, to perform the operation with a view to saving her life.

Here let me diverge for one moment to touch upon a matter that has been mentioned to you-- namely, the various views which are held by different people with regard to this operation. Apparently there is a great divergence of view even in the medical profession itself. Some there may be, for all I know, who hold the view that the fact that the woman desires the operation to be performed is a sufficient justification for it. That is not the law. The desire of a woman to be relieved of her pregnancy is no justification for performing the operation. On the other hand, no doubt there are people who, from what are said to be religious reasons, object to the operation being performed at all, in any circumstances. That is not the law either. On the contrary, a person who holds such an opinion ought not to be a doctor practising in that branch of medicine, for, if a case arose where the life of the woman could be saved by performing the operation and the doctor refused to perform it because of some religious opinion, and the woman died, he would be in grave peril of being brought before this court on a charge of man-[619]slaughter by negligence. He would have no better defence than would a person who, again for some religious reason, refused to call in a doctor to attend his child, where a doctor could have been called in and the life of the child saved. If the father, for a so-called religious reason, refused to call in a doctor, he also would be answerable to the criminal law for the death of his child. I mention those two extreme cases merely to show that the law--whether or not you think it a reasonable law is immaterial--lies at any rate between those two. It does not permit of the termination of pregnancy except for the purpose of preserving the life of the mother. As I have said, I think that those words ought to be construed in a reasonable sense, and, if the doctor is of opinion, on reasonable grounds and with adequate knowledge, that the probable consequence of the continuance of the pregnancy will be to make the woman a physical or mental wreck, the jury are

4

quite entitled to take the view that the doctor, who, in those circumstances, and in that honest belief, operates, is operating for the purpose of preserving the life of the woman.

These general considerations have got to be applied to the particular facts of this case. The verdict of the jury must depend on the facts of the case proved before them. No doubt--and I think the evidence now makes it clear--it is very undesirable that a young girl should be delivered of a child. Parliament has recently raised the age of marriage for a girl from 12 to 16, presumably on the view that it is very undesirable that a girl under the age of 16 should marry and have a child. The medical evidence given here establishes that view. Apparently the pelvic bones are not set until a girl is 18, and it is an observation that appeals to one's common sense that it must be undesirable that a girl should go through the state of pregnancy, and, finally, of labour, when she is of tender years. Then, too, you must consider the evidence about the effect of rape, especially on a child, as this girl was, under the age of 15. Within the last ten days she has reached the age of 15. Here you have the evidence of Dr. Rees, a gentleman of eminence in the profession, that, from his experience and his knowledge, the mental effect produced by pregnancy brought about by the terrible rape which Dr. Gorsky described to you must be most prejudicial. You are the judges of the facts, and it is for you to say what weight you give to the testimony of the witnesses, but no doubt you will think it is only common sense that a girl who for 9 months has to carry in her body the reminder of the dreadful scene and then go through the pangs of childbirth must suffer great mental anguish, unless, indeed, she is a girl of a very exceptional character, such as a feeble-minded girl, or one belonging to the class described as "the prostitute class," some girl "marked cross from the womb and perverse." In the case of an ordinary decent girl, brought up in an ordinary decent way, you may well think that Dr. Rees was not over-stating the effect on her mind of giving birth to her child. So far as danger to life is concerned, you cannot, of course, be certain of the [620] result unless you wait until a person is dead. Nobody suggests that the operation only becomes legal when a patient is dead. The case was mentioned of a person suffering from acute appendicitis, and the circumstances that would justify the surgeon in performing the operation for the removal of the appendix. Take the case of a child suffering from symptoms which the doctor diagnoses as appendicitis. The symptoms subside, and the doctor says: "The symptoms have subsided, and the child will probably get quite well, but at the same time I am not sure that they have definitely subsided, and tomorrow the child may be much worse." The doctor says to the parents: "If you will let me operate today, I can guarantee the life of your child. The operation can be performed, and can be performed with perfect safety. If, however, the child gets worse, and the appendicitis becomes acute, I may have to operate, and I will have to operate then in such circumstances that I cannot guarantee the life of the child. I will do my best, but the child may die." Supposing that choice is put to a parent: "Will you have the operation today or will you wait until tomorrow to see if the operation becomes immediately necessary?" What man or woman can answer the question except by saying: "Do it, and do it now. Do it while it is still safe to do it. Do not wait to see whether she is near death." When the operation is performed, it may be found that the appendix is not inflamed, and that the diagnosis was mistaken, but is the surgeon to blame for performing the operation? He used his best judgment. There you have a case where only the result can prove whether the diagnosis was right or wrong, whether the anticipation was right or wrong. In the case that we are considering--that of the danger to the child--the doctor or the surgeon who has to decide the matter can only base his opinion on knowledge and experience, and, if he in good faith thinks that it is necessary for the purpose of preserving the life of the girl, in the circumstances that I

have explained to you, then not only is he entitled to perform the operation but it is also his duty to do so. With regard to any other operation on the human body, obviously no difficulty arises. The surgeon is justified in cutting off an arm or a leg, or taking out an eye, if, in his honest opinion, he thinks it is desirable to do so for the sake of the patient's health. The difficulty that arises in the case of abortion is that by the operation the potential life of the unborn child is destroyed. The law of this land has always held human life to be sacred, and the protection that the law gives to human life it extends also to the unborn child in the womb. The unborn child in the womb must not be destroyed unless the destruction of that child is for the purpose of preserving the yet more precious life of the mother.

I do not think it is necessary for me to recapitulate the evidence that has been given before you with regard to the reasons why Mr. Bourne in this case thought it right to perform the operation. He has given his evidence, and the Attorney-General accepts his evidence as a frank [621] statement of what actually passed through his mind. In view of the age of the girl and the fact that she had been raped with great violence, he thought that the operation ought to be performed. As I told you yesterday, and as I tell you today, the question that you have got to determine is not whether you are satisfied that he did it in good faith for the purpose of preserving the life of the girl. The question is whether the Crown have proved the negative of that. Have the Crown proved that he did not remove the pregnancy of this girl in good faith for the purpose of preserving her life? That is the question you have got to answer when you come to consider the facts. If the Crown have satisfied you beyond reasonable doubt--if there is a doubt, by our law the accused is always entitled to be acquitted--that he did not do this act in good faith for the purpose of preserving the life of the girl, then he is guilty of the offence with which he is charged. If the Crown have failed to satisfy you of that, then by the law of England he is entitled to a verdict of acquittal. The case is a grave case, and no doubt raises matters of grave concern both to the medical profession and to the public. As I said at the beginning of my summing up, it does not touch the case of the professional abortionist. As far as the members of the medical profession themselves are concerned and they alone could properly perform such an operation-- we may hope and expect that none of them would ever lend themselves to the malpractices of professional abortionists. As Mr. Bourne said, in cases of this sort no doctor would venture to act except after consulting some other member of the profession of high standing, so as to confirm his view that the circumstances were such that an operation ought to be performed and that the act was legal.

**Solicitors:** *The Director of Public Prosecutions* (for the Crown); *Le Brasseur & Oakley* (for the defendant).

[*Reported by* REGINALD TOWNSEND, ESQ., *Barrister-at-Law.*]

[Back to State Abortion Laws]

# Exhibit D

No. 23-727

IN THE

## Supreme Court of the United States

STATE OF IDAHO,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

*On Writ of Certiorari to the*
*United States Court of Appeals for the Ninth Circuit*

### BRIEF FOR THE PETITIONER

| | |
|---|---|
| JOHN J. BURSCH | RAÚL R. LABRADOR |
| ERIN M. HAWLEY | ATTORNEY GENERAL |
| MATTHEW S. BOWMAN | ALAN M. HURST |
| LINCOLN DAVIS WILSON | SOLICITOR GENERAL |
| JACOB P. WARNER | JOSHUA N. TURNER |
| ALLIANCE DEFENDING | *Counsel of Record* |
| FREEDOM | JAMES E.M. CRAIG |
| 440 First Street, NW, | 700 W Jefferson St #210 |
| Suite 600 | Boise, ID 83720 |
| Washington, DC 20001 | josh.turner@ag.idaho.gov |
| JAMES A. CAMPBELL | (208) 332-3548 |
| JULIE MARIE BLAKE | CHARLES J. COOPER |
| RORY GRAY | DAVID H. THOMPSON |
| ALLIANCE DEFENDING | PETER A. PATTERSON |
| FREEDOM | MEGAN M. WOLD |
| 44180 Riverside Pkwy | COOPER & KIRK PLLC |
| Lansdowne, VA 20176 | 1523 New Hampshire NW |
| | Washington, DC 20036 |

*Counsel for Petitioner*

i

## QUESTION PRESENTED

Whether the Emergency Medical Treatment and Active Labor Act (EMTALA) preempts state abortion regulations and requires hospitals to perform abortions disallowed by state law.

ii

## PARTIES TO THE PROCEEDING AND CORPORATE DISCLOSURE

Petitioner is the State of Idaho. Respondent is the United States of America. Mike Moyle, Speaker of the Idaho House of Representatives; Chuck Winder, President Pro Tempore of the Idaho Senate; and The Sixty-Seventh Idaho Legislature were proposed intervenors and appellants below and are petitioners in the consolidated case, No. 23-726.

## LIST OF ALL PROCEEDINGS

U.S. Court of Appeals for the Ninth Circuit, Nos. 23-35440, 23-35450, *United States of America* v. *State of Idaho* and *United States of America* v. *Mike Moyle et al.*, en banc order entered November 13, 2023, reprinted at J.A.710–11.

U.S. Court of Appeals for the Ninth Circuit, Nos. 23-35440, 23-35450, *United States of America* v. *State of Idaho* and *United States of America* v. *Mike Moyle et al.*, order entered September 28, 2023, and corrected October 2, 2023, reprinted at J.A.690–708.

U.S. District Court for the District of Idaho, No. 1:22-cv-00329-BLW, *United States of America* v. *State of Idaho*, order entered August 24, 2022, reprinted at J.A.620–56.

