UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | Case No. 1:24-cv-00244-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, | |
| Defendants. | |

## INTRODUCTION

Before the Court are three motions to dismiss: one filed by 41 county prosecutors and the Idaho Board of Medicine (Dkt. 25), one filed by Bonneville County Prosecuting Attorney (Dkt. 26), and a third filed jointly by the plaintiff and the Elmore County Prosecuting Attorney (Dkt. 30). In December 2024, the Court held a hearing on the motions to dismiss. Shortly thereafter, Dr. Stacy Seyb filed a motion to amend (Dkt. 48). For the reasons set forth below, the Court will grant the Bonneville County Prosecuting Attorney's motion and the joint motion, grant in part and deny in part the 41 county prosecutors' and Board's motion, and grant Dr. Seyb's motion to amend.

# BACKGROUND

## A.    Dr. Seyb

Dr. Seyb is board-certified maternal-fetal medicine physician licensed to practice in Idaho. *Complaint* at ¶ 15. Maternal-fetal medicine is a subspeciality of obstetrics and gynecology focused on caring for people with high-risk or complicated pregnancies. *Id.* Part of his practice includes providing "medically indicated abortions." *Id.* at ¶ 7. An "indication is a symptom, condition, or factor that makes a particular course of action advisable." *Id.* at ¶ 80. Dr. Seyb alleges that abortion care is medically indicated where "pregnancy-related complications jeopardize the pregnant person's health," continuing the pregnancy would exacerbate or interfere with treatment for an underlying health condition, continuing the pregnancy would put the pregnant person at-risk from self-harm, "the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable," or "a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses." *Id.* at ¶¶ 7, 82, 86, 94, 96, 100.

Dr. Seyb alleges that Idaho's abortion bans interfere with his ability to provide abortions to his patients when it is medically indicated. More specifically, he alleges that before Idaho enacted the abortion bans, Dr. Seyb provided two or three abortions a month. *Seyb Decl.* at ¶ 8, Dkt. 33-1. Since the bans took effect, he

has referred six-patients a month to out-of-state abortion providers. *Id.* at ¶ 10. Without the bans, Dr. Seyb would provide this care himself. *Id.* at ¶ 11.

**B.    The Abortion Bans.**

There are two bans currently in effect in Idaho. The Defense of Life Act, Idaho Code § 18-622, which bans abortion at all stages of pregnancy and a ban on abortion beginning at approximately six-weeks of pregnancy, Idaho Code § 18-8801 through 18-8808. *Id.* at ¶ 3. The Defense of Life Act criminalizes abortions provided at any stage of pregnancy. Idaho Code § 18-622. "Criminal abortion" is a felony punishable by two to five years imprisonment in addition to suspension or revocation of the physician's medical license. *Id.* § 18-622(1). There is a narrow exception for the life of the pregnant person when:

> (a) The abortion was performed or attempted by a physician as defined in this chapter and:
>
>> (i) The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and
>>
>> (ii) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such

> greater risk shall be deemed to exist because the physician believes
> that the woman may or will take action to harm herself[.]

Idaho Code § 18-622(2)(a). There is also an exception for abortions provided in the first trimester that were the result of rape of incest when the patient reported the rape or incest to law enforcement. *Id.* § 18-622(2)(b).

The six-week ban criminalizes abortions provided to "a pregnant woman when a fetal heartbeat has been detected, except in the case of a medical emergency, in the case of rape . . . , or in the case of incest . . . ." Idaho Code § 18-8804(1). The statute defines "medical emergency" as "a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." *Id.* § 18-8801(5). The exceptions for rape and incest, as in the Defense of Life Act, are only applicable when the rape or incest was reported to law enforcement. *Id.* § 18-8804(a)–(b).

Dr. Seyb brings this action individually and on behalf of his patients alleging the defendants' enforcement of this ban violates the due process and equal protection clauses of the Fourteenth Amendment. The defendants now move to dismiss the Complaint alleging Dr. Seyb lacks standing and fails to state a claim upon which relief may be granted. Dr. Seyb opposes the motion to dismiss. He also

seeks to amend the Complaint to include additional allegations related to standing. The defendants oppose any amendment.

## LEGAL STANDARD

### A.    Motion to Amend

Motions to amend a pleading filed after a Case Management Order deadline has expired are governed by the more restrictive provisions of Rule 16(b). *Johnson v. Mammoth Mountain*, 975 F.2d 604, 607–08 (9th Cir. 1992). "A party seeking to amend a pleading after the date specified in the scheduling order must first show good cause for amendment under Rule 16, then if good cause be shown, the party must demonstrate that amendment was proper under Rule 15." *Id*. at 608 (internal citations omitted).

Leave to amend under Rule 15 should be granted where "justice so requires." Fed. R. Civ. P. 15(a)(2). "In determining whether leave to amend is appropriate, the district court considers . . . four factors: bad faith, undue delay, prejudice to the opposing party, and. . . futility." *Herring Networks, Inc. v. Maddow,* 8 F.4th 1148, 1161–62 (9th Cir. 1999). Generally, a court must make a determination "with all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

### B.    Motion to Dismiss

The defendants' motions to dismiss are brought pursuant to Rule 12(b)(1)

and 12(b)(6). Where both jurisdictional and merits grounds are presented, the Court looks to the jurisdictional issues first. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

A complaint must be dismissed on a Rule 12(b)(1) motion if a court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A jurisdictional attack on subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In contrast, a factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* The present motions are facial challenges to Dr. Seyb's standing. When evaluating a facial challenge, the court must take all the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Salter v. Quality Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir. 2020).

Likewise, on a Rule 12(b)(6) motion, the Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "[T]he court accepts the facts alleged in the Complaint as true, and dismissal can be based on the lack of a cognizable legal theory or the absence of

sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). A complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when it pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556.

