RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

AARON M. GREEN, ISB #12397
KYLE D. GRIGSBY, ISB #10709
Deputy Attorneys General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
aaron.green@ag.idaho.gov
kyle.grigsby@ag.idaho.gov

*Attorneys for Defendants Members
of the Idaho Board of Medicine and
Intervenor Raúl Labrador*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D.<br><br>*Plaintiff*,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>*Defendants*,<br><br>ATTORNEY GENERAL RAÚL LABRADOR,<br><br>*Intervenor.* | Case No. 1:24-cv-00244-BLW<br><br>**MEMORANDUM IN SUPPORT OF INTERVENOR ATTORNEY GENERAL RAÚL LABRADOR'S AND DEFENDANT IDAHO BOARD OF MEDICINE'S MOTION FOR LEAVE TO FILE MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

This case suffers from four critical flaws that should be resolved at summary judgment. The first is that Plaintiff, Dr. Stacy Seyb, lacks Article III standing. As to all of the claims he brings, and as to all of his patients, Plaintiff lacks standing because the harms he identifies are caused by his own misunderstanding of Idaho's abortion laws. When directly asked at deposition what sort of guidance he would find useful, he identified guidance that the Idaho Supreme Court gave over two-and-half years ago—that there is no requirement for certainty or immediacy when a doctor determines in his good faith medical judgment whether an abortion is necessary to save the life of the mother. *Planned Parenthood Great Nw. v. Idaho*, 171 Idaho 374, 522 P.3d 1132 (2023). Plaintiff cannot manufacture his own injury by remaining in ignorance of what the law permits him to do— but that is exactly what he has done. This foundational defect bars each of his claims.

Second, specific to the mental health claims in this case, summary judgment is warranted because Plaintiff has admitted that he does not perform abortions for mental health reasons. If he does not perform abortions for mental health reasons, he cannot sue to vindicate the right of his patients to access mental health abortions. Count II must therefore be dismissed.

Third, no challenged portion of Idaho's abortion laws lacks rational basis.

Lastly, on the merits of Plaintiff's claim that an unenumerated fundamental right to any abortion at all exists, the affirmative expert offered by Plaintiff comes up short. Even taking Plaintiff's affirmative historian at face value, the research she provided and her testimony at deposition demonstrates that there is no unenumerated right to abortion for *any* reason cognizable under the Fourteenth Amendment. Summary judgment is accordingly warranted on Count I.

A party has a right to file for summary judgment under the Federal Rules, and this Court may not go beyond regulating timing, by prohibiting Defendants from filing for summary judgment in this case. The Court should grant the motion for leave to file summary judgment and

allow resolution of these issues, as Defendant is entitled, as a matter of law.

## PROCEDURAL BACKGROUND

The procedural posture of this motion is very unusual. As the Court recounted in its Order on the subject, Dkt. 65, on May 6, 2025, the Court held a status conference with the parties. Defendants indicated that summary judgment would likely be appropriate in this case, but the Court expressed some skepticism. Moving beyond skepticism, the Court *sua sponte* entered an Order one month later, requiring a party to seek leave before filing a motion for summary judgment. This was done, based solely upon the Court's view of the issues—far before the close of the discovery cutoff, months before any depositions had been taken, and before any discovered evidence had been brought before the Court. Dkt. 65 at 1. Thus, in compliance with the Court's order, the Defendant Idaho Board of Medicine and Intervenor Raúl Labrador now file this motion asking for leave to file a motion for summary judgment.

## LEGAL STANDARD

A motion for summary judgment is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The summary judgment rule serves to "isolate and dispose of factually unsupported claims or defenses." *Id*. at 323–24. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The ability to file a motion for summary judgment protects "the rights of persons opposing [an opposing party's] claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

Thus, Rule 56 permits a party to move for summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court *shall grant* summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) (emphasis added). "[I]f the moving party would not bear the burden at trial, it can meet its burden on summary judgment by 'either of two methods.'" *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F.Supp.3d 1117, 1127 (S.D. Cal. 2020) (quoting *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000)). It can "produce affirmative evidence negating an essential element of the nonmoving party's [case]" or "show that the nonmoving party does not have enough evidence of an essential element of its claim . . . to carry its ultimate burden of persuasion at trial." *Nissan*, 210 F.3d at 1106.

### ARGUMENT

Disposition of Plaintiff's claims at summary judgment is appropriate for four reasons. First, Plaintiff lacks standing as a general principle because his injuries are manufactured, as his deposition testimony shows. Second, Plaintiff lacks standing as to mental health abortions because he has testified that he doesn't perform them. Third, Idaho's abortion statutes satisfy rational basis. Fourth, Plaintiff's proffered historical experts cannot support an enumerated right to abortion because the evidence they point to is not sufficient to show an enumerated right as a matter of law. Accordingly, Defendants are entitled to summary judgment as a matter of law.

## I.    The Defendants and Intervenor are entitled to file a motion for summary judgment.

The Federal Rules provide for a party's right to file a motion for summary judgment. Fed. R. Civ. P. 56(a). While federal courts regularly set forth the timing and procedure of summary judgment proceedings, *see* Rule 56(b), they do not generally preclude a party from filing altogether.

Here, the Court has indicated that the consequence of the Court's ruling on this motion may be the harsh result of precluding a ruling on summary judgment altogether. Dkt. 65. Concerningly, this Court has set up as a standard the presentation of "compelling reasons" to permit such a filing and has done so only (as far as Defendants can tell) in this single case about abortion. Dkt. 65 at 2; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 286 (2022) (disapproving the "ad hoc nullification" of rules and doctrines when they would otherwise apply in an abortion case).

Circuit courts have admonished trial courts that have taken to *de facto* or *de jure* prohibitions on otherwise authorized motion practice, including motions for summary judgment, *see Kowalchuck v. Metropolitan Transp. Auth.*, 94 F.4th 210, 215 (2d Cir. 2024), with the Eleventh Circuit Court of Appeals even stating that it was "[b]affled by the district court's denial of a right accorded under Federal Rule of Civil Procedure 56 to file a summary judgment motion." *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1007 (11th Cir. 1992). "Absent extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation or a failure to comply with sanctions imposed for such conduct a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 649 (2d Cir. 1987) (internal citations omitted) (applying principle to motion to amend complaint and noting availability of mandamus). "District courts . . . must not circumvent the Federal Rules of Civil Procedure by implementing local rules or "procedures" which do not afford parties rights that they are accorded under the Federal Rules." *Brown*, 960 F.2d at 1008.

As *Brown*, 960 F.2d at 1009, held:

> Federal Rule of Civil Procedure 56 makes no allowance for a preliminary "procedure" by the district court for reviewing, with the potential of denying, a party's prospective summary judgment motion. Essentially, the local summary judgment "procedure" that has been used in the Middle District of Georgia constitutes advance screening. Under Rule 56, a party is entitled to make a summary judgment motion, which the district court then may decide.

This imposition of an apparently stringent "compelling reasons" standard similarly violates the spirit and clear import of F.R.C.P. 56. Rule 56 provides for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." There is no substitute for the opportunity to show the Court (as movants here believe) why they are entitled to judgment *now*, rather than after trial, by presenting undisputed (or indisputable) facts, or showing that Plaintiff cannot meet his burden. "Where there is no genuine issue as to any material fact, it is the duty of the Court to grant a motion for summary judgment in order to save the time and expense which would be required for the preparation and trial of the issues covered by the motion." *Bond Distrib. Co. v. Carling Brewing Co.*, 32 F.R.D. 409, 415 (D. Md. 1963) (citing Rule 56). Consequently, this motion should be granted as a matter of course, rather than under any higher standard.

Defendants are entitled to summary judgment if Plaintiffs cannot adduce evidence going to each of the elements of their claims—and Defendants (and the Court) cannot know if Plaintiffs will, unless and until Defendants move for summary judgment. *See Williams v. Boeing Co.*, 517 F.3d 1120, 1128 (9th Cir. 2008). Indeed, Defendants need not even present any evidence in support of their motion for summary judgment and are entitled to rely on the absence of evidence in the record, thus placing the burden on the Plaintiffs to present sufficient affidavits or other evidence to show that summary judgment is not appropriate. *See Celotex Corp.*, 477 U.S. at 323–24 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.").

Defendants are entitled to put Plaintiff to the test by filing a motion for summary judgment. The Court should accordingly grant this instant motion as a matter of course.

## II.    All Counts - The deposition of Dr. Seyb demonstrates that he lacks an injury in fact sufficient for pre-enforcement standing.[1]

Standing must be shown by Plaintiff "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992). This means that while "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage, summary judgment requires the plaintiff to set forth "specific facts" supporting standing. *Id.; see also Celotex Corp.*, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (internal quotations omitted).

In this case, that requires Plaintiff to show a constitutional injury-in-fact through specific facts demonstrating a concrete and particularized injury that is actual and imminent. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That injury must be caused by the defendant and redressable by judicial relief. *Id.* In the specific pre-enforcement standing context applicable here, Plaintiff must demonstrate that he intends to engage in a course of conduct arguably affected with a constitutional interest, that is arguably proscribed by statute, where the threat of enforcement against him is substantial. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–67 (2014).

### A. Plaintiff is ignorant of the scope of life exceptions in Idaho law, resulting in life-threatening referrals out of state, and thus manufacturing his own injury.

Plaintiff's sole claim to standing in his own right, as well as the third party standing to assert the rights of his patients, is the addition of a single paragraph in the amended complaint

---

[1] While Defendant IBOM and Intervenor AG Labrador are presenting an abbreviated argument on the merits, to comply with the Court's order to show "compelling reasons why summary judgment proceedings are appropriate," Dkt. 65 at 2, these are necessarily not the complete argument that will be presented in a full motion for summary judgment, and Defendant IBOM and Intervenor Labrador reserve all rights to present any and all necessary additional argument in their motions for summary judgment.

making the following allegations in support of his injury-in-fact sufficient for pre-enforcement standing:

> Since Idaho's abortion bans have been in effect, Dr. Seyb has had to refer approximately six patients per month with serious medical conditions to out-of-state abortion providers. Dr. Seyb no longer provides abortions in Idaho because he fears criminal prosecution or professional discipline for violating the abortion bans. But for Idaho's abortion bans, he would continue to provide abortion care in Idaho to patients with serious medical conditions rather than refer them to out-of-state abortion providers.

Dkt. 56 ¶ 16. He also refers to referrals he has "had" to make or otherwise "fac[e] prosecution for violating the [Defense of Life Act]" in his rebuttal expert report. The abortions that he would otherwise perform in lieu of referral is the constitutionally proscribed conduct that he contends is affected with a constitutional interest.

But fatal to Plaintiff's claim of standing is that he has not even taken the basic step of familiarizing himself with the actual requirements of the new law, despite his obligation as a physician to understand and obey "any and all state and local laws and rules related to the licensee or permittee's practice or profession." IDAPA 24.33.01.300.04(h); *see also* Idaho Code § 54-1814(26). He has no idea what the law requires or permits—not because it is alleged to be vague, but because Plaintiff hasn't educated himself on it before referring patients out of state, at the patient's expense and risk of adverse health consequences to the patients, and because Plaintiff's employer (St. Luke's) has not made efforts to ensure its doctors understand the law governing their practice. During his deposition, Plaintiff testified as follows:

> **Q.** Are there any exceptions [to the Defense of Life Act prohibitions]?
> **A.** I would like to understand what - - I think there are, probably, but I think it's hard to understand what those 'exceptions' are.

> Seyb Depo. at 45:16-19

> **Q.** Have you received any continuing education training on the Defense of Life Act?
> **A.** No.

Seyb Depo. at 49:10-12

**Q.** So what advice has St. Luke's administration given you on Defense of Life Act?
**A.** I think everybody -- you know, they haven't given us that much advice.

Seyb Depo. at 50:16-19

**Q.** Have they given you any training on how to interpret the phrase "necessary to prevent the death of the mother"?
**A.** No. I think everybody has a little bit different feeling about a broad-term word like "necessary."

Seyb Depo at 51:1-6; *see also* 51:9-11 (on "good faith medical judgment")

**Q.** What does that mean to you, "necessary to prevent the death of the mother"? What's your understanding of that?
**A.** I think it's -- the exception is only if you know that the mother is going to die.
**Q.** When you say, "know that the mother is going to die," what do you mean by that?
**A.** It is, shall we say, relatively inevitable you know, that there's no question, you know?

Seyb Depo. at 52:6-15

**Q.** How certain do you have to be as a physician that she is going to die before you can perform the abortion?
**[Objection]**
**A.** I think they have to be in a very unstable condition.
**Q.** What do you mean by that?
**A.** Abnormal vital signs, you know – shall we just say seriously ill.
**Q**. Okay. And how close to death does she need to be?
**[Objection]**
**A.** I wish someone would answer that for me.

Seyb Depo. at 53:3-20

Someone did answer that (and his other concerns) for Dr. Seyb—a year before he and other

St. Luke's physicians airlifted pregnant women out of state. *See Planned Parenthood*, 171 Idaho

at 445, 522 P.3d at 1203.

The Idaho Supreme Court, in January 2023, a year before Dr. Seyb claims he had to refer

patients out of state, held that Idaho's Defense of Life Act: 1) does not require "objective certainty"

that an abortion is necessary to prevent a woman's death before a doctor may perform an abortion;

and 2) does not require "a particular level of immediacy" before the abortion may be considered

necessary. *Planned Parenthood*, 171 Idaho at 445, 522 P.3d at 1203. "Instead, the statute uses broad language to allow for the clinical judgment that physicians are routinely called upon to make for proper treatment of their patients." *Id.* (citation and internal quotation marks omitted).

But despite the Idaho Supreme Court issuing its authoritative interpretation of the Defense of Life Act, Dr. Seyb was ignorant of this case:

> **Q.** Have you read the Idaho Supreme Court opinion in Planned Parenthood Great Northwest versus State of Idaho that was issued in January 2023.
> **A.** I don't believe I have.
> **Q.** Okay. Have you received any training on it?
> **A.** No.
> **Q.** Has St. Luke's given you any guidance on it?
> **Q.** No.

Seyb. Depo. at 73:14-24.

Because he is ignorant of the law's requirements, he cannot say whether any of his referrals are, in fact, the result of the law's requirements, or because of his own incompetence in failing to understand the law, resulting in his own unfounded fears of prosecution in situations in which he, as the treating physician, could make the determination in his good faith medical judgment that an abortion is necessary to prevent the death of the mother. Plaintiff's actions or purported chilling are untethered to the demands of the law, so any chilling effect on his practice (and any consequences to his patients) are the result of his own incompetence and ignorance, not Idaho's abortion laws. Seyb Depo. at 45:6–54:16; 73:14–76:2. The Idaho Supreme Court, in January 2023, a year before Dr. Seyb claims he had to refer patients out of state, held that Idaho's Defense of Life Act: 1) does not require "objective certainty" that an abortion is necessary to prevent a woman's death before a doctor may perform an abortion; and 2) does not require "a particular level of immediacy" before the abortion may be considered necessary. *Planned Parenthood*, 171 Idaho at 445, 522 P.3d at 1203. "Instead, the statute uses broad language to allow for the clinical judgment

that physicians are routinely called upon to make for proper treatment of their patients." *Id.* (citation and internal quotation marks omitted).

An examination of those patients that Plaintiff says he had to refer out of state on an emergency basis, despite his ignorance of the law, makes the problem of his self-imposed ignorance especially, and heartbreakingly, acute.[2] Plaintiff has not provided evidence that any of these referrals were necessary under Idaho law. *See Clapper*, 568 U.S. at 416 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam); *Nat'l Family Planning & Reproductive Health Ass'n, Inc.*, 468 F.3d 826, 831 (D.C. Cir. 2006)).

The first patient discussed at deposition was one with pre-viability, pre-term rupture of membranes (PPROM) at 20 weeks, with signs of an infection. Seyb Depo. at 113:12–114:4; Ex. 6 ¶ 9. Dr. Seyb admitted at deposition that this patient not only faced a risk of death from this condition but in fact had "a high probability" of death if not treated. Seyb Depo. at 113:22–114:4.

The second patient that Dr. Seyb treated[3] was also a PPROM patient with signs of infection and with membranes visible in a manner indicative of "pregnancy loss." *Id.* at 115:12–116:23; *see also Id.* Ex. 6 ¶ 10. Because of the potential for "infection, bleeding, [the] same things as a ruptured bag of water" there was a risk to the patient's life in this case as well. *Id.*

Last, a patient that Dr. Seyb consulted on was airlifted but didn't have an abortion at all, but instead delivered healthy twins—in Idaho. Seyb Depo. at 119:5–120:12. *Id.* Ex. 6 ¶ 14.

---

[2] Specifically, those referrals made during the United States Supreme Court's stay of the injunction in *United States v. Idaho* from January 5, 2024, to June 27, 2024. *See* 144 S. Ct. 540 (2024) and 603 U.S. 324 (2024); *see also* Seyb Depo. at 109:15–22.

[3] Dr. Seyb reviewed records for, but was not the treating or consulting physician for, three patients who were airlifted during the stay. While we do not know the subjective state of mind of the doctor(s) who treated these other patients (whose standing Dr. Seyb cannot assert anyway, because these are not his patients), Dr. Seyb testified that these patients also faced a risk of death from their condition. Seyb Depo. at 114:19–115:11, 116:24–117:23, 117:24–11; *Id.* Ex. 6 ¶¶ 11–13.

Despite these facts, known to Plaintiff at the time, he chose (or consulted) to have the women sent out of state on an emergency basis rather than providing necessary and appropriate treatment in Idaho. But he did so not taking the basic step of familiarizing himself with what Idaho law actually requires. Seyb Depo. at 73:14-77:16; 79:13-14 ("I believe you just educated me on that."). If Plaintiff believed in his good faith medical judgment that it was necessary to perform an abortion to prevent the death of the mother, let alone when there was *a high probability* of death without an abortion, then these abortions would be permitted in Idaho, he did not need to be certain that death would occur, and it was not necessary for him to believe that death was imminent. *Planned Parenthood*, 171 Idaho at 445, 522 P.3d at 1203.

So why needlessly airlift patients? Plaintiff was apparently unaware of the state of the law. Seyb Depo. at 73:14–76:22. He received no guidance or training on the law from St. Luke's. *Id.* at 73:22–24; 48:24–49:2; 50:13–51:15. Plaintiff admitted that he does not understand what exceptions the Defense of Life Act permits, *id.* at 45:12–19, and incorrectly, and inexcusably, believes that a woman has to be "in a very unstable condition" to lawfully receive an abortion to save her life in Idaho. *Id.* at 53:3–14. He incorrectly believes that Idaho law requires "the imminent death of the mother" despite the Idaho Supreme Court's explicit instruction to the contrary *a year before* he decided that he had to airlift the patients out of state. *Id.* at 78:17–79:7.

Dr. Seyb's decisions are not without consequence or risk to the patients he was required to treat. As he has opined in a declaration in another case pending before this Court:

> Arranging an airlift to transfer a patient out of state is not without risk or cost. It takes time. During that time, the patient's condition could deteriorate to the point of no longer being stable for transport. Once a patient is no longer stable enough for transport, the risks of transfer may outweigh the benefits, placing the treating physician once again in the position of deciding whether to wait until termination is necessary to prevent death, even though the wait could pose severe health consequences, including damage to the patient's future reproductive health.

*Id.* Ex. 6 ¶ 17.

Dr. Seyb admitted at deposition that it is "very, very important" for a doctor to have a correct understanding of the law so that the physician "can provide needed care to women when they need care." Seyb Depo. at 79:15–80:1. And, when asked what guidance would be useful to him in deciding how to treat patients, he specifically indicated that guidance on the imminence of death ("I wish someone would answer that for me") and the certainty of the doctor as guidance that would be helpful. *Id.* at 53:24–54:16.

But he, for whatever reason, despite being an active participant in several abortion related lawsuits going all the way back to 2001,[4] remained ignorant of the Idaho Supreme Court's guidance on those very issues until his deposition in this case. *Id.* at 73:14–76:8. Dr. Seyb is referring patients out of state for a reason other than a conflict between Idaho law and his understanding of proper medical care, because he has, for whatever reason, remained ignorant on the actual language and controlling interpretation of Idaho law. He cannot attribute harm to himself or his patients from the State and its officers for the resulting risks to his patients; that fault rests with him and his employer, St. Luke's, for failing to properly train its doctors in governing law that they would find helpful in treating their patients. Seyb Depo. at 73:22–24.

Circling back to Plaintiff's standing requirements, the above demonstrates that Plaintiff lacks standing in multiple respects. To recap from prior briefing, pre-enforcement first-party (i.e., constitutional) standing requires that a plaintiff show an intended course of conduct that is arguably proscribed by statute. *Driehaus*, 573 U.S. at 162–63. But the only evidence to date is that Plaintiff's referrals out of state have been for circumstances that either 1) would not violate Idaho's abortion statute if an abortion was performed, or 2) did not require an abortion at all. These are the only

---

[4] *See Planned Parenthood of Idaho, Inc. v. Kurtz*, No. CVOC0103909D, 2001 WL 34157539 (Idaho Fourth Jud. Dist., Aug. 17, 2001) (citing Aff. of Seyb); Seyb Depo. Exh. 6 (Affidavit Dr. Seyb signed in *St. Luke's Health System, Ltd. v. Labrador*, 1:25-cv-00015-BLW (D. Idaho).

examples whose specificity even conceivably meets the demands of Article III at summary judgment, *see Lujan*, 504 U.S. at 561, and they do not show what *Driehaus* requires. 573 U.S. at 162–63.

Putting aside the specificity of the circumstances in which Plaintiff has made referrals, his admitted lack of understanding of the circumstances in which the law permits or forbids an abortion break the causal chain. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013) (citations omitted). Plaintiff is manufacturing standing—whether construed as an injury to himself or to his own patients—because he ultimately cannot tell the Court *why* he is referring patients when he is relying on his erroneous belief as to what Idaho's law allows or does not allow. Put differently, if Dr. Seyb doesn't understand when abortion is permitted under Idaho law, he cannot ascribe to Idaho's abortion laws the injuries to himself or his patients from being prohibited from performing an abortion. He therefore lacks an injury caused by Idaho's abortion statutes and lacks Article III standing.

For similar reasons, Dr. Seyb cannot show third-party standing. The closeness of his relationship with the third party requires that those third parties not be hypothetical. Where Dr. Seyb cannot articulate which women seeking an abortion the challenged law stops him from treating, the remaining categories concern merely hypothetical future third-party patients, insufficient for third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004).

Because he is ignorant of the law's requirements, he cannot say whether any of his referrals are, in fact, the result of the law's requirements, or because of his own failure to understand the law, resulting in unfounded fears of prosecution in situations in which he, as the treating physician, could make the determination in his good faith medical judgment that an abortion is necessary to

prevent the death of the mother. Plaintiff's actions or purported chilling are untethered to the demands of the law, so any chilling effect on his practice (and any consequences to his patients) are the result of his own ignorance of the law, not Idaho's abortion laws. Seyb Depo. at 45:6–54:16; 73:14–76:22. He therefore lacks standing to challenge them.

### III.    Count II - The deposition of Dr. Seyb demonstrates that he lacks standing to sue on behalf of women seeking an abortion for mental health reasons.

Even assuming Dr. Seyb's standing overall survives these admissions, he lacks standing to bring claims relating to abortions performed for mental health reasons. This is for the simple reason that he doesn't perform them and in over 25 years of practice in his current position *has never been asked*. Plaintiff testified plainly at deposition:

> **Question:** How many abortions have you done in your career for the sole reason of treating the mother's mental health?
> **Answer:** I don't think I've done any.
> **Question:** Why is that?
> **Answer:** For one thing, I don't think it's ever really been posited to me, if that makes sense. It's never been an issue that has come before me.
> **. . .**
> **Question:** Okay so those are cases – those are not cases that you treat, then?
> **[Objection]**
> **Answer:** It's just I have never been asked to . . . in my sphere of where I've been practicing.

Seyb Depo. at 65:8–66:11.

Because plaintiff has never performed an abortion for mental health reasons and has no imminent plans, let alone actual plans, to do so—and in fact the customs of his practice make it exceptionally unlikely that he *will* ever do so (*see* Seyb Depo. at 65:12–68:9)—he lacks standing to sue to vindicate the alleged rights of patients seeking mental health abortions.

### IV.    Count I – No part of Idaho's abortion laws lack rational basis.

Summary judgment is proper on Count I to the extent that Plaintiff claims the lines drawn by the statute are arbitrary. None of Idaho's abortion laws lack rational basis. "The rational basis

inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *United States v. Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816, 1835 (2025) (quotation omitted). "Under this standard, [courts] will uphold a statutory classification so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quotation omitted). "Where there exist plausible reasons for the relevant government action, the inquiry is at an end." *Id.* (cleaned up).

Here, Plaintiff identified (and the Court considered plausible) a circumstance in which Idaho's abortion statutes might lack rational basis, namely, "restricting abortions where there is no possibility of fetal life." Dkt. 54 at 35. But the statutes at issue derive their definition of abortion from Idaho Code § 18-604, which defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, *cause* the death of the unborn child." Put succinctly, if the unborn child is not alive at the time the "means" are used, there is no abortion. *See also* Idaho Code § 18-604(1)(b) (stating removal of deceased unborn child not an abortion); (11) (defining pregnancy for purposes of abortion as the condition of having "a *developing* fetus").

Deposition testimony has further revealed that circumstances in which the Idaho Legislature's interest in life is not irrationally pursued.[5] For each fatal condition identified by Plaintiff, either the child will die in utero, or will live for some period (brief or not) after birth. *See*

---

[5] The Court in its memorandum decision left other proposed classifications named in the Complaint/Amended Complaint (Dkt. 56 at 22–23) unaddressed—presumably because they reflect more clearly the balance of life in favor of non-life that the legislature has chosen. Dkt. 54 at 35–36; *see also* Idaho Code § 18-601. To the extent necessary to show summary judgment is warranted on these issues, those will be included in the full briefing nonetheless.

Seyb Depo. at 132:5–133:3, 133:5–6, 133:20–21, 23–24. This eliminates the conflict the Court identified and calls for summary judgment.

**V.      Count I - The historian experts disclosed by Plaintiffs fail to support any fundamental right to an abortion.**

In support of Plaintiff's substantive due process claims to a right to abortion under Count I, Plaintiff put forward a single affirmative expert, Dr. Eppinger. Summarized, her theory goes like this: menstrual regulation was considered lifesaving treatment under the humoral theories of health that most people accepted before the Nineteenth Century, treatments to 'bring on the menses' were considered necessary and therefore not criminalized under common law, and some of these may have actually produced abortions. This, combined with supposed gaps in the circumstances for which abortions were prosecuted, they contend suggests an implicit right to a medically indicated abortion existed under common law, and because humoral theory's view of therapeutic purposes was generally accepted by Americans through the mid-19th Century, that this tacit acceptance is deeply rooted in American tradition. *See generally* Eppinger Depo. Ex. 1 ¶¶ 2–4, 16–18.

While this theory fails, both as a matter of law and as a matter of history, for purposes of this motion, Dr. Eppinger's theory will be addressed on her own terms.

Assume for the sake of argument that the abortions Dr. Eppinger describes (i.e., reasonably safe, medically indicated, abortions taking place before antiseptics, regularized dosages of medicine, any kind of understanding of the early months of reproduction, or any of the other formative Nineteenth Century medical innovations) took place, and took place regularly. Assuming that some abortions for medical purposes occurred as a matter of fact, these facts, by themselves fail to establish a substantive due process right to medically indicated abortion.

**A. An unenumerated fundamental right must be found in an affirmative legal tradition.**

The United States Supreme Court has been exceedingly cautious about recognizing unenumerated rights and has erected an exceptionally high barrier to the recognition of such a right under the due process clause of the Fourteenth Amendment. The Supreme Court has recognized "that the [Fourteenth Amendment] Due Process Clause protects two categories of substantive rights[,]" under the textual guarantee of liberty. *Dobbs*, 597 U.S. at 237, 239. The first category are those enumerated in the Bill of Rights, and the second category is comprised of "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.* at 237. "In deciding whether a right falls into either of these categories, the Court has long asked whether the right is 'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty.'" *Id.* (quoting *Timbs v. Indiana*, 586 U.S. 146, 150 (2019)) (brackets in *Dobbs*). In undertaking this analysis, the Court has required a "'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993) and collecting cases).

Having framed the inquiry around a properly defined legal right, the Court canvasses the legal tradition at the time of the Fourteenth Amendment (or, in the case of an enumerated Amendment, the text at issue) to determine whether the right is affirmatively protected in the American legal tradition. *Dobbs*, 597 U.S. at 238 (discussing *Timbs*, *supra* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)). The affirmative nature of the right is important—nowhere has the Supreme Court announced an unenumerated fundamental right from simply the absence of historical evidence to the contrary. *See e.g.*, *Timbs*, 586 U.S. at 151–54 (recounting the *repeated* express legal protections against excessive fines); *McDonald*, 561 U.S. at 767–68 (recounting historical tradition of affirmative protection of the right to bear arms described in *District of*

*Columbia v. Heller*, 554 U.S. 570, 591–95 (2008)). In addition, this tradition must reveal a *legal* right rather than a custom or practice; after all, it does not follow from lack of criminalization to the uttermost that a given practice "was permissible at common law—much less that abortion was a legal right." *Dobbs*, 597 U.S. at 243 (citing *Glucksberg*, 521 U.S. at 713).

**B. Plaintiff's affirmative evidence lacks any connection to an affirmative legal right.**

Dr. Eppinger tries to derive a substantive due process right to medically indicated abortion through several strands of history. These strands are not consistent with each other, and have differing conceptual flaws, but in the main fall into three buckets: 1) affirmative evidence of medical practices that were not known to be abortions; 2) the absence of specific prosecutions for abortions that might be described as medically indicated; and 3) misuse of few legal sources that either don't mention abortion at all or describe it as a crime. But none of these buckets are sufficient—the Supreme Court has demanded a history of affirmative protections to be shown in the Anglo-American legal tradition. Here, there is no such record for abortion, regardless of purpose. From Dr. Eppinger's perspective, it is anachronistic to ask that question before the early modern period:

> **A:** So there weren't – there was not a right to speech, there wasn't a right to be free from tyranny, there wasn't a right to assembly, religion, there wasn't a right to life, there wasn't a right to walk or to sit. There wasn't a right to anything. So, yeah, there wasn't a right to an abortion either. If there weren't rights, then abortion is part of [a] set that's a null set. That's an anachronistic question.

Eppinger Depo. at 59:10–18.

And for the period after rights language is developed, the best Dr. Eppinger has are inferences, not express legal protections:

> **A:** So I did not find in my reading rights language applied to medical care, receiving medical care as a patient or medical provision as a doctor in the same way - - and I want to emphasize this as part of the same sentence. I didn't find a right to practice law. I didn't find a right to be a law professor or a right to be a farmer.
> There [were] some things that rights language was not applied to.

*Id.* at 67:25–68:9. Plaintiff's rebuttal expert, incidentally, agrees with the results of this canvass.

> **Q:** Sweeping more broadly, did you find any source - - it can be from any category that we've discussed or haven't discussed - - stating that a legal right to abortion existed anywhere before the 20th Century?

> **A:** That it did exist, a legal right? A positive statement?

> **Q:** Correct.

> **A:** Right. I have not encountered such a statement.

Cohen Depo. at 51:1–10.

Rights language *must* be applied to a proposed right under substantive due process, within the Anglo-American legal tradition, and it must be done *expressly*. *Dobbs*, 597 U.S. at 238 (discussing *Timbs* and *McDonald*). Mere common practice or removal of "harsh sanctions" in some cases, is not enough. *Id.* at 243 (citing *Glucksberg*, 521 U.S. at 713. Indeed, as *Dobbs* put it with respect to pre-quickening abortions generally, "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so. When legislatures began to exercise that authority as the century wore on, no one, as far as we are aware, argued that the laws they enacted violated a fundamental right." *Id.* at 253. That is still true for 'medically indicated' abortions, and summary judgment on the due process claim for these reasons alone is warranted. A mere inference based on non-legal material, or lacunae in abortion jurisprudence, cannot substitute for express development of a right in our legal traditions.

But assume for the sake of argument that mere inferences are good enough. Dr. Eppinger still fails to show how one can derive a right to abortion from the historical sources she chooses. These include everything from inferring a right to abortion from Bracton's doctrines of homicide by word, to the prevalence of treatment that was not taken with the intent to cause abortion (i.e.,

emmenagogues). Eppinger Depo. Ex. 1 ¶¶ 30–36. These strain credulity as the basis for a fundamental right under substantive due process, and will be dealt with in more detail in the motion for summary judgment. But the lack of express support for the position that a substantive due process right exists is good reason for summary judgment.

\* \* \*

What *Dobbs* said about abortion as a general matter, we can also say about the ostensibly narrower class of abortions that Plaintiff wants to legitimize through his experts. The Supreme Court has made clear that "we are aware of no common-law case or authority, and the parties have not pointed to any, that remotely suggests a positive *right* to procure an abortion at any stage of pregnancy." *Dobbs*, 597 U.S. at 245.

To the extent anyone in the Anglo-American legal tradition had anything to say about abortion in the 19th Century (or before), it was a crime. To be sure, the crime was, for one reason or another, occasionally excused or pardoned (for reasons that varied from state to state, and from England to America), *id.* at 260, but that does not transmute the excused crime into *a right* under those conditions. No legal source describes abortion as a fundamental right before the turn of the 20th Century. Eppinger Depo. at 59:10–18; 67:25–68:7; Cohen Depo. 51:1–53:13. This is true regardless of the reason for the abortion, and Plaintiff's experts have offered nothing to the contrary. There is, consequently, no deeply rooted right to abortion—medically indicated or otherwise—in the Anglo-American legal tradition. Summary judgment on substantive due process is proper.

## CONCLUSION

For the foregoing reasons, the Court should grant the Attorney General and Defendant Idaho Board of Medicine's Motion for Leave to File Summary Judgment.

DATED: October 3, 2025

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


/s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation
and Constitutional Defense

*Attorneys for Defendants Members*
*of the Idaho Board of Medicine*
*and Intervenor Raúl Labrador*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on October 3, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jamila Johnson
jjohnson@lawyeringproject.org

Tanya Pellegrini
tpellegrini@lawyeringproject.org

Paige Suelzle
psuelzle@lawyeringproject.org

Stephanie Toti
stoti@lawyeringproject.org

Wendy S. Heipt
wheipt@legalvoice.org

*Attorneys for Plaintiff*

/s/ *James E. M. Craig*_____
JAMES E. M. CRAIG