RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

AARON M. GREEN, ISB #12397
KYLE D. GRIGSBY, ISB #10709
Deputy Attorneys General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
aaron.green@ag.idaho.gov
kyle.grigsby@ag.idaho.gov

*Attorneys for Defendants Intervenor*
*Attorney General Raúl Labrador and*
*Members of the Idaho Board of Medicine*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D. | Case No. 1:24-cv-00244-BLW |
| *Plaintiff*, | |
| v. | **MEMORANDUM IN SUPPORT OF ATTORNEY GENERAL LABRADOR'S AND MEMBERS OF THE IDAHO BOARD OF MEDICINE'S MOTION FOR SUMMARY JUDGMENT** |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, | |
| *Defendants*, | |
| ATTORNEY GENERAL RAÚL LABRADOR | |
| *Intervenor*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................................. 2

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ................................................................................................................... 4

I.    Plaintiff lacks standing or third-party standing to challenge Idaho's abortion statutes as articulated here. ................................................................................................ 4

    A.   Plaintiff lacks standing to challenge any of Idaho's abortion laws. ............................. 5

    B.   Plaintiff lacks standing to challenge Idaho's abortion laws related to mental health abortions because he has never performed them and lacks plans to do so. .................. 9

II.   Count 1 - There is no substantive due process right to any abortion for any reason, and the law is rational. ............................................................................................ 10

    A.   No substantive due process right to abortion for any reason exists. ........................... 10

    B.   Idaho's abortion statutes do not irrationally apply to ill or disabled unborn children. ............................................................................................. 20

III.  Count 2 - Idaho's abortion laws do not violate the Equal Protection Clause. .................... 22

    A.   Rational basis is the only standard that applies. .......................................................... 22

    B.   Idaho's abortion statutes do not irrationally apply to self-harm. ................................ 23

CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

### CASES

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ............................................................................13

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ..............................................................................................4

*Barksy v. Bd. of Regents of Univ.*,
347 U.S. 442 (1954) ............................................................................................13

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ..............................................................................4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................................................3

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ............................................................................................23

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982) ..............................................................................................3

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..........................................................................................6, 8

*Dent v. West Virginia*,
129 U.S. 114 (1889) ............................................................................................13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................................................12

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .................................................................................... *passim*

*Heller v. Doe*,
509 U.S. 312 (1993) ............................................................................................19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..............................................................................................5

*Gallinger v. Becerra*,
898 F.3d 1012 (9th Cir. 2018) ......................................................................19, 22

*Gonzales v. Oregon*,
546 U.S. 243 (2008) ............................................................................................13

*Judge Rotenberg Educ. Ctr., Inc. v. U.S. F.D.A.*,
3 F.4th 390 (D.C.Cir. 2021) ...............................................................................13

*Kerry v. Din*,
576 U.S. 86 (2015) ..............................................................................................12

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ..............................................................................................9

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................4, 10

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ....................................................................................11

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ....................................................................................7, 8

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
  210 F.3d 1099 (9th Cir. 2000) ......................................................................4

*Oracle Corp. Sec. Litig.,*
  627 F.3d 376 (9th Cir. 2010) ........................................................................4

*Peace Ranch, LLC v. Bonta,*
  93 F.4th 482 (9th Cir. 2024) ........................................................................5

*Planned Parenthood Great Nw. v. State,*
  171 Idaho 374, 522 P.3d 1132 (2023) ......................................................6, 8

*Raidoo v. Moylan,*
  75 F.4th 1115 (9th Cir. 2023) ................................................................19, 24

*Reno v. Flores,*
  507 U.S. 292 (1993) ..............................................................................11, 14

*United States v. Skrmetti,*
  605 U.S. ___, 145 S. Ct. 1816 (2025) ....................................................13, 23

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ..................................................................................5, 7

*Timbs v. Indiana,*
  586 U.S. 146 (2019) ..............................................................................11, 12

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ......................................................................................5

*United States v. Salerno,*
  481 U.S. 739 (1987) ....................................................................................14

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ..............................................................................11, 19

*Whalen v. Roe,*
  429 U.S. 589 (1977) ....................................................................................13

**STATUTES**

Idaho Code § 18-601 ..........................................................................................20

Idaho Code § 18-604 ....................................................................................2, 8, 21

Idaho Code § 18-622 ......................................................................................3, 6

Idaho Code § 18-8801 ..........................................................................................2

Idaho Code § 18-8805.................................................................................................2

Idaho Code § 54-1814...............................................................................................7

**RULE**

Fed. R. Civ. P. 56.....................................................................................................3

IDAPA 24.33.01.300.04............................................................................................6

**OTHER AUTHORITIES**

3 John Calvin, *Commentary on the Four Last Books of Moses*, (Bingham, trans. 1854)...............1

Elder Neil L. Anderson, General Conference (Apr. 2025) ........................................................2

Monica E. Eppinger, *The Health Exception*, 17 Geo. J. Gender & L. 665 (2016) .......................19

Oral Argument Transcript, *Moyle v. United States*,
    Nos. 23-726, 23-727 (April 24, 2024, U.S. Supreme Court)....................................................24

*The Didache*, The Apostolic Fathers, (3d ed. 2007 Michael W. Holmes trans.)............................1

## INTRODUCTION

This is a case clearly controlled by *Dobbs*. In *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Supreme Court recognized that "Abortion presents a profound moral question. The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives." 597 U.S. at 302. *Dobbs* makes clear that regulations surrounding abortion are like any other medical, moral, or policy line-drawing: subject only to rational basis review and left to the discretion of the elected representatives of the individual states.

The people of Idaho through their Legislature have answered this moral question by taking the policy position that unborn children should be protected from unjustifiable abortion. This is not a new position, and is consistent with millennia of moral thought. As *Dobbs* noted, "[a]bortion is nothing new. It has been addressed by lawmakers for centuries, and the fundamental moral question that it poses is ageless." 597 U.S. at 258. As but three examples of the "ageless" nature of this moral issue, First Century Christian teachings taught that "you shall not abort a child or commit infanticide." *The Didache*, The Apostolic Fathers, 347 (3d ed. 2007 Michael W. Holmes trans.). In the Sixteenth Century, John Calvin wrote that "If it seems more horrible to kill a man in his own house than in a field, because a man's house is his place of most secure refuge, it ought surely to be deemed more atrocious to destroy a fetus in the womb before it has come to light." 3 John Calvin, *Commentary on the Four Last Books of Moses*, 41–42 (Bingham, trans. 1854). And, as was recently stated just a few months ago at the General Conference of the Church of Jesus Christ of Latter-Day Saints: "[n]urturing and protecting life that is yet unborn is not a political

position. It is a moral law confirmed by the Lord through His prophets." Elder Neil L. Anderson, General Conference (Apr. 2025).[1]

Idaho's decision to answer that moral question in a manner designed to protect unborn children and prohibit abortion (with certain exceptions) is also consistent with the history and traditions underpinning the U.S. Constitution. *See generally Dobbs*, 597 U.S. at 241–53 (examining the history and tradition concerning abortion). Thus, the exact manner in which the people of Idaho choose to draw exceptions to their prohibition of abortion, based on principles they believe are morally or medically justified, is subject to the most deferential review under *Dobbs*.

However, the Court need not dive into that moral and policy question because this case ought to be dismissed solely on the grounds that Plaintiff lacks standing. He is unfamiliar with basic tenets of Idaho's abortion law as explained by the Idaho Supreme Court in 2023, and he has never performed any abortions for reasons to prevent a woman from engaging in self-harm, and lacks any plans to do so. Should the Court instead determine that he does have standing, Plaintiff's claims of a deeply rooted fundamental right to abortion, his challenges to the rationality of the law and his claim of an Equal Protection Clause violation all fail on the merits. The Court should grant this Motion for Summary Judgment and dismiss the case.

### FACTUAL AND PROCEDURAL BACKGROUND

This is a challenge to the State of Idaho's medical regulations concerning abortion. The Defense of Life Act[2] prohibits abortions as defined by Idaho Code § 18-604 except, as relevant

---

[1] *Available at* https://tinyurl.com/4webnpxd.

[2] While the Amended Complaint, *see* Dkt. 56 ¶¶ 127–28, also challenges the Fetal Heartbeat Preborn Child Protection Act, Idaho Code § 18-8801 *et. seq.*, the Court need not reach the constitutionality of that law because the Defense of Life Act supersedes the Fetal Heartbeat Preborn Child Protection Act. *See* Idaho Code § 18-8805(4). Thus, should the Court uphold the

here, when necessary in a physician's good faith medical judgment to prevent the death of the mother. *See* Idaho Code § 18-622.

On May 24, 2024, Plaintiff, a physician and Maternal Fetal Medicine Specialist employed by St. Luke's Health System, sued seeking declaratory and injunctive relief under two causes of action, both styled as as-applied challenges to Idaho's abortion statutes. Count 1 is a substantive due process claim, based on a purported fundamental right to an abortion. Dkt. 56 at 22–24. Count 2 is an equal protection claim, based on the statute's prohibition of using a risk of death by self-harm to determine that an abortion is necessary to prevent the death of the mother. *Id.* at 24. After the Court granted dismissal as to all but the Ada County Prosecutor and the Members of the Idaho Board of Medicine, Dkt. 54, and after the Idaho Attorney General's Motion to Intervene was granted, Dkt. 66, the parties engaged in discovery. Discovery has now closed. Dkt. 63.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not file material "*negating* the opponent's claim" but merely bears the burden of "informing the district court of the basis for its motion" and establishing the absence of a genuine issue of material fact. *Id.* at 323 (emphasis in original). The movant may either "negat[e] an essential element of the nonmoving party's claim or defense or show that the nonmoving party

---

constitutionality of the Defense of Life Act, as it must under Supreme Court precedent, there is no need to reach constitutionality of another statute. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 294 (1982) (citation omitted).

does not have enough evidence of an essential element . . ." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once that burden is met, the non-movant's burden "is not a light one." *Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted). This evidence must be more than "merely colorable" in support of the non-movant to survive summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

ARGUMENT

Plaintiff's claims fail for several reasons. Plaintiff lacks standing, both because any harm he has incurred is caused by his own ignorance of the law, and because he does not perform abortions in the circumstances he seeks to vindicate. On the merits, Plaintiff's substantive due process claim fails because (1) Plaintiff's experts conceded that the necessary evidence for a right to medically indicated abortion doesn't exist, and (2) even if Plaintiff's evidence were of the kind deemed necessary by the Supreme Court, it fails to support a right to abortion. Last, Plaintiff's equal protection claim fails because classifications based on the medical use of an abortion are reviewed for rational basis, which the statutes easily pass.

## I.   Plaintiff lacks standing or third-party standing to challenge Idaho's abortion statutes as articulated here.

In order to prove Article III standing, a plaintiff must prove that (1) he has suffered an injury in fact; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). An "injury in fact" must be "an invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). The plaintiff has the burden on each element, and at summary judgment he must "set forth by affidavit or other evidence specific facts" to prove standing. *Id.* at 561 (cleaned up). Standing is an "indispensable part of the plaintiff[] case," *id.*, and "is not dispensed in gross . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

For a pre-enforcement challenge, the Supreme Court has set out an additional three-prong test to show that an injury is likely. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). This requires a plaintiff to show: (1) he intends "to engage in a course of conduct arguably affected with a constitutional interest"; (2) that conduct is "arguably proscribed by the challenged statute"; and (3) "the threat of future enforcement is substantial." *Peace Ranch,* 93 F.4th at 487 (cleaned up).

In order to assert third-party standing, the Plaintiff must first show he has suffered an injury in fact. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024). "The third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries." *Id.* at 393 n.5.

**A. Plaintiff lacks standing to challenge any of Idaho's abortion laws.**

Plaintiff's sole claim of injury is that he is no longer able to perform certain abortions, including those in which there are medical indications that would otherwise result in "serious injury or death" of the pregnant women who are his patients, and has had to refer women to out-of-state abortion providers instead because he believed he could not perform an abortion "consistent with" the Defense of Life Act. SOF ¶ 15; Dkt. 56 ¶ 16; *see also* Dkt. 56 ¶¶ 108, 122–23. However, Plaintiff cannot show that it was the provisions of the Defense of Life Act—and not his own ignorance of the law—that caused him to refer women out of state. This dooms his claim

to standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12, 416 (2013) (holding "mere speculation" and "mak[ing] assumptions" about "hypothetical future harm" caused by statute was not sufficient for Article III standing).

For example, in January 2023, a year before Plaintiff airlifted patients out of state, the Idaho Supreme Court held that the Defense of Life Act: (1) does not require "objective certainty" that an abortion is necessary to prevent a woman's death before a doctor may perform an abortion; and (2) does not require "a particular level of immediacy" before the abortion may be considered necessary. *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 445, 522 P.3d 1132, 1203 (2023). "Instead, the statute uses broad language to allow for the clinical judgment that physicians are routinely called upon to make for proper treatment of their patients." *Id.* (citation and internal quotation marks omitted).

Yet during his deposition, Plaintiff testified that he does not understand the law's exceptions to the general prohibition on abortion, that he has not received any training on the Defense of Life Act, SOF ¶¶ 2, 3, 9, that he has not read the *Planned Parenthood* case, and that St. Luke's has not given him any training or advice on how to interpret the phrase "necessary to prevent the death of the mother." Idaho Code § 18-622(2)(a)(i); SOF ¶ 5, 7. As a result, he testified that he believes a mother's death *does* need to be imminent and that a woman has to be "in a very unstable condition" before a doctor can lawfully perform an abortion. SOF ¶¶ 3, 8. In response to a question asking him how close to death a mother needs to be before a physician can perform an abortion, he stated "I wish someone would answer that for me"—even though the Idaho Supreme Court already had, over two years before his deposition. SOF ¶ 6; *see also* IDAPA 24.33.01.300.04(h) (physicians have an obligation to understand and obey "any and all state and local laws and rules related to the licensee or permittee's practice or profession"); Idaho Code

§ 54-1814(26); *see also* SOF ¶ 10 (Plaintiff testifying in his deposition that it is "very, very important" for a doctor to have a correct understanding of the law so that he can provide a woman with needed care). In fact, the Idaho Supreme Court provided exactly the information Plaintiff needed. SOF ¶ 11 (Plaintiff admitting it would be "helpful" to have official guidance on the issues addressed by *Planned Parenthood*).

This ignorance is not without consequences. As Plaintiff himself stated in his *St. Luke's* affidavit, "arranging an airlift is not without risk or cost." SOF ¶ 15. This is because a "patient's condition could deteriorate to the point of no longer being stable for transport. Once a patient is no longer stable enough for transport, the risks of transfer may outweigh the benefits." *Id.* The clear facts show that Dr. Seyb and St. Luke's were flying patients out of state in ignorance of the laws' requirements. Because Plaintiff is ignorant of the law's requirements, he cannot say whether any of his referrals—which he alleges (as he must) occurred in circumstances where an abortion would be prohibited by Idaho law but protected by the Constitution—are, in fact, the result of the law's requirements, or because of his own misunderstanding of the law. *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (citing *Clapper* and noting that harm must be traceable to the actions of defendants). Similarly, because of his own ignorance of the law, Plaintiff is unable to show that the abortions he claims he must perform are "arguably proscribed" by the Defense of Life Act, and cannot meet the second factor of the *Driehaus* test for pre-enforcement standing. 573 U.S. at 162–63. Plaintiff may allege that he has been chilled by uncertainty in the law, but—setting aside that the uncertainty is of his own lack of diligence in learning the law—he is not raising a vagueness claim. He must show that Idaho law has prohibited (or will prohibit) him from carrying out an abortion that is protected as a fundamental right by the Constitution, and he cannot do so if he doesn't know whether Idaho law would have actually prohibited the abortions he has referred out of state.

An examination of the circumstances in which Plaintiff says he had to refer patients out of state on an emergency basis makes the problem of his ignorance of the law especially, and heartbreakingly, acute and frustrating.[3] Plaintiff's deposition testimony shows that he cannot prove whether any of these referrals, or any others he has since made, were "necessary" under Idaho law. *See Clapper*, 568 U.S. at 416 (citations omitted). These cases either presented Plaintiff with a patient who faced a risk or even a "high probability" of death, or a patient who did not need an abortion and gave birth to healthy twins in Idaho. SOF ¶ 12.

Despite these facts, Plaintiff referred (or consulted on a referral) to have the women sent out of state on an emergency basis rather than providing necessary and appropriate treatment in Idaho and did so *in spite of* what the law required. SOF ¶12, 15; *see also* SOF ¶¶ 2–8. If Plaintiff believed in his good faith medical judgment that it was necessary to perform an abortion to prevent the death of the mother, then these abortions would be permitted in Idaho, he did not need to be certain that death would occur, and it was not necessary for him to believe that death was imminent. *Planned Parenthood*, 171 Idaho at 445, 522 P.3d at 1203. Thus, Plaintiff's admitted lack of understanding of the law breaks the causal chain for Article III standing. *Clapper*, 568 U.S. at 416.

Instead, Plaintiff is manufacturing standing—whether construed as an injury to himself or to his own patients—because he ultimately cannot tell the Court *why* he is referring patients when he is relying on his erroneous belief as to what Idaho's law allows or does not allow. A related example drives the point home, if a doctor erroneously believed that Idaho's laws prevented him from removing an ectopic or molar pregnancy, *see* Idaho Code § 18-604(1)(c), and he therefore referred a patient with an ectopic pregnancy out of state for treatment, any injury would not be

---

[3] Specifically, those referrals made during the United States Supreme Court's stay of the injunction in *United States v. Idaho* from January 5, 2024, to June 27, 2024. *See* 144 S. Ct. 540 (2024) and 603 U.S. 324 (2024); *see also* SOF ¶ 12.

caused by or traceable to Idaho's law, but instead by that doctor's ignorance of Idaho's laws. So it goes here, if Plaintiff doesn't understand when abortion is permitted under Idaho law, he cannot ascribe to Idaho's abortion laws any injury from being prohibited from performing an abortion. Rather, any alleged injury is caused by his own ignorance of the law.

For similar reasons, Plaintiff cannot show third-party standing. The closeness of his relationship with a third party requires that those third parties not be hypothetical. Where Plaintiff cannot articulate which women seeking an abortion the challenged law stops him from treating, the remaining categories concern merely hypothetical future third-party patients, insufficient for third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004).

**B. Plaintiff lacks standing to challenge Idaho's abortion laws related to mental health abortions because he has never performed them and lacks plans to do so.**

In Count 2 of the Amended Complaint, Plaintiff alleges that Idaho's abortion laws violate the Equal Protection Clause of the Fourteenth Amendment because they treat "pregnant people at risk . . . from self-harm differently than pregnant people at risk of death from other causes." Dkt. 56 ¶ 130. Further, he alleges that Idaho's abortion laws' "differential treatment of pregnant people at risk of death from self-harm is motivated by animus against people with mental illness" and "against people with behavioral health disorders." *Id.* ¶¶ 132, 133.

But Plaintiff lacks standing to bring claims relating to abortions performed for mental health reasons for the simple reason that he does not perform abortions for mental health reasons and in over 25 years of practice in his current position as a maternal fetal medicine specialist for St. Luke's *has never been asked to do so*. SOF ¶ 13. Because plaintiff has never performed an abortion for mental health reasons and has no imminent plans, let alone actual plans, to do so— and in fact the customs of his practice make it exceptionally unlikely that he *will* ever do so (*see* SOF ¶¶ 13, 14)—he lacks standing to sue to vindicate the alleged rights of patients seeking mental

health abortions, and Count 2 must be dismissed for lack of standing. *Lujan*, 504 U.S. at 564 (holding mere "some day" intentions insufficient to find actual or imminent injury).

## II. Count 1 - There is no substantive due process right to any abortion for any reason, and the law is rational.

Count 1 of Plaintiff's Amended Complaint alleges a fundamental right to abortion exists when that abortion is done for medical reasons, but such a right does not exist under the U.S. Constitution. Plaintiff's experts concede that what the Supreme Court requires (evidence of a *legal* right in our history and tradition) does not exist. And even assuming that something less than this evidence would suffice, the affirmative evidence offered does not actually support a conclusion that a right to such abortions is deeply rooted in our history and tradition.

To the extent Plaintiff argues that Idaho's laws are simply irrational, this fails. The laws rationally relate to Idaho's compelling interests, including protecting unborn children.

### A. No substantive due process right to abortion for any reason exists.

No right to any abortion exists under the U.S. Constitution. Plaintiff's experts' concessions that no legal description of abortion as a legal right before the 20th Century exists, thwart his claim. And even if inference from other sources could support such a right, the inferences here fail.

#### 1. *Plaintiff's experts concede that abortion for medical reasons was not described as a legal right before the 20th Century.*

The United States Supreme Court has been exceedingly cautious about recognizing unenumerated rights and has erected an exceptionally high barrier to the recognition of such a right under the Due Process Clause of the Fourteenth Amendment. The Supreme Court has explained "that the Due Process Clause protects two categories of substantive rights" under the textual guarantee of "liberty." *Dobbs*, 597 U.S. at 237, 239. The first category includes those enumerated in the Bill of Rights, and the second category is comprised of "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.* at 237. "In deciding whether a right falls

into either of these categories, the Court has long asked whether the right is 'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty.'" *Id.* (quoting *Timbs v. Indiana*, 586 U.S. 146, 150 (2019)) (brackets in *Dobbs*). In asking those questions, the Court has required a "'careful description' of the asserted fundamental liberty interest," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993) and collecting cases).

After carefully defining the legal right, the Court canvasses the legal tradition at the time of the Fourteenth Amendment to determine whether the right has been affirmatively protected in the American legal tradition. *Dobbs*, 597 U.S. at 238. Evidence of affirmative historical protections for a right is important—nowhere has the Supreme Court announced an unenumerated fundamental right from the mere absence of historical evidence to the contrary. *See, e.g.*, *Timbs*, 586 U.S. at 151–54 (recounting the *repeated* express legal protections against excessive fines); *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) (recounting historical tradition of affirmative protection of the right to bear arms). In addition, the necessary historical tradition must reveal a *legal right* rather than a custom or practice; after all, it does not follow that because a practice was excused in some circumstances that the practice generally "was permissible at common law—much less . . . a legal right." *Dobbs*, 597 U.S. at 243 (citing *Glucksberg*, 521 U.S. at 713).

Here, the concessions by Plaintiff's affirmative historical expert, Dr. Eppinger, defeat Plaintiff's claim that a legal right to an abortion for health reasons is protected by the Due Process Clause. Dr. Eppinger testified that trying to ask whether a legal right exists to a specific behavior or practice like abortion is anachronistic before the early modern period because (in her view) rights language wasn't generally applied until one arrives at the mid-15th Century. As she put it:

"[t]here wasn't a right to anything. So, yeah, there wasn't a right to an abortion either. If there weren't rights, then abortion is part of [a] set that's a null set. That's an anachronistic question." Eppinger Depo. at SOF ¶ 21.[4] And for the period after language describing rights is developed, Dr. Eppinger is clear that she has no evidence of a legal right to any type of medical care, SOF ¶ 22, much less abortion. "There [were] some things that rights language was not applied to," like "medical care" or the right to practice a specific profession. *Id.* Plaintiff's rebuttal expert generally agrees, also testifying that she did not find any positive statement that a legal right to abortion existed before the 20th century. SOF ¶ 37.

Without affirmative evidence of legal protections for any type of abortions, there can be no tradition of a legal right. Contrast the clear lack of evidence here with the evidence relied on by *Heller* and *McDonald*. *Heller* described a history which, from the time of the Glorious Revolution of 1689 through the Founding, repeatedly included legal protection of the right to bear arms, codified by statute, and interpreted as pertaining to individuals rather than militias by legal commentators and jurists. *District of Columbia v. Heller*, 554 U.S. 570, 593–95 (2008). Or consider the history supporting the right against excessive fines described in *Timbs*, traced all the way back to the Magna Carta, reiterated by subsequent parliaments, and incorporated expressly in state constitutions going back to the colonial period. 586 U.S. at 151–54. With no similar historical pedigree, a right to medical abortion (however defined) cannot be deeply embedded in American history and tradition for purposes of substantive due process. Faced with the clear lack of historical

---

[4] To be sure, Dr. Eppinger's concession that rights-language wasn't applied at the time of Bracton is wrong as a matter of fact. The Magna Carta itself contains protections for due process of law, *see Kerry v. Din*, 576 U.S. 86, 91 (2015) (plur. op.), and the Supreme Court began its look at the Excessive Fines Clause in *Timbs* at that point. 586 U.S. at 151–52. Either way, the concession that this language wasn't applied to abortion, for medical reasons or otherwise, is the end of the argument whether or not the more sweeping form of the concession is true.

evidence to support a right to abortion, the Supreme Court made clear in *Dobbs* that the "inescapable conclusion is that a right to abortion is not deeply rooted in the Nation's history and traditions." 597 U.S. at 250.

The lack of a right to abortion is in accord with the Supreme Court's holdings on states' ability to regulate the medical profession generally. The Supreme Court has long acknowledged that state governments may regulate the practice of medicine, *Dent v. West Virginia*, 129 U.S. 114 (1889), and that regulation of matters "concerned with health" is "a vital part of a state's police power." *Barksy v. Bd. of Regents of Univ.*, 347 U.S. 442, 449 (1954).

More pointedly, this police power includes the ability to prescribe (or proscribe) particular acts for specific conditions. "States . . . traditionally have regulated the practice of medicine. [*Gonzales v. Oregon*, 546 U.S. 243, 275 (2006)] Choosing what treatments are or are not appropriate for a particular condition is at the heart of the practice of medicine." *Judge Rotenberg Educ. Ctr., Inc. v. U.S. F.D.A.*, 3 F.4th 390, 400 (D.C. Cir. 2021) (collecting cases)); *see also Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703–04 (D.C. Cir. 2007) (en banc); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977) ("It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions."). In the last year, the Supreme Court has reaffirmed that laws prohibiting a practice on the basis of its medical use are subject to rational basis review. *United States v. Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816 (2025). If, as Plaintiff believes, the mere historical practice of a procedure for medical purposes—without any evidence of affirmative legal protections—were enough to entrench a right to the procedure as a fundamental right, then states would not really be free to regulate the medical profession. Indeed, it would be impossible for states to regulate *any*

medical practice with the appropriate historical usage. In light of state police power over the medical profession, this cannot be the right result.

As *Dobbs* noted, "[a]bortion is nothing new. It has been addressed by lawmakers for centuries, and the fundamental moral question that it poses is ageless." 597 U.S. at 258. The fact that, despite being addressed for centuries, abortion was *never* spoken of as a protected legal right—even in the context of medical necessity—is damning, and leads to the "inescapable conclusion" just like in *Dobbs* "that a right to abortion is not deeply rooted in the Nation's history and traditions." *Id.* at 250. "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Reno*, 507 U.S. at 303 (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987)).

### 2. *Plaintiff's sole affirmative expert fails to adduce evidence supporting such a right.*

In any event, the evidence that Plaintiff's affirmative historical expert draws from is not sufficient to support a fundamental right to an abortion.

The only affirmative evidence Plaintiff advances of a right to a medically indicated abortion comes from his expert Dr. Eppinger, who draws inferences from the prevailing theory of medicine before germ theory—called humoral theory.[5] Under humoral theory, a woman's menstruation was considered medically necessary, and its cessation absent pregnancy or menopause was believed to be a life-threatening condition because of the accumulation (so it was thought) of blood and waste. SOF ¶ 30. Treatment could include administering an emmenagogue—a substance administered with the intention of increasing menstrual flow. But Dr. Eppinger believes administering an

---

[5] Humoral theory posited that human health and disease were correlated with the surplus or absence of four humors, one of which was blood. SOF ¶ 29.

emmenagogue could have also caused an abortion if the patient were unknowingly pregnant at the time of the treatment. SOF ¶ 31. Dr. Eppinger therefore posits that the common law, which was developing in the context of the humoral theory of medicine, would have respected physicians' decision to administer a treatment that could cause an abortion.

Dr. Eppinger's argument fails as a matter of law to show a deeply rooted fundamental right to a medically indicated abortion for at least three reasons.[6]

*First*, her report relies primarily on the history of a medical treatment (administering emmenagogues) that is not abortion, was not generally thought of as causing abortion, and was not administered for the purpose of causing an abortion. SOF ¶ 31. Dr. Eppinger conceded as much in her report and at her deposition, adding that doctors operating under humoral theory attempting to restart the menses generally lacked the scientific knowledge to know whether or not women were pregnant when administering an emmenagogue. SOF ¶¶ 23, 31. Consequently, the doctors would not have described what they were doing as performing an abortion, even if they were aware that a pregnancy could theoretically end as a result of administering the same substance with a different intent. The distinction that Dr. Eppinger makes based on the intent of the physician (based on their limited understanding and ability to diagnose pregnancy) in characterizing whether a treatment is abortifacient or an emmenagogue, entirely undermines Plaintiff's theory that there is a longstanding accepted practice of administering an abortion in certain circumstances. SOF ¶¶ 23, 24, 25. Simply put, she's describing the history of a different course of treatment, to treat different conditions, administered with different knowledge and different intent, than the right she is attempting to demonstrate in the historical record.

---

[6] To be sure, Defendants have also retained an expert on abortion history, Professor Joseph Dellapenna. However, the instant motion is limited to the failure of Plaintiff, who bears the burden to demonstrate the existence of a fundamental right, to offer affirmative evidence.

*Second*, Dr. Eppinger's report has no tangible way to connect practices concerning emmenagogues—or any other abortion practices—to the common law. Consider her use of the works of Bracton (an early common law writer) from the 13th Century. She cites to Bracton's discussion of "homicide by word"—that is, persuading a would-be rescuer to not aid a dying victim and thereby becoming liable for their death. SOF ¶ 32. From this principle, she infers that—since "pregnancy or childbirth regularly imperiled women during this time"—Bracton "suggests that dissuading a health practitioner from performing an intervention to terminate a pregnancy for therapeutic reasons would constitute homicide if the pregnant woman subsequently died." *Id*. But she has zero evidence that the common law actually supported this extrapolation of Bracton's abstract principle in practice. Indeed, when asked, Dr. Eppinger could not cite to a single specific application of the homicide by word doctrine in the medical context, let alone against a defendant prosecuted for dissuading a doctor from providing an abortion. SOF ¶ 26. While she also cites to Bracton's articulation of homicide by chance (i.e., unintentional homicide) and its exceptions, suggesting that it would excuse an abortion done with curative intent, she does not point to any documented medical abortion from the 13th through the 17th Centuries, when any of these principles is supposed to have operated in the way she infers. SOF ¶¶ 27, 33.

Dr. Eppinger's treatment of Sir Matthew Hale's (another common law writer cited by *Dobbs*) 17th Century work is similarly flawed. Dr. Eppinger suggests that Hale's exception from the definition of homicide for medical treatment resulting in death applies generally to excuse abortion for medical reasons—though she never says why or how or give any examples of these doctrines being applied to excuse abortion in practice. SOF ¶ 34. Nor does such an application make sense, since Hale's exception was intended to excuse failed treatments, not to authorize all practices with a potential medical purpose. *Id.* Consequently, as was true in her treatment of

medieval history, we are left with speculation (at the very best) about how the common law would have interacted with an intended abortion done for reasons of health—if that ever happened prior to the 18th Century. And while she argues that both Hale and Bracton offered "blanket protection" for abortions done with "curative intent," Bracton's articulation of an exception to homicide by chance required "all the care" one could offer. SOF ¶¶ 33–34. Even more conspicuously working against her inference, as *Dobbs* noted, Hale regarded abortion generally as a crime, even absent quickening, even if the woman survived, and even going so far as to treat physicians who perform abortions *differently* than other physicians who caused the death of a patient. *Dobbs*, 597 U.S. at 244–45; *but see* SOF ¶ 34.

*Third*, from Hale to the Nineteenth Century, Dr. Eppinger blends flawed inference upon flawed inference together to attempt to show some kind of connection between emmenagogic treatment (which no one thought was an abortion), excusable homicide (which no one had yet apparently applied to abortion), and early efforts at codifying abortion restrictions in Great Britain and the early United States in the early 19th Century, concluding that the "therapeutic intent doctrine" that she believes exists, was somehow incorporated into state statutes. SOF ¶ 36. This fails. Dr. Eppinger, in this section and throughout her report, relies on the purported quickening rule of abortion prosecutions, that abortion prior to quickening was not criminalized under common law, to argue that the common law and its codifications were meant to protect women *as opposed* to fetal health. But in addition to questioning the historical validity of this distinction, *Dobbs*, 597 U.S. at 243–45, the Supreme Court has more importantly already rejected the *relevance* of this distinction to whether abortion constitutes a fundamental right. *Id.* at 242–49.

Dr. Eppinger's own analysis about the state of the law from the American Founding to the time of the Fourteenth Amendment—even if one assumes she's correct about everything predating

that time—subverts her bottom-line conclusion. She sweepingly canvasses abortion prohibitions from Lord Ellenborough's Act in England to State regulations from the 1820s onward, pointing to all statutes alike and suggesting that because they (usually) included some (highly varied) forms of exception to save the life (or in just two express cases, health) of the mother, then they must imply that the American tradition had adopted as fundamental the broadest sweep of the common law "curative intent" doctrine she believes is reflected by the foregoing history. But Dr. Eppinger *also* says that American law and culture at the time of the Fourteenth Amendment *had moved away* from earlier traditions, with the Nineteenth Century American Medical Association campaign for state criminal prohibitions on abortion (which successfully resulted in state legislatures criminalizing abortion by statute) "marked not by respect for history and tradition but rather, by suppressing it." SOF ¶ 35. But if that's true, then whatever tradition existed at the time of the Fourteenth Amendment was not a deeply rooted legal right.

Moreover, she cannot account for the variations in state statutes that provided greater and lesser room for this supposedly 'deeply rooted' exception, which, as a matter of text, appeared as an exception for serious bodily harm in only two statutes by about 1865. SOF ¶ 38. All of this confirms that when states enacted statutes that, by and large included "life," but not "health," exceptions, *see id.*, nobody "as far as we are aware, argued that the laws they enacted violated a fundamental right" when they protected something less than health-writ-large. *See Dobbs* 597 U.S. at 253.

\* \* \*

Dr. Eppinger's theory is a pre-*Dobbs* theory from a 2016 paper that she has lightly repurposed after *Dobbs* to include a perfunctory addition of the "deeply rooted" standard—even though she conducted no additional research, other than to ensure historians generally still believed

what they did in 2016, to justify that characterization. Monica E. Eppinger, *The Health Exception*, 17 Geo. J. Gender & L. 665 (2016); SOF ¶ 28. But the Supreme Court (in *Dobbs* and elsewhere) has clearly rejected this type of haphazard attempt to invent a fundamental right. The occurrence of medical practices that *could* have caused abortions does not show a legal right to procedures that *would* cause abortions. The *excuse* that existed for surgeons when a patient died generally does not prove a *right* to an abortion in the absence of a patient's death. And exceptions that varied by scope and date of enactment show only that abortion, including abortions performed for medical reasons, was a policy realm left to the regulation of legislatures.

Plaintiff wants the Court to invent a fundamental right, specifically to an abortion, for reasons that are medically indicated. No evidence supports the existence of such a right, and the twisting historical threads that Dr. Eppinger draws on make impossible to "carefully describe" what that ostensible 'right' would even include. *Glucksberg*, 521 U.S. at 721. There's no thread connecting these contradictory and disparate, theories, inferences, and historical lacunae into any clearly defined right, and so Plaintiff has failed to carry his burden at summary judgment. Thus, without a fundamental right at issue, Idaho's laws are subject to rational basis review. *See Dobbs*, 597 U.S. at 300.

### 3. *Idaho's laws satisfy rational basis review.*

Idaho's abortion laws easily survive rational basis review. Under rational basis, the laws "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Raidoo v. Moylan*, 75 F.4th 1115, 1125 (9th Cir. 2023) (quoting *Gallinger v. Becerra*, 898 F.3d 1012, 1017 (9th Cir. 2018)). Plaintiff bears the burden to "negative every conceivable basis which might support it," even if that basis arises from "rational speculation unsupported by evidence or empirical data." *Heller v. Doe*, 509 U.S. 312, 320–21 (1993) (citations omitted).

As in *Dobbs*, Idaho's laws are supported by "legitimate interests includ[ing] respect for and preservation of prenatal life at all stages of development, . . . the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." *Dobbs*, 597 U.S. at 301. (collecting cases) (citation omitted). Indeed, the Idaho Legislature has expressly stated that it has a "profound interest in preserving the life of preborn children," and that it is State policy that "all state statutes, rules and constitutional provisions shall be interpreted to prefer, by all legal means, live childbirth over abortion." Idaho Code § 18-601.

## B.  Idaho's abortion statutes do not irrationally apply to ill or disabled unborn children.

Plaintiff also offers a few examples of fetal abnormalities that he deems "lethal," and contends that Idaho's abortion statutes are irrational when they prohibit abortions when a fetus has been diagnosed with such an abnormality because the prohibition supposedly runs against the Legislature's preference for life over non-life for unborn children. *See generally* Dkt. 56 ¶ 98.

Not so. According to Plaintiff's experts, these "lethal" abnormalities can be sorted into two circumstances. First, there are instances in which an unborn child will be born and live a life of uncertain duration outside the womb. *See* SOF ¶¶ 39, 41 ("the definition of lethality is not correlated to the amount of time" an unborn child survives after birth). In these instances, whether the child lives for minutes, hours, days, weeks, months, years, or for an otherwise normal span, the Legislature's interest in protecting unborn life is rationally furthered through Idaho's laws restricting abortion.[7] Second, there are instances where an unborn child will decease in utero, in

---

[7] This remains true even before birth in circumstances where the unborn child has not yet deceased, though there is some likelihood of it perishing in utero, because the State's interest extends to the

which case the removal of the deceased unborn child is not an abortion at all within the definition of Idaho's criminal abortion statutes. Idaho Code § 18-604(1)(b); SOF ¶ 40.

For much the same reason, Plaintiff's argument that a prohibition on the abortion of one or more healthy unborn children to give the surviving unborn children in the womb a better chance of making to full term, so-called "multi-fetal pregnancy reduction," is not irrational. Dkt. 56 ¶ 126. Even if the chances of one unborn child would be increased if another co-developing child is killed, abortion statutes that announce a preference for giving all life a chance at development rather than allowing doctors to play 'survival of the fittest' are rationally related to the State's interest in preserving unborn life.

And where these conditions, which might be fatal, instead result in a child who survives but is disabled, the protection of these unborn children from being aborted is a similarly compelling state interest. *Dobbs*, 597 U.S. at 301 (recognizing the legitimate state interest in "the prevention of discrimination on the basis of . . . disability" in the context of abortion statutes). The abortion of an unborn child on the basis that it has a genetic condition that, even if not ultimately fatal, could also result in lifelong disability or impairment, is discrimination on the basis of disability. Consequently, by forbidding abortion in circumstances where a so-called fatal diagnosis is present but could result in the birth of a child who lives with a disability, the law prohibits discrimination on the basis of disability or perceived disability.

To be sure, Plaintiff and his experts may disagree that unborn children who might only live hours or days after birth deserve a chance to live. But that tailoring question is a policy argument

---

"preservation of prenatal life at *all* stages of development" itself. *Dobbs*, 597 U.S. at 301 (emphasis added).

that he can bring to the Legislature, which has determined that every unborn child regardless of disability, genetic condition, or likelihood of survival is entitled to have that chance at life.

### III. Count 2 - Idaho's abortion laws do not violate the Equal Protection Clause.

Count 2 of Plaintiff's Amended Complaint challenges Idaho's abortion laws under the Equal Protection Clause on the ground that it allows abortion for some life-threatening medical situations but not in situations where the threat comes from self-harm. Dkt. 56 ¶¶ 129–33. Because Idaho's abortion laws do not discriminate on the basis of a suspect classification, they are reviewed for rational basis. They easily meet this low bar.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Gallinger*, 898 F.3d at 1016 (cleaned up). The Court's equal protection analysis consists of three steps: (1) identify the classification, (2) identify a control group of individuals similarly situated in relevant respects, and (3) if the two groups are similarly situated, identify and apply the appropriate level of scrutiny. *Id.* Here, Idaho's abortion laws do not treat similarly situated individuals differently, and do not discriminate on the basis of a suspect classification anyways, so they are reviewed for rational basis, which they easily satisfy.

#### A. Rational basis is the only standard that applies.

The first step of the Equal Protection analysis is to identify the group that Plaintiff believes has been improperly classified by the statute. According to his operative complaint, that group is "pregnant [women] at risk of death from self-harm." Dkt. 56 ¶ 130. The second step is to identify a control and determine if those in the group are similarly situated. The control group, Plaintiff contends, is women "at risk of death from [all] other causes." *Id.* And this is where the analysis should end—the control group is not similarly situated to the group at issue.

Pregnant women at risk of self-harm are not in the same position as those at risk from other medical conditions. Self-harm, by definition, is not limited to any specific physical condition, and unlike other medical conditions, determining the risk of self-harm relies on self-reporting that can be difficult-to-verify or unreliable. Indeed, whether a person experiences suicidal ideation or attempts suicide can be unpredictable. SOF ¶ 16. Further, unlike risks from other conditions (like cancer, for example), self-harm causes injury only through an affirmative action by the patient herself.

But even assuming the two groups were similarly situated, the Court would still apply rational basis review at step three because the classification drawn by the statute does not discriminate on the basis of a suspect or quasi-suspect class, like race or sex. *See Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816 (classifying on the basis of medical diagnosis triggers rational basis). Mental illness is not a suspect or quasi-suspect classification. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 445–46 (1985).

### B. Idaho's abortion statutes do not irrationally apply to self-harm.

Whether considered under the rubric of animus (of which Plaintiff has adduced no evidence) or arbitrariness, the Defense of Life Act satisfies rational basis under circumstances where a woman faces risk of death from self-harm.

Simply put, Idaho's law satisfies rational basis because, among other reasons, other treatment options exist for self-harm or suicidality, apart from an abortion. That much is confirmed by Plaintiff's own expert psychiatrist. Dr. Payne testified in her deposition that options to treat a pregnant woman experiencing symptoms prompting potential self-harm vary depending on the underlying cause, but include: treating the woman with medication, cognitive behavioral therapy, dialectical behavioral therapy, electroconvulsive therapy, transcranial magnetic stimulation, and light box therapy. SOF ¶ 18. In appropriate cases, hospitalization to prevent self-harm is also an

option. SOF ¶ 17. Adjustments of medication during pregnancy, stopping or starting different kinds of medications, taking psychiatric medications during pregnancy (most of which are safe during pregnancy), or even taking teratogenic medications (which may cause harm to an unborn child) during pregnancy, are all options as well. SOF ¶¶ 19–20.

With all these other treatments, the Legislature could rationally conclude that an abortion wouldn't be necessary to save the life of the mother, and so abortions should be prohibited to preserve unborn life. *See also* Oral Argument Transcript, *Moyle v. United States*, Nos. 23-726, 23-727 at 78–79 (April 24, 2024, U.S. Supreme Court) (then-U.S. Solicitor General Prelogar arguing that "pregnancy termination . . . is not the accepted standard of practice to treat any mental health emergency"). Moreover, the Legislature could reasonably believe that a risk of death from self-harm, which anyone can profess, is justifiably treated differently than physical symptoms in light of the unborn life at stake. *See Raidoo*, 75 F.4th at 1125 (citing *Dobbs*, 597 U.S. at 290). The statute therefore satisfies rational basis review and does not violate the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, the Court should grant this Motion for Summary Judgment and dismiss all causes of action in the Amended Complaint.

DATED: October 21, 2025

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

/s/ *Aaron M. Green*
AARON M. GREEN
Deputy Attorney General

*Attorney for Defendants Intervenor Attorney*
*General Raúl Labrador and Members*
*of the Idaho Board of Medicine*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on October 21, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jamila Johnson
jjohnson@lawyeringproject.org

Paige Suelzle
psuelzle@lawyeringproject.org

Wendy S. Heipt
wheipt@legalvoice.org

*Attorneys for Plaintiff*

Tanya Pellegrini
tpellegrini@lawyeringproject.org

Stephanie Toti
stoti@lawyeringproject.org

Ronell Tshiela
rtshiela@lawyeringproject.org

Kelly O'Neill
koneill@legalvoice.org


/s/ *Aaron M. Green*
AARON M. GREEN