# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al*.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:24-cv-00244-BLW |

**EXPERT REPORT OF MONICA EPPINGER, J.D., PH.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), MONICA EPPINGER, J.D., PH.D., makes the following disclosures:

1. I am an Assistant Professor of Law and Anthropology. I offer the following opinions as an expert in the history of abortion regulation in the United States.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

**Introduction**

2. This report concerns the history of health care and its regulation in the United States as respects the practice of abortion. It covers theories of health that prevailed in the United States; the health care, medical interventions, and therapies that arose under them, with specific attention to abortion; and the legal treatment of those practices.

3. In the treatment of abortion at law in the United States, common law doctrines controlled until a period of state-by-state statutory regulation in the 1800s. Statutes preserved the language and the logic of those prior doctrines as well as presumptions from the regime of health in which they arose. Understanding the history of this body of law requires understanding

the history and tradition of health care in which the doctrines developed and to which the law applied.

4. Accordingly, this report starts by explaining health theories and practices prevalent in Europe and North America at least through the third quarter of the nineteenth century in tandem with the formation and application of relevant common-law doctrine. It then explains health ideas and practices, and their treatment at law, under state statutes initiated in a first period of legislating on abortion between 1821-1857 and in a second period between 1857-1959. This review shows how statutes preserved key components of that earlier history and tradition even as ideas and techniques in health evolved. This report's historical review concludes at 1959, when the introduction of the Model Penal Code brought prior periods of statutory development to a close.

## Theory and Practice of Health under the Common Law

### A. Health under Common Law

5. The theory of health that informed medical practice and legal doctrine in the U.S. through most of the 1800s, even well into the 1900s, was humoral health. Ideas and practices from Mediterranean antiquity figure prominently in this history for reasons specifically related to women's health and with direct consequences for the practice and conceptualization of abortion. Particularly foundational core ideas derive from the Hippocratic tradition (fifth-second century

B.C.)[1] and the physician Claudius Galen (129-199 A.D.).[2] Through a formative period of the common law—encompassing the time of Bracton's treatise *On the Laws and Customs of England* (1210–1268)[3] through the time of Sir Edward Coke (1628-1644),[4] Sir Matthew Hale (d. 1676),[5] and thence into U.S. law —Hippocratic-Galenic theories served as the taken-for-granted background of health practice.[6]

---

[1] The Hippocratic tradition was established in a body of Greek writings from the 4th-5th centuries B.C., eventually circulated under the name of the physician Hippocrates of Cos (b. 460 B.C.). W.H.S. Jones, *General Introduction, in* HIPPOCRATES, HIPPOCRATES ix, xliii (W.H.S. Jones trans., 1979 (1923)). For English translation of the Hippocratic treatise on women's physiology, see HIPPOCRATES, *Nature of Women, in* 10 HIPPOCRATES 189 (Paul Potter ed. & trans., Loeb Classical Library 2012) (fifth century B.C.). Hippocratic ideas about women's health were conveyed to early modern Europe in two principal texts, *Diseases of Women I* and *Diseases of Women II*. Monica H. Green, *Introduction* to THE TROTULA: AN ENGLISH TRANSLATION OF THE MEDIEVAL COMPENDIUM OF WOMEN'S MEDICINE 1, 15 (Monica H. Green ed. and trans., 2001) [hereinafter Green, *Introduction* to THE TROTULA].

[2] For three of Galen's works in English translation, see PETER BRAIN, GALEN ON BLOODLETTING: A STUDY OF THE ORIGINS, DEVELOPMENT, AND VALIDITY OF HIS OPINIONS, WITH A TRANSLATION OF THE THREE WORKS 15 (Peter Brain ed. & trans., 1986) (second century A.D.) [hereinafter GALEN, ON BLOODLETTING]. For the reach of Hippocratic-Galenic thought in the history of English medicine, see RICHARD MARSDEN, THE CAMBRIDGE OLD ENGLISH READER 17 (2004) (explaining that the surviving major Old English medical treatises (from before 1100 A.D.) are translation of Latinate works of the Hippocratic-Galenic tradition). On Galen's influence on medicine and the development of early modern gynecology, see Green, *Introduction* to THE TROTULA *supra* note 1 at 18-25.

[3] HENRI DE BRACTON, 2 ON THE LAWS AND CUSTOMS OF ENGLAND (George Woodbine Latin text, Samuel E. Thorne trans., 1968–1977) (1210–1268), http://bracton.law.harvard.edu/Unframed/English/v2/340.htm [hereinafter BRACTON, LAWS AND CUSTOMS OF ENGLAND].

[4] SIR EDWARD COKE, A FOURTH PART OF THE INSTITUTES OF THE LAWS OF ENGLAND (W. Clarke & Sons ed. 1817) (1628–1644), https://books.google.com/books?id=S2w0AQAAMAAJ&pg=PA251&lpg=PA251&dq=3+E.+3+Coron.+163&source=bl&ots=LTVhC9Lv0w&sig=o9JxlE9G25vntYsGXg7wB3kg1fg&hl=en&sa=X&ei=91zhVMAVhKmDBMKwhIAP&ved=0CBQQ6AEwAA#v=onepage&q=3%20E.%203%20Coron.%20163&f=false [hereinafter COKE, LAWS OF ENGLAND FOURTH].

[5] 1 SIR MATTHEW HALE, HISTORY OF PLEAS OF THE CROWN: OR A METHODICAL SUMMARY OF THE PRINCIPAL MATTERS RELATING TO THAT SUBJECT (1736) (1682), [hereinafter HALE, PLEAS OF THE CROWN], *reprinted at* https://archive.org/details/historiaplacitor01hale.

[6] For evidence of gynecological practice in the medical treatises circulating through early modern times, see THE TROTULA: AN ENGLISH TRANSLATION OF THE MEDIEVAL COMPENDIUM OF WOMEN'S MEDICINE (Monica H. Green ed. and trans., 2002) (twelfth century) [hereinafter THE TROTULA]; see also HILDEGARD OF BINGEN, HOLISTIC HEALING (Manfred Pawlik trans. Latin-German, 1989; Patrick Madigan, S.J. trans. German-English; Mary Palmquist & John Kulas, O.S.B. eds. of English text, 1994) (1151–1158) [hereinafter HILDEGARD OF BINGEN, HEALING]. On the prominence of the *Trotula* and

6. In these theories of health, which prevailed in Europe through the early modern period and were carried to North America with colonization and settlement, good health depended on maintaining a correct balance of certain "humors" (manifest in the bodily fluids of blood, phlegm, yellow bile, and black bile)[7] and elements (hot, cold, wet, and dry).[8] Poor interworking of the elements or disruption in the balance of humors was believed to cause illness[9] and called for intervention to restore balance.[10]

7. When it came to humors, excess was considered as dangerous as deficiency[11] and many treatments were meant to absorb or rid the body of excess.[12] One well-known method of

---

Hildegard's work in early modern health practice, see HILDEGARD OF BINGEN, HEALING, *id.*, at 72 (with the *Trotula*, Hildegard's work is the most consulted handbook on women's health in medieval Europe); Green, *Introduction to* THE TROTULA, *supra* note 1, at 2; *id.*, at 60 (explaining the *Trotula* informs practice from "Italy to Ireland, from Spain to Poland"). For a sixteenth-century example of Galenism in thinking about health, see JEAN FERNEL, THE "PHYSIOLOGIA" OF JEAN FERNEL (John M. Forrester & John Henry eds. and trans., Am. Phil. Soc'y 2003) (1567) [hereinafter "PHYSIOLOGIA" OF JEAN FERNEL].

[7] Manfred Pawlik, *Foreword* to HILDEGARD OF BINGEN, HOLISTIC HEALING, xvi (Manfred Pawlik trans. Latin-German; John Kulas, O.S.B. trans. German-English; Mary Palmquist & John Kulas, O.S.B. eds. of English text, 1994 (1989)) [hereinafter Pawlik, *Foreword* to HILDEGARD].

[8] *See, e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 45 ("Fire, air, water, and earth are in every human being . . . If the elements work properly in a human being, they sustain him and keep him healthy. However, if they do not live harmoniously in him they disturb him and make him sick."); *see also* "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, ch. 5, at 198–200 ("The body of man, like everything else, is united and held together by the coalescence of the four elements.").

[9] *See, e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 51 ("a condition of peace and health" depends on maintaining the humors in "correct balance and proper proportion" but "when they conflict with each other, the humors make him weak and sick . . .").

[10] Pawlik, *Foreword* to HILDEGARD, *supra* note 7, at xvi–xvii (Galen's theory of humors explains physical health and temperament); John Henry & John M. Forrester, *Introduction*, *in* THE "PHYSIOLOGIA" OF JEAN FERNEL, 1, 10 (John M. Forrester & John Henry eds. and trans., Am. Phil. Soc'y 2003) [hereinafter Henry & Forrester, *Introduction* to FERNEL] (describing Fernel's "Physiologia" as the fullest exposition of Renaissance Galenism).

[11] HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 46 ("[W]henever any humor increases beyond its proper amount, the person is in danger.").

[12] *See, e.g.*, JAMES HAMILTON, OBSERVATIONS ON UTILITY AND ADMINISTRATION OF PURGATIVE MEDICINE IN SEVERAL DISEASES (1805). Hamilton (1749–1835) was highly regarded, a physician to the Royal Infirmary, and his work on purgative medicine enjoyed such popularity that it wass reprinted through seven editions in the 1800s. 2 JOHN COMRIE, HISTORY OF SCOTTISH MEDI.CINE 489 (1932),

restoring humoral balance, if an excess build-up of the sanguine humor was diagnosed, was blood-letting[13] (also known as "venesection," an incision into a vein to release blood).[14] A famous example shows the persistence of humoral health and treatments in the United States: the blood-letting treatment demanded by George Washington, subsequently re-prescribed by his doctors, resulting in his being bled four times in the last forty-eight hours of life of roughly eighty ounces of blood.[15] A century later, an eminent Boston physician reviewing Washington's case confirmed that the bleeding given Washington would have been accepted treatment for the same condition in 1860.[16]

### i. Warmth, Retained Matter, and Natural Purgation

8. The idea of humoral balance provided an overarching heuristic within which other details of Galen's theories of health fit. Men, in Galen's schema, are constitutionally "warmer"[17]

---

https://archive.org/stream/b20457273M002/b20457273M002_djvu.txt [hereinafter COMRIE, HISTORY OF SCOTTISH MEDICINE].

[13] *See*, *e.g*., Galen, *On Venesection* [incision in a vein] *against Erasistratus*, *in* GALEN, ON BLOODLETTING *supra* note 2, at 15, 21, 25; Galen, *On Treatment by Venesection*, *in* GALEN, *id*., 67–99.

[14] *See*, *e.g*., *On Treatment by Venesection*, *id*. For an example of the accepted use of bloodletting to treat a variety of diagnoses interpreted as an excess of sanguine humor, see ARCHBALD PITCAIRNE, THE METHOD OF CURING THE SMALL-POX; WRITTEN IN THE YEAR 1704 OF THE USE OF THE NOBLE AND HONOURABLE FAMILY MARCH (printed ed. 1715) (advising bloodletting and then a purgative to treat smallpox), *cited in* COMRIE, HISTORY OF SCOTTISH MEDICINE, *supra* note 12, at 428–29.

[15] *See*, *e.g*., *The Death of George Washington*, Digital Encyclopedia of George Washington, http://www.mountvernon.org/research-collections/digital-encyclopedia/article/the-death-of-george-washington/.

[16] *See* J.H. Mason Knox, Jr., *The Medical History of George Washington, His Physicians, Friends, and Advisers*, 1 BULL. INST. HIST. MED. 174, at 180 (1933) (reporting Washington's treatment and the opinion, a century later, of Boston physician Dr. James Jackson). Despite skepticism, "heroic treatment" as a response to the inflammation in Washington's throat is still legible to medical commentators as late as the 1930s. *Id*. at 182.

[17] In "hot" and "cold," Galen and Galenic physicians are not referring to measurable differences in thermal heat (and, moreover, no instruments then existed to measure thermal heat) but rather are referring to general principles of warmth or its absence. Green, *Introduction* to THE TROTULA, *supra* note 1, at 174 n.81.

than women,[18] a fact of physiology with basic effects on digestion and consequences for women's humoral balance. The reasoning ran as follows: Retained matter such as residue from digestion leads to humoral imbalance and illness.[19] Women, because of their insufficient heat, produce a greater proportion of leftover or waste matter during digestion, but cannot get rid of it through other processes like sweating or hair growth that occur naturally in men.[20] Consequently, women need an additional method of purging themselves of waste matter. Menstruation, in Galenic theories of health, served that indispensable function.[21]

**ii. Menstruation: First, a Means of Purgation**

9. Menstruation, a regular process of emission directly involving one of the humors (blood), thus bore particular significance in Galenic theories of health. In Hippocratic-Galenic gynecology, menstruation did not have a role in a "reproductive system"; rather, "menstruation was a necessary purgation, needed to keep the whole female organism healthy."[22] If not expelled through menstruation, excess materials would "accumulate and sooner or later lead to a humoral

[18] GALEN, *De usu partium*, bk. 14, ch. 7, at 630 (Margaret Tallmadge May trans., 1968), *cited in* "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at 625 n.8.

[19] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 19–20.

[20] *Id.* at 20. *See also, e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 108 ("A woman has a greater number of damaging fluids and a more damaging corruption in her body than a man. " Menstruation rids women of excess, "their noxious fluids and poisonous corruptions," and if not for its cleansing, "their whole body would . . . become bloated and not be able to remain alive."); "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 561, 563 (Since the male "overflows with a great deal of heat, he completely modifies and digests all the food he has taken in" and "powerfully dispels anything further overflowing," but the female "secured a heat too weak to be capable of dispelling an excess. She has accordingly been granted the benefit of menstrual blood, out of . . . an imperfect nature." What flows out at the appointed cycles is a "sick kind of blood.").

[21] THE TROTULA, *supra* note 6, at sect. 3, 66 ("Because there is not enough heat in women to dry up the bad and superfluous humors which are in them, nor is their weakness able to tolerate sufficient labor so that Nature might expel [the excess] to the outside through sweat as [it does] in men, Nature established a certain purgation especially for women, that is, the menses, to temper their poverty of heat.").

[22] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 19.

imbalance—in other words, to disease."[23] Through menstruation, a woman's body achieved its necessary purging.

10. Within the core schema of humors, balance, excess, and health, then, the absence of menstruation was taken *not merely as a symptom* of some underlying cause. *It was seen as a cause*, in itself, of disease.[24] From menarche to menopause, "a woman should be menstruating regularly if she is to remain healthy."[25] The horrors wrought by "suppressed menstruation" included "blockages of viscera, wasting, cancer, epilepsy, and very many [sorts] of this destruction."[26] In Hippocratic and Galenic thought, "absence of menstruation—or rather, *retention* of the menses, for the waste material was almost always thought to be collecting whether it issued from the body or not—was cause for grave concern, for it meant that one of the major purgative systems of the female body was inoperative."[27]

11. In early modern thought, therefore, menstruation was a significant way for a woman's body to maintain humoral balance and health. Amenorrhea, i.e., the absence of menstruation in a woman of menstruating age, posed danger. This is not to say that early moderns did not understand a connection between pregnancy and cessation of menstruation. It is more complicated than that. The function of menstruation, they thought, was to preserve health: when menstruation happened "in normal amounts, at the normal times," a woman was likely to

---

[23] *Id.* at 20. *See also, e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 91 ("[T]he woman is weak and cold, and the humors in her are weak. As a consequence, she would be continually sick if her blood were not periodically cleansed through menstruation. In the same way, food cooking in the pot is cleansed when it throws off its foam from itself.").

[24] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[25] *Id.* at 19–20.

[26] "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 563.

[27] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

be healthy.[28] If menstruation failed to occur, pregnancy itself might absorb potential accumulations of excess materials and humoral imbalance.[29] "Retained menses" and "pregnancy" were not synonyms; these two conditions might exist in parallel. In fact, for some medical thinkers, retaining menstruation was one more condition of heightened danger attendant upon being pregnant, and the effect of retained menses during pregnancy was the subject of much concern.[30]

### iii. Amenorrhea and Therapeutic Response

12. Amenorrhea thus demanded a therapeutic response from any responsible medical practitioner and "the necessary therapeutic response was simple: induce menstruation."[31] For that reason, the largest percentage of prescriptions for women's diseases in most early medical texts were "aids for provoking the menses."[32] They worked. These medieval prescriptions, twentieth-century medical research reveals, commonly contained ingredients and compounds we now know to be emmenagogues (i.e., agents that induce menstruation) or abortifacients (i.e., agents that effectuate abortion).[33]

---

[28] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[29] *Id.* (explaining that when a woman did not menstruate because of pregnancy or lactation, "the excess matter—now no longer deemed 'waste'—either went to nourish the child in utero or was converted into milk").

[30] *See, e.g.*, "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 563, 565 (arguing that, since menstrual blood, unlike "more useful blood" is inherently "noxious," it is implausible that "a fetus carried in the womb possibly snatches nutriment from it.").

[31] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[32] *Id.*

[33] *See generally* John M. Riddle, *Oral Contraceptives and Early-Term Abortifacients During Classical Antiquity and the Middle Ages*, 132 PAST & PRESENT 3 (1991) (identifying purgative compounds from humoral health tested as abortifacient and/or contraceptive by modern laboratory science).

### iv. Quickening and Pregnancy in Humoral Health

13. Three factors made detecting fetal life an important diagnostic step in preserving women's health for early moderns: (1) the importance of menstruation in humoral health and the alarm that amenorrhea thus raised; (2) understanding pregnancy as a condition that could absorb excess materials and stave off humoral imbalance; and (3) the absence of pregnancy tests, imaging, or alternative means of ascertaining pregnancy. Conception and what happens afterwards thus became a matter of importance in the domain of women's health beyond concerns about reproduction, and the subject of much speculation.

14. The Latin in which most medieval and early modern medical texts were written makes a distinction between the *conceptus*, the product of human conception, and its later developed state, the *fetus*.[34] This distinction supported the idea, widely accepted in medieval and early modern thought, of *in utero* development:[35] a *conceptus* took on human form and was instilled with its own vital heat, or "animated," over time.[36] For early moderns concerned with detecting pregnancy in order to diagnose pathological amenorrhea, animation became a key diagnostic.

[34] Henry and Forrester, *Introduction* to FERNEL, *supra* note 10, at 10. This distinction is hard to render into English, which lacks an equivalent for *conceptus*. *Id*. (The more encompassing term "embryo" does not appear in an English text until 1576, where it appears in translation of a Latin text on distilling medical and alchemic substances. OXFORD ENGLISH DICTIONARY (2013 rev.), https://www.oed.com/dictionary/embryo_n?tab=factsheet#5706260. On the history of embryology, see generally JOSEPH NEEDHAM, A HISTORY OF EMBRYOLOGY (1934).)

[35] *See*, *e.g*., ARISTOTLE, POLITICS, 7.16.15.1335b19-26 (H. Rackham trans., G.P. Putnam's Sons ed. 1932) (distinguishing the "unformed," a state "before sense and life have begun in the embryo," and "the formed" *in utero*). For later adherents to an Aristotelian conception of *in utero* development, see for example HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 54–55 (describing how during the first month a seed *in utero*, although already with the four humors and four elements, becomes a still unformed "thick mass that is not yet alive" and develops from there).

[36] *See*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 55–56 (correlating an immature stage of *in utero* development, at the second month, with the inability of "the form" to "move itself").

15. As a corollary, in medieval and early modern thought the soul was not necessarily a feature of the *conceptus*[37] but rather entered the body later, a development referred to as "ensoulment."[38] Even when a woman had reason to suspect conception, the soul was not always considered present in a *conceptus*.[39] Some procedures meant to provoke menstruation, undertaken to restore humoral balance for a woman, might never have been thought to implicate an ensouled creature, even after conception. However, at other times treatment might have been understood as interrupting the continuing development of an ensouled, and thus animated or enlivened, being.[40] Precise knowledge of the internal functioning of women's bodies and

---

[37] For Augustine, *e.g.*, the body of one "not yet formed," though "some sort of living, shapeless thing [*informiter*]" is "not yet endowed with its senses" and does yet not contain a "living soul." 33 AUGUSTINE, *Quaestiones Exodi*, 80.1439-45 *in* SANCTI AURELII AUGUSTINI QUAESTIONUM IN HEPTATEUCHUM, LIBRI 7, pt. 5 (J. Fraipont & Donatien de Bruyne eds., Corpus Christianorum: Series Latina Brepols 1958) [hereinafter AUGUSTINE, *Quaestiones Exodi*], *translated and discussed in* G.R. Dunstan, *The Human Embryo in the Western Moral Tradition*, *in* THE STATUS OF THE HUMAN EMBRYO: PERSPECTIVES FROM MORAL TRADITION 39, 44 (G.R. Dunstan & Mary J. Seller eds., 1988) [hereinafter Dunstan, *The Human Embryo*].

[38] *See* Augustine, *Quaestiones in Heptateuchem* 2.80 [on Exodus 21:22], *in* 28 CORPUS SCRIPTORUM ECCLESIASTICORUM LATINORUM pt. 2, at 146–147 (Joseph Zyche ed., Tempsky 1887), *cited in* JOHN RIDDLE, CONTRACEPTION AND ABORTION FROM THE ANCIENT WORLD TO THE RENAISSANCE 21 (1992) [hereinafter RIDDLE, ANCIENT ABORTION] (discussing various possible combinations, according to the works of Augustine and other church fathers, of stages of formation and ensoulment in an embryo); *see also*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 55–56 (describing ensoulment as the entering of the "breath of life" and the "inflowing of the soul"). For treatment of ensoulment in Renaissance science, *see, e.g.*, "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at 576 (explaining that the physical form and the soul develop *in utero* until the being can be considered "vital," alive as a human in both body and soul); *see also id*. at 626 n.23 (discussing Fernel's idea of the parallel development of biological growth and ensoulment as part of his Aristotelian convictions).

[39] The timing of "ensoulment" was never settled in Greco-Roman thought, Judaism, or Christianity. *See generally* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 20–21. *See also, e.g.*, 1 ARISTOTLE, *Generation of Animals* 736a-b *in* THE COMPLETE WORKS OF ARISTOTLE at 1111, 1142–43 (Jonathan Barnes ed. & A. Platt trans., Bollingen Series, Princeton Univ. Press, 1995 (1984)) (avoiding stating a definite point at which a being *in utero* is endowed with a rational soul).

[40] The prevailing thought at this time was that the interval between "conception" and "animation" was perceived as a zone in which action could be taken without raising questions -- moral, legal, or otherwise -- for patient or health practitioner in regard to a fetus. MARIE-THÉRÈSE FONTANILLE, ABORTION ET CONTRACEPTION DANS LA MÉDECINE GRÈCO-ROMAÎNE 194 (1977) [hereinafter FONTANILLE, ABORTION DANS LA MÉDECINE GRÈCO-ROMAÎNE], *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 22–23.

pregnancy was limited. The duration of human gestation itself was actively debated into the first decades of the 1800s; Karl Ernst von Baer discovered the mammalian ovum only in 1826; and the human ovum was not given detailed description until Edgar Allen's work in 1928.[41] Prenatal imaging and pregnancy tests did not exist before the 1930s.[42] Deciphering what was going on came to rely on "quickening," an English idea about *in utero* development cued by the perception of fetal movement by the pregnant woman, into which Hellenic concepts of animation and ensoulment were assimilated. "Quickening" was understood as a proxy heuristic, not to be confused with an equivalent of certainty regarding pregnancy. Practitioners as late as the early twentieth century guarded against over-relying on "quickening" to diagnose pregnancy, alert,

---

[41] KARL ERNST VON BAER, ON THE GENESIS OF THE OVUM OF MAMMALS AND OF MAN 137 (Charles Donald O'Malley trans., 1956) (1827) (establishing that mammals develop from eggs). Edgar Allen et al., *Recovery of Human Ova from the Uterine Tubes: Time of Ovulation in Menstrual Cycle*, 91 J. AM. MED. ASS'N 1018 (1928). In regard to the persistence of imprecise understandings of human gestation among laypeople, see for example *Joseph Hall, Judge of Probate etc. v. Hancock,* 32 Mass. (15 Pick.) 255, 257 (1834) (defense counsel opposing eligibility of after-born heir on grounds that gestation defies precise specification and for a given fetus can vary by weeks).

[42] In regard to prenatal imaging, see Ian Donald, J. MacVicar, & T.G. Brown, *Investigation of Abdominal Masses by Pulsed Ultrasound*, 1 LANCET 1188, 1188–95 (1958); Douglass H. Howry, *The Ultrasonic Visualization of Soft Tissue Structures and Disease Processes*, 40 J. LABORATORY & CLINICAL MED. 812, 812–13 (1952) (reporting Howry's discovery of the first means to produce tomographic images of human anatomy); *see generally* S. Campbell, *A Short History of Sonography in Obstetrics and Gynaecology*, FACTS, VIEWS & VISION IN OBGYN 213 (2013). In regard to pregnancy tests, see Harry E. Kaplan, M.D., *The Aschheim-Zondek Hormone Test for Pregnancy*, 3 CAL, & W. MED. 412, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1657279/?page=1 (reporting Selmar Aschheim and Bernhard Zondek's isolation of the hormone human chorionic gonadotropin, hCG, and development of the "A-Z Test," a test of injecting human urine in a mouse that could detect the presence of hCG); *see also* Marian D. Damewood, M.D. & John A. Rock, M.D., *In Memoriam: Georgeanna Seegar Jones, M.D.: Her Legacy Lives On,* 84 FERTILITY AND STERILITY 541 (Aug. 2005), https://www.deepdyve.com/lp/elsevier/in-memoriam-georgeanna-seegar-jones-m-d-her-legacy-lives-on-JvDw1P3MuE (reporting Jones' discovery around 1936 that hCG was produced by the placenta, rather than the pituitary as previously thought); Judith L. Vaitukaitis, Glenn Braunstein, & Griff Ross, *A Radioimmunoassay Which Specifically Measures Human Chorionic Gonadotropin in the Presence of Human Luteinizing Hormone*, 113 AM. J. OBSTETRICS GYNECOLOGY 751 (1972) (reporting their discovery of a test sensitive enough to detect a subunit of hCG only days after a missed period); Andrea Tone, *A Thin Blue Line: A History of the Pregnancy Test Kit*, 81 BULL. HIST. MED. 439 (2007) (in review of NIH exhibit, explaining the first FDA approval, in 1976, of a home pregnancy test); Office of NIH History, *A Thin Blue Line: The History of the Pregnancy Test Kit* (Sarah Leavitt curator, Dec. 3, 2003–present) https://history.nih.gov/exhibits/thinblueline/ *accessed* February 8, 2025.

*inter alia*, to so-called "false quickening."[43] Understood with this background caveat, "quickening" became a pivotal concept and element of proof in common-law legal doctrine on abortion. It stood as a proxy for ascertaining pregnancy, only after which something called "abortion" would explicitly have been at issue.

### v. The Reach of this History and Tradition in the United States

16. These ideas are deeply rooted in U.S. history and tradition. As noted above, humoral health theory and practices stem as far back as Hippocratic and Galenic traditions. This regime of health ideas and practices had spread from the Mediterranean basin through medieval Europe to England, accumulating a practical gynecology of abortifacient knowledge to texts as local practitioners across Europe and the British Isles added their techniques during the transmission and recopying of medical manuscripts. This history and tradition were introduced to the North American continent with European colonization. Humoral health constituted the background of medical ideas and practices through the period of the formation of common law doctrines that likewise came to North America with colonization.

### vi. From Theory to Practice in Humoral Health

17. In the regime of humoral health, amenorrhea was understood to cause a dangerous build-up of waste materials in a woman that any responsible medical practitioner would find it incumbent to address. "Abortion" typically meant intervention after quickening and risked side effects (like uncontrolled hemorrhaging) that become increasingly dangerous to the patient over the duration of pregnancy; pre-quickening intervention and its risks were understood in a completely different light.

---

[43] *See, e.g.*, ALEXANDER MILNE, THE PRINCIPLES AND PRACTICE OF MIDWIFERY WITH SOME OF THE DISEASES OF WOMEN 67–79 (1884) (describing, in physician-authored medical textbook, "false quickening" and other problems with diagnosing pregnancy).

18. Within this body of theory, practitioners in early-modern England, benefitting from centuries of accumulated experimentation,[44] deployed a remarkable range of uterine-purging measures when faced with amenorrhea in a woman of menstruating age.[45] Some were classed as "emmenagogue," a treatment intended to induce menstruation without any necessary reference to terminating pregnancy.[46] Others were classed as "abortifacient," intended to expel a *conceptus* or *fetus*.[47] Medical texts admitted the potential for ambiguity, noting some measures both provoke menstruation and cease generation,[48] making intent impossible to assume with such treatments even if administered after quickening.[49] While admitting overlap in medical thinking and in practice, for explanatory purposes I divide up the two therapeutic classifications, emmenagogue and abortifacient. For each therapeutic classification, I consider three kinds of treatment options that can be identified from surveying contemporaneous medical materials: (1) *medication*, meaning intentional administration of a chemical or biochemical substance, usually

---

[44] *See generally* RIDDLE, ANCIENT ABORTION, *supra* note 38 (cataloguing thousands of emmenagogic and abortifacient prescriptions from antiquity through early modern times, with modern laboratory verifications of their abortifacient properties, to argue that since antiquity, abortions were always available in the West); *see also id*. at 7 (summarizing his conclusion that a widespread culture of abortion obtained during the periods under study).

[45] For example, in the foundational practice manual *Conditions of Women*, a portion of *The Trotula* meant to cover all aspects of women's health, more than one-third of the entire catalogue is devoted to treating conditions related to menstruation. Green, *Introduction* to THE TROTULA, *supra* note 1, at 21.

[46] *See* GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20 (pointing out *Trotula* manuscripts' distinction between pregnant and pathological amenorrhea).

[47] Some are also understood as, and administered as, contraceptives, but that usage is beyond the scope of the present report and will not be treated here.

[48] *See*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA [MATERIALS OF MEDICINE] 1.103 (Max Wellman ed., Weidmann 1958) [hereinafter DIOSCORIDES, DE MATERIA MEDICA] ("The Chaste Tree destroys generation as well as provokes menstruation"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 31; DIOSCORIDES, DE MATERIA MEDICA, *id*. at 3.7 (prescribing birthwort, drunk with pepper and myrrh, to expel menstrua and to expel a *conceptus* or *fetus*), *cited in* RIDDLE, ANCIENT ABORTION, *id*. at 32.

[49] Historian Monica H. Green points out medical texts considered some substances uterine purgatives to induce menstruation, a legitimately separate domain of Hippocratic-Galenic medical practice from purposefully inducing miscarriage. Green, *Introduction* to THE TROTULA, *supra* note 1, at 21, 215 n.83.

a plant preparation; (2) *external manipulation*, which can range from poultice to massage to abdominal blows; and (3) *internal intrusion*, mechanical rather than biochemical intervention, by vaginal insertion (or, more rarely, incision through the abdominal wall) to interrupt uterine function.

***Emmenagogues***

19. *Medication*: *Medicational* emmenagogue was the most common response to interrupted menstruation or amennorhea either before or after quickening. "Retained menses" could exist separately from and simultaneously with pregnancy. Early modern gynecology gives scores of recipes to "extract the menses,"[50] "move the menstrua,"[51] or "put in motion the menstrua."[52] There were two primary means of administering such an emmenagogic medication: the preparation could be administered orally[53] or soaked in a ball of cotton or other tampon-like object to make a vaginal suppository known as a *pessary*, also widely attested in practice manuals.[54]

---

[50] *See* DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.109, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 32 (listing cultivated lupine as a remedy to extract the menses or expel a fetus).

[51] *Id*. at 3.80 (listing *silphium* drunk with pepper and myrrh to move the menstrua).

[52] *Id.* at 4.146 (listing a treatment of Mediterranean mezereon); *see also*, *e.g.*, GALEN, *De compositione medicamentorum secundum locus* ["On Compound Medicines according to Site"], 9.4, 13:283-284 *in* CLAUDII GALENI OPERA OMNIA (Karl Gottlieb Kühn ed., Olms 1964-65 (1821-33)) (prescribing willow and rue), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 85; THE TROTULA, *supra* note 6, at 89–90 (prescribing *inter alia* red willow stewed with wine or water); *id*. at 67 (prescribing *diathessaron*: mint or myrtleberry, felwort, birthwort, and laurel berry, cooked with honey).

[53] THE TROTULA, *supra* note 6, at at 68 (describing a powder of yellow flag, hemlock, castoreum, mugwort, sea wormwood, myrrh, common centaury, and sage mixed with a stew of myrrh and savin and drunk); *id*. at 106 (prescribing vervain and rue, pounded and cooked with bacon, followed by a beverage of ground delicate willow root juice and madder mixed with wine); HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 165–66 (prescribing *inter alia* a beverage made from stewed and ground heidelberries, yarrow, rue, Easter lilies, cloves, and white pepper with wine).

[54] *See*, *e.g.*, THE TROTULA, *supra* note 6, at 68 (calling for carded wool to be soaked in a prescribed preaparation and then "pressed so it is hard and rigid and long so that it can be put into the vagina"). *See also*, *e.g.*, 8 HIPPOCRATES, *De mulierum affectibus*, *in* OEUVRES COMPLÈTES D'HIPPOCRATE:

20. *External manipulation*: In addition to medicational means, practice manuals prescribe emmenagogic treatment by *external manipulations* ranging from poultice[55] and massage[56] to bleeding by venesection under the arch of the foot. [57]

21. *Note on Internal intrusion*: This form of medical intervention is missing from a survey of emmenagogues. None of the materials I surveyed provided evidence of emmenagogic treatment by internal intrusion.

***Abortifacients***

22. *Medication*: As with emmenagogues, ingested *medication* was the most common abortifacient intervention. Hippocratic texts prescribed them,[58] other widely consulted medical authorities advised them,[59] and private sources attest to widespread practical knowledge of

---

TRADUCTION NOUVELLE AVEC LE TEXTE GREC EN REGARD bk. 1, § 78, 1–12, at 173 (Emile Littré ed., chez J.B. Baillière 1839–1861), (*reproduced in* Hakkert, 1973) [hereinafter HIPPOCRATES, *De mulierum affectibus*] (offering prescription for "an efficacious pessary"); DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.152 (advising a garlic pessary to "bring down the menses"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 37. *See generally* RIDDLE, ANCIENT ABORTION, *id.* at 36–38 (reviewing twentieth-century biomedical research verifying the efficacy of various vaginal suppositories prescribed in earlier texts).

[55] *See*, *e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 165 (prescribing a poultice of aniseed and feverfew applied externally to the genitalia to "relax the monthly flow").

[56] *See*, *e.g.*, THE TROTULA, *supra* note 6, at 106 (advising a cushion of carded wool, soaked in mugwort stewed with savin, pennyroyal, or other herbs, laid as a poultice on the belly); *see also id.* at 68 (calling for laying cooked chickweed on the belly).

[57] For retention of the menses, the *Trotula* advises the practitioner bleed the woman from the vein under the arch of the inside of the foot, alternating feet day by day. *Id.* at 67; *see also id.* at 106.

[58] HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, bk. 1, § § 80–82 (listing six early-stage abortifacients to be taken with wine or water), bk. 1, § § 82–84 (giving eight ingestibles to induce miscarriage), *discussed in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 78–80.

[59] *See*, *e.g.*, DIOSCORIDES, DE MATERIA MEDICA *supra* note 48, at bk. 2, ch. 159–166, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 44–45 (discussing "sharp herbs" among which abortifacients figure prominently, including soapwort to dry out menses and kill embryo; edderwort to abort a developing, or perhaps early stage, *fetus*; and lords and ladies to expel a *conceptus*); *see also* DIOSCORIDES, THE GREEK HERBAL OF DIOSCORIDES: ILLUSTRATED BY A BYZANTINE A.D. 512. ENGLISHED BY JOHN GOODYER A.D. 1655 (Robert T. Gunther ed., Hafner 1959 (1933)) [hereinafter DIOSCORIDES, THE GREEK HERBAL] at ch. 48 (no pagination) ("Dioscorides sayth that Peper, Rue, Tuttsayne, Calamint, Castoreum, wast the sede of generacyon (by dryuynge it up) of their propertie and strong heate . . ."), *cited in* RIDDLE, ANCIENT ABORTION, *id.* at 149.

medications that could, as one says, "cause miscarriage" and "force away the birth dead or alive as allso [*sic*] the afterbirth."[60]

23. Medicational abortion by pessary was also widely known.[61] The Hippocratic corpus labeled some *pessaries* as "ecbolic suppository" (an ecbolic being a substance that causes contraction of the uterus),[62] but labeled others, straightforwardly, as abortifacient,[63] meant to "draw down the crippled embryo/fetus" or to "release a half-completed embryo/fetus."[64] (Hippocratic abortifacients[65] are particularly notable given the symbolic weight that the Hippocratic oath came to hold in the nineteenth-century United States physicians' movement to

---

[60] Jerningham family medicinal receipt book, Jerningham MS 3/H/1, fol. 65 (late seventeenth century) (Stafford, Eng. Record Office), *cited in* Linda A. Pollock, *Embarking on a Rough Passage: The Experience of Pregnancy in Early-Modern Society*, *in* WOMEN AS MOTHERS IN PRE-INDUSTRIAL ENGLAND: ESSAYS IN MEMORY OF DOROTHY MCLAREN 39, 56 (Valerie Fildes ed., 2013 (1990)) [hereinafter Pollock, *Pregnancy in Early-Modern Society*]; *see generally id*. at 53–58 (discussing miscarriage in early modern England). *See also* ANGUS MCLAREN, REPRODUCTIVE RITUALS: PERCEPTIONS OF FERTILITY IN ENGLAND FROM THE SIXTEENTH CENTURY TO THE NINETEENTH CENTURY 73–75 (1984) (surveying early modern England women using abortifacient plant preparations received from older medical tradition).

[61] *See*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 4.172 (giving Mediterranean mezereon "on a pad" to expel a fetus), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 36; *see also* DIOSCORIDES, *id*. at 1.1 (describing lily root, applied as a pessary with honey, to "draw down the embryo"); RIDDLE, ANCIENT ABORTION, *id*. at 35 (citing a pepper pessary to "dry out" a fetus/embryo).

[62] HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, bk. 1, § 78, 1–12, at 173; *id*. at 12–14 (suggesting the squirting cucumber plant).

[63] *Id*. at bk. 1, § 78–80, at 173-200 (grouping respectively ecbolic suppositories and nine abortifacient vaginal suppositories).

[64] *Id*. at bk. 1, § 78, at 177. *See also*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.152 (advising a garlic pessary to "bring down the menses").

[65] *See*, *e.g*., HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, at bk. 1, § 78–80, at 173-200; *see also*, *e.g*., HIPPOCRATES, *id*. bk. 1, § § 80–82 (listing six early-stage abortifacients to be taken with wine or water), bk. 1, § § 82–84 (giving eight ingestibles to induce miscarriage), *discussed in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 78–80 (Hippocratic texts describing substances openly described as abortifacient, explained, and prescribed).

prohibit abortion by law.[66]) Such prescriptions for medicational abortion—ingested or pessary—were common knowledge among early-modern health practitioners.

24. *External manipulation*: Among *external manipulations* meant to induce abortion, early modern texts give evidence of poultice,[67] bloodletting,[68] or simple activity. One treatise advocated jumping[69] and another prescribed walking energetically[70] or, if pregnancy persisted, pairing treatments like softening vaginal suppositories, bleeding, or fasting with getting "shaken" by riding draft animals.[71] Another form of external manipulation, beating the stomach of a pregnant woman -- "abortion by blows" -- is nearly absent from medical manuals but descriptions of its practice appear in historical and legal texts.[72]

---

[66] *See infra* text at notes 188-94 (discussing the nineteenth-century anti-abortion movement led by U.S. physicians and the role of the Hippocratic oath therein).

[67] *See, e.g.*, DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 3.3 (describing a poultice of gentian among treatments explicitly labelled "abortifacient"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 39. *See also* DIOSCORIDES *id.* at 1.1.

[68] *See, e.g.*, John Christopoulos, *Abortion and the Confessional in Counter-Reformation Italy*, 65 RENAISSANCE Q. 443, 463 (2012) [hereinafter Christopoulos, *Abortion and the Confessional*] (citing MARTIN AZPILCUETA, CONSILIORUM SIVE RESPONSORUM cons. 47, 455 (1595) (priest admitting to the Apostolic Penitentiary in the late 1500s that, before taking orders, he had impregnated a woman and after "forty days" (meaning a *conceptus* was presumed) counseled her to abort by letting blood)).

[69] 7 HIPPOCRATES, *De natura pueri* ["*On the Nature of the Child*"] bk 4, § 90 (Emile Littré ed., chez J.B. Baillière 1839–1861) (*reproduced* Hakkert, 1973) (advising the so-called "Lacedaemonian leap, that is, 'leaping with the heels to the buttocks for the sake of expulsion'"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 9. This Hippocratic instruction for expelling an unwanted *fetus repeated in* SORANUS, GYNAECOLOGY 63 (Oswei Temkin ed. & trans., 1956) [hereinafter SORANUS, GYNAECOLOGY], *cited in* RIDDLE, ANCIENT ABORTION, *id*., at 9.

[70] SORANUS, GYNAECOLOGY *id*., 1.64 at 66 (prescribing walking energetically, riding horseback, jumping, or carrying heavy loads), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 46.

[71] *Id*. at 67, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 47.

[72] For rare instance of a description of hitting a woman's stomach intentionally to cause miscarriage in a widely circulated medical text, *see, e.g.*, DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 1.93, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 51 (advising beating the stomach of a pregnant woman with a hawthorn root to end pregnancy). For abortion by blows appearing in a legal or historical text, *see, e.g.*, the papal bull of 1588 which includes among its prohibitions violence and violent external manipulations imposed on a pregnant woman "to kill . . . immature fetuses in the maternal viscera." Sixtus V, *Contra Procurantes, consulentes, & consentientes, quocumque modo Abortum*, *preface* to

25. *Internal intrustion*: In contrast to commonly prescribed abortifacient treatments by medication and external manipulation, causing abortion by *internal intrusion* via the vagina to pierce a placenta, cause expulsion, or extract a *fetus* or via incision through the abdominal wall—though an option also well-known to caregivers—was generally disfavored. Medical texts typically warn against "separating the embryo by means of something sharp-edged" because adjacent parts could be injured and the woman doing so risked her own death.[73] Few accounts of abortion by instrument exist from early modern England.[74] Historian Cornelia Hughes Dayton finds only one description of it in her review of colonial American court records.[75] The overall impression left by early modern medical texts and legal records is that abortion by vaginal intrusion or surgical intervention was seen as dangerous and irresponsible, and thus rare, in sharp contrast with commonplace medicational uterine purging.[76]

---

CONSTITUTIO, n.1, n.5) (1588), *cited in* Christopoulos, *Abortion and the Confessional*, *supra* note 68, at 466–467, 468.

[73] SORANUS, GYNAECOLOGY, *supra* note 69, 1.65 at 68, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 48.

[74] One of the rare accounts from England comes from the trial of Eleanor Beare, accused of abortion by instrument in 1732. Witness Grace Belfort testified that her employer Beare, having heard that Grace feared herself pregnant, collected 30 shillings for the procedure and then "my Mistress brought a kind of an Instrument, I took it to be like an Iron Skewer, and she put it up into my Body a great Way, and hurt me," thereby inducing miscarriage. Upon conviction in this and on a poison procurement charge in a separate incident, Beare was sentenced to stand pillory two market days and suffer "close Imprisonment" for three years. Though the press account does not report the legal rule invoked, clues indicate that because the procedure posed exceptional danger to Grace Belfort, it aroused the attention of the law. *See The Tryal of Eleanor Beare of Derby*, 2 GENTLEMAN'S MAGAZINE, Tuesday, August 15, 1732, at 931–32 (1732).

[75] Cornelia Hughes Dayton, *Taking the Trade: Abortion and Gender Relations in an Eighteenth Century New England Village*, 48 WM. & MARY Q., 19, 20 (1991) [hereinafter Dayton, *Taking the Trade*] (describing abortion practice and its treatment under the law in colonial New England).

[76] RIDDLE, ANCIENT ABORTION, *supra* note 38, at 10, 166. In contrast to medicational interventions, "[s]urgical or manipulated abortions were recognized as dangerous" and therefore rarely attempted. *Id*. at 10.

**B. Law and Abortion under Humoral Health**

26. In sum, under Galenic theory, health required humoral balance; in women, that depended on regular menstruation; its interruption demanded purgative treatment. Untreated, retained menses were understood to cause dire effects, from cancer to epilepsy. Early modern medicine developed purgative compounds (many principal ingredients of which, twentieth-century science finds, are abortifacient).[77] A responsible practitioner routinely induced menstruation during what might have turned out to have been the early months of pregnancy for reasons often unrelated to birth control.

27. Moreover, with pregnancy undiagnosable for crucial months and the prevailing medical theory providing a widely accepted diagnosis for the cessation of menstruation in women of menstruating age, "quickening,"[78] the subjective experience of fetal movement by the pregnant woman, came to serve as a heuristic for pregnancy and thus, for "abortion." Before quickening, no "pregnancy"; no pregnancy, no abortion. The difference between provoking menstruation and causing a miscarriage "was seen as so minimal as not to warrant discussion."[79] After quickening, intervention (particularly by internal intrusion) was considered increasingly dangerous to the woman and a responsible, well-versed practitioner or patient would undertake it reluctantly, weighing it against the consequences for the woman of inaction.

28. It was in this same period, in which health care enjoyed a widely circulated and routinely practiced body of gynecological knowledge for treatment of ammenorhea or

---

[77] *See* text *infra* footnote 33 *supra*.

[78] *See* Cathy McClive, *The Hidden Truths of the Belly: The Uncertainties of Pregnancy in Early Modern Europe*, 15 SOC. HIST. OF MED. 209 (2002) [hereinafter McClive, *Uncertainties of Pregnancy*] (describing history of quickening and other contemporaneous understandings).

[79] Carla Spivack, *To 'Bring Down the Flowers': the Cultural Context of Abortion Law in Early Modern England*, 14 WM. & MARY J. WOMEN & L., 107, 123 (2007) [hereinafter Spivack, *Cultural Context of Abortion Law in Early Modern England*].

pregnancy, that the abortion doctrine accepted as the common-law standard was formulated. And even as it provided an array of treatments from a rich practical gynecology, medicine confessed finding the female abdomen and some of its inner workings inscrutable.[80] This admittedly incomplete understanding in medicine defied precision and abetted flexibility in law.

**C. The Common Law**

29. Two authoritative legal sources that bookend the early-modern period, Bracton and Hale, provide elements that crystalize into regulation of medical practice that encompassed abortion at common law, the doctrines that prevailed in the U.S. from its colonial foundations through the time in the 1800s that state statutes introduced regulations concerning abortion.

**i. Bracton: The Legality Distinction and the Precautionary Principle**

30. The work of collective authorship that bears Bracton's name, *On the Laws and Customs of England* (1220-1230),[81] is regarded as the standard statement of the common law from the Middle Ages[82] and foundational to its further development.[83] It mentions abortion twice: once in a section concerning homicide, and once in a section on "wounding."

---

[80] *See generally* McClive, *Uncertainties of Pregnancy*, *supra* note 78 (concluding that for women and their medical attendants, the experience and understanding of pregnancy was primarily uncertain, including in regard to quickening, false conceptions, and the threat of miscarriage).

[81] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3.

[82] *See*, *e.g*., PAUL VINOGRADOFF, LETTER TO THE ATHENAEUM (July 19, 1884) (Bracton's treatise is "a statement so detailed and accurate that that there is nothing to match it in the whole legal literature of the Middle Ages") *reprinted in* 1 F.W. MAITLAND, BRACTON'S NOTEBOOK: A COLLECTION OF CASES DECIDED IN THE KING'S COURTS DURING THE REIGN OF HENRY III, at xvii (1887), https://archive.org/stream/bractonsnoteboo00maitgoog#page/n8/mode/2up.

[83] The continued influence of Bracton was manifest in ways large and small. An 1843 Iowa criminal statute, for example, uses (without citation) the canon law hypothetical that Bracton's retransmission entrenches of homicide by chance, as when a master flogs a pupil in discipline and the pupil dies as a result. BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 341; *cf*. IOWA (TERR.) REV. STAT., ch. 49 §19 (1843) (giving an example of "excusable homicide by misadventure").

31. In the section on homicide, before discussing abortion, Bracton first explains two kinds of homicide. He describes one kind, "homicide by word" (a legal category borrowed from canon law[84]), as when "one dissuades another . . . from rescu[ing] someone from death; thus in an indirect way he commits homicide."[85] This doctrine would expose to liability in homicide a bystander who merely dissuaded a rescuer from saving someone in mortal peril. Given that pregnancy or childbirth regularly imperiled women during this time,[86] this passage suggests that dissuading a health practitioner from performing an intervention to terminate a pregnancy for therapeutic reasons would constitute homicide if the pregnant woman subsequently died.

32. Bracton goes on to explain a second kind, "homicide by deed." He describes four circumstances that might result in homicide by deed: homicide in the administration of justice; by chance; by necessity; or by intention, "as where one in anger or hatred or for the sake of gain, deliberately and in premeditated assault, has killed another wickedly and feloniously and in breach of the king's peace."[87] One of these, "homicide by chance,"[88] would apply to the provision of healthcare that resulted in the patient's death, but an accused person would be

---

[84] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 340 (naming two types of homicide, corporeal and spiritual, and specifying the former can be accomplished by word or by deed). *Cf.* CORPUS IURIS CANONICI EDITIO LIPSIENSIS SECUNDA POST AEMILII LUDOUCI RICHTERI, PARS SECUNDA, DECRETALIUM COLLECTIONES, DECRETALES D. GREGORII P. IX COMPILATIO (A. Friedberg ed., 2000) (1234) [hereinfafter DECRETALS OF POPE GREGORY IX] at tit. 14, cap. 2, http://www.thelatinlibrary.com/gregdecretals5.html (proposing that homicide might be perpetrated by word or by deed: "Homicidium autem tam facto quam praecepto, sive consilio aut defensione non est dubium perpetrari"). *See also* CARL GÜTERBOCK, BRACTON AND HIS RELATION TO THE ROMAN LAW: A CONTRIBUTION TO THE HISTORY OF THE ROMAN LAW IN THE MIDDLE AGES 169 (Brinton Coxe trans., 1866) http://babel.hathitrust.org/cgi/pt?id=hvd.32044010502342;view=1up;seq=177 (identifying a passage in the *Decretals* that specifies homicide by word and by deed that Bracton repeats here).

[85] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 341.

[86] *See supra* text accompanying note 42 (on later technologies for understanding the mechanics of pregnancy and treating common complications unavailable before the nineteenth century); *infra* notes 158–160 (discussing the risks of pregnancy and childbirth).

[87] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 340–41 ).

[88] *Id*. at 341.

exempt from liability if he was (1) engaged in a lawful act and (2) "employed all the care he could."[89] Thus, the doctrine served to shield from liability the caregiver whose patient died despite best efforts to cure or to treat.

33. Bracton then specifically discusses abortion in an example of homicide by deed. "If one strikes a pregnant woman or gives her poison in order to procure an abortion, if the fetus is already formed or quickened, especially if it is quickened, he commits homicide."[90] Read within the terms of its day, several things are notable. First, Bracton's reference to fetal formation or quickening excludes from his homicide discussion most emmenagogues and many early-term conceptus- or fetal-expulsives. Second, this was not a blanket sanction against abortion. The passage specifically prohibits only two methods of abortion: striking a pregnant woman or giving her "poison," a substance meant to harm or kill and not a normal synonym for a "medication" used for uterine purgation or abortion.[91] It leaves out the most common means of accomplishing abortion known to Bracton's time, purgative medication.[92] Third, the two enumerated acts speak of assault, undermining easy inference of due care or patient consent and implying a post-quickening procedure posing heightened patient risk. For women's healthcare providers or others who might have wished a woman not pregnant, this doctrine stood as a warning against uncertain, particularly patient-risky practices. Taking all of these specifics into consideration, the text supports the inference that it is the woman's death or endangerment—not

[89] *See id*. (giving as example the result when one fells a tree and another is accidentally crushed beneath it).

[90] *Id*. at 341. What Samuel E. Thorne translates here into English as "quickened" reads in Latin *animatum fuerit*, "has been animated."

[91] *Id*. at 341.

[92] *See also*, *e.g.*, *infra* text accompanying notes 182–85 (describing Bracton's second abortion passage, on abortion by intrusive measures, which is not treated in homicide).

the fetus'—that evokes liability for homicide. Read with standard healthcare practices in mind, the passage would expose a practitioner to liability in homicide for causing a pregnant woman's death by poisoning or abortion by blows, but not otherwise for inducing miscarriage in the course of healthcare.

34. This first abortion passage is followed by reiteration of the duty to rescue. A person "who, though he could rescue a man from death, failed to do so,"[93] ought not be free from punishment. Thus, both before and after Bracton discusses liability for the death of a patient from certain abortion methods as a form of homicide, he repeats a statement of liability for one who could rescue a person from death but does not. After warning against dangerous practices, the text reiterates care providers' duty to save a woman, including from pregnancy, if her life were imperiled.

35. Bracton treats abortion by intrusion separately (in his second abortion passage) in a section on "wounding." In general, a charge of "wounding" only arose from injury by blade, not from assault by weapons like clubs or stones.[94] A "wounding" charge required as proof visual evidence of a "fresh and open wound"[95] and mere "bruises and contusions" were insufficient,[96] with only one exception: "If anyone forcibly interferes with a woman's internal organs in order to produce abortion," he is liable for wounding in breach of the king's peace.[97] .

36. In Bracton, we find several elements that will recur in later abortion regulation: a concern with poison; a precautionary principle, evidenced through imposing liability for patient

---

[93] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 342.

[94] *Id.* at 408.

[95] *Id.* at 406.

[96] *Id.* at 408.

[97] *Id.*

death if a procedure occurred at a time or in a manner that raised risk to the patient, hedged by a duty to save; and wariness in regard to intrusive measures. What we do not find is also significant: prohibition of abortion *per se*. Regarding all pre-quickening emmenagogues and regarding the most common abortion practice of the time, medicational abortion, the law is silent. Instead, it imposes a duty of care on the health care provider and holds a dissuading bystander liable in homicide should a patient perish from care withheld.

**ii. Hale: The Curative Intent Distinction**

37. Hale's treatment of abortion comes in his discussion of homicide in his restatement treatise, *History of Pleas of the Crown*.[98] The premises of Hale's discussion are familiar. The person whom a defendant would be accused of harming is the *woman* upon whom the procedure is performed, not the fetus.[99] Hale first rephrases a rule to which Elizabethan jurist Edward Coke had drawn attention, wherein curative intent excuses lethal consequences of medical practice.[100] In Hale's restatement, "If a physician gives a person a medication without any intent of doing him any bodily harm, but with an intent to cure or prevent a disease, and contrary to the expectation of the physician it kills him, this is no homicide, and the like of a chiurgeon."[101] As with Bracton's "homicide by chance" doctrine, for anyone who administered a medication after which a woman died, Hale's holding offered blanket protection. The charge

---

[98] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429–34. *See also* Rex v. Anonymous (1670) (the only recorded case of "abortion" over which Hale presided as judge), *summarized in* HALE, *id*. at 429–30 [hereinafter Rex v. Anonymous].

[99] HALE, *id*. at 432–33.

[100] Within his section on the college of physicians in London, Coke specifies a therapeutic intent exception: "If one that is of the mysterie of a physician take a man in cure and giveth him such physick as within three days he dye thereof, without any felonious intent, and against his will, it is no homicide." COKE, LAWS OF ENGLAND FOURTH, *supra* note 4, at 251 (*citing* 3 *E.3 Coron*. 163).

[101] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429.

would not lie if the person administered the medication with intent to "cure her of a disease."[102] This would excuse administering emmenagogic or abortifacient preparations with humoral-balancing intent. Practitioners of his day routinely administered compounds to induce menstruation knowing they might expel a *conceptus* or *fetus*, and "curative intent" encompassed this abortion practice and excluded it from the category of punishable offenses.[103]

38. Hale then separately considers an intervention or act undertaken to effect abortion, in Hale's words, to "destroy the child within her."[104] Recall abortion was by definition a post-quickening intervention, and in the conditions of the day, it was understood that the later in term, the more dangerous to the pregnant person. Even so, in Hale's restatement, the common law did not consider such a post-quickening intervention an offense if the patient survived the procedure. Abortion that a woman survived, says Hale, was "not murder or manslaughter by the law of England."[105] To reach this conclusion, he does not reason from necessity doctrine (that would excuse the taking of fetal life, if necessary to save the woman's), because a fetus was "not yet *in rerum naturae*" (translated literally, "in the nature of things," meaning "in existence," a status entered into at live birth).[106] Clearly, "feticide" is not the legal issue for Hale, but rather, patient protection is. Hale's next statement makes clear that the purpose is patient protection,

---

[102] *Id*. at 429.

[103] Therapeutic intervention that could terminate a pregnancy in his day was not limited to emergency cases of, say, saving a woman from life-threatening labor.

[104] *Id*.

[105] "If a woman be quick or great with child, if she take, or another give her any potion to make an abortion, or if a man strike her, whereby the child within her is *kild*, it is not murder nor manslaughter by the law of *England*, because it is not yet *in rerum naturae*, tho it be a great crime, and by the judicial law of *Moses* was punishable with death, nor can it legally be made known whether it were kild or not, *22 E.3 Coron. 263*. So it is, if after such child were born alive, and baptized, and after die of the stroke given to the mother this is not homicide. *1 E.3. 23 b. Coron. 146*." *Id.* at 433.

[106] *Id*.

reminiscent of Bracton's doctrine in its emphasis on patient protection. Hale states clearly that if a medication administered with intent to destroy a fetus[107] is so strong that it kills the patient, only then does the abortion practitioner bear the risk[108] of a murder charge.

39. As Hale's *Pleas of the Crowne*[109] became a widely accepted working reference for lawyers and judges, his therapeutic intent doctrine became the standard statement of the common law on abortion.[110] In the rare event of an abortion prosecution, a therapeutic defense shielded the good-faith care provider.

40. Accepted medical practice continued in the space afforded by law, practicing fetal expulsion in the interest of health of the pregnant person. The prevalence of "medically indicated" abortion under this presumption of the legality of its practice with therapeutic intent is evidenced in a variety of sources. It can be inferred, for example, from a review of virtually all major obstetrical texts published in England between 1734 and 1937 showing that, of sixty-two texts, all but two condoned inducing labor either before, or after, viability of the fetus for reasons related to the health of the pregnant woman.[111] Acceptance of this default position was

---

[107] "But if a woman be with child, and any gives her a potion to destroy the child within her, and she take it, and it works so strongly, that it kills her, this is murder, for it was not given to cure her of a disease, but unlawfully to destroy the child within her, and therefore he, that gives a potion to this end, must take the hazard, and if it kill the mother, it is murder, and so ruled before me at the assizes of *Bury* in the year 1670 . . . ." *Id.* at 429–30.

[108] In Hale's phrase, the physician then "must take the hazard." *Id.* at 430.

[109] The earliest publication of Hale's summary of case law doctrine appeared in 1682. HALE, PLEAS OF THE CROWN, *supra* note 5.

[110] As evidence of the prominence of Hale's treatise, the Boston Public Library's copy is inscribed "John Adams 1760. John Quincy Adams 1800. George Washington Adams 1825." *Frontspiece* of HALE, PLEAS OF THE CROWN, https://archive.org/details/historiaplacitor01hale. *See also, e.g.*, JOSEPH W. DELLAPENNA, DISPELLING THE MYTHS OF ABORTION HISTORY 207–08 (2006) [hereinafter DELLAPENNA, DISPELLING MYTHS] at 185 n.7, 207, 208 n.190 (citing Hale).

[111] JOHN KEOWN, ABORTION, DOCTORS, AND THE LAW: SOME ASPECTS OF LEGAL REGULATION OF ABORTION IN ENGLAND FROM 1803 TO 1982 80–83 (Charles Webster and Charles Rosenberg eds., 1988) [hereinafter KEOWN, ABORTION, DOCTORS, AND THE LAW].

sometimes explicitly articulated, for example in the decision of a 1756 London medical convocation that it was justifiable to sacrifice an "unborn child" to save the life of a pregnant woman, up to and even during delivery.[112]

**iii. Health at Common Law**

41. Considering conceptions of health, practices of medicine, and precepts of law, we can discern several domains of possible action for early modern patients and practitioners, subject to different legal doctrines.

***Pre-Quickening: Privileging Health Care and Curative Intent by Presumption***

42. Pre-quickening treatment to induce menses constituted one domain of possible action. As discussed above, not all instances of amenorrhea indicated pregnancy to early modern women. Treatment for amenorrhea, pre-quickening, might have been undertaken either with no suspicion of pregnancy or lack of clarity whether the amenorrhea correlated with pregnancy. Under dominant theories of health, it was incumbent on a responsible practitioner to induce menstruation if he or she diagnosed "retained menses" (or "obstructed menses," as the condition came to be commonly called in the United States).[113]

43. My research supports the conclusion that in the administration of emmenagogues (some known to cause fetal expulsion), the common law saw health practice. Where the law recognized the possible side effect of fetal expulsion in the administration of an emmenagogue to treat suppressed menses (i.e., ending a pregnancy by emmenagogue), considering amenorrhea a

---

[112] *See* L[EONARD] A[RTHUR] PARRY, CRIMINAL ABORTION 9 (1932); *see also* JAMES C. MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY, 1800–1900 30, 270 n.18 (1978) [hereinafter MOHR, ABORTION IN AMERICA].

[113] *See, e.g.*, MOHR, ABORTION IN AMERICA, *id*. at 14, 268 n.27 (1978) (citing Walter Channing's lectures in midwifery and diseases of women at Harvard Medical School (1821, 1822, and 1825-26)). *See also id*. at 6.

source of humoral imbalance causing grave threats to a woman's health, the law actively supported so treating it.

44. Although provoking menstruation was the most common pre-quickening intervention, sometimes women and their care providers, even before quickening, suspected pregnancy and intervened to terminate it. If done for health reasons, for example if a woman was in fragile health or suffered from certain conditions thought to be incompatible with pregnancy, such health-motivated induced miscarriage too was tolerated at common law with health-care providers protected by therapeutic intent doctrines. Abortion therefore was routinely administered as a way to safeguard women's health without interference from the law or threat of legal sanction.

45. Alternatively, such a procedure might have been undertaken for birth control purposes. Indictment for pre-quickening pregnancy termination was virtually unheard of, compared with its routine frequency.

***Post-Quickening: The Life-Health Defense***

46. Even post-quickening, it was not always clear whether pregnancy, illness, or both were at issue. What was clear was increasing risk over time: experts of the day warned that medical intervention—regardless of means or intent—posed greater danger to the woman the longer it had been since her last menstrual period. In an era before preventive asepsis, fail-proof anti-hemorrhagics, or antibiotics, later interventions bore greater risk to the patient. A responsible practitioner would have initiated a procedure only if the risk of inaction outweighed the risk of action; if the patient were to die, only the irresponsible practitioner would have been legally exposed. Post-quickening treatments fell into several domains of possible action with respective treatments at law.

47. Post-quickening emmenagogue constituted one domain. Even after clear indications of pregnancy (which the law accepted as the perception of fetal movement by the pregnant woman, "quickening"), some conditions called for emmenagogue. Even after quickening, administration of a substance thought of as an emmenagogue, or for an emmenagogic purpose (as with pre-quickening intervention), would be protected by law.

48. Post-quickening treatment to terminate possible pregnancy constituted another possible domain of action. Contemporaneous legal authorities suggest a prevailing duty to intervene in post-quickening situations where the pregnant woman's life was imperiled, with the protection of curative intent doctrine if her life was lost in the attempt. In the case, say, of a dangerous pregnancy or difficult delivery, legal doctrine favored therapeutic intervention.

49. Under practice conditions of the time, "saving life" was often inseparable from "saving health," making common-law doctrine on saving life practically and conceptually indistinguishable from saving health. In this broad category of circumstances, the doctrine offered a defense from a charge of homicide in the case of patient death. Here we discern in legal doctrine a respect for those acting to preserve life and health resulting in what can be characterized as a "life-health defense."

**iv. Summary of Health, Abortion, and Law at Common Law**

50. Before legislation on abortion, common-law doctrine controlled. The earliest regulation of medical practice -- including abortion -- in the common law tradition required a medical practitioner to intervene to save a person's life. Distinction between medical intervention "to save life" and "to preserve health" was often not obvious. In many circumstances, "saving life" was theoretically and practically indistinguishable from "preserving health." The law responded accordingly.

51. Under the regime of humoral health and corresponding common-law doctrine, many medical interventions to **restore humoral balance by unblocking the menses** (emmenagogues) were known to terminate pregnancy, if indeed a patient were pregnant. The law supported emmenagogic treatment undertaken before or after quickening. Administering an emmenagogue under humoral health theory was required under of **duties of care** and **non-interference** (with one saving a life) and the legal doctrine of **necessity**.

52. After quickening, medical interventions **intended to end a pregnancy**, if a medical practitioner judged such measures necessary to preserve a patient's health and life, were likewise required under those duties and doctrines. Therapeutic intervention after quickening, whether emmenagogic or abortifacient, was protected by a life-health defense which shielded a practitioner who might otherwise have faced liability for unintended death of the patient. Under this legal paradigm, there is one set of conditions under which legal liability for abortion might have attached to the health practitioner: for procedures knowingly undertaken to interrupt pregnancy, without curative intent, resulting in the death of the pregnant person. This paradigm obtained through the colonial period in Anglophone North America, the founding of the United States, and into the nineteenth century.

## Theory and Practice of Medicine under Statutory Regulation of Abortion

### A. A New Approach in Great Britain: Rise of Empirical Science and Abortion in Legislation

53. Legal treatment of abortion was influenced in the 1800s by radical shifts in thinking about health and practice of medicine. The first U.S. state abortion statutes were inspired by new legislation in Great Britain. There, the rise of an empirical science through the 1700s produced new conceptualizations of "bodily systems" -- the circulatory system, the reproductive system -- that divided the body rather than thinking of it holistically. These

reconceptualizations profoundly shifted thinking in health away from humoral theories and towards location-based ones.

54. In 1803, British legislators adopted Lord Ellenborough's Act, the first Anglophone statute to regulate abortion.[114] Its first draft limited treatment of abortion to poison control (in a narrow provision, within a general section on poisoning, that prohibited poisoning a person to induce miscarriage),[115] but in response to objections that the bill failed to reflect new scientific thinking in embryology, the Lords created a wholly new category, "pre-quickening abortion," criminalized "pre-quickening abortion" (at first as a misdemeanor,[116] raised in revision to a felony),[117] and briefly made post-quickening abortion a capital crime.[118]

55. Nevertheless, the statute did not ban all abortions. As finally passed, the statute criminalized only "wilfully and maliciously"[119] administering a substance with intent to procure miscarriage before quickening or "wilfully, maliciously, and unlawfully" doing so after

[114] Lord Ellenborough's Act, 43 Geo. 3 ch. 58, *reprinted at* https://en.wikisource.org/wiki/Lord_Ellenborough's_Act_1803. For further discussion of the relationship between embryology and Lord Ellenborough's Act, *see* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 15.

[115] For progress of the Bill in the House of Lords, see 44 H.L. JOUR. 111, 151, 156, 170, 172, 187, 256 (1802-1804), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 175 n.77; for progress in the House of Commons, see 58 H.C. JOUR. 424, 514, 516, 513, 543 (1802-1803) *cited in* KEOWN *id*. at 175 n.78.

[116] For discussion of the influence of scientific knowledge on the treatment of abortion in Lord Ellenborough's Act, see KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 22–24. For progress of the Bill in the House of Lords, see 44 H.L. JOUR. 111, 151, 156, 170, 172, 187, 256 (1802-1804), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 175 n.77; for progress in the House of Commons, see 58 H.C. JOUR. 424, 514, 516, 513, 543 (1802-1803) *cited in* KEOWN *id*. at 175 n.78.

[117] Lord Ellenborough's Act, 43 Geo. 3 ch. 58, § 2, *Act reprinted at* https://en.wikisource.org/wiki/Lord_Ellenborough's_Act_1803.

[118] Lord Ellenboroughs Act, § 1. Its 1837 successor, Offenses Against the Person Act § 6, abolished the death penalty for abortion. KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 27 n.2.

[119] Lord Ellenborough's Act, § 2 (regarding pre-quickening abortion).

quickening.[120] These intent elements preserved and incorporated prior common-law doctrine on therapeutic intent, and they were retained in subsequent revisions of the criminal statute through the 1800s.[121]

56. The statute's intent doctrine, as incorporated in those elements, foreshadowed and influenced U.S. law. "Unlawfulness" was already familiar in homicide doctrine.[122] Hale had distinguished abortion with intent to cure or prevent disease in a woman from abortion with intent to destroy the child within her, only characterizing the latter as "unlawful."[123] Courts interpreting Lord Ellenborough's Act and its successors distinguished "lawful" abortion[124] in a way that preserved the common-law protections for those who provided therapeutic abortions

---

[120] Lord Ellenborough's Act, § 1 (regarding post-quickening abortion).

[121] KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 27 n.2. (citing the 1837 successor act, Offenses Against the Person Act § 6, that preserved the requirement that to be punishable, an act be done "unlawfully"); *id*. (citing the 1846 draft revision of criminal law, including on abortion and the intent provision, Parl. Pap. 24 (Commissioners for Revising and Consolidating the Criminal Law ed., 1846)) that proposed in relevant part, ". . . no Act . . . shall be punishable when such act is done in good faith with the intention of saving the life of the mother whose miscarriage is intended to be procured")); *id*. at 167 (Appendix I) (reprinting relevant sections of the revised criminal law as finally adopted, The Offenses Against the Person Act of 1861, that stipulate to be punishable, an abortion must be done "unlawfully"). For discussion of the 1846 draft revision, exempting from punishment an act done with the intent of saving the life of the mother, see also D. Seaborne Davies, *The Law of Abortion and Necessity*, 2 MOD. L. REV. 126 (1938) [hereinafter Davies, *Necessity*].

[122] COKE, LAWS OF ENGLAND FOURTH, *supra* note 4, at 251. Blackstone, elaborating on Coke's doctrine, had defined "unlawfulness" in regard to homicide as "killing without warrant or excuse." WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND: BOOK THE FOURTH, ch. 14, 196 (1765–1769), http://avalon.law.yale.edu/18th_century/blackstone_bk4ch14.asp [hereinafter BLACKSTONE, COMMENTARIES].

[123] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429.

[124] *See, e.g.*, R. v. Wilhelm, 17 MED. TIM. GAZ. 658 (1858)) (judge discusses the possibility of a "lawful cause" for attempted abortion), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 53, 182 n.29; R v. Bell [1929], 1 BRIT. MED. J. 1061) (judge states certain operations to terminate pregnancy in its last stages to save patient's are legal and necessary), *cited in* KEOWN, *id*., at 53, 182 n.27. *See also, e.g.*, R. v. Bourne, 1 K.B. 687, 3 All E.R. 615, L.R. 471 (Central Criminal Court [U.K.])) (judge upholds defense submission to amend indictment to include the word "unlawfully," adding to elements Crown prosecutors have to prove), *cited in* KEOWN, *id*., at 51, 182 n.11.

and practitioners who acted with therapeutic intent.[125] Juries were instructed accordingly.[126] "Malice," another element from the statute, was also already a familiar (if confusing) term.[127] "Malice aforethought," premeditated ill-intent, was the doctrinal element distinguishing murder from manslaughter.[128] Prosecutors subsequently assured physicians in official correspondence that the law did not forbid abortion necessary to save a pregnant woman's life,[129] and legal experts distinguished abortions performed for patient safety reasons from criminal abortions.[130] In short, through intent elements, nineteenth-century British statutes on abortion incorporated the common-law rule that abortion was not punishable when performed for therapeutic reasons. The

[125] *See generally* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111 (arguing courts interpreted statutes' intent language to permit therapeutic abortions).

[126] *See*, *e.g*., R. v. Wilhelm, 17 Med. Tim. Gaz. 658 (1858)) (judge instructs jury that to convict it must be satisfied that defendant used "an unlawful instrument for an unlawful purpose"), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, supra note 111, at 52; R. v. Collins, 2 BRIT. MED. J. 59, 122, 129 (1898)) (in murder trial of medical practitioner charged with using an instrument to procure abortion, judge instructs jury that in some cases "forcible miscarriage" is necessary to save the patient's life and "a properly qualified doctor had to say when that time had arrived. That was not unlawful."), *cited in* KEOWN, *id*. at 52; *Death after operation to terminate pregnancy*, 2 BRIT. MED. J. 549, 550 (1933) (at inquest into possibility of wrongful death, coroner instructs jury that where surgical abortion was medically indicated in view of attending physicians, felonious intent could "of course" be ruled out), *cited in* KEOWN, *id*. at 53.

[127] *See*, *e.g*., The People v. William Enoch, 13 Wend. 159, 167 (N.Y. Dec. 1834) (court trying to make sense of common-law element of malice in context of altered terms in revised criminal code).

[128] *See* COKE, LAWS OF ENGLAND FOURTH, *supra* note 4.

[129] Sir Edward Clarke Q.C. & Horace Avory, *Opinion of Q.C. on Abortion for Purpose of Saving Life of Mother, Requested by Royal College of Physicians (1895)*, *in* TAYLOR'S PRINCIPLES AND PRACTICE OF MEDICAL JURISPRUDENCE 154 (F.J. Smith ed., 5th ed. 1905)) (Queen's Counsel, regarding a request for opinion on abortion from Royal College of Physicians, responded, "the law does not forbid the procurement of abortion during pregnancy, or the destruction of the child during labour, where such procurement or destruction is necessary to save the mother's life."). For background on this opinion and on the intent provision interpreted for medical care providers, see KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 54.

[130] *See e . g*., *The Ethical, Legal, and Medical Aspects of Abortion*, 1 LANCET 230–231 (1927)) (in joint meeting of Medico-Legal Society and obstetrics section of Royal Society of Medicine, Justice Humphreys distinguished non-criminal abortion as "steps taken by a qualified medical man to get rid of a condition in his patient which he considered, using the best of his skill and ability, and of course honestly, on medical grounds and on medical grounds alone, to be dangerous to the safety of his patient."), *discussed in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 54–55, 183 n.32–36, 38–39.

courts found a life-health exception in statutory language that criminalized only "malicious" or "unlawful" acts to procure miscarriage.

**B. Statute in the United States 1821-1857: Protecting Patients**

57. The criminalizing thrust of the abortion provisions in Lord Ellenborough's Act initially found no reception in the U.S.[131] When U.S. state lawmakers did begin to regulate abortion through statute, their legislation principally reflected concern with patient protection. A first wave of U.S. abortion statutes across different states, then, was characterized not by principled opposition to abortion, but by a common motivation of protecting patients, manifest in provisions on poison control or malpractice. A second wave concentrated mid-nineteenth century, similarly motivated, reflected increasing anxiety over new ideas and practices in medical care.

**i. First Wave Statutes, 1821-1857: Poison Control and Consumer Protection**

***Poison Control***

58. The first statutory regulation of abortion in the U.S. came in 1821 when Connecticut Revisers included, in a new section of the state criminal code against murder by poisoning, a clause making administering poison with intent to cause post-quickening miscarriage punishable.[132] Its specifics, considered within the dominant regime of humoral health, demonstrate its limits and adherence to patient-protection motivation. The Connecticut

[131] *See, e.g.*, Commonwealth v. Bangs, 9 Mass. 387, 388 (1812) (reciting common law doctrine in dismissing charge of attempted abortion on grounds that even "if an abortion had been alleged and proved to have ensued," "averment that woman was quick with child is a necessary part of the indictment," i.e., excluding any wider attempt doctrine or liability for pre-quickening procedure that Lord Ellenborough's Act had introduced in the U.K.).

[132] CONN. GEN. STAT. tit. 22, § § 14, 16, at 152, 153 (1821). *See also* MOHR, ABORTION IN AMERICA, *supra* note 112, at 21–22 (describing the poison-control aspects of the Connecticut statute).

provision only covered "poison," not all medications that induced miscarriage.[133] It incorporated the common-law doctrines protecting any practitioner acting with therapeutic intent in statutory intent elements requiring "poison" be administered "willfully and maliciously,"[134] excluding therapeutic abortion. By 1857, six jurisdictions had followed this example, adopting their first abortion legislation with reference to poison.[135] Prosecution under such a provision was aimed at those who peddled poisons with the promise of procuring miscarriage and practically limited to cases of patient death or serious harm.[136]

***Consumer Protection***

59. In the same decade that revisers in Connecticut took up poison control, in New York, formally trained physicians (referred to as "regulars") began to advocate for legislating stricter regulation medical practice. In 1827 the New York legislature made unauthorized practice of medicine a misdemeanor, the toughest such measure in the U.S. at the time.[137] The following year, revisers of the state criminal code took patient-protection reform further with

---

[133] tit. 22, § § 14, 16.

[134] tit. 22, § § 14, 16. For discussion of the Connecticut legislation, *see also* N.E.H. HULL & PETER CHARLES HOFFER, ROE V. WADE: THE ABORTION RIGHTS CONTROVERSY IN AMERICAN HISTORY 21 (2001) [hereinafter HULL & HOFFER, ABORTION RIGHTS IN AMERICAN HISTORY].

[135] For full list of statutes regulating abortion in reference to poison before 1857, see Appendix A, Part I.

[136] HULL & HOFFER, ABORTION RIGHTS IN AMERICAN HISTORY, *supra* note 140, at 20. ("Prosecutions occurred only when a woman died or suffered grievous harm through the abortionist's recklessness or negligence.").

[137] It had been declared unlawful to practice "physic [*sic*] and surgery" in New York if "not regularly licensed" in 1796. In re Smith, 10 Wend. 449, 453 (N.Y. Sup. Ct. 1833). ALEXANDER WILDER, HISTORY OF MEDICINE: A BRIEF OUTLINE OF MEDICAL HISTORY AND SECTS OF PHYSICIANS, FROM THE EARLIEST HISTORICAL PERIOD; WITH AN EXTENDED ACCOUNT OF THE NEW SCHOOLS OF THE HEALING ART IN THE NINETEENTH CENTURY, AND ESPECIALLY A HISTORY OF THE AMERICAN ECLECTIC PRACTICE OF MEDICINE, NEVER BEFORE PUBLISHED 440–445 (1901)), *cited in* MOHR, ABORTION IN AMERICA, *supra* note 112, at 38, 272 n.35. *But see* JOHN S. HALLER, AMERICAN MEDICINE IN TRANSITION, 1840-1910 200-01 (1981) (on licensing, describing a countervailing trend pushed by the new commercial medical institutes of the 1800s, by which between 1826 and 1861, states repealed preexisting licensing requirements such that by the time of the Civil War, "no effective medical licenses existed in any of the states").

new abortion legislation.[138] Their statutory provisions distinguished between kinds of practitioner intent in ways that were consistent with humoral theory and that provided protection for therapeutic practice. [139] The New York revisers' initiatives, described below, provided an example followed in other states.

60. The most stringent of the three statutory provisions on abortion adopted in New York contemplated abortion by blows. It raised "wilful [*sic*] killing" of an unborn quick child, by any injury to the mother which would be considered murder if it had resulted in the death of the mother,[140] from misdemeanor to first-degree manslaughter.[141] It thus penalized battery in a particular way if against a pregnant woman post-quickening. Abortion by blows was not usual or even accepted humoral practice; this measure thus excluded practices typical of health care practitioners working with therapeutic intent.[142] Following the New York example, nine more states subsequently adopted a similar measure prohibiting abortion by blows.[143]

61. The New York statute's other abortion provisions made willfully employing any means with intent to procure miscarriage a misdemeanor[144] and criminalized intervention with the intent to "destroy" a quick fetus as second-degree manslaughter.[145] These provisions

[138] MOHR, ABORTION IN AMERICA, *supra* note 112, at 38.

[139] For evidence that the push for abortion regulation came from doctors, *see* MOHR, *id*. at 26–27.

[140] An Act Concerning Crimes and Punishments; proceedings in criminal cases; and prison discipline, pt. 4 (Act of Dec. 18, 1828) (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 8, at 659, 661 (1828)).

[141] 2 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 2, art. 1, § 8, at 811, 812 (1828–1835) (explaining that the offense theretofore had only been classed a misdemeanor).

[142] *See generally* THE TROTULA, *supra* note 6; *see also* Green, *Introduction* to THE TROTULA, *supra* note 1.

[143] For full list, see Appendix B, Part I.

[144] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828).

[145] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9, at 659, 661 (1828). (Specifying a "pregnant woman," it imposed on the prosecution the burden of proving pregnancy, which normally entailed proving quickening.) *Id*.

introduced the first explicit therapeutic exception to an abortion prohibition in Anglophone legislation, excluding from punishment an act undertaken to preserve the woman's life or advised as such by two physicians.[146] In authorizing therapeutic abortion explicitly rather than implicitly through an intent requirement, the New York Revisers consciously departed from the approach in Lord Ellenborough's Act, the accompanying Notes stating, "The last section is founded upon an English statute . . . but with a qualification which is deemed just and necessary,"[147] *i.e.*, the therapeutic exception. By 1857, a dozen jurisdictions followed New York, providing to practitioners a therapeutic defense through consultation with a "regular" physician serving as adequate proof of medical necessity.[148] (Note: all jurisdictions enacting an abortion statute before 1857 provided some kind of therapeutic defense.)[149]

**ii. Second-Wave Statutes, Mid-Nineteenth Century: Preserving Historic Legal Protections in a Changing Context**

62. As in the U.K., in the U.S. empirical science introduced new ideas about health. In the U.S., with the shift in the predominant theory of health away from humoral health, the social organization of medicine also began to shift radically, regendering care, engaging different

---

[146] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9, at 659, 661 (1828); 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828).

[147] 3 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 6, § 21, at 811, 829 (1828–1835) (quotation in text above omitting Revisers' reference to Lord Ellenborough's Act).

[148] For a full list of such statutes, see Appendix C, Part III.A. By 1857, only a few states neither privilege the regular physician directly, nor provide the procedural safeguard of physician consultation as to necessity to evidence therapeutic intent. *See, e.g.*, Indiana (IND. REV. STAT. § § 1, 3, at 224 (1838) (Act of Feb. 7, 1835) (retained, unchanged in this respect, in amended abortion provision of 2 IND. REV. STAT. pt. 3, ch. 6, § 36, at 424, 437 (1852)); Maine (ME. REV. STAT., tit. 12, ch. 160, §§ 13, 14, 661, 686 (1841) (Act of Oct. 22, 1840)); Oregon (OR. STAT. ch. 3, § 13, at 187 (1853–1854)); Virginia (1848 Va. Acts tit. 2, ch. 3, § 9, at 96) (no physician required, but neither does advice of physician convey protection from prosecution).

[149] For a list of such statutes, see Appendix C, Part I.A.

techniques and ethics,[150] and operationalizing new bodies of knowledge. Formalization of medical training propelled these changes and imparted a different sense of what good practice or bad entailed, and emergent structures for policing the boundaries between them.[151]

63. As previously noted, in the new schema of health, a conceptualization of relatively discrete bodily systems—a "circulatory system," a "respiratory system," a "reproductive system"—gradually replaced belief in the four humors. This shift was gradual, sporadic, and not always conscious or intentional. New thinking about health spread via new venues for disseminating medical knowledge, medical schools producing trained "regular" physicians. Whereas in 1800, only four medical schools operated in the United States[152] and "irregulars" vastly outnumbered "regulars,"[153] between 1810 and 1910, 447 new medical schools opened in the U.S. and Canada (156 of which stayed in business by 1910).[154] Nearly all excluded women students.[155] Thus in medical education, through these primarily commercial institutes, lecture hall education (with students viewing diagrams or observing cadaver

---

[150] *See* Reva Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 STAN. L. REV. 261, 287 [hereinafter Siegel, *Reasoning from the Body*].

[151] *See generally* Charles E. Rosenberg, *The Therapeutic Revolution: Medicine, Meaning, and Social Change* [hereinafter Rosenberg, *Therapeutic Revolution*], *in* SICKNESS AND HEALTH IN AMERICA: READINGS IN THE HISTORY OF MEDICINE AND PUBLIC HEALTH 39, 39 (Judith Walzer Leavitt and Ronald Numbers eds., 2nd ed. 1985) [hereinafter Leavitt and Numbers, SICKNESS AND HEALTH].

[152] *See* Abraham Flexner, *Medical Education in America: Rethinking the Training of American Doctors*, THE ATLANTIC (June 1910), http://www.theatlantic.com/magazine/archive/1910/06/medical-education-in-america/306088/ [hereinafter Flexner, *Medical Education in America*].

[153] *See, e.g.*, MOHR, ABORTION IN AMERICA, *supra* note 112, at 32.

[154] *See* Flexner, *Medical Education in America, supra* note 152.

[155] In 1849, Elizabeth Blackwell became the first openly female graduate of a U.S. medical school (Geneva College in New York). JACALYN DUFFIN, HISTORY OF MEDICINE: A SCANDALOUSLY SHORT INTRODUCTION 301 (2010) [hereinafter DUFFIN, HISTORY OF MEDICINE]. Two sex-segregated medical schools for women opened in Philadelphia (1850) and New York (1863). *Id*. at 303. When Johns Hopkins University founded its medical department in 1893, a stipulation of donor Mary Garrett obliged it to offer 10% of its seats to women students. *Id*.

dissection) supplanted prior modes of apprenticeship or woman-to-woman hands-on training;[156] instruction in surgical cutting replaced training in herbal purgatives. "Brash young men" trained in the new theories of health and intrusive techniques took up obstetrics[157] before other developments that eventually made intrusive measures less lethal: knowledge of sepsis in childbirth[158] and how to prevent it in gynecological procedures[159] became widespread in the U.S. only by the last quarter of the nineteenth century, and antibiotics, by the 1930s.[160] In the meantime, with the abandonment of humoral treatments and midwifery, mortality from complications of pregnancy and childbirth increased.[161]

64. Changes in the health regime raised anxieties about medical practices. The motivations of consumer protection and malpractice regulation reflected in first-wave statutes

---

[156] Flexner, *Medical Education in America, supra* note 152. The home medical manual, containing recipes to restore menstrual flow or "blocked menses," became a widely-referenced source in health care practice for women in the U.S. *See, e.g.*, S.K. JENNINGS, THE MARRIED LADY'S COMPANION, OR POOR MAN'S FRIEND (1808) [hereinafter JENNINGS, LADY'S COMPANION], *excerpted in* MELODY ROSE, ABORTION: A DOCUMENTARY AND REFERENCE GUIDE 1–2 (2008) [hereinafter ROSE, ABORTION DOCUMENTARY GUIDE]; *see also, e.g.*, *Letter to Ladies* (1817), *cited in* MOHR, ABORTION IN AMERICA, *supra* note 112, at 6.

[157] Laurel Thatcher Ulrich, *'The Living Mother of a Living Child': Midwifery and Mortality in Postrevolutionary New England* 61 [hereinafter Ulrich, *Midwifery and Mortality*] *in* WOMAN AND HEALTH IN AMERICA 38, 42 (Judith Walzer Leavit ed., 2nd ed. 1999) [hereinafter Leavitt, WOMAN AND HEALTH]. *See also* KRISTIN LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD 15–16 (1984) [hereinafter LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD] (describing the rise to prominence of elite "regular" physicians).

[158] IGNAZ SEMMELWEIS, ETIOLOGY, CONCEPT, AND PROPHYLAXIS OF CHILDBED FEVER (K. Codell trans., 1983) (1861) (reporting Semmelweis' 1847 discovery of sepsis as a cause of maternal mortality in childbirth, and doctor handwashing and other doctor disinfection measures as the key to its prevention).

[159] Joseph Lister, *On the Antiseptic Principle in the Practice of Surgery*, 90 THE LANCET 353 (1867); Joseph Lister, *Of the Effects of the Antiseptic System of Treatment on the Salubrity of a Surgical Hospital*, 95 THE LANCET 4 (1870) (reporting the findings of Joseph and Agnes Lister's experiments with antiseptics and their application to preventing infection from surgery).

[160] Alexander K. Fleming, *On The Bacterial Action of the Cultures of a Penicillium, with Special Reference to their use in the Isolation of B. Influenza*, 10 BRIT. J. EXPERIMENTAL PATHOLOGY 226 (1929) (reporting Fleming's 1927 discovery of antibiotics, in the form of penicillin).

[161] Ulrich, *Midwifery and Mortality*, *supra* note 157, at 59.

became more charged. As early as 1828, revisers of the New York criminal code reported their skepticism towards a new willingness to perform surgery and acknowledged it inspired increased regulation of medical practice:

> The rashness of many young practitioners in performing the most important surgical operations for the mere purpose of distinguishing themselves, has been a subject of much complaint, and we are advised by old and experienced surgeons, that the loss of life occasioned by such practice, is alarming.[162]

65. Public alarm at "rashness" in medical practice became a recurrent theme of this time,[163] informing a wider backlash.[164] A handful of irregulars engaged in commercial practice of very risky abortion by internal intrusion became emblematic of public concern over a general category of risky new practices adopted with less caution by regulars in all branches of medicine, particularly intrusive measures and surgeries. The celebrated case of "Madame Restell," the professional name of New York businesswoman Ann Lohman, provides a prominent example. Restell advertised sale of potions purporting to restore menses and provided boarding facilities for pregnant women in which, the accusations ran, she engaged in acts ranging from

[162] 3 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 6, § 28, 811, 829–30 (1828–1835). Contrast this eagerness with the reluctant trepidation of surgeons called to remove a nearly one-pound breast tumor in 1814: "I was willing the business should proceed," writes the patient, "but the young men hesitating to perform it, it was judged best to delay the matter" until an older, more experienced doctor could perform it. Susan Garfinkel, *'This Trial was Sent in Love and Mercy for My Refinement': A Quaker Woman's Experience of Breast Cancer Surgery in* 1814, *in* Leavitt, WOMEN AND HEALTH, *supra* note 157, at 68, 72.

[163] *See, e.g.*, Rice v. State, 8 Mo. 403, 405 (1844) ("If a person assume to act as a physician, however ignorant of medical science, and prescribe with an honest intention of curing the patient, but ... the patient die in consequence of the treatment, contrary to the expectation of the person prescribing, he is not guilty of murder or manslaughter. But if the party prescribing have so much knowledge of the fatal tendency of the prescription, that it may reasonably be presumed that he administered the medicine from an obstinate, willful rashness" he is guilty of manslaughter at least, even if he did not intended any bodily harm to the patient) (also *cited in* MO. REV. STAT. art. 2, ch. 47, § 22, n. c, 348 (1844–45) (case in footnote to manslaughter provision of state criminal statute, which read together implies this jurisdiction continued the doctrine of excluding from criminal culpability a medical practitioner acting with curative intent but modifying it to make culpable a practitioner acting out of "obstinate, willful rashness")).

[164] *See* Rosenberg, *Therapeutic Revolution*, *supra* note 151, at 49 (describing the "therapeutic nihilism" movement of the second third of the century).

administering toxic substances with the promise of ending unwanted pregnancy, performing abortion by internally intrusive methods, and stealing babies. Lurid accounts of her purported acts fed sales of new New York newspapers and inspired other such coverage in Boston, leading to a series of highly publicized scandals and trials in the early 1840s.[165] "Abortion" thus treated became a locus for societal debate over broader changes in health theories and treatment with the shift from humoral health in the latter half of the 1800s. It bears noting that in these scandals and attendant publicity, the emphasis was on the danger that a specific procedure posed to the pregnant person. Patient well-being sparked this concern.

66. This revolution in medicine also unsettled the law. As anxieties over sociological and epistemic changes in medicine surfaced more broadly and abortion became a locus of debate over patient care, institutions of populism and popular sovereignty—the penny press, elected representatives—got involved. The tempo of change increased. At the start of the 1820s, no state regulated abortion by statute; by 1857, nearly two-thirds did.[166] Legislatures became locomotives of change.[167]

---

165 For a full account of "Madame Restell," the associated scandals, and the impact of such sensationalized publicity on the development of news media and law in New York, *see generally* CLIFFORD BROWDER, THE WICKEDEST WOMAN IN NEW YORK (1988).

166 Twenty of thirty-one states and four of seven territories regulated abortion by statute by 1857. See Part I of Appendices A-C. Hawaii also enacted an abortion regulation in 1850, although it did not become a U.S. territory until 1900. HAW. PEN. CODE, ch. 12, §§ 1, 2 (1850).

167 Until a jurisdiction made abortion the subject of statute, common-law presumptions of legality continue. *See, e.g.*, Boies v. McAllister, 3 Me. 308, 308 (1835) (finding evidentiary rule admitting rumor of plaintiff as criminal suspect not applicable to testimony regarding woman's rumored measures to procure abortion, implying court does not consider abortion a crime in Maine, five years before passage of statute). In those jurisdictions with an abortion statute, interpretation of therapeutic intent doctrine is increasingly informed by conceptions of risk and malpractice. *See, e.g.*, Commonwealth ex rel. Chauncey & Nixon v. Keeper of the Prison, 2 Ashmead 1st Jud. D. Pa. 227, 231 (1841) (Philadelphia County, 1838), (finding that responsibility for death of abortion patient lies with the men who administered the abortifacient, even where they did not intend to kill patient, but they were "deliberate and malicious" and their acts were "attended with great danger.").

67. Amidst all the change, however, the law preserved the history and tradition of core protections for those practicing abortion with therapeutic intent. States' new statutory provisions conserved some of the rationale of the humoral health regime. It was the well-being of the patient, not fetal life, that was the object of legislation. In contemplating legal liability for patient death resulting from medical intervention, practices disfavored under humoral health, having no humoral benefit and posing patient risk, were singled out for statutory prohibition, for example prohibiting abortion by blows without therapeutic exception.[168] Similarly, many statutes, by distinguishing "poison," preserved the presumption of a healthcare motivation for medicational abortion.[169]

68. Other common-law therapeutic-intent doctrines developed under humoral care were preserved in legal formulations in the new statutes. Cognizant that some uterine purgatives were also known means for terminating pregnancy, the common law exercised flexibility by relying on categories of intent rather than lists of controlled substances.

69. The new approach, regulating abortion by statute, preserved some of these nuances and legal protections for health care providers. Consistent with humoral health, Hale had distinguished between an act intended to "destroy a child" from one intended to "cure a woman."[170] The new statutes preserved this sense: Although "quickening" was losing its significance as the determinative condition marking pregnancy, new statutes commonly

---

[168] For pre-1857 state laws prohibiting abortion by blows, see Appendix B, Part I. The language in these provisions, nearly identical, typically reads in full, "The wilful killing of any unborn quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother... ." MO. REV. STAT. § 9 at 168 (1835).

[169] For pre-1857 state laws prohibiting abortion by "poison" specifically, see Appendix A, Part I. An Indiana statute singled out "poison" in § 1 but adds "medicines" and "instruments" in § 3. IND. REV. STAT. ch. 26, § § 1, 3, at 224, 224 (1838) (Act of Feb. 7, 1835).

[170] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429–34.

preserved a distinction between post-quickening procedures, which entailed greater risk for the patient, and procedures performed earlier in pregnancy, differentiating between an act intended "to destroy a child"[171] from one merely "to procure miscarriage,"[172] penalizing the former more heavily.[173]

70. Most significantly, the old humoral gynecology routinely administered uterine purgatives to preserve health and life and in nearly all of the new statutes, a therapeutic exception protected intervention deemed necessary to "preserve the woman's life" (regardless of whether undertaken to "destroy a child" or "procure a miscarriage").[174] Curative intent doctrines inhering in the old humoral health practice were also preserved in the many statutes distinguishing "lawful" from "unlawful" abortion as the threshold element for prosecution.[175] Some statutes repeated other intent elements from Lord Ellenborough's Act[176] requiring that an

---

[171] Full list of pre-1857 statutes requiring, to be punishable, an act be undertaken with intent "to destroy child" provided in Appendix D.

[172] Full list of pre-1857 statutes requiring, to be punishable, an act be undertaken with intent to "procure miscarriage," distinct from one to "destroy child" provided in Appendix E.

[173] *See*, *e.g*., 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 and tit. 6, § 20 (1828-1845); MO. REV. STAT. art. 2, § § 10, 36 (1835); OHIO GEN. STAT. ch. 35, § § 111, 112 (1841); 1848 N.H. Laws ch. 743, § § 1, 2; MICH. REV. STAT. ch. 153, § § 32, 33, 34, at 662 (1846); 1848 Va. Acts. tit. 2, ch. 3, § 9; 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § § 37, 38; KAN. (TERR.) STAT. ch. 48, § § 10, 39 (1855); ME. REV. STAT. tit. 11, ch. 124, § 9 (1857) (penalizing an act with intent "to procure miscarriage" more lightly than one "to destroy a child"). Compare, generally, provisions given in Appendix D and Appendix E, respectively.

[174] Nearly all pre-1857 statutes, whether criminalizing an act to "destroy child" or to "procure miscarriage," include an exception for any act undertaken to "preserve the life" of the woman. For full list, see Appendix C, Part I.A. New York revised its abortion statutes after the Madame Restell scandals of the 1840s and several states followed its lead. Those post-1845 scandal statutes make no explicit therapeutic provision but encode a therapeutic defense in mental state elements. See Appendix C, Part II.A.

[175] For list of statutes invoking the "unlawful" distinction, see Appendix C, Part II. A.1. Some state courts added to or reinforced statutory provisions in case law. *See e.g*., State v. Murphy, 27 N.J.L. 112, 113 (Sup. Ct. 1858) (specifying act must have been done "without lawful justification"); Commonwealth v. Wheeler, 53 N.E. 2d 4 (Mass. 1944) (interpreting an act with therapeutic intent as "lawful").

[176] Lord Ellenborough's Act, 43 Geo. 3 ch. 58.

act be done “maliciously”[177] or “willfully”[178] to be punishable, i.e., excluding the healthcare provider acting in good faith towards a person in need. Courts typically understood these intent elements as allowing abortions performed for therapeutic reasons.[179]

### iii. Lag between New Theory and New Practice, and Tolerance for Therapeutic Intent at Law

71. Compared with the U.K., in the U.S. the shift away from humoral health took place more gradually and the erosion of the humoral health regime took time. Even among formally educated physicians, in practice and belief humoral therapeutics co-exised with new theories of health,[180] the legal and medical record show. The reasons for this lag between theory and practice are many. It took time for new therapeutics, supported by the new theory of health, to be developed. Even once they were developed, the old practices were not readily abandoned. Many prior therapeutic practices "worked" in restoring health to ill patients, were known to practicing physicians and health care providers, and were known to and accepted by patients.

72. The record on the persistence of humoral therapeutics after the wane of humoral theory is clear. Through the second third of the nineteenth century, older modes of therapeutics

---

[177] For list of pre-1857 statutes requiring, to be punishable, an act be undertaken “maliciously,” see Appendix C Part II.A.2 *But see* ILL. REV. CODE div. 5, § 46, at 174, 179 (1833) (revision in poison section of statute removing “wilfully and maliciously” in regard to procuring abortion). *See also* IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843) (revising statute to add an explicit “preserve-life” exception and omitting "maliciously"); 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (adopting as the law of Oregon territory the 1843 Iowa laws).

[178] For list of pre-1857 statutes requiring, to be punishable, an act be undertaking "willfully," see Appendix C Part II.A.3

[179] *See, e.g.*, State v. Murphy, 27 N.J.L. 112, 113 (Sup. Ct. 1858) (specifying to be considered an offense, the intervention must have been done “without lawful justification”); Commonwealth v. Wheeler, 53 N.E. 2d 4 (1944).

[180] Rosenberg, *Therapeutic Revolution, supra* note 151, at 47 (reporting that older therapeutic practices were not abruptly abandoned but were merely used with less frequency); *see also id*. (Physicians’ rhetoric disparaging humoral interventions notwithstanding, in the decades between 1850 and 1870, “[p]ractice changed a good deal less than the rhetoric surrounding it would suggest.”).

continued; practice was marked by a change in the intensity of their deployment rather than a categorical abandonment.[181] Well after the Civil War, physicians still administered purgatives in spring and fall "to facilitate the body's adjustment to the changing seasons."[182] As late as 1897, uterine purgation remained such accepted practice that a U.K. court could not preclude curative intent in the administration of an abortifacient emmenagogue.[183] In 1908, defenders of humoral medicine spoke out against its detractors and alternatives.[184] In 1910, about fifty percent of all U.S. births were still reported by midwives.[185] Across medical practice areas, dosage levels of humoral preparations decreased rather than ceased, and although bleeding sank into disuse, purgatives like mercury still figured in the practice of most physicians.[186] Medical schools' anti-humoral rhetoric notwithstanding, in practice, clinicians "insure[d] the greatest possible degree of continuity with older ideas"[187] at least to the turn of the twentieth century. In some areas, humoral treatments were still common into the 1930s.

73. As humoral medicine continued, *sub rosa*, in therapeutic practices, state abortion legislation focused on lethal malpractice or rashly undertaken intrusive measures. Not all states passed abortion-regulating statutes and in those jurisdictions, intentional termination of pregnancy continued without interference from the law as those jurisdictions continued to follow

---

[181] *See id.*

[182] *Id.*

[183] Rex v. Collins, 2 BRIT. MED. J. 122 (1898).

[184] Rosenberg, *Therapeutic Revolution*, *supra* note 151, at 49 (quoting Abraham Jacobs denouncing one of the post-humoral approaches, so-called "expectant treatment," as "too often a combination of indolence and ignorance," "the sin of omission, which not infrequently rises to the dignity of a crime.").

[185] Francis Kobrin, *The American Midwife Controversy: A Crisis of Professionalization*, *in* Leavitt and Numbers, SICKNESS AND HEALTH *supra* note 151, at 197, *citing* J. Clifton Edgar, *The Remedy for the Midwife Problem*, 63 AM. J. OBST. & GYNEC. 882 (1911).

[186] *Id.*

[187] *Id.*

common-law doctrine. States that did pass abortion legislation incorporated a therapeutic defense in statutory language excepting from prosecution a procedure deemed necessary to preserve a woman's life.

**C. Statutes 1857-1959**

**i. The Campaign to Criminalize and its Limits**

74. In 1847, formally trained physicians (the so-called "regulars") founded the American Medical Association (A.M.A.).[188] Struggling to compete with midwives and other experienced health care providers, regulars seized upon standardizing professional ethics as part of an effort to distinguish themselves and resurrected an oath from the Hippocratic corpus as statement of their disciplinary commitment.[189] The wording they used took on decisive significance. In the original ancient Greek wording, the "Hippocratic Oath" includes swearing not to administer poison to anyone[190] nor, in gynecological practice, to resort to late-term pessary[191] but the A.M.A. physicians apparently relied on a partially mistranslated version that rendered "pessary" as "abortion."[192] Regular physicians' project to create a distinct professional

[188] American Medical Association, *The Founding of the A.M.A.*, www.ama-assn.org/ama/hub/about-ama/our-history/the-founding-of-ama.page?.

[189] *See* MOHR, ABORTION IN AMERICA, *supra* note 112, at 35 (arguing the Hippocratic Oath holds a special place in the history of ethics and identity formation among U.S. regular physicians).

[190] *See The Hippocratic Oath*, 3 LONDON MED. REPOSITORY: MONTHLY J. & REV. pt. 5, at 258, (James Copland ed., Jan.–June 1825) [hereinafter *The London Hippocratic Oath*] *http://books.google.ie/books?id=Oe0EAAAAQAAJ&pg=PA258#v=onepage&q&f=false* (translation of the Oath circulated in England in the first quarter of the nineteenth century including the promise, "Nor shall any man's entreaty prevail upon me to administer poison to anyone; neither will I counsel any man to do so").

[191] 1 HIPPOCRATES 229 (W.H.S. Jones ed., 1934-88), *cited in* RIDDLE, ANCIENT ABORTION, ABORTION, *supra* note 38, at 173 n.28. Classical historian John Riddle would translate the relevant phrase, "Neither will I give a suppository to cause an abortion." RIDDLE, ANCIENT ABORTION, *id*., at 9. We understand "abortion" in Hippocratic understanding to indicate a late-term procedure, hence my rendering of the phrase as "late-term pessary."

[192] Mohr argues that allegiance to the Oath in (mis)translation moved regulars to oppose abortion. MOHR, ABORTION IN AMERICA, *supra* note 112, at 65. To be clear, accounts about the A.M.A.

identity through standardized ethical norms came to underwrite a full program hostile to abortion[193] led by a zealous A.M.A. subcommittee on "criminal abortion" formed in 1857.[194]

75. The A.M.A. "criminal abortion" campaign succeeded in getting a new wave of state abortion legislation passed[195] and consolidated regular physicians' hold on practice of abortion.[196] Hinging assurance of a therapeutic defense on consultation with a regular physician expanded to other jurisdictions,[197] some requiring that the provider himself actually be a regular physician.[198]

---

physicians' campaign against abortion tell us that A.M.A. members swore not to perform abortions as part of the nineteenth-century Hippocratic Oath; however, contemporaneous sources confirming the actual words physicians repeated when taking the Oath at that time are thin indeed. *See* Siegel, *Reasoning from the Body*, *supra* note 150, at 349 n.77. Prior to the A.M.A. campaign, it was not clear that physicians' ethics prohibited abortion. Siegel, *Reasoning from the Body*, *id*., at 282 n.77.

[193] *See* Siegel, *Reasoning from the Body*, *supra* note 150, at 280–314 (describing the A.M.A. campaign); *see also* LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157, at 15–16 (describing the A.M.A. campaign as a "direct social struggle" led by elite "regular" physicians "as part of an effort to achieve other political and social goals").

[194] *See* MOHR, ABORTION IN AMERICA, *supra* note 112, at 147–170 (describing the physicians' crusade against abortion). The campaign concentrated on changing public consciousness as well as legislation. "It may be asked," poses one "informational" volume ostensibly written for women on sex and birth control, "if there is no latitude to be allowed [in regard to abortion] for extreme cases . . . We are compelled to answer, 'None.'" HORATIO STORER, WHY NOT? A BOOK FOR EVERY WOMAN: A PROPER BOSTONIAN ON SEX AND BIRTH CONTROL (1864), *excerpted in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 11, 16. *See also American Medical Association*, *Report on Criminal Abortion* (1859), *reprinted in* ROSE, ABORTION DOCUMENTARY GUIDE, *id*. at 8, 10; Siegel, *Reasoning from the Body*, *supra* note 150, at 280–314 (describing arguments for that the A.M.A. campaign raises).

[195] *See, e.g.*, MOHR, ABORTION IN AMERICA, *supra* note 112, at 200–226 (detailing anti-abortion legislation resulting from the A.M.A. campaign).

[196] The rare irregular who practiced commercial-scale abortion, if known, became famous as an exception. *See, e.g.*, *generally*, RICKIE SOLINGER, THE ABORTIONIST (1994) (on the famously successful irregular practitioner Ruth Hanna of Portland, Oregon, who practiced from 1918-1968); *see also, e.g.*, CATHERINE CUSSET, THE STORY OF JANE (2001) (on laywomen who learned to perform abortion for each other before re-legalization in *Roe v. Wade* as a form of altruism and empowerment).

[197] For list of additional physician-consultation statutes see Appendix C Part III.A.

[198] The use of the male pronoun here is deliberate, as nearly all medical schools excluded female students. For list of post-1857 statutes that limiting therapeutic intent to physicians, see Appendix C, Part III.A.3. *But see* IDAHO COMP. LAWS ch. 5, § 42, at 328 (1874-1875) (changing the category covered by the provision to "physician practitioner"); ARIZ. REV. STAT. § 454, at 138 (1887) (expanding the defense to

76. The campaign and its sociological effects bore epistemic consequences: this period was marked not by respect for history and tradition but rather, by suppressing it. Tying legal practice of abortion to formally trained physicians at a time when most medical schools excluded female students drove midwives and herbalists from practice[199] and restricted lawfully performed abortion to regulars not trained in humoral health or its potional purgatives. Legislation produced by the A.M.A. anti-abortion campaign blocked transmission of knowledge about emmenagogues and medicational abortifacients.[200] Written sources were suppressed under federal legislation resulting from the A.M.A. campaign (so-called "Comstock Laws")[201] and its state-law imitators prohibiting advertising or distributing information about abortifacient herbs, instruments, or practitioners.[202] Oral traditions of knowledge transmission about humoral health

---

include any person of the opinion that inducing miscarriage was "necessary to preserve the woman's life").

[199] *See* Siegel, *Reasoning from the Body*, *supra* note 150, at 287; LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157 at 30–31; *see generally* MOHR, ABORTION IN AMERICA, *supra* note 112.

[200] After the A.M.A. abortion committee report came out in 1859 but still before the 1873 federal obscenity legislation, a few jurisdictions restricted advertising information about inducing miscarriage. *See, e.g.* (in order of adoption): KAN. GEN. LAWS ch. 28, § 10 (1859) (excepting publication of "standard medical works"); 1860 Conn. Pub. Acts ch. 71, § 4; 1867 Vt. Acts No. 57, § 3; Act of Mar. 14, 1867, ch. 216, 1867 R.I. Pub. Laws Jan. Sess. (codified as amended at R.I. GEN. STAT. tit. 30, ch. 232, § 23) (amending criminal "decency" law to prohibit *inter alia* advertising any person with "information or knowledge" about causing miscarriage); 1868 Fla. Acts 1st Sess., ch. 1637, III, § 10; 1868 Md. Laws ch. 179, § 2, at 315; 1869 Mich. Laws ch. 106, § 2, at 175 (advertising any compound medicine of an "immoral" nature or publishing any recipe); 1870 Pa. Laws No. 19, § 2; ILL. REV. STAT. ch. 38, § 4, at 369 (1871-1872) (additionally restricting pharmacists). Massachusetts was the only state that anticipated the A.M.A. campaign, criminalizing in its "second wave" post-scandal legislation distributing or advertising any drug or instrument for use in abortion. 1847 Mass. Stat. ch. 83, § 10.

[201] Act for the Suppression of Trade in, and Circulation of, Obscene Literature and Articles of Immoral Use [Comstock Act], 18 U.S.C. § § 1461, 1463, 1735 (1873), *reprinted in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 19–21. The legislation takes its name from New York policeman Anthony Comstock, who gained prominence wrangling with Madame Restell and, subsequently elected to Congress, sponsored federal obscenity legislation. ROSE, *supra*.

[202] After federal legislation passed, other states and territories passed "Comstock statutes" that prohibited the advertising of means of potional or instrumental abortion. *See, e .g.* (in order of adoption), 2 MINN. STAT. ch. 54, Sec. 29, § 4, at 987 (1873); Act of Nov. 8, 1875, § 2, 1875 Ark. Laws 4th Adj. Sess.; 1881 Ind. Laws ch. 37 § 93; 1883 Del. Laws ch. 226, § 1, at 522; IDAHO REV. STAT. (PENAL CODE) § 18-603

were similarly disrupted.[203] Legislation restricting abortion practice blocked the transmission of knowledge that otherwise could have been available to future generations.

77. The A.M.A. successfully lobbied state legislatures, which responded with the third, largest, and strictest wave of abortion-regulating statutes in the 1870s. Against this background of suppressing information about abortion and undercutting a regime of health that had promoted it, however, the states' statutes preserved prior legal formulations. Although new statutes might at first glance look only as if they were abortion-restricting, in them, the common-law therapeutic intent doctrine survived. **Even the new, strictest statutes** that targeted practices specific to the "irregulars" **did not by and large bar the "regulars" from providing medically-indicated abortion**.

(1887); D.C. CODE ch. 19, § 872 (1901); ARIZ. REV. PENAL CODE § 288 (1901); 2 NEV. REV. LAWS pt. 4, ch. 14, § 187 (1912); 1920 La. Acts No. 95, § 1; N.J. REV. STAT. ANN. § 2A:170-76 (1953); ME. REV. STAT. ANN. ch. 134, § 11 (1954) (prohibiting publishing abortifacient recipe); MISS. CODE ANN. § 2289 (1956) (including giving information orally); VA. CODE ANN. § 18.1-63 (Supp. 1960).

[203] *See, e.g.* (in order of adoption), 1847 Mass. Stat. ch. 83, § 10. (prohibiting selling or giving away a drug or instrument, as well as advertising it, for "unlawful" abortion); ; 1869 N.Y. Laws ch. 631, § 2, at 1502 (prohibiting supplying any substance to be "unlawfully" used); N.Y. GEN. STAT. ch. 181, § 3, at 71 (1872) (making manufacturing, selling, or giving away any drug for producing miscarriage a felony); ILL. REV. STAT. ch. 38, § 4, at 369 (1871–-1872) (restricting pharmacists); 1911 Nev. Laws, Crimes and Punishments, § 183 (codified at 2 NEV. REV. LAWS pt. 4, ch. 14, § 6448 (1912)) (prohibiting making, selling, or giving away any substance known to cause abortion); IOWA CODE § 205.1 (1946) (prohibiting sale, delivery, or giving away named products — cotton root, ergot, oil of tansy, oil of savin, or derivatives of any of them — all known emmenagogue and/or abortifacients , unless to a physician, veterinarian, or dentist and prohibiting pharmacist from filling prescription for an abortifacient unless prescribing doctor is personally known to the pharmacist (and even then, prohibiting refills); MINN. STAT. ANN. § 617.25 (1953) (adding a prohibition on selling an abortifacient drug to statutory prohibition on advertising). These efforts carried on well beyond the nineteenth century. *See* N.J. REV. STAT. ANN. §§ 2A:170-76 (1953) (criminalizing "uttering" or "exposing to view" any instrument or medicine for abortion, or even recommending against it); *see also* VA. CODE ANN. § 18.1-63 (Supp. 1960) (prohibiting publication, sale or circulation of a publication, or even *lecture* that might "encourage or prompt procuring abortion or miscarriage").

**ii. Preserving Common-Law Protections for Abortion Providers in Statutes, 1857-1959**

78. Abortion statutes enacted between 1857 and 1959 continued to bear the imprint of the prior humoral health regime. Procedures disfavored under humoral health, such as abortion by blows, continued to be disfavored at law without therapeutic exception.[204] New statutes continued to give special treatment to "poison."[205] The humoral-era distinction between treatment intended to cure a patient versus a procedure intended to "destroy a child" in the womb[206] survived and between 1857 and 1959 thirteen states added statutory provisions structured around the distinction.[207]

79. Some statutes preserved protections for abortion providers by replicating common-law intent doctrine in elements requiring an act be done "maliciously,"[208] "unlawfully"

---

[204] For list of abortion-by-blows prohibitions in statutes adopted 1857-1959, see Appendix B, Part II.

[205] For list of abortion statutes with reference to poison adopted 1857-1959, see Appendix A, Part II.

[206] HALE, PLEAS OF THE CROWN, *supra* note 5 (in legal doctrine that reflects humoral theory, distinguishing between a medical intervention "to cause miscarriage" versus "to destroy the child within her"); *see also* text *infra* notes 98-108 *supra* (discussing Hale's formulation of curative intent doctrine).

[207] Compare, for example, two sections of one 1881 North Carolina statute. The first section made it a felony to administer a substance or employ an instrument on a pregnant woman "with intent thereby to destroy said child." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 1, at 584. The second section made it a misdemeanor to do the same "with intent thereby to procure the miscarriage of any such woman." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 2, at 584. (Alarmingly, the second section of the North Carolina statute relegates to the misdemeanor passage acting with intent "to injure or destroy such woman." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 2, at 584–85.) Just thirty years later, Kentucky legislators used language much more consistent with our contemporary thinking, while providing a specificity that implies some users of the law might be less clear, and while allowing that technologies of verification have still not caught up with the certainty of legal categories. Section one of the law, criminalizing attempt, encompassed an act intended to procure miscarriage towards "any pregnant woman, *or to any woman he has reason to believe pregnant*, at any time during the period of gestation" (emphasis added). Section two made an act resulting in a successfully procured miscarriage, "causing the death of the unborn child," a felony; section three makes a resulting death of the woman herself murder or manslaughter, "as the facts may justify." Act of March 22, 1910, An Act Defining the Crime of Abortion and Prescribing a Penalty Therefore, 1910 Ky. Acts ch. 58, § § 2, 3, at 189–90.

[208] For post-1857 statutes requiring, for an act to be punishable, "malicious" intent in a practitioner, see,

(or "without lawful justification"),[209] or "wilfully"[210] to be punishable. In other instances, courts construed such intent doctrine.[211] Most states, following the early New York example, straightforwardly included an explicit "life exception" with any restriction on abortion,[212] shielding from liability a provider acting to save the life of the pregnant person. In doing so, the new statutes affirmed some of the longest-standing doctrines of the law on abortion since its common-law beginnings.

---

for example. Appendix C, Part II.B.2.

[209] For post-1857 adoption of the implicit exception in the requirement of "unlawful purpose" or that an act took place "without lawful justification," see Appendix C. II.B.1. Some states used "unlawful" or "criminal" abortion, not justified by therapeutic intent, as a measure of "unprofessionalism," making performing unlawful abortion grounds for stripping a regular physician of his license. *See, e.g.*, H. B. 120, 1938 Miss. Extraordinary Session, *reported in* MISS. CODE ch. 148, § 2011, at 1321 (1930) (Supp. 1938) (amending 1930 Code section 5863 (a) (5), to list procuring, attempting, or pretending to procure any abortion not necessary to preserve the life of a pregnant woman among causes authorizing State Board of Health to revoke a physician's license). See also, for example, similar statutes linking abortion to physician licensing: Act of Apr. 5, 1911, § 2 (codified as 1 ALA. CODE ch. 52, art. 1, § 2847(5), at 1279, 1283 (1923) (amending existing state medical-practice certification provision to add, as a cause for revocation, inducing "criminal" abortion, miscarriage, or premature delivery unless, when done to save her life, attending physician "use due diligence to obtain the advice and help of one or more consulting physicians"); 1914 La. Acts No. 54, § 10.1 (codified as LA. REV. STAT. ANN. §§ 14:8, at 889 (West 1950)); 1917 Alaska Sess. Laws § § 7, 8; MD. ANN. CODE § 3 (West 1924); OR. COMP. LAWS ANN. ch. 9, art. 1, § 54-931 (1940); IOWA CODE § 147.56 (1946); MO. REV. STAT. § § 559.100 (1949); FLA. STAT. ANN. § 458.12 (1952); 1955 HAW. REV. LAWS § 60-9 ("criminal" abortion).

[210] For post-1857 adoption of the implicit exception in the requirement that an act be done "wilfully," see Appendix C, Part II.B.3. *See also* 1868 Md. Laws 315 (not specifying other intent elements but adding "knowingly").

[211] *See, e.g.*, Passley v. State, 21 S.E.2d 230, 232 (Ga. 1942) (statutory provisions criminalizing causing death to a woman (§ 26-1103) or a quick fetus (§ 26-1101) as a consequence of abortion procedure require "malice" towards, respectively, the deceased woman or the fetus); Commonwealth v. Wheeler, 53 N.E. 2d 4 (Mass. 1944) (requiring act to have been "unlawful," "malicious," "without lawful justification").

[212] For a list of statutes containing an explicit exception for medically indicated abortion, see Appendix C, Part I. *See also* LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157, at 30–35 (discussing the meaning of "saving the life" of a woman in the last quarter of the nineteenth century and Horatio Storer's and other A.M.A. anti-abortion crusaders' own arguments for performing abortion to save a woman's life).

**iii. Mental Health as a Basis for Therapeutic Abortion**

80. In place of an earlier belief in "temperament" related to the balance of humors, under locational conceptions of health, a new theory related to "the psyche" arose[213] and a new term, "mental health," entered the practitioner lexicon. The formalization of the discipline of psychiatry in the U.S. parallelled that of medicine more broadly, with its early luminaries educated abroad[214] and institutionalization accelerating in the mid-nineteenth century. The founding of the American Psychiatric Association in 1844[215] and Dorothea Dix's post-Civil War campaign for specialized treatment hospitals[216] helped to establish psychiatry as part of the emerging medical mainstream. Some psychiatric diagnoses were given equal weight with other medical conditions in the eyes of the law and protecting "mental health" was increasingly invoked as a justification for abortion under statutory therapeutic provisions.[217] Into the mid-

[213] Previous psychiatric theory had attempted to fit observations of "insanity" into humoral schema of theories of health and treatment. *See, e.g.*, MASON COX, PRACTICAL OBSERVATIONS ON INSANITY (1804) (proposing too much blood in the brain is the cause of all mental disease and purgation is the cure), *cited in* GREGORY ZILBOORG (IN COLLABORATION WITH GEORGE W. HENRY), A HISTORY OF MEDICAL PSYCHOLOGY 411 (1941) [hereinafter ZILBOORG, HISTORY OF MEDICAL PSYCHOLOGY].

[214] *See, e.g.*, BENJAMIN RUSH, MEDICAL INQUIRIES AND OBSERVATIONS UPON DISEASES OF THE MIND (1812). (Rush's first American textbook on psychiatry); JOHN REVERE, DISPUTATIO MEDICA INAUGURALIS DE INSANIA (1811) (son of Paul Revere, John Revere's, doctoral thesis in medicine at the University of Edinburgh).

[215] ZILBOORG, HISTORY OF MEDICAL PSYCHOLOGY, *supra* note 213, at 410–11 (describing the founding of the American Psychiatric Association, actually predating the A.M.A. by three years, in the context of the development of the field of psychiatry internationally).

[216] *See generally* FRANCIS TIFFANY, LIFE OF DOROTHEA LYNDE DIX (1891); *see also* ALBERT DEUTSCH, THE MENTALLY ILL IN AMERICA, ch. 9 (1937) (reporting her achievements).

[217] Studies show in 1947 one-fifth of all therapeutic abortions granted on psychiatric grounds, a proportion that grows to one-half of all therapeutic abortions by 1960. On the rising acceptance of "psychiatric indications" for therapeutic abortion in the 1940-1960, see LESLIE J. REAGAN, WHEN ABORTION WAS A CRIME: WOMEN, MEDICINE, AND THE LAW 1867–1973 201–03 (1997) [hereinafter REAGAN, WHEN ABORTION WAS A CRIME].

twentieth century, regulars' journals hosted robust discussions of "medical indications" for abortion,[218] including the psychotherapeutic.[219]

81. In this, U.S. law followed a trajectory taken in the U.K. U.K. statute ostensibly prohibited abortion except where necessary to save a woman's "life."[220] In the watershed case *Rex v. Bourne*, a 1938 abortion prosecution, the defense made no assertion that the patient, a fourteen-year-old impregnated through rape, faced danger to her physical "life" if pregnancy continued. The physician defendant testified that his decision to curette was based on the threat to the patient of "mental and nervous injury."[221] Under cross-examination, he denied a clear distinction between danger to life and to health.[222] The defense argued that because of "mental and nervous injury," health could become so compromised that it would shorten life.[223] The prosecution argued a bright-line distinction between saving life and preserving health[224] and queried the lawfulness of abortion in regard to the latter,[225] especially to mitigate a possible

---

[218] *See, e.g.*, REAGAN, *id*. at 278 n.55, 279 n.57 (1997) (citing E.C. McKee, *Abortion*, AM. J. OBSTETRICS 1333–34 (1891); W.C. Bowers, *Justifiable Artificial Abortion and Induced Premature Labor*, J. AM. MED. ASSOC. 568–569 (1899); Frank A. Higgins, *The Propriety, Indications and Methods for the Termination of Pregnancy*, 43 J. AM. MED. ASSOC. 1531–33 (1904); Paul Titus, *A Statistical Study of a Series of Abortions Occurring in the Obstetrical Department of the Johns Hopkins Hospital*, 65 AM. J. OBSTETRICS 960 (1912); Irving K. Perlmutter, *Analysis of Therapeutic Abortions, Bellevue Hospital 1935–1945*, 53 AM. J. OBSTETRICS & GYNECOLOGY 1012 (1947)).

[219] *See, e.g.*, *Is Abortion Justifiable in the Insane Pregnant?*, 38 J. AM. MED. ASSOC. 69 (1902); R. Finely Gayle, *The Psychiatric Consideration of Abortion*, 91 S. MED. AND SURG. 251 (1929), *cited in* REAGAN, WHEN ABORTION WAS A CRIME, *supra* note 217, at 279 n.59 (1997) R. Finely Gayle, *The Psychiatric Consideration of Abortion*, 91 S. MED. AND SURG. 251 (1929)).

[220] *See generally* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111.

[221] *Charge of Procuring Abortion*, 2 BRIT. MED. J. 97 (1939), *cited in* KEOWN, *id*. at 50.

[222] *Id*.

[223] *Id*.

[224] *Id*.

[225] *Id*. at 50–51 (in *Rex v. Bourne*, Attorney-General conceded that if necessary to save the life of the mother, induced or forcible miscarriage is not "unlawful").

threat to mental ill-health.[226] In jury instructions, the judge clarified that a doctor need not wait until a patient was in immediate danger but was duty-bound to intervene if pregnancy threatened life.[227] He further instructed the jury that "life depends on health, and it may be that health is so gravely impaired that death results."[228] Statutory provision permitting abortion for "the preservation of life" was to be construed in a "reasonable sense": if a doctor thought "the probable consequence of continuation of the pregnancy will be to make the woman a physical or mental wreck," the jury was entitled to find that the doctor operated for the purpose of preserving the life of the mother.[229]

82. The approach in *Rex v. Bourne* illustrates a few matters intrinsic to the development of the therapeutic exception. Some courts, as in *Bourne*, reasoned that the threat to life and grounds for invoking the "life" defense need not be restricted to birthing emergency and its immediate temporality.[230] A threat to health over the long term could make a person a "wreck" and ruin her life or tempt her to end it. As with the old life-health exception, the "life" exception included defense of health, but here, "health" included mental health. Once again, the aim of protecting a woman's life and health guided the law.

83. In the U.S., over the decades after state legislatures passed the therapeutic exception into statute, abortion decisions first made by individual physicians were increasingly

---

[226] THE TIMES, July 20, 1938, *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, supra note 111, at 50, 182 n.8.

[227] Rex v. Bourne, 1 K.B. 687, 693 (1939), *cited in* KEOWN, *id.* at 182 n.14.

[228] *Id*. at 692.

[229] *Id*. at 694.

[230] *See* People v. Ballard, 167 Cal. App. 2d 803, 335 P.2d 204 (Dist. Ct. App. 1959) (peril to woman's life need not be "imminent" to justify abortion under statutory standard of necessity); *see also, e .g*., R v. Bell [1929], 1 BRIT. MED. J. 1061 (in case of patient whose obesity made pregnancy increasingly risky, judge states certain operations to terminate pregnancy in its last stages are legal and necessary), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 182 n.27.

made by hospitals. Hospitals set up therapeutic abortion review boards to weigh the medical justification of abortion in a particular case.[231] When the American Law Institute (ALI) proposed a model penal code section on abortion in 1959, it repeated the old New York formula of requiring that two physicians consult on the medical necessity of the procedure.[232] However, following a few state courts, the ALI defined the life/health exception to include "substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother."[233]

## FACTS OR DATA CONSIDERED IN FORMING MY OPINIONS

84. My opinions are based on my education, scholarship; research; engagement with other scholars; and knowledge of the relevant literature, including the sources cited in this report and its appendices.

## EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS

85. I have prepared several appendices, which are attached hereto, to support my opinions. I reserve the right to create additional exhibits for use at trial.

[231] For accounts of how the hospital review boards worked, see, e.g., HAROLD ROSEN, THERAPEUTIC ABORTION: MEDICAL, PSYCHIATRIC, ANTHROPOLOGICAL, AND RELIGIOUS CONSIDERATIONS (1954). *See also* Alan Guttmacher, *The Genesis of Liberalized Abortion in New York: A Personal Insight*, 23 CASE W. L. REV. 756 (1971–72); REAGAN, WHEN ABORTION WAS A CRIME, *supra* note 217, at 173–79, 214 (describing the work and institutionalization of hospital "therapeutic abortion" review committees). For a description of one aspect of the work of hospital abortion committees, transferring decisional authority over pregnancy from the woman to a team of male doctors, see Rickie Sollinger, *"A Complete Disaster": Abortion and the Politics of Hospital Abortion Committees, 1950–1970, in* Leavitt, WOMEN AND HEALTH *supra* note 157 at 659, 664–68

[232] MODEL PENAL CODE § 230.3(3) (1959), *in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 38.

[233] § 230.3(2) (1959), *in* ROSE, ABORTION DOCUMENTARY GUIDE, *id*. at 38.

## MY QUALIFICATIONS AND PUBLICATIONS

86. I earned a J.D. from Yale Law School and a Ph.D. in Anthropology from the University of California, Berkeley.

87. I serve as an Assistant Professor of Law and Anthropology at a university in Missouri.

88. From 2015-2019, I served on the Executive Board of the Anthropology of Law Section of the American Association of Law Schools, and served as Chair of the Section from 2017-2018. I currently serve on the Editorial Board of the Political and Legal Anthropology Review.

89. My research traces legal ideas and practices across time and geography. Although much of my scholarship has focused on comparative and international law and the law of war, I have conducted extensive research on the history of abortion regulation in the United States.

90. I authored an article titled *The Health Exception* arguing that theories of health lie at the heart of U.S. legal doctrine concerning abortion, shaping common-law treatment of abortion and persisting in nineteenth- and twentieth-century statutes. It was published in the Georgetown Journal of Gender and the Law in 2016.

91. A more complete list of my publications since 2015 is attached hereto as Appendix F.

## CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS

92. None

## COMPENSATION

93. I am being compensated at the rate of $350 per hour for my work on this case.

Dated: February 20, 2025

Monica Eppinger, J.D., Ph.D.

## Appendix A
## State Statutes on Abortion
## in Reference to Poison Control

**Part I:**
**States regulating abortion in reference to poison before 1857, in order of adoption:**

Connecticut: CONN. GEN. STAT. tit. 22, § § 14, 16, at 151, 152–53 (1821) (N.B.: Revision of the Connecticut statute in 1830 extended the provision regarding poison to include abortion by instrument as well. 1830 Conn. Acts ch. 1, § 16.)

Missouri: 1825 1 Mo. Rev. Laws ch. 1, § 78

Illinois: 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46

Iowa: An Act Defining Crimes and Punishments §18, 1838–1839 Iowa (Terr.) Acts §18, at 142, 145 (Act of Jan. 5, 1839).

Indiana: An Act to Amend "an Act Relative to Crimes & Punishment approved Feb. 10, 1831" § 3, IND. REV. STAT. ch. 26, § 3, at 224, 224 (1838) (Act of Feb. 8, 1835) (amending Indiana criminal code to add a general provision on poisoning that also included a section on using a substance or an instrument with intent to procure miscarriage)

California: 1849–1850 Cal. Sess. Stats. ch. 99, § 45, at 229, 223 (abortion-regulating provision given in poisoning section of criminal code, but note it includes using an “instrument” as well as a “medicine” or “substance”)

Hawaii: HAW. (KINGDOM) PENAL CODE ch. 12, § 1 (1850) (prohibiting producing miscarriage by “instrument” as well as “poison” or “noxious thing”)

**Part II:**
**States regulating abortion in reference to poison after 1857, in order of adoption:**

Nevada: An Act Concerning Crimes and Punishments, Nov. 26, 1861, 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63 (codified as NEV. COMP. LAWS ch. 55, pt. 4, § 2348 (1873)

Montana: An Act Concerning Crimes and Punishments, 1864 Mont. (Terr.) Laws 1st Legislative Assembly ch. 3, § 41, at 184 (placing provision on abortion by potion or instrument within poison-control section of statute)

Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 6, § 39, at 727–28 (adding provision on attempt to procure miscarriage to the chapter of the criminal code on attempted poisoning)

Rhode Island: R.I. GEN. LAWS ch. 277, § 22, at 977 (1896) (prohibiting using “poison or other noxious thing,” or an instrument, on a woman pregnant or supposed pregnant)

**Appendix B**
**State Statutes on Abortion**
**Prohibiting Abortion by Blows**

**Part I: Abortion by blows prohibitions adopted before 1857 (in order of adoption)**

New York: An Act Concerning Crimes and Punishments, pt. 4, tit. 2, § 8, codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 8, at 659, 661 (1828) (Act of Dec. 18, 1828)

Missouri: An Act concerning Crimes and their Punishments art. 2, § 9 (codified as MO. REV. STAT. art. 2, § 9, at 168 (1835)) (Act of March 20, 1835)

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 5, at 240 (1838)

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi) ch. 14, § 70, 1839 Miss. Laws app. ch. 14, § 70 at 858, 866 (Act of Feb. 15, 1839) (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 8) (1839)

Iowa: An Act Defining Crimes and Punishments ch. 49, § 10, codified as IOWA (TERR.) REV. STAT. ch. 49, § 10, at 162, 167 (1843)) (Act of Feb. 16, 1843)

Oregon: An Act Regulating the Executive Power, the Judiciary, and for Other Purposes art. 3, § 1, 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (adopting for Oregon territory the 1843 revised laws of Iowa, incorporating provision targeting abortion by blows)

Michigan: Act of May 18, 1846, tit. 30, § 32, MICH. REV. STAT. tit. 30, ch. 153, § 32 (1846)

Minnesota: MINN. (TERR.) REV. STAT. ch. 100, § 10, at 491, 493 (1851)

Wisconson: WIS. REV. STAT. pt. 4, tit. 30, ch. 133, §10, at 682, 683 (1849)

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, § 9, codified as KAN. (TERR.) STAT. ch. 48, § 9 (1855) (Act of July 22, 1855)

**Part II: Examples of abortion by blows prohibitions 1857-1959, in order of adoption:**

Georgia: An Act to Prevent and Punish Foeticide [*sic*] or Criminal Abortion in the State of Georgia, 1876 Ga. Laws No. 130, § 1, at 133 (Act of Feb. 25, 1876)

Arkansas: 4 ARK. STAT. ANN. § 41-2229 (1964)

Florida: 22 FLA. STAT. ANN. § 782-09 (1965)

Kansas: 2 KAN. STAT. ANN. § 21-409 (1964)

Michigan: 25 MICH. STAT. ANN. § 28.554 (1954)

Mississippi: 2A MISS. CODE ANN. § 2222 (1942)

North Dakota: 2 N.D. CENTURY CODE § 12-25-03 (1960)

Oklahoma: OKLA. STAT. ANN. tit. 21, § 713 (1958)

**Appendix C**
**Statutes Providing Therapeutic Defense**

**Part I**

**A. Statutes before 1857 including explicit protection for an act undertaken to "preserve the life" of the woman**

Alabama: 1840 Ala. Acts ch. 6, § 2
Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 6 (1838)
California: 1849–1850 Cal. Sess. Stat. ch. 99, § 45 (limiting therapeutic exception to physician "in discharge of his professional duties")
Hawaii: HAW. PENAL CODE § § 1, 2, 3 (1850) (in pre-territorial statute, exception for "surgeon or other" saving the life of a woman).
Indiana: Act of Feb. 7, 1835, codified as IND. REV. STAT. ch. 26, § 3, at 224, 224 (1838) ("preserve the life" exception retained in amended abortion provision, Act of June 14, 1852 ch. 6, 2 IND. REV. STAT. pt. 3, ch. 6, § 36, at 424, 437 (1852))
Iowa: IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843) (amending criminal statute to add exception for preserving a patient's life) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)
Kansas: KAN. (TERR.) STAT., ch. 48, § § 10, 39 (1855)
Maine: ME. REV. STAT. tit. 12, ch. 160, § § 13, 14 (1841) (retained in a single section, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))
Michigan: MICH. REV. STAT. tit. 30, ch. 153, § § 33, 34 (1846)
Minnesota: MINN. (TERR.) REV. STAT. ch. 100, §§ 10, 11 (1851)
Mississippi: MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9 (1839)
Missouri: MO. REV. STAT. art. 2, § § 10, 36 (1835)
New Hampshire: 1848 N.H. Laws Nov. Sess. ch. 743, § § 1, 2
New York: 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 (limiting "preserve life" exception to "destroy child" provision but excluding it from "procure miscarriage" provision)
Ohio: OHIO GEN. STAT. ch. 35, § § 111, 112 (1841)
Oregon: 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (adopting 1843 Iowa provisions)
Virginia: 1848 Va. Acts. tit. 2, ch. 3, § 9
Washington: 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § § 37, 38
Wisconsin: WIS. REV. STAT. pt, 4, tit. 30, ch. 133, § 11 (1849)

**B. Statutes after 1857 providing an explicit protection for provider of therapeutic abortion**

Mississippi: MISS. REV. CODE ch. 64, § 34, art. 173, at 601 (1857)
Texas: TEX. DIGEST OF GEN. STAT. LAWS, PENAL CODE, pt. 2, tit. 17, ch. 7, art. 536, at 524 (1859)
Connecticut: 1860 Conn. Pub. Acts ch. 71, § § 1, 3, at 65 (codified as CONN. GEN. STAT. tit. 12, ch. 2, § § 22, 24 (1866))
Nevada: An Act Concerning Crimes and Punishments, 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63 (Act of Nov. 26, 1861) (codified as NEV. COMP. LAWS ch. 55, pt. 4, § 2348 (1873)
Montana: An Act Concerning Crimes and Punishments, 1864 Mont. (Terr.) Laws 1st Legislative Assembly ch. 3, § 41, at 184
Rhode Island: Act of Mar. 14, 1867 ch. 689, 1867 R.I. Acts & Resolves Jan. Sess. ch. 689, § 1, at 148

Vermont: Act of Nov. 21, 1867 § 1, 1867 Vt. Acts & Resolves No. 57, § 1, at 64
Minnesota: MINN. GEN. STAT. ch. 94, § 11 (1866) (*repealed by, but life exception replicated in*, Act of March 10, 1873, ch. 9, An Act to Punish Abortionists and Attempts to Procure Abortion, and Improper Advertising in that Direction, 1873 Minn. Gen. Laws 15th Sess. ch. 9, § 1 (codified as 2 MINN. STAT. AT LARGE ch. 54, Sec. 29, § § 1, 3, at 987 (1873))
Illinois: An Act to Amend the Criminal Code of this State in relation to the Offense of Abortion, § § 2, 3 1867 Ill. Pub. Laws 25th Gen. Assembly 1st Sess. § § 2, 3, at 89 (Act of Feb. 28, 1867) (abortion criminalization provisions shall not apply to "any person" attempting or procuring miscarriage "for *bona fide* medical or surgical purposes")
Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28
Utah: The Penal Code of Utah § 142, 1876 Utah (Terr.) Laws 22nd Sess. § 142 (Act of Feb. 18, 1876) (codified as UTAH (TERR.) COMP. STAT. tit. 21 Penal Code, tit. 9, ch. 3, § 142 (1876))
Delaware: An Act to Punish Procurement of Abortion, Feb. 13, 1883 ch. 226, 1883 7 Del. Laws pt. 1, tit. 20, ch. 226, § 2, at 523;
Dakota: DAK. (TERR.) REV. CODES, PENAL CODE ch. 29, § § 337, 338, at 776 (1877) ("necessary to preserve her life"), *adopted as* N. DAK. REV. CODES, PENAL CODE ch. 30, § § 7177, 7178, at 1271-72 (1895) *and* S. DAK. REV. CODES, PENAL CODE ch. 29, § § 342, 343, at 1134 (1903)
Indiana: An Act concerning Public Offenses and their Punishment ch. 87, 1881 Ind. Laws Spec. Sess. ch. 37, §§ 22, 23, at 177 (Act of Apr. 14, 1881)
North Carolina: An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 1, at 584 (Act of Mar. 12, 1881)
South Carolina: An Act to Amend the Criminal Law by Providing for the Punishment of Abortion, 1883 S.C. Acts No. 354, 99 § § 1, 3, at 547–48 (Act of Dec. 24, 1883)
Tennessee: An Act to Punish Criminal Abortion, 1883 Tenn. Pub. Acts ch. 140, § § 1, 2, at 188–89 (Act of March 23, 1883)
Oklahoma: 1890 Okla. (Terr.) Gen. Stat. 1st Regular Sess. ch. 25, art. 29, § § 1, 2, at 459 (codified as OKLA. GEN. STAT. ch. 25, art. 29, § § 1, 2 (1890))
Alaska: An Act to Define and Punish Crimes in the District of Alaska and to Provide a Code of Criminal Procedure for Said District (enacted by Senate and House of Representatives of the United States in Congress assembled) 30 Stat. L., 1253 Alaska Criminal Code (Act of Mar. 3, 1899), *published as* ALASKA (TERR.) LAWS pt. 1 (Penal Code), ch. 2, § 8, at 3 (1900)
New Mexico: Act of Mar. 18, 1907 § 6, 1907 N.M. (Terr.) Acts 37th Sess. ch. 36, § 6, at 41, 42
Kentucky: An Act Defining the Crime of Abortion and Prescribing a Penalty Therefore, 1910 Ky. Acts ch. 58, § 1, at 189 (Act of March 22, 1910)
Alabama: The Code of Alabama, Crimes and Offenses, Act of July 2, 1940, tit. 14, ch. 2, § 9, 4 ALA. CODE tit. 14, ch. 2, § 9, at 7 (1940)

**Part II**

**A. Statutes before 1857 encoding therapeutic defense in intent elements, in order of adoption**

**1. Statutes before 1857, distinguishing "lawful" from "unlawful" abortion by invoking the "unlawful" distinction, in order of adoption:**

Massachusetts: 1845 Mass. Gen. Laws ch. 27, at 322 ("maliciously or without lawful justification")

Vertmont: 1846 Vt. Acts & Resolves No. 33, § 1, at 34–35 (codified as Vt. Comp. Stat. tit. 28, ch. 108, § 8 (1851)) ("maliciously" or "without lawful justification")
New Jersey: 1849 N.J. Laws at 266–67 ("maliciously" or "without lawful justification")
Hawaii: HAW. PENAL CODE §1 (1850) (in pre-territorial statute, "maliciously, without lawful justification")
Louisiana: LA. REV. STAT. § 24 (1856) ("feloniously administer")

**2. Statutes before 1857 requiring, to be punishable, an act be undertaken "maliciously," in order of adoption:**

Connecticut: CONN. STAT. tit. 22, § 14 (1821) ("maliciously"), *retained in amended provision in* 1830 Conn. Laws. ch. 1, § 16, at 255 retaining "willfully and maliciously" elements of first Connecticut statute)
Illinois: 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46, at 124, 131 ("wilfully and maliciously")
Iowa: IOWA (TERR.) STAT. 1st Legis., 1st Sess. § 18 (1838–1839) ("maliciously")
Massachusetts: 1845 Mass. Acts & Resolves ch. 27 ("maliciously or without lawful justification")
Vermont: 1846 Vt. Acts No. 33, § 1 ("maliciously" or "without lawful justification")
New Jersey: 1849 N.J. Laws tit. 2, § 75, at 146–47 ("maliciously" or "without lawful justification")
Hawaii: HAW. PENAL CODE ch. 12, §1 (1850) ("maliciously, without lawful justification"; §2 adds explicit life exception).

**3. Statutes before 1857 requiring, to be punishable, an act be undertaken "willfully," in order of adoption:**

CONN. STAT. tit. 22, § 14 at 152, 153 (1821), *retained in amended provision in* 1830 Conn. Laws. ch. 1, § 16, at 255 retaining "willfully and maliciously" elements of first Connecticut statute)
1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46 ("wilfully")

**B. Statutes after 1857 encoding therapeutic exception in intent elements**

**1. Statutes after 1857 requiring "unlawful purpose" or that an act took place "without lawful justification," in order of adoption:**

Pennsylvania: 1860 Pa. Laws NO. 374, § § 87, 88 ("unlawfully")
Florida: 1868 Fla. Acts 1st Sess. ch. 1637 ("unlawfully")
Hawaii: HAW. PENAL CODE ch. 12, § 1 (1869) ("maliciously, without lawful justification")
New York: 1869 N.Y. Laws ch. 631, §§ 1, 2, at 1502 ("unlawfully")
New Jersey: N.J. REV. STAT. ANN. §§ 2A:87-1 (1953) ("maliciously and without lawful justification")

**2. Some statutes after 1857 requiring, to be punishable, an act be undertaken "maliciously," in order of adoption**

Hawaii: HAW. PENAL CODE ch. 12, § 1 (1869) (in pre-territorial law, "maliciously, without lawful justification")

Wyoming: 1869 Wyo. (Terr.) Sess. Laws 1st Sess. ch. 3, § 25, at 104, ("willfully and maliciously")
New Jersey: N.J. REV. STAT. ANN. §§ 2A:87-1 (1953) ("maliciously and without lawful justification")

**3. Statutes before 1857 requiring, to be punishable, an act be undertaken "willfully," in order of adoption:**
Rhode Island: 1867 R.I. Acts & Resolves Jan. Sess. ch. 689, § 1 ("wilfully administering")
Wyoming: 1869 Wyo. (Terr.) Sess. Laws 1st Sess. ch. 3, § 25, at 104, ("willfully and maliciously")
Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28 ("wilfully")
North Carolina: 1881 N.C. Sess. Laws ch. 351, § 1, at 584 ("wilfully administer")

**Part III**
**A. Statutes before 1857 providing Therapeutic Defense upon Physician Consultation**
**1. States providing practitioners a statutory therapeutic defense, with consultation with two physicians serving as adequate proof of medical necessity, in order of adoption:**

New York: An Act Concerning Crimes and Punishments; proceedings in criminal cases; and prison discipline, tit. 2, § 9, tit. 6, § 21 (Act of Dec. 18, 1828) (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, § 9, tit. 6, § 21 (1828))

Ohio: An act to provide for the punishment of certain crimes therein named § § 1, 2, 1833 Ohio Gen. Acts 32nd Sess. at 20, 20-21 (Act of Feb. 27, 1834) (codified as OHIO GEN. STAT. ch. 35, § § 111, 112 (1841))

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi), 1839 Miss. Laws app. ch. 14, § 71 at 858, 867 (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9, at 693, 695 (1839))

Michigan: MICH. REV. STAT. ch. 153, § § 33, 34 (1846) (Act of May 18, 1846)

New Hampshire: An Act to punish certain crimes therein named, ch. 743, § § 1, 2, 1848 N.H. Laws Nov. Sess. ch. 743, § § 1, 2, at 708, 708 (Act of Jan. 4, 1849)

Wisconsin: WIS. REV. STAT. pt, 4, tit. 30, ch. 133, § 11 (1849); MINN. (TERR.) REV. STAT. ch. 100, § 11, at 493 (1851)

**2. States providing practitioners a statutory therapeutic defense, with consultation with one physician serving as adequate proof of medical necessity, in order of adoption:**

Missouri: An Act concerning crimes and their punishments art. 2, § § 10, 36 (codified as MO. REV. STAT. art. 2, § § 10, 36 (1835)) (Act of March 20, 1835) (amending Missouri's earlier poison-control statute to add, *inter alia*, a physician-consultation defense)

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, §6 (1837)

Alabama: An Act Regulating Punishments under the Penitentiary System (Penal Code), ch. 6, §2, 1840 Ala. Acts ch. 6, §2, at 143 (an act undertaken in consultation with a "respecable [*sic*] physician")

Hawaii: HAW. (KINGDOM) PENAL CODE §2 (1850) (exception for surgeon "or other" saving life of the mother)

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, § § 10, 39 (codified as KAN. (TERR.) STAT., ch. 48, § § 10, 39 (1855)) (Act of July 22, 1855)

3. **Jurisdictions providing that only a physician could enjoy a therapeutic exception based on expert judgement of medical necessity:**

California: 1849–1850 Cal. Sess. Stats. ch. 99, § 45, at 223 (presumption of legality only available to physician, not others, acting to save life of woman).

**B. "Physician" statutes after 1857**

**1. Statutes after 1857 providing protection for an abortion provider wherein consultation with a physician provided adequate evidence of medical necessity, in order of adoption**:

Wisconsin: WIS. REV. STAT. ch. 164, § 11 (1858)

Texas: TEX. GEN. STAT. DIG. ch. 7, art. 536, at 524 (Oldham & White 1859) (excepting abortion procured or attempted on "medical advice")

Illinois: An Act to Amend the Criminal Code of this State in relation to the Offense of Abortion, Act of Feb. 28, 1867 § 3 1867 Ill. Pub. Laws 25th Gen. Assembly 1st Sess. § 3, at 89 (excepting "any person" acting "for *bona fide* medical or surgical purposes")

Florida: 1868 Fla. Acts 1st Sess., ch. 1637, 3, § 11

Wyoming: 1869 Wyo. (Terr.) Laws 1st Sess., ch. 3, § 25, at 104

Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28 (two physicians)

New Mexico: Act of Mar. 18, 1907 § 6, 1907 N.M. (Terr.) Acts 37th Sess. ch. 36, § 6, at 41, 42

Georgia: An Act to Prevent and Punish Foeticide or Criminal Abortion in the State of Georgia, Act of Feb. 25, 1876, 1876 Ga. Laws. No. 130 § § 2, 3

Mississippi: MISS. CODE § 2223 (1942)

Missouri: MO. REV. STAT. § 559.100 (1949)

**2.** Post-1857 statutes that limited the shield of therapeutic intent to physicians include, in order of adoption:

Nevada: 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63

Idaho: 1863–1864 Idaho (Terr.) Laws § 42, at 435 (limiting exception to "physician" who, "in discharge of his professional duties," "deems it necessary" to "save her life");
Montana: 1864 Mont. (Terr.) Laws § 41, at 184
Arizona: ARIZ. HOWELL CODE ch. 10, § 45 (1865)
Arkansas: Act of Nov. 8, 1875, § 21, 1875 Ark. Laws 4th Adj. Sess. § 21, at 5 ("any regular practicing physician").
Indiana: Act of Apr. 14, 1881 ch. 87, An Act concerning Public Offenses and their Punishment, 1881 Ind. Laws Spec. Sess. ch. 37, § 23, at 177 (making liable a woman herself solicits intervention to procure miscarriage "except when by a physician for saving the life of mother or child")
Maryland: MD. LAWS ch. 179, § 2, at 315 (1868) (requiring provider be physician who consults with one or more other "respectable physicians")

## Appendix D
## Statutory Provisions Requiring Intent to "destroy a child"

**Part I: Pre-1857 statutes requiring, to be punishable, an act be undertaken with intent "to destroy child" (in order of adoption)**
Connecticut: 1830 Conn. Laws ch. 1, § 16, at 255

Missouri: An Act concerning crimes and their punishments art. 2, (codified as MO. REV. STAT. art. 2, § 10, at 168, 169 (1835)) (Act of March 20, 1835)

New York: An Act Concerning Crimes and Punishments pt. 4, codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2 § 9, at 659, 661 (Act of Dec. 18, 1828); after subsequent reform, 1845 N.Y. Laws 68th Sess. ch. 260, § 1, at 285, 285–86 (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 (1828–1845))

Ohio: An act to provide for the punishment of certain crimes therein named § 2, 1833 Ohio Gen. Acts 32nd Sess. § 2, at 20, 21 (Act of Feb. 27, 1834) (codified as OHIO GEN. STAT. ch. 35, § 112 (1841))

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 6, at 240 (1838)

Iowa: An Act Defining Crimes and Punishments, codified as IOWA (TERR.) REV. STAT. ch. 49, § 10, at 162, 167 (1843) (Act of Feb. 16, 1843) (amending criminal statute to add "destroy child" provision) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi), 1839 Miss. Laws app. ch. 14, § 71, at 858, 867 (Act of Feb. 15, 1839) (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9, at 693, 695 (1839))

Maine: Act of Oct. 22, 1840, ch. 160, ME. REV. STAT. tit. 12, ch. 160, § 13, at 684, 686 (1841) (retained, though succinctly combined in same section with "procure miscarriage" provision, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))

Oregon: An Act Regulating the Executive Power, the Judiciary, and for Other Purposes Art. 3, § 1, 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (importing, wholesale, the 1843 laws of Iowa, including the "destroy child" provision encoded in IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843))

Michigan: Revised Statutes of the State of Michigan, tit. 30, ch. 153, MICH. REV. STAT. tit. 30, ch. 153, § 33, at 657, 662 (1846) (Act of May 18, 1846)
New Hampshire: An Act to punish certain crimes therein named, ch. 743, 1848 N.H. Laws Nov. Sess. ch. 743, § 2, at 708, 709 (Act of Jan. 4, 1849)

Wisconsin: WIS. REV. STAT. pt. 4, tit. 30, ch. 133, § 11, at 682, 683 (1849)

Minnesota: Revised Statutes of the Territory of Minnesota, MINN. (TERR.) REV. STAT. ch. 100, § 11, at 491, 493 (1851)

Washington: An Act Relative to Crimes and Punishments, and Procedures in Criminal Cases, 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § 37, at 75, 81

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, codified as KAN. (TERR.) STAT., ch. 48, § 10, at 236, 238 (1855) (Act of July 22, 1855)

## Appendix E
## Statutory Provisions Requiring Intent to "Procure Miscarriage"

**Part I: Pre-1857 statutes requiring, to be punishable, an act be undertaken with intent to "procure miscarriage" (rather than intent to "destroy child") (in order of adoption)**

Illinois: An Act Relative to Criminal Jurisprudence, div. 5, 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46, at 124, 131 (Act of Jan. 6, 1827)

Missouri: MO. REV. STAT. art. 2, § 36, at 168, 172 (1835)

New York: 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828); after statutory reform, 1845 N.Y. Laws 68th Sess. ch. 260, § 2, at 285, 286 (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 20 (1828–1845))

Iowa: An Act Defining Crimes and Punishments § 18, 1838–1839 Iowa (Terr.) Acts 1st Sess. div. 1, §18, at 142, 145 (Act of Jan. 5, 1839) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)

Ohio: OHIO GEN. STAT. ch. 35, § 111 (1841))

Alabama: An Act Regulating Punishments under the Penitentiary System (Penal Code), ch. 6, §2, 1840 Ala. Acts ch. 6, §2, at 143, 143

Maine: Act of Oct. 22, 1840, ch. 160, ME. REV. STAT. tit. 12, ch. 160, § 14, at 684, 686 (1841) (retained, though with higher punishment and combined in one section with "destroy child" provision, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))

Oregon: 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (importing, wholesale, the 1843 laws of Iowa, including the "procure miscarriage" provision)

Michigan: MICH. REV. STAT. tit. 30, ch. 153, § 34, at 657, 662 (1846)

New Hampshire: 1848 N.H. Laws Nov. Sess. ch. 743, § 1, at 708, 709

California: 1849–1850 Cal. Sess. Stat. ch. 99, § 45, at 233

Washington: 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § 38, at 75, 81

Kansas: KAN. (TERR.) STAT., ch. 48, § 39, at 236, 243–44 (1855)

**Appendix F**
**Eppinger Research Publications 2015-2025**

*Assailed: The Paradoxical State of the Commons in the United States*, with Heidi Roberston, *in* PROPERTY: MEETING THE CHALLENGE OF THE COMMONS (Ugo Mattei, Alessandra Quarta, Filippo Valguarna, Ryan J. Fisher, eds.) (Springer *Ius Comparatum* series, 2023).

*From "Limited Sovereignty" to Decolonization in Ukraine*, HAU: J. ETHNOGRAPHIC THEORY (2023) (peer-reviewed).

*Herding History: Law and the Transformation of Collective Subjectivities in the Dairyspheres of Ukraine*, 16(2) J. FOOD L. & POLICY (2021).

*The Challenge of the Commons: Beyond Trespass and Necessity*, 66 AM. J. COMP. L. SUPP. 1 (June 2018).

*Cold-War Commons: Tragedy, Critique, and the Future of the Illiberal Problem Space*, 19 THEORETICAL INQU. L. 457 (July 2018).

*The Health Exception*, 17 GEORGETOWN J. GENDER & L. 665 (Summer 2016).

*Property and Political Community: Democracy, Oligarchy, and the Case of Ukraine*, 47 GEORGE WASHINGTON INT'L L. REV 825 (August 2015).