Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | ) Case No.: 1:24-cv-00244-BLW |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) **PLAINTIFF'S RESPONSE IN** |
| v. | ) **OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION** |
| MEMBERS OF THE IDAHO BOARD OF | ) **FOR SUMMARY** |
| MEDICINE, in their official capacities; *et al.,* | ) **JUDGMENT [DKT. 79 & 80]** |
| | ) |
| Defendants. | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

    I.    Summary Judgment Standard .................................................................. 2

    II.   Dr. Seyb Has Standing .......................................................................... 3

        A.  The Record Establishes Dr. Seyb's Standing to Challenge the Abortion
            Bans' Application to Medically Indicated Abortion ................................. 3

        B.  The Record Establishes Dr. Seyb's Standing to Challenge the Ban
            Throughout Pregnancy's Application to Patients at Risk of Death from Self-
            Harm .................................................................................................. 7

        C.  Dr. Seyb Can Assert Third-Party Standing on Behalf of His Patients ..................... 8

    III.  The State is Not Entitled to Summary Judgment on Plaintiff's Due Process Claim. ...... 10

        A.  The Historical Record Demonstrates That, When Medically Indicated,
            Abortion is a Fundamental Right ........................................................... 11

           1.  The Legal Standard Applicable in This Case Raises Novel Methodological
              Questions That the Supreme Court Has Not Yet Answered ......................... 11

           2.  Although Expert Witness Testimony Plays a Critical Role in Expounding
              the Historical Record, Plaintiff's Historical Evidence Is Not Limited to
              Such Testimony ................................................................................ 13

           3.  Plaintiff's Evidence is Sufficient to Establish a Fundamental Right to
              Abortion Care for Therapeutic Reasons ............................................... 15

              a.  The State Mischaracterizes the Testimony of Plaintiff's Experts by
                 Improperly Conflating Use of the Word Right with the Existence of
                 a Right in Practice ........................................................................ 16

              b.  The Legal Standard Requires Proof That a Right Existed in
                 Practice ..................................................................................... 16

              c.  There is Ample Evidence That Therapeutic Abortion Enjoyed
                 Substantial Legal Protection at All Relevant Times in History ............. 18

                  i.  The Right to Therapeutic Abortion is Implicit in the Right to
                     Self-Defense ......................................................................... 18

                    ii.  The Right to Therapeutic Abortion is Part of the Fundamental
                     Right to Treatment for Serious Medical Needs ......................... 19

                    iii.  Therapeutic Abortion Has Enjoyed Consistent Legal Protection
                     from the Medieval Period Through the Twentieth Century .......... 22

iv. The State's Attempts to Undermine Dr. Eppinger's Testimony
Are Unavailing.................................................................................. 31

B. Alternatively, the Abortion Bans Are Arbitrary and Irrational as Applied to
Medically Indicated Abortion Care ....................................................... 32

IV. The State is Not Entitled to Summary Judgment on Plaintiff's Equal Protection
Claim.....................................................................................................35

A. People With Life-Threatening Mental Health Conditions Are Similarly
Situated
to People With Other Life-Threatening Conditions ................................. 35

B. The Statutory Classification Cannot Withstand Any Level of Scrutiny ............... 38

CONCLUSION..................................................................................................... 40

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Allaire v. St. Luke's Hosp.*,
76 Ill. App. 441 (1898), *aff'd*, 184 Ill. 359 (1900) ............................................ 23, 24

*Anderson v. Commonwealth*,
58 S.E.2d 72 (Va. 1950) ............................................................................................. 29

*Barrows v. Jackson*,
346 U.S. 249 (1953) ...................................................................................................... 9

*Beauharnais v. Illinois*,
343 U.S. 250 (1952) .................................................................................................... 22

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) .................................................................................................... 22

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) .................................................................................................... 21

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................................................................ 35, 38, 39

*Colburn v. Upper Darby Twp.*,
946 F.2d 1017 (3d Cir. 1991) .................................................................................... 37

*Commonwealth v. Brunelle*,
171 N.E.2d 850 (Mass. 1961) .................................................................................... 29

*Commonwealth v. Wheeler*,
53 N.E.2d 4 (Mass. 1944) ........................................................................................... 27

*Conn v. City of Reno*,
572 F.3d 1047 (9th Cir. 2009), *amended by* 591 F.3d 1081 (9th Cir. 2010), *cert. granted,
judgment vacated, and case remanded by* 563 U.S. 915 (2011), *reinstated in relevant
part by* 658 F.3d 897 (9th Cir. 2011) ...................................................................... 20

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........................................................................................................ 6

*Craig v. Boren*,
429 U.S. 190 (1976) ...................................................................................................... 9

*Damiano v. Grants Pass Sch. Dist. No. 7*,
140 F.4th 1117 (9th Cir. 2025) .................................................................................... 2

*Dietrich v. Inhabitants of Northampton*,
138 Mass. 14 (1884) ...................................................................................... 23, 24

*Disability Rts. Mont., Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) .................................................................................... 20

iv

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................................ *passim*

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ................................................................................ *passim*

*Doty v. Cnty. of Lassen*,
   37 F.3d 540 (9th Cir. 1994) ......................................................................... 20

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ...................................................................................... 19

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) .................................................................................... 21

*Gleitman v. Cosgrove*,
   227 A.2d 689 (N.J. 1967) ............................................................................ 27

*Gordon v. Cnty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ..................................................................... 19

*Gorman v. Budlong*,
   23 R.I. 169 (1901) ...................................................................................... 23

*Griswold v. Connecticut*,
   381 U.S. 479 (1965) ...................................................................................... 9

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) .................................................................................... 11

*Kilgore v. SpecPro Pro. Servs., LLC*,
   51 F.4th 973 (9th Cir. 2022) ......................................................................... 2

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ...................................................................................... 9

*M'Culloch v. Maryland*,
   17 U.S. 316 (1819) ...................................................................................... 28

*McDonald v. City of Chi.*,
   561 U.S. 742 (2010) ............................................................................... 11, 18

*N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*,
   597 U.S. 1 (2022) ..................................................................................... *passim*

*Navarro v. Block*,
   72 F.3d 712 (9th Cir. 1995) ......................................................................... 38

*New York v. Ferber*,
   458 U.S. 747 (1982) .................................................................................... 22

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ................................................................................... 33, 38

*Peace Ranch, LLC v. Bonta*,
   93 F.4th 482 (9th Cir. 2024) ...................................................................... 3, 7

*People v. Abarbanel,*
   48 Cal. Rptr. 336 (Cal. Dist. Ct. App. 1965) ....................................................... 27

*People v. Darrow,*
   298 P. 1 (Cal. 1931) ................................................................................................. 29

*Planned Parenthood Great Nw. v. State,*
   522 P.3d 1132 (Idaho 2023) ............................................................................... 4, 27

*Powers v. Ohio,*
   499 U.S. 400 (1991) ................................................................................................... 9

*Rex v. Bourne,*
   (1938) 3 All E.R. 615 (Eng.) ..................................................................................... 9

*Roe v. Wade,*
   410 U.S. 113 (1973) ................................................................................................. 25

*Roth v. United States,*
   354 U.S. 476 (1957) ................................................................................................. 22

*Silveira v. Lockyer,*
   312 F.3d 1052 (9th Cir. 2002), *as amended* (Jan. 27, 2003), *abrogated on other grounds
   by District of Columbia v. Heller,* 554 U.S. 570 (2008) ........................................ 38

*St. Luke's Health Sys., Ltd. v. Labrador,*
   782 F. Supp. 3d 983 (D. Idaho 2025) ........................................................................ 2

*State v. Boozer,*
   291 P.2d 786 (Ariz. 1955) ....................................................................................... 29

*State v. Dunklebarger,*
   221 N.W. 592 (Iowa 1928) ...................................................................................... 27

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................................... 3, 7

*Torraco v. Maloney,*
   923 F.2d 231 (1st Cir. 1991) .................................................................................... 37

*U.S. Dep't of Agric. v. Moreno,*
   413 U.S. 528 (1973) ................................................................................................. 38

*Union Pac. Ry. Co. v. Botsford,*
   141 U.S. 250 (1891) ................................................................................................. 20

*United States v. Baily,*
   444 U.S. 394 (1980) ................................................................................................. 28

*United States v. Rahimi,*
   602 U.S. 680 (2024) ............................................................................... 11, 12, 14, 21

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) ................................................................................................. 22

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................................................... 22

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................... 9

*Watts v. United States*,
    394 U.S. 705 (1969) ......................................................................... 22

*Zobel v. Williams*,
    457 U.S. 55 (1982) ........................................................................... 38

**STATUTES**

Act of Apr. 4, 2023, ch. 298, H.B. 374, 67th Leg., 1st Reg. Sess. (Idaho).................................... 6

**RULES**

Fed. R. Civ. P. 56 ............................................................................................. 2

**OTHER AUTHORITIES**

U.S. Const. amend IX ........................................................................................ 11

1 William Blackstone, Commentaries 126 (1765)........................................................... 18

4 William Blackstone, Commentaries 186 (1769)........................................................... 28

3 Edward Coke, Institutes 50-51 (1644) ................................................................... 28

*Moyle v. United States*, No. 23-726, oral argument tr. (U.S. Apr. 24, 2024) .............................. 40

Paul Benjamin Linton, *Abortion Convictions Before Roe*, 36 Issues L. & Med. 77 (2021)......... 28

John A. Robertson, *Embryo Culture and the "Culture of Life": Constitutional Issues in the Embryonic Stem Cell Debate*, 2006 U. Chi. Legal. F. 1 (2006) ................................ 21

Paul H. Robinson et al., *The American Criminal Code: General Defenses*, 7 J. Legal Analysis 37 (2015) ........................................................................................ 19

## INTRODUCTION

This case concerns the constitutionality of Idaho's abortion bans—Idaho Code § 18-622 (Ban Throughout Pregnancy"), and Idaho Code §§ 18-8801 to 18-8808 ("Cardiac Activity Ban") (collectively, the "Abortion Bans")[1]—as applied to medically indicated abortion care (also called therapeutic abortion care).[2]  Plaintiff Stacy Seyb, M.D., is an Idaho physician who specializes in treating patients with high-risk pregnancies.  Pl.'s App. at 276-77 (Seyb Decl. ¶¶ 2, 11).  Before the Abortion Bans took effect, Dr. Seyb provided approximately two to three abortions per month to high-risk patients.  *Id.* at 276 (Seyb Decl. ¶ 7).  Since the Abortion Bans took effect, he has had to withhold care from some patients with serious medical needs, referring them to abortion providers in other states.  *Id.* at 277, 286, 288, 293 (Seyb Decl. ¶¶ 9, 41, 50, 72).

For example, Dr. Seyb recently saw a patient with end-stage renal disease who was undergoing peritoneal dialysis and had become pregnant unintentionally following a contraceptive failure.  *Id.* at 286 (Seyb Decl. ¶ 41).  Although the pregnancy was not necessarily life-threatening for the patient, it would have exposed her to additional health risks, complicated her treatment, and jeopardized her place on the kidney transplant list.  *Id.*  After Dr. Seyb counseled the patient about her options, she decided to have an abortion.  *Id.*  Dr. Seyb had to refer her to an out-of-state provider because the Ban Throughout Pregnancy prohibited him from performing her abortion in

---

[1] The Cardiac Activity Ban contains both criminal and civil enforcement mechanisms.  Idaho Code §§ 18-8805(2), 18-8807.  The criminal enforcement mechanism may not be used while the Ban Throughout Pregnancy is in effect, but it may be used if that statute were repealed or invalidated through judicial review.  *See id.* § 18-8805(4).

[2] "Medically indicated abortion" is a contemporary term that refers to abortion care provided for a medical reason.  "Therapeutic abortion" is an older term that means the same thing.  The medical experts in this case—and the contemporary medical literature—tend to favor the term "medically indicated abortion," *see, e.g.*, Pl.'s App. at 287 (Seyb Decl. ¶¶ 45-46), 302-03 (Smid Expert Report ¶¶ 19-20), whereas the historical experts and literature tend to favor "therapeutic abortion," *see e.g.*, *id.* at 142-44, 164-65 (Eppinger Expert Report ¶¶ 56, 83), 5, 9-10 (Cohen Rebuttal Expert Report ¶¶ 5, 12).  This brief uses the terms interchangeably.

Idaho.  *Id.*; *see* Idaho Code § 18-622.  Dr. Seyb seeks relief from the Abortion Bans that would allow him to provide abortion care in all cases of serious medical need.[3]

The Court should deny the summary judgment motion by Defendants and Defendant-Intervenor (collectively, the "State") because Dr. Seyb has standing to challenge the Abortion Bans and genuine issues of material fact require a trial on the merits of his constitutional claims.

## ARGUMENT

### I.    Summary Judgment Standard

A court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law."  *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1136 (9th Cir. 2025) (citations omitted).  On a motion for summary judgment, a court must view all "evidence in the light most favorable to the nonmoving party."  *Kilgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022) (citations omitted).  Further, a court may not resolve disputed issues of material fact.  *Damiano*, 140 F.4th at 1134 n.3.  Instead, it must deny the motion if a genuine issue of material fact exists.  *Kilgore*, 51 F.4th at 986 (reversing entry of summary judgment in part) ("Viewing such evidence in the light most

---

[3] On March 20, 2025, this Court entered a preliminary injunction in a different case barring enforcement of the Ban Throughout Pregnancy against Dr. Seyb and his colleagues at St. Luke's Health System for providing an abortion that is necessary to stabilize a patient presenting in the hospital emergency department with an "emergency medical condition," as that term is used in the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(e)(1)(A), (3)(A).  Mem. Decision & Order, *St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 983, 987 (D. Idaho 2025).  Although this injunction enabled Dr. Seyb to resume providing abortion care to some patients with serious medical needs, it does not authorize him to provide abortion care to all such patients.  The patient with end-stage renal disease, for example, was not covered by its terms.  *See* Pl.'s App. at 286 (Seyb Decl. ¶ 41.)

favorable to the nonmoving party, we conclude that the evidence creates a genuine dispute of material fact ….").

## II.    Dr. Seyb Has Standing

### A.    The Record Establishes Dr. Seyb's Standing to Challenge the Abortion Bans' Application to Medically Indicated Abortion

The State's contention that Dr. Seyb lacks standing to challenge the constitutionality of the Abortion Bans as applied to medically indicated abortion care is unavailing.  The State's standing arguments differ little from those asserted in its earlier motions to dismiss, and the Court should reject them now for the same reasons it did previously.  *See* Mem. Decision & Order [Dkt. # 54] ("MTD Decision") at 9-20.

"One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality."  *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).  A plaintiff in a pre-enforcement challenge has standing if (1) the plaintiff has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) the conduct is arguably "proscribed by a statute;" and (3) "there exists a credible threat of prosecution."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-63 (2014).  As the Court previously determined, Dr. Seyb satisfies these requirements for pre-enforcement standing.  MTD Decision at 11-17.

The State claims that "Plaintiff is unable to show that the abortions he claims he must perform are 'arguably proscribed' by the [Ban Throughout Pregnancy], and cannot meet the second factor of the *Driehaus* test for pre-enforcement standing."  Defs.' Mot. Summ. J. at 7.  This assertion ignores the undisputed fact that the Ban Throughout Pregnancy prohibits abortion in cases where an embryo or fetus has a condition that is incompatible with life.  *See* Pl.'s App. At 429-30 (Resp. to Interrog. 10) (asserting a purported state interest in prohibiting physicians like Plaintiff from providing an abortion when a pregnant person has received a diagnosis that their

embryo or fetus has a fatal condition); Pl.'s App. 436 (Resp. to RFA 9) (admitting that "an abortion is not always necessary to save a pregnant person's life in cases where the pregnant person receives a diagnosis that their embryo or fetus has a condition that is likely to result in miscarriage, stillbirth, or infant mortality").  Likewise, it ignores the undisputed fact that the Ban Throughout Pregnancy prohibits abortion in cases where a pregnant person faces a risk of death from self-harm.  Idaho Code § 18-622(2) ("No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself.").

Further, the State's assertion ignores the undisputed fact that the Ban Throughout Pregnancy prohibits abortion in cases where a medical condition threatens a pregnant person's health but not their life.  Idaho Code § 18-622 (permitting abortion only when "necessary to prevent the *death* of the pregnant woman.").  Although, as discussed below, there may be some dispute about the breadth of this category, all parties agree that it is not an empty set.  Thus, it is undisputed that the Abortion Bans prohibit some abortions that Dr. Seyb would otherwise perform.  MTD Decision at 15-16 ("[A]n abortion is medically indicated in a number of situations not permitted under the statutes …. Both [Abortion Bans] contain narrow exceptions that prohibit abortion in at least some of the situations where it is medically necessarily.").

The State makes repeated, disingenuous claims that Dr. Seyb's fear of prosecution is unfounded because the Idaho Supreme Court has said that death need not be imminent for the life exception in the Ban Throughout Pregnancy to apply.  *See Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1203 (Idaho 2023) ("[T]he statute does not require … a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life."); *see* Defs.' Mot. Summ. J. at 5-9 [Dkt. 79-1].  But neither that court nor the State has said that *all* abortions performed to preserve a pregnant person's health fall within the statute's life exception.  To the

contrary, the State insists that many do not.

For example, Dr. Kraus, a medical expert for the State, testified that an abortion would not be medically necessary in every case where it "would prevent a serious risk of substantial and irreversible impairment of a major bodily function." Pl.'s App. at 463 (Kraus Dep. Tr. 104:14-20) ("It depends on the situation."). Likewise, her expert report states that, in "most" cases in which continuing a pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition, "abortion is not medically necessary." *Id.* at 376 (Kraus Expert Report ¶ 38). She also stated, contrary to the views of Plaintiff and Plaintiff's medical experts, that "[a]bortion is not generally considered a medically indicated option" for chronic placental abruption. *Id.* at 374 (Kraus Expert Report ¶ 35). *Contra id.* at 290 (Seyb Decl. ¶¶ 57-58), 306, 307 (Smid Expert Report ¶¶ 39, 41), 76-77 (Eller Expert Report ¶ 40).

The State denies that even preterm premature rupture of membranes ("PPROM") always satisfies the Ban Throughout Pregnancy's life exception. *Id.* at 436 (Resp. to RFA 8). Dr. Kraus explains that, when PPROM occurs, a physician may not terminate the pregnancy immediately but must wait until the patient is no longer medically stable. *Id.* at 373-74 (Kraus Expert Report ¶ 34) ("If patients [with PPROM] are medically stable and elect for termination of pregnancy instead of expectant management, they would need to arrange for termination out of state."). She takes this position despite acknowledging that "infections can escalate quickly," and "in rare cases, infections progress so rapidly a patient's life becomes endangered very rapidly." *Id.* at 410 (Kraus Expert Report ¶ 86).

Among other circumstances, Dr. Seyb would like to offer his patients the option of having an abortion in Idaho in all cases where abortion would prevent a serious risk of substantial and

irreversible impairment of a major bodily function, all cases in which continuing a pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition, and all cases of PPROM. *See id.* at 277, 283-84 (Seyb Decl. ¶¶ 10, 34). Because there is no dispute that the Abortion Bans prohibit him from doing so, he has standing to challenge them. Even if the State were correct that the Ban Throughout Pregnancy's life exception is marginally broader than Dr. Seyb understands it to be, that would go to the scope of relief the Court should grant Dr. Seyb, and not to whether he has standing to challenge the statute in the first instance.[4]

---

[4] The State's hyperbolic assertion that "Dr. Seyb and St. Luke's were flying patients out of state in ignorance of the law's requirements," Defs.' Mem. at 7, is belied by the State's own admissions about what the law prohibits and was plainly made in bad faith. It is well known that legal prohibitions "have the potential to chill, or deter," lawful activities outside their boundaries. *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Defendants place the onus on Dr. Seyb to mitigate the Abortion Bans' chilling effect on the provision of care in Idaho. Defs.' Mem. at 6 (asserting that Dr. Seyb should have sought training on the statute's exceptions). But Dr. Seyb has explained that the Abortion Bans' chilling effect arises not just from the ambiguities in the laws themselves, but from uncertainty about how prosecutors and their medical experts will interpret them. Pl.'s App. at 280 (Seyb Decl. ¶ 24) ("Because of the uncertainty inherent in predicting patient outcomes, it is possible for reasonable doctors to disagree about whether an abortion is necessary to prevent a patient's death. I am afraid that, even if I believe that an abortion is needed to prevent the death of one of my patients, another doctor will second-guess my judgment, and a prosecutor will file charges against me on this basis."). There's no training that St. Luke's or a professional organization could offer that would mitigate the fear that this uncertainty creates. *Cf. Counterman*, 600 U.S. at 75 ("A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system." (citation omitted)).

Although the Idaho Legislature amended the Ban Throughout Pregnancy in 2023 to clarify it in certain respects, it declined to clarify or expand the scope of the life exception. *See* Act of Apr. 4, 2023, ch. 298, H.B. 374, 67th Leg., 1st Reg. Sess. (Idaho 2023). The legislature's unwillingness "to expand or clarify the medical exception in the statute to provide doctors with a manifest safe harbor for providing abortion care to patients with serious medical needs," Pl.'s App. at 281 (Seyb Decl. ¶ 25), combined with the statute's felony criminal penalties and the Attorney General's open hostility to abortion and abortion providers, "exacerbate the statute's chilling effect on doctors who treat pregnant patients," *id.* at 281-82 (Seyb Decl. ¶¶ 25, 28-31). Notably, no State agency has offered formal guidance or training on the scope of the Abortion Bans' exceptions.

### B.   The Record Establishes Dr. Seyb's Standing to Challenge the Ban Throughout Pregnancy's Application to Patients at Risk of Death from Self-Harm

Dr. Seyb has standing to challenge the Ban Throughout Pregnancy as applied to patients at risk of death from self-harm because he asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Peace Ranch, LLC*, 93 F.4th at 487 (citing *Driehaus*, 572 U.S. at 161); *see* MTD Decision at 12-25. "Intention," in this context, is a counterfactual construct: it asks not what the plaintiff has done, but what he would do if the law did not forbid it. *Id.* at 488. Dr. Seyb testified that he intends to provide abortion care to any patient referred to him with a mental health condition that complicates their pregnancy. Pl.'s App. at 491-92 (Seyb Dep. Tr. 158:22-159:2).

Although Dr. Seyb has not provided an abortion for mental health reasons in the past, he *has* treated patients at risk of death from self-harm, including one who died from suicide shortly after giving birth. *Id.* at 292 (Seyb Decl. at ¶ 67) ("I personally treated a patient with bipolar disorder who became pregnant .… She decided to continue the pregnancy and stop taking her medication to avoid risks to the fetus .… [S]he died from suicide during the post-partum period."); *see also id.* at 491 (Seyb Dep. Tr. 158:15-21). That patient did not choose to have an abortion, but other patients with serious mental health conditions do choose that option. *Id.* at 472-73 (Payne Dep. Tr. 19:18-20:14).

The State mischaracterizes Dr. Seyb's testimony about outpatient abortion clinics: Dr. Seyb explained that, before *Dobbs*, patients seeking abortion for mental health reasons would often obtain care in outpatient abortion clinics. *See id.* at 489-90 (Seyb Dep. Tr. 66:6-67:17). Since the Ban Throughout Pregnancy took effect, all of Idaho's outpatient abortion clinics have closed, eliminating that option. *Id.* at 492 (Seyb Dep. Tr. at 159:3-12). Now, any patient eligible to have an abortion in Idaho must have the abortion in a hospital. Moreover, citing a study in a JAMA-

affiliated journal, Dr. Seyb testified that, since the Ban Throughout Pregnancy has been in effect, more than a third of Idaho's OB-GYNs have left the State or stopped treating pregnant people. *Id.* at 283 (Seyb Decl. ¶ 33). Given the closure of all outpatient abortion clinics and the massive reduction of OB-GYNs in the state, the share of patients seeking medically indicated abortion care from Dr. Seyb is going to be higher in the future than it has been in the past

The State also ignores the fact that many of the conditions that create medical indications for abortion are rare—some patients' circumstances may even be unique. *See e.g.*, *id.* at 454, 456, 457 (Dahl Dep. Tr. 64:10-15, 66:12-19, 67:17-20), 51-52 (Dahl Expert Report ¶¶ 35, 38), 74 (Eller Rebuttal Expert Report ¶ 33), 260-61 (Prentice Expert Report ¶ 11); 469-70 (Kraus Dep. Tr. 179:22-180:11). Dr. Seyb is challenging the Abortion Bans as applied to *all* patients with high-risk pregnancies who desire termination, and he stands ready, willing, and able to provide abortion care to all such patients. *See* Am. Compl. [Dkt. # 56] at 25-27; Pl.'s App. at 277-78, 283-84 (Seyb Decl. ¶¶ 10, 13-14, 34). This is true regardless of whether he has treated a patient with an identical condition in the past, and regardless of whether the high-risk status of a patient's pregnancy results from a patient's physical health condition, a patient's mental health condition, or an embryonic or fetal condition. *See id.* at 277-78, 287-94 (Seyb Decl. ¶¶ 13-14, 45-79).

In sum, at a minimum, the record presents disputed issues of fact concerning abortion and mental health. But on the whole, the record demonstrates that Dr. Seyb intends to provide abortion care to patients at risk of self-harm who want to end their pregnancies, and he faces a credible threat of prosecution for doing so. Accordingly, he has standing to challenge the Ban Throughout Pregnancy's application to patients at risk of death from self-harm.

### C. Dr. Seyb Can Assert Third-Party Standing on Behalf of His Patients

The State's contention that Dr. Seyb lacks third-party standing simply rehashes the same argument already rejected by this Court in response to the State's motions to dismiss. MTD Order

at 21-23.  Specifically, the State argues that Dr. Seyb cannot satisfy the close relationship requirement of the third-party standing test because he asserts the rights of hypothetical future patients.  Defs.' Mem. at 9.  This argument fails for two reasons.

First, this Court already concluded that Dr. Seyb satisfies the close relationship test, MTD Order at 21-22, and the State cites no new factual or legal developments relevant to this issue. Second, a litigant need not satisfy the close relationship test "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). In *Kowalski*, the Supreme Court expressly recognized "other concerns that justify a lessening of prudential limitations on standing" besides the traditional requirements that a litigant demonstrate a close relationship to a third party and some hindrance to the third party's ability to protect their own interests.  *Id.* (citation omitted).  Where challenged laws directly penalize a litigant for conduct that facilitates a third party's exercise of constitutional rights, no further showing is required to establish third-party standing.  *Id.*

That is precisely the case here.  Enforcement of the Abortion Bans against Dr. Seyb would result indirectly in the violation of his patients' right to therapeutic abortion care.  *See* Idaho Code §§ 18-622(1), 18-8805(2).  As a result, Dr. Seyb has standing to assert his patients' rights when seeking relief from the Abortion Bans.  *Cf. Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that a criminal defendant had third-party standing to assert the rights of potential jurors excluded from jury service); *Craig v. Boren*, 429 U.S. 190, 194-95 (1976) (holding that a beer vendor had third-party standing to assert the rights of potential customers); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (holding that healthcare providers had third-party standing to assert the rights of patients seeking to use contraception); *Barrows v. Jackson*, 346 U.S. 249, 258 (1953) (holding that

white property owners had third-party standing to assert the rights of potential black purchasers). The State fails to identify a compelling reason to depart from well-settled precedent on this issue.

## III.    The State is Not Entitled to Summary Judgment on Plaintiff's Due Process Claim.

The State is not entitled to judgment as a matter of law on Plaintiff's due process claim because its characterizations of both the applicable legal standard and the factual record are faulty in critical respects.  First, the State mischaracterizes the legal standard.  It requires Plaintiff to demonstrate that the right to therapeutic abortion is deeply rooted in American history and tradition as a practical matter, and not that the word *right* was used to describe the legal protection afforded to therapeutic abortion throughout history.  The State likewise errs in asserting that the Court must confine its historical inquiry to the narrow time period encompassing ratification of the Fourteenth Amendment.  The Supreme Court has explained that both pre- and post-ratification history are vital to the application of the history-and-tradition standard.

Next, the State mischaracterizes the factual record.  Contrary to its assertion, Plaintiff's evidence is not limited to the testimony of a single expert witness.  Plaintiff has proffered two experts on the historical record—an anthropologist of law and a historian—whose testimony will help the Court understand the social, medical, and legal context in which key legal authorities arose.  But the significance of some legal authorities—such as those underlying the right to self-defense—has been so well established by contemporary caselaw that expert testimony is not needed to elucidate it.  Legal authorities of this sort provide additional evidence that the right to therapeutic abortion is deeply rooted.  Thus, the record as a whole amply demonstrates that, from medieval times to the twentieth century, therapeutic abortion has always been treated by law and society as a right in practice, connected to the broader rights of self-defense and treatment for serious medical needs.  The State's critiques of the opinions offered by one of Plaintiff's experts amount to a dispute over material facts, which cannot be resolved on summary judgment.

Finally, the State is wrong that all applications of the challenged laws have a rational basis. The record shows that at least some applications are arbitrary and irrational.

### A. The Historical Record Demonstrates That, When Medically Indicated, Abortion is a Fundamental Right

#### 1. The Legal Standard Applicable in This Case Raises Novel Methodological Questions That the Supreme Court Has Not Yet Answered

Although the Bill of Rights enumerates certain individual rights, the Framers did not intend it to create an exhaustive list. The Ninth Amendment thus states: "The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people." U.S. Const. amend IX. The Supreme Court has long recognized that the Due Process Clause of the Fourteenth Amendment provides substantive protection for both enumerated and unenumerated rights against infringement by the states. *See McDonald v. City of Chi.*, 561 U.S. 742, 758 (2010) (plurality opinion).

In recent years, the Supreme Court has eschewed traditional methods of inquiry concerning the nature and scope of both enumerated and unenumerated rights in favor of an originalist approach that focuses exclusively on whether a right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (citation omitted); *accord McDonald*, 561 U.S. at 767. *See also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022) (holding that analysis of Establishment Clause claims must focus on "original meaning and history"). As lower courts have identified challenges in implementing this methodological shift, *see United States v. Rahimi*, 602 U.S. 680, 742 n.1 (Jackson, J., concurring) (collecting cases), the Supreme Court has acknowledged the difficulties inherent in making history the touchstone for constitutional analysis and endeavored to provide guidance, most notably in its recent Second Amendment cases, *see, e.g.*, *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 25 (2022) ("To be sure, '[h]istorical analysis can be

difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" (citation omitted)).

In *Bruen*, for example, the Supreme Court explained that courts must engage in case-by-case determination of historical questions based on evidence presented by the parties:

> The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." Courts are thus entitled to decide a case based on the historical record compiled by the parties.

597 U.S. at 25 n.6 (citations omitted). Likewise, the Supreme Court has indicated that emerging methodological questions must be resolved through case-by-case adjudication. *Rahimi*, 602 U.S. at 692 n.1 (declining to resolve an "ongoing scholarly debate" about an aspect of originalist methodology (citation omitted)); *Bruen*, 597 U.S. at 37 (same); *id.* at 81-2 (Barrett, J., concurring) (highlighting "two methodological points that the Court does not resolve") ("The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case."). *See generally Rahimi*, 602 U.S. at 713-14 (Gorsuch, J., concurring) ("Article III of the Constitution vests in this Court the power to decide only the 'actual cas[e]' before us, 'not abstractions.'" (cleaned up) (citation omitted)).[5]

---

[5] In *Rahimi*, decided just last Term, eight Justices joined the opinion of the Court holding that, on its face, a federal statute that prohibits individuals subject to a domestic violence restraining order from possessing a firearm does not violate the Second Amendment. 602 U.S at 702. Five of them filed separate concurring opinions (one joined by a sixth Justice), each of which put a distinct gloss on the manner in which courts ought to utilize historical evidence in future cases. *Compare id.* at 702 (Sotomayor, J., joined by Kagan, J., concurring), *with id.* at 708 (Gorsuch, J., concurring), *with id.* at 714 (Kavanaugh, J., concurring), *with id.* at 737 (Barrett, J., concurring), *with id.* at 740 (Jackson, J., concurring). A seventh Justice filed a dissenting opinion arguing that proper analysis of the historical record yields an opposite conclusion from the one the majority reached. *Id.* at 747 (Thomas, J., dissenting). Thus, many questions concerning the proper use of historical evidence in constitutional cases have yet to be conclusively answered.

In conducting the historical analysis in this case, the Court should follow specific directives from the Supreme Court or Ninth Circuit where they exist. And where there are gaps, it should adopt the methods that are most consistent with the goals that the Supreme Court has articulated for historical inquiry and that result in the most workable application of the legal standard.

> **2. Although Expert Witness Testimony Plays a Critical Role in Expounding the Historical Record, Plaintiff's Historical Evidence Is Not Limited to Such Testimony**

The State incorrectly asserts that Plaintiff's only source of evidence about the historical record is expert witness testimony. To date, the Supreme Court has not addressed the proper role of expert witness testimony in an inquiry concerning constitutional history and tradition, which is best understood as presenting mixed questions of law and fact. But its discussion of historical evidence in other cases makes clear that, sometimes, understanding the significance of legal authorities from the historical record will depend on understanding the social and legal context in which they arose, matters that an expert witness can help to elucidate. Other times, legal authorities from the historical record will speak for themselves.

The Supreme Court has explained, for instance, that pre-ratification history—from both England and the American colonies—is a critical component of history-and-tradition analysis. *See Bruen*, 597 U.S. at 20; *District of Columbia v. Heller*, 554 U.S. 570, 595-601 (2008). At the same time, it has cautioned that not all pre-ratification legal authority is probative evidence of the Constitution's meaning. In *Bruen*, it declared: "As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights. The common law, of course, developed over time. And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." 597 U.S. at 35 (citations omitted). "Even 'the words of Magna Charta'—foundational as they were to the rights of America's forefathers—'stood for very different things at the time of the separation

of the American Colonies from what they represented originally.'" *Id.* (citation omitted). *See also Rahimi*, 602 U.S. at 694 ("Through these centuries, English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic."); *id.* at 722 n.3 (Kavanaugh, J., concurring) ("[R]eflexively resorting to English law or history without careful analysis can sometimes be problematic because America had fought a war—and would soon fight another in 1812—to free itself of tyrannical British rule." (citations omitted)); *id.* at 723 ("The Equal Protection Clause provides another example. Ratified in 1868, that Clause sought to reject the Nation's history of racial discrimination, not to backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution.").

Similarly, while the Supreme Court has explained that "'examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification' [i]s 'a critical tool of constitutional interpretation,'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605), it has also said that litigants and courts must "guard against giving postenactment history more weight than it can rightly bear, *id.* at 35. Further, it has warned that some historical precedents are simply outliers that should be ignored. *See, e.g.*, *id.* at 65 ("We acknowledge that the Texas cases support New York's proper-cause requirement …. But the Texas statute, and the rationales set forth in [the Texas cases], are outliers.").

Here, expert witnesses can aid the Court in navigating the relevant historical record by contextualizing legal authorities and helping the Court to distinguish between those that are probative evidence of constitutional meaning and those that are outliers. In doing so, they add critical value. At the same time, some legal authorities have already been discussed to such an

extent by contemporary caselaw—or have an import that is so self-evident—that expert witness testimony is not necessary to expound their meaning or relevance. Plaintiff draws on both expert witness testimony and independent legal authority to support his claim.

Thus, the State incorrectly asserts that the "only affirmative evidence Plaintiff advances of a right to a medically indicated abortion comes from his expert Dr. Eppinger." Defs.' Mem. at 14. In fact, as explained below and in opposition to the State's motions to dismiss, Plaintiff's evidence includes legal authorities establishing well-settled rights to self-defense and treatment for serious medical needs. *See infra* at 18-22; Pl.'s Consolidated Resp. in Opp'n to Defs.' Mots. to Dismiss [Dkt. #33] at 20-21, 23-25. Plaintiff does not need expert testimony about these rights because their existence and contours are amply discussed in contemporary caselaw, which speaks for itself. *See infra* at 18-20. Testimony by Plaintiff's historical experts—Dr. Eppinger, who is an anthropologist of law, Pl.'s App. at 166 (Eppinger Expert Report ¶¶ 86-91), and Dr. Cohen, who is a historian, *id.* at 34-35 (Cohen Rebuttal Expert Report ¶¶ 52-58)—is offered to help the Court understand how these rights intersect with the practice of abortion and related medical interventions, the legal treatment of therapeutic abortion and related medical interventions, and the public's understanding of legal protection for therapeutic abortion and related medical interventions at relevant times in history.

### 3. Plaintiff's Evidence is Sufficient to Establish a Fundamental Right to Abortion Care for Therapeutic Reasons

The State's principal argument is that Plaintiff's experts concede that abortion for medical reasons was not described as a legal right before the twentieth century. *See* Defs.' Mem. at 10. This argument suffers from at least three fatal flaws: (1) the State mischaracterizes the testimony of Plaintiff's experts by improperly conflating use of the word *right* with the existence of a right in practice; (2) the legal standard requires evidence that a right existed in practice—*i.e.*, that it is

deeply rooted in the nation's history and tradition and implicit in the concept of ordered liberty, not evidence that the word *right* was historically used to describe the legal protection afforded to a practice; and (3) the historical record contains ample evidence that the right to therapeutic abortion is deeply rooted.

### a. The State Mischaracterizes the Testimony of Plaintiff's Experts by Improperly Conflating Use of the Word Right with the Existence of a Right in Practice

The State mischaracterize the testimony of Plaintiff's experts by improperly conflating use of the word *right* with "affirmative evidence of legal protections for any type of abortions." Defs.' Mem. at 12. While Plaintiff's experts acknowledge that the word *right* was not typically used to describe the legal protection afforded to therapeutic abortion, Pl.'s App. at 448-49 (Cohen Dep. Tr. 51:1-52:15), 460-61 (Eppinger Dep. Tr. 67:4-68:19), Dr. Eppinger's expert report is filled with evidence that, when performed with a therapeutic intent, abortion was consistently protected by the law—and immune from civil and criminal liability—from medieval times to the twentieth century, *id.* at 111-65 (Eppinger Expert Report ¶¶ 2-83). Dr. Cohen's expert report provides additional evidence of abortion's legally protected status when performed for medical reasons. *Id.* at 6-34 (Cohen Rebuttal Expert Report ¶¶ 6-49). This legal protection created a right in practice, even if it was not expressly characterized as such.

### b. The Legal Standard Requires Proof That a Right Existed in Practice

The State mischaracterizes the legal standard applicable in this case in two respects. First, it contends that the standard requires "legal description of abortion as a legal right before the 20th Century." Defs.' Mem. at 10. Then, it contends that the Court must "canvass[] the legal tradition at the time of the Fourteenth Amendment to determine whether the right has been affirmatively protected in the American legal tradition." *Id.* at 11. Neither contention is correct.

As explained above, in *Dobbs*, the Supreme Court held that an unenumerated right must

16

be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Supra* at 11 (quoting *Dobbs*, 597 U.S. at 231). This standard does not require express use of the word *right* to describe the legal protection afforded to a practice. Indeed, *Dobbs* confirmed the status of several unenumerated rights that could not satisfy that condition, including rights related to marriage, contraception, parenting, procreation, bodily integrity, and consensual sexual activity. *See Dobbs*, 597 U.S. at 257 ("[O]ur conclusion that the Constitution does not confer … a right [to abortion] does not undermine [those other unenumerated rights] in any way."); *id.* at 262 (describing as "unfounded" the fear that *Dobbs* will imperil the rights to "contraception"; "sexual conduct with [a] member of the same sex"; and "same-sex marriage"). Instead, *Dobbs* makes clear that proponents of a right must offer evidence of primary or secondary legal authorities demonstrating that the right existed in practice, which may include "state constitutional provision[s] or statute[s]"; "federal or state judicial precedent"; or "even … scholarly treatise[s]." *Id.* at 260.

Similarly, the Court's historical inquiry should not be limited to the time of the Fourteenth Amendment's ratification. As explained above, when seeking to determine the existence or scope of a constitutional right, courts must examine both pre- and post-ratification history. *Supra* at 13-14. For example, when determining whether the Second Amendment encompasses an individual right to bear arms, *Heller* surveyed pre-ratification "English history dating from the late 1600s, along with American colonial views leading up to the founding." *Bruen*, 597 U.S. at 20 (discussing *Heller*, 554 U.S. at 595). *Heller* then considered "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.* at 20 (quoting *Heller*, 554 U.S. at 605), relying on "four different types of sources": (1) three "founding-era legal scholars;" (2) nineteenth-century caselaw; (3) the congressional record and general public

discourse; and (4) "post-Civil War commentators," *id.* at 21.  Likewise, in assessing whether the Fourteenth Amendment encompasses a right to abortion generally, *Dobbs* began its historical inquiry with "Henry de Bracton's 13th-century treatise" on the common law, 597 U.S. at 242, and continued its "review of this Nation's tradition … for more than a century after 1868," the year that the Fourteenth Amendment was ratified, *id.* at 261.  Indeed, *Dobbs* expressly declares that its review of the historical record is not limited to "the legal status of abortion in the 19th century." *Id.* (citation omitted).

As explained below, Plaintiff's evidence is more than sufficient to establish that the right to therapeutic abortion satisfies the legal standard, properly understood, for an unenumerated constitutional right.  *Infra* at 18-30.

### c.   There is Ample Evidence That Therapeutic Abortion Enjoyed Substantial Legal Protection at All Relevant Times in History

#### i.   The Right to Therapeutic Abortion is Implicit in the Right to Self-Defense

It is beyond dispute that self-defense is a fundamental right in Anglo-American law.  *See McDonald*, 561 U.S. at 767 ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day …."). The Supreme Court has repeatedly explained that "individual self-defense is 'the *central component*' of the Second Amendment right" to bear arms. *Id.* (quoting *Heller*, 554 U.S. at 599); *accord Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). For centuries, the common law authorized use of deadly force when it was reasonably believed necessary to mitigate threats of death or serious bodily harm. *See, e.g.*, 1 William Blackstone, Commentaries *126 (1765) ("Both the life and limbs of a man are of such high value, in the estimation of the law of England, that it pardons even homicide if committed *se defendendo*, or in order to preserve them."). Today, every state allows use of deadly force against threats of death or serious bodily injury to oneself or a

third party.  Paul H. Robinson et al., *The American Criminal Code: General Defenses*, 7 J. Legal Analysis 37, 49-50, 53 (2015).  It would make no sense for the law to guarantee a person's ability to preserve their own or a third party's "life and limbs" through arms but not medical care.  Thus, therapeutic abortion is best understood as a form of medical self-defense, and its status as a fundamental right is as implicit in the concept of ordered liberty as self-defense generally.

### ii.  The Right to Therapeutic Abortion is Part of the Fundamental Right to Treatment for Serious Medical Needs

Likewise, the right to therapeutic abortion is part of a broader fundamental right to obtain treatment for serious medical needs without undue interference by the government.  History and tradition provide ample evidence of this right.  For example, it is well settled that the Eighth Amendment's prohibition on cruel and unusual punishment creates a governmental obligation "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).[6]  Deliberate indifference to the "serious medical needs of prisoners" therefore violates the Eighth Amendment. *Id.* at 104.  The existence of an Eighth Amendment right for prisoners to obtain treatment from the government for serious medical needs necessarily implies a pre-existing, fundamental right for people who are not in governmental custody to obtain treatment for serious medical needs without undue governmental interference.  If the government had the power to prohibit treatment for serious medical needs generally, then it could not constitute cruel and unusual punishment to deny such treatment to people who are incarcerated.[7]

---

[6] The Due Process Clause likewise requires the government to provide medical care to individuals who are in governmental custody for reasons other than a criminal conviction. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122-23 (9th Cir. 2018).

[7] Notably, prisoners' Eighth Amendment right to obtain treatment for serious medical needs encompasses needs related to both physical and mental health, including suicidal ideation. *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("In accordance with the other courts of appeals

Further, the well-established right to bodily integrity contributes to a zone of constitutional protection for medical decision-making and treatment. *See generally* MTD Decision at 32-33. Less than twenty-five years after ratification of the Fourteenth Amendment, the Supreme Court declared that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). This right is especially salient in the context of pregnancy-related complications, which if untreated, interfere with a pregnant person's possession and control of their body.

The law's historical treatment of the practice of medicine is consistent with its status as a fundamental right. English common law afforded special protection to medical practice. Henry de Bracton, who wrote an influential treatise on English common law during the medieval period, noted that a person who caused the death of another would be immune from liability for homicide if they were engaged in a lawful act and employed due care. Pl.'s App. at 131-32 (Eppinger Expert Report ¶ 32). This doctrine would have shielded from liability a caregiver whose patient died despite the caregiver's best efforts to cure or treat them. *Id.* Later, during the early-modern period, Sir Edward Coke and Sir Matthew Hale each detailed the legal protection that the common law afforded to medical practice in express terms, explaining that, as long as a health practitioner acted

---

that have examined this issue, we now hold that the requirements for mental health care are the same as those for physical health care needs."); *see also Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019) ("[A]n Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm, and this is met with deliberate indifference to their condition."); *Conn v. City of Reno*, 572 F.3d 1047, 1055 (9th Cir. 2009) ("A heightened suicide risk or an attempted suicide is a serious medical need."), *amended by* 591 F.3d 1081 (9th Cir. 2010), *cert. granted, judgment vacated, and case remanded by* 563 U.S. 915 (2011), *reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011).

with therapeutic intent, they were immune from liability for a patient's death. *Id.* at 134-35 (Eppinger Expert Report ¶ 37). Hale noted that a physician who administered medication was no different from a surgeon in this respect. *Id.*

Prior to the twentieth century, American law imposed little restriction on medical practice. As Professor Robertson explains:

> Medical practice was not regulated by the states in 1789 and not much more so in 1868. Medical licensure began in the 1830s, spurred by the drive to oust itinerant and irregular healers. But persons licensed to practice medicine had no restrictions placed on clinical judgment or on the products that they could use. The first federal drug law passed in 1914 to control non-medical drug abuse left physicians free to prescribe cocaine and opiates for legitimate medical purposes. The Food and Drug Administration, founded in 1906, did not begin to exercise pre-market approval of the safety and efficacy of drugs and biologics until the thalidomide scandal in 1962.

John A. Robertson, *Embryo Culture and the "Culture of Life": Constitutional Issues in the Embryonic Stem Cell Debate*, 2006 U. Chi. Legal. F. 1, 11 (2006) (footnotes omitted).

The State contends that states' police power to regulate the practice of medicine means that there cannot be a right to treatment for serious medical needs. Defs.' Mem. at 13. This argument is belied by Supreme Court precedent holding that "most rights" are "not unlimited." *Heller*, 554 U.S. at 626. For example, notwithstanding the Second Amendment right to bear arms, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *Rahimi*, 602 U.S. at 691. "Some jurisdictions banned the carrying of 'dangerous and unusual weapons.'" *Id.* (citation omitted). "Others forbade carrying concealed firearms." *Id.* (citation omitted). Similarly, notwithstanding the First Amendment right to free speech, a handful of "well-defined and narrowly limited classes of speech" are exempt from First Amendment protection, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), most notably: fighting words, *id.* at 572; speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); defamation, *Beauharnais v.*

*Illinois*, 343 U.S. 250, 254-55 (1952); obscenity, *Roth v. United States*, 354 U.S. 476, 485 (1957); true threats, *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (per curiam); incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (per curiam); fraud, *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976); and child pornography, *New York v. Ferber*, 458 U.S. 747, 763-64 (1982). And the government may subject even protected speech to content-neutral time, place, and manner restrictions in appropriate circumstances. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

### iii. Therapeutic Abortion Has Enjoyed Consistent Legal Protection from the Medieval Period Through the Twentieth Century

In accordance with these principles, therapeutic abortion has enjoyed consistent legal protection from the medieval period through the twentieth century. The common law never banned abortion *per se*. Rather, it took a nuanced approach to abortion that varied based on the stage of pregnancy, the method employed, and the reason for ending a pregnancy. *See* Pl.'s App. at 130-40 (Eppinger Expert Report ¶¶ 29-52). In the medieval period, Bracton reported that abortion performed by striking or poisoning a pregnant woman constituted homicide, "especially if [the fetus] is quickened," *id.* at 132 (Eppinger Expert Report ¶ 33), and abortion performed by "forcibly interfere[ing] with a woman's internal organs" constituted unlawful "wounding," an offense generally associated with injury by blade, *id.* at 133 (Eppinger Expert Report ¶ 35). These methods of abortion were considered irresponsible and were rarely, if ever, utilized by healthcare practitioners acting with therapeutic intent. *See id.* at 127-28 (Eppinger Expert Report ¶¶ 24-25). Bracton did not report any liability for using purgative medications to end a pregnancy or treat amenorrhea (without confirmation of pregnancy), a healthcare practice that was common in his time. *Id.* at 133-34 (Eppinger Expert Report ¶ 36) ("Regarding all pre-quickening emmenagogues and regarding the most common abortion practice of the time, medicinal abortion, the law is

silent."). Moreover, as noted above, he reported that someone engaged in a lawful act who exercised due care was immune from liability if his actions caused a death. *Supra* at 20.

Coke, writing in the seventeenth century, took the position that abortion after quickening is a misprision if the fetus died in utero, and murder if the fetus was born alive and died after birth. 3 Edward Coke, Institutes 50-51 (1644). Hale took a different position on the common law of abortion. He reported that abortion constitutes homicide only if it is performed with an intent to "destroy the child"—in contrast to "an intent to cure or prevent a disease"—and it results in the death of the pregnant woman. Pl.'s App. at 134-36 (Eppinger Expert Report ¶¶ 37-38). In Hale's view, death of a fetus alone could not support a common-law charge of murder at any stage of pregnancy, and abortion was not unlawful at all if performed with a therapeutic intent. *See id.* Dr. Eppinger explains that, "[a]s Hale's *Pleas of the Crowne* became a widely accepted working reference for lawyers and judges, his therapeutic intent doctrine became the standard statement of the common law on abortion." *Id.* at 136 (Eppinger Expert Report ¶ 39 (footnotes omitted)). Its reach extended beyond England to colonial America and the early American republic. Indeed, the Boston Public Library's copy is inscribed "John Adams 1760. John Quincy Adams 1800. George Washington Adams 1825." *Id.* (Eppinger Expert Report ¶ 39 n.110).

In the late nineteenth century, several American courts had occasion to consider whether a prospective parent could recover civil damages for the wrongful death of a fetus. *See, e.g.*, *Gorman v. Budlong*, 23 R.I. 169 (R.I. 1901); *Allaire v. St. Luke's Hosp.*, 76 Ill. App. 441 (Ill. App. Ct. 1898), *aff'd*, 184 Ill. 359 (Ill. 1900) (*per curiam*); *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14 (Mass. 1884) (Holmes, J.). All held that the death of a fetus is not compensable because a fetus is not a person under the common law or applicable statutes. *Gorman*, 23 R.I. at 707; *Allaire*, 76 Ill. App. at 450; *Dietrich*, 138 Mass. at 17. In *Dietrich*, Oliver Wendell Holmes, writing

for the Supreme Judicial Court of Massachusetts, held that fetal death was not compensable even if the fetus was born alive and lived briefly before dying. 138 Mass. at 15. He reasoned that Coke's treatise did not support the imposition of civil liability because, even if it was an accurate statement of the common law—which Holmes acknowledged was contested by Hale—it provided that criminal liability would lie only if the act causing the abortion occurred after quickening, "which, as this court has decided, means more than pregnant, and requires that the child shall have reached some degree of quasi independent life at the moment of the act." *Id.* at 16. He further reasoned that the Commonwealth's criminal abortion statute did not support the imposition of civil liability because it assigned lesser value to fetal life than maternal life. *Id.* at 17 ("[W]hile they greatly increase the severity of the punishment if the woman dies in consequence of the attempt, they make no corresponding distinction if the child dies, even after leaving the womb.").

Although, when the Fourteenth Amendment was ratified in 1868, twenty-eight out of thirty-seven states had enacted statutes criminalizing abortion in at least some circumstances, *Dobbs*, 597 U.S. at 248; *see id.* at 302-17 app. A, eighteen of these statutes contained express exceptions for abortions necessary to preserve the pregnant person's life. *See id.* at 302-17 app. A (New York; Ohio; Indiana; Maine; Alabama; Michigan; Virginia; New Hampshire; California; Iowa; Wisconsin; Kansas; Connecticut; Rhode Island; Nevada; West Virginia; Oregon; and Florida). None of these statutes distinguished self-harm from other threats to a pregnant person's life. *Id.* A nineteenth statute, Maryland's, contained an express exception for cases of incomplete miscarriage and cases in which abortion is necessary to "secure the safety" of the pregnant person. *Id.* at 316-17 app. A. Of the remaining nine statutes, five expressly applied only to abortions that were "unlawful," lacked "lawful justification," or were administered "feloniously." *Id.* at 306-13

app. A (Massachusetts; Vermont; New Jersey; Louisiana; and Pennsylvania).[8]

Significant historical evidence demonstrates that the foregoing statutes were generally understood to contain implied exceptions for all cases of serious medical need, including serious threats to both physical and mental health.[9]  *Rex v. Bourne*, (1938) 3 All E.R. 615 (Eng.), is particularly noteworthy.  An English case, it concerns a doctor charged with violating an 1861 Act of Parliament prohibiting "unlawful" abortions, which contained no express exceptions, by providing an abortion to a fourteen-year-old girl who had been raped.  *Id.*  The English statute is a contemporary of the American statutes cited in the *Dobbs* appendices.[10]  The reported opinion is comprised of the judge's instructions to the jury, which ultimately acquitted the doctor.  *See id*; *Roe v. Wade*, 410 U.S. 113, 137 (1973).  The judge explained that the statute at issue contained an implied exception for acts "done in good faith for the purpose only of preserving the life of the mother."  *Bourne*, 3 All E.R. at 617 ("Those words express what, in my view, has always been the

---

[8] In 1868, only six of the thirteen territories that would eventually become states had statutes that criminalized abortion in at least some circumstances.  *See Dobbs*, 597 U.S. at 324-27 app. B (Hawaii; Washington; Colorado; Idaho; Montana; and Arizona).  Five of these statutes contained express life exceptions that did not distinguish between the threat of self-harm and other threats to a pregnant person's life.  *Id.* (Hawaii; Washington; Idaho; Montana; and Arizona).

[9] All of the abortion bans enacted after 1868 contained express life exceptions.  *See Dobbs*, 597 U.S. at 317-23 app. A (Minnesota; Arkansas; Georgia; North Carolina; Delaware; Tennessee; South Carolina; Kentucky; and Mississippi); *id.* at 327-30 app. B (Wyoming; Utah; North Dakota; South Dakota; Oklahoma; Alaska; New Mexico; and District of Columbia).  The Wyoming, New Mexico, and District of Columbia statutes also contained express health exceptions.  *Id.* at 327-30 app. B.  None of these statutes excluded the risk of death or injury from self-harm.  *Id.* at 302-30 apps. A-B.

[10] The 1861 statute discussed in *Rex v. Bourne* was a successor of Lord Ellenborough's Act of 1803, the first Anglophone statute to regulate abortion.  *See* Pl.'s App. at 141 (Eppinger Expert Report ¶ 54).  Dr. Eppinger says of that statute:  "As finally passed, the statute criminalized only 'wilfully and maliciously' administering a substance with intent to procure miscarriage before quickening or 'wilfully, maliciously, and unlawfully' doing so after quickening.  These intent elements preserved and incorporated prior common-law doctrine on therapeutic intent, and they were retained in subsequent revisions of the criminal statute through the 1800s."  *Id.* at 141-42 (Eppinger Expert Report ¶ 55 (footnotes omitted)).

law with regard to the procuring of an abortion, and, although not expressed in s. 58 of the Act of 1861, they are implied by the word 'unlawful' in that section."). The judge further instructed the jury that there is not a firm boundary between preserving a person's life and preserving a person's health. *Id.* ("Life depends upon health, and it may be that health is so gravely impaired that death results."). He explained that, when a patient faces a risk of death, a physician need not wait until death is imminent to provide an abortion. *Id.* at 618.

The judge then went a step further and instructed the jury that, if continuing the pregnancy would cause serious harm to the pregnant person's physical or mental health, the implied life exception is satisfied. *Id.* at 619 ("[I]f the doctor is of opinion, on reasonable grounds and with adequate knowledge, that the probable consequence of the continuance of the pregnancy will be to make the woman a physical or mental wreck, the jury are quite entitled to take the view that the doctor, who, in those circumstances, and in that honest belief, operates, is operating for the purpose of preserving the life of the woman."). The judge also instructed the jury to take the risk of suicidal ideation into account. *Id.* at 619-20 ("Here you have the evidence of Dr. Rees, a gentleman of eminence in the profession, that, from his experience and his knowledge, the mental effect produced by pregnancy brought about by the terrible rape which Dr. Gorsky described to you must be most prejudicial …. So far as danger to life is concerned, you cannot, of course, be certain of the result unless you wait until a person is dead. Nobody suggests that the operation only becomes legal when a patient is dead."). Thus, *Rex v. Bourne* established that an abortion ban enacted by the British Parliament in 1861, seven years before ratification of the Fourteenth Amendment, contained an implied exception for abortions provided in good faith to preserve the life or physical or mental health of the pregnant person, including to mitigate the risk of suicide. *Id. See generally* Pl.'s App at 163-64 (Eppinger Expert Report ¶¶ 81-82); MTD Decision at 30-31.

American caselaw likewise indicates that nineteenth and early twentieth century abortion bans were commonly understood to contain implied, if not express, exceptions for abortions in cases of serious medical need.  In *Commonwealth v. Wheeler*, for example, the Supreme Judicial Court of Massachusetts held that, as a general matter, "a physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary *to save her life or to prevent serious impairment of her health, mental or physical*, and if his judgment corresponds with the general opinion of competent practitioners in the community in which he practises."[11]  53 N.E.2d 4, 5 (Mass. 1944) (emphasis added).  *See also Planned Parenthood Great Nw.*, 522 P.3d at 1218 (Zahn, J., dissenting) ("Idaho's history and traditions demonstrate that Idaho has historically permitted pregnant women to obtain an abortion to preserve their life or health."); *Gleitman v. Cosgrove*, 227 A.2d 689, 694 (N.J. 1967) (declining to reach the issue but noting that "[i]t may well be that when a physician performs an abortion because of a good faith determination in accordance with accepted medical standards that an abortion is medically indicated, the physician has acted with lawful justification within the meaning of our statute and has not committed a crime."); *People v. Abarbanel*, 48 Cal. Rptr. 336, 337-38 (Cal. Dist. Ct. App. 1965) (reversing a conviction for abortion) (holding that the prosecution failed to establish that the defendant physician possessed the requisite criminal intent where credible evidence established that the patient faced a risk of death from suicide); *State v. Dunklebarger*, 221 N.W. 592, 596 (Iowa 1928) (reversing a conviction for procuring a miscarriage) ("In order to justify the act of Dr. Wallace, it was not essential that the peril to life should be imminent. It was enough that it be potentially present, even though its full development might be delayed to a greater or less extent. Nor was it

---

[11] The relevant Massachusetts statute prohibited abortions provided "maliciously or without lawful justification" but did not contain express exceptions for acts done to preserve the pregnant person's life or health.  *Dobbs*, 597 U.S. at 306 app. A.

essential that the doctor should believe that the death of the patient would be otherwise *certain* in order to justify him in affording present relief.").[12]

In addition, the defenses of self-defense and necessity were available to those charged with providing abortions in cases of serious medical need—both under nineteenth and twentieth century abortion statutes and their common law antecedents. *See supra* at 18-19 (discussing self-defense); 4 William Blackstone, Commentaries *186 (1769) (discussing the defense of necessity); *United States v. Baily*, 444 U.S. 394, 409-10 (1980) (explaining that, at common law, "the defense of necessity, or choice of evils, . . . covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils."); MTD Decision at 31.

Notably, that the historical record in the United States is devoid of evidence that physicians were punished for providing therapeutic abortions. Professor Linton has published a "comprehensive list of *pre-Roe* abortion (and abortion-related) convictions that were affirmed on appeal." Paul Benjamin Linton, *Abortion Convictions Before Roe*, 36 Issues L. & Med. 77, 77 (2021) (footnote omitted). The appellate decisions he catalogs range in time from the 1840s to the 1970s. *Id.* The list includes a total of 693 convictions. *Id.* at 78. Fewer than one-third of these involve physicians. *Id.* Plaintiff's review of the cases where physicians' convictions were affirmed found that few, if any, involved circumstances in which abortion was performed to

---

[12] In *M'Culloch v. Maryland*, Chief Justice Marshall famously explained that the word "necessary" in the Constitution's Necessary and Proper Clause, does not require "absolute physical necessity," but instead requires a reasonable fit between means and ends. 17 U.S. 316, 413-14 (1819) ("If reference be had to [use of the word necessary] in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."). This early American understanding of the term "necessary" supports a broad reading of nineteenth and early-twentieth century statutes authorizing abortions that are "necessary to preserve" a person's life as encompassing all abortions performed in cases of serious medical need.

preserve a pregnant person's health.[13]  To the contrary, many decisions suggest that a conviction could not be sustained in such circumstances.  *See, e.g.*, *Commonwealth v. Brunelle*, 171 N.E.2d 850, 852 (Mass. 1961) ("It required the Commonwealth not only to prove the facts of the abortion but also to disprove either an honest belief on the part of the defendant that he acted to preserve the life or health of the woman or that his judgment conformed to that of competent fellow practitioners.  Where the defendant is not a physician the mere proof of his act ordinarily would be sufficient to establish its unlawfulness … but in the case of a licensed physician the proof of these negatives would depend on the circumstances in which the abortion was performed." (citations omitted));  *State v. Boozer*, 291 P.2d 786, 787 (Ariz. 1955) ("Taking the evidence as a whole, construed in a light most favorable to the state, the jury was fully justified in finding that Dora Jean Williams, accompanied by her husband, came to defendant for the purpose of procuring a criminal abortion, this without any regard to whether she needed it for the sake of her health."); *Anderson v. Commonwealth*, 58 S.E.2d 72, 75 (Va. 1950) ("By his own testimony it is disclosed that he administered a medicine by hypodermic needle for the express purpose of causing the expulsion of the fetus. It is true he said he did this as a protection to her health, but the jury were well warranted in not accepting that statement."); *People v. Darrow*, 298 P. 1, 6 (Cal. 1931) ("The question would not, in the first instance, necessarily incriminate the appellant if, as a matter of fact, acting in good faith, appellant attempted to empty the uterus in the interest of the health or for the preservation of the life of the patient.").

The American abortion statutes enacted in the mid-nineteenth century were largely the product of a nationwide lobbying campaign by the newly formed American Medical Association and its formally trained physician members (generally referred to as "regulars" in contrast to

---

[13] Plaintiff's counsel was unable to locate and review five of these cases.

midwives and other healthcare practitioners who lacked medical school training).  *See* Pl.'s App. at 156-57 (Eppinger Expert Report ¶¶ 74-75), 7, 21, 22 (Cohen Rebuttal Expert Report ¶¶ 9, 28, 30).  The campaign focused on outlawing so-called "criminal abortion."  *Id.* at 156-57 (Eppinger Expert Report ¶¶ 74-75).  Discourse within the medical community during this period makes clear that the regular physicians did not intend the statutes for which they were lobbying to limit their ability to provide therapeutic abortions nor understand the enacted statutes to have that effect.  *See id.* at 6-10 (Cohen Rebuttal Expert Report ¶¶ 8-14).  For example:

> The very doctor who oversaw the American Medical Association's national lobbying campaign of 1860 to tighten anti-abortion laws, Dr. Horatio R. Storer of Boston, wrote about what he thought were justifiable reasons to take pregnancy-ending medical actions in 1860 in a professional publication and again in 1866 in a book for the general public. To medical colleagues, he listed severe thoracic and cardiac threats to the mother's life, uterine cancer, contracted pelvis, diseases of the placenta, puerperal convulsions, obstinate vomiting, edema, as well as malformations and "monstrosities" of the fetus.  In the popular publication, he added a broader consideration: "general ill-health, where there is perhaps a chance of a patient becoming an invalid for life; and cases of insanity, of epilepsy, or other mental lesion, where there is fear of transmitting the malady to a line of offspring."

*Id.* at 7-8 (Cohen Rebuttal Expert Report ¶ 9).  In the late-nineteenth and early-twentieth centuries, articles about therapeutic abortion filled medical journals.  *Id.* at 9-10 (Cohen Rebuttal Expert Report ¶¶ 12-13).  Notably, in the 1910-20s, journals of state and regional medical societies followed a custom of printing the prior year's board exams for licensing, as a study aid.  *Id.* at 10 (Cohen Rebuttal Expert Report ¶ 13).  In the Northwest Medicine Journal (published jointly by state medical societies in Idaho, Washington, and Oregon), an essay exam question in 1911 asked: "Under what circumstances may a physician be justified in producing an abortion, and how is the operation performed."  *Id.*  As Dr. Cohen explains:  "This tells us that the distinction between criminal and therapeutic abortions was a standard part of the medical schools' curriculum, along with instruction in how to accomplish a safe abortion."  *Id.*

#### iv. The State's Attempts to Undermine Dr. Eppinger's Testimony Are Unavailing

The State takes issue with three aspects of Dr. Eppinger's testimony.  First, it contends that she "relies primarily on the history of a medical treatment (administering emmenagogues) that is not abortion, was not generally thought of as causing abortion, and was not administered for the purpose of causing an abortion."  Defs.' Mem. at 15.  But whether emmenagogic treatment may cause an abortion or was historically thought to cause abortion are issues of material fact that may not be resolved on summary judgment.  *See supra* at 2-3.  Dr. Eppinger asserts that health practitioners in the early-modern period "routinely administered compounds to induce menstruation knowing they might expel a *conceptus* or *fetus.*"  Pl.'s App. at 134-35 (Eppinger Expert Report ¶ 37); *see also id.* at 140 (Eppinger Expert Report ¶ 51).  And Dr. Cohen explains that this practice continued well into the nineteenth century.  *Id.* at 27-30 (Cohen Expert Report ¶¶ 39-42).  Indeed, after detailing specific examples documented in medical textbooks, journal articles, and private correspondence, she concludes:  "In short, highly respectable doctors in the late 1850s were applying the humoral theory described by Monica Eppinger to patients by treating them for blocked periods, accepting the risks of ending a few very early pregnancies, and even feeling confident (in the case of Dr. Bowditch) to make child-spacing decisions with (or for) their patients."  *Id.* at 29 (Cohen Rebuttal Expert Report ¶ 42).

Second, the State criticizes the inferences that Dr. Eppinger draws from the doctrines reported by Bracton and Hale.  Defs.' Mem. at 16.  Presumably, the State's expert draws different inferences.  But on a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party.  *Supra* at 2-3.  Only at trial may the Court determine which side's evidence concerning how to contextualize these archaic legal authorities is more persuasive.

Third, the State asserts that Dr. Eppinger's testimony overall "blends flawed inference

upon flawed inference." Defs.' Mem. at 17. As an initial matter, the State greatly mischaracterizes Dr. Eppinger's testimony, as the discussion of the historical record above makes plain. *See supra* at 20-30. But more importantly, this argument fails for the same reason as the previous one: At this stage of the proceedings, the Court must view all evidence in the light most favorable to the nonmoving party. *Supra* at 2-3. When viewed in that light, Dr. Eppinger's testimony, together with Dr. Cohen's testimony and the other legal authorities presented by Plaintiff, provides a sufficient basis for the Court to conclude that the right to therapeutic abortion is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.

### B. Alternatively, the Abortion Bans Are Arbitrary and Irrational as Applied to Medically Indicated Abortion Care

The State contends that the Abortion Ban's application in cases where a family learns that their embryo or fetus has a condition that is incompatible with life is supported by

> legitimate interests include[ing] respect for and preservation of prenatal life at all stages of development, … the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

Defs.' Mem. at 20 (quoting *Dobbs*, 597 U.S. at 301).[14]

But these interests are not rationally advanced in cases where the embryo or fetus does not have a realistic chance of surviving past childbirth. *See, e.g.*, Pl.'s App. at 44-45, 47-51 (Dahl Expert Report ¶¶ 11-12, 19-33), 451, 456, 458 (Dahl Dep. Tr. 61:11-14, 66:3-8, 68:14-22). The State argues that the Abortion Bans are rational because they permit doctors to remove an embryo or fetus that dies in utero. Defs.' Mem. at 21. This argument misses the point. The record

---

[14] The State also makes arguments about genetic conditions that result in disabilities but are not incompatible with life. *See* Defs.' Mem. at 21. These arguments are not relevant to Plaintiff's claims because Plaintiff is not seeking relief from the Abortion Bans in these circumstances.

establishes that weeks or months may elapse between the time when a fatal fetal condition is diagnosed and the time when embryonic or fetal death occurs.  Pl.'s App. at 464-68 (Kraus Dep. Tr. 156:7-160:12).  It is arbitrary and irrational to force a pregnant person to endure the risks of pregnancy during that interval when the embryo or fetus has a fatal condition.  Plaintiff is seeking relief from the Abortion Bans that would enable him to terminate a pregnancy promptly after diagnosing a fatal fetal condition, if termination is what his patient wants.

Likewise, these interests are not rationally advanced in cases where a multifetal pregnancy reduction would give one or more embryos or fetuses a meaningful chance of survival when they would otherwise have none.  *See id.* at 73-75 (Eller Expert Report ¶¶ 30-37), 293-94 (Seyb Decl. ¶¶ 73-79), 495 (Smid Dep. Tr. 74:5-17).  The State contends that its interest in preserving prenatal life permits it to condemn all developing embryos and fetuses to death rather than allowing some to have a chance at life.  But this is the very definition of irrational.  Nor is it rational to hope that that a miracle will enable some embryos or fetuses to survive when all available evidence demonstrates that a medical intervention is necessary.  *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (explaining that a statute may withstand rational basis scrutiny only if the legislative facts on which it is based "rationally may have been considered to be true by the governmental decisionmaker").  In these heartbreaking cases, the State simply has no legitimate interest in overriding the decision of parents of a wanted pregnancy about how best to maximize the chances of at least one child being successfully delivered and thriving after birth.

Finally, the State misses the mark in arguing that the interests cited above support application of the Abortion Bans in cases where an embryo or fetus has a condition that, although incompatible with sustained life, may allow it to live for a brief time after birth.  *See* Defs.' Mem. at 20.  The State may not advance its interests in a way that differentiates between the welfare of

an embryo or fetus and the welfare of a pregnant person because such differentiation is not rational. For instance, the State's interest in respect for and preservation of prenatal life is a subset of a broader interest in life. The State cannot rationally advance that interest in a way that disrespects or fails to preserve postnatal life. Similarly, the State's interest in mitigating fetal pain is a subset of a broader interest in mitigating pain. The State cannot rationally advance that interest in a way that augments pregnant people's pain.

Defendants cannot seriously contest what common sense and the evidentiary record make clear: When someone with a wanted pregnancy receives the devastating news that their embryo or fetus has a condition that is incompatible with life, forcing them to remain pregnant for weeks or months against their will only to watch their child experience intense suffering and death in infancy subverts the very interests the State seeks to advance. It disrespects maternal life, undermines maternal health, and imposes extraordinary pain and suffering on those already experiencing loss. *See* Pl.'s App. at 277-78 (Seyb Decl. ¶ 13). Likewise, it is beyond dispute that forcing doctors to turn their backs on pregnant patients' pain and suffering and ignore their pleas for help is a gruesome and barbaric medical practice that undermines the integrity of the medical profession. *See id.* at 278 (Seyb Decl. ¶ 14) (discussing the principles of medical ethics). Further, it is undeniable that the practice has a disparate impact on women and gender minorities, compelling them to endure physical and psychological torment because of their gender-specific capacity for pregnancy.

In sum, banning abortion in cases where a developing embryo or fetus has a condition that is incompatible with life, or a multifetal pregnancy reduction would give one or more embryos or fetuses a meaningful chance of survival when they would otherwise have none, fails to rationally advance any legitimate state interest. The Court should reject Defendants' contrary arguments.

**IV.    The State is Not Entitled to Summary Judgment on Plaintiff's Equal Protection Claim**

The Equal Protection Clause commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The constitutional injury here arises from singling out one class of life-threatening conditions, mental health conditions that put pregnant individuals at risk of death from self-harm, for categorical exclusion from life-saving medical care. Under the Ban Throughout Pregnancy, a pregnant patient whose life is endangered by a mental health condition cannot obtain a lawful abortion in Idaho, while a pregnant patient facing death from any other medical condition can. *See* Idaho Code § 18-622(2)(a)(i). The differential treatment of "mental" and "physical" conditions is arbitrary, medically unsound, and constitutionally impermissible. *See* MTD Decision at 38.

### A.    People With Life-Threatening Mental Health Conditions Are Similarly Situated to People With Other Life-Threatening Conditions

The distinction between patients whose risk of death arises from mental illness and patients whose risk arises from other conditions has no medical foundation. As Dr. Smid explains, Idaho's framework rests on a "fundamental misunderstanding about mental health." *See* Pl.'s App. at 312 (Smid Expert Report ¶ 67). "Mental health," she continues, "is the addressing of physical conditions—changes in neurotransmitter levels, receptor changes and hormone levels." *Id.* Like other specialties, psychiatry and addiction medicine treat pathologies that are rooted in a patient's anatomy and physiology. *See id.* 312-13 (Smid Expert Report ¶ 67).

This Court must view the facts in the light most favorable to Plaintiff, *supra* at 2-3, which means accepting the opinions of Plaintiff's experts that, with respect to medically indicated abortion, "[t]here is no medical reason to treat medical conditions that have symptoms that can cause self-harm differently from other medical conditions," Pl.'s App. at 313 (Smid Expert Report ¶ 68), and that Idaho's distinction is as senseless as forbidding abortion when a diabetic patient's

life is at risk from diabetes, but allowing it when the patient's life is at risk from another illness, *id.* at 487 (Payne Dep. Tr. 82:13-23) ("From my perspective as a psychiatrist, it's like the law is written and it says persons with gestational diabetes cannot receive abortion care. I think it's discriminatory against mental health conditions.").  The distinction advanced by the State comes from stigma, not from science, given that a "patient cannot rely on will power to overcome a serious mental health condition like depression any more than a patient can rely on will power to overcome a serious condition like cancer." *Id.* at 313 (Smid Expert Report ¶ 68); *accord id.* at 292 (Seyb Decl. ¶ 68).  Defendants' position is particularly chilling because suicide and overdose are among the leading causes of death for pregnant and post-partum people.  *Id.* at 312 (Smid Expert Report ¶ 66); *see id.* at 185-86 (Payne Rebuttal Expert Report ¶ 9).  Indeed, in Idaho, mental health conditions comprise the leading underlying cause of maternal mortality.  *Id.* at 185-86 (Payne Rebuttal Expert Report ¶¶ 8-9), 292 (Seyb Decl. ¶ 66), 312 (Smid Expert Report ¶ 66).

Defendants' twin assertions—that self-harm by definition is different because (1) it is not limited to any specific physical condition and (2) it comes from the affirmative actions of patients—rely on disputed facts.  Defs' Mem. at 23.  Plaintiff's evidence shows that self-harm and suicidality are symptoms of underlying, diagnosable illnesses like major depressive disorder, bipolar disorder, schizoaffective disorder, and substance use disorder, among others.  Pl.'s App. at 475-76 (Payne Dep. Tr. 22:24-23:6), 494 (Smid Dep. Tr. 73:5-14).  They are no different from symptoms that emerge from physical conditions in this respect.  Indeed, clinicians evaluate risks related to suicide and self-harm through standardized, evidence-based protocols like structured interviews, validated scales, clinical histories, and corroborating information, just as they assess

risks related to pain, fatigue, and nausea. *See id.* at 186 (Payne Rebuttal Expert Report ¶¶10-11).[15]

Likewise, the State's claim that "self-harm causes injury only through an affirmative act by the patient" demonstrates a fundamental misunderstanding of medical causation. Defs.' Mem. at 23. The cause of suicide is untreated or inadequately treated mental illness, just as the cause of death from diabetic ketoacidosis is untreated or inadequately treated diabetes. In both cases, a patient's actions may contribute to the progression of illness, but in neither case can a patient overcome the illness on their own, without medical intervention.

For these reasons, courts consistently recognize mental health conditions and suicidality as serious medical needs. *See supra* at 19-20 n.7 (citing Ninth Circuit cases); *see also Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) ("[T]he extension of the eighth amendment's protection from *physical* health needs…to *mental* health needs is appropriate because, as courts have noted, there is "'[n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.'" (citation omitted)); *Colburn v. Upper Darby Tp.,* 946 F.2d 1017, 1023 (3d Cir. 1991) ("[A] 'particular vulnerability to suicide' represents a 'serious medical need.'" (citations omitted)).

Denying care because a patient's illness might "require her own act" would be absurd in any other context. Imagine a law that bars doctors from using an effective means to treat a seizure disorder because the body *injures itself* during a seizure, or a law that bars doctors from using an

---

[15] *See also* Pl's App. at 187 (Payne Rebuttal Expert Report ¶ 14 n.11) (citing relevant medical literature), 192 (Payne Rebuttal Expert Report ¶ 25 & n.27) (same), 199 (Payne Rebuttal Expert Report ¶ 49 n.49) (same); *see also id.* at 199-200 (Payne Rebuttal Expert Report ¶ 50) ("For some patients, the onset of mental health conditions during pregnancy occurs because of sensitivity to fluctuations in hormones, including levels of progesterone and estrogen, that occur during pregnancy and postpartum ….[M]y research has identified two biomarkers of this trait that can be identified in a blood sample and predict with 80% accuracy which women will become depressed during the perinatal time period.").

effective means to treat diabetes because a patient's diet may contribute to the progression of the disease. These hypothetical laws are plainly arbitrary and irrational, as is a law that bars doctors from using an effective means to eliminate a patient's risk of death from self-harm.

### B. The Statutory Classification Cannot Withstand Any Level of Scrutiny

As explained above, the Ban Throughout Pregnancy infringes on the fundamental right to therapeutic abortion. *See supra* at 10-32. Accordingly, the statute's classification is subject to heightened scrutiny. *City of Cleburne*, 473 U.S. at 440. However, even if this Court were to apply rational-basis review, the classification would fail.

The Supreme Court has long held that a "[s]tate may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *see also Zobel v. Williams*, 457 U.S. 55, 61-64 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). Deference is not abdication and "'rational-basis scrutiny' is still scrutiny." *Silveira v. Lockyer*, 312 F.3d 1052, 1088-89 (9th Cir. 2002) (quoting *Nordlinger*, 505 U.S. at 31 (Stevens, J., dissenting)), *as amended* (Jan. 27, 2003), *abrogated on other grounds by Heller*, 554 U.S. at 570; *id.* at 1089 ("Although the government is relieved of providing a justification for a statute challenged under the rational-basis test, such a justification must nevertheless exist, or the standard of review would have no meaning at all."). In *Navarro v. Block*, 72 F.3d 712, 717 (9th Cir. 1995), the Ninth Circuit reversed entry of summary judgment for the defendants, holding that a factfinder could conclude that differential treatment of 911 callers reporting domestic violence and 911 callers reporting other crimes was irrational.

The only purported justification the State offers for treating pregnant people at risk of death from self-harm differently than pregnant people at risk of death from other causes is that other treatments exist for suicidality and self-harm besides termination of pregnancy. But alternative treatments exist for other conditions, too. Pl's App. at 285 (Seyb Decl. ¶ 39); *see* MTD Decision

at 39.  Further, Plaintiff's evidence demonstrates that alternative treatments are not effective in all cases where mental illness complicates or is exacerbated by pregnancy.  Plaintiff's experts explain, for example, that psychiatric interventions often take weeks or months to become effective and cannot always avert risk during pregnancy.  *Id.* at 481 (Payne Dep. Tr. 59:7-8) ("Psychiatric medications, in general do not work very quickly."), 486 (Payne Dep. Tr. 64:2-11) ("In pregnancy, it's very hard to titrate lamotrigine because you can only increase it every two weeks and by the time you get to two weeks, estrogen levels have increased, which decreases the amount of lamotrigine that the woman is taking. So yes, we can adjust medications, and sometimes that helps, but sometimes it doesn't. And it depends on the medication, the woman, the stage of pregnancy, etc.").  The State's assumption that alternative therapies or hospitalization always suffice is contrary to the evidence and therefore irrational.  Plaintiff's experts are clear that, while alternative therapies may be appropriate for some patients, they are not appropriate for all patients.  *See id.* at 310 (Smid Expert Report ¶ 55) (noting that Idaho has "extremely limited" options for residential treatment of substance use disorder), 482 (Payne Dep. Tr. 60:13-14) ("[T]here are conditions and situations that might preclude hospitalization."); *see also id.* at 475 (Payne Dep. Tr. 22:15-18) (explaining that not all women can be effectively treated for psychosis), 477-78 (Payne Dep. Tr. 24:22-25:1) (same for self-harm), 480 (Payne Dep. Tr. 27:12-14) (same for suicidality).

Moreover, disdain for people with mental illness cannot serve as a legitimate basis for state action.  *See City of Cleburne*, 473 U.S. at 450 (finding an equal protection violation where state action "appears to us to rest on an irrational prejudice against" people with developmental disabilities).  The State's claim that suicidality can be "professed by anyone" reflects precisely the kind of irrational animus and ignorance of psychiatry condemned in *Cleburne*.

Nor can the State's interest in "preserving life"—not mentioned as a basis for the

challenged classification—rationally justify denying life-saving treatment to pregnant people suffering from mental illness.  Idaho's own Maternal Mortality Review Committee found that the most common underlying cause of maternal death in Idaho in recent years was mental-health conditions, encompassing deaths related to suicide, substance-use disorder, and other types of self-harm.  Pl.'s App. at 292 (Seyb Decl. ¶ 66), 312 (Smid Expert Report ¶ 66), 185-86 (Payne Rebuttal Expert Report ¶¶ 8-9).  It is the height of irrationality for Idaho to exclude from the class of people authorized to obtain life-saving abortions those most at risk of pregnancy-related death.

Finally, the State's reliance on a snippet from the oral argument in *Moyle v. United States*, falls short.  Defs.' Mem. at 24 (citing Oral Argument Tr., *Moyle v. United States*, Nos. 23-726, 23-727 at 78-79 (U.S. Apr. 24, 2024).  Then-U.S. Solicitor General Prelogar did not argue that abortion is never indicated to treat mental health conditions during pregnancy—only that abortion is not typically used to treat mental health *emergencies* during pregnancy, given the case's focus on the scope of emergency treatment required by EMTALA.[16]  In any event, the federal government is not a party to this case, and statements made by the U.S. Solicitor General in a different case cannot bind Dr. Seyb here.  Rather, the Court must look to the evidentiary record compiled in this case when evaluating the merits of Plaintiff's constitutional claims.  *See generally supra* at 12 (discussing the principle of party presentation).

## CONCLUSION

For the reasons set forth above, the Court should deny the State's motion for summary judgment.

---

[16] *Moyle v. United States*, No. 23-726, oral argument tr. (U.S. Supreme Court, April 24, 2024) https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-726_ggco.pdf, p. 77, ln. 21-24.

Dated:  November 12, 2025

*/s/ Stephanie Toti* _____
Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine Street, No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

*Attorneys for Plaintiff*

41

## CERTIFICATE OF SERVICE

I hereby certify that, on November 12, 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/ *Stephanie Toti*
Stephanie Toti