U.S. Court of Appeals for the Ninth Circuit, No. 23-35153, *United States of America* v. *Idaho*, oral argument on the Idaho legislature's intervention request scheduled for April 4, 2024; legislature's motion to adjourn argument denied.

iii

## TABLE OF CONTENTS

QUESTION PRESENTED .......................................... i

PARTIES TO THE PROCEEDING AND
    CORPORATE DISCLOSURE .............................. ii

LIST OF ALL PROCEEDINGS ................................ ii

TABLE OF AUTHORITIES ..................................... v

OPINIONS BELOW .................................................. 1

STATEMENT OF JURISDICTION ......................... 1

PERTINENT STATUTE ........................................... 2

INTRODUCTION .................................................... 3

STATEMENT OF THE CASE .................................. 5

I.  Idaho protects the lives of women and unborn
    children. .................................................................. 5

II. EMTALA protects indigent patients and
    unborn children. .................................................... 7

III.EMTALA defers to state-law medical
    standards. ............................................................ 10

IV.The administration reinterprets EMTALA as
    an abortion mandate. ......................................... 11

PROCEEDINGS BELOW ....................................... 14

SUMMARY OF THE ARGUMENT ......................... 17

ARGUMENT .......................................................... 19

I.  Three threshold interpretive principles place a
    high burden on the United States to prove
    that its reading of EMTALA is correct. ............. 19

    A.  Courts presume that Congress does not
       preempt state regulation of medicine. .......... 19

iv

B. Congress must speak unambiguously through Spending Clause legislation like EMTALA. ....................................................... 20

C. Congress speaks clearly when it addresses questions of major political significance ....... 21

II. EMTALA does not require emergency rooms to become abortion enclaves in violation of state law. ............................................................... 23

A. It is not impossible to comply with EMTALA and Idaho's Defense of Life Act .... 23

1. EMTALA imposes no federal standard of care, much less a standard that conflicts with Idaho law. ......................... 24

2. EMTALA requires hospitals to care for an unborn child. ....................................... 32

B. Idaho law is no obstacle to EMTALA's purpose. ........................................................... 36

III. The equities favor Idaho. .................................... 38

A. The administration is experiencing no harm, let alone irreparable harm. ................ 38

B. The balance of equities and public interest favor Idaho. ................................................... 39

IV. The district court's injunction is overbroad. ....... 41

CONCLUSION ....................................................... 42

v

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott* v. *Perez*,
  138 S. Ct. 2305 (2018)........................................ 39

*Abigail Alliance for Better Access to Development Drugs* v. *von Eschenbach*,
  495 F.3d 696 (D.C. Cir. 2007)........................... 30

*Alabama Association of Realtors* v. *Department of Health & Human Services*,
  141 S. Ct. 2485 (2021).................................. 22, 38

*Altria Group, Inc.* v. *Good*,
  555 U.S. 70 (2008)............................................. 19

*Arlington Central School District Board of Education* v. *Murphy*,
  548 U.S. 291 (2006)........................................... 20

*Baker* v. *Adventist Health, Inc.*,
  260 F.3d 987 (9th Cir. 2001) ........................... 29

*Bates* v. *Dow Agrosciences LLC*,
  544 U.S. 431 (2005)........................................... 19

*Biden* v. *Nebraska*,
  143 S. Ct. 2355 (2023)...................................... 35

*Bittner* v. *United States*,
  598 U.S. 85 (2023)............................................. 33

*Brooker* v. *Desert Hospital Corp.*,
  947 F.2d 412 (9th Cir. 1991) ........................... 36

*Bryan* v. *Rectors & Visitors of University of Virginia*,
  95 F.3d 349 (4th Cir. 1996) .............................. 36

vi

*Bryant* v. *Adventist Health System/West*,
  289 F.3d 1162 (9th Cir. 2002) ............................. 9

*Califano* v. *Yamasaki*,
  442 U.S. 682 (1979)............................................ 41

*California* v. *United States*,
  2008 WL 744840 (N.D. Cal. Mar. 18, 2008)...... 28

*Cherukuri* v. *Shalala*,
  175 F.3d 446 (6th Cir. 1999) ............................. 36

*Cipollone* v. *Liggett Group, Inc.*,
  505 U.S. 504 (1992)............................................ 10

*Cleland* v. *Bronson Health Care Group, Inc.*,
  917 F.2d 266 (6th Cir. 1990) ............................. 27

*Correa* v. *Hospital San Francisco*,
  69 F.3d 1184 (1st Cir.1995) ............................... 26

*Crosby* v. *National Foreign Trade Council*,
  530 U.S. 363 (2000)............................................ 23

*Dobbs* v. *Jackson Women's Health Organization*,
  597 U.S. 215 (2022)...............................3, 6, 11, 40

*Draper* v. *Chiapuzio*,
  9 F.3d 1391 (9th Cir. 1993) ............................... 11

*English* v. *General Electric Company*,
  496 U.S. 72 (1990)............................................... 23

*Florida Lime & Avocado Growers, Inc.* v. *Paul*,
  373 U.S. 132 (1963)............................................ 23

*Gatewood* v. *Washington Healthcare Corp.*,
  933 F.2d 1037 (D.C. Cir. 1991)........................... 26

*Gonzales* v. *Oregon*,
  546 U.S. 243 (2006)............................................ 10

vii

*Goodman* v. *Sullivan*,
　891 F.2d 449 (2d Cir. 1989) ............................... 25

*Guardians Association* v. *Civil Service*
　*Commission of New York*,
　463 U.S. 582 (1983) ........................................... 21

*Hardy* v. *New York City Health & Hospital Corp.*,
　164 F.3d 789 (2d Cir. 1999) ........................ 26, 36

*Harry* v. *Marchant*,
　291 F.3d 767 (11th Cir. 2002) .......................... 36

*Holcomb* v. *Monahan*,
　30 F.3d 116 (11th Cir. 1994) ............................ 27

*In re Baby "K" (Three Cases)*,
　16 F.3d 590 (4th Cir. 1994) .............................. 33

*Jackson* v. *East Bay Hospital*,
　246 F.3d 1248 (9th Cir. 2001) ............................ 7

*K Mart Corp.* v. *Cartier, Inc.*,
　486 U.S. 281 (1988) ........................................... 29

*Marshall ex rel. Marshall* v. *East Carroll Parish*
　*Hospital Service District*,
　134 F.3d 319 (5th Cir. 1998) .................. 7, 29, 36

*Martindale* v. *Indiana University Health*
　*Bloomington, Inc.*,
　39 F.4th 416 (7th Cir. 2022) .............................. 36

*Maryland* v. *King*,
　567 U.S. 1301 (2012) .......................................... 39

*Medtronic, Inc.* v. *Lohr*,
　518 U.S. 470, 475 (1996) .................10, 19, 25, 37

*Morin* v. *Eastern Maine Medical Center*,
　780 F. Supp. 2d 84 (D. Me. 2010) ...................... 28

viii

*Mutual Pharmaceutical Company, Inc.* v. *Bartlett*,
570 U.S. 472 (2013)............................................ 21

*Nartey* v. *Franciscan Health Hospital*,
2 F.4th 1020 (7th Cir. 2021) ............................. 27

*New Motor Vehicle Board* v. *Orrin W. Fox Company*,
434 U.S. 1345 (1977).......................................... 39

*New York* v. *Department of Health & Human Services*,
2022 WL 17974424 (2d Cir. Dec. 8, 2022) ........ 28

*New York* v. *Department of Health & Human Services*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............... 28

*NFIB* v. *Department of Labor, Occupational Safety & Health Administration*,
595 U.S. 109 (2022)..................................... 22, 39

*Nken* v. *Holder*,
556 U.S. 418 (2009)............................................ 39

*Pennhurst State School & Hospital* v. *Halderman*,
451 U.S. 1 (1981)......................................... 11, 20

*Planned Parenthood Arizona Inc.* v. *Betlach*,
727 F.3d 960 (9th Cir. 2013) ............................. 34

*Planned Parenthood Great Northwest* v. *State*,
522 P.3d 1132, 1148 (Idaho 2023)....3, 5–6, 15, 31

*Rice* v. *Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)..................................... 10, 19

*Ritten* v. *Lapeer Regional Medical Center*,
611 F. Supp. 2d 696 (E.D. Mich. 2009) ............. 28

*Roberts* v. *Galen of Virginia, Inc.*,
525 U.S. 249 (1999)............................................ 9

ix

*Summers* v. *Baptist Medical Center Arkadelphia*,
 91 F.3d 1132 (8th Cir. 1996) ...................... 27, 31

*Texas* v. *Becerra*,
 623 F. Supp. 3d 696 (N.D. Tex. 2022) .............. 35

*Texas* v. *Becerra*,
 89 F.4th 529 (5th Cir. 2024) ............ 4, 18, 24–25,
 27, 29, 32–33, 36–37

*Torretti* v. *Main Line Hospitals, Inc.*,
 580 F.3d 168 (3d Cir. 2009) ............................. 26

*Trump* v. *Hawaii*,
 585 U.S. 667 (2018) .......................................... 38

*Union Insurance Company* v. *United States*,
 73 U.S. (6 Wall.) 759 (1867) ............................ 34

*United States* v. *Idaho*,
 83 F.4th 1130 (9th Cir. 2023) ........................... 31

*United States* v. *University Hospital, State
 University of New York at Stony Brook*,
 729 F.2d 144 (2d Cir. 1984) .............................. 25

*Urban By & Through Urban* v. *King*,
 43 F.3d 523 (10th Cir.1994) ............................. 27

*Utility Air Regulatory Group* v. *E.P.A.*,
 573 U.S. 302 (2014) .......................................... 22

*Vickers* v. *Nash General Hospital, Inc.*,
 78 F.3d 139 (4th Cir. 1996) .............................. 26

*Washington* v. *Glucksberg*,
 521 U.S. 702 (1997) .................................... 10, 20

*West Virginia* v. *E.P.A.*,
 597 U.S. 697 (2022) ...................................... 21, 22

x

*Whitman* v. *American Trucking Associations*,
 531 U.S. 457 (2001)............................................ 21

*Whole Woman's Health* v. *Jackson*,
 141 S. Ct. 2494 (2021)....................................... 38

*Winter* v. *Natural Resources Defense Council, Inc.*,
 555 U.S. 7 (2008).............................................. 17

*Wyeth* v. *Levine*,
 555 U.S. 555 (2009)............................... 19, 23, 36

## Statutes

1973 Idaho Sess. Laws 442, 448 ............................... 3

2020 Idaho Sess. Laws 827 ...................................... 6

28 U.S.C. 1254................................................... 2

28 U.S.C. 1331................................................... 1

28 U.S.C. 1345................................................... 1

28 U.S.C. 2101................................................... 2

42 U.S.C. 1395............................................. 11, 20

42 U.S.C. 1395dd.........................7–11, 17, 20–21, 23,
           25, 28, 32, 34, 41

Act of Dec. 23, 1864, ch. III, § 42, 1864 Idaho Terr.
 Sess. Laws 305.................................................. 5

Act of Feb. 4, 1864, ch. IV, § 42, 1863-64 Idaho
 Terr. Sess. Laws 443........................................... 5

Act of Jan. 14, 1875, ch. IV, § 42, 1874-75 Idaho
 Terr. Sess. Laws 328........................................... 5

Consolidated Appropriations Act of 2023, Pub. L.
 No. 117-328, Div. H., Tit. V, § 507, 136 Stat.
 4459 (Dec. 29, 2022).......................................... 35

xi

Consolidated Appropriations Act of 2023, Pub. L.
    No. 117-328, Div. B., Tit. II, § 203, 136 Stat.
    4459 (Dec. 29, 2022)........................................... 34

Idaho Code § 16-2423......................................... 10, 30

Idaho Code § 18-604........................................... 24, 31

Idaho Code § 18-608................................................ 38

Idaho Code § 18-613 (1979)........................................ 3

Idaho Code § 18-622 (2020)........................................ 6

Idaho Code §  18-622 (2023).................... 6, 10, 15, 18,
                                                   24, 31, 40, 41

Idaho Code § 18-8802.............................................. 5

Idaho Code § 37-2705......................................... 10, 30

Idaho Code § 39-4514.............................................. 30

Idaho Rev. Stat. § 6794 (1887)................................. 5

Idaho Rev. Stat. § 6795 (1887)................................. 5

Omnibus Budget Reconciliation Act of 1989, Pub.
    L. No. 101-239, § 6211(h), 103 Stat. 2106
    (Dec. 19, 1989)............................................. 32, 37

Va. Code Ann. § 54.1-2990 (1993)........................... 33

## **Other Authorities**

Bryan A. Garner, *Garner's American Modern
    Usage* (2d ed. 2003)............................................. 34

Centers for Medicare & Medicaid Services,
    *Reinforcement of EMTALA Obligations
    Specific to Patients who are Pregnant or are
    Experiencing Pregnancy Loss* (July 11,
    2022)..................................................... 13, 14, 35

xii

Freedom to Travel for Health Care Act, S. 2053, 118th Cong. (2023) ............................................. 13

Godlasky, Ellis, & Sergent, *Where is abortion legal? Everywhere. But . . .*, USA Today (Apr. 23, 2020) ............................................................. 38

H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985) ................................................................. 7

H.R. Rep. No. 241, 99th Cong., 2d Sess. 27 ............. 36

Let Doctors Provide Reproductive Health Care Act, H.R. 2907, 118th Cong. (2023) ................... 13

Let Doctors Provide Reproductive Health Care Act, S. 1297, 118th Cong. (2023) ....................... 13

Note, *Preventing Patient Dumping*, 61 N.Y.U. L. Rev. 1186 (1986) ................................................. 36

Right to Contraception Act, S. 1999, 118th Cong. (2023) .................................................................. 13

The White House, FACT SHEET: Biden-Harris Administration Highlights Commitment to Defending Reproductive Rights and Actions to Protect Access to Reproductive Health Care One Year After Overturning of Roe v. Wade (June 23, 2023) ..................................................... 12

The White House, FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services (July 8, 2022) .................................................................. 12

The White House, *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade* (June 24, 2022) ........................................ 12

xiii

U.S. Dep't of Health & Hum. Servs., *HHS Secretary Xavier Becerra Statement on EMTALA Enforcement* (May 1, 2023) ............... 35

UPHOLD Privacy Act of 2023, S. 631, 118th Cong. (2023) ................................................................. 13

Women's Health Protection Act of 2021, H.R. 3755, 117th Cong. (2021) ................................... 13

Women's Health Protection Act of 2021, S. 1975, 117th Cong. (2021) ............................................ 13

Women's Health Protection Act of 2022, S. 4132, 117th Cong. (2022) ............................................ 13

Women's Health Protection Act of 2023, H.R. 12, 118th Cong. (2023) ............................................ 13

Women's Health Protection Act of 2023, S. 701, 118th Cong. (2023) ............................................ 13

## **Regulations**

Further Efforts To Protect Access to Reproductive Healthcare Services, Presidential Memorandum, 88 Fed. Reg. 4895 (Jan. 22, 2023) ............ 12

Protecting Access to Reproductive Healthcare Services, Exec. Order No. 14076, 87 Fed. Reg. 42053, 42053–54 (July 8, 2022) ........................ 12

Securing Access to Reproductive and Other Healthcare Services, Exec. Order No. 14079, 87 Fed. Reg. 49505 (Aug. 3, 2022) ..................... 12

## **Constitutional Provisions**

Idaho Const., *Preamble* ............................................. 3

Idaho Const., art. 1, § 1 ............................................. 3

1

## OPINIONS BELOW

The October 10, 2023 order of the en banc court of appeals is published at 82 F.4th 1296 and reprinted at J.A.709. The September 28, 2023 order of the court of appeals, as corrected on October 2, 2023, is published at 83 F.4th 1130 and reprinted at J.A.690–708. The May 4, 2023 order of the district court denying reconsideration is unpublished but available at 2023 WL 3284977 and reprinted at J.A.660–71. The August 24, 2022 order of the district court granting a preliminary injunction is published at 623 F. Supp. 3d 1096 and reprinted at J.A.620–56.

## STATEMENT OF JURISDICTION

The United States filed its complaint on August 2, 2022, invoking jurisdiction under 28 U.S.C. 1331 and 1345. The United States moved for a preliminary injunction that the district court granted on August 24, 2022. On May 4, 2023, the district court denied timely motions for reconsideration filed by Idaho and the Idaho legislature. Idaho and the legislature filed timely notices of appeal on June 28 and July 3, 2023, respectively, and a stay of the injunction pending appeal was sought.

A Ninth Circuit panel issued a published opinion granting a stay of the injunction pending appeal on September 28, 2023. The United States moved for emergency reconsideration en banc on September 30, 2023, which the Ninth Circuit granted in an unreasoned order on October 10, 2023. The en banc Ninth Circuit then denied the motion to stay pending appeal on November 13, 2023.

2

On November 20, 2023, Idaho and the legislature filed emergency applications for a stay with this Court, invoking 28 U.S.C. 1254(1) and 2101(f) and Supreme Court Rule 23.3. Idaho also asked the Court to treat its application as a petition for writ of certiorari before judgment.

On January 5, 2024, the Court granted the applications and stayed the district court's injunction. It also treated both applications as petitions for writ of certiorari before judgment, granted the petitions on the question presented in Idaho's application, and consolidated the cases for oral argument. The Court's jurisdiction rests on 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

### PERTINENT STATUTE

The federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. 1395dd, is reprinted in full at J.A.712–22.

3

## INTRODUCTION

In 1890, the people of the State of Idaho established a government and a constitution to secure the blessings of liberty and to promote the common welfare. Idaho Const., *Preamble*. Their new government recognized that all persons are by nature free and equal, and man-made laws exist to defend life and liberty. *Id.* art. I, § 1. Consistent with those principles, the people of Idaho have unwaveringly acted to protect the life and liberty of unborn children. Ending an unborn life except to save the mother's life has always been viewed in Idaho "as an immoral act and treated as a crime." *Planned Parenthood Great Nw.* v. *State*, 522 P.3d 1132, 1148 (Idaho 2023). Idaho's 150 years of protecting life is a heritage broken only by *Roe* v. *Wade*. But even during those 50 years when its hands were unconstitutionally tied, Idaho continued to defend unborn children. It passed laws regulating abortion to the extent federal courts would allow under *Roe,* and it enacted trigger laws that would reimplement Idaho's prior prohibitions against abortion "[i]n the event that the states are again permitted to safeguard the lives of unborn infants before the twenty-fifth week of pregnancy." See 1973 Idaho Sess. Laws 442, 448; see also Idaho Code § 18-613 (1979).

That anticipated day was finally realized when this Court overruled *Roe* and "return[ed] the issue of abortion to the people's elected representatives." *Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022). States were no longer subject to the "exercise of raw judicial power" that had overridden their laws and forced them to permit abortions. *Id.* at 261. And in Idaho, *Dobbs* triggered enforcement of the State's Defense of Life Act, Idaho Code § 18-622.

4

Two weeks after *Dobbs*, the Biden administration reinterpreted the Emergency Medical Treatment and Active Labor Act (EMTALA) to create a nationwide abortion mandate in hospital emergency rooms that accept Medicare funding. That mandate—discovered nearly 40 years after EMTALA's enactment—has no support in the statutory text. The mandate was an attempt to reimpose a federal abortion requirement, this time through the exercise of raw executive power. But EMTALA merely prohibits emergency rooms from turning away indigent patients with serious medical conditions. Rejecting the identical arguments advanced here, the Fifth Circuit recently held that "EMTALA does not mandate any specific type of medical treatment, let alone abortion." *Texas* v. *Becerra*, 89 F.4th 529, 542 (5th Cir. 2024).

In addition to requiring equal treatment of patients generally, EMTALA explicitly promises in four places *protection* for an "unborn child." That admonition belies any requirement that hospitals must end the lives of unborn children in violation of state law. In fact, EMTALA and Idaho's Defense of Life Act share a common goal—protecting unborn children. As the Fifth Circuit put it, "[t]he text speaks for itself: EMTALA requires hospitals to stabilize both the pregnant woman and her unborn child." *Texas*, 89 F.4th at 544.

According to the administration, EMTALA's protection for the unborn nullifies more than 20 states' pro-life laws, forcing doctors to abort unborn children in violation of state law. The United States' view also means that EMTALA preempts countless other state laws, such as those restricting experimental medication and procedures. That position is untenable given EMTALA's text and the clarity

5

required to preempt state law, especially in a Spending Clause context involving a major political question as significant as overriding state medical standards on abortion.

The administration's position—EMTALA conditions hospitals' Medicare participation on performing abortions a state deems unlawful—also attributes deep incoherence to Congress. The Hyde Amendment generally prohibits hospitals from using federal funds to pay for abortions, and the Hyde-Weldon Amendment prevents the Department of Health and Human Services (HHS) from using federal funds to require a healthcare entity to facilitate abortion. It is nonsensical to assume that Congress required the very thing it prohibits using federal dollars to fund. The district court's judgment should be reversed.

## STATEMENT OF THE CASE

### I.  Idaho protects the lives of women and unborn children.

The people of Idaho recognize that the "life of each human being begins at fertilization, and preborn children have interests in life, health, and well-being that should be protected." Idaho Code § 18-8802(1). That statutory finding governs all of Idaho law. And it is consistent with over 150 years of Idaho policy that abortion should generally be allowed only if necessary to preserve the mother's life. *Planned Parenthood Great Nw.*, 522 P.3d at 1149–50 (citing Act of Feb. 4, 1864, ch. IV, § 42, 1863-64 Idaho Terr. Sess. Laws 443; Act of Dec. 23, 1864, ch. III, § 42, 1864 Idaho Terr. Sess. Laws 305; Act of Jan. 14, 1875, ch. IV, § 42, 1874-75 Idaho Terr. Sess. Laws 328; Idaho Rev. Stat. §§ 6794, 6795 (1887)).

6

Consistent with this statutory finding, in 2020, Idaho enacted a statute now known as the Defense of Life Act, which prohibits most abortions with exceptions for rape or incest. Idaho Code § 18-622. That Act became effective after this Court's *Dobbs* decision restored to the states the authority to regulate abortion. 597 U.S. at 292; 2020 Idaho Sess. Laws 827. As originally enacted, the Act created an affirmative defense for a physician performing an abortion where the "abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(i)–(iii) (2020).

After the district court entered the preliminary injunction at issue here, the Idaho Supreme Court issued its interpretation of the Defense of Life Act, which it upheld against a state-law challenge. *Planned Parenthood Great Nw.*, 522 P.3d at 1203. The Idaho Supreme Court clarified that removing an ectopic pregnancy is not an abortion under the Act, that the Act does not require "certainty" of physicians, and that the Act allows physicians to rely on good-faith medical judgment where necessary to save a mother's life. *Id*. at 1202–03.

The Idaho legislature then amended the Act to codify the Idaho Supreme Court's clarification on ectopic pregnancies and to recharacterize the Act's life-saving language as an exception to the Act's abortion prohibition rather than an affirmative defense. Idaho Code § 18-622 (2023).

7

## II. EMTALA protects indigent patients and unborn children.

Congress enacted and President Reagan signed EMTALA into law nearly 40 years ago as part of the Medicare Act. The law addressed a specific concern: "that hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized." *Jackson* v. *E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), reprinted in 1986 U.S.C.C.A.N. 579, 605). For that reason, the Act is "commonly known as the 'Patient Anti-Dumping Act.'" *Ibid.*; *Marshall ex rel. Marshall* v. *E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (emergency rooms were "refusing to treat patients who are unable to pay").

Consistent with that purpose, EMTALA requires hospitals that accept Medicare to "provide" "any individual" who asks for examination or treatment "an appropriate medical screening examination within the capability of the hospital's emergency department … to determine whether" the individual has an "emergency medical condition." 42 U.S.C. 1395dd(a).

EMTALA defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health

8

of the woman *or her unborn child*) in serious
jeopardy;

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or
part[.]"

42 U.S.C. 1395dd(e)(1)(A) (emphasis added). Con-
gress thus specifically protected the "unborn child."
And in the case of a pregnant woman in labor, an
"emergency medical condition" also includes situa-
tions in which a transfer of the pregnant woman "may
pose a threat to the health or safety of the woman *or
the unborn child*." 42 U.S.C. 1395dd(e)(1)(B)(ii)
(emphasis added).

Recognizing limits from hospital competencies
and state-law requirements, EMTALA restricts a
hospital's treatment obligation to those treatments
available at the hospital. If a hospital determines that
a patient has an emergency medical condition, it has
two options: (1) provide, "within the staff and facilities
*available at the hospital*, for such further medical
examination and such treatment as may be required
to stabilize the medical condition," or (2) "transfer …
the individual to another medical facility." 42 U.S.C.
1395dd(b)(1) (emphasis added). To "stabilize" means
"to provide such medical treatment of the condition as
may be necessary to assure, within reasonable
medical probability, that no material deterioration of
the condition is likely to result from or occur during
the transfer of the individual from a facility." 42
U.S.C. 1395dd(e)(3)(A).

Transfers under EMTALA must also ensure the
protection of unborn children. Transfers cannot occur
without a physician certifying expected benefits to

9

"the individual and, in the case of labor, *to the unborn child*," and transfers are not "appropriate" unless they "minimize[ ] the risks to the individual's health and, in the case of a woman in labor, the health *of the unborn child*." 42 U.S.C. 1395dd(c)(1)(A)(ii), (c)(2)(A).

For its entire history, courts have construed EMTALA consistent with its statutory purpose. As discussed below, every court of appeals to address the issue—including the Ninth Circuit—has correctly read EMTALA as an anti-dumping statute, not a statute dictating any particular "standard of care." *Bryant* v. *Adventist Health System/West*, 289 F.3d 1162, 1166 (9th Cir. 2002). "[T]here is no question" that EMTALA "does not require an 'appropriate' stabilization." *Roberts* v. *Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) (per curiam). It requires only the care "available" at the hospital. 42 U.S.C. 1395dd(b)(1).

In sum, EMTALA leaves the question of specific treatments for stabilizing care to state law. And all women in labor—regardless of their ability to pay—can expect that their unborn children will be safely delivered. Indeed, EMTALA treats medical emergencies faced by "the unborn child" of a pregnant woman no differently than emergencies faced by the mother herself. 42 U.S.C. 1395dd(e)(1)(A).

Penalties for violating EMTALA are severe. A Medicare-participating hospital or physician "that negligently violates" EMTALA "is subject to a civil money penalty" up to $50,000 per violation. 42 U.S.C. 1395dd(d)(1)(A), (B). And if doctors violate EMTALA in a way that is more than negligent, they are "subject to … exclusion from participation in [Medicare] and State health care programs," including Medicaid and other programs. 42 U.S.C. 1395dd(d)(1)(B).

10

### III. EMTALA defers to state-law medical standards.

States license and regulate medical providers "under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 475 (1996) (citation omitted). That is just as true for abortion, Idaho Code § 18-622, as it is for psychosurgery and electroconvulsive treatments, Idaho Code § 16-2423, and opioid and other pharmaceutical prescriptions, Idaho Code § 37-2705, to name a few examples. States retain the authority to protect the integrity and ethics of the medical profession. *Washington* v. *Glucksberg*, 521 U.S. 702, 731 (1997). That has always been the case "given the structure and limitations of federalism." *Gonzales* v. *Oregon*, 546 U.S. 243, 270 (2006). EMTALA operates against that backdrop of state regulation.

EMTALA does not preempt state laws regulating the practice of medicine for numerous reasons. First, any preemption analysis starts with the "assumption that the historical police powers of the States"—including their power to impose medical standards of care—do not yield to federal law apart from "the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Courts must construe statutes narrowly due to "the presumption against the pre-emption of state police power regulations." *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992).

11

Second, the Medicare Act contains a savings clause clarifying that EMTALA does not override state regulation of medicine: "[n]othing in this subchapter"—which includes EMTALA—"shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. 1395.

Third, EMTALA provides a second savings clause affirming that it does "not preempt any State or local law requirement, except to the extent that the requirement *directly conflicts* with a requirement of this section." 42 U.S.C. 1395dd(f) (emphasis added).

Finally, EMTALA is Spending Clause legislation, and courts will read Congress's intent to have imposed "a condition on the grant of federal moneys" only if Congress did so "unambiguously." *Pennhurst State Sch. & Hosp.* v. *Halderman*, 451 U.S. 1, 17 (1981).

All of this means—as the Ninth Circuit used to recognize—that EMTALA's "preemptive effect" must be construed "as narrowly as possible." *Draper* v. *Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam) (citation omitted).

## IV. The administration reinterprets EMTALA as an abortion mandate.

In *Dobbs*, this Court returned the abortion issue to the states. 597 U.S. at 292, 302. Idaho law thus governs the regulation of abortion in Idaho. See *id.* at 302.

12

President Biden immediately decried *Dobbs* while nonetheless initially recognizing that the people—not his administration—now have "the final word" on the subject. The White House, *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade* (June 24, 2022). That position lasted all of two weeks. The President then issued an executive order directing multiple agencies—including HHS, the Department of Justice, the Secretary of Homeland Security, and the Federal Trade Commission—to undertake a government-wide effort to use federal law to "promote" abortion. Protecting Access to Reproductive Healthcare Services, Exec. Order No. 14076, 87 Fed. Reg. 42053, 42053–54 (July 8, 2022). See also The White House, FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services (July 8, 2022), https://perma.cc/NHE6-D5J9; Securing Access to Reproductive and Other Healthcare Services, Exec. Order No. 14079, 87 Fed. Reg. 49505 (Aug. 3, 2022); Further Efforts To Protect Access to Reproductive Healthcare Services, Presidential Memorandum, 88 Fed. Reg. 4895 (Jan. 22, 2023); The White House, FACT SHEET: Biden-Harris Administration Highlights Commitment to Defending Reproductive Rights and Actions to Protect Access to Reproductive Health Care One Year After Overturning of Roe v. Wade (June 23, 2023), https://perma.cc/66WV-EVAM (collecting actions). The President's directive called on his administration to "consider[ ] updates to current guidance on obligations specific to emergency conditions and stabilizing care under" EMTALA. 87 Fed. Reg. at 42054.

13

Meanwhile, Congress has repeatedly entertained proposed legislation to authorize agencies to undertake pro-abortion initiatives. *E.g.*, Women's Health Protection Act of 2023, S. 701, 118th Cong. (2023); Women's Health Protection Act of 2023, H.R. 12, 118th Cong. (2023); Women's Health Protection Act of 2022, S. 4132, 117th Cong. (2022); Women's Health Protection Act of 2021, S. 1975, 117th Cong. (2021); Women's Health Protection Act of 2021, H.R. 3755, 117th Cong. (2021); Let Doctors Provide Reproductive Health Care Act, S. 1297, 118th Cong. (2023); Let Doctors Provide Reproductive Health Care Act, H.R. 2907, 118th Cong. (2023); Right to Contraception Act, S. 1999, 118th Cong. (2023); Freedom to Travel for Health Care Act, S. 2053, 118th Cong. (2023); UPHOLD Privacy Act of 2023, S. 631, 118th Cong. (2023). It has declined every invitation.

President Biden did not wait for Congress to enact pro-abortion legislation. Instead, three days after issuing the executive order, the administration discovered a national abortion mandate in the silence of EMTALA, where it had evidently lain dormant for 36 years. HHS promptly issued novel "guidance" to "remind" hospitals receiving Medicare funds of a position it had never before taken: that EMTALA requires emergency room doctors to perform or complete abortions, including "incomplete" chemical-induced abortions, regardless of—or more likely, as a response to—state laws that would bar them. Centers for Medicare & Medicaid Services (CMS), *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022). The memorandum's title tried to veil the titanic change, falsely labeling its novel directive as mere "reinforcement" of existing duties.

14

The memorandum insists that if "a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and … abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* provide that treatment." *Id.* at 1. In nearly four decades since EMTALA was enacted, neither the statute nor previous federal guidance ever stated "obligations" requiring hospitals and physicians to provide any particular procedure, much less an abortion. The memorandum also purported to authorize private lawsuits, *id.* at 5, and insisted that "[a]ny state actions against a physician who provides an abortion in order to stabilize an emergency medical condition [as defined by that physician] in a pregnant individual presenting to the hospital would be preempted," *id.* at 5–6. And the administration threatened that if a hospital terminates its Medicare provider agreement to avoid this reinterpretation of EMTALA, CMS may penalize the hospital. *Id.* at 4.

## PROCEEDINGS BELOW

Within weeks, the United States sued Idaho, seeking to enjoin the Defense of Life Act as preempted by EMTALA. *United States* v. *State of Idaho*, No. 1:22-cv-00329-BLW, J.A.1–23. The Idaho legislature moved to intervene and was given leave to file briefs and present oral argument on a limited basis, though the court later denied its request to intervene.[1]

---

[1] The decision was based on the court's factual determination that the Idaho legislature's interests were adequately represented by the State. Though the State has taken no position on intervention, the State and the legislature have both defended Idaho law and vigorously opposed the preemption theory.

15

The administration's claims were novel in procedure as well as substance. It was not doctors or patients who brought claims against hospitals accepting Medicare funds. Rather, the federal government sued the State, seeking a declaratory judgment and injunction under the Supremacy Clause.

The district court granted a preliminary injunction. J.A.620–56. It held that the Defense of Life Act was preempted by EMTALA for abortions necessary to avoid "(i) placing the health of a pregnant patient in serious jeopardy; (ii) a serious impairment to bodily functions of the pregnant patient; or (iii) a serious dysfunction of any bodily organ or part of the pregnant patient." J.A.656 (quotation marks omitted).

The State and the legislature moved for reconsideration. While those motions were pending, the Idaho Supreme Court issued its authoritative interpretation of the Defense of Life Act. *Planned Parenthood Great Nw.*, 522 P.3d at 1202–03. Thereafter, the legislature amended the Act with the changes noted above, including converting the affirmative defense that an abortion was necessary to protect the life of the mother to a statutory exception. Idaho Code § 18-622(2)(a)(i). The district court denied reconsideration. J.A.660–71.

The State and the legislature appealed, a stay of the injunction pending appeal was filed, and a unanimous Ninth Circuit panel granted a stay in a published order, concluding that "EMTALA does not preempt" Idaho's Defense of Life Act. J.A.695. It held there was no conflict between EMTALA and the Act, and the Act poses no obstacle to EMTALA's purpose. J.A.696–04.

16

The panel determined that conflict preemption did not exist. EMTALA "does not set standards of care or specifically mandate that certain procedures, such as abortion, be offered." J.A.696–97. And Congress did not intend EMTALA to supersede "the historic police powers of the States," including the right to prohibit abortion. J.A.698.

The panel also held that there was no obstacle preemption between the Act and EMTALA. Congress did not enact EMTALA "to create a national standard of care for hospitals," but "to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." J.A.703 (cleaned up). Because of this, the Act's "limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients." J.A.704.

The panel further concluded that the remaining stay factors were met. The State would be irreparably harmed absent a stay because its democratically enacted law was enjoined. J.A.704–06. The balance of equities also favored a stay because "the federal government has no discernable interest in regulating the internal medical affairs of the State, and the public interest is best served by preserving the force and effect of a duly enacted Idaho law during the pendency of this appeal." J.A.707.

Within days, the en banc Ninth Circuit vacated the panel's stay opinion and granted en banc review even before a merits decision had issued. J.A.709. The en banc court provided no explanation of its order and nowhere addressed the analysis in the panel's stay opinion. J.A.710–11.

17

The State moved for a stay of the district court's injunction pending appeal and asked this Court to treat the application as a petition for a writ of certiorari before judgment. On January 5, 2024, the Court granted the stay and the petition.

## SUMMARY OF THE ARGUMENT

The United States cannot establish the requirements to obtain a preliminary injunction. For that extraordinary relief, the administration must show that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The government has not made any of these showings.

On the merits, EMTALA prohibits patient dumping; it does not supersede state standards of care. EMTALA operates *within* the menu of lawful treatments in a particular state and available at a particular hospital, requiring hospitals to offer stabilizing care *from that menu*. It neither authorizes nor requires hospitals to violate state law.

That general proposition is especially true here, because EMTALA does not even mention "abortion." Instead, the statute covers both pregnant mother and "unborn child" alike, 42 U.S.C. 1395dd(e)(1)(A)(i), and its requirement that indigent and paying clients be treated equally includes delivery of an "unborn child," 42 U.S.C. 1395dd(e)(3)(A). A medical provider complies with EMTALA when it offers stabilizing treatment in accord with state law and the hospital's capabilities. 42 U.S.C. 1395dd(a). That is exactly

18

what the Fifth Circuit held in *Texas*, 89 F.4th at 541–
45, and that is why there is also no conflict between
Idaho's Defense of Life Act and EMTALA.

The balance of harm weighs decisively in Idaho's
favor, too. A state suffers irreparable injury when
enjoined from implementing its law. The whole point
of *Dobbs* was to restore to the states their authority
to regulate abortion. Yet the administration seeks to
thwart Idaho's exercise of self-government on this
important topic. Conversely, denying an injunction
causes no irreparable harm to the administration. Its
claimed EMTALA abortion mandate is imaginary.
The Medicare Act generally—and EMTALA
specifically—preserve the right of states to regulate
the practice of medicine, including on the issue of
abortion.

Nor does the public interest support the district
court's injunction. Reversing that injunction poses no
threat to pregnant women's healthcare in Idaho
because "Idaho's law expressly contemplates neces-
sary medical care for pregnant women in distress."
J.A.707 (citing Idaho Code § 18-622(4)). In sum, the
administration has no legitimate interest in compel-
ling Idaho's compliance with a supposed federal
mandate that is contrary to EMTALA's text.

19

## ARGUMENT

**I. Three threshold interpretive principles place a high burden on the United States to prove that its reading of EMTALA is correct.**

### A. Courts presume that Congress does not preempt state regulation of medicine.

This Court's preemption analysis starts "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp., Inc.* v. *Good*, 555 U.S. 70, 77 (2008). This presumption, based on the "historic presence of state law," is so strong it applies even when the federal government has also regulated in an area "for more than a century." *Wyeth*, 555 U.S. at 565 n.3. Thus, in applying that presumption to a federal statute "susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria*, 555 U.S. at 77 (quoting *Bates* v. *Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

These principles pose a substantial obstacle to the United States' novel preemption theory. There is no question of "the historic primacy of state regulation of matters of health and safety." *Medtronic*, 518 U.S. at 485. The regulation of medicine is "a field which the States have traditionally occupied," *Wyeth*, 555 U.S. at 565 & n.3, and states have a deep interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731.

20

In fact, it is out of respect for these state regulations that the Medicare Act specifically disclaims any federal interference in the states' "control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. 1395; *see also* 42 U.S.C. 1395dd(f) (limiting EMTALA's preemptive effect to situations where state law "*directly conflicts* with a requirement of this section" (emphasis added)).

## B. Congress must speak unambiguously through Spending Clause legislation like EMTALA.

EMTALA is Spending Clause legislation, which "is much in the nature of a contract," and "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Because "[t]here can … be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it," Congress must "speak with a clear voice" and impose conditions on spending legislation "unambiguously." *Id.* at 17–18.

EMTALA provides no "clear notice" that it mandates abortion, *Arlington Cent. Sch. Dist. Bd. of Educ.* v. *Murphy*, 548 U.S. 291, 296 (2006), but rather the opposite: it directs covered hospitals to provide care for "the unborn child," 42 U.S.C. 1395dd(e)(1)(A)(i). That is why, throughout the nearly first four decades of EMTALA's enactment, no federal official or court construed it the way the administration now does.

Ultimately, covered hospitals could opt out of EMTALA by "not using federal funds and withdrawing from the federal program entirely." *Guardians*

21

*Ass'n* v. *Civ. Serv. Comm'n of N.Y.*, 463 U.S. 582, 596 (1983) (quotation omitted). While "the option of ceasing to act" is not sufficient to defeat a direct conflict between state and federal law for legislation enacted under Congress's other powers, see *Mut. Pharm. Co., Inc.* v. *Bartlett*, 570 U.S. 472, 488 (2013), it is sufficient under the Spending Clause, where legislation turns on the acceptance of the federal government's terms. That covered hospitals could take such an action again highlights that the federal government's remedy is to seek penalties against hospitals who accept federal funds but fail to comply with its requirements—not to sue Idaho to enforce requirements the State did not accept. 42 U.S.C. 1395dd(d)(1).

## C. Congress speaks clearly when it addresses questions of major political significance.

The major-questions doctrine is based on "both separation of powers principles and a practical understanding of legislative intent." *West Virginia* v. *E.P.A.*, 597 U.S. 697, 723 (2022). It is rooted in the common-sense presumptions that "Congress intends to make major policy decisions itself," *ibid.* (citation omitted), that Congress does not "hide elephants in mouseholes," *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and that Congress refrains from settling important political issues using "cryptic" language, *West Virginia*, 597 U.S. at 721.

22

The major-questions framework applies to this case. Enacting an emergency-room mandate that overrides state-law standards of care—whether those involve experimental medications, marijuana, or abortion—is a matter of undoubted "political significance." *West Virginia*, 597 U.S. at 721.

As for state abortion laws, even the administration concedes that "when Congress intends to create special rules governing abortion …, it does so explicitly." Appl.Opp.33–34 (citations omitted). The "lack of historical precedent" for invoking EMTALA to mandate abortions further confirms that the major-questions principles apply. *NFIB* v. *Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119–20 (2022) (per curiam).

The same is true of "the sheer scope" of the government's reading of EMTALA, *Ala. Ass'n of Realtors* v. *Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam). The administration's reimagining of the statute would override state law in emergency rooms *whenever* a doctor deems an unlawful treatment necessary for stabilizing care.

Under major-questions principles, the Court should meet with a considerable "measure of skepticism" the administration's claim that Congress mandated abortions without even mentioning that word in the statute. *Util. Air Regul. Grp.* v. *E.P.A.*, 573 U.S. 302, 324 (2014). For the United States to make its case, it must point to "clear congressional authorization." *West Virginia*, 597 U.S. at 723. A "plausible" or "colorable textual basis" will not suffice. *Id.* at 722–23.

23

Here, the administration's reading of EMTALA is not even plausible, as explained below. It is inconceivable that Congress overrode all state medical regulations—including state-by-state abortion regulations—through a federal anti-dumping statute that protects indigent people in emergency rooms without ever mentioning the word "abortion."

## II. EMTALA does not require emergency rooms to become abortion enclaves in violation of state law.

A "direct conflict[ ]," 42 U.S.C. 1395dd(f), between EMTALA and state law could occur in only two instances. First, if compliance with both EMTALA and a state law is "impossible." *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (citing *Fla. Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142–43 (1963)). And second, if a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation omitted). But see *Wyeth*, 555 U.S. at 594 (Thomas, J., concurring) ("This Court's entire body of 'purposes and objectives' pre-emption jurisprudence is inherently flawed."). Neither type of conflict exists here, so the district court's injunction must be vacated and its decision reversed.

## A. It is not impossible to comply with EMTALA and Idaho's Defense of Life Act.

EMTALA creates no impossibility conflict with Idaho law. Indeed, the two do not conflict at all.

24

The administration says EMTALA requires hospital emergency department doctors to perform abortions *whenever* those doctors subjectively believe an abortion is "stabilizing care." But EMTALA only requires hospitals to offer treatments that are "available." In Idaho, the abortions for which the administration vies are not "available" to any patient. EMTALA does not require hospital emergency rooms to become abortion enclaves in violation of state law. *Texas*, 89 F.4th at 545 (EMTALA does not "mandate[] physicians to provide abortions when that is the necessary stabilizing treatment for an emergency medical condition.").

### 1. EMTALA imposes no federal standard of care, much less a standard that conflicts with Idaho law.

The Defense of Life Act generally prohibits abortion in Idaho except in cases of rape or incest or if a doctor believes—"in his good faith medical judgment and based on the facts known to [him] at the time"— that it is "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a). Removing the remains of a dead, unborn child or removing an ectopic or molar pregnancy is not an "abortion." Idaho Code § 18-604(1). EMTALA does not mandate abortions in cases where the Defense of Life Act prohibits them.

Congress recognized that the Medicare Act— which includes EMTALA—"shall [not] be construed" to interfere with "the practice of medicine or the manner in which medical services are provided." 42 U.S.C. 1395. Regulating the practice of medicine is one of "the historic police powers of the States" that federal law is presumed not to displace. *Medtronic*,

25

518 U.S. at 485. This statutory provision "underscores the 'congressional policy against the involvement of federal personnel in medical treatment decisions.'" *Texas*, 89 F.4th at 542 (quoting *United States* v. *Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 160 (2d Cir. 1984)). That is why Congress prohibited the government from "direct[ing] or prohibit[ing] any [particular] kind of treatment or diagnosis" in administering Medicare. *Goodman* v. *Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam). So EMTALA cannot be construed to demand specific procedures. Like the rest of the Medicare Act, it leaves state standards of care intact.

EMTALA's statutory text confirms this. It begins by requiring hospitals to screen patients who come to the emergency department "to determine whether … an emergency medical condition … exists." 42 U.S.C. 1395dd(a). If such a condition exists, hospitals must provide, "within the staff and facilities *available at the hospital*, for such further medical examination and such treatment as may be required to stabilize the medical condition, or … for transfer of the individual to another medical facility." 42 U.S.C. 1395dd(b)(1) (emphasis added). This directive necessarily precludes treatments that state law prohibits because such treatments are not "available at the hospital." 42 U.S.C. 1395dd(b)(1).

Nothing in EMTALA indicates Congress intended it to supersede a state's limitations on what treatments are generally "available" to any patient. For example, if a person presents with a condition that could result in "serious impairment to bodily functions" unless she gets immediate treatment, 42 U.S.C. 1395dd(e)(1)(A)(ii), and the attending physician believes that condition could be stabilized with

26

an experimental medication that state law forbids, EMTALA would not authorize or require that the medication be prescribed anyway. The physician's judgment does not override contrary state regulations and make that medication "available" at the hospital. And if no other treatments are available to stabilize the patient—an unlikely event given the capacious meaning of "stabilizing treatment" that encompasses many treatment options—the hospital complies with EMTALA by providing a transfer. EMTALA's demands are focused on ensuring that every patient— whether insured, paying out of pocket, or having no money or coverage at all—is treated the same within the bounds of the hospital's capabilities and state law.

That is why every circuit to have addressed the question has uniformly held that EMTALA does not create a national standard of care. *E.g.*, *Gatewood* v. *Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) (EMTALA does not duplicate standards of care but instead creates a cause of action "for what amounts to failure to treat"); *Correa* v. *Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995) ("EMTALA does not create a cause of action for medical malpractice"; it prohibits "disparate" treatment); *Hardy* v. *N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792–93 (2d Cir. 1999) (EMTALA is not intended "to provide a federal remedy for misdiagnosis or medical negligence" but to impose a legal duty "to provide emergency care to all") (citations omitted); *Torretti* v. *Main Line Hosps., Inc.*, 580 F.3d 168, 173–74 (3d Cir. 2009) (EMTALA "does not create liability for malpractice based upon breach of national or community standard of care"; "the statute was aimed at disparate patient treatment") (citation omitted); *Vickers* v. *Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142–43

27

(4th Cir. 1996) (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice," only for "what amounts to failure to treat") (citations omitted); *Cleland* v. *Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268, 272 (6th Cir. 1990) (EMTALA's terms "preclude[ ] resort to a malpractice or other objective standard of care"; hospital need merely "act[ ] in the same manner as it would have for the usual paying patient"); *Nartey* v. *Franciscan Health Hosp.*, 2 F.4th 1020, 1025 (7th Cir. 2021) (per curiam) ("We therefore join the chorus of circuits that have concluded the EMTALA cannot be used to challenge the quality of medical care") (collecting cases); *Summers* v. *Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136–38 (8th Cir. 1996) (en banc) ("every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms"; plaintiffs are entitled "to be treated as other similarly situated patients are treated, within the hospital's capabilities") (citations omitted); *Urban By & Through Urban* v. *King*, 43 F.3d 523, 525 (10th Cir. 1994) (EMTALA "is neither a malpractice nor a negligence statute"); *Holcomb* v. *Monahan*, 30 F.3d 116, 117 & n.2 (11th Cir. 1994) (EMTALA creates no negligence or malpractice claims; indigent patients need merely be treated the same as other patients).

And it is also why the Fifth Circuit rejected the administration's position in this very context: "EMTALA does not impose a national standard of care." *Texas*, 89 F.4th at 543. The United States cannot escape the consequences of this point—just as a patient who wanted, but was denied, an abortion cannot wield EMTALA to force an emergency room to perform one, neither can the federal government.

28

The administration has insisted that courts "have long recognized that abortion care is among the treatments required as stabilizing treatment under EMTALA." Appl.Opp.29. But none of the four pre-*Dobbs* district court decisions on which the administration has relied actually says that—much less strikes down any state law on that basis.

*California* v. *United States* upheld a federal conscience law allowing doctors to *refrain* from performing abortions, despite the argument that EMTALA required them. No. 05-00328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). *Morin* v. *Eastern Maine Medical Center* concerned not an abortion but whether to deliver an unborn child that was already dead. 780 F. Supp. 2d 84, 86 (D. Me. 2010). *Ritten* v. *Lapeer Regional Medical Center* involved a factual dispute about whether a patient "was truly in labor" and required premature delivery. 611 F. Supp. 2d 696, 715 (E.D. Mich. 2009). And *New York* v. *U.S. Department of Health & Human Services* was not an EMTALA case at all but a ruling against the Trump administration's regulation enforcing federal conscience laws, a regulation the current administration rescinded after *Dobbs*. 414 F. Supp. 3d 475, 537–39 (S.D.N.Y. 2019), *appeal withdrawn by* No. 19-4254, 2022 WL 17974424 (2d Cir. Dec. 8, 2022).

To transform EMTALA into a state-law wrecking ball would require repealing the Medicare Act's savings clause, rewriting 42 U.S.C. 1395dd(b)(1)(A) to require "treatment as may be required to stabilize [an emergency] medical condition [*regardless of whether such treatment is authorized under state law*]," and removing states as the principal regulators of the practice of medicine. Unsurprisingly, the administra-

29

tion has cited no authority for this extraordinary reading, which is contrary to "the language and design of the statute as a whole." *K Mart Corp.* v. *Cartier, Inc.*, 486 U.S. 281, 291 (1988).

EMTALA's focused mandate merely ensures that indigent patients are not denied treatments that are authorized under state law for paying patients. *Texas*, 89 F.4th at 542 (EMTALA judges a hospital's action "by whether it was performed equitably in comparison to other patients with similar symptoms") (quoting *Marshall*, 134 F.3d at 322). In other words, EMTALA takes state standards of care—and hospitals' capabilities—as it finds them.

The Ninth Circuit's pre-*Dobbs* decision in *Baker* v. *Adventist Health, Inc.* is illustrative. 260 F.3d 987 (9th Cir. 2001). There, the plaintiff argued that EMTALA required a 40-bed rural hospital to offer psychiatric treatment. *Id.* at 991. The hospital operated an emergency room but did not offer psychiatric treatment and had no psychiatrists or any other mental health professionals on staff. *Ibid.* The court held that forcing a hospital to provide treatment beyond its capability was "not a tenable position under the statute." *Id.* at 993.

Just as EMTALA does not require emergency rooms to provide psychiatric services that are not available on site, it does not require emergency rooms to provide treatments that are unavailable because state law forbids them. If emergency rooms need not hire psychiatrists, they certainly do not have to employ abortion providers.

EMTALA does not override other state laws, either. Though physicians are regulated by state medical-practice standards, the administration's view

30

would allow doctors' professional judgment to supersede those standards in the emergency room, making doctors a law unto themselves. See J.A.698 (noting that "a medical professional may believe an organ transplant is necessary to stabilize a patient's emergency medical condition, but EMTALA would not then preempt a state's requirements governing organ transplants"). If physician judgment becomes the trump card, emergency-room doctors could administer an experimental drug that is neither FDA-approved nor covered by Medicare. Cf. *Abigail All. for Better Access to Development Drugs* v. *von Eschenbach*, 495 F.3d 696 (D.C. Cir. 2007). Despite contrary state law, they could also treat emergency mental-health conditions with marijuana or euthanasia medications, and could treat children with electro-convulsive therapy or psychosurgery, including lobotomies. *E.g.*, Idaho Code § 37-2705(d)(28) (THC schedule I controlled substance); *id.* § 39-4514; (prohibition on euthanasia); *id.* § 16-2423(3) (prohibition on pediatric psychosurgery and electroconvulsive treatment).

Perhaps most troubling, the United States' novel theory would open the same "mental health" loophole for abortion as *Roe*. It would authorize emergency-room doctors to perform abortions whenever they say those abortions are necessary to avoid "serious jeopardy" to the mother's mental health. 42 U.S.C. 1395dd(e)(1)(A)(i). That would turn emergency rooms into federal abortion enclaves governed not by state law but by subjective physician judgment. The administration's conception of preemption results in wide latitude to perform abortions for the alleged purpose of treating mental health—no matter how broadly that concept might stretch.

31

Beyond failing to establish that EMTALA's text preempts Idaho law, the administration has also been unable to show any practical conflict between EMTALA and the Defense of Life Act. It proffered declarations from physicians who described various emergency-room situations where, in their medical judgment, abortion was appropriate. J.A. 24–44, 354–76, 596–619. But none of those situations pose a conflict with Idaho law. For instance, several declarations address ectopic pregnancies. J.A. 30–32, 606–09, 618. Yet treating an ectopic pregnancy is consistent with the Defense of Life Act. See Idaho Code § 18-604(1)(c); *United States* v. *Idaho*, 83 F.4th 1130, 1137 (9th Cir. 2023).

As the Ninth Circuit stay panel noted, every other circumstance those declarations describe involved life-threatening circumstances, such that Idaho law would allow an abortion because the physician determined "in his good faith medical judgment" that it was necessary to "prevent the death" of the mother. Idaho Code § 18-622(2)(a)(i); J.A.667 (citing *Planned Parenthood Great Nw.*, 522 P.3d at 1203). The administration offered no evidence of a situation where abortion is the *only* possible stabilizing treatment for a mother facing a non-life-threatening medical condition.

Of course, because the question presented focuses on preemption, the Court need only decide whether EMTALA requires abortions that Idaho law forbids. Neither EMTALA's text nor its purpose requires those abortions. It is enough for the Court to hold that. EMTALA gives patients the right "to be treated as other similarly situated patients are treated, within the hospital's capabilities." *Summers*, 91 F.3d at 1138. The statute does not give patients a federal

32

right to receive in the emergency room what state law prohibits providing to anyone.

### 2.  EMTALA requires hospitals to care for an unborn child.

EMTALA cannot be read to require abortions for a second reason: its text demands equal treatment for "the unborn child." 42 U.S.C. 1395dd(e)(1)(A)(i). In 1989, Congress added the phrase "unborn child" to EMTALA, defining "emergency medical condition" to include a condition that jeopardizes the health of either "the woman or her unborn child." *Ibid.*; see Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6211(h), 103 Stat. 2106, 2248 (Dec. 19, 1989). On top of requiring care to stabilize an unborn child who presents with an emergency medical condition, 42 U.S.C. 1395dd(e)(3)(A), EMTALA also requires that patient transfers (1) minimize risks to the unborn child, 42 U.S.C. 1395dd(c)(2)(A); (2) do not threaten the health or safety of the unborn child, 42 U.S.C. 1395dd(e)(1)(B)(ii); and (3) assess the medical benefits to the unborn child, 42 U.S.C. 1395dd(c)(1)(A)(ii). So "EMTALA imposes obligations on physicians with respect to both the pregnant woman and her unborn child." *Texas*, 89 F.4th at 544 (citation omitted).

Again, EMTALA does not mandate any specific services or standard of care, merely equal treatment. So when a woman is in active labor, EMTALA requires the hospital to deliver the unborn child and placenta, even if the mother is unable to pay. 42 U.S.C. 1395dd(e)(3)(A); see also U.S. Br. at 39, *Texas* v. *Becerra*, No. 23-10246 (5th Cir. May 1, 2023) (citing 42 U.S.C. 1395dd(e)(3)(A) and acknowledging that EMTALA requires a hospital to deliver an unborn

child of a woman in active labor). "The inclusion of [this] one stabilizing treatment indicates the others are not mandated." *Texas*, 89 F.4th at 542 (citation omitted); cf. *Bittner* v. *United States*, 598 U.S. 85, 94 (2023) (applying the *expressio unius est exclusio alterius* canon). It is particularly unlikely that EMTALA overrides state law in the context of abortion given its solicitude for the child.

The administration's primary case in opposition to the stay application, *In re Baby "K" (Three Cases)*, 16 F.3d 590 (4th Cir. 1994), is a perfect illustration of EMTALA's care for all human life—and its narrow preemptive sweep. There, the Fourth Circuit held that a physician's EMTALA duty to stabilize an already-born baby preempted a hospital's claim that it could withhold stabilizing care that it deemed "medically or ethically inappropriate." *Id.* at 597 (quoting Va. Code Ann. § 54.1-2990 (1993)).

The child had anencephaly—"a congenital malformation in which a major portion of the brain, skull, and scalp are missing"—rendering her "permanently unconscious." *Id.* at 592. So only the baby, not the mother, had an emergency medical condition. *Ibid.*

There was no question that Virginia state law allowed the stabilizing care requested—placing the child on a ventilator—because the hospital had previously provided that care to Baby K. *Id.* at 592–93. That was why the Fourth Circuit rejected the hospital's attempt to invoke Virginia law to allow a physician to let the child die, holding that approach preempted by EMTALA's "stabilizing treatment" requirement. *Id.* at 597.

34

In other words, the administration relies on a case that required hospitals to *preserve* a child's life as grounds to require them to take it. In so doing, the administration says that because EMTALA references "the woman *or* her unborn child," 42 U.S.C. 1395dd(e)(1)(A)(i) (emphasis added), then if it comes down to a choice of the child's life or the mother's fertility, for example, the mother's non-life-threatening interest always prevails. Appl.Opp.32–33. That is not a faithful reading of the word "or" in the statutory text. "If you are offered coffee or tea, you may pick either … or you may for whatever reason order both. This is the ordinary sense of the word, understood by everyone." Bryan A. Garner, *Garner's American Modern Usage* 45 (2d ed. 2003). See generally *Union Ins. Co.* v. *United States*, 73 U.S. (6 Wall.) 759, 764 (1867) (when "the obvious intent" is "that the word 'or' must be taken conjunctively," then that is how the word should be interpreted).

To put it another way, EMTALA does *not* force a choice between mother and child. As a result, there can be no impossibility conflict with an Idaho statute that requires saving the child's life in such circumstances.

Tellingly, the administration's position also conflicts with the Hyde Amendment, which prohibits federal funds from being "used to pay for abortions except in cases of danger to the life of the mother, rape, or incest," *Planned Parenthood Ariz. Inc.* v. *Betlach*, 727 F.3d 960, 964 (9th Cir. 2013). And its position further conflicts with several abortion-specific laws that prevent agencies from requiring healthcare providers to perform abortions. *E.g.*, Consol. Appropriations Act of 2023, Pub. L. No. 117-328, Div. B., Tit. II, § 203, 136 Stat. 4459, 4541 (Dec.

35

29, 2022) (restricting DOJ from using any funds to "require any person to perform, or facilitate in any way the performance of, any abortion.*"); id.* at Div. H., Tit. V, § 507(d)(1) (restricting HHS from requiring healthcare entities to facilitate abortions). So if the administration is right—that EMTALA requires abortions to stabilize emergency medical conditions that fall short of threatening the life of the pregnant woman—then federal law would simultaneously override state law to *mandate* the performance of certain abortions while *prohibiting* the use of federal funds to pay for them. EMTALA's text in no way supports attributing to Congress such incoherence.

The administration's opportunistic attempt to assert powers that it "never previously claimed" is troubling indeed. *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2372 (2023). And it has consequences not just for Idaho's sovereignty and its citizens but for others beyond this case. For example, the federal government's revisionist interpretation of EMTALA seeks to immunize doctors who provide abortions from complying with state law. But its new statutory reading also coerces emergency-room doctors to perform or complete abortions, including "incomplete medical abortion[s]," contrary to their deeply held beliefs. CMS, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022); see also *Texas* v. *Becerra*, 623 F. Supp. 3d 696, 716, 728 (N.D. Tex. 2022). HHS is already threatening hospitals and physicians with six-figure fines for failing to comply with a non-existent abortion mandate. U.S. Dep't of Health & Hum. Servs., *HHS Secretary Xavier Becerra Statement on EMTALA Enforcement* (May 1, 2023). The Court should reject this mangling of EMTALA.

36

## B. Idaho law is no obstacle to EMTALA's purpose.

EMTALA's call for stabilizing care to prevent patient dumping does not mandate abortion or any other procedure. Accordingly, a state law defining when abortion may be performed—in line with the historic police powers of states as reaffirmed in *Dobbs*—is no obstacle to a statute seeking to prevent patient dumping.

Assuming there is a place for so-called obstacle preemption, cf. *Wyeth*, 555 U.S. at 594 (Thomas, J., concurring), the starting place is to establish, based on text and structure, Congress's purpose and objective in enacting EMTALA. On that subject, the circuits have spoken with one voice until now: to prevent patient dumping or otherwise refusing to treat indigent patients who present to emergency rooms. *E.g.*, *Texas*, 89 F.4th at 542 ("the purpose of EMTALA is to provide emergency care to the uninsured") (citation omitted). Accord*, e.g., Brooker* v. *Desert Hosp. Corp.*, 947 F.2d 412, 414 (9th Cir. 1991) (citing H.R. Rep. No. 241, 99th Cong., 2d Sess. 27, *reprinted in* 1986 U.S.C.C.A.N. 42, 605, and Note, *Preventing Patient Dumping*, 61 N.Y.U. L. Rev. 1186, 1187–88 (1986)); *Hardy*, 164 F.3d at 792; *Bryan* v. *Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996); *Marshall*, 134 F.3d at 322; *Cherukuri* v. *Shalala*, 175 F.3d 446, 450 (6th Cir. 1999); *Martindale* v. *Ind. Univ. Health Bloomington, Inc.*, 39 F.4th 416, 419, 423 (7th Cir. 2022); *Harry* v. *Marchant*, 291 F.3d 767, 772–73 (11th Cir. 2002).

The Defense of Life Act poses no obstacle to the goal of prohibiting patient dumping. The Act does not direct that uninsured patients presenting to an

37

emergency department be sent away without medical treatment while comparable patients with money or insurance are treated. Instead, the Act addresses a topic that EMTALA does not—abortion—and it affirms that unborn life is generally protected in Idaho.

If anything, the Defense of Life Act and EMTALA share a common purpose: to protect unborn life. Indeed, both statutes have specific, detailed language manifesting that purpose. Far from being at cross-purposes, then, Idaho's law and EMTALA run along the same track. Accordingly, Idaho's protection for the unborn is no obstacle to EMTALA's anti-patient dumping purpose, and the Court should invalidate the district court's contrary holding.

\* \* \*

EMTALA is a basic law with a clear purpose: to stop hospitals from dumping indigent patients. There is zero evidence Congress enacted EMTALA to mandate abortions, much less to run roughshod over state judgments on appropriate medical treatments. Quite the opposite, Congress amended the statute in four places to require hospitals to protect the "unborn child." Pub. L. No. 101-239, § 6211(c), (h), 103 Stat. 2106, 2248 (1989); see also *Texas*, 89 F.4th at 545 ("EMTALA does not provide an unqualified right for the pregnant mother to abort her child especially when EMTALA imposes equal stabilization obligations."). Because "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case," *Medtronic*, 518 U.S. at 485 (cleaned up), the United States is unlikely to prevail on the merits of its pre-emption claim.

38

### III. The equities favor Idaho.

The administration cannot show a likelihood of success on its preemption claim—not even a serious question going to the merits. Accordingly, there is no need to consider the other *Winter* factors. *Whole Woman's Health* v. *Jackson*, 141 S. Ct. 2494, 2495 (2021); *Trump* v. *Hawaii*, 585 U.S. 667, 710–11 (2018). But those factors, too, weigh in Idaho's favor.

### A. The administration is experiencing no harm, let alone irreparable harm.

The United States is suffering no harm. It has no legitimate interest in applying EMTALA to override the Defense of Life Act because EMTALA does not preempt the Act. Given that the government has no interest in enforcing federal law in illegal ways, it cannot establish irreparable harm. See *Ala. Ass'n of Realtors.*, 141 S. Ct. at 2490 ("our system does not permit agencies to act unlawfully").

The administration's lack of harm is exposed—and its unreasonable statutory interpretation highlighted—by the fact that it did not raise its novel preemption theory until more than three decades after EMTALA was enacted and the alleged conflict between EMTALA and Idaho law first arose. Idaho has long prohibited abortions that the administration says EMTALA requires. Before *Dobbs* and the Defense of Life Act, Idaho was one of 17 states that prohibited abortions after viability; six more states prohibited abortion after 24 weeks, and another state after 25 weeks. Idaho Code, § 18-608 (enacted in 1973); Godlasky, Ellis, & Sergent, *Where is abortion legal? Everywhere. But . . .*, USA Today (Apr. 23, 2020), https://perma.cc/Q8JW-PPTN. Yet the federal

39

government never claimed that any of these laws conflicted with and were therefore preempted by EMTALA. This over-three-decade delay confirms the lack of irreparable injury and an opportunistic (and baseless) interpretation of a plain statute.

### B. The balance of equities and public interest favor Idaho.

The balancing of the equities and the public interest merge when the United States is a party. *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Those factors weigh decisively against the district court's injunction.

Notably, the Court need not balance the equities or the public interest by "weigh[ing] … tradeoffs" in a case like this, where the government has acted unlawfully. *NFIB*, 595 U.S. at 120. In those situations, the Court recognizes that balancing any competing interests "is the responsibility of those chosen by the people through democratic processes." *Ibid.* Here, Congress has done that by crafting EM-TALA so that it does not preempt state laws like Idaho's. That decision should be respected.

Regardless, the balance of competing interests tips sharply toward Idaho. The harm to the State is substantial. A State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott* v. *Perez*, 585 U.S. 579, 602 n.17 (2018) (citing *Maryland* v. *King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers); accord *New Motor Vehicle Bd.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). That principle applies with full force here.

40

Idaho enacted the Defense of Life Act anticipating that this Court would restore to the states their authority to regulate abortion. *Dobbs* did precisely that, returning "to the people and their elected representatives" the power to "regulat[e] or prohibit[ ] abortion." 597 U.S. at 302. A court order blocking that return of sovereign authority would thwart Idaho's exercise of self-government on a matter of critical social and political significance. This causes irreparable harm to Idaho, its republican institutions, and its people.

The district court's injunction impairs not only Idaho's sovereignty but also its interest in preserving "prenatal life at all stages of development" and its interest in protecting "the integrity of the medical profession." *Dobbs*, 597 U.S. at 301. That injunction empowers emergency-room physicians who want to perform abortions to do so in violation of state law, and it compels doctors who object to abortion to participate in it. That risks the loss of unborn life and harm to the medical profession.

On the flip side, as the stay panel recognized, "Idaho's law expressly contemplates necessary medical care for pregnant women in distress." J.A.707 (citing Idaho Code § 18-622(4)). There is no reasonable prospect, for example, that a woman experiencing an ectopic pregnancy will be denied life-saving medical care. Idaho Code § 18-622(2).

In short, the equitable balance and public interest favor Idaho. The irreparable harm to Idaho's sovereignty and the pro-life interests of its people vastly outweigh any purported injuries that the United States asserts from its inability to rewrite EMTALA.

41

**IV. The district court's injunction is overbroad.**

The district court separately erred by entering an overbroad injunction.

Injunctive relief must be narrowly tailored to remedy the specific harm alleged. See *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). The district court says it enjoined Idaho from enforcing Idaho Code § 18-622(2)–(3) "as applied to medical care" required by EMTALA. J.A.656. Yet the very next sentence prohibits Idaho from taking certain actions against medical providers or hospitals based on their performance of conduct "that is necessary to avoid" an emergency medical condition. J.A.656.

This "necessary to avoid an emergency medical condition" standard does not align with EMTALA's definition of stabilizing treatment. Rather, it greatly expands the statute's scope. Under EMTALA, "to stabilize" means to provide "such medical treatment of the condition *as may be necessary to assure*, within reasonable medical probability, *that no material deterioration of the condition is likely* to result from or occur during the transfer of the individual from a facility." 42 U.S.C. 1395dd(e)(3)(A) (emphasis added). EMTALA uses a "necessary to assure no material deterioration" standard and applies that standard to patients that present with an existing emergency condition. This is obviously different, and much narrower, than the district court's "necessary to avoid an emergency medical condition" standard.

42

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

| | |
|---|---|
| JOHN J. BURSCH | RAÚL R. LABRADOR |
| ERIN M. HAWLEY | ATTORNEY GENERAL |
| MATTHEW S. BOWMAN | ALAN M. HURST |
| LINCOLN DAVIS WILSON | SOLICITOR GENERAL |
| JACOB P. WARNER | JOSHUA N. TURNER |
| ALLIANCE DEFENDING | *Counsel of Record* |
| FREEDOM | JAMES E.M. CRAIG |
| 440 First Street, NW, | 700 W Jefferson St #210 |
| Suite 600 | Boise, ID 83720 |
| Washington, DC 20001 | josh.turner@ag.idaho.gov |
| | (208) 332-3548 |
| JAMES A. CAMPBELL | |
| JULIE MARIE BLAKE | CHARLES J. COOPER |
| RORY GRAY | DAVID H. THOMPSON |
| ALLIANCE DEFENDING | PETER A. PATTERSON |
| FREEDOM | MEGAN M. WOLD |
| 44180 Riverside Pkwy | COOPER & KIRK PLLC |
| Lansdowne, VA 20176 | 1523 New Hampshire NW |
| | Washington, DC 20036 |

FEBRUARY 2024