## ANALYSIS

There are four related motions presently before the Court. At the outset, the Court will grant the joint motion to dismiss Elmore County Prosecuting Attorney. Dkt. 30. For the remaining three motions—two motions to dismiss and a motion to amend—the Court will begin by first addressing Dr. Seyb's motion to amend before addressing the arguments contained in the defendants' motions to dismiss. This approach allows the Court to address the defendants' arguments in opposition to the motion to amend based on futility and in favor of dismissal together as they are largely co-extensive.

### A.    Amendment

Dr. Seyb's proposed amended complaint adds a single paragraph that includes allegations related to Dr. Seyb's standing. *See Prop. Am. Compl.* at ¶ 16,

Dkt 48-2. These allegations incorporate the information contained in Dr. Seyb's supplemental declaration submitted in response to the motion to dismiss. *Seyb Supp. Decl.*, Dkt. 33-1. The defendants oppose the motion to amend, claiming Dr. Seyb cannot show due diligence and that amendment is futile.

Dr. Seyb seeks to amend the Complaint after the expiration of the deadline to amend pleadings set in the Court's scheduling order. Dkt. 42. The primary focus of Rule 16(b)'s good cause standard is the diligence of the moving party. *Johnson*, 975 F.2d at 609. A court should find good cause only if the moving party shows it "could not reasonably meet the established timeline in a scheduling order despite [its] diligence." *DIRECTV, Inc. v. Busdon*, No. CV-04-265-S-LMB, 2005 WL 1364571, at *1 (D. Idaho 2005). Dr. Seyb meets this standard. All of the additional facts in the proposed amended complaint were disclosed in Dr. Seyb's supplemental declaration. When the Court indicated at the hearing that it was not inclined to consider this supplemental declaration for the purposes of a motion to dismiss, Dr. Seyb moved to amend just over a week later. Under these circumstances, the Court finds that Dr. Seyb has been diligent.

Turning now to the requirements under Rule 15. There is no indication of bad faith, undue delay, or prejudice to the defendants. Any prejudice is mitigated by Dr. Seyb's disclosure of the amended allegations in his supplemental

declaration. As for futility, the defendants argue that amendment is futile because all of the deficiencies identified in their motions to dismiss are still present. Indeed, Dr. Seyb's proposed amended complaint is "substantively identical to the original complaint." *Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099, 1108 (9th Cir. 2023). As such, the motion to amend does not moot the defendants' motions to dismiss. The Court will, therefore, address the defendants' arguments as to futility below and need not address them here. *See Ni-Q LLC v. Prolacta Bioscience, Inc.*, 407 F. Supp.3d 1153, 1161 (D. Ore. 2019) ("The standard for assessing whether a proposed amendment is futile therefore is the same as the standard imposed under Rule 12(b)(6)."). Moreover, denying leave to amend makes little sense in this situation. If the Court were to dismiss Dr. Seyb's original Complaint for failing to adequately allege standing, the Court would grant Dr. Seyb leave to amend to fix those deficiencies. *See* 28 U.S.C. § 1653. Given no other Rule 15 consideration requires denying the motion, the Court will grant leave to amend and will treat the proposed amended complaint as the operative complaint for the purposes of the motions to dismiss.

## B.    Standing

Moving on to the motions to dismiss, the defendants argue Dr. Seyb lacks standing to bring a claim on behalf of himself or his patients. "Standing is a

threshold question in every case before a federal court." *McMichael v. Napa County*, 709 F.2d 1268, 1269 (1983). The doctrine reflects "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1103 (9th Cir. 2006) (internal quotation marks omitted). The constitutional limitations on standing give meaning to Article III's "case or controversy requirement by "identify[ing] those disputes which are properly resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). The prudential rules of standing are "essentially matters of judicial self-governance." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Particularly relevant here is the exception to prudential limitations that permits third party standing in some cases. *Fleck & Assocs.*, 471 F.3d at 1104. That exception, however, "presuppose[s] a litigant who has already met the constitutional requirements." *Id.*

The Court will begin with the threshold question of whether Dr. Seyb has constitutional standing to bring this action before turning to the issue of third party standing.

### 1.  Constitutional Standing

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) sufficient 'causal connection between the injury and the conduct

complained of' and (3) a 'lik[lihood]' that the injury 'will be redressed by a favorable decision." *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023) (quoting *Driehaus*, 573 U.S. at 157–58). To survive a facial challenge to standing, the complaint must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). With this framework in mind, the Court will tick through the standing requirements.

a.  Injury-in-Fact

Dr. Seyb alleges a pre-enforcement challenge to both bans, meaning no defendant has taken any enforcement action against him, however, "[o]ne need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). Indeed, "[p]re-enforcement injury is a special subset of injury-in fact,' where 'the injury is the anticipated enforcement of the challenged statute in the future.'" *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (quoting *Peace Ranch*, 93 F.4th at 487)). That said, "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the injury requirement." *Id.*

Rather, a plaintiff challenging a statute not yet enforced against him, can satisfy the injury-in-fact requirement if: (1) the plaintiff has alleged "an intention

to engage in a course of conduct arguably affected with a constitutional interest;"
(2) the conduct is "arguably proscribed by statute;" and (3) "there exists a credible
threat of prosecution." *Driehaus*, 573 U.S. at 159–63.

### i.   Intent to Engage in a Course of Conduct

The plaintiff "need not plan to break the law" to meet the first prong of this
test. *Peace Ranch*, 93 F.4th at 488. Rather, "courts must ask whether the plaintiff
would have the intention to engage in the proscribed conduct were it not
proscribed." *Id.* The proposed amended complaint alleges before the abortion bans
took effect, Dr. Seyb provided two to three abortions a month. *Prop. Am. Compl.* at
¶ 16, Dkt. 48-2. Due to the possibility of criminal prosecution, Dr. Seyb no longer
provides abortions in Idaho. *Id.* Instead, he refers six patients per month to out-of-
state abortion providers. *Id.* If these bans were not in place, he would provide the
abortions himself. *Id.* These allegations are sufficient to show the requisite intent to
engage in a course of conduct. *See Planned Parenthood Great Northwest*, 122
F.4th at 837. The defendants, nonetheless, suggest that Dr. Seyb cannot satisfy the
first prong of the *Driehaus* test because his conduct is not "arguably affected with
a constitutional interest" and, even if it was, Dr. Seyb must demonstrate that it is
*his* constitutional interest that is at stake. Neither argument is compelling.

With respect to the first argument, the defendants suggest Dr. Seyb's

conduct is not "affected with a constitutional interest" because there is no constitutional right to an abortion after *Dobbs*. Importantly, however, *Dobbs* held there is no constitutional right to an elective abortion. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 234 (2022). This leaves the scope, if any, of the right to non-elective abortions unresolved. *Id.* at 393 (Sotomayor, Kagan, Breyer JJ., dissenting). Here, Dr. Seyb's conduct is "arguably affected with a constitutional interest" because "[a] woman cannot safely secure an abortion without the aid of a physician. . . . The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here." *Singleton v. Wulff*, 428 U.S. 106, 117 (1976). In any event, Dr. Seyb's conduct implicates other constitutional interests including "interests protected by the Fifth and Fourteenth Amendments: (1) the [Abortion Bans] imperil Plaintiff['s] liberty because violating the statute[s] could result in imprisonment, and (2) the statute[s] threatens [his] property because a statutory violation may result in revocation of Plaintiffs' licenses. . ." *Isaacson*, 84 F.4th at 1099.

The defendants' second argument fares no better. They insist that the conduct at issue must affect Dr. Seyb's constitutional interests, not those of a third party. *Supp. Br.* at 1, Dkt. 49. This reading is unjustifiably narrow and ignores the plain language of *Driehaus* and *Peace Ranch* that requires only that the conduct be

"arguably affected with *a* constitutional interest." *Driehaus*, 573 U.S. at 159;

*Peace Ranch*, 93 F.4th at 488. There is nothing in either case suggesting that it

must be the litigant's constitutional interest, only that there must be some

constitutional interest implicated by the statute. Moreover, this narrow reading is

belied by cases, including *Dobbs*, that have permitted litigants to bring pre-

enforcement challenges when their constitutional rights were not directly affected

by the challenged action. In *Dobbs*, for example, the plaintiffs were a clinic and

provider bringing a claim on behalf of their patients. *Dobbs*, 597 U.S. at 233. If, as

the defendants claim, a plaintiff only has standing to bring a pre-enforcement

challenge when the challenged conduct affects their constitutional rights, then the

plaintiffs in *Dobbs* would have lacked standing.

Even to the extent *Dobbs*' statement that the Court's abortion cases "have

ignored the Court's third-party standing doctrine" has any effect on standing

doctrine, which it does not, cases outside of the abortion context demonstrate that

the affected with a constitutional interest standard has not been applied as

stringently as the defendants suggest. *Id.* at 286–87. For example, courts in this

circuit have found that the firearm manufacturers' and gun sellers' conduct is

arguably affected with a constitutional interest. *Mitchell v. Atkins*, No. C19-5106-

JCC, 2024 WL 755950, at *2 (W.D. Wash. Feb. 23, 2024) (concluding "entire

business of selling guns" constitute a course of conduct affected with a constitutional interest). Just as "[t]he firearm industry's practices have an arguable constitutional dimension," sufficient to satisfy the first element of the *Peace Ranch* test, so too does Dr. Seyb's provision of abortion care. *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1250 (S.D. Cal. 2024). Accordingly, the proposed amended complaint adequately alleges an intent to engage in a course of conduct arguably affected by a constitutional interest.

### ii.  Arguably Proscribed by Statute

Second, this conduct is "arguably proscribed by law." *Driehaus*, 573 U.S. at 162. As detailed in the Complaint and proposed amended complaint, an abortion is medically indicated in a number of situations not permitted under the statutes. Generally, abortion may be medically indicated due to adverse effects on the health of the pregnant person or where the fetus suffers from fatal abnormalities that are incompatible with life. *Prop. Am. Compl.* at ¶¶ 83, 97, Dkt. 48-2. An abortion may be needed to ensure the health of the pregnant person when conditions arise as a result of pregnancy, such as incomplete miscarriage, PPROM, or hypertension. *Id.* at ¶¶ 82, 83–86. Or where continuing the pregnancy exacerbates an underlying condition or interferes with life-saving treatment for that condition. *Id.* at ¶¶ 87–96. Both the Defense of Life Act and the six-week ban contain narrow exceptions that

prohibit abortion in at least some of the situations where it is medically necessary. *Id.* at ¶¶ 67–68 (discussing exceptions to the Defense of Life Act), 73–74 (discussing exceptions to the six-week ban). Dr. Seyb has adequately pled that some of the abortions he intends to provide are proscribed by the statutes.

### iii. Credible Threat of Prosecution

Third, Dr. Seyb has alleged a credible threat of prosecution. "To evaluate threat of prosecution, we consider: (1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement." *Isaacson*, 84 F.4th at 1099.

As discussed above, Dr. Seyb has alleged an intent to engage in proscribed conduct. Although he is complying with the abortion bans, his "choice to eliminate the threat of enforcement by not doing what [he] want[s] should not bar [his] suit." *Isaacson*, 84 F.4th at 1100. *Driehaus* made clear that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Driehaus*, 573 U.S. at 163.

Idaho has repeatedly expressed its intent to enforce both bans. Even this general threat of enforcement, could reasonably be understood "as a threat to investigate physicians who run afoul of those regulations." *Isaacson*, 84 F.4th at

1100. While there is no history of past prosecution, the Court will give that factor little weight where abortion care is practically unavailable in Idaho. *Prop. Am. Compl.* at ¶¶ 119–23, Dkt. 48-2. As Dr. Seyb points out, "[t]his final prong often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch*, 93 F.4th at 490. The defendants have failed to disavow enforcement here, which further weighs in favor of Dr. Seyb. As such, Dr. Seyb's proposed amended complaint adequately alleges injury-in-fact.

### b.  Causation

The defendants argue that Dr. Seyb's injury cannot be fairly traced to either the County prosecutors or the Idaho Board of Medicine. "To satisfy the causality element for Article III standing, [p]laintiffs must show that the injury is causally linked or 'fairly traceable' to the [defendants'] alleged misconduct." *Washington Enviorn. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013). "The line of causation between the defendant's action and the plaintiff's harm must be more than attenuated." *Native Vill. Of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012). But will "not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Wash. Enviorn. Counsel*, 732 F.3d at 1141–42.

First, all of the county prosecutors have the authority to enforce both

abortion bans.[1] *See* Idaho Code § 31-2227(1). Dr. Seyb practices medicine in

Boise, so there is undoubtedly causal connection between the Ada County

prosecutor and Dr. Seyb's injury. The Court, however, is not convinced that there

is the necessary causal link between Dr. Seyb's injury and the other county

prosecutors. Dr. Seyb's theory of causation is that he may be charged with

conspiracy should he provide an abortion to a patient from another county. To

support the plausibility of this theory, Dr. Seyb points to the refusal of the 43

prosecutors to disavow their authority to prosecute Dr. Seyb for conspiracy. While

these prosecutors have not disavowed this possibility, it is undisputed Dr. Seyb

only provides abortions in Ada County and has no intention of providing abortions

in any other county. The causal link between Dr. Seyb's injury—risk of

prosecution—and the 43 county prosecutors is not sufficiently plausible to warrant

joining all county prosecutors. Accordingly, all of the prosecutors except for the

Ada County prosecutor are dismissed from the action without prejudice and

---

[1] The defendants briefly invoke the Eleventh Amendment as a basis for dismissal. *Motion* at 4 n. 4, Dkt. 25. This passing mention of the Eleventh Amendment in a single footnote does not require further consideration by the court as "[a] footnote is the wrong place for substantive arguments on the merits." *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal. 2008). Moreover, it appears to be a meritless argument. Dr. Seyb seeks only prospective relief consistent with the *Ex Parte Young* exception to sovereign immunity. *See Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 705 (9th Cir.1992).

without leave to amend.

Second, the defendants argue the Idaho Board of Medicine does not have a role in enforcing criminal statutes, including the abortion bans. Instead, its role is merely ministerial. After conviction, the Board will suspend the convicted physician's medical license consistent with the statute. *See Motion* at 5, Dkt. 25. The defendants emphasize that the Board has no authority to prosecute either abortion ban and insist that the Board may only suspend a license upon a conviction. At the hearing, counsel confirmed that the Board would consistently apply the statutes as requiring a conviction before suspension.

Nonetheless, the Medical Practice Act authorizes the Board to discipline providers for "performing or procuring an unlawful abortion." Idaho Code § 54-1814(6). This disciplinary authority would seem to include disciplining providers for providing abortions in violation of Idaho Code § 18-8801 or § 18-622, even without a conviction. At this point, there is a sufficiently plausible relationship between Dr. Seyb's injury—the risk of losing his license either temporarily or permanently—and the Board to survive a motion to dismiss.

### c. Redressability

To establish redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan*, 504 U.S. at 561. Additionally, "[r]edressability requires an analysis of whether the court *has the power* to right or prevent the claimed injury." *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017). The injury Dr. Seyb seeks to redress is possible prosecution and suspension of his medical license by enjoining enforcement of the abortion bans with respect to medically indicated abortions. Clearly, the requested relief would remedy Dr. Seyb's injury and has met the requirements of constitutional standing with respect to his claims against the Ada County prosecutor and the Board.

### 2. Third Party Standing

Turning now to third party standing. A plaintiff has "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth*, 422 U.S. at 510. Courts consider a two-factor test when evaluating whether a plaintiff can invoke third party standing: (1) whether the plaintiff has a close relationship to the third party and (2) whether the third parties are "hindered" from bringing their own claim. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

The contours of third-party standing in the wake of *Dobbs* were a significant point of tension during the hearing. In *Dobbs*, the Supreme Court stated its abortion cases "have ignored the Court's third-party standing doctrine." *Dobbs*,

597 U.S. at 287. Despite the defendants' suggestion that this statement indicates some sort of rejection of existing standing doctrine, the Court is unwilling to assume "the Supreme Court, in eight words, upended the law of standing." *See e.g.*, *Yellowhammer Fund v. Attorney General of Alabama Steve Marshall*, 733 F. Supp. 3d 1167, 1184 (M.D. Ala. 2024). Importantly, for purposes of the present motions, the plaintiffs in *Dobbs* brought their challenge to the Mississippi's abortion ban based upon third-party standing. Like Dr. Seyb, the plaintiffs, a clinic and one of its physicians, brought a pre-enforcement challenge to a Mississippi abortion restriction because the law infringed on their patients' right to an abortion. *Dobbs*, 597 U.S. at 233. Whatever the dicta in *Dobbs* may indicate about the future of third-party standing is of no matter here. The Court must apply the current law to the facts before it.

First, Dr. Seyb has alleged a close relationship with the third-party. Dr. Seyb is a physician, and the third parties are his patients. "The closeness of the relationship is patent, as it was in *Griswold* and in *Doe*" and a litany of other cases. *Singleton*, 428 U.S. at 117. Even in the wake of *Dobbs*, physicians' relationships to their patients satisfy this standard. *See e.g.*, *Share Our Selves v. City of Santa Ana*, No. 8:23-cv-00504-DOC-KES, 2024 WL 4866815, at *6–7 (C.D. Cal. Sept. 30, 2024) (finding health center could assert claims on behalf of patients). The

defendants argue that even if Dr. Seyb can establish a general close relationship with his patients, he must provide more specifics. Or, as the defendants put it, he must allege more than "merely hypothetical third parties," with "hypothetical injuries." *Reply* at 6, Dkt. 41.

        In support of this argument, the defendants rely on *Kowalski v. Temser*, where the Supreme Court held that attorneys could not invoke third party standing based on their relationship with hypothetical future clients. 543 U.S. 125, 131 (2004). *Kowalski*, however, drew a distinction between cases where the litigant is the regulated party and those where the litigant is not the regulated party. *Id.* This distinction actually supports the existence of third-party standing here. The purpose of third-party standing is to address cases such as this, where the regulation of the litigant results in the violation of an unregulated party's rights. The defendants' reliance on *Food and Drug Administration v. Alliance for Hippocratic Medicine* to suggest the contrary is also misplaced. 602 U.S. 367 (2024). In *Alliance*, the Supreme Court found that a group of doctors did not have standing to sue the FDA to challenge its approval of mifepristone. Importantly, the plaintiffs in that case were "unregulated parties [seeking] to challenge the FDA's regulation *of others*." *Id.* at 385 (emphasis in original).

        Here, unlike in *Kowalski* and *Alliance*, "enforcement of the challenged

restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (internal quotations omitted) (emphasis in original). In other words, enforcement of the abortion bans *against* Dr. Seyb would result indirectly in the violation of his patients' rights. This application of third-party standing is not unique to abortion cases nor does this principle represent a departure from normal third-party standing doctrine. *See Craig v. Boren*, 429 U.S. 190, 194 (1976). Indeed, the Supreme Court has long recognized that vendors may bring challenges on behalf of their customers when the challenged regulation directly regulates the vendor, but indirectly interferes with their customers' constitutional rights. *Id*; *Free Speech Coalition v. Knudsen*, --- F. Supp. 3d ----, 2024 WL 4542260, at *10 (D. Mont. 2024). There is no reason why this principal should not apply with equal force here where, indisputably, Dr. Seyb is the regulated party. Accordingly, Dr. Seyb has shown a close relationship to his patients.

Moving on the second prong of the third-party standing analysis: whether the third parties are "hindered" from bringing their own claims. *Powers*, 499 U.S. at 411. A third party may be hindered for the purposes of the third party standing even where the barriers are not "insurmountable." *Singleton*, 428 U.S. at 117–18. Courts have long recognized that women seeking abortions may be hindered from

asserting their own rights. For instance, "she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit." *Id.* at 117. This risk of publicity is even more true today than it was in 1970's.[2] Additionally, any determination on the merits is unlikely to come before the end of pregnancy and, therefore, is unlikely to grant any individual woman the relief she seeks. As one district court explained:

> The end of pregnancy may not technically moot the clients' claim, but the sheer unlikelihood of obtaining personal relief before the end of pregnancy will inevitably deter clients from filing their own suits. Clients who are unlikely to succeed in obtaining an abortion through litigation have "little incentive to set in motion the arduous process needed to vindicate [their] own rights."

*Yellowhammer Fund*, 733 F. Supp. 3d at 1183 (quoting *Powers*, 499 U.S. at 415). This is to say nothing of the cost and time required to maintain a litigation of this magnitude. *See Campbell v. Louisiana*, 523 U.S. 392, 398 (1998). Accordingly, Dr. Seyb has satisfied the requirements of third party standing.

### C.    Failure to State a Claim

---

[2] This point is illustrated by the publicity surrounding *Adkins v. State of Idaho*, where several women challenged Idaho's abortion ban. The defendants cite to this case to support the proposition that women can, and do, assert their own constitutional rights while ignoring the high cost of doing so. These women's names, faces, and stories have become the subject of national news as they share some of their most vulnerable and traumatic moments with the public. Not everyone may wish to put themselves in this position, particularly when the immediate need for an abortion has already passed.

Dr. Seyb alleges the abortion bans violate the due process and equal protection clauses of the Fourteenth Amendment. The defendants seek to dismiss both claims, arguing that Dr. Seyb has failed to allege an as-applied challenge and that both claims fail to state a claim upon which relief can be granted. The Court will address each argument in turn.

### 1. As-applied

The defendants argue that Dr. Seyb has failed to state an as-applied challenge for the same reasons he has failed to allege standing. The Supreme Court has made clear,

> the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in the Complaint.

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010). "A paradigmatic as-applied attack. . . challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to specific factual circumstances, under the assumption that a court can separate valid from invalid subrules or applications." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (internal quotations marks omitted). Dr. Seyb's Complaint attacks the application of the abortion bans to medically necessary abortions. This attack can

be characterized as either an attack on the subset of the statutes' application or the application of the statutes to specific factual circumstances. Either way, Dr. Seyb has pled an as-applied challenge, and the Court will not dismiss the Complaint on that basis.

### 2. Substantive Due Process

Dr. Seyb alleges both abortion bans violate the due process clause of the Fourteenth Amendment by banning abortion without exception for serious medical need. This clause provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. The due process clause guarantees more than "fair process." *Washington v. Glucksburg*, 521 U.S. 702, 719–20 (1997). It also "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id*. "When a fundamental right is at stake, the Government can only act by narrowly tailored means that serve a compelling state interest." *Department of States v. Muñoz,* 602 U.S. 899, 910 (2012). If no fundamental right is at stake, then rational basis applies and the state action will be sustained so long as it is "rationally related to a legitimate government interest." *Glucksburg*, 521 U.S. at 728. The Court will begin by evaluating whether Dr. Seyb has adequately alleged that the abortion bans interfere with a fundamental right before determining whether the

government satisfies the appropriate standard of review.

> *a.* The Abortion Bans Arguably Interferes with a Fundamental Right

The due process clause of the Fourteenth Amendment provides heightened protection for two types of substantive rights: (1) enumerated rights, which are those guaranteed by the first eight amendments; and (2) implied rights, which are "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 597 U.S. at 237. The right to an abortion in cases of serious medical need clearly falls into that second category of implied rights, which calls for a two-step analysis. First, the Court must describe the asserted fundamental liberty interest. *Glucksberg*, 521 U.S. at 721. Second, it must then decide whether that interest is "objectively, deeply rooted in this nation's history and tradition." *Id.* at 720–21.

First, the claimed fundamental right is the right to obtain an abortion in cases of serious medical need. Dr. Seyb uses this framing interchangeably with the right to a "medically indicated abortion." *Prop. Am. Compl.* at ¶¶ 7, 8, 80, Dkt. 48-2. Regardless of the wording, Dr. Seyb has clearly articulated several situations where an abortion is medically indicated, or where an abortion is the medically advisable course of action. *Id.* at ¶ 81. More specifically, an abortion is medically indicated when continuing the pregnancy would "exacerbate an underlying

physical, mental, or behavioral health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition," or would "put the pregnant person at-risk from self harm." *Id.* at ¶¶ 83, 87, 95. Abortion is also medically indicated when the embryo or fetus has a fatal or grave condition, miscarriage is inevitable, or a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses. *Id.* at ¶¶ 97, 101. At its broadest, a right to an abortion in cases of serious medical need encompasses the full range of medically indicated abortion care.

Importantly, the right to an abortion in cases of serious medical need is a significantly narrower right than that articulated in *Roe v. Wade* and overruled in *Dobbs*. Indeed, the issue presented by *Dobbs* was "whether 'all pre-viability prohibitions on elective abortions are unconstitutional.'" *Id.* at 234. The majority did not address "whether a State may prevent a woman from obtaining an abortion when she and her doctor have determined it is a needed medical treatment." *Id.* at 380 (Breyer, Sotomayor & Kagan, JJ., dissenting).[3] Despite the defendants'

---

[3] Other courts have recognized that a more limited right to abortion may exist following *Dobbs*. *See Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc. v. Cameron*, 624 F. Supp. 3d 739, 749 (W.D. Ky. 2022) *vacated and remanded for mootness by Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc. v. Cameron*, No. 22-5832, 2023 WL 3620977 (6th Cir. May 24, 2023); *Bernard v. Individual Members of Indiana Med. Licensing Board*, 667 F. Supp. 3d 939, 944–46 (S.D. Ind. 2023).

protestations otherwise, *Dobbs* does not resolve this motion.

Next, the Court must consider "whether the right is 'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 597 U.S. at 237. The Supreme Court has instructed courts to engage in a careful analysis of the history of the right at issue. *Id.* at 238. The precise contours of this careful analysis are unclear.[4] Nonetheless, based on the analysis in *Dobbs*, an important consideration is how states regulated abortion around the time of ratification of the Fourteenth Amendment in 1868. *See Dobbs*, 597 U.S. at 246–50. By the *Dobbs* majority's count, 28 of 37 states had statutes that prohibited abortion in a least some circumstances. *Id.* at 248. Eighteen of those contained express exceptions to "save the life of," "preserve the life of the woman," or to "secure the safety of the woman."[5] *Id* at 302–30. Five other states

---

[4] It is unclear precisely how this analysis must be conducted. Presumably, it will require a hearing in which both sides will provide evidence of the state of the law and public sentiment at the time of the adoption of the Fourteenth Amendment. For that reason, it is only necessary for Dr. Seyb, at this juncture, to make credible allegations that the right to a medically necessary abortion is deeply rooted in our history and tradition. He has done so. But whether that is borne out by a full hearing on the issue remains to be seen.

[5] New York, Ohio, Indiana, Maine, Alabama, Michigan, Virginia, New Hampshire, California, Iowa, Wisconsin, Kansas, Connecticut, Rhode Island, Nevada, West Virginia, Oregon, Florida, and Maryland. *Dobbs v. Jackson Women's Health*, 597 U.S. 215, 303–317 (2022). Between 1868 and 1952, eight of the nine states that enacted abortion restrictions also contained similar exceptions.[5] *Id.* at 317–323.

had statutes that criminalized only abortions performed without lawful justification, or feloniously.[6] *Id.* Dr. Seyb suggests these statutes necessarily contain a similar exemption, by way of affirmative defense, for the life and health of the mother. For example, Massachusetts' statute prohibited abortions performed "maliciously or without lawful justification." *Id.* at 306. In a trial for an unlawful abortion, the trial court instructed the jury that "a physician may lawfully procure a miscarriage of a woman pregnant with child if in doing so he acts in good faith for the preservation of the life or health of such pregnant woman." *Commonwealth v. Brown*, 121 Mass. 69, 76 (1876). These exceptions suggest that it was well-understood that women could legally obtain abortions in cases where their life and health were at risk.

Additionally, both English and American courts appear to have understood the "health of the mother" to include mental health. In *Rex v. Bourne*, an English court instructed the jury that:

> [I]f the doctor is of opinion, on reasonable grounds and with adequate knowledge, that the probable consequences of the continuance of the pregnancy will be to make the woman a physician or mental wreck, the jury are quite entitled to take the view that the doctor. . . is operating for the

---

[6] Massachusetts, Vermont, New Jersey, Louisiana, and Pennsylvania. *Id.* at 597 U.S. 215, 303–317 (2022). Although the Vermont statute cited by the majority in *Dobbs* does not contain an exception, one was added by amendment in 1867 to preclude liability "when the act is necessary to preserve the life of the woman." *State v. Stokes*, 54 Vt. 179, 180 (1881).

purpose of preserving the life of the woman.

(1938) 3 All E.R. 615, 619 (Eng.); *see also Commonwealth v. Wheeler*, 315 Mass. 394, 395 (Mass. 1944) (assuming "a physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary to save her life or to prevent serious impairment of her health, mental or physical[.]").

Moreover, these exceptions are consistent with broader common law principles of necessity and self-defense. It is well documented that both principles have long traditions in American law. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day[.]"). While both defenses would have been available to physicians charged with criminal abortion in 1868, these principles also have a broader implication. Indeed, they indicate a recognition that certain situations require the "choice of evils." *United States v. Bailey*, 444 U.S. 394, 310 (1980). The statutory exceptions align with these principles. They suggest that a more thorough exploration of this issue may well lead the Court to conclude there is a deeply held tradition and belief that a woman would not be required to

continue a pregnancy that places her life or health at risk.[7]

Additionally, Dr. Seyb argues that a narrower right to abortion is consistent with the already-recognized fundamental right to bodily integrity. The Supreme Court has stated "[n]o right is held more sacred, or is more carefully guarded. . . than the right of every individual to the possession and control of his [or her] own person, free from all restraint or interference of others, unless clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). Before *Dobbs*, courts generally avoided grounding any right to abortion in the right to bodily integrity because *Roe* and *Casey* provided the relevant framework for challenges to abortion restrictions. *See e.g.*, *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 507 (6th Cir. 2012). That said, some courts now recognize that support for a similarly narrow right to non-elective, or medically necessary abortions, "can be found in the right to bodily integrity." *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc. v. Cameron*, 624 F. Supp. 3d 739, 749 (W.D. Ky. 2022). The Court

---

[7] Obviously, statutes and published cases are only a part of the historical record but, based on *Dobbs*, are instructive to determining the existence of a fundamental right. Indeed, although *Dobbs* makes little mention of other sources, as a practical matter, it seems necessary to look beyond statutes to determine whether a right is "deeply rooted in history and tradition," particularly where that right in question disproportionately impacts women who exercised little, if any, political power in 1868.

agrees that this argument is not precluded by current precedent. Even after *Dobbs*, patients may well, "retain a liberty interest in non-elective emergency abortion procedures for the life [or health] of the pregnant woman." *Bernard v. Individual Members of Indiana Licensing Board*, 667 F. Supp. 3d 939, 945 (S.D. Ind. 2023). The precise scope of that right in the post-*Dobbs* world is yet to be determined. But, arguably, includes at a minimum "those circumstances in which the pregnant patient's life or health is at serious risk." *Id.*

      *b.*   The Abortion Bans Plausibly Fail Strict Scrutiny and Rational Basis Review.

Dr. Seyb has adequately alleged that the statutes interfere with a fundamental right. If, after further development of the record at trial, the abortion bans are determined to interfere with such a right then "substantive due process forbids the infringement of that right 'at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Witt v. Department of Air Force*, 527 F.3d 806, 817 (9th Cir. 2008) (quoting *Reno v. Flores*, 507 U.S. 292, 301–02 (1993)). The state's compelling interest is, presumably, the protection of fetal life. *See* Idaho Code § 18-8802(8).

Dr. Seyb has adequately alleged that the abortion bans are not narrowly tailored to serve a compelling government interest. For one, the Defense of Life Act contains no exception for any risk to the pregnant person's health, only their

life. This restrictive statute infringes on the bare minimum fundamental right to an abortion in cases where the pregnant person's health is at serious risk. The Defense of Act Life is not narrowly tailored to preserve fetal life because it requires continuing a pregnancy even where there is no possibility of fetal life. *Prop. Am. Compl.* at ¶¶ 84–86, 100, Dkt. 48-2 (describing several pregnancy related conditions that can lead to infection, organ damage or failure, stroke, kidney failure, liver failure, and seizures); *id.* at ¶¶ 97–100 (describing fetal abnormalities that are incompatible with life). The exception also precludes the provision of abortions necessary for the pregnant person to continue life or health saving care. *Id.* at ¶¶ 87–94.

The same is true with respect to the six-week ban. While the exception to the six-week ban is broader than the exception provided for in the Defense of Life Act as it permits an abortion where "delay will create a serious risk of substantial and irreversible impairment of a major bodily function," it is not narrowly tailored to protect fetal life. *See* Idaho Code § 18-8801(5). Again, it provides no exception for abortions to preserve the health of the mother even when there is no possibility of fetal life. *Prop. Am. Compl.* at ¶¶ 97–100, Dkt. 48-2. It, similarly, does not encompass situations where continuing the pregnancy will prevent the provision of life or health saving care. *Id.* at ¶¶ 87–94. Under the heightened standard of review,

neither abortion bans are narrowly tailored to a compelling government interest as applied to medically indicated abortions.

In fact, Dr. Seyb has adequately alleged the abortion bans, as applied to at least some medically indicated abortions, do not survive even rational basis review. Under rational basis review, state conduct is presumed valid and will be upheld is it is "rationally related to legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although more lenient than higher forms of security, rational basis review is not "toothless." *Matthews v. De Castro*, 429 U.S. 181, 185 (1976). Again, the state's legitimate interest is the protection of fetal life. *See Dobbs*, 597 U.S. at 301; Idaho Code § 18-8802(8). This interest is not rationally related to restricting abortions where there is no possibility of fetal life. Both statutes prohibit at least some medically indicated abortions even where there is no possibility of fetal life, such as where miscarriage is inevitable or where the embryo or fetus has a fatal abnormality. *Prop. Am. Compl*. at ¶¶ 97–107, Dkt. 48-2. Prohibiting abortion in the absence of fetal life cannot be rationally related to protecting fetal life. In such situations, the abortion bans serve only to require a pregnant person to continue a non-viable pregnancy despite no interest in fetal life and at obvious peril to the pregnant person. *Id.* at ¶ 98. Under Dr. Seyb's allegations, such an application of the statute may be so arbitrary as to fail even

rational basis review. As such, the defendants' motion to dismiss is denied.

### 3. Equal Protection

Dr. Seyb argues the Defense of Life Act violates the equal protection clause by treating pregnant people at-risk of death from self-harm differently than those at risk of death for other reasons. The equal protection clause of the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. This has long been understood as "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439 (citing *Plyer v. Doe*, 457 U.S. 2020, 216 (1982)).

To analyze an equal protection claim, the first step is "to identify the state's classification of groups." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (quoting *Country Classic Dairies, Inc v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)). The Court then looks for a "control group," that includes "individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policies." *Id.* Once the Court has articulated the appropriate classification, it must determine the proper level of scrutiny to apply. When the state restricts access to a fundamental right or discriminates against a suspect class, strict scrutiny applies. *Id.* at 1017. When the

state discriminates on the basis of a quasi-suspect class, such as sex, "heightened" scrutiny applies. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Finally, when there is no fundamental right involved and the state does not discriminate based on a suspect or quasi-suspect class, rational basis review applies. *Heller v. Doe*, 509 U.S. 312, 319–321 (1993).

Beginning with the first step of the equal protection analysis, Dr. Seyb alleges the Defense of Life Act creates a classification based on risk of death from self-harm and risk of death from other conditions. In other words, "the classified group" is pregnant people with life-threatening mental illnesses and "the control group" is pregnant people with life threatening physical conditions. The defendants argue that this description of the classification is inappropriate because the abortion ban is enforceable only against the abortion provider, so the only classification is providers who provide abortions and providers who do not. This argument ignores that the statute nonetheless results in different treatment of pregnant people at risk of death from self-harm compared to pregnant people at-risk of death from physical conditions. *See Craig*, 429 U.S. at 192 (statute "prohibiting the sale of. . . beer to males under the age of 21 and females under the age of 18" created a classification based on gender even though statute was enforceable against the alcohol vendor).

**MEMORANDUM DECISION AND ORDER - 37**

Although ultimately a "fact-specific inquiry," Dr. Seyb has adequately alleged that the two groups are similarly situated "in those respects relevant to the Defendants' policy." *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (internal quotation marks omitted). Both groups face life-threatening illnesses or conditions for which an abortion is medically indicated. *Prop. Am. Compl.* at ¶¶ 95, 113–117, Dkt. 48-2. Failure to provide treatment to an individual in either group is likely to result in the same outcome–death of the pregnant person and the fetus. *Id*. Despite those similarities, the two groups are treated differently. An individual's ability to obtain the medically indicated treatment varies based upon whether the underlying condition that places them at risk is a physical or mental condition. "In other words, [mental illness] is the critical variable here." *Harrison v. Kernan*, 971 F.3d 1069, 1076 (9th Cir. 2020).

When, as alleged here, a legislative classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," strict scrutiny applies. *Mass Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Such classifications will only be upheld upon the government's showing that the law is narrowly tailored to a compelling governmental interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16–17 (1973). Here, Dr. Seyb has plausibly alleged the statute interferes with his

patient's fundamental right to obtain abortion care in cases of serious medical need. The Defense of Life Act prohibits abortions in cases where the risk of death arises from self-harm while permitting abortions where the risk of death is the result of physical conditions. This classification is not narrowly tailored to the government's compelling interest in fetal life because the risk to the pregnant person and the fetus are the same in both situations—death. Despite these similarities, one group is able to obtain a legal abortion while the other is not. *See Prop. Am. Compl.* at ¶¶ 95–96, Dkt. 48-2 (explaining self-harm is one of the leading causes of death for pregnant people).

The defendants offer an unavailing explanation for the classification: that pregnant people facing death from self-harm have other treatment options or may be "otherwise prevented from engaging in self-harm." *Reply* at 15, Dkt. 41. Even setting aside the vagueness of this justification, the Court is unconvinced that this explanation suffices to show, as a matter of law, that the law is narrowly tailored to the government's interest in fetal life. If the two groups are similarly situated, as Dr. Seyb has alleged, abortion is medically indicated in both situations. However, only one group is able to get the necessary care. In either situation, the risk of death to the pregnant person necessarily results in a risk of death to the fetus. Dr. Seyb's allegations are sufficient to survive the motion to dismiss.

MEMORANDUM DECISION AND ORDER - 39

The defendants also argue that Dr. Seyb has waived his equal protection claim based on animus. *See* Dkt. 50 at 15. The proposed amended complaint contains allegations that the Defense of Life Act's differential treatment of pregnant people at risk of death from self-harm and those at risk of death for other conditions is motivated by animus towards people with mental illness or people with behavioral health disorders. *Prop. Am. Compl.* at 132–133, Dkt. 48-2. The Court does not understand Dr. Seyb's animus claim to be distinct from his equal protection claim, a claim which the Court has already concluded is plausibly alleged. These allegations relate to the standard of scrutiny and, given the Court's conclusion that Dr. Seyb has alleged the Defense of Life Act fails strict scrutiny, the Court need not consider the allegations related to animus. *Navarro v. Block*, 72 F.3d 712, 717 (9th Cir. 1995); *see also Romer v. Evans*, 517 U.S. 620, 632–33 (1996) Accordingly, the motion to dismiss Dr. Seyb's equal protection claim is denied.

## ORDER

**IT IS ORDERED that:**

1.     Plaintiffs' Motion to Amend (Dkt. 48) is **GRANTED**. Plaintiff may file an amended complaint consistent with this order within 21 days of the issuance of this order.

2.    The Joint Motion to Dismiss (Dkt. 30) is **GRANTED.**

3.    The Bonneville County Prosecutor's Motion to Dismiss (Dkt. 26) is

**GRANTED.**

4.    The Members of the Idaho Board of Medicine's and 41 County

Prosecutors' Motion to Dismiss (Dkt. 25) is **DENIED IN PART AND**

**GRANTED IN PART.**

DATED: March 31, 2025

_____

B. Lynn Winmill
U.S. District Court Judge