Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D., | ) | Case No.: 1:24-cv-00244-BLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S APPENDIX** |
| v. | ) | |
| | ) | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS

Declaration of Patricia Cline Cohen, Ph.D. ....... App. 1

Declaration of Carly Dahl, M.D. ....... App. 40

Declaration of Alexandra G. Eller, M.D. ....... App. 64

Declaration of Monica Eppinger, Ph.D. ....... App. 107

Declaration of Jennifer Payne, M.D. ....... App. 180

Declaration of Danielle Prentice, D.O. ....... App. 255

Declaration of Stacy Seyb, M.D. ....... App. 275

Declaration of Marcela Smid, M.D. ....... App. 295

Expert Report of Elena Kraus, M.D., Ph.D., MSCI, FACOG (excluding Exhibit A) ....... App. 355

Defendants Members of the Idaho Board of Medicine Responses to Plaintiff's First Set of Interrogatories, Requests for Production, and Requests for Admission ....... App. 421

Transcript of the Deposition of Patricia Cline Cohen, Ph.D. (excerpted) ....... App. 447

Transcript of the Deposition of Carly Dahl, M.D. (excerpted) ....... App. 450

Transcript of the Deposition of Monica Eppinger, J.D., Ph.D. (excerpted) ....... App. 459

Transcript of the Deposition of Elena Kraus, M.D., Ph.D., MSCI, FACOG (excerpted) ....... App. 462

Transcript of the Deposition of Jennifer Payne, M.D. (excerpted) ....... App. 471

Transcript of the Deposition of Stacy Seyb, M.D. (excerpted) ....... App. 488

Transcript of the Deposition of Marcela Smid, M.D. (excerpted) ....... App. 493

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D., | ) | Case No.: 1:24-cv-00244-BLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF** |
| v. | ) | **PATRICIA CLINE COHEN,** |
| | ) | **PH.D.** |
| MEMBERS OF THE IDAHO BOARD OF | ) | |
| MEDICINE, in their official capacities; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

PATRICIA CLINE COHEN, PH.D., hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. A historian, I have studied the history of abortion and abortion regulation, with a particular focus on the nineteenth and early twentieth centuries. Earlier this year, I convened a research conference that took place at the Huntington Library titled "Abortion in American History: Intimate Decisions, Medical Knowledge, and Legal Decrees in the Two Centuries before *Roe v. Wade*."

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). The statements in the expert report are true and correct to the best of my knowledge. It provides a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/10/2025

Signed by:
Patricia Cline Cohen
FD3C2726F8FF47D...
Patricia Cline Cohen, Ph.D.

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al*.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:24-cv-00244-BLW |

**REBUTTAL EXPERT REPORT OF PATRICIA CLINE COHEN, PH.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), PATRICIA CLINE COHEN, PH.D., makes the following disclosures:

1. I am a historian who has studied the history of abortion and abortion regulation in the United States, with a particular focus on the 19th and early 20th centuries.

2. I intend to offer testimony rebutting the opinions of Professor Joseph Dellapenna, one of Defendants' experts.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

***Introduction***

3. Professor Joseph Dellapenna's expert witness report is recycled, sometimes verbatim, from his amicus brief submitted in *Casey* in 1992 and again in *Dobbs* in 2021. He presents a tenuous straw-man argument Dellapenna Expert Report ¶ 19, accusing a group of historians of holding to an "orthodoxy" virtually unchanged over 50 years, yet his own argument remains wedded to the same set of data points he relied on 35 years ago. He accuses a conjured coterie of historians of "deliberate distortions," even of lying in one case, when his accusations themselves demonstrably arise from his own deliberate distortions of selective quotation. He has

constructed an "orthodoxy" on abortion history and dismisses it as an anti-male polemic which sees "the story of abortion as male oppression of women so dear to contemporary advocacy about abortion history." Dellapenna Exprt Report ¶ 19 n.54. Apparently, the trope from the1970s that feminism is mainly a denigration of men is a piece of misogyny not entirely gone from the culture.

4. Dellapenna's distortions and charges call into serious question the reliability of his testimony. His fixation on the debate circa 1970-1990 prevents him from seeing what is new and relevant in Professor Monica Eppinger's expert witness report about the long history of menstrual regulation and its relationship to abortion. It also prevents him from recognizing relevant new research. Had he done so, he would not have evinced such incredulity at, and apparent unawareness of, the vast paradigm shift in medical knowledge and practice that historians of medicine concur was taking place across the nineteenth century in the U.S. and as detailed in the Eppinger expert witness report (as, for example, he does in referring to such change as "a fable"). Dellapenna Expert Report ¶36. Aside from a few citations to the 2021 Historians' amicus brief filed in *Dobbs*, there are only five citations in his entire report to works published in the 21st century, works he summarily dismisses as being repeats of the old orthodoxy. Dellapenna Expert Report ¶¶ 16 nn.35-36, 53 n.205. He is seriously out of date.

5. Most surprisingly, Professor Dellapenna ignores the historical record concerning the practice and regulation of therapeutic abortion in the United States, so central to this case. He fails to acknowledge that therapeutic abortion was exempted right at the start of the wave of U.S. statutes criminalizing abortion in the early nineteenth century. Up to and through modern times, the therapeutic exception has been left in the hands of licensed physicians.

***Professor Dellapenna Overlooks Critical Evidence About the Practice and Regulation of Therapeutic Abortion in the Nineteenth and Early-Twentieth Centuries***

6. Near the end of the 1820s, the first decade of statutory regulation of abortion in the United States, the New York legislature wrote the first therapeutic exception into U.S. law, allowing termination of a pregnancy if "the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose."

7. A therapeutic exception has been part of U.S. state criminal codes ever since, with most state laws after 1830 allowing provision for physicians' discretion to perform medically indicated abortions. Idaho's earliest law required only a single physician, who "deems it necessary to produce the miscarriage of any woman in order to save her life.[1] Two state statutes (Colorado, 1868, and Wyoming, 1869) went beyond the narrowly stated intent to save the mother's life to include the prevention of "serious and permanent bodily injury" to the mother. Legislatures did not define what it meant to save a woman's life, nor did they offer lists of acceptable exceptions. They, along with police and judges, accepted the professional judgment of physicians.

8. Medical journals and textbooks provided outlets for physicians to confer about standards of treatment that might require induced abortion. In the mid-19th century, hyperemesis, severely excessive vomiting, was a threatening condition high on the list. Dr. Gunning Bedford of New York City, a devout Catholic on record as opposing all abortion on religious grounds, was called to an afflicted and wasted patient in 1847 and immediately used an instrument to empty her uterus. He wrote in detail about his fast-acting decision in a lecture delivered to his medical students and was soon surprised to find the entire lecture printed on the front page of the

[1] Rev. Stat. 1875-1875, ch IV, section 42.

New York *Herald*, then an irreverent and sensationalist two-penny paper. Shocked objections were raised by other doctors in New York and Boston to the public airing of a graphic description of how to do an abortion, but there was no challenge to Dr. Bedford's medical judgment. The doctor reported that hydatids emerged from the woman's uterus, a growth today called a hydatidiform mole, formed when abnormal cells proliferate from a fertilized egg; it can grow into a mass that mimics mid-stage pregnancy. When he first took action, he could not have known it would turn out to be a blighted pregnancy. He proudly included it in his lectures for students.[2]

9. The very doctor who oversaw the American Medical Association's national lobbying campaign of 1860 to tighten anti-abortion laws, Dr. Horatio R. Storer of Boston, wrote about what he thought were justifiable reasons to take pregnancy-ending medical actions in 1860 in a professional publication and again in 1866 in a book for the general public. To medical colleagues, he listed severe thoracic and cardiac threats to the mother's life, uterine cancer, contracted pelvis, diseases of the placenta, puerperal convulsions, obstinate vomiting, edema, as well as malformations and "monstrosities" of the fetus. In the popular publication, he added a broader consideration: "general ill-health, where there is perhaps a chance of a patient becoming

---

[2] Bedford was probably the most prominent and active physician of the 1840s decrying abortion; see Joseph G. Ryan of Villanova University, "Doctor Gunning S. Bedford (1806-70) and the Search for Safe Obstetric Care, 1833-70," *Journal of Medical Biography* 2008; 16: 134– 143. Ryan does not mention this incident of a therapeutic abortion. "Medical. New York University," *New York Herald*, Feb. 13, 1848. Original pamphlet is Bedford, *A Lecture Introductory to a Course on Obstetrics* (New York, Joseph H. Jennings, Printer, Nov. 1847), 17-18. (HathiTrust) Dr. Edward Dixon in New York sent the Herald clipping to the *Boston Medical and Surgical Journal*, calling for a Grand Jury investigation: "Is the Professor desirous of obtaining the business of Madame Restell?" "Dr. Bedford's Lecture," *BMSJ*, vol. 38 (March 8, 1848), 115-18. Dr. Dixon came around, and along with Austin Flint, medical editor in Buffalo, praised Bedford's skill in undertaking this necessary abortion; E.H. D., "Dr. Bedford's Reply," *BMSJ* March 15, 1848, p. 146; A Flint, "Introductory Lectures," *Buffalo Medical Journal*, Vol. 3 (1848), 716-17.

an invalid for life; and cases of insanity, of epilepsy, or other mental lesion, where there is fear of transmitting the malady to a line of offspring."[3]

10. Storer lived in Massachusetts where the abortion statute did not specify that the life of the mother had to be at risk. The law instead criminalized abortions that were "malicious" and "without lawful justification". The line between malicious and lawful abortion was made apparent in an unusual case appealed to Massachusetts' highest court in 1858. A Dr. Robert Wood in Hampden County claimed he was trying to preserve the mother with an induced abortion; she did indeed live. At trial, the judge told the jury "that if the defendant, a practising physician, in the exercise of his best skill and judgment, honestly believed that the act was necessary to preserve the mother from great peril to life or health, and in good faith procured a miscarriage with that view, he could not be convicted." Yet the jury found him guilty, so he appealed to the Supreme Court of Judicature, claiming that the fetus "had lost all vitality, so that it never could have matured into a living child." The higher court agreed that, in theory, a jury could find that a dead fetus might well justify a doctor's lawful action, but also observed that no evidence had been presented at trial about the status of the fetus. The guilty verdict was sustained, likely because of persuasive witnesses who testified that the doctor had had an ongoing sexual relationship with the widowed woman. Thus, he had a malicious motive, "to screen the female or himself from exposure and disgrace."[4] The case illustrates that terminating a pregnancy for the purpose of saving a woman's health was understood to be lawful in Massachusetts.

---

[3] Horatio R. Storer, *On Criminal Abortion* (Philadelphia, 1860), 64-65; Storer, *Why Not? A Book for Every Woman* (Boston: Lea and Shepard, 1866), 24-25 (orig pub. 1863).

[4] *Commonwealth v. Wood*, 77 Mass. 85, 92 (1858). *Commonwealth v. Brown*, 121 Mass. 69, 76 (1876), is another case in that state which makes clear that abortions for both life and health reasons were considered lawful.

11. Even in New York state, where the statutory text was less capacious, referencing preservation of the mother's life, Dr. T. Gaillard Thomas delivered lectures at New York City's College of Physician and Surgeons in 1889-90 urging a broad view to the students. Anything that threatens "to destroy the life or intellect, or to permanently ruin the health of a patient," should be addressed by immediate abortion, he said. The "vomiting of pregnancy" topped his list, but he also cautioned that some women might fake the symptoms to get a termination. Another danger was a kidney condition called puerperal nephritis, which the doctor called "cruel" to subject a patient to the risk of dying in puerperal convulsions, or surviving it with the doom of chronic Bright's disease. Cardiac disease, cancer, chorea, and contracted pelvis, along with uterine hemorrhage and convulsions rounded out his list of indications for abortion, all events he had himself encountered.[5] Dr. Thomas urged the young doctors always to secure a second opinion from a colleague before proceeding. He concluded his last lecture with a detailed description of how to do an abortion safely (at three months, with tampons, glass plugs, and cervical studs to provoke labor), along with how <u>not</u> to do it (with the intrusive tools characteristic of criminal abortionists, i.e. uterine probes or tents).

12. The proliferation and improvement of medical techniques from the 1880s to the 1920s, starting with the germ theory of disease and greater hygienic precautions, tipped the balance between safety and danger in the decision to perform justifiable abortions. Articles about therapeutic abortions populated medical journals. Dr. William Parrish of Baltimore noted that, "The law leaves it quite entirely to the medical profession to determine what constitutes

---

[5] T. Gaillard Thomas, *Abortion and its Treatment, from the Stand-Point of Practical Experience; a special course of lectures delivered at the College of Physicians and Surgeons, New York, session of 1889-'90.* (New York: Appleton and Co, 1896), at 99-104 [HathiTrust].

justifiable abortion."[6] In 1907, Dr. Montgomery Russell of Seattle wrote that "there are very few physicians who have practised medicine for any length of time who have not had to perform the operation to save the life of the mother. The law leaves it entirely to the judgment of the medical profession to determine when it is necessary and warrantable to produce abortion."[7]

13. In the 1910-20s, journals of state and regional medical societies followed a custom of printing the prior year's board exams for licensing, as a study aid. In the Northwest Medicine Journal (published jointly by state medical societies in Idaho, Washington and Oregon), an essay exam question in 1911 asked, "Under what circumstances may a physician be justified in producing an abortion, and how is the operation performed."[8] This tells us that the distinction between criminal and therapeutic abortions was a standard part of the medical schools' curriculum, along with instruction in how to accomplish a safe abortion.

14. U.S. birthing practices increasingly moved into hospital settings in the first third of the 20th century, and by the 1940s to 60s, some abortions followed suit, for patients with ability to pay. Many hospitals set up official committees of physicians to judge whether each case met state criteria for therapeutic interventions. These were physicians' decisions being made without oversight from governmental agencies.[9]

---

[6] William H. Parrish, "Criminal Abortion," *Maryland Medical Journal*, 29 (1893), 89-90.

[7] Montgomery Russell, "Criminal Abortion," *Northwest Medicine*, 5 (1907): 303. Other examples include R. C. Eve, "The Medico-Legal, Legal, and Moral Aspects of Criminal Abortion and Infanticide," *Atlanta Medical & Surgical Journal*, (1894): 516-531; and one from Idaho: W.W. Watkins, "Abortion and Infanticide from a Medico-Legal Standpoint," 8 *Medical Sentinel*, p.108 -114 (1900).

[8] "Examination Questions," *Northwest Medicine*, Vol. 3 (Sept. 1911), at 269. State and regional medical journals commonly printed the prior year's exam.

[9] Leslie Reagan, *When Abortion Was a Crime: Women, Medicine, and the Law in the United States, 1867-1973* ( U. of California Press, 2nd edition, 2022); Alicia Gutierrez-Romine, *From Back Alley to the Border: Criminal Abortion in California* (U of Nebraska Press, 2020). Rickie Solinger, "Pregnancy and Power Before Roe v. Wade, 1950-1970," chapter 1 (p. 15-32) in Solinger, ed. *Abortion Wars: A Half Century of Struggle, 1950-2000* (U. of California Press, 1998).

15. In the early 1960s, two unexpected events disturbed this system: a German drug, thalidomide, taken by relatively few mothers, was shown to cause birth defects in utero, joined by a much larger epidemic of German measles (rubella) in 1963-1965 that often caused grave debilities in fetal development. The thalidomide news story jumped from local to national when a television personality in Phoenix, who had first secured permission from a hospital committee, lost that approval in the face of the local media attention. National headlines ensued, putting a person-centered spotlight on therapeutic abortions. Pregnant women with rubella had little trouble getting committee approvals in most jurisdictions, but in California an energized state Board of Medical Examiners decided to make an issue of it. Fetal abnormality, some argued, was not explicitly covered by the language of saving the life of the mother common to so many abortion statutes. The gap between the statutory text and medical practice played a key role in launching the movement to liberalize abortion statutes in the 1960s.[10]

***Recent Technological Advancements Have Enhanced Our Understanding of the History of Abortion in the United States***

16. The recent research tool of digitized databases has allowed historians to deepen the stories we find in the past, getting a fuller picture of events, often from multiple viewpoints. The new tools have led to advancements in our understanding of history, including the history of abortion. Many large newspaper databases from public and proprietary sources now offer a wealth of information about publicized news events and the dissemination of ideas. Likewise, libraries and archives now supply full runs of books and periodicals. These include the National Library of Medicine with 35,000 accessible medical titles from 1610 to 1920 published in the Americas, the Harvard Case Law Project with full digitization of the state supreme court case

[10] Leslie J. Reagan, *Dangerous Pregnancies: Mothers, Disabilities, and Abortion in Modern America* (University of California Press, 2010), Chapter 4, 139-179.

reports for every state, the vast collection of U.S. legal treatises from 1800 to 1926 created by the Gale Group Publishers, and the EBSCO database of 7,000 US periodicals titles from 1790 to 1880, plus much more on the Internet Archive and HathiTrust. Professor Dellapenna's report overlooks the vast trove of historical evidence about abortion that these sources can provide.[11] His reliance on anthropological work by a single anthropologist, published in 1954 and 1955 Dellapenna Expert Report ¶27 n.82, ignores seventy years of subsequent scholarship in anthropology that would not support the statements that he makes about "primitive societies" nor his extrapolating from such contemporary (if "primitive") societies to conclusions regarding the history of medicine in early modern Europe or the nineteenth century U.S. Dellapenna Expert Report ¶¶ 27 n.82, 34 n.117. His loose treatment of sources mars other portions of his

[11] Recent work using such sources include Brooke Lansing Mai, "The Helpless French Girl: Seduction Narratives in a Nineteenth-century Abortion Trial," *Gender & History*, 2024, Vol. 36, p. 313; Nicholas Syrett, *The Trials of Madame Restell: Nineteenth-Century America's Most Infamous Female Physician and the Campaign to Make Abortion a Crime* (The New Press, 2023); Daniel D. Sunne, "A Change in Enforcement Absent a Change in Law: Abortion Prosecution in Nineteenth-Century Iowa," *Annals of Iowa* 83 (Winter 2024), 35-63.

discussion.[12] His suggestion that the ecclesiastical courts would have punished abortions using ingestion techniques as witchcraft is wholly unsupported by the textual evidence he cites.[13]

17. In the American colonies before the 19th century, evidence about induced abortions is remarkably scarce. The few existing newspapers freely disseminated bawdy jokes (think Benjamin Franklin), but news stories about actual people's sex lives were off-limits for general distribution. Local gossip circulating in oral networks might find expression in private writings, but printed news typically focused on bringing events from afar to local attention. Changes in journalistic practices starting around 1800 (as in the political smears of Thomas Jefferson and "dusky Sally") and greatly accelerating into the 1830s with the sex and crime reportage of the penny papers injected sensationalist coverage of abortion events into the public sphere. This new attention to abortion shapes what we as historians can know; equally important, it shaped what people living at the time could learn about what had before been an entirely private behavior.

---

[12] For example, Dellapenna cites to two articles, by Frederick Taussig and Louis Lewin, respectively, as if they were two separate sources independently supporting his point. Dellapenna Expert Report ¶ 33. However, the former (the Taussig article, cited in Dellapenna Expert Report ¶ 33 n.112) purports only to be a summary of the latter (the Lewin article, cited in Dellapenna Expert Report ¶ 33 n.112). Moreover, the Lewin article, as a literature review rather than a report of one consolidated study, cannot produce the set of figures comparable across unlike cases that the Dellapenna report represents in paragraph 33. Dellapenna Expert Report ¶ 33.

[13] Neither the cases to which he alludes nor the article to which he cites makes any mention of witchcraft. The matter arises in a passage in which Dellapenna attempts to explain away 16th-century legal sources denying that abortion was considered a felony by hazarding the guess that those authors "likely" thought that abortion "belonged before a court other than the Queen's Bench," namely "the Courts Christian (the ecclesiastical courts) that would have punished abortions using ingestion techniques as witchcraft." Dellapenna Expert Report ¶ 40, text *infra* n.145. The footnote in support of that statement cites to five cases (by case number and by page number) in the compendium Before the Bawdy Court (P.E.H. Hair ed. 1972). However, none of the cases cited make any mention of witchcraft. The footnote also includes citation to a secondary source, an article by Richard H. Helmhoz, *Infanticide in the Province of Canterbury in the Fifteenth Century*, that—although it does mention abortion, on pp. 380-81—also makes no mention of abortion being tried as witchcraft. Dellapenna Expert Report, ¶ 40, n.145.

18. There is good reason to think that induced abortions were uncommon in the 17th and 18th centuries. Dellapenna also asserts this. He may not be wrong in this observation, if we take the past on its own terms and do not consider pre-quickening administration of emmenagogues—some of which certainly interrupted pregnancy—as "abortion." The paucity of judicial evidence of the practice speaks to the rarity of abortion by intrusion due to its danger to the woman and the law's concern with her medical well-being.[14] But he is wrong to assume the infrequency of abortion in the legal record was a result of the common law prohibition of post-quick abortions which somehow also morally condemned disruptions to pregnancy in the pre-quick phase as well.

19. In paragraph 19 of his report, he lists four tenets he claims all the opposing historians adhere to, which he claims are all wrong. The first is the claim "that abortion was a generally accepted and common practice in American society at the opening of the nineteenth century." Dellapenna Expert Report ¶ 19. Here, he completely runs together the crucial distinction between pre- and post-quickened abortions. For centuries well into the 19th century, quickening was the only clear diagnostic indicator of pregnancy. As the expert report by Professor Monica Eppinger explains, the humoral theory regarded retained menses as a serious danger to health; therapeutic treatment methods for this amenorrhea (mostly the administration of medicines in the first several months of missed periods) ran the risk of expelling embryos and

[14] He cites Laurel Thatcher Ulrich, A Midwife's Tale, based on an extraordinarily detailed daily diary recording over 800 births in the town of Hallowell, Maine, from 1785 to 1812 with no hint of abortion activity. Ballard's diary was akin to a business record, and her business was birthing babies. She recorded births and noted when she was paid her fee. Her records also officially supported claims of paternity charged by unmarried mothers. She did not record details of every patient visit she made. Ballard's diary of midwifery—the business primarily of birthing babies—would not have addressed treatment by emmenagogue nor some other medical interventions that could end pregnancy outside of the childbirthing context in which she worked. Marvin Olasky also agrees about the paucity of colonial-era evidence: Olasky and Leah Savas, *The Story of Abortion in America: A Street-Level History, 1652-2022* (Crossway, 2023).

early fetal formations. Abortions of this sort, both unintended and intentional, could have been happening invisibly, out of the sight of people at the time as well as historians three centuries later. To many, they would have been indistinguishable from naturally-occurring early abortions, a routine fact of life for women in high-fertility communities.

20. Unlike Dellapenna, I and many historians do not look to the common law to explain what appears to be a dearth of deliberate abortions. A more obvious explanation is that the two major drivers of resort to abortion were largely absent in the 18th century. There was neither a life-shattering stigma associated with unwed motherhood, nor an expectation or desire to curtail family size among married couples. What scholars have called the demographic transition of a marked culture-wide drop in fertility did not begin until a few decades into the 19th century. Colonial families were typically quite large, on the order of 8 to 10 children in completed families (those that remained intact through the wife's childbearing years). Unmarried women who became pregnant generally got married, as we know from the well-maintained records of births and marriages in New England towns dating from the mid-1600s forward. In the central decades of the 18th century, something like a quarter to a third of all New England brides gave birth to a child 7 or fewer months after the marriage date, with little or no apparent stigma attached. In the uncommon occasions when marriage was not possible, due to class differences or the already-married status of the father, a mother of a bastard child could press a claim against the father with a justice of the peace and secure child support; her chances for marriage later on were not decisively "ruined."[15]

---

[15] A summary of the literature in the 18th century appears in John D'Emilio and Estelle B. Freedman, *Intimate Matters: A History of Sexuality in America* (University of Chicago Press, 2010), Part I: The Reproductive Matrix, 1600-1800. See also Patricia Cline Cohen, "Public and Print Cultures of Sex in the Long Nineteenth Century," *Oxford Handbook of American Women's and Gender History,* eds. Ellen Hartigan-O'Connor and Lisa G. Materson (Oxford University Press, 2018), 195-216.

21. Thus, it is no surprise that just a tiny number of legal cases about abortion came before magistrates in the two colonial centuries.[16] Only one among the very few cases Professor Dellapenna cites, a case in Pomfret, Connecticut, in 1742, actually presents a clear-cut case of abortion. (The others are sketchily documented and include possible abortion activity bundled with other charges like fornication, blasphemy or assault and battery, making it hard to isolate and assess the abortion component before the court.) In the Connecticut case, the documents are uniquely rich. A courting couple experienced pregnancy; the young man acquired ineffective medications and then recruited a self-styled doctor from Rhode Island who performed an instrument abortion, causing the death of the post-quickened young woman a month later, probably from sepsis. Curiously, the doctor was not charged for three years, and his trial and sentencing came five years after the girl's death. The charge was "hainious" misdemeanor for the abortion, with no extra penalty stemming from the woman's death; he was sentenced to 29 lashes, which he evaded by retreating to Rhode Island.[17]

---

[16] Dellapenna claims to know of 7 such cases but he conveys nothing in his expert report about them; 7 cases in two centuries is not a lot. Three scholars deeply immersed in court records for other projects dealing with sex and the law in Connecticut, North Carolina, and Massachusetts have found a scattering of infanticides but report no criminal charges for induced abortions beyond the one exceptional case in Connecticut, discussed below. Cornelia Hughes Dayton, *Women Before the Bar: Gender Law and Society in Connecticut, 1639-1789* (University of North Carolina Press, 1995); Kirsten Fischer, *Suspect Relations: Sex, Race, and Resistance in Colonial North Carolina* (Cornell University Press, 2002), and Kelly A. Ryan, *Regulating Passion: Sexuality and Patriarchal Rule in Massachusetts, 1700-1830* (Oxford University Press, 2014).

[17] To Cornelia Hughes Dayton, "Taking the Trade: Abortion and Gender Relations in an Eighteenth-Century New England Village," *The William and Mary Quarterly* Vol 48 (Jan. 1991), 19-49. For many primary source documents on this unusual case, see website, "Taking the Trade", University of Connecticut: https://history.uconn.edu/taking-the-trade/. Sarah Grosvenor, the young women, came from a very respectable family in the town; the father of the pregnancy was similarly situated, holding town offices in his later adulthood. Sarah's large set of siblings included one sister who gave birth just 3 months after her marriage date, so premarital sex was not a deal breaker. In Dayton's telling, the pregnancy and abortion were secrets held by the younger generation; Sarah chose not enlist her parents, who in the normal course of events would endorse and enforce marriage on the couple. In the 19th century, I have found quite a few accounts of abortions undertaken by newly married couples in order to hide the shame of premarital sex from their families, such was the power of stigma.

22. The Pomfret event also shows that intrusive instruments were part of at least one doctor's medical kit. Professor Dellapenna insists that intrusive instruments were rarely used before the 1880s and emerged relatively late in history.[18] Dellapenna Expert Report ¶¶ 34-35. He also declares, with no evidence, that up to a third or more of women experiencing an instrument abortion died, from puncture wounds or infection. Yet he credits texts from the ancient Roman era that reported widespread and successful use of instruments to effect abortion.

[18] Dellapenna is simply mistaken on the latter point. Such techniques, even if rarely employed, are attested in medical texts widely circulated through early modern Europe and the Americas. See, for example, The Four Books on Medicine by Octavius Horatius and the Three Books by Abu Al-Qasim, Distinguished Among All Surgeons (Strasbourg edition, 1532), which reprinted an already widely circulated Latin translation of a surgical manual, book 30, of the reknowned surgeon of Spain known to early modern medicine as Albucasis. In it, Albucasis describes *inter alia* surgical abortion, gives techniques for extracting a dead fetus from the womb, and provides figures of instruments used in fetal extraction (pp. 219-224). In his report, Dellapenna points to one trial in Great Britain in the 1730s with perhaps the earliest documented use of an instrument in Anglo-American legal cases, to maintain his claim that this was rare. While I have not found 18th-century medical texts or physicians' manuals from Britain that describe instrument intrusions, there is one unusual source that suggests the use of instruments was in play. The pioneering British multivolume work, *Campbell's Cyclopedia*, included an entry on abortion in all four of its editions dating from the first in the 1720s to the last in the 1780s. The first two editions were one-inch entries describing the medical event of a spontaneous pregnancy loss, while the last two, in 1755 and 1781, expanded to include induced abortions. In 1781, the entry ran close to 19 large-column inches, replete with ancient Greek and Roman history sources and studded with sentences like "The practise is chiefly in the hands of women and nurses." Roman church councils "have declared against it" yet "we are told that the modern Romish ecclesiastical laws allow of dispensation for it." "The time for it is presently after impregnation, at least within the third or fourth month of gestation." A list of medicines was headed by juniper and savin. Most dangerous was "puncturing the uterus. . . by running a stiletto, or a kind of bodkin, up the vagina, into the orifice of the uterus." For details about the compilation of this first encyclopedia (an idea copied by the French team of Diderot and D'Alembert) see Krista Kennedy, *Textual Curation: Authorship, Agency, and Technology in Wikipedia and Chambers's Cyclopaedia* (University of South Carolina Press, 2016). Kennedy explains that Ephraim Chambers used an operation rather like the crowdsourcing of Wikipedia. He hired a wide range of people (presumably male) to prepare entries, instead of relying solely on the learned classes.

In fact, instrument abortions were the method of choice, well documented from the earliest phase of the early 19th-century rise in abortions.[19]

23. The incentives for producing agricultural labor manifest in colonial New England obtained with even greater force in the Southern states. Recent scholarship documents the worry among plantation owners that enslaved women were practicing abortion; plantation owners' attempts to police pregnancy and prevent enslaved women from engaging in medicational abortion; and pregnancy, birth, and miscarriage records that indicate enslaved women may have evaded such attempts in measurable ways. Keeping enslaved women from cotton root, an efficacious abortifacient known in West Africa, appears as a particular preoccupation.[20]

24. The major change in abortion history first began in the larger cities like New York and Boston by 1820, spreading quickly in the 1830s and 40s to newly established textile mill towns, with their large populations of unmarried mill girls living away from their parents. This was a high at-risk population, attracting abortion providers to set up shop in towns like Lowell, Massachusetts, and Lewiston and Saco in Maine. We glean this chronological and geographical shift principally from newspaper reports and secondarily from medical journals, proliferating to meet the needs of a burgeoning medical profession centered in Philadelphia, New York City, and Boston. Did the appearance of abortion stories in these print outlets reflect a surge in actual induced abortions, or was it largely an artifact of new canons of print culture, manifested in

---

[19] Two examples: the 1820 Ammi Rogers trial in Connecticut (*Report of the Trial of Ammi Rogers : for a high crime and misdemeanor in a brutal and high handed assault on the body of Asenath Caroline Smith of Griswold, Con.*,(1820); and an 1825 medical journal report of the use of a silver catheter to disrupt a pregnancy followed up by ergot to empty the uterus. (Ergot does stimulate uterine contractions.) Both women survived. Dr. [John] Baxter, "ART. III. Case of Abortion, Procured by Violence," *Medical Recorder, of Original Papers & Intelligence in Medicine & Surgery*, July 1, 1825, 461-62.

[20] See, for example, Marie Jenkins Schwartz, *Birthing a Slave: Motherhood and Medicine in the Antebellum Sout*h (Harvard University Press, 2006); Adedoyin Adekunle, *Enslaved Women: Reproductive Choices and Medicine* (M.A. thesis, University of South Carolina, Department of History, 2024), https://scholarcommons.sc.edu/cgi/viewcontent.cgi?article=8633&context=etd.

cheap daily papers featuring high human-interest stories of sex, crime, and tragedy? Probably both; sexual and reproductive behavior was changing; the new media covered it and at the same time amplified it. Precisely what they were covering, most of the time, were official actions of a coroner's inquest over a dead woman's body, often with verbatim testimony, and/or an actual trial (few as the latter were). Successful abortions of course do not figure much at all in the newspaper accounts; they remain an understudied aspect of this whole history. But it is reasonable to assume that they resemble the publicized stories up to the critical point of divergence when something goes wrong and officials become involved.

25. I've collected some 250 newspaper accounts of individual abortions between 1800 and 1860.[21] From a slow start in the 1820s, the case numbers mushroom by the 1840s, and go off the charts in the late 1850s. Nearly half of the entire set occurred in the years 1855-1860, definitely a fraught time for public concern over actual abortions. My unit of analysis was the case, but it is also relevant to consider news distribution in the form of multiple reprints in papers around the country, which tells us about resonant cases that amplified a national conversation about abortion. The use of the railroad and the telegraph in the 1840s to distribute newspaper stories added velocity and news value to these high-interest items. Another way to slice the data is to pick one news market, for example Boston, where a tempest was brewing over abortion

[21] I have two checks on the question of comprehensiveness. One is that when I search new databases, for example state archives recently coming online, often with coverage of many smaller regional papers, I very rarely find a case I have not yet encountered. And for the state of Massachusetts, I have consulted the annual reports of the Attorney General, available online, that contain full statistical information on all crimes including abortion charged from 1830 to 1860 in every county, and find I have close to a one-to-one correspondence with the Massachusetts newspaper cases in my database.

concerns in the 1850s, to get a sense of what the reading public of Boston could know about uncomfortable stories involving dead young women, both local and distant.[22]

26. Of course, the central place where the public learned about the new abortion laws came from newspaper coverage of arrests and trials. By the 1840s, lots of northern papers supplied instructive content, mostly focused on the very sad outcomes when pregnant women died. However, the outcomes of legal trials supplied quite a contrary message: that few people were actually convicted of the crime. The first conviction ever on an abortion charge in the Commonwealth of Massachusetts occurred in 1859, after some 30 failed legal cases brought since 1845, the year of the state's first abortion statute. New York City, justly known as the abortion capital of the country with its many providers made visible in coded but open advertisements, saw just 10 abortion cases in the city's courtrooms in the years from 1830 to 1850. For a century, from the mid-19th to the mid-20th century, newspaper and medical journal articles pointed to a consistent rarity of convictions.

27. The crescendo of newspaper coverage in the late 1850s sparked particular concern with one man, a 27-year old Boston doctor named Horatio Storer. In two years, from 1857 to 1859, he built an effective case that abortions by married women were skyrocketing. This was startling news, because four out of five cases in news circulation up until then involved single women "hiding their shame." Storer's innovation was to point to married women of the comfortable classes aborting to keep families small, and doing it, he wrote, out of selfish preference for an easier life with more time for the social activities of the leisured classes.

[22] For an early analysis of my evidence, see Patricia Cline Cohen, "Married Women and Induced Abortion in the United States, 1820 – 1860," Social Science Research Network 4197554, posted 2022.

28. Storer was an excellent strategist and propagandist.[23] In 1857, he tried and failed to galvanize his local medical society, so he approached the American Medical Association which invited him to write a report, the heart of which was a startling statistical report that in early 1860 was distributed to federal and state governing bodies as well as to state medical societies, along with a vote from the AMA membership endorsing new legislation in every state.[24]

29. Storer's essay, dense with numbers and many spurious calculations, was wholly derived from official mortality statistics collected in Massachusetts and New York City. The numbers appeared to substantiate his shocking claim that abortion was occurring at epidemic levels: 1 out of every 40.4 births, his initial data showed, soon repeated as 1 in 4.04 in a misprint. But those claims were bogus. He used data about stillbirths and "premature birth" as a cause of death, as if the numbers somehow cast light on actual abortions. But stillbirths were defined as being of 7 to 9 months gestation, an unlikely age for most induced abortions. The mortality category of "premature births" denoted the very early death of a premature infant born alive—so again, post viability. Plus it seems very unlikely that aborting doctors or women would even report a death from an illegal act to the city's vital registration office.

[23] Frederick N. Dyer's deeply researched biography of Storer is invaluable: *Champion of Women and the Unborn: Horatio Robinson Storer, M.D*. (Science History Publications, 1999). It does not explore Storer's statistics.

[24] H. R. Storer, "On the Decrease in the Rate of Increase of Population now obtaining in Europe and America." The initial ideas were presented in December 1858 to the American Academy of Arts and Sciences in Boston. Storer published the essay first in the *North American Medico-Chirurgical Review* in Philadelphia in 1859, and second in his short book *On Criminal Abortion* (Philadelphia, 1860), circulated nationally by the AMA. Storer summarized his statistical findings first in his book *Why Not?,* aimed at a general audience and particularly women, and second, in his 1868 medical jurisprudence book, co-authored with lawyer Franklin Fiske Heard, where the misprint occurred. The original essay was published in full in 1867 in the *American Journal of Science and Arts*, 2nd series, Vol. 43 (March 1867), 142-155. Storer there declared that, "Not an attempt even has been made to controvert [his statistics]. . . .Physicians are now of one mind as to the existence of the main facts proved."

30. The significance of Storer's deeply flawed report is trifold. First, it worked; the AMA campaign touched off a wave of revision with 10 new laws from1860 to 1868 and another 10 up to 1876. Second, it spurred a cottage industry of medical and social science men seeking to corroborate Storer's findings, mounting surveys of private physicians, asking a new question on the 1865 New York State census, and visiting town clerks to nail down declining family size. And some participants in this enterprise generated numbers from who knows where: for example, a claim that Manhattan, with a population of one million, saw 100,000 abortions per year, or the more grandiose claim from the homeopath Dr. Edwin M. Hale in Chicago that two-thirds of all conceptions in the United States "are destroyed criminally."[25]

31. And third, somewhat counterintuitively, the shocking numbers actually normalized a practice usually hidden from view: If so many women are doing this, and just a handful actually die, it must be safer that the nay-sayers claim. And it must be the case that women support this action, said an anonymous lawyer speaking to the New York Medico-Legal Society in 1889. The speaker reviewed current statistics on stillbirths, and he wrote to the clerk of the court of General Sessions to learn how many trials had occurred in the previous 15 years. The answer was 10, with 9 convictions and one acquittal. The anonymous speaker pronounced New York's abortion statute to be a "dead letter," worthy of repeal: "The laws are in violation of the universal sentiment of woman, though no one has, apparently, dared to say so." He observed that it was fruitless to increase the severity and penalties of the laws, all "without the slightest

---

[25] The Manhattan claim circulated in 1874, landing in *Woodhull and Claflin's Weekly*; "The Slaughter of the Innocents" (June 20, 1874). E.M. Hale's overblown figure appeared in a pamphlet of 1867, titled "The Great Crime of the Nineteenth Century." Hale was soon after fired from his medical college professorship, charged by his homeopathic medical society (but not by legal authorities) with abortion practices. Two decades later he was caught up in the much-publicized journalists' sting operation in 1888, which exposed scores of abortion-friendly doctors in the highest reaches of the Chicago medical establishment. Leslie J. Reagan, *When Abortion was a Crime Women, Medicine, and the Law in the United States, 1867-1973* (University of California Press, 1997), chapter 2.

perceptible or probable effect upon women, either in preventing the practice, or diminishing its frequency in the slightest degree."[26]

32. The author of this article shielded himself from criticism by withholding his name. He did think he was speaking a truth that the men in his medico-legal society simply denied: that women shared a universal sentiment in favor of abortion, and they would continue to have them despite the laws.

***Professor Dellapenna Selectively Quotes Historians Who Worked on the* Webster *Brief in a Misleading Manner***

33. To discredit historians' research on abortion that departs from his favored view that abortion has always been illegal and prohibited, Dellapenna distorts three very small quotations from the chief authors of the Historians' amicus brief filed in *Webster* in 1988. Along with other historians and law professors on the brief-writing team, the three he quotes spoke at a session at the Organization of American Historians' 1989 conference devoted to the writing of the *Webster* brief. All the papers were then published as a forum in *The Public Historian*. Dellapenna cherry-picked a few words from Professors Sylvia Law and James Mohr to make it appear that they are confessing to malfeasance and regrets. He quotes Law as saying she "candidly lamented the authors' 'serious deficiencies as truth-tellers.'" The context of her five-word phrase was quite different: Prof. Law explained that the historians on the team brought nuance and context, while a legal approach favored a sharp precision as "truth tellers," the strategy that prevailed. The choice of precision over nuance caused her to write that, "Our most serious deficiencies as truth-tellers were failures of flatness" which, as she explained in her immediately following words, meant that they left out consideration of non-white and

[26] Anonymous, "Abortion," *The Medico-Legal Journal* at 181, Vol. 7. p 170-187.

marginalized groups of women of the era, and they failed to deal with claims that leading 19th-century feminists opposed abortion.

34. James Mohr's short quote was also reframed as an admission: he "admitted that he did not 'consider the brief to be history, as I understand the craft,'" which sounds like Mohr thought the brief was wrong or false history. Yet his next two sentences read: "It was instead legal argument based on historical evidence. Ultimately, it was a political document." The burden of his entire paper was to compare what historians do (nuanced arguments considering all the known facts) with what legal experts in court do (making a persuasive case of advocacy for a client with a selection of facts).[27] Dellapenna exhibits manifest dishonesty in his distorting quotations from the essays by Law and Mohr.

35. His worst infraction in selective quotation occurs in his accusation that historian Estelle Freedman, a lead author of the *Webster* brief, confessed to acceding to falsehoods in the brief. He appears to praise her for "remarkable candor" in the single sentence he quotes from her OAH forum paper, a sentence he has twisted in this way at least twice before (in his briefs in *Casey* and *Dobbs*), but this time he adds something new, truly fighting words. Her "candor" reveals that the *Webster* brief was "lying to the Supreme Court and to the public." And what was the lie? In this same forum, Freedman wrote that she found "it was necessary to suspend certain critiques to make common cause" with all the many signers on the project. That is his single quote from her. Dellapenna then explains that Freedman "signed the brief despite knowing that her own research demonstrated a very different story." But this is a great exaggeration. In her essay, Freedman made it clear that her suggested revisions of the material had in fact been

[27] James C. Mohr, "Historically Based Legal Briefs: Observations of a Participant in the *Webster* Process," *The Public Historian,* vol 12, no 3 (Summer 1990), 19-26, at 25.

incorporated into the final version, and that her comment about making common cause across the disciplines of history and law arose in debate over the earlier versions of that passage, not the final version. Freedman completely agreed with the legal writers on the amicus team that under the prevailing common law in the 18th century, abortions before quickening were not criminalized. She also knew, as do most 18th-century historians, that abortion at any stage of pregnancy was unlikely to be common, based on the careful demographic studies done in the 1970s and on social and economic factors like the ones I have discussed above. The law professors wished to emphasize the possibilities available to women before criminalization, possibilities that Dellapenna denies ever existed.[28]

***Professor Dellapenna Mischaracterizes a Feminist Historical Approach as a Quest to Recover "Lost Voices"***

36. Every Dellapenna brief on abortion from *Casey* forward includes several pages characterizing the "orthodox" historical approach to researching women's history as a quest to recover "lost voices," a phrase he repeats six times in this expert report. Dellapenna Expert Report ¶¶ 11-14. By definition, he says, lost voices can't be recovered—they are forever mute, he thinks. No professional historian would agree with that; new sources as well as new uses of old sources fuel continuous advances in our knowledge of the past. Dellapenna gestures to a few female historians who he says are "decoding" for "counter-meanings," leading him to suggest that at least one named scholar fabricated something in her work, although he doesn't say what.[29] But he himself does not actually show his work—i.e., identify demonstrable errors that result

[28] Estelle B. Freedman, *Historical Interpretation and Legal Advocacy: Rethinking the Webster Amicus Brief*, 12 THE PUB. HISTORIAN 27, 32 (1990). See also Estelle Freeman, *Feminism, Sexuality, and Politics: Essays by Estelle B. Freedman* (U. of North Carolina Press, 2006), Ch 10: When Historical Interpretation Meets Legal Advocacy: Abortion, Sodomy, and Same-Sex Marriage, 175-195, 236-240.

[29] In paragraph 13, he grandiosely compares Linda Gordon's 1976 book on the history of birth control to medieval fabrications of the lives of the saints, filling in for what is not known.

from this so-called method. The giveaway to his own bad faith in this matter of making up facts occurs in his footnote to the first appearance of "lost voices," Dellapenna Expert Report ¶ 11 n.19, immediately attached to those two words, which cites the Historians' amicus brief in *Casey* and Sylvia Law's forum contribution on *Webster* as the grounds for a "lost voices" approach. But neither source, at the pages cited nor anywhere else, say anything at all about "lost voices," in those words or in concept. In 1992, we might charitably call this a mistake, where citations in a footnote somehow lose their connection with the actual text. But he has repeated the exact error in his briefs in *Casey* and *Dobbs*, in his expert report in this case, and in his book (2006, second edition 2023), where "Lost Voices" is an index entry with 23 subheads! One subhead critiques Reva Siegel's landmark 1992 article as a model of a pointless "lost voices" approach: "Her strenuous effort to 'deconstruct' the historical record and to patch together a narrative of 'lost voices' in fact eloquently exposes the reality that actually recorded voices do not support her thesis."[30] (Siegel uses neither of those terms in quotations in her article.) Dellapenna does not say here whose "actually recorded voices" he means, but it seems likely that this refers to his chapter on feminist leaders in the 1870s, whom he erroneously claims are clearly on record opposing abortion, a claim taken up below.

37. With the digital revolution in historical research, we can in fact know something of the intentions, concerns, and often words of hundreds of 19th-century women (pregnant or witnessing at the sidelines) confronting abortion decisions, as revealed in coroner's inquests, legal depositions, dying declarations, trial reports, and the often sensationalized newspaper reportage of the era, as described above. There is good recent work as well scouring private

[30] Dellapenna, *Dispelling the Myths of Abortion History* (Carolina Press, 2nd ed. 2023), charging Siegel with failure without supporting detail supplied here, p. 1035; and again at 397-98, his second index entry for Siegel and "lost voices."

letters and diaries for stories of pregnancy loss, a very frequent natural occurrence that provides a highly useful backdrop for evaluating abortion decisions.[31] The news accounts in print skew lurid and sad, since they mostly involved the death of a woman, almost always framed as a very sympathetic victim. It seems reasonable to suppose that those printed reports played a role in the passage of at least some of the new state statutes, suggesting that abortion should be regulated to protect women's health. In contrast, before the late 1850s, I have found almost no attention in news accounts to fetal remains or concerns over a loss of pre-natal life.[32]

***Professor Dellapenna's Critique of Professor Eppinger is Unfounded***

38. Professor Dellapenna ridicules the expert witness report by Professor Monica Eppinger as "yet another exercise in deconstructing the history of abortion through the recovery of lost voices with the virtues and vices of that approach." In fact, her report offers nothing whatsoever about "deconstruction" or "lost voices." Eppinger actually demonstrates how a long-established medical practice of bringing on the menses in "blocked" women, sailing under long-accepted humoral theories of bodily health, could easily morph into practices and techniques effective at ending early-term pregnancies. Early-term pregnancies are at the heart of this scholarly dispute about the prevalence of abortions, not the last half of gestation, indictable under common law. Dellapenna often conveniently conflates the two.

39. Eppinger's work centers on the early modern centuries, but the generality of 19th-century obstetrical texts and practices show clear continuity with these humoral theories. The two physicians at the very center of the 1860 AMA campaign to beef up the state statutes

---

[31] Shannon Withycombe, *Lost: Miscarriage in Nineteenth-Century America* (Rutgers University Press, 2018).

[32] Marvin Olasky shared his surprise over this same finding, a total lack of solicitude for aborted remains, in his 1992 book about newspaper accounts of 19th-century abortions, written without benefit of newspaper databases. *Abortion Rites: A Social History of Abortion in America* (Crossways Books).

described their routine use of intra-uterine probes to restore their blocked patients to health. Dr. Henry Miller, a professor in the medical department at the University of Louisville and president of the AMA in 1859-1860 and thus the designated backer of the national lobbying campaign, made "free use of the uterine sound" which "caused little pain at first but severe hypogastric suffering" a day or so later. Miller believed the humoral theory that "menstruation is, as all experience testifies, so essential to female health; why, when it is morbidly suppressed, the whole system suffers, and when it is restored, the flow of health revisits the cheeks.") He acknowledged that using the tool to probe the uterus created a risk of abortion: "In truth, this is a misfortune which can only be avoided by perpetual vigilance. It occurred once in my own hands."[33] That is, only once that he knew of. Undoubtedly, some of his own married patients, able to see local newspaper ads in Louisville promising relief from blocked menstruation,[34] presented for treatment of suppressed menses and went home to have early-term abortions, with Dr. Miller or indeed the patients' families none the wiser. All would assume that the common event of natural pregnancy loss had just occurred.

40. Dr. Horatio R. Storer of Boston, the key guiding force behind the AMA campaign, bragged of his prowess with the uterine probe to treat amenorrhea (absence of menses). In an 1864 article, he warned of "unintentionally, and so far innocently, committing malpractice, and thereby adding confirmation to an opinion already but too prevalent, that the

---

[33] Dr. Henry Miller, *Principles and Practices of Obstetrics* (Philadelphia: Blanchard and Lea, 1858), 82, 96-98.

[34] See running ads in the *Louisville Daily Democrat*, July 28, 1864, p. 2. Sample text for "Dr. Lyon's periodical drops" which "remove all obstructions of nature from whatever cause, producing health, vigor, and strength…. Care should be taken to ascertain if pregnancy be the cause, as these DROPS would be sure to produce miscarriage, if taken while in that situation." Idaho newspapers circa the 1890s ran ads for female pills, e.g., "French tansy Wafers for female irregularities…will give relief in all cases, no matter WHAT the cause" in the *Wood River Times* in Hailey ID, May 3, 1890.

profession directly or by implication, sanction the induction of criminal abortion." Storer certainly realized that invading the uterus with a tool had to be done very carefully; he urged his medical audience to consider the possibility of pregnancy, even for unmarried women. The trouble was that there was no sure way to know if an early pregnancy was in progress. Amazingly and candidly, Storer admitted to having "more than one direct occurrence of the accident against which I would now guard the profession."[35]

41. A close compatriot of Storer was Dr. Henry I. Bowditch of Harvard University, a firm supporter of the AMA campaign against abortion. Yet he worried that tougher laws would eliminate his unchecked prerogative to use the probe. In a private letter to Storer, he wrote:

> Are there not cases where a physician would be justified in suggesting a course [of?] med as he would use in Amenorrhoea, even when he might suspect, but not be able to know of the evidence of pregnancy? Suppose a mother of several children which she has in rapid succession & the physician feels assured that health & possible life will be endangered if another pregnancy occurs, would he be criminal if he were to use common means for amenorrhoea if the menses have been absent six weeks? Are the cases always so plain that a man can decide & may he not balance a choice of evils?[36]

42. In short, highly respectable doctors in the late 1850s were applying the humoral theory described by Monica Eppinger to patients by treating them for blocked periods, accepting the risks of ending a few very early pregnancies, and even feeling confident (in the case of Dr. Bowditch) to make child-spacing decisions with (or for) their patients. This scenario, right in the heart of Storer territory in Suffolk County, is greatly at odds with Dellapenna's claim that all

---

[35] Horatio R. Storer, "The Surgical Treatment of Amenorrhoea," p. 1, 37 *American Journal of the Medical Sciences* 48 (Jan 1864); offprint at National Library of Medicine, http://resource.nlm.nih.gov/101503876.

[36] Henry I. Bowditch to H.R. Storer, April 20, 1857, original at the Countway Library, Harvard University; on Dyer's website: https://horatiostorer.net/letters-to/.

professional doctors simply knew that life began at conception and that the smallest embryonic tissue was a rights' bearing person.

***Professor Dellapenna Overstates Opposition to Abortion by Leading Feminists of the 1870s***

43. This is a contentious issue, since a present-day anti-abortion group (Feminists for Life) has adopted Susan B. Anthony as their guiding light for a feminist disapproval of abortions, and Dellapenna early on sided with them. Wikipedia has a sensible and balanced article that, as of this date, presents thoughtful evidence on both sides. The professional historians who have headed the Stanton-Anthony Papers Project for decades have a compelling argument, based on their close knowledge of an archive of 14,000 papers. Anthony never weighed in on abortion, they say.[37] The Feminists for Life webpage makes its best case for Anthony's periodic disparagement of abortion, mostly delivered in one sentence remarks as asides in other speeches or letters. They concede that authorship of the essay signed by "A." titled "Marriage and Maternity" which they once attributed to Anthony, cannot be established. "Abortion was not an issue to which Anthony devoted much time. But the historical evidence that does exist points to her opposition to abortion."[38]

44. Dellapenna touts this inaccurate claim: "Even the most militant and well-known feminists of that time, including Susan B. Anthony, the Claflin sisters, and Elizabeth Cady Stanton, were adamantly opposed to legal abortion and they frequently put that in writing."

---

[37] "Susan B. Anthony abortion dispute," Wikipedia (consulted May 28, 2025).

[38] Feminists for Life, https://feministsforlife.org/the-truth-about-susan-b-anthony/, consulted June 3, 2025. For the other side, see also Tracy A. Thomas, "Misappropriating Women's History in the Law and Politics of Abortion," 36 *Seattle U. L. Rev*. 1 (2012); and Harper D. Ward, "Misrepresenting Susan B. Anthony on Abortion," National Susan B. Anthony Museum & House blog (2018). https://susanbanthonyhouse.org/blog/misrepresenting-susan-b-anthony-on-abortion/. Dellapenna cites the Thomas article, one of his five references from a 20th-century scholarly work, only to issue an empty dismissal calling it "fanciful history," along with Mohr, Siegel, and all three Historians' amicus briefs.

Dellapenna Expert Report ¶ 54. In fact, very little is in writing from these four women concerning abortion. The anti-abortion essay he credits to the sisters, titled "The Slaughter of the Innocents" (June 20, 1874), was published when both were on a months-long national lecture tour spending May and June in California; neither could have written it. The article, apparently by a man, sets forth scare statistics typical for the post-Storer 1870s, i.e., an improbable claim that Manhattan's population of one million produced 100,000 abortions a year, and that 12,000 childless households in that city surely implicated each of those 12,000 wives having annual abortions to maintain childlessness. It is the only article about abortion in the entire dozen-year run of the *Woodhull & Claflin Weekly*, so hardly a frequent topic.

45. The very short article he credits to Stanton, "Child-Murder" (*The Revolution*, March 5, 1868), does bemoan the evils of abortion, in direct reaction to an astonishing report out of a factory town in Maine where a physician there alleged 400 abortions occurred annually. The late 1860s to early 1870s were the height of the scare over abortion statistics, and the Maine Medical Society was at the peak of its AMA-inspired lobbying of the state legislature for a tougher law; in fact, no new law was passed.[39] This brief comment on a very shocking (and dubious) anecdote does not add up to an "adamant" opposition to abortion "frequently" published, to repeat Dellapenna's words.

***Professor Dellapenna's Bias Against Feminism Taints His Historical Analysis***

46. Dellapenna contends that historians of his ascribed orthodoxy "widely and unquestioningly" accept a claim that an "organized' (largely male) medical profession"

---

[39] Is 400 a year a credible number? Lewiston, the county seat of Androscoggin County, had a fast-growing population, rising by 80% in 1870 (13,600) over the 1860 population (7,424). Young females arrived from the countryside to work in the factories. Assume <u>all</u> the new arrivals (a maximum of 6,200) were young females (and they weren't), then 400 abortions in that population means 1 out of 15 factory workers had an abortion each year. The ratio gets yet more improbable if we interpolate a lower population size for 1868, the year of the news story.

promoted stricter laws on abortion in order to "suppress competition from 'disorganized' (largely female) 'irregular' practitioners.'" His footnote to this statement is James Mohr's 35-page chapter titled, "The Physicians' Crusade Against Abortion, 1857 -1880." Dellapenna Expert Report ¶ 19 n.55. This is serious misreading and over-simplification of Mohr's thesis, coupled with the ridiculous claim that female historians have all accepted it "unquestioningly," meaning without doing their own research. And why? Presumably because they all share a pre-existing anti-male bias, a belief that men always and everywhere oppress women, coupled with a perverse claim that the female historians hold this oppression "dear" for some unstated reason.

47. The oppression theme appears again in footnote 54, where "the current orthodox history of abortion" is all about "male oppression of women," a concept "so dear to contemporary advocacy about abortion history." Dellapenna Expert Report ¶ 19 n.54. Or again in paragraph 53: the historians he mocks "would have us believe that nineteenth-century abortion statutes were adopted as instances of male oppressors subjugating oppressed females, with doctors usurping the market for midwives and husbands dominating their wives in their home life."[40] Dellapenna Expert Report ¶ 53. The authorities he cites for this statement do not in fact claim that male doctors backed the criminalization of abortion *as a means of* oppressing female patients. Instead, these writings by professional historians are showing us what the doctors leading the AMA campaign thought, said and wrote to justify their avowal of stricter abortion laws, largely a pro-natalist view based on old and stereotypical attitudes and beliefs that we now consider to be constitutionally impermissible to be embedded in laws. Storer and others also abhorred birth control, for the same reasons. It was the duty of women to bear children; untying

---

[40] Dellapenna's footnote to this sentence cites: segments of Mohr adding up to about 125 pages of text, along with substantial pages in the historians' briefs in *Webster*, *Casey* and *Dobbs*, and also Eppinger's expert report and the landmark 1992 article by Siegel. Dellapenna Expert Report ¶ 53 n.204.

sex from reproduction turned marital sex into "prostitution" in that sex untied from reproduction was driven by lust and not happy hopes of maternity.

48. Dellapenna's citations for the oppression claim map to the pages where the historians quote freely from a large cast of medical experts who sincerely believed that women belonged in the home, living as wives with large numbers of children. They had reason to worry that their world view was under threat. The 1860s and 1870s were opening decades of much social and economic change for women, arising from new opportunities for education and employment. The doctors focused their complaints on women of the respectable and professional classes who they claimed (with wonder, consternation, and likely accuracy) were the largest component of the abortion trade. They complained that such women preferred frivolous social activities—card games, evening balls—over the hard work of time-intensive and repeated maternity. "Shirking their duties" was an oft-repeated catchphrase in these writings. A dark streak of anti-immigrant fear found easy expression in these writings: immigrants with larger families might soon be taking over, while Anglo-American whites of the educated classes shrink in numbers.

49. To read these diatribes against women is to get a full blast of very old attitudes about woman's circumscribed place in the world, even—especially?—among a class of men with good educations and good incomes. Quoting them at length shows their limited and limiting views, views that at a later time many people would call sexist. Does Dellapenna think these physicians are being misquoted or misunderstood? On what grounds does he criticize the so-called orthodox historians for exposing these old attitudes? He seems to impute animosity by historians toward the physicians due to their opinions, when in fact the animosity runs the other direction. The historians are revealing animosity that leaders in the anti-abortion campaign held

toward women who were carving new pathways in life, choosing to have fewer children to create more time and space in their own lives. A real fertility decline was in process, speeding up in the post-Civil War years. It did not go unobserved that the fertility decline was especially apparent in the families of doctors. At a meeting of the Vermont State Medical Society, in 1867, an address on abortion and population decline sparked a lively discussion, and then one physician in the room observed (the minutes show) that "on looking around him, he noticed as few children among the medical profession as out of it. He thought in this matter 'Charity should begin at home,'" meaning physicians should clean up their own act before telling everyone else what to do.[41]

## FACTS OR DATA CONSIDERED IN FORMING MY OPINIONS

50. My opinions are based on my education, scholarship; research; engagement with other scholars; and knowledge of the relevant literature, including the sources cited in this report.

## EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS

51. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

## MY QUALIFICATIONS AND PUBLICATIONS

52. I am a historian and the Edward A. Dickson Emerita Professor of History at the University of California, Santa Barbara ("UCSB"). I previously served as a professor in the History Department at UCSB from 1976 to 2014. My research interests encompass eighteenth and nineteenth century American history, with an emphasis on women, gender, sexuality, journalism, historical demography, and medicine.

[41] Dr. Stiles comment, "Reports of Medical Societies," Vermont Medical Society—Semi-Annual Session. at 479; *Boston Medical and Surgical Journal*, July 11, 1867, 478-80 at 479.

53. I have conducted extensive research on the history of abortion and abortion regulation in the United States.

54. I convened a research conference that took place in January of this year at the Huntington Library titled "Abortion in American History: Intimate Decisions, Medical Knowledge, and Legal Decrees in the Two Centuries before *Roe v. Wade*."

55. I served as President of the Society for Historians of the Early American Republic ("SHEAR") during 2012-13, and President of the Western Association of Women Historians during 2005-07.

56. My work has been recognized with a Mellon Distinguished Fellowship, a Guggenheim Fellowship, and National Endowment for the Humanities grants, among other awards and honors.

57. I earned a Ph.D. in history from the University of California, Berkeley, and a B.A. from the University of Chicago.

58. My curriculum vitae, which sets forth my qualifications in more detail and includes a complete list of the publications I have authored during the previous ten years, is attached hereto as Exhibit 1.

**CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS**

59. None

**COMPENSATION**

60. I will be compensated $15,000 for general consultation services and the preparation of this report. In addition, I will be compensated at the rate of $350 per hour for testimony at deposition and trial.

Dated: June 9, 2025

Signed by:
Patricia Cline Cohen
FD3C2726F8FF47D...

Patricia Cline Cohen, Ph.D.

# EXHIBIT 1

**Brief C.V.—Patricia Cline Cohen**

**Education**: B.A. University of Chicago, 1968; Ph.D. UC- Berkeley, 1977

**Employment:** History Department, U. of Calif., Santa Barbara 1976-2014 (retired)

**Appointment**: Edward A. Dickson Emerita Professorship, 2024-2024

**Selected Books**:

- *A Calculating People: The Spread of Numeracy in Early America* (Univ. of Chicago Press, 1982). Republished Fall 1999 by Routledge.
- *The Murder of Helen Jewett: The Life and Death of a Prostitute in Nineteenth-Century New York* (Alfred A. Knopf, 1998, Vintage 1999; Books on Tape 1999).
  Top 100 books list of the New York Times, the LA Times, Publisher's Weekly; published runner-up for the PEN Center USA Book Award and the Mark Lynton History Prize.
- *The Flash Press: Sporting Male Weeklies in 1840s New York* (University of Chicago Press, 2008), coauthored with Helen L. Horowitz and Timothy J. Gilfoyle.
- *The American Promise;* coauthored college US history survey text, (Macmillan, 7 editions).

**Selected Articles, Chapters:**

- "Statistics and the State: Changing Social Thought and the Emergence of a Quantitative Mentality in America, 1790-1820," *William and Mary Quarterly*, (1981), 35-55.
- "Safety and Danger: Women on American Public Transport, 1750-1850," in Susan Reverby and Dorothy Helly, eds., *Gendered Domains: Beyond the Public-Private Dichotomy in Women's History,* (Cornell, 1992), 109-122.
- "Unregulated Youth: Masculinity and Murder in the 1830s City," *Radical History Review*, 52 (Winter 1992), 33-52.
- "Reckoning with Commerce: Numeracy in 17th- and 18th-Century America," in Roy Porter and John Brewer, *Consumption and the World of Goods* (Routledge, 1993) 320-334.
- "Ministerial Misdeeds: The Onderdonk Trial and Sexual Harassment in the 1840s," *The Journal of Women's History*, Vol. 7 (Fall 1995), 34-57. Anthologized 3 times.
- "Numeracy in Nineteenth-Century America," *A History of School Mathematics*, 2 volumes, from the National Council of Teachers of Mathematics, ed. by George M. A. Stanic and Jeremy Kilpatrick (Reston, Virginia, 2003), I: 43-76.
- "Sex and Sexuality: The Private, the Public, and the Spirit Worlds," *Journal of the Early Republic*, 24 (Summer 2004), 310-18.
- " 'The Anti-Marriage Theory' of Thomas and Mary Gove Nichols: A Radical Critique of Monogamy in the 1850s," *Journal of the Early Republic*, 34 (Spring 2014), 1-20.
- "Public and Print Cultures of Sex in the Long Nineteenth Century," *Oxford Handbook of American Women's and Gender History,* eds. Ellen Hartigan-O'Connor and Lisa G. Materson (Oxford University Press, 2018), 195-216.
- "The Trial that Sparked Maine's 1840 Abortion Statute," *Commonplace: The Journal of Early American Life,* October 2024.

**Public History**:
Co-authorship in 2021-22 of 3 legal briefs in state and federal jurisdictions about the history of abortion in the 19th century.

**Honors**: President of SHEAR 2012-13; President of Western Association of Women Historians 2005-2007; Mellon Distinguished Fellow, AAS; Guggenheim, NEH awards, inter alia.

**Conference convenor**: "Abortion in American History: Intimate Decisions, Medical Knowledge, and Legal Decrees in the Two Centuries Before Roe v. Wade," Huntington Library, Jan. 17-18, 2025. (12 historians and legal scholars presenting)

**Current research**:

- a biographical study of Thomas Low Nichols and Mary Gove Nichols, journalists and health, sex and marriage reformers in the 1830s-1880s and advocates of "Free Love" in the 1850s United States

- a history of abortion, 1790-1890: cultures of sexuality, fertility decline, sensationalized journalism, gynecology/obstetrics, medical jurisprudence, state statutes and court decisions. Preliminary findings:

- http://thepanorama.shear.org/2022/10/24/induced-abortion-in-the-early-republic/

- https://www.washingtonpost.com/outlook/2022/06/24/dobbs-decision-looks-history-rescind-roe/

- SSRN 4197554 "Married Women and Induced Abortion in the United States, 1820-1860," posted Aug. 2022 to Social Science Research Network

- https://commonplace.online/article/the-trial-that-sparked-maines-1840-abortion-statute/

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW<br><br>**DECLARATION OF CARLY DAHL, MD** |

CARLY DAHL, MD, hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My areas of expertise are obstetrics-gynecology, maternal-fetal medicine, and diagnosing and treating patients who are pregnant with embryos or fetuses that have fatal or grave conditions.

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). All of the statements in the expert report are true and correct to the best of my knowledge. The expert report provides a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/10/2025

Signed by:
Carly Dahl
B9C58DFAD2434BD...
Carly Dahl, MD

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | Case No.: 1:24-cv-00244-BLW |

**<u>EXPERT REPORT OF CARLY DAHL, M.D.</u>**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), CARLY DAHL, M.D., makes the following disclosures:

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

1. I am a Board-certified obstetrician-gynecologist ("OB-GYN") and medical researcher.

**<u>Idaho's Abortion Bans</u>**

2. I understand that Idaho has banned abortion care in almost all circumstances with limited exceptions. *See* Idaho Code § 18-622 ("Ban Throughout Pregnancy"); Idaho Code §§ 18-8801 to 18-8808 ("Fetal Heartbeat Ban"). I will refer to these laws throughout as the "Abortion Bans."
3. In my expert opinion, the Abortion Bans are profoundly harmful to patients because they prevent physicians from providing medically indicated abortion care in many cases of serious medical need.
4. My colleagues and I have treated many patients who were transferred from Idaho to Utah because they could not receive the care they needed in their home state.

5. I have personally accepted at least two patients who were transported from Idaho since the Abortion Bans took effect. I am not always the receiving physician (i.e., the attending physician accepting the patient on the day of the transportation) and I take care of people throughout their hospital care after their transport.

6. Abortion is safe with an extremely low risk of complication. It is safer to have an abortion than it is to remain pregnant.[1]

7. Additionally, there are many circumstances where abortion care is medically indicated. A treatment is medically indicated when there is a medical reason to undertake it.

8. Circumstances where abortion care is medically indicated include, but are not limited to, pregnancy-related complications, existing conditions that are exacerbated by pregnancy, conditions for which treatment is complicated by pregnancy, continuing the pregnancy would put the pregnant person at risk of death from self-harm, pregnancies where the embryo or fetus is diagnosed with a fatal or grave condition, and multifetal pregnancy reduction, among others.

9. As a maternal-fetal medicine specialist (i.e., a high-risk pregnancy physician), I treat pregnant patients who have serious medical needs on a daily basis.

10. A significant portion of my practice is dedicated to treating patients who are pregnant with embryos or fetuses that have fatal or grave conditions.

**Fatal or Grave Conditions Affecting an Embryo or Fetus**

11. As a Maternal Fetal Medicine fellow, I routinely perform anatomic surveys and assess embryonic and fetal anomalies.

---

[1] *Abortion Access Fact Sheet*, ACOG (last visited Feb. 14, 2025), https://www.acog.org/advocacy/abortion-is-essential/come-prepared/abortion-access-fact-sheet; Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012 Feb;119(2 Pt 1):215-9. doi: 10.1097/AOG.0b013e31823fe923. PMID: 22270271.

12. If an embryo or fetus has a condition that is incompatible with life, I will discuss that condition with the patient, explain the risks of continuing the pregnancy, and counsel the patient about their options, including terminating the pregnancy and seeking palliative care for the fetus.

13. I will also discuss these options with patients who have embryonic or fetal anomalies even if they are not incompatible with life. If I am unable to provide abortion care under Utah law, I will provide an out-of-state abortion referral if that is what the patient wants. If fetal or neonatal intervention is possible, I will refer the patient to the Fetal Center for additional consultation by other neonatal/pediatric subspecialists.

14. I see patients with a variety of embryonic or fetal conditions on a regular basis.

15. All pregnancies entail serious risks for the pregnant person. In some cases of embryonic or fetal anomaly, the pregnant person faces additional risks as a result of the embryonic or fetal condition.

16. For instance, fetal hydrops, which is a condition where the fetus develops multiple fluid collections throughout its body (which can occur for many reasons), increases the risk of "mirror syndrome" and preeclampsia, which can cause serious injury to maternal organs that can be irreversible or can cause maternal death.

17. Some pregnant patients have a higher baseline risk of developing pregnancy-related complications and must weigh that risk against continuing a pregnancy that cannot result in the birth of a child that can sustain life. For example, patients who have a history of cesarean sections in previous pregnancies are at higher risk of having another cesarean section in future pregnancies. A cesarean section is a major abdominal surgery that entails significant risk to the pregnant patient, including increased blood loss, the need for blood transfusions, the risk of operative injury to intraabdominal organs, wound infection, need for further operations,

infection, etc. The number of prior cesareans a patient has had is directly correlated to a pregnancy-specific condition called placenta accreta spectrum, where the pregnancy and placenta grow into the prior uterine scar. When this occurs, the risk of maternal death is elevated, and the risk of serious maternal morbidity is significantly higher.[2] Reducing the number of cesarean sections a patient has (including abortion as an alternative option to a cesarean) is paramount to reduce the risk of placenta accreta spectrum in future pregnancies. Furthermore, the number of prior cesareans often directly correlates to surgical complexity and risk of operative injury in future pregnancies. Patients who have pre-existing medical conditions have an increased likelihood of experiencing exacerbation of these conditions with pregnancy. An example of this is chronic hypertension. Individuals with chronic hypertension have a 20-50% risk of developing preeclampsia with pregnancy continuation, which increases the risk of organ damage, stroke, venous thromboembolism, seizures, and death.[3]

18. In some cases, an embryonic or fetal condition is not incompatible with life by definition, but taken together with other conditions would result in the lack of a meaningful life for the neonate and low likelihood for long-term survival. This depends significantly on the clinical scenario. An example may be a fetus with severe growth restriction, which alone is not necessarily incompatible with life but when it occurs concurrently with an open neural tube defect, a

---

[2] Shellhaas CS, Gilbert S, Landon MB, Varner MW, Leveno KJ, Hauth JC, Spong CY, Caritis SN, Wapner RJ, Sorokin Y, Miodovnik M, O'Sullivan MJ, Sibai BM, Langer O, Gabbe SG; Eunice Kennedy Shriver National Institutes of Health and Human Development (NICHD) Maternal–Fetal Medicine Units Network (MFMU). The frequency and complication rates of hysterectomy accompanying cesarean delivery. Obstet Gynecol. 2009 Aug;114(2 Pt 1):224-229. doi: 10.1097/AOG.0b013e3181ad9442. PMID: 19622981; PMCID: PMC2771379; *Placenta Accreta Spectrum*, ACOG (July 2012, reaffirmed 2021), https://www.acog.org/clinical/clinical-guidance/obstetric-care-consensus/articles/2018/12/placenta-accreta-spectrum.

[3] *Chronic Hypertension in Pregnancy*, ACOG (Jan. 2019), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2019/01/chronic-hypertension-in-pregnancy.

significant heart defect, and oligohydramnios due to placental insufficiency, this may be considered incompatible with life.

19. There are some embryonic or fetal conditions that result in the embryo or fetus being incompatible with life, like anencephaly. Anencephaly is a neural tube defect where the fetal calvarium (skull) and covering skin does not form, which exposes the brain tissue to amniotic fluid. This causes the brain tissue to undergo degeneration.

20. Craniorachischisis is a severe version of anencephaly, which is an absence of the brain and cranial vault as well as a bony defect of the cervical spine, which leads to an absence of any tissue covering the upper spinal cord. Due to the lack of covering of the brain and spinal cord, these tissues are eroded during pregnancy making this a universally lethal condition.

21. Exencephaly is functionally the same as anencephaly (see above). This condition is commonly referred to as "exencephaly-anencephaly sequence." Exencephaly is the precursor for anencephaly where there is neural tissue present that has not yet been degraded by amniotic fluid due to the absence of the fetal skull. Fetal outcomes are the same as described in anencephaly.

22. Triploidy is a genetic condition in which a fetus has three of each chromosome, instead of two. This condition increases the risk of maternal preeclampsia, placental abruption, and postpartum hemorrhage. These risks increase as the pregnancy continues and can cause severe maternal morbidity or death. Triploidy is associated with congenital heart conditions, abnormal brain development, cystic kidney disease, growth abnormalities, musculoskeletal abnormalities, facial abnormalities, intellectual disability, and seizures. Most commonly, triploidy results in a spontaneous abortion in the first trimester but in rare cases it results in fetal survival into the

second or third trimester of pregnancy. Because of the extra set of chromosomes (69) and the associated resulting anomalies, this is a lethal condition.

23. Trisomy 13 is a genetic condition in which a fetus has three copies of chromosome 13, instead of two. Trisomy 13 is associated with multiple fetal anomalies, including brain anomalies (most commonly holoprosencephaly), cardiac defects, renal abnormalities, and fetal growth restriction. Approximately 50% of expectantly managed pregnancies experience an intrauterine fetal demise. Less than 50% of neonates survive one week of life, and there is a 90% mortality rate in the first year of life. The rate of survival is associated with the severity of the associated anomalies but regardless, it is considered a lethal condition.

24. Trisomy 18 is a genetic condition in which a fetus has three copies of chromosome 18, instead of two. Trisomy 18 is associated with multiple fetal anomalies, including cardiac defects, musculoskeletal anomalies, omphalocele, congenital diaphragmatic hernia, spina bifida, and brain and facial anomalies. Approximately 50% of cases will result in a fetal demise if managed expectantly. Less than 10% of liveborn neonates survive beyond one month of life. The rate of survival is associated with the severity of the associated anomalies but regardless, it is considered a lethal condition.

25. Bilateral renal agenesis occurs when a fetus's kidneys do not develop. This results in a complete absence of renal tissue. Due to the critical function that renal tissue provides in making amniotic fluid, the resulting issue is called anhydramnios (the lack of amniotic fluid). Amniotic fluid is essential for fetal lung development as well as appropriate limb development. Without it, fetuses develop pulmonary hypoplasia and other musculoskeletal issues such as clubfeet and joint contractures. Together the effects of anhydramnios are called "Potter's Sequence," which are the characteristic traits of abnormal facies due to compression and limb

deformities. Due to the combination of pulmonary hypoplasia and the lack of lung development that cannot occur postnatally as well as the absence of kidneys, this condition is lethal.

26. Hypoplastic left heart syndrome (HLHS) is when the left side of a fetus's heart does not develop correctly, impairing normal blood flow throughout the body. This condition, if untreated, is lethal within days to weeks due to the inability to pump blood from the left side of the heart to the remainder of the brain and body. This condition can be treated with multiple, major cardiac surgeries that require extensive hospitalization and medical intervention as well as significant financial and post-surgery resources. With intervention (which is a combination of three major surgeries within the first ~five years of life), the mortality rate remains approximately 35-40% and survival depends on other co-morbid conditions and the severity of the disease.

27. Achondrogenesis is a group of lethal osteochondrodysplasias that result from a failure of the cartilaginous matrix formation in the fetus. This causes severe limb abnormalities, deficient spine ossification, a short trunk, and a disproportionately large head. The abnormalities of skeletal growth in the chest restrict the ability for the fetal lungs to develop, leading to pulmonary hypoplasia. These conditions are considered lethal skeletal dysplasias. There is no available prenatal or postnatal treatment.

28. Acardia is the absence of cardiac tissue that can occur in conjoined twins or in the setting of twin reversed arterial perfusion (TRAP sequence). TRAP is a complication of monochorionic twin gestation where one twin does not develop normally due to abnormal arterial connections. One twin is developed by reversed perfusion from the other twin that leads to an axial organization with the development of a central skeleton and a lower body and typically absence

of the upper body (head, heart, and upper extremities). The abnormal blood flow to the acardiac twin leads to lethal anomalies outside of the uterus including an absence of the heart, absence of skull, and severe maldevelopment of the upper body.

29. Body stalk anomaly is a lethal malformation characterized by the attachment of fetal visceral organs to the placenta with a short or absent umbilical cord. This is also called limb-body-wall complex. It is associated with limb defects, deformity of the spine, neural tube defects, craniofacial defects, malformation of the chest wall, pulmonary hypoplasia, and abnormalities of the intraabdominal organs. The fetus is essentially inseparable from the placenta as a result of abnormal development early in pregnancy. Because the organs grow outside of the fetal abdominal cavity, this is considered a universally lethal condition.

30. Campomelic dysplasia is a severe skeletal dysplasia that leads to severely abnormal extremities, disorders of sexual development (XY sex reversal or male to female development), abnormal development of the chest, and abnormal facial development. It can also cause tracheobronchomalacia, which can be severe and impair respiratory function. This is considered a lethal condition due to the impact on neonatal respiratory function.

31. Meckel-Gruber syndrome is a genetic syndrome comprised of renal cystic dysplasia, encephalocele (abnormal brain development outside of the skull) or other central nervous system abnormalities, and postaxial polydactyly. Due to the renal cystic dysplasia, the kidneys do not develop appropriately, and this leads to severe oligohydramnios or anhydramnios causing life limiting pulmonary hypoplasia. Most cases result in an intrauterine fetal demise or death within hours of birth. The physiology is similar to bilateral renal agenesis (see above).

32. Ectopia cordis is a fetal anomaly in which the fetal heart lies completely or partially outside of the thoracic cavity. It is commonly associated with congenital heart defects, omphalocele,

facial clefting, and pulmonary hypoplasia. Some cases may be amenable to surgical repair although the survival rate with surgery remains low due to sepsis, respiratory failure, and circulatory collapse.

33. Holoprosencephaly is the lack of separation of the brain (cerebral) hemispheres and abnormal brain development. There are multiple forms of holoprosencephaly that vary in severity. It is commonly associated with trisomy 13 or other chromosomal abnormalities. It is associated with facial deformities (including cyclopia or a single eye orbit). Due to the abnormal brain development, this condition results in hypotonia, feeding difficulties, severe seizure disorders, impaired vision, and severe intellectual disability. 50% of affected neonates die within five months and 80% die within one year.

34. Iniencephaly is a neural tube defect in which there is extreme and fixed retroflexion of the neck with the orbits permanently displaced upwards. The mandible is contiguous with the chest. It is associated with occipital encephaloceles and fused or missing cervical vertebrae. Due to the severe dysmorphia of this condition that impairs normal basic functions, this is a lethal condition. As the fetus is malpositioned, this can cause labor dystocia (typically the head must be flexed towards the chest to facilitate a vaginal delivery). Withholding appropriate abortion care significantly increases the risk of abnormal labor requiring a cesarean delivery which significantly impacts future pregnancies (as discussed above) and increases maternal morbidity.

35. Perinatal hypophosphatasia is a rare inherited disorder of bone metabolism resulting in the loss of the gene that creates alkaline phosphatase. There are three subtypes, including the perinatal lethal subtype which causes severe bone hypomineralization and abnormal bone development including hypomineralization of the skull. This is a lethal condition due to the associated

pulmonary hypoplasia and chest deformities as well as severely abnormal skeletal development.

36. Osteogenesis imperfecta (type II) is a connective tissue disorder that leads to osteopenia and fractures. There are multiple subtypes. Type II is the perinatal lethal subtype of OI. It leads to abnormal sclarea, a small chest with beaded ribs, severe limb shortening and fractures, and a demineralized skull. The abnormal chest wall development leads to severe pulmonary hypoplasia which is a common cause of neonatal death.

37. Short rib polydactyly syndrome is a type of osteochondrodysplasia that leads to short tubular bones, short horizonal ribs with a severely constricted thorax as well as other extremity abnormalities and abnormal viscera including abnormal kidney development. Due to the constricted thorax, there is severe pulmonary hypoplasia that causes this to be a lethal condition. Nearly 70% of neonates experience a neonatal or infantile death, and survival past this time often leads to other severe abnormalities including renal insufficiency/renal failure or other severe conditions such as portal hypertension.

38. Sirenomelia is a rare lethal malformation characterized by having a single lower extremity as well as other skeletal, gastrointestinal, and genitourinary abnormalities. There is an abnormal development of the lumbosacral spine. It is commonly associated with bilateral renal agenesis (see above) or bilateral cystic dysplastic kidneys that leads to anhydramnios. The majority of cases are lethal due to pulmonary hypoplasia or obstructions within the gastrointestinal or genitourinary systems. Only 1% these infants survive beyond the first week of life.

39. Thanatophoric dysplasia is a skeletal dysplasia that is lethal. There are two types of thanatophoric dysplasia (both of which are lethal). These conditions are associated with abnormal bone development and abnormal development of the cranial bones. It is associated

with cleft palate, heterotopias, polymicrogyria, and other central nervous system abnormalities. It is lethal within the first hours to days of life due to the small thorax and associated pulmonary hypoplasia as well as central apnea and the abnormal skull compression on the brainstem. Those surviving beyond infancy are ventilator dependent with severe intellectual disability and seizures.

40. Trisomy 16 (full) is a genetic condition where there is a third copy of chromosome 16. This condition is considered to be lethal in the embryonic period. It is the most common trisomy in spontaneous abortions. Because of the extra genetic material when it is in all cell lines of the body, it is a lethal condition that rarely survives beyond the first trimester.

41. Trisomy 22 is a genetic condition where there is a third copy of chromosome 22. It typically causes a spontaneous abortion in the first trimester of pregnancy. Because of the extra genetic material when it is in all cell lines of the body, it is a lethal condition that rarely survives beyond the first trimester.

42. Lower urinary tract obstruction (LUTO) is an abnormal development of the genitourinary system in which urine cannot exit the fetal bladder. This results in anhydramnios as fetal urine is the primary component of amniotic fluid. As amniotic fluid is essential to fetal lung development, this results in pulmonary hypoplasia and is considered a lethal condition.

43. The conditions discussed herein are a non-exhaustive list of fatal or grave embryonic or fetal anomalies where a patient must weigh the risks of continuing a pregnancy against the reality that the embryo or fetus cannot sustain life after birth. It is impossible to provide a complete list of such conditions, and the examples listed herein should not be used to exclude other conditions when determining whether abortion care would address a serious medical need.

## FACTS OR DATA CONSIDERED IN FORMING MY OPINIONS

44. My opinions are based on my extensive education and training; research; attendance at professional conferences; and knowledge of the relevant literature, including the sources cited in this report, and my clinical experience.

45. For my discussion of various fatal or grave embryonic or fetal conditions, I primarily relied upon the textbook: Woodward, P. J. (2021). Diagnostic imaging: Obstetrics (4th ed.). Elsevier. ISBN 9780323793971.

## EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS

46. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

## MY QUALIFICATIONS AND PUBLICATIONS

47. I am a Board-certified obstetrician-gynecologist and medical researcher licensed to practice medicine in Utah.

48. I am currently a Maternal Fetal Medicine Fellow at the University of Utah and Intermountain Health – Department of Maternal Fetal Medicine in Salt Lake City, Utah. I am also obtaining a Master of Science in Clinical Investigation (MSCI) degree at the University of Utah. In June of this year, I will complete my fellowship and graduate from the MSCI program. I will then become a full-time physician at Intermountain Health.

49. I attended the University of Minnesota Medical School, where I earned a medical degree, and then I completed a residency in obstetrics and gynecology at Northwestern Medicine & John H. Stroger, Jr. Hospital of Cook County.

50. I currently serve, and have served, on many committees and associations, including the Society of Maternal Fetal Medicine Reproductive Health Committee, the Utah Reproductive Round

Table Coalition Steering Committee, and the Utah Medical Association. I am also a member of Physicians for Reproductive Health Leadership Training Academy.

51. My research includes studying obstetric transportation in the Intermountain West, including the frequency and indications of patients transferred from Idaho to the University of Utah and Intermountain Health for abortion care.

52. I publish extensively on pregnancy, abortion, and reproductive autonomy and have given multiple presentations at national conferences on these topics.

53. My curriculum vitae, which sets forth my qualifications, experience, and publications more fully, is attached hereto as Exhibit 1.

**CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS**

54. None.

**COMPENSATION**

55. I am being compensated at the rate of $300 per hour for my work on this case.

Dated: February 18, 2025

Signed by:
Carly Dahl
B9C58DFAD2434BD...

Carly Dahl, M.D.

# Exhibit 1

# Carly Morgan Dahl, M.D.

[redacted]


## EDUCATION & TRAINING

2022 - Present **University of Utah & Intermountain Health – Department of Maternal Fetal Medicine**, Salt Lake City, UT
Maternal Fetal Medicine Fellow, Post Graduate Year 6
Advocacy Track Fellow

2022 - Present **University of Utah – Master of Science in Clinical Investigation (MSCI)**, Salt Lake City, UT
Anticipated completion date: June 2025

2018 - 2022 **Northwestern Medicine & John H. Stroger, Jr. Hospital of Cook County – Department of Obstetrics and Gynecology**, Chicago, IL
Resident Physician
Administrative Chief Resident

2014 - 2018 **University of Minnesota Medical School**, Minneapolis, MN
Doctor of Medicine

2010 - 2014 **University of Minnesota – College of Biological Sciences**, Minneapolis, MN
Bachelor of Science: Neuroscience, *summa cum laude, with high distinction*

## EMPLOYMENT

2011 - 2014 **U.S. Department of Veterans Affairs**, Minneapolis, MN
Research Assistant - Neuropsychiatric testing and cognitive remediation instructor

2011 - 2012 **U.S. Department of Education: Trio Upward Bound**, Minneapolis, MN
Tutor - Low-income and first-generation high school students

## LICENSURE

2022 - Present **Utah Licensed Physician and Surgeon** (License No. 12791482.1205, Exp: 01/31/2026)
**Utah Licensed Physician and Surgeon CS Schedule 2-5** (License No. 12791482.8905, Exp 01/31/2026)

2022-2024 **Advanced Cardiovascular Life Support**
ID: 225403825044, Exp 03/2024

## BOARD CERTIFICATION

2022 - Present **American Board of Obstetrics and Gynecology**
Active Diplomat, ABOG ID: 9039765

## LEADERSHIP

2023-2024 **Society of Maternal Fetal Medicine Course Director**, National Harbor, MD
Course Co-Director - *Language Matters: Impacts on Access to Abortion Care and Policy*

2023 – Present **Society of Maternal Fetal Medicine Reproductive Health Committee**
Fellow Member

2023 - Present **Utah Reproductive Round Table Coalition Steering Committee**, Salt Lake City, UT
Physician Member

2023 - Present **Utah Medical Association**, Salt Lake City, UT
Vice Chair, Resident/Fellow Section

2023 - Present **Utah Reproductive Round Table Coalition**, Salt Lake City, UT
Physician Member

2023 - Present **Utah Providers Reproductive Organization and Advocacy after Roe (UPROAR)**, Salt Lake City, UT
Communications Director

2023 - Present **University of Utah Obstetrics and Gynecology Advocacy Curriculum**, Salt Lake City, UT
Advisor

2022 - Present **University of Utah Equity, Diversity, and Inclusion Committee**, Salt Lake City, UT
Recruitment and Retention Subcommittee Lead

2021 - 2022 **Northwestern Obstetrics and Gynecology - Chief Resident**, Chicago, IL
Administrative Chief Resident

2021 - 2022 **Northwestern Obstetrics & Gynecology Diversity, Equity, and Inclusion Committee**, Chicago, IL
Elected Member, Patient Care Subcommittee

2020 **Northwestern University Department of Obstetrics and Gynecology Resident Lecture Series – *The Personal Is Political 2020: The Intersection of Politics, Advocacy, and Women's Healthcare on the 100th Anniversary of a Woman's Right to Vote***, Chicago, IL
Co-Director

2020 - 2022 **American College of Obstetrics and Gynecology**, Chicago, IL
Northwestern Program Representative

2018 – 2022 **Illinois Perinatal Quality Collaborative "Promoting Vaginal Birth" Initiative**, Chicago IL
Resident Member

2018 - 2022 **Social Morbidity & Mortality Resident Curriculum**, Chicago, IL
Organizer

2018 - 2022 **John H. Stroger, Jr. Hospital of Cook County / Cermak County Jail - Labor Support Project**
Founder and Resident Liaison

2017 - 2018 **Gold Humanism Honor Society**, Minneapolis, MN
Organization Co-Chair

2017 - 2018 **Women's Health Initiative - Phillips Neighborhood Clinic**, Minneapolis, MN
Project Founder & Women's Health Lead Coordinator

2015 **Himalayan Health Exchange**, Leh/Ladakh, India
International Medical Volunteer

| | |
|---|---|
| 2014 - 2018 | **Phillips Neighborhood Clinic**, Minneapolis, MN<br>Administrative Board/Organization Co-Chair (2015-2016), Volunteer Medical Clinician (2015-2016), Patient Advocate (2014-2015) |
| 2014 | **Tom Burnett Advanced Leadership Program**, Minneapolis, MN<br>Selected Member |
| 2014 | **House of Grace: Agricultural and Nutritional Initiative**, Bukoba, Tanzania<br>International Project Director |
| 2011 - 2014 | **Biology Without Borders**, Minneapolis, MN<br>President (2013-2014), Vice President (2012-2013), Local Volunteer Coordinator (2011-2012) |

## HONORS / AWARDS

| | |
|---|---|
| 2022 | REIS Residency Research Award, 1st Place – Northwestern University Department of Obstetrics and Gynecology |
| 2022 | Excellence in Medical Student Teaching Award – Northwestern University Department of Obstetrics and Gynecology |
| 2021 | Excellence in Medical Student Teaching Award – Northwestern University Department of Obstetrics and Gynecology |
| 2020 | Northwestern University Department of Obstetrics and Gynecology Chair's Research Award |
| 2020 | Northwestern University Department of Obstetrics and Gynecology Bill Banzhaf Research Award |
| 2020 | Excellence in Medical Student Teaching Award – Northwestern University Department of Obstetrics and Gynecology |
| 2019 | Northwestern University Department of Obstetrics and Gynecology Chair's Research Award |
| 2017 | *Minnesota Medicine* Writing Contest, Student Category: Honorable Mention |
| 2016 | Award for Scholarly Achievement, National Conference for Student Run Free Clinics |
| 2015 | *Walter B. Judd* International Travel Fellowship |
| 2014 | University of Minnesota President's Leadership and Service Award |
| 2013 | College of Biological Sciences Annual Giving Scholarship |
| 2012 | Rosenberg Scholarship for International Travel and Humanitarian Efforts |
| 2011 - 2014 | University of Minnesota Honors Program, *summa cum laude* |
| 2010 - 2014 | College of Biological Sciences Dean's Scholars Program |

## PROFESSIONAL MEMBERSHIPS

2022 – Present **Utah Medical Association**

2020 - Present **Society of Maternal Fetal Medicine**

2017 - Present **Alpha Omega Alpha (AOA) Honor Society**

2017 - Present **Gold Humanism Honor Society**

2015 - Present **American College of Obstetricians and Gynecologists**

2014 - Present **American Medical Association**

2014 - 2018 **Minnesota Medical Association**

## PUBLICATIONS / PRESENTATIONS

**Journal Articles**

**Dahl, C**., Fay, K., Wright, S., Heuser, C. Pregnancy Planning, Prevention and Risk Evaluation Clinics: Rethinking the Traditional Preconception Consult. American Journal of Obstetrics and Gynecology-MFM. 2024, April. ePub ahead of Print. PMID: 38614207

**Dahl, C**., Turok, D., Heuser, C., Sanders, J., Elliot, S. & Pangasa, M. Strategies for Obstetricians and Gynecologists to Advance Reproductive Autonomy in a Post-Roe Landscape. American Journal of Obstetrics and Gynecology. 2024, Feb; 230(2):226-234. PMID: 37536485.

**Dahl, C**., Turner, A., Bayles, C., Cheu, L., Singh, A., Zumpf, K., Cowett, A., & McCloskey, L. Influence of the Coronavirus Disease 2019 (COVID-19) Pandemic on Delays and Barriers to Abortion. Obstetrics & Gynecology. 2021, Nov; 138(5):805-808. PMID: 34619741.

**Dahl, C**., Zhang, Y., Ong, J., Yeh, C., Son, M., Miller, E., Roy, A., & Grobman, W. A Multivariable Predictive Model for Success of External Cephalic Version. Obstetrics & Gynecology. 2021, Sept; 138(3):426-433. PMID: 34352823.

**Dahl, C**., Miller, E., Leziak, K., Jackson, J., & Yee, L. Communication Between Pregnant Women and their Partners about HIV Testing in the United States. AIDS Research and Human Retroviruses. 2021, Mar; EPub(Online): 1-13. PMID: 33736463.

**Dahl, C**., Zhang, Y., Ong, J., Yeh, C., Son, M., Miller, E., Roy, A., & Grobman, W. Patient Characteristics Associated with ECV Complications. American Journal of Obstetrics and Gynecology - Maternal Fetal Medicine. 2021, Sep; 3(5):100411. PMID: 34058425.

**Dahl, C**., Geynisman-Tan, J., & Premkumar, A. Birth Behind Bars: Labor Support for Incarcerated Persons. Obstetrics & Gynecology. 2020, Nov; 136(4):1036-1039. PMID: 33030860.

HogenEsch, E., **Dahl, C**., Samworth, A., Vekatachalam, S., Rajan, P., Lange, E. Atrial fibrillation with rapid ventricular response as a maternal presentation of mirror syndrome: a case report. Case Reports in Women's Health. 2022, Nov 36: e00469. PMID: 36425248.

Iroz, C., **Dahl, C**., Cassimatis, I., Wescott, A., & Miller, E. Prophylactic Anticoagulation for Preterm Premature Rupture of Membranes (PPROM): A Decision Analysis. American Journal of Obstetrics and Gynecology - Maternal Fetal Medicine. 2021, May; 3(3):100311. PMID: 33493702.

Sobeck-Rauch, J, Madrigal, J, Cavens, A, **Dahl, C**, Patel, A. Evaluation of Adherence Rates following Ectopic Pregnancy to Inform Management Decisions in a Public Hospital System. Journal of Gynecology Obstetrics and Human Reproduction. 2021, Nov; 50(9):102180. PMID: 34107357.
Leziak, K., **Dahl, C**., Jackson, J., Miller, E., & Yee, L. HIV Knowledge and Attitudes Among Minority Pregnant Patients and their Non-Pregnant Partners in an Urban Hospital Clinic. Journal of Sexual and Reproductive Health. 2021, Dec; 30:100656. PMID: 34521028.

Wesley, E., Uppendahl, L., Felices, M., **Dahl, C**., Messelt, A., Boylan, K., Skubitz, A., Vogel, R., Nelson, H., & Geller, M. Cytomegalovirus and Systemic Inflammation at Time of Surgery is Associated with Worse Outcomes in Serous Ovarian Cancer. Gynecology Oncology. 2020, Oct; 160(1):193-198. PMID: 33168306.

Geynisman-Tan, J., Milewski, A., **Dahl, C**., Collins, S., Mueller, M., Kenton, K., & Lewicky-Gaupp, C. Lower Urinary Tract Symptoms in Women with Female Genital Mutilation. Female Pelvic Medicine and Reconstructive Surgery. 2019, Mar; 25(2):157-160. PMID: 30807420.

Uppendahl, L., **Dahl, C**., Miller, J., Felices, M., & Geller, M. Natural Killer Cell-Based Immunotherapy in Gynecologic Malignancy: A Review. Frontiers in Immunology. 2018, Jan; 8(1825):1-15. PMID: 29354116.

**Dahl, Carly**. (2018, May 01). Toenails and Teenage Drama. Minnesota Medicine.

**<u>Oral Presentations</u>**

**Dahl, C**., Premkumar, A., Allshouse, A., Turner, A., Cowett, A., McCloskey, L., Debbink, M. (February, 2023). The Impact of Geography on Abortion Stigma: Community Level Factors Impacting Individual-Level Abortion Stigma. Society of Maternal Fetal Medicine; San Francisco, CA, USA.

**Dahl, C**. (January, 2022). The Ownership of Women's Bodies by the Carceral State and the Perpetuation of Reproductive Control. American College of Obstetrics & Gynecology Indiana Scientific Conference. Virtual.

**Dahl, C**., Zhang, Y., Ong, J., Yeh, C., Son, M., Miller, E., Roy, A., & Grobman, W. (January, 2022). A Multivariable Predictive Model for Success of External Cephalic Version: The ECV Calculator. American College of Obstetrics & Gynecology Indiana Scientific Conference. Virtual.

**Dahl, C**., Zhang, Y., Ong, J., Yeh, C., Son, M., Miller, E., Roy, A., & Grobman, W. (January, 2021). A Multivariable Predictive Model for Success of External Cephalic Version: The ECV Calculator. Society of Maternal Fetal Medicine; Las Vegas, NV, USA. Virtual.

**Dahl, C**., Mallon, J., & Sick, B. (February, 2018). Creating a Women's Health Initiative at a Student Run Free Clinic: A Guide to Comprehensive Women's Health Care Delivery. National Student Run Free Clinic Conference; Omaha, NE, USA.

**Dahl, C**. (February, 2016). Interprofessional Education and Specialty Services Panel. Society for Student Run Free Clinics Conference; Phoenix, AZ, USA.

**Dahl, C**., Fujisawa, C., & Aasand, T. (February, 2016). Law Involvement in a Student Run Free Clinic: The Phillips Neighborhood Clinic. Society for Student Run Free Clinics Conference; Phoenix, AZ, USA.

Samworth, A., **Dahl, C**., & Lange, L. Atrial Fibrillation as Maternal Presentation for Mirror Syndrome. (May, 2022). Society for Obstetric Anesthesia and Perinatology (SOAP) Annual Conference; Chicago, IL, USA.

Geynisman-Tan, J., Milewski, A., **Dahl, C**., Kenton, K., & Lewicky-Gaupp, C. (June, 2018). Lower Urinary Tract Symptoms in Women with Female Genital Circumcision. American Urogynecologic Society National Conference; Vienna, AUT.

Geynisman-Tan, J., Milewski, A., **Dahl, C**., Kenton, K., & Lewicky-Gaupp, C. (August, 2018). Lower Urinary Tract Symptoms in Women with Female Genital Circumcision. International Continence Society Annual Meeting; Philadelphia, PA, USA.

**Poster Presentations**

**Dahl, C.,** Chahine, R., Wiener, B., Silver, R., McMillin, G., Catov, J., Chung, J., Greenland, P., Grobman, W., Hoffman, M., Khan, S., Levine, L., Mercer, B., Merz, N., Simhan, H., Reddy, U., Saade, G., Shanks, A., Yee, L., Varagic, J., McNeil, B., Metz, T. (February, 2024). Cannabis Use and Development of Hypertension in the NuMoM2b Heart Health Study. Society of Maternal Fetal Medicine; National Harbor, MD, USA.

**Dahl, C**., Allshouse, A., Turner, A., Premkumar, A., Bales, C., Cheu, L., Singh, A., McCloskey, L., Cowett, A., Debbink., M. (February, 2023). Association between Distance Traveled and Abortion Stigma. Society of Maternal Fetal Medicine; San Francisco, CA, USA.

**Dahl, C**., Iroz, C., Wescott, A., Cassimatis, I., & Miller, E. (October, 2020). Prophylactic Anticoagulation While Hospitalized for Premature Prelabor Rupture of Membranes: A Decision Analysis. American College of Obstetrics and Gynecology Clinical and Scientific Meeting; Seattle, WA, USA.

**Dahl, C**., Bedell, S., Uppendahl L., Pulver, T., Hellweg, R., Isaksson Vogel, R., Richter, J., Mullany, S., & Winterhoff, B. (March, 2018). The Role of L1CAM in Early Stage Endometrial Cancer Recurrence. Society for Gynecologic Oncology National Conference; New Orleans, LA, USA.

**Dahl, C**. & Kalikawe, E. (April, 2017). Health and Education is a Human Right: Piloting a Nutrition, Education and Agriculture Project in Rural Tanzania with a Focus on Community Led Directorship. Social Medicine Consortium Conference (International); Chicago, IL, USA.

**Dahl, C**., Lasswell, T., Mallon, J., & Sick, B. (April, 2017). A Women's Health Initiative at an Interprofessional Student-Run Free Clinic: The Phillips Neighborhood Clinic. Robert Hebbel Medicine Research Day; Minneapolis, MN, USA.

**Dahl, C**., Mallon, J., & Sick, B. (September, 2017). A Women's Health Initiative at a Student Run Free Clinic: A Focus on Pap Smears. Minnesota Medical Association Annual Conference; Rochester, MN, USA.

**Dahl, C**., Aasand, T., Werner, L., & Sick, B. (February, 2016). Improving Attitudes Towards Underserved Patients at a Student Run Free Clinic: The Phillips Neighborhood Clinic. Society of Student Run Free Clinics Conference; Phoenix, AZ, USA.

**Dahl, C**., Aasand, T., Werner, L., & Sick, B. (March, 2016). Improving Attitudes Towards Underserved Patients at a Student Run Free Clinic: The Phillips Neighborhood Clinic. University of Minnesota Academic Health Center 1Health Research Symposium; Minneapolis, MN, USA.

**Dahl, C**., Aasand, T., Werner, L., & Sick, B. (May, 2016). Improving Attitudes Towards Underserved Patients at a Student Run Free Clinic: The Phillips Neighborhood Clinic. University of Minnesota's Robert Hebbel Medicine Research Day; Minneapolis, MN, USA.

**Dahl, C**., Abraham, A., & Singh, R. (September, 2016). Providing Rural Health Care in the Himalayas. University of Minnesota Service Learning Symposium; Minneapolis, MN, USA.

**Dahl, C**. (May, 2015). Providing Rural Healthcare in the Himalayas. Judd Fellows Symposium; Minneapolis, MN, USA.

**Dahl, C**., Abraham, A., & Singh, R. (October, 2015). Providing Rural Health Care in the Himalayas. University of Minnesota's Global Health Day; Minneapolis, MN, USA.

Samworth, A., **Dahl, C**., & Lange, L. Atrial Fibrillation as Maternal Presentation for Mirror Syndrome. (May, 2022). Society for Obstetric Anesthesia and Perinatology (SOAP) Annual Conference; Chicago, IL, USA.

Uppendahl, L., **Dahl, C**., Messelt, A., Felices, M., Nelson, H., Boylan, K., Skubitz, A., Geschwind, K., Vogel, R., & Geller, M. (March, 2019). Cytomegalovirus and Systemic Inflammation is Associated with Worse Outcomes in Serous Ovarian Cancer Patients. Society of Gynecologic Oncology Annual Conference; Oahu, HI, USA.

Donelan, C., Wagar, M., Howard, C., Benson, S., **Dahl, C**., Ianovich, F., & Leitch, B. (April, 2017). Implementation of an Undergraduate Medical Education Course in Global Health Based on the Consortium of Universities for Global Health Core Competencies: A Pilot Program. Healthy People, Healthy Ecosystems: Implementation Leadership & Sustainability in Global Health (International); Washington D.C., DC, USA.

Black, A., **Dahl, C**., Fisher, W., Hurd, R., Karp, E., & Thomas, K. (April, 2016). Quality Improvement and Patient Satisfaction at the University of Minnesota's Intermediate Care Unit: The Impact of Sitting. University of Minnesota Medical School Quality Improvement Symposium; Minneapolis, MN, USA.

Forster, S., Wang, Y., MacDonald, A., Thuras, P., Dubke, R., Lupo, J., Marggraf, M., **Dahl, C**. & Nienow, T. (June, 2015). For Whom Does Cognitive Remediation Work: Prediction from Baseline Cognitive Characteristics. Cognitive Remediation in Psychiatry; New York City, NY, USA.

Forster, S., Wang,Y., MacDonald, A., Thuras, P., Dubke, R., Lupo, J., Marggraf, M., **Dahl, C**., & Nienow, T. (October, 2015). Learning During Cognitive Remediation Training in Patients with Schizophrenia: An Investigation of Learning Curves Associated with Distinct Neurocognitive Profiles. Society for Research in Psychopathology; New Orleans, LA, USA.

Nienow, T., Dubke, R., Lupo, J., Wang, Y., **Dahl, C**., Marggraf, M., Yang, K., Pratapaneni, S., Gerould, H., Sponheim, S., & MacDonald, A. (October, 2015). Working Memory Training for Patients with Schizophrenia: Outcomes at 4 and 8 Month Follow Up. Society for Research in Psychopathology; New Orleans, LA, USA.

Nienow, T., Marggraf, M., **Dahl, C**., Yang, K., Wang, Y., Gerould, H., Smith, M., Landrum, C., Dubke, R., Sponheim, S., & MacDonald, A. (September, 2014). Remediation of Working Memory in Outpatients with Schizophrenia. Society for Research in Psychopathology; Evanston, IL, USA.

**Other Publications**

**Dahl, C**. Utah Medical Association. Resolution A3: Medical Trainees Protection for Interstate Training-Related Travel. Approved September 2023.

**Publications Under Review**

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D., Plaintiff, v. MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, Defendants. | Case No.: 1:24-cv-00244-BLW **DECLARATION OF ALEXANDRA G. ELLER, MD** |

ALEXANDRA G. ELLER, MD, hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My areas of expertise are obstetrics-gynecology, maternal-fetal medicine, complex family planning, and treatment of patients with high-risk pregnancies.

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). All of the statements in the expert report are true and correct to the best of my knowledge.

3. Attached hereto as Exhibit B is a true and correct copy of the rebuttal expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). All of the statements in the rebuttal expert report are true and correct to the best of my knowledge.

4. Collectively, these two reports provide a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/10/2025

DocuSigned by:
Alexandra Eller
011F792907E942D...

Alexandra G. Eller, MD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW |

**EXPERT REPORT OF ALEXANDRA G. ELLER, M.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), Alexandra G. Eller, M.D., makes the following disclosures:

1. I am a physician with board-certifications in obstetrics and gynecology, maternal-fetal medicine, and complex family planning. I offer the following opinions as an expert in the medical treatment of patients with high-risk pregnancies.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

2. As a maternal-fetal medicine specialist ("MFM"), a significant portion of my practice is dedicated to treating pregnant patients who face heightened maternal health risks and/or have been diagnosed with conditions that are fatal or grave for their embryo or fetus.

3. I have been practicing for more than 20 years and have encountered many patients who have come to me for care in circumstances where abortion is medically indicated.

4. In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of action advisable. An abortion is "medically indicated" when there is a medical reason for terminating a patient's pregnancy.

5. I have cared for patients when abortion was medically indicated because there were fatal or grave fetal conditions, pregnancy-related complications, existing conditions that were exacerbated by pregnancy, conditions for which treatment was complicated by pregnancy, and where a multifetal pregnancy reduction was warranted.

6. Compared to the risk of abortion, the risk of ongoing pregnancy poses a 37-fold increased risk of maternal death. [Hoyert, etal, Raymond, et al]. As such, when embryonic or fetal death is expected, pregnancy termination is protective of maternal health.

7. I understand that Idaho has banned abortion care in almost all circumstances with limited exceptions. *See* Idaho Code § 18-622; Idaho Code §§ 18-8801 to 18-8808. I will refer to these laws throughout as the "Abortion Bans."

8. In my expert opinion, the Abortion Bans endanger patients' health by preventing physicians from providing medically indicated abortion care in cases where patients have serious medical needs. Recent studies confirm that pregnancy-related mortality is nearly doubled in restrictive states compared to states where abortion is legal and protected (28.5/100,000 births compared to 15.7/100,000 births). [Addante, et al.].

9. Because every patient's circumstances are different, it is important for physicians to have discretion in offering treatment options to their patients.

10. While I have provided medically indicated abortion care in a wide variety of circumstances, my testimony in this lawsuit will focus on when abortion is medically indicated because of (a) serious cardiac conditions, (b) autoimmune disorders, (c) transplant needs, and (d) multifetal pregnancies. I will also testify to my experience treating patients who have traveled to Utah for abortion care because of Idaho's abortion bans.

**A. Serious Cardiac Conditions**

11. In my over 20 years practicing medicine, I have encountered patients with various chronic medical conditions that are exacerbated by pregnancy. Women with certain cardiac conditions are at particularly high risk for serious cardiac complications in pregnancy.

12. The normal adaptation to pregnancy involves a significant increase in circulating blood volume. This dramatically increases the workload of the heart, an adaptation well tolerated by most otherwise healthy women. However, for women with preexisting heart disease, these changes can lead to life threatening cardiac decompensation. Indeed, some otherwise young, seemingly healthy women are diagnosed with cardiac disease in pregnancy because of the development of symptoms that prompt further evaluation and, ultimately, a diagnosis of previously unknown cardiac disease. In other words, the pregnancy "unmasks" an underlying cardiac condition. Pregnancy is also associated with more frequent electrical irritability that results in what most people refer to as palpitations. These are typically benign, but in a woman with a history of heart rate abnormalities (often called arrythmias), pregnancy can promote worsening or more frequent episodes of potentially life threatening arrythmia and sudden death.

13. Pregnant patients with a history of congenital heart disease, valvular heart disease, arrhythmias, pulmonary hypertension, and cardiomyopathy often need a multidisciplinary team to provide care with cardiologists, obstetricians and maternal fetal medicine specialists. Under the best of circumstances, the medical team does a risk assessment prior to the patient attempting pregnancy to enable an informed decision about the risk associated with pregnancy. In many cases, we do not have the luxury of seeing the patient before they become pregnant, and we must assess the maternal life risk of continuing the pregnancy and help the patient make an informed choice about continuing the pregnancy or undergoing a medically indicated abortion. Maternal

cardiac conditions are stratified by four levels of risk, known as the WHO Risk Classes I-IV. These predict the risk for potentially life-threatening cardiovascular complications or maternal death in pregnancy. Class I includes patients with mild forms of heart disease wherein the risk for major cardiac events is 5-10% and escalates to women with Class IV cardiac conditions, among whom the risk for serious events of death is 40-100%. [Thorne, et al., Regitz-Zagrosek et al., Zhang, et al.].

14. The imperative and inevitable increase in circulating blood volume to support pregnancy underlies much of the risk. The heart is made up of four chambers connected by valve inflows and outflows. The heart muscle pumps the blood through the valves and into the lungs for oxygenation and then to the body to supply that vital oxygen to the organs. If one of the valves is narrow, for example, the blood backs up at the choke point and can cause serious ramifications. The excess blood stretches the chamber that cannot empty and promotes abnormal electrical signals (arrythmia). If the blockage is at the outflow of the pumping chamber, then the pump works harder and harder to overcome the obstruction and move blood across the narrow valve until it begins to fail (heart failure).

15. Some patients have a heart condition called cardiomyopathy which means the heart muscle itself is weaker than normal. Some cardiomyopathies are pregnancy induced due to an aberrant response to the elevated estrogenic state of pregnancy. If the cardiac pump begins to fail for any reason, then fluid can rapidly flood the woman's lungs leading to an emergent and often life-threatening condition called pulmonary edema. Sometimes failure leads to an inability to circulate blood to the lungs adequately and there is sudden and dramatic loss of oxygenation. Simultaneously, oxygenated blood is no longer being efficiently delivered to the brain and vital

organs — including the fetus. This can lead to rapid maternal decompensation, fetal death and maternal death if immediate action is not taken.

16. How best to end a pregnancy (through delivery with intervention on fetal behalf or through pregnancy termination by induction or surgical methods) depends on a number of factors that vary from patient to patient, including the clinical scenario, gestational age, fetal size, maternal stability, and patient/family wishes. In some cases, we (the multidisciplinary team including maternal fetal medicine, cardiothoracic surgery, anesthesiology, and neonatology) proceeded with immediate delivery with preparations for maternal cardiopulmonary bypass (basically connecting a person's circulation to an artificial pump and oxygenation machine because the heart can no longer support life). In other cases, we proceeded to medically indicated pregnancy termination because of a prior history of cardiomyopathy or known high risk cardiac disease. In others still, we kept the patient hospitalized for the duration of pregnancy (weeks or, in some cases, months) in case of sudden decompensation to balance maternal and fetal risk and achieve as favorable a gestational age for the fetus as reasonably possible — walking the line of maternal and fetal risk at the patient's request. Some of these women have died postpartum in cases wherein they made an informed choice to continue the pregnancy in spite of the risks, leaving a motherless neonate. Others have survived because of extraordinary critical care resources and multidisciplinary care — sometimes with 4 or more subspecialty physicians in the room simultaneously. Some women have recovered fully, others have endured lifelong health consequences.

17. In cases where a patient has a serious cardiac condition exacerbated by pregnancy, it is not possible to predict with certainty whether the patient will die, nor is it possible to determine with mathematical precision the patient's risk of death. But it is likely that continuing

the pregnancy substantially increases the risk for serious, and potentially long-term, impacts on a patient's health. In at least some cases, these impacts will result in maternal death; in others, they will result in progressive heart failure leading to a need for cardiac transplant.

**B. Autoimmune Disorders**

18. Another example of a medical indication for abortion is a serious or poorly controlled autoimmune disease such as systemic lupus erythematosus (lupus).

19. Typically, the immune system shields the body from infectious threats like bacteria and viruses by producing antibodies that attack foreign invaders. However, some individuals develop antibodies against parts of their own body, leading to a so-called "auto-immune" condition in which the immune system attacks the body's own tissues and organs, having wrongly identified them as foreign and harmful.

20. Autoimmune conditions tend to be chronic diseases that persist over time. They can include lupus, antiphospholipid syndrome, rheumatoid arthritis, vasculitis, autoimmune thrombocytopenia, autoimmune hepatitis, among others. Some are relatively benign and easy to control and others are life threatening. The severity of an autoimmune disease can vary widely among individuals. Lupus is an example with a broad severity ranging from mild rashes and joint pain in some individuals to severe inflammation of the lining surrounding the lungs and heart and severe kidney involvement leading to renal failure (so-called lupus nephritis).

21. Autoimmune thrombocytopenia is a condition where the body attacks a component of the blood clotting system, called platelets, and can lead to dangerously low platelet counts that can result in major bleeding risk at the time of an injury, trauma, or surgery. If the platelets fall low enough, then spontaneous bleeding in the brain can result, with devastating consequences.

22. Antiphospholipid syndrome is a particularly dangerous condition associated with arterial and venous blood clotting that can lead to stroke and pulmonary embolism (blood clots that lodge in the lungs and can cause sudden death).

23. Some autoimmune diseases are typically well tolerated in pregnancy, such as rheumatoid arthritis and multiple sclerosis, due to natural immunological shifts that happen in pregnancy to protect the "foreign" fetus. Other autoimmune conditions can be exacerbated and lead to serious medical and obstetrical complications, such as poorly controlled lupus, lupus nephritis, antiphospholipid syndrome and severe autoimmune thrombocytopenia.

24. The risk of serious and life-threatening hypertension disorders, placental abruption (premature placental separation leading to vaginal bleeding that can range from mild to life threatening), the formation of blood clots during or after pregnancy, and fetal complications (such as severe fetal growth restriction and stillbirth) are much higher in women with certain high risk autoimmune conditions — lupus and antiphospholipid syndrome in particular. For women with lupus nephritis, pregnancy may permanently worsen renal function and shorten the interval to end stage renal disease and the need for dialysis or transplant. [Mehta et al., Wagner et al., Wiles et al., Clowse et al.]

25. In some cases, denying a pregnant patient access to abortion in circumstances where the patient has an autoimmune disease exacerbated by pregnancy will result in serious, long-term impacts on a patient's health, such as immediate death, decreased life expectancy, or profoundly diminished quality of life.

**C. Transplants**

26. Organ transplant is not performed during pregnancy and for a person with end stage liver, cardiac or renal disease in need of or awaiting transplant, pregnancy poses substantial life risk and termination is recommended. Patients with prior transplants can often carry a

pregnancy when desired, but pregnancy may, in some cases, pose a substantial risk to the transplanted organ, particularly if the patient has to adjust their anti-organ rejection medications during a pregnancy due to potential maternal or fetal toxicity. As such, patients with prior solid organ transplantation must make a fully informed decision about the risks to the transplanted organ before taking on a pregnancy.

27. If a patient inadvertently becomes pregnant, stopping vital medications could imperil the transplanted organ and thus threaten maternal life. But death, although possible and in some cases likely, is not certain. Moreover, continuing the vital medications could imperil the fetus. Unplanned pregnancies in patients with a solid organ transplant present complex clinical scenarios to navigate with multidisciplinary teams that include maternal fetal medicine, transplant medicine, and medical subspecialists.

28. I have cared for patients who were on a waiting list for an organ transplant and inadvertently became pregnant and required medically indicated termination. I have also been involved with the care of pregnant patients with renal disease whose pregnancies resulted in the worsening of their renal function requiring dialysis during and after pregnancy.

29. In some cases, denying a pregnant patient access to abortion in circumstances where the patient has had or is in need of an organ transplant will result in serious, long-term impacts to a patient's health, such as immediate death, decreased life expectancy, or profoundly diminished quality of life.

**D. Multifetal Reduction**

30. Abortion care is medically indicated when a multifetal pregnancy reduction would reduce a pregnant person's risk of death or serious injury and/or increase the likelihood of survival of the remaining fetus(es). Multifetal reduction and selective fetal reduction are terms used to describe an abortion of one or more fetuses in a multiple gestation.

31. Multifetal pregnancies carry substantially greater risk to the pregnant woman and the fetuses. Multifetal gestation is associated with higher rates of hypertensive disorders of pregnancy, cesarean delivery, and preterm birth [Day et al, Wen et al.]. The cardiovascular physiologic adaptations to pregnancy are even more profound for multifetal as compared to singleton gestations.

32. There are a variety of clinical scenarios that can lead to consideration of multifetal or selective reduction. Higher order multifetal pregnancy (triplets or greater) poses substantial risk for obstetrical complications. Among triplets, 7% deliver prior to viability due to preterm labor and all fetuses perish. In 2022, 99% of U.S. triplets were born premature (before 37 weeks gestation) and 68% were very premature (<34w gestation) compared to 9% of singletons born premature and just 2% very premature [Osterman et al]. The rate of preeclampsia for women with triplets is 10-20% (compared to 6.5% among singletons). For quadruplets and higher, these risks are substantially greater. Selective reduction is offered and often strongly recommended for women with quadruplets or higher multifetal gestation due to extremely high rates of maternal and fetal/neonatal morbidity. Reduction to 1-2 healthy fetuses both increases the likelihood that those fetuses will survive and be delivered at or near full term and decreases maternal health risk.

33. Patients with underlying medical complications may be at substantially higher risk in the setting of a multiple gestation as compared to singleton pregnancy. For example, patients with milder cardiac and renal disease, for whom a singleton pregnancy is high risk but manageable, may be advised to reduce to a singleton to reduce the risk for serious complications.

34. Patients who have experienced a prior preterm birth are at substantial risk of an even earlier preterm birth with potentially life-threatening fetal implications if carrying twins or higher order multiples. The uterine overdistension of multiples already predisposes to preterm

delivery and a history of early birth raises this risk substantially. A patient with such a history faces a difficult decision about trying to provide the healthiest outcome possible for one fetus or risk losing all the fetuses or having multiple, extremely preterm neonates with potentially serious short and long-term morbidity.

35. Patients sometimes have multifetal pregnancies where one or more babies are affected by serious birth defects or complications that put the other fetus at risk. Some life-threatening fetal conditions result in complications like excess amniotic fluid. This can over distend the uterus and lead to early preterm labor with a very premature delivery or death of the fetuses. Other fetal conditions can result in a high risk for maternal hypertensive disorders (so-called "mirror syndrome") leading to substantial maternal risk and the need for earlier delivery and potential loss of the healthy fetus(es).

36. I have cared for a patient from Idaho who was pregnant with twins wherein one fetus had a life-threatening abnormality, and the other was healthy. The condition was going to predispose her to a higher risk for preterm birth with increased morbidity for the healthy co-twin. The family knew that the sick fetus could not survive no matter how long she carried the pregnancy; hospice care would have been the only option at birth and death was inevitable. They sought to optimize the health of the co-twin, but had to travel out-of-state to do so. I performed a selective reduction in Salt Lake City, and the patient delivered a healthy baby at full term. Her birth announcement acknowledged the loss of the co-twin and the pain of that decision along with the joy of welcoming her first child.

37. Multifetal and selective reduction can greatly increase the chances of a healthy pregnancy, protect the pregnant person, and increase the chances of healthy babies at delivery [Liu et al, Anthoulakis et al, Stone et al, Kristensen et al].

**E. Idaho Patients**

38. I have personally provided abortion care to approximately 5 patients who traveled to Utah from Idaho since the Abortion Bans took effect. I specifically recall several women with previable preterm premature rupture of membranes with or without placental abruption, a woman with preexisting heart failure who became inadvertently pregnant due to birth control failure, and the woman described above with a complex twin pregnancy wherein one fetus had a lethal abnormality and she sought to optimize the outcome of the healthy co-twin. As I write this, I was asked about another patient whose baby has anencephaly, a condition where the skull fails to form and the brain is uncovered and exposed, essentially dissolving over time with lethal outcome. If she seeks early delivery for this undeniably lethal abnormality (associated with high amniotic fluid levels in pregnancy that could increase her risk for hemorrhage), then she will have to travel outside of her home state of Idaho.

39. I am also aware of many other patients traveling from Idaho to Utah for abortion care since the Abortion Bans took effect. I am part of a group practice where one of us may consult with a patient about their medical care options but may not be the one who ultimately treats the patient.

40. Idaho providers have typically called me or one of my colleagues frustrated by their inability to practice standard of care medicine in their home state when women face serious, well known obstetrical complications, such as previable preterm premature rupture of membranes or previable chronic placental abruption that they fear is not yet severe enough to warrant intervention based on Idaho's requirement that abortion only occur when deemed *necessary* to prevent the death of a pregnant patient. They reach out to our practice in Salt Lake City because they know that there is a substantial risk for an emergent situation, and they do not want their patient to be forced to wait until the situation is overtly life threatening to obtain care.

Other times, a patient has been given a lethal fetal diagnosis and wants to proceed with pregnancy termination out of compassion for her fetus and/or to reduce the psychological and physical harms of pregnancy continuation knowing there is no chance for neonatal survival.

41. In most cases, we are contacted by obstetric and MFM colleagues in Idaho to first consult with the patient. In urgent situations, the patients have been medically transported (at great expense to the patient and the medical system) from Idaho to Utah for termination services that could have safely been provided in their home State. In non-urgent cases, we typically arrange either an in-person or telehealth consultation with the patient to discuss the options, alternatives, risks, and benefits of various treatment plans ranging from pregnancy continuation to pregnancy termination. Without sharing any patient-identifying information, and when applicable and appropriate, I share with them experiences I have had with other patients with similar conditions and outcomes of possible courses of treatment. I do my best to provide my patients with as much information as possible in an unbiased fashion so that they can make an informed decision about what is best for them personally.

42. I always emphasize that my job is to provide as much information as I can and then support whatever decision they feel is right for themselves and their fetus and their family. If a patient chooses pregnancy termination, then they travel to Utah for these services with me or a colleague.

43. Pregnancy increases the pregnant person's risk of death (mortality) and serious health complications (morbidity). In appropriate cases, having an abortion can significantly reduce a patient's risk of mortality and morbidity, and Idaho patients continue to come to Utah to get that care.

**FACTS OR DATA CONSIDERED IN FORMING MY OPINIONS**

44. My opinions are based on my education and training; clinical experience; research; attendance at professional conferences; and knowledge of the relevant literature, including the following sources:


a. Addante AN, Eisenberg DL, Valentine MC, Leonard J, Maddox KEJ, Hoofnagle MH. The association between state-level abortion restrictions and maternal mortality in the United States, 1995-2017. Contraception. 2021;104(5):496. Epub 2021 Mar 26.

b. Anthoulakis C, Dagklis T, Mamopoulos A, Athanasiadis A. Risks of miscarriage or preterm delivery in trichorionic and dichorionic triplet pregnancies with embryo reduction versus expectant management: a systematic review and meta-analysis. Hum Reprod 2017;32:1351.

c. Clowse ME, Jamison M, Myers E, James AH. A national study of the complications of lupus in pregnancy. Am J Obstet Gynecol. 2008 Aug;199(2):127. e1-6. Epub 2008 May 5.

d. Day MC, Barton JR, O'Brien JM, Istwan NB, Sibai BM. The effect of fetal number on the development of hypertensive conditions of pregnancy. Obstet Gynecol. 2005 Nov;106(5 Pt 1):927-31.

e. Hoyert DL. Maternal mortality rates in the United States, 2022. NCHS Health E-Stats. 2024.

f. Kristensen SE, Kvist Ekelund C, Sandager P, Stener Jørgensen F, Hoseth E, Sperling L, Zingenberg HJ, Duelund Hjortshøj T, Gadsbøll K, Wright A, Wright D, McLennan A, Sundberg K, Petersen OB. Triple trouble: uncovering the risks and benefits of early fetal reduction in trichorionic triplets in a large national Danish cohort study. Am J Obstet Gynecol. 2023 Nov;229(5):555. e1-555. e14.

g. Liu S, Li G, Wang C, Zhou P, Wei Z, Song B. Pregnancy and obstetric outcomes of dichorionic and trichorionic triamniotic triplet pregnancy with multifetal pregnancy reduction: a retrospective analysis study. BMC Pregnancy Childbirth. 2022 Apr 5;22(1):280.

h. Mehta B, Jannat-Khah D, Glaser KK, Luo Y, Sammaritano LR, Branch DW, Goodman SM, Lockshin M, Wang F, Ibrahim S, Salmon JE. Fetal and maternal morbidity in pregnant patients with Lupus: a 10-year US nationwide analysis. RMD Open. 2023;9(1).

i. Osterman MJK , Hamilton BE, Martin JA, et al. Births: Final Data for 2022. https://www. cdc. gov/nchs//data/nvsr/nvsr73/nvsr73-02. pdf (Accessed on Feb 6, 2025).

j. Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012 Feb;119(2 Pt 1):215-9.

k. Regits-Zagrosek V, Roos-Hesselink JW, Bauersachs J, et al. 2018 ESC Guidelines for the management of cardiovascular diseases during pregnancy. Eur Heart J 2018; 39:3165.

l. Stone J, Ferrara L, Kamrath J, Getrajdman J, Berkowitz R, Moshier E, Eddleman K Contemporary outcomes with the latest 1000 cases of multifetal pregnancy reduction (MPR). Am J Obstet Gynecol. 2008;199(4):406. e1.

m. Thorne S, MacGregor A, Nelson-Piercy C. Risks of contraception and pregnancy in heart disease. Heart. 2006 Oct;92(10):1520-5.

n. Wagner SJ, Craici I, Reed D, Norby S, Bailey K, Wiste HJ, Wood CM, Moder KG, Liang KP, Liang KV, Rose C, Rozkos T, Sitina M, Grande JP, Garovic VD. Maternal and foetal outcomes in pregnant patients with active lupus nephritis. Lupus. 2009;18(4):342.

o. Wen SW, Demissie K, Yang Q, Walker MC. Maternal morbidity and obstetric complications in triplet pregnancies and quadruplet and higher-order multiple pregnancies. Am J Obstet Gynecol. 2004 Jul;191(1):254-8.

p. Wiles K, Webster P, Seed PT, Bennett-Richards K, Bramham K, Brunskill N, Carr S, Hall M, Khan R, Nelson-Piercy C, Webster LM, Chappell LC, Lightstone L. The impact of chronic kidney disease Stages 3-5 on pregnancy outcomes. Nephrol Dial Transplant. 2021 Nov 9;36(11):2008-2017.

q. Zhang Q, Zhu F, Shi G, Hu C, Zhang W, Huang P, Zhu C, Gu H, Yang D, Li Q, Niu Y, Chen H, Ma R, Pan Z, Miao H, Zhang X, Li G, Tang Y, Qiao G, Yan Y, Zhu Z, Zhang H, Han F, Li Y, Lin J, Chen H. Maternal Outcomes Among Pregnant Women With Congenital Heart Disease-Associated Pulmonary Hypertension. Circulation. 2023;147(7):549. Epub 2023 Feb 13.

**EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS**

45. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

**MY QUALIFICATIONS AND PUBLICATIONS**

46. I earned a Bachelor of Arts degree magna cum laude from Princeton University, where I majored in molecular biology. I earned a Medical Degree from Wake Forest University School of Medicine. I also have a Master of Public Health degree from the University of Utah.

47. Following my medical degree, I interned and completed my residency in obstetrics and gynecology at Oregon Health and Science University. I then completed a maternal-fetal medicine fellowship at the University of Utah.

48. I am licensed to practice medicine in Utah and have an inactive license in Oregon.

49. I have a varied practice that includes ultrasound prenatal diagnosis and consultation services, inpatient obstetrical management, and my own private high risk obstetrical patients whom I care for across the spectrum of their pregnancies through delivery. Working at an academic medical center, I am also actively involved in the education and training of obstetrical resident physicians in complex pregnancy care, which is one of the most rewarding parts of my job. Clinically, I serve as a referral resource to provide pregnancy termination services for maternal medical, obstetrical and fetal indications. I also see women with complex medical or obstetrical histories for reproductive risk counseling about safe methods of contraception and health optimization prior to attempting pregnancy for those who choose to move forward with a clear understanding of the maternal and fetal risks. As a complex family planning specialist, I also consult with patients and families facing a grave fetal diagnosis about pregnancy management options ranging from pregnancy continuation with hospice services at birth to pregnancy termination, often referred to as compassionate early delivery to prevent suffering when fetal or neonatal death is inevitable. Finally, one of my areas of interest is in optimal interpretation of fetal heart rate monitoring during labor to recognize fetal compromise and enable timely intervention to expedite delivery and reduce the risk for intrapartum fetal brain injury. To this end, I have co-led a postgraduate course on Advanced Fetal Heart Rate Monitoring at the Society for Obstetrician and Gynecologic hospitalists for the last seven years and am responsible for quarterly nursing education seminars for the Intermountain system that

includes several hundred nurses across 21 labor and delivery units. Teaching the next generation of obstetrical providers and nurses is one of the most rewarding parts of my job.

50. In addition, I serve as an assistant professor of obstetrics and gynecology at the University of Utah Health Sciences Center.

51. I have active board certifications for general obstetrics and gynecology, maternal fetal medicine, and complex family planning. I am a member of the American College of Obstetricians and Gynecologists ("ACOG"), the Society for Maternal Fetal Medicine ("SMFM"), and the Society for Family Planning ("SFP").

52. I have written on pregnancy, pregnancy complications, and maternal morbidity, including:

a. Branch DW, **Eller AG**. *Antiphospholipid syndrome and thrombosis*. Clin Obstet Gynecol. 2006 49(4):861-74.

b. **Eller AG**, Bennett MA, Sharshiner M, Masheter C, Soisson AP, Dodson M, Silver RM. *Maternal morbidity in cases of placenta accreta managed by a multidisciplinary care team compared with standard obstetric care*. Obstet Gynecol. 2011 Feb; 117(2Pt1): 331-7.

c. Manuck TA, **Eller AG**, Esplin MS, Stoddard GJ, Varner MV, Silver RM. *Outcomes of expectantly managed preterm premature rupture of membranes occurring before 24 weeks gestation*. Obstet Gynecol. 2009 114(1):29-37.

53. My curriculum vitae, which summarizes my education, credentials, professional experience, and publications more fully, is attached hereto as Exhibit 1.

## CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS

54. None.

## COMPENSATION

55. I am being compensated at the rate of $300 per hour for my work on this case.

Dated: February 19, 2025

Signed by:

011F792907E942D...

Alexandra G. Eller, M.D., M.P.H.

# Exhibit 1

**CURRICULUM VITAE**
**January 2025**

# Alexandra Grosvenor Eller, MD, FACOG

## Employment

| | |
|---|---|
| 04/2021 – 10/2023 | Intermountain Healthcare<br>Associate Medical Director for Women's Health |
| 07/2008 – Present | Intermountain Healthcare<br>Physician, Maternal Fetal Medicine |
| 07/2008 – Present | University of Utah<br>Assistant Professor, Obstetrics and Gynecology |
| 07/2005-07/2008 | University of Utah<br>Visiting Clinical Instructor, Obstetrics and Gynecology |
| 07/2003-06/2005 | Multnomah County Jail<br>General Practitioner for Women's Health Clinic |

## Other Activities

Member, Board of Trustees, National Geographic Society 2008-2022
Member, Board of Trustees, Natural History Museum of Utah 2023-present

## Education:

| | |
|---|---|
| 2007-2009 | **University of Utah**<br>Salt Lake City, UT 84132<br>Degree: Master of Public Health |
| 2005-2008 | **University of Utah**<br>Salt Lake City, UT 84132<br>Fellowship, Maternal Fetal Medicine |
| 2001- 2005 | **Oregon Health and Science University**<br>Portland, OR 97201<br>Internship and Residency in Obstetrics and Gynecology |
| 1997-2001 | **Wake Forest University School of Medicine**<br>Winston-Salem, NC 27157<br>Degree: MD |
| 1991-1994 | **Princeton University**<br>Princeton, NJ 08544<br>Degree: BA Molecular Biology (magna cum laude) |
| 1992 | **Johns Hopkins University**<br>Baltimore, MD<br>Degree: none (summer session) |

## Board Certification

Diplomate, American Board of Obstetrics and Gynecology
- General Obstetrics and Gynecology since November, 2007
- Maternal Fetal Medicine since April, 2011

- Complex Family Planning since July, 2024

## Licensure

Utah State Medical License # 5792769-1205 (Active)
Oregon State Medical License # MD 24349 (Inactive)
Drug Enforcement Agency License (Active)

## Honors / Awards

| | |
|---|---|
| 2024 | SMFM 2024 Pregnancy Meeting Oral Session Presentation Award |
| 2004 | Oregon Health and Science University Resident Research Award |
| 2001 | Faculty Award, Wake Forest University School of Medicine |
| 2001 | American Medical Women's Association, Janet M. Glasgow Memorial Achievement Citation |
| 2000 | Alpha Omega Alpha |
| 1997 | Academic Merit Award: four-year medical school scholarship |
| 1996 | Autism Society of North Carolina "Camp Counselor of the Year" |
| 1994 | Magna Cum Laude, Princeton University |
| 1994 | George Khoury '65 Senior Prize for Academic Excellence in Molecular Biology |
| 1994 | Phi Beta Kappa Society |
| 1994 | Society of Sigma Xi |

## Research/Clinical Interests

**Current:**

- Antenatal fetal testing practices and maternal/fetal outcomes
- Reproductive advocacy and complex family planning/abortion care
- Simulation in Maternal Fetal Medicine Education
- Ethics in the practice of maternal fetal medicine

**Fellowship:**

- Genetic polymorphisms and recurrent pregnancy loss.
- The role of traditional birth attendants in HIV education, counseling and testing in western Kenya.
- Optimal management strategies for patients with pregnancies complicated by suspected placenta accreta.

**Residency:**

- Matrix metalloproteinase expression in a non-human primate model of intra-amniotic infection in chronically catheterized rhesus macaques

**Undergraduate:**

- Investigation of the *in vivo* function of the intra-Golgi transport factor p115 that our lab had recently cloned and sequenced. The experiment involved creating dominant negative mutations of the cloned gene and expressing the protein in cultured fibroblasts after DNA transfection.

## Review Articles

1. Eller, AG *Interventions for Intrapartum Fetal Heart Rate Abnormalities*. Clin Obstet Gynecol 2020 63(3):635-644.
2. Eller AG, Esplin MS *Management of the category II fetal heart rate tracing.* Clin Obstet Gynecol 2020 Sep; 63(3):659-667.

## Peer Reviewed Publications:

1. Herrera, CA, Manuck TA, Stoddard GJ, Varner MW, Esplin MS, Clark EAS, Silver RM, **Eller AG**. Perinatal outcomes associated with intrahepatic cholestasis of pregnancy. J Matern Fetal Neonatal Med. 2018 Jul;31(14):
2. Bowman ZS, **Eller AG**, Kennedy AM, Richards DS, Winter TC 3rd, Woodward PJ, Silver RM. Interobserver variability of sonography for prediction of placenta accreta. J Ultrasound Med 2014 Dec;33(12):2153-8.
3. Bowman ZS, **Eller AG,** Kennedy AM, Richards DS, Winter TC 3rd, Woodward PJ, Silver RM. Accuracy of ultrasound for the prediction of placenta accreta. AJOG 2014 Aug;211(2):177.e1-7.
4. Rose NC, **Eller AG**. The impact of noninvasive fetal evaluation: its effect on education, training, and the maintenance of clinical competence in prenatal diagnosis. Curr Opin Obstet Gynecol 2014 Apr;26(2):117-23.
5. Bowman ZS, **Eller AG**, Bardsley TR, Greene T, Varner MW, Silver RM. Risk factors for placenta accreta:a large prospective cohort. Am J Perinatol 2014 Oct;31(9):799-804.
6. Bowman ZS, Manuck TA, **Eller AG**, Simons M, Silver RM. Risk factors for unscheduled delivery in patients patients with placenta accreta. AJOG 2014 Mar;210(3):241.e1-6.
7. Heuser CC, Knight S, Esplin MS, **Eller AG**, Holmgren CM, Manuck TA, Richards D, Henry E, Jackson GM. Tachystole in term labor: incidence, risk factors, outcomes, and effect on fetal heart tracings. AJOG 2013 Jul;209(1):32.e1-6.
8. Heuser CC, **Eller AG,** Byrne JL. *Survey of physicians approach to severe fetal anomalies*. J Med Ethics. 2012 Jul;38(7):391-5.
9. Heuser CC, **Eller AG**, Warren J, Branch DW, Salmon J, Silver RM. *A case-control study of membrane cofactor protein mutations in two populations of patients with early pregnancy loss.* J Reprod Immunol. 2011 Sep; 91(1-2):71-5.
10. **M**cLean LA, Heilbrun ME, **Eller AG**, Kennedy AM, Woodward PJ. *Assessing the role of magnetic resonance imaging in the management of gravid patients at risk for placenta accreta*. Acad Radiol. 2011 Sep; 18(9): 1175-80.
11. **Eller AG**, Bennett MA, Sharshiner M, Masheter C, Soisson AP, Dodson M, Silver RM. *Maternal morbidity in cases of placenta accreta managed by a multidisciplinary care team compared with standard obstetric care*. Obstet Gynecol. 2011 Feb; 117(2Pt1): 331-7.
12. **Eller AG**, Nelson L, Branch DW, Porter TF, Silver RM. *Vascular endothelial growth factor A gene polymorphisms in women with recurrent pregnancy loss*. J Reprod Immunol. 2011 Jan; 88(1):48-52.
13. Manuck TA, **Eller AG**, Esplin MS, Stoddard GJ, Varner MV, Silver RM. *Outcomes of expectantly managed preterm premature rupture of membranes occurring before 24 weeks gestation*. Obstet Gynecol. 2009 114(1):29-37.
14. **Eller AG**, Porter TF, Soisson AP, Silver RM. *Optimal Management Strategies for Placenta Accreta*. BJOG 2009; 116(5):648-54.
15. **Eller AG**, Fisher B *Images in Clinical Medicine. Diagnosis of Uterine Rupture on CT*. N Engl J Med. 2009 360(2):170.
16. Gravett MG, Adams KM, Sadowsky DW, **Grosvenor AR**, Witkin SS, Axthelm MK, Novy MJ. *Immunomodulators Plus Antibiotics Delay Preterm Delivery After Experimental Intra-Amniotic Infection in a Non-Human Primate Model.* Am J Obstet Gynecol. 2007 197:518.e1-8.
17. Branch DW, **Eller AG**. *Antiphospholipid syndrome and thrombosis*. Clin Obstet Gynecol. 2006 49(4):861-74.
18. **Eller AG**, Branch DW, Byrne JLB. *Stillbirth at Term.* Obstet Gynecol. 2006 108(2):442-447.
19. Namen AM, **Grosvenor AR**, Chin R, Daybell D, Adair N, Woodruff RD, Kavanagh PV, Haponik EF. *Pulmonary Infiltrates after Intravesical Bacille Calmette-Guerin: Two Cases and Review of the Literature.* Clin Pulm Med. 2001 **8(3)**:177-179.

20. Sapperstein SK, Walter DM, **Grosvenor AR**, Heuser JE, and Waters MG *p115 is a General Vesicular Transport Factor Related to the Yeast Endoplasmic Reticulum to Golgi Transport Factor Uso1p.* PNAS. 1995 **92**: 522-526

**Abstracts and Presentations:**

1. Esplin MS, **Eller AG**, Dizon-Townsend D, Martial C, Henry E, Page J, Einerson B, Porter TF. Evaluaton of standardized management of category II tracings: Category II Action Plan Study. Society for Maternal-Fetal Medicine Meeting, National Harbor, MD February 2024.

2. Nance JD, **Eller AG**, Espin MS. Routine antenatal testing in women over 35 leads to increased intervention without apparent reduction in morbidity. Society for Maternal-Fetal Medicine Meeting, Atlanta, GA February 2016.

3. Bowman SC, **Eller AG**, Bardsley T, Green T, Varner MW, Silver RM. Risk factors for development of placenta accreta. Society for Gynecological Investigation (SGI) International Meeting, Orlando, FL, March 2013.

4. Bowman ZS, Manuck TA, **Eller AG**, Simons M, Silver RM. Risk factors for unscheduled delivery in patients with placenta accrete. Society for Gynecological Investigation (SGI) International Meeting, Orlando, FL, March 2013.

5. Heuser C, **Eller L**, Holmgren C, Jackson M, Esplin S, Knight S. Effects of tachysystole on fetal heart rate tracings. Society for Gynecological Investigation (SGI) International Meeting, San Diego, CA, March 2012.

6. Simmons M, Manuck T, **Eller A**, Silver B. Antenatal vaginal bleeding and perinatal outcomes among women with suspected placenta accrete. Poster. Society for Maternal-Fetal Medicine Annual Meeting, Dallas, TX, February 2012.

7. Heuser C, Esplin MS, **Eller A**, Holmgren C, Richards D, Knight S,Jackson GM. Outcomes associated with tachysystole term laboring patients. Poster. Society for Maternal-Fetal Medicine Annual Meeting, Dallas, TX, February 2012.

8. Heuser C, Esplin MS, **Eller A**, Holmgren C, Richards D, Knight S, Jackson GM. Incidence and risk factors for tachysystole in term laboring patients. Society for Mtaernal-Fetal Medicine Annual Meeting, Dallas, TX, February 2012.

9. Chin J, Heuser C, **Eller A**, Branch DW, Silver R. Leptin and leptin receptor single nucleotide polymorphisms and recurrent pregnancy loss. Poster. Society for Maternal-Fetal Medicine Annual Meeting, San Francisco, CA, February 2011.

10. Heuser C, Byrne J, Rose N, **Eller A**. Variation in physician approach to obstetrical management of both severe and uniformly lethal anomalies. Poster. Society for Maternal-Fetal Medicine Annual Meeting, San Francisco, CA, February 2011.

11. **Eller AG**, Lu L, Hibbard JU, Wilkins I, Jim Z, Bailit J, Burkman R, Branch W, Gonzalez-Quintero V, Gregory K, Haberman S, Hatjis C, Hoffman M, Kominiarek M, Landy H, Ramirez M, Reddy U, Troendle J, Van Veldhuisen P. The impact of epidural timing on the mode of delivery in nulliparous women at term. A poster presented at the Annual Meeting of the Society for Maternal-Fetal Medicine, San Diego, CA, February, 2010.

12. Bennett M, **Eller AG**, Silver RM. Placenta accreta spectrum: comparing outcomes between multidisciplinary care centers & community hospitals. A poster presented at the Annual Meeting of the Society for Maternal-Fetal Medicine, San Diego, CA, February, 2010.

13. Heuser C, **Eller A**, Branch W, Salmon J, Silver R. Functional mutations in membrane cofactor protein are not associated with idiopathic recurrent pregnancy loss in a Caucasian population. Poster, Society for Maternal-Fetal Medicine, Chicago, IL, February 2010.

14. **Eller AG**, Branch DW, Nelson L, Silver RM. *The -634 G→C Polymorphism in the Regulatory 5' Untranslated Region (5'UTR) of the Vascular Endothelial Growth Factor (VEGF) Gene is Associated with Unexplained, Recurrent Pregnancy Loss (RPL).* A poster presented at the Annual Meeting of the Society for Maternal-Fetal Medicine, San Diego, CA, January, 2009.

15. Manuck TA, **Eller AG**, Esplin MS, Silver RM. *"Outcomes following expectant management of previable preterm premature rupture of membranes"*. Poster presentation – Society for Gynecological Investigation (SGI) International Meeting March 2008, San Diego, CA.

16. **Eller AG**, Silver RM, Zempolich K, Soisson P, Simonsen SE *Strategies for Optimal Management of Patients with Placenta Accreta: A retrospective review of 15 years experience.* A poster presented at the Annual Meeting of the Society for Maternal-Fetal Medicine, San Franscisco, CA, February, 2007.

17. Holmgren C, **Grosvenor A**, Nelson K, Rose N. *Evaluation of pregnancy outcome in euploid fetuses with a screen positive second trimester maternal serum screen for trisomy 18*. Presentation at the Society for Maternal Fetal Medicine 2007 Annual Meeting, San Francisco, CA.

18. **Grosvenor AR** (1994) *Sequence Analysis and Functional Characterization of the Intra-Golgi Transport Factor P115.* [A thesis presented to Princeton University in partial fulfillment of the degree of Bachelor of Arts in the department of molecular biology.]

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW |

**REBUTTAL EXPERT REPORT OF ALEXANDRA G. ELLER, M.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), ALEXANDRA G. ELLER, M.D., makes the following disclosures:

1. I am a physician with board-certifications in obstetrics and gynecology, maternal-fetal medicine, and complex family planning. I offer the following opinions as an expert in the medical treatment of patients with high-risk pregnancies.

2. I provided an expert report pursuant to Federal Rules of Civil Procedure 26(a)(2)(B), and I further intend to offer rebuttal expert testimony in response to the testimony offered by Defendants' expert witnesses Dr. Dustan Hughes and Dr. Elena Marie Kraus.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

**A. The Safety of Abortion Care**

3. Dr. Hughes describes the potential complications of surgical termination at less than 13 weeks gestation and greater than 13 weeks gestation. Hughes Expert Report ¶¶ 20-22. He states that termination subjects a stable patient to increased risk by performing a procedure that would otherwise not be undertaken.

4. I would argue that Dr. Hughes is making the wrong comparison. The comparison is between the risks of termination and the risk of *ongoing pregnancy*, not the immediate risk of doing nothing versus performing an abortion. Delivery will be required at some point, and there will be inevitable risks of infection, hemorrhage, and retained placental tissue. The appropriate comparison would be the *relative risk* of termination versus the risk of continuing the pregnancy. Even for a low-risk obstetrical patient, there is an abundance of peer-reviewed, published scientific evidence that first and second trimester pregnancy termination carries less maternal risk for infection, hemorrhage, and death compared to an ongoing pregnancy.

5. For example, large studies that include tens of thousands of women undergoing first-trimester abortion have shown infection rates of 0.01 to 0.6% and hemorrhage requiring transfusion rates of 0.03-0.6% (Chen and Creinin, 2015; Upadhyay et al 2015). In a study including more than 19,000 women undergoing medication abortion, the overall adverse event rates (defined as a need for any of the following: surgical D&C for bleeding, hospital admission, blood transfusion, emergency room visit, or death) was 0.3% (Grossman and Grindley, 2017). Compare this to recent data showing that in 2019, 4.3% of U.S. births were complicated by postpartum hemorrhage, among which 15% of women required transfusion (Corbetta-Rastelli, et al 2023). Thus, the proper comparison for hemorrhage with first-trimester abortion compared to ongoing pregnancy is 0.3% versus 4.3%, more than 10-fold higher risk for women who go on to have a live birth. One large study showed that, compared to women who have an abortion, women experiencing a live birth had 1.3 times higher risk for mental health disorders, 4.4 times higher risk for hemorrhage, 5 times higher for infectious complications, and 24 times higher for hypertensive conditions (Raymond, E. & Grimes, D. 2012).

6. Dr. Hughes sees only a narrow subset of pregnant women undergoing abortion care—those who arrive at the emergency room for patient concerns or possible complications when he is covering hospital call. This limited clinical exposure can understandably shape his perspective on abortion safety, just as a maternal-fetal medicine specialist might develop a skewed view of home birth after seeing only the cases that result in hospital admission for maternal and fetal complications. Both situations reflect a selection bias due to a provider seeing only the cases wherein there are possible complications.

7. Both Dr. Hughes and Dr. Kraus overstate the risks of abortion. In 2018, a Committee of the National Academies of Sciences, Engineering, and Medicine ("National Academies") issued a Consensus Study Report on the Safety and Quality of Abortion Care in the United States after systematically reviewing the relevant evidence. It concluded that abortion in the United States is safe; serious complications of abortion are rare; and abortion does not increase the risk of long-term physical or mental health disorders.[1]

8. The absolute risks of pregnancy are low for most healthy patients, but it is important to have honest, evidence-based discussions with pregnant women about their risks and options to enable informed decision-making. Healthy patients accept these risks every day when pregnancy and childbirth are unlikely to lead to severe organ injury or death, and when they are carrying a fetus that is expected to survive beyond the first months of life.

9. Deciding about pregnancy termination involves a different calculus for pregnant patients with serious medical conditions or who are carrying a fetus that is not going to survive. After counseling, many patients choose to continue a pregnancy despite the risks, but many also

---

[1] Nat'l Acads. of Scis., Eng'g, and Med., *The Safety and Quality of Abortion Care in the United States*, 1-16 (2018) https://doi.org/10.17226/24950.

consider the well-being of their spouse, their other children, and their larger family in the setting of significant maternal risk and decide to end their pregnancies. In my experience, it is not an easy decision for these patients who often express that they would rather take on the suffering (physical, emotional, spiritual) than pass that suffering on to their baby or, potentially, to their families.

10. Overall abortion related maternal mortality is estimated at 0.6/100,000 women compared to an overall maternal mortality rate of 18.6/100,000 among women experiencing a live birth in 2023 (Raymond & Grimes, 2012; Hoyert, DL., 2023). In Idaho specifically, the overall maternal mortality rate is 22.6/100,000 among women experiencing a live birth in 2023.[2] One large review of the CDC's Pregnancy Mortality Surveillance System showed that among 16.1 million abortions performed in the US between 1998-2010, maternal mortality occurred in 108 women for a rate of 0.7/100,000 (Zane, 2015). Twenty of those 108 deaths (19%) were in women with high-risk pregnancies terminating due to the life-threatening nature of the pregnancy. When stratified by gestational age, terminations at less than 8 weeks gestation had a maternal mortality risk of 0.3/100,000. In comparison, those after 17 weeks had a mortality rate of 6.7/100,000, *still far less than ongoing pregnancy and childbirth*. In 2021, 5.7% of all abortions occurred at 14-20 weeks and 1% occurred at 21 weeks or later (Kortsmith, et al 2023). These abortions in the latter half of the second trimester are often related to lethal fetal conditions not previously known to exist in a desired pregnancy or for maternal complications prior to fetal viability.

**B. D&E Procedure**

[2] Idaho Maternal Mortality Rev. Comm., *2021 Maternal Deaths in Idaho* 6, 22 (2023), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=26443&dbid=0&repo=PUBLIC-DOCUMENTS.

11. Drs. Hughes and Kraus cite the risks associated with a dilation and extraction (D&E) procedure. *See*, *e.g.*, Kraus Expert Report ¶ 21; Hughes Expert Report ¶ 22. Many studies have shown the risk to be less than 1% for any of the following serious complications in experienced hands: uterine perforation, cervical laceration, hemorrhage requiring transfusion, or infection (Chen and Creinin, 2015; Upadhyay, et al 2015). To suggest otherwise is to deny an abundance of peer-reviewed literature to the contrary and is disingenuous.

12. Indeed, many studies have demonstrated that a D&E is a safer method for pregnancy termination in the second trimester as compared to induction of labor. For patients with one or more prior cesareans, induction of labor carries a much higher risk for uterine rupture and complications, which may impact future fertility. For these reasons, D&E is recommended to these patients.

13. Dr. Hughes attempts to describe a procedure he has never performed for dramatic effect. Hughes Expert Report ¶ 22. In my experience, it can be a difficult procedure to discuss with patients, (and it is critical to be honest for informed consent) and to perform. It is a medical procedure that can also be lifesaving, particularly in emergent situations like massive hemorrhage, maternal sepsis/severe infection, or maternal medical decompensation in a previable pregnancy wherein induction of labor is not feasible, and cesarean would not improve fetal survival while increasing maternal risk dramatically in some cases.

14. A Utah state legislator—who generally opposes abortion but supports access in cases involving maternal health—once shared with me that her own mother's life was saved by an emergency D&E in the second trimester. She acknowledged that she herself might not have been born had her mother's obstetrician not had the skill to perform that life-saving intervention. These are acquired surgical skills, not something you can perform for the first time in a life-

threatening situation with an unstable patient. My D&E trained colleagues and I in Salt Lake City have come into the hospital urgently from home multiple times to perform this procedure under duress for a bleeding patient wherein induction of labor was not a safe option, and cesarean was inappropriate (in a previable fetus due to the increased maternal risks and impacts on future childbearing).

15. While graphic and disturbing descriptions of a D&E procedure may have rhetorical flair, it is unprofessional and unfair to patients for physicians to discuss a treatment option in such a biased manner. I have the utmost respect for the patient and her fetus, and as a result, I present the patient's options using unbiased and honest language and engage in a process of shared decision-making with the patient. I acknowledge to the assistant surgeon, the nursing staff, and the anesthesiologist that these cases are hard to witness but critical for women facing the need to end a pregnancy (for abortion care or late fetal death) and that I appreciate their willingness to participate in the care of my patient. Whenever possible and desired, I make hand and footprints for the grieving parents. I have seen those footprints tattooed on patients and made into jewelry they never remove.

16. Both Dr. Hughes and Dr. Kraus refer to the psychological trauma of a D&E and how seeing and holding the baby is critical for the grieving process. Evidence suggests that these decisions are deeply personal and there is no "one size fits all" for what will or will not help a family grieve this kind of loss [Burgoine, G et al, 2005]. For some, going to sleep for a procedure and waking up 30 minutes later with the procedure complete is less traumatizing than laboring for 12-48 hours, seeing the fetus—sometimes quite disfigured depending on the fetal abnormalities involved—and potentially needing a surgical procedure for a retained placenta (about 20% incidence with inductions of labor at 12-18 weeks gestation in particular). I always

counsel my patients thoroughly to help explore their own values and needs and support their personal choices about how to proceed with an indicated pregnancy termination. I find it outdated and paternalistic that a physician would provide such biased counseling that contradicts the available, peer-reviewed evidence—both with regard to procedural risk and the grieving process.

17. Dr. Kraus indicates that she has "never been in a situation where there was no other option but to perform a D&C or D&E in a viable pregnancy (meaning the baby is still alive, usually confirmed by a heartbeat on ultrasound) to save the life of the mother." Kraus Expert Report ¶ 24. Unless Dr. Kraus has a consultation-only MFM practice, I find it shocking that she has never been in a situation with an unstable patient experiencing a first or second-trimester miscarriage where there might still be a fetal heartbeat. I am not aware of any obstetrician who has never been involved in a first or early second trimester incomplete miscarriage with hemorrhage requiring urgent/emergent uterine evacuation by D&C. In those situations, we are not looking for a heartbeat. Instead, we are coordinating maternal resuscitation and trying to get to an operating room as quickly as possible to save the patient's life.

18. The window where emergent D&E can be critical is between 15 and 22 weeks gestation, before the point at which a fetus can survive outside the woman's body (another common definition of the term "viable" pregnancy). Attempting a cesarean delivery at 15-22 weeks gestation is not medically feasible and would pose significant and unnecessary morbidity to the patient. Performing such a procedure when safer alternatives exist would fall below the standard of care. If a patient is hemorrhaging or in septic shock and hemodynamically unstable due to intrauterine infection (developing from expectantly managed previable PPROM, for example), then the safest and most appropriate course of action would be a D&E if a provider is

available to save the patient's life and future fertility. In a pregnancy after 26 weeks gestation, an emergent delivery for an unstable patient would typically require cesarean, including some situations wherein the fetus has already died in utero. At 23-25 weeks, these decisions are shared with the patient and her family and, in many cases, result in a cesarean delivery with attempts at neonatal resuscitation or provision of neonatal hospice, when appropriate.

19. Dr. Kraus also indicated an increased risk for subsequent pregnancy complications such as cervical insufficiency or abnormal placentation after second trimester D&E. Kraus Expert Report ¶ 88. Decades ago, when cervical preparation was not routine, there were concerns about higher risks for cervical injury at the time of surgery and in future pregnancies. However, many contemporary studies in the last 20 years have refuted this finding and show no association between a history of D&E at 12-24 weeks gestation and subsequent preterm birth or subsequent increased risk for hemorrhage or placental abnormalities in future pregnancies compared to women with no such history (Jackson, J.E. et al 2007; Woolner, A. et al 2014; Kalish. R. et al 2002; Little, S.E. et al 2015). Honest, unbiased counseling is critical to ethical obstetrical care, and I find it disturbing that a physician would provide either biased or uninformed counseling to a pregnant woman in an effort to direct her decision-making.

**C. Fetal Pain and Analgesia**

20. Dr. Kraus contends that "[a]nother component of surgical abortions on live fetuses is the concern for fetal pain." Kraus Expert Report ¶ 22. She cites the use of anesthetic agents during fetal surgical procedures to attenuate the "physical fetal response to the procedure" and implies this contradicts the concept that the fetus does not feel pain. *Id.* As a maternal fetal medicine physician, I feel certain she understands the difference between autonomic physiologic responses to pain and the experience of pain. For example, as high-risk specialists, we care for

patients with spinal cord injuries in pregnancy who have no sensation below the level of their injury. If these injuries are higher in the spine, typically at or above the 10th vertebrae, then these patients are at high risk for autonomic dysreflexia. It is well established that it is critical to control autonomic physiologic responses in labor for these patients, despite the absence of any maternal perception of pain. That is because the autonomic, physical, reflexive responses to noxious stimuli still exist and are unregulated in these patients. These patients can have dramatic and life-threatening fluctuations in blood pressure and pulse in the presence of noxious stimuli like labor. They do not feel or perceive pain, but their bodies respond robustly (and excessively) to noxious stimuli. This is the basis for using fetal analgesia during fetal surgical procedures as well. This demonstrates the concept of the complexity of the pain pathways—there are incoming signals that detect noxious stimuli and then different connections (severed in some spinal cord injury patients) that communicate the noxious stimuli to the deep brain and then outward to the cortex, the seat of our conscious experiences. Anatomical studies suggest that the physical, neural pathways that connect the deeper brain structures to the cerebral cortex (the source of conscious perception and the complex experience of pain) are not fully connected until the third trimester.

21. Many studies have examined the potential for fetal pain, and the overwhelming consensus is that a fetus is not capable of experiencing pain before 24 weeks gestation—and likely not until closer to 28 weeks gestation (Lee, J.L. et al 2005). There is consensus among the American College of Obstetrician Gynecologists, the Royal College of Obstetricians and Gynecologists, and the Society for Maternal Fetal Medicine that the fetus is not pain capable prior to the third trimester (conservatively defined here as 24 weeks gestation but more typically defined, even in this context, as greater than 28 weeks gestation) (ACOG, RCOG, SMFM

statement references below). Accordingly, when I counsel patients, I explain that while the best available scientific evidence indicates that a fetus cannot experience pain before viability, it would be presumptuous to claim with absolute certainty that fetal pain is impossible. As with many aspects of medicine, some uncertainty will always remain. For that reason, we discuss options to address even the potential for fetal pain, should the patient wish to do so.

22. The D&E procedure cannot be performed without some form of maternal anesthesia, which can range from being fully asleep (like for a gallbladder surgery, for example) to sedation (like that used to set broken bones in the emergency room or for wisdom tooth extraction surgeries). These medications pass from maternal circulation to fetal circulation and thus provide anesthesia to the fetus as well. Finally, pregnant patients are offered the option of a lethal fetal injection prior to surgery. This procedure stops the fetal heart before surgery. Those of us who care for these patients give honest, evidence-based counseling, and address the possibility of fetal pain and options for anesthesia that goes to the pregnant woman, and, via the placenta, to the fetus.

**D. Cardiac Disease in Pregnant Women**

23. For a pregnant woman ending a pregnancy for a medical reason, the risks of an abortion are often vastly lower than the risks of continuing a pregnancy. Ending a pregnancy for a woman with cardiac disease in the first trimester, before the majority of volume expansion has occurred, can avert a substantial risk of serious cardiac events such as unstable/life-threatening arrhythmias, myocardial infarction, heart failure, pulmonary edema, or death.

24. Dr. Kraus states, "In these rare cases, terminating the pregnancy is offered as a way to avoid severe morbidity and mortality. As these situations are clearly defined as being associated with a substantial risk to the life of the pregnant woman, it would fit within the

exception for abortions done with the aim of preventing the death of the pregnant patient." Kraus Expert Report ¶ 41. I have personally cared for pregnant women from Idaho with serious cardiac conditions associated with a high risk for mortality in Utah because no provider was willing to perform their first-trimester abortion in Idaho due to the Abortion Bans.

25. Many of my pregnant patients choose to continue their pregnancies despite the risks. But I do not force them to make that choice. Rather, we have multidisciplinary conversations and use shared decision-making. Once they decide, I provide them with medical care no matter what path they ultimately choose, and I fight hard to help those who choose pregnancy continuation to have the best outcomes possible for both the mother and the fetus.

**E. Terminology Used For Abortion Care**

26. Dr. Kraus states that the term "abortion" is rarely used by maternal fetal medicine physicians. Kraus Expert Report ¶ 14. I agree. Stigma makes many doctors and patients uncomfortable with the term. Nevertheless, the law declares that certain medical interventions constitute an abortion, regardless of what euphemisms doctors or patients may prefer. In Utah, patients must sign various state consent forms and watch state-sponsored videos about forcing their partners to pay child support, or that adoption is always an alternative when their baby has a lethal condition, and I have to explain why they are forced to do those things. It is because state law defines the intentional ending of a pregnancy through use of a medication or surgery that leads to the death of the fetus as an abortion. These state definitions and requirements lead to tremendous additional suffering for many women and families, who tell me their entire concept of the word abortion has been upended in an instant. It is unfathomable to them that under their circumstances, delivering early is considered an abortion. I agree wholeheartedly that the semantics are extremely difficult to navigate with patients and the public.

27. For example, in a discussion with a panel of activists speaking out against abortion, a colleague once described induction of labor for a lethal fetal condition as an abortion and was corrected by the activists who said, "No, that is a compassionate early delivery." Yes, it is a compassionate early delivery, and it is also an abortion. Physicians must abide by rules and regulations or face felony charges in many states, and this often involves a discussion with the patient about the legal term "abortion".

28. Dr. Kraus specifically discusses previable preterm premature rupture of membranes (PPROM) and the appropriateness of offering pregnancy termination as standard of care based on widely accepted national standards of obstetrical care due to substantial maternal risk and grave fetal prognosis. Kraus Expert Report ¶ 34. She then acknowledges that in Idaho, women with PPROM who "are medically stable and elect for termination of pregnancy instead of expectant management, they would need to arrange for termination out of state." *Id.* This acknowledges what the broader obstetrical community is worried about—that in Idaho, you can no longer practice standard of care medicine because of the restrictive laws. She suggests that a termination for PPROM is an "elective abortion," even though the purpose of the termination is to protect the patient's health and life. Dr. Kraus says that in non-emergent cases, Idahoans can simply get medically indicated care out of state, ignoring the additional health risks and financial and logistical burdens this imposes on patients. *Id.* at ¶ 34 (related to PPROM), ¶ 38 (related to preexisting complex medical disorders), ¶ 40 (related to preexisting diabetes with significant renal or vascular dysfunction), ¶ 45 (women can travel out of state when they have substantial risk).

29. Dr. Kraus suggests that in cases of chronic abruption and PPROM "the usual question at or after fetal viability is not when it is necessary to perform an abortion, but when is

the best time to deliver the baby." Kraus Expert Report ¶ 35. This is true. This is what we do, too. But if Dr. Kraus practices maternal fetal medicine, then she also knows that these situations are often much more complex than simply deciding "when to deliver," especially before the point at which the fetus can survive outside the uterus. These discussions and interventions depend completely on the gestational age and health of the fetus, too. Not all fetuses are viable at 24 weeks gestation, and as a maternal fetal medicine specialist, Dr. Kraus should know that, too.[3] When a fetus has severe congenital heart disease, for example, viability occurs much later in pregnancy, when the fetus is big enough and mature enough to undergo surgery. There is so much nuance in maternal fetal medicine. If a pregnant woman has PPROM and a fetus with comorbidities, the picture becomes very complex. For Dr. Kraus to suggest otherwise is disingenuous. Maternal fetal medicine specialists discuss the need to deliver followed by a discussion about options for intervention on fetal behalf, such as cesarean for a non-reassuring heart rate pattern, immediate intubation and resuscitation versus hospice for peri viable neonates at 22-23 weeks gestation or babies with coexistent conditions like growth restriction or structural abnormalities. This is the complexity of maternal fetal medicine. We do have two patients, and we fight hard for the best outcome for both in maternal fetal medicine; but we must also respect the autonomy of the pregnant person. Medical ethics requires us to engage in shared decision-making and honor the pregnant woman's view of what is in the best interests of herself *and* her fetus.

30. I also take issue with Dr. Kraus's statement that patients with medical conditions can simply "take medication to prevent pregnancy or terminate pregnancy prior to the pregnancy

---

[3] Ecker, J., Kaimal, A., Mercer, B.M., et. al., & American College of Obstetricians and Gynecologists & Society for Maternal-Fetal Medicine on Obstetric Care Consensus Number 6 on Periviable Birth *Obstetrics and Gynecology*, 130(4), e187-196 (October 2017).

being a 'clinically diagnoseable pregnancy.'" Yes, contraception is imperative for these patients, and we have created preconception clinics to try and broaden access to this resource. But contraception does fail sometimes, and some women don't know they have one of these conditions until it is unmasked by the physiologic changes of pregnancy. Others are notoriously told "you will never be able to get pregnant" by their non-obstetric subspecialists and don't use contraception. Finally, terminating a pregnancy that is not clinically diagnosable would involve a patient taking abortion medications based on sheer speculation that they recently conceived. Seemingly by definition, a person does not know they are pregnant prior to a clinically diagnoseable pregnancy. This option is neither feasible nor advisable for most patients, nor is it an equitable way of providing patient care.

**F. Multifetal reduction**

31. Dr. Kraus acknowledges that multifetal reduction from higher order multiples (triplets or greater) is considered and offered as standard practice. While such a reduction does not eliminate all the risk of higher-order multiple gestation, it does significantly reduce the maternal, fetal, and neonatal complications that are well-documented in these pregnancies. In some cases, patients with preexisting medical conditions who deeply desire pregnancy may conceive twins and face the difficult choice to reduce to a singleton. This decision is often made in the hope of increasing the likelihood of a healthy outcome for both the parent and the baby. These scenarios—though statistically uncommon—are not rare in maternal-fetal medicine practice. For example, in a patient with a history of extremely preterm births due to cervical insufficiency, carrying multiples greatly increases the risk of losing both twins prior to viability or delivering very prematurely, with serious, lifelong consequences for both children. In such circumstances, reducing to a singleton can give a much better chance for one baby to survive and

thrive.

32. Despite Dr. Kraus' agreement that higher order multiples are risky, and that reduction may reduce but not eliminate those risks, she states, "our 'standard' of care in maternal fetal medicine is not to reduce risks by eliminating a pregnancy or pregnancies." As specialists, our job is to understand the risks, counsel the patient, and provide options for care. We must respect the autonomous decisions that our patients make, even if they are different from the decisions we would make for ourselves. The standard of care requires unbiased counseling based on data to enable informed patient decision-making.

33. Dr. Kraus also refers to my discussion of discordant fetal abnormalities in multiples wherein selective reduction can protect both the mother and the co-twin. Yes, this is rare, but I have cared for a patient from Idaho in this exact situation. I still receive photographs of her beautiful, healthy child, and we always also acknowledge her "angel baby," who would not have survived past birth and whose death likely allowed her to carry her healthy twin to full term because of the nature of the co-twin's condition.

**FACTS OF DATA CONSIDERED IN FORMING MY OPINIONS**

34. My opinions are based on my clinical experience, education and training, research, attendance at professional conferences, and knowledge of the relevant literature, including the sources identified in my footnotes herein, and the following sources:

a. American College of Obstetricians and Gynecologists (ACOG), *Facts are important: gestational development and capacity for pain*, Advocacy 2023 [cited June 2, 2025] Available at https://www.acog.org/advocacy/facts-are-important/gestational-development-capacity-for-pain.

b. Biggs, M.A. et al *JAMA Psychiatry* 2016; 74(2):169-178.

c. Burgoine, G. et al *Am J Obstet Gynecol* 2005; 192(6):1928-1932.

d. Charles, V. E. et al *Contraception* 2008; 78(6):436-450.

e. Chen, M.J. and M.D. Creinin *Obstet Gynecol* 2015; 126(1):12-21.

f. Corbetta-Rastelli, et al *Obstet Gynecol* 2023; 141(1):152-161.

g. Dobkin, L.M. et al *Women's Health Issues* 2014; 2(1):e115-e123.

h. Gerdts, C. et al *Women's Health Issues* 2016; 26(1):55-59.

i. Grossman, D. and K. Grindlay *Obstet Gynecol* 2017;130(4):778-782.

j. Hoyert DL, *Maternal mortality rates in the United States, 2023.* NCHS Health E-Stats [cited June 2, 2025] Available at: https://dx.doi.org/10.15620/cdc/174577.

k. Jackson, J.E. et al *Intl J of Gynaecol Obstet* 2007; 96(1):12-15.

l. Kalish, R.B. et al *Am J Obstet Gynecol* 2002; 187(4):882-885.

m. Kortsmith, et al *MMWR Surveill Summ* 2023;72(No. SS-9:1-29).

n. Lee, J.L. et al *JAMA* 2005; 294(8):947-954.

o. Little, S.E. et al *J Perinatol* 215;35(12):1006-1010.

p. Raymond, E.G. and D.A. Grimes *Obstet Gynecol* 2012; Feb;119(2 Pt. 1):215-219.

q. Royal College of Obstetricians and Gynaecologists (RCOG), *Fetal awareness:review of research and recommendations for practice*, [cited June 2, 2025] Available at: https://www.rcog.org.uk/media/gdtnncdk/rcog-fetal-awareness-evidence-review-dec-2022.pdf.

r. Society for Maternal Fetal Medicine (SMFM), *SMFM Consult Series #59: The use of analgesia and anesthesia for maternal-fetal procedures*, Am J Obstet Gynecol 2021; Consult Series B2-B8.

s. Upadhyay, U.D. et al *Obset Gynecol* 2015;125(1):175-183.

t. Woolner, A. et al *British J Obstet Gynaecol* 2014; 121(3):309-318.

u. Zane, S. et al *Obset Gynecol* 2015;126(2):258-265.


**EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS**

35. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

**MY QUALIFICATIONS AND PUBLICATIONS**

36. My qualifications remain the same as my primary disclosure of my expert testimony. I incorporate them as restated herein, along with Exhibit 1 attached to my primary disclosure.

**CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS**

37. I incorporate my response from my primary disclosure as if restated herein, and disclose no additional testimony.

**COMPENSATION**

38. I incorporate my response from my primary disclosure as if restated herein, and disclose no additional change in my compensation.

Dated: 6/8/2025

Signed by:
011F792907E942D...
ALEXNDRA G. ELLER, M.D.

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | Case No.: 1:24-cv-00244-BLW<br><br>**DECLARATION OF MONICA EPPINGER, J.D., PH.D.** |

MONICA EPPINGER, J.D., PH.D., hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My area of expertise is the anthropology of law, and I have conducted extensive research on the treatment of abortion in the Anglo-American legal tradition. In 2016, the Georgetown Journal of Gender and Law published an article I wrote titled *The Health Exception*, which discusses how prevailing theories of health helped to shape this area of the law. The full citation for the article is: Monica Eppinger, *The Health Exception*, 17 Georgetown J. Gender & L. 665 (2016).

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B).

3. Since I completed the expert report, my title has changed to Professor.

4. In addition, footnote 35 of my expert report cites to several sources including Aristotle's *Politics*, Book Seven. The overall proposition for which the Aristotle passage is cited is correct: that Aristotle was one prominent authority among the many authorities informing the medieval and early modern belief in continuous formation in utero, and the cited passage from Aristotle's *Politics*, Book Seven (in the commonly given paragraph numbering, 1335b), is indeed an example of where that view by Aristotle is expressed. There are, however, scores of translations of Aristotle. On further review, I cannot confirm that the Putnam Son's 1932 edition is the one that contains the phrasing I reproduced ("before sense and life have begun in the embryo").[1] I can confirm that this exact phrasing does appear in an essay by scholar of Aristotle Joanna G. Patsioti, *Aristotlean Perspectives on Social Ethics*[2]; however, she does not specify

---

[1] ARISTOTLE, POLITICS, 7.16.15.1335b19-26 (H. Rackham trans., G.P. Putnam's Sons ed. 1932).

[2] Joanna G. Patsioti, *Aristotlean Perspectives on Social Ethics*, section I, fourth paragraph, *available at* https://www.bu.edu/wcp/Papers/TEth/TEthPats.htm.

which edition of Aristotle's *Politics* she was citing. Nearly this exact phrasing ("before sense and life have begun") appears in the translation of Aristotle's *Politics*, Book Seven, Part XVI, by Benjamin Jowett.[3]

5. Apart from that, all of the statements in the expert report are true and correct to the best of my knowledge. The expert report provides a summary of the opinions that I would offer if called to testify at trial.

Dated: ___________________

_____________________________
Monica Eppinger, J.D., Ph.D.

[3] ARISTOTLE, POLITICS, Book Seven, Part XIV at 178 (Benjamin Jowett trans., Kitchener Batoche Books ed. 1999) *available at https://historyofeconomicthought.mcmaster.ca/aristotle/Politics.pdf*.

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al*.,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW |

**EXPERT REPORT OF MONICA EPPINGER, J.D., PH.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), MONICA EPPINGER, J.D., PH.D., makes the following disclosures:

1. I am an Assistant Professor of Law and Anthropology. I offer the following opinions as an expert in the history of abortion regulation in the United States.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

**Introduction**

2. This report concerns the history of health care and its regulation in the United States as respects the practice of abortion. It covers theories of health that prevailed in the United States; the health care, medical interventions, and therapies that arose under them, with specific attention to abortion; and the legal treatment of those practices.

3. In the treatment of abortion at law in the United States, common law doctrines controlled until a period of state-by-state statutory regulation in the 1800s. Statutes preserved the language and the logic of those prior doctrines as well as presumptions from the regime of health in which they arose. Understanding the history of this body of law requires understanding

the history and tradition of health care in which the doctrines developed and to which the law applied.

4. Accordingly, this report starts by explaining health theories and practices prevalent in Europe and North America at least through the third quarter of the nineteenth century in tandem with the formation and application of relevant common-law doctrine. It then explains health ideas and practices, and their treatment at law, under state statutes initiated in a first period of legislating on abortion between 1821-1857 and in a second period between 1857-1959. This review shows how statutes preserved key components of that earlier history and tradition even as ideas and techniques in health evolved. This report's historical review concludes at 1959, when the introduction of the Model Penal Code brought prior periods of statutory development to a close.

## Theory and Practice of Health under the Common Law

### A. Health under Common Law

5. The theory of health that informed medical practice and legal doctrine in the U.S. through most of the 1800s, even well into the 1900s, was humoral health. Ideas and practices from Mediterranean antiquity figure prominently in this history for reasons specifically related to women's health and with direct consequences for the practice and conceptualization of abortion. Particularly foundational core ideas derive from the Hippocratic tradition (fifth-second century

B.C.)[1] and the physician Claudius Galen (129-199 A.D.).[2] Through a formative period of the common law—encompassing the time of Bracton's treatise *On the Laws and Customs of England* (1210–1268)[3] through the time of Sir Edward Coke (1628-1644),[4] Sir Matthew Hale (d. 1676),[5] and thence into U.S. law —Hippocratic-Galenic theories served as the taken-for-granted background of health practice.[6]

---

[1] The Hippocratic tradition was established in a body of Greek writings from the 4th-5th centuries B.C., eventually circulated under the name of the physician Hippocrates of Cos (b. 460 B.C.). W.H.S. Jones, *General Introduction*, *in* HIPPOCRATES, HIPPOCRATES ix, xliii (W.H.S. Jones trans., 1979 (1923)). For English translation of the Hippocratic treatise on women's physiology, see HIPPOCRATES, *Nature of Women*, *in* 10 HIPPOCRATES 189 (Paul Potter ed. & trans., Loeb Classical Library 2012) (fifth century B.C.). Hippocratic ideas about women's health were conveyed to early modern Europe in two principal texts, *Diseases of Women I* and *Diseases of Women II*. Monica H. Green, *Introduction* to THE TROTULA: AN ENGLISH TRANSLATION OF THE MEDIEVAL COMPENDIUM OF WOMEN'S MEDICINE 1, 15 (Monica H. Green ed. and trans., 2001) [hereinafter Green, *Introduction* to THE TROTULA].

[2] For three of Galen's works in English translation, see PETER BRAIN, GALEN ON BLOODLETTING: A STUDY OF THE ORIGINS, DEVELOPMENT, AND VALIDITY OF HIS OPINIONS, WITH A TRANSLATION OF THE THREE WORKS 15 (Peter Brain ed. & trans., 1986) (second century A.D.) [hereinafter GALEN, ON BLOODLETTING]. For the reach of Hippocratic-Galenic thought in the history of English medicine, see RICHARD MARSDEN, THE CAMBRIDGE OLD ENGLISH READER 17 (2004) (explaining that the surviving major Old English medical treatises (from before 1100 A.D.) are translation of Latinate works of the Hippocratic-Galenic tradition). On Galen's influence on medicine and the development of early modern gynecology, see Green, *Introduction* to THE TROTULA *supra* note 1 at 18-25.

[3] HENRI DE BRACTON, 2 ON THE LAWS AND CUSTOMS OF ENGLAND (George Woodbine Latin text, Samuel E. Thorne trans., 1968–1977) (1210–1268), http://bracton.law.harvard.edu/Unframed/English/v2/340.htm [hereinafter BRACTON, LAWS AND CUSTOMS OF ENGLAND].

[4] SIR EDWARD COKE, A FOURTH PART OF THE INSTITUTES OF THE LAWS OF ENGLAND (W. Clarke & Sons ed. 1817) (1628–1644), https://books.google.com/books?id=S2w0AQAAMAAJ&pg=PA251&lpg=PA251&dq=3+E.+3+Coron.+163&source=bl&ots=LTVhC9Lv0w&sig=o9JxlE9G25vntYsGXg7wB3kg1fg&hl=en&sa=X&ei=91zhVMAVhKmDBMKwhIAP&ved=0CBQQ6AEwAA#v=onepage&q=3%20E.%203%20Coron.%20163&f=false [hereinafter COKE, LAWS OF ENGLAND FOURTH].

[5] 1 SIR MATTHEW HALE, HISTORY OF PLEAS OF THE CROWN: OR A METHODICAL SUMMARY OF THE PRINCIPAL MATTERS RELATING TO THAT SUBJECT (1736) (1682), [hereinafter HALE, PLEAS OF THE CROWN], *reprinted at* https://archive.org/details/historiaplacitor01hale.

[6] For evidence of gynecological practice in the medical treatises circulating through early modern times, see THE TROTULA: AN ENGLISH TRANSLATION OF THE MEDIEVAL COMPENDIUM OF WOMEN'S MEDICINE (Monica H. Green ed. and trans., 2002) (twelfth century) [hereinafter THE TROTULA]; see also HILDEGARD OF BINGEN, HOLISTIC HEALING (Manfred Pawlik trans. Latin-German, 1989; Patrick Madigan, S.J. trans. German-English; Mary Palmquist & John Kulas, O.S.B. eds. of English text, 1994) (1151–1158) [hereinafter HILDEGARD OF BINGEN, HEALING]. On the prominence of the *Trotula* and

6. In these theories of health, which prevailed in Europe through the early modern period and were carried to North America with colonization and settlement, good health depended on maintaining a correct balance of certain "humors" (manifest in the bodily fluids of blood, phlegm, yellow bile, and black bile)[7] and elements (hot, cold, wet, and dry).[8] Poor interworking of the elements or disruption in the balance of humors was believed to cause illness[9] and called for intervention to restore balance.[10]

7. When it came to humors, excess was considered as dangerous as deficiency[11] and many treatments were meant to absorb or rid the body of excess.[12] One well-known method of

Hildegard's work in early modern health practice, see HILDEGARD OF BINGEN, HEALING, *id.*, at 72 (with the *Trotula*, Hildegard's work is the most consulted handbook on women's health in medieval Europe); Green*, Introduction to* THE TROTULA*, supra* note 1, at 2; *id*., at 60 (explaining the *Trotula* informs practice from "Italy to Ireland, from Spain to Poland"). For a sixteenth-century example of Galenism in thinking about health, see JEAN FERNEL, THE "PHYSIOLOGIA" OF JEAN FERNEL (John M. Forrester & John Henry eds. and trans., Am. Phil. Soc'y 2003) (1567) [hereinafter "PHYSIOLOGIA" OF JEAN FERNEL].

[7] Manfred Pawlik, *Foreword* to HILDEGARD OF BINGEN, HOLISTIC HEALING, xvi (Manfred Pawlik trans. Latin-German; John Kulas, O.S.B. trans. German-English; Mary Palmquist & John Kulas, O.S.B. eds. of English text, 1994 (1989)) [hereinafter Pawlik, *Foreword* to HILDEGARD].

[8] *See*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 45 ("Fire, air, water, and earth are in every human being . . . If the elements work properly in a human being, they sustain him and keep him healthy. However, if they do not live harmoniously in him they disturb him and make him sick."); *see also* "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, ch. 5, at 198–200 ("The body of man, like everything else, is united and held together by the coalescence of the four elements.").

[9] *See*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 51 ("a condition of peace and health" depends on maintaining the humors in "correct balance and proper proportion" but "when they conflict with each other, the humors make him weak and sick . . .").

[10] Pawlik, *Foreword* to HILDEGARD, *supra* note 7, at xvi–xvii (Galen's theory of humors explains physical health and temperament); John Henry & John M. Forrester, *Introduction*, *in* THE "PHYSIOLOGIA" OF JEAN FERNEL, 1, 10 (John M. Forrester & John Henry eds. and trans., Am. Phil. Soc'y 2003) [hereinafter Henry & Forrester, *Introduction* to FERNEL] (describing Fernel's "Physiologia" as the fullest exposition of Renaissance Galenism).

[11] HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 46 ("[W]henever any humor increases beyond its proper amount, the person is in danger.").

[12] *See*, *e.g*., JAMES HAMILTON, OBSERVATIONS ON UTILITY AND ADMINISTRATION OF PURGATIVE MEDICINE IN SEVERAL DISEASES (1805). Hamilton (1749–1835) was highly regarded, a physician to the Royal Infirmary, and his work on purgative medicine enjoyed such popularity that it wass reprinted through seven editions in the 1800s. 2 JOHN COMRIE, HISTORY OF SCOTTISH MEDI.CINE 489 (1932),

restoring humoral balance, if an excess build-up of the sanguine humor was diagnosed, was blood-letting[13] (also known as "venesection," an incision into a vein to release blood).[14] A famous example shows the persistence of humoral health and treatments in the United States: the blood-letting treatment demanded by George Washington, subsequently re-prescribed by his doctors, resulting in his being bled four times in the last forty-eight hours of life of roughly eighty ounces of blood.[15] A century later, an eminent Boston physician reviewing Washington's case confirmed that the bleeding given Washington would have been accepted treatment for the same condition in 1860.[16]

**i. Warmth, Retained Matter, and Natural Purgation**

8. The idea of humoral balance provided an overarching heuristic within which other details of Galen's theories of health fit. Men, in Galen's schema, are constitutionally "warmer"[17]

https://archive.org/stream/b20457273M002/b20457273M002_djvu.txt [hereinafter COMRIE, HISTORY OF SCOTTISH MEDICINE].

[13] *See*, *e.g.*, Galen, *On Venesection* [incision in a vein] *against Erasistratus*, *in* GALEN, ON BLOODLETTING *supra* note 2, at 15, 21, 25; Galen, *On Treatment by Venesection*, *in* GALEN, *id*., 67–99.

[14] *See*, *e.g.*, *On Treatment by Venesection*, *id*. For an example of the accepted use of bloodletting to treat a variety of diagnoses interpreted as an excess of sanguine humor, see ARCHBALD PITCAIRNE, THE METHOD OF CURING THE SMALL-POX; WRITTEN IN THE YEAR 1704 OF THE USE OF THE NOBLE AND HONOURABLE FAMILY MARCH (printed ed. 1715) (advising bloodletting and then a purgative to treat smallpox), *cited in* COMRIE, HISTORY OF SCOTTISH MEDICINE, *supra* note 12, at 428–29.

[15] *See*, *e.g.*, *The Death of George Washington*, Digital Encyclopedia of George Washington, http://www.mountvernon.org/research-collections/digital-encyclopedia/article/the-death-of-george-washington/.

[16] *See* J.H. Mason Knox, Jr., *The Medical History of George Washington, His Physicians, Friends, and Advisers*, 1 BULL. INST. HIST. MED. 174, at 180 (1933) (reporting Washington's treatment and the opinion, a century later, of Boston physician Dr. James Jackson). Despite skepticism, "heroic treatment" as a response to the inflammation in Washington's throat is still legible to medical commentators as late as the 1930s. *Id*. at 182.

[17] In "hot" and "cold," Galen and Galenic physicians are not referring to measurable differences in thermal heat (and, moreover, no instruments then existed to measure thermal heat) but rather are referring to general principles of warmth or its absence. Green, *Introduction* to THE TROTULA, *supra* note 1, at 174 n.81.

than women,[18] a fact of physiology with basic effects on digestion and consequences for women's humoral balance. The reasoning ran as follows: Retained matter such as residue from digestion leads to humoral imbalance and illness.[19] Women, because of their insufficient heat, produce a greater proportion of leftover or waste matter during digestion, but cannot get rid of it through other processes like sweating or hair growth that occur naturally in men.[20] Consequently, women need an additional method of purging themselves of waste matter. Menstruation, in Galenic theories of health, served that indispensable function.[21]

**ii. Menstruation: First, a Means of Purgation**

9. Menstruation, a regular process of emission directly involving one of the humors (blood), thus bore particular significance in Galenic theories of health. In Hippocratic-Galenic gynecology, menstruation did not have a role in a "reproductive system"; rather, "menstruation was a necessary purgation, needed to keep the whole female organism healthy."[22] If not expelled through menstruation, excess materials would "accumulate and sooner or later lead to a humoral

---

[18] GALEN, *De usu partium*, bk. 14, ch. 7, at 630 (Margaret Tallmadge May trans., 1968), *cited in* "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at 625 n.8.

[19] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 19–20.

[20] *Id.* at 20. *See also*, *e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 108 ("A woman has a greater number of damaging fluids and a more damaging corruption in her body than a man. " Menstruation rids women of excess, "their noxious fluids and poisonous corruptions," and if not for its cleansing, "their whole body would . . . become bloated and not be able to remain alive."); "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 561, 563 (Since the male "overflows with a great deal of heat, he completely modifies and digests all the food he has taken in" and "powerfully dispels anything further overflowing," but the female "secured a heat too weak to be capable of dispelling an excess. She has accordingly been granted the benefit of menstrual blood, out of . . . an imperfect nature." What flows out at the appointed cycles is a "sick kind of blood.").

[21] THE TROTULA, *supra* note 6, at sect. 3, 66 ("Because there is not enough heat in women to dry up the bad and superfluous humors which are in them, nor is their weakness able to tolerate sufficient labor so that Nature might expel [the excess] to the outside through sweat as [it does] in men, Nature established a certain purgation especially for women, that is, the menses, to temper their poverty of heat.").

[22] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 19.

imbalance—in other words, to disease."[23] Through menstruation, a woman's body achieved its necessary purging.

10. Within the core schema of humors, balance, excess, and health, then, the absence of menstruation was taken *not merely as a symptom* of some underlying cause. *It was seen as a cause*, in itself, of disease.[24] From menarche to menopause, "a woman should be menstruating regularly if she is to remain healthy."[25] The horrors wrought by "suppressed menstruation" included "blockages of viscera, wasting, cancer, epilepsy, and very many [sorts] of this destruction."[26] In Hippocratic and Galenic thought, "absence of menstruation—or rather, *retention* of the menses, for the waste material was almost always thought to be collecting whether it issued from the body or not—was cause for grave concern, for it meant that one of the major purgative systems of the female body was inoperative."[27]

11. In early modern thought, therefore, menstruation was a significant way for a woman's body to maintain humoral balance and health. Amenorrhea, i.e., the absence of menstruation in a woman of menstruating age, posed danger. This is not to say that early moderns did not understand a connection between pregnancy and cessation of menstruation. It is more complicated than that. The function of menstruation, they thought, was to preserve health: when menstruation happened "in normal amounts, at the normal times," a woman was likely to

---

[23] *Id.* at 20. *See also*, *e.g.*, HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 91 ("[T]he woman is weak and cold, and the humors in her are weak. As a consequence, she would be continually sick if her blood were not periodically cleansed through menstruation. In the same way, food cooking in the pot is cleansed when it throws off its foam from itself.").

[24] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[25] *Id.* at 19–20.

[26] "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 563.

[27] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

be healthy.[28] If menstruation failed to occur, pregnancy itself might absorb potential accumulations of excess materials and humoral imbalance.[29] "Retained menses" and "pregnancy" were not synonyms; these two conditions might exist in parallel. In fact, for some medical thinkers, retaining menstruation was one more condition of heightened danger attendant upon being pregnant, and the effect of retained menses during pregnancy was the subject of much concern.[30]

**iii. Amenorrhea and Therapeutic Response**

12. Amenorrhea thus demanded a therapeutic response from any responsible medical practitioner and "the necessary therapeutic response was simple: induce menstruation."[31] For that reason, the largest percentage of prescriptions for women's diseases in most early medical texts were "aids for provoking the menses."[32] They worked. These medieval prescriptions, twentieth-century medical research reveals, commonly contained ingredients and compounds we now know to be emmenagogues (i.e., agents that induce menstruation) or abortifacients (i.e., agents that effectuate abortion).[33]

---

[28] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[29] *Id.* (explaining that when a woman did not menstruate because of pregnancy or lactation, "the excess matter—now no longer deemed 'waste'—either went to nourish the child in utero or was converted into milk").

[30] *See*, *e.g.*, "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at ch. 7, bk. 7, 563, 565 (arguing that, since menstrual blood, unlike "more useful blood" is inherently "noxious," it is implausible that "a fetus carried in the womb possibly snatches nutriment from it.").

[31] GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20.

[32] *Id.*

[33] *See generally* John M. Riddle, *Oral Contraceptives and Early-Term Abortifacients During Classical Antiquity and the Middle Ages*, 132 PAST & PRESENT 3 (1991) (identifying purgative compounds from humoral health tested as abortifacient and/or contraceptive by modern laboratory science).

### iv. Quickening and Pregnancy in Humoral Health

13. Three factors made detecting fetal life an important diagnostic step in preserving women's health for early moderns: (1) the importance of menstruation in humoral health and the alarm that amenorrhea thus raised; (2) understanding pregnancy as a condition that could absorb excess materials and stave off humoral imbalance; and (3) the absence of pregnancy tests, imaging, or alternative means of ascertaining pregnancy. Conception and what happens afterwards thus became a matter of importance in the domain of women's health beyond concerns about reproduction, and the subject of much speculation.

14. The Latin in which most medieval and early modern medical texts were written makes a distinction between the *conceptus*, the product of human conception, and its later developed state, the *fetus*.[34] This distinction supported the idea, widely accepted in medieval and early modern thought, of *in utero* development:[35] a *conceptus* took on human form and was instilled with its own vital heat, or "animated," over time.[36] For early moderns concerned with detecting pregnancy in order to diagnose pathological amenorrhea, animation became a key diagnostic.

---

[34] Henry and Forrester, *Introduction* to FERNEL, *supra* note 10, at 10. This distinction is hard to render into English, which lacks an equivalent for *conceptus*. *Id*. (The more encompassing term "embryo" does not appear in an English text until 1576, where it appears in translation of a Latin text on distilling medical and alchemic substances. OXFORD ENGLISH DICTIONARY (2013 rev.), https://www.oed.com/dictionary/embryo_n?tab=factsheet#5706260. On the history of embryology, see generally JOSEPH NEEDHAM, A HISTORY OF EMBRYOLOGY (1934).)

[35] *See*, *e.g*., ARISTOTLE, POLITICS, 7.16.15.1335b19-26 (H. Rackham trans., G.P. Putnam's Sons ed. 1932) (distinguishing the "unformed," a state "before sense and life have begun in the embryo," and "the formed" *in utero*). For later adherents to an Aristotelian conception of *in utero* development, see for example HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 54–55 (describing how during the first month a seed *in utero*, although already with the four humors and four elements, becomes a still unformed "thick mass that is not yet alive" and develops from there).

[36] *See*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 55–56 (correlating an immature stage of *in utero* development, at the second month, with the inability of "the form" to "move itself").

15. As a corollary, in medieval and early modern thought the soul was not necessarily a feature of the *conceptus*[37] but rather entered the body later, a development referred to as "ensoulment."[38] Even when a woman had reason to suspect conception, the soul was not always considered present in a *conceptus*.[39] Some procedures meant to provoke menstruation, undertaken to restore humoral balance for a woman, might never have been thought to implicate an ensouled creature, even after conception. However, at other times treatment might have been understood as interrupting the continuing development of an ensouled, and thus animated or enlivened, being.[40] Precise knowledge of the internal functioning of women's bodies and

[37] For Augustine, *e.g.*, the body of one "not yet formed," though "some sort of living, shapeless thing [*informiter*]" is "not yet endowed with its senses" and does yet not contain a "living soul." 33 AUGUSTINE, *Quaestiones Exodi*, 80.1439-45 *in* SANCTI AURELII AUGUSTINI QUAESTIONUM IN HEPTATEUCHUM, LIBRI 7, pt. 5 (J. Fraipont & Donatien de Bruyne eds., Corpus Christianorum: Series Latina Brepols 1958) [hereinafter AUGUSTINE, *Quaestiones Exodi*], *translated and discussed in* G.R. Dunstan, *The Human Embryo in the Western Moral Tradition*, *in* THE STATUS OF THE HUMAN EMBRYO: PERSPECTIVES FROM MORAL TRADITION 39, 44 (G.R. Dunstan & Mary J. Seller eds., 1988) [hereinafter Dunstan, *The Human Embryo*].

[38] *See* Augustine, *Quaestiones in Heptateuchem* 2.80 [on Exodus 21:22], *in* 28 CORPUS SCRIPTORUM ECCLESIASTICORUM LATINORUM pt. 2, at 146–147 (Joseph Zyche ed., Tempsky 1887), *cited in* JOHN RIDDLE, CONTRACEPTION AND ABORTION FROM THE ANCIENT WORLD TO THE RENAISSANCE 21 (1992) [hereinafter RIDDLE, ANCIENT ABORTION] (discussing various possible combinations, according to the works of Augustine and other church fathers, of stages of formation and ensoulment in an embryo); *see also*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 55–56 (describing ensoulment as the entering of the "breath of life" and the "inflowing of the soul"). For treatment of ensoulment in Renaissance science, *see*, *e.g*., "PHYSIOLOGIA" OF JEAN FERNEL, *supra* note 6, at 576 (explaining that the physical form and the soul develop *in utero* until the being can be considered "vital," alive as a human in both body and soul); *see also id*. at 626 n.23 (discussing Fernel's idea of the parallel development of biological growth and ensoulment as part of his Aristotelian convictions).

[39] The timing of "ensoulment" was never settled in Greco-Roman thought, Judaism, or Christianity. *See generally* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 20–21. *See also, e.g.*, 1 ARISTOTLE, *Generation of Animals* 736a-b *in* THE COMPLETE WORKS OF ARISTOTLE at 1111, 1142–43 (Jonathan Barnes ed. & A. Platt trans., Bollingen Series, Princeton Univ. Press, 1995 (1984)) (avoiding stating a definite point at which a being *in utero* is endowed with a rational soul).

[40] The prevailing thought at this time was that the interval between "conception" and "animation" was perceived as a zone in which action could be taken without raising questions -- moral, legal, or otherwise -- for patient or health practitioner in regard to a fetus. MARIE-THÉRÈSE FONTANILLE, ABORTION ET CONTRACEPTION DANS LA MÉDECINE GRÈCO-ROMAÎNE 194 (1977) [hereinafter FONTANILLE, ABORTION DANS LA MÉDECINE GRÈCO-ROMAÎNE], *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 22–23.

pregnancy was limited. The duration of human gestation itself was actively debated into the first decades of the 1800s; Karl Ernst von Baer discovered the mammalian ovum only in 1826; and the human ovum was not given detailed description until Edgar Allen's work in 1928.[41] Prenatal imaging and pregnancy tests did not exist before the 1930s.[42] Deciphering what was going on came to rely on "quickening," an English idea about *in utero* development cued by the perception of fetal movement by the pregnant woman, into which Hellenic concepts of animation and ensoulment were assimilated. "Quickening" was understood as a proxy heuristic, not to be confused with an equivalent of certainty regarding pregnancy. Practitioners as late as the early twentieth century guarded against over-relying on "quickening" to diagnose pregnancy, alert,

---

[41] KARL ERNST VON BAER, ON THE GENESIS OF THE OVUM OF MAMMALS AND OF MAN 137 (Charles Donald O'Malley trans., 1956) (1827) (establishing that mammals develop from eggs). Edgar Allen et al., *Recovery of Human Ova from the Uterine Tubes: Time of Ovulation in Menstrual Cycle*, 91 J. AM. MED. ASS'N 1018 (1928). In regard to the persistence of imprecise understandings of human gestation among laypeople, see for example *Joseph Hall*, *Judge of Probate etc. v. Hancock*, 32 Mass. (15 Pick.) 255, 257 (1834) (defense counsel opposing eligibility of after-born heir on grounds that gestation defies precise specification and for a given fetus can vary by weeks).

[42] In regard to prenatal imaging, see Ian Donald, J. MacVicar, & T.G. Brown, *Investigation of Abdominal Masses by Pulsed Ultrasound*, 1 LANCET 1188, 1188–95 (1958); Douglass H. Howry, *The Ultrasonic Visualization of Soft Tissue Structures and Disease Processes*, 40 J. LABORATORY & CLINICAL MED. 812, 812–13 (1952) (reporting Howry's discovery of the first means to produce tomographic images of human anatomy); *see generally* S. Campbell, *A Short History of Sonography in Obstetrics and Gynaecology*, FACTS, VIEWS & VISION IN OBGYN 213 (2013). In regard to pregnancy tests, see Harry E. Kaplan, M.D., *The Aschheim-Zondek Hormone Test for Pregnancy*, 3 CAL, & W. MED. 412, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1657279/?page=1 (reporting Selmar Aschheim and Bernhard Zondek's isolation of the hormone human chorionic gonadotropin, hCG, and development of the "A-Z Test," a test of injecting human urine in a mouse that could detect the presence of hCG); *see also* Marian D. Damewood, M.D. & John A. Rock, M.D., *In Memoriam: Georgeanna Seegar Jones, M.D.: Her Legacy Lives On*, 84 FERTILITY AND STERILITY 541 (Aug. 2005), https://www.deepdyve.com/lp/elsevier/in-memoriam-georgeanna-seegar-jones-m-d-her-legacy-lives-on-JvDw1P3MuE (reporting Jones' discovery around 1936 that hCG was produced by the placenta, rather than the pituitary as previously thought); Judith L. Vaitukaitis, Glenn Braunstein, & Griff Ross, *A Radioimmunoassay Which Specifically Measures Human Chorionic Gonadotropin in the Presence of Human Luteinizing Hormone*, 113 AM. J. OBSTETRICS GYNECOLOGY 751 (1972) (reporting their discovery of a test sensitive enough to detect a subunit of hCG only days after a missed period); Andrea Tone, *A Thin Blue Line: A History of the Pregnancy Test Kit*, 81 BULL. HIST. MED. 439 (2007) (in review of NIH exhibit, explaining the first FDA approval, in 1976, of a home pregnancy test); Office of NIH History, *A Thin Blue Line: The History of the Pregnancy Test Kit* (Sarah Leavitt curator, Dec. 3, 2003–present) https://history.nih.gov/exhibits/thinblueline/ *accessed* February 8, 2025.

*inter alia,* to so-called "false quickening."[43] Understood with this background caveat, "quickening" became a pivotal concept and element of proof in common-law legal doctrine on abortion. It stood as a proxy for ascertaining pregnancy, only after which something called "abortion" would explicitly have been at issue.

**v. The Reach of this History and Tradition in the United States**

16. These ideas are deeply rooted in U.S. history and tradition. As noted above, humoral health theory and practices stem as far back as Hippocratic and Galenic traditions. This regime of health ideas and practices had spread from the Mediterranean basin through medieval Europe to England, accumulating a practical gynecology of abortifacient knowledge to texts as local practitioners across Europe and the British Isles added their techniques during the transmission and recopying of medical manuscripts. This history and tradition were introduced to the North American continent with European colonization. Humoral health constituted the background of medical ideas and practices through the period of the formation of common law doctrines that likewise came to North America with colonization.

**vi. From Theory to Practice in Humoral Health**

17. In the regime of humoral health, amenorrhea was understood to cause a dangerous build-up of waste materials in a woman that any responsible medical practitioner would find it incumbent to address. "Abortion" typically meant intervention after quickening and risked side effects (like uncontrolled hemorrhaging) that become increasingly dangerous to the patient over the duration of pregnancy; pre-quickening intervention and its risks were understood in a completely different light.

---

[43] *See*, *e.g.*, ALEXANDER MILNE, THE PRINCIPLES AND PRACTICE OF MIDWIFERY WITH SOME OF THE DISEASES OF WOMEN 67–79 (1884) (describing, in physician-authored medical textbook, "false quickening" and other problems with diagnosing pregnancy).

18. Within this body of theory, practitioners in early-modern England, benefitting from centuries of accumulated experimentation,[44] deployed a remarkable range of uterine-purging measures when faced with amenorrhea in a woman of menstruating age.[45] Some were classed as "emmenagogue," a treatment intended to induce menstruation without any necessary reference to terminating pregnancy.[46] Others were classed as "abortifacient," intended to expel a *conceptus* or *fetus*.[47] Medical texts admitted the potential for ambiguity, noting some measures both provoke menstruation and cease generation,[48] making intent impossible to assume with such treatments even if administered after quickening.[49] While admitting overlap in medical thinking and in practice, for explanatory purposes I divide up the two therapeutic classifications, emmenagogue and abortifacient. For each therapeutic classification, I consider three kinds of treatment options that can be identified from surveying contemporaneous medical materials: (1) *medication*, meaning intentional administration of a chemical or biochemical substance, usually

---

[44] *See generally* RIDDLE, ANCIENT ABORTION, *supra* note 38 (cataloguing thousands of emmenagogic and abortifacient prescriptions from antiquity through early modern times, with modern laboratory verifications of their abortifacient properties, to argue that since antiquity, abortions were always available in the West); *see also id*. at 7 (summarizing his conclusion that a widespread culture of abortion obtained during the periods under study).

[45] For example, in the foundational practice manual *Conditions of Women*, a portion of *The Trotula* meant to cover all aspects of women's health, more than one-third of the entire catalogue is devoted to treating conditions related to menstruation. Green, *Introduction* to THE TROTULA, *supra* note 1, at 21.

[46] *See* GREEN, *Introduction* to THE TROTULA, *supra* note 1, at 20 (pointing out *Trotula* manuscripts' distinction between pregnant and pathological amenorrhea).

[47] Some are also understood as, and administered as, contraceptives, but that usage is beyond the scope of the present report and will not be treated here.

[48] *See*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA [MATERIALS OF MEDICINE] 1.103 (Max Wellman ed., Weidmann 1958) [hereinafter DIOSCORIDES, DE MATERIA MEDICA] ("The Chaste Tree destroys generation as well as provokes menstruation"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 31; DIOSCORIDES, DE MATERIA MEDICA, *id*. at 3.7 (prescribing birthwort, drunk with pepper and myrrh, to expel menstrua and to expel a *conceptus* or *fetus*), *cited in* RIDDLE, ANCIENT ABORTION, *id*. at 32.

[49] Historian Monica H. Green points out medical texts considered some substances uterine purgatives to induce menstruation, a legitimately separate domain of Hippocratic-Galenic medical practice from purposefully inducing miscarriage. Green, *Introduction* to THE TROTULA, *supra* note 1, at 21, 215 n.83.

a plant preparation; (2) *external manipulation*, which can range from poultice to massage to abdominal blows; and (3) *internal intrusion*, mechanical rather than biochemical intervention, by vaginal insertion (or, more rarely, incision through the abdominal wall) to interrupt uterine function.

***Emmenagogues***

19. *Medication*: *Medicational* emmenagogue was the most common response to interrupted menstruation or amennorhea either before or after quickening. "Retained menses" could exist separately from and simultaneously with pregnancy. Early modern gynecology gives scores of recipes to "extract the menses,"[50] "move the menstrua,"[51] or "put in motion the menstrua."[52] There were two primary means of administering such an emmenagogic medication: the preparation could be administered orally[53] or soaked in a ball of cotton or other tampon-like object to make a vaginal suppository known as a *pessary*, also widely attested in practice manuals.[54]

---

[50] *See* DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.109, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 32 (listing cultivated lupine as a remedy to extract the menses or expel a fetus).

[51] *Id*. at 3.80 (listing *silphium* drunk with pepper and myrrh to move the menstrua).

[52] *Id.* at 4.146 (listing a treatment of Mediterranean mezereon); *see also*, *e.g.*, GALEN, *De compositione medicamentorum secundum locus* ["On Compound Medicines according to Site"], 9.4, 13:283-284 *in* CLAUDII GALENI OPERA OMNIA (Karl Gottlieb Kühn ed., Olms 1964-65 (1821-33)) (prescribing willow and rue), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 85; THE TROTULA, *supra* note 6, at 89–90 (prescribing *inter alia* red willow stewed with wine or water); *id*. at 67 (prescribing *diathessaron*: mint or myrtleberry, felwort, birthwort, and laurel berry, cooked with honey).

[53] THE TROTULA, *supra* note 6, at at 68 (describing a powder of yellow flag, hemlock, castoreum, mugwort, sea wormwood, myrrh, common centaury, and sage mixed with a stew of myrrh and savin and drunk); *id*. at 106 (prescribing vervain and rue, pounded and cooked with bacon, followed by a beverage of ground delicate willow root juice and madder mixed with wine); HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 165–66 (prescribing *inter alia* a beverage made from stewed and ground heidelberries, yarrow, rue, Easter lilies, cloves, and white pepper with wine).

[54] *See*, *e.g.*, THE TROTULA, *supra* note 6, at 68 (calling for carded wool to be soaked in a prescribed preaparation and then "pressed so it is hard and rigid and long so that it can be put into the vagina"). *See also*, *e.g.*, 8 HIPPOCRATES, *De mulierum affectibus*, *in* OEUVRES COMPLÈTES D'HIPPOCRATE:

20. *External manipulation*: In addition to medicational means, practice manuals prescribe emmenagogic treatment by *external manipulations* ranging from poultice[55] and massage[56] to bleeding by venesection under the arch of the foot. [57]

21. *Note on Internal intrusion*: This form of medical intervention is missing from a survey of emmenagogues. None of the materials I surveyed provided evidence of emmenagogic treatment by internal intrusion.

***Abortifacients***

22. *Medication*: As with emmenagogues, ingested *medication* was the most common abortifacient intervention. Hippocratic texts prescribed them,[58] other widely consulted medical authorities advised them,[59] and private sources attest to widespread practical knowledge of

---

TRADUCTION NOUVELLE AVEC LE TEXTE GREC EN REGARD bk. 1, § 78, 1–12, at 173 (Emile Littré ed., chez J.B. Baillière 1839–1861), (*reproduced in* Hakkert, 1973) [hereinafter HIPPOCRATES, *De mulierum affectibus*] (offering prescription for "an efficacious pessary"); DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.152 (advising a garlic pessary to "bring down the menses"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 37. *See generally* RIDDLE, ANCIENT ABORTION, *id*. at 36–38 (reviewing twentieth-century biomedical research verifying the efficacy of various vaginal suppositories prescribed in earlier texts).

[55] *See*, *e.g*., HILDEGARD OF BINGEN, HEALING, *supra* note 6, at 165 (prescribing a poultice of aniseed and feverfew applied externally to the genitalia to "relax the monthly flow").

[56] *See*, *e.g*., THE TROTULA, *supra* note 6, at 106 (advising a cushion of carded wool, soaked in mugwort stewed with savin, pennyroyal, or other herbs, laid as a poultice on the belly); *see also id*. at 68 (calling for laying cooked chickweed on the belly).

[57] For retention of the menses, the *Trotula* advises the practitioner bleed the woman from the vein under the arch of the inside of the foot, alternating feet day by day. *Id.* at 67; *see also id*. at 106.

[58] HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, bk. 1, § § 80–82 (listing six early-stage abortifacients to be taken with wine or water), bk. 1, § § 82–84 (giving eight ingestibles to induce miscarriage), *discussed in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 78–80.

[59] *See, e.g*., DIOSCORIDES, DE MATERIA MEDICA *supra* note 48, at bk. 2, ch. 159–166, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 44–45 (discussing "sharp herbs" among which abortifacients figure prominently, including soapwort to dry out menses and kill embryo; edderwort to abort a developing, or perhaps early stage, *fetus*; and lords and ladies to expel a *conceptus*); *see also* DIOSCORIDES, THE GREEK HERBAL OF DIOSCORIDES: ILLUSTRATED BY A BYZANTINE A.D. 512. ENGLISHED BY JOHN GOODYER A.D. 1655 (Robert T. Gunther ed., Hafner 1959 (1933)) [hereinafter DIOSCORIDES, THE GREEK HERBAL] at ch. 48 (no pagination) ("Dioscorides sayth that Peper, Rue, Tuttsayne, Calamint, Castoreum, wast the sede of generacyon (by dryuynge it up) of their propertie and strong heate . . ."), *cited in* RIDDLE, ANCIENT ABORTION, *id*. at 149.

medications that could, as one says, "cause miscarriage" and "force away the birth dead or alive as allso [*sic*] the afterbirth."[60]

23. Medicational abortion by pessary was also widely known.[61] The Hippocratic corpus labeled some *pessaries* as "ecbolic suppository" (an ecbolic being a substance that causes contraction of the uterus),[62] but labeled others, straightforwardly, as abortifacient,[63] meant to "draw down the crippled embryo/fetus" or to "release a half-completed embryo/fetus."[64] (Hippocratic abortifacients[65] are particularly notable given the symbolic weight that the Hippocratic oath came to hold in the nineteenth-century United States physicians' movement to

[60] Jerningham family medicinal receipt book, Jerningham MS 3/H/1, fol. 65 (late seventeenth century) (Stafford, Eng. Record Office), *cited in* Linda A. Pollock, *Embarking on a Rough Passage: The Experience of Pregnancy in Early-Modern Society*, *in* WOMEN AS MOTHERS IN PRE-INDUSTRIAL ENGLAND: ESSAYS IN MEMORY OF DOROTHY MCLAREN 39, 56 (Valerie Fildes ed., 2013 (1990)) [hereinafter Pollock, *Pregnancy in Early-Modern Society*]; *see generally id*. at 53–58 (discussing miscarriage in early modern England). *See also* ANGUS MCLAREN, REPRODUCTIVE RITUALS: PERCEPTIONS OF FERTILITY IN ENGLAND FROM THE SIXTEENTH CENTURY TO THE NINETEENTH CENTURY 73–75 (1984) (surveying early modern England women using abortifacient plant preparations received from older medical tradition).

[61] *See*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 4.172 (giving Mediterranean mezereon "on a pad" to expel a fetus), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 36; *see also* DIOSCORIDES, *id*. at 1.1 (describing lily root, applied as a pessary with honey, to "draw down the embryo"); RIDDLE, ANCIENT ABORTION, *id*. at 35 (citing a pepper pessary to "dry out" a fetus/embryo).

[62] HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, bk. 1, § 78, 1–12, at 173; *id*. at 12–14 (suggesting the squirting cucumber plant).

[63] *Id*. at bk. 1, § 78–80, at 173-200 (grouping respectively ecbolic suppositories and nine abortifacient vaginal suppositories).

[64] *Id*. at bk. 1, § 78, at 177. *See also*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 2.152 (advising a garlic pessary to "bring down the menses").

[65] *See*, *e.g*., HIPPOCRATES, *De mulierum affectibus*, *supra* note 54, at bk. 1, § 78–80, at 173-200; *see also*, *e.g*., HIPPOCRATES, *id*. bk. 1, § § 80–82 (listing six early-stage abortifacients to be taken with wine or water), bk. 1, § § 82–84 (giving eight ingestibles to induce miscarriage), *discussed in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 78–80 (Hippocratic texts describing substances openly described as abortifacient, explained, and prescribed).

prohibit abortion by law.[66]) Such prescriptions for medicational abortion—ingested or pessary—were common knowledge among early-modern health practitioners.

24. *External manipulation*: Among *external manipulations* meant to induce abortion, early modern texts give evidence of poultice,[67] bloodletting,[68] or simple activity. One treatise advocated jumping[69] and another prescribed walking energetically[70] or, if pregnancy persisted, pairing treatments like softening vaginal suppositories, bleeding, or fasting with getting "shaken" by riding draft animals.[71] Another form of external manipulation, beating the stomach of a pregnant woman -- "abortion by blows" -- is nearly absent from medical manuals but descriptions of its practice appear in historical and legal texts.[72]

---

[66] *See infra* text at notes 188-94 (discussing the nineteenth-century anti-abortion movement led by U.S. physicians and the role of the Hippocratic oath therein).

[67] *See*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 3.3 (describing a poultice of gentian among treatments explicitly labelled "abortifacient"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 39. *See also* DIOSCORIDES *id.* at 1.1.

[68] *See*, *e.g*., John Christopoulos, *Abortion and the Confessional in Counter-Reformation Italy*, 65 RENAISSANCE Q. 443, 463 (2012) [hereinafter Christopoulos, *Abortion and the Confessional*] (citing MARTIN AZPILCUETA, CONSILIORUM SIVE RESPONSORUM cons. 47, 455 (1595) (priest admitting to the Apostolic Penitentiary in the late 1500s that, before taking orders, he had impregnated a woman and after "forty days" (meaning a *conceptus* was presumed) counseled her to abort by letting blood)).

[69] 7 HIPPOCRATES, *De natura pueri* ["*On the Nature of the Child*"] bk 4, § 90 (Emile Littré ed., chez J.B. Baillière 1839–1861) (*reproduced* Hakkert, 1973) (advising the so-called "Lacedaemonian leap, that is, 'leaping with the heels to the buttocks for the sake of expulsion'"), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 9. This Hippocratic instruction for expelling an unwanted *fetus repeated in* SORANUS, GYNAECOLOGY 63 (Oswei Temkin ed. & trans., 1956) [hereinafter SORANUS, GYNAECOLOGY], *cited in* RIDDLE, ANCIENT ABORTION, *id*., at 9.

[70] SORANUS, GYNAECOLOGY *id*., 1.64 at 66 (prescribing walking energetically, riding horseback, jumping, or carrying heavy loads), *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 46.

[71] *Id*. at 67, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 47.

[72] For rare instance of a description of hitting a woman's stomach intentionally to cause miscarriage in a widely circulated medical text, *see*, *e.g*., DIOSCORIDES, DE MATERIA MEDICA, *supra* note 48, at 1.93, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 51 (advising beating the stomach of a pregnant woman with a hawthorn root to end pregnancy). For abortion by blows appearing in a legal or historical text, *see, e.g*., the papal bull of 1588 which includes among its prohibitions violence and violent external manipulations imposed on a pregnant woman "to kill . . . immature fetuses in the maternal viscera." Sixtus V, *Contra Procurantes, consulentes, & consentientes, quocumque modo Abortum*, *preface* to

25. *Internal intrustion*: In contrast to commonly prescribed abortifacient treatments by medication and external manipulation, causing abortion by *internal intrusion* via the vagina to pierce a placenta, cause expulsion, or extract a *fetus* or via incision through the abdominal wall—though an option also well-known to caregivers—was generally disfavored. Medical texts typically warn against "separating the embryo by means of something sharp-edged" because adjacent parts could be injured and the woman doing so risked her own death.[73] Few accounts of abortion by instrument exist from early modern England.[74] Historian Cornelia Hughes Dayton finds only one description of it in her review of colonial American court records.[75] The overall impression left by early modern medical texts and legal records is that abortion by vaginal intrusion or surgical intervention was seen as dangerous and irresponsible, and thus rare, in sharp contrast with commonplace medicational uterine purging.[76]

CONSTITUTIO, n.1, n.5) (1588), *cited in* Christopoulos, *Abortion and the Confessional*, *supra* note 68, at 466–467, 468.

[73] SORANUS, GYNAECOLOGY, *supra* note 69, 1.65 at 68, *cited in* RIDDLE, ANCIENT ABORTION, *supra* note 38, at 48.

[74] One of the rare accounts from England comes from the trial of Eleanor Beare, accused of abortion by instrument in 1732. Witness Grace Belfort testified that her employer Beare, having heard that Grace feared herself pregnant, collected 30 shillings for the procedure and then "my Mistress brought a kind of an Instrument, I took it to be like an Iron Skewer, and she put it up into my Body a great Way, and hurt me," thereby inducing miscarriage. Upon conviction in this and on a poison procurement charge in a separate incident, Beare was sentenced to stand pillory two market days and suffer "close Imprisonment" for three years. Though the press account does not report the legal rule invoked, clues indicate that because the procedure posed exceptional danger to Grace Belfort, it aroused the attention of the law. *See The Tryal of Eleanor Beare of Derby,* 2 GENTLEMAN'S MAGAZINE, Tuesday, August 15, 1732, at 931–32 (1732).

[75] Cornelia Hughes Dayton, *Taking the Trade: Abortion and Gender Relations in an Eighteenth Century New England Village*, 48 WM. & MARY Q., 19, 20 (1991) [hereinafter Dayton, *Taking the Trade*] (describing abortion practice and its treatment under the law in colonial New England).

[76] RIDDLE, ANCIENT ABORTION, *supra* note 38, at 10, 166. In contrast to medicational interventions, "[s]urgical or manipulated abortions were recognized as dangerous" and therefore rarely attempted. *Id*. at 10.

**B. Law and Abortion under Humoral Health**

26. In sum, under Galenic theory, health required humoral balance; in women, that depended on regular menstruation; its interruption demanded purgative treatment. Untreated, retained menses were understood to cause dire effects, from cancer to epilepsy. Early modern medicine developed purgative compounds (many principal ingredients of which, twentieth-century science finds, are abortifacient).[77] A responsible practitioner routinely induced menstruation during what might have turned out to have been the early months of pregnancy for reasons often unrelated to birth control.

27. Moreover, with pregnancy undiagnosable for crucial months and the prevailing medical theory providing a widely accepted diagnosis for the cessation of menstruation in women of menstruating age, "quickening,"[78] the subjective experience of fetal movement by the pregnant woman, came to serve as a heuristic for pregnancy and thus, for "abortion." Before quickening, no "pregnancy"; no pregnancy, no abortion. The difference between provoking menstruation and causing a miscarriage "was seen as so minimal as not to warrant discussion."[79] After quickening, intervention (particularly by internal intrusion) was considered increasingly dangerous to the woman and a responsible, well-versed practitioner or patient would undertake it reluctantly, weighing it against the consequences for the woman of inaction.

28. It was in this same period, in which health care enjoyed a widely circulated and routinely practiced body of gynecological knowledge for treatment of ammenorhea or

---

[77] *See* text *infra* footnote 33 *supra*.

[78] *See* Cathy McClive, *The Hidden Truths of the Belly: The Uncertainties of Pregnancy in Early Modern Europe*, 15 SOC. HIST. OF MED. 209 (2002) [hereinafter McClive, *Uncertainties of Pregnancy*] (describing history of quickening and other contemporaneous understandings).

[79] Carla Spivack, *To 'Bring Down the Flowers': the Cultural Context of Abortion Law in Early Modern England*, 14 WM. & MARY J. WOMEN & L., 107, 123 (2007) [hereinafter Spivack, *Cultural Context of Abortion Law in Early Modern England*].

pregnancy, that the abortion doctrine accepted as the common-law standard was formulated. And even as it provided an array of treatments from a rich practical gynecology, medicine confessed finding the female abdomen and some of its inner workings inscrutable.[80] This admittedly incomplete understanding in medicine defied precision and abetted flexibility in law.

### C. The Common Law

29. Two authoritative legal sources that bookend the early-modern period, Bracton and Hale, provide elements that crystalize into regulation of medical practice that encompassed abortion at common law, the doctrines that prevailed in the U.S. from its colonial foundations through the time in the 1800s that state statutes introduced regulations concerning abortion.

#### i. Bracton: The Legality Distinction and the Precautionary Principle

30. The work of collective authorship that bears Bracton's name, *On the Laws and Customs of England* (1220-1230),[81] is regarded as the standard statement of the common law from the Middle Ages[82] and foundational to its further development.[83] It mentions abortion twice: once in a section concerning homicide, and once in a section on "wounding."

---

[80] *See generally* McClive, *Uncertainties of Pregnancy*, *supra* note 78 (concluding that for women and their medical attendants, the experience and understanding of pregnancy was primarily uncertain, including in regard to quickening, false conceptions, and the threat of miscarriage).

[81] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3.

[82] *See*, *e.g.*, PAUL VINOGRADOFF, LETTER TO THE ATHENAEUM (July 19, 1884) (Bracton's treatise is "a statement so detailed and accurate that that there is nothing to match it in the whole legal literature of the Middle Ages") *reprinted in* 1 F.W. MAITLAND, BRACTON'S NOTEBOOK: A COLLECTION OF CASES DECIDED IN THE KING'S COURTS DURING THE REIGN OF HENRY III, at xvii (1887), https://archive.org/stream/bractonsnoteboo00maitgoog#page/n8/mode/2up.

[83] The continued influence of Bracton was manifest in ways large and small. An 1843 Iowa criminal statute, for example, uses (without citation) the canon law hypothetical that Bracton's retransmission entrenches of homicide by chance, as when a master flogs a pupil in discipline and the pupil dies as a result. BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 341; *cf.* IOWA (TERR.) REV. STAT., ch. 49 §19 (1843) (giving an example of "excusable homicide by misadventure").

31. In the section on homicide, before discussing abortion, Bracton first explains two kinds of homicide. He describes one kind, "homicide by word" (a legal category borrowed from canon law[84]), as when "one dissuades another . . . from rescu[ing] someone from death; thus in an indirect way he commits homicide."[85] This doctrine would expose to liability in homicide a bystander who merely dissuaded a rescuer from saving someone in mortal peril. Given that pregnancy or childbirth regularly imperiled women during this time,[86] this passage suggests that dissuading a health practitioner from performing an intervention to terminate a pregnancy for therapeutic reasons would constitute homicide if the pregnant woman subsequently died.

32. Bracton goes on to explain a second kind, "homicide by deed." He describes four circumstances that might result in homicide by deed: homicide in the administration of justice; by chance; by necessity; or by intention, "as where one in anger or hatred or for the sake of gain, deliberately and in premeditated assault, has killed another wickedly and feloniously and in breach of the king's peace."[87] One of these, "homicide by chance,"[88] would apply to the provision of healthcare that resulted in the patient's death, but an accused person would be

---

[84] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 340 (naming two types of homicide, corporeal and spiritual, and specifying the former can be accomplished by word or by deed). *Cf.* CORPUS IURIS CANONICI EDITIO LIPSIENSIS SECUNDA POST AEMILII LUDOUCI RICHTERI, PARS SECUNDA, DECRETALIUM COLLECTIONES, DECRETALES D. GREGORII P. IX COMPILATIO (A. Friedberg ed., 2000) (1234) [hereinfafter DECRETALS OF POPE GREGORY IX] at tit. 14, cap. 2, http://www.thelatinlibrary.com/gregdecretals5.html (proposing that homicide might be perpetrated by word or by deed: "Homicidium autem tam facto quam praecepto, sive consilio aut defensione non est dubium perpetrari"). *See also* CARL GÜTERBOCK, BRACTON AND HIS RELATION TO THE ROMAN LAW: A CONTRIBUTION TO THE HISTORY OF THE ROMAN LAW IN THE MIDDLE AGES 169 (Brinton Coxe trans., 1866) http://babel.hathitrust.org/cgi/pt?id=hvd.32044010502342;view=1up;seq=177 (identifying a passage in the *Decretals* that specifies homicide by word and by deed that Bracton repeats here).

[85] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 341.

[86] *See supra* text accompanying note 42 (on later technologies for understanding the mechanics of pregnancy and treating common complications unavailable before the nineteenth century); *infra* notes 158–160 (discussing the risks of pregnancy and childbirth).

[87] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 340–41 ).

[88] *Id*. at 341.

exempt from liability if he was (1) engaged in a lawful act and (2) "employed all the care he could."[89] Thus, the doctrine served to shield from liability the caregiver whose patient died despite best efforts to cure or to treat.

33. Bracton then specifically discusses abortion in an example of homicide by deed. "If one strikes a pregnant woman or gives her poison in order to procure an abortion, if the fetus is already formed or quickened, especially if it is quickened, he commits homicide."[90] Read within the terms of its day, several things are notable. First, Bracton's reference to fetal formation or quickening excludes from his homicide discussion most emmenagogues and many early-term conceptus- or fetal-expulsives. Second, this was not a blanket sanction against abortion. The passage specifically prohibits only two methods of abortion: striking a pregnant woman or giving her "poison," a substance meant to harm or kill and not a normal synonym for a "medication" used for uterine purgation or abortion.[91] It leaves out the most common means of accomplishing abortion known to Bracton's time, purgative medication.[92] Third, the two enumerated acts speak of assault, undermining easy inference of due care or patient consent and implying a post-quickening procedure posing heightened patient risk. For women's healthcare providers or others who might have wished a woman not pregnant, this doctrine stood as a warning against uncertain, particularly patient-risky practices. Taking all of these specifics into consideration, the text supports the inference that it is the woman's death or endangerment—not

---

[89] *See id*. (giving as example the result when one fells a tree and another is accidentally crushed beneath it).

[90] *Id*. at 341. What Samuel E. Thorne translates here into English as "quickened" reads in Latin *animatum fuerit*, "has been animated."

[91] *Id*. at 341.

[92] *See also*, *e.g*., *infra* text accompanying notes 182–85 (describing Bracton's second abortion passage, on abortion by intrusive measures, which is not treated in homicide).

the fetus'—that evokes liability for homicide. Read with standard healthcare practices in mind, the passage would expose a practitioner to liability in homicide for causing a pregnant woman's death by poisoning or abortion by blows, but not otherwise for inducing miscarriage in the course of healthcare.

34. This first abortion passage is followed by reiteration of the duty to rescue. A person "who, though he could rescue a man from death, failed to do so,"[93] ought not be free from punishment. Thus, both before and after Bracton discusses liability for the death of a patient from certain abortion methods as a form of homicide, he repeats a statement of liability for one who could rescue a person from death but does not. After warning against dangerous practices, the text reiterates care providers' duty to save a woman, including from pregnancy, if her life were imperiled.

35. Bracton treats abortion by intrusion separately (in his second abortion passage) in a section on "wounding." In general, a charge of "wounding" only arose from injury by blade, not from assault by weapons like clubs or stones.[94] A "wounding" charge required as proof visual evidence of a "fresh and open wound"[95] and mere "bruises and contusions" were insufficient,[96] with only one exception: "If anyone forcibly interferes with a woman's internal organs in order to produce abortion," he is liable for wounding in breach of the king's peace.[97] .

36. In Bracton, we find several elements that will recur in later abortion regulation: a concern with poison; a precautionary principle, evidenced through imposing liability for patient

---

[93] BRACTON, LAWS AND CUSTOMS OF ENGLAND, *supra* note 3, at 342.

[94] *Id.* at 408.

[95] *Id.* at 406.

[96] *Id.* at 408.

[97] *Id.*

death if a procedure occurred at a time or in a manner that raised risk to the patient, hedged by a duty to save; and wariness in regard to intrusive measures. What we do not find is also significant: prohibition of abortion *per se*. Regarding all pre-quickening emmenagogues and regarding the most common abortion practice of the time, medicational abortion, the law is silent. Instead, it imposes a duty of care on the health care provider and holds a dissuading bystander liable in homicide should a patient perish from care withheld.

**ii. Hale: The Curative Intent Distinction**

37. Hale's treatment of abortion comes in his discussion of homicide in his restatement treatise, *History of Pleas of the Crown*.[98] The premises of Hale's discussion are familiar. The person whom a defendant would be accused of harming is the *woman* upon whom the procedure is performed, not the fetus.[99] Hale first rephrases a rule to which Elizabethan jurist Edward Coke had drawn attention, wherein curative intent excuses lethal consequences of medical practice.[100] In Hale's restatement, "If a physician gives a person a medication without any intent of doing him any bodily harm, but with an intent to cure or prevent a disease, and contrary to the expectation of the physician it kills him, this is no homicide, and the like of a chiurgeon."[101] As with Bracton's "homicide by chance" doctrine, for anyone who administered a medication after which a woman died, Hale's holding offered blanket protection. The charge

[98] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429–34. *See also* Rex v. Anonymous (1670) (the only recorded case of "abortion" over which Hale presided as judge), *summarized in* HALE, *id*. at 429–30 [hereinafter Rex v. Anonymous].

[99] HALE, *id*. at 432–33.

[100] Within his section on the college of physicians in London, Coke specifies a therapeutic intent exception: "If one that is of the mysterie of a physician take a man in cure and giveth him such physick as within three days he dye thereof, without any felonious intent, and against his will, it is no homicide." COKE, LAWS OF ENGLAND FOURTH, *supra* note 4, at 251 (*citing* 3 *E.3 Coron*. 163).

[101] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429.

would not lie if the person administered the medication with intent to "cure her of a disease."[102] This would excuse administering emmenagogic or abortifacient preparations with humoral-balancing intent. Practitioners of his day routinely administered compounds to induce menstruation knowing they might expel a *conceptus* or *fetus*, and "curative intent" encompassed this abortion practice and excluded it from the category of punishable offenses. [103]

38. Hale then separately considers an intervention or act undertaken to effect abortion, in Hale's words, to "destroy the child within her."[104] Recall abortion was by definition a post-quickening intervention, and in the conditions of the day, it was understood that the later in term, the more dangerous to the pregnant person. Even so, in Hale's restatement, the common law did not consider such a post-quickening intervention an offense if the patient survived the procedure. Abortion that a woman survived, says Hale, was "not murder or manslaughter by the law of England."[105] To reach this conclusion, he does not reason from necessity doctrine (that would excuse the taking of fetal life, if necessary to save the woman's), because a fetus was "not yet *in rerum naturae*" (translated literally, "in the nature of things," meaning "in existence," a status entered into at live birth).[106] Clearly, "feticide" is not the legal issue for Hale, but rather, patient protection is. Hale's next statement makes clear that the purpose is patient protection,

---

[102] *Id*. at 429.

[103] Therapeutic intervention that could terminate a pregnancy in his day was not limited to emergency cases of, say, saving a woman from life-threatening labor.

[104] *Id*.

[105] "If a woman be quick or great with child, if she take, or another give her any potion to make an abortion, or if a man strike her, whereby the child within her is *kild*, it is not murder nor manslaughter by the law of *England*, because it is not yet *in rerum naturae*, tho it be a great crime, and by the judicial law of *Moses* was punishable with death, nor can it legally be made known whether it were kild or not, *22 E.3 Coron. 263*. So it is, if after such child were born alive, and baptized, and after die of the stroke given to the mother this is not homicide. *1 E.3. 23 b. Coron. 146*." *Id.* at 433.

[106] *Id*.

reminiscent of Bracton's doctrine in its emphasis on patient protection. Hale states clearly that if a medication administered with intent to destroy a fetus[107] is so strong that it kills the patient, only then does the abortion practitioner bear the risk[108] of a murder charge.

39. As Hale's *Pleas of the Crowne*[109] became a widely accepted working reference for lawyers and judges, his therapeutic intent doctrine became the standard statement of the common law on abortion.[110] In the rare event of an abortion prosecution, a therapeutic defense shielded the good-faith care provider.

40. Accepted medical practice continued in the space afforded by law, practicing fetal expulsion in the interest of health of the pregnant person. The prevalence of "medically indicated" abortion under this presumption of the legality of its practice with therapeutic intent is evidenced in a variety of sources. It can be inferred, for example, from a review of virtually all major obstetrical texts published in England between 1734 and 1937 showing that, of sixty-two texts, all but two condoned inducing labor either before, or after, viability of the fetus for reasons related to the health of the pregnant woman.[111] Acceptance of this default position was

---

[107] "But if a woman be with child, and any gives her a potion to destroy the child within her, and she take it, and it works so strongly, that it kills her, this is murder, for it was not given to cure her of a disease, but unlawfully to destroy the child within her, and therefore he, that gives a potion to this end, must take the hazard, and if it kill the mother, it is murder, and so ruled before me at the assizes of *Bury* in the year 1670 . . . ." *Id*. at 429–30.

[108] In Hale's phrase, the physician then "must take the hazard." *Id*. at 430.

[109] The earliest publication of Hale's summary of case law doctrine appeared in 1682. HALE, PLEAS OF THE CROWN, *supra* note 5.

[110] As evidence of the prominence of Hale's treatise, the Boston Public Library's copy is inscribed "John Adams 1760. John Quincy Adams 1800. George Washington Adams 1825." *Frontspiece* of HALE, PLEAS OF THE CROWN, https://archive.org/details/historiaplacitor01hale. *See also, e.g*., JOSEPH W. DELLAPENNA, DISPELLING THE MYTHS OF ABORTION HISTORY 207–08 (2006) [hereinafter DELLAPENNA, DISPELLING MYTHS] at 185 n.7, 207, 208 n.190 (citing Hale).

[111] JOHN KEOWN, ABORTION, DOCTORS, AND THE LAW: SOME ASPECTS OF LEGAL REGULATION OF ABORTION IN ENGLAND FROM 1803 TO 1982 80–83 (Charles Webster and Charles Rosenberg eds., 1988) [hereinafter KEOWN, ABORTION, DOCTORS, AND THE LAW].

sometimes explicitly articulated, for example in the decision of a 1756 London medical convocation that it was justifiable to sacrifice an "unborn child" to save the life of a pregnant woman, up to and even during delivery.[112]

**iii. Health at Common Law**

41. Considering conceptions of health, practices of medicine, and precepts of law, we can discern several domains of possible action for early modern patients and practitioners, subject to different legal doctrines.

***Pre-Quickening: Privileging Health Care and Curative Intent by Presumption***

42. Pre-quickening treatment to induce menses constituted one domain of possible action. As discussed above, not all instances of amenorrhea indicated pregnancy to early modern women. Treatment for amenorrhea, pre-quickening, might have been undertaken either with no suspicion of pregnancy or lack of clarity whether the amenorrhea correlated with pregnancy. Under dominant theories of health, it was incumbent on a responsible practitioner to induce menstruation if he or she diagnosed "retained menses" (or "obstructed menses," as the condition came to be commonly called in the United States).[113]

43. My research supports the conclusion that in the administration of emmenagogues (some known to cause fetal expulsion), the common law saw health practice. Where the law recognized the possible side effect of fetal expulsion in the administration of an emmenagogue to treat suppressed menses (i.e., ending a pregnancy by emmenagogue), considering amenorrhea a

[112] *See* L[EONARD] A[RTHUR] PARRY, CRIMINAL ABORTION 9 (1932); *see also* JAMES C. MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY, 1800–1900 30, 270 n.18 (1978) [hereinafter MOHR, ABORTION IN AMERICA].

[113] *See*, *e.g.*, MOHR, ABORTION IN AMERICA, *id*. at 14, 268 n.27 (1978) (citing Walter Channing's lectures in midwifery and diseases of women at Harvard Medical School (1821, 1822, and 1825-26)). *See also id*. at 6.

source of humoral imbalance causing grave threats to a woman's health, the law actively supported so treating it.

44. Although provoking menstruation was the most common pre-quickening intervention, sometimes women and their care providers, even before quickening, suspected pregnancy and intervened to terminate it. If done for health reasons, for example if a woman was in fragile health or suffered from certain conditions thought to be incompatible with pregnancy, such health-motivated induced miscarriage too was tolerated at common law with health-care providers protected by therapeutic intent doctrines. Abortion therefore was routinely administered as a way to safeguard women's health without interference from the law or threat of legal sanction.

45. Alternatively, such a procedure might have been undertaken for birth control purposes. Indictment for pre-quickening pregnancy termination was virtually unheard of, compared with its routine frequency.

***Post-Quickening: The Life-Health Defense***

46. Even post-quickening, it was not always clear whether pregnancy, illness, or both were at issue. What was clear was increasing risk over time: experts of the day warned that medical intervention—regardless of means or intent—posed greater danger to the woman the longer it had been since her last menstrual period. In an era before preventive asepsis, fail-proof anti-hemorrhagics, or antibiotics, later interventions bore greater risk to the patient. A responsible practitioner would have initiated a procedure only if the risk of inaction outweighed the risk of action; if the patient were to die, only the irresponsible practitioner would have been legally exposed. Post-quickening treatments fell into several domains of possible action with respective treatments at law.

47. Post-quickening emmenagogue constituted one domain. Even after clear indications of pregnancy (which the law accepted as the perception of fetal movement by the pregnant woman, “quickening”), some conditions called for emmenagogue. Even after quickening, administration of a substance thought of as an emmenagogue, or for an emmenagogic purpose (as with pre-quickening intervention), would be protected by law.

48. Post-quickening treatment to terminate possible pregnancy constituted another possible domain of action. Contemporaneous legal authorities suggest a prevailing duty to intervene in post-quickening situations where the pregnant woman’s life was imperiled, with the protection of curative intent doctrine if her life was lost in the attempt. In the case, say, of a dangerous pregnancy or difficult delivery, legal doctrine favored therapeutic intervention.

49. Under practice conditions of the time, “saving life” was often inseparable from “saving health,” making common-law doctrine on saving life practically and conceptually indistinguishable from saving health. In this broad category of circumstances, the doctrine offered a defense from a charge of homicide in the case of patient death. Here we discern in legal doctrine a respect for those acting to preserve life and health resulting in what can be characterized as a “life-health defense.”

**iv. Summary of Health, Abortion, and Law at Common Law**

50. Before legislation on abortion, common-law doctrine controlled. The earliest regulation of medical practice -- including abortion -- in the common law tradition required a medical practitioner to intervene to save a person's life. Distinction between medical intervention "to save life" and "to preserve health" was often not obvious. In many circumstances, "saving life" was theoretically and practically indistinguishable from "preserving health." The law responded accordingly.

51. Under the regime of humoral health and corresponding common-law doctrine, many medical interventions to **restore humoral balance by unblocking the menses** (emmenagogues) were known to terminate pregnancy, if indeed a patient were pregnant. The law supported emmenagogic treatment undertaken before or after quickening. Administering an emmenagogue under humoral health theory was required under of **duties of care** and **non-interference** (with one saving a life) and the legal doctrine of **necessity**.

52. After quickening, medical interventions **intended to end a pregnancy**, if a medical practitioner judged such measures necessary to preserve a patient's health and life, were likewise required under those duties and doctrines. Therapeutic intervention after quickening, whether emmenagogic or abortifacient, was protected by a life-health defense which shielded a practitioner who might otherwise have faced liability for unintended death of the patient. Under this legal paradigm, there is one set of conditions under which legal liability for abortion might have attached to the health practitioner: for procedures knowingly undertaken to interrupt pregnancy, without curative intent, resulting in the death of the pregnant person. This paradigm obtained through the colonial period in Anglophone North America, the founding of the United States, and into the nineteenth century.

## Theory and Practice of Medicine under Statutory Regulation of Abortion

### A. A New Approach in Great Britain: Rise of Empirical Science and Abortion in Legislation

53. Legal treatment of abortion was influenced in the 1800s by radical shifts in thinking about health and practice of medicine. The first U.S. state abortion statutes were inspired by new legislation in Great Britain. There, the rise of an empirical science through the 1700s produced new conceptualizations of "bodily systems" -- the circulatory system, the reproductive system -- that divided the body rather than thinking of it holistically. These

reconceptualizations profoundly shifted thinking in health away from humoral theories and towards location-based ones.

54. In 1803, British legislators adopted Lord Ellenborough's Act, the first Anglophone statute to regulate abortion.[114] Its first draft limited treatment of abortion to poison control (in a narrow provision, within a general section on poisoning, that prohibited poisoning a person to induce miscarriage),[115] but in response to objections that the bill failed to reflect new scientific thinking in embryology, the Lords created a wholly new category, "pre-quickening abortion," criminalized "pre-quickening abortion" (at first as a misdemeanor,[116] raised in revision to a felony),[117] and briefly made post-quickening abortion a capital crime.[118]

55. Nevertheless, the statute did not ban all abortions. As finally passed, the statute criminalized only "wilfully and maliciously"[119] administering a substance with intent to procure miscarriage before quickening or "wilfully, maliciously, and unlawfully" doing so after

---

[114] Lord Ellenborough's Act, 43 Geo. 3 ch. 58, *reprinted at* https://en.wikisource.org/wiki/Lord_Ellenborough's_Act_1803. For further discussion of the relationship between embryology and Lord Ellenborough's Act, *see* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 15.

[115] For progress of the Bill in the House of Lords, see 44 H.L. JOUR. 111, 151, 156, 170, 172, 187, 256 (1802-1804), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 175 n.77; for progress in the House of Commons, see 58 H.C. JOUR. 424, 514, 516, 513, 543 (1802-1803) *cited in* KEOWN *id*. at 175 n.78.

[116] For discussion of the influence of scientific knowledge on the treatment of abortion in Lord Ellenborough's Act, see KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 22–24. For progress of the Bill in the House of Lords, see 44 H.L. JOUR. 111, 151, 156, 170, 172, 187, 256 (1802-1804), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *id*. at 175 n.77; for progress in the House of Commons, see 58 H.C. JOUR. 424, 514, 516, 513, 543 (1802-1803) *cited in* KEOWN *id*. at 175 n.78.

[117] Lord Ellenborough's Act, 43 Geo. 3 ch. 58, § 2, *Act reprinted at* https://en.wikisource.org/wiki/Lord_Ellenborough's_Act_1803.

[118] Lord Ellenboroughs Act, § 1. Its 1837 successor, Offenses Against the Person Act § 6, abolished the death penalty for abortion. KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 27 n.2.

[119] Lord Ellenborough's Act, § 2 (regarding pre-quickening abortion).

quickening.[120] These intent elements preserved and incorporated prior common-law doctrine on therapeutic intent, and they were retained in subsequent revisions of the criminal statute through the 1800s.[121]

56. The statute's intent doctrine, as incorporated in those elements, foreshadowed and influenced U.S. law. "Unlawfulness" was already familiar in homicide doctrine.[122] Hale had distinguished abortion with intent to cure or prevent disease in a woman from abortion with intent to destroy the child within her, only characterizing the latter as "unlawful."[123] Courts interpreting Lord Ellenborough's Act and its successors distinguished "lawful" abortion[124] in a way that preserved the common-law protections for those who provided therapeutic abortions

[120] Lord Ellenborough's Act, § 1 (regarding post-quickening abortion).

[121] KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 27 n.2. (citing the 1837 successor act, Offenses Against the Person Act § 6, that preserved the requirement that to be punishable, an act be done "unlawfully"); *id*. (citing the 1846 draft revision of criminal law, including on abortion and the intent provision, Parl. Pap. 24 (Commissioners for Revising and Consolidating the Criminal Law ed., 1846)) that proposed in relevant part, ". . . no Act . . . shall be punishable when such act is done in good faith with the intention of saving the life of the mother whose miscarriage is intended to be procured")); *id*. at 167 (Appendix I) (reprinting relevant sections of the revised criminal law as finally adopted, The Offenses Against the Person Act of 1861, that stipulate to be punishable, an abortion must be done "unlawfully"). For discussion of the 1846 draft revision, exempting from punishment an act done with the intent of saving the life of the mother, see also D. Seaborne Davies, *The Law of Abortion and Necessity*, 2 MOD. L. REV. 126 (1938) [hereinafter Davies, *Necessity*].

[122] COKE, LAWS OF ENGLAND FOURTH, *supra* note 4, at 251. Blackstone, elaborating on Coke's doctrine, had defined "unlawfulness" in regard to homicide as "killing without warrant or excuse." WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND: BOOK THE FOURTH, ch. 14, 196 (1765–1769), http://avalon.law.yale.edu/18th_century/blackstone_bk4ch14.asp [hereinafter BLACKSTONE, COMMENTARIES].

[123] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429.

[124] *See*, *e.g*., R. v. Wilhelm, 17 MED. TIM. GAZ. 658 (1858)) (judge discusses the possibility of a "lawful cause" for attempted abortion), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 53, 182 n.29; R v. Bell [1929], 1 BRIT. MED. J. 1061) (judge states certain operations to terminate pregnancy in its last stages to save patient's are legal and necessary), *cited in* KEOWN, *id*., at 53, 182 n.27. *See also*, *e.g*., R. v. Bourne, 1 K.B. 687, 3 All E.R. 615, L.R. 471 (Central Criminal Court [U.K.])) (judge upholds defense submission to amend indictment to include the word "unlawfully," adding to elements Crown prosecutors have to prove), *cited in* KEOWN, *id*., at 51, 182 n.11.

and practitioners who acted with therapeutic intent.[125] Juries were instructed accordingly.[126] "Malice," another element from the statute, was also already a familiar (if confusing) term.[127] "Malice aforethought," premeditated ill-intent, was the doctrinal element distinguishing murder from manslaughter.[128] Prosecutors subsequently assured physicians in official correspondence that the law did not forbid abortion necessary to save a pregnant woman's life,[129] and legal experts distinguished abortions performed for patient safety reasons from criminal abortions.[130] In short, through intent elements, nineteenth-century British statutes on abortion incorporated the common-law rule that abortion was not punishable when performed for therapeutic reasons. The

[125] *See generally* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111 (arguing courts interpreted statutes' intent language to permit therapeutic abortions).

[126] *See*, *e.g*., R. v. Wilhelm, 17 Med. Tim. Gaz. 658 (1858)) (judge instructs jury that to convict it must be satisfied that defendant used "an unlawful instrument for an unlawful purpose"), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, supra note 111, at 52; R. v. Collins, 2 BRIT. MED. J. 59, 122, 129 (1898)) (in murder trial of medical practitioner charged with using an instrument to procure abortion, judge instructs jury that in some cases "forcible miscarriage" is necessary to save the patient's life and "a properly qualified doctor had to say when that time had arrived. That was not unlawful."), *cited in* KEOWN, *id*. at 52; *Death after operation to terminate pregnancy*, 2 BRIT. MED. J. 549, 550 (1933) (at inquest into possibility of wrongful death, coroner instructs jury that where surgical abortion was medically indicated in view of attending physicians, felonious intent could "of course" be ruled out), *cited in* KEOWN, *id*. at 53.

[127] *See*, *e.g*., The People v. William Enoch, 13 Wend. 159, 167 (N.Y. Dec. 1834) (court trying to make sense of common-law element of malice in context of altered terms in revised criminal code).

[128] *See* COKE, LAWS OF ENGLAND FOURTH, *supra* note 4.

[129] Sir Edward Clarke Q.C. & Horace Avory, *Opinion of Q.C. on Abortion for Purpose of Saving Life of Mother, Requested by Royal College of Physicians (1895)*, *in* TAYLOR'S PRINCIPLES AND PRACTICE OF MEDICAL JURISPRUDENCE 154 (F.J. Smith ed., 5th ed. 1905)) (Queen's Counsel, regarding a request for opinion on abortion from Royal College of Physicians, responded, "the law does not forbid the procurement of abortion during pregnancy, or the destruction of the child during labour, where such procurement or destruction is necessary to save the mother's life."). For background on this opinion and on the intent provision interpreted for medical care providers, see KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 54.

[130] *See e . g*., *The Ethical, Legal, and Medical Aspects of Abortion*, 1 LANCET 230–231 (1927)) (in joint meeting of Medico-Legal Society and obstetrics section of Royal Society of Medicine, Justice Humphreys distinguished non-criminal abortion as "steps taken by a qualified medical man to get rid of a condition in his patient which he considered, using the best of his skill and ability, and of course honestly, on medical grounds and on medical grounds alone, to be dangerous to the safety of his patient."), *discussed in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 54–55, 183 n.32–36, 38–39.

courts found a life-health exception in statutory language that criminalized only "malicious" or "unlawful" acts to procure miscarriage.

### B. Statute in the United States 1821-1857: Protecting Patients

57. The criminalizing thrust of the abortion provisions in Lord Ellenborough's Act initially found no reception in the U.S.[131] When U.S. state lawmakers did begin to regulate abortion through statute, their legislation principally reflected concern with patient protection. A first wave of U.S. abortion statutes across different states, then, was characterized not by principled opposition to abortion, but by a common motivation of protecting patients, manifest in provisions on poison control or malpractice. A second wave concentrated mid-nineteenth century, similarly motivated, reflected increasing anxiety over new ideas and practices in medical care.

#### i. First Wave Statutes, 1821-1857: Poison Control and Consumer Protection

***Poison Control***

58. The first statutory regulation of abortion in the U.S. came in 1821 when Connecticut Revisers included, in a new section of the state criminal code against murder by poisoning, a clause making administering poison with intent to cause post-quickening miscarriage punishable.[132] Its specifics, considered within the dominant regime of humoral health, demonstrate its limits and adherence to patient-protection motivation. The Connecticut

---

[131] *See*, *e.g*., Commonwealth v. Bangs, 9 Mass. 387, 388 (1812) (reciting common law doctrine in dismissing charge of attempted abortion on grounds that even "if an abortion had been alleged and proved to have ensued," "averment that woman was quick with child is a necessary part of the indictment," i.e., excluding any wider attempt doctrine or liability for pre-quickening procedure that Lord Ellenborough's Act had introduced in the U.K.).

[132] CONN. GEN. STAT. tit. 22, § § 14, 16, at 152, 153 (1821). *See also* MOHR, ABORTION IN AMERICA, *supra* note 112, at 21–22 (describing the poison-control aspects of the Connecticut statute).

provision only covered "poison," not all medications that induced miscarriage.[133] It incorporated the common-law doctrines protecting any practitioner acting with therapeutic intent in statutory intent elements requiring "poison" be administered "willfully and maliciously,"[134] excluding therapeutic abortion. By 1857, six jurisdictions had followed this example, adopting their first abortion legislation with reference to poison.[135] Prosecution under such a provision was aimed at those who peddled poisons with the promise of procuring miscarriage and practically limited to cases of patient death or serious harm.[136]

***Consumer Protection***

59. In the same decade that revisers in Connecticut took up poison control, in New York, formally trained physicians (referred to as "regulars") began to advocate for legislating stricter regulation medical practice. In 1827 the New York legislature made unauthorized practice of medicine a misdemeanor, the toughest such measure in the U.S. at the time.[137] The following year, revisers of the state criminal code took patient-protection reform further with

[133] tit. 22, § § 14, 16.

[134] tit. 22, § § 14, 16. For discussion of the Connecticut legislation, *see also* N.E.H. HULL & PETER CHARLES HOFFER, ROE V. WADE: THE ABORTION RIGHTS CONTROVERSY IN AMERICAN HISTORY 21 (2001) [hereinafter HULL & HOFFER, ABORTION RIGHTS IN AMERICAN HISTORY].

[135] For full list of statutes regulating abortion in reference to poison before 1857, see Appendix A, Part I.

[136] HULL & HOFFER, ABORTION RIGHTS IN AMERICAN HISTORY, *supra* note 140, at 20. ("Prosecutions occurred only when a woman died or suffered grievous harm through the abortionist's recklessness or negligence.").

[137] It had been declared unlawful to practice "physic [*sic*] and surgery" in New York if "not regularly licensed" in 1796. In re Smith, 10 Wend. 449, 453 (N.Y. Sup. Ct. 1833). ALEXANDER WILDER, HISTORY OF MEDICINE: A BRIEF OUTLINE OF MEDICAL HISTORY AND SECTS OF PHYSICIANS, FROM THE EARLIEST HISTORICAL PERIOD; WITH AN EXTENDED ACCOUNT OF THE NEW SCHOOLS OF THE HEALING ART IN THE NINETEENTH CENTURY, AND ESPECIALLY A HISTORY OF THE AMERICAN ECLECTIC PRACTICE OF MEDICINE, NEVER BEFORE PUBLISHED 440–445 (1901)), *cited in* MOHR, ABORTION IN AMERICA, *supra* note 112, at 38, 272 n.35. *But see* JOHN S. HALLER, AMERICAN MEDICINE IN TRANSITION, 1840-1910 200-01 (1981) (on licensing, describing a countervailing trend pushed by the new commercial medical institutes of the 1800s, by which between 1826 and 1861, states repealed preexisting licensing requirements such that by the time of the Civil War, "no effective medical licenses existed in any of the states").

new abortion legislation.[138] Their statutory provisions distinguished between kinds of practitioner intent in ways that were consistent with humoral theory and that provided protection for therapeutic practice. [139] The New York revisers' initiatives, described below, provided an example followed in other states.

60. The most stringent of the three statutory provisions on abortion adopted in New York contemplated abortion by blows. It raised "wilful [*sic*] killing" of an unborn quick child, by any injury to the mother which would be considered murder if it had resulted in the death of the mother,[140] from misdemeanor to first-degree manslaughter.[141] It thus penalized battery in a particular way if against a pregnant woman post-quickening. Abortion by blows was not usual or even accepted humoral practice; this measure thus excluded practices typical of health care practitioners working with therapeutic intent.[142] Following the New York example, nine more states subsequently adopted a similar measure prohibiting abortion by blows.[143]

61. The New York statute's other abortion provisions made willfully employing any means with intent to procure miscarriage a misdemeanor[144] and criminalized intervention with the intent to "destroy" a quick fetus as second-degree manslaughter.[145] These provisions

---

[138] MOHR, ABORTION IN AMERICA, *supra* note 112, at 38.

[139] For evidence that the push for abortion regulation came from doctors, *see* MOHR, *id*. at 26–27.

[140] An Act Concerning Crimes and Punishments; proceedings in criminal cases; and prison discipline, pt. 4 (Act of Dec. 18, 1828) (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 8, at 659, 661 (1828)).

[141] 2 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 2, art. 1, § 8, at 811, 812 (1828–1835) (explaining that the offense theretofore had only been classed a misdemeanor).

[142] *See generally* THE TROTULA, *supra* note 6; *see also* Green, *Introduction* to THE TROTULA, *supra* note 1.

[143] For full list, see Appendix B, Part I.

[144] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828).

[145] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9, at 659, 661 (1828). (Specifying a "pregnant woman," it imposed on the prosecution the burden of proving pregnancy, which normally entailed proving quickening.) *Id*.

introduced the first explicit therapeutic exception to an abortion prohibition in Anglophone legislation, excluding from punishment an act undertaken to preserve the woman's life or advised as such by two physicians.[146] In authorizing therapeutic abortion explicitly rather than implicitly through an intent requirement, the New York Revisers consciously departed from the approach in Lord Ellenborough's Act, the accompanying Notes stating, "The last section is founded upon an English statute . . . but with a qualification which is deemed just and necessary,"[147] *i.e.*, the therapeutic exception. By 1857, a dozen jurisdictions followed New York, providing to practitioners a therapeutic defense through consultation with a "regular" physician serving as adequate proof of medical necessity.[148] (Note: all jurisdictions enacting an abortion statute before 1857 provided some kind of therapeutic defense.)[149]

**ii. Second-Wave Statutes, Mid-Nineteenth Century: Preserving Historic Legal Protections in a Changing Context**

62. As in the U.K., in the U.S. empirical science introduced new ideas about health. In the U.S., with the shift in the predominant theory of health away from humoral health, the social organization of medicine also began to shift radically, regendering care, engaging different

---

[146] 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9, at 659, 661 (1828); 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828).

[147] 3 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 6, § 21, at 811, 829 (1828–1835) (quotation in text above omitting Revisers' reference to Lord Ellenborough's Act).

[148] For a full list of such statutes, see Appendix C, Part III.A. By 1857, only a few states neither privilege the regular physician directly, nor provide the procedural safeguard of physician consultation as to necessity to evidence therapeutic intent. *See, e.g*., Indiana (IND. REV. STAT. § § 1, 3, at 224 (1838) (Act of Feb. 7, 1835) (retained, unchanged in this respect, in amended abortion provision of 2 IND. REV. STAT. pt. 3, ch. 6, § 36, at 424, 437 (1852)); Maine (ME. REV. STAT., tit. 12, ch. 160, §§ 13, 14, 661, 686 (1841) (Act of Oct. 22, 1840)); Oregon (OR. STAT. ch. 3, § 13, at 187 (1853–1854)); Virginia (1848 Va. Acts tit. 2, ch. 3, § 9, at 96) (no physician required, but neither does advice of physician convey protection from prosecution).

[149] For a list of such statutes, see Appendix C, Part I.A.

techniques and ethics,[150] and operationalizing new bodies of knowledge. Formalization of medical training propelled these changes and imparted a different sense of what good practice or bad entailed, and emergent structures for policing the boundaries between them.[151]

63. As previously noted, in the new schema of health, a conceptualization of relatively discrete bodily systems—a "circulatory system," a "respiratory system," a "reproductive system"—gradually replaced belief in the four humors. This shift was gradual, sporadic, and not always conscious or intentional. New thinking about health spread via new venues for disseminating medical knowledge, medical schools producing trained "regular" physicians. Whereas in 1800, only four medical schools operated in the United States[152] and "irregulars" vastly outnumbered "regulars,"[153] between 1810 and 1910, 447 new medical schools opened in the U.S. and Canada (156 of which stayed in business by 1910).[154] Nearly all excluded women students.[155] Thus in medical education, through these primarily commercial institutes, lecture hall education (with students viewing diagrams or observing cadaver

[150] *See* Reva Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 STAN. L. REV. 261, 287 [hereinafter Siegel, *Reasoning from the Body*].

[151] *See generally* Charles E. Rosenberg, *The Therapeutic Revolution: Medicine, Meaning, and Social Change* [hereinafter Rosenberg, *Therapeutic Revolution*], *in* SICKNESS AND HEALTH IN AMERICA: READINGS IN THE HISTORY OF MEDICINE AND PUBLIC HEALTH 39, 39 (Judith Walzer Leavitt and Ronald Numbers eds., 2nd ed. 1985) [hereinafter Leavitt and Numbers, SICKNESS AND HEALTH].

[152] *See* Abraham Flexner, *Medical Education in America: Rethinking the Training of American Doctors*, THE ATLANTIC (June 1910), http://www.theatlantic.com/magazine/archive/1910/06/medical-education-in-america/306088/ [hereinafter Flexner, *Medical Education in America*].

[153] *See*, *e.g*., MOHR, ABORTION IN AMERICA, *supra* note 112, at 32.

[154] *See* Flexner, *Medical Education in America, supra* note 152.

[155] In 1849, Elizabeth Blackwell became the first openly female graduate of a U.S. medical school (Geneva College in New York). JACALYN DUFFIN, HISTORY OF MEDICINE: A SCANDALOUSLY SHORT INTRODUCTION 301 (2010) [hereinafter DUFFIN, HISTORY OF MEDICINE]. Two sex-segregated medical schools for women opened in Philadelphia (1850) and New York (1863). *Id*. at 303. When Johns Hopkins University founded its medical department in 1893, a stipulation of donor Mary Garrett obliged it to offer 10% of its seats to women students. *Id*.

dissection) supplanted prior modes of apprenticeship or woman-to-woman hands-on training;[156] instruction in surgical cutting replaced training in herbal purgatives. "Brash young men" trained in the new theories of health and intrusive techniques took up obstetrics[157] before other developments that eventually made intrusive measures less lethal: knowledge of sepsis in childbirth[158] and how to prevent it in gynecological procedures[159] became widespread in the U.S. only by the last quarter of the nineteenth century, and antibiotics, by the 1930s.[160] In the meantime, with the abandonment of humoral treatments and midwifery, mortality from complications of pregnancy and childbirth increased.[161]

64. Changes in the health regime raised anxieties about medical practices. The motivations of consumer protection and malpractice regulation reflected in first-wave statutes

---

[156] Flexner, *Medical Education in America, supra* note 152. The home medical manual, containing recipes to restore menstrual flow or "blocked menses," became a widely-referenced source in health care practice for women in the U.S. *See*, *e.g*., S.K. JENNINGS, THE MARRIED LADY'S COMPANION, OR POOR MAN'S FRIEND (1808) [hereinafter JENNINGS, LADY'S COMPANION], *excerpted in* MELODY ROSE, ABORTION: A DOCUMENTARY AND REFERENCE GUIDE 1–2 (2008) [hereinafter ROSE, ABORTION DOCUMENTARY GUIDE]; *see also*, *e.g*., *Letter to Ladies* (1817), *cited in* MOHR, ABORTION IN AMERICA, *supra* note 112, at 6.

[157] Laurel Thatcher Ulrich, *'The Living Mother of a Living Child': Midwifery and Mortality in Postrevolutionary New England* 61 [hereinafter Ulrich, *Midwifery and Mortality*] *in* WOMAN AND HEALTH IN AMERICA 38, 42 (Judith Walzer Leavit ed., 2nd ed. 1999) [hereinafter Leavitt, WOMAN AND HEALTH]. *See also* KRISTIN LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD 15–16 (1984) [hereinafter LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD] (describing the rise to prominence of elite "regular" physicians).

[158] IGNAZ SEMMELWEIS, ETIOLOGY, CONCEPT, AND PROPHYLAXIS OF CHILDBED FEVER (K. Codell trans., 1983) (1861) (reporting Semmelweis' 1847 discovery of sepsis as a cause of maternal mortality in childbirth, and doctor handwashing and other doctor disinfection measures as the key to its prevention).

[159] Joseph Lister, *On the Antiseptic Principle in the Practice of Surgery*, 90 THE LANCET 353 (1867); Joseph Lister, *Of the Effects of the Antiseptic System of Treatment on the Salubrity of a Surgical Hospital*, 95 THE LANCET 4 (1870) (reporting the findings of Joseph and Agnes Lister's experiments with antiseptics and their application to preventing infection from surgery).

[160] Alexander K. Fleming, *On The Bacterial Action of the Cultures of a Penicillium, with Special Reference to their use in the Isolation of B. Influenza*, 10 BRIT. J. EXPERIMENTAL PATHOLOGY 226 (1929) (reporting Fleming's 1927 discovery of antibiotics, in the form of penicillin).

[161] Ulrich, *Midwifery and Mortality*, *supra* note 157, at 59.

became more charged. As early as 1828, revisers of the New York criminal code reported their skepticism towards a new willingness to perform surgery and acknowledged it inspired increased regulation of medical practice:

> The rashness of many young practitioners in performing the most important surgical operations for the mere purpose of distinguishing themselves, has been a subject of much complaint, and we are advised by old and experienced surgeons, that the loss of life occasioned by such practice, is alarming.[162]

65. Public alarm at "rashness" in medical practice became a recurrent theme of this time,[163] informing a wider backlash.[164] A handful of irregulars engaged in commercial practice of very risky abortion by internal intrusion became emblematic of public concern over a general category of risky new practices adopted with less caution by regulars in all branches of medicine, particularly intrusive measures and surgeries. The celebrated case of "Madame Restell," the professional name of New York businesswoman Ann Lohman, provides a prominent example. Restell advertised sale of potions purporting to restore menses and provided boarding facilities for pregnant women in which, the accusations ran, she engaged in acts ranging from

[162] 3 N.Y. REV. STAT. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 6, § 28, 811, 829–30 (1828–1835). Contrast this eagerness with the reluctant trepidation of surgeons called to remove a nearly one-pound breast tumor in 1814: "I was willing the business should proceed," writes the patient, "but the young men hesitating to perform it, it was judged best to delay the matter" until an older, more experienced doctor could perform it. Susan Garfinkel, *'This Trial was Sent in Love and Mercy for My Refinement': A Quaker Woman's Experience of Breast Cancer Surgery in* 1814, *in* Leavitt, WOMEN AND HEALTH*, supra* note 157, at 68, 72.

[163] *See, e.g.*, Rice v. State, 8 Mo. 403, 405 (1844) ("If a person assume to act as a physician, however ignorant of medical science, and prescribe with an honest intention of curing the patient, but ... the patient die in consequence of the treatment, contrary to the expectation of the person prescribing, he is not guilty of murder or manslaughter. But if the party prescribing have so much knowledge of the fatal tendency of the prescription, that it may reasonably be presumed that he administered the medicine from an obstinate, willful rashness" he is guilty of manslaughter at least, even if he did not intended any bodily harm to the patient) (also *cited in* MO. REV. STAT. art. 2, ch. 47, § 22, n. c, 348 (1844–45) (case in footnote to manslaughter provision of state criminal statute, which read together implies this jurisdiction continued the doctrine of excluding from criminal culpability a medical practitioner acting with curative intent but modifying it to make culpable a practitioner acting out of "obstinate, willful rashness")).

[164] *See* Rosenberg, *Therapeutic Revolution*, *supra* note 151, at 49 (describing the "therapeutic nihilism" movement of the second third of the century).

administering toxic substances with the promise of ending unwanted pregnancy, performing abortion by internally intrusive methods, and stealing babies. Lurid accounts of her purported acts fed sales of new New York newspapers and inspired other such coverage in Boston, leading to a series of highly publicized scandals and trials in the early 1840s.[165] "Abortion" thus treated became a locus for societal debate over broader changes in health theories and treatment with the shift from humoral health in the latter half of the 1800s. It bears noting that in these scandals and attendant publicity, the emphasis was on the danger that a specific procedure posed to the pregnant person. Patient well-being sparked this concern.

66. This revolution in medicine also unsettled the law. As anxieties over sociological and epistemic changes in medicine surfaced more broadly and abortion became a locus of debate over patient care, institutions of populism and popular sovereignty—the penny press, elected representatives—got involved. The tempo of change increased. At the start of the 1820s, no state regulated abortion by statute; by 1857, nearly two-thirds did.[166] Legislatures became locomotives of change.[167]

---

[165] For a full account of "Madame Restell," the associated scandals, and the impact of such sensationalized publicity on the development of news media and law in New York, *see generally* CLIFFORD BROWDER, THE WICKEDEST WOMAN IN NEW YORK (1988).

[166] Twenty of thirty-one states and four of seven territories regulated abortion by statute by 1857. See Part I of Appendices A-C. Hawaii also enacted an abortion regulation in 1850, although it did not become a U.S. territory until 1900. HAW. PEN. CODE, ch. 12, §§ 1, 2 (1850).

[167] Until a jurisdiction made abortion the subject of statute, common-law presumptions of legality continue. *See, e.g.*, Boies v. McAllister*,* 3 Me. 308, 308 (1835) (finding evidentiary rule admitting rumor of plaintiff as criminal suspect not applicable to testimony regarding woman's rumored measures to procure abortion, implying court does not consider abortion a crime in Maine, five years before passage of statute). In those jurisdictions with an abortion statute, interpretation of therapeutic intent doctrine is increasingly informed by conceptions of risk and malpractice. *See*, *e.g*., Commonwealth ex rel. Chauncey & Nixon v. Keeper of the Prison, 2 Ashmead 1st Jud. D. Pa. 227, 231 (1841) (Philadelphia County, 1838), (finding that responsibility for death of abortion patient lies with the men who administered the abortifacient, even where they did not intend to kill patient, but they were "deliberate and malicious" and their acts were "attended with great danger.").

67. Amidst all the change, however, the law preserved the history and tradition of core protections for those practicing abortion with therapeutic intent. States' new statutory provisions conserved some of the rationale of the humoral health regime. It was the well-being of the patient, not fetal life, that was the object of legislation. In contemplating legal liability for patient death resulting from medical intervention, practices disfavored under humoral health, having no humoral benefit and posing patient risk, were singled out for statutory prohibition, for example prohibiting abortion by blows without therapeutic exception.[168] Similarly, many statutes, by distinguishing "poison," preserved the presumption of a healthcare motivation for medicational abortion.[169]

68. Other common-law therapeutic-intent doctrines developed under humoral care were preserved in legal formulations in the new statutes. Cognizant that some uterine purgatives were also known means for terminating pregnancy, the common law exercised flexibility by relying on categories of intent rather than lists of controlled substances.

69. The new approach, regulating abortion by statute, preserved some of these nuances and legal protections for health care providers. Consistent with humoral health, Hale had distinguished between an act intended to "destroy a child" from one intended to "cure a woman."[170] The new statutes preserved this sense: Although "quickening" was losing its significance as the determinative condition marking pregnancy, new statutes commonly

---

[168] For pre-1857 state laws prohibiting abortion by blows, see Appendix B, Part I. The language in these provisions, nearly identical, typically reads in full, "The wilful killing of any unborn quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother... ." MO. REV. STAT. § 9 at 168 (1835).

[169] For pre-1857 state laws prohibiting abortion by "poison" specifically, see Appendix A, Part I. An Indiana statute singled out "poison" in § 1 but adds "medicines" and "instruments" in § 3. IND. REV. STAT. ch. 26, § § 1, 3, at 224, 224 (1838) (Act of Feb. 7, 1835).

[170] HALE, PLEAS OF THE CROWN, *supra* note 5, at 429–34.

preserved a distinction between post-quickening procedures, which entailed greater risk for the patient, and procedures performed earlier in pregnancy, differentiating between an act intended "to destroy a child"[171] from one merely "to procure miscarriage,"[172] penalizing the former more heavily.[173]

70. Most significantly, the old humoral gynecology routinely administered uterine purgatives to preserve health and life and in nearly all of the new statutes, a therapeutic exception protected intervention deemed necessary to "preserve the woman's life" (regardless of whether undertaken to "destroy a child" or "procure a miscarriage").[174] Curative intent doctrines inhering in the old humoral health practice were also preserved in the many statutes distinguishing "lawful" from "unlawful" abortion as the threshold element for prosecution.[175] Some statutes repeated other intent elements from Lord Ellenborough's Act[176] requiring that an

---

[171] Full list of pre-1857 statutes requiring, to be punishable, an act be undertaken with intent "to destroy child" provided in Appendix D.

[172] Full list of pre-1857 statutes requiring, to be punishable, an act be undertaken with intent to "procure miscarriage," distinct from one to "destroy child" provided in Appendix E.

[173] *See*, *e.g*., 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 and tit. 6, § 20 (1828-1845); MO. REV. STAT. art. 2, § § 10, 36 (1835); OHIO GEN. STAT. ch. 35, § § 111, 112 (1841); 1848 N.H. Laws ch. 743, § § 1, 2; MICH. REV. STAT. ch. 153, § § 32, 33, 34, at 662 (1846); 1848 Va. Acts. tit. 2, ch. 3, § 9; 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § § 37, 38; KAN. (TERR.) STAT. ch. 48, § § 10, 39 (1855); ME. REV. STAT. tit. 11, ch. 124, § 9 (1857) (penalizing an act with intent "to procure miscarriage" more lightly than one "to destroy a child"). Compare, generally, provisions given in Appendix D and Appendix E, respectively.

[174] Nearly all pre-1857 statutes, whether criminalizing an act to "destroy child" or to "procure miscarriage," include an exception for any act undertaken to "preserve the life" of the woman. For full list, see Appendix C, Part I.A. New York revised its abortion statutes after the Madame Restell scandals of the 1840s and several states followed its lead. Those post-1845 scandal statutes make no explicit therapeutic provision but encode a therapeutic defense in mental state elements. See Appendix C, Part II.A.

[175] For list of statutes invoking the "unlawful" distinction, see Appendix C, Part II. A.1. Some state courts added to or reinforced statutory provisions in case law. *See e.g*., State v. Murphy, 27 N.J.L. 112, 113 (Sup. Ct. 1858) (specifying act must have been done "without lawful justification"); Commonwealth v. Wheeler, 53 N.E. 2d 4 (Mass. 1944) (interpreting an act with therapeutic intent as "lawful").

[176] Lord Ellenborough's Act, 43 Geo. 3 ch. 58.

act be done "maliciously"[177] or "willfully"[178] to be punishable, i.e., excluding the healthcare provider acting in good faith towards a person in need. Courts typically understood these intent elements as allowing abortions performed for therapeutic reasons.[179]

**iii. Lag between New Theory and New Practice, and Tolerance for Therapeutic Intent at Law**

71. Compared with the U.K., in the U.S. the shift away from humoral health took place more gradually and the erosion of the humoral health regime took time. Even among formally educated physicians, in practice and belief humoral therapeutics co-exised with new theories of health,[180] the legal and medical record show. The reasons for this lag between theory and practice are many. It took time for new therapeutics, supported by the new theory of health, to be developed. Even once they were developed, the old practices were not readily abandoned. Many prior therapeutic practices "worked" in restoring health to ill patients, were known to practicing physicians and health care providers, and were known to and accepted by patients.

72. The record on the persistence of humoral therapeutics after the wane of humoral theory is clear. Through the second third of the nineteenth century, older modes of therapeutics

---

[177] For list of pre-1857 statutes requiring, to be punishable, an act be undertaken "maliciously," see Appendix C Part II.A.2 *But see* ILL. REV. CODE div. 5, § 46, at 174, 179 (1833) (revision in poison section of statute removing "wilfully and maliciously" in regard to procuring abortion). *See also* IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843) (revising statute to add an explicit "preserve-life" exception and omitting "maliciously"); 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (adopting as the law of Oregon territory the 1843 Iowa laws).

[178] For list of pre-1857 statutes requiring, to be punishable, an act be undertaking "willfully," see Appendix C Part II.A.3

[179] *See*, *e.g*., State v. Murphy*,* 27 N.J.L. 112, 113 (Sup. Ct. 1858) (specifying to be considered an offense, the intervention must have been done "without lawful justification"); Commonwealth v. Wheeler, 53 N.E. 2d 4 (1944).

[180] Rosenberg, *Therapeutic Revolution*, *supra* note 151, at 47 (reporting that older therapeutic practices were not abruptly abandoned but were merely used with less frequency); *see also id*. (Physicians' rhetoric disparaging humoral interventions notwithstanding, in the decades between 1850 and 1870, "[p]ractice changed a good deal less than the rhetoric surrounding it would suggest.").

continued; practice was marked by a change in the intensity of their deployment rather than a categorical abandonment.[181] Well after the Civil War, physicians still administered purgatives in spring and fall "to facilitate the body's adjustment to the changing seasons."[182] As late as 1897, uterine purgation remained such accepted practice that a U.K. court could not preclude curative intent in the administration of an abortifacient emmenagogue.[183] In 1908, defenders of humoral medicine spoke out against its detractors and alternatives.[184] In 1910, about fifty percent of all U.S. births were still reported by midwives.[185] Across medical practice areas, dosage levels of humoral preparations decreased rather than ceased, and although bleeding sank into disuse, purgatives like mercury still figured in the practice of most physicians.[186] Medical schools' anti-humoral rhetoric notwithstanding, in practice, clinicians "insure[d] the greatest possible degree of continuity with older ideas"[187] at least to the turn of the twentieth century. In some areas, humoral treatments were still common into the 1930s.

73. As humoral medicine continued, *sub rosa*, in therapeutic practices, state abortion legislation focused on lethal malpractice or rashly undertaken intrusive measures. Not all states passed abortion-regulating statutes and in those jurisdictions, intentional termination of pregnancy continued without interference from the law as those jurisdictions continued to follow

---

[181] *See id*.

[182] *Id*.

[183] Rex v. Collins, 2 BRIT. MED. J. 122 (1898).

[184] Rosenberg, *Therapeutic Revolution*, *supra* note 151, at 49 (quoting Abraham Jacobs denouncing one of the post-humoral approaches, so-called "expectant treatment," as "too often a combination of indolence and ignorance," "the sin of omission, which not infrequently rises to the dignity of a crime.").

[185] Francis Kobrin, *The American Midwife Controversy: A Crisis of Professionalization*, *in* Leavitt and Numbers, SICKNESS AND HEALTH *supra* note 151, at 197, *citing* J. Clifton Edgar, *The Remedy for the Midwife Problem*, 63 AM. J. OBST. & GYNEC. 882 (1911).

[186] *Id*.

[187] *Id*.

common-law doctrine. States that did pass abortion legislation incorporated a therapeutic defense in statutory language excepting from prosecution a procedure deemed necessary to preserve a woman's life.

### C. Statutes 1857-1959

#### i. The Campaign to Criminalize and its Limits

74. In 1847, formally trained physicians (the so-called "regulars") founded the American Medical Association (A.M.A.).[188] Struggling to compete with midwives and other experienced health care providers, regulars seized upon standardizing professional ethics as part of an effort to distinguish themselves and resurrected an oath from the Hippocratic corpus as statement of their disciplinary commitment.[189] The wording they used took on decisive significance. In the original ancient Greek wording, the "Hippocratic Oath" includes swearing not to administer poison to anyone[190] nor, in gynecological practice, to resort to late-term pessary[191] but the A.M.A. physicians apparently relied on a partially mistranslated version that rendered "pessary" as "abortion."[192] Regular physicians' project to create a distinct professional

---

[188] American Medical Association, *The Founding of the A.M.A.*, www.ama-assn.org/ama/hub/about-ama/our-history/the-founding-of-ama.page?.

[189] *See* MOHR, ABORTION IN AMERICA, *supra* note 112, at 35 (arguing the Hippocratic Oath holds a special place in the history of ethics and identity formation among U.S. regular physicians).

[190] *See The Hippocratic Oath*, 3 LONDON MED. REPOSITORY: MONTHLY J. & REV. pt. 5, at 258, (James Copland ed., Jan.–June 1825) [hereinafter *The London Hippocratic Oath*] *http://books.google.ie/books?id=Oe0EAAAAQAAJ&pg=PA258#v=onepage&q&f=false* (translation of the Oath circulated in England in the first quarter of the nineteenth century including the promise, "Nor shall any man's entreaty prevail upon me to administer poison to anyone; neither will I counsel any man to do so").

[191] 1 HIPPOCRATES 229 (W.H.S. Jones ed., 1934-88), *cited in* RIDDLE, ANCIENT ABORTION, ABORTION, *supra* note 38, at 173 n.28. Classical historian John Riddle would translate the relevant phrase, "Neither will I give a suppository to cause an abortion." RIDDLE, ANCIENT ABORTION, *id*., at 9. We understand "abortion" in Hippocratic understanding to indicate a late-term procedure, hence my rendering of the phrase as "late-term pessary."

[192] Mohr argues that allegiance to the Oath in (mis)translation moved regulars to oppose abortion. MOHR, ABORTION IN AMERICA, *supra* note 112, at 65. To be clear, accounts about the A.M.A.

identity through standardized ethical norms came to underwrite a full program hostile to abortion[193] led by a zealous A.M.A. subcommittee on "criminal abortion" formed in 1857.[194]

75. The A.M.A. "criminal abortion" campaign succeeded in getting a new wave of state abortion legislation passed[195] and consolidated regular physicians' hold on practice of abortion.[196] Hinging assurance of a therapeutic defense on consultation with a regular physician expanded to other jurisdictions,[197] some requiring that the provider himself actually be a regular physician.[198]

---

physicians' campaign against abortion tell us that A.M.A. members swore not to perform abortions as part of the nineteenth-century Hippocratic Oath; however, contemporaneous sources confirming the actual words physicians repeated when taking the Oath at that time are thin indeed. *See* Siegel, *Reasoning from the Body, supra* note 150, at 349 n.77. Prior to the A.M.A. campaign, it was not clear that physicians' ethics prohibited abortion. Siegel, *Reasoning from the Body*, *id*., at 282 n.77.

[193] *See* Siegel, *Reasoning from the Body*, *supra* note 150, at 280–314 (describing the A.M.A. campaign); *see also* LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157, at 15–16 (describing the A.M.A. campaign as a "direct social struggle" led by elite "regular" physicians "as part of an effort to achieve other political and social goals").

[194] *See* MOHR, ABORTION IN AMERICA, *supra* note 112, at 147–170 (describing the physicians' crusade against abortion). The campaign concentrated on changing public consciousness as well as legislation. "It may be asked," poses one "informational" volume ostensibly written for women on sex and birth control, "if there is no latitude to be allowed [in regard to abortion] for extreme cases . . . We are compelled to answer, 'None.'" HORATIO STORER, WHY NOT? A BOOK FOR EVERY WOMAN: A PROPER BOSTONIAN ON SEX AND BIRTH CONTROL (1864), *excerpted in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 11, 16. *See also American Medical Association*, *Report on Criminal Abortion* (1859), *reprinted in* ROSE, ABORTION DOCUMENTARY GUIDE, *id*. at 8, 10; Siegel, *Reasoning from the Body, supra* note 150, at 280–314 (describing arguments for that the A.M.A. campaign raises).

[195] *See, e.g.*, MOHR, ABORTION IN AMERICA, *supra* note 112, at 200–226 (detailing anti-abortion legislation resulting from the A.M.A. campaign).

[196] The rare irregular who practiced commercial-scale abortion, if known, became famous as an exception. *See, e.g.*, *generally*, RICKIE SOLINGER, THE ABORTIONIST (1994) (on the famously successful irregular practitioner Ruth Hanna of Portland, Oregon, who practiced from 1918-1968); *see also, e.g.*, CATHERINE CUSSET, THE STORY OF JANE (2001) (on laywomen who learned to perform abortion for each other before re-legalization in *Roe v. Wade* as a form of altruism and empowerment).

[197] For list of additional physician-consultation statutes see Appendix C Part III.A.

[198] The use of the male pronoun here is deliberate, as nearly all medical schools excluded female students. For list of post-1857 statutes that limiting therapeutic intent to physicians, see Appendix C, Part III.A.3. *But see* IDAHO COMP. LAWS ch. 5, § 42, at 328 (1874-1875) (changing the category covered by the provision to "physician practitioner"); ARIZ. REV. STAT. § 454, at 138 (1887) (expanding the defense to

76. The campaign and its sociological effects bore epistemic consequences: this period was marked not by respect for history and tradition but rather, by suppressing it. Tying legal practice of abortion to formally trained physicians at a time when most medical schools excluded female students drove midwives and herbalists from practice[199] and restricted lawfully performed abortion to regulars not trained in humoral health or its potional purgatives. Legislation produced by the A.M.A. anti-abortion campaign blocked transmission of knowledge about emmenagogues and medicational abortifacients.[200] Written sources were suppressed under federal legislation resulting from the A.M.A. campaign (so-called "Comstock Laws")[201] and its state-law imitators prohibiting advertising or distributing information about abortifacient herbs, instruments, or practitioners.[202] Oral traditions of knowledge transmission about humoral health

include any person of the opinion that inducing miscarriage was "necessary to preserve the woman's life").

[199] *See* Siegel, *Reasoning from the Body*, *supra* note 150, at 287; LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157 at 30–31; *see generally* MOHR, ABORTION IN AMERICA, *supra* note 112.

[200] After the A.M.A. abortion committee report came out in 1859 but still before the 1873 federal obscenity legislation, a few jurisdictions restricted advertising information about inducing miscarriage. *See, e.g.* (in order of adoption): KAN. GEN. LAWS ch. 28, § 10 (1859) (excepting publication of "standard medical works"); 1860 Conn. Pub. Acts ch. 71, § 4; 1867 Vt. Acts No. 57, § 3; Act of Mar. 14, 1867, ch. 216, 1867 R.I. Pub. Laws Jan. Sess. (codified as amended at R.I. GEN. STAT. tit. 30, ch. 232, § 23) (amending criminal "decency" law to prohibit *inter alia* advertising any person with "information or knowledge" about causing miscarriage); 1868 Fla. Acts 1st Sess., ch. 1637, III, § 10; 1868 Md. Laws ch. 179, § 2, at 315; 1869 Mich. Laws ch. 106, § 2, at 175 (advertising any compound medicine of an "immoral" nature or publishing any recipe); 1870 Pa. Laws No. 19, § 2; ILL. REV. STAT. ch. 38, § 4, at 369 (1871-1872) (additionally restricting pharmacists). Massachusetts was the only state that anticipated the A.M.A. campaign, criminalizing in its "second wave" post-scandal legislation distributing or advertising any drug or instrument for use in abortion. 1847 Mass. Stat. ch. 83, § 10.

[201] Act for the Suppression of Trade in, and Circulation of, Obscene Literature and Articles of Immoral Use [Comstock Act], 18 U.S.C. § § 1461, 1463, 1735 (1873), *reprinted in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 19–21. The legislation takes its name from New York policeman Anthony Comstock, who gained prominence wrangling with Madame Restell and, subsequently elected to Congress, sponsored federal obscenity legislation. ROSE, *supra*.

[202] After federal legislation passed, other states and territories passed "Comstock statutes" that prohibited the advertising of means of potional or instrumental abortion. *See, e .g.* (in order of adoption), 2 MINN. STAT. ch. 54, Sec. 29, § 4, at 987 (1873); Act of Nov. 8, 1875, § 2, 1875 Ark. Laws 4th Adj. Sess.; 1881 Ind. Laws ch. 37 § 93; 1883 Del. Laws ch. 226, § 1, at 522; IDAHO REV. STAT. (PENAL CODE) § 18-603

were similarly disrupted.[203] Legislation restricting abortion practice blocked the transmission of knowledge that otherwise could have been available to future generations.

77. The A.M.A. successfully lobbied state legislatures, which responded with the third, largest, and strictest wave of abortion-regulating statutes in the 1870s. Against this background of suppressing information about abortion and undercutting a regime of health that had promoted it, however, the states' statutes preserved prior legal formulations. Although new statutes might at first glance look only as if they were abortion-restricting, in them, the common-law therapeutic intent doctrine survived. **Even the new, strictest statutes** that targeted practices specific to the "irregulars" **did not by and large bar the "regulars" from providing medically-indicated abortion**.

---

(1887); D.C. CODE ch. 19, § 872 (1901); ARIZ. REV. PENAL CODE § 288 (1901); 2 NEV. REV. LAWS pt. 4, ch. 14, § 187 (1912); 1920 La. Acts No. 95, § 1; N.J. REV. STAT. ANN. § 2A:170-76 (1953); ME. REV. STAT. ANN. ch. 134, § 11 (1954) (prohibiting publishing abortifacient recipe); MISS. CODE ANN. § 2289 (1956) (including giving information orally); VA. CODE ANN. § 18.1-63 (Supp. 1960).

[203] *See, e.g*. (in order of adoption), 1847 Mass. Stat. ch. 83, § 10. (prohibiting selling or giving away a drug or instrument, as well as advertising it, for "unlawful" abortion); ; 1869 N.Y. Laws ch. 631, § 2, at 1502 (prohibiting supplying any substance to be "unlawfully" used); N.Y. GEN. STAT. ch. 181, § 3, at 71 (1872) (making manufacturing, selling, or giving away any drug for producing miscarriage a felony); ILL. REV. STAT. ch. 38, § 4, at 369 (1871–-1872) (restricting pharmacists); 1911 Nev. Laws, Crimes and Punishments, § 183 (codified at 2 NEV. REV. LAWS pt. 4, ch. 14, § 6448 (1912)) (prohibiting making, selling, or giving away any substance known to cause abortion); IOWA CODE § 205.1 (1946) (prohibiting sale, delivery, or giving away named products — cotton root, ergot, oil of tansy, oil of savin, or derivatives of any of them — all known emmenagogue and/or abortifacients , unless to a physician, veterinarian, or dentist and prohibiting pharmacist from filling prescription for an abortifacient unless prescribing doctor is personally known to the pharmacist (and even then, prohibiting refills); MINN. STAT. ANN. § 617.25 (1953) (adding a prohibition on selling an abortifacient drug to statutory prohibition on advertising). These efforts carried on well beyond the nineteenth century. *See* N.J. REV. STAT. ANN. §§ 2A:170-76 (1953) (criminalizing "uttering" or "exposing to view" any instrument or medicine for abortion, or even recommending against it); *see also* VA. CODE ANN. § 18.1-63 (Supp. 1960) (prohibiting publication, sale or circulation of a publication, or even *lecture* that might "encourage or prompt procuring abortion or miscarriage").

### ii. Preserving Common-Law Protections for Abortion Providers in Statutes, 1857-1959

78. Abortion statutes enacted between 1857 and 1959 continued to bear the imprint of the prior humoral health regime. Procedures disfavored under humoral health, such as abortion by blows, continued to be disfavored at law without therapeutic exception.[204] New statutes continued to give special treatment to "poison."[205] The humoral-era distinction between treatment intended to cure a patient versus a procedure intended to "destroy a child" in the womb[206] survived and between 1857 and 1959 thirteen states added statutory provisions structured around the distinction.[207]

79. Some statutes preserved protections for abortion providers by replicating common-law intent doctrine in elements requiring an act be done "maliciously,"[208] "unlawfully"

---

[204] For list of abortion-by-blows prohibitions in statutes adopted 1857-1959, see Appendix B, Part II.

[205] For list of abortion statutes with reference to poison adopted 1857-1959, see Appendix A, Part II.

[206] HALE, PLEAS OF THE CROWN, *supra* note 5 (in legal doctrine that reflects humoral theory, distinguishing between a medical intervention "to cause miscarriage" versus "to destroy the child within her"); *see also* text *infra* notes 98-108 *supra* (discussing Hale's formulation of curative intent doctrine).

[207] Compare, for example, two sections of one 1881 North Carolina statute. The first section made it a felony to administer a substance or employ an instrument on a pregnant woman "with intent thereby to destroy said child." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 1, at 584. The second section made it a misdemeanor to do the same "with intent thereby to procure the miscarriage of any such woman." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 2, at 584. (Alarmingly, the second section of the North Carolina statute relegates to the misdemeanor passage acting with intent "to injure or destroy such woman." Act of March 12, 1881 ch. 35, An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 2, at 584–85.) Just thirty years later, Kentucky legislators used language much more consistent with our contemporary thinking, while providing a specificity that implies some users of the law might be less clear, and while allowing that technologies of verification have still not caught up with the certainty of legal categories. Section one of the law, criminalizing attempt, encompassed an act intended to procure miscarriage towards "any pregnant woman, *or to any woman he has reason to believe pregnant*, at any time during the period of gestation" (emphasis added). Section two made an act resulting in a successfully procured miscarriage, "causing the death of the unborn child," a felony; section three makes a resulting death of the woman herself murder or manslaughter, "as the facts may justify." Act of March 22, 1910, An Act Defining the Crime of Abortion and Prescribing a Penalty Therefore, 1910 Ky. Acts ch. 58, § § 2, 3, at 189–90.

[208] For post-1857 statutes requiring, for an act to be punishable, "malicious" intent in a practitioner, see,

(or "without lawful justification"),[209] or "wilfully"[210] to be punishable. In other instances, courts construed such intent doctrine.[211] Most states, following the early New York example, straightforwardly included an explicit "life exception" with any restriction on abortion,[212] shielding from liability a provider acting to save the life of the pregnant person. In doing so, the new statutes affirmed some of the longest-standing doctrines of the law on abortion since its common-law beginnings.

---

for example. Appendix C, Part II.B.2.

[209] For post-1857 adoption of the implicit exception in the requirement of "unlawful purpose" or that an act took place "without lawful justification," see Appendix C. II.B.1. Some states used "unlawful" or "criminal" abortion, not justified by therapeutic intent, as a measure of "unprofessionalism," making performing unlawful abortion grounds for stripping a regular physician of his license. *See*, *e.g*., H. B. 120, 1938 Miss. Extraordinary Session, *reported in* MISS. CODE ch. 148, § 2011, at 1321 (1930) (Supp. 1938) (amending 1930 Code section 5863 (a) (5), to list procuring, attempting, or pretending to procure any abortion not necessary to preserve the life of a pregnant woman among causes authorizing State Board of Health to revoke a physician's license). See also, for example, similar statutes linking abortion to physician licensing: Act of Apr. 5, 1911, § 2 (codified as 1 ALA. CODE ch. 52, art. 1, § 2847(5), at 1279, 1283 (1923) (amending existing state medical-practice certification provision to add, as a cause for revocation, inducing "criminal" abortion, miscarriage, or premature delivery unless, when done to save her life, attending physician "use due diligence to obtain the advice and help of one or more consulting physicians"); 1914 La. Acts No. 54, § 10.1 (codified as LA. REV. STAT. ANN. §§ 14:8, at 889 (West 1950)); 1917 Alaska Sess. Laws § § 7, 8; MD. ANN. CODE § 3 (West 1924); OR. COMP. LAWS ANN. ch. 9, art. 1, § 54-931 (1940); IOWA CODE § 147.56 (1946); MO. REV. STAT. § § 559.100 (1949); FLA. STAT. ANN. § 458.12 (1952); 1955 HAW. REV. LAWS § 60-9 ("criminal" abortion).

[210] For post-1857 adoption of the implicit exception in the requirement that an act be done "wilfully," see Appendix C, Part II.B.3. *See also* 1868 Md. Laws 315 (not specifying other intent elements but adding "knowingly").

[211] *See*, *e.g*., Passley v. State, 21 S.E.2d 230, 232 (Ga. 1942) (statutory provisions criminalizing causing death to a woman (§ 26-1103) or a quick fetus (§ 26-1101) as a consequence of abortion procedure require "malice" towards, respectively, the deceased woman or the fetus); Commonwealth v. Wheeler, 53 N.E. 2d 4 (Mass. 1944) (requiring act to have been "unlawful," "malicious," "without lawful justification").

[212] For a list of statutes containing an explicit exception for medically indicated abortion, see Appendix C, Part I. *See also* LUKER, ABORTION AND THE POLITICS OF MOTHERHOOD, *supra* note 157, at 30–35 (discussing the meaning of "saving the life" of a woman in the last quarter of the nineteenth century and Horatio Storer's and other A.M.A. anti-abortion crusaders' own arguments for performing abortion to save a woman's life).

**iii. Mental Health as a Basis for Therapeutic Abortion**

80. In place of an earlier belief in "temperament" related to the balance of humors, under locational conceptions of health, a new theory related to "the psyche" arose[213] and a new term, "mental health," entered the practitioner lexicon. The formalization of the discipline of psychiatry in the U.S. parallelled that of medicine more broadly, with its early luminaries educated abroad[214] and institutionalization accelerating in the mid-nineteenth century. The founding of the American Psychiatric Association in 1844[215] and Dorothea Dix's post-Civil War campaign for specialized treatment hospitals[216] helped to establish psychiatry as part of the emerging medical mainstream. Some psychiatric diagnoses were given equal weight with other medical conditions in the eyes of the law and protecting "mental health" was increasingly invoked as a justification for abortion under statutory therapeutic provisions.[217] Into the mid-

[213] Previous psychiatric theory had attempted to fit observations of "insanity" into humoral schema of theories of health and treatment. *See*, *e.g*., MASON COX, PRACTICAL OBSERVATIONS ON INSANITY (1804) (proposing too much blood in the brain is the cause of all mental disease and purgation is the cure), *cited in* GREGORY ZILBOORG (IN COLLABORATION WITH GEORGE W. HENRY), A HISTORY OF MEDICAL PSYCHOLOGY 411 (1941) [hereinafter ZILBOORG, HISTORY OF MEDICAL PSYCHOLOGY].

[214] *See*, *e.g*., BENJAMIN RUSH, MEDICAL INQUIRIES AND OBSERVATIONS UPON DISEASES OF THE MIND (1812). (Rush's first American textbook on psychiatry); JOHN REVERE, DISPUTATIO MEDICA INAUGURALIS DE INSANIA (1811) (son of Paul Revere, John Revere's, doctoral thesis in medicine at the University of Edinburgh).

[215] ZILBOORG, HISTORY OF MEDICAL PSYCHOLOGY, *supra* note 213, at 410–11 (describing the founding of the American Psychiatric Association, actually predating the A.M.A. by three years, in the context of the development of the field of psychiatry internationally).

[216] *See generally* FRANCIS TIFFANY, LIFE OF DOROTHEA LYNDE DIX (1891); *see also* ALBERT DEUTSCH, THE MENTALLY ILL IN AMERICA, ch. 9 (1937) (reporting her achievements).

[217] Studies show in 1947 one-fifth of all therapeutic abortions granted on psychiatric grounds, a proportion that grows to one-half of all therapeutic abortions by 1960. On the rising acceptance of "psychiatric indications" for therapeutic abortion in the 1940-1960, see LESLIE J. REAGAN, WHEN ABORTION WAS A CRIME: WOMEN, MEDICINE, AND THE LAW 1867–1973 201–03 (1997) [hereinafter REAGAN, WHEN ABORTION WAS A CRIME].

twentieth century, regulars' journals hosted robust discussions of "medical indications" for abortion,[218] including the psychotherapeutic.[219]

81. In this, U.S. law followed a trajectory taken in the U.K. U.K. statute ostensibly prohibited abortion except where necessary to save a woman's "life."[220] In the watershed case *Rex v. Bourne*, a 1938 abortion prosecution, the defense made no assertion that the patient, a fourteen-year-old impregnated through rape, faced danger to her physical "life" if pregnancy continued. The physician defendant testified that his decision to curette was based on the threat to the patient of "mental and nervous injury."[221] Under cross-examination, he denied a clear distinction between danger to life and to health.[222] The defense argued that because of "mental and nervous injury," health could become so compromised that it would shorten life.[223] The prosecution argued a bright-line distinction between saving life and preserving health[224] and queried the lawfulness of abortion in regard to the latter,[225] especially to mitigate a possible

---

[218] *See*, *e.g.*, REAGAN, *id*. at 278 n.55, 279 n.57 (1997) (citing E.C. McKee, *Abortion*, AM. J. OBSTETRICS 1333–34 (1891); W.C. Bowers, *Justifiable Artificial Abortion and Induced Premature Labor*, J. AM. MED. ASSOC. 568–569 (1899); Frank A. Higgins, *The Propriety, Indications and Methods for the Termination of Pregnancy*, 43 J. AM. MED. ASSOC. 1531–33 (1904); Paul Titus, *A Statistical Study of a Series of Abortions Occurring in the Obstetrical Department of the Johns Hopkins Hospital*, 65 AM. J. OBSTETRICS 960 (1912); Irving K. Perlmutter, *Analysis of Therapeutic Abortions, Bellevue Hospital 1935–1945*, 53 AM. J. OBSTETRICS & GYNECOLOGY 1012 (1947)).

[219] *See, e.g.*, *Is Abortion Justifiable in the Insane Pregnant?*, 38 J. AM. MED. ASSOC. 69 (1902); R. Finely Gayle, *The Psychiatric Consideration of Abortion*, 91 S. MED. AND SURG. 251 (1929), *cited in* REAGAN, WHEN ABORTION WAS A CRIME, *supra* note 217, at 279 n.59 (1997) R. Finely Gayle, *The Psychiatric Consideration of Abortion*, 91 S. MED. AND SURG. 251 (1929)).

[220] *See generally* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111.

[221] *Charge of Procuring Abortion*, 2 BRIT. MED. J. 97 (1939), *cited in* KEOWN, *id*. at 50.

[222] *Id*.

[223] *Id.*

[224] *Id*.

[225] *Id*. at 50–51 (in *Rex v. Bourne*, Attorney-General conceded that if necessary to save the life of the mother, induced or forcible miscarriage is not "unlawful").

threat to mental ill-health.[226] In jury instructions, the judge clarified that a doctor need not wait until a patient was in immediate danger but was duty-bound to intervene if pregnancy threatened life.[227] He further instructed the jury that "life depends on health, and it may be that health is so gravely impaired that death results."[228] Statutory provision permitting abortion for "the preservation of life" was to be construed in a "reasonable sense": if a doctor thought "the probable consequence of continuation of the pregnancy will be to make the woman a physical or mental wreck," the jury was entitled to find that the doctor operated for the purpose of preserving the life of the mother.[229]

82. The approach in *Rex v. Bourne* illustrates a few matters intrinsic to the development of the therapeutic exception. Some courts, as in *Bourne*, reasoned that the threat to life and grounds for invoking the "life" defense need not be restricted to birthing emergency and its immediate temporality.[230] A threat to health over the long term could make a person a "wreck" and ruin her life or tempt her to end it. As with the old life-health exception, the "life" exception included defense of health, but here, "health" included mental health. Once again, the aim of protecting a woman's life and health guided the law.

83. In the U.S., over the decades after state legislatures passed the therapeutic exception into statute, abortion decisions first made by individual physicians were increasingly

---

[226] THE TIMES, July 20, 1938, *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, supra note 111, at 50, 182 n.8.

[227] Rex v. Bourne, 1 K.B. 687, 693 (1939), *cited in* KEOWN, *id.* at 182 n.14.

[228] *Id*. at 692.

[229] *Id*. at 694.

[230] *See* People v. Ballard, 167 Cal. App. 2d 803, 335 P.2d 204 (Dist. Ct. App. 1959) (peril to woman's life need not be "imminent" to justify abortion under statutory standard of necessity); *see also, e .g*., R v. Bell [1929], 1 BRIT. MED. J. 1061 (in case of patient whose obesity made pregnancy increasingly risky, judge states certain operations to terminate pregnancy in its last stages are legal and necessary), *cited in* KEOWN, ABORTION, DOCTORS, AND THE LAW, *supra* note 111, at 182 n.27.

made by hospitals. Hospitals set up therapeutic abortion review boards to weigh the medical justification of abortion in a particular case.[231] When the American Law Institute (ALI) proposed a model penal code section on abortion in 1959, it repeated the old New York formula of requiring that two physicians consult on the medical necessity of the procedure.[232] However, following a few state courts, the ALI defined the life/health exception to include "substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother."[233]

**FACTS OR DATA CONSIDERED IN FORMING MY OPINIONS**

84. My opinions are based on my education, scholarship; research; engagement with other scholars; and knowledge of the relevant literature, including the sources cited in this report and its appendices.

**EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS**

85. I have prepared several appendices, which are attached hereto, to support my opinions. I reserve the right to create additional exhibits for use at trial.

---

[231] For accounts of how the hospital review boards worked, see, e.g., HAROLD ROSEN, THERAPEUTIC ABORTION: MEDICAL, PSYCHIATRIC, ANTHROPOLOGICAL, AND RELIGIOUS CONSIDERATIONS (1954). *See also* Alan Guttmacher, *The Genesis of Liberalized Abortion in New York: A Personal Insight*, 23 CASE W. L. REV. 756 (1971–72); REAGAN, WHEN ABORTION WAS A CRIME, *supra* note 217, at 173–79, 214 (describing the work and institutionalization of hospital "therapeutic abortion" review committees). For a description of one aspect of the work of hospital abortion committees, transferring decisional authority over pregnancy from the woman to a team of male doctors, see Rickie Sollinger, *"A Complete Disaster": Abortion and the Politics of Hospital Abortion Committees, 1950–1970*, *in* Leavitt, WOMEN AND HEALTH *supra* note 157 at 659, 664–68

[232] MODEL PENAL CODE § 230.3(3) (1959), *in* ROSE, ABORTION DOCUMENTARY GUIDE, *supra* note 156, at 38.

[233] § 230.3(2) (1959), *in* ROSE, ABORTION DOCUMENTARY GUIDE, *id*. at 38.

## MY QUALIFICATIONS AND PUBLICATIONS

86. I earned a J.D. from Yale Law School and a Ph.D. in Anthropology from the University of California, Berkeley.

87. I serve as an Assistant Professor of Law and Anthropology at a university in Missouri.

88. From 2015-2019, I served on the Executive Board of the Anthropology of Law Section of the American Association of Law Schools, and served as Chair of the Section from 2017-2018. I currently serve on the Editorial Board of the Political and Legal Anthropology Review.

89. My research traces legal ideas and practices across time and geography. Although much of my scholarship has focused on comparative and international law and the law of war, I have conducted extensive research on the history of abortion regulation in the United States.

90. I authored an article titled *The Health Exception* arguing that theories of health lie at the heart of U.S. legal doctrine concerning abortion, shaping common-law treatment of abortion and persisting in nineteenth- and twentieth-century statutes. It was published in the Georgetown Journal of Gender and the Law in 2016.

91. A more complete list of my publications since 2015 is attached hereto as Appendix F.

## CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS

92. None

## COMPENSATION

93. I am being compensated at the rate of $350 per hour for my work on this case.

Dated: February 20, 2025

Monica Eppinger, J.D., Ph.D.

## Appendix A
## State Statutes on Abortion
## in Reference to Poison Control

**Part I:**
**States regulating abortion in reference to poison before 1857, in order of adoption:**

Connecticut: CONN. GEN. STAT. tit. 22, § § 14, 16, at 151, 152–53 (1821) (N.B.: Revision of the Connecticut statute in 1830 extended the provision regarding poison to include abortion by instrument as well. 1830 Conn. Acts ch. 1, § 16.)

Missouri: 1825 1 Mo. Rev. Laws ch. 1, § 78

Illinois: 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46

Iowa: An Act Defining Crimes and Punishments §18, 1838–1839 Iowa (Terr.) Acts §18, at 142, 145 (Act of Jan. 5, 1839).

Indiana: An Act to Amend "an Act Relative to Crimes & Punishment approved Feb. 10, 1831" § 3, IND. REV. STAT. ch. 26, § 3, at 224, 224 (1838) (Act of Feb. 8, 1835) (amending Indiana criminal code to add a general provision on poisoning that also included a section on using a substance or an instrument with intent to procure miscarriage)

California: 1849–1850 Cal. Sess. Stats. ch. 99, § 45, at 229, 223 (abortion-regulating provision given in poisoning section of criminal code, but note it includes using an "instrument" as well as a "medicine" or "substance")

Hawaii: HAW. (KINGDOM) PENAL CODE ch. 12, § 1 (1850) (prohibiting producing miscarriage by "instrument" as well as "poison" or "noxious thing")

**Part II:**
**States regulating abortion in reference to poison after 1857, in order of adoption:**

Nevada: An Act Concerning Crimes and Punishments, Nov. 26, 1861, 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63 (codified as NEV. COMP. LAWS ch. 55, pt. 4, § 2348 (1873)

Montana: An Act Concerning Crimes and Punishments, 1864 Mont. (Terr.) Laws 1st Legislative Assembly ch. 3, § 41, at 184 (placing provision on abortion by potion or instrument within poison-control section of statute)

Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 6, § 39, at 727–28 (adding provision on attempt to procure miscarriage to the chapter of the criminal code on attempted poisoning)

Rhode Island: R.I. GEN. LAWS ch. 277, § 22, at 977 (1896) (prohibiting using "poison or other noxious thing," or an instrument, on a woman pregnant or supposed pregnant)

**Appendix B**
**State Statutes on Abortion**
**Prohibiting Abortion by Blows**

**Part I: Abortion by blows prohibitions adopted before 1857 (in order of adoption)**

New York: An Act Concerning Crimes and Punishments, pt. 4, tit. 2, § 8, codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 8, at 659, 661 (1828) (Act of Dec. 18, 1828)

Missouri: An Act concerning Crimes and their Punishments art. 2, § 9 (codified as MO. REV. STAT. art. 2, § 9, at 168 (1835)) (Act of March 20, 1835)

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 5, at 240 (1838)

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi) ch. 14, § 70, 1839 Miss. Laws app. ch. 14, § 70 at 858, 866 (Act of Feb. 15, 1839) (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 8) (1839)

Iowa: An Act Defining Crimes and Punishments ch. 49, § 10, codified as IOWA (TERR.) REV. STAT. ch. 49, § 10, at 162, 167 (1843)) (Act of Feb. 16, 1843)

Oregon: An Act Regulating the Executive Power, the Judiciary, and for Other Purposes art. 3, § 1, 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (adopting for Oregon territory the 1843 revised laws of Iowa, incorporating provision targeting abortion by blows)

Michigan: Act of May 18, 1846, tit. 30, § 32, MICH. REV. STAT. tit. 30, ch. 153, § 32 (1846)

Minnesota: MINN. (TERR.) REV. STAT. ch. 100, § 10, at 491, 493 (1851)

Wisconson: WIS. REV. STAT. pt. 4, tit. 30, ch. 133, §10, at 682, 683 (1849)

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, § 9, codified as KAN. (TERR.) STAT. ch. 48, § 9 (1855) (Act of July 22, 1855)

**Part II: Examples of abortion by blows prohibitions 1857-1959, in order of adoption:**

Georgia: An Act to Prevent and Punish Foeticide [*sic*] or Criminal Abortion in the State of Georgia, 1876 Ga. Laws No. 130, § 1, at 133 (Act of Feb. 25, 1876)

Arkansas: 4 ARK. STAT. ANN. § 41-2229 (1964)

Florida: 22 FLA. STAT. ANN. § 782-09 (1965)

Kansas: 2 KAN. STAT. ANN. § 21-409 (1964)

Michigan: 25 MICH. STAT. ANN. § 28.554 (1954)

Mississippi: 2A MISS. CODE ANN. § 2222 (1942)

North Dakota: 2 N.D. CENTURY CODE § 12-25-03 (1960)

Oklahoma: OKLA. STAT. ANN. tit. 21, § 713 (1958)

**Appendix C**
**Statutes Providing Therapeutic Defense**

**Part I**
**A. Statutes before 1857 including explicit protection for an act undertaken to "preserve the life" of the woman**
Alabama: 1840 Ala. Acts ch. 6, § 2
Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 6 (1838)
California: 1849–1850 Cal. Sess. Stat. ch. 99, § 45 (limiting therapeutic exception to physician "in discharge of his professional duties")
Hawaii: HAW. PENAL CODE § § 1, 2, 3 (1850) (in pre-territorial statute, exception for "surgeon or other" saving the life of a woman).
Indiana: Act of Feb. 7, 1835, codified as IND. REV. STAT. ch. 26, § 3, at 224, 224 (1838) ("preserve the life" exception retained in amended abortion provision, Act of June 14, 1852 ch. 6, 2 IND. REV. STAT. pt. 3, ch. 6, § 36, at 424, 437 (1852))
Iowa: IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843) (amending criminal statute to add exception for preserving a patient's life) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)
Kansas: KAN. (TERR.) STAT., ch. 48, § § 10, 39 (1855)
Maine: ME. REV. STAT. tit. 12, ch. 160, § § 13, 14 (1841) (retained in a single section, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))
Michigan: MICH. REV. STAT. tit. 30, ch. 153, § § 33, 34 (1846)
Minnesota: MINN. (TERR.) REV. STAT. ch. 100, §§ 10, 11 (1851)
Mississippi: MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9 (1839)
Missouri: MO. REV. STAT. art. 2, § § 10, 36 (1835)
New Hampshire: 1848 N.H. Laws Nov. Sess. ch. 743, § § 1, 2
New York: 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 (limiting "preserve life" exception to "destroy child" provision but excluding it from "procure miscarriage" provision)
Ohio: OHIO GEN. STAT. ch. 35, § § 111, 112 (1841)
Oregon: 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (adopting 1843 Iowa provisions)
Virginia: 1848 Va. Acts. tit. 2, ch. 3, § 9
Washington: 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § § 37, 38
Wisconsin: WIS. REV. STAT. pt, 4, tit. 30, ch. 133, § 11 (1849)

**B. Statutes after 1857 providing an explicit protection for provider of therapeutic abortion**
Mississippi: MISS. REV. CODE ch. 64, § 34, art. 173, at 601 (1857)
Texas: TEX. DIGEST OF GEN. STAT. LAWS, PENAL CODE, pt. 2, tit. 17, ch. 7, art. 536, at 524 (1859)
Connecticut: 1860 Conn. Pub. Acts ch. 71, § § 1, 3, at 65 (codified as CONN. GEN. STAT. tit. 12, ch. 2, § § 22, 24 (1866))
Nevada: An Act Concerning Crimes and Punishments, 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63 (Act of Nov. 26, 1861) (codified as NEV. COMP. LAWS ch. 55, pt. 4, § 2348 (1873)
Montana: An Act Concerning Crimes and Punishments, 1864 Mont. (Terr.) Laws 1st Legislative Assembly ch. 3, § 41, at 184
Rhode Island: Act of Mar. 14, 1867 ch. 689, 1867 R.I. Acts & Resolves Jan. Sess. ch. 689, § 1, at 148

Vermont: Act of Nov. 21, 1867 § 1, 1867 Vt. Acts & Resolves No. 57, § 1, at 64
Minnesota: MINN. GEN. STAT. ch. 94, § 11 (1866) (*repealed by, but life exception replicated in*, Act of March 10, 1873, ch. 9, An Act to Punish Abortionists and Attempts to Procure Abortion, and Improper Advertising in that Direction, 1873 Minn. Gen. Laws 15th Sess. ch. 9, § 1 (codified as 2 MINN. STAT. AT LARGE ch. 54, Sec. 29, § § 1, 3, at 987 (1873))
Illinois: An Act to Amend the Criminal Code of this State in relation to the Offense of Abortion, § § 2, 3 1867 Ill. Pub. Laws 25th Gen. Assembly 1st Sess. § § 2, 3, at 89 (Act of Feb. 28, 1867) (abortion criminalization provisions shall not apply to "any person" attempting or procuring miscarriage "for *bona fide* medical or surgical purposes")
Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28
Utah: The Penal Code of Utah § 142, 1876 Utah (Terr.) Laws 22nd Sess. § 142 (Act of Feb. 18, 1876) (codified as UTAH (TERR.) COMP. STAT. tit. 21 Penal Code, tit. 9, ch. 3, § 142 (1876))
Delaware: An Act to Punish Procurement of Abortion, Feb. 13, 1883 ch. 226, 1883 7 Del. Laws pt. 1, tit. 20, ch. 226, § 2, at 523;
Dakota: DAK. (TERR.) REV. CODES, PENAL CODE ch. 29, § § 337, 338, at 776 (1877) ("necessary to preserve her life"), *adopted as* N. DAK. REV. CODES, PENAL CODE ch. 30, § § 7177, 7178, at 1271-72 (1895) *and* S. DAK. REV. CODES, PENAL CODE ch. 29, § § 342, 343, at 1134 (1903)
Indiana: An Act concerning Public Offenses and their Punishment ch. 87, 1881 Ind. Laws Spec. Sess. ch. 37, §§ 22, 23, at 177 (Act of Apr. 14, 1881)
North Carolina: An Act to Punish the Crime of Producing Abortion, 1881 N.C. Sess. Laws ch. 351, § 1, at 584 (Act of Mar. 12, 1881)
South Carolina: An Act to Amend the Criminal Law by Providing for the Punishment of Abortion, 1883 S.C. Acts No. 354, 99 § § 1, 3, at 547–48 (Act of Dec. 24, 1883)
Tennessee: An Act to Punish Criminal Abortion, 1883 Tenn. Pub. Acts ch. 140, § § 1, 2, at 188–89 (Act of March 23, 1883)
Oklahoma: 1890 Okla. (Terr.) Gen. Stat. 1st Regular Sess. ch. 25, art. 29, § § 1, 2, at 459 (codified as OKLA. GEN. STAT. ch. 25, art. 29, § § 1, 2 (1890))
Alaska: An Act to Define and Punish Crimes in the District of Alaska and to Provide a Code of Criminal Procedure for Said District (enacted by Senate and House of Representatives of the United States in Congress assembled) 30 Stat. L., 1253 Alaska Criminal Code (Act of Mar. 3, 1899), *published as* ALASKA (TERR.) LAWS pt. 1 (Penal Code), ch. 2, § 8, at 3 (1900)
New Mexico: Act of Mar. 18, 1907 § 6, 1907 N.M. (Terr.) Acts 37th Sess. ch. 36, § 6, at 41, 42
Kentucky: An Act Defining the Crime of Abortion and Prescribing a Penalty Therefore, 1910 Ky. Acts ch. 58, § 1, at 189 (Act of March 22, 1910)
Alabama: The Code of Alabama, Crimes and Offenses, Act of July 2, 1940, tit. 14, ch. 2, § 9, 4 ALA. CODE tit. 14, ch. 2, § 9, at 7 (1940)

**Part II**
**A. Statutes before 1857 encoding therapeutic defense in intent elements, in order of adoption**
**1. Statutes before 1857, distinguishing "lawful" from "unlawful" abortion by invoking the "unlawful" distinction, in order of adoption:**
Massachusetts: 1845 Mass. Gen. Laws ch. 27, at 322 ("maliciously or without lawful justification")

Vermont: 1846 Vt. Acts & Resolves No. 33, § 1, at 34–35 (codified as Vt. Comp. Stat. tit. 28, ch. 108, § 8 (1851)) ("maliciously" or "without lawful justification")
New Jersey: 1849 N.J. Laws at 266–67 ("maliciously" or "without lawful justification")
Hawaii: HAW. PENAL CODE §1 (1850) (in pre-territorial statute, "maliciously, without lawful justification")
Louisiana: LA. REV. STAT. § 24 (1856) ("feloniously administer")

**2. Statutes before 1857 requiring, to be punishable, an act be undertaken "maliciously," in order of adoption:**
Connecticut: CONN. STAT. tit. 22, § 14 (1821) ("maliciously"), *retained in amended provision in* 1830 Conn. Laws. ch. 1, § 16, at 255 retaining "willfully and maliciously" elements of first Connecticut statute)
Illinois: 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46, at 124, 131 ("wilfully and maliciously")
Iowa: IOWA (TERR.) STAT. 1st Legis., 1st Sess. § 18 (1838–1839) ("maliciously")
Massachusetts: 1845 Mass. Acts & Resolves ch. 27 ("maliciously or without lawful justification")
Vermont: 1846 Vt. Acts No. 33, § 1 ("maliciously" or "without lawful justification")
New Jersey: 1849 N.J. Laws tit. 2, § 75, at 146–47 ("maliciously" or "without lawful justification")
Hawaii: HAW. PENAL CODE ch. 12, §1 (1850) ("maliciously, without lawful justification"; §2 adds explicit life exception).

**3. Statutes before 1857 requiring, to be punishable, an act be undertaken "willfully," in order of adoption:**
CONN. STAT. tit. 22, § 14 at 152, 153 (1821), *retained in amended provision in* 1830 Conn. Laws. ch. 1, § 16, at 255 retaining "willfully and maliciously" elements of first Connecticut statute)
1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46 ("wilfully")

**B. Statutes after 1857 encoding therapeutic exception in intent elements**
**1. Statutes after 1857 requiring "unlawful purpose" or that an act took place "without lawful justification," in order of adoption:**
Pennsylvania: 1860 Pa. Laws NO. 374, § § 87, 88 ("unlawfully")
Florida: 1868 Fla. Acts 1st Sess. ch. 1637 ("unlawfully")
Hawaii: HAW. PENAL CODE ch. 12, § 1 (1869) ("maliciously, without lawful justification")
New York: 1869 N.Y. Laws ch. 631, §§ 1, 2, at 1502 ("unlawfully")
New Jersey: N.J. REV. STAT. ANN. §§ 2A:87-1 (1953) ("maliciously and without lawful justification")

**2. Some statutes after 1857 requiring, to be punishable, an act be undertaken "maliciously," in order of adoption**
Hawaii: HAW. PENAL CODE ch. 12, § 1 (1869) (in pre-territorial law, "maliciously, without lawful justification")

Wyoming: 1869 Wyo. (Terr.) Sess. Laws 1st Sess. ch. 3, § 25, at 104, ("willfully and maliciously")
New Jersey: N.J. REV. STAT. ANN. §§ 2A:87-1 (1953) ("maliciously and without lawful justification")

**3. Statutes before 1857 requiring, to be punishable, an act be undertaken "willfully," in order of adoption:**
Rhode Island: 1867 R.I. Acts & Resolves Jan. Sess. ch. 689, § 1 ("wilfully administering")
Wyoming: 1869 Wyo. (Terr.) Sess. Laws 1st Sess. ch. 3, § 25, at 104, ("willfully and maliciously")
Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28 ("wilfully")
North Carolina: 1881 N.C. Sess. Laws ch. 351, § 1, at 584 ("wilfully administer")

**Part III**
**A. Statutes before 1857 providing Therapeutic Defense upon Physician Consultation**
**1. States providing practitioners a statutory therapeutic defense, with <u>consultation with two physicians</u> serving as adequate proof of medical necessity, in order of adoption:**

New York: An Act Concerning Crimes and Punishments; proceedings in criminal cases; and prison discipline, tit. 2, § 9, tit. 6, § 21 (Act of Dec. 18, 1828) (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, § 9, tit. 6, § 21 (1828))

Ohio: An act to provide for the punishment of certain crimes therein named § § 1, 2, 1833 Ohio Gen. Acts 32nd Sess. at 20, 20-21 (Act of Feb. 27, 1834) (codified as OHIO GEN. STAT. ch. 35, § § 111, 112 (1841))

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi), 1839 Miss. Laws app. ch. 14, § 71 at 858, 867 (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9, at 693, 695 (1839))

Michigan: MICH. REV. STAT. ch. 153, § § 33, 34 (1846) (Act of May 18, 1846)

New Hampshire: An Act to punish certain crimes therein named, ch. 743, § § 1, 2, 1848 N.H. Laws Nov. Sess. ch. 743, § § 1, 2, at 708, 708 (Act of Jan. 4, 1849)

Wisconsin: WIS. REV. STAT. pt, 4, tit. 30, ch. 133, § 11 (1849); MINN. (TERR.) REV. STAT. ch. 100, § 11, at 493 (1851)

**2. States providing practitioners a statutory therapeutic defense, with <u>consultation with one physician</u> serving as adequate proof of medical necessity, in order of adoption:**

Missouri: An Act concerning crimes and their punishments art. 2, § § 10, 36 (codified as MO. REV. STAT. art. 2, § § 10, 36 (1835)) (Act of March 20, 1835) (amending Missouri's earlier poison-control statute to add, *inter alia*, a physician-consultation defense)

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, §6 (1837)

Alabama: An Act Regulating Punishments under the Penitentiary System (Penal Code), ch. 6, §2, 1840 Ala. Acts ch. 6, §2, at 143 (an act undertaken in consultation with a "respecable [*sic*] physician")

Hawaii: HAW. (KINGDOM) PENAL CODE §2 (1850) (exception for surgeon "or other" saving life of the mother)

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, § § 10, 39 (codified as KAN. (TERR.) STAT., ch. 48, § § 10, 39 (1855)) (Act of July 22, 1855)

3. **Jurisdictions providing that only a physician could enjoy a therapeutic exception based on expert judgement of medical necessity:**

California: 1849–1850 Cal. Sess. Stats. ch. 99, § 45, at 223 (presumption of legality only available to physician, not others, acting to save life of woman).

**B. "Physician" statutes after 1857**

**1. Statutes after 1857 providing protection for an abortion provider wherein consultation with a physician provided adequate evidence of medical necessity, in order of adoption**:

Wisconsin: WIS. REV. STAT. ch. 164, § 11 (1858)
Texas: TEX. GEN. STAT. DIG. ch. 7, art. 536, at 524 (Oldham & White 1859) (excepting abortion procured or attempted on "medical advice")
Illinois: An Act to Amend the Criminal Code of this State in relation to the Offense of Abortion, Act of Feb. 28, 1867 § 3 1867 Ill. Pub. Laws 25th Gen. Assembly 1st Sess. § 3, at 89 (excepting "any person" acting "for *bona fide* medical or surgical purposes")
Florida: 1868 Fla. Acts 1st Sess., ch. 1637, 3, § 11
Wyoming: 1869 Wyo. (Terr.) Laws 1st Sess., ch. 3, § 25, at 104
Nebraska: Act of March 1, 1873, ch. 58, 1873 Neb. Gen. Stat. ch. 58, pt. 1, ch. 2, § 6, ch. 6, §39, at 720, 727–28 (two physicians)
New Mexico: Act of Mar. 18, 1907 § 6, 1907 N.M. (Terr.) Acts 37th Sess. ch. 36, § 6, at 41, 42
Georgia: An Act to Prevent and Punish Foeticide or Criminal Abortion in the State of Georgia, Act of Feb. 25, 1876, 1876 Ga. Laws. No. 130 § § 2, 3
Mississippi: MISS. CODE § 2223 (1942)
Missouri: MO. REV. STAT. § 559.100 (1949)

**2.** Post-1857 statutes that limited the shield of therapeutic intent to physicians include, in order of adoption:
Nevada: 1861 Nev. (Terr.) Laws ch. 28, § 42, at 63

Idaho: 1863–1864 Idaho (Terr.) Laws § 42, at 435 (limiting exception to "physician" who, "in discharge of his professional duties," "deems it necessary" to "save her life");

Montana: 1864 Mont. (Terr.) Laws § 41, at 184

Arizona: ARIZ. HOWELL CODE ch. 10, § 45 (1865)

Arkansas: Act of Nov. 8, 1875, § 21, 1875 Ark. Laws 4th Adj. Sess. § 21, at 5 ("any regular practicing physician").

Indiana: Act of Apr. 14, 1881 ch. 87, An Act concerning Public Offenses and their Punishment, 1881 Ind. Laws Spec. Sess. ch. 37, § 23, at 177 (making liable a woman herself solicits intervention to procure miscarriage "except when by a physician for saving the life of mother or child")

Maryland: MD. LAWS ch. 179, § 2, at 315 (1868) (requiring provider be physician who consults with one or more other "respectable physicians")

## Appendix D
## Statutory Provisions Requiring Intent to "destroy a child"

**Part I: Pre-1857 statutes requiring, to be punishable, an act be undertaken with intent "to destroy child" (in order of adoption)**
Connecticut: 1830 Conn. Laws ch. 1, § 16, at 255

Missouri: An Act concerning crimes and their punishments art. 2, (codified as MO. REV. STAT. art. 2, § 10, at 168, 169 (1835)) (Act of March 20, 1835)

New York: An Act Concerning Crimes and Punishments pt. 4, codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2 § 9, at 659, 661 (Act of Dec. 18, 1828); after subsequent reform, 1845 N.Y. Laws 68th Sess. ch. 260, § 1, at 285, 285–86 (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 2, art. 1, § 9 (1828–1845))

Ohio: An act to provide for the punishment of certain crimes therein named § 2, 1833 Ohio Gen. Acts 32nd Sess. § 2, at 20, 21 (Act of Feb. 27, 1834) (codified as OHIO GEN. STAT. ch. 35, § 112 (1841))

Arkansas: ARK. REV. STAT. ch. 44, div. 3, art. 2, § 6, at 240 (1838)

Iowa: An Act Defining Crimes and Punishments, codified as IOWA (TERR.) REV. STAT. ch. 49, § 10, at 162, 167 (1843) (Act of Feb. 16, 1843) (amending criminal statute to add "destroy child" provision) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)

Mississippi: An Act to amend the Acts of this State concerning Crimes and Punishments, and the Penitentiary (An Act, to establish a Penitentiary in the State of Mississippi), 1839 Miss. Laws app. ch. 14, § 71, at 858, 867 (Act of Feb. 15, 1839) (codified as MISS. STAT. ch. 50, act 1, tit. 3, art. 1, § 9, at 693, 695 (1839))

Maine: Act of Oct. 22, 1840, ch. 160, ME. REV. STAT. tit. 12, ch. 160, § 13, at 684, 686 (1841) (retained, though succinctly combined in same section with "procure miscarriage" provision, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))

Oregon: An Act Regulating the Executive Power, the Judiciary, and for Other Purposes Art. 3, § 1, 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (importing, wholesale, the 1843 laws of Iowa, including the "destroy child" provision encoded in IOWA (TERR.) REV. STAT. ch. 49, § 10 (1843))

Michigan: Revised Statutes of the State of Michigan, tit. 30, ch. 153, MICH. REV. STAT. tit. 30, ch. 153, § 33, at 657, 662 (1846) (Act of May 18, 1846)
New Hampshire: An Act to punish certain crimes therein named, ch. 743, 1848 N.H. Laws Nov. Sess. ch. 743, § 2, at 708, 709 (Act of Jan. 4, 1849)

Wisconsin: WIS. REV. STAT. pt. 4, tit. 30, ch. 133, § 11, at 682, 683 (1849)

Minnesota: Revised Statutes of the Territory of Minnesota, MINN. (TERR.) REV. STAT. ch. 100, § 11, at 491, 493 (1851)

Washington: An Act Relative to Crimes and Punishments, and Procedures in Criminal Cases, 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § 37, at 75, 81

Kansas: An Act concerning crimes and the punishment of offenses against the persons of individuals, ch. 48, codified as KAN. (TERR.) STAT., ch. 48, § 10, at 236, 238 (1855) (Act of July 22, 1855)

## Appendix E
## Statutory Provisions Requiring Intent to "Procure Miscarriage"

**Part I: Pre-1857 statutes requiring, to be punishable, an act be undertaken with intent to "procure miscarriage" (rather than intent to "destroy child") (in order of adoption)**

Illinois: An Act Relative to Criminal Jurisprudence, div. 5, 1827 Ill. Rev. Laws, Criminal Code, div. 5, § 46, at 124, 131 (Act of Jan. 6, 1827)

Missouri: MO. REV. STAT. art. 2, § 36, at 168, 172 (1835)

New York: 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828); after statutory reform, 1845 N.Y. Laws 68th Sess. ch. 260, § 2, at 285, 286 (codified as 2 N.Y. REV. STAT. pt. 4, ch. 1, tit. 6, § 20 (1828–1845))

Iowa: An Act Defining Crimes and Punishments § 18, 1838–1839 Iowa (Terr.) Acts 1st Sess. div. 1, §18, at 142, 145 (Act of Jan. 5, 1839) (repealed in IOWA CODE tit. 1, ch. 4, § 28, leaving no statutory regulation of abortion in Iowa 1851–1858)

Ohio: OHIO GEN. STAT. ch. 35, § 111 (1841))

Alabama: An Act Regulating Punishments under the Penitentiary System (Penal Code), ch. 6, §2, 1840 Ala. Acts ch. 6, §2, at 143, 143

Maine: Act of Oct. 22, 1840, ch. 160, ME. REV. STAT. tit. 12, ch. 160, § 14, at 684, 686 (1841) (retained, though with higher punishment and combined in one section with "destroy child" provision, *in* ME. REV. STAT. tit. 11, ch. 124, § 9 (1857))

Oregon: 1843-49 Or. (Terr.) Gen. Laws art. 3, § 1 (Act of June 27, 1844) (importing, wholesale, the 1843 laws of Iowa, including the "procure miscarriage" provision)

Michigan: MICH. REV. STAT. tit. 30, ch. 153, § 34, at 657, 662 (1846)

New Hampshire: 1848 N.H. Laws Nov. Sess. ch. 743, § 1, at 708, 709

California: 1849–1850 Cal. Sess. Stat. ch. 99, § 45, at 233

Washington: 1854 Wash. (Terr.) Laws 1st Sess. ch. 2, § 38, at 75, 81

Kansas: KAN. (TERR.) STAT., ch. 48, § 39, at 236, 243–44 (1855)

**Appendix F**
**Eppinger Research Publications 2015-2025**

*Assailed: The Paradoxical State of the Commons in the United States*, with Heidi Roberston, *in* PROPERTY: MEETING THE CHALLENGE OF THE COMMONS (Ugo Mattei, Alessandra Quarta, Filippo Valguarna, Ryan J. Fisher, eds.) (Springer *Ius Comparatum* series, 2023).

*From "Limited Sovereignty" to Decolonization in Ukraine*, HAU: J. ETHNOGRAPHIC THEORY (2023) (peer-reviewed).

*Herding History: Law and the Transformation of Collective Subjectivities in the Dairyspheres of Ukraine*, 16(2) J. FOOD L. & POLICY (2021).

*The Challenge of the Commons: Beyond Trespass and Necessity*, 66 AM. J. COMP. L. SUPP. 1 (June 2018).

*Cold-War Commons: Tragedy, Critique, and the Future of the Illiberal Problem Space*, 19 THEORETICAL INQU. L. 457 (July 2018).

*The Health Exception,* 17 GEORGETOWN J. GENDER & L. 665 (Summer 2016).

*Property and Political Community: Democracy, Oligarchy, and the Case of Ukraine*, 47 GEORGE WASHINGTON INT'L L. REV 825 (August 2015).

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | Case No.: 1:24-cv-00244-BLW<br><br>**DECLARATION OF JENNIFER PAYNE, MD** |

JENNIFER PAYNE, MD, hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My areas of expertise are psychiatry, reproductive psychiatry, and the management of perinatal psychiatric disorders.

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). All of the statements in the expert report are true and correct to the best of my knowledge, except the last sentence in paragraph 78, which has an error in it.

3. The 2013 Fergusson study discussed in paragraph 78 reversed course and found the data did not support an increased risk of *major depression*, as had been found in the 2008 paper. Additionally, although the paper states that anxiety disorders were significantly associated with abortion, the reported odds ratio confidence interval and associated p value indicated that it was not statistically significant. Not all data used in the study was controlled for pre-existing mental health conditions and behaviors like substance use and suicidal behaviors, leaving the data hard to interpret for other mental health conditions.

4. The expert report provides a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/05/2025

Jennifer Payne, MD

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW |

**REBUTTAL EXPERT REPORT OF JENNIFER PAYNE, M.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), JENNIFER PAYNE, M.D., makes the following disclosures:

1. I am a board-certified psychiatrist licensed to practice in the states of Virginia and Maryland. I am an expert in reproductive psychiatry and in the management of perinatal[1] psychiatric disorders. Reproductive psychiatry is a subspecialization of psychiatry that researches and manages the treatment of psychiatric conditions around times of reproductive hormonal change, including the perinatal and menopausal periods.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

**Scope of Rebuttal**

2. I offer my opinions in response to those of Dr. Elena Kraus, who asserts that there are no medical indications for abortion when a pregnancy places the pregnant person at risk of death from self-harm, as stated in paragraphs ¶¶ 46–49 and 53–56 of her report.

[1] Perinatal refers to the period from when a person becomes pregnant until one year after giving birth.

3. My opinions are also offered in response to Dr. Kraus's assertion in ¶ 89 that "[w]hat is often not considered, and was not addressed by the plaintiff's expert reports, is the difference in the psychological effect of termination of pregnancy versus remaining pregnant," as well as her statement in ¶ 101 that "[a]bortions have risks that are both physical and psychological, with potential for lasting effects on many aspects of a woman's life."

4. Similarly, my opinions are offered to rebut Dr. Kraus's opinions regarding the psychological effects of pregnancy termination, particularly in cases involving lethal fetal anomalies. She contends that carrying a fetus with a fatal condition does not pose significant physical or psychological risks to the pregnant person, and that such risks do not increase as the pregnancy progresses, as discussed in ¶¶ 69 and 71–72.

5. Additionally, my opinions rebut Dr. Kraus's statement in ¶ 80 of her report that "[f]urthermore, even if successful, the reduction does not completely eliminate the risks associated with multiple pregnancies, and there are documented adverse psychological consequences."

6. My opinions rebut the statement in ¶ 13 of Dr. Dustan Hughes's report concerning his clinical practices.

7. Lastly, my opinions rebut the statement in Defendants' Response to Interrogatories 8 and 9, which was provided after primary expert disclosures, that "[B]ecause post-partum suicide, by definition, takes place after the birth of a child, an abortion cannot prevent the death of a woman who is at risk of death from self-harm during the post-partum period."

## Background

### A. Mental health conditions are the leading cause of maternal mortality in Idaho and nationwide.

8. At least one in five women experience perinatal mental health conditions.[2] A 2001-2002 study with 43,093 participants found that 25.7% of women who had been pregnant in the prior year met criteria for at least one psychiatric disorder.[3] Substance use disorder is also a psychiatric disorder. I understand another expert in this case will be addressing substance use disorder in pregnancy in greater detail.

9. Idaho's Maternal Mortality Review Committee, which was established by the State of Idaho in 2019, found that mental health conditions were the leading cause of pregnancy-related deaths in the state in 2018, 2020, and 2021.[4] In 2019, although not the leading cause of death, substance use disorder was determined to be a contributing factor in three of the five deaths and mental health disorder was a contributing factor in two of the deaths and was a probably factor in another two deaths.[4] These findings mirror national maternal mortality statistics, which demonstrate that the leading cause of maternal mortality in the United States is mental health

[2] Stacy Weiner, The toll of maternal mental illness in America, AAMC News, https://www.aamc.org/news/toll-maternal-mental-illness-america, Dec. 5, 2023 (last visited June 5, 2024);P*sychiatric Disorders During Pregnancy*, MGH Ctr. for Women's Mental Health, https://womensmentalhealth.org/specialty- clinics-2/psychiatric-disorders-during-pregnancy/ (last visited June 5, 2025); David Mongan et al., *Prevalence of Self-Reported Mental Disorders in Pregnancy and Associations with Adverse Neonatal Outcomes: A Population- Based Cross-sectional Study*, BMC Pregnancy & Childbirth, Nov. 8, 2019, at 1, 5.

[3] Oriana Vesga-López et al., *Psychiatric Disorders in Pregnant and Postpartum Women in the United States*, 65 Archives of Gen. Psychiatry 805, 809 & tbl.2 (2008).

[4] *Maternal Mortality Review Committee*, Idaho Dep't of Health & Welfare, https://healthandwelfare.idaho.gov/about-dhw/boards-councils-committees/maternal-mortality-review-committee (last visited June 5, 2025); Idaho Maternal Mortality Rev. Comm., *2018 Maternal Deaths in Idaho* 17-18 (2021), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=16014&dbid=0&repo=PUBLIC-DOCUMENTS&cr=1; Idaho Maternal Mortality Rev. Comm., *2020 Maternal Deaths in Idaho* 5, 19 (2022), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=24216&dbid=0&repo=PUBLIC-DOCUMENTS; Idaho Maternal Mortality Rev. Comm., *2021 Maternal Deaths in Idaho* 6, 22 (2023), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=26443&dbid=0&repo=PUBLIC-DOCUMENTS.

conditions.[5] Indeed, the Centers for Disease Control and Prevention (CDC) found in a recent study that almost 23% of pregnancy-related deaths were due to mental health conditions.[6]

### B. Clinicians use their medical judgment and professional training to diagnose and treat psychiatric patients.

10. As with all health conditions, clinicians diagnose psychiatric symptoms and mental health conditions through a comprehensive process. When evaluating patients for mental health conditions, clinicians reference the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR"), which provides criteria to define and diagnose psychiatric conditions.[7] However, the diagnostic process extends beyond consulting the DSM-5-TR because the DSM-5-TR alone does not capture the full range of mental health conditions and psychiatric symptoms people experience.

11. In addition to referencing the DSM-5-TR, clinicians draw from other medical literature, their training, clinical experiences, and professional expertise to assess patients' behavior and demeanor, interactions with others, and communication patterns. Based on this comprehensive approach, clinicians can discern nuances in patients' presentations and identify patients with potentially life- or health-endangering psychiatric symptoms discussed in Section C.1.a.

12. Clinicians also rely on their medical judgment and clinical expertise to determine the appropriate care for patients experiencing psychiatric symptoms, which often includes a combination of medication and therapeutic treatment.

### C. Certain psychiatric symptoms that may present in mental health

---

[5] Susanna Trost et al., Ctrs. for Disease Control & Prev. *Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 US States, 2017–2019*, at 2-3 & tbl.4 (2022), https://www.cdc.gov/reproductivehealth/maternal-mortality/docs/pdf/pregnancy-related-deaths-data-mmrcs-2017-2019-h.pdf.

[6] *Id.*

[7] *See generally* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev. 2022) [hereinafter "DSM-5-TR"].

**conditions are life- or health-endangering.**

13. This subsection first introduces life- or health-endangering psychiatric symptoms, including psychosis, self-harm and suicidality, and catatonia. These symptoms may present across several major psychiatric conditions, including major depressive disorder, bipolar disorder, schizophrenia, and schizoaffective disorder, which are discussed in turn below. The symptoms and conditions described here are illustrative. They do not constitute an exhaustive list of life- or health-endangering symptoms and conditions in which they appear, and clinicians must assess patients through comprehensive and holistic clinical evaluations to determine whether certain symptoms endanger their life or health.

**1. Life- or health-endangering symptoms**

*a. Psychosis*

14. Psychosis, or psychotic symptoms, encompasses a range of psychiatric symptoms typically marked by a distorted perception of reality. Patients experiencing psychosis may present with hallucinations,[8] delusions (including paranoia),[9] disorganized thinking,[10] or disorganized behavior, each indicative of a departure from typical mental function.[11] Clinicians diagnose patients experiencing psychosis based on reported symptoms, but more importantly, based on

---

[8] Hallucinations are defined as a sensory perception occurring in the absence of sensory input. *See* DSM-5-TR, *supra* note 7, at 102. For example, an auditory hallucination is when a patient describes hearing voices or sounds through their ears without external stimuli. *See id.* A patient may also experience sensations (such as spiders crawling on them) without external stimuli.

[9] Delusions are defined as fixed, false, idiosyncratic beliefs that are not consistent with cultural norms. *See* DSM-5-TR, *supra* note 7, at 101-02. Delusions can include paranoia, which is an unfounded or exaggerated belief, which can be tied to thoughts about persecution, conspiracy, and interpersonal threats. *See id.*

[10] Disorganized thinking is typically inferred from a patient's speech patterns. DSM-5-TR, *supra* note 7, at 102. For example, a patient may switch between unrelated topics, respond to questions with unrelated information, or speak in a manner that is nearly incomprehensible. *Id.*

[11] DSM-5-TR, *supra* note 7, at 101-03; *see, e.g.*, David B. Arciniegas, *Psychosis*, 3 Behavioral Neurology and Neuropsychiatry 715, 716-17 (2015) (reviewing definitions of psychosis and defining psychosis as the "presence of delusions, hallucinations without insight, or both").

observations and direct questioning. For example, many patients with hallucinations will admit to them in response to direct inquiry (e.g., "Are you hearing voices? Can you describe them for me?"). Similarly, patients with delusions will often spontaneously tell clinicians what they perceive to be happening (e.g., "the FBI is following me") or will answer direct questions (e.g., "Is there anything unusual or strange happening to you? Do you have special talents or abilities?"). Behaviors associated with psychosis often manifest during sessions with patients. For example, when a patient presents with disorganized thought content, they may reply to a question with an irrelevant or off-topic answer. They may appear easily distracted by actual or perceived stimuli, the latter indicating that they may be experiencing hallucinations. In severe cases, patients experiencing psychosis can lack cohesion in their speech and speak incomprehensibly.

15. Psychosis is a life- or health-endangering symptom because it results in functional impairment. A functional impairment refers to a significant difficulty or disruption in one or more areas of life, including a person's ability to (1) perform daily activities, such as feeding and hydrating oneself, maintaining personal hygiene, conducting daily chores, or managing finances; (2) pursue or fulfill academic or work-related responsibilities; (3) maintain healthy interpersonal relationships; and (4) regulate emotions and engage in cognitive functioning, including processing, keeping memories, concentrating on tasks, or decision-making.[12]

16. Psychosis is also life- or health-endangering because a patient experiencing psychosis might act on their false perceptions and beliefs to engage in risky behavior, like running into traffic, self-harming, or attempting suicide.

17. Though postpartum psychosis occurs in less than 1% of pregnant patients, it has a

[12] *See, e.g.*, DSM-5-TR, *supra* note 7, at 27, 107, 113, 119-120, 135 (describing functional impairment, including in conditions where psychosis is a symptom).

high mortality rate due to a 4 to 11% rate of suicide.[13] Few studies have examined the prevalence of psychotic disorders in pregnancy, though an epidemiological study in the United States showed no difference in the prevalence of psychotic disorders in pregnant women compared with non-pregnant women.[14] The prevalence is therefore thought to be approximately the same as that seen in the general population. In general, it is recommended that women with a history of a psychotic disorder remain on their medications during pregnancy. In particular, clinicians recommend that women with a history of postpartum psychosis either continue psychiatric medications during pregnancy, or if they elect to stop taking their medication during pregnancy, restart them immediately postpartum.

*b. Self-Harm & Suicidality*

18. Self-harm, the intentional and deliberate hurting of oneself, encompasses a spectrum of behavior, including ingesting harmful substances and engaging in behaviors that cause bleeding, bruising, burns, or pain.[15] Self-harm is distinct from suicidal ideation and suicide attempts; it can serve as a coping mechanism for emotional distress, a signal to others that the individual is distressed, or a reassurance for patients that they are still alive.

19. Suicidality refers to a heightened risk of suicide that typically presents with suicidal ideation or intent, which refers to thoughts or plans about ending one's life.[16] Women experience a greater rate of suicidal ideation than men and are more likely to attempt suicide.[17] Although men

---

[13] Janneke Gilden et al., *Long-Term Outcomes of Postpartum Psychosis: A Systematic Review and Meta-Analysis*, 81. J. Clinical Psychiatry e1, e1, e8 (2020).

[14] Vesga- López et al., *supra* note 3, at 811.

[15] DSM-5-TR, *supra* note 7, at 822.

[16] *MB26.A Suicidal Ideation*, ICD-11 for Mortality & Morbidity Stats. (2024). ICD-11 for Mortality and Morbidity Statistics (search for suicidal Ideation)

[17] Asha Z. Ivey-Stephenson et al., *Suicidal Thoughts and Behaviors Among Adults Aged ≥18 Years – United States, 2015—2019*, Morbidity & Mortality Weekly Report, Jan. 7, 2022, at 5-8; National Institutes of Health, 2021,

are more likely to die by suicide overall,[18] the Centers for Disease Control has reported that the age-adjusted suicide rate among women has increased by 55% compared to a 28% increase in men over the last 20 years.[19]

20. In general, clinicians are able to assess whether a patient is at serious risk of self-harm and/or suicide by conducting a thorough clinical diagnostic interview, and directly inquiring about the patient's intentions. When diagnosing and treating patients presenting with symptoms of self-harm or suicidality, and to understand the severity and depth of these symptoms, clinicians carefully interview patients about the patient's history of self-harm or suicide attempts, the methods they have used, and what motivated their actions. Clinicians also evaluate patients through careful observation. In clinical settings, some patients experiencing suicidality may present with visible injuries from self-harm, while others may express active suicidal ideation, including future plans and methods to die by suicide. They may also present to a hospital after a suicide attempt.

21. Approximately 2 to 3% of pregnant patients struggle with symptoms of suicidality, with higher rates in women with pre-existing psychiatric disorders.[20] One study found that suicidal ideation during pregnancy and postpartum ranged from 5 to 14%.[21] Suicide accounts for

---

Substance Abuse & Mental Health Servs. Admin., *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health*, at A-49 tbl.A.38B (2021),https://www.cdc.gov/mmwr/volumes/71/ss/ss7101a1.htm.

[18] *Suicide Mortality in the United States, 2001-2021*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/nchs/products/databriefs/db464.htm (2023).

[19] Holly Hedegaard et al., Nat'l Ctr. on Health Stats., No. 356, *Increase in Suicide Mortality in the United States, 1999–2018*, at 2 (2020), https://www.cdc.gov/nchs/data/databriefs/db362-h.pdf.

[20] Pilar Carolina Castelao Legazpi et al., *Suicidal Ideation: Prevalence and Risk Factors During Pregnancy*, Midwifery, Mar. 2022, at 1, 2 & tbl.1.

[21] Virginia Lindahl et al., *Prevalence of Suicidality During Pregnancy and the Postpartum*, 8 Archives Women's Mental Health 77, 77, 84 (2008).

approximately 20% of all postpartum deaths in the year after delivery.[22]

22. Suicide rates vary by state. For example, in 2023, Alaska had the highest suicide rate at 28.2 per 100,000 people, and District of Columbia had the lowest at 5.81.[23] Idaho's rate of suicide was considered high at 23.3 per 100,000 people.[24]

*c. Catatonia*

23. Catatonia refers to symptoms characterized by a range of psychomotor disturbances that interfere with mobility and communication. These symptoms may result in a lack of movement and communication or impulsive or erratic movements.

24. Although each patient with catatonia presents with distinct manifestations and behaviors, clinicians can diagnose patients with catatonia if they present with three or more of the following symptoms: (1) muscle rigidity; (2) failure to actively relate to one's environment, which can present as a blank facial expression, appearing devoid of emotion, or having minimal or no verbal response; (3) purposeless movements including repetitive, abnormally frequent, non-goal directed movements; (4) negativism, including opposition to or no response to instruction or external stimuli; (5) echolalia, i.e., repeating words or sounds that are made by other people or other external stimuli; and (6) inappropriate or unusual posturing, which can include a spontaneous and active maintenance of a posture against gravity.[25] Generally, there are three subtypes of catatonia. Patients with akinetic catatonia, for example, may present with extreme immobility, a flat affect, or a stare with "dead eyes," and they may appear totally non-responsive, almost statue-like. They may even fail to respond to external stimuli that others would, including painful stimuli,

---

[22] *Id*.

[23] *Suicide Rates by State*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/suicide/facts/rates-by-state.html, (2023).

[24] *Id*.

[25] DSM-5-TR, *supra* note 7, at 134-35.

such as not reacting to being pinched. Others may present with excited catatonia, where they display heightened impulsivity and agitation, resulting in erratic and sometimes dangerous movement that can inflict self-harm, posing significant risk to their health and life.[26] Finally, malignant catatonia refers to patients that may present with delirium and extreme rigidity.

25. The Bush Francis Catatonia Rating Scale is widely used in clinical settings to assess patients for catatonia, rate the severity of their symptoms, and to help guide clinicians in making treatment decisions and evaluating the effectiveness of the treatment plan that is implemented including medication management.[27]

26. Catatonia itself is a life- or health-endangering symptom because it impairs daily functioning. Patients with catatonia may develop additional life- or health-endangering medical symptoms, including severe dehydration or malnutrition due to inadequate food or fluid intake and autonomic nervous system instability, which can lead to dangerous fluctuations in body temperature, heart rate, and blood pressure. In addition, the protracted immobility associated with catatonia may lead patients to develop blood clots, which may in turn lead to a stroke or pulmonary embolism.[28]

27. While the exact prevalence of catatonia in pregnancy is unknown, the prevalence is reported to be between 7 to 17% of acutely ill psychiatric inpatients, and pregnancy is not thought to change this risk.[29] In hospital settings, there are fewer studies, and catatonia is likely

---

[26] *Id*.

[27] *See* George Bush et al., *Catatonia. I. Rating scale and standardized examination*, 93 Acta Psychiatrica Scandinavica 129, 131-34 (1996) (finding the Bush Francis Catatonia Rating Scale a valid and reliable rating scale for catatonia).

[28] DSM-5-TR, *supra* note 7, at 134-135; *see also, e.g.*, Julia Park et al., *Malignant Catatonia Warrants Early Psychiatric-Critical Care Collaborative Management: Two Cases and Literature Review*, Case Reports in Critical Care, Jan. 30, 2017, at 1, 3.

[29] Levente Csihi et al., *Catatonia During Pregnancy and the Postpartum Period*, 263 Schizophrenia Rsch. 257, 257, 262-63 (2024).

underdiagnosed, though one study found a prevalence rate of 0.05%.[30]

### 2. Mental health conditions in which life- or health-endangering symptoms may present

#### *a. Major Depressive Disorder*

28. Major depressive disorder is a debilitating mental health condition which causes a patient to experience either a persistent, extended period of low mood without an environmental stimulus or major depressive episodes, which are shorter periods of severely low mood that result in functional impairment.

29. Although major depressive disorder is a recurrent condition, patients with major depressive disorder have periods of time where they are well, particularly when they are taking medications that treat their symptoms. This is akin to a patient with diabetes that may have a normal blood sugar but still has the underlying condition of diabetes. Major depressive disorder is unlike "adjustment disorder," which is a condition where people experience low mood due to a stressful or traumatic life event. Adjustment disorder, unlike major depressive disorder, calls for resources and social support as opposed to psychiatric intervention.

30. Assessing a patient for major depressive disorder requires clinicians to carefully consider the duration and intensity of a patient's depressive symptoms and their impact on a patient's daily functioning. Clinicians also carefully observe a patient's behavior when assessing for major depressive disorder, including assessing whether the patient exhibits difficulty engaging in the conversation, makes poor eye-contact, appears disheveled, and exhibits slow speech, emotional responses, and thought processes (psychomotor slowing). The DSM-5-TR is a valuable guide for making a major depressive disorder diagnosis because it provides specific criteria and

---

[30] *See generally* James Luccarelli, et al., *The Occurrence of Catatonia Diagnosis in Acute Care Hospitals in the United States: A National Inpatient Sample Analysis*, 77 Gen. Hosp. Psychiatry 141 (2022).

allows clinicians to exclude depressive symptoms in response to life events. In addition to having a depressed mood for two weeks or longer, patients are required to have four or more of the following co-occurring symptoms to meet the criteria for a major depressive episode: (1) loss of interest or pleasure in activities; (2) significant weight change (either loss or gain); (3) change in sleeping habits (insomnia or hypersomnia); (4) psychomotor slowing or psychomotor agitation (appearing anxious or restless); (5) fatigue or loss of energy; (6) strong feelings of guilt or worthlessness; (7) difficulty concentrating; or (8) suicidality, including thoughts of death or suicide. Adverse impact on functioning, in particular, is a required symptom to meet the criteria for the diagnosis.

31. While major depressive disorder is generally recurrent, with patients experiencing multiple major depressive episodes throughout their lifetime, prompt and proper treatment can help treat these symptoms and improve functioning. This underscores the importance of comprehensive, holistic, and even dynamic psychiatric care that considers not only the DSM-5-TR but also clinicians' training and work experience.

32. 10 to 15% of women in the United States experience depression during pregnancy.[31] Most of these patients can be successfully treated with a combination of medication and psychotherapy. But in its most extreme manifestation, major depressive disorder can present with life- or health-endangering symptoms such as catatonia, self-harm and suicidality, and psychosis.

33. The risk of suicide in individuals with depressive conditions like major depressive disorder, and other mood disorders, is 17-fold greater than that of the general population, and 10

[31] Lauren M. Osborne & Catherine Birndorf, *Depressive Disorders*, in *Textbook of Women's Reproductive Mental Health* 344 (Lucy A. Hutner et al. eds., 2022).

to 15% of individuals with major depressive disorder die by suicide based on follow-up studies.[32] It is estimated that approximately 7 out of every 100 men and 1 out of every 100 women who have been diagnosed with major depressive disorder in their lifetime will die by suicide.[33]

*b. Bipolar Disorder*

34. Bipolar disorder is a mental health condition in which patients experience mood fluctuations between periods of abnormally elevated mood and energy and major depressive episodes. There are generally two types of bipolar disorder: bipolar I and bipolar II.[34]

35. Bipolar I is characterized by the presence of manic episodes, which are intense periods of elevated mood that last at least one week.[35] During manic episodes, patients may exhibit a range of excessively dangerous behavior, present with psychotic symptoms discussed *supra* Section C.1.a, and may require psychiatric hospitalization to help manage their symptoms.

36. Bipolar II is characterized by the presence of hypomanic episodes, which are periods of elevated mood that are milder and shorter-lived than manic episodes, lasting for at least four days.[36] While hypomanic episodes can be associated with symptoms of increased energy and even increased productivity, unlike manic episodes, they are not associated with the same level of impairment or excessively dangerous behavior, psychiatric hospitalization, and psychotic symptoms. The severity of symptoms is what separates manic episodes from hypomanic episodes.

37. Patients with bipolar disorder may exhibit manic or hypomanic symptoms,

[32] DSM-5-TR, *supra* note 7, at 190; Thomas Sobanski et al., *Suicidal Behavior-Advances in Clinical and Neurobiological Research and Improvement of Prevention Strategies*, 12 World. J. Psychiatry 1115, 1116 (2022).

[33] Am. Ass'n of Suicidology, *Some Facts About Suicide: What is Depression?* 2 (2009), https://www.cga.ct.gov/asaferconnecticut/tmy/0129/Some%20Facts%20About%20Suicide%20and%20Depression%20-%20Article.pdf.

[34] DSM-5-TR, *supra* note 7, at 139-44 (BPI); *id.* at 150-53 (BPII).

[35] *Id.* at 140.

[36] *Id*. at 140, 152.

including: expressing an inflated self-esteem, or grandiosity; talking more than usual or feeling internal pressure to keep talking; expressing flight of ideas, or having a subjective experience that thoughts are racing; distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli); an increase in goal-directed activity (either socially, at work or school, or sexually); psychomotor agitation (i.e., purposeless, non-goal-directed activity); involvement in risky activities; and a decreased need for sleep (e.g., feeling rested after three hours of sleep).[37]

38. These symptoms can significantly impact patients' functioning, including in their work, relationships, ability to carry out daily activities, and their personal safety. In severe cases, bipolar disorder can present with life- or health-endangering symptoms, including psychosis, self-harm and suicidality, and catatonia.

39. The risk of suicide in people living with bipolar disorder is 20- to 30-fold greater than that of the general population, and 5 to 6% of individuals living with bipolar disorder die by suicide. [38]A peer-reviewed meta-analysis did not find a difference between bipolar I and bipolar II in terms of lifetime history of suicide attempts.[39]

40. In women with no pre-existing mood disorder, a recent review and meta-analysis found that the pooled prevalence of bipolar disorder in pregnancy was 2.6% and that 54.9% of pregnant women with a pre-pregnancy diagnosis of bipolar disorder experienced a mood episode (i.e., a major depressive episode, hypomanic or manic episode) during pregnancy.[40]

*c. Schizophrenia*

---

[37] *Id*. at 140-41 (BPI); *Id*. at 150-51 (BPII).

[38] *Id*. at 148.

[39] Danielle M. Novick et al., *Suicide Attempts in Bipolar I and Bipolar II Disorder: A Review and Meta-Analysis of the Evidence*, 12 Bipolar Disorder 1, 6-7 (2010).

[40] Grace A. Masters et al., *Prevalence of Bipolar Disorder in Perinatal Women: A Systematic Review and Meta-Analysis*, 83 J. Clinical Psychiatry e1, e6 & tbl.3 (2022).

41. Schizophrenia is a chronic and major mental health condition with psychotic symptoms that profoundly impacts patients' lives and constitutes a significant disability. Most patients living with schizophrenia are diagnosed in their teens or early twenties—i.e., during reproductive age—and are not able to accomplish life goals such as education, work, and relationships.

42. The official DSM-5-TR definition requires the presence of at least two of the following psychotic symptoms to diagnose a patient with schizophrenia: delusions, hallucinations, catatonia, or disorganized thought, behavior, or speech.[41] The presence of negative symptoms is also required for a schizophrenia diagnosis, which include an inability to show emotions, apathy, difficulty talking, and withdrawing from social situations and relationships.[42]

43. These symptoms are health-endangering and can be life-endangering in more extreme manifestations. Despite its relatively low prevalence—less than 1% of the population is diagnosed with schizophrenia—schizophrenia carries a significant risk of suicide: 5 to 6% of individuals with the condition die by suicide.[43] Additionally, women with schizophrenia are at a 10.5-fold increased risk of accidental death as compared to the general population.[44]

44. Patients living with schizophrenia or schizoaffective disorder (discussed further below) are at elevated risk of psychiatric relapse during pregnancy, particularly if they discontinue their medication during pregnancy.[45] Psychiatric relapse during pregnancy is also discussed

---

[41] DSM-5-TR, *supra* note 7, at 113-15.

[42] *Id*. at 102-03.

[43] *Id*. at 116, 119.

[44] Line Amalie Aarestrup Hellemose et al., *Accidental Deaths Among Persons with Schizophrenia: A Nationwide Population-Based Cohort Study*, 199 Schizophrenia Rsch. 149, 151 (2018).

[45] Carolyn Breadon & Jayashri Kulkarni, *An Update on Medication Management of Women with Schizophrenia in Pregnancy*, 20 Expert Opinion Pharmacotherapy 1365, 1366-68 (2019).

further below in the A and B of the Medically Indicated Abortion Care Section.

*d. Schizoaffective Disorder*

45. Schizoaffective disorder is a complex mental health condition in which patients prominently exhibit mood symptoms (such as those found in people living with major depressive disorder or bipolar disorder) as well as chronic psychotic symptoms found in people living with schizophrenia in between mood episodes.[46] Like schizophrenia, the typical age of onset of schizoaffective disorder is in the late teens and early twenties—i.e., during reproductive age.

46. Schizoaffective disorder has a slightly better prognosis than schizophrenia, but it is also a cause of significant disability. People living with schizoaffective disorder may also present with life- or health-endangering symptoms, including catatonia, self-harm, and suicidality. People living with schizoaffective disorder face an increased risk of suicide compared to the general population, at a rate of approximately 5%.[47]

**Medically Indicated Abortion Care**

47. Although many people who live with or develop a mental health condition during pregnancy can safely carry a pregnancy to term, some experience psychiatric symptoms that make continuing the pregnancy a clear risk to their life or health. Additionally, some patients need to take teratogenic medications to treat their mental health conditions, and for these patients continuing their pregnancy may endanger their lives or health. Clinicians must be permitted to use their medical judgment and training to determine whether a pregnant patient's mental health condition constitutes an emergent condition that warrants prompt and appropriate life- and health-

[46] DSM-5-TR, *supra* note 7, at 121-23.

[47] *Id*. at 125.

preserving abortion care.

**A. Patients who experience life- or health-endangering psychiatric symptoms as a result of the onset, recurrence, or worsening of a mental health condition due to pregnancy should have access to abortion care in Idaho.**

48. Pregnancy itself may trigger a sudden onset of mental health conditions that may present with life- or health-endangering symptoms, and patients should have access to abortion care to alleviate those symptoms.

49. For example, perinatal depression (depression during pregnancy or after giving birth) is one subset of major depressive disorder that is likely related to and caused by hormonal changes that are associated with pregnancy and childbirth.[48] Approximately 1 in 13 women experience a new onset of a major depressive episode during pregnancy.[49] In my clinical and research experience, these patients often continue experiencing major depressive disorder after pregnancy and in subsequent pregnancies.

50. For some patients, the onset of mental health conditions during pregnancy occurs because of sensitivity to fluctuations in hormones, including levels of progesterone and estrogen, that occur during pregnancy and postpartum.[50] While this observation has been well known clinically for decades,[51] my research has identified two biomarkers of this trait that can be identified in a blood sample and predict with 80% accuracy which women will become depressed

---

[48] *See generally* Maureen Sayres Van Niel & Jennifer L. Payne, *Perinatal Depression: A Review*, 87 Clev. Clinic J. of Med. 273 (2020); *see also* Masters et al., *supra* note 40, et al.

[49] Lisette Rodriguez-Cabezas & Crystal Clark, *Psychiatric Emergencies in Pregnancy and Postpartum*, 61 Clinical Obstetrics & Gynecology 615, 615 (2018); Bradley N. Gaynes et al., Agency for Healthcare Rsch. & Quality , No. 119, *Perinatal Depression: Prevalence, Screening Accuracy, and Screening Outcomes*, (2005).

[50] Van Niel & Payne, *supra* note 48, at 274.

[51] *See, e.g.*, Osborne & Birndorf, *supra* note 31, at 343, 354.

during the perinatal time period.[52] While we do not yet understand the underlying biological basis of this sensitivity to hormonal change (research is ongoing), it is clear that there is a biological basis for it given the presence of the biomarkers. For women with a biologically based sensitivity to hormonal fluctuations associated with pregnancy, abortion care can relieve them of the associated psychiatric symptoms and decrease and even eliminate the risk associated with suicidal thoughts and other severe psychiatric symptoms.

51. For instance, I had a patient who experienced a major depressive episode for the first time during pregnancy. Her symptoms—including low mood, hopelessness, insomnia, inability to eat, poor concentration, and agitation—were so life-impairing that she could no longer take care of herself, complete household chores, or work. Although I tried to treat her symptoms with psychiatric medications, her symptoms did not subside until after delivery. Due to the severity of her psychiatric symptoms, my patient elected not to have more children. She later had recurrent major depressive episodes when exposed to progesterone-containing birth control pills and a relapse of major depressive disorder during perimenopause, since it is a time of significant hormonal changes. It is likely that her major depressive disorder was originally triggered by hormonal changes during pregnancy.

52. Additionally, people living with mental health conditions that were well managed before pregnancy may experience recurrence or a worsening course of their condition after becoming pregnant. Although treatment worked for these patients before pregnancy, these patients' conditions can become unmanageable. Although there is no specific diagnosis code that this corresponds to in the DSM-5-TR, it is a well-known phenomenon to reproductive

[52] *See generally* Guintivano et al., *infra* note 89; Osborne et al., *infra* note 89; Payne et al., *infra* note 89.

psychiatrists.[53]

53. Studies that examined the relapse rate of women with major depressive disorder and bipolar disorder found that a significant portion of women still experienced relapse of their psychiatric symptoms despite continuing their medication during pregnancy. For example, in pregnant women with major depressive disorder, approximately 25% experienced relapse despite continuing their medications.[54] For women living with bipolar disorder, about 30% of those who continued their medications during pregnancy experienced relapse.[55] Similarly, treatments for catatonia and psychotic symptoms may not work as well during pregnancy.

54. This phenomenon may occur because of sensitivity to hormonal changes as described above. It can also occur due to physiological changes in pregnancy, such as significant changes in blood volume and metabolism, which can affect medications' efficacy. While some women may respond to an increase in medication dosage, others do not, and they may experience life or health-endangering psychiatric symptoms.

55. Pregnant patients with a prior history of a severe pregnancy-associated mental health condition are also likely to develop a mental health condition—and accompanying life or health-endangering symptoms—in subsequent pregnancies. Specifically, women who have experienced perinatal depression, which can be life-endangering, are at a 75% risk for developing

---

[53] *See, e.g.*, Osborne & Birndorf, *supra* note 31, at 343, 354 (describing perinatal anxiety and mood disorders that worsen in the setting of reproductive hormonal change); *see generally* Ian Brockington, *The Psychoses of Menstruation and Childbearing* (2017) (discussing this phenomenon in detail).

[54] Lee S. Cohen, *Relapse of Major Depression During Pregnancy in Women Who Maintain or Discontinue Antidepressant Treatment*, 295 JAMA 499, 504 (2006); *see also* Lee S. Cohen et al., *Relapse of Depression During Pregnancy Following Discontinuation: A Preliminary Prospective Study*, 7 Archives Women's Mental Health 217 (2004).

[55] Adele C. Viguera et al., *Risk of Recurrence in Women with Bipolar Disorder During Pregnancy: Prospective Study of Mood Stabilizer Discontinuation*, 164 Am. J. Psychiatry 1817, 1820 (2007); *see generally* Adele C. Viguera et al., *Risk of Recurrence of Bipolar Disorder in Pregnant and Nonpregnant Women After Discontinuing Lithium Maintenance*, 157 Am. J. Psychiatry 179 (2000); Adele C. Viguera & Lee S. Cohen, *The Course and Management of Bipolar Disorder During Pregnancy*, 34 Psychopharmacology Bull. 339 (1998).

depression in a subsequent perinatal time period.[56] Women who experience psychosis after pregnancy are at a 50 to 80% risk of developing another psychotic episode outside of the peripartum time period as part of another psychiatric illness, usually bipolar disorder.[57] These women are also at elevated risk of recurrence during the postpartum time period.[58] 20 to 50% of women with a history of postpartum psychosis only experience recurrence during the postpartum time if they undergo another pregnancy.[59]

56. With the onset, recurrence, or worsening of mental health conditions due to pregnancy, patients may experience life- or health-endangering psychiatric symptoms, including psychosis, self-harm and suicidality, and catatonia. The symptoms may be unmanageable through traditional treatment plans such as psychotherapy and medication. For these patients, these emergent symptoms only subside when the exacerbating factor is removed—that is, when the pregnancy ends.

57. For example, a pregnant patient under my care who was living with well-managed bipolar disorder had a history of worsening major depressive episodes with each subsequent pregnancy. During her third pregnancy, she experienced life- and health-endangering symptoms including poor functioning, self-harm, and suicidality. Despite appropriate medication management and psychotherapy, she ultimately received life- and health-preserving abortion care.

---

[56] Mary Kimmel et al., *Family History, Not Lack of Medication Use, Is Associated with the Development of Postpartum Depression in a High-Risk Sample*, 18 Archives Women's Mental Health 113, 119 (2015); *see generally* Jerry Guintivano et al., *Predictors of Postpartum Depression: A Comprehensive Review of the Last Decade of Evidence*, 61 Clinical Obstetrics & Gynecology 591 (2018) (illustrating that pregnant psychiatric patients with a history of perinatal depression are at elevated risk for developing it in a future pregnancy).

[57] Veerle Bergink et al., *Postpartum Psychosis: Madness, Mania, and Melancholiain Motherhood*, 173 Am. J. Psychiatry 1179, 1181-82 (2016).

[58] *Id*.; *see also* Ian Jones & Nick Craddock, *Familiality of the Puerperal Trigger in Bipolar Disorder: Results of a Family Study*, 158 Am. J. Psychiatry 913, 916 (2001).

[59] Bergink, *supra* note 57, at 1181; *see also* Jones & Craddock, *supra* note 58.

It was only after receiving abortion care that my patient's life- and health-endangering symptoms subsided.

58. Patients facing life- or health-endangering psychiatric symptoms stemming from the emergence, relapse, or worsening course of mental health conditions due to pregnancy should have access to abortion care.

### B. Patients who require teratogenic medication to treat their mental health conditions should have access to life- or health-preserving abortion care in Idaho.

59. Some people living with mental health conditions require treatment with teratogenic medications—i.e., medications that are known to cause major issues in fetal organ system development. For example, people living with bipolar disorder, schizophrenia, or schizoaffective disorder may require teratogenic medications such as carbamazepine or valproic acid for mood stabilization. Notably, carbamazepine and valproic acid are also taken for epilepsy and certain pain conditions. Teratogenic medications cannot be taken safely during pregnancy because they are known to interfere with fetal development, and because many fetal conditions can in turn pose risks for pregnant patients during pregnancy, labor, and delivery.[60]

60. For example, exposure to valproic acid increases the risk of neural tube defects like anencephaly (failure of fetal brain development). These fetal conditions are associated with increased risks for the pregnant patient during labor and delivery, such as polyhydramnios (excessive amniotic fluid) and need for drainage of amniotic fluid, an increased risk of C-section, and an increased risk of obstetrical hemorrhage.[61] Excessive amniotic fluid in the uterus can cause pregnancy complications by putting pressure on the pregnant patient's surrounding organs, and it

[60] *See, e.g.*, *Teratogen*, Am. Psychological Ass'n Dictionary of Psychology (2d ed. Am. 2015).

[61] *See generally* Emre Ekmekci & Servet Gencdal, *What's Happening When the Pregnancies Are Not Terminated in Case of Anencephalic Fetuses?*, 11 J. Clinical Med. Research 332 (2019).

also increases the risk of placental abruption, an emergent medical condition where the placenta prematurely detaches from the uterus.

61. In addition, I would not recommend that patients who take carbamazepine or valproic acid, or other psychiatric medications, discontinue their medication for pregnancy. 70% of patients with major depressive disorder and 80 to 100% of patients with bipolar disorder or schizoaffective disorder who stop their psychiatric medications for pregnancy experience a relapse of their psychiatric condition and can experience life- or health-endangering symptoms.[62] These patients cannot easily switch to a different psychiatric medication that is not teratogenic either. For example, most pregnant patients who take carbamazepine or valproic acid have usually failed to respond to other, non-teratogenic mood stabilizing medication—clinicians are reluctant, given the risks, to prescribe them to women of reproductive age unless clearly necessary.

62. When pregnant patients stop taking their medication or switch to a different one and experience a relapse of their mental health condition due to these changes in treatment, their symptoms often get worse. The more severe these symptoms become, the harder they are to treat. There is also no guarantee that restarting the teratogenic medication after pregnancy, even if it worked well before, will work again in the future for these particular patients. While this phenomenon, i.e., the loss of psychiatric medications' efficacy for these particular patients, has not been well-studied in the literature (it would be difficult to do so due to sample size issues), it is well known clinically and is believed to happen because of adaptation and changes in brain chemistry, progression of the mental health condition, or physiological changes that occur with aging or due to hormonal changes such as in the setting of pregnancy.

[62] *See, e.g.*, R. Kumar et al., *Clinical Survey of a Psychiatric Mother and Baby Unit: Characteristics of 100 Consecutive Admissions*, 33 J. Affective Disorders 11, 12, 17-19 (1995); *see also* sources cited *supra* notes 54-55.

63. Pregnant patients who require teratogenic medications to treat their mental health condition should have access to life- or health-preserving abortion care.

**C. Maternal mortality and morbidity in Idaho will likely increase if psychiatric patients are blocked from access to life- or health-preserving abortion care.**

64. Idaho's Ban Throughout Pregnancy prohibits all abortion care unless "the abortion was necessary to prevent the death of the pregnant woman," and it states that "[n]o abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself." Idaho Code § 18-622(2)(a)(ii). As discussed above, life- or health-endangering symptoms spurred or exacerbated by pregnancy may cause pregnant patients to self-harm or die by suicide. These patients should not be blocked from accessing life- or health-preserving abortion care.

65. Additionally, the abortion bans' conflicting and vague exceptions make it unclear whether patients facing other life- or health-endangering psychiatric symptoms such as catatonia or psychosis can receive abortion care. It is unclear to me as a clinician whether the presence of these symptoms meets the Ban Throughout Pregnancy's exception for preventing death. I understand the Ban Throughout Pregnancy's exception for preventing death has been interpreted by the Idaho Supreme Court as not requiring the risk of death to be immediate, but it is still unclear to me what the threshold risk of death a pregnant psychiatric patient must experience for this exception to apply. It is also unclear to me whether these symptoms constitute a "substantial and irreversible impairment of a major bodily function" under the Fetal Heartbeat Ban Idaho Code § 18-604(9).

66. Finally, for the same reasons, it is also unclear whether patients who require teratogenic medication to treat their mental health condition have access to life- or health-preserving abortion care under the abortion bans' exceptions. If these patients are forced to carry

a pregnancy to term because of Idaho's abortion bans, they will be caught in an impossible situation of having to choose between (1) continuing their medication, which poses a risk of experiencing an obstetrical emergency due to a fetal condition or (2) discontinuing their medication, which poses a risk of experiencing life- or health-endangering psychiatric symptoms due to relapse.

67. Based on this understanding of the legal regime in Idaho concerning the provision of abortion care, as well as my education, training, and experience as a reproductive psychiatrist, it is my opinion that Idaho's abortion bans endanger the health and life of pregnant patients living with mental health conditions. Without access to health- and life-preserving abortion care, pregnant psychiatric patients are likely to experience adverse health outcomes including deaths by suicide, and severe maternal morbidity in the form of worsening course of their mental health condition and in turn, their overall health.

68. As discussed above, my research and clinical experience support the conclusion that certain psychiatric symptoms or treatment of mental health conditions can pose life- or health-endangering risks during pregnancy. The abortion bans and their limited medical exceptions make preventing these risks difficult or impossible for clinicians, including OBGYNs, maternal fetal medicine providers, family medicine providers, and psychiatrists—all of whom may need to coordinate or provide pregnant psychiatric patients with access to health- and life-preserving abortion care.

69. As discussed *supra* Section C.1, mental health conditions are the leading cause of pregnancy-related deaths in Idaho and in the United States more broadly. Although these statistics include deaths that occur up to one year after childbirth, these statistics are still relevant. First, psychiatric illness during pregnancy is one of the strongest risk factors for psychiatric illness

during the postpartum period. For example, depression during pregnancy is one of the strongest predictors of postpartum depression. Second, because timely and effective treatment reduces death from psychiatric disorders, treating psychiatric disorders effectively during pregnancy reduces death in the postpartum period. The Maternal Mortality Review Committee statistics therefore reflect the pressing need for legal protections for pregnant psychiatric patients.

70. Maternal health outcomes for pregnant psychiatric patients needing life- or health-preserving abortion care will likely worsen under Idaho's current abortion bans, which do not adequately safeguard the health and lives of pregnant patients living with mental health conditions. This is of particular concern given Idaho's jarring statistics on maternal mortality as they relate to mental health conditions.

**Impact of Abortion Care**

71. Dr. Kraus's claims about abortion and an increased risk of adverse psychological outcomes (Kraus Report ¶¶ 89) are not supported by reliable scientific evidence. Dr. Kraus's claims are contrary to the positions of leading medical authorities such as the American Psychiatric Association, American Psychological Association, National Academies of Sciences, Engineering, and Medicine, and the United Kingdom's Royal College of Psychiatrists, all of which have conducted robust scientific reviews of the relevant literature and unanimously rejected the false association advanced by Dr. Kraus. Dr. Kraus's outlier opinion also stands in contrast to the conclusions of numerous rigorous, well-designed studies and reviews that have concluded that abortion does not adversely impact mental health.

72. Contrary to Dr. Kraus's claims that abortion leads to mental health problems (Kraus Report ¶ 89), well-designed and rigorous studies have repeatedly demonstrated that

having an abortion does *not* increase a person's risk of mental health problems.[63] For example, the Turnaway Study, a seminal longitudinal cohort study of almost 1,000 people who sought an abortion and either obtained one or were unable to secure one, found that (1) having a wanted abortion was not associated with mental health harms; (2) compared to receiving an abortion, being denied a wanted abortion was associated with experiencing symptoms of anxiety and low self-esteem one week after denial; (3) a prior history of a mental health condition or physical or mental abuse were the factors most strongly associated with experiencing adverse mental health outcomes after abortion, and (4) abortion does not increase women's risk of experiencing

[63] M. Antonia Biggs et al., *Mental Health Diagnoses 3 Years After Receiving or Being Denied an Abortion in the United States*, 105 Am. J. Pub. Health 2557 (2015); M. Antonia Biggs et al., *Does Abortion Increase Women's Risk for Post-Traumatic Stress? Findings from a Prospective Longitudinal Cohort Study*, 6 Brit. Med. J. Open, no. 2, at e009698 (2016); M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169 (2017); Diana Greene Foster, *A Comparison of Depression and Anxiety Symptom Trajectories Between Women Who Had an Abortion and Women Denied One*, 45 Psych. Med. 2073 (2015); A.C. Gilchrist et al., *Termination of Pregnancy and Psychiatric Morbidity*, 167 Brit. J. Psychiatry 243 (1995); A.M. Gomez, *Abortion and Subsequent Depressive Symptoms: An Analysis of the National Longitudinal Study of Adolescent Health*, 48 Psych. Med. 294 (2018); Trine Munk-Olsen et al., *Induced First-Trimester Abortion and Risk of Mental Disorder*, 364 New England J. Med. 332 (2011); Trine Munk-Olsen et al., *First-Time First-Trimester Induced Abortion and Risk of Readmission to a Psychiatric Hospital in Women with a History of Treated Mental Disorder*, 69 Archives Gen. Psychiatry 159 (2012); Nancy F. Russo & Jean E. Denious, *Violence in the Lives of Women Having Abortion: Implications for Practice and Public Policy*, 32 Pro. Psych. Rsch. & Prac. 142 (2001); Nancy F. Russo & Kristin L. Zierk, *Abortion, Childbearing, and Women's Well-Being*, 23 Pro. Psych.: Rsch. & Prac. 269 (1992); Sarah Schmiege & Nancy F. Russo, *Depression and Unwanted First Pregnancy: Longitudinal Cohort Study*, 331 Brit. Med. J. 1303 (2005); Julia R. Steinberg & Nancy F. Russo, *Abortion and Anxiety: What's the Relationship?*, 67 Soc. Sci. & Med. 238 (2008); Julia R. Steinberg, *Later Abortions and Mental Health: Psychological Experiences of Women Having Later Abortions: A Critical Review of Research*, 21 Women's Health Issues, no. 3S, at S44 (2011); Julia R. Steinberg & Lawrence B. Finer, *Examining the Association of Abortion History and Current Mental Health: A Reanalysis of the National Comorbidity Survey Using a Common-Risk-Factors Model*, 72 Soc. Sci. & Med., no. 11, at 78 (2011); Julia R. Steinberg et al., *Does the Outcome of a First Pregnancy Predict Depression, Suicidal Ideation, or Lower Self-Esteem? Data from the National Comorbidity Survey*, 81 Am. J. Orthopsychiatry 193 (2011); Julia R. Steinberg et al., *Abortion and Mental Health: Findings from the National Comorbidity Study-Replication*, 123 J. Obstetrics & Gynecology 263 (2014); Julia R. Steinberg et al., *Examining the Association of Antidepressant Prescriptions with First Abortion and First Childbirth*, 75 JAMA Psychiatry 828 (2018); Angela J. Taft & Lyndsey F. Watson, *Depression and Termination of Pregnancy (Induced Abortion) in a National Cohort of Young Australian Women: The Confounding Effect of Women's Experience of Violence*, 8 BMC Public Health 75 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278138/; Jenneke van Ditzhuijzen et al., *Incidence and Recurrence of Common Mental Disorders After Abortion: Results from a Prospective Cohort Study*, 84 J. Psychiatric Rsch. 200 (2017); Jenneke van Ditzhuijzen et al., *Long-Term Incidence and Recurrence of Common Mental Disorders After Abortion. A Dutch Prospective Cohort Study*, 102 J. Psychiatric Rsch. 132 (2018); Jocelyn T. Warren et al., *Do Depression and Low Self-Esteem Follow Abortion Among Adolescents? Evidence from a National Study*, 42 Persps. on Sexual & Reprod. Health 230 (2010).

symptoms of depression, post-traumatic stress disorder ("PTSD"), anxiety or stress in either the short term or over five years. Leading professional health and scientific organizations have reviewed and analyzed the relevant literature on this topic, and they have consistently concluded that the claim that abortion causes mental health problems is not supported by reliable evidence.[64] Similarly, several reputable psychology and psychiatry organizations state clearly that abortion is not known to cause mental or emotional harm.[65]

73. Dr. Kraus, in contrast with the studies above, relies on two reviews, one by Reardon (ref 117) who is a discredited investigator in this area, and another by Bradshaw from 2003 that does not contain more recent studies which have been carefully conducted with appropriate control groups. The lead author of the more recent review, Dr. Reardon, has also repeatedly had the quality of his research methodologies called into question. In February of 2024, a journal retracted two abortion studies that Dr. Reardon coauthored, citing concerns about the studies' data selection and analysis.[66] Additionally, an international group of seventeen

[64] Brenda Major et al., *Report of the APA Task Force on Mental Health and Abortion* 4, Am. Psych. Ass'n (2008), https://perma.cc/YLZ9-4R3G (finding "no evidence sufficient to support the claim that an observed association between abortion history and mental health was caused by the abortion per se, as opposed to other factors."); Brenda Major et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 Am. Psych. 863 (2009) (update to APA Task Force Report 2008), https://perma.cc/Q4J4-8P8Y; Nat'l Acads. of Sci., Eng'g & Med., *The Safety and Quality of Abortion Care in the United States* (2018), https://perma.cc/7PF8-LCSN; Nat'l Collaborating Ctr. for Mental Health (NCCMH), *Induced Abortion and Mental Health: A Systematic Review of the Mental Health Outcomes of Induced Abortion, Including Their Prevalence and Associated Factors*, Acad. of Med. Royal Colls. (2011), https://perma.cc/UWB5-RD35; Am. Psychiatry Ass'n, *Position Statement on Abortion and Women's Reproductive Health Care Rights* (2020), https://perma.cc/JA5Y-39KE.

[65] Zara Abrams, *The Facts About Abortion and Mental Health*, 53 Monitor on Psych. 40 (2023), https://www.apa.org/monitor/2022/09/news-facts-abortion-mental-health; Am. Psych. Ass'n, Position Statement on Abortion (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Abortion.pdf.

[66] *Retraction Notice*, 11 Health Servs. Rsch. & Managerial Epidemiology 1 (2024) ("At the request of Sage and the Journal Editor, the following articles have been retracted: Studnicki J, Harrison D, Longbons T, Kraus I, et al. A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015. *Health Services Research and Managerial Epidemiology*. 2021;8. doi:10.1177/23333928211053965; Studnicki J, Longbons T, Harrison D, Kraus I, et al. A Post Hoc Exploratory

independent health and science experts has called for the correction or retraction of three more studies coauthored by Dr. Reardon, pointing to their "serious methodological problems."[67]

74. Below I discuss the methodological issues that plague the now discredited literature on whether abortion is associated with negative psychological outcomes.

75. First, it is critical to use comparison groups that are as similar as possible, thus isolating the effects of the abortion and ruling out confounding factors. Unfortunately, as numerous scientific reviews have acknowledged, studies in this area often fail to identify and use an appropriate comparison group. Specifically, several studies compare women who have abortions either to women who have never been pregnant[68] or to women with intended pregnancies that are carried to term.[69]

76. For example, the problem with comparing women seeking abortions to women who choose to carry a pregnancy to term is that the circumstances in their lives, including their pre-pregnancy mental health, are different. Women who have abortions usually have a higher incidence of pre-pregnancy mental health conditions than women without a history of abortion.[70] And some of the reasons women seek abortion—financial, partner-related, the desire to end an

---

Analysis: Induced Abortion Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization. *Health Services Research and Managerial Epidemiology*. 2022;9.doi: 10.1177/23333928221103107; Studnicki J, Longbons T, Fisher JW, Harrison DJ, Kraus I, MacKinnon SJ. Doctors Who Perform Abortions: Their Characteristics and Patterns of Holding and Using Hospital Privileges. *Health Services Research and Managerial Epidemiology*. 2019;6. doi:10.1177/2333392819841211.")

[67] Julia Littell et al., *Correcting the Scientific Record on Abortion and Mental Health Outcomes*, Brit. Med. J., Feb. 27, 2024, at 1.

[68] *See, e.g.*, David M. Fergusson et al., *Abortion and Mental Health Disorders: Evidence From a 30-Year Longitudinal Study*, 193 Brit. J. Psychiatry 444 (2008).

[69] *See, e.g.*, Mika Gissler et al., *Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987–2000*, 15 Eur. J. Pub. Health 459 (2005).

[70] Steinberg et al. (2011), *Does the Outcome of a First Pregnancy Predict Depression, Suicidal Ideation, or Lower Self-Esteem?*, *supra* note 63, at 196–97 & tbl. 1; Steinberg et al. (2014), *supra* note 63, at 267–69; Jenneke van Ditzhuijzen et al., *Psychiatric History of Women Who Have Had an Abortion*, 47 J. Psychiatric Rsch. 1737, 1740–41 & tbl. 3 (2013); Munk-Olsen et al. (2011), *supra* note 663, at 336; Munk-Olsen et al. (2012), *supra* note 663, at 162.

abusive relationship or to avoid bringing children into an abusive relationship—can affect women's mental health outcomes post-abortion.[71] Thus, when studies compare women who have abortions to those with intended pregnancies that are carried to term, they may erroneously attribute any differences in mental health outcomes to the abortion, when in fact these differences more likely stem from a woman's circumstances around the time she decides to have an abortion or carry to term, or even before she became pregnant. Researchers should instead compare women who have an abortion to those who want an abortion but are unable to get one.[72]

77. Second, many studies fail to take pregnancy intention or "wantedness" into account when comparing women who have abortions to women who carry a pregnancy to term.[73] Because the overwhelming majority of pregnancies in the abortion group are unintended, while only a minority of pregnancies in the delivery group are unintended, such studies are biased in favor of finding that women who have abortions will have more mental health problems than women who deliver. This is because unintended pregnancy is associated with prior or preexisting mental health problems, intimate partner violence, and social disadvantages, all of which may affect subsequent mental health problems.[74]

78. Third, there are a number of studies that do not control,[75] or inappropriately

---

[71] Biggs et al., *Understanding Why Women Seek Abortions in the US*63, 13 BMC Women's Health 33 (2013).

[72] Nada L. Stotland, *Induced Abortion and Adolescent Mental Health*, 23 Current Op. Obstetrics & Gynecology 340, 341 (2011).

[73] *See, e.g.*, Gissler et al. (2005), *supra* note 669, at 459; Donald Paul Sullins, *Abortion, Substance Abuse and Mental Health in Early Adulthood: Thirteen-Year Longitudinal Evidence from the United States*, 4 SAGE Open Med. 1, 3 (2016).

[74] Major et al. (2009), *supra* note 64, at 868–69, 884–85.

[75] *See, e.g.*, Gissler et al. (2005), *supra* note 69, at 459–60; Mika Gissler et al., *Suicides After Pregnancy in Finland, 1987–94: Register Linkage Study*, 313 Brit. Med. J. 1431 (1996).

control,[76] for pre-existing mental health conditions. Pre-pregnancy mental health and previous experiences of violence, trauma, and abuse increase the risk of subsequent depression, suicidal ideation, and other mental health outcomes.[77] Among those studies which have reported an association between abortion and subsequent mental health outcomes, many fail to account for pre-existing mental health conditions or use inappropriate comparison groups.[78] For example a 2008 study by Dr. Fergusson and colleagues, did not control for any mental health condition that a participant experienced before pregnancy but after the age of fifteen.[79] These errors mean that mental health conditions after an abortion are attributed to the abortion rather than circumstances that predated the pregnancy, and in fact, may have prompted the decision to terminate.[80] A later 2013 Fergusson study re-analyzed the data from the 2008 study and reversed course, concluding that the data did *not* in fact support an increased risk of mental health disorders in women having abortions compared to women giving birth to unintended pregnancies.[81]

79. A number of studies in this area have been denounced. For example, a meta-analysis by Dr. P. Coleman has been widely denounced for its numerous methodological flaws,

[76] *See, e.g.*, Fergusson et al. (2008), *supra* note 68, at 446; Sullins, *supra* note 73, at 3–8; David C Reardon et al., *Pregnancy Associated Death in Record Linkage Studies Relative to Delivery, Termination of Pregnancy, and Natural Losses: A Systematic Review with a Narrative Synthesis and Metaanalysis*, 5 SAGE Open Med. 1 (2017).

[77] Biggs et al. (2017), *supra* note 663, at 176; Beth S. Brodsky & Barbara Stanley, *Adverse Childhood Experiences and Suicidal Behavior*, 31 Psychiatric Clinics N. Am. 223 (2008); Foster et al. (2015), *supra* note 663, at 2079; Herbert Fliege et al., *Risk Factors and Correlates of Deliberate Self-Harm Behavior: A Systematic Review*, 66 J. Psychosomatic Rsch. 477 (2009); Jacqueline M. Golding, *Intimate Partner Violence as a Risk Factor for Mental Disorders: A Meta-Analysis*, 14 J. Fam. Violence 99 (1999); Kim L. Gratz, *Risk Factors for and Functions of Deliberate Self-Harm: An Empirical and Conceptual Review*, 10 Clinical Psychol.: Sci. & Prac. 192, 194–96 (2003); Steinberg et al. (2014), *supra* note 63, at 267–69 & tbls. 2–363; Steinberg & Russo (2008), *supra* note 63, at 243–4463; Taft & Watson (2008), *supra* note 663; Steinberg & Finer (2011), *supra* note 63, at 78–81.

[78] *See* Nat'l Acads., *supra* note 664, at 150.

[79] Fergusson et al. (2008), *supra* note 68.

[80] Steinberg & Finer (2011), *supra* note 63, at 7377.

[81] David M. Fergusson et al., *Does Abortion Reduce the Mental Health Risks of Unwanted or Unintended Pregnancy? A Re-Appraisal of The Evidence*, 47 Austl. N.Z. J. Psych. 819 (2013).

including that Dr. Coleman failed to differentiate mental health problems diagnosed prior to an abortion and those that occur after an abortion; and did not disclose that fully half of the reviewed studies were authored or co-authored by Dr. Coleman herself.[82] Multiple experts called for the meta-analysis to be retracted[83] and others concluded that the analysis "cannot be regarded as a formal systematic review."[84] Experts and the National Academies have resoundingly criticized Dr. Coleman's methods and analysis in other studies, too.[85] Even more recently, in 2022, a journal, *Frontiers of Psychology*, formally retracted a review of the Turnaway Study by Dr. Coleman after the journal conducted a post-publication assessment and concluded that "the

[82] *See, e.g.*, Julia H. Littel, *Coleman Review Does Not Conform to Reporting Standards and Has Undisclosed Conflicts of Interest*, Brit. J. Psychiatry, Nov. 2, 2011; Helene H. Thygesen, *Shortcomings in the Data Analysis in Coleman (2011 199)*, Brit. J. Psychiatry, Nov. 2, 2011; James C. Coyne, *Coleman Article Should Be Retracted, Not Debated in a Subsequent Issue of BJP*, Brit. J. Psychiatry, Nov. 4, 2011; Ben Goldacre, *Re: Abortion & Mental Health*, Brit. J. Psychiatry, Nov. 7, 2011; Gregory L. Kinney, *Re: Abortion and Mental Health*, Brit. J. Psychiatry, Nov. 29, 2011. All of the above can be accessed at https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/abortion-and-mental-health-quantitative-synthesis-and-analysis-of-research-published-19952009/E8D556AAE1C1D2F0F8B060B28BEE6C3D#comments. *See also* Louise M. Howard et al., Correspondence, *Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored*, 200 Brit. J. Psychiatry 74 (2012); Kathryn M. Abel, Correspondence, *Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored,* 200 Brit. J. Psychiatry 74 (2012); Julia H. Littell & James C. Coyne, Correspondence, *Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored*, 200 Brit. J. Psychiatry 75 (2012); Chelsea Polis, Correspondence, *Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored,* 200 Brit. J. Psychiatry 76 (2012); Ben Goldacre & William Lee, *Correspondence: Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored*, 200 Brit. J. Psychiatry 77 (2012); Toine Lagro-Janssen et al., Correspondence, *Abortion and Mental Health: Guidelines for Proper Scientific Conduct Ignored,* 200 Brit. J. Psychiatry 78 (2011); Gail E. Robinson et al., Correspondence, *Abortion And Mental Health: Guidelines for Proper Scientific Conduct Ignored*, 200 Brit. J. Psychiatry 78 (2012); Tim Kendall et al., *To Meta-Analyse or Not to Meta-Analyse: Abortion, Birth and Mental Health*, 200 Brit. J. Psychiatry 12–14 (2012); Julia Steinberg et al., *Fatal Flaws in A Recent Meta-Analysis on Abortion and Mental Health*, 86 Contraception 430 (2012); NCCMH, *supra* note 64, at 18.

[83] *See, e.g.*, Coyne, *Coleman Article Should Be Retracted, Not Debated in a Subsequent Issue of BJP, supra* note 82; Littel, *Coleman Review Does Not Conform to Reporting Standards and Has Undisclosed Conflicts of Interest*, *supra* note 82.

[84] Kendall et al., *supra* note 82, at 12–14.

[85] *See, e.g.*, Ronald C. Kessler & Alan F. Schatzberg, *Commentary on Abortion Studies of Steinberg and Finer and Coleman*, 46 J. Psychiatric Rsch. 410 (2012); Julia R. Steinberg & Lawrence B. Finer, *Coleman, Coyle, Shuping, and Rue Make False Statements and Draw Erroneous Conclusions in Analyses of Abortion and Mental Health Using the National Comorbidity Survey*, 46 J. Psychiatric Rsch. 407 (2012); Nat'l Acads., *supra* note 64, at 149–52.

article does not meet the standards of publication."[86]

80. Dr. Kraus also cites no reliable evidence in support of her claim that abortion increases mental health risks for pregnant people who have received a diagnosis of a lethal fetal condition (69, ref 85 and 86). The Asplin 2014 study (ref 85) used semi-structured interviews to explore what women who had abortion care for a fetal malformation perceived as important in their encounters with caregivers and did not study whether abortion increased the risk for negative mental health outcomes. The Cope 2015 study (ref 86) did examine whether abortion care was associated with negative mental health symptoms, and found an association in women who underwent abortion care for a fetal diagnosis of anencephaly compared to women who continued pregnancy BUT did not control for pre-existing mental health conditions or other potential confounding variables.

81. To the contrary, research indicates that having the option to terminate a pregnancy following a lethal fetal diagnosis *preserves* patients' mental health. While this is a difficult area to study, "[t]he few published studies that examined women's responses following an induced abortion due to fetal abnormality suggest that terminating a wanted pregnancy late in pregnancy due to fetal abnormality appears to be associated with negative psychological reactions . . . [but] less than those who deliver a child with life-threatening abnormalities."[87] A report by the APA Task Force on Mental Health and Abortion looked at several studies involving anxiety and depression in patients after receiving a fetal diagnosis and found only one that directly compared the mental health of women who chose to terminate after receiving a diagnosis to that of women

[86] *Retraction: The Turnaway Study: A Case of Self-Correction in Science Upended by Political Motivation and Unvetted Findings*, Frontiers in Psych. (Dec. 25, 2022), https://www.frontiersin.org/journals/psychology/articles/10.3389/fpsyg.2022.1130026/full.

[87] Major et al. (2008), *supra* note 664, at 4.

who chose to continue the pregnancy. That study found that those patients who chose to terminate after receiving a diagnosis were generally faring better from a mental health perspective six to ten months later than those who chose to continue the pregnancy.[88]

82. When attempting to understand what the best available evidence tells us on this issue, it is critical to pay careful attention to study quality, which Dr. Kraus does not do. It is my opinion that reliable, well-designed evidence from the scientific literature does not support Dr. Kraus's claim that abortion places women at an increased risk of mental health issues.

**FACTS OF DATA CONSIDERED IN FORMING MY OPINIONS**

83. My opinions are based on my clinical experience, education and training, research, attendance at professional conferences, and knowledge of the relevant literature, including the sources identified in my footnotes herein.

**EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS**

84. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

**MY QUALIFICATIONS AND PUBLICATIONS**

85. I earned a B.S. in Biology from Davidson College in 1990, graduating *cum laude* with High Honors. I received my M.D. from Washington University School of Medicine in 1997. After medical school, I completed my residency in psychiatry at the Johns Hopkins School of Medicine, where I served as chief resident in my final year. I then completed a clinical research fellowship in mood disorders and clinical trial work in Bethesda, Maryland, at the National Institute of Mental Health.

86. I currently serve as the Director of the University of Virginia's (UVA) Perinatal

[88] *Id.* at 70, 72.

Mental Health Clinic, where approximately half of the patients are pregnant and visit the Clinic during the perinatal and postpartum period. At UVA, I am the Vice Chair of Research for Psychiatry and Neurobehavioral Sciences, and a Professor of Psychiatry and Neurobehavioral Sciences and Obstetrics and Gynecology. I also direct the Reproductive Psychiatry Research Program (RPRP). In addition to my teaching and research, I see patients through UVA's Outpatient Clinic, where I conduct long-term follow-up care for approximately 45 patients. I also supervise UVA's Resident's Clinic, where I train 15 to 20 third- and fourth-year psychiatry residents in the outpatient setting.

87. The patients that I treat in these clinical settings live with a broad range of mental health conditions, including, but not limited to, major depressive disorder, bipolar disorder, schizophrenia, and schizoaffective disorder.

88. Prior to joining UVA, I was faculty in the Departments of Psychiatry and Behavioral Sciences and Gynecology and Obstetrics at the Johns Hopkins School of Medicine for 18 years. I was also the founder and director of the Johns Hopkins Women's Mood Disorders Center, now called the Johns Hopkins Reproductive Mental Health Center, where approximately 15% of the patients presented for clinical care while pregnant, and approximately 30% presented during the perinatal or postpartum periods. In addition to providing clinical care to women with psychiatric disorders, at the time I worked there, the Women's Mood Disorders Center was a research center that in part focused on perinatal and postpartum depression and best management practices for women with psychiatric disorders during and after pregnancy. While at Hopkins, I was also co-director of the residents' outpatient psychiatry program, where I trained 12 residents yearly within the Women's Mood Disorders Center, and directed the Mood Disorder Clinical Trial Group, which carried out clinical trials of novel therapeutics to

treat mood disorders such as major depressive disorder and bipolar disorder.

89. I have authored dozens of articles in peer-reviewed journals, lectured, and presented extensively on topics relating to perinatal mental health. Specifically, my research focuses on the management of psychiatric conditions during and after pregnancy and the biological, genetic, and environmental risk factors for these conditions. As part of my research, I helped identify two epigenetic biomarkers of perinatal depression and have validated these findings in several samples collected by other researchers. These biomarkers are predictive, prior to symptom onset, of depression that begins during pregnancy or in the immediate postpartum time-period (perinatal depression).[89] I also serve as the principal investigator for multiple ongoing clinical studies, including the Prospective Study of Pregnant Women with and without Mood Disorders, an observational research study that seeks to understand the causes of postpartum mood episodes associated with postpartum depression.

90. In addition to my faculty, clinical, and research work, I have served in a number of national and international societies with a focus on women's mental health. I am the immediate past President for the International Marcé Society for Perinatal Mental Health, and I also served as President for Marcé of North America Perinatal Mental Health Society from 2022 to 2024. Previously, I served as a member of the Council of State Governments State Mental Health Policy Advisory Group from 2021 to 2022. I was also appointed to the Steering Committee for the National Academy of Sciences, Engineering, and Medicine for the workshop "Women's Mental Health Across the Life Course Through a Sex-Gender Lens." Finally, I

[89] J. Guintivano et al., *Antenatal prediction of postpartum depression with blood DNA methylation biomarkers*, 19(5) Molecular Psychiatry 560 (2013); Lauren Osborne et al., *Replication of epigenetic postpartum depression biomarkers and variation with hormone levels*, 41(6) Neuropsychopharmacology 1648 (2016); Jennifer L. Payne, et al., *DNA methylation biomarkers prospectively predict both antenatal and postpartum depression*, 285:112711 Psychiatry Research (2020), https://pubmed.ncbi.nlm.nih.gov/31843207/.

currently serve on the Council on Women's Mental Health for the American Psychiatric Association.

91. My curriculum vitae, which sets forth my qualifications and publications in more detail, is attached hereto as **Exhibit 1**.

## CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS

a. April 26, 2021. Deposition: *Schmidt/McKinney vs. Hendricks*. Retained by Wharton, Levin, Ehrmantraut and Klein, Wilmington, DE.

b. May 28, 2021. Testimony: *Adkins vs. Ball et al.* Retained by Wharton, Levin, Ehrmantraut and Klein, Wilmington, DE.

c. June 16 and July 11, 2022. Deposition: *Seymour, et al., vs. St. Agnes Healthcare, Inc*. Retained by Pessin Katz Law, Towson, MD.

d. August 12, 2022. Deposition: *Abicht, et al., vs. Frederick Health Hospital, Inc*. Retained by Pessin Katz Law, Towson, MD.

e. September 15, 2022. Testimony: *Abicht, et al., vs. Frederick Health Hospital, Inc.* Retained by Pessin Katz Law, Frederick, MD.

f. October 17, 2022. Deposition: *Aragaw vs. Carhart*. Retained by Nelson Mullins, Baltimore, MD.

g. May 8, 2023. Deposition: *Berger vs. Uddin*. Retained by Leventhal, Puga, Bradley, P.C., Denver, CO

h. June 20, 2023. Testimony: *Bandy vs. Reston Hospital Center*. Retained by Moran Reeves Conn and Mitchell and Simopoulos, Fairfax, VA

i. November 21, 2023. Deposition: *Watts vs. Nakasone*. Retained by US Attorney's Office, District of Maryland, Baltimore, MD.

j. December 5, 2024. Video Testimony: *Middleton vs. Khan Medical Practice*. Retained by Balaguer, Milewski, & Imbrogno of Wilmington, DE.

k. June 28, 2024 Video Deposition: *Adkins, et al., v. State of Idaho*. Retained by the Center for Reproductive Rights.

l. November 19, 2024 (Live) and November 21, 2024 (video), Testimony: *Adkins, et al., v. State of Idaho*. Retained by the Center for Reproductive Rights.

## COMPENSATION

92. I am being compensated at the rate of $300 per hour for my work on this case.

Dated: June 6, 2025

JENNIFER PAYNE, M.D.

# Exhibit 1

# CURRICULUM VITAE

## Jennifer L. Payne, MD

March 2, 2025

### PERSONAL DATA

University of Virginia
Department of Psychiatry and Neurobehavioral Sciences
2955 Ivy Road
Suite 210
Charlottesville, VA 22903
Phone: 301-641-6637
Email: jlp4n@uvahealth.org

### EDUCATION

| | | |
|---|---|---|
| 1992-1997 | M.D. | Washington University |
| 1994-1995 | Fellowship | Howard Hughes Medical Institute at NIH |
| 1986-1990 | B.S. in Biology | Davidson College |

### POST-GRADUATE EDUCATION

| | | |
|---|---|---|
| 2001-2003 | Fellowship in Mood Disorders | National Institute of Mental Health |
| 2000-2001 | Chief Resident | Johns Hopkins Hospital |
| 1998-2000 | Resident of Psychiatry | Johns Hopkins Hospital |
| 1997-1998 | Internship | Johns Hopkins Bayview |

### ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2021 | Vice Chair of Research, Psychiatry and Neurobehavioral Sciences, University of Virginia |
| 2021 | Professor of Psychiatry and Neurobehavioral Sciences, University of Virginia |
| 2021 | Professor of Obstetrics and Gynecology, University of Virginia |
| 2017 | Associate Professor of Gynecology and Obstetrics, Johns Hopkins School of Medicine |
| 2011 | Associate Professor of Psychiatry and Behavioral Sciences, Johns Hopkins School of Medicine |
| 2003 | Assistant Professor Psychiatry and Behavioral Sciences, Johns Hopkins School of Medicine |

### CERTIFICATION AND LICENSURE

**Certification**

| | |
|---|---|
| American Board of Psychiatry and Neurology | 2002-present |
| Basic Life Support | 2002-present |

**Licensure**

| | | |
|---|---|---|
| Maryland | Expires 9/30/25 | D56749 |

| | | |
|---|---|---|
| Virginia | Expires 12/31/26 | 0101272586 |

**HONORS AND AWARDS**

| | |
|---|---|
| 2024-2027 | UVA Vivian Pinn Scholar |
| 2024 | Frank Shobe Lecture in the Department of Psychiatry, Washington, University |
| 2024 | Inducted into the American College of Psychiatrists |
| 2024 | Head of winning team for Shark Tank Competition at the School of Medicine Research Retreat for the proposal: "Postpartum Depression Research and Training Center Program Grant Development" |
| 2023 | UVA Department of Psychiatry and Neurobehavioral Sciences Larry Merkel Award for Teaching in the Outpatient Setting |
| 2023 | UVA Leadership in Academic Medicine (LAM) participant (Departmental Nomination). |
| 2023-2025 | President for International Marcé Society for Perinatal Mental Health |
| 2022-2024 | President, Marcé of North America Perinatal Mental Health Society (MONA) |
| 2022 | UVA Department of Psychiatry and Neurobehavioral Sciences Larry Merkel Award for Teaching in the Outpatient Setting |
| 2022-2023 | EMPOWER, Virtual Peer Mentorship Program participant in conjunction with the ELAM program. |
| 2019-2020 | Mary Elizabeth Garret Executive Women's Leadership Program Participant ( Departmental Nomination) |
| 2019 | Appointed to the DSM-5-TR Revision Subcommittee on Gender-Related Diagnostic Issues |
| 2019 | Co-Host International Initiative for Mental Health Leadership (IIMHL) Infant and Perinatal Mental Health Workshop, Washington, DC |
| 2019 | American Psychiatric Association Assembly Resident-Fellow Member (RFM) Mentor award |
| 2018 | Elected as the Deputy Representative of the Women's Caucus to the American Psychiatric Association |
| 2018 | Elected to the International Marcé Society for Perinatal Mental Health Board of Directors |
| 2018 | Appointed to Scientific Advisory Council, The Royal Institute of Mental Health Research (IMHR), University of Ottawa, Canada |
| 2018 | Appointed to the Scientific Board for the Marcé of North America (MONA) 2019 meeting |
| 2018 | Appointed to the Scientific Advisory Board for North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) 2020 meeting |
| 2017 | Appointed to the Steering Committee for the National Academy of Sciences, Engineering, and Medicine Workshop "Women's Mental Health Across the Life Course Through a Sex-Gender Lens." |
| 2017 | Appointed as the Deputy Representative of the Women's Caucus to the American Psychiatric Association |
| 2017 | Appointed by the APA Council on Research to the Working Group on the Position statement on MH Screening in Pregnancy and Postpartum" which produced a position statement |
| 2016-2017 | Johns Hopkins Medicine Leadership Development Program (Departmental Nomination) |
| 2016 | DHHS Office of Women's Health Maternal Depression Advisory Meeting Participant |

| | |
|---|---|
| 2015-2016 | Appointed by Johns Hopkins and the Maryland governor to serve on the Maryland State Maternal Mental Health Task Force. Testified to the Maryland State Legislature twice which resulting in the passing of two bills dealing with perinatal mental health at the state level. |
| 2015 | Participant, Johns Hopkins Economics of Clinical Operations Course (Departmental Nomination) |
| 2012 | American Psychiatric Association Distinguished Fellow |
| 2006-2009 | NIH Loan Repayment Awards |
| 2005, 2006 | Passano Physician-Scientist Award (Johns Hopkins Clinician Scientist Award) |
| 2003 | NCDEU (New Clinical Drug Evaluation Unit) New Investigator Award |
| 2002 | NIMH Award for "Excellence in Care and Management of Patients in Clinical Research." |
| 2001 | Laughlin Fellow, American College of Psychiatrists |
| 2001 | APA/Lilly Resident Research Award |
| 2000-2001 | Chief Resident, Psychiatry, Johns Hopkins School of Medicine |
| 1999 | National Institute of Mental Health Outstanding Resident Award |
| 1997 | Richard S. Brookings Medical School Award for Research |
| 1992-1997 | Spencer T. Olin Fellowship (full tuition support) Washington University School of Medicine |
| 1994-1995 | Howard Hughes Research Scholar, National Institutes of Health |
| 1990 | NIH and Howard Hughes Grant, Conference on Undergraduate Research, Davidson College |
| 1990 | Phi Beta Kappa |
| 1990 | Graduated cum laude with High Honors in Biology, Davidson College |
| 1989-1990 | Merck Scholar, Davidson College |
| 1987-1990 | Charles A. Dana Honor Scholarship, Davidson College |
| 1986-1987 | Samuel H. Bell Honor Scholarship, Davidson College |

## PROFESSIONAL AFFILIATIONS (INCLUDING OFFICES HELD)

**American Psychiatric Association**

| | |
|---|---|
| 1998-present | Member |
| 2017-2018 | Appointed as the Deputy Representative from the Women's Caucus to the American Psychiatric Association Assembly |
| 2017 | Appointed to the APA Assembly Reference Committee, "Advancing Psychiatric Knowledge and Research." |
| 2017 | Appointed by the APA Council on Research to the "Working Group on the Position statement on MH Screening in Pregnancy and Postpartum" which produced a position statement |
| 2018-2021 | Elected as the Deputy Representative from the Women's Caucus to the American Psychiatric Association Assembly |
| 2019 | American Psychiatric Association Assembly Resident-Fellow Member (RFM) Mentor award |
| 2019 | Appointed to the APA Workgroup on Women's Mental Health |
| 2019-2021 | Appointed to the APA Assembly Committee on Procedures |
| 2019 | Appointed to the APA Reference Committee, "Membership and Organization." |
| 2019-2024 | Appointed as Member, Committee on Women's Mental Health under the Council on Children, Adolescents and their Families |
| 2024-present | Appointed as Member, Council on Women's Mental Health |

**Maryland Psychiatric Society (MPS)**

| | |
|---|---|
| 1998-2001, 2004-2021 | Member |
| 2014-2021 | MPS Distinguished Fellows Committee |
| 1998-1999 | MPS Residents and Fellows Committee |
| 1999-2001 | MPS Residents and Fellows Committee, Chair |
| 2007-2009 | Elected MPS Early Career Councilor |
| 2018-2019 | Appointed by the Area 3 Representative to serve on the Workgroup on Finance and Management for Area 3 |

**Psychiatric Society of Virginia**

| | |
|---|---|
| 2021-present | Member |

**Washington Psychiatric Society**

| | |
|---|---|
| 2001-2004 | Member |

**Society of Biological Psychiatry**

| | |
|---|---|
| 2005-present | Member |
| 2007-2012 | Society of Biological Psychiatry Membership Committee, Chair |
| 2014-2015 | Society of Biological Psychiatry Ziskind-Somerfield Research Award Committee |
| 2016 | Chair, Society of Biological Psychiatry Ziskind-Somerfield Research Award Committee |
| 2024-2027 | Appointed to the SOBP Conference Planning Committee |

**International Marcé Society for Perinatal Mental Health**

| | |
|---|---|
| 2016-present | Member |
| 2018-2020 | Board of Directors |
| 2020-2022 | President Elect. |
| 2022-present | President |
| 2025-2027 | Immediate Past President |

**Marcé of North America (MONA) (formed in 2018)**

| | |
|---|---|
| 2018-present | Member |
| 2018-2019 | Scientific Advisory Board for 2019 meeting |
| 2019-2021 | President Elect for MONA. |
| 2020-2022 | Chair, Governance Committee |
| 2021-2023 | President |
| 2024-2026 | Immediate Past President |

**North American Society for Psychosocial Obstetrics and Gynecology (NASPOG)**

| | |
|---|---|
| 2016-present | Member |
| 2018-2020 | Appointed to the Scientific Advisory Board for North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) 2020 meeting |

**Postpartum Support International (PSI)**

| | |
|---|---|
| 2016-present | Member |
| 2018-present | Volunteer, PSI Consultation Line (weekly basis) |

**American College of Psychiatrists**

| | |
|---|---|
| 2024-present | Member |

## RESEARCH ACTIVITIES

### Areas of Research Interest

My research work throughout my career has focused on the biological, genetic and environmental risk factors for postpartum depression as well as establishing evidence for best psychiatric medication management practices during pregnancy. My collaborator, Zachary Kaminsky, and I have identified two epigenetic biomarkers of postpartum depression and have since confirmed our findings in several outside samples. We have recently replicated this work with NIH funding and are working with a start-up company, Dionysus Health, to bring this technology to market and an IDE application is being filed with the FDA in 2024. This work is ongoing at UVA through the Reproductive Psychiatry Research Group. I have also conducted research examining the role of neuroactive steroids, such as allopregnanolone, in the development of postpartum depression and have identified evidence for decreased autophagy using extracellular vesicles in blood samples from pregnant women prior to onset of postpartum depression symptoms. These research projects aim to identify the underlying biological processes of postpartum depression. While at Johns Hopkins I also directed the Mood Disorders Clinical Trials group, which had the goal of developing novel therapeutic treatments for mood disorders. Through this group we also focused on novel treatments for postpartum depression, including brexanolone, and tested clinical protocols for the management of mood disorders during pregnancy. These included the use of chronotherapy for treatment of perinatal depression and management of lamotrigine during pregnancy. Therefore, I have experience in conducting clinical trials, conducting clinical research during pregnancy and partnering with basic scientists to explore the underlying biological basis of perinatal depression.

### Current Program

2021-present. Reproductive Psychiatry Research Program at UVA. In 2021 I moved my research program in order to become the Vice Chair of Research in the Department of Psychiatry and Neurobehavioral Sciences at UVA. Protocols that were originally at Johns Hopkins that were moved to UVA included the Prospective Study of Pregnant Women with and without Mood Disorders and Personalized Integrate Chronotherapy for Perinatal Depression. In addition, we currently have funding to examine blood samples from approximately 150 women with Postpartum Psychosis for the presence of our previously identified biomarkers through an R21, DOD funding for a protocol that will examine if we can prevent postpartum depression by targeting and improving infant sleep and a recently funded multi-site grant to look at the role of neuroactive steroids and $GABA_A$ Receptor activity across the menstrual cycle in women with Premenstrual Dysphoric Disorder. Two other grants have been awarded and are in the start-up phase: A large multi-site grant through the DOD which will examine the real-world use of our biomarker test and will examine outcomes including rates of postpartum depression, referral for mental health care and use of resources and a NIMH grant to replicate our and extend our findings of an association between our biomarkers and Premenstrual Dysphoric Disorder. Three other grants have been recommended for funding: a NIMH grant to look at the role of microRNA in the development of postpartum depression; a DOD grant to examine the role of neuroactive steroids and $GABA_A$ Receptor activity in the development of postpartum depression; and, finally, a DOD grant to examine our biomarker test in both blood and saliva as well as to determine if samples taken postpartum are associated with postpartum depression. This brings the total of federally funded grants obtained by the Reproductive Psychiatry Program since my transfer to UVA to five, eight if all those recommended for funding are indeed funded. My postdoc, Lizzie Wenzel, recently received a 3rd percentile score on her F32 application and we are hopeful it will also be funded. I currently have support for a research program manager, six clinical research coordinators (CRCs) and a junior faculty. I expect to have funding for four more CRCs based on grants that have been recommended for funding by September.

**Research Collaboration/Team Science**

2019-present. Consultative Agreement, **Dionysus Health**. I am providing consulting services to Dionysus Health, a digital health company developing a phone app to help identify pregnant women at risk of developing postpartum depression. As part of their business plan they are currently negotiating with Johns Hopkins and UVA for rights to our patents on Epigenetic Biomarkers of Postpartum Depression and Premenstrual Dysphoric Disorder with plans to bring the biomarker tests to market. As a team we applied for the RADX Challenge Prize through NIH for the Maternal Mental Health Challenge and are a finalist for the final prize money, having made it through 4 rounds of competition. The large DOD grant, "PPD: Preventing Postpartum Depression: A Real-World Examination of a Predictive Test for PPD" that has been recommended for funding partners with Dionysus Health and will result in data needed for a successful FDA application.

2019-present. Collaborative Agreement, **Flo Health**. I have an ongoing collaborative agreement (initially through Johns Hopkins, now through UVA) with the international phone application "Flo" in which we have previously analyzed data on an international level on self-reported postpartum mood symptoms and premenstrual mood symptoms. We analyzed data from 138 countries with more than 1 million pregnancies and data from 141 countries with over 1 million women answering questions about premenstrual mood symptoms. Ongoing projects include advising Flo on research studies that use the Flo app to collect data and a survey of perimenopausal women on their seeking medical help for their symptoms as well as the range and severity of their symptoms.

**TEACHING ACTIVITIES**

**Classroom, Seminar, or Teaching Laboratory**

University of Virginia

| | |
|---|---|
| 2023-present | Child Fellow Lecture on Maternal Mental Health |
| 2021-present | PGY3 Seminar, Co-Lead Mini-Seminar on Women's Mental Health, 6 weeks |
| 2021-present | PGY3 Seminar, Co-Lead Mini-Seminar on Conducting Research in Psychiatry, 12 weeks |

Johns Hopkins

| | |
|---|---|
| 2013-2021 | Obstetrics and Gynecology Selective in Women's Mood Disorders (2 weeks per term) |
| 2008-2021 | Clinical Case Conference and Journal Club, Residents Mood Disorders Clinic (weekly) |
| 2008-2020 | PGY2 Practice of Outpatient Psychiatry and Psychotherapy Lecture Series (weekly) |
| 2009-2021 | PRECEDE Module for Ob-Gyn rotation, Medical School, Workshop on Postpartum Depression (4 times yearly) |
| 2016-2021 | "Perinatal Mood Disorders: Outcomes for Mothers and Babies" for Intersection of Physical and Mental Health course in Bloomberg School of Public Health (yearly) |
| 2003-2021 | PGY 2 Lecture on "Bipolar Disorders" (yearly) |
| 2003-2021 | PGY4 Lecture on "Post Residency Research Fellowships" (yearly) |
| 2003-2007 | 1st year of Medical School Small Group Interviewing Instructor and Tutorial in Psychiatry |
| 2003-2007 | 2nd year of Medical School Pharmacology Lecture Series (Antidepressants) |
| 2005-2007 | 2nd year Genes to Society Lecture Series (Postpartum Depression, Premenstrual Mood Disorders, Ob-Gyn Section) |
| 2005-2007 | 4th year of Medical School Psychiatry Rotation Lecture Series (Mood Disorders) |

**Clinical Teaching**

University of Virginia

| | |
|---|---|
| 2022-2024 | Outpatient Preceptor, Nurse Practitioner, Masters in Mental Health. Provided weekly supervision of NP master's candidate management of outpatient cases with an emphasis on perinatal mental health cases. |
| 2021-present | Outpatient Supervisor. Provides weekly clinical supervision of resident outpatient cases. Supervisors rotate every 12 months. |
| 2021-present | Outpatient Supervisor PGY 3 clinic. Provides real-time supervision of PGY3 outpatient cases. |
| 2021- present | Outpatient Supervisor PGY 4 clinic. Provides real-time supervision of PGY4 outpatient cases. |

Johns Hopkins

| | |
|---|---|
| 2013-2021 | Johns Hopkins Obstetrics and Gynecology Selective in Women's Mood Disorders. Two weeks (4 times yearly) of individual clinical supervision in the evaluation and management of women with mood disorders for a medical student rotating on Obstetrics and Gynecology. |
| 2008-2021 | Director, Johns Hopkins Residents Mood Disorders Clinic. Provided weekly hands-on clinical supervision for 6-7 PGY3 residents in the evaluation and follow-up care of patients with mood disorders. |
| 2004-2021 | Outpatient Supervisor. Provided weekly clinical supervision of resident outpatient cases. Supervisors rotate every 6 months. |
| 2003-2021 | PGY 2 Inpatient Rotation Supervisor. Provided daily clinical supervision of resident inpatient cases for 2-3 months per year. |

**CME Instruction**

| | |
|---|---|
| 2024 | "Beyond Baby Blues: Pathophysiology, Psychopharmacology, and New Treatments in Postpartum Depression,"10th Annual Psychopharmacology Update 2024, Miami, FL, by Clinical Care Options CME |
| 2024 | "Empowering Recovery: Targeted Therapies for Postpartum Depression," 11th Annual Mood Disorders Summit, Scottsdale, AZ by Clinical Care Options CME |
| 2024 | "Clinical Updates in Postpartum Depression Management: Integrating Novel Therapeutics Targeting GABA-A Receptors in Practice," American College of Obstetrics and Gynecology Symposium, San Francisco, CA |
| 2023 | "Management of Psychiatric Disorders during and after Pregnancy," SMI Advisor, American Psychiatric Association webinar |
| 2023 | "Opioid Use Disorder: Concerns during Pregnancy," Project ECHO (Extension for Community Health Care Outcomes), Opioid Course for Virginia Providers, "Substance misuse and Opioid Use Disorders." |
| 2022 | Author of CME content for "GABA Receptor Modulators for Postpartum Depression" In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series |
| 2021 | Author of CME content for "Management of Depression in Pregnancy," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series. |
| 2021 | Author of CME content for "Management of Anxiety in Pregnancy," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series |
| 2021 | Author of CME content for "Perimenopausal Depression," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series |

| | |
|---|---|
| 2021 | Author of CME content for "Postpartum Psychosis," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series |
| 2019 | Author of CME content for "Management of Bipolar Disorder during and after Pregnancy," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series. |
| 2019 | Author of CME content for "Myths and Realities of Antidepressant Use in Pregnancy," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series. |
| 2019 | Medscape Video Curbside Consult: "Three Steps for Effective Diagnosis of Postpartum Depression." Developed content and participated in videotaping. |
| 2018 | Author of CME content for "Evaluation and Treatment of Premenstrual Mood Disorders," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series. |
| 2018 | Author of CME content for "Peripartum Depression: Update on Assessment and Management," In: American Physician Institute for Advanced Professional Studies (API) CMEtoGO Audio Series. |
| 2013 | Faculty Speaker for "Optimizing Assessment and Management of Patients with Depression: A Case-based Virtual CME Summit Series," live video telecast of lecture and questions and answers from online audience. |
| 2013 | Faculty Speaker for "A Close Look at Treatment-Resistant Depression," live video telecast of lecture and questions and answers from online audience |
| 2012 | Author of CME content for "The management of major depression in pregnancy" In: Cyberounds (www.Cyberounds.com). |
| 2010 | Course Director and Participant for "Improving Bipolar Disorder Health Outcomes Through Integrated Care," online interactive CME presentation and case review |
| 2008 | Course Director and Participant for "The Hidden Peril of Mixed Bipolar Episodes in Primary Care," DVD. |
| 2008 | Faculty Reviewer of "Differential Diagnosis and Management of Bipolar II Disorder," Monograph. |

## OTHER PROFESSIONAL ACTIVITIES (BOARDS, EDITORSHIPS, ETC.)

**Editorial Board Appointments**

| | |
|---|---|
| 2023-present | Section Editor, UpToDate, Perinatal Depression |
| 2020-present | Editorial Board, Archives of Women's Mental Health |
| 2018-present | Editorial Board, Brazilian Journal of Psychiatry |
| 2012-present | Editorial Board, Depression and Anxiety |
| 2007-2009 | Editorial Board, American Psychiatry News |

**Editor, Special Collections**

| | |
|---|---|
| 2023-2024 | Perinatal Mental Health, Acta Psychiatrica Scandinavica |
| 2023 | Special Report: Women's Mental Health, Psychiatric Times |

**Journal Peer Review Activities**

Ad hoc reviewer for:

American Journal of Obstetrics and Gynecology
American Journal of Psychiatry

Archives of General Psychiatry
Archives of Women's Mental Health
Australian and New Zealand Journal of Psychiatry
Biological Psychiatry
Biological Psychology
Bipolar Disorders
Birth Defects Research
BMC Health Services Research
BMC Pregnancy and Childbirth
BMC Psychiatry
British Medical Journal
British Journal of Psychiatry
Clinical Epidemiology
Data in Brief
Depression and Anxiety
Depression Research and Treatment
European Psychiatry
Expert Opinion on Drug Safety
Expert Opinion on Pharmacotherapy
Expert Review of Neurotherapeutics
Genes, Brain and Behavior
Harvard Review of Psychiatry
Journal of American Medical Association
Journal of American Medical Association, Psychiatry
Journal of Affective Disorders
Journal of Clinical Psychiatry
Journal of Clinical Psychopharmacology
Journal of Psychiatric Research
Journal of Psychosomatic Research
Journal of Women's Health
Molecular Psychiatry
Neuromolecular Medicine
Neuropsychopharmacology
Neurotherapeutics
Nutrition Research
Personalized Medicine in Psychiatry
Pharmacology and Therapeutics
Psychoneuroendocrinology
Revista Brasileira de Psiquiatria,  Brazilian Journal of Psychiatry

**Advisory Committees, Review Groups/Study Sections:**

| | |
|---|---|
| 2025 | Reviewer for Neurological, Mental and Behavioral Health (NMBH) Study Section |
| 2024 | Reviewer for CSR Biobehavioral Processes Special Emphasis Panel 10 ZRGBp-A(02) |
| 2023 | Reviewer for Department of Defense FY23 PRMRP FPA-PH (Psychological Health) |
| 2023 | Advisory Board Member for the eRose mobile phone app for the prevention of postpartum depression |
| 2023 | Reviewer for the United Kingdom's Medical Research Council |
| 2022 | Reviewer for Behavioral Genetics and Epidemiology Study Section (BGES) |

| | |
|---|---|
| | (virtual) |
| 2022 | Delegate to the American Board of Psychiatry and Neurology (ABPN) Forum on Supporting and Promoting Women in Academic Neurology and Psychiatry |
| 2022 | Reviewer for NIH Adult Psychopathology and Disorders of Aging (APDA) Study Section (virtual) |
| 2022 | Reviewer for US-Israel Binational Science Foundation |
| 2022 | Reviewer for the Wellcome Trust DBT India Alliance Fellowship |
| 2022 | Reviewer for Alliance for Innovation on Maternal Health of the American College of Obstetrics and Gynecology (ACOG)'s Maternal Mental Health Bundle. |
| 2021 | Reviewer for NIH Review for Social Epigenomics Research Focused on Minority Health and Health Disparities (virtual) |
| 2020 | Reviewer for NIH Review for Social Epigenomics Research Focused on Minority Health and Health Disparities (virtual) |
| 2020 | Reviewer for NIMH Review Panel for applications in response to RFA-MH-20-345, "Safety and Feasibility Trials for Rapid-Acting Interventions for Severe Suicide Risk." (virtual) |
| 2020 | External Reviewer for Health Research Council of New Zealand (HRC) for an international clinical trial in bipolar disorder |
| 2020 | Reviewer for Infectious, Reproductive, Asthma and Pulmonary Conditions Study Section (IRAP) (virtual) |
| 2020-present | Royal-Mach-Gaensslen Prize for Mental Health Research Prize Selection Committee (The Royal's Institute of Mental Health Research (IMHR), University of Ottawa, Canada). (virtual) |
| 2019-present | Advisory Board of the "Mind the Gap" Taskforce which is a Collective Impact Initiative led by Postpartum Support International (PSI), The Reilly Group, and other stakeholders, to set a strategic course to ensure perinatal mental health is a national priority. |
| 2019-2020 | Appointed to the "Pay for Metrics Workgroup" of the Healthy Brains Financing Initiative which seeks to "Establish a set of new global financing instruments that will measurably reduce the global burden of mental health, delivering fiscal returns to governments/sovereigns, sharing these with impact investors, and delivering human impact returns to individuals and societies" via a collaboration between One Mind and the National Academy of Medicine. |
| 2019 | National Academy of Sciences, Engineering and Medicine Workshop on Women's Mental Health, invited subject matter expert participant. |
| 2019 | Reviewer for Adult Psychopathology and Disorders of Aging (APDA) study section, San Francisco, CA |
| 2018-2019 | Scientific Advisory Board, The Royal Institute of Mental Health Research (IMHR), University of Ottawa, Canada |
| 2018-present | Scientific Advisory Board for the Marcé of North America (MONA) 2021 and 2023 meetings |
| 2018-2020 | Scientific Advisory Board for North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) 2020 meeting |
| 2018 | Reviewer for NIH Review ZRG1 BBBP-T (55) for the Program Announcements "Human-Animal Interaction (HAI) Research" |
| 2017 | Reviewer for NIH Review for Social Epigenomics Research Focused on Minority Health and Health Disparities |
| 2017 | Appointed to the Steering Committee for the National Academy of Sciences, Engineering, and Medicine Workshop "Women's Mental Health Across the Life Course Through a Sex-Gender Lens." |

| | |
|---|---|
| 2017 | Reviewer for NIH Review ZRG1 BBBP-T (55) for the Program Announcements "Human-Animal Interaction (HAI) Research" |
| 2016 | Stroum Fellowship for the University of Washington's Diabetes Research Center, Ad Hoc Grant Reviewer |
| 2016 | Departmental Reviewer for Venture Discovery Fund |
| 2016 | SAMHSA Clinical Treatment Options, Expert Panels Conference Participant |
| 2016 | DHHS Office of Women's Health Maternal Depression Advisory Meeting, Invited subject matter expert participant |
| 2016 | Johns Hopkins Psychiatry Department Reviewer for Venture Discovery Fund |
| 2015 | NIMH K99 Review Committee |
| 2009-2012 | Translational Research Center in Behavioral Sciences (TRCBS) at Emory University, DSMB Panel for the grant "Stress in Pregnancy" |
| 2010 | Special Emphasis Panel/Scientific Review Group 2010/08 ZRG1 PSE-K (55) R meeting |
| 2010 | Special Emphasis Panel/Scientific Review Group 2011/01 ZRG1 BBBP-T (10) B meeting |
| 2009 | Accelerated Translational Incubator Program for the Institute for Clinical and Translational Research, Ad Hoc Grant Reviewer |
| 2009 | BBBP, Biobehavioral and Behavioral Processes IRG, Challenge Grant Reviewer |
| 2009 | Foundation for Polish Science, Welcome Program, Ad Hoc Grant Reviewer |
| 2005-2008 | BBBP Biobehavioral and Behavioral Processes, Small Business Activities Panel (8 cycles) |
| 2007 | ZMH1-ERB, Special Emphasis Panel, NRSA Institutional Research Training Grants |
| 2005-2006 | ZMH1 ERB-W, ASCEND Review Panel, "Antidepressant Sequences/Combinations to Enhance Depression Treatment" (2 cycles) |
| 2005 | The Myositis Association, Ad Hoc Grant Reviewer |
| 2005 | The Wellcome Trust, Ad Hoc Grant Reviewer |

## CLINICAL ACTIVITIES

**Leadership**

| | |
|---|---|
| 2023-present | UVA Perinatal Mental Health Clinic, Director |
| 2023-2024 | UVA Brexanolone Service Line Leader |
| 2020-2021 | Johns Hopkins Brexanolone Unit Service Line Leader |
| 2008-2021 | Johns Hopkins Psychiatry Residents Mood Disorders Clinic, Director |
| 2004-2021 | Johns Hopkins Women's Mood Disorders Center, Director |
| 2008-2021 | Johns Hopkins Outpatient Residency Program, Co-Director |

**Inpatient**

<u>University of Virginia</u>

| | |
|---|---|
| 2021-present | UVA Inpatient and Consultation Call, approximately 8 weekends a year. Overnight telephone call approximately 10 nights per year. |

<u>Johns Hopkins</u>

| | |
|---|---|
| 2011-2021 | Inpatient attending on the Johns Hopkins Mood Disorders Unit and/or Chronic Pain service, 2-3 months per year. |
| 2003-2021 | Weekend inpatient attending on General Service or inpatient Pain and Geriatric units approximately five to seven weekends per year |
| 2003-2008 | Inpatient attending on Mood Disorders Unit two months per year |

**Outpatient**

University of Virginia

2021-present UVA Outpatient Clinic- long-term follow-up of approximately 45 outpatients

2021-present UVA Resident Clinic Supervision- Supervising PGY3 and PGY4 residents in evaluation and follow-up care of patients with psychiatric disorders on a weekly basis.

Johns Hopkins

2008-2021 Johns Hopkins Resident's Mood Disorders Clinic-Supervised residents in the evaluation and follow-up care of patients with mood disorders on a weekly basis. Provided two-three consults/intakes and 14-16 follow-ups per week.

2004-2021 Johns Hopkins Women's Mood Disorders Center consultations- I both conduct and supervise junior faculty and residents in evaluating women with mood disorders performing 1-4 consults weekly

2003-2021 Johns Hopkins Outpatient Clinic- long-term follow-up of approximately 200 outpatients

2012-2018 Harriet Lane Clinic- provided mental health services on a weekly basis to women whose children are evaluated in the Harriet Lane Pediatric Clinic.

2005-2011 Project Connections- provided mental health services on a weekly basis to women participating in the Healthy Start community program. This program is supported by private foundation grants through Johns Hopkins Bayview Community Psychiatry.

2003-2007 Mood Disorders Consultation Clinic-performed consults on approximately a weekly basis

**Virginia State**

2024-present Consultant for VMAP (Virginia Mental health Access Program), Maternal Mental Health Helpline- 10% weekly effort providing consultations to Virginia state providers evaluating pregnant and postpartum women for mental health concerns

**Clinical Productivity Summary:** I am currently (23/24 Academic Year, data through May) 35% above budget in work RVU's and 35% above budget in Gross Charges.

**SCHOOL, UNIVERSITY, UVA HOSPITALS, DEPARTMENTS, NATIONAL, AND STATE COMMITTEES & COUNCILS**

**School of Medicine**

University of Virginia

2024-present Chair, School of Medicine's Research Advisory Committee

2023-present School of Medicine's Research Advisory Committee

2023-present School of Medicine's Communications Committee

2023-present Brain Institute Internal Advisory Committee

2023 Selection Committee, Dean's Excellence in Faculty Research Award

2022 Molecular Physiology and Biological Physics Department Chair Search Committee

Johns Hopkins

2016-2021 Appointed to the Johns Hopkins CME Advisory Committee

2014-2021 Member, Professional Advisory Committee (PAC), Johns Hopkins

2014-2021 Department Liaison and Case Supervisor to Faculty and Staff Assistance Program (FASAP), Johns Hopkins

| | |
|---|---|
| 2018 | Internal reviewer for the Johns Hopkins Department of Gynecology and Obstetrics 5 year review |
| 2013 | Johns Hopkins Obstetrics and Gynecology Department Chair Search Committee |

**Department**

University of Virginia

| | |
|---|---|
| 2024-present | Departmental Promotions and Tenure Committee |
| 2023-present | Departmental Diversity, Equity and Inclusion Committee |
| 2021-present | Departmental Leadership Committee |
| 2021-2022 | Departmental Mentorship Program Development |
| 2021-present | Director, Launch Program for Junior Investigator Pilot Grants |
| 2022-2023 | Departmental Award Program Development |

Johns Hopkins

| | |
|---|---|
| 2020-2021 | Appointed to the Johns Hopkins Psychiatry Department COVID 19 Mental Health Response Team |
| 2014-2017 | Member, Task Force on Women Faculty, Johns Hopkins |
| 2013-2015 | Member, Psychiatry Department Research Conference Planning Committee, Johns Hopkins |

**State**

| | |
|---|---|
| 2016 | Testified to the State of Maryland Congress regarding the recommendations of the Maryland State Maternal Health Task Force |
| 2015-2016 | Appointed by Johns Hopkins and the Maryland governor to serve on the Maryland State Maternal Mental Health Task Force |
| 2024-present | Scientific Advisory Board member, iTHRIVE (Integrated Translational Health Research Institute of Virginia) |

**National**

| | |
|---|---|
| 2021-2022 | Appointed to State Mental Health Policy Advisory Group through the Council of State Governments |

**FINANCIAL RESOURCES (GRANTS AND CONTRACTS)**

**Federal**

Current

MPI: Epigenetic Biomarkers of Postpartum Psychosis, R21 MH134114 (Payne, Kaminsky): 8/2/2023-8/1/2025: $451,138

The goal of this study is to determine if our previously identified epigenetic biomarkers of postpartum depression are also associated with postpartum psychosis and to conduct an epigenome-wide association study for unique epigenetic biomarkers in samples collected from women with and without postpartum psychosis.

Co-I: Improving Maternal Mental health in Military-Affiliated Pregnant Women: Effectiveness of a Smart Bassinet, DOD PR230578 (Okun): 6/15/2024-6/14/2028: $3,649,824

This study will conduct a 2-arm randomized controlled trial to compare infant and maternal sleep of infants who use the SNOO bassinet compared to a standard bassinet plus white noise machine (usual care) and follow mother-infant pairs for 6 months post-delivery. Primary outcomes will be infant and maternal sleep and the development of postpartum depression as well as immune

function in the peripartum time-period.

MPI: 2/2 Allopregnanolone and Dynamic GABA-A Receptor Plasticity in Selective Serotonin Reuptake Inhibitor Responsive Premenstrual Dysphoric Disorder, 1R01MH134908 (Hantsoo and Payne): 8/1/24-4/30/29: $1,648,681
This study will collect a prospective sample of women with premenstrual dysphoric disorder (PMDD) who are responsive to selective serotonin reuptake inhibitors (SSRIs) compared to women without PMDD and examine peripheral neuroactive steroid levels, GABAA Receptor subunit changes and neurosteroid enzyme expression levels in order to identify changes that are associated with PMDD.

Site PI: PPD: Preventing Postpartum Depression: A Real-World Examination of a Predictive Test for PPD, DOD PR230933, (Kaminsky): 9/30/2024-9/29/2028: $6,045,550.
This study will randomize 1000 women in obstetrics clinics settings (UVA and Inova) to being either informed or not informed of their epigenetic biomarker for postpartum depression status during the third trimester. Clinical outcomes including rates of postpartum depression, rates of mental health referral and time to remission in the two groups will be compared.

Co-I: Validation and Identification of Epigenetic Biomarkers of PMDD R01 MH135896, (Hantsoo): 12/20/2024-10/31/2029: $3,192,901
This project seeks to replicate and extend preliminary data that found that our previously identified epigenetic biomarkers for postpartum depression are found in women with Premenstrual Dysphoric Disorder (PMDD) who respond to Selective Serotonin Reuptake Inhibitors. This project will replicate that finding in a larger sample and, in addition, perform an epigenome wide genetic association study to identify epigenetic biomarkers specific to PMDD.

MPI: miRNA Expression Patterns of Neuron Originating Exosomes and Postpartum Depression, R21 MH138836, (Roberson-Nay and Payne): 9/1/24-8/31/26: $450,217
This study will explore the link between postpartum depression and variations in the microRNA content of neuron-derived exosomes in existing samples across pregnancy and postpartum comparing women with and without postpartum depression.

PI: A Prospective Validation of the Enlighten Device in Predicting Postpartum Depression Using At-Home Sample Collection in Both Blood and Saliva, DOD PR240447, (Payne): 1/1/25-12/31/28. $4,032,394.
This project will prospectively validate the false and true positive and negative rates of previously identified biomarkers of postpartum depression in order to collect data for FDA approval. We will also expand the access and flexibility of the test through: a) testing in saliva as well as blood, to compare accuracy; and b) testing at 6 weeks postpartum, to determine the utility of testing at this time point.

MPI: Neuroactive Steroid Biosynthesis and Dynamic $GABA_A$ Receptor Reconfiguration in Postpartum Depression, DOD PR240186, (Payne, Pinna): 1/1/25-12/31/28. $2,730,470.
This study will collect a prospective sample of pregnant women at elevated risk for the development of postpartum depression as well as a sample of pregnant women at low risk for postpartum depression and compare peripheral neurosteroid levels, neurosteroid enzyme expression levels and $GABA_A$ Receptor subunit changes in those that develop postpartum depression compared to those that do not. The goal is a comprehensive examination of neuroactive steroids and the $GABA_A$ system in the development of postpartum depression.

Mentor: Epigenetic Biomarker Status, Negative Valence, and HPA-Axis Dysregulation: Mechanisms Underlying Risk for Postpartum Depression, F32 (Wenzel): 4/1/25-3/31/28. $255,391. This proposal will serve as Dr. Lizzie Wenzel's training grant for her postdoctoral work with me in the Reproductive Psychiatry Program. She will investigate HPA axis functioning and negative valence in women with and without epigenetic biomarkers for postpartum depression.

<u>Pending</u>
Co-I: Longitudinal Analysis of miRNA Alterations in Neuron Enriched Exosomes Across the Menopausal Transition, NIMH R01AG092481, (Roberson-Nay): 4/1/25-3/31/30. $3,802,179
The goal of this study is to examine the expression patterns of microRNA derived from neuron-enriched exosomes in order to understand how genes in the brain are regulated and to identify key pathways affects by the menopause transition.

<u>Completed</u>
Other Significant Contributor: Allopregnanolone and Gamma-Aminobutyric Acid Receptor (GABA-A-R) Plasticity in Women with Premenstrual Mood Symptoms, R21MH125936 (Hantsoo): 5/15/2022-4/30/2024 (NCE): $461,063
Allopregnanolone levels and GABA-A Receptor Subunit expression levels will be examined across the course of the menstrual cycle in women with and without premenstrual dysphoric disorder.

Multi-PI: Prospective Study of Epigenetic Markers of Postpartum Depression (R01 MH112704, (Payne and Kaminsky)): 4/1/2017-NCE: $2,163,058
This study will identify epigenetic markers of postpartum depression in a large sample (300) of pregnant and postpartum women with and without mood disorders.

Site PI: Personalized Integrated Chronotherapy for Perinatal Depression (R01MH118269): 2/1/2020-3/31/2023: $777,820.00
This multisite study will examine the efficacy of a personalized chronotherapy intervention in women with perinatal depression and anxiety symptoms.

Co-Investigator: Neuroimaging epigenetics of prospective postpartum depression biomarkers (R01MH104262 (Kaminsky-PI): 4/1/2014-6/30/2019: $1,621,509.00
This study examines neuroimaging and epigenetic biomarkers of postpartum depression in women with and without a history of mood disorders.

Co-I: Integrating Multiple Data Sources for Meta-Analysis to Improve Patient-Centered Outcomes Research (PCORI: ME-1303-5785 (Dickinson)): 6/1/13-5/31/15: $543,770.00
This study explored the reliability and validity of incorporating data from multiple data sources for two specific cases (gabapentin for neuropathic pain and quetiapine for bipolar disorder) in order to produce open access guidance about using multiple data sources.

Co-Investigator: Prevalence and Correlates of Minor Depression in Type 2 Diabetes (R03 DK088997 (Golden- PI)): 7/1/10-6/30/13: $375,555.55
The goal of this study was to test the hypothesis that minor depression among adults with type 2 diabetes (T2D) is prevalent and is associated with poor metabolic control, as is seen in major depressive disorder, and that this association might be explained by behavioral and biological factors associated with these disorders.

PI: Genetics of Postpartum Depression in Affective Disorders (K23 MH074799): 12/1/06-11/30/11: $847,006

This purpose of this mentored K23 career development award was to enable Dr. Payne to develop into an independent investigator in the genetics of affective disorders with an emphasis on hormonally-triggered symptoms in women, particularly postpartum depression.

**Pharmaceutical Company Support**

Current

PI: Myriad: Changes in sertraline metabolism during pregnancy and postpartum: informing the clinical validity of the GeneSight algorithm: (Payne): 4/30/2024-10/1/2024: $177,918.00
This study will determine when metabolism of sertraline, which is altered during pregnancy, returns to normal during the postpartum time-period.

Completed

Janssen Pharmaceuticals
Site PI: A Randomized, Double-blind, Multicenter, Parallel-group, Placebo-controlled Study to Evaluate the Efficacy, Safety, and Tolerability of Aticaprant10mg as Adjunctive Therapy in Adult Participants with Major Depressive Disorder(MDD) with moderate to severe Anhedonia and Inadequate Response to Current Antidepressant Therapy.: 08/01/2023-Ongoing
This multisite study will examine the efficacy of Aticaprant as an adjunctive therapy to antidepressant treatment in Major Depression with anhedonia.

Janssen Pharmaceuticals
Site PI: An open-label, long-term, Safety and Efficacy Study of Aticaprant as Adjunctive Therapy in Adult and Elderly Participants with Major Depressive Disorder (MDD).: 08/01/2023-Ongoing
This multisite study will examine the efficacy of Aticaprant as an adjunctive therapy to antidepressant treatment in Adults, including elderly patients, with Major Depression.

SAGE Therapeutics
Site PI: A multicenter, randomized, double-blind, parallel-group, placebo-controlled study evaluating the efficacy, safety and pharmacokinetics of SAGE-547 Injection in the treatment of adult female subjects with severe postpartum depression (SAGE 547-PPD-202): 12/1/15-8/31/16: $108,830.00
The study investigated the efficacy, safety and pharmacokinetics of allopregnanolone in the treatment of postpartum depression.

Corcept
Site PI: A Double-Blind, Placebo-Controlled Study of the Efficacy and Safety of CORLUX® (Mifepristone) vs. Placebo in the Treatment of Psychotic Symptoms in Patients with Major Depressive Disorder with Psychotic Features (ICON 115-006): 5/15/13-5/14/14: $210,358.00
This was a double-blind, placebo controlled trial of mifepristone in the treatment of Major Depression with Psychotic Features.

Repligen
PI: A Phase II Randomized, Double-Blind, Placebo-Controlled, Flexible-Dose Study to Assess the Safety, Tolerability and Efficacy of RG2417 (Uridine) in the Treatment of Bipolar I Depression (RG2417-03): 7/1/09-6/30/10: $114,775.00
This study examined the hypothesis patients with Bipolar I depression will experience improved depressive symptoms if randomized to Uridine, a compound involved in energy metabolism and DNA synthesis, as compared to placebo.

Novartis

Co-Investigator: Agomelatine in Major Depression (CAGO178A2303 (Mondimore-PI)): 4/1/07-3/31/09: $202,834.95
This study examined the efficacy of agomelatine in the treatment of Major Depression. It is a double-blind, placebo- and paroxetine-controlled multicenter study. 10 subjects will be recruited and randomized at Johns Hopkins.

**Other Support**
Current
UVA Brain Institute
PI: Epigenome-Wide Association Study of Newborns with In Utero Exposure to Antenatal Depression and/or Antidepressants11/15/23-12/31/24: $75,000
The major goals of this study are to 1) determine if our previously identified biomarkers of postpartum depression are inherited in infants and 2) identify unique epigenomic patterns associated with in utero maternal depression and/or antidepressant exposure.

UVA Dean's Office Shark Tank
PI: Postpartum Depression Research and Training Center Program Grant Development
Shark Tank was a competition at the SOM Research Retreat to obtain funding to provide preliminary data and effort support towards writing and submitting a Program Grant to NIH. This program provides $150,000 in funding to support preliminary data and salary support in order to promote the development and submission of a Program grant application.

UVA Vivian Pinn Scholar
PI: The Pinn Scholar's Program provides $120,000 to support the Scholar's research program, with an emphasis on developing the research in a new area.

Completed
Venture Discovery Fund, Johns Hopkins Department of Psychiatry
PI: A Pilot Study of the Prophylactic Management of Lamotrigine for Bipolar Disorder in Pregnant Women: 1/1/2018-12/31/2020: $50,000
This study is collecting pilot data testing a prophylactic therapeutic drug monitoring protocol for lamotrigine in pregnant women with bipolar disorder.

The Krieger Fund (PI: Solomon)
Co-Investigator (Clinician Supervisor): Enhancing Mental Health Services for Mothers and Infants at the Harriet Lane Clinic (90069526): 7/1/14-6/30/18: $253,792
The goal of this project was to expand the capacity of our urban primary care clinic to provide additional on-site maternal mental health treatment services, group-based interventions and intensive case management.

Stanley Medical Research Institute
PI: A Double-Blind Placebo-Controlled Trial of Valacyclovir in the Cognitive Impairment of Bipolar Disorder (6TGF-981): 4/1/07-3/31/10: $434,782.00
This study examined the hypothesis that subjects with Bipolar Disorder and cognitive impairment who are HSV-1 positive will experience improved cognitive functioning if randomized to valacyclovir as compared to placebo.

Stanley Medical Research Institute
PI: A Double-Blind, Placebo Controlled Trial of Riluzole in Bipolar Depression (03T-457): 3/1/04-2/28/07: $596,711.00

The major goal of this project was to test the hypothesis that riluzole, an antiglutamatergic agent, is more efficacious than placebo in patients with Bipolar I or II disorder who are currently episode depressed.

NARSAD Young Investigator
PI: An Examination of Genetic Polymorphisms Associated with Hormonally-Induced Mood Changes in Women with Mood Disorders (381-2035): 7/1/04-6/30/06: $60,000.00
The major goal of this project was to determine if the trait of mood symptoms which are triggered by hormonal fluctuations such as the menstrual cycle and in the postpartum period exhibits familiality (runs in some families and not others).

**PERSONNEL CURRENTLY SUPERVISED**
Meeta Pangtey, MPH, Research Program Manager
Kayla Pennycuff, BS, Clinical Research Coordinator
Lauren Williamson, PhD, Clinical Research Coordinator
Emmalee Johnson, BS, Clinical Research Coordinator
Katherine Wang, BS, Clinical Research Coordinator
Leena Pai, BS, Clinical Research Coordinator
Melanie Cottrell, BS, Clinical Research Coordinator
Mary "Ginny" Bowers, DNP, PMHNP-BC, CNM, IBCLC, Nurse Practitioner, Perinatal Mental Health Clinic
Lizzie Wenzel, PhD, Postdoctoral Student

**MENTORSHIP**

2023-present Elizabeth "Lizzie" Wenzel, PhD. Dr. Wenzel has recently completed her PhD in Behavioral Neuroscience and has joined the Reproductive Psychiatry Research Program as a postdoctoral student. Her F32 application, "Epigenetic Biomarker Status, Negative Valence, and HPA-Axis Dysregulation: Mechanisms Underlying Risk for Postpartum Depression," received a Percentile of 3rd percentile and we are hoping for funding notification shortly. She applied for and was awarded the UVA Bold Research Advancement in Neuroscience (BRAIN) postdoctoral fellowship which recognizes "exceptional talent in new postdoctoral fellows interested in pursuing a career in academia." I meet with her for mentorship on a weekly basis.

2023-present Preceptor Mentorship of Mary "Ginny" Bowers, DNP, PMHNP-BC, CNM, IBCLC for the Nurse Practitioner Program at Wilmington University for 210 hours toward completing her nurse practitioner degree. Ongoing mentorship and supervision in the Perinatal Mental Health Clinic on a weekly basis.

2023-2024 Mentorship of "Launch Program" grantees, Anne Louise Stewart, Lucy Guarnera, Jackie Sheppard on their proposed clinical research projects. The Launch Program provides junior faculty individual funding for one year on research projects and grantees are provided regular mentorship throughout the year of funding on their projects.

2022-2023 Mentorship of "Launch Program" grantees, Casey Cavanagh, Heather Brushwein, and Virginia Andersen on their proposed clinical research projects.

2021-present Anne Louise Stewart, MD. Dr. Steward is an Assistant Professor of Psychiatry at UVA and provides consult liaison psychiatry services on the inpatient medical services. I am providing research mentorship to Dr. Stewart. I have also served as her official mentor during her participation in the Junior Faculty Mentorship Program and more recently for the Educational Scholars program. We have

published one paper and one letter to the editor together.

2019-present Liisa Hantsoo, PhD. I recruited Dr. Hantsoo to join the Johns Hopkins faculty from the University of Pennsylvania in 2019. Dr. Hantsoo clinical and research interest is in Premenstrual Dysphoric Disorder, a type of reproductive depression. Dr. Hantsoo and I have published several papers together and I mentor her during a weekly hour-long meeting (including since my move to UVA). She was awarded a R21 on which I am listed as "Other Significant Contributor." She has also been appointed as the Research Director of the newly named Johns Hopkins Center for Women's Reproductive Health. She was just awarded her first R01, on which we are MPI (Neuroactive Steroid Biosynthesis and GABA-A-R Plasticity in SSRI-Responsive PMDD, 1R01MH134908 (Hantsoo and Payne)) and received a 3rd percentile score on another R01 (Validation and Identification of Epigenetic Biomarkers of PMDD R01 MH135896, (Hantsoo)) and has just received funding.

2018-present Julia Riddle, MD. Dr. Riddle was the third "Reproductive Psychiatry Fellow" from 2020-2022. Dr. Riddle and I wrote two papers together and I provided weekly supervision to her at our weekly Science Meeting. She has taken a job as an Assistant Professor at UNC where she works in the Center for Women's Mood Disorders.

2018-present Lindsay Standeven, MD. Dr. Standeven was the second "Reproductive Psychiatry Fellow" for the Women's Mood Disorders Center and ended her fellowship and joined faculty as an Assistant Professor in July of 2020. She completed two years of intensive clinical and research training through the WMDC in Reproductive Psychiatry. She is currently conducting a research project on the influence of hormonal contraceptive-based methods on mood and anxiety symptoms. We have published several research and review articles together and she's written a chapter for our book: Biomarkers of Postpartum Psychiatric Disorders. Dr. Standeven was also awarded a BIRCWH grant evaluating psychiatric symptoms and syndromes in women with polycystic ovarian syndrome. She became the Clinical Director of the newly named Johns Hopkins Center for Women's Reproductive Health. We continue to meet bi-weekly.

2016-2018 Katherine McEvoy, MD. Dr. McEvoy was the first "Reproductive Psychiatry Fellow" for the Women's Mood Disorders Center and began her fellowship in July of 2016. She completed two years of intensive clinical and research training through the WMDC in Reproductive Psychiatry. She returned to her native Ireland after fellowship and is conducting clinical work focused on women with psychiatric disorders in Galway, Ireland.

2014-present Lauren Osborne, MD. Dr. Osborne joined my group as junior faculty in 2014 as an Assistant Professor of Psychiatry and the Assistant Director of the Women's Mood Disorders Center. She completed clinical and research training in women's mental health at Columbia and specializes in the management of mood and anxiety disorders in women. She has successfully obtained NARSAD funding, funding from the NIH loan repayment program and has successfully obtained her K award entitled "Biological Mechanisms of Perinatal Anxiety" in June 2017. We have co-authored a number of papers, developed an education program for residents and fellows and frequently present together at conferences. We also co-edited a book together: Biomarkers of Postpartum Psychiatric Disorders published by Elsevier. Most recently, we have submitted two multi-site grants together to the DOD and continue our collaboration at our new institutions. One of these grants, studying neuroactive steroids in postpartum depression was recommended for funding.

2012-2014 Mary Kimmel, MD. I served as a mentor for Dr. Kimmel during her fellowship in

mood disorders with an emphasis on mood disorders in women. She published a first- author clinical research publication during her fellowship and helped start a successful embedded psychiatry clinic in the Harriet Lane Pediatric Clinic dedicated to treating mothers of pediatric patients. In total we have published 4 original research articles and one invited review together. Dr. Kimmel was successfully recruited to UNC as a Clinical Assistant Professor and serves as the Medical Director of the Perinatal Psychiatry Inpatient Unit, a one-of-a-kind psychiatry unit dedicated to psychiatric care of women during and after pregnancy. She has received her K award, "The Microbiota-Gut-Brain Axis and Postpartum Depression (MH110660-01) and contributed a chapter to the book "Biomarkers of Postpartum Psychiatric Disorders" which I am editing. We have also given several lectures together as part of symposium at major conferences such as Society for Biological Psychiatry.

2013-present Society of Biological Psychiatry Mentor. I serve as a mentor to a junior investigator attending the Annual SOBP meeting on an approximately yearly basis.

2007-2009 Emily Bost, M.D. Dr. Bost completed a fellowship year with me post-residency during which she focused on specialized training in mood disorders and clinical trial work. During the last year of her residency training I oversaw a chart review project on Bipolar Disorder and ECT that Dr. Bost designed.2007-2012 Jennifer Meuchel, M.D. Dr. Meuchel is currently a clinical associate in the Community Psychiatry Program at Hopkins. I supervised her conducting clinical consultation in the Women's Mood Disorders Center as well as clinical research interviews and follow-up appointments.

2007-2016 Jennifer Teitelbaum-Palmer, M.D. Dr. Palmer completed a fellowship year with me post-residency during which she focused on specialized training in mood disorders and clinical trial work. We have published one original research article, one case report and one invited review together. Dr. Palmer continued to work with me part-time in the Women's Center on a weekly basis until the end of 2016 when she began practicing in private practice full time. She has served as the President of the Maryland Psychiatric Society and has been named an APA Distinguished fellow.

2004-2012 Patricia Roy, M.D., Instructor of Psychiatry and Behavioral Sciences, Johns Hopkins School of Medicine. Dr. Roy completed a post-doctoral year (2004-2005) under my supervision and continued working with me during residency. I successfully recruited Dr. Roy to join my group in 2008 as a junior faculty. She left in 2012 to become the director of a psychiatric unit at Virginia Hospital Center and is currently working at the College of William and Mary as a clinical psychiatrist. We published 2 original research papers and one book chapter together.

2004-2007 Eve Fields, M.D. Currently Medical Director of Concert Health. I served as the mentor for Dr. Fields during her residency and oversaw a clinical research project that she conducted on depressive symptoms in adoptive mothers. This work has been published.

**PAPERS PUBLISHED**



**Peer Reviewed**

<u>Original Research</u>

1) **Payne JL**, Sabunciyan S. Liquid biopsies in psychiatric disorders: identifying peripheral biomarkers of brain health. Neural Regen Res. 2025 Jan 13. Epub ahead of print.

2) Osborne LM, Etyemez S, Pinna G, Alemani R, Standeven LR, Wang XQ, **Payne JL**. Neuroactive steroid biosynthesis during pregnancy predicts future postpartum depression: a role for the 3α and/or 3β-HSD neurosteroidogenic enzymes? Neuropsychopharmacology. 2025 Jan 30. Epub ahead of print.
3) Cunningham, AC, Hewings-Martin, Y, Wickham, AP, Prentice, C, **Payne, JL**, Zhaunova, L. Perimenopause symptoms, severity, and healthcare seeking in women in the US. NPJ Women's Health 2025 Feb; 3 (12), Epub ahead of print.
4) Schoretsanitis G, Osborne LM, Sundström-Poromaa I, Wenzel ES, **Payne JL**, Barbui C, Gastaldon C, Deligiannidis KM. Peripartum allopregnanolone blood concentrations and depressive symptoms: a systematic review and individual participant data meta-analysis. Mol Psychiatry. 2025 Mar;30 (3):1148-1160. Epub 2024 Nov 7.
5) Barone, JC, Ho, A, Osborne, LM, Eisenlohr-Moul, TA, Morrow, L, **Payne, JL**, Eppersom, CN, Hantsoo, L. Luteal phase sertraline treatment of premenstrual dysphoric disorder (PMDD): effects on markers of hypothalamic pituitary adrenal (HPA) axis activation and inflammation. Psychoneuroendocrinology. 2024 Nov;169:107145. Epub 2024 Jul 24.
6) Standeven, LR, Bajaj M, McEvoy K, Voegtline K, Shirinian, D, Osborne, LM, **Payne, JL**, Hantsoo, L. The link between childhood traumatic events and the continuum of premenstrual disorders. Frontiers in Psychiatry, section Perinatal Psychiatry. 2024, submitted. Front Psychiatry. 2024 Oct 9;15:1443352.
7) Hannan K, Li X, Mehta A, Yenokyan G, **Payne JL**, Shea AA, Hantsoo L. Mood symptoms and gut function across the menstrual cycle in individuals with premenstrual syndrome. Horm Behav. 2024 Nov;166:105634. Epub 2024 Sep 11
8) Niwa M, Lockhart S, Wood DJ, Yang K, Francis-Oliveira J, Kin K, Ahmed A, Wand GS, Kano SI, **Payne JL**, Sawa A. Prolonged HPA axis dysregulation in postpartum depression associated with adverse early life experiences: A cross-species translational study. Nat Ment Health. 2024 May;2(5):593-604.
9) Smirnova L, Modafferi S, Schlett C, Osborne LM, **Payne JL**, Sabunciyan S. Blood extracellular vesicles carrying brain-specific mRNAs are potential biomarkers for detecting gene expression changes in the female brain. Mol Psychiatry. 2024 Apr;29(4):962-973.
10) Miller KN, Standeven L, Morrow AL, **Payne JL**, Epperson CN, Hantsoo L. GABAergic neuroactive steroid response to sertraline in premenstrual dysphoric disorder. Psychoneuroendocrinology. 2024 Feb;160:106684. Epub 2023 Nov 30.
11) Cunningham, AC, Prentice, C, Peven, K, Wickham, A, Bamford, R, Radovic, T., Klepchukova, A, Fomina, M, Cunningham, K, Hill, SE, Hantsoo, L, **Payne, JL**, Zhaunova, L, Ponzo, S. "Efficacy of the Flo app in improving health literacy, menstrual and general health, and wellbeing in women: a pilot randomized controlled trial"*JMIR mHealth and uHealth,* 2024.
12) Etyemez S, Miller KN, Voegtline KM, Özdemir İ, Standeven LR, Santovito LS, Pinna G, **Payne JL**, Osborne LM. Metabolites of progesterone in pregnancy: Associations with perinatal anxiety. *Psychoneuroendocrinology*. 156:106327, 2023.
13) Hantsoo L., Rangswamy S., Voegtline K., Salimgaraev R., Zhaunova L., **Payne J.L.** Premenstrual symptoms across the lifespan in an international sample: data from a mobile application (electronic publication). *Archives of Women's Mental Health*. 25(5):903-910, 2022.
14) Osborne L.M., **Payne J.L.,** Sherer M.L., Sabunciyan S. Altered extracellular mRNA communication in postpartum depression is associated with decreased autophagy. *Mol Psychiatry*. 27(11):4526-4535, 2022.
15) Ponzo S, Wickham A, Bamford R, Radovic T, Zhaunova L, Peven K, Klepchukova A, **Payne JL**. Menstrual cycle-associated symptoms and workplace productivity in US employees: A cross-sectional survey of users of the Flo mobile phone app. *Digit Health*. Dec. 15, 2022.
16) Bradshaw H., Riddle J.N., Salimgaraev R., Zhaunova L., **Payne J.L**. Risk factors associated with postpartum depressive symptoms: a multinational study. *J Affect Disord*. 301: 345-351, 2022.

17) Bajaj M.A., Salimgaraev R., Zhaunova L., **Payne J.L**. Rates of self-reported postpartum depressive symptoms in the United States before and after the start of the COVID-19 pandemic. *J Psychiatr Res*. 151:108-112, 2022.
18) Standeven L.R., Osborne L.M., Betz J.F., Yenokyan G., Voegtline K., Hantsoo L., **Payne J.L.** Allopregnanolone and depression and anxiety symptoms across the peripartum: an exploratory study. *Arch Womens Ment Health*. 25(2):521-526, 2022.
19) Osborne L.M., Voegtline K., Standeven L.R., Sundel B., Pangtey M., Hantsoo L., **Payne J.L**. High worry in pregnancy predicts postpartum depression. *J Affect Disord*. 294:701-706, 2021.
20) Standeven L.R., **Payne J.L.**, Pangtey M., Osborne L.M. Lack of psychotropic medication changes among mood disordered women across the peripartum period. *Hum Psychopharmacol*. 36(5): e2786, 2021.
21) Voegtline K., **Payne J.L.**, Standeven L.R., Sundel B., Pangtey M., Osborne L.M. Using the Penn State Worry Questionnaire in the peripartum. *J Womens Health (Larchmt)*. 30(12):2762-2768, 2021.
22) Kaminsky Z., Osborne L., Guglielmi V., Jones I., Grenier W., Clark K., Ross E., Meilman S., Nestadt P., **Payne J.L.**, Samuels J., Nestadt G. Postpartum depression biomarkers predict exacerbation of OCD symptoms during pregnancy. *Psychiatry Research*. 293:113332, 2020.
23) **Payne J.L.**, Osborne L.M., Cox O., Kelly J., Meilman S., Jones I., Grenier W., Clark K., Ross E., McGinn R., Wadhwa P.D., Entringer S., Dunlop A.L., Knight A.K., Smith A.K., Buss C., Kaminsky Z.A. DNA methylation biomarkers prospectively predict both antenatal and postpartum depression. *Psychiatry Research*. 285:112711, 2020.
24) McEvoy K.M., Rayapati D., Washington Cole K.O., Erdly C., **Payne J.L.**, Osborne L.M. Poor Postpartum Sleep Quality Predicts Subsequent Postpartum Depressive Symptoms in a High-Risk Sample. *J Clin Sleep Med*. 15(9):1303-1310, 2019.
25) Osborne L.M., Betz J.F., Yenokyan G., Standeven L.R., **Payne J.L**. The role of allopregnanolone in pregnancy in predicting postpartum anxiety symptoms. *Frontiers in Psychology*. 10:1033, 2018.
26) Mayo-Wilson E., Golozar A., Cowley T., Fusco N., Gresham G., Haythornthwaite J., Tolbert E., **Payne J.L.**, Rosman L., Hutfless S., Canner J.K., Dickersin K. Methods to identify and prioritize patient-centered outcomes for use in comparative effectiveness research. *BMC Pilot and Feasibility Studies*. 4:95, 2018.
27) Knight A.K., Conneely K.N., Kilaru V., Cobb D., **Payne J.L.**, Meilman S., Corwin E.J., Kaminsky Z.A., Dunlop A.L., Smith A.K. *SLC9B1* Methylation Predicts Fetal Intolerance of Labor (electronic publication). *Epigenetics*. 13(1):33-39, 2018.
28) Mayo-Wilson E., Li T., Fusco N., Bertizzolo L., Canner J., Cowley T., Doshi P., Ehmsen J., Gresham G., Guo N., Haythornthwaite J.A., Heyward J., Hong H., Lock D., **Payne J.L.**, Rosman L., Stuart E.A., Suarez-Cuervo C., Tolbert E., Twose C., Vedula S., Dickersin K. Cherry-picking by trialists and meta-analysts can drive conclusions about intervention efficacy. *J Clin Epidemiol*. 91:95-110, 2017.
29) Postpartum Depression: Action Towards Causes and Treatment (PACT) Consortium: Putnam K., Wilcox M., Robertson-Blackmore E., Sharkey K., , Bergink V., Munk-Olsen T., Deligiannidis K., **Payne J.L.**, Altemus M., Newport J., Apter G., Devouche E., Viktorin A., Magnusson P[13]., Lichtenstein P., Penninx B., Buist A., Bilszta J., O'Hara M., Stuart S., Brock R., Roza S., Tiemeier H., Guille C., Epperson C.N., Kim D., Schmidt P., Martinez P., Wisner K.L., Stowe Z., Jones I., Sullivan P.F., Rubinow D., Wildenhaus K., Meltzer-Brody S. Clinical phenotypes of perinatal depression are associated with time of symptom onset: Findings from an International Consortium. *Lancet Psychiatry*. 4(6):477-485, 2017.
30) Shin N., Hill-Briggs F., Langan S., **Payne J.L.**, Lyketsos C., Golden S.H. The association of minor and major depression with health problem-solving and diabetes self-care activities in a

clinic-based population of adults with type 2 diabetes mellitus. *J Diabetes Complications.* 31 (5): 880-885, 2017.

31) Golden S.H., Shah N., Naqubuddin M., **Payne J.L.**, Hill-Briggs F., Wand G.S., Wang N.Y., Langan S., Lyketsos C. The prevalence and specificity of depression diagnosis in a clinic-based population of adults with type 2 diabetes mellitus. *Psychosomatics*. 58(1):28-37, 2017.

32) Osborne L.M., Gispen F., Sanyal A., Yenokyan G., Meilman S., **Payne J.L**. Lower allopregnanolone during pregnancy predicts postpartum depression: An exploratory study. *Psychoneuroendocrinology*. 79:116-121, 2017.

33) Postpartum Depression: Action Towards Causes and Treatment (PACT) Consortium: DiFlorio A., Putnam K., Altemus M., Apter G., Bergink V., Bilszta J., Brock R., Buist A., Deligiannidis K.M., Devouche E., Epperson C.N., Guille C., Kim D., Lichtenstein P., Magnusson P.K., Martinez P., Munk-Olsen T., Newport J., **Payne J.L.**, Penninx B.W., O'Hara M., Robertson-Blackmore E., Roza S.J., Sharkey K.M., Stuart S., Tiemeier H., Viktorin A., Schmidt P.J., Sullivan P.F., Stowe Z.N., Wisner K.L., Jones I., Rubinow D.R., Meltzer-Brody S. The impact of education, country, race and ethnicity on the self-report of postpartum depression using the Edinburgh Postnatal Depression Scale. *Psychol Med*. 2(1):59-67, 2016.

34) Kimmel M.C., Platt R.E., Steinberg D.N., Cluxton-Keller F., Osborne L.M., Carter T., **Payne J.L.**, Solomon B.S. Integrating maternal mental health care in the pediatric medical home: treatment engagement and child outcomes (electronic publication). *Clin Pediatr*. 56(12)1148-1156, 2016.

35) Clive M.L., Boks M.P., Vinkers C.H., Osborne L.M., **Payne J.L.**, Ressler K.J., Smith A.K., Wilcox H.C., Kaminsky Z. Discovery and replication of a peripheral tissue DNA methylation biosignature to augment a suicide prediction model. *Clinic Epigenetics*. 8:113, 2016.

36) Kimmel M., Clive M., Gispen F., Gunitivano J., Brown T., Cox O., Beckmann M.W., Kornhuber J., Fasching P.A., Osborne L.M., Binder E., **Payne J.L.**, Kaminsky Z. Oxytocin receptor DNA methylation in postpartum depression. *Psychoneuroendocrinology*. 69:150-60, 2016.

37) Postpartum Depression: Action Towards Causes and Treatment (PACT) Consortium: Putnam K.T., Robertson-Blackmore E., Sharkey K.M., **Payne J.L.**, Bergink V., Munk-Olsen T., Deligiannidis K.M., Altemus M., Newport D.J., Apter G., Devouche E., Vikorin A., Magnusson P.K., Lichtenstein P., Penninx B.W., Buist A., Bilszta J., O'Hara M.W., Stuart S., Brock R.L., Roza S.J., Tiemeier H., Guille C., Epperson C.N., Kim D.R., Schmidt P.J., Martinez P., Wisner K.L., Stowe Z.N., Jones I., Rubinow D.R., Sullivan P.F., Meltzer-Brody S. Heterogeneity of postpartum depression: a latent class analysis. *Lancet Psychiatry*. 2(1):59-67, 2015.

38) Osborne L., Clive M., Kimmel M., Gispen F., Guintivano J., Brown T., Cox O., Judy J., Meilman S., Braier A., Beckmann M.W., Kornhuber J., Fasching P.A., Goes F., **Payne J.L.**, Binder E.B., Kaminsky Z. Replication of epigenetic postpartum depression biomarkers and variation with hormone levels. *Neuropsychopharmacology*. 41(6):1648-58, 2015.

39) Mayo-Wilson E., Hutfless S., Li T., Gresham G., Fusco N., Ehmsen J., Heyward J., Vedula S., Lock D., Haythornthwaite J., **Payne J.L.**, Cowley T., Tolbert E., Rosman L., Twose C., Stuart E.A., Hong H., Doshi P., Suarez-Cuervo C., Singh S., Dickersin K. Integrating multiple data sources (MUDS) for meta-analysis to improve patient-centered outcomes research: a protocol for a systematic review. *Systematic Review*. 2(4):143, 2015.

40) Kimmel M., Hess E., Roy P.S., Palmer J.T., Meltzer-Brody S., Meuchel J.M., Bost-Baxter E., **Payne J.L**. Family history, not lack of medication use, is associated with the development of postpartum depression in a high risk sample. *Archives of Women's Mental Health*. 18(1):113-21, 2015.

41) Guintivano J., Brown T., Newcomer A., Jones M., Cox O., Maher B.S., Eaton W.W., **Payne J.L.**, Wilcox H.C., Kaminsky Z.A. Identification and replication of a combined epigenetic and genetic biomarker predicting suicide and suicidal behaviors. *American Journal of Psychiatry*. 171(12):1287-96, 2014.

42) Guintivano J., Arad M., Gould T.D., **Payne J.L.**, Kaminsky Z. Antenatal prediction of postpartum depression with blood DNA methylation biomarkers. *Molecular Psychiatry*. 19(5):560-7, 2014.

43) **Payne J.L.**, Fields E.S., Meuchel J.M., Jaffe C.J., Jha M. Post adoption depression: a model for environmental influences of postpartum depression. *Archives of Women's Mental Health*. 13 (2): 147-151, 2010.

44) Mahon P.B.,***Payne J.L.**,* MacKinnon D.F., Mondimore F.M., Schweizer B., Jancic D., NIMH Genetics Initiative Bipolar Disorder Consortium, BiGS Consortium, Crowe R.P., Coryell W.H., Holmans P.A., Knowles J.A., Scheftner W.A., Weissman M.M., Levinson D.F., DePaulo J.R., Zandi P.P., Potash J.B. Genome-wide linkage and follow-up association study of postpartum mood symptoms. *American Journal of Psychiatry*. 166(11):1229-1237, 2009. *Shared First authorship

45) **Payne J.L.**, Klein S.R., Zamoiski R.B., Zandi P.P., Bienvenu O.J., MacKinnon D.F., Mondimore F.M., Schweizer B., Swartz K.L., NIMH Genetics Initiative Bipolar Disorder Consortium, Crowe R.P., Scheftner W.A., Weissman M.M., Levinson D.F., DePaulo J.R., Potash J.B. Premenstrual mood symptoms: study of familiality and personality correlates in mood disorder pedigrees. *Archives of Women's Mental Health*. 12(1):27-36, 2009.

46) **Payne J.L.**, MacKinnon D.F., Mondimore F.M., McInnis M.G., Schweizer B., McMahon F.J., Nurnberger J.I., Rice J.P., Scheftner W., Coryell W., Berrettini W.H., Kelsoe J.R., Byerley W., Murphy D.L., Gershon E.S., DePaulo J.R., Potash J.B. Familial aggregation of postpartum mood symptoms in families with bipolar disorder. *Journal of Bipolar Disorders*. 10(1):38-44, 2008.

47) **Payne J.L.**, Roy P.S., Murphy-Eberenz K., Weissman M.M., Swartz K.L., McInnis M.G., Nwulia E., Mondimore F.M., MacKinnon D.F., Miller E.B., Nurnberger J.I., Levinson D.F., DePaulo J.R., Potash J.B. Reproductive cycle-associated mood symptoms in women with major depression and bipolar I disorder. *Journal of Affective Disorders*. 99:221-229, 2007.

48) Murphy-Eberenz K., Zandi P.P., March D., Crowe R.R., Scheftner W.A., Alexander M., McInnis M.G., Coryell W., Adams P., DePaulo J.R., Miller E.B., Marta D.H., Potash J.B., **Payne J.L.**, Levinson D.F. Is perinatal depression familial? *Journal of Affective Disorders*. 90(1):49-55, 2006.

49) Zarate C.A., **Payne J.L.**, Quiroz J.A., Sporn J., Denicoff K.K., Luckenbaugh D., Charney D.S., Manji H.K. An open-label trial of riluzole in patients with treatment-resistant major depression. American *Journal of Psychiatry*. 161:171-174, 2004.

50) Zarate C.A, **Payne J.L.**, Singh J., Quiroz J., Luckenbaugh D., Denicoff K.K., Charney D.S., Manji H.K. Pramipexole for bipolar II depression: a placebo-controlled proof of concept study. *Biological Psychiatry*. 56(1):54-60, 2004.

51) **Payne J.L.**, Sheppard J.E., Steinberg M., Warren A., Baker A., Steele C., Brandt J., Lyketsos C.G. Incidence, prevalence and outcomes of depression in residents of a long-term care facility. *International Journal of Geriatric Psychiatry*. 17(3):247-253, 2001.

52) **Payne J.L.**, Lyketsos C.G., Steele C., Baker L., Galik E., Kopunek S., Steinberg M., Warren A. Relationship of cognitive and functional impairment to depressive features in Alzheimer's disease and other dementias. *Journal of Neuropsychiatry*. 10(4):440-446, 1998.

53) Etcheberrigaray R., **Payne J.L.**, Alkon D. Soluble β-amyloid induces Alzheimer's disease features in human fibroblasts and in neuronal tissues. *Life Sciences*. 59(5/6):491-498, 1996.

Review Articles

1) Clark CT, **Payne JL**. Gender Diversity in the Psychiatric Workforce: It's Still a (White) Man's World in Psychiatry. Child Adolesc Psychiatr Clin N Am. 2024. 33(1):45-52.

2) Londoño Tobón A, McNicholas E, Clare CA, Ireland LD, **Payne JL**, Moore Simas TA, Scott RK, Becker M, Byatt N. The end of Roe v. Wade: implications for Women's mental health and care. Front Psychiatry. 2023 May 5;14:1087045. doi: 10.3389/fpsyt.2023.1087045. PMID:

37215676; PMCID: PMC10196497.
3) Hantsoo L, **Payne JL**. Towards understanding the biology of premenstrual dysphoric disorder: From genes to GABA. *Neurosci Biobehav Rev*. 2023 Jun;149:105168.
4) Stewart A.L., **Payne J.L.** Perinatal Depression: A Review and an Update. *Psychiatr Clin North Am*. 46(3):447-461, 2023.
5) Clark C.K., **Payne J.L**. Gender diversity in the psychiatric workforce: it's still a (white) man's world in psychiatry. *Psychiatr Clin North Am*. 2022, 45(2):271-278, 2022.
6) Riddle J.N.**, Payne J.L.** The Unimaginable: pregnancy and infant loss in psychiatric practice. *Psychiatric Times*. 2021.
7) Standeven L.R., Olson E., Leistikow N., **Payne J.L.**, Osborne L.M., Hantsoo L. Polycystic ovary syndrome, affective symptoms, and neuroactive steroids: a focus on allopregnanolone. *Curr Psychiatry Rep*. 23(6):36, 2021.
8) **Payne J.L**. Evaluating brexanolone for the treatment of postpartum depression. *Expert Opin Pharmacother*. 22(8):959-964, 2021.
9) **Payne J.L**. Psychiatric medication use in pregnancy and breastfeeding. *Obstet Gynecol Clin North Am*. 48(1):131-149, 2021.
10) **Payne J.L.** The search for postpartum depression biomarkers (electronic publication). *Psychiatric Times*. 2021.
11) **Payne J.L.** Common errors psychiatrists make when managing mood disorder in pregnant patients. *Psychiatric Times*. 37(3):16-17, 2020.
12) Sayres Van Niel M., **Payne J.L**. Perinatal depression: a review. *Cleveland Clinic Journal of Medicine*. 87(5):273-277, 2020.
13) **Payne J.L**. Psychopharmacology in pregnancy and breastfeeding. *Medical Clinics of North American*. 40(2):217-238, 2019. (Reissue).
14) **Payne J.L.** Reproductive psychiatry: giving birth to a new subspecialty. Editor of "Reproductive Psychiatry," *Special Issue for International Psychiatry*. 40(2):217-238, 2019.
15) **Payne** J.L, Maguire J. Pathophysiological mechanisms implicated in postpartum depression, Special Issue: "Parental Brain and Behavior," *Frontiers in Neuroendocrinology*. 52:165-180, 2019.
16) McEvoy K., **Payne J.L.**, Osborne L.M. Neuroactive steroids and perinatal depression: a review of recent literature. *Current Psychiatry Reports*. 20(9):78, 2018.
17) Standeven L., Osborne L.M., **Payne J.L**. The Trouble with Don't Ask Don't Tell: Commentary on "Depression Screening during Pregnancy and the Postpartum Period: Enhancing Informed Consent Practices," *Women's Reproductive Health*. 5:1,25-31, 2018.
18) **Payne J.L.** Book Forum: "The Psychosis of Menstruation and Childbearing." *American Journal of Psychiatry*. 175(2):190–191, 2018.
19) McEvoy K., Osborne L.M., **Payne J.L**. Reproductive Affective Disorders: A Review of the Genetic Evidence for Premenstrual Dysphoric Disorder and Postpartum Depression, *Current Psychiatry Reports*. 30;19(12):94, 2017.
20) **Payne J.L**. Psychopharmacology in pregnancy and breastfeeding. In: *Women's Mental Health Issue of Psychiatric Clinics of North American* (Edited by Pearlstein). 40(2):217-238, 2017.
21) Osborne L.M., McEvoy K., **Payne J.L**. Antidepressants in pregnancy: balancing needs and risks in clinical practice. *Psychiatric Times Special Report*. 2017.
22) **Payne J.L.** Recent advances and controversies in peripartum depression. *Current Obstetrics and Gynecology Reports*. 5:250-56, 2016.
23) Chisolm M.S., **Payne J.L**. Management of psychotropic drugs during pregnancy. *British Medical Journal*. 20;532:h5918, 2016.
24) Osborne L., **Payne J.L**. Antidepressants, pregnancy, and stigma: how we are failing mothers and babies. *The Journal of Nervous and Mental Disease*. 203(3):164-6, 2015.
25) Kaminsky Z., **Payne J.L**. Seeing the future: epigenetic biomarkers of postpartum depression. *Neuropsychopharmacology*. 39:234, 2014.

26) Uher R., **Payne J.L.**, Pavlova B., Perlis R.H. Major depressive disorder in DSM-5: implications for clinical practice and research of changes from DSM-IV. *Depression and Anxiety*. 31(6):459-71, 2014.
27) Kimmel M., Kaminsky Z., **Payne J.L**. Biomarker or pathophysiology? The role of DNA methylation in postpartum depression. *Epigenomics*. 5(5):473-5, 2013.
28) Richards E., **Payne J.L**. Management of depression during pregnancy: alternatives to antidepressants. *CNS Spectrums*. 18(5):261-71, 2013.
29) **Payne J.L.**, Meltzer-Brody S. Antidepressant use during pregnancy: current controversies and treatment strategies. *Clinical Obstetrics and Gynecology*. 52(3):469-82, 2009.
30) **Payne J.L.**, Teitelbaum-Palmer J., Joffe H. A reproductive subtype of depression: conceptualizing models and moving towards etiology. *Harvard Review of Psychiatry*. 17(2):72-86, 2009.
31) Meltzer-Brody S., **Payne J.L.**, Rubinow D. Postpartum depression: evolving etiology and treatment considerations. *Current Psychiatry*. 7(5):87, 2008.
32) **Payne J.L**. Antidepressant use in the postpartum period: practical considerations. *American Journal of Psychiatry*. 164(9):1329-32, 2007.
33) **Payne J.L**. Evaluation of outcomes with citalopram for depression using measurement-based care in STAR*D: implications for clinical practice. Invited Review. *Nature Clinical Practice Neurology*. 2(10):2-3, 2006.
34) **Payne J.L**, Potash J.B., DePaulo J.R. Recent Findings on the genetic basis of bipolar disorder. *Psychiatric Clinics of North America*. 28(2):481-498, 2005.
35) Quiroz J., **Payne J.L.**, Zarate C.A., Jr. A selected review of novel pharmacologic strategies for treatment of acute mania. *Clinical Approaches in Bipolar Disorders*. 2(1):13-23, 2003.
36) **Payne J.L**. The role of estrogen in mood disorders in women. *International Review of Psychiatry*. 15:279-289, 2003.
37) Manji H.K., Quiroz J.A., **Payne J.L.**, Singh J., Lopes B.P., Viegas J.S., Zarate C.A. The underlying neurobiology of bipolar disorder. *World Psychiatry*. 2(3):136-146, 2003.
38) Manji H.K., Quiroz J.A., Sporn J., **Payne J.L.**, Denicoff K., Gray N., Chen G., Zarate C.A., Charney D.S. Enhancing synaptic plasticity and cellular resilience to develop novel, improved therapeutics for difficult to treat depression. *Biological Psychiatry*. 53:707-742, 2003.
39) **Payne J.L**, Quiroz A.J., Zarate C.A., Manji H.K. Timing is everything: does the robust regulation of noradrenergicaly regulated plasticity genes underlie the rapid antidepressant effects of sleep deprivation? *Biological Psychiatry*. 52(10): 921-9261, 2002.
40) Zarate C.A., Quiroz J., **Payne J.L.**, Manji H.K. Modulators of the glutamatergic system: implications for the development of improved therapeutics in mood disorders. *Psychopharmacology Bulletin*. 36(4):35-83, 2002.

Editorials

1) Deligiannidis KM, **Payne JL**. Progress in perinatal mental health research. Acta Psychiatr Scand. 2024 Nov;150(5):249-252. Epub 2024 Aug 13.
2) Hantsoo, L, **Payne, JL**. Premenstrual dysphoric disorder (PMDD) affects five times as many individuals as postpartum depression, but receives 80% less NIH research funding. Journal of Women's Health, 2024. Journal of Women's Health, 2024 Oct;33(10):1296-1297. Epub 2024 Jul 22.
3) Londoño Tobón A, McNicholas E, Clare CA, Ireland LD, **Payne JL**, Moore Simas TA, Scott RK, Becker M, Byatt N. The end of Roe v. Wade: implications for Women's mental health and care. *Front Psychiatry,* 2023.
4) Byatt N., **Payne J.L.**, Becker M.A. Restricting rights to abortion is direct assault on women's mental health (electronic publication). *Psychiatric News*. 2022.

5) **Payne J.L.** Speaking out on schizoaffective disorder (electronic publication). *Psychiatric Times*. 2021.
6) **Payne J.L.**, Umberson D., Kellog E. Maternal Mental Health: Where Should Our Research and Policy Priorities Be? (electronic publication). *National Academy of Medicine, Washington, DC*. 2020.
7) **Payne J.L.** Yes or no: prescribing antidepressants to pregnant patients. *Psychiatric News Psychopharmacology*. 2(3), 2016.
8) **Payne J.L**. Antidepressant exposure during the first trimester does not increase the risk of cardiac malformations in infants. Invited Commentary on "Antidepressant Use in Pregnancy and the Risk of Cardiac Defects." *Evidence Based Mental Health*. 18(2):48, 2015.
9) **Payne J.L**. Use of antidepressants in the second trimester is associated with reduced pregnancy duration, and third trimester antidepressant use with infant convulsions. *Evid Based Nurs*. 16(3):74-5, 2012.
10) **Payne J.L**. Depression: is pregnancy protective? Invited Editorial of "Depression and Treatment among U.S. Pregnant and Non-pregnant Women of Reproductive Age, 2005-2009. *J Womens Health*. 21(8):809-10, 2012.
11) **Payne J.L**. Editorial: Bipolar disorder in women with premenstrual exacerbation. *American Journal of Psychiatry*. 168 (4): 344-346, 2011.

Letters to the Editor
1) Njoku IO, Stewart AL, **Payne JL**. The Case for Increased Psychiatric Training for Nonpsychiatric Physicians. Acad Med. 2025 Feb 1;100(2):121-122. Epub 2024 Nov 15.
2) Leistikow N., Smith M., Payne J., Osborne L. Is valproate reasonable ? Commentary on: "Standard of care : reasonable but not perfect" by Suri et al. in March 2020 *American Journal of Psychiatry*. 178(1): 99, 2021.

**Books and/or Chapters**
Books
**1)** Biomarkers of Postpartum Psychiatric Disorders. Editors **Payne J.L.** and Osborne L.M. Elsevier Publishing. 2019.

Chapters
1) **Payne J.L.**, Kornstein S.G. Psychiatric conditions during peripartum and perimenopause. In: Psychiatry, 5th edition (Edited by Tasman, Lieberman, Kay, First, Riba). John Wiley & Sons, 2023.
2) **Payne J.L**. Genetic basis for postpartum depression. In: Biomarkers of Postpartum Psychiatric Disorders. Editors **Payne J.L.** and Osborne L.O. Elsevier Publishing. 2019.
3) Kaminsky Z., **Payne J.L.** Epigenetic biomarkers of postpartum depression. In: Biomarkers of Postpartum Psychiatric Disorders. Editors **Payne J.L.** and Osborne L.O. Elsevier Publishing. 2019.
4) **Payne J.L**. Psychopharmacology in pregnancy and lactation. In: Women's Mental Health – A Clinical and Evidence-Based Guide. (Editors: Rennó Jr, Valadares, Cantilino, Mendes-Ribeiro, Rocha, Geraldo da Silva.) Springer International Publishing, 2018.
5) **Payne J.L**. Postpartum psychosis: epidemiology, clinical manifestations, assessment and diagnosis. In: UpToDate (www.UpToDate.com) (Edited by Marder, Hermann). Wolters Kluwer, 2017.
6) Osborne L.M., **Payne J.L**. Depression and Anxiety Monograph. In: Clinical Updates in Women's Health Care. American College of Obstetrics and Gynecologists (Edited by Snyder), 2017.

7) **Payne J.L.** The management of bipolar disorder during and after pregnancy. In: Bipolar Depression: Molecular Neurobiology, Clinical Diagnosis and Pharmacotherapy, 2nd Edition (Edited by Zarate, Manji). Springer International Publishing, 2016.
8) **Payne J.L.**, Kornstein S.G. Psychiatric conditions during peripartum and perimenopause. In: Psychiatry, 4th edition (Edited by Tasman, Lieberman, Kay, First, Riba). John Wiley & Sons, 2015.
9) Rogan S.C., **Payne J.L.**, Meltzer-Brody S. Relationship between depressive mood and maternal obesity: implications for postpartum depression. In: Obesity during Pregnancy in Clinical Practice. Springer, Inc. 2013.
10) Roy P., **Payne J.L**. The use of psychotropic medications in bipolar disorder during pregnancy. In: Bipolar Depression: Molecular Neurobiology, Clinical Diagnosis, and Pharmacotherapy (Edited by Zarate, Manji). Milestones in Drug Therapy Series, (Edited by Parnham, Bruinvels). Birkhäuser Publishing, 2008.
11) **Payne J.L.**, Quiroz J., Gould T.D., Zarate C.A., Manji H.K. The cellular neurobiology of bipolar disorder. In: The Neurobiology of Mental Illness (Edited by Charney, Nestler). Oxford University Press, New York, NY. 2005.

*I*

**TECHNOLOGY TRANSFER ACTIVITY**

Issued Patent:
Patent number 13851897.2-1403 PCT/US2013068241 "DNA Methylation Biomarkers of Postpartum Depression Risk."

Patent Application Filed:
Patent Application Serial No.: 63/373,151, filed August 22, 2022
A Method to Identify Serotonin Reuptake Inhibitor Responders and Non-Responders in Women with Reproductive Depression

Dionysus Health
Dr. Zach Kaminsky and I are working with the start-up health company, Dionysus Health, to begin the process of bringing our epigenetic biomarkers to market. While serving as a non-paid consultant, I have "Founder's Stock" in Dionysus Health. The company is currently in the 4th round of NIH's RADX Prize challenge for Maternal Mental Health and has a DOD grant that has been recommended for funding to examine the use of the biomarkers in real-world obstetrics settings. Dionysus is currently negotiating for the rights to use the above two patents.

**INVITED LECTURES AND SYMPOSIUMS**

National
2025 "The Time is Now- Barriers and Solutions for an ACGME requirement in Reproductive Psychiatry," APA Council on Women's Mental Health, American Association of Directors of Psychiatric Residency Training (AADPRT) annual meeting, San Francisco, CA
2025 "The Hunt for the Biological Basis of Postpartum Depression," Inova Department of Obstetrics and Gynecology Grand Rounds, Fairfax, VA
2025 "Managing Perinatal Depression in the Setting of Opioid Use Disorder," Project ECHO (Extension for Community Health Care Outcomes), Opioid Course for Virginia Providers, "Substance misuse and Opioid Use Disorders."
2024 "Epigenetic Biomarkers of Reproductive Depression: Moving Towards Understanding the Pathophysiology of Postpartum Depression," Frank Shobe Lecture, Washington University, St. Louis, MO

2024 "Beyond Baby Blues: Pathophysiology, Psychopharmacology, and New Treatments in Postpartum Depression,"10th Annual Psychopharmacology Update 2024, Miami, FL, by Clinical Care Options CME

2024 "Empowering Recovery: Targeted Therapies for Postpartum Depression," 11th Annual Mood Disorders Summit, Scottsdale, AZ by Clinical Care Options CME

2024 "Clinical Updates in Postpartum Depression Management: Integrating Novel Therapeutics Targeting GABA-A Receptors in Practice," American College of Obstetrics and Gynecology Symposium, San Francisco, CA

2023 "Management of Psychiatric Disorders during and after Pregnancy," SMI Advisor, American Psychiatric Association webinar

2023 "Opioid Use Disorder: Concerns during Pregnancy," Project ECHO (Extension for Community Health Care Outcomes), Opioid Course for Virginia Providers, "Substance misuse and Opioid Use Disorders."

2023 "Epigenetic Biomarkers of Postpartum Depression," Inova Department of Obstetrics and Gynecology Grand Rounds, Fairfax, VA

2023 "Psychiatric Medication Use in Pregnancy and Lactation," UVA Family Medicine Department Grand Rounds, Charlottesville, VA

2023 Panelist, Maternal Mental Health Forum, (Virtual), 2020 MOM

2023 Project ECHO (Extension for Community Health Care Outcomes) Series of 3 Lectures on Perinatal Mental Health. Supported by Postpartum Support Virginia: Management of Psychiatric Disorders During Pregnancy, Postpartum Psychiatric Illness and Neuroactive Steroid Treatments for Postpartum Depression.

2022 "Reproductive Depression across the Life Cycle," New York Medical College Department of Psychiatry Grand Rounds, Valhalla, NY (virtual)

2022 "Neuroactive Steroids in Psychiatric Disorders," UVA Neurology Department Grand Rounds, Charlottesville, VA

2021 "Maternal Mental Health: What We Know and Where Do We Go From Here?" Medela Clinical Education webinar (virtual)

2021 "Maternal Mental Health in the Time of COVID" NAMI Maryland Annual Conference (virtual)

2021 "Substance Abuse Treatment: Addressing the Specific Needs of Women," Psychiatric Times World CME Conference, San Diego, CA (virtual)

2021 "Women's Mental Health in the Time of COVID," United Way of Central Maryland, for Women United-Conversation Starters-Addressing the Mental Health Needs of our Community (virtual)

2020 "Psychopharmacology for Perinatal Depression," Medical Grand Rounds, Abington-Jefferson Health, Abingdon, PA

2020 "The Best of Times, The Worst of Times: Anxiety, Depression, Stress or All of the Above?" BrainWeekEnd, Ann Arbor, MI (canceled)

2020 "Psychosocial and Psychopharmacological Options for Postpartum Depression," Psychiatric Times World CME Conference, San Diego, CA (virtual)

2020 "Women's Mental Health Across the Lifecycle," 12th Annual Eating Recovery Foundation Conference, Denver, CO (virtual)

2019 "Management of Psychiatric Medications in Pregnancy," Obstetrics and Gynecology Grand Rounds, Stony Brook Medicine, Stony Brook, NY.

2019 "Treatment and Prevention of Peripartum Depression," Washington Psychiatric Society Fall CME Symposium, Washington, DC

2019 "Identifying Major Depression in the Medically Ill Population," Johns Hopkins Bayview Scleroderma Clinic, Baltimore, MD

2019 "Management of Perinatal Depression," Johns Hopkins Department of Psychiatry Grand

Rounds, Baltimore, MD

2018 "Management of Bipolar Disorder in Pregnancy and Postpartum," Grand Rounds, Psychiatry Department Annual Bipolar Disorder Research Lecture, Case Western Reserve University School of Medicine, Cleveland, OH

2018 "Antidepressant Use in Pregnancy: The Myths, the Realities, the Stigma" Johns Hopkins Department of Psychiatry Grand Rounds, Baltimore, MD

2018 "Fireside Chat: Gender and Mental Health: How Bias Affects Women's Mental Health and Treatment," Women's Health Empowerment Summit, by the Coalition for Women's Health Equity, Washington, DC

2018 "Evidence-Based Approaches to Psychiatric Care during Pregnancy in the Age of Sensationalized Media," Grand Rounds, The 20th Annual Rachel Gundry Lecture, Psychiatry Department, University of Maryland, Baltimore, MD

2018 "What is Psychosis?" for the Gregory Paul Friedman (GPF) Foundation, Chicago, IL.

2018 "Mood Disorders in Pregnancy," for Johns Hopkins Community Physicians 19th Annual Provider Retreat, Baltimore, MD.

2017 "Evidence-Based Approaches to Psychiatric Care during Pregnancy in the Age of Sensationalized Media," "Medication for Women in the Perinatal Timeframe: Safe and Effective Pharmacology," and "Advanced Perinatal Pharmacology," Alaska Psychiatric Association Conference, Anchorage, AK

2017 "Evidence-Based Approaches to Psychiatric Care during Pregnancy in the Age of Sensationalized Media," Maryland Maternal Mortality Review Summit, Maryland Medical Society (MedChi), Baltimore, MD

2016 "The Management of Mood Disorders in Pregnancy," Southern Psychiatric Association and Maryland Psychiatric Society Annual Conference, Baltimore,

2016 "Epigenetic Biomarkers of Postpartum Depression," FDA, Silver Spring, MD

2016 "Management of Mood Disorders during Pregnancy," Grand Rounds, Obstetrics-Gynecology Department, University of Maryland, Baltimore, MD

2016 "Focus on Medication Management of Psychiatric Disorders during Pregnancy," Grand Rounds, Psychiatry Department, West Virginia University, Morgantown, WV

2016 "Stress and Anxiety," for A Woman's Journey: Ladies Night Out, Baltimore, MD

2016 "Evidence-Based Approaches to Psychiatric Care during Pregnancy in the Age of Sensationalized Media," "Medication for Women in the Perinatal Timeframe: Safe and Effective Pharmacology," and "Advanced Perinatal Pharmacology," for Update on Maternal Mental Health (sponsored by Postpartum Support Virginia), Williamsburg, VA

2015 "Management of Mood Disorders During Pregnancy," Maryland Psychiatric Society CME Activity, Women's Mental Health: Trauma, Mood Disorders and Resilience, Baltimore, MD.

2015 "Management of Mood Disorders During Pregnancy," and "DSM-5: Why Peripartum Depression is a Scientific Mistake." Residency Lecture and Grand Rounds, Penn State, Hershey, PA

2015 "Antidepressant Use in Pregnancy: The Myths, the Realities, the Stigma." Fetal Infant Mortality Review, Maternal and Child Health, Baltimore City Health Department, Mercy Medical Center, Baltimore, MD

2015 "Antidepressant Use in Pregnancy: The Myths, the Realities, the Stigma," Grand Rounds, Johns Hopkins Department of Psychiatry, Baltimore, MD

2014 "DSM-5- Why Peripartum Depression is a Scientific Mistake," Grand Rounds, University of Massachusetts Medical School, Boston, MA.

2014 "DSM-5: They Say "Peripartum," I Say "Postpartum"- Let's Call the Whole Thing Off!" Grand Rounds, Johns Hopkins Department of Psychiatry, Baltimore, MD

2013 "The Management of Mood Disorders in Pregnancy," and "The Management of Bipolar

Disorder in Women" Keynote address, Tidewater Perinatal Mental Health Conference, Hampton, VA

2013 "The Management of Mood Disorders in Pregnancy" at The Healthy Woman: Mind, Body, Spirit" Symposium, Saint Francis Hospital, Wilmington, DE.

2013 "Perinatal Mood and Anxiety Disorders: Debunking Myths and Advances in Treatment Options." Washington Psychiatric Society, Washington, DC.

2013 "Life After Fellowship." NIMH Clinical Fellow Seminar, NIH, Rockville, MD.

2013 "Postpartum Depression: A Model for Elucidating the Etiology of Depression," Grand Rounds, Department of Psychiatry, Brigham and Women's Hospital, Boston, MA.

2012 "Antidepressant Use During Pregnancy," NAMI, Rockville, MD

2012 "Adolescent Pregnancy and Psychotropic Medication Use," Adolescent Medicine Grand Rounds, Johns Hopkins School of Medicine, Baltimore, MD

2012 "Management of Mood Disorders in Pregnancy," Department of Psychiatry Grand Rounds, Georgetown University School of Medicine, Washington, DC

2012 "Diagnosis and Management of Postpartum Depression," Department of Obstetrics and Gynecology Grand Rounds, St. Joe's Hospital, Baltimore, MD

2011 "Depression During the Reproductive Years," Hope for Depression Research Foundation Conference, Palm Beach, FL

2011 "Treatment of Depression During Pregnancy," Medicine for the Public Lecture Series, Suburban Hospital/NIH, Bethesda, MD

2011 "Identification and Treatment of Premenstrual Mood Disorders," Brookhaven Retreat Comprehensive Recovery Program for Women, Seymour, TN

2011 "Major Depression and Pregnancy: Clinical Care and Lessons from Research," Psychiatric Clinic of the University of Chile, Santiago, Chile

2010 "Perinatal Mood Disorders," Delaware healthy Mother and Infant Consortium, 5th Annual Summit on Maternal and Child Health, Wilmington, DE

2010 "Management of Mood Disorders During and After Pregnancy," High Risk Obstetrical Conference, Johns Hopkins Obstetrics and Gynecology Department, Baltimore, MD

2009 "Clinical Care of Mood Disorders During and After Pregnancy," Johns Hopkins Department of Psychiatry Grand Rounds, Baltimore, MD

2009 "Clinical Care of Mood Disorders During and After Pregnancy," Delaware Healthy Mothers and Infant Consortium, Committee on Systems of Care, Dover, DE

2009 "Management of Mood Disorders During Pregnancy," Child Psychiatry Conference, Johns Hopkins Child Psychiatry Department, Baltimore, MD

2008 "What does Adoption have to do with Postpartum Depression?" The 22nd Annual Mood Disorders Symposium, Johns Hopkins School of Medicine, Baltimore, MD

2008 "Bipolar Cases & Conversations Workshop," The American Conference on Psychiatric Disorders, New York, NY

2008 "Postpartum and Postadoption Depression: Genetics versus the Environment," Johns Hopkins Department of Psychiatry Grand Rounds, Baltimore, MD

2008 "Treatment Approaches for Reproductive Depression," Psychosomatic Medicine Conference, Miami, FL

2007 "Postpartum Depression," The MidAtlantic Regional Conference for Nurse Practitioners, College Park, MD

2007 "Genetics of Peripartum Depression," Jennifer Mudd Houghtaling Perinatal Depression Conference, Chicago, IL

2006 "Depression and Heart Disease in Women," Sister to Sister National Woman's Heart Day Health Fair, Baltimore, MD

2006 "Bipolar Depression: Treatment Issues and New Directions" Johns Hopkins Department of Psychiatry Grand Rounds, Baltimore, MD

2006 "Hormonal Influences on Mood," University of Maryland Grand Rounds, Baltimore, MD
2006 "Hormonal Influences on Mood in Women with Affective Disorders" and "Genetics of Postpartum Depression" (2 lectures), Sacred Heart Annual Psychiatry Conference, Allentown, PA
2006 "Mood Disorders in Women," Y-ME National Breast Cancer Organization Telephone Conference
2006 "Women's Mood Disorders and Depression," Women's Health Conference, Doctor's Community Hospital, Lanham MD
2005 "Hormonal Influences on Mood in Women with Affective Disorders", Penn Foundation, Sellersville, PA
2005 "The Interplay Between Hormones and Mood," A Woman's Journey Conference, Baltimore, MD
2004 "Clinical Research in Mood Disorders," Department of Social Work, Baltimore, MD
2004 "Postpartum Mood Symptoms in Women with Affective Disorders," Johns Hopkins Department of Psychiatry Grand Rounds, Baltimore, MD

National, Scientific Conferences
2024 "Biomarkers of Future Mental Illness: Focus on Postpartum Depression," American Society of Clinical Psychopharmacology, Miami, Fl
2024 Chair and Speaker, "Epigenetic Biomarkers associated with "Reproductive Depression," North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) Biannual Meeting, Denver, CO
2022 Chair, "Topics in Reproductive Psychiatry," and Speaker, "Neuroactive Steroids in Postpartum Depression," American Society of Clinical Psychopharmacology Annual Meeting, Phoenix, AZ
2021 "Economic Predictors of Self-Reported Postpartum Depressive Symptoms," American Psychiatric Association (virtual)
2021 Chair, "Clinical Approaches for Reproductive Psychiatry," and Speaker, "Designing a Psychiatric Treatment Strategy for Pregnancy," American Psychiatric Association (virtual)
2021 Chair, "Using an Internet Application To Obtain Data On Reproductive Depressive Disorders," and Speaker, Economic Factors Specific to Women are Associated with Postpartum Depressive Symptoms: An Analysis of Data from 138 Countries" and "The Effect of the COVID-19 Pandemic on Self-Reported Postpartum Depressive Symptoms in the US: A Breakdown by State," Marcé of North America (MONA) Conference (virtual)
2020 "Genetic Association Study of Postpartum Depression and a Gene Involved in the Synthesis of Allopregnanolone," NASPOG, St. Louis, MO (virtual)
2020 "Transdermal Estrogen for Psychiatric Disorders: Benefits and Risks," American Psychiatric Association, Philadelphia, PA (canceled)
2019 Chair "Gut and Brain in Motherhood: Perinatal Distress and Neuroimmune, Neuroendocrine and Microbiota Alterations" Symposium, Society for Biological Psychiatry Annual Meeting, Chicago, IL.
2019 "General Treatment Strategies for the Management of Psychiatric Illness during Pregnancy and Lactation" in the "Management of Psychiatric Illness During Pregnancy and Postpartum: What Every Psychiatrist Needs to Know" Workshop, American Psychiatric Association Annual Meeting, San Francisco, CA
2019 "Psychopharmacology of Perinatal Depression," American Society of Clinical Psychopharmacology, Scottsdale, AZ
2019 "Genetic Association Studies of HMCN1 and ESR1 in Postpartum Depression," Marcé of North America (MONA) Conference, Chapel Hill, NC
2019 "Maternal Mental Health and Preterm Birth," Keynote speaker for March of Dimes

Prematurity Summit, Providence, RI
2018 "Timing Is Everything: A Review of The Genetics of Postpartum Depression," North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) Biennial Meeting, Philadelphia, PA
2018 Chair (Invited) Forum: "Fact or Fiction? Antidepressants Aren't Safe in Pregnancy," American Psychiatric Association Annual Meeting, New York, NY
2018 "Evidence-Based Approaches to Psychiatric Care during Pregnancy," Presidential Symposium (Invited Speaker), American Psychiatric Association Annual Meeting, New York, NY
2018 "Update on the Genetic Basis for Postpartum Depression," Women's Mental Health across the Lifespan: Knowledge Gained and Evidence Gaps Workshop (Invited Speaker), American Society of Clinical Psychopharmacology Annual Meeting, Miami, Florida
2017 "Replication of Epigenetic Biomarkers of Postpartum Depression" and "The "Reproductive" Subtype of Depression," Perinatal Mental Health Meeting, Chicago, IL
2016 Chair, Symposium "Advances in Identifying Biomarkers of Postpartum Mood Disorders," and individual talk "Identification and Validation of Epigenetic Biomarkers of Postpartum Depression," Biological Psychiatry Annual Meeting, Atlanta, GA
2016 "Replication of Epigenetic Biomarkers of Postpartum Depression," North American Society for Psychosocial Obstetrics and Gynecology (NASPOG) Biennial Meeting, New York, NY
2013 "A Double-Blind, Placebo Controlled Trial of Valacyclovir in Cognitive Impairment Associated with Bipolar Disorder and HSV-1," Biological Psychiatry Annual Meeting, San Francisco, CA
2013 "A Double-Blind, Placebo Controlled Trial of Valacyclovir in Cognitive Impairment Associated with Bipolar Disorder and HSV-1," NCDEU Annual Meeting, Hollywood, FL
2013 "Antenatal prediction of postpartum depression with blood DNA methylation biomarkers" as part of the Symposium: "Evidence of the Puerperal Trigger in Perinatal Psychiatric Illness—What Do We Know Now?" Perinatal Mental Health Meeting, Chicago, IL
2011 "A Double-Blind, Placebo-Controlled Trial of Riluzole in Bipolar Depression," Biological Psychiatry Annual Meeting, San Francisco, CA
2010 "Post Adoption Depression," Marcé Society Meeting, Pittsburgh, PA
2007 "Familiality of Reproductive Cycle Associated Mood Symptoms in Families with Major Depression and Bipolar Disorder," Biological Psychiatry Annual Meeting, San Diego, CA

<u>International</u>
2024 "Epigenetic Biomarkers of Postpartum Depression: Moving Towards Prevention and Understanding Biological Vulnerability," International Marcé Perinatal Mental Health Society, Barcelona, Spain.
2023 Chair, "Seeing the Future of Perinatal Mental Health Care: A Transformative Agenda," and Speaker, "Epigenetic Biomarkers of Postpartum Depression, Moving Towards Prevention," Marcé of North America (MONA) Perinatal Mental Health Society, Arlington, VA.
2023 "Epigenetic Biomarkers of Postpartum Depression, Moving Towards Prevention," World Association of Infant Mental Health, Dublin, Ireland
2023 "Biomarkers of Postpartum Depression: Moving Towards Prevention," Keynote, Research Workshop of the Israel Science Foundation, 26th Annual Israel Society of Biological Psychiatry Kfar Blum, Israel
2022 "Biomarkers of Postpartum Depression," Guest Colloquium, University of Zurich, Clinical Psychology and Psychotherapy Program, Zurich, Switzerland (virtual)
2022 "Psychopharmacology in Pregnancy and Lactation," 7th International Neuroscience Symposium-Women's Mental Health, Brazilian Psychiatric Association, Rio de Janeiro, Brazil (virtual)

2022 Chair, "Diversity, Equality and Inclusion Initiatives through the Marcé of North American Perinatal Mental Health Society," International Marcé Perinatal Mental Health Society Biannual Meeting, London, United Kingdom

2022 Chair, "The Role of Neuroactive Steroids in Reproductive Psychiatric Disorders," and Speaker, "Neuroactive Steroids in Perinatal Depression," International Association of Women's Mental Health (IAWMH), Maastricht, the Netherlands.

2021 "Approaches to Borderline Personality Disorder in Clinical Practice," Johns Hopkins Medical Institution-Bermuda Hospitals Board CME program (virtual)

2021 "Treating Depression during Pregnancy: An Approach to Medication Management," International Marcé Perinatal Mental Health Society webinar (virtual)

2020 "Women's Mental Health: Focus on Pregnancy," 3nd International Forum on Women's Brain and Mental Health, Zurich Switzerland (virtual)

2020 Chair, Symposium "The Role of Allopregnanolone in Perinatal Mood and Anxiety Disorders," and individual talk "Genetic Association Study of Postpartum Depression and a Gene Involved in the Synthesis of Allopregnanolone," The International Marcé Society for Perinatal Mental Health, Iowa City, Iowa (virtual)

2019 "Update on the Genetic Basis of Postpartum Depression," International Association of Women's Mental Health, Paris, France

2019 "Women's Mental Health," 2nd International Forum on Women's Brain and Mental Health, Zurich Switzerland

2018 "Genetic Basis and Epigenetic Biomarkers of Postpartum Depression," 1st International Congress on Perinatal TOTAL Health, Sinaia, Romania

2018 "Masterclass: The International Network on Phenomics & Genomics of Perinatal Health: from Vision to Realization," 1st International Congress on Perinatal TOTAL Health, Sinaia, Romania

2018 Visiting Professor, Department of Psychiatry at Fundacion Santa Fe de Bogota (FSFB), Bogota, Columbia. "Postpartum Depression," "Management of Bipolar Disorder in Pregnancy and Postpartum," "Antidepressant Use in Pregnancy: The Myths, The Realities, The Stigma."

2018 "The Genetic Basis for Postpartum Depression," The International Marcé Society for Perinatal Mental Health Conference, Bangalore, India

2018 "Update on Epigenetic Biomarkers of Postpartum Depression," The International Marcé Society for Perinatal Mental Health Conference, Bangalore, India

2017 "Stress and Anxiety" for A Woman's Journey Saudi Arabia, Dhahran, Saudi Arabia.

2016 "Replication of Epigenetic Biomarkers of Postpartum Depression," The Marcé Society for Perinatal Mental Health meeting, Melbourne, Australia. Note: given by Dr. L. Osborne in my absence due to daughter's illness

2014 "Antenatal Prediction of Postpartum Depression with Blood DNA Methylation Biomarkers," World Psychiatric Association, Madrid, Spain.

2014 "Smooth Sailing through the Stresses of the Sandwich Generation," Women's Health Forum, MedCan Clinic, Toronto Canada.

2011 "Depression, Pregnancy, and Child Development," 10th World Congress of the World Federation of Biological Psychiatry, Prague, Czech Republic

2009 "Genome-Wide Linkage and Follow-up Association Study of Postpartum Mood Symptoms," Biological Psychiatry Annual Meeting, Vancouver, Canada

**COMMUNITY**

2018-present Volunteer on a weekly basis to Postpartum Support International (PSI) providing consults for providers treating pregnant and postpartum women with psychiatric disorders.

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW<br><br>**DECLARATION OF DANIELLE PRENTICE, DO** |

DANIELLE PRENTICE, DO, hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My area of expertise is treating diabetes in pregnancy.

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B).

3. Since I completed the expert report, I have become the Co-Director of the Diabetes and Pregnancy Program (DAPP) at Oregon Health and Science University (OHSU).

4. In paragraphs 1, 30, and 31 of my expert report, "OSHU" should say "OHSU."

5. Apart from that, all of the statements in the expert report are true and correct to the best of my knowledge. The expert report provides a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/10/2025

Signed by:
Danielle Prentice
F663C88C3BA4421...

Danielle Prentice, DO

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D., | ) | Case No.: 1:24-cv-00244-BLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF DANIELLE PRENTICE, D.O.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), DANIELLE PRENTICE, D.O., makes the following disclosures:

DRAFT

1. I am a board-certified obstetrician-gynecologist and the incoming Director of the Diabetes and Pregnancy Program (DAPP) at Oregon Health and Science University (OSHU). I offer the following opinions as an expert in treating pregnant patients with diabetes.

**STATEMENT OF OPINIONS AND THE BASIS AND REASONS FOR THEM**

2. Diabetes is a medical indication for abortion.

3. I have reviewed Idaho Code § 18-622 ("Ban Throughout Pregnancy") and Idaho Code §§ 18-8801 to 18-8808 ("Six-Week Ban").

4. The Ban Throughout Pregnancy allows abortion only where "the physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." *See* Idaho Code § 18-622. This exception from the abortion ban does not apply when the pregnant person faces a risk of death from self-harm. *Id.* § 18-622(2)(a)(i).

5. The Six-Week Ban allows abortion only in times of a "medical emergency," *id.* § 18-8804(1), defined as "a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function," *id.* § 18-8801(5).

6. It is the standard of care in the practice of Obstetrics and Gynecology to recognize certain conditions relating to diabetes as medical indications for abortion and provide that treatment to patients if a patient selects that treatment option.

7. The Ban Throughout Pregnancy deprives pregnant people with Type 1, Type 2, and complicated gestational diabetes of important treatment options by prohibiting medically indicated abortion in many circumstances of serious medical need. *See* Idaho Code § 18-622. Likewise, the Six-Week Ban prevents doctors from offering abortion as an option to pregnant people with diabetes in many circumstances where it would preserve their health. *Id.* § 18-8801(5).

DRAFT

8. Therefore, it is my opinion that the Ban Throughout Pregnancy and the Six-Week Ban deprive pregnant people in Idaho of appropriate diabetes care options that are part of standard medical practice. That deprivation will have lifelong impacts in some cases.

9. When counseling about pregnancy and disease, it is important not just to consider the impact of a disease on pregnancy but also to consider pregnancy's impact on disease. When I treat patients with diabetes who are pregnant, we must create treatment plans and counsel patients surrounding how the physiological changes of pregnancy affect blood sugar levels, insulin sensitivity, and overall diabetes management in many ways.

10. In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of action advisable. An abortion is "medically indicated" when there is a medical reason for terminating a patient's pregnancy.

11. It is routine medical practice to discuss abortion care with patients who have Type 1 and Type 2 diabetes early in their pregnancies. This is especially true in those with uncontrolled diabetes early in pregnancy. Type 1 and Type 2 diabetes are chronic conditions that affect how the body regulates blood sugar (glucose). Type 1 diabetes is an autoimmune condition where the body's immune system attacks and destroys the insulin-producing beta cells in the pancreas. As a result, the pancreas produces little to no insulin. People with Type 1 diabetes need access to exogenous insulin in order to survive. Often people with Type 1 diabetes receive a diagnosis as children, teens, and young adults, but it can develop at any age. Diabetic ketoacidosis (DKA) is a serious complication that can arise in people with Type 1 diabetes, and it is life-threatening. It is considered an obstetric emergency when it occurs during pregnancy. DKA impacts 1-3% of pregnancies complicated by diabetes. If not recognized and treated promptly, DKA can lead to maternal mortality. Additionally, a single episode of DKA increases the risk of perinatal mortality to 10-25%. Unfortunately, pregnancy predisposes pregnant people to DKA due to a number of reasons not limited to accelerated starvation, dehydration, N/V of pregnancy, respiratory alkalosis of pregnancy, stress, and increased production of hormones that act as antagonists to insulin. The process of DKA in pregnancy causes severe dehydration with about 7-10L of fluid loss. This leads to significant electrolyte abnormalities. Associated nausea and vomiting in response to the above changes can lead to even worse dehydration and electrolyte abnormalities. Complicating this

DRAFT

picture, the risk of euglycemic DKA, or DKA with normal glucoses instead of high glucoses, in pregnancy is increased, often leading to delays in diagnosis.[1]

12. Type 2 diabetes is more appropriately described as a chronic condition where the body's cells become resistant to insulin—insulin production may still occur in the pancreas but the body stops responding effectively to it. Over time, the pancreas may no longer be able to produce enough insulin to keep blood glucose levels in the normal range. The incidence of Type 2 diabetes in reproductive age individuals has been steadily increasing. Type 2 diabetes is associated with many multi-organ system complications including, but not limited to, increased risk of hypertension, cardiovascular disease, kidney disease, neuropathy, and retinopathy. Many of these conditions tend to worsen during pregnancy and make pregnancies riskier. This leads to an increased risk of maternal morbidity and mortality during pregnancy and the postpartum period, but also an increased risk of diabetes related morbidity and mortality across the lifespan.

DRAFT

13. Hemoglobin A1c (A1c) is a blood test that provides an average level of blood sugar. It is used to diagnose and monitor diabetes, which helps determine how well a person's blood sugar levels are controlled over time. Normal A1c is less than 5.7%. Patients with prediabetes present with an A1c between 5.7% and 6.4%. People will be diagnosed with diabetes if the A1c is higher than 6.5%.

14. Pregnant patients present for care with various levels of management of their diabetes. In a perfect world with regular access to preventative healthcare and screening, every patient who becomes pregnant would have been screened for diabetes prior to pregnancy. If diagnosed, they would have received treatment and achieved an A1c level below 6.5% and would

[1] Sibai, Baha M. MD; Viteri, Oscar A. MD. Diabetic Ketoacidosis in Pregnancy. Obstetrics & Gynecology 123(1):p 167-178, January 2014. | DOI: 10.1097/AOG.0000000000000060.

have no complications from their diabetes, but this is not the world we live in, and more often than not complications and comorbidities need special attention during pregnancy.

15. Some of the treatments to address diabetes during pregnancy add their own physical consequences. An example of that is that when trying to aggressively control a patient's blood sugar for a healthy pregnancy and healthy baby after delivery, it is possible that diabetic retinopathy worsens. Pregnancy has been shown to accelerate progression of diabetic retinopathy. Diabetic retinopathy is the leading cause of blindness in American working-age adults.[2] While diabetic retinopathy is not fatal, it can result in a loss of sight for the remainder of the patient's life.

16. The physiology of pregnancy leads to a patient experiencing a large change in the volume of blood within their body. To address this, blood vessels often expand. In the case of diabetic patients, vascular contraction can occur. This leads to reduced blood volume to the placenta, which increases risks to the mother and fetus. This leads to increased risks of preeclampsia, fetal growth restriction, preterm birth, congenital malformations, and perinatal death.[3] This decreased ability of the body to process glucose through insulin resistance is likely from an increase in placental hormones and requires careful attention and treatment for those with preexisting diabetes or gestational diabetes to remain in a pregnancy-safe range.

DRAFT

17. Diabetes has a significant impact on fetal development. The impact of A1c on miscarriage and fetal anomaly is dose-dependent, meaning that the higher the A1c is above normal

[2] Chandrasekaran PR, Madanagopalan VG, Narayanan R. Diabetic retinopathy in pregnancy - A review. Indian J Ophthalmol. 2021 Nov;69(11):3015-3025. doi: 10.4103/ijo.IJO_1377_21. PMID: 34708737; PMCID: PMC8725079.

[3] Samii L, Kallas-Koeman M, Donovan LE, Lodha A, Crawford S, Butalia S. The association between vascular complications during pregnancy in women with Type 1 diabetes and congenital malformations. Diabet Med. 2019 Feb;36(2):237-242. doi: 10.1111/dme.13872. Epub 2018 Dec 13. PMID: 30499197.

range, the higher the risk of pregnancy loss or major congenital anomalies. For instance, spine and heart development are particularly vulnerable with increased blood sugar. The severity of the congenital anomalies are variable ranging from mild to severe, but the overall impacts can be large including some conditions that can require multiple complicated surgeries across the lifetime time, conditions that are life-limiting, or conditions that are lethal.

18. Below is an image of (a) a female child with anencephaly, a female child with encephalocele, and (c) a male child with spina bifida cystica on the lower spine.[4]



(a) A female child with anencephaly, (b) A female child with encephalocele, (c) A male child with spina bifida cystica on the lower spine

19. Below is a chart on HbA1c thresholds for spontaneaous abortion and congenital major malformations[5]

[4] Wender-Ozegowska E, Wróblewska K, Zawiejska A, Pietryga M, Szczapa J, Biczysko R. Threshold values of maternal blood glucose in early diabetic pregnancy--prediction of fetal malformations. Acta Obstet Gynecol Scand. 2005 Jan;84(1):17-25. doi: 10.1111/j.0001-6349.2005.00606.x. PMID: 15603562.

[5] Suthern, M., & McCrossin, T. (2018, March 2). *Management of infants of diabetic mothers*. O&G Magazine. https://www.ogmagazine.org.au/20/1-20/management-of-infants-of-diabetic-mothers/

**HbA1c thresholds for spontaneous abortion and congenital major malformations**

| HbA1c (%) | % Major Malformation | % Spontaneous abortion |
|---|---|---|
| <=6.0 | 3 | |
| 6.1-8.0 | 5.2 | 8 |
| 8.0-9.9 | 8.1 | 18 |
| 10.0-12.0 | 23.5 | 20 |
| 12.1-15 | 38.9 | 45 |
| >=15 | 40 | |

20. Below is another chart on congenital abnormalities and neonatal complications.[6]

| Congenital abnormalities | Neonatal complications |
|---|---|
| Congenital heart disease<br>• Transposition of the great arteries<br>• Double outlet right ventricle<br>• Ventricular septal defect<br>• Truncus arteriosus<br>• Tricuspid atresia<br>• Patent ductus arteriosus<br>Neural tube defects<br>• Anencephaly<br>• Spina bifida<br>Caudal regression syndrome<br>Small left colon syndrome<br>Cleft palate<br>Vertebral anomalies<br>Flexion contracture of the limbs<br>Intestinal anomalies | Prematurity (spontaneous or medically-induced)<br>Macrosomic/LGA infants<br>• including associated birth complications and injuries<br>Perinatal hypoxia<br>Respiratory distress<br>Metabolic complications<br>• Hypoglycaemia<br>• Hypocalcaemia<br>• Hypomagnesaemia<br>• Cardiomyopathy<br>Haematological complications<br>• Polycythaemia<br>• Low iron stores<br>Hyperbilirubinaemia |

Table 1. Potential neonatal complications in the infant of a diabetic mother.

21. Increased blood sugar in pregnancy can cause macrosomia (larger babies). Some studies suggest macrosomia can occur in up to 60% of pregnancies complicated by pre-gestational diabetes. Macrosomia can lead to worsening maternal and fetal outcomes including birth trauma, cesarean birth, shoulder dystocia, and perinatal asphyxia. Shoulder dystocia is a birth complication that occurs when the fetal shoulder does not deliver after the fetal head. This is an obstetric emergency. There are maneuvers to release shoulder dystocia, but they are not always successful.

[6] Anyanwu, Lofty-John & Danborno, Barnabas & Hamman, WilsonOliver. (2015). The prevalence of neural tube defects in live born neonates in Kano, North-Western Nigeria. Sub-Saharan African Journal of Medicine. 2. 105. 10.4103/2384-5147.164417.

Shoulder dystocia may lead to neurological conditions like brachial plexus injuries, anoxic brain injury, and even perinatal death.

22. Another common complication is neonatal hypoglycemia. This occurs when the fetus starts producing its own insulin at high rates due to elevated maternal blood sugars. After the baby is born, the insulin production remains high despite the rapid decrease in exogenous glucose. Neonatal hypoglycemia often leads to an increased risk of neonatal ICU admission and may be related to impaired neurodevelopment as the child ages.

23. Another growth issue fetuses may have due to maternal preexisting diabetes is fetal growth restriction or estimated fetal weight less than the 10th percentile. This is often seen in patients with diabetes complicated by vascular disease. Both macrosomia and fetal growth restriction are related to an increased risk of stillbirth. In fact, pregnant patients with preexisting diabetes are at a 4-5 fold increased risk of stillbirth.[7]

DRAFT

24. 12–20% of pregnant patients are diagnosed with gestational diabetes. Occasionally, patients with preexisting diabetes are diagnosed with gestational diabetes due to lack of access to preventative healthcare prior to pregnancy.

25. True gestational diabetes typically goes away after birth. Patients with a diagnosis of gestational diabetes undergo another glucose tolerance test at 4-6 weeks postpartum to assess for insulin resistance or outright diabetes. Up to 50% of patients with gestational diabetes later develop Type 2 diabetes. Additionally, patients with a diagnosis of gestational diabetes are at

[7] Mackin ST, Nelson SM, Wild SH, Colhoun HM, Wood R, Lindsay RS; SDRN Epidemiology Group and Scottish Diabetes Group Pregnancy subgroup. Factors associated with stillbirth in women with diabetes. Diabetologia. 2019 Oct;62(10):1938-1947. doi: 10.1007/s00125-019-4943-9. Epub 2019 Jul 29. PMID: 31353418; PMCID: PMC6731193.

higher risk for cardiovascular disease regardless of whether or not they develop Type 2 diabetes. Due to these risks, lifelong preventative screening for DM and CVD is recommended.

26. In my practice and in my experience, some patients with diabetes choose to have an abortion after considering their A1C, their history of hospitalizations, their diabetes associated comorbidities, and their history of diabetic ketoacidosis because continuing their pregnancy would pose serious risks to their long-term health and even their life during and after pregnancy. Others choose to have an abortion after being diagnosed with major congenital anomalies associated with diabetes. It is my expert opinion that access to all reproductive options is paramount in caring for women with a diagnosis of diabetes.

**FACTS OF DATA CONSIDERED IN FORMING MY OPINIONS**

27. My opinions are based on my clinical experience, education and training; research; attendance at professional conferences; and knowledge of the relevant literature, including the publications cited above.

DRAFT

**EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS**

28. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

**QUALIFICATIONS AND PUBLICATIONS**

29. I am an expert in the treatment of diabetes during pregnancy. I am board-certified in obstetrics and gynecology and board-eligible in maternal-fetal medicine.

30. I currently practice at OSHU and have seen patients from Idaho since I began there two and a half years ago.

31. I am also the incoming Director of DAPP at OSHU. DAPP is a comprehensive initiative designed to support pregnant patients managing diabetes. This includes Type 1 diabetes,

Type 2 diabetes, and insulin-dependent gestational diabetes. I will start this role in the summer of 2025, but I regularly see clinical patients through DAPP as a faculty member in the clinic currently.

32. Additionally, I serve as a reviewer for the American Journal of Obstetrics and Gynecology. I am a fellow with the Society for Maternal Fetal Medicine, the American Congress of Obstetricians and Gynecologists (ACOG), and the American College of Osteopathic Obstetricians and Gynecologists.

33. I received a Bachelor of Science degree in biology with a minor in physics and psychology from the University of Denver. I then attended medical school at the Oklahoma State University College of Osteopathic Medicine, where I earned a medical degree. Following graduation, I completed a residency in obstetrics and gynecology at SSMHealth St. Anthony Hospital in Oklahoma City. Subsequently, I completed a maternal-fetal medicine fellowship at Penn State Milton S. Hershey Medical Center.

DRAFT

34. My curriculum vitae, which more fully summarizes my qualifications and publications, is attached as Exhibit 1.

**CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS**

35. None.

**COMPENSATION**

36. I am being compensated at the rate of $300 per hour for my work on this case.

Dated: February 14, 2025

DocuSigned by:

Danielle Prentice, DO

F663C88C3BA4421...

Danielle Prentice, D.O.

# Exhibit 1

**Danielle Prentice (Kirchhof), DO**

[redacted]

**Office Address:**

[redacted]

**Home Address:**

[redacted]

## EXPERIENCE

September 2022- Present

**Oregon Health and Science University**
Department of OB/GYN
Maternal Fetal Medicine
Assistant Professor
Incoming Director of Diabetes and Pregnancy Program (Summer 2025)

## EDUCATION

2019 – 2022
Penn State Milton S. Hershey Medical Center, Hershey, PA
Maternal Fetal Medicine Fellowship

2015 – 2019
SSMHealth St Anthony Hospital, Oklahoma City, OK
Obstetrics and Gynecology Residency

2011 – 2015
Oklahoma State University College of Osteopathic Medicine, Tulsa, OK
Medical School – D)

2007– 2011
University of Denver, Denver, CO
Bachelor of Science in Biology – BS,
Minor in Physics and Psychology

## CURRENT LICENSE

June 2022- present
Washington Medical License-DO
Active-Expires December 8, 2024

March 2022 – present
Oregon Medical License-DO
Active- Expires December 31, 2025

## BOARD CERTIFICATION

American Board of Obstetrics and Gynecology
- Obstetrics and Gynecology- effective 12/10/2021
- Maternal Fetal Medicine- board eligible

## PROFESSIONAL COMMITTEES

- ACOG Nutrition Expert Working Group
  - 2022-present
- SMFM Communications Committee
  - 2024-2027

## PROFESSIONAL SOCIETIES

Society for Maternal Fetal Medicine (SMFM)
Fellow

American Congress of Obstetricians and Gynecologists (ACOG)
Fellow

American College of Osteopathic Obstetricians and Gynecologists (ACOOG)
Fellow

American Medical Society for Sports Medicine (AMSSM)
Associate Member

## JOURNAL REVIEWER:

American Journal of Obstetrics and Gynecology

American Journal of Obstetrics and Gynecology SMFM Edition

American Journal of Osteopathic Medicine

## HONORS AND AWARDS

| | |
|---|---|
| June 2021 | 97th Perinatal & Developmental Medicine Symposium Excellent Presentation Award |
| June 2019 | Oklahoma City OB/GYN Society Award for Research Contributions |
| October 2016 | ACOOG Fall Scholar Award |

## TEACHING EXPERIENCES

*NATIONAL LECTURES (INVITED LECTURES)*

**February 2024- When can I start working out? Exercise and activity postpartum. (Society for Maternal Fetal Medicine Annual Meeting Postgraduate Course Lecture)**

*STATE/REGIONAL (INVITED LECTURES)*

**May 2024- Exercise in pregnancy: Where we are, where we've been, and where we need to go (Oregon Nutrition Day)**

*GRAND ROUNDS (INVITED LECTURES)*

**March 2024- Can I Exercise in Pregnancy? Targeted Counseling for Physical Activity During and After Pregnancy (CAMC OBGYN Department)**

**February 2024- Can I Exercise in Pregnancy? Targeted Counseling for Physical Activity During and After Pregnancy (Oregon Health & Science University)**

May 2021- Respectful Care in Women's Health (Penn State Health)

April 2021- Respectful Care in Women's Health (University of Missouri)

*STUDENT/RESIDENT LECTURES:*

**April 2024- Exercise in Pregnancy and Postpartum *(*SSMHealth-St. Anthony OBGYN Residency Lecture)**

**January 2024- Intrahepatic Cholestasis of Pregnancy (PHSW Family Medicine Residency)**

**September 2023- Exercise Prescription in Pregnancy (Monday morning conference)**

October 2022- Exercise in Pregnancy (Fellowship lecture)

February 2022- Cardioobstetrics (Residency program lecture)

January 2022- Obstetrics CREOG Review (Residency program lecture)

September 2021- Diabetes in Pregnancy (Fellowship program lecture)

May 2021- Cholestasis in Pregnancy (Residency program lecture)

April 2021- Complications in Pregnancy (Physician assistant student lecture)

October 2020 –Invited Student Lecture on Respectful Maternity Care (Wayne State AMWA Chapter)

September 2020 – Invited Student Lecture on Maternal Fetal Medicine (Rocky Vista ACOOG Chapter)

May 2020 – OB/GYN Emergency Simulations (3rd year virtual clerkships)

March 2020 – COVID and Vulnerable Populations (3rd year virtual clerkships)

October 2019 – Hypertensive Disorders of Pregnancy (3rd year clerkships)

**SERVICE TO THE COMMUNITY**

December 2020: Respectful Care in Women's Health discussion with sophomore high school students at The Bergen Academies for their Healthcare Innovations Class

**REPORT OF SCHOLARSHIP**

**TEXTBOOK CHAPTERS:**

Prentice, D., Plante, L. Trauma. In: Berghella, Vincenzo, editor. Maternal-Fetal Evidence Based Guidelines, Fourth Edition. Published: January 13, 2022.

**PUBLICATIONS:**

The Association Between Adverse Childhood Experiences and Postpartum Depression. **Danielle Prentice**; Banan Otaibi; Christy Stetter; Allen Kunselman; Serdar Ural. *Frontiers in Global Women's Health.* May 2022.

Opioids in the Postpartum Period. **Danielle Prentice, DO**; Amanda Hill, DO; Linzi Stewart, DO; Serdar Ural, MD; Raymond Deiter, DO. *The Journal of the American Osteopathic Association.* October 2020.

Management of newborns born to mothers with confirmed or suspect COVID-19. Amatya, S., Corr, T.E., Gandhi, C.K. **Prentice, D.M.** *et al. Journal of Perinatology.* July 2020. 40, 987–996

Elevated international normalized ratio (INR) and new diagnosis of hepatitis C associated with severe intrahepatic cholestasis of pregnancy (ICP): A case report. Birchall C, **Prentice D**, Pauli J. *Case Reports in Women's Health*. 2020;26:e00178. doi:10.1016/j.crwh.2020.e00178

Death of a Fetus With Myeloproliferative Disorder and Trisomy 21. **Danielle Prentice, DO**; Raymond Deiter, DO; John Stanley, MD *The Journal of the American Osteopathic Association*, March 2019, Vol. 119, 208-211.

A Cystine-Rich Whey Supplement (Immunocal®) Provides Neuroprotection from Diverse Oxidative Stress-Inducing Agents In Vitro by Preserving Cellular Glutathione. Aimee N. Winter, Erika K. Ross, Vamsi Daliparthi, Whitney A. Sumner, **Danielle M. Kirchhof,** Evan Manning, Heather M. Wilkins, and Daniel A.Linseman. *Oxidative Medicine and Cellular Longevity.* August 2017.

Mitochondrial Glutathione Transport Is a Key Determinant of Neuronal Susceptibility to Oxidative and Nitrosative Stress. Heather M. Wilkins, **Danielle Kirchhof**, Evan Manning, Jamie W. Joseph and Daniel A. Linseman. *Journal of Biological Chemistry*. January 2013.

**ORAL PRESENTATIONS:**

Maternal exercise shifts adiposity distribution in offspring towards energy burning fat. **Danielle Prentice**; Sarah Bingaman; Serdar Ural; Kirsteen Browning; Amy Arnold. Presented at The Society for Maternal Fetal Medicine's 43rd Annual Pregnancy Meeting. February 2023.

Determining the association between adverse childhood experiences and postpartum depression to guide interventional implementation. **Prentice, D**., Otaibi, B., Ural, S. Presented virtually at the 97th Perinatal & Developmental Medicine Symposium. June 2021.

Opiate Use in the Postpartum Period: Establishing Hospital Guidelines for Prescribing. **Prentice, D.**, Hill, A., Deiter, R. Presented at the Japan Society of Obstetrics and Gynecology. Candidate for the JSOG Encouragement Award. April 2019.

Residency Education in the United States of America. Presented at the Japan Society of Obstetrics and Gynecology. April 2019.

**ABSTRACTS/POSTER PRESENTATIONS:**

**February 2024**

**The Society for Maternal Fetal Medicine Annual Pregnancy Meeting**

- **Link between adiposity distribution and cytokine signaling in offspring brains of exercises versus sedentary mice. Danielle Prentice; Sarah Bingaman; Serdar Ural; Kirsteen Browning; Rebecca Fleeman; Elizabeth Proctor; Amy Arnold**
- 

February 2023
The Society for Maternal Fetal Medicine Annual Meeting

- Offspring neurobehavioral phenotype following maternal exercise versus sedentary behavior. **Danielle Prentice**; Nicole Lookfong; Sarah Bingaman; Serdar Ural; Kirsteen Browning; Amy Arnold

April 2022
POMA Virtual Poster Session

- Accepted Poster Presentation: Does infection with SARS-CoV-2 during pregnancy increase the risk of developing pregnancy-related mood disorders? Marshall, C., Stetter, C., Kunselman, A., Ural, S., **Prentice, D.**

April 2022
PAMED Virtual Poster Contest

- Accepted Poster Presentation: Does infection with SARS-CoV-2 during pregnancy increase the risk of developing pregnancy-related mood disorders? Marshall, C., Stetter, C., Kunselman, A., Ural, S., **Prentice, D.**

April 2022
Experimental Biology 2022

- Accepted Poster Presentation: Maternal exercise may improve metabolic outcomes in offspring in mice. **Prentice, D**., Bingaman, S., Ural, S., Browning, K., Arnold, A.

May 2021
62nd Annual National Student Research Forum

- Accepted Poster Presentation: An atypical presentation of Twin Anemia Polycythemia Sequence (TAPS) and review of varying presentations of TAPS and Twin-twin transfusion syndrome (TTTS). Fiorillo, M. **Prentice, D.**

May 2021
American College of Obstetricians and Gynecologist Annual Clinical and Scientific Meeting

- Accepted Poster Presentation: The Prevalence of the Types of Adverse Childhood Experiences in a Postpartum Depression Population. **Prentice, D**., Otaibi, B., Ural, S.

January 2021
The Society for Maternal Fetal Medicine Annual Meeting

- Accepted Poster Presentation: The Association Between Adverse Childhood Experiences and Postpartum Depression. **Prentice, D**., Otaibi, B., Ural, S.

March 2020
The Society for Reproductive Endocrinology Annual Meeting

- Accepted Poster Presentation: NICHD Workshop Criteria for Suspected Triple I Confirmation by Placental Pathology. (Meeting cancelled due to COVID-19). **Prentice, D.**, Curtin, B.

Summer 2012
Weill Cornell Judith Jaffe Multiple Sclerosis Center
American Academy of Neurology Annual Meeting, March 2013

- Abstract: Is Relapse Pattern Predictable in Relapsing-Remitting Multiple Sclerosis? **Kirchhof, D.,** Perumal, J.

**GRANT FUNDED STUDIES:**

Danielle Peress, MD Memorial Fund, The Foundation of The Society for Maternal Fetal Medicine, January 2021, Impact of Exercise on Neurodevelopmental Programming Effects of Maternal Obesity in Mice. **Prentice, D**, Ural, S.

Internal-Department of Obstetrics and Gynecology (Prentice) 11/04/2020 – 11/03/2021 PROTO202001616 IACUC Impact of Exercise on Neurodevelopmental Programming Effects of Maternal Obesity in Mice. **Prentice, D**., Ural, S., Arnold, A., Browning, K.

**RESEARCH IN PROGRESS/PENDING GRANTS:**

**Understanding the role of physical activity in high-risk pregnancies: A pilot study. Submitted for the 2024 Mission Support Award. - pending review/selection**

**Understanding the role of physical activity in high-risk pregnancies: A pilot study. Submitted for the 2024 Circle of Giving Award. - pending review/selection**

**Understanding the role of physical activity in high-risk pregnancies: A pilot study. Submitted for the 2023 AMSSM Foundation Award.- pending review/selection**

**Understanding the role of physical activity in high-risk pregnancies: A pilot study. Submitted for 2024 MRF New Investigator Award.- not selected**

Step Count and Goal Gestational Weight Gain. Submitted to 2019 CROWN fund – not selected.

Step Count and Goal Gestational Weight Gain. Submitted to 2019 SMFM Danielle Peress, MD Memorial Fund – not selected.

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D., | ) | Case No.: 1:24-cv-00244-BLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF STACY** |
| v. | ) | **SEYB, M.D.** |
| | ) | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

STACY SEYB, M.D., hereby declares under penalty of perjury that the following statements are true and correct:

1. I am the Plaintiff in this case. I submit this declaration in support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

## Introduction

2. I am a board-certified obstetrician-gynecologist ("OB-GYN") and maternal-fetal medicine specialist ("MFM") licensed to practice medicine in Idaho.

3. From 2019 to 2023, I served on Idaho's Maternal Mortality Review Committee.

4. Since April 2000, I have served as an Attending Physician in maternal-fetal medicine at St. Luke's, a hospital in Boise.

5. The abortion bans challenged in this case prevent me from providing appropriate care to all of my patients.

6. Over the course of my career, I have delivered approximately 2,000 to 3,000 babies and provided approximately 500 abortions. The vast majority of those abortions have been for patients with medical indications.

7. In recent years, before Idaho's abortion bans took effect, I provided two to three abortions per month, on average. All of those abortions were for patients with serious medical conditions. In addition, I assisted other doctors with medically indicated abortion procedures six to eight times per year.

8. Although most of my abortion patients have resided in southwest Idaho, I have occasionally provided abortion care to patients who traveled to St. Luke's from other parts of the state, including northern Idaho and eastern Idaho.

9. Since Idaho's abortion bans have been in effect, I have had to refer some patients with serious medical conditions to out-of-state abortion providers.

10. But for Idaho's abortion bans, I would continue to provide abortion care in Idaho to all patients with serious medical conditions seeking such care, rather than refer them to out-of-state abortion providers.

**My Role as a Maternal-Fetal Medicine Specialist**

11. Maternal-fetal medicine is a subspecialty of obstetrics and gynecology that focuses on the treatment of patients with high-risk pregnancies. After completing medical school and a residency in obstetrics and gynecology, doctors who want to be maternal-fetal medicine specialists must complete a three-year fellowship.

12. As an MFM, the patients I treat typically have wanted pregnancies. Sometimes complications arise that pose serious risks to a patient's health and/or create a high likelihood of miscarriage, stillbirth, or infant mortality. Management of some complications may include the option of terminating a pregnancy.

13. In these circumstances, patients face difficult and heart-wrenching decisions about how to proceed. In my experience, patients do not take these decisions lightly and give strong consideration to their personal values and religious beliefs. They take a variety of individualized factors into account, such as the nature and magnitude of the risks to their health; the likelihood that their pregnancy will result in a live birth; the degree to which their child may suffer after birth; the impact that their own death or disability would have on their loved ones, including any current children; the strength of their social and emotional support systems; their financial resources; and their prior experiences with pregnancy. It is hard to understand the complexity of

these decisions and the range of emotions patients experience if one has not been confronted with this dilemma.

14. Some patients decide to terminate their pregnancies. As a doctor, I respect my patients' treatment decisions and help them obtain desired care that will promote, preserve, or protect their health. I am guided by the four principles of medical ethics. These universal principles guiding medical professionals to help patients make decisions about care are: autonomy, or supporting the right that patients have to make their own healthcare decisions; beneficence, or acting in a way to benefit the patient; nonmaleficence, or not doing harm to the patient; and justice, or treating all patients equally and equitably.

**Impact of Idaho's Abortion Bans on Doctors and Their Pregnant Patients**

15. In Idaho, two abortion bans are currently in effect, which I will refer to as the "Ban Throughout Pregnancy," Idaho Code § 18-622, and the "Fetal Heartbeat Ban," *id.* §§ 18-8801 to 18-8808 (collectively, the "Abortion Bans").[1]

16. For purposes of the Ban Throughout Pregnancy, abortion is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of an unborn child," with exceptions for use of birth control pills and intrauterine devices

[1] Although I am not a lawyer, my understanding is that the Fetal Heartbeat Ban contains both criminal and civil enforcement mechanisms. The criminal enforcement mechanism may not be used while the Ban Throughout Pregnancy is in effect, but it may be used if that statute were repealed or invalidated through judicial review. *See* Idaho Code § 18-8805(4). The civil enforcement mechanism may be used while the Ban Throughout Pregnancy is in effect.

("IUDs"); removal of an embryo or fetus that has already died; removal of an ectopic or molar pregnancy; and the treatment of a patient who is no longer pregnant. Idaho Code § 18-604(1).

17. In the context of pregnancy, the term "viability" refers to the ability of a fetus to sustain life outside the uterus. Recently, viability has been associated with 24 weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("lmp"), but the precise time that viability occurs varies on a case-by-case basis, depending on factors such as the fetal health condition, sex, weight, and genetics. As the pregnancy progresses beyond 24 weeks, the likelihood of survival increases, and the risk of severe, life-long problems decreases. Prior to 24 weeks, the rates of survival decrease rapidly, and rates of severe lifelong complications increase. Survival before 22 weeks' gestation is virtually non-existent, even with the recent technological advances of neonatology.

18. Terminating a pregnancy by any method before 24 weeks is associated with a high likelihood that the termination will cause perinatal death, thus satisfying the statutory definition of abortion.

19. Terminating a pregnancy between 24 and 26 weeks, by means that are not inherently lethal, still poses a significant chance of perinatal death.[2] It is not clear to me whether inducing labor at these gestational ages satisfies the statutory definition of abortion.

20. The Ban Throughout Pregnancy criminalizes abortion at all stages of pregnancy except when "the abortion was necessary to prevent the death of the pregnant woman" from a cause other than self-harm, Idaho Code § 18-622(2)(a), or when a pregnant survivor of rape or

---

[2] Am. Coll. of Obstetricians & Gynecologists, *Periviable Birth: Obstetric Care Consensus No. 6*, 130 Obstetrics & Gynecology e187, e188-89 (2017).

incest (or their parent or guardian if the survivor is a minor) reported the crime to a government agency and can furnish documentation of the report to the abortion provider, *id.* § 18-622(2)(b).

21. The Ban Throughout Pregnancy thus criminalizes a wide range of abortion care for patients with serious medical needs.

22. Notably, it expressly criminalizes abortion care in cases where continued pregnancy would pose serious risks to a patient's health that would not necessarily result in the patient's death, and in cases where a pregnant patient faces a risk of death from self-harm, such as suicide or overdose. In addition, the statute expressly criminalizes abortion care in cases where miscarriage, stillbirth, or infant mortality is expected, unless the pregnant patient will necessarily die absent an abortion.

23. The statute also has a chilling effect on the provision of abortion care even in cases where continued pregnancy would pose life-threatening risks to the patient. That is because it is often impossible for me or my colleagues to determine that an abortion is *necessary* to prevent a patient's death. Medical outcomes are rarely certain. At best, doctors can assess the probability of an outcome based on clinical evidence and prior experience, but every patient's circumstances are unique, and such assessments are not mathematically precise.

24. Because of the uncertainty inherent in predicting patient outcomes, it is possible for reasonable doctors to disagree about whether an abortion is necessary to prevent a patient's death. I am afraid that, even if I believe that an abortion is needed to prevent the death of one of my patients, another doctor will second-guess my judgment, and a prosecutor will file charges against me on that basis. Based on my interactions with other Idaho doctors, this fear is widespread.

25. Moreover, Idaho's Attorney General has openly expressed hostility to abortion and abortion providers in both court filings and public statements. Additionally, Idaho's legislature has declined to expand or clarify the medical exception in the statute to provide doctors with a manifest safe harbor for providing abortion care to patients with serious medical needs. These governmental actions and omissions exacerbate the statute's chilling effect on doctors who treat pregnant patients.

26. Further, violating the Ban Throughout Pregnancy constitutes a felony that is punishable by two to five years in prison, as well as grounds for a doctor's medical license to be suspended or revoked. Idaho Code § 18-622(1). Such high stakes cause doctors to err on the side of denying care to patients.

27. Although the medical exception in the Fetal Heartbeat Ban is worded differently, it is likewise narrow and creates its own chilling effect.

28. Defendants' expert, Dr. Hughes seeks to minimize the chilling effect of the Abortion Bans by stating that Idaho healthcare providers "are always aware our care may be reviewed by our peers within and outside the state, hospital Peer Review Committees, Quality Assurance Committees, Risk Management, Credentials Committees, and the legal community." Hughes Expert Report ¶ 6. But none of these review mechanisms are comparable to the felony criminal liability imposed by the Abortion Bans. An abortion performed in violation of the Ban Throughout Pregnancy constitutes a felony punishable by two to five years in prison. Idaho Code § 18-622(1). If the Ban Throughout Pregnancy were invalidated, an abortion performed in violation of the Fetal Heartbeat Ban would likewise constitute a felony punishable by two to five years in prison. *Id.* § 18-8805(2). Neither hospital peer review processes nor medical malpractice proceedings may result in a healthcare provider's imprisonment.

29. Peer review through hospital committees does not serve a punitive function. The goal of such review is to study the provision of care to determine whether improvements can be made in the future, and not to punish or disparage providers for past actions.

30. A healthcare provider can purchase insurance to manage the risk of medical malpractice liability, and this practice is standard. In contrast, healthcare providers cannot insure themselves against the risk of felony criminal liability.

31. Apart from the Abortion Bans, I am not aware of any circumstances in which an Idaho clinician practicing obstetrics and gynecology can be convicted of a crime and sentenced to multiple years in prison for providing a medical treatment—with the patient's consent—that satisfies national standards of care. Thus, the felony criminal liability imposed by the Abortion Bans is unique in obstetrics and gynecology, and so is its chilling effect on healthcare providers.

32. Dr. Hughes opines that fear about the Abortion Bans' chilling effect is unfounded. Hughes Expert Report ¶ 6. ("A fear with the new abortion law relates to criminal prosecution if a provider who performs an abortion that does not conform with the law. The implication is that a provider would choose no treatment or inadequate treatment to avoid prosecution and thus cause patient harm. I believe that fear is unfounded."). His opinion is belied by actual events in Idaho since the Abortion Bans took effect. Notably, numerous pregnant patients with serious medical needs have had to travel out of state to obtain abortion care—some by emergency air transport. But for the Abortion Bans, those patients would have been able to obtain abortion care in Idaho. In addition, several obstetrician-gynecologists, including some of my colleagues at St. Luke's, have ceased practicing medicine in the state rather than face the risk of criminal liability for providing vital and appropriate medical care to their patients.

33. Indeed, on July 31, 2025, the medical journal JAMA Network Open published the following article: J. Edward McEachern, M.D., et al., *Change in Number of OB/GYN Physicians Practicing Obstetrics After the Dobbs Decision*, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2837058. The study assesses changes in the number of OB/GYNs practicing obstetrics in Idaho after the Abortion Bans took effect. It concludes that, between August 2022 and December 2024, Idaho had a net loss of 94 OB/GYNs practicing obstetrics, more than one-third of the corps of such doctors practicing in the state.

34. There is currently a preliminary injunction in effect that bars enforcement of the Ban Throughout Pregnancy against me and my colleagues at St. Luke's for providing an abortion that is necessary to stabilize a patient presenting in the hospital emergency department with an "emergency medical condition," as that term is used in the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(e)(1)(A), (3)(A) (the "St. Luke's EMTALA Injunction"). *See* Mem. Decision & Order, *St. Luke's Health Sys., Ltd. v. Labrador*, No. 1:25-CV-00015-BLW (D. Idaho Mar. 20, 2025). I am aware that other lawsuits are also pending in federal and state courts seeking relief from the Abortion Bans. To date, none of these cases has resulted in a final judgment that would allow me to provide medically indicated abortion care in all of the following circumstances: (a) when pregnancy-related complications jeopardize the patient's health; (b) when continuing the pregnancy would exacerbate an underlying health condition or interfere with the patient's ability to obtain treatment for that condition; (c) when continuing the pregnancy would put the patient at risk of death from self-harm; (d) when the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable; and (e) when a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses. As explained below, I face a credible threat of prosecution for providing a patient with

an abortion in these circumstances, unless the abortion is necessary to prevent the patient's death from a cause other than self-harm or the conditions of the preliminary injunction described above are satisfied.

**Credible Threat of Prosecution for Providing Medically Indicated Abortion Care**

35. Although Defendants' expert Dr. Kraus opines that the Abortion Bans prohibit only "so-called elective abortions," Kraus Expert Report ¶ 12, her testimony underscores why I and other Idaho healthcare providers face a credible threat of prosecution for providing abortion care in a wide range of cases where maternal or fetal health indications for abortion are present.

36. Contrary to well-established standards in obstetrics and gynecology, Dr. Kraus contends that abortion is medically indicated only when strictly necessary to prevent a pregnant patient's death. She deems all other abortions performed for maternal or fetal health reasons to be "elective." *Id.* at ¶ 30. Indeed, she contends that the "litany of examples" of serious medical indications for abortion that Plaintiff's medical experts discussed in their expert reports "is an attempt to medicalize elective abortions." *Id.* Thus, it is her view—and by extension Defendants' view since they have proffered her as an expert—that I and other healthcare providers violate the Abortion Bans and are subject to criminal prosecution for providing therapeutic abortion care in any circumstance where it is not strictly necessary to prevent a pregnant patient's death, including the circumstances described in my prior expert report and Plaintiff's other medical expert reports.

37. For example, Dr. Kraus contends that an abortion would constitute a criminal violation of the Abortion Bans when performed in cases where the embryo or fetus is diagnosed with a fatal or grave condition, unless the pregnant patient is also likely to die if the pregnancy continues. *Id.* at ¶ 57 ("Termination of pregnancy if only desired due to an adverse fetal

diagnosis and without preexisting or new risks to the mother's health is not medically necessary."). So too in cases where a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses. *Id.* at ¶ 74 ("Multifetal reduction is an option for patients with multiple gestations, however I would not say it is medically indicated or necessary . . . .").

38. Dr. Kraus will not even concede that abortion is statutorily permissible in Idaho in all cases where a pregnancy-related complication poses a life-threatening risk to a pregnant patient. She says only that an abortion "may" be permissible in these circumstances. *See, e,g.*, *id.* at ¶ 33 ("MFMs routinely deal with medical issues that arise as a result of the pregnancy. In some of these situations, a pregnant woman's life is threatened and an abortion *may* be medically indicated." (emphasis added)). She contends, for example, that when preterm premature rupture of membranes ("PPROM") occurs, a physician may not terminate the pregnancy immediately but must wait until the patient is no longer medically stable. *Id.* at ¶ 34 ("If patients are medically stable and elect for termination of pregnancy instead of expectant management, they would need to arrange for termination out of state."). She takes this position despite acknowledging that, "infections can escalate quickly," and "in rare cases, infections progress so rapidly a patient's life becomes endangered very rapidly." *Id.* at ¶ 86.

39. Notably, Dr. Kraus contends that, "when there are other options for treatment[,] . . . abortion as a specific intervention may not be necessary." Kraus Expert Report ¶ 84. This casts further doubt on the ability of Idaho doctors to provide even lifesaving abortion care because there are always other options for treatment, though they may entail much greater risk for the patient.

40. In addition, Dr. Kraus contends that "[a]bortion is not [n]ecessary in [c]ases where the [p]regnancy [m]ay [i]nfluence [t]reatments for a [c]ondition." *Id.* at 25 (heading). She states that "[i]f, through shared decision making, the patient desires to terminate the pregnancy as a way to optimize care of any underlying conditions, or if they become pregnant while taking medications dangerous or teratogenic to an early pregnancy," the patient must travel out of state to obtain abortion care, making clear her view that I could be criminally prosecuted for providing such care in Idaho. *Id.* at ¶ 45.

41. I recently saw a patient with end-stage renal disease ("ESRD") who is undergoing peritoneal dialysis and is on the kidney transplant list. She became pregnant unintentionally following a contraceptive failure. For patients with chronic kidney disease and especially ESRD, pregnancy poses high risks to both the pregnant person and the fetus.[3] Moreover, patients are generally not eligible for a kidney transplant while pregnant, and the American Society of Transplantation and the American Society of Transplant Surgeons recommend waiting at least one year after receiving a kidney transplant before becoming pregnant.[4] After being counseled about the risks of pregnancy and her treatment options, the patient decided that an abortion would be in her best interest. I could not provide the abortion for her without facing prosecution for violating the Ban Throughout Pregnancy, so I had to refer her out-of-state.

---

[3] McCarthy S, Tasset J, Curl O, Dzubay S, Caughey AB. The impact of denying abortion access to patients with chronic kidney disease: a cost-effectiveness analysis. Contraception 2025; 146:110863. doi: 10.1016/j.contraception.2025.110863.

[4] Kidney Disease: Improving Global Outcomes (KDIGO) Transplant Work Group. KDIGO clinical practice guideline for the care of kidney transplant recipients. Am J Transplantation 2009; 9(Suppl 3):S1–S157. doi:10.1111/j.1600-6143.2009.02834.x.

**Avoidable Harms of Out-of-State Travel**

42. Having to travel out of state to obtain a therapeutic abortion delays access to care and increases the medical risks that patients face. In addition, the need to travel may prevent patients who lack the necessary resources from obtaining care at all.

43. Dr. Kraus acknowledges that having to travel out of state to obtain healthcare services "may lead to burdens on the patient due to travel, cost, or other factors," but contends that this is par for the course, stating that "[t]here are many situations where, due to the lack of access to certain therapies (most commonly due to the absence of trained medical providers), patients need to travel for specific care." Kraus Expert Report ¶ 100.

44. This is not an apt comparison. Having an insufficient number of trained medical providers to serve the local community is a failure of the healthcare system. When it occurs, the resulting harms are unavoidable. In contrast, the harms that result from forcing patients to travel out of state to obtain care that Idaho doctors are ready and willing to provide are completely avoidable.

**Medical Indications for Abortion**

45. Abortions for maternal or fetal health reasons are generally referred to as medically indicated abortions. In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of conduct advisable.

46. There are a wide variety of indications for abortion, many of which constitute serious medical needs.

47. While it is impossible to catalog all of the serious medical needs that are indications for abortion given the sheer variety and diversity of patient health circumstances, such needs generally arise in the following five circumstances: (1) pregnancy-related complications jeopardize the patient's health; (2) pregnancy exacerbates underlying health

conditions or interferes with the patient's ability to obtain effective treatment for those conditions; (3) continuing the pregnancy would put the patient at risk of death from self-harm; (4) the fetus is diagnosed with a fatal or grave condition; and (5) a multifetal pregnancy reduction would increase the likelihood of survival of the remaining embryos or fetuses.

**A. Pregnancy-Related Complications**

48. A wide variety of complications can develop during pregnancy that pose serious threats to a patient's health but will not necessarily result in the patient's death. It is impossible to provide an exhaustive list of these, but I will offer a few examples.

49. Preterm premature rupture of membranes ("PPROM") occurs when a patient's gestational sac ruptures before the pregnancy reaches full term, allowing amniotic fluid to leak out, disrupting the barrier between the fetus and normal bacteria on our bodies. Loss of the fluid, especially early in the pregnancy, can lead to inadequate lung development, which can be lethal, as well as severe infection that can be lethal to both mother and fetus.

50. After the Abortion Bans took effect but before the St. Luke's EMTALA Injunction was in place, I saw a patient who was approximately 18 weeks' gestation and presented with grossly ruptured membranes. She showed early signs of an infection, including an elevated white blood cell count and an elevated heartbeat. My assessment was that she had an early intrauterine infection and, unless her pregnancy was terminated, she would develop a worsening infection, but I could not say for sure that it would be fatal. If she delayed termination until it became clear that death was inevitable, it might have been too late to save her life. She wanted to terminate the pregnancy immediately, so I referred her to a doctor in Utah and arranged for air transport. By the time she arrived in Utah, she met the criteria for sepsis. Sepsis is a very serious complication of infection. Without prompt treatment, sepsis can lead to multiple organ failure and death. People who recover from sepsis may experience long-term physical and

psychological effects. Thankfully, the patient recovered after having a dilation and evacuation ("D&E") procedure to terminate her pregnancy and receiving antibiotics, but she may experience ongoing health effects.

51. Cervical insufficiency is a condition where the cervix dilates without any symptoms leading to the membranes, and possibly the fetus, beginning to pass through the cervix. This exposes the uterine contents to the normal bacteria of the body. It is sometimes possible to replace the contents and close the cervix with a cerclage (in other words, tie it closed), but this is dangerous. The risks of infection are very high and almost always PPROM will subsequently occur.

52. Before the Abortion Bans took effect, I treated a patient who was admitted to the hospital at 20 weeks after presenting with no pain but feeling that something was wrong. On examination, she was found to have the membranes ballooning through the cervix as well as fetal parts. This was clearly not a situation where the pregnancy would be able to make it to viability, and prolonging the pregnancy would have placed the patient at risk of infection and complications. Ultimately, we proceeded with a medically induced abortion at the hospital in Idaho.

53. If I encountered a patient in the same condition today, she would have to be referred to another state.

54. Hypertensive disorders like pre-eclampsia are common complications of pregnancy that are extremely serious. Pre-eclampsia is characterized by high blood pressure and high levels of protein in the urine. It can lead to seizure, stroke, organ failure, and death.

55. Before the Abortion Bans took effect, I treated a patient at approximately 20 weeks who presented in the emergency department with pre-eclampsia. Her blood pressure was

in the severe range, her platelets were dropping, and she was starting to develop HELLP Syndrome, a serious complication that entails hemolysis, elevated liver enzymes, low platelet levels, and low red blood cell levels. Continued pregnancy would have put her at high risk of liver failure, kidney failure, stroke, and disseminated intravascular coagulation ("DIC"), a blood clotting disorder. The only way to reverse pregnancy-associated hypertension is to remove the placenta. The patient chose to terminate the pregnancy through induction of labor. I was able to treat her immediately in Idaho.

56. Since the Abortion Bans took effect, my colleagues have had to refer several patients with hypertensive disorders to out-of-state abortion providers.

57. Placental abruption is another serious complication of pregnancy. It occurs when the placenta prematurely detaches from the uterus. Major vaginal bleeding or large amounts of blood collecting in the uterus can lead the patient to become anemic. It can also lead to poor placental function and deprive the fetus of oxygen. A large blood clot in the uterus can lead to PPROM and it also can increase the likelihood of infection around the fetus.

58. Before the Abortion Bans took effect, I treated a patient who started to experience vaginal bleeding from a placental abruption at approximately 12 weeks' gestation. By approximately 17 weeks' gestation, the patient required blood transfusions for the anemia. The bleeding continued unpredictably, and it was unlikely that the pregnancy would be able to reach viability. The risks of needing multiple transfusions, PPROM, infection, or DIC all remained high. At approximately 19 weeks' gestation, the patient decided to terminate the pregnancy, and we were able to perform a D&E procedure for her in Idaho.

59. If I encountered a patient in the same situation today, I would have to refer her out of state to obtain abortion care.

**B. Underlying Health Conditions**

60. Pregnancy can exacerbate underlying health conditions and interfere with treatment of those conditions. It is impossible to provide a comprehensive list of these. Illustrative examples include heart disease, hypertension, chronic kidney disease, diabetes, cancer, autoimmune disorders, and mental health disorders.

61. Before the Abortion Bans took effect, I treated a woman who suffered from severe heart failure. She was able to function with difficulty, but the addition of the stresses of pregnancy placed her at risk of death. We worked with her cardiologist to help determine her level of risk. After discussing and considering the risks, she ultimately made the difficult decision to undergo termination of the pregnancy.

62. At that time, I was able to provide the termination in Idaho, but today, she would have to travel to another state.

63. The patient with ESRD who I discuss in paragraph 41, above, is another example of a patient whose underlying health condition is a medical indication for abortion.

**C. Risk of Death from Self-Harm**

64. For some patients with serious mental health disorders, pregnancy will exacerbate their condition or complicate their treatment. This includes patients with substance use disorders.

65. Some medications used to treat mental health disorders are associated with birth defects. People managing their mental health with such medications who become pregnant must make a difficult decision about whether to continue taking their medication despite the risk to the fetus, to stop taking their medication despite the risk to their mental health, or to terminate the pregnancy.

66. I served on Idaho's Maternal Mortality Review Committee ("MMRC") from 2019 to 2023. The MMRC reviewed all maternal deaths in the state during the time period from the beginning of the pregnancy until one year after the end of the pregnancy. Consistent with other MMRCs from across the United States, we determined that the most common underlying cause of death was mental health conditions. Often, these deaths resulted from self-harm such as suicide or overdose.

67. I personally treated a patient with bipolar disorder who became pregnant. Before her pregnancy, the patient was taking medication to manage her condition. She decided to continue the pregnancy and stop taking her medication to avoid risks to the fetus. Subsequently, her mental health deteriorated. She was able to carry the fetus to term and give birth, but she died from suicide during the postpartum period.

68. Severe mental health disorders, including substance use disorders, are medical diseases that need medical treatment and cannot be overcome with willpower or wishful thinking. If mental health conditions influence someone to commit suicide or overdose from substance use, they are not exercising their free will. They are responding to feelings and impulses that are beyond their immediate control. The hormonal and social changes of pregnancy add additional challenges that can compound the illness.

**D. Fatal or Grave Conditions Affecting the Embryo or Fetus**

69. Reproduction is an imperfect process that can lead to an embryo or fetus developing abnormally. This abnormal process may lead to a wide range of conditions that are fatal or grave, meaning they will result in miscarriage, stillbirth, or infant mortality (*i.e.*, death within a year of birth). It is impossible to provide an exhaustive list of these conditions.

70. Illustrative examples include anencephaly, a fatal condition in which the fetal brain and skull do not develop properly; Trisomy 13 and 18, significant chromosomal disorders

that often have major abnormal organ development and usually result in miscarriage or death within a year of birth; Meckel Syndrome, a fatal disorder dominated by abnormal kidneys that prevent generation of amniotic fluid that is important for fetal lung development; Limb Body Wall Complex, another fatal condition characterized by the disruption of the development of fetal organs, limbs, and other body structures; and some fetal heart defects.

71. Before the Abortion Bans took effect, I regularly provided abortion care to patients diagnosed with fatal or grave fetal conditions. Now, I must refer those patients to out-of-state doctors when they want to terminate their pregnancies, which increases both the stress and expense for families when they must leave their community for care.

72. Recently, I referred two patients with fatal fetal conditions out of state. One was approximately 12 weeks' gestation whose fetus was affected with anencephaly. The other was approximately 14 weeks' gestation whose fetus was complicated by a fatal Limb Body Wall Complex.

**E. Multifetal Pregnancy Reductions**

73. Multifetal pregnancies pose serious risks to both the pregnant patient and the developing embryos and fetuses, especially in cases of higher-order multiples. Performing a pre-viability procedure to reduce the total number of gestations both decreases the risk of serious injury and death for the patient and increases the likelihood of survival for the remaining embryos or fetuses.

74. Twin pregnancies can be affected by a developmental or genetic anomaly in one twin while the other is healthy. Reducing the pregnancy to a single fetus can provide benefits to the unaffected fetus.

75. Over the course of my career, before the Abortions Bans took effect, I performed several reduction procedures for patients with multiple gestations.

76. For example, I treated a patient carrying quadruplets and reduced the pregnancy to twins. The patient subsequently delivered near term without complication.

77. I also vividly recall a case where I was not able to provide intervention soon enough. The patient was pregnant with septuplets and wanted to reduce the pregnancy, but she ultimately miscarried all the fetuses at 10 weeks before I was able to perform the procedure.

78. In addition, I counseled a patient with quintuplets about the risks of higher-order multiples. The family was determined not to reduce the pregnancy, and our practice supported their decision. Unfortunately, the patient ultimately delivered so early that the outcome was only one surviving neonate with multiple, severe, long-term complications.

79. Recently, I treated a patient carrying twins. One twin was healthy and the other had a lethal condition. Absent intervention, the patient would have faced heightened risks of pre-eclampsia, gestational diabetes, postpartum hemorrhage, and miscarriage. She wanted to reduce the pregnancy, but the Abortion Bans prevented me from performing the procedure in Idaho. Instead, I referred the patient to a doctor in Utah, who performed the procedure. Ultimately the pregnancy ended with the birth of a healthy baby.

Dated: 11/8/2025

Signed by:

8FA80DAB4D674B6...

Stacy Seyb, M.D.

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D., <br><br> Plaintiff, <br><br> v. <br><br> MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, <br><br> Defendants. | ) | Case No.: 1:24-cv-00244-BLW <br><br> **DECLARATION OF MARCELA SMID, MD** |

MARCELA SMID, MD, hereby declares under penalty of perjury that the following statements are true and correct:

1. I am an expert witness for Plaintiff in this case. My areas of expertise are obstetrics-gynecology, maternal-fetal medicine, complex family planning, and addiction medicine.

2. Attached hereto as Exhibit A is a true and correct copy of the expert report I prepared for this case in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). All of the statements in the expert report are true and correct to the best of my knowledge. The expert report provides a summary of the opinions that I would offer if called to testify at trial.

Dated: 11/4/25

Marcela Smid, MD

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| STACY SEYB, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al*.,<br><br>Defendants. | ) | Case No.: 1:24-cv-00244-BLW |

**EXPERT REPORT OF MARCELA SMID, M.D.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), MARCELA SMID, M.D., makes the following disclosures:

1. I am a physician board-certified in obstetrics-gynecology, maternal-fetal medicine, complex family planning, and addiction medicine. I provide the following opinions as an expert in the treatment of patients with high-risk pregnancies.

**STATEMENT OF MY OPINIONS AND THE BASIS AND REASONS FOR THEM**

**Overview of Opinions**

2. In treating patients with high-risk pregnancies, it is standard to recognize certain medical indications for abortion and counsel patients about that treatment option.

3. Idaho's abortion bans deprive pregnant people of vital treatment options for serious medical needs by prohibiting medically indicated abortion in most circumstances where it may be indicated. *See* Idaho Code § 18-622 ("Ban Throughout Pregnancy"); Idaho Code §§ 18-8801 to 18-8808 ("Fetal Heartbeat Ban").

4. Therefore, the abortion bans force pregnant people with travel resources to leave Idaho and come to medical facilities outside of the state—such as mine in Utah—to obtain medically indicated abortion care. In some instances, travel delays can have serious medical consequences. In other instances, when pregnant people cannot travel, they are deprived of care options for their serious medical needs.

**Physiology of Pregnancy**

5. To understand my opinions on the medical indications for abortion, it is important to understand the physiology of pregnancy.

6. When a person becomes pregnant, their body rapidly undergoes various physiological changes to accommodate the growing fetus, support fetal development, and prepare for delivery and postpartum changes.

7. In fact, almost every organ system in the body changes during pregnancy. Pregnant patients can expect cardiovascular, respiratory, renal, endocrine, gastrointestinal, musculoskeletal, integumentary, reproductive, immune, and nervous system changes.

8. Starting with the cardiovascular system, blood volume increases by 30–100% in order supply oxygen and nutrients to the embryo and support the pregnant person's body. This means the heart must pump more blood each minute, increasing cardiac output. For twins and higher-order gestation (e.g., triplets), the blood volume and cardiac output are further exaggerated. Blood pressure changes throughout the 40 weeks; in some cases, blood pressure can rise to dangerous levels, increasing the risk of stroke. The growing uterus can compress the inferior vena cava—the large vein that returns blood from the lower body to the heart—predisposing pregnant individuals to development of deep vein thrombosis that can be life-threatening. Immediately post-partum, the body has to transform again. The uterus size decreases

dramatically to prevent bleeding and the blood that was previously in the uterus returns into maternal circulation.

9. Pregnancy increases the body's demand for oxygen within the respiratory system, and the breathing rate often rises to meet the demand. The expansion of the uterus pushes upward against the diaphragm, causing a feeling of shortness of breath. The amount of air inhaled and exhaled with each breath increases, circulating more air through the lungs. The oxygen disassociation curve causes a patient's entire pH (acid/base status) to change.

10. The renal system is impacted because the kidneys must work harder than before to filter the increased volume of blood running in the body and to excrete waste products from both the fetus and the pregnant person. This increased glomerular filtration rate leads to increased urine output.

11. The endocrine system changes as the physiology of pregnancy dramatically increases the hormones in the body, fundamentally changing the neurobiology of a pregnant person. Outside of being born, pregnancy is the single most dramatic—sometimes catastrophic—change in hormones in a person's life. The placenta produces Human Chorionic Gondaotropin, which ensures the continued production of high progesterone and estrogen levels. Progesterone levels increase significantly to maintain the uterine lining, suppress uterine contractions, and support pregnancy. Estrogen levels rise steadily throughout pregnancy, contributing to uterine growth, breast tissue development, and increased blood flow to the uterus. Prolactin levels rise to prepare for lactation after birth. Pregnancy typically increases thyroid hormone production to help with metabolic changes and sometimes leads to conditions like gestational hyperthyroidism. Pregnancy can also induce insulin resistance, which in some cases causes worsening of Type 1 or Type 2 diabetes or development of gestational diabetes, to ensure the fetus receives adequate

glucose. Additionally, the increase in hormones can promote the development of some cancers, including breast or ovarian cancer. Additionally, because hormones function as neuro-steroids, these dramatic fluctuations can affect neurotransmitter signaling including dopamine, serotonin, GABA receptor modulation, resulting in destabilization of depression, anxiety, bipolar disorder, or development of postpartum depression or psychosis.

12. In the gastrointestinal system, progesterone relaxes the smooth muscles, including those inside the gastrointestinal tract. This can lead to gastroparesis, a condition where the stomach's normal ability to move food into the small intestine is slowed down or stopped. The liver increases its production of certain proteins, and there may be slowing of cessation of bile acids moving from the liver to the gallbladder that can result in complications including cholestasis of pregnancy.

13. Hormones like relaxin soften ligaments and joints in the musculoskeletal system. As the uterus grows, the center of gravity shifts and the body compensates by altering posture. Weight gain increases the stress on the musculoskeletal system, especially the spine and lower limbs, resulting in increased pain, particularly when there are underlying or pre-existing injuries or conditions.

14. In the integumentary system, changes occur to the skin and hair. Hormonal changes increase sweating. Dark pigmentation may appear on the forehead and cheeks, and a dark vertical line may appear on the abdomen from the pubic area to the belly button. The skin stretches rapidly, particularly around the abdomen, breasts, and thighs. Estrogen prolongs the hair's growth phase.

15. In the reproductive system, the uterus grows from the size of a pear to the size of a watermelon. The cervix shortens and increases vascularity, and mucus plugs may form to protect a developing fetus from infections.

16. Pregnancy causes a complex modulation of the immune system to protect the mother from disease while preventing the rejection of the fetus. This can change the infection response. Immunosuppression can make the pregnant person more prone to infections such as respiratory, yeast, or urinary infections, particularly if they are already immunocompromised from autoimmune conditions such as lupus.

17. In the nervous system, pregnancy has a variety of impacts. It affects the autonomic nervous system, which controls many basic bodily functions such as heart rate, blood pressure, digestion, urination, and temperature regulation. Thus, the autonomic nervous system is responsible for triggering many of the pregnancy-related changes in other body systems discussed above. For example, pregnancy increase "sympathetic" activity, which is one of the body's ways of responding to stress, resulting in increased heart rate and blood flow, and slowed digestion, among other things. The hormonal changes brought about by pregnancy also impact the brain in ways that affect mood, behavior, and other psychologic attributes.

18. Considering how the body changes during and after pregnancy, it is not difficult to see how it can substantially impact a person's health during pregnancy and potentially for the rest of a patient's life.

**Medically Indicated Abortion**

19. In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of action advisable. An abortion is "medically indicated" when there is a medical reason for terminating a patient's pregnancy.

20. Abortions can be medically indicated in circumstances where pregnancy-related complications jeopardize the pregnant person's health. They can be medically indicated where continuing the pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain effective treatment for that condition. They can also be medically indicated in circumstances where continuing the pregnancy would put the pregnant person at risk of death from self-harm. Further, abortions can be medically indicated when the embryo or fetus is diagnosed with a fatal or grave condition. They can also be medically indicated in multifetal pregnancy when a reduction would increase the likelihood of survival of the remaining fetuses.

21. One of the Idaho abortion bans allows abortion only in certain instances of sexual assault or where "the physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." *See* Idaho Code § 18-622. This exception from the abortion ban does not apply when the pregnant person faces a risk of death from self-harm. *Id.* § 18-622(2)(a)(i).

22. The other ban allows abortion only in certain instances of sexual assault or when there is a "medical emergency," *id.* § 18-8804(1), defined as "a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function," *id.* § 18-8801(5).

23. In my expert medical opinion, Idaho's abortion bans prohibit doctors from providing medically indicated abortion care in a wide range of circumstances in which patients have serious medical needs, and this is profoundly detrimental to patient health.

### A. Options Counseling and Medical Decision-making

24. Shared decision-making between a physician and patient is the standard for all healthcare. For shared decision-making to be effective, physicians must provide patients with clear, accurate, and comprehensive information that informs the patient about their diagnosis, treatment options, potential risks, and expected outcomes. This is often understood as informed consent, and it empowers patients to make decisions aligned with their values, goals, and preferences.

25. A physician's judgment and a patient's autonomy to make decisions about the impacts of a particular course of treatment are closely interconnected and critical elements of healthcare.

26. A physician makes decisions based on medical training, clinical experience, and evidence-based guidelines. The physician must analyze signs and symptoms, test results, and other diagnostic information to form a diagnosis and recommend treatment options. However, a physician cannot say for certain that an outcome will happen to a specific person: only what is probable or possible.

27. Most medical decisions, from whether to have surgery to whether to take a course of antibiotics, involve uncertainty. The practice of medicine cannot be separated from the simple reality that physicians use their judgment to navigate situations where the evidence is incomplete or ambiguous.

28. There is no one formula for options counseling and physician recommendations for any medical indication for a certain treatment. Each circumstance is different and varies based on the blend of a physician's clinical knowledge, expertise, data, and the specific details of an individual patient's presentation, course and circumstances.

29. Physicians are guided by ethical principles such as beneficence, nonmaleficence, autonomy, and justice. Beneficence essentially means acting in a patient's best interests. Nonmaleficence can be described as avoiding harm. Autonomy gives rise to a duty to respect a patient's right to make their own decisions in line with their personal values. Justice in this context equates to a duty to treat everyone fairly and ensure that no one is disadvantaged relative to others.

30. Respecting patients' autonomy is key to shared decision-making. This means a physician must acknowledge their patient's right to decide about their treatment.

31. Not all patients with medical indications for abortion choose to have an abortion, but many do.

32. Even if a patient's decision differs from the physician's recommendation, their autonomy is paramount, as long as they are fully informed and capable of decision-making. In other words, even if a patient's decision may conflict with what the physician believes is medically optimal, the act of patient decision-making with the full context of diagnosis, treatment options, potential risks, and expected outcomes is the foundation of healthcare.

33. When helping a pregnant person explore a medically indicated abortion, there are often long conversations about the health risks to the pregnant person, fetal health concerns, mental health considerations, and the exploration of all treatment options.

34. In my experience, patients consider the specifics of pre-existing health conditions and how likely pregnancy will affect them, the diagnosis, resources in the immediate community, whether they want to have additional children, their values around abortion, input from their partner and other family members, whether abortion is affordable and accessible, the health of the fetus and the prognosis for the health of an infant after delivery, the quality of life that infant

would have, and whether the medical resources could support a child with special needs in the community.

**B. Pregnancy-Related Conditions**

35. Pregnancy itself is life-threatening. In 2021, maternal mortality was 32.9 per 100,000 births. A recent study compared childbirth mortality rates to notoriously hazardous professions and found childbirth would come in sixth—just below aircraft pilots and flight engineers and just above truck drivers—if it were a profession. Aircraft pilot and flight engineer deaths were 35.9 per 100,000, and truck drivers were 30.4 per 100,000.

36. Frankly, pregnancy brings with it a host of risks, from infections to hemorrhaging. And some pregnancies are riskier than others. As a maternal-fetal medicine practitioner, I specialize in treating people whose pregnancies entail a heightened level of risk.

37. Many serious complications can arise during a pregnancy that lead the patient to terminate the pregnancy. While it would be impossible to provide an exhaustive list of these, common examples include preterm premature rupture of membranes (“PPROM”); placental abnormalities, and hypertensive disorders in pregnancy (“HPDs”).

38. PPROM occurs when a patient’s gestational sac ruptures and amniotic fluid leaks out before the onset of labor. In some cases, continued pregnancy will lead to the development of a serious infection, referred to as Triple I (Intrauterine Infection of Inflammation), which can result in the death of both the pregnant person and the fetus.

39. Placental abnormalities include placenta previa (when the placenta covers the cervix) and placental abruption (when the placenta prematurely detaches from the uterus). These conditions may cause hemorrhaging that can lead to organ damage, organ failure, or death.

40. HDPs are common pregnancy-related complications that entail persistently high blood pressure and can lead to organ damage, organ failure, or death. Preeclampsia is an HDP that typically occurs after twenty weeks of pregnancy, although some cases have been reported at seventeen to nineteen weeks of pregnancy. Pre-eclampsia can lead to stroke, kidney failure, liver failure, seizures, and death.

41. I have personally provided medically indicated abortion care at least once or twice a year throughout my career for these pregnancy-related conditions.

42. In the eight years I have worked in Utah, I am certain I have treated patients from Idaho with these conditions. These conditions are experienced across all regions of the country.

43. In my experience, denying a pregnant patient with a serious complication access to abortion exposes the patient to serious, long-term health impacts. These impacts will create an immediate risk of death for some patients, and for some patients, they will shorten a patient's life expectancy over a longer time horizon or profoundly harm a patient's quality of life.

**C. Conditions Exacerbated by Pregnancy**

44. Pregnancy can exacerbate many chronic medical conditions, including but not limited to cardiac diseases, hypertension, liver and kidney conditions, diabetes, asthma, autoimmune disorders, anxiety, depression, and substance use disorder. This list is not exhaustive.

45. Abortion is medically indicated when continuing the pregnancy would exacerbate an underlying physical or mental health condition or interfere with the pregnant person's ability to obtain effective treatment for that condition.

46. For example, as discussed in the physiology of pregnancy section above, pregnancy results in the kidneys needing to filter up to twice the amount of blood they usually filter. Consider someone who already has renal insufficiency. Pregnancy could accelerate that

patient's renal condition to the point of needing dialysis. Kidney dialysis is particularly challenging to maintain for those living in rural communities without nearby dialysis services. It interrupts familial and work obligations and can add considerable expense. Degeneration in renal function, which can occur due to pregnancy, may result in someone ultimately needing a kidney transplant—a procedure that will not be performed on a pregnant person.

47. Similarly, liver problems can be exacerbated by the underlying physiology of pregnancy. Pregnant individuals with liver compromise (cirrhosis) due to viral or autoimmune hepatitis, fatty liver disease or acholic liver disease may experience rapid decompensation due to increased blood volume with increase portal hypertension that can result in life-threatening esophageal varices and catastrophic bleeding. In the event of complete liver failure, a liver transplant will also not be performed on a pregnant person.

48. As another example, pregnancy makes it much harder for people with Type 1 and Type 2 diabetes to control their blood sugar. People with diabetes who have poorly controlled blood sugar are at high risk of heart disease, chronic kidney disease, nerve damage, blindness, amputations, and other serious conditions. Diabetes also increases the risk of adverse outcomes including birth defects, miscarriage, stillbirth, preterm birth, cesarean delivery and maternal intensive care unit admission.

49. For those with seizure disorders, seizures can be more common and less responsive to medications during pregnancy. Some medications are teratogenic. Pregnancy complications such as pre-eclampsia can lead to life-threatening eclamptic seizures. If this occurs in the pre-viable stage, there is no role for expectant management and termination must occur for maternal health.

50. Mental health and substance use disorder are conditions exacerbated by pregnancy. Pregnancy comes with a dramatic increase in hormones that fundamentally change the neurobiology of a pregnant person.

51. The end of a pregnancy—be it through live birth, miscarriage, or termination—dramatically changes the hormone levels of the pregnant person again. In some instances, the significant amount of estrogen and progesterone the body produces during pregnancy can stabilize a patient, but a person may experience significant decompensation following the end of a pregnancy when the hormones return to pre-pregnancy levels.

52. Most commonly, depression and anxiety conditions are impacted by hormonal changes. People with bipolar disorder can be very destabilized by pregnancy and the postpartum period. Some medications that are used to stabilize mental health conditions (e.g. lithium, carbamazepine, valproic acid) are associated with severe birth defects. Suicidal and self-harm thoughts may worsen, even if a pregnant person does not change their medications. About 1:1000 postpartum people experience postpartum psychosis, which is both life threatening to self and the infant.

53. Substance use disorder and pregnancy also interact in ways that are dangerous both to the pregnant person and to the fetus. Most people who use controlled substances stop by week 20 or dramatically decrease their usage. Post-partum, up 80% of these patients return to substance use.

54. Generally, pregnant people know that substance use is not healthy for themselves or their fetuses. Unfortunately, some are in the throes of substance use disorder and are unable to stop. That inability to stop use is diagnostic of this condition.

55. Substance use during pregnancy is actually a diagnostic sign of substance use disorder. This use is compulsive and distressing to the person with the disorder who is trying to stop usage during pregnancy and cannot. For people with more severe substance use disorder, cessation of substance use during pregnancy is extremely challenging, particularly when treatment programs are not available to accept pregnant or parenting individuals. In Idaho, there are extremely limited options for residential treatment for pregnant or parenting individuals with substance use disorder.

56. Physiologically, the brain has remodeled itself to recognize that substance use is necessary. Once the brain has remodeled itself in this way, people experiencing pregnancy still carry shame and face blame but cannot control their usage. They seek to hide their pregnancy and delay prenatal care while trying to change usage and cannot understand why they cannot stop their usage.

57. If a person cannot stop using substances despite medical intervention, and their continued use poses a life-threatening risk to themselves during pregnancy, abortion might be part of a broader care plan to preserve their health.

58. If abortion is banned in a state and there is no option of medically indicated abortion, the stigma will continue to delay care. It is only within the last decade that there have been medications and treatment options to assist those with substance use disorder, so many people are unaware of the treatment options or may not be comfortable with them.

59. Under the American Society of Addiction Medicine guidelines, pregnant patients with alcohol use disorder should be hospitalized for withdrawal to avoid life-threatening complications, including seizures that may result in cardio-pulmonary collapse. Pregnant patients who cannot undergo such hospitalization would be patients for whom abortion is medically

indicated. Pregnant patients who have both an opioid use disorder and a seizure disorder are at high medical risk during opioid withdrawal. Seizure disorders are disproportionately present in people with substance use disorder. Abortion may be medically indicated for pregnant patients with substance use disorder and with a seizure condition who need to withdraw from opioid usage.

60. There is also substantial risk when people who use opioids return to use after pregnancy, even if they stopped during pregnancy. These patients have had changes in their tolerance and what would have been normal usage before pregnancy puts the person at risk for respiratory depression and subsequent overdose.

61. Moreover, pregnancy can limit or complicate treatment options for people with certain serious health conditions.

62. For example, pregnancy is a contraindication for some routine cancer treatments, including radiation and chemotherapy, because those treatments carry a high risk of fetal death or serious birth defects. Alternative treatments are generally far less effective, threatening the pregnant person's likelihood of sustained survival.

63. As referenced above, some medications prescribed for mental health create complications during pregnancy. Lithium, for instance, is associated with birth defects, specifically congenital cardiac disease (Epstein's anomaly). Exposure happens in the early first trimester at the time that most pregnancy test become positive and when cardiac development occurs. Therefore, switching medication in the first trimester after learning of pregnancy does not reduce this risk. Some patients can safely switch to another medication if they plan for pregnancy before becoming pregnant, but the efficacy of the new medication is not guaranteed for the duration of the pregnancy.

64. Denying a pregnant patient access to abortion in these circumstances in this section may result in serious, long-term impacts to a patient's health. In some cases, these impacts will create an immediate risk of death, but in others, they will shorten a patient's life expectancy over a longer time horizon or profoundly harm a patient's quality of life.

65. I reach the opinions in this section based on my training, education, and vast experience treating people with these conditions. I had personally provided medically indicated abortion care for people when pregnancy exacerbated or had a significant risk of exacerbating an underlying medical condition that causes untenable risks to a person's health. In the eight years I have worked in Utah, I am nearly certain I have treated patients from Idaho who had most pre-existing conditions exacerbated by pregnancy discussed above. For those conditions I may not have treated Idaho patients for, I have treated patients with these conditions from other states. These conditions are not such that my practice in Utah would be any different from a provider in Idaho, except for the impact laws have started having on the delivery of care.

**D. Self Harm**

66. Suicide and overdose are among the leading causes of death for pregnant and post-partum people. I have reviewed the findings of Idaho's Maternal Mortality Review Committee, and found that the most common underlying cause of maternal death in Idaho was mental health conditions, encompassing deaths related to suicide, substance use disorder, overdose/poisonings and unintentional injuries.

67. There is a systematic stigma within the use of the term mental health as different than physical health. This usage draws from a fundamental misunderstanding about mental health. Mental health is the addressing of physical conditions—changes in neurotransmitter levels, receptor changes and hormone levels are physical conditions. Similarly, substance use

disorder is characterized by physical changes to the brain. Addiction medicine is a medical specialty like emergency medicine and internal medicine.

68. There is no medical reason to treat medical conditions that have symptoms that can cause self-harm differently from other medical conditions when it comes to medically indicated abortion. A patient cannot rely on will power to overcome a serious mental health condition like depression any more than a patient can rely on will power to overcome a serious condition like cancer.

**E. Fatal or Grave Condition of Fetus or Embryo**

69. It is my opinion that abortion is medically indicated when the embryo or fetus is diagnosed with a fatal or grave condition.

70. Some conditions, such as anencephaly, are universally lethal. For instance, major cardiac conditions such as hypoplastic left heart syndrome may be very likely to lead to death without multiple palliative surgical interventions. Other conditions, like Trisomy 13 and 18, have an extremely high rate of infant mortality.

**F. Multifetal Pregnancy Reduction**

71. Abortion is medically indicated when a multifetal pregnancy reduction would reduce a pregnant person's risk of death or serious injury and/or increase the likelihood of survival of the remaining fetuses.

72. Pregnancy outcomes and safety become more complicated with multifetal pregnancies. Depending on the type of multi-fetal gestation, the perinatal risks to both the fetus and the pregnant person can be 10-1000 times higher than a singleton pregnancy. Triplets are one thousand times more complicated, and quadruples are ten thousand times more complicated.

73. The risks for pre-eclampsia, deep venous thrombosis (blood clots), and heart defects are incredibly high. Multifetal pregnancies have a significantly high risk of preterm birth, which can lead to respiratory distress, feeding difficulties, and developmental delays.

74. Multifetal pregnancies are more likely to have low birth weight in part due to space and resources in the womb. Infants with low birth weight are likely to have increased susceptibility to infections, feeding difficulties, respiratory problems, and longer hospital stays.

75. Gestational diabetes is an increased risk for pregnant in people carrying multiple fetuses, which increases the chances of macrosomia, preterm birth, increased risk of cesarean section, and neonatal hypoglycemia. In monochorionic pregnancies where the fetuses share the placenta, blood flow can be uneven between the twins, with one fetus receiving too much blood and the other too little. This can lead to a risk of death for both fetuses if untreated.

76. Cesarean sections are more common across the board for multifetal pregnancies because of the malposition of the babies, fetal distress, and the likelihood of preterm birth. This increases the risks to the pregnant person of infection and bleeding.

77. Fetal growth restrictions are common in multifetal pregnancies in the second and third trimesters. If the growth is abnormal, there may be respiratory issues at birth, difficulty maintaining body temperature, and an increased risk of long-term developmental delays.

78. Postpartum hemorrhage is also more common because the uterus has to accommodate more than one fetus, which can cause it to be overdistended. This increases the likelihood of postpartum hemorrhage.

79. Because of all these complications, stillbirth rates are higher for multifetal pregnancies.

80. Multifetal reduction—also known as selective reduction—is a medical procedure used to reduce the number of fetuses in a multifetal pregnancy. It is more likely in triplets or higher, with the goal of improving the likelihood of a healthier pregnancy outcome for the remaining fetuses and the mother.

81. An early selective reduction can greatly increase the chances of a healthy pregnancy, protect the pregnant person, and increase the chances of healthy babies at delivery. Most multifetal pregnancy reductions occur in the first trimester.

**FACTS OF DATA CONSIDERED IN FORMING MY OPINIONS**

82. My opinions are based on my clinical experience; education and training; research; attendance at professional conferences; and knowledge of the relevant literature, including the sources identified below:

a. Forbes, L., Werner, E., Lappen, J. R., Policy, S. H., Society for Maternal-Fetal Medicine (SMFM, SMFM Reproductive Health Committee, & Advocacy Committee), Society for Maternal-Fetal Medicine Position Statement: Access to abortion care, *American Journal of Obstetrics and Gynecology*, 231(1), B7 (July 2024).

b. Battarbee, A. N., Osmundson, S. S., McCarthy, A. M., Louis, J. M., Society for Maternal-Fetal Medicine (SMFM, & SMFM Publications Committee), Society for Maternal-Fetal Medicine Consult Series # 71: Management of previable and periviable preterm prelabor rupture of membranes, *American Journal of Obstetrics and Gynecology*, 231(4), B2 (October 2024).

c. Irani, R. A., Coscia, L. A., Chang, E., Lappen, J. R., Society for Maternal-Fetal Medicine (SMFM, & SMFM Publications Committee), Society for Maternal-Fetal Medicine Consult Series # 66: Prepregnancy evaluation and pregnancy management of patients with solid organ transplants, *American Journal of Obstetrics and Gynecology*, 229(2), B10–B32, B11 (August 2023).

d. Kaimal, A., Norton, M. E., & Society for Maternal-Fetal Medicine (SMFM), Society for Maternal-Fetal Medicine Consult Series # 55: Counseling women at increased risk of maternal morbidity and mortality, *American Journal of Obstetrics and Gynecology*, 224(4), B19–B20 (April 2021).

e. Miller, R. S., Miller, J. L., Monson, M. A., Porter, T. F., Običan, S. G., Simpson, L. L., et. al., & SMFM Publications Committee, Society for

Maternal-Fetal Medicine Consult Series # 72: Twin-twin transfusion syndrome and twin anemia-polycythemia sequence, *American Journal of Obstetrics and Gynecology*, 231(4), B22 (October 2024).

f. Wyndi Kappes, If Childbirth Were a Job, It'd Rank Among the Most Dangerous in the US, *The Bump*, November 22, 2024, https://www.thebump.com/news/most-dangerous-jobs-childbirth.

g. Caughey, A. B., Kaimal, A., Gabbe, S., & American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Obstetrics, ACOG Practice Bulletin No. 201: Pregestational Diabetes Mellitus, *Obstetrics and Gynecology*, 132(6), e228–e248 (December 2018).

h. Steinauer, J., Jackson, A., Grossman D., & American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Obstetrics, ACOG Practice Bulletin No. 135: Second Trimester Abortion ACOG, *Obstetrics and Gynecology*, 121(6), 1394–1406 (June 2013).

i. Caughey, A.B., Turrentine, M., & American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Obstetrics, ACOG Practice Bulletin No. 190: Gestational Diabetes Mellitus, *Obstetrics and Gynecology*, 131(2), e49–e64 (February 2018).

j. Silverman, N.S., Beigi, R.H., Shields, A.D., et. al., & American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Obstetrics, ACOG Clinical Practice Update: Update on Criteria for Suspected Diagnosis of Intraamniotic Infection *Obstetrics and Gynecology*, 144(1), e17–19 (July 2024).

k. Smid, M. C., & Terplan, M., What Obstetrician–Gynecologists Should Know About Substance Use Disorders in the Perinatal Period, *Obstetrics & Gynecology*, 139(2), 317–37 (February 2022).

l. American Society of Addiction Medicine, Definition of Addiction, https://www.asam.org/quality-care/definition-of-addiction (Updated September 15, 2019).

m. Volkow, N. D., & Blanco, C., U.S. National Institute of Drug Abuse, Substance use disorders: a comprehensive update of classification, epidemiology, neurobiology, clinical aspects, treatment and prevention, *World Psychiatry*, 22:2, 203–229 (June 2023).

n. Koob, G. F., & Volkow, N. D. (2016). Neurobiology of addiction: a neurocircuitry analysis. *The Lancet Psychiatry*, *3*(8), 760–773.

o. Meltzer-Brody, S., Stuebe, A., Dole, N., Savitz, D., Rubinow, D., & Thorp, J. (2011). Elevated corticotropin releasing hormone (CRH) during pregnancy

and risk of postpartum depression (PPD). *The Journal of Clinical Endocrinology & Metabolism*, *96*(1), E40-E47.

p. Patterson, R., Balan, I., Morrow, A. L., & Meltzer-Brody, S. (2024). Novel neurosteroid therapeutics for post-partum depression: perspectives on clinical trials, program development, active research, and future directions. *Neuropsychopharmacology*, *49*(1), 67-72.

q. Pawluski, J. L., Lonstein, J. S., & Fleming, A. S. (2017). The neurobiology of postpartum anxiety and depression. *Trends in neurosciences*, *40*(2), 106-120.

r. Pawluski, J. L. (2019). The neurobiology of maternal mental illness: current understanding and future directions. *Archives of Women's Mental Health*, *22*(3), 407-408.

s. Treatment and management of mental health conditions during pregnancy and postpartum. Clinical Practice Guideline No. 5. American College of Obstetricians and Gynecologists. Obstet Gynecol 2023;141:1262-88. doi: 10.1097/AOG.0000000000005202.

t. Meltzer-Brody, S. (2011). New insights into perinatal depression: pathogenesis and treatment during pregnancy and postpartum. *Dialogues in clinical neuroscience*, *13*(1), 89-100.

u. Hayes, EJ, Society for Maternal Fetal Medicine, American College of Obstetricians and Gynecologists, ACOG Practice Bulletin No. 231: Multifetal Gestations: Twin, Triplet, and Higher-Order Multifetal Pregnancies, 137(6), e145–e162 (June 2021).

v. Vidaeff, A., Espinoza, J., Simhan, H., et al, & American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Obstetrics, ACOG Practice Bulletin No. 203: Chronic Hypertension in Pregnancy, 133(1), e26–e50 (January 2019).

## EXHIBITS USED TO SUMMARIZE OR SUPPORT MY OPINIONS

83. I have not used any exhibits to support my opinions, but I reserve the right to create demonstrative exhibits that summarize my opinions for use at trial.

## MY QUALIFICATIONS AND PUBLICATIONS

84. I am a physician with board certifications in obstetrics & gynecology, maternal fetal medicine, complex family planning, and addiction medicine.

85. I serve as an Associate Professor in Obstetrics and Gynecology and an Adjunct Professor in Psychiatry at the University of Utah.

86. I have been practicing medicine for 12 years and am licensed to practice medicine in Utah, North Carolina, Wyoming, and Nevada.

87. I also hold certifications in Nuchal Translucency and Cervical Length Education and Review. Cervical length education and review refers to the process of understanding, measuring, and assessing the length of the cervix during pregnancy, typically to evaluate the risk of preterm labor or other complications. Nuchal translucency refers to the fluid-filled space at the back of a fetus' neck that can be measured via ultrasound during early pregnancy. The nuchal translucency test is a screening test typically performed between 11 and 14 weeks of gestation to assess the risk of chromosomal abnormalities and other fetal conditions.

88. I serve as the Director of Perinatal Addiction Services and the medical director of the Substance Use & Pregnancy – Recovery, Addiction, Dependence (SUPeRAD) specialty prenatal clinic at the University of Utah. This multi-disciplinary clinic provides care to those who are pregnant and postpartum individuals with substance use disorders, providing tailored care and support.

89. In addition to my above duties, I am the chair of the Utah Maternal Mortality Review Committee ("UMMRC") and a member of the Utah Infant Mortality Review Committee ("UPMRC").

90. The UMMRC is a statewide committee dedicated to reviewing maternal deaths in Utah to understand their causes and contributing factors. Specifically, we look at deaths that occur during pregnancy, childbirth, or within one year postpartum. The UMMRC reviews all available data, including medical records, autopsy reports, and any other relevant documentation,

to determine the cause of death and identify any preventable factors. We strive to prevent future maternal deaths through data collection, analysis, and recommendations for improving maternal care.

91. Similarly, UPMRC is a statewide committee that reviews infant deaths in Utah. We work to understand the causes and contributing factors behind stillbirths (generally fetal deaths after 20 weeks of gestation) and neonatal losses (including deaths of a live-born infant within the first 28 days of life). The committee gathers and reviews available data, including medical records, autopsy reports, and other relevant information, to understand the circumstances and causes of death.

92. I am also the medical director of the OB Air Med at the University of Utah in Salt Lake City—a specialized air medical transport service designed to provide rapid and safe transportation for obstetric patients experiencing emergencies. The service is part of the broader AirMed program at the University of Utah, which offers critical care air ambulance transport across the region. Our service is essential for providing access to high-level maternal and neonatal care, especially in rural or underserved areas in Utah or surrounding states, where access to specialized obstetric services might be limited. Idaho is a surrounding state served by our OB Air Med at the University of Utah.

93. I am a member of several professional societies, including the American College of Obstetricians and Gynecologists, the Society for Maternal-Fetal Medicine, the American Society of Addiction Medicine, the Infectious Disease Society for Obstetrics-Gynecology, and the Utah Society of Addiction Medicine.

94. I serve on the steering committee of the Utah Department of Health Opioid Safety Bundle. I am a supporting editor at the Journal of Addiction Medicine, the academic journal for

the American Society of Addiction Medicine. Additionally, I serve as a board member with the Utah Women and Newborn Quality Collaborative, a group of stakeholders who seek to enhance the quality of care for pregnant people and newborns by reducing adverse outcomes such as maternal and perinatal mortality and morbidity (serious health complications).

95. I earned a Bachelor of Arts degree from Case Western Reserve University with a major in medical anthropology and minors in chemistry and art history. I also earned a Master of Arts in medical anthropology with a concentration in international health from Case Western Reserve University.

96. I earned a Master of Science in health and medical sciences and an M.D. degree from the University of California, Berkeley.

97. Following my medical degree, I interned in obstetrics and gynecology at the University of Chicago Medical Center and completed a residency there, where I was Academic Chief Resident. I then completed a maternal-fetal medicine fellowship at the University of North Carolina at Chapel Hill.

98. My curriculum vitae, which sets forth my qualifications and publications in more detail, is attached hereto as **Exhibit 1**.

## CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT DURING THE PAST FOUR YEARS

99. None.

## COMPENSATION

100. I am being compensated at the rate of $300 per hour for my work on this case.

Dated: February 20, 2025

Marcela Smid

MARCELA SMID, M.D.

# Exhibit 1

# Marcela C. Smid, MD

HEALTH
UNIVERSITY OF UTAH

Associate Professor (Tenure Track)
Medical Director of Substance Use &
Pregnancy Recovery Addiction and Dependence Clinic
**Department of Obstetrics & Gynecology**
**Division of Maternal-Fetal Medicine**

[redacted]


## EDUCATION

| | |
|---|---|
| 07/2013 – 06/2016 | University of North Carolina at Chapel Hill<br>Chapel Hill, North Carolina<br>**Maternal-Fetal Medicine Fellowship** |
| 06/2012 – 06/2013 | University of Chicago Medical Center (Obstetrics and Gynecology)<br>Chicago, Illinois<br>**Academic Chief Resident** |
| 07/2009 – 08/2012 | University of Chicago Medical Center (Obstetrics and Gynecology)<br>Chicago, Illinois<br>**Resident** |
| 07/2009 – 07/2010 | University of Chicago Medical Center (Obstetrics and Gynecology)<br>Chicago, Illinois<br>**Intern** |
| 08/2003 – 05/2009 | University of California, San Francisco/University of California, Berkeley)<br>(Joint Medical Program: combined MD/MS program with additional research year)<br>**M.D.** |
| 08/2003 – 05/2006 | University of California, Berkeley (Health and Medical Sciences)<br>Berkeley, CA<br>**M.S.** |
| 08/2002 – 05/2003 | Case Western Reserve University (Medical Anthropology, Concentrations: International Health)<br>Cleveland, OH<br>**M.A.** |
| 08/1999 – 05/2003 | Case Western Reserve University (Major: Medical Anthropology; Minors: Chemistry, Art History)<br>Cleveland, OH<br>**B.A.** |

## BOARD CERTICIATIONS

| | |
|---|---|
| 07/23/2023- present | American Board of Obstetrics & Gynecology (Complex Family Planning) |
| 01/01/2019 - present | American Board of Preventative Medicine (Addiction Medicine) |
| 01/02/2018 - present | American Board of Obstetrics & Gynecology (Maternal Fetal Medicine) |
| 11/20/2014 - present | American Board of Obstetrics & Gynecology (Obstetrics and Gynecology) |

## CURRENT LICENSES/CERTIFICATIONS

| | |
|---|---|
| 2018 - Present | Medical License (NV) |
| 2018 - Present | Medical License (WY) |
| 2016 - Present | Medical License (UT) |
| 2016 - Present | Nuchal Translucency: Certification |
| 2014 - Present | Cervical Length Education and Review (CLEAR): Certification |
| 2013 - Present | Medical License (NC) |

## ACADEMIC EXPERIENCE

09/2016 - present **Associate Professor**
Department of Obstetrics and Gynecology
Division of Maternal-Fetal Medicine
University of Utah School of Medicine
Salt Lake City, Utah

01/2019 - present **Adjunct Assistant Professor** Department of Psychology
University of Utah School of Medicine Salt Lake City, Utah

03/2020 - present **Adjunct Associate Professor** Department of Psychiatry
University of Utah School of Medicine Salt Lake City, Utah

## PROFESSIONAL EXPERIENCE

### Full-Time Positions

2013 - 2016 **Clinical Instructor,** University of North Carolina Chapel Hill, Chapel Hill, NC

### Part-Time Positions

2015 - 2016 **Physician,** Planned Parenthood of South Atlantic, Chapel Hill, NC

### Editorial Experience

08/18/2022 – present **Supporting Editor,** Journal of Addiction Medicine

2020 - 2022 **Editorial Board Fellow**, Journal of Addiction Medicine

### Reviewer Experience

| | |
|---|---|
| 2022 | *Drug and Alcohol Dependence Reports* |
| 2020 - Present | *American Journal of Obstetrics and Gynecology MFM* |
| 2020 - 2022 | *Drug Abuse and Dependence* |
| 2020 | *Infectious Disease in Obstetrics and Gynecology* |
| 2020 | *Archives of Women's Mental Health* |
| 2020 | *Paediatric & Perinatal Epidemiology* |
| 2019-2022 | *Journal of Addiction Medicine* |

| | |
|---|---|
| 2019 | *Contraception* |
| 2019 | *PLOS Medicine* |
| 2019 | *Reproductive Toxicology* |
| 2019 | *Journal of Psychoactive Substances* |
| 2018-2021 | *Journal of Perinatal Medicine Substance Abuse* |
| 2017-2019 | *PlosOne* |
| 2017-2019 | *Acta Obstetricia et Gynecologica Scandanavia* |
| 2017-2019 | *International Journal of Gynecology and Obstetrics* |
| 2017-2019 | *British Journal of Obstetrics and Gynecology* |
| 2015-Present | *American Journal of Perinatology* |
| 2014-2020 | *Journal of Health Care for the Poor and Underserved* |
| 2014-2016 | *Journal of Perinatology* |
| 2014-2016 | American *Journal of Public Health* |
| 2011-Present | *American Journal of Obstetrics and Gynecology* |
| 2010-Present | *Obstetrics and Gynecology* |

## SCHOLASTIC HONORS

| | |
|---|---|
| 2021 | University of Utah Excellence in Resident Education Chief's Award |
| 2019 | Healthcare Heroes, Utah Business Magazine |
| 2019 | House of Hope Residential Treatment Center Award for Compassionate Care for Women |
| 2018 - 2019 | Scholar, Vice President's Clinical and Translational Research Scholar Program, Office of Academic Affairs and Faculty Development, University of Utah |
| 2017 | Multi-site CTSA Innovations Lab – Radical Solutions to the Opioid Misuse Epidemic, University of Buffalo |
| 2016 - 2017 | Perinatal Research Society Young Investigator Award |
| 2015 - 2016 | Leadership Training Academy, Physicians for Reproductive Health |
| 2015 | Scholar, Infectious Disease Society of Obstetrics and Gynecology |
| 2014 - 2015 | Golden Tarheel Award (Medical Student Teaching Award), University of North Carolina at Chapel Hill |
| 2014 | Bowes/Cefalo Young Researcher Award, University of North Carolina Center for Maternal and Infant Health |
| 2014 | Global Partnership Award, University of North Carolina at Chapel Hill |
| 2012 - 2013 | OB/GYN Medical Student Teaching Award, Chicago Lying-In Hospital |
| 2009 | Medical Student Scholarship, Kaiser Permanente, Northern California Residency Programs |
| 2008 | Fellowship, Soroptimist International of the Americas – Sierra Nevada Regional |
| 2008 | Ruth G. White, Women in Medicine Scholarship, P.E.O. California State Chapter |

| | |
|---|---|
| 2003 | *Summa Cum Laude*, Case Western Reserve University Cleveland OH |
| 1999 | Valedictorian, Eleanor Roosevelt High School Greenbelt, Maryland |

## ADMINISTRATIVE EXPERIENCE

### Administrative Duties

| | |
|---|---|
| 08/2023 – present | **Director of Perinatal Addiction Services** |
| 08/2023 – present | **Chair:** Utah Maternal Mortality Review Committee |
| 08/2018 – present | **Board Member**: Utah Women and Newborn Quality Collaborative |
| 07/2017 - present | **Medical Director**, Substance Use &Pregnancy – Recovery, Addiction and Dependence (SUPeRAD) Clinic<br>Department of Obstetrics and Gynecology<br>Division of Maternal-Fetal Medicine<br>University of Utah School of Medicine, Salt Lake City, Utah |
| 07/2016 – present | **Medical Director**<br>OB Air Med<br>University of Utah Health Salt Lake City, Utah |

### Professional Organization & Scientific Activities

| | |
|---|---|
| 2022 | **Ad hoc peer reviewer** for the Systematically Testing the Evidence on Marijuana Project: https://www.cannabisevidence.org/ |
| 2021 - Present | **Committee Member**, Society of Maternal Fetal Medicine Health Policy Committee |
| 2020 – Present | **Board Member:** Planned Parenthood Association of Utah |
| 2019 - Present | **Abstract Reviewer,** Society of Maternal Fetal Medicine Annual Meeting |
| 2019 | **Abstract Reviewer,** Addiction Health Services Research Conference, Park City Utah |
| 2019 - Present | **Faculty Member,** American College of Obstetricians and Gynecologist and American Society of Addiction Medicine Faculty Member |
| 2019 – Present | **Sub-committee member**, *Eunice Kennedy Shriver* National Institute of Child Health and Human Development Maternal-Fetal Medicine Units Network Prescription After Cesarean Trial (PACT) (NCT04296396) |
| 2018 – 2020 | **Abstract Reviewer**: Society for Reproductive Investigation |
| 2018 – Present | **Membership Committee Member**: Infectious Disease Society for Obstetrics-Gynecology |
| 2017 – Present | **Steering Committee Member**, Utah Department of Health Opioid Safety Bundle |
| 2017 – Present | **Board Member:** Utah Society of Addiction Medicine |
| 2016 – Present | **Member**, Utah Perinatal Mortality Review Committee |
| 2015 - Present | **Member**, Institutional Review Board, American College of Obstetricians and Gynecologists |
| 2015 - 2017 | **Representative**, American College of Obstetricians and Gynecologists, National Institute of Health MyPregnancy Demographics and Outcomes Group |

### Grant Review Committee/Study Section

| | |
|---|---|
| 09/29-30/2022 | **Invited Reviewer**, National Institutes of Health, Health Services Quality and Effectiveness Study Section, Virtual Meeting |
| 02/24-25/2022 | **Invited Reviewer**, National Institutes of Health, Health Services Quality and Effectiveness Study Section, Virtual Meeting |
| 07/17-18/2019 | **Invited Reviewer** National Institutes of Health Eunice Kennedy Shriver's National Institute on Child and Human Development RFA HD-19-025, HEAL Initiative: Antenatal OPIOID Exposure Longitudinal Study CONSORTIUM (PL1), Bethesda, Maryland |
| 04/13 -14/2018 | **Invited Reviewer** National Institutes of Health Eunice Kennedy Shriver's National Institute on Child and Human Development RFA-HD-18-036 Opioid use in pregnancy (R01), Bethesda Maryland |

### Symposium/Meeting Coordinator

| | |
|---|---|
| 04/29/2023 | **Substance Use Disorder Counselor**, Training Workshop Organizer, Salt Lake City, UT |
| 02/05/2022 | **Oral Concurrent Moderator**, Health Equity and Policy, Society of Maternal Fetal Medicine Annual Meeting, San Francisco |
| 02/09/2023 | **Poster Judge,** Society of Maternal Fetal Medicine Annual Meeting, San Francisco CA |
| 02/09/2023 | **Lucheon Roundtable Lead**, Approaching pain management for postpartum individuals with opioid and other substance use disorders, Society for Maternal Fetal Medicine, San Francisco, CA |
| 02/05/2022 | **Oral Concurrent Moderator**, Health Equity and Policy, Society of Maternal Fetal Medicine Annual Meeting, Virtual Meeting |
| 05/08/2022 | **Course Director**, Things you didn't learn in residency: updates in perinatal substance use. American College of Obstetricians and Gynecologist Annual clinical meeting, San Diego, California |
| 02/05/2022 | **Oral Concurrent Moderator**, Health Equity and Policy, Society of Maternal Fetal Medicine Annual Meeting, Virtual Meeting |
| 02/04/2022 | **Poster Judge,** Society of Maternal Fetal Medicine Annual Meeting, Virtual Meeting |
| 2021-Present | **Scientific Forum Leader,** Epidemiology<br>Society of Maternal Fetal Medicine |
| 01/27/2021 | **Course Director** Pill, Pot and Powdery Substances – Practical Considerations for MFMs in Addressing Perinatal Substance Use<br>Society of Maternal Fetal Medicine, Virtual Annual Meeting |
| 07/30/2021 | **Program Committee Member,** Infectious Disease Society of Obstetrics and Gynecology 2021 Annual Meeting Program Committee |
| 10/30-31/2020 | **Course Director** Pill, Pot and Powdery Substances – Practical Considerations for OB Providers in Addressing Perinatal Substance Use<br>American College of Obstetricians and Gynecologist Annual Clinical Meeting |
| 2018-2019 | **Scientific Forum Leader,** Global Health |

Society of Maternal Fetal Medicine

## UNIVERSITY COMMUNITY ACTIVITIES

05/2020 - present **Severe Maternal and Neonatal Morbidity and Mortality Review Committee**
Department of Obstetrics and Gynecology
University of Utah School of Medicine Salt Lake City, Utah

04/2019 - present **Core Faculty**, Program for Addiction Research, Clinical Care, Knowledge and Advocacy (PARCKA)Department of Internal Medicine
Division of Epidemiology
University of Utah School of Medicine Salt Lake City, Utah

07/2017 – present **Fellowship Faculty**, Addiction Psychiatry and Addiction Medicine,
Department of Psychiatry
University of Utah School of Medicine, Salt Lake City, Utah

## CURRENT MEMBERSHIPS IN PROFESSIONAL SOCIETIES

American Board of Preventative Medicine Addiction Medicine
American Society of Addiction Medicine
American College of Obstetricians & Gynecologists
Society of Maternal Fetal Medicine
Infectious Disease Society of Obstetrics and Gynecology
North Carolina Medical Society

## FUNDING

### Active Grants

03/01/2023 – 02/28/2026 *Prevention of Perinatal Depression among at-risk Individuals through Integration of a Multimedia, Web-based Intervention within the Healthcare System*
1RFINR020841-01 (Latendresse)
NIH National Institute of Nursing Research/National Institute of Child and Human Development
Role: **Co-Investigator**

04/01/2022 - 03/31/2023 *Safety, Tolerability, and Outcomes of Velpatasvir/SofosbuviR in Treatment of Chronic Hepatitis C Virus during Pregnancy (STORC)*
Gilead Science Inc (PI: Chappell)
Role: Site **Principal Investigator**

06/01/2022 – 05/31/2023 *Prevention of Methamphetamine Use among Postpartum Women Trial (PROMPT)* Supplement Award
3R21DA053463-02S1 (Smid)
NIH National Institute on Drug Abuse
Role: **Principal Investigator**

| | |
|---|---|
| 04/01/2021-03/31/2023 | *Prevention of Methamphetamine Use among Postpartum Women Trial (PROMPT)*<br>R21DA053463 (Smid)<br>NIH National Institute on Drug Abuse<br>Role: **Principal Investigator** |
| 10/01/2019-07/31/2023 | *MAT-LINK: MATernaL and Infant Network: Understanding Outcomes Associated with Medication for Opioid Use Disorder during Pregnancy*<br>PI-CD32-OPI (Smid/Shakib)<br>Centers for Disease Control and Prevention<br>Role: **Co-Principal Investigator** |
| 07/01/2019-06/30/2024 | *Clinical Trials Network 0080 MOMS Trial: Extended release versus sublingual buprenorphine among pregnant and postpartum women*<br>DA013732-20s# (Winhusen)<br>NIH National Institute on Drug Abuse<br>Role: **Co-Investigator** |
| 04/01/2019 – 03/31/2024 | *Emotion dysregulation across generations: Identifying early developmental and clinical indicators of risk.* The goal of this study is to identify bio behavioral markers of risk for emotion dysregulation across early childhood.<br>1R011MH119070 (Crowell)<br>NIH National Institute on Drug Abuse<br>Role: **Co-Investigator** |

**Past Grants**

| | |
|---|---|
| 04/01/2022 - 12/31/2022 | *Novel Psychoactive Umbilical Cord (NEPTUNE) Study*<br>*Novel Psychiatrive Substance (NASCIO) Study*<br>Salt Lake County Department of Health<br>Role: **Principal Investigator** |
| 02/15/2021 – 01/31/2022 | *Establishing national criteria for classification of pregnancy-associated suicide and unintentional drug overdose*<br>Principal Investigator(s): Marcela C. Smid; Kristine Campbell<br>Centers for Disease Control and Prevention Foundation<br>Role: **Co-Principal Investigator** |
| 09/30/2019 - 10/01/2022 | *Addiction among Pregnant and Reproductive Age Individuals in San Juan County, Utah*<br>Project Number A02769 (Cochran/Smid)<br>Utah Division of Substance Use and Mental Health<br>Role: **Co-Principal Investigator** |
| 04/19/2021 – 12/31/2022 | Post Market Registry on the Jada System (*RUBY)*<br>Alydia Health |

Role: **Site Principal Investigator**

09/30/2018 – 9/29/2022 *Opioid-Related Adverse Events among Women Persist as a Serious Public Health Problem (Opti-Mom)*
1R01CD002996-01-00
Centers for Disease Control and Prevention
Role: **Co-Investigator**

10/01/2019 - 09/30/2020 *Cord Prevalence Anonymous Substance Use* (C-PAST) Study: study of prenatal substance use exposure in Utah
State of Utah Commission on Criminal and Juvenile Justice (Bureau of Justice Assistance, Grant No. 2016-DJ-0772)
Role: **Principal Investigator**

12/01/2018 – 11/30/2021 R01NR017620 (Latendresse) *Randomized trial of telehealth group intervention to reduce perinatal depressive symptoms in diverse and rural populations.*
National Institute for Nursing Research
Role: **Co-Investigator**

09/30/2018 – 09/28/2020 TI-18-015 (Smid) *Services for pregnant Opioid Use Disorder clients, training and TA for other OB's*
Utah Department of Human Services
Role: **Principal Investigator (Smid/Cochran)**

07/01/2018 – 06/30/2020 *Women's Reproductive Health Research (WRHR) Career Development Program (K12)* Eunice Kennedy Shriver National Institute of Child Health and Human Development
5K12HD085816 (Silver)
Role: **Trainee**

07/31/2018 - 03/25/2020 *Safety and Effectiveness of the Jada System in Treating Primary Postpartum Hemorrhage (PEARLE)*
Alydia Health
Role: **Site Principal Investigator**

03/30/2018 - 02/28/2019 *Pregnancy and Opioids Models of Care*
National Center for Advancing Translational Sciences
UL1TR002538 (Smid)
Role: **Principal Investigator**

## TEACHING RESPONSIBILITIES/ASSIGNMENTS

### Mentoring

11/19/2019-12/31/22 Bennion Scholar Mentor
Mentee: Miao Lai, Doctorate of Pharmacy candidate

Mentored on development and conducting of survey of pregnant and postpartum individual's knowledge and perception of extended-release buprenorphine

04/20/2020-Present Mentee: Justin Bowman, Doctorate of Medicine candidate
Mentored on development and conducting of survey of pregnant and postpartum individual's knowledge and perception of kratom

**Graduate Student Committees**

07/01/2023 - Present Master of Science in Clinical Investigation Committee Member
Carlie Dahl MD: MSCI Candidate
Project: Identification of urban and rural factors for maternal transport in Utah

07/01/2021 – 06/30/23 Master of Science in Clinical Investigation Committee Member
Lauren Gimbel: MSCI Candidate
Project: Differences in Rural and Urban Treatment of Postpartum Depression and Anxiety in the United States

3/01/2022 – 6/30/2023 PhD Dissertation Committee Member
Marcia Williams: PhD Candidate, University of Utah College of Nursing
Dissertation: Mixed methodological approach to explore role of rural-dwelling on seeking mental health services among pregnant and postpartum women with depression and anxiety
Role: Serving as content and qualitative methodology expert

10/1/2022 – 6/30/2022 PhD Dissertation Committee Member
Ryoko Pentecost: PhD Candidate, University of Utah College of Nursing
Dissertation: Feasibility and acceptability of a telehealth intervention among women with perinatal depression/anxiety and substance use risk
Role: Serving as content and qualitative methodology expert

**Clinical Education**

03/01/2021 – Present Preceptorship director for Obstetrics and Addiction Medicine elective for fourth year medical student

08/04/2017 – Present Supervision of Addiction Medicine and Addiction psychiatry fellow in SUPeRAD Clinic Responsible for supervising and directing education of fellows on perinatal addiction care.

**CE Education**

05/30/2017 - Present The impact of the opidemic on pregnant women.
Utah Division of Occupational and Professional Licensure (DOPL)
2017-2022 Opioid Education for Utah Licensed Practitioners
Course objectives included reviewing opioid use and opioid use disorder among reproductive age and pregnant women, basics of addiction

medicine and obstetric issues for women with opioid use disorder, medication for OUD and prevention

10/06/2020 Instructor, Medication assisted treatment waiver for obstetric and pediatric providers
Physician Clinical Support System
Anchorage, Alaska

07/20-21/2019 Addiction Boards Review Lecturer: Pregnancy and Women's Health, Genetics of Substance Use, Prevention and Public Health, Addiction in the Workplace, Homeless and Incarcerated Populations.
American Physician Institute. Chicago, Illinois

**Courses taught**

| | |
|---|---|
| 2021-2022 | MD ID 6650 Applied Community Health and Leadership in Tribal, Rural, and Underserved (TRU) Setting. University of Utah School of Medicine |
| 2005 | Graduate Student Instructor, 140: Human Reproduction, University of California, Berkeley, Integrative Biology |
| 2005 | Graduate Student Instructor, 135E: Physiology of Human Development, University of California, Berkeley, Molecular and Cell Biology |
| 2005 | Graduate Student Instructor, 62: Drugs and the Brain, University of California, Berkeley, Molecular and Cell Biology |
| 2005 | Graduate Student Instructor, 203: Anatomy and Radiology, University of California, Berkeley, Health and Medical Science |
| 2002 | Graduate Student Instructor, 15: Controversies in Biological Science, University of California, Berkeley, Molecular and Cell Biology |
| 2004 | Graduate Student Instructor, 62: Drugs and the Brain, University of California, Berkeley, Molecular and Cell Biology |

## PEER-REVIEWED PUBLICATIONS IN PRESS

Smid MC, P Vaughn, Nowicki CC, DA Goodman, J Zaharatos, KA Campbell. Consensus for pregnancy-related criteria for suicide and unintentional overdoses using a Delphi Process. Arch Womens Ment Health. *In press.*

Cochran G, Smid M, Krans EE, Yu Z, Carlston K, White A, Abdullah W, Baylis J, Charron E, Okifugi A, Gordon AJ, Lundahl B, Silipigni J, Seliski N, Haaland B, Tarter R. (In press ). Patient Navigation for Pregnant Persons with Opioid Use Disorder: Results of a Randomized Multisite Pilot Trial. Addiction.

Kurtz T, Charles JE, Schwartz M and Smid MC, Postpartum Extended Release Buprenorphine Tissue Necrosis, Obster Gyncol. In Press.

**2025**

1. Xu KY, Pappas LM, Brown TR, Jansen MO, Tardelli VS, Fidalgo TM, Levin FR, Grucza RA, Suarez EA, **Smid MC,** Horns JJ, Bruno AM. Attention-deficit Hyperactivity Disorder Medication Discontinuation During Pregnancy and Resumption Postpartum. Am J Obstet Gynecol MFM. 2025 Feb 1:101625. doi: 10.1016/j.ajogmf.2025.101625. Epub ahead of print. PMID: 39900247.
2. Xu KY, Jones HE, Martin CE**, Smid MC,** Tiako MJN, Terplan M, Krans EE. Perinatal Substance Use-Related Content at Major Addiction Scientific Conferences: An Analysis of Oral Presentation Sessions. J Addict Med. 2025 Feb 17. doi: 10.1097/ADM.0000000000001438. Epub ahead of print. PMID: 39960779.
3. Rood KM, Bianco A, Biggio JR, **Smid MC,** Simhan HN, Li J, Yong C, Carney PI, Croft DJ, Goffman D. Real-world use of a vacuum-induced hemorrhage-control device in births <34 weeks gestational age. J Matern Fetal Neonatal Med. 2025 Dec;38(1):2451658. doi: 10.1080/14767058.2025.2451658. Epub 2025 Feb 9. PMID: 39924257.
4. Board A, Vivolo-Kantor A, Kim SY, Tran EL, Thomas SA, Terplan M, **Smid MC,** Sanjuan PM, Wright T, Davidson A, Wachman EM, Rood KM, Morse D, Chu E, Miele K. Using ICD Codes Alone May Misclassify Overdoses Among Perinatal People. Am J Prev Med. 2025 Mar;68(3):563-570. doi: 10.1016/j.amepre.2024.12.001. Epub 2024 Dec 5. PMID: 39645154.
5. Schauberger CW, **Smid MC,** Terplan M, Wright TE. Lessons from Maternal Mortality Reviews. How Addiction Care Providers can help improve Outcomes for Pregnant, Postpartum, and Parenting people. Subst Use Misuse. 2025;60(3):446-451. doi: 10.1080/10826084.2024.2422957. Epub 2024 Dec 11. PMID: 39663576.

**2024**

6. Atluru S, Bruehlman AK, Vaughn P, Schauberger CW, **Smid MC**. Naltrexone Compared With Buprenorphine or Methadone in Pregnancy: A Systematic Review. Obstet Gynecol. 2024 Mar 1;143(3):403-410. doi: 10.1097/AOG.0000000000005510. Epub 2024 Jan 16. PMID: 38227945.
7. **Smid MC**, Clifton RG, Rood K, Srinivas S, Simhan HN, Casey BM, Longo M, Landau R, MacPherson C, Bartholomew A, Sowles A, Reddy UM, Rouse DJ, Bailit JL, Thorp JM Jr, Chauhan SP, Saade GR, Grobman WA, Macones GA; for the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD) Maternal-Fetal Medicine Units (MFMU) Network*. Optimizing Opioid Prescription Quantity After Cesarean Delivery: A Randomized Controlled Trial. Obstet Gynecol. 2024 Aug 1;144(2):195-205. doi: 10.1097/AOG.0000000000005649. Epub 2024 Jun 10. PMID: 38857509; PMCID: PMC11257794.
8. Gimbel LA, Weingarten SJ, **Smid MC,** Hoffman MC. Maternal mental health as a major contributor to maternal mortality. Semin Perinatol. 2024 Oct;48(6):151943. doi: 10.1016/j.semperi.2024.151943. Epub 2024 Jul 14. PMID: 39095259.
9. Nabi R, Bonvini M, Kennedy EH, Huang MY, **Smid M,** Scharfstein DO. Semiparametric sensitivity analysis: unmeasured confounding in observational studies. Biometrics. 2024 Oct 3;80(4):ujae106. doi: 10.1093/biomtc/ujae106. PMID: 39400259.
10. McMillin GA, Morad AW, Boyd JM, Johnson-Davis KL, Metz TD, **Smid MC**, Krasowski MD. Biological Testing and Interpretation of Laboratory Results Associated with Detecting Newborns with Substance Exposure. Clin Chem. 2024 Jul 5;70(7):934-947. doi: 10.1093/clinchem/hvae018. PMID: 38549034.
11. Cochran G, **Smid MC,** Krans EE, Yu Z, Carlston K, White A, Abdulla W, Baylis J, Charron E, Okifugi A, Gordon AJ, Lundahl B, Silipigni J, Seliski N, Haaland B, Tarter R. Patient navigation for pregnant individuals with opioid use disorder: Results of a randomized multi-site pilot trial. Addiction. 2024 Mar;119(3):544-556. doi: 10.1111/add.16364. Epub 2023 Oct 20. PMID: 37859587.
12. **Smid MC,** Allshouse AA, Metz TD, Debbink MP, Charron E, Campbell K, Cochran G. Co-

occurring opioid and methamphetamine use disorder and severe maternal morbidity and mortality in Utah. Am J Obstet Gynecol MFM. 2024 Jan;6(1):101221. doi: 10.1016/j.ajogmf.2023.101221. Epub 2023 Nov 8. PMID: 37949409.

13. Kurtz T, Charron E, Shakib J**, Smid MC**. Drug Testing Interpretation in the Peripartum Setting: Results of Clinician Survey. J Addict Med. 2024 Sep-Oct 01;18(5):595-598. doi: 10.1097/ADM.0000000000001322. Epub 2024 Jun 5. PMID: 38842171.
14. **Smid MC,** Vaughn P, Nowicki CC, Goodman DA, Zaharatos J, Campbell KA. Consensus pregnancy-related criteria for suicide and unintentional overdoses using a Delphi process. Arch Womens Ment Health. 2024 Feb;27(1):109-125. doi: 10.1007/s00737-023-01375-4. Epub 2023 Sep 28. PMID: 37770631; PMCID: PMC11000257.
15. Maylott SE, Reese SE, Zhou AM, Kaliush PR, Terrell S, Saenz C, Brown L, Crowell SE, Lester B, **Smid MC,** Shakib JH, Garland EL, Conradt E. Maternal psychophysiology profiles: associations with prenatal opioid use, maternal emotion dysregulation, and newborn neurobehavior. Pediatr Res. 2024 Aug 3. doi: 10.1038/s41390-024-03399-7. Epub ahead of print. PMID: 39097654.
16. Seliski N, Madsen T, Eley S, Colosimo J, Engar T, Gordon A, Barnett C, Humiston G, Morsillo T, Stolebarger L, **Smid MC,** Cochran G. Implementation of a rural emergency department-initiated buprenorphine program in the mountain west: a study protocol. Addict Sci Clin Pract. 2024 Sep 3;19(1):63. doi: 10.1186/s13722-024-00496-0. PMID: 39228007; PMCID: PMC11369999.
17. Jawish R, **Smid M,** Gordon A, Shangraw K, Mickey BJ. Prolonged transcranial magnetic stimulation in a pregnant patient with treatment-resistant depression: a case report. J Med Case Rep. 2024 Oct 23;18(1):512. doi: 10.1186/s13256-024-04855-y. PMID: 39438948; PMCID: PMC11498958.
18. Iacob E, Kausler R, Williams M, Simonsen S, **Smid M,** Weissinger K, Latendresse G. Protocol for a randomized controlled trial to evaluate the effectiveness of a telehealth group intervention to reduce perinatal depressive symptoms. Contemp Clin Trials. 2024 Dec;147:107738. doi: 10.1016/j.cct.2024.107738. Epub 2024 Nov 13.
19. Tran EL, Dorsey AN, Miele K, Gilboa SM, Gosdin L, Terplan M, Sanjuan PM, Seligman NS, Wright T, Wachman EM, **Smid M**, Henninger M, Leeman L, Schneider PD, Rood K, Louis JM, Caveglia S, Davidson A, Shakib J, Shrestha H, Meaney-Delman DM, Kim SY. Patterns of Medication for Opioid Use Disorder During Pregnancy, 7 Clinical Sites, MATernaL and Infant clinical NetworK (MAT-LINK), 2014-2021. J Addict Med. 2024 Dec 12. doi: 10.1097/ADM.0000000000001426. Epub ahead of print. PMID: 39665432.

**2023**

20. Bowman J, Lai M, Charles JE, Gordon AJ, **Smid MC**. Kratom Use Among Pregnant and Lactating Individuals With Substance Use Disorder. J Addict Med. 2023 Aug 23. doi: 10.1097/ADM.0000000000001212. Epub ahead of print. PMID: 37615360.
21. Kurtz T, Smid MC. Office-Based Management of Perinatal Substance Use and Substance Use Disorder for the General Obstetrician-Gynecologist. Obstet Gynecol Clin North Am. 2023 Sep;50(3):609-627. doi: 10.1016/j.ogc.2023.03.010. Epub 2023 May 8. PMID: 37500220.
22. Herrera CA, McPherson JA, Vladutiu CJ, **Smid MC**. Neonatal morbidity associated with maternal Group B Streptococcal colonization in individuals undergoing planned cesarean delivery. J Matern Fetal Neonatal Med. 2023 Dec;36(1):2183740. doi: 10.1080/14767058.2023.2183740. PMID: 36851857.
23. Park Y, Dang EP, Board A, Gilboa SM, Ondersma SJ, **Smid MC**, Shakib JH, Mitchell KT, England LJ, Broussard CS, Meaney-Delman D, Iskander J, Kim SY. Polysubstance Use in Pregnancy: Surveillance, Interventions, and Next Steps. J Womens Health (Larchmt). 2023 Aug 8. doi: 10.1089/jwh.2023.0341. Epub ahead of print. PMID: 37552850.
24. Lai M, Bowman J, Charles J, **Smid MC.** Pregnant and Postpartum Individuals' Knowledge, Attitudes, and Perceptions of Extended-release Buprenorphine for Treatment of Opioid Use Disorder. J Addict Med. 2023 May-Jun 01;17(3):342-345. doi: 10.1097/ADM.0000000000001100. Epub 2022 Oct 16. PMID: 37267186.

25. Kropp FB, **Smid MC**, Lofwall MR, Wachman EM, Martin PR, Murphy SM, Wilder CM, Winhusen TJ. Collaborative care programs for pregnant and postpartum individuals with opioid use disorder: Organizational characteristics of sites participating in the NIDA CTN0080 MOMs study. J Subst Use Addict Treat. 2023 Jun;149:209030. doi: 10.1016/j.josat.2023.209030. Epub 2023 Apr 4. PMID: 37023858; PMCID: PMC10249488.
26. Kurtz T, **Smid MC**. The Fall of Roe v. Wade: The Addiction Specialist's Role in Championing Reproductive Rights. J Addict Med. 2023 May 23. doi: 10.1097/ADM.0000000000001179. Epub ahead of print. PMID: 37222561.
27. Charles JE, Baylis J, **Smid MC**, Cochran G. Nonfatal Overdoses Among Pregnant Individuals With Opioid Use Disorder. Obstet Gynecol. 2023 May 1;141(5):961-963. doi: 10.1097/AOG.0000000000005129. Epub 2023 Apr 5. PMID: 37103536.
28. Charron E, Yu Z, Lundahl B, Silipigni J, Okifuji A, Gordon AJ, Baylis JD, White A, Carlston K, Abdullah W, Haaland B, Krans EE, **Smid MC**, Cochran G. Cluster analysis to identify patient profiles and substance use patterns among pregnant persons with opioid use disorder. Addict Behav Rep. 2023 Feb 15;17:100484. doi: 10.1016/j.abrep.2023.100484. PMID: 36844693; PMCID: PMC9950438.
29. Charron E, White A, Carlston K, Abdullah W, Baylis JD, Pierce S, Businelle MS, Gordon AJ, Krans EE, **Smid MC**, Cochran G. Prospective acceptability of digital phenotyping among pregnant and parenting people with opioid use disorder: A multisite qualitative study. Front Psychiatry. 2023 Apr 17;14:1137071. doi: 10.3389/fpsyt.2023.1137071. PMID: 37139320; PMCID: PMC10149825.
30. Cleary E., **Smid M.C.,** Bokat C., Costantine M., Rood K. (2021). Indicated Opioids in Pregnancy: Guidance on Providing Comprehensive Care. *American Journal of Perinatology*. https://doi.org/10.1055/s-0041-1739427 PMID: 34768306
31. Dude AM, **Smid MC**, Branch DW, West J, Meeks H, Yu Z, Fraser A, Smith K, Reddy D. Interpregnancy Body Mass Index Change and Offspring Mortality Risk following the Second Pregnancy. Am J Perinatol. 2023 Mar;40(4):387-393. doi: 10.1055/s-0041-1727230. Epub 2021 Apr 20. PMID: 33878768.
32. Bruno AM, Horns JJ, Allshouse AA, Metz TD, Debbink ML, **Smid MC**. Association Between Periviable Delivery and New Onset of or Exacerbation of Existing Mental Health Disorders. Obstet Gynecol. 2023 Feb 1;141(2):395-402. doi: 10.1097/AOG.0000000000005050. Epub 2023 Jan 4. PMID: 36657144.
33. Herrera CA, McPherson JA, Vladutiu CJ, **Smid MC**. Neonatal morbidity associated with maternal Group B Streptococcal colonization in individuals undergoing planned cesarean delivery. J Matern Fetal Neonatal Med. 2023 Dec;36(1):2183740. doi: 10.1080/14767058.2023.2183740. PMID: 36851857.

**2022**

34. **Smid MC**, Allshouse AA, McMillin GA, Nunez K, Cavin T, Worden J, Buchi K, Muniyappa B, Varner MW, Cochran G, Metz TD. Umbilical Cord Collection and Drug Testing to Estimate Prenatal Substance Exposure in Utah. Obstet Gynecol. 2022 Aug 1;140(2):153-162. doi: 10.1097/AOG.0000000000004868. Epub 2022 Jul 6. PMID: 35852263.
35. Kurtz T, **Smid MC.** Challenges in Perinatal Drug Testing. Obstet Gynecol. 2022 Aug 1;140(2):163-166. doi: 10.1097/AOG.0000000000004808. Epub 2022 Jul 6. PMID: 35852264.
36. Baylis JD, Charron E, Archer S, Garets M, Bryan MA, Foringer J, Kelley AT, **Smid MC**, Cochran G. Attitudes, self-efficacy, and practices related to opioid risk assessment and mitigation: A comparison of health care professionals in rural communities. Subst Abus. 2022;43(1):1163-1171. doi: 10.1080/08897077.2022.2074593. PMID: 35617634
37. **Smid M.C.**, Terplan M. What Obstetrician-Gynecologists Should Know About Substance Use Disorders in the Perinatal Period. Obstet Gynecol. 2022 Feb 1;139(2):317-337. doi: 10.1097/AOG.0000000000004657. PMID: 34991147.
38. Metz TD, Allshouse AA, McMillin GA, Silver RM, **Smid MC**, Haas DM, Simhan HN, Saade GR,

Grobman WA, Parry S, Chung JH, Jarlenski MP. Association of Cannabis Use With Nausea and Vomiting of Pregnancy. Obstet Gynecol. 2022 Aug 1;140(2):266-270. doi: 10.1097/AOG.0000000000004850. Epub 2022 Jul 6. PMID: 35852278

39. **Smid, M. C.,** Metz, T., McMillin, G., Mele, L., Casey, B., & Reddy, U. et al. (2022). Prenatal Nicotine or Cannabis Exposure and Offspring Neurobehavioral Outcomes. *Obstetrics & Gynecology*, 139(1), 21-30. https://doi.org/10.1097/aog.0000000000004632 PMID: 34856574
40. White A., Lundahl B., Bryan M.A., Okifuji A., **Smid M.C.**, Gordon A.J., Carlston K., Silipigni J., Abdullah W., Krans E.E., Kenney A., Cochran G. Pregnancy and the Opioid Crisis: Heightened Effects of COVID-19. J Addict Med. 2022 Jan-Feb 01;16(1):e2-e4. doi: 10.1097/ADM.0000000000000822. PMID: 34282083; PMCID: PMC8761178
41. Fallin-Bennett A., **Smid M.C.**, Salvador J.G., Coker J., McKinney K., Weitzen S., Bonham C., Ashford K. Perceived Effect of Research on Clinical Care for Women With Opioid Use Disorder. J Obstet Gynecol Neonatal Nurs. 2022 Mar;51(2):195-204. doi: 10.1016/j.jogn.2021.12.006. Epub 2022 Jan 31. PMID: 35104441.
42. Kelley AT, **Smid MC**, Baylis JD, Charron E, Begaye LJ, Binns-Calvey A, Archer S, Weiner S, Pettey W, Cochran G. Treatment access for opioid use disorder in pregnancy among rural and American Indian communities. J Subst Abuse Treat. 2022 May;136:108685. doi: 10.1016/j.jsat.2021.108685. Epub 2021 Dec 13. PMID: 34953636.
43. Debbink M., Metz T., Nelson R., Janes S., Kroes A., R L., Heuser C. C., **Smid M. C.,** Silver R. M., Varner M. W., Einerson B. D. (2021). Directly Measured Costs of Severe Maternal Morbidity Events during Delivery Admission Compared with Uncomplicated Deliveries. *American Journal of Perinatology*. https://doi.org/10.1055/s-0041-1740237 PMID: 34856617

**2021**

44. Cleary E. M., **Smid M.C.,** Charles J. E., Jones K. M., Costantine M. M., Saade G., Rood K. M. (2021). Buprenorphine X-waiver exemption – beyond the basics for the obstetrical provider. *American Journal of Obstetrics & Gynecology MFM*, *3*(6). https://doi.org/10.1016/j.ajogmf.2021.100451 PMID: 34320429
45. Pentecost R., Latendresse G., **Smid M.C**. Scoping Review of the Associations Between Perinatal Substance Use and Perinatal Depression and Anxiety. J Obstet Gynecol Neonatal Nurs. 2021 Jul;50(4):382-391. doi: 10.1016/j.jogn.2021.02.008. Epub 2021 Mar 25. PMID: 33773955; PMCID: PMC8286297
46. Kelley A. T., **Smid M. C.,** Baylis J. D., Charron E., Binns-Calvey A. E., Archer S., Weiner S. J., Begaye L. J., Cochran G. (2021). Development of an unannounced standardized patient protocol to evaluate opioid use disorder treatment in pregnancy for American Indian and rural communities. *Addiction Science & Clinical Practice*, 16(1). https://doi.org/10.1186/s13722-021-00246-6 PMID: 34172081
47. Reese S. E., Riquino M. R., Molloy J., Nguyen V., **Smid M. C.,** Tenort B., Gezinski L. B. (2020). Experiences of nursing professionals working with women diagnosed with opioid use disorder and their newborns. *Advances in Neonatal Care*, *21*(1), 32–40. https://doi.org/10.1097/anc.0000000000000816 PMID: 33055519

**2020**

48. D'Alton M. E., Rood K. M., **Smid M. C.,** Simhan H. N., Skupski D. W., Subramaniam A., Gibson K. S., Rosen T., Clark S. M., Dudley D., Iqbal S. N., Paglia M. J., Duzyj C. M., Chien E. K., Gibbins K. J., Wine K. D., Bentum N. A., Kominiarek M. A., Tuuli M. G., Goffman D. (2020). Intrauterine vacuum-induced hemorrhage-control device for rapid treatment of postpartum hemorrhage. *Obstetrics & Gynecology*, *136*(5), 882–891. https://doi.org/10.1097/aog.0000000000004138 PMID: 32909970

49. Metz T. D., Allshouse A. A., Pinar H., Varner M., **Smid M. C.,** Hogue C., Dudley D. J., Bukowski R., Saade G. R., Goldenberg R. L., Reddy U., Silver R. M. (2020). Maternal marijuana exposure, Feto-placental weight ratio, and placental histology. *American Journal of Perinatology*. https://doi.org/10.1055/s-0040-1717092 PMID: 32971561
50. Page J. M., Allshouse A. A., Cassimatis I., **Smid M. C.,** Arslan E., Thorsten V., Parker C., Varner M. W., Dudley D. J., Saade G. R., Goldenberg R. L., Stoll B. J., Hogue C. J., Bukowski R., Conway D., Pinar H., Reddy U. M., Silver R. M. (2020). Characteristics of Stillbirths associated with diabetes in a diverse U.S. cohort. *Obstetrics & Gynecology*, *136*(6), 1095–1102. https://doi.org/10.1097/aog.0000000000004117 PMID: 33156199
51. **Smid M. C.,** Maeda J., Stone N. M., Sylvester H., Baksh L., Debbink M. P., Varner M. W., Metz T. D. (2020). Standardized criteria for review of perinatal suicides and accidental drug-related deaths. *Obstetrics & Gynecology*, *136*(4), 645–653. https://doi.org/10.1097/aog.0000000000003988 PMID: 32925616
52. Cassimatis I. R., Battarbee A. N., Allshouse A. A., Badreldin N., Vranes C. M., Oler A. M., **Smid, M.C.** (2020). Neonatal outcomes associated with late preterm betamethasone administration in women with pregestational diabetes. *Pediatrics & Neonatology*, *61*(6), 645–646. https://doi.org/10.1016/j.pedneo.2020.07.002 PMID: 32763054
53. Bryan M. A., **Smid M. C.,** Cheng M., Fortenberry K. T., Kenney A., Muniyappa B., Pendergrass D., Gordon A. J., Cochran G. (2020). Addressing opioid use disorder among rural pregnant and postpartum women: A study protocol. *Addiction Science & Clinical Practice*, *15*(1). https://doi.org/10.1186/s13722-020-00206-6 PMID: 33129355
54. **Smid M. C.,** Schauberger C. W., Terplan M., Wright T. E. (2020). Early lessons from Maternal Mortality Review Committees on drug-related deaths—time for obstetrical providers to take the lead in addressing addiction. *American Journal of Obstetrics & Gynecology MFM*, 2(4). https://doi.org/10.1016/j.ajogmf.2020.100177 PMID: 33345905
55. Venkatesh, K. K., Pate, V., Boggess, K. A., Jones, H. E., Funk, M. J., & **Smid, M. C.** (2020). Trends in opioid and psychotropic prescription in pregnancy in the United States from 2001 to 2015 in a privately insured population. *Annals of Internal Medicine*, *173*(11_Supplement). https://doi.org/10.7326/m19-3249 PMID: 33253018

**2019**

56. **Smid, M. C.,** Metz, T. D., & Gordon, A. J. (2019). Stimulant Use in Pregnancy: An Under-recognized Epidemic Among Pregnant Women. *Clinical obstetrics and gynecology*, 62(1), 168–184. https://doi.org/10.1097/GRF.0000000000000418 PMID: 30601144
57. **Smid, M. C.,** Stone, N. M., Baksh, L., Debbink, M. P., Einerson, B. D., Varner, M. W., Gordon, A. J., & Clark, E. (2019). Pregnancy-Associated Death in Utah: Contribution of Drug-Induced Deaths. *Obstetrics and gynecology*, 133(6), 1131–1140. https://doi.org/10.1097/AOG.0000000000003279 PMID: 31135726
58. Rizk A.H., Simonsen S.E., Roberts L., Taylor-Swanson L., Lemoine J.B., **Smid M.C.**. Maternity Care for Pregnant Women with Opioid Use Disorder: A Review. J Midwifery Womens Health. 2019 Sep;64(5):532-544. doi: 10.1111/jmwh.13019. Epub 2019 Aug 12. Erratum in: J Midwifery Womens Health. 2020 Jan;65(1):176. PMID: 31407485; PMCID: PMC7675450.
59. **Smid M.C.**, Stuebe A.M., Manuck T.A., Sen S. Maternal obesity, fish intake, and recurrent spontaneous preterm birth. J Matern Fetal Neonatal Med. 2019 Aug;32(15):2486-2492. doi: 10.1080/14767058.2018.1439008. Epub 2018 Feb 21. PMID: 29415593; PMCID: PMC6438753.
60. Panzer A., Dotters-Katz S., **Smid M.C.,** Boggess K., Manuck T. (2019). Factors Associated with Previable Delivery following Second Trimester Rupture of Membranes. *American journal of perinatology,* 36(8), 812–817. https://doi.org/10.1055/s-0038-1675373 PMID: 30388716

61. Dotters-Katz S.K., **Smid M.C.**, Grace M.R., Gunatilake R.P., Sykes C., Blake K., Boggess K.A., Patil A.S., Manuck T. The Effect of Blood Loss on Cefazolin Levels in Women Undergoing Cesarean Delivery. Am J Perinatol. 2019 Jun;36(7):688-694. doi: 10.1055/s-0038-1673654. Epub 2018 Oct 18. PMID: 30336498.
62. Cochran G., **Smid M.C.,** Krans E.E., Bryan M.A., Gordon A.J., Lundahl B., Silipigni J., Haaland B., Tarter R. (2019). A pilot multisite study of patient navigation for pregnant women with opioid use disorder. *Contemp Clin Trials*. 87:105888. doi: 10.1016/j.cct.2019.105888. Epub 2019 Nov 12. PMID:31731006
63. Lin, B., Kaliush, P. R., Conradt, E., Terrell, S.M., Neff, D., Allen, A., **Smid M. C.,** Monk, C., & Crowell, S. E. (2019). Intergenerational transmission of emotion dysregulation part I: Psychopathology, self-injury, and parasympathetic responsivity among pregnant women. *Dev Psychopathol.,* 31(3), 817-831. Http://doi.org/10.1017/S0954579419000336
64. Rothwell E., Johnson E., Wong B., Rose N.C., Latendresse G., Altizer R., Zagal J., **Smid M.C.**, Watson A, Botkin JR. The Use of a Game-Based Decision Aid to Educate Pregnant Women about Prenatal Screening: A Randomized Controlled Study. Am J Perinatol. 2019 Feb;36(3):322-328. doi: 10.1055/s-0038-1667371. Epub 2018 Aug 14. PMID: 30107621; PMCID: PMC6512317

**2018**

65. **Smid M.C.**, Ricks N.M., Panzer A., McCoy A.N., Azcarate-Peril M.A., Keku T.O., Boggess K.A. Maternal Gut Microbiome Biodiversity in Pregnancy. Am J Perinatol. 2018 Jan;35(1):24-30. doi: 10.1055/s-0037-1604412. Epub 2017 Jul 27. PMID: 28750469; PMCID: PMC6102712.
66. Penfield-Cyr A., Monthe-Dreze C., **Smid M.C.**, Sen S. Maternal BMI, Mid-pregnancy Fatty Acid Concentrations, and Perinatal Outcomes. Clin Ther. 2018 Oct;40(10):1659-1667.e1. doi: 10.1016/j.clinthera.2018.08.011. Epub 2018 Sep 19. PMID: 30241686.
67. **Smid M.C.**, Charles J.E., Gordon A.J., Wright T.E. Use of Kratom, an Opioid-like Traditional Herb, in Pregnancy. Obstet Gynecol. 2018 Oct;132(4):926-928. doi: 10.1097/AOG.0000000000002871. PMID: 30204686.
68. Kominiarek M.A., **Smid M.C.**, Mele L., Casey B.M., Sorokin Y., Reddy U.M., Wapner R.J., Thorp J.M. Jr, Saade G.R., Tita A.T.N., Rouse D.J., Sibai B., Iams J.D., Mercer B.M., Tolosa J., Caritis S. N., Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD) Maternal-Fetal Medicine Units Network (MFMU). (2018). Child Neurodevelopmental Outcomes by Pre-interpregnancy Body Mass Index and Gestational Weight Gain. *Obstet Gynecol*, 132(6), 1386-1393. http://doi.org/10.1097/AOG.0000000000002974 PMID: 30399108
69. Dotters-Katz S.K., **Smid M.C.**, McElwain C., Kuller J.A., Schulkin J. Obstetric practice patterns in pregnancies complicated by fetal trisomy 13 or 18. J Matern Fetal Neonatal Med. 2018 Sep;31(18):2441-2445. doi: 10.1080/14767058.2017.1344638. Epub 2017 Jul 11. PMID: 28629247.
70. Monthé-Drèze, C., Penfield-Cyr, A., **Smid, M. C.,** & Sen, S. (2018). Maternal Pre-Pregnancy Obesity Attenuates Response to Omega-3 Fatty Acids Supplementation During Pregnancy. *Nutrients*, 10(12), 1908. https://doi.org/10.3390/nu10121908 PMID: 30518052
71. Li, F., Kakoki, M., **Smid, M. C.,** Boggess, K., Wilder, J., Hiller, S., Bounajim, C., Parnell, S. E., Sulik, K. K., Smithies, O., & Maeda-Smithies, N. (2018). Causative Effects of Genetically Determined High Maternal/Fetal Endothelin-1 on Preeclampsia-Like Conditions in Mice. *Hypertension* (Dallas, Tex.: 1979), 71(5), 894–903. https://doi.org/10.1161/HYPERTENSIONAHA.117.10849 PMID: 29610266
72. Dotters-Katz S., Panzer A., Givens M., **Smid M. C.,** & Chuang, A. (2018). Preclinical Labor-and-Delivery Shadowing: The Impact on Medical Students' Perceptions of Obstetrics and

Gynecology. *AJP reports*, 8(2), e64–e67. https://doi.org/10.1055/s-0038-1641723 PMID: 29651359

73. Hopkins M. K., Dotters-Katz S.K., Boggess K.A., Heine R. P., **Smid M. C.** (2018). Perioperative Antibiotic Choice in Labored versus Unlabored Cesareans and Risk of Post cesarean Infectious Morbidity. *Am J Perinatol*, 35(2), 127-133. http://doi.org/10.1055/s-0037-1606187 PMID: 28838006
74. **Smid M.C.**, Gordon A.J., Plumb S., Plumb J. Opioid Use in Pregnancy, Neonatal Abstinence Syndrome, and Childhood Outcomes: Executive Summary of a Joint Workshop by the Eunice Kennedy Shriver National Institute of Child Health and Human Development, American College of Obstetricians and Gynecologists, American Academy of Pediatrics, Society for Maternal-Fetal Medicine, Centers for Disease Control and Prevention, and the March of Dimes Foundation. Obstet Gynecol. 2018 Jan;131(1):163-164. doi: 10.1097/AOG.0000000000002426. PMID: 29266062.
75. Dotters-Katz S., Panzer A., Givens M., **Smid M.C.**, Chuang A. Preclinical Labor-and-Delivery Shadowing: The Impact on Medical Students' Perceptions of Obstetrics and Gynecology. AJP Rep. 2018 Apr;8(2):e64-e67. doi: 10.1055/s-0038-1641723. Epub 2018 Apr 11. PMID: 29651359; PMCID: PMC5895465

**2017**

76. Heuser C.C., Gibbins K.J., **Smid M.C.,** Branch D.W. (2017). Reproductive rights advocacy: not just for the family-planning community. *Am J Obstet Gynecol*, 217(3), 322.e1-322.e4. https://doi.org/10.1016/j.ajog.2017.06.006 PMID: 28610899
77. **Smid M.C.,** Lee J.H., Grant J.H., Miles G., Stoddard G.J., Chapman D.A., Manuck T.A. (2017). Maternal race and intergenerational preterm birth recurrence. *Am J Obstet Gynecol*, 217(4), 480.e1-480.e9. https://doi.org/10.1016/j.ajog.2017.05.051 PMID: 28578169
78. Dotters-Katz S.K., Panzer A., Grace M. R., **Smid M. C.,** Keku J. A., Vladutiu C. J., Boggess, K. A., & Manuck, T. A. (2017). Maternal Morbidity After Previable Prelabor Rupture of Membranes. *Obstetrics and gynecology*, 129(1), 101–106. https://doi.org/10.1097/AOG.0000000000001803 PMID: 27926655
79. **Smid M.C.,** Dotters-Katz S.K., Grace M., Wright S.T., Villers M.S., Hardy-Fairbanks A., Stamilio D. M. (2017). Prophylactic Negative Pressure Wound Therapy for Obese Women After Cesarean Delivery: A Systematic Review and Meta-analysis. *Obstet Gynecol*, 130(5), 969-978. http://doi.org/10.1097/AOG.0000000000002259 PMID: 29016508
80. **Smid M.C.,** Dotters-Katz S.K., Vaught A.J., Vladutiu C.J., Boggess K.A., Stamilio D.M. (2017). Maternal super obesity and risk for intensive care unit admission in the MFMU Cesarean Registry. *Acta Obstet Gynecol Scand,* 96(8), 976-983. https://doi.org/10.1111/aogs.13145 PMID: 28382734
81. **Smid M.C.,** Vladutiu C.J., Dotters-Katz S.K., Boggess K.A., Manuck T.A., Stamilio D.M. (2017). Maternal obesity and major intraoperative complications during cesarean delivery. *Am J Obstet Gynecol,* 216(6), 614.e1-614.e7. https://doi.org/10.1016/j.ajog.2017.02.011 PMID: 28209495
82. Dotters-Katz S.K., **Smid M.C.**, Grace M.R., Thompson J.L., Heine R.P., Manuck T. Risk Factors for Postpartum Septic Pelvic Thrombophlebitis: A Multicenter Cohort. Am J Perinatol. 2017 Sep;34(11):1148-1151. doi: 10.1055/s-0037-1604245. Epub 2017 Jul 13. PMID: 28704844.
83. Carlson L.M., Dotters-Katz S.K., **Smid M.C.**, Manuck T.A. How Low Is Too Low? Postpartum Hemorrhage Risk among Women with Thrombocytopenia. Am J Perinatol. 2017 Sep;34(11):1135-1141. doi: 10.1055/s-0037-1604194. Epub 2017 Jul 6. PMID: 28683512.
84. McPherson J.A., **Smid M.C.**, Smiley S., Stamilio D.M. Association of Maternal Obesity with

Child Cerebral Palsy or Death. Am J Perinatol. 2017 May;34(6):563-567. doi: 10.1055/s-0036-1594015. Epub 2016 Nov 17. PMID: 27855463.

85. Staley S. A., **Smid M. C.,** Dotters-Katz S. K., Stringer E. M. (2017). Epstein-Barr Virus-Induced Mononucleosis as an Imitator of Severe Preeclampsia. *AJP reports*, 7(1), e5–e7. https://doi.org/10.1055/s-0036-1597265 PMID: 28210518
86. **Smid M.C.,** Stamilio D. M. (2017). Incorrect analysis of cesarean skin incision type and wound complications in obese women? *Am J Obstet Gynecol*, 217(1), 102-103. https://doi.org/10.1016/j.ajog.2017.06.012
87. Dotters-Katz S.K., **Smid M.C.,** Manuck T.A., Metz T.D. (2017). Risk of neonatal and childhood morbidity among preterm infants exposed to marijuana. *J Matern Fetal Neonatal Med*, 30(24), 2933-2939. https://doi.org/10.1080/14767058.2016.1269165 PMID: 27921445
88. **Smid M.C.,** Dotters-Katz S. K., McElwain C. A., Volckmann E. T., Schulkin J., Stuebe A. M. (2017). Pregnancy After Bariatric Surgery: National Survey of Obstetrician's Comfort, Knowledge, and Practice Patterns. *Obes Surg*, 27(9), 2354-2359. http://doi.org/10.1007/s11695-017-2661-2 PMID: 28361492
89. **Smid M.C.**, Edwards R.K., Biggio J.R., Dorman K., Leduke R.C., Lesher L.L., Manuck T.A., Saade G.R., Salazar A.E., Stamilio D.M., Stuebe A.M., Tita A.T., Torres C.M., Varner M.W., Wapner R.J. Class III Obese Women's Preferences and Concerns for Cesarean Skin Incision: A Multicenter Survey. Am J Perinatol. 2017 Feb;34(3):289-294. doi: 10.1055/s-0036-1586750. Epub 2016 Aug 17. PMID: 27533104.
90. **Smid M.C.**, Dotters-Katz S.K., Vaught A.J., Vladutiu C.J., Boggess K.A., Stamilio D.M. Maternal super obesity and risk for intensive care unit admission in the MFMU Cesarean Registry. Acta Obstet Gynecol Scand. 2017 Aug;96(8):976-983. doi: 10.1111/aogs.13145. Epub 2017 May 27. PMID: 28382734.
91. **Smid M.C.**, Ahmed Y., Stoner M.C., Vwalika B., Stringer E.M., Stringer J.S. Association of previous severe low birth weight with adverse perinatal outcomes in a subsequent pregnancy among HIV-prevalent urban African women. Int J Gynaecol Obstet. 2017 Feb;136(2):188-194. doi: 10.1002/ijgo.12040. Epub 2016 Nov 30. PMID: 28099740; PMCID: PMC5416820.
92. Stoner M.C., Vwalika B., **Smid M.C.**, Kumwenda A., Stringer E., Chi B.H., Stringer J.S. Dosage of Sulfadoxine-Pyrimethamine and Risk of Low Birth Weight in a Cohort of Zambian Pregnant Women in a Low Malaria Prevalence Region. Am J Trop Med Hyg. 2017 Jan 11;96(1):170-177. doi: 10.4269/ajtmh.16-0658. Epub 2016 Oct 31. PMID: 27799645; PMCID: PMC5239688.
93. **Smid M.C.**, Dotters-Katz S.K., Silver R.M., Kuller J.A. Body Mass Index 50 kg/m2 and Beyond: Perioperative Care of Pregnant Women with Superobesity Undergoing Cesarean Delivery. Obstet Gynecol Surv. 2017 Aug;72(8):500-510. doi: 10.1097/OGX.0000000000000469. PMID: 28817167.

**2016**

94. **Smid M.C.**, Stringer E.M., Stringer J.S. A Worldwide Epidemic: The Problem and Challenges of Preterm Birth in Low- and Middle-Income Countries. Am J Perinatol. 2016 Feb;33(3):276-89. doi: 10.1055/s-0035-1571199. Epub 2016 Feb 3. PMID: 26841086.
95. **Smid M. C.,** Smiley S. G., Schulkin J., Stamilio D. M., Edwards R. K., Stuebe A. M. (2016). The Problem of the Pannus: Physician Preference Survey and a Review of the Literature on Cesarean Skin Incision in Morbidly Obese Women. *Am J Perinatol*, 33(5), 463-72. http://doi.org/10.1055/s-0035-1566000 PMID: 26510932
96. **Smid, M. C.,** Waltner-Toews, R., & Goodnight, W. (2016). Spontaneous Posterior Uterine Rupture in Twin-Twin Transfusion Syndrome. *AJP reports*, 6(1), e68–e70. https://doi.org/10.1055/s-0035-1566243 PMID: 26929874

97. Chibwesha C.J., Zanolini A., **Smid M.C.**, Vwalika B., Phiri Kasaro M., Mwanahamuntu M., Stringer J.S., Stringer E.M. Predictors and outcomes of low birth weight in Lusaka, Zambia. Int J Gynaecol Obstet. 2016 Sep;134(3):309-14. doi: 10.1016/j.ijgo.2016.03.021. Epub 2016 Jun 9. PMID: 27365291; PMCID: PMC4987240.
98. **Smid M.C.**, Vladutiu C.J., Dotters-Katz S.K., Manuck T.A., Boggess K.A., Stamilio D.M. Maternal Super Obesity and Neonatal Morbidity after Term Cesarean Delivery. Am J Perinatol. 2016 Oct;33(12):1198-204. doi: 10.1055/s-0036-1586122. Epub 2016 Jul 27. PMID: 27464019.
99. Stoner M.C., Vwalika B., **Smid M.C.**, George S., Chi B.H., Stringer E.M., Stringer J.S. A retrospective study of HIV, antiretroviral therapy, and pregnancy-associated hypertension among women in Lusaka, Zambia. Int J Gynaecol Obstet. 2016 Sep;134(3):299-303. doi: 10.1016/j.ijgo.2016.03.014. Epub 2016 May 25. PMID: 27365290; PMCID: PMC4987258.

**2015**

100. **Smid M.C.**, Ahmed Y., Ivester T. Special considerations--Induction of labor in low-resource settings. Semin Perinatol. 2015 Oct;39(6):430-6. doi: 10.1053/j.semperi.2015.07.002. Epub 2015 Aug 29. PMID: 26323239.
101. **Smid M.C.**, Dotters-Katz S.K., Plongla R., Boggess K.A. Leptotrichia Buccalis: A Novel Cause of Chorioamnionitis. Infect Dis Rep. 2015 May 26;7(2):5801. doi: 10.4081/idr.2015.5801. PMID: 26294950; PMCID: PMC4508535.
102. **Smid M.C.,** Kearney M.S., Stamilio D.M. Extreme Obesity and Postcesarean Wound Complications in the Maternal-Fetal Medicine Unit Cesarean Registry. Am J Perinatol. 2015 Dec;32(14):1336-41. doi: 10.1055/s-0035-1564883. Epub 2015 Oct 21. PMID: 26489063.
103. **Smid M.C.,** Bhardwaj N.R., Di Giovanni L.M., Eggener S., Torre M.D. Renal hemorrhagic actinomycotic abscess in pregnancy. Infect Dis Rep. 2014 Feb 14;6(1):5157. doi: 10.4081/idr.2014.5157. PMID: 24757509; PMCID: PMC3987246.
104. **Smid M.C.**, Martins S., Whitaker A.K., Gilliam M. Correlates of pregnancy before age 15 compared with pregnancy between the ages of 15 and 19 in the United States. Obstet Gynecol. 2014 Mar;123(3):578-583. doi: 10.1097/AOG.0000000000000136. PMID: 24499756.
105. **Smid M.C.**, Dorman K.F., Boggess K.A. Lost in translation? English- and Spanish-speaking women's perceptions of gestational weight gain safety, health risks and counseling. J Perinatol. 2015 Aug;35(8):585-9. doi: 10.1038/jp.2015.24. Epub 2015 Apr 2. PMID: 25836322.

**2010**

106. **Smid M.C.**, Bourgois P., Auerswald C.L. The challenge of pregnancy among homeless youth: reclaiming a lost opportunity. J Health Care Poor Underserved. 2010 May;21(2 Suppl):140-56. doi: 10.1353/hpu.0.0318. PMID: 20453382; PMCID: PMC3037014.
107. **Smid M.C.**, Campero L., Cragin L., Gonzalez Hernandez D., Walker D. Bringing two worlds together: exploring the integration of traditional midwives as doulas in Mexican public hospitals. Health Care Women Int. 2010 Jun;31(6):475-98. doi: 10.1080/07399331003628438. PMID: 20461600.

**2009**

108. Savage U.K., Masters S.J., **Smid M.C.**, Hung Y.Y., Jacobson G.F. Hysteroscopic sterilization in a large group practice: experience and effectiveness. Obstet Gynecol. 2009 Dec;114(6):1227-1231. doi: 10.1097/AOG.0b013e3181c2a10d. PMID: 19935023.

## BOOK CHAPTERS

1. **Smid M. C.**, M. Terplan. In Creasy R. K., Resnik R., Iams J. D., Lockwood C. J., Moore T. R., Greene M. F., editors. Substance Use In Pregnancy and Postpartum Period: *Creasy and Resnik's Maternal-Fetal Medicine*. (9th ed.) Philadelphia: Elsevier 2022.
2. Kominiarek M**, Smid M. C.**, Y. Lacoursiere. In Creasy R. K., Resnik R., Iams J. D., Lockwood C. J., Moore T. R., Greene M. F., editors. Maternal Obesity in Pregnancy: *Creasy and Resnik's Maternal-Fetal Medicine*. (9th ed.) Philadelphia: Elsevier 2022.
3. Kominiarek M., **Smid M. C.**, Y. Lacoursiere. Creasy R. K., Resnik R., Iams J. D., Lockwood C. J., Moore T. R., Greene M. F., editors. Maternal Obesity in Pregnancy. In: *Creasy and Resnik's maternal-fetal medicine*. (9th ed.) Philadelphia: Elsevier 2022.
4. Gordon, A. J., Cochran, G., **Smid, M. C.**, Manhapra, A., & Kertesz, S. G. (2019). Prescribing, Prescription Monitoring, and Health Policy. In *Treating Opioid Addiction* (pp. 223-238). Humana, Cham. DOI:10.1007/978-3-030-16257-3_11
5. **Smid M. C.**, Y. Lacoursiere, T. Kelly. Creasy R. K., Resnik R., Iams J. D., Lockwood C. J., Moore T. R., Greene M. F., editors. Maternal Obesity in Pregnancy. In: *Creasy and Resnik's maternal-fetal medicine*. (8th ed.) Philadelphia: Elsevier 2018.
6. **Smid M. C.** and Robert Strauss. Maternal anemia. Berghella V, editor. In: *Maternal-Fetal Evidence-Based Guidelines*. (3rd ed.) Boca Raton: CRC Press 2017.
7. **Smid M.C.** (2009) Obstetrics. In *Le T, Bhushan V, Bagga H (Eds.), First Aid for USMLE Step 2: Clinical Knowledge* (7th edition, pp. 319-56). McGraw-Hill Medical.
8. **Smid M.C.** (2009). Gynecology. In Le T, Bhushan V, Bagga H (Eds.), First Aid for USMLE Step 2: Clinical Knowledge (7th edition, pp. 357-94). McGraw-Hill Medical.

## ADDITIONAL PUBLICATIONS

1. Scharfstein D.O., Nabi R., Kennedy E.H., Huang M., Bonvini M., **Smid M.C**. (2021) Semiparametric Sensitivity Analysis: Unmeasured Confounding in Observational Studies. https://arxiv.org/abs/2104.08300. https://doi.org/10.48550/arXiv.2104.08300
2. Archer S., Bryan M. A., Garets M., Baylis J. B., Charron E., Kelley A. T., Foringer J., Kenney A., Pendergrass D., Cooper M., Costanzo S., Muniyappa B., Carlston K., Hill J., Begaye L., Fortenberry K. T., Cheng M., **Smid M. C.**, Cochran G. (2020). Substance Use in Pregnancy Recovery, Addiction and Dependence Carbon, Emery, and San Juan Counties. *Salt Lake City: University of Utah, Program for Addiction Research, Clinical Care, Knowledge, and Advocacy.*
3. **Smid M. C.**, Ivester T. I. (2015). Achieving pregnancy after gynecological cancer. *OB GYN News*.
4. **Smid M.C.** (2015). Obstetrical care for women post-bariatric surgery [Web], University of North Carolina Maternal-Fetal Medicine Protocol. Available: http://www.mombaby.org/index.php?c=2&s=30.

### EDITORIALS

1. **Smid M.C.** Preventing Postpartum Opioid Overdoses: Our Patients, Our Job. Obstet Gynecol. 2023 Apr 1;141(4):653-655. doi: 10.1097/AOG.0000000000005140. Epub 2023 Mar 9. PMID: 36897153.
2. **Smid, M. C.,** & Saitz, R. (2021). Postpartum treatment of individuals with opioid use disorder: Maternal risk and need for evidence do not end when pregnancy ends. *Journal of*

*Addiction Medicine*, *15*(4), 267–268. https://doi.org/10.1097/adm.0000000000000878 PMID: 34397779

3. **Smid M. C.** (2019) Marijuana use among young pregnant women: more common and more harmful than we think. *BJOG: an international journal of obstetrics and gynaecology,* 126(12), 1498. https://doi.org/10.1111/1471-0528.15919 PMID: 31454457

## POSTER PRESENTATIONS

1. Melicher A, Fallin-BennettA, Coker J, McKinney K, Weitzen S, Ashford K, **Smid MC**. (2023) *What about the ones who got away?* Longitudinal studies may over-represent pregnant individuals with more severe opioid use disorder. Poster presented at the Colorado Perinatal Substance Use Disorder Integration Conference. Avon CO.
2. **Smid MC**, William M, Merced-Morales K, Latendresse G (2023) A Phenomenological Study of Lived Experiences of Individuals with Perinatal Depression and Telehealth Group Interventions. Poster Presentation at Society of Behavioral Medicine. Phoenix AZ
3. William M, **Smid MC**, Iacob J, Kausler R, Simonsen S, Latendresse G (2023) Mixed Method Approach to Understanding Participation Barriers in a Perinatal Depression Group Telehealth Intervention Trial. Poster Presentation at Society of Behavioral Medicine. Phoenix AZ
4. **Smid MC**, Worden J, Hughes M, McMIllin G. (2023). Untargeted Umbilical Cord Testing to Detect Novel Psychoactive Substances. College on Problems of Drug Dependence, 85th Annual Scientific Meeting, Denver, CO.
5. Charron E, White A, Carlston K, Abdullah W, Pierce S, Gordon AJ, Krans EE, **Smid MC**, Cochran J. (2023). Prospective Acceptability of Digital Phenotyping among Pregnant and Parenting People with Opioid Use Disorder. College on Problems of Drug Dependence, 85th Annual Scientific Meeting, Denver, CO.
6. Debbink MD, Tanana H, **Smid MC**, Hardy C, Bloomquist K, Zickmund T, Galyean P, Zickmund S, Cochran G. (2023). Barriers to implementation of substance use screening and treatment services for pregnant and postpartum individuals in a predominantly rural Native US county. Poster Presentation at Society for Reproductive Investigation. Melbourne, Australia.
7. William M, **Smid MC**, Iacob J, Kausler R, Simonsen S, Latendresse G (2023) Mixed Method Approach to Understanding Participation Barriers in a Perinatal Depression Group Telehealth Intervention Trial. Poster Presentation at Society for Maternal Fetal Medicine 2023. San Francisco CA
8. **Smid MC,** Charron E, Debbink M, Allshouse AA, Campbell K, Gordon AJ, Cochran G, Opioid Prescriptions during Pregnancy by Race and Ethnicity in Utah's Urban and Rural counties, 2014-2017, Poster Presentation at Society for Maternal Fetal Medicine. San Francisco CA
9. **Smid MC,** Charron E, Debbink M, Allshouse AA, Campbell K, Gordon AJ, Cochran G, Opioid Trends in Outpatient Opioid Prescriptions during Pregnancy by Clinician Specialty in Utah, 2014-2017, Poster Presentation at Society for Maternal Fetal Medicine. San Francisco CA
10. Bowman J., Lai M., Charles J., Gordon A., **Smid M.C.** (2022) Kratom Use among Pregnant and Postpartum Individuals with Substance Use Disorders. Poster Presentation at College on Problems of Drug Dependence. Minneapolis MN. June 2022
11. Smid, M., Allshouse, A. A., Campbell, K., Debbink, M. P., & Cochran, G. (2022). Neonatal outcomes among pregnant individuals with co-occurring opioid/methamphetamine use disorders and mental health diagnosis. *American Journal of Obstetrics & Gynecology*, *226*(1), S361-S362. Poster presentation at Virtual Society for Maternal Fetal Medicine Meeting 2022.
12. **Smid M.C.**, Worden J., Cochran G., Hughs M, O'Brien A, McMillin G. (2022) Umbilical Cord

Homogenate Assay to Estimate Prenatal Kratom Exposure. Poster Presentation at College on Problems of Drug Dependence. Minneapolis MN. June 2022

13. Fermin O., Khallouq B, Desai N., **Smid M.C**., Herrera C., (2022). Risk of Uterine Rupture Among Women Attempting Vaginal Birth After Low Vertical Incision. Poster presentation at American College of Obstetricians and Gynecologists Annual Clinical and Scientific Meeting. San Diego, CA. May, 2022.
14. Hafen K., **Smid M.C.,** Garets M., Machado A., White A., and Cochran G. *Motivations for Recovery among Pregnant Individuals with Opioid Use Disorder.* (2022). Poster presentation at A American College of Obstetricians and Gynecologists. Annual Clinical and Scientific Meeting. San Diego, CA. May, 2022.
15. Lai M., Bowman J., Charles J., Nickman N., Gunning K., **Smid M.C.** (2022). *Mothers' Knowledge, Attitudes, and Perception regarding Extended-Release Buprenorphine.* Poster Presentation at American Society of Addiction Medicine. Hollywood Beach, FL. April 2022
16. **Smid M.C.**, Metz T.D., on behalf of National Institute of Child Health and Development. (2021) *Early prenatal marijuana and nicotine exposure and child neurodevelopmental outcomes. Poster presentation abstract # 174*, Society of Maternal Fetal Medicine's 41st Annual Pregnancy Meeting, Virtual Conference. January, 2021.
17. **Smid M.C.,** Allshouse A., Campbell K., Debbink M., Gordon A., Kim J., Metz T.D., Varner M., Weitzman N., West N., Cochran G. (2021*) Co-occurring opioid and methamphetamine use disorder and severe maternal morbidity and mortality In Utah.* Poster presentation Abstract # 639, Society of Maternal Fetal Medicine 2020, Virtual Conference. American Journal of Obstetrics & Gynecology 224, no. 2 (2021): S401-S402.
18. Weitzen S., Coker J., McKinney K., **Smid M.C.,** Ashford K. (2021). *Models of care for pregnant Women with opioid use disorder: A multisite pilot study from the Pregnancy Models of Care Collaborative (PROMO)*. Virtual Conference. North American Primary Research Group Conference.
19. Begaye L.J., Kelley A.T., **Smid M.C.**, Baylis J., Charron E., Archer S., Foringer J., Cochran G. (2021). *Healthcare access among rural-dwelling American Indians and non-American Indians with opioid use disorder in pregnancy. Poster presentation abstract # 683*, Society of Maternal Fetal Medicine 2021, Virtual Conference. American Journal of Obstetrics & Gynecology 224(2): S429
20. Debbink M., Metz T.D., Silver R.M., Varner M**., Smid M.C.**, Einerson, B. (2020). Actual Hospital Costs Associated with Severe Maternal Morbidity Compared to Uncomplicated Pregnancies. *Obstetrics & Gynecology*, 135,124S. DOI:10.1097/01.AOG.0000664560.86727.5a.
21. Garets M., Archer S., Kenney A., **Smid M.C.**, Cochran G. (2020*). Opioid Use Disorder Stigma & Barriers to Pregnancy Care and Treatment in Rural Communities*. Poster presentation, Vermont Center on Behavior & Health 2020, Virtual Conference.
22. Baylis J., **Smid M.C.**, Muniyappa B., Cheng M., Fortenberry K.T., Pendergrass D., Foringer J., Archer S., Garets M., Hill J., Bryan A., Carlston K., Cooper M., Cochran G. (2020). *Prenatal Opioid Use Disorder in Rural Communities: Measure of Providers' Perceptions and Attitudes Toward Treating Patients with Prenatal Opioid Use Disorder*. Oral presentation, Addiction Health Services Research 2020, Virtual Conference.
23. Humphreys M., **Smid M.C.**, Gavin E., Fung C., Johnson E., Allshouse A. (2020) *Accuracy of Maternal Substance Use History Among Infants at Risk of Neonatal Abstinence Syndrome*. Obstetrics & Gynecology, 135, 157S.
24. **Smid M.C.**, Cavin T., Charles J., Cochran G., Gordon A., and Varner M. (2020) *Takes two to make three: pregnant women with substance use disorder's intentions for partner's role*. E-poster presented at: American College of Obstetricians and Gynecologist Virtual Annual Clinical Meeting; April 24-27, 2020; Seattle WA.
25. **Smid M.C**. *Pregnancy and Parenting in the Midst of a Methamphetamine Epidemic.* Family

Recovery Pathways: Addiction, Parenting, and Implications for practice. Sioux Falls, South Dakota.

26. **Smid M.C.**, Stone N., Baksh L., Prebish A., Barbeau B. (2020) *Maternal and neonatal outcomes among pregnant women with Hepatitis C in Utah, 2009-2017.* Am J Obstet Gynecol, 222(1), S733. February 8th, 2020.
27. **Smid M.C.** (2020) *Association between body mass index and adverse perinatal outcomes in metabolically healthy pregnant women.* Am J Obstet Gynecol, 222(1) S571-S572. February 7th, 2020.
28. **Smid M.C.**, Lauer S., Hake S., Muniyappa B., Shakib J.H., Meyer K., Charles J., Wilkins S., Baksh L., Fisher J. (2019) *What are we missing? Safety bundle implementation for pregnant women with opioid use disorder*. Poster session presented at the 2019 Addiction Health Service Research conference, Park City, Utah.
29. Conradt E., Priddy S., Saenz C., **Smid M.C.,** Shakib J.H., Fung C., Buchi K., Garland E., Crowell S. (2019) *Neurodevelopmental consequences of prenatal opioid exposure: A pilot study*. Poster session presented at 2019 Society for Research in Child Development Biennial Meeting, Baltimore, MD.
30. Priddy S., Saenz C., **Smid M.C.**, Crowell S., Conradt E., Garland E. (2019) *Exploring the effects of opioid use during pregnancy on mothers' RSA responses to infant cues*. Poster session presented at 2019 Society for Research in Child Development Biennial Meeting, Baltimore.
31. Benson, A. E., **Smid, M. C.,** Boggess, K. A., Vora, N. L., Barrow, D. A., & Dotters-Katz, S. (2019). *Biomarkers of Inflammation in Pregnancy (BIG): Amniotic Fluid and Serum Inflammatory Markers at Time of Cesarean Delivery.* In REPRODUCTIVE SCIENCES (Vol. 26, pp. 321A-321A). Scientific Program 64th Annual Scientific Meeting. https://doi.org/10.1177/1933719119834079
32. Venkatesh K.K., Pate V., Boggess K.A., Funk M., and **Smid M.C**. (2019) Co-*prescription of opioids and psychotropics among commercially insured US pregnant women and adverse pregnancy outcome*. Poster session presented at SMFM, Las Vegas, NV.
33. **Smid, M.C.** (2018, March). *Obesity, Tocolytic Adipokines, and Labor in Term Deliveries.* In REPRODUCTIVE SCIENCES (Vol. 25, pp. 198A-198A). Scientific Program 65th Annual Scientific Meeting. https://doi.org/10.1177/1933719118759998
34. **Smid M.C.**, Martins S., Whitaker A., Gilliam M. (2019) *Very young and pregnant: correlates of early (<15 years old) vs. late (15-19 years old) teenage pregnancy in the National Survey of Family Growth.* Poster session presented at Society of Family Planning: North American Forum on Family Planning, Denver, CO. Presented at 2019 Society for Research in Child Development Biennial Meeting, Baltimore.
35. **Smid M.C.**, Maeda J., Stone N., Shakib J.H., Baksh, L. (2019) *Hepatitis C Viral Infection Among Pregnant Women in Utah, 2009–2016*. Obstetrics & Gynecology: May 2019; 133, p185S[18Q].
36. Monson, M., Carpenter, J., Murtaugh, M., Varner, M. W., & **Smid, M.C.** (2018, March). *Maternal Serum Leptin, Body Mass Index and Risk for Postpartum Hemorrhage*. In REPRODUCTIVE SCIENCES (Vol. 25, pp. 150A-151A). Scientific Program 65th Annual Scientific Meeting. https://doi.org/10.1177/1933719118759998
37. **Smid M.C.**, Maeda J., Stone N., Baksh L., Einerson B., Gordon A., Powers F., Varner M., Clark E., Metz T. (2018) *Drug-related maternal deaths in Utah, 2013-2016*. Poster session presented at SMFM, Las Vegas, NV. Poster session presented at Society of Maternal Fetal Medicine, Las Vegas, NV. American Journal of Obstetrics & Gynecology, 218(1): S473
38. **Smid M.C.**, Kominiarek M. (2018) Child *neurodevelopmental outcomes by pre-pregnancy body mass index and adequacy and timing of gestational weight gain*. Poster session presented at Society of Maternal Fetal Medicine, Las Vegas, NV. American Journal of Obstetrics & Gynecology, 218(1): S390
39. Cassimatis I.R., Gibbins K.J., Dudley D.J., Silver R.M., and **Smid M.C.** (2018) *Causes and timing*

*of stillbirth among women with pre-gestational and gestational diabetes: Stillbirth Collaborative Research Network data*. Poster session presented at Society of Maternal Fetal Medicine, Las Vegas, NV. American Journal of Obstetrics & Gynecology, 218(1): S571

40. **Smid M.C.,** Branch D.W., West J., Meeks H., Yu Z., Fraser A., Smith K.R., and Reddy D. (2018) *Interpregnancy BMI changes and offspring mortality following second pregnancy*. Poster session presented at Society of Maternal Fetal Medicine, Las Vegas, NV. American Journal of Obstetrics & Gynecology, 218(1): S435
41. **Smid M.C.**, Stone N., Baksh L., Simonsen S.E., Debbink M.L., Hammad I.A., Einerson B.D., Varner M.W., and Clark E.A. (2018) *Drug-related pregnancy-associated deaths in Utah, 2005-2014*. Poster session presented at Society of Maternal Fetal Medicine, Las Vegas, NV. American Journal of Obstetrics & Gynecology, 218(1): S435-S436.
42. **Smid M.C.** and CSOAP Consortium. *Talosporin perioperative antibiotic regimen and maternal postoperative infection.*
43. **Smid M.C.** on behalf of CSOAP Consortium. (2017) *Non-elective cesarean delivery and perioperative complications-does maternal obesity increase complications*? Poster session presented at Society of Maternal Fetal Medicine, Grapevine, TX. American Journal of Obstetrics & Gynecology, 216(1): S518.
44. Markova K., Yu Z., Meeks H., Fraser A., **Smid M. C.**, Branch D., ... & Reddy, D. (2017). *BMI Change between Pregnancies and Neonatal Outcomes: Data from the Utah Population Database from 1989-2015.* American diabetes Association 77th Scientific Sessions. San Diego, CA. June 9-13, 2017.
45. **Smid M.C.,** Einerson B., Spivak E., Dotters-Katz S.K., Hopkins M., and Nelson R. (2017) *A cost-effectiveness analysis of antenatal penicillin sensitivity testing for to prevent cesarean wound infections.* American Journal of Obstetrics and Gynecology, 217(6), p.719. Infectious Disease Society of Obstetrics and Gynecology. Deer Valley, UT.
46. **Smid M.C.**, McPherson J., Dotters-Katz S.K., Grace M., Manuck T.A., Stamilio D.M., Boggess K.A. (2017) *Hypertensive disorders of pregnancy-unrecognized risk factors for post-cesarean wound complications*. Poster session presented at Society of Maternal Fetal Medicine, Grapevine TX, 2017. American Journal of Obstetrics & Gynecology, 216(1): S392-S393.BMI Change between Pregnancies and Neonatal Outcomes: Data from the Utah Population Database from 1989-2015. In *DIABETES* (Vol. 66, pp. LB54-LB54).
47. Monthé-Drèze C., Penfield-Cyr A., **Smid M.C.,** Sen S. (2017). *Maternal Obesity Modulates Response to Omega-3 Fatty Acids Supplementation During Pregnancy*. In *REPRODUCTIVE SCIENCES* (Vol. 24, pp. 186A-186A). Scientific Program 64th Annual Scientific Meeting. March 1, 2017. https://doi.org/10.1177/1933719117699545
48. **Smid M. C.,** Monthé-Drèze C., Boggess K., Gibbins K., Commins S., Sen S. (2017). *Maternal BMI, Cytokine Profiles and Risk of Early Infection in Pregnancy*. In REPRODUCTIVE SCIENCES (Vol. 24, pp. 191A-191A). Scientific Program 64th Annual Scientific Meeting. March 1, 2017. https://doi.org/10.1177/1933719117699545
49. **Smid M.C.**, Vladutiu C.J., Dotters-Katz S.K., Manuck T.A., Stamilio D.M. (2016) *Maternal obesity and acute neonatal morbidity after cesarean delivery.* Poster session presented at Society of Maternal Fetal Medicine 36th Annual Pregnancy Meeting, Atlanta, GA. American Journal of Obstetrics & Gynecology 214(1): S132
50. **Smid M.C.**, Vladutiu C.J., Dotters-Katz S.K., Manuck T.A., Stamilio D.M. (2016) *Association between maternal obesity and major intraoperative complications.* Poster session presented at Society of Maternal Fetal Medicine 36th Annual Pregnancy Meeting, Atlanta, GA. American Journal of Obstetrics & Gynecology 214(1): S208
51. **Smid M.C.**, Vladutiu C.J., Dotters-Katz S.K., Manuck T.A., Stamilio D.M. (2016) *The association between maternal obesity or super-morbid obesity and severe neonatal adverse outcomes*

*after cesarean delivery*. Poster session presented at Society of Maternal Fetal Medicine 36th Annual Pregnancy Meeting, Atlanta, GA. American Journal of Obstetrics & Gynecology 214(1): S345-S346

52. **Smid M.C.**, Vwalika B., Stoner M., Ahmed Y., Chi B., Stringer E.M., Stringer J.S.A. (2016) *Adverse perinatal outcomes and vertical HIV transmission among women with history of low birth weight infant in Lusaka, Zambia.* Poster session presented at Society of Maternal Fetal Medicine 36th Annual Pregnancy Meeting, Atlanta, GA. American Journal of Obstetrics & Gynecology 214(1): S208-S209.
53. **Smid M.C.**, Lee J.H., Miles G., Chapman D., Manuck T.A. (2016) *Transgenerational preterm birth (PTB) risk among black and white women*. Poster session presented at Society of Maternal Fetal Medicine 36th Annual Pregnancy Meeting, Atlanta, GA Am J Obstet Gynecol, 216(a): S314.
54. Myrick O., Dotters-Katz S.K., **Smid M.C.**, Boggess K.A., Goodnight W. *Association of Prophylactic Antibiotics and Latency in Women with Expectant Management of Previable Preterm Premature Rupture of Membranes in Multi-fetal Pregnancy.* Poster session presented at 42nd Infectious Diseases Society for Obstetrics and Gynecology Annual Meeting, Portland, OR.
55. **Smid M.C.**, Vwalika B., Stoner M., Dotters-Katz S.K., Kumwenda A., Stringer E., Stinger J.S.A. (2015) *Dosing Regimens of Sulfadoxine-Pyrimethamine for Malaria Prophylaxis and Risk of Low Birth Weight among HIV positive women in Lusaka, Zambia.* Poster session presented at 42nd Infectious Diseases Society for Obstetrics and Gynecology Annual Meeting, Portland, OR. American Journal of Obstetrics & Gynecology 213(6):904.
56. **Smid M.C.**, Feng L., Smithies O., Boggess K.A. (2015) *Endothelin-1 overexpression mimics preeclampsia in pregnant mice.* Poster session presented at 35th Society of Maternal-Fetal Medicine Annual Pregnancy Meeting, San Diego, CA. American Journal of Obstetrics & Gynecology, 212(1): S1145
57. **Smid M.C.**, Stoner M., Stringer E., Stringer J. (2015) *Risk of recurrent low birth weight among women in Lusaka, Zambia.* Poster session presented at 35th Society of Maternal-Fetal Medicine Annual Pregnancy Meeting, San Diego, CA. American Journal of Obstetrics & Gynecology, 212(1): S402.
58. Kearney M., **Smid M.C.**, Stamilio D. (2015) *Extreme obesity and neonatal outcomes in Cesarean registry.* Poster session presented at 35th Society of Maternal-Fetal Medicine Annual Pregnancy Meeting, San Diego, CA. American Journal of Obstetrics & Gynecology, 212(1): S116.
59. Straub H., **Smid M.C.**, Ochoa P., Grable I., Blanchard A., Plunkett B.A. (2014) *High- fidelity simulation experience improves resident operative vaginal delivery clinical experience.* Council on Resident Education in Obstetrics and Gynecology (CREOG)/Association of Professors of Gynecology and Obstetrics (APGO) Annual Meeting, Phoenix, AZ.
60. **Smid M.C.**, Victorson D., Plunkett B.A. (2013) *The Role of Depression and Anxiety on Weight Gain among Obese Pregnant Women*. Poster session presented at 33rd Society of Maternal-Fetal Medicine Annual Pregnancy Meeting, San Francisco, CA. American Journal of Obstetrics & Gynecology, 208(1), S238.
61. **Smid M.C.**, Blood A., Banayen J., Siddiqui M., Nunes K., Scavone B., Nwankwo C. Improving *Team Response to an Obstetric Emergency: Interprofessional Simulation Focused on Shoulder Dystocia*. Poster session presented at University of Chicago Quality Fair, Chicago, IL.
62. **Smid M.C**. *Substance Use & Pregnancy*. (2018) Pregnancy Care ECHO, University of Utah, Salt Lake City, UT.
63. **Smid M.C**. *Opioids and Pregnancy*, (2018) Chair and Moderator District VIII Section on

Neonatal - Perinatal Medicine 42nd Annual Conference, Midway, UT

64. **Smid M.C**. *Opioids, Opiates & Pregnancy (Oops) - The Impact of The Opidemic On Pregnant Women in Utah.* (2018) Addictions Update: Science, Policy & Treatment, Salt Lake City, UT.
65. **Smid M.C**. *Opioids, Opiates & Pregnancy (Oops) - The Impact of The Opidemic On Pregnant Women in Utah.* (2018) Association of Women's Health, Obstetric and Neonatal Nurses (AWHONN), Utah Section's Annual Conference, Salt Lake City, UT.
66. Stoner M., Vwalika B., **Smid M.C.**, Dotters-Katz S.K., Kumwenda A., Stringer E., Stinger J.S.A. *The Interaction between Sulfadoxine-Pyrimethamine for Malaria Prophylaxis and Highly Active Antiretroviral Therapy (HAART) on Risk of Low Birth Weight in a Cohort of HIV Positive Pregnant Women in Lusaka, Zambia.* 42nd Infectious Diseases Society for Obstetrics and Gynecology Annual Meeting, Portland, OR
67. **Smid M.C.**, Walker D., Cragin L., De Maria L., Suarez L., Gonzalez D., Romero M. (2012) *Trained birth attendants In Mexico: How do general physicians, obstetric nurses and professional midwives rank compared to WHO evidence-based practice guidelines?* 137th American Public Health Association Annual Meeting, Philadelphia, PA
68. **Smid M.C.,** Gonzalez D., Campero L., Cragin .L, Walker D. *From herbs to episiotomies: Redefining the Mexican "traditional" midwife and her importance in pregnancy care*. Poster session presented at 137th American Public Health Association Annual Meeting. November, 2009. Philadelphia, PA
69. **Smid M.C.** *Understanding opioid use among pregnant women – a primer for the Child Protective Services Caseworkers.* Salt Lake County Department of Child and Family Services
70. **Smid M.C.**, Bourgois P., Sokal-Guttierez K., Auerswald C. (2006) *Help me! Pregnancy Decision-making among Berkeley Street Youth.* 10th Annual San Francisco Bay Area Regional Homeless Perinatal Conference, Oakland, CA
71. **Smid M.C.**, Bourgois P., Sokal-Guttierez K., Auerswald C. (2006) *Leave me alone! Pregnancy Decision-making among Berkeley Street Youth.* 10th Annual San Francisco Bay Area Regional Homeless Perinatal Conference, Oakland, CA

## ORAL PRESENTATIONS

### Peer-Reviewed Presentations

| | |
|---|---|
| 11/02/2023 | Cochran G, **Smid MC**, Krans EE, Yu Z, Charron E, Okifuji A, Gordon AJ, Lundahl B, Silipigni J, Haaland B, Tarter R. Patient Navigation for Pregnant Persons with Opioid Use Disorder: Results of a Multisite Pilot Study. Oral presentation at the Association for Multidisciplinary Education and Research in Substance Use and Addiction annual conference. Washington DC |
| 05/21/2023 | **Smid MC,** Louis J, Davidson A, K Miele. Tips and Tricks for Gestating an Opioid Use Disorder in Pregnancy. American College of Obsteteics and Gynecology. Annual Clinical and Scientific Meeting. Baltimore, Maryland. |
| 02/10/2023 | Goffman D. Rood KM, Bianco A, Biggio JR, Dietz P, Drake K, Heilman E, Hopkins M, De Four Jones M, Katz T, Martin C, Prasad M, **Smid MC**, Wine K, Ryan R, Yong C, Carney PI, Simham H. Real-world Utilization of an Intrauterine Vacuum-induced Hemorrhage Control Device. Late breaking Oral Concurrent Presentation. Society for Maternal Fetal Medicine. San Francisco, CA. |
| 06/23/2021 | **Smid M.C.**, Allshouse A., Cochran G., McMillin G., Nunez K., Cavin T., Buchi K., Varner M., Metz T.D. *Cord Prevalence Anonymous Substance Use* (C-PAST) Study: |

| | |
|---|---|
| | Anonymous Umbilical Cord Collection to Determine Statewide Prenatal Substance Use in Utah. College on Problems of Drug Dependence. Virtual Meeting. |
| 01/29/2021 | **Smid M.C.**, McMillin G., Metz T.D. for the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development Maternal-Fetal Medicine Units Network. Early prenatal marijuana and nicotine exposure and child neurodevelopmental outcomes. Society of Maternal Fetal Medicine. Abstract 55. Virtual Meeting. *American Journal of Obstetrics & Gynecology* 224.2 (2021): S38-S39. |
| 08/12/2017 | **Smid M.C.**, Einerson B., Spivak E., Dotters-Katz S., Hopkins M., Nelson R. *A cost-effectiveness analysis of antenatal penicillin sensitivity testing for to prevent cesarean wound infections.* Abstract presented at Infectious Disease Society of Obstetrics and Gynecology. October, 2017. Deer Valley, UT. |
| 08/11/2017 | Dotters-Katz S.K., **Smid M.C.**, Grace M., Sykes C., Handy K., Gunitilake R., Boggess K., Patil A., Manuck T. *The effect of blood loss on cefazolin levels in women undergoing cesarean delivery.* Abstract presented at Infectious Disease Society of Obstetrics and Gynecology. December, 2017. Deer Valley, UT. |
| 08/12/2015 | Dotters-Katz S., Myrick O., **Smid M.C.**, Boggess K., Goodnight W. Association of Prophylactic Antibiotics and Latency in Women with Expectant Management of Previable Preterm Premature Rupture of Membranes. Presented at 42nd Infectious Diseases Society for Obstetrics and Gynecology Annual Meeting. August, 2015. Portland, OR. |
| 08/07/2015 | Stoner M., Vwalika B., **Smid M.C.**, Dotters-Katz S.K., Kumwenda A., Stringer E., Stinger J.S.A. The Interaction between Sulfadoxine-Pyrimethamine for Malaria Prophylaxis and Highly Active Antiretroviral Therapy (HAART) on Risk of Low Birth Weight in a Cohort of HIV Positive Pregnant Women in Lusaka, Zambia. Presented at 42nd Infectious Diseases Society for Obstetrics and Gynecology Annual Meeting. August, 2015. Portland, OR. |
| 06/06/2008 | **Smid M.C.**, Gonzalez D., Campero L., Cragin L., Walker D. La Partera as Doula?: Exploring the integration of Mexican traditional midwives as doulas in public hospitals. Presented at Midwives Alliance of North American International Conference. June, 2008. San Cristobal de las Casas, Chiapas, Mexico. |

**Meeting Presentations**

| | |
|---|---|
| 04/02/2022 | Schauberger C., Smid M.C. *Methamphetamine Use Disorder in Pregnancy*. Oral Presentation at American Society of Addiction Medicine Annual Meeting. Hollywood Beach, Florida |
| 03/12/2012 | Straub H., **Smid M.C.**, Ochoa P., Grable I., Blanchard A., Plunkett B.A. *High-fidelity simulation experience improves resident operative vaginal delivery clinical experience.* Presented at Council on Resident Education in Obstetrics and Gynecology (CREOG)/Association of Professors of Gynecology and Obstetrics (APGO) Annual Meeting. March, 2012. Phoenix, AZ. |
| 11/03/2009 | **Smid M.C.**, Walker D., Cragin L., De Maria L., Suarez L., Gonzalez D., Romero M. *Trained birth attendants In Mexico: How do general physicians, obstetric nurses and professional midwives rank compared to WHO evidence-based* |

*practice guidelines?* Presented at 137th American Public Health Association Annual Meeting. November, 2009. Philadelphia, PA

**Invited/Visiting Professor Presentations**

International

| | |
|---|---|
| 05/10/2023 | Intrapartum and postpartum management of obstetric patients with opioid use disorder on L&D<br>North American Society of Obstetric Medicine<br>Virtual Meeting |
| 09/23/2022 | *Mamas, Munchkins and Methamphetamines.*<br>Western Canada Addiction Forum<br>Kelowna, British Columbia, Canada |
| 02/20/2022 | *Substance Use in Pregnancy*<br>Ethiopian Society of Obstetrics and Gynecology |
| 07/13/2020 | *Vacuum-Induced Hemorrhage Control*<br>JHPIEGO Postpartum Hemorrhage Community of Practice Annual Meeting<br>Virtual Meeting. |

National

| | |
|---|---|
| 06/12/2023 | *Determing pregnancy-relatedness of suicide and drug overdoses*. District VIII Maternal Mortality Summitt. Virtual Meeting. |
| 06/02/2023 | *Substance use disorders: what is it, how common and how does it contribute to maternal mortality and what we all need to know.* Maternal Mortality Symposium. Virtual Meeting. |
| 05/22/2023 | *Pregnancy + SUD + mental health = diagnostic & management challenges.* Generation 22nd annual meeting. Salt Lake City, UT. |
| 05/03/2023 | *Understanding the Neurobiology of addiction in pregnancy*. Colorado Perinatal Substance Use Disorder Integration Conference. Break-out session. Avon, Colorado. |
| 05/03/2023 | *Mamas, Munchkins and Methamphetamines*. Colorado Perinatal Substance Use Disorder Integration Conference. Break-out session. Avon, Colorado. |
| 10/19/2022 | *Drug related and suicide deaths: North Dakota and South Dakota* Maternal Mortality Review Committee Meeting. Virtual Meeting. |

| | |
|---|---|
| 06/29/2022 | *Mamas, Munchkins and Methamphetamines*. Opioid Reponse Network State Targeted Response-Technical Assitance District 7. |
| 05/11/2022 | *How do we all agree? Using the Delphi method to achieve national consensus for pregnancy related consensus for pregnancy related deaths from suicides and overdoses.*<br>Centers for Disease Control and Prevention<br>7th Annual MMRIA User Meeting |
| 04/12/2022 | *Seeing the writing on the wall: when perinatal substance use become lethal.* Alaska Perinatal Quality Collaborative and Maternal Child Death Review |
| 01/26/2022 | *Methamphetamines, Mamas and Munchkins*<br>*Frontiers in Addiction & Pregnancy Advanced Training Program*<br>Magee-Women's Research Institute & Foundation |
| 01/26/2022 | *Methamphetamines, Mamas and Munchkins: the Kansas experience*<br>*Substance Abuse and Mental Health Administration Opioid Response Network*<br>Shawnee County Division of Children and Family Services |
| 11/19/2021 | *Drug related and suicide deaths: pregnancy related criteria*<br>Northern New England Perinatal Quality Improvement Network<br>Fall Virtual Conference |
| 10/21/2021 | *Screening, SBIRT and Substance Use in the OB setting – so what does this all mean?*<br>Kentucky Perinatal Quality Collaborative Virtual Annual Meeting |
| 10/19/2021 | *Drug related and suicide deaths: pregnancy related criteria*<br>Montana Maternal Mortality Review Committee Virtual Inaugural Meeting |
| 10/13/2021 | *Drug related and suicide deaths: pregnancy and the postpartum period – national conversation and why they matter*<br>Montana Maternal Mortality Review Committee Inaugural Meeting |
| 09/09/2021 | *Voices from the Grave: How Maternal Mortality Review Committee data reflects health disparities in rural and Native American populations*<br>American College of Obstetricians and Gynecologists District VIII meeting<br>Salt Lake City, UT |
| 08/23/2021 | *Let's talk about substance use, overdose and death in pregnancy and the postpartum period – national conversations and why they matter*<br>Indiana Perinatal Substance Use Virtual Conference<br>Indiana Perinatal Quality Improvement Collaborative |
| 04/22/2021 | *Substance Use and Mental Health Death in Maternal Mortality Review*<br>6th Annual MMRIA User Meeting (MUM)<br>Erase Maternal Mortality<br>Maternal Mortality Prevention Team, Division of Reproductive Health<br>National Center for Chronic Disease Prevention and Health Promotion<br>Centers for Disease Control and Prevention |
| 11/03/2020 | *Drugs hijack your brain and pregnancy can hijack it back: Understanding the power of pregnancy for women with substance use disorders*. Healthy Mom, Health Babies: Virtual Perinatal Mental Health Conference. Montana Department of Health and Human Services. |
| 11/03/2020 | *Pills, Pot and Powdery Substances: Practical advice for caring pregnant women with substance use disorders* |

| | |
|---|---|
| | Healthy Mom, Health Babies: Virtual Perinatal Mental Health Conference Montana Department of Health and Human Services |
| 09/10/2020 | *Utah Perinatal Mortality Review Committee* American College of Obstetricians and Gynecologists District VIII Maternal Mortality Virtual Summit |
| 07/15/2020 | *Reducing Polysubstance Use in Pregnancy: Putting the LINK in MAT-LINK - Linking clinical data and surveillance of substance use in pregnancy*. Centers for Disease Control Public Health Grand Rounds. Recording available at https://www.cdc.gov/grand-rounds/pp/2020/20200729-reducing-polysubstance-pregnancy.html?deliveryName=USCDC_445-DM36573 |
| 01/15/2020 | *Outreach Perinatal Care: Reaching pregnant and postpartum women in rural Utah.* National Women and Addiction Summit: Compassionate Care for Women Infants, Families and Communities Impacted by Substance Use Disorder. Women and Addiction Group of the American Society of Medicine. Seattle, Washington. |
| 01/07/2020 | *Methamphetamine and pregnancy: Mamas & munchkins*. Frontiers in Addiction Research & Pregnancy. San Diego, California. |
| 10/03/2019 | *Perinatal Addiction Pearls*. 19th Community Response to Child Abuse Conference. Sioux Falls, South Dakota. |
| 10/02/2019 | *Understanding Evidence-based approaches to perinatal addiction*. 19th Community Response to Child Abuse Conference. Sioux Falls, South Dakota. |
| 09/21/2019 | "*Methamphetamines, Marijuana and Munchkins – impact on mamas and munchkins.*" Montana Department of Public Health and Human Services, Addictive & Mental Disorders Division. Butte, Montana. |
| 06/04/2019 | *Maternal Mortality Review Committee Role in Addressing Perinatal Mental Health and Substance Use Disorder*. Fifth Annual Maternal Mortality Review Information App User Meeting (MUMS), Centers for Disease Control Atlanta, Georgia |
| 05/07/2019 | *Pregnancy and Parenting in the Midst of a Methamphetamine Epidemic.* Family Recovery Pathways: Addiction, Parenting, and Implications for practice. Sioux Falls, South Dakota. |

<u>Local/Regional</u>

| | |
|---|---|
| 05/17/2023 | Neonatal Astinence Syndrome Anti-stigma Training. Health Extension: Advocacy, Research, & Teaching (HEART) Initiative. Utah State University. Salt Lake and Tooele Counties. Virtual |
| 11/19/2023 | Substance Use Disorder and Pregnancy, Intermountain Healthcare Department of Obstetrics and Gynecology. |
| 11/03/2023 | Lunch and Learn: Opioids and Obstetric. Healthy Connections SelectHealth, Intermountain Healthcare. Virtual meeting |
| 07/13/2022 | *Pregnancy for women with substance use disorders: a whirlwind* overview *of important things I think you should know* LDS Hospital Labor and Delivery nurses staff meeting |
| 04/21/2022 | *Perinatal Psychiatric Condition and Psychopharmacology* University of Utah Obstetrics and Gynecology Residents |

| | |
|---|---|
| 04/20/2022 | *Pregnancy for women with substance use disorders: a whirlwind* overview *of important things I think you should know*<br>Intermountain Health Center Labor and Delivery nurses staff meeting |
| 01/26/2022 | *Methamphetamines, Mamas and Munchkins* – the Utah Experience<br>Association of Women's Health, Obstetric and Neonatal Nurses<br>Utah Annual Conference |
| 08/10/2021 | *Pregnancy for women with substance use disorders: a whirlwind overview of important things I think you should know*<br>University of Utah Project Supporting Children of the Opioid Epidemic (Project Scope) |
| 03/31/2021 | *Pregnancy for women with substance use disorders: a whirlwind overview of important things I think you should know*<br>Tooele County Division of Child and Family Services Virtual Meeting<br>Utah State University |
| 11/05/2020 | *Pregnancy and Substance use disorder*<br>University of Utah Behavioral Health Project Echo Session |
| 10/22/2020 | *Pregnant and parenting women with substance use disorder and intimate partner violence*<br>University of Utah Domestic Violence Committee Virtual Meeting |
| 08/24/2020 | *Substance use and Pregnancy*. Generations 2020 Virtual Conference. *sponsored by the University of Utah Department of Psychiatry in partnership w/the* Utah Division of Substance Abuse & Mental Health *and the* Utah Division of Occupational & Professional Licensing, Salt Lake City Utah. |
| 08/24/2020 | *Real Life Lessons About Expanding Perinatal Addiction Services to Rural Areas*. 2020 ADDICTIONS UPDATE: SCIENCE, POLICY & TREATMENT sponsored by the University of Utah Department of Psychiatry in partnership w/the Utah Division of Substance Abuse & Mental Health *and the* Utah Division of Occupational & Professional Licensing, Salt Lake City Utah. |
| 05/13/2020 | *Evidence-based practices for pregnant and parenting women with substance use disorders.* Utah Attorney General's Office Child Protection CLE. Cedar City, Utah. |
| 10/30/2019 | *Mamas, munchkins and methamphetamines*. Mountain Plains Region 8 Addiction Technology Transfer Center. Project Echo presentation. |
| 09/25/2019 | Montana Public Health Fall Prevention Symposium "*Methamphetamines, marijuana and margaritas: effects on mamas and munchkins*" |
| 10/02/2019 | *Project Echo "Interviewing do and don't for people with substance use disorder."* Behavioral Health Echo. University of Utah Health. Salt Lake City, Utah. |
| 09/11/2019 | *Fourth Annual Utah Criminal Justice Conference Opioids, opiate and obstetrics: impact of opidemic on pregnant women*. West Jordan. Utah |
| 06/15/2019 | *Opioids, Opiates & Pregnancy (Oops) - The Impact of The Opidemic On Pregnant Women in Utah.* Association of Women's Health, Obstetric and Neonatal Nurses (AWHONN), Utah Section's Annual Conference, Salt Lake City, UT. |
| 06/14/2019 | *Genes, Gender & Gestation - How Pregnancy Hijacks a Brain w/Sex & Gender in Women's Health Research, Addiction Conference.* 2019 Addiction Update: Science, Policy and Treatment |

| | |
|---|---|
| | University of Utah Department of Psychiatry, Utah Division of Substance Abuse & Mental Health and the Utah Division of Occupational & Professional Licensing, Salt Lake City Utah. |
| 05/14/2019 | *Children's Justice Symposium Opioids, Opiate – the impact of the opidemic on pregnant women*. Snowbird, UT. |
| 03/29/2019 | *Opiate, Opioids and Obstetrics!: The impact of the opidemic on pregnant women*. Newborn Pediatric Critical Care Conference. Provo, UT |
| 03/212019 | *Utah Department of Health Violence & Injury Prevention Program*. Utah/ Canada Opioid Workshop on Treatment – Rural vs. Urban Perspectives. Salt Lake City, Utah |
| 12/15/2018 | *Understanding opioid use among pregnant women – a primer for the Child Protective Services Caseworkers*. Presented at Salt Lake County Department of Child and Family Services. December, 2018. Salt Lake City, Utah. |
| 11/12/2018 | *Opioid use in Pregnancy*. Presented at Academy of Certified Nurse Midwives Region VI Webinar. November, 2018. Virtual Meeting. |
| 06/15/2018 | **Smid M.C**. *Opiate, Opioids and Obstetrics!: The impact of the opidemic on pregnant women*. Presented at American Academy of Pediatrics District VIII Section on Neonatal-Perinatal Medicine. June, 2018. |
| 05/09/2018 | **Smid M.C**. *Understanding opioid use among pregnant women – a primer for the Correctional Officers*. Presented at Utah Department of Correction Women's Symposium. May, 2018. Salt Lake City, UT. |

**Grand Rounds Presentations**

| | |
|---|---|
| 04/05/2023 | Pregnancy & postpartum for people with substance use disorders: a whirlwind overview of important things I think you should know. Univeristy of Nebraska. Department of Psychiatry. |
| 10/19/2022 | Pregnancy & postpartum for people with substance use disorders: a whirlwind overview of important things I think you should know. The ObG Project Grand Rounds. Virtual |
| 10/12/2022 | Opioid use disorder (but really all SUD), obstetrics, oh my! Louisana State University, New Orleans, LA. Departmet of Obstetrics and Gynecolgy |
| 04/28/2021 | Substance Use in Pregnancy: the myths, the legends and the evidence informed truth. University of Buffalo, Department of Obstetrics and Gynecology |
| 01/20/2021 | Pregnancy for women with substance use disorders: a whirlwind overview of important things I think you should know University of Utah Department of Psychiatry |
| 09/14/2018 | Opiate, Opioids and Obstetrics!: The impact of the opidemic on pregnant women. University of Oklahoma Department of Obstetrics and Gynecology |
| 09/15/2017 | University of Utah Opioids. Opioids, opiates and obstetrics (OOPS) – The Impact of the opioid epidemic on pregnant women, Salt Lake City, UT |

| | |
|---|---|
| 10/17/2015 | OB3: Obesity, Obstetrics and Outcomes – Oh My!! Grand Rounds, University of Chicago, Chicago, IL |
| 12/15/2014 | Obesity and Obstetrics, Grand Rounds, University of North Carolina, Chapel Hill, NC |
| 09/18/2014 | Advanced cardiac life support in the pregnant patient. Grand Rounds, New Hanover Regional Hospital, New Hanover, NC |
| 07/31/2014 | Pregnancy after bariatric surgery. Grand Rounds, Nash General Hospital, Rocky Mount, NC |
| 08/22/2013 | How to deliver a baby on a plane: emergency obstetrics in the field. Grand Rounds, University of Chicago, Chicago, IL |

## PERSONAL INFORMATION

Birth date: [redacted]

Birthplace: [redacted] Czech Republic

## HOBBIES AND PERSONAL INTERESTS

Skiing, Backpacking, Hiking

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

Case No. 1:24-cv-00244-BLW

Dr. STACY SEYB

Plaintiff,

v.

MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities *et al.*,

Defendants,

**EXPERT REPORT OF ELENA KRAUS, MD, PHD, MSCI, FACOG**

I, Elena Kraus, state as follows:

1. I am over the age of eighteen (18), of sound mind, and competent to make the statements contained in this declaration.

## I. Professional Background and Qualifications

2. I received my undergraduate degree from the University of Dallas. I completed a combined ("dual degree") medical doctorate and doctorate in philosophy in Health Care Ethics at Saint Louis University. I completed residency training in Obstetrics and Gynecology, followed by a fellowship in Maternal Fetal Medicine (MFM), at Saint Louis University. During my fellowship, I also completed a Master of Science in Clinical Investigation (MSCI) as part of a Mentored Training Program in Clinical Investigation at Washington University in Saint Louis.

3. I have been employed by Mercy Clinic as a MFM Specialist since September 2024. In both the outpatient and inpatient setting, I provide high risk obstetric care, including the treatment of

medical and surgical complications in pregnancy, and the diagnosis and treatment of fetal conditions, including structural and genetic abnormalities. I perform fetal genetic screening and diagnosis through laboratory and ultrasound assessments including amniocentesis. I perform intrauterine fetal procedures that treat life-threatening fetal diagnoses. I diagnose, monitor, and coordinate appropriate delivery and postnatal care for babies with a variety of genetic and other prenatal diagnoses. I see patients referred to and transferred to our facilities from the state of Missouri and Illinois.

4. In my current position I serve as a supervising and/or collaborating physician and clinical educator to Certified Nurse Midwives, Nurse Practitioners, medical students, and resident physicians in Obstetrics and Gynecology and Family Medicine. I also participate in the research activities of residents in Obstetrics and Gynecology. I am a clinical educator for medical students enrolled in Ponce Health Sciences University.

5. I am board-certified in Obstetrics and Gynecology and Maternal Fetal Medicine. I am currently licensed to practice medicine in Missouri and Nebraska.

6. Prior to my current position, I worked for two years for CHI Health in Lincoln and Omaha, Nebraska. During that time, I also served as the Medical Director for the CHI Health Birth Center in Lincoln, Nebraska. I was an Assistant Professor of Obstetrics and Gynecology at Creighton University in Omaha, Nebraska. I participated in the Perinatal Safety and Quality Committee and Maternal Morbidity and Mortality Review Committee for CHI Health, which focuses on reviewing outcomes and improving the quality of maternal and fetal care across the state of Nebraska. I also served on the committee for the Nebraska Perinatal Quality Improvement Collaborative (NPQIC), a state program that aims to improve the delivery of and access to evidence-based and equitable health care for mothers and newborns. I worked with the Women and Infants Clinical Institute (WICI), to perform and evaluate research and

implement healthcare initiatives across the national CHI Health system to improve maternal and fetal outcomes.

7. I have conducted original research and have authored or co-authored peer-reviewed and other publications in areas of medicine and health care ethics. My primary areas of investigation have been in professional and ethical behavior in clinical medicine and medical research, medical business ethics, interprofessional teamwork in medicine, trial of labor after cesarean section, and family planning in women with medical comorbidities. My research during my Maternal Fetal Medicine Fellowship was supported by a National Institute of Health Loan Repayment (NIHRP) Award from the National Institute of Child Health and Human Development.

8. A copy of my curriculum vitae (CV) is attached as Exhibit A. I make this declaration based on 16 years of post-baccalaureate education and training, almost 10 years of clinical education and practice, experience and interaction with colleagues and patients, and my own clinical and social sciences research and review of relevant medical and other research and literature. Unless stated differently, the opinions contained herein are based on my education, training, and experience and are given to a reasonable degree of medical certainty.

9. As an MFM physician (also known as a Perinatologist), I specialize in caring for high-risk pregnancies, that is, pregnancies that either by virtue of pre-existing maternal conditions, conditions that develop as a result of the pregnancy, or fetal conditions, are at increased risk for morbidity and mortality in pregnancy, delivery, and after delivery. Every MFM has two patients – the pregnant woman and her unborn baby (or babies). MFMs manage a multitude of medical conditions with the aim of improving outcomes for both the mother and her unborn baby. Sometimes, the best medical decisions for the mom and baby are in conflict, and difficult decisions have to be made to optimize care. We sometimes need to make the decision for delivery knowing that this action is in the best interest of the mother, but that it

increases risks related to prematurity for the baby. If this decision to deliver is critical or even life-saving for the mother, we may need to proceed with delivery knowing the baby will have little to no chance of survival based on his or her gestational age. In other circumstances, we can perform medical interventions on babies while still in the womb. Sometimes, we anticipate a baby will require significant medical interventions to correct or treat a diagnosed abnormality, or in some cases a diagnosis that will lead to stillbirth or death shortly after birth. I work with patients facing immensely difficult challenges in pregnancy, many resulting in not only medical and surgical complications, but loss and heartbreak, all despite excellent medical care. Even in these cases, it is possible to maintain the human dignity of both the mother and the baby, not treating the baby as something less than a second patient. Indeed, the pregnant woman and her child are both worthy of our consideration and care.

## II. Summary of Opinions

10. I have reviewed Idaho's Defense of Life Act, Idaho Code 18-622 (Section 18-622 – Idaho State Legislature), the Fetal Heartbeat Preborn Child Protection Act (Chapter 88, Title 18), and the opinion from the Idaho Supreme Court in the January 2023 decision on Planned parenthood Great Northwest v. State of Idaho. I have also reviewed the plaintiff's Amended Complaint, as well as the declarations of the plaintiff and medical experts in this case submitted in support of the plaintiff's Request for Relief.

11. In response, the following represent my primary opinions in this case:

    a. Although frequently referred to as an "abortion ban," a plain reading of the text of Idaho's Defense of Life Act and the Fetal Heartbeat Preborn Child Protection Act provides medical exceptions for situations where it is "necessary to prevent the death of the pregnant woman." 18-622(2)(a)(i), or in any case of "Medical emergency" 18-

8804(1). Furthermore, there are also clear exceptions outlined for cases of ectopic or molar pregnancy, or in cases of rape or incest.

b. Throughout their filed documents, the term "abortion" and "medically indicated abortion" is used by the plaintiff's experts to encompass a variety of actions with various intentions that represent a wide range of clinical situations. The ambiguity facilitates arguments to advocate for the medical necessity of abortion in many circumstances where it is not medically necessary and not supported by medical evidence.

c. The Idaho law clearly states exceptions that allow for abortions when medically indicated "to prevent the death of the pregnant woman" *id.* and in cases of "medical emergency." 18-604(9). These are terms that are well defined by Idaho's law and that should be readily understood by the medical profession, who are trained to act swiftly and decisively to prevent death of the maternal or fetal patient, or in other cases of medical emergency. These terms, within a standard of "good faith medical judgment" provides deference to a physician's knowledge, training, and medical judgment. Furthermore, the Idaho statutes indicate that a physician could act to "[*prevent*] the death of the pregnant woman" 18-622(2)(a)(i) or in cases involving "a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy *to avert her death* or *for which a delay* will create serious risk of substantial and irreversible impairment of a major bodily function" 18-604(9). Reasonably understood, this would support a physician to act in good faith before the condition progresses, not only after the threat is imminent.

d. Pregnancy is overall safe, and abortions are not without risk of harm to the pregnant woman. The expert reports in support of the plaintiff in this case overstate the risks of pregnancy to make misleading arguments that performing an abortion is invariably safer or better for pregnant patients than remaining pregnant.

e. The specialty of Maternal Fetal Medicine, or Perinatology, was developed to improve care for pregnant women, but also their unborn babies. By definition, we care for and consider two patients: the mother, and her unborn child or children. We evaluate, monitor, and treat both in order to improve medical outcomes for both.

## III. Opinions

**Idaho's Defense of Life Act and the Fetal Heartbeat Preborn Child Protection Act are not Abortion Bans**

12. I interpret the purpose and meaning of Idaho's law to be consistent with prohibiting so-called elective abortions, or terminations of pregnancy, meaning abortions performed to "intentionally terminate" the pregnancy outside of instances where there is a threat to the life of the pregnant woman.[1] It is clear that this law, by its own terms, is not an "abortion ban," as frequently referred to in the reports submitted by the plaintiff and expert witnesses in this case. Every expert testimony submitted refers to Idaho's laws governing abortion as Idaho's "abortion bans." Collectively, these Idaho State Statutes (Idaho Code § 18-622 and Idaho Code §§ 18-8801 to 18-8808) are referred to collectively as "abortion bans" (See Seyb ¶ 8, Smid ¶ 3, Eller ¶ 7, Dahl ¶ 2). They also repeatedly substitute these laws with similar misleading verbiage, including replacing Idaho Code §§ 18-8801 to 18-8808 as a "Ban Throughout

[1] Idaho statute 18-604(1).

Pregnancy," and the Fetal Heartbeat Preborn Child Protection Act as the "Fetal Heartbeat Ban" (see Smid ¶ 3, Eller ¶ 2) or "six week ban" (Prentice ¶ 3, Complaint Section II).

13. There are several clear and explicit exceptions outlining situations where the termination of pregnancy is allowed (as in ectopic or molar pregnancies), but also allow exceptions in cases of a threat to the life of the mother, and in cases of rape and incest. Ectopic and molar pregnancies are situations where continuing the pregnancy is an active threat to the mother's life and cannot continue as normal pregnancies. There are other situations, like when a patient is hemorrhaging, where swift action may be necessary to preserve the life of the mother. In these types of medical emergencies, there is no question intervention is required, and delivery of the pregnancy is necessary. This can be done usually through medical means to expel an early pregnancy or induce labor and delivery, but could also involve a surgical abortion procedure. These exceptions protect women from harm as a result of life-threatening situations related to pregnancy. They provide latitude to a licensed physician to determine, through good faith medical judgment, medical situations that threaten, or could risk threatening the mother's life, justifying an intervention that leads to the termination of the pregnancy.

**Abortion Must be Clearly Defined in Discussions about Laws on Abortion**

14. The term "abortion" has far from a universal meaning, and there is significant ambiguity and confusion with how the term is used by medical professionals. The term is usually used to refer to an induced abortion or termination of pregnancy (TOP), as described in the Idaho laws. The term "spontaneous abortion" is also used when describing a spontaneous miscarriage in the first or second trimester.[2]

[2] ACOG. "Early Pregnancy Loss." Obstetrics & Gynecology 132, no. 5 (2018).

15. Recent studies have investigated how reproductive age women define abortion.[3] Results indicated that reproductive age women have varying definitions of abortion that were sometimes inconsistent and had significant ambiguity. Still, the majority of participants agreed upon concept of an abortion was a "procedure with a provider and surgical abortion," with the majority also focusing on both intent to end the pregnancy and intervention as contributing to what constitutes an abortion.[4] As I will expand on below, one of our primary professional organizations in obstetrics and gynecology, the American College of Obstetricians and Gynecologists (ACOG), does not acknowledge either of these factors when classifying abortion. The authors of the aforementioned study claimed that respondents' views are a reflection of stigma and blurred definitions that abortion opponents use, concluding that "anti-abortion legislation in the United States exploits misinformation and ignores medical definitions to curtail access to essential healthcare." Critically, although the authors argue for the importance of understanding what abortion is and distinguishing it from other pregnancy outcomes, they never actually provide a medical definition of abortion, or what the "correct" definition is. Similarly, ACOG does not explicitly define abortion, neither in their published reVITALize obstetrics or gynecology data definitions[5, 6] or their Practice Bulletins on first and second trimester abortions.[7, 8] Following a survey of the literature on this topic, my impression

---

[3] Alicia J VandeVussee, Jennifer Mueller, Marielle Kirstein, Joe Strong, Laura D Lindberg, ""Technically an Abortion": Understanding Perceptions and Definitions of Abortion in the United States." Soc Sci Med 335, no. 116216 (Sep 5, 2023).
[4] Alicia J VandeVussee, Jennifer Mueller, Marielle Kirstein, Joe Strong, Laura D Lindberg, ""Technically an Abortion": Understanding Perceptions and Definitions of Abortion in the United States." Soc Sci Med 335, no. 116216 (Sep 5, 2023).
[5] ACOG. Obstetrics Data Definitions Washington, D.C.: American College of Obstetricians and Gynecologists; 2024 Available from: https://www.acog.org/practice-management/health-it-and-clinical-informatics/revitalize-obstetrics-data-definitions.
[6] ACOG. Gynecology Data Definitions Washington, D.C.: American College of Obstetricians and Gynecologists; 2024 Available from: https://www.acog.org/practice-management/health-it-and-clinical-informatics/revitalize-gynecology-data-definitions.
[7] ACOG Practice Bulletin No. 225. Medication Abortion Up to 70 Days of Gestation. Obstet Gynecol. 2020; 136(4):e31-e47.
[8] The American College of Obstetricians and Gynecologists. ACOG Guide to Language and Abortion, November 25, 2023. Available from: https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/publications/abortion-language-guide.pdf.

is that the medical community has not committed to a single, clear definition of abortion, and this is reflected in the understanding of reproductive age women. The plaintiff's experts also adopt the medical community's confusion in this case, frequently using the term "abortion" and "medically indicated abortion" in a confusing and catch-all manner to include multiple medical situations and procedures. This omission provides more latitude to those arguing for its medical necessity, and obscures the distinctions that in my training and experience, are significant. Perhaps there is truth to the author's conclusion that "abortion and miscarriage definitions are socially constructed and multi-layered."[9] However, if this is true, and without an agreed-upon and clear definition and meaning in the medical community, it is critical that those using the term be explicit about the intended definition and meaning.

16. ACOG and many healthcare providers do not distinguish abortions based on the reason or intention of the abortion.[10] That is, an abortion performed because the pregnancy is unintended or undesired is not considered different from an abortion performed because delivery of the pregnancy is indicated based on a medical situation. The plaintiff and experts appear to share this view, as is stated in the complaint: "Everyone deserves access to abortion care without judgment or stigma—regardless of their reasons for wanting an abortion" (Complaint ¶ 2). Abortions obtained because the pregnancy is unintended or undesired are also termed "elective abortions." ACOG recommends against the use of this term, instead promoting use of the term "induced abortion" when necessary.[11] In my opinion, this is

[9] Alicia J VandeVussee, Jennifer Mueller, Marielle Kirstein, Joe Strong, Laura D Lindberg, ""Technically an Abortion": Understanding Perceptions and Definitions of Abortion in the United States." Soc Sci Med 335, no. 116216 (Sep 5, 2023).
[10] The American College of Obstetricians and Gynecologists. ACOG Guide to Language and Abortion, November 25, 2023. Available from: https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/publications/abortion-language-guide.pdf.
[11] The American College of Obstetricians and Gynecologists. ACOG Guide to Language and Abortion, November 25, 2023. Available from: https://www.acog.org/-/media/project/acog/acogorg/files/pdfs/publications/abortion-language-guide.pdf.

confusing, because all abortions that are not spontaneous abortions, regardless of intention or rationale, are by matter of fact induced.

17. ACOG does distinguish between medical and surgical abortions. In a medical abortion, medications are used to induce delivery of the pregnancy. In surgical abortion, a woman's cervix is dilated and the pregnancy removed via aspiration, suction, or extraction.[12] The medications used and surgical techniques employed to induce delivery are similar in cases where the pregnancy is viable, or in cases where miscarriage or stillbirth is medically or surgically managed. For this reason, training in obstetrics and gynecology and board certification requirements do not mandate participation in abortions of viable pregnancies. I have personally received training in dilation and curettage (D&C) and dilation and extraction (D&E) up to 18 weeks gestation without ever causing the death of a viable pregnancy.

18. The procedure and experience of a D&C and D&E are significantly different than medically inducing delivery. When delivery is induced with medications, the body is triggered to go through the process of expelling or delivering the pregnancy. We frequently induce deliveries by inducing labor, even at preterm gestational ages, when medical complications develop that threaten the mother or the baby. When medical inductions are successful, the body of the baby is delivered intact, and can be examined by clinicians as well as viewed by the family. In cases where the baby is alive and subsequently born alive, it allows for the parents and family to spend time with their baby and be present for their natural death, if this is the anticipated outcome.

19. In a D&C, which is generally performed in the first trimester (generally up to 12 weeks), medications and instruments are used to dilate the cervix to the amount anticipated to accommodate removal of the pregnancy. Then, the uterine contents are scraped with

[12] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6):1394-406.

instruments and suctioned out using a hollow curette attached to a vacuum device. The resulting unborn child and placenta (the so called "products of conception") can then be examined and have genetic and other testing performed. After this procedure, the pregnancy is usually not in one piece, and as a result visualization of the actual embryo or fetus is difficult.

20. In a D&E, which is generally performed in the second trimester, the cervix is also dilated with medications and osmotic dilators, as well as with sequentially larger metal dilators to the extent anticipated to accommodate delivery of the unborn baby. Then, instruments are used, usually with ultrasound guidance, to grasp and remove the baby. The body is generally removed in parts, which are then placed and organized on a surgical table to ensure the entire body is removed.[13] The fetal parts and placenta can be examined and tested, or disposed of. Remains are generally not shown to or returned to the woman or family, as the body is in pieces following the procedure. However, it is generally possible for fetal remains to be returned to the family for burial, if desired. In most cases of surgical abortions where the decision for abortion was made electively (that is, without a medical reason), fetal parts and products of conception are simply disposed of.

21. In my experience, the D&E procedure is quite gruesome, not only because it sometimes requires significant force in dilating the cervix (despite use of osmotic, medical, and mechanical dilators), but also you can feel the corpus of the fetus being disarticulated, and have to arrange all parts to ensure you have removed the body entirely. For a physician who is trained to treat illness and sustain life, the experience can be jarring. It would go against all my instincts as a physician to perform such a procedure with a live fetus, except in cases of true medical emergency.

[13] ACOG Practice Bulletin No. 135: Second-Trimester Abortion. Obstet Gynecol 121, no. 6 (Jun 2013): 1394-406.

22. Another component of surgical abortions on live fetuses is the concern for fetal pain. ACOG states on its page of "Facts Are Important: Gestational Development and Capacity for Pain" that "[t]he science conclusively establishes that a human fetus does not have the capacity to experience pain until after at least 24–25 weeks," thereby concluding that "abortion before this point does not result in the perception of pain in a fetus.[14] Similarly, the society of Maternal and Fetal Medicine (SMFM) further expanded on this topic in their Consult Series #59: The use of analgesia and anesthesia for maternal-fetal procedures.[15] In this document, also endorsed by The Royal College of Obstetricians and Gynaecologists, they argue that fetal pain perception is not present until at least 24-25 weeks, when a more developed cortex has the required somatosensory cortical connections. Any observed response to noxious stimuli before that point is unconscious, reflexive, and subcortical, and does not directly correlate with actual pain.[16] Still, SMFM recommends fetal opioid analgesia for maternal-fetal interventions, not to treat pain, but to "attenuate acute autonomic responses that may be deleterious, avoid longer consequences of nociception and physiological stress on the fetus, and decrease fetal movement to enable the safe execution of procedures."[17] It is concerning that despite their argument that pain cannot be felt, they still recommend opiate pain medications to moderate a physical fetal response to the procedure. Furthermore, their recommendation for fetal opiate

---

[14] American College of Obstetricians and Gynecologists. "Facts Are Important: Gestational Development and Capacity for Pain." American College of Obstetricians and Gynecologists, https://www.acog.org/advocacy/facts-are-important/gestational-development-capacity-for-pain.

[15] Society for Maternal-Fetal Medicine (SMFM), Society of Family Planning (SFP), Mary E. Norton, Arianna Cassidy, Steven J. Ralston, Debnath Chatterjee, Diana Farmer, Anitra D. Beasley, Monica Dragoman. "Society for Maternal-Fetal Medicine Consult Series #59: The Use of Analgesia and Anesthesia for Maternal-Fetal Procedures." American Journal of Obstetrics & Gynecology 225, no. 6 (December 2021): PB2-PB8.

[16] Society for Maternal-Fetal Medicine (SMFM), Society of Family Planning (SFP), Mary E. Norton, Arianna Cassidy, Steven J. Ralston, Debnath Chatterjee, Diana Farmer, Anitra D. Beasley, Monica Dragoman. "Society for Maternal-Fetal Medicine Consult Series #59: The Use of Analgesia and Anesthesia for Maternal-Fetal Procedures." American Journal of Obstetrics & Gynecology 225, no. 6 (December 2021): PB2-PB8.

[17] Society for Maternal-Fetal Medicine (SMFM), Society of Family Planning (SFP), Mary E. Norton, Arianna Cassidy, Steven J. Ralston, Debnath Chatterjee, Diana Farmer, Anitra D. Beasley, Monica Dragoman. "Society for Maternal-Fetal Medicine Consult Series #59: The Use of Analgesia and Anesthesia for Maternal-Fetal Procedures." American Journal of Obstetrics & Gynecology 225, no. 6 (December 2021): PB2-PB8.

analgesia is a 2C recommendation, meaning the recommendation is weak and admittedly based on "low quality evidence."[18] Taken together, the conclusions they claim to be based on a consensus of scientific data are far from that. Indeed, there is ongoing scientific research on the topic of fetal pain, as well as more than a single theory of fetal pain. Two leading theories are the hypothesis of cortical necessity, that would suggest pain is not perceived until 24 weeks or later, and the subplate modulation hypothesis, which supports the perception of pain much earlier.[19] As a result, recommendations are also not consistent across professional organizations. Per the American Society of Anesthesiologists Committees on Obstetric and Pediatric Anesthesiology and the North American Fetal Therapy Network, in all invasive maternal-fetal procedures, fetal anesthesia is a recommended consideration with the aim to "inhibit the humoral stress response, decrease fetal movement, and blunt any perception of pain."[20] Furthermore, the American Academy of Pediatrics recommends that pain be anticipated and treated in severely premature neonates as early as 22-24 weeks, even during minor medical procedures. Treatment is based on validated scales of pain assessment.[21] Numerous neonatal pain scales exist, at least 5 with rigorous psychometric testing behind them to help document and measure physiologic and behavioral responses in premature infants to guide medial therapy for pain.[22] Fetal pain is a potential clinical effect of abortion procedures that should be considered when these procedures are used in our care of patients.

---

[18] Society for Maternal-Fetal Medicine (SMFM), Society of Family Planning (SFP), Mary E. Norton, Arianna Cassidy, Steven J. Ralston, Debnath Chatterjee, Diana Farmer, Anitra D. Beasley, Monica Dragoman. "Society for Maternal-Fetal Medicine Consult Series #59: The Use of Analgesia and Anesthesia for Maternal-Fetal Procedures." American Journal of Obstetrics & Gynecology 225, no. 6 (December 2021): PB2-PB8.
[19] Thill, Bridget. "The Fetal Pain Paradox." Front Pain Res 21, no. 4 (March 21, 2023).
[20] D. Chatterjee, K.W. Arendt, J.S. Moldenhauer, O.A. Olutoye, J.M. Parikh, K. M. Tran, et al. "Anesthesia for Maternal-Fetal Interventions: A Consensus Statement from the American Society of Anesthesiologists Committees on Obstetric and Pediatric Anesthesiology and the North American Fetal Therapy Network." Anesth Analg 132, no. 4 (2021): 1164-73.
[21] American Academy of Pediatrics. Committee on Fetus and Newborn and Section on Anesthesiology and Pain Medicine. "Prevention and Management of Procedural Pain in the Neonate: An Update." Pediatrics 137, no. 2 (February 1, 2016).
[22] American Academy of Pediatrics. Committee on Fetus and Newborn and Section on Anesthesiology and Pain Medicine. "Prevention and Management of Procedural Pain in the Neonate: An Update." Pediatrics 137, no. 2 (February 1, 2016).

23. As a result of the medical complexities and dilemmas encountered in MFM, we do consider early delivery as therapeutic in some medical situations. When there are compelling medical reasons to end a pregnancy, regardless of the gestational age and methods used, I do not tell a patient they need to have an abortion, or that I recommend an abortion. When delivery of a pregnancy is recommended due to medical complications or a medical emergency, the term "abortion" is not commonly used by physicians. The terms generally used are "induction of labor" or "medically indicated delivery." In other cases, a surgery or procedure is performed to deliver the baby, which could include a D&C, D&E, cesarean section, hysterotomy, or hysterectomy. Emergent D&C, or rarely, emergent D&E, are used in cases where achieving delivery as soon as possible is critical. In cases of ectopic pregnancy, there are other medications and techniques used to end the pregnancy that I describe to the patient. I would not call any of these procedures abortions per say, however some involve the same medications and techniques as abortions.

24. In my experience, I have never been in a situation where there was no other option but to perform a D&C or D&E in a viable pregnancy (meaning the baby is still alive, usually confirmed by a heartbeat on ultrasound) to save the life of the mother. In cases where the health or life of the mother is threatened, medically induced delivery (of both viable and non-viable pregnancies) is usually effective. In many of these cases, there is spontaneous delivery prior to any medical or surgical intervention. In addition, it is usually the woman's preference to deliver through induction rather than with an abortion. In a desired pregnancy in the second trimester, the majority of patients with a pregnancy that still shows signs of life (i.e. a heartbeat, or fetal movement) with compelling medical reasons for delivery, will elect for a medial

induction of labor versus a D&E.[23] One explanation is that medical induction is safe and effective, and with induction, they are able to see and hold their baby after delivery, which is not possible following D&E (as described above).

25. The definition of abortion within Idaho's statutes is clear. Idaho's law specifically prohibits performing an abortion, which they define as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." The qualification for abortions to have an intent to terminate a pregnancy is a critical phrase in my view. In my experience, when a physician recommends delivery of a baby knowing there may be little to no chance of survival, or performs a D&C or D&E to save the life of the mother, the intent is to deliver the baby in order to provide therapy and resolution for a medical diagnosis. These actions are not the same as performing an act with the intent to terminate an otherwise viable and progressing pregnancy.

26. It is the ambiguity often present when referring to abortion that leads to confusion on the part of the plaintiff's experts as to what actions would constitute an abortion under Idaho's statutes. Dr. Seyb expresses concerns that "terminating a pregnancy by any method before 24 weeks," would satisfy the statutory definition of abortion, because there is a high likelihood at that gestational age that perinatal death will occur even if the baby is born alive. However, the Idaho statutes would allow for exceptions in cases where the pregnant woman's life is threatened. In these cases, whether it was or was not an action that satisfies the state's definition of abortion is moot, because it would be allowed. If delivery was medically indicated, as in cases of previable severe preeclampsia, and effected through induction of labor, where

[23] Kerns J, Vanjani R, Freedman L, Meckstroth K, Drey EA, Steinauer J. Women's decision making regarding choice of second trimester termination method for pregnancy complications. Int J Gynaecol Obstet. 2012; 116(3): 244-8.

the intent was delivery and not direct killing of the fetus as occurs with D&E, Idaho laws would also allow for that intervention.

27. Similarly, Dr. Seyb expresses uncertainty whether "[t]erminating a pregnancy between 24 and 26 weeks, by means that are not inherently lethal, still poses a significant chance of perinatal death," and thus could also be characterized as an abortion according to Idaho statutes (Seyb ¶ 12) This is an inaccurate interpretation of Idaho's laws. If the mother's life is threatened, termination of the pregnancy would be acceptable by any means. If there is an indication for delivery, induction of labor or cesarean section can be performed. Delivery in the periviable period has significant risks to the neonate, which is why we try to avoid it, if possible, for fetal benefit. Delivery does not inherently mean the fetal life will be terminated, as in cases of D&E. In cases of periviable delivery, there is a clear understanding that the intention is to have a healthy mother and child as an outcome, even if the likelihood of that is decreased. Inducing delivery with the understanding that the fetus, once delivered, has little to no chance of survival, or even performing a D&E on a fetus that still has a heartbeat in a situation where there is an active threat to the life of the mother, is not acting "with intent to terminate" the pregnancy. In these complex medical situations, the intention is not termination of the life of the fetus, but instead delivery of the fetus. Indeed, delivery is the medical treatment for these situations, not direct termination of the baby. Similarly, the term "abortion," reasonably understood as used in the Idaho statutes, could not include medical procedures where a mother would hope, even if unlikely, that the baby will be born alive and survive, or situations where, understanding that her life is in danger, she undergoes a D&E knowing that the baby will die during the procedure.

28. The plaintiff in this case specifically seeks declaratory and injunctive relief from application of the Idaho State Laws to abortion care that is "medically indicated." Multiple expert testimonies

describe Idaho's laws as "prohibiting medically indicated abortion in most circumstances where it may be indicated" (Smid ¶ 3, also see Dahl ¶ 7, and Seyb ¶ 7). The concept of "medically indicated abortion" is used repeatedly by the plaintiff and expert witnesses in this case (See Eller ¶ 3, Dahl, ¶ 7, Prentice, ¶ 10, Seyb, ¶ 23, Smid, ¶ 19, Complaint, ¶ 7). It is therefore important to address and define this concept of abortion. The plaintiff's experts collectively define this term to mean "when there is a medical reason for terminating a patient's pregnancy." (Smid ¶ 19). Dr. Seyb further discusses the meaning of the word "indication" to mean "a symptom, condition, or factor that makes a particular course of conduct advisable" (Seyb ¶ 23).

29. In my opinion, a "medical reason" that makes a certain intervention "advisable" is highly vague, and includes a wide variety of situations where termination of the pregnancy does not actually treat or improve a medical condition. Instead, there are many examples provided where abortion is argued to be indicated, but are not cases where it is medically necessary.

**The Plaintiff's Experts have a Broad Understanding of when Abortion is "Medically Indicated" that Supports Abortion in Many Circumstances where it is not Necessary**

30. The term "medically indicated abortion" is not well established as a medical term, and its meaning, as illustrated by the expert witnesses in this case, is vague. Its use by these experts manufactures medical urgency where it does not exist in order to support abortion in essentially any situation. They thereby provide evidence that "Idaho's Abortion Bans are unjust and profoundly harmful in all of their applications." (Complaint ¶ 4). The complaint in this case even opens with the statement: "for anyone who is pregnant and does not want to be, abortion is essential healthcare" (Complaint ¶ 1). The subsequent litany of examples the expert witnesses provide where abortion is "medically indicated" is an attempt to medicalize

elective abortions. In truth, "essential abortion" exists as the Idaho law defines exceptions. That is, in cases where the abortion is necessary to prevent the death of the pregnant woman.

31. In the complaint, five circumstances are identified where abortion is "medically indicated." These include situations where:

a. pregnancy-related complications jeopardize the pregnant person's health;

b. continuing the pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition;

c. continuing the pregnancy would put the pregnant person at risk of death from self-harm;

d. the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable; or

e. a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses (Complaint ¶ 7).

**In Cases where a Pregnant Woman's Life is Threatened, Abortion may be Medically Indicated**

32. During pregnancy, we do encounter medical situations where a pregnant woman's life is threatened, and delivering the pregnancy is necessary for the threat to resolve. In these cases, abortion using medication, D&C, or D&E may be required to treat a significant medical problem that threatens the life of the pregnant woman, and it is anticipated that termination of the pregnancy or delivery of the baby will lead to resolution of this threat to life. These cases can be emergent, and there may be a medical indication to perform an abortion. When physicians encounter such situations, a patient may be advised that this is an important

treatment to prevent their death, and that there are no other options to treat the condition or situation.

33. MFMs routinely deal with medical issues that arise as a result of the pregnancy. In some of these situations, a pregnant woman's life is threatened and an abortion may be medically indicated. One such situation is preterm premature rupture of membranes "PPROM." This is where the bag of water breaks before term and in the absence of labor.[24] Management depends mostly on the gestational age when this occurs. At any time between approximately 23 weeks and 37 weeks, medications to optimize fetal outcomes are administered, and then expectant management occurs until there is evidence of any complication that will increase risks to the mother or fetus or both. At that time, delivery is indicated. In these cases, as the baby is at a "viable" gestational age, the focus is on prolonging the pregnancy, if safe, to reduce complications to the baby related to prematurity. Abortion is generally not considered a medically indicated option in these cases.[25]

34. In cases of previable prelabor rupture of membranes, rupture occurs in the second trimester and prior to the age of viability. It is rare, affecting less than 1 percent of pregnancies. As a result of the loss of fluid, fetal lung tissue development is compromised, and fetal outcomes are generally poor, even if the pregnancy makes it to much later gestational ages before delivery.[26] In these cases, due to the poor fetal prognosis, both expectant management and abortion are routinely offered to patients with a detailed discussion of potential risks and

[24] American College of Obstetricians and Gynecologists' Committee on Practice Bulletins, Robert Ehsanipoor, Christian Pettker. "ACOG Practice Bulletin No. 217: Prelabor Rupture of Membranes." Obstet Gynecol 135, no. 3 (2020).
[25] Society for Maternal-Fetal, Medicine, A. Sciscione, V. Berghella, S. Blackwell, K. Boggess, A. Helfgott, B. Iriye*, et al.* "Society for Maternal-Fetal Medicine (SMFM) Special Report: The Maternal-Fetal Medicine Subspecialists' Role within a Health Care System." *Am J Obstet Gynecol* 211, no. 6 (Dec. 2014): 607-16.
[26] Society for Maternal-Fetal Medicine, Ashley N. Battarbee, Sarah S. Osmundson, Allison M. McCarthy, Judette M. Louis, SMFM Publications Committee, "Previable and Perivable Preterm Prelabor Rupture of Membranes." American Journal of Obstetrics & Gynecology 231, no. 4 (2024): PB2-PB15.

benefits. If complications arise during expectant management, delivery is recommended.[27] The Society of Maternal Fetal Medicine (SMFM) offers clear guidelines as to what constitutes contraindications to expectant management, as their presence increases maternal risks. These include any signs and symptoms of infection, hemorrhage, and labor. In these cases, delivery by induction of labor is effective to prevent progression to a life-threatening situation. In rare cases, a complication escalates so quickly that delivery needs to be affected immediately, and an abortion may be necessary. This is most frequently seen with infections that escalate to life-threatening sepsis in a short period of time. In ten years, I have only had one case where a D&E was attempted to facilitate delivery in such a case. Just prior to the start of the procedure, the baby delivered spontaneously and the procedure was not required. If patients are medically stable and elect for termination of pregnancy instead of expectant management, they would need to arrange for the termination out of state.

35. The plaintiff and medical experts discussed situations like PPROM as well as chronic placental abruption as situations where the medical situation is "not yet severe enough to warrant intervention based on Idaho's requirement that abortion only occur when deemed *necessary* to prevent the death of a pregnant patient" (see Eller ¶ 40). I have treated many patients with PPROM and chronic abruptions, and the usual question at or after fetal viability (approximately 23 weeks) is not when it is necessary to perform an abortion, but when is the best time to deliver. In these cases, most patients want to optimize outcomes as much as they can for the baby, which means staying pregnant as long as it is safe. When bleeding is worsening, an infection is suspected, or labor progresses, we move toward delivery to resolve these problems. Abortion is not generally considered a medically indicated option.

---

[27] Society for Maternal-Fetal Medicine, Ashley N. Battarbee, Sarah S. Osmundson, Allison M. McCarthy, Judette M. Louis, SMFM Publications Committee, "Previable and Perivable Preterm Prelabor Rupture of Membranes." American Journal of Obstetrics & Gynecology 231, no. 4 (2024): PB2-PB15.

36. In cases of PPROM or ongoing hemorrhage in the first or second trimester of pregnancy where outcomes are much worse for the baby, and/or the baby is too early to survive outside the womb, expectant management or a termination of pregnancy with abortion may be offered as potential management options to patients.[28] Expectant management is only recommended in the absence of medical complications that would put the mother at increased risks of morbidity and mortality. With evidence of ongoing hemorrhage or infection, delivery may be indicated. Within Idaho's laws, a physician could act in good faith to prevent death and perform an abortion with evidence of progression of a potential threat to life, like hemorrhage or infection. Contrary to what some experts expressed, under Idaho's laws no physician or patient would need "to wait until the situation is overtly life threatening to obtain care" (Eller ¶ 40).

37. Similar issues arise in the treatment of pregnancy-induced hypertension. Hypertensive disorders of pregnancy can be severe and life-threatening. Most cases occur in the third trimester, where delivery may be recommended for the benefit of the pregnant patient, which is generally curative. In these cases, abortion is not considered a treatment or usual option for care, as in most cases the baby is a viable gestational age.[29] If a severe hypertensive disorder occurs in a previable period, delivery may still the recommended treatment for the benefit of the mother. In these cases, delivery is induced even with the understanding that the baby has little to no chance of survival. These disorders are much more common in patients with other medical conditions, such as diabetes, autoimmune disease, and kidney disease.

---

[28] Society for Maternal-Fetal Medicine, Ashley N. Battarbee, Sarah S. Osmundson, Allison M. McCarthy, Judette M. Louis, SMFM Publications Committee, "Previable and Perivable Preterm Prelabor Rupture of Membranes." American Journal of Obstetrics & Gynecology 231, no. 4 (2024): PB2-PB15.

[29] Gestational Hypertension and Preeclampsia: Acog Practice Bulletin, Number 222." Obstet Gynecol 135, no. 6 (Jun 2020): e237-e60.

**Abortion is not Necessary in Cases Where Pregnancy has the Potential to Exacerbate an Underlying Health Condition**

38. In the second case, the plaintiff's experts argue that abortion is indicated where "continuing the pregnancy would exacerbate an underlying health condition or interfere with the pregnant person's ability to obtain standard treatment for that condition" (Complaint ¶ 7). These cases are far more complex, and pregnancy termination is not the only option, nor does it effectively treat the underlying condition. For this reason, in most of these cases, abortion is not medically necessary. In the majority of these cases, termination of pregnancy is also not emergent, but performed preemptively to avoid possible severe medical complications.

39. There are a large variety of pre-existing health conditions that can have effects on a pregnancy, or on the other hand, a pregnancy can affect the condition.[30] These include obesity, diabetes, chronic hypertension, autoimmune disease, gastrointestinal disorders, kidney disease, thyroid disease, and many others. Maternal fetal medicine specialists are specifically trained and have additional experience in the diagnosis and treatment of a wide variety of medical conditions in pregnancy.[31] The general approach is to counsel a patient about the potential increased risks related to pregnancy, and provide an individualized plan of care that involves treatment of the underlying condition with medications safe in pregnancy, as well as increased fetal ultrasounds and other surveillance to monitor for potential effects on the baby.

40. One common example used by the plaintiff's experts is diabetes in pregnancy (see Prentice ¶¶ 6–9). I agree that diabetes in pregnancy, particularly pre-existing diabetes, can be very

---

[30] Society for Maternal-Fetal, Medicine, A. Sciscione, V. Berghella, S. Blackwell, K. Boggess, A. Helfgott, B. Iriye, *et al.* "Society for Maternal-Fetal Medicine (SMFM) Special Report: The Maternal-Fetal Medicine Subspecialists' Role within a Health Care System." *Am J Obstet Gynecol* 211, no. 6 (Dec. 2014): 607-16.

[31] Society for Maternal-Fetal, Medicine, A. Sciscione, V. Berghella, S. Blackwell, K. Boggess, A. Helfgott, B. Iriye, *et al.* "Society for Maternal-Fetal Medicine (SMFM) Special Report: The Maternal-Fetal Medicine Subspecialists' Role within a Health Care System." *Am J Obstet Gynecol* 211, no. 6 (Dec. 2014): 607-16.

challenging to treat, and puts a patient and their baby at increased risks of morbidity and mortality in pregnancy. There may be cases (for example, when there is significant underlying end organ damage, such as kidney disease) where pregnancy can create clear, serious, and potentially irreversible risks to a woman's health. I, like other experts in this case, counsel a patient thoroughly about all these risks when they are seen in either preconception consultation, or after they are already pregnant. In those with significant complications, included in this counseling is the option of termination in consideration of these risks. For others being seen in preconception consultation, I may recommend against pregnancy or recommend delaying conception until we are able to medically optimize their treatment and/or underlying organ damage. In my experience, it is extremely rare for a patient to have such significant underlying end organ damage from her diabetes to make pregnancy truly life-threatening. In these cases, if a patient desires abortion, it is generally not critical to have it done immediately, but it can be planned days or weeks in the future.

41. There are some specific conditions, such as preexisting maternal cardiac conditions, that have high risks of mortality in pregnancy. These include conditions such as pulmonary arterial hypertension, cases of Marfan syndrome with a dilated aorta, and dilated cardiomyopathy.[32] These are some of what are considered Class IV or "high risk" in the modified World Health Organization (WHO) Pregnancy Risk Classification for women with preexisting cardiovascular disease. In this category, there is an extremely high risk of maternal mortality or severe morbidity, and a greater than 27% risk of a maternal cardiac event during pregnancy or postpartum.[33] I am uncertain as to the meaning of Dr. Eller's statement on those in this WHO Class IV risk category, that the "risk for serious events of death" is 40-100% (Eller

[32] ACOG Practice Bulletin 212: Pregnancy and Heart Disease. Obstet Gynecol 133, no. 5 (2019).
[33] ACOG Practice Bulletin 212: Pregnancy and Heart Disease. Obstet Gynecol 133, no. 5 (2019).

¶ 13). In truth, these conditions carry mortality risks that generally do not exceed 50% and outcomes have improved with our medical advancements and improvements in medical care. For example, more recent estimates of mortality rates in pregnancy for patients with pulmonary hypertension is approximately 12%.[34] In these rare cases, terminating the pregnancy is offered as a way to avoid severe morbidity and mortality. As these situations are clearly defined as being associated with a substantial risk to the life of the pregnant woman, it would fit within the exception for abortions done with the aim of preventing the death of the pregnant patient. In my training and experience, many women in these situations decide to continue the pregnancy despite the significant risks. In these cases, an interdisciplinary team including obstetricians, MFMs, cardiologists, and anesthesiologists closely monitor, provide treatment, and plan delivery with the goal of optimizing the pregnant woman's health and preventing morbidity and mortality. We try to get the pregnant patient as far in the pregnancy as we safely can in order to also optimize outcomes for the baby after delivery.

42. In my experience treating a wide variety of underlying conditions during pregnancy,[35] I have never had a patient elect to terminate a pregnancy after a discussion of these risks if they are already pregnant. However, I have heard many patients express relief that there are physicians who can help them during pregnancy to optimize their care. I also see patients frequently who have never really understood or managed their underlying conditions well, but in pregnancy, due to expanded health insurance coverage (in the United States, Medicaid is available for all pregnant people), and additional specialists like MFMs, are able to significantly improve

---

[34] Ting-Ting Low, Nita Guron, Robin Ducas, Kenichiro Yamamura, Pradeepkumar Charla, John Granton, Candice K Silversides, "Pulmonary Arterial Hypertension in Pregnancy— a Systematic Review of Outcomes in the Modern Era." Pulmonary Circulation 11, no. 2 (2021).

[35] Society for Maternal-Fetal, Medicine, A. Sciscione, V. Berghella, S. Blackwell, K. Boggess, A. Helfgott, B. Iriye, *et al.* "Society for Maternal-Fetal Medicine (Smfm) Special Report: The Maternal-Fetal Medicine Subspecialists' Role within a Health Care System." *Am J Obstet Gynecol* 211, no. 6 (Dec. 2014): 607-16.

management of their underlying condition. In the realm of diabetes, for example, our careful attention to this as well as other underlying conditions significantly mitigates the additional risks of pregnancy, and ensures "quality diabetes care before, during and after pregnancy."[36] In a qualitative study I performed specifically to understand family planning in reproductive age women with pre-existing medical conditions, many of the 28 women I interviewed expressed concepts of empowerment that came with pregnancy and childbirth, not least of all because they were able to better manage their health conditions and successfully have children.[37]

**Abortion is not Necessary in Cases where the Pregnancy May Influence Treatments for a Condition**

43. The complaint argues that disastrous consequences will result for a woman being treated for medical conditions in pregnancy where the standard therapy is unsafe in pregnancy, and they are not able to have an abortion. Per the complaint: "When abortion is not an option, a person taking one of those medications who has an unplanned pregnancy is forced to choose between exposing the fetus to the risk of severe birth defects or abruptly discontinuing their medication with potentially devastating effects on their health" (Complaint ¶ 91). Rarely, if ever, are the decisions in these cases so dichotomous. In general, we do not ask patients to choose between either abortion or abruptly discontinuing their medication, as there are many alternatives. For example, take the use of Lithium for bipolar disorder (also see Smid ¶ 52). Its use in the first

---

[36] Anastasia-Stefania Alexopoulos, Rachel Blair, Anne L Peters. "Management of Preexisting Diabetes in Pregnancy: A Review." JAMA 321, no. 18 (July 25, 2019): 1811-19.
[37] Kraus, E. M., N. R. Chavan, V. Whelan, J. Goldkamp, and J. M. DuBois. "Reproductive Decision Making in Women with Medical Comorbidities: A Qualitative Study." *BMC Pregnancy Childbirth* 23, no. 1 (Dec 11, 2023): 848.

trimester has been associated with severe congenital cardiac defects. However, the risk is now considered lower than previously thought, particularly at low doses.[38] Furthermore, the actual risk of having a defect related to its use is still low, even though it is significantly increased relative to the general population. In one study the rate of any cardiac defect was 2.41% in those exposed to Lithium and 1.15% in those not exposed.[39] This difference translates to an "increased risk of cardiac malformations ranging from 2 to 270%, or up to 2 additional cases per 100 births among pregnancies in women who were exposed to lithium during the first trimester as compared with pregnancies in unexposed women with similar characteristics."[40] When starting with such a low baseline risk, the overall chances of a baby actually having a congenital heart defect as a result of lithium use are still low. For this reason, after an individualized assessment of risks and benefits, some people are maintained on their Lithium in pregnancy. Alternatively, medication substitutions for Lithium are made in the first trimester, with resumption of Lithium after the risk of adverse effects is less likely. If abortion was performed in order to successfully eliminate babies with congenital heart defects in cases of Lithium exposure, it would only succeed in terminating an estimated 2 cases out of every 100 pregnancies, with most babies not having the abnormality in question. This case is similar for other medications – the relative increased risk does not translate into a medically necessity for abortion. Furthermore, there are many alternative medications with fewer risks in pregnancy that can be used to treat the underlying conditions.

[38] Elisabetta Patorno, Krista F. Huybrechts, Brian T. Bateman, Jacqueline M. Cohen, Rishi J. Desai, Helen mogun, Lee S. Cohen, Sonia Hernandez-Diaz, "Lithium Use in Pregnancy and the Risk of Cardiac Malformations." New England Journal of Medicine 376, no. 23 (2017): 22445-2254.

[39] Elisabetta Patorno, Krista F. Huybrechts, Brian T. Bateman, Jacqueline M. Cohen, Rishi J. Desai, Helen mogun, Lee S. Cohen, Sonia Hernandez-Diaz, "Lithium Use in Pregnancy and the Risk of Cardiac Malformations." New England Journal of Medicine 376, no. 23 (2017): 22445-2254.

[40] Elisabetta Patorno, Krista F. Huybrechts, Brian T. Bateman, Jacqueline M. Cohen, Rishi J. Desai, Helen mogun, Lee S. Cohen, Sonia Hernandez-Diaz, "Lithium Use in Pregnancy and the Risk of Cardiac Malformations." New England Journal of Medicine 376, no. 23 (2017): 22445-2254.

44. Testimonies identified where pregnancy would affect a woman's ability to obtain standard treatment for an underlying condition (see complaint ¶ 7(b), specific examples from Smid ¶¶ 62–63). There are only rare cases where being pregnant affects a woman's ability to obtain standard treatment for an underlying condition. An example provided by the plaintiff's experts is cancer treatment during pregnancy, where radiation and chemotherapy can lead to increased risks for stillbirth or birth defects (see Smid ¶ 62). In these cases, with an interdisciplinary team including oncologists, radiologists, and MFMs, a pregnant woman is counseled about the risks of her cancer progressing and the risks of the specific recommended treatment in pregnancy. In these cases, we are generally able to establish a plan that may include standard therapy (there are many chemotherapies that can safely be administered in the second and third trimesters of pregnancy),[41] or with adjustments to treatment. We also consider a scheduled earlier delivery so some treatments not allowed in pregnancy (like pelvic radiation) can start as soon as possible. Although there are some additional maternal and fetal risks, surgery and chemotherapy for breast cancer, the most common malignancy identified in pregnancy, are performed in pregnancy.[42] I have never had a woman elect to terminate a pregnancy in these cases, but I have had women elect to change or delay care if it meant that outcomes for her baby could be improved.

45. The conditions discussed above are a small example of the range of conditions MFMs treat in pregnancy. Generally, however, as MFMs we have plans of care that work to reduce risks and optimize outcomes, and pregnancy is a time of additional focus on and resources for pregnant

[41] A Cubillo, S Morales, E Goni, F Matute, J L Munoz, D Perez-Diaz, J de Santiago, A Rodriguez-Lescure, "Multidisciplinary Consensus on 91. Similarly, some medications used to treat serious illnesses are harmful to embryos and fetuses. When abortion is not an option, a person taking one of those medications who has an unplanned pregnancy is forced to choose between exposing the fetus to the risk of severe birth defects or abruptly discontinuing their medication with potentially devastating effects on their health. Management during Pregnancy." Clin Transl Oncol 23, no. 6 (November 16, 2020): 1054-66.

[42] Ayelet Alfasi, Irit Ben-Aharon. "Breast Cancer during Pregnancy - Current Paradigms, Paths to Explore." Cancers 11, no. 11 (2019).

women. To say that abortion in these cases is medically *necessary* would work against all that we are trained to do as physicians and as MFMs. Indeed, abortion in none of these cases truly improves or *treats* any of these underlying conditions. Abortion can still be an option, however. If, through shared decision making, the patient desires to terminate the pregnancy as a way to optimize care of any underlying conditions, or if they become pregnant while taking medications dangerous or teratogenic to an early pregnancy, they still have two options in the state of Idaho. First, they may take medications to prevent pregnancy or terminate pregnancy prior to the pregnancy being a "clinically diagnosable pregnancy." 18-604(1). Alternatively, they can travel to a location where abortion would be legal in that case. If a woman's life was threatened as a result of the pregnancy's effects on her underlying medical condition, an abortion could be performed if necessary to prevent her death.

**Abortion is not a Medical Treatment for Women at Risk of Death or Injury from Self-harm**

46. I disagree with the plaintiff's experts that there is an indication for abortion when "continuing the pregnancy would put the pregnant person at risk of death from self-harm." (Complaint ¶ 7(c), Smid ¶ 94, Dahl ¶ 8). The complaint outlines several situations that they include in this category, namely "mental health conditions, including deaths related to suicide, substance use disorder, [and] overdose/poisoning," (Complaint ¶¶ 112–116) or as Dr. Seyb describes in paragraph 15 "in cases where a pregnant patient faces a risk of death from self-harm, such as suicide or overdose" (See also Smid ¶ 66).

47. In my professional experience, I have never had a patient threaten self-harm or suicide specifically as a result of being pregnant, or express desires to terminate the pregnancy in order to alleviate thoughts of self-harm or suicide. Usually, patients with pre-existing or new mental health diagnoses in pregnancy, including substance use disorders, are counseled on the risks

of these conditions in pregnancy and offered treatment for them that is safe in pregnancy. Essentially all the standard treatments for mental health conditions and substance use disorders are used in pregnancy. Effective treatment reduces bad outcomes related to these conditions.

48. Mental health diagnoses are incredibly common in pregnancy, and substance use disorders and mental health diagnoses are frequently found together. Both must be addressed and treated.[43] There is a high prevalence of mental illness in women in the U.S., and 20 percent of women will first be diagnosed with a mental health condition during pregnancy or postpartum.[44] I would estimate at least 60 percent of patients I see on a daily basis have a psychiatric diagnosis as the primary or secondary medical problem I am helping to treat in pregnancy. The problem of maternal death related to mental health conditions in Idaho and the rest of the United States is also significant. Idaho's Maternal Mortality Review Committee (MMRC) report showed that "from 2018 to 2021, the period studied by Idaho's MMRC, the most common underlying cause of maternal death in Idaho was mental health conditions, encompassing deaths related to suicide, substance use disorder, and other types of self-harm" (Complaint ¶ 95, also see ¶¶ 112–16). These patterns are also true for pregnant and postpartum

[43] Emily S. Miller, Torri Metz, Tiffany A. Moore Simas, M. Camille Hoffman, Nancy Byatt, Kay Roussos-Ross, "Treatment and Management of Mental Health Conditions during Pregnancy and Postpartum." Obstet Gynecol 141, no. 6 (2023): 1262-88.

[44] Emily S. Miller, Torri Metz, Tiffany A. Moore Simas, M. Camille Hoffman, Nancy Byatt, Kay Roussos-Ross, "Treatment and Management of Mental Health Conditions during Pregnancy and Postpartum." Obstet Gynecol 141, no. 6 (2023): 1262-88.

women in the entire U.S.[45] In addition, recent studies have indicated that when cause of death was determined, even more women died of homicide than suicide in pregnancy.[46, 47]

49. Although rates of mortality due to self-harm from overdose and suicide are high in this patient population, pregnancy itself does not worsen substance use disorder or lead to an increased risk of suicide. As a result, performing more abortions should not reduce these numbers. The plaintiff's experts provide no clear arguments substantiated in medical research that demonstrate how providing abortions in these cases change these outcomes. Indeed, abortion is not a treatment for those at risk of self-harm through overdose or suicide. I fail to see how facilitating more abortions in cases of women at risk of self-harm would change the rates of these outcomes.

50. Smid argues that "pregnancy can exacerbate the symptoms of substance use disorder, resulting in higher risk of overdose" (Smid ¶ 92). Data shows that indeed overdose rates have significantly increased in the time around pregnancy, defined as during pregnancy and for 1 year postpartum.[48] However, the most significant increase was seen from 2018 – 2021, where overdose increased significantly across all populations during the Covid pandemic. Smid incorrectly attributes increased rates of overdose in pregnancy and postpartum to an actual increased risk of these outcomes as a result of the pregnancy. Indeed, overdose rates in those in the peripartum period are currently the same or lower when compared to other adults in

---

45 CDC. "Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017-2019." U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/maternal-mortality/php/data-research/mmrc-2017-2019.html.

46 CDC. "Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017-2019." U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/maternal-mortality/php/data-research/mmrc-2017-2019.html.

47 Addis, Karen. "New National Study Finds Homicide and Suicide Is the #1 Cause of Maternal Death in the U.S." Society of Maternal Fetal Medicine, https://www.smfm.org/news/new-national-study-finds-homicide-and-suicide-is-the-1-cause-of-maternal-death-in-the-us#:~:text=Findings%20show%20that%20over%20the,four%20times%20the%20national%20average.

48 Beth Han, Wilson M. Compton, Emily B Einstein, "Pregnancy and Postpartum Drug Overdose Deaths in the Us before and during the Covid-19 Pandemic." JAMA Psychiatry 81, no. 3 (2023): 270-83.

the U.S. (15.8 in pregnant and postpartum women vs. 13.5 in ages 15–24, 45.6 in ages 25–34, and 63.1 in ages 35–44).[49]

51. Patients with substance use disorders are at increased risk for poor outcomes in pregnancy, including stillbirth, fetal growth restriction, prematurity, and sudden unexplained infant death.[50] There is also a high rate of associated mental health diagnoses. Dr. Smid argues that due to the dramatic changes in hormones in pregnancy, mental health and substance use disorders are "exacerbated by pregnancy" (Smid ¶ 50). Although it is true that hormones change significantly in pregnancy, she presents no evidence that these disorders increase or worsen in pregnancy. In fact, in pregnancy, women generally decrease their substance use, in part, as Dr. Smid acknowledges (Smid ¶ 54), because pregnant women know their substance use is not healthy for them, but also not good for their unborn child. With treatment, there is a decreased risk of bad outcomes as well as relapse. Dr. Smit insinuates that rates of overdose are increased when relapse occurs after a period of reduced use or abstinence (Smid ¶ 54), but she offers no medical data to support the relative increased rates of overdose in the postpartum period. It is true that rates of relapse are high in the postpartum period.[51] However, relapse rates are high for all adults with substance use disorders who get treatment and who achieve abstinence, not only those who received treatment in pregnancy. Relapse can only occur if one is able to, by their own determination or by availing themselves of treatment, reduce their use. Without further evidence, I see no clear association established with pregnancy and an *increased* risk of overdose. Abortion will end the pregnancy, but the substance use disorder will remain,

[49] Matthew F. Garnett, Arialdi M Minino. "Drug Overdose Deaths in States, 2003 - 2023." National Center of Health Statistics, CDC, https://www.cdc.gov/nchs/products/databriefs/db522.htm#:~:text=The%20age%2Dadjusted%20rate%20of,adults%20age%2055%20and%20older.
[50] Mary K. Prince, Sharon F. Dalley, Derek Ayers, "Substance Use in Pregnancy." StatPearls Publishing LLC, https://www.ncbi.nlm.nih.gov/books/NBK542330/.
[51] Mary K. Prince, Sharon F. Dalley, Derek Ayers, . "Substance Use in Pregnancy." StatPearls Publishing LLC, https://www.ncbi.nlm.nih.gov/books/NBK542330/.

and non-pregnant reproductive age women will still be at high risk for poor outcomes with these conditions. Furthermore, rates of postpartum depression are significant not only for women who have live births; they are also present for those after miscarriages and abortions.[52]

52. Treatment of substance use disorders can mitigate these outcomes, and that is what MFMs and other specialists recommend during pregnancy.[53] In my experience, women who are pregnant have higher motivation to manage their mental health and substance use disorders because pregnancy is a unique state that challenges them to consider more than just their own health. Furthermore, as noted above, pregnancy becomes an opportunity for them to get excellent healthcare, including medication assisted therapy (MAT), and mental health resources. This truth plays out in rates of treatment for substance use disorders and their ability to achieve abstinence, which are both higher in pregnancy than in non-pregnant adults.[54] Rates of abstinence from several substances are approximately 83% in pregnancy[55] Rates of relapse after pregnancy, even if abstinence is achieved, are high, approximately 80%.[56] Return to use rates are similarly high in non-pregnant adults at up to 60%.[57] With proportionately more receiving treatment and achieving abstinence, even with high relapse rates, there is no evidence pregnancy worsens these conditions or their outcomes compared with other nonpregnant reproductive age women. Returning to substance use after a period of abstinence is common

[52] Natnael Atnafu Gebeyehu, Kirubel Dagnaw Tegegne, Kelemu Abebe, Yibeltal Asefa, Belete Birhan Assfaw, Getachew Asmare Adella, Biresaw Wassihun Alemu, Dagne Addisu Sewyew,. "Global Prevalence of Post-Abortion Depression: Systematic Review and Meta-Analysis." BMC Psychiatry 23, no. 786 (2023).

[53] Committee on Obstetric Practice American Society of Addiction Medicine. "Committee Opinion No. 711: Opioid Use and Opioid Use Disorder in Pregnancy." Obstet Gynecol 130, no. 2 (2017): e81-e94.

[54] Ariadna Forray, Brian Merry, Haiqun Lin, Jennifer Prah Ruger, Kimberly A Yonkers, "Perinatal Substance Use: A Prospective Evaluation of Abstinence and Relapse." Drug Alcohol Depend 150 (2015): 147-55.

[55] Ariadna Forray, Brian Merry, Haiqun Lin, Jennifer Prah Ruger, Kimberly A Yonkers, "Perinatal Substance Use: A Prospective Evaluation of Abstinence and Relapse." Drug Alcohol Depend 150 (2015): 147-55.

[56] Ariadna Forray, Brian Merry, Haiqun Lin, Jennifer Prah Ruger, Kimberly A Yonkers, "Perinatal Substance Use: A Prospective Evaluation of Abstinence and Relapse." Drug Alcohol Depend 150 (2015): 147-55.

[57] A. Thomas McLellan, David C. Lewis, Charles P. O'Brien, Herbert D. Kleber, "Drug Dependence, a Chronic Medical Illness Implications for Treatment, Insurance, and Outcomes Evaluation." JAMA 284, no. 13 (2000).

in these types of conditions, but that does not mean we should disregard or not attempt treatment when possible, especially since these therapies are safe in pregnancy. In many cases, periods of abstinence lead to less frequent use than before, and any reduced use is beneficial to short and long-term outcomes for those who struggle with these conditions.[58] I currently work in a practice with a specific clinic that focuses specifically on the treatment of substance use disorders as well as mental health diagnoses, where they get excellent healthcare for their underlying conditions. Treatment involves medication, therapy, and other resources, all working to improve maternal and fetal outcomes in pregnancy, as well as postpartum.

53. Taken together, Dr. Smid's and other expert's arguments that providing a pregnant woman in a situation where she is at risk for or threatening self-harm with a pregnancy termination is therapeutic or medically indicated is not supported by evidence. Dr. Smid and others also fail to mention the potential difference in the psychological effects of termination of pregnancy versus remaining pregnant. Although fiercely debated, there is substantial evidence that abortion in fact contributes to and worsens mental health disorders, not improves them. There have been many studies on the short and long-term psychological effects of abortion. Although it is often suggested by abortion advocates that the vast majority of women are satisfied with their decision to have an abortion,[59, 60] the results are more complicated, and many studies have been called into question due to methodological flaws, bias, and reliance

[58] Volkow, Nora. "Making Addiction Treatment More Realistic and Pragmatic: The Perfect Should Not Be the Enemy of the Good." U.S. Department of Health and Human Services, https://nida.nih.gov/about-nida/noras-blog/2022/01/making-addiction-treatment-more-realistic-pragmatic-perfect-should-not-be-enemy-good.
[59] Diana Green Foster, The Turnaway Study: Ten Years, a Thousand Women, and the Consequences of Having—or Being Denied—an Abortion (Scribner. 2021).

[60] Corinne H. Rocca, et al., *Decision Rightness and Emotional Responses to Abortion in the United States: A Longitudinal Study*, 10 PLoS ONE e0128832 (2015).

on unvalidated and inadequate assessment of decision satisfaction.[61, 62] Some women do not have worse mental health outcomes, but there is quality data to say that others do.[63] One longitudinal study assessing the risk of depression, anxiety, suicidal ideation, alcohol abuse, drug abuse, cannabis abuse, and nicotine dependence by pregnancy outcome found an increased risk of mental health disorders in those who had abortions, even after controlling for about 25 other factors, including prior mental health issues, other pregnancy outcomes, and sociodemographic differences.[64] In another study, one third of women who chose to have abortions persistently believed the choice was consistent with their values and preferences, but that approximately two thirds of women who chose abortions felt the choice was unwanted, coerced, or in other ways inconsistent with their values and preferences.[65] This and other recent studies have associated this pressure to have an abortion with an increase in mental health symptoms and a decline in overall mental health.[66] These challenging dynamics often present in abortion decisions increase the chances of emotional disturbance following the abortion, including regret, depression, shame, grief, relationships strain and difficulty bonding with subsequent children.[67] Depression is increased in women after having abortions with an overall rate of approximately 35%,[68] significantly above baseline rates of depression in

[61] David C. Reardon, et al., *The Effects of Abortion Decision Rightness and Decision Type on Women's Satisfaction and Mental Health*, 15 Cureus e38882 (2023).

[62] Brenda Major, et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 American Psychologist 863-890 (2009).

[63] Brenda Major, et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 American Psychologist 863-890 (2009).

[64] Donald Paul Sullins. "Abortion, Substance Abuse and Mental Health in Early Adulthood: Thirteen-Year Longitudinal Evidence from the United States." SAGE Open Med 4 (2016).

[65] Brenda Major, et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 American Psychologist 863-890 (2009).

[66] David C Reardon, Tessa Longbons. "Effects of Pressure to Abort on Women's Emotional Responses and Mental Health." Cureus 15, no. 1 (2023).

[67] Brenda Major, et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 American Psychologist 863-890 (2009).

[68] Natnael Atnafu Gebeyehu, et al., *Global prevalence of post-abortion depression: systematic review and Meta-analysis*, 23 BMC Psychiatry 786 (2023).

reproductive age women (7-14%).[69] Pregnancy is difficult, as is making a decision about abortion. Unfortunately, women often make a decision to end their pregnancy when they are sick, scared, or otherwise stressed. Many feel immense pressure from family, partners, or even healthcare providers. These and other pressures lead them to believe they must choose between their own life and that of their unborn child, and feel like abortion is their only option. Indeed, the data indicates to me that abortion, instead of being an intervention that will protect a woman from bad outcomes related to mental health and substance use disorders, instead have a much higher likelihood of worsening these symptoms and related poor outcomes.

54. The plaintiff's experts argue that it is a violation of the Equal Protection Clause of the Fourteenth Amendment to treat "pregnant people at risk of death from self-harm differently than pregnant people at risk of death from other causes" (Complaint, ¶ 129). In fact, the standard treatment for suicidality, substance use disorders, and threats of self-harm would be evaluation with a mental health provider with possible inpatient admission, and treatment with medications and therapy. If instead, they are offered an abortion as a way to somehow improve or treat these situations, that, in fact, is the true threat to the Equal Protection Clause of the Fourteenth Amendment. Dr. Smid argues that "there is no medical reason to treat medical conditions that have symptoms that can cause self-harm differently from other medical conditions . . . a patient cannot rely on will power to overcome a serious mental health condition like depression any more than a patient can rely on will power to overcome a serious condition like cancer" (Smid ¶ 68, see also Seyb ¶ 45). No one is advocating for will power as a way of overcoming serious mental health conditions. Just as with cancer, mental health conditions have a variety of medical and other treatments that are the standard of care both

[69] Jean Y. Ko, et al., *Depression and Treatment Among U.S. Pregnant and Nonpregnant Women of Reproductive Age, 2005-2009*, 21 J. Womens Health (Larchmt) 830-6 (2012).

in and outside of pregnancy.[70] The Idaho laws do not prevent these standards from being implemented. On the contrary, they protect women and unborn babies from unnecessary abortions that will not treat their underlying medical conditions, and may even make them worse.

55. I also have concerns with having the threat of self-harm be a medical indication to justify terminating a pregnancy, because there is no clear way to objectively substantiate threat of self-harm as a medical indication. A physician could simply document that a patient is threatening self-harm in a wide range of situations where this sentiment may or may not exist, in order to create a medical indication for an abortion. Not only would this lead to cases of fraud, but it could also be used by health professionals and others to take advantage of patients who are by definition in extremely vulnerable situations, physically and emotionally. Physicians could also be manipulated by patients attempting to acquire elective abortions. It is critical to evaluate and treat the patient's mental health condition first, and then later assess indications to terminate the pregnancy.

56. Ultimately, performing more abortions is not going to change rates of suicide and overdose in pregnant women, except for the potential effect of fewer people being pregnant when they die of these conditions, which are already some of the leading causes of death in reproductive age women.[71] Instead, they need indicated therapies for mental health disorders, suicidal ideation, and substance use disorders. In my experience, when women are pregnant, they have improved access to high-quality healthcare in these specialties. At my practice, as is the case in

[70] Emily S. Miller, Torri Metz, Tiffany A. Moore Simas, M. Camille Hoffman, Nancy Byatt, Kay Roussos-Ross, "Treatment and Management of Mental Health Conditions during Pregnancy and Postpartum." Obstet Gynecol 141, no. 6 (2023): 1262-88.
[71] CDC. "Pregnancy-Related Deaths: Data from Maternal Mortality Review Committees in 36 U.S. States, 2017-2019." U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/maternal-mortality/php/data-research/mmrc-2017-2019.html.

many MFM practices, we have a designated perinatal psychiatrist, social workers, nurses, counselors, and other staff that primarily work toward treating mental health, including providing medications to treat these conditions that are safe and effective in pregnancy.

**The Statute Allows Physicians Latitude to Address Rare Cases of Suspected Life-Limiting or Lethal Fetal Anomalies**

57. The complaint argues for the medical necessity for abortion in cases where "the embryo or fetus is diagnosed with a fatal or grave condition or miscarriage is inevitable" (Complaint 7 ¶ (d)). Several of the expert witness describe fetal diagnoses that are considered fatal or grave, and argue this is an indication for abortion (Complaint ¶ 97, see also Dahl ¶¶ 16–32). When serious fetal abnormalities or diagnoses are made, it is our practice to discuss termination with the patient. These conversations are very difficult, not least of all because prior to that moment where we, the physicians discuss a new finding that may change every expectation they have for the pregnancy, they desired their baby and I would even say loved their baby. Then within moments, I am discussing termination. Although patients can choose to terminate a pregnancy with any diagnosis, I disagree that in these cases there is a medical indication for an abortion. Termination of pregnancy if only desired due to an adverse fetal diagnosis and without preexisting or new risks to the mother's health is not medically necessary. Laws that do not have abortion exceptions for fatal or grave fetal abnormalities protect preborn humans from discrimination based on disability or genetic information. There are other therapeutic options to consider in this situation beyond simply termination or expectant management.

58. There are many fetal abnormalities that can be diagnosed antenatally with a range of anticipated outcomes. The overall rate of birth defects in the United States is 3%.[72] In many cases, babies have few to no clinical issues and do not experience significant changes in short or long-term outcomes. In other cases, such as with congenital heart defects, there are known treatments following delivery, including corrective surgery. Other abnormalities can be treated during the pregnancy to improve outcomes. A patient should be counseled on all the potential options for treatment when a particular diagnosis is suspected. In my experience, mothers almost invariably choose to do everything possible to help their baby survive or optimize outcomes, even if it involves medical or surgical therapy during pregnancy or after birth. This preference is borne out in research in situations where congenital heart defects are suspected.[73] Maternal Fetal Medicine Specialists then help coordinate delivery and the plan of care with pediatric specialists to help optimize neonatal and long-term health and survival outcomes.

59. Lethal fetal diagnoses are diagnoses made during pregnancy where stillbirth, or death soon after birth is anticipated. These conditions are relatively rare. Recent evaluation of a large database in the United States estimated these conditions are present in approximately 0.3% of pregnancies.[74] It is important to note that although many identifiable conditions are associated with almost 100% mortality, there are always exceptions, and no one can say how long these babies will survive. In addition, many babies with abnormalities, particularly life-limiting ones, are aborted, and so we have less data and knowledge on potential outcomes in these cases. Furthermore, although for many of these diagnoses they also have a higher risk of stillbirth,

---

[72] CDC. Data & Statistics on Birth Defects in the United States: U.S. Department of Health & Human Services, 2023, updated June 28, 2023. Available from: https://www.cdc.gov/ncbddd/birthdefects/data.html.

[73] Qiu X, Weng Z, Liu M, et al. Prenatal diagnosis and pregnancy outcomes of 1492 fetuses with congenital heart disease: role of multidisciplinary-joint consultation in prenatal diagnosis. Sci Rep. May 5, 2020;10(1): 7564. doi:10.1038/s41598-020-64591-3

[74] Clare O'Connor RM, Heather Hughes, Barbara Cathcart, Shane Higgins, Rhona Mahony, Stephen Carroll PM, Fionnuala M. Mcauliffe, Jennifer Walsh. How accurate is the prenatal diagnosis of a fatal fetal abnormality? [Poster]. American Journal of Obstetrics & Gynecology. January 2020; (S524).

in many cases, they are protected from complications while still in the womb. It is after delivery where we anticipate further complications and likely death. In these cases, MFMs discuss termination of pregnancy with patients as an option for care. In cases where there is not a clear medical indication for delivery, this would be considered an induced (elective) abortion, or termination of what is at that point still a viable pregnancy. In most cases of a lethal fetal diagnosis, the diagnosis itself does not necessarily increase the risk of pregnancy to the mother.

60. Many examples of serious fetal anatomic abnormalities or syndromes were presented by the experts in this case, including anencephaly, exencephaly, craniorachischisis, bilateral renal agenesis and other conditions that lead to lack of renal function and amniotic fluid production, such as bilateral multicystic dysplastic kidneys and Meckel Gruber syndrome, ectopia cordis, holoprosencephaly, short rib polydactyly syndrome, sirenomelia, campomelic dysplasia, perinatal hypophosphatasia, body stalk anomaly, lower urinary tract obstruction (LUTO), and genetic conditions such as Trisomy 13, and Trisomy 18 (see Dahl ¶¶ 19–42). As indicated above, the incidence of these severe and life-limiting abnormalities is low. When they are diagnosed, further genetic and other testing and consultation with specialists are offered. We also discuss termination and expectant management as general approaches to the pregnancy.

61. It is important to note that Dr. Dahl does not mention Trisomy 21, or Down Syndrome, among her list of lethal fetal diagnoses. I expect this is because although there are many medical complications related to Down Syndrome, this condition is not generally considered life-limiting or life-threatening to the extent some of the genetic abnormalities she listed are. Still, rates of abortion for babies with this diagnosis is 60-90%.[75] This fact calls attention to the worrisome practice of itemizing conditions that should warrant the option for termination

[75] Jaime L. Natoli, Deborah L. Ackerman, Suzanne McDermott, Janice G. Edwards, "Prenatal Diagnosis of down Syndrome: A Systematic Review of Termination Rates (1995-2011)." Prenatal Diagnosis 32, no. 2 (2012).

of pregnancy. Clearly babies with much less "severe" or "lethal" conditions are also routinely terminated. Where that line is drawn will inherently attribute different value to those with various medical diagnoses. Ultimately, it will also facilitate termination for conditions that are not life-threatening, but undesirable.

62. In some cases of significant fetal anomalies, our management of delivery may be affected by the physical realities of the baby. This includes conditions like thanatophoric dysplasia and iniencephaly. In cases where the size of the fetal head is abnormally large, such as thanatophoric dysplasia and cases of severe hydrocephalus, the head size increases the need for cesarean section at term. Similarly with iniencephaly, the extreme retroflexion of the neck precludes a vaginal delivery at term due to the inability to pass through the birth canal. Dr. Dahl infers that if women in these situations are unable to have abortions, this will significantly increase "the risk of abnormal labor requiring a cesarean delivery which significantly impacts future pregnancies…and increases maternal morbidity." (Dahl ¶ 34). However, it is also an option to induce the labor earlier than term in order to optimize chances of a vaginal delivery. I have seen this facilitate vaginal deliveries in extremely rare cases of conjoined twins, thanatophoric dysplasia, and severe hydrocephalus in order to avoid the additional morbidity a cesarean section confers on a pregnant woman. In these cases, it is reasonable to avoid a direct termination of the baby as well as optimize outcomes for the mother in an already difficult situation.

63. The problems posed by a lethal fetal diagnosis do not automatically go away following an abortion. The diagnosis is not treated or cured through termination. However, patients often feel that without the hope of a live birth or normal life of their child, it is better for them to terminate the pregnancy. Physicians may emphasize the risks of continuing the pregnancy, which is characterized as unnecessary or even unsafe without the expectation of a normal or

healthy baby. Other options to offer patients include palliative care after delivery, which ensures the mother and her family create an environment they desire for the anticipated short life of their child, and that the child is kept comfortable until a natural death.[76] Most MFM practices that offer antenatal fetal diagnosis and care will have teams tasked with providing many types of support to families who are put in these incredibly difficult and heartbreaking situations. They coordinate consultation with pediatric specialists, counsel about expectations and help them process through their grief over losing their "normal" pregnancy, and offer mementos of their babies while still alive in the womb (ultrasound photos, recordings of the fetal heartbeat).

64. It is critical to note that there are inherent limitations on a physician's ability to accurately diagnose all fetal abnormalities, including life-limiting, life-threatening, or lethal fetal conditions.[77] These diagnoses are usually made with ultrasound or laboratory assessments, which have an understood rate of inaccurate results. On ultrasound, some characteristics can be difficult to see based on several factors, and I have had many experiences where examining a baby after delivery leads to a different diagnosis, or things we thought were present are not confirmed. Although our technology and ability to see abnormalities at earlier gestational ages is increasing, there will always be some degree of inherent limitation in our ability to make diagnoses before the baby is born. For example, one multicenter study of suspected congenital heart defects, the most common category of fetal anomaly, indicated the suspected diagnosis and prognosis was confirmed correct 92% of the time. This still leaves approximately 8%

[76] Kidszun A, Linebarger J, Walter JK, Paul NW, Fruth A, Mildenberger E, Lantos JD. What If the Prenatal Diagnosis of a Lethal Anomaly Turns Out to Be Wrong? Pediatrics. 2016; 137(5).
[77] Kidszun A, Linebarger J, Walter JK, Paul NW, Fruth A, Mildenberger E, Lantos JD. What If the Prenatal Diagnosis of a Lethal Anomaly Turns Out to Be Wrong? Pediatrics. 2016; 137(5).

where the prenatal and postnatal diagnoses were different.[78] Accuracy of diagnosing central nervous system abnormalities is worse, approximately 68% with use of two-dimensional ultrasound, and 91% with three dimensional methods.[79] Many other anomalies may be identified antenatally, but there is no way to know for certain how what is observed will affect the baby's life until we observe the baby after birth. With this degree of uncertainty, it is difficult to feel comfortable supporting such a permanent decision as termination. Even in cases of more diagnostic certainty, such as a genetic diagnosis performed with highly accurate and reliable diagnostic tests, there is a range of manifestations of the diagnosis, and no one can be sure how long the baby will live and what specific medical issues they will or will not have.

65. It is important to note that, although there may be extended exposure to the inherent risks of pregnancy when a patient remains pregnant in situations of lethal fetal conditions, most pregnancies are otherwise uncomplicated and will have uncomplicated deliveries. In some situations, medical complications develop, and delivery is recommended. In these situations, just as in pregnancies where a baby is anticipated to be normal and healthy, delivery is medically indicated and should not be confused with elective abortions performed strictly "with the intent" to terminate the pregnancy.

66. There are cases where maternal complications develop as a result of the pregnancy or the fetal diagnosis. In these situations, we recommend delivery. For example, mirror syndrome is a maternal condition associated with a fetal condition called hydrops. It is listed by Dr. Dahl as fatal or grave fetal condition that can threaten the life of the mother (Dahl ¶ 16). Mirror

[78] Van Velzen CL, Clur SA, Rijlaarsdam ME, et al. Prenatal diagnosis of congenital heart defects: accuracy and discrepancies in a multicenter cohort. Ultrasound Obstet Gynecol. May 2016; 47(5): 616-22. doi:10.1002/uog.15742

[79] Pang B, Pan JJ, Li Q, Zhang X. Accuracy of ultrasonography in diagnosis of fetal central nervous system malformation. World J Clin Cases. Sep. 26, 2021; 9(27): 8027-8034. doi:10.12998/wjcc.v9.i27.8027

syndrome is a maternal condition, similar to severe preeclampsia, that is most commonly associated with non-immune fetal hydrops, which represents 90% of fetal hydrops cases. Fetal hydrops is uncommon, with a prevalence of approximately 1/1700 - 1/3000 pregnancies.[80] Maternal mirror syndrome is similarly uncommon and likely underdiagnosed, and so the incidence is not clear. However, there were less than 25 cases reported prior to 2007.[81] In most cases, the development of mirror syndrome necessitates delivery, however, if the fetal hydrops can be corrected, the maternal condition may improve. If mirror syndrome is suspected or confirmed, delivery as a treatment would be recommended for maternal benefit at whatever gestational age it is diagnosed. Even if delivered at later gestational ages, fetal hydrops has high neonatal morbidity and mortality,[82] and pregnant women are prepared for this outcome.

67. I disagree with Dr. Dahl that abortion is the recommended care in cases of patients with prior cesarean sections and pregnancies with a grave or fatal fetal diagnosis. I agree that an increased number of cesarean sections may create higher risks of developing pregnancy-related complications, however providing an abortion has its own risks. Because a cesarean section is not anticipated to improve fetal outcomes, I would discuss the option of a trial of labor after cesarean section (in appropriate candidates) with the goal to have a vaginal delivery. Abortion also cannot be performed free of risk. Any procedure on the uterus can increase a woman's risk of placenta accreta spectrum in the future, including a D&C or D&E.[83] Even if a medical

[80] Braun T, Brauer M, Fuchs I, et al. Mirror syndrome: a systematic review of fetal associated conditions, maternal presentation and perinatal outcome. Fetal Diagn Ther. 2010; 27(4): 191-203. doi:10.1159/000305096

[81] Braun T, Brauer M, Fuchs I, et al. Mirror syndrome: a systematic review of fetal associated conditions, maternal presentation and perinatal outcome. Fetal Diagn Ther. 2010; 27(4): 191-203. doi:10.1159/000305096

[82] Society for Maternal-Fetal M, Norton ME, Chauhan SP, Dashe JS. Society for maternal-fetal medicine (SMFM) clinical guideline #7: nonimmune hydrops fetalis. Am J Obstet Gynecol. Feb. 2015; 212(2):127-39. doi:10.1016/j.ajog.2014.12.018

[83] Heather J. Baldwin, Jillian A Patterson, Tanya A Nippita, Siranda Torvaldsen, Ibinabo Ibiebele, Judy M Simpson,Jane B. Ford, "Antecedents of Abnormally Invasive Placenta in Primiparous Women: Risk Associated with Gynecologic Procedures." Obstet Gynecol 131 (2018): 227-33.

abortion is performed, there is a risk of uterine rupture, and a D&C may still be required if unsuccessful or if there is a retained placenta.[84]

68. With the aim of reducing surgical risks to the pregnant patient, if the baby is not anticipated to survive labor or survive long after delivery, physicians can offer unmonitored deliveries, to avoid performing a cesarean section without fetal benefit. We discuss with the patient the increased risk of stillbirth during labor and delivery, and we agree to avoid an emergent cesarean section for fetal distress. The absolute recommendation for cesarean delivery (CD) for fetal benefit in these cases would not be made where a fetal condition precludes neonatal survival. I would similarly offer vaginal deliveries in appropriate candidates in situations where the infant is breech, with the expressed goal of avoiding the additional maternal risk of major surgery in cases where a cesarean section would provide no fetal benefit. Only if a patient expressly desires to have the best chance of holding a live baby following delivery, or if she has other compelling medical indications for a cesarean section (like previous cesarean sections) would a CD be more imperative. Alternatively, there are cases where there is a significantly increased risk of stillbirth and the pregnant patient's expressed goal is to hold a live baby, even if for a short time. In these cases, I would offer an earlier delivery, and intervene for fetal distress, after a shared decision-making process with the patient. Idaho's laws would not prohibit any of this individualized care for patients in these situations.

69. Once again, the plaintiff's experts do not address the psychological effects of termination specifically in cases of lethal fetal anomalies. Choosing to terminate a pregnancy that carries a life-limiting diagnosis is immediately lethal to the fetus, and it does not treat the medical diagnosis or the associated heartbreak of the patient. In my experience, the decision to terminate such a pregnancy (or any pregnancy, without medical need) only propagates and

[84] ACOG Practice Bulletin No. 135: Second-Trimester Abortion." Obstet Gynecol 121, no. 6 (Jun 2013): 1394-406.

deepens the heartbreak. It can lead to more physical trauma, and the associated shame and guilt limits acknowledgement of the baby's life and closure about the diagnosis. When a woman is supported in carrying her pregnancy to the point when delivery is medically indicated, she and her family are able to receive the life of her child, however long he or she lives. This is an experience that I have observed leading to closure, healing, and peace for the woman and her family. In my experience, patients benefit psychologically and emotionally from this ability to affirm and grieve the life of their child. Research shows that termination of pregnancy specifically in situations of adverse prenatal diagnoses increases psychological distress in the mother, even with compassionate medical care,[85] and that rates of despair and depression are increased compared with those that choose to continue their pregnancies.[86] Medically examining a baby following delivery can lead to confirmation of the cause of the loss or anatomic defect, which brings closure for the family and health provider and aids in discussions about the risk of recurrence in future pregnancies.

70. From an ethical standpoint, allowing for or recommending the termination of pregnancy in specific populations that have medical diagnoses, physical limitations, or are anticipated to have shorter lives is highly concerning. These actions inherently involve value judgments on what people are worthy or not worthy of life, and what falls outside our personal concepts of what is or is not a normal or good life. Terminating pregnancies in these situations discriminates against unborn humans that are considered different or undesirable, and who are unable to speak for themselves.

[85] Asplin N, Wessel H, Marions L, Georgsson Ohman S. Pregnancy termination due to fetal anomaly: women's reactions, satisfaction and experiences of care. Midwifery. 2014; 30(6):620-7.
[86] Cope H, Garrett ME, Gregory S, Ashley-Koch A. Pregnancy continuation and organizational religious activity following prenatal diagnosis of a lethal fetal defect are associated with improved psychological outcome. Prenat Diagn. 2015; 35(8):761-8.

71. I disagree with the complaint of the plaintiffs that "carrying a fetus with a fatal condition poses significant risks of physical and psychological harm to the pregnant person, and those risks increase as the pregnancy progresses" (Complaint ¶ 97). These words are an overstatement unsupported by evidence. When physicians treat patients, particularly in the profoundly complex situations we encounter in high-risk pregnancies, it is critical to consider all interests of the patients, and not focus only on maternal medical risks. Furthermore, the actual risks of ongoing pregnancy versus delivery are highly dependent on the specific clinical situation, including overall maternal health, gestational age, and the specific fetal anomaly identified. Once pregnant, particularly in the second trimester when most lethal anomalies are diagnosed, the additional medical risks of continuing a pregnancy are very difficult to quantify, but generally small. As already stated, if additional medical complications arise, delivery would be considered to resolve the potential increased risk to the mother.

72. There are deeply emotional and psychological effects of complicated pregnancies, particularly if the pregnancies lead to a spontaneous or induced loss of a baby. I see it as the duty of a physician to see a patient wholistically, and not pressure them into any path of medical care that does not treat the complete medical situation at hand. I have heard so many stories from patients about the immense pressure put on them to terminate their pregnancies with adverse fetal diagnoses. Many patients choose to continue their pregnancies, despite adverse fetal diagnoses, and in my experience, they suffer fewer psychiatric medical complications as a result. The benefit of choosing a natural end to the pregnancy and the baby's postnatal life, as noted above, has been shown to reduce despair and depression in these specific situations.[87,]

[87] Cope H, Garrett ME, Gregory S, Ashley-Koch A. Pregnancy continuation and organizational religious activity following prenatal diagnosis of a lethal fetal defect are associated with improved psychological outcome. Prenat Diagn. 2015; 35(8):761

[88] These are potentially life-long psychological effects that are similarly difficult to quantify, but absolutely should be considered when determining our medical recommendations and plan for care.

**Abortion is Generally not Necessary in Cases of Inevitable Abortion or Multifetal Gestations**

73. The plaintiff's experts also argue that Idaho's laws need to have allowances for abortion when "miscarriage is inevitable" (Complaint ¶ 7(d). This is a situation where "a miscarriage cannot be avoided because the pregnant person is cramping, bleeding, and has a dilated cervix." However, there is still "[e]mbryonic or fetal cardiac activity." The complaint goes on to say "if the pregnancy is not promptly terminated, the pregnant person can develop a serious and potentially life-threatening hemorrhage or infection" (Complaint ¶ 99). These are very challenging cases where patients may hold on to hope that their pregnancy, still with signs of life, may continue, even if it is very unlikely. In cases of "life-threatening hemorrhage or infection" abortion would be allowed by Idaho's statutes. When this point occurs is not difficult to establish with careful assessment and documentation.

74. Finally, the plaintiff argues that abortion should be allowed in cases where "a multifetal pregnancy reduction would increase the likelihood of survival of the remaining fetuses" (Complaint ¶ 7). Per Dr. Eller, selective reduction "is medically indicated when a multifetal pregnancy reduction would reduce a pregnant person's risk of death or serious injury and/or increase the likelihood of survival of the remaining fetus(es)" (¶ 37), and "can greatly increase the chances of a healthy pregnancy, protect the pregnant person, and increase the chances of healthy babies at delivery" (Eller ¶ 37, see also Seyb ¶ 50). I agree that twins, and even more

[88] Asplin N, Wessel H, Marions L, Georgsson Ohman S. Pregnancy termination due to fetal anomaly: women's reactions, satisfaction and experiences of care. Midwifery. 2014; 30(6):620-7.

so triplets or higher order multiples, increase risks to the woman who is pregnant as well as her babies. Primarily, it increases risk to the pregnant woman related to an increased number or volume of placenta(s), including the risks of gestational hypertension and gestational diabetes. Twins and other multiples also increase the risk of needing a cesarean section for delivery. The primary source of morbidity and mortality for the babies in multiple gestations are the medical complications associated with preterm birth, which is significantly increased with twins, but particularly triplets and higher order multiples.[89] Multifetal reduction is an option for patients with multiple gestations, however I would not say it is medically indicated or necessary, nor completely protective against poor outcomes. Like many situations that occur in pregnancy, there are increased risks related to multiple gestations. However, our "standard" of care in maternal fetal medicine is not to reduce risks by eliminating a pregnancy or pregnancies.

75. Twins are a regular occurrence and are seen routinely by maternal fetal medicine specialists. Current twin rates are approximately 31 per 1000 births, or 3% of births. Although recent rates of twins have stabilized, the twinning rate rose 76% from 1980 to 2009, rose at a lower rate between 2009-2014 and then finally decreased 8% from 2014 to 2020.[90] The rate of triplet and higher-order multiple births was approximately 79 per 100,000 births in 2022, or 0.08 percent of births. Notably, the rate of these higher order multiples rose more than 400% between 1990 and 1998, when it peaked.[91] The most significant influencer of these rates of twins, and especially higher-order multiples, is the use of artificial reproductive technologies,

---

[89] Committee on Ethics. "Committee Opinion No. 719: Multifetal Pregnancy Reduction." Obstet Gynecol 130, no. 3 (2017): e158-e63.

[90] CDC. "Births: Final Data for 2022." In National Vital Statistics Reports, edited by Brady E. Hamilton Michelle J.K. Osterman, Joyce A. Martin, Anne K. Driscoll, Claudia P. Valenzuela, Center for Disease Control, 2024.

[91] CDC. "Births: Final Data for 2022." In National Vital Statistics Reports, edited by Brady E. Hamilton Michelle J.K. Osterman, Joyce A. Martin, Anne K. Driscoll, Claudia P. Valenzuela, Center for Disease Control, 2024.

particularly the transfer of more than one embryo in IVF, as well as the use of medications for the induction of ovulation. As per the American Society of Reproductive Medicine (ASRM), "the main factor that increases your chances of having a multiple pregnancy is the use of infertility treatment."[92] To put this in perspective, one study of almost 2 million pregnancies in Canada indicated that the multifetal pregnancy rate was 1.4% in unassisted conception, compared with 10.5% with ovulation induction and 15.5% after in vitro fertilization.[93] Early in the development of assisted reproductive technology, rates of multiple gestations were extremely high, as well as their associated complications and significant increased health care costs, due to the formally routine transfer of more than one embryo.[94] Since the 1990s, significant improvements in IVF led to better rates of live birth, but this included a 15-30% incidence of multiple gestations. Also at this time, the process of elective single embryo transfer (eSET) started to be identified and promoted as a way to reduce the rate of multiple gestations and therefore improve outcomes without compromising live birth rates.[95] It is now recommended by national and international professional organizations, and even integrated into some country's laws governing assisted reproductive technologies, as a preferred approach in its practice.[96] Subsequently, ASRM published guidelines that encouraged the transfer of only single embryos, except in specific situations, and only with thorough counseling about the increased medical and ethical risks.[97] They in fact recommend that

---

[92] Patient Education Committee and the Publications Committee. "Multiple Pregnancy and Birth: Twins, Triplets, and High-Order Multiples." In A Guide for Patients, edited by American Society for Reproductive Medicine, 2012.
[93] Maria P Velez, Allison Soule, Laura Gaudet, Jessica Pudwell, Paul Nguyen, Joel G Ray, "Multifetal Pregnancy after Implementation of a Publicly Funded Fertility Program." JAMA Netw Open 7, no. 4 (2024).
[94] Amy M. Lee, Matthew T. Connell, John M. Csokmay, Aaron K. Styer. "Elective Single Embryo Transfer- the Power of One." Contraception and Reproductive Medicine 1, no. 11 (2016).
[95] Amy M. Lee, Matthew T. Connell, John M. Csokmay, Aaron K. Styer. "Elective Single Embryo Transfer- the Power of One." Contraception and Reproductive Medicine 1, no. 11 (2016).
[96] ESHRE Guideline Group on the Number of Embryos to Transfer, Alessandra Alteri, , et al. "Eshre Guideline: Number of Embryos to Transfer during IVF/ICSI." Human Reproduction 39, no. 4 (2024).
[97] Practice Committee of the American Society for Reproductive Medicine and the Practice Committee for the Society for Assisted Reproductive Technologies. "Guidance on the Limits to the Number of Embryos to Transfer: A Committee Opinion." Fertility and Sterility 116, no. 3 (2021).

"[p]atients with a coexisting medical condition for which a multiple pregnancy may increase the risk of significant morbidity should not have more than one embryo transferred."[98] As a result of these recommendations governing practice, the rates of multiple gestation have decreased approximately 59% since 1998.[99]

76. Multi-fetal pregnancy reduction (MFPR) is a procedure to reduce the number of fetuses in a multiple pregnancy. This is offered to all patients pregnant with multi-fetal gestations, including twins, but particularly triplets or more, as the risks related to these types of pregnancies are increased. The procedure is usually done between the 11th and 13th week of pregnancy, with the most common procedure being the ultrasound-guided, trans-abdominal insertion of a needle through the woman's abdomen and uterus and into the thorax of the targeted fetus. A concentrated potassium solution is then injected through the needle to stop the fetal heart. The fetus selected for reduction is based on technical considerations, that is, which fetus is closest and most easily accessible.[100] The pregnancy then continues for the surviving pregnancy or pregnancies. This method cannot be used in pregnancies where there is a shared placenta (monochorionic pregnancies) due to the vascular connections between the fetuses. There is a risk of transfer of medication from one fetus to the other, as well as other blood flow changes that can compromise the remaining fetus when the connected twin dies. In cases of mono-chorionic twins where a reduction is performed, it is generally done with a procedure that uses thermal energy through a small device inserted through a needle or a small port with ultrasound guidance to cauterize the umbilical cord at its insertion into the targeted

---

[98] Practice Committee of the American Society for Reproductive Medicine and the Practice Committee for the Society for Assisted Reproductive Technologies. "Guidance on the Limits to the Number of Embryos to Transfer: A Committee Opinion." Fertility and Sterility 116, no. 3 (2021).

[99] CDC. "Births: Final Data for 2022." In National Vital Statistics Reports, edited by Brady E. Hamilton Michelle J.K. Osterman, Joyce A. Martin, Anne K. Driscoll, Claudia P. Valenzuela: Center for Disease Control, 2024.

[100] Committee on Ethics. "Committee Opinion No. 719: Multifetal Pregnancy Reduction." Obstet Gynecol 130, no. 3 (2017): e158-e63.

twin to stop blood flow in the umbilical vessels.[101] The remains of the fetus that is terminated in these cases is left inside the womb, where it will be compressed from the growing surviving cotwin(s), and ultimately deliver with the co-twin(s) or with the placenta.

77. Selective fetal reduction (SFR) is a similar process whereby a fetus is chosen for reduction based on health status. This is the rare situation that several of the plaintiff's experts referred to, where one baby of a twin or other multifetal pregnancy is affected by a life-threatening or limiting abnormality, in some cases leading to increased morbidity or mortality for the healthy twin, usually due to the increased risk for premature delivery (Eller ¶¶ 35–36). In these cases, termination of one of the babies is offered, however it is not emergent, allowing for consultation in locations and with specialists that can provide this procedure.

78. Alternatives to termination also exist. If the baby with an adverse diagnosis is not expected to survive, we offer continued expectant management of the pregnancy to allow for the benefit of a longer pregnancy to the healthy twin, knowing that the affected twin may not survive to delivery or survive labor. Indeed, there is no requirement that a woman or physician does everything possible to save both babies, and individualized counseling and care plans are appropriate in these situations after shared decision making with the patient. In many cases, the pregnant woman elects to continue the pregnancy and deliver the babies at a time that would give the best chances of two live births, even if one twin experiences more complications as a result of prematurity.

79. In other cases, one twin is actively threatening the life of the other twin as well as the mother. This occurs in cases where, for example, one twin is normal, and the other a molar pregnancy. In these cases, the threat may be significant enough to threaten the life of the mother and

[101] M.J.C. van Hoek, J.M.M. van Klink, E.J.T. Verweij, J.M. Middeldorp, M.C. Haak, E. Lopriore, F. Slaghekke. "Perinatal Outcome after Selective Fetal Reduction in Monochorionic Twin Pregnancies: A Comparison of Techniques over a 20-Year Period." Prenatal Diagnosis 43 (2023): 1028-35.

justify either an induced delivery or an abortion, which will ultimately deliver or "terminate" both pregnancies. These are highly unusual and heartbreaking. In some cases, I have still had mothers choose to continue the pregnancy in the hope that it will get far enough for one to survive. In these rare cases, Idaho's law would not prevent a procedure to treat a molar pregnancy, even with the necessary effect that treatment would end both pregnancies.

80. Not described in the plaintiff's expert reports are the risks inherent to these reduction procedures. Risks to multifetal pregnancy reduction include loss of all fetuses. Furthermore, even if successful, the reduction does not completely eliminate the risks associated with multiple pregnancies, and there are documented adverse psychological consequences.[102] Risks of umbilical cord coagulation in monochorionic twin pregnancies are increased, including higher risks of fetal loss, infection, and rupturing the bag of water (preterm premature rupture of membranes).[103] However, monochorionic twins also have higher rates of complications which may lead to a patient electing for selective reduction, and are more technically challenging. Finally, any type of multifetal or selective reduction may not be an acceptable option for many women.

81. There are also ethical issues that arise in multi-fetal or selective reductions involving the termination of unwanted or undesired fetuses based on health status or convenience. In cases of multi-fetal reduction, genetic testing is often performed to ensure that the one terminated is not affected by a genetic abnormality. If patients are aware of the sexes of the different fetuses, this may influence their decision about which gestation to terminate. ACOG and

[102] Practice Committee of the American Society for Reproductive Medicine and the Practice Committee for the Society for Assisted Reproductive Technologies. "Guidance on the Limits to the Number of Embryos to Transfer: A Committee Opinion." Fertility and Sterility 116, no. 3 (2021).

[103] M.J.C. van Hoek, J.M.M. van Klink, E.J.T. Verweij, J.M. Middeldorp, M.C. Haak, E. Lopriore, F. Slaghekke, "Perinatal Outcome after Selective Fetal Reduction in Monochorionic Twin Pregnancies: A Comparison of Techniques over a 20-Year Period." Prenatal Diagnosis 43 (2023): 1028-35.

SMFM discourages against the use of sex as a consideration in determining which fetus to reduce (although the information should not be withheld for patients who desire it), and encourage physicians to "randomly select the fetus to be reduced" in cases where two or more are equally accessible, "therefore eliminating physician bias or subtle discrimination in making this determination."[104] In truth, any targeted reduction of life risks judgement on who should live and who should not. In my experience, most mothers elect to continue the pregnancy without a reduction due to the inherent conflict in such a decision.

**The Terms Used in the Idaho Statutes to Define Exceptions are Clear and Allow for Preemptive Measures**

82. A situation where the pregnant woman's life is threatened is a situation that is well-understood by physicians. When a physician performs an intervention that is medically indicated, this means that, based on clinical and other evidence, it is been shown to be an appropriate medical therapy for a specific medical diagnosis. I therefore disagree with Dr. Dahl who states: "A treatment is medically indicated when there is a medical reason to undertake it" (¶ 7). This statement is extraordinarily vague. The real question is whether the treatment actually resolves the medical problem, or is a therapy for it.

83. Idaho's Statutes clearly define "medical emergency" as "a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." 18-604(9). Physicians are educated and trained in how to provide evidence-based and lifesaving care for our patients. As ACOG states "it is impossible for a law to

[104] Hayes, J. "Multifetal Gestations: Twin, Triplet, and Higher-Order Multifetal Pregnancies." Obstet Gynecol (2016).

appropriately capture how or whether a "medical emergency" exception applies to a clinical situation."[105] Indeed, there can be no "comprehensive list of medical conditions that ought to qualify for a health exception"[106] within laws governing the legal boundaries of abortion. However, physicians identify and treat medical emergencies every day, and differences are delineated constantly to triage patients into higher and lower risk categories. The determination of what poses a serious risk constituting a threat to the life of the mother is something physicians must reasonably determine every day. We should not confuse our own uncertainty about specific risks in pregnancy with uncertainty about what a threat to life may encompass. It is understood that it is difficult for any physician to accurately know *how much* various factors contribute to pregnancy risk, or if and how any risk factor or group of factors will actually play out in pregnancy outcomes. Predicting an individual's specific risk is particularly difficult. However, SMFM and others do discuss this topic, as well as suggest various descriptions of conditions and situations that impose serious risk on a pregnancy--that is, risk above and beyond a normal pregnancy (high-risk pregnancies).[107] There also exist specific risk stratification guidelines pertaining to particular maternal conditions to help guide counseling and pregnancy management.[108]

---

[105] ACOG, *Understanding and Navigating Medical Emergency Exceptions in Abortion Bans and Restrictions* (Aug. 15, 2022), https://www.acog.org/news/news-articles/2022/08/understanding-medical-emergency-exceptions-in-abortion-bans-restrictions.

[106] ACOG, *Understanding and Navigating Medical Emergency Exceptions in Abortion Bans and Restrictions* (Aug. 15, 2022), https://www.acog.org/news/news-articles/2022/08/understanding-medical-emergency-exceptions-in-abortion-bans-restrictions.

[107] Lappen JR, Pettker CM, Louis JM. Society for Maternal-Fetal Medicine Consult Series #54: Assessing the risk of maternal morbidity and mortality. Am J Obstet Gynecol. Apr 2021; 224(4): B2-B15. doi:10.1016/j.ajog.2020.12.006; Blackwell S, Louis JM, Norton ME, et al. Reproductive services for women at high risk for maternal mortality: a report of the workshop of the Society for Maternal-Fetal Medicine, the American College of Obstetricians and Gynecologists, the Fellowship in Family Planning, and the Society of Family Planning. Am J Obstet Gynecol. Apr 2020; 222(4): B2-B18. doi:10.1016/j.ajog.2019.12.008.

[108] Lappen JR, Pettker CM, Louis JM. Society for Maternal-Fetal Medicine Consult Series #54: Assessing the risk of maternal morbidity and mortality. Am J Obstet Gynecol. Apr 2021; 224(4): B2-B15. doi:10.1016/j.ajog.2020.12.006

84. I am unconvinced by Dr. Seyb's expressed concern about the Idaho statutes placing a "chilling effect on the provision of abortion care, even in cases where continued pregnancy would pose life-threatening risks to the patient" (Seyb ¶ 16). If there are life-threatening risks to a patient, a physician knows if intervention is needed, and Idaho laws would allow an abortion. Perhaps one may intervene slightly earlier, or later than another, but there is a general understanding of when that type of intervention is necessary. Per Dr. Seyb "it is often impossible for me or my colleagues to determine that an abortion is *necessary* to prevent patient's death" (Seyb ¶ 16). This is where the standard of decision making referenced in Idaho's laws, good faith medical judgment, is helpful. This standard provides deference to physician judgment in cases of medical uncertainty. Physicians also know when there are other options for treatment. In these cases, abortion as a specific intervention may not be necessary. In most if not all situations of medical necessity, there is an understanding that the intervention you institute will resolve an active threat to the life of the mother. Physician knowledge and training prepares them to make these decisions. Idaho's laws do not require that these medical decisions be perfect, correct, or agreed upon by peers, but that they are made in good faith.

85. Idaho's statutes defer to a physician's "good faith medical judgment" in assessing the potential need for an abortion. This legal threshold provides significant deference to physicians making medical decisions. By definition, it provides substantial latitude for a physician to use his or her education, knowledge, and training to determine when an abortion is medically necessary to prevent the death of the pregnant woman. It allows for the uncertainty inherent in making medical decisions. Dr. Seyb expressed concern related to this uncertainty, that – "it is possible for reasonable doctors to disagree about whether an abortion is necessary to prevent a patient's death," and fears if another doctor disagrees or second guesses this judgment, he could be prosecuted under Idaho's laws (Seyb ¶ 17). However, the "good faith" standard only requires

a physician to act honestly and without malice. A physician would have to be far outside of the standard of care, and acting with deceit and malevolence, to be held criminally liable in these cases

86. I interpret the Idaho statutes to mean that it is not necessary that the consequences of a serious threat be present for a physician to intervene. The law plainly allows physicians to act *prior* to actual threats to life in order to *prevent* her death. Expert testimonies expressed concern that the law prevents action even if the medical situation significantly worsens, or that they would have to wait until a medical emergency is present to act, causing patients to be turned away for initial care and increasing risks to the patient. I do not share these concerns. With real health threats, a physician would not turn away a patient. Take cases of previable prelabor rupture of membranes. Expectant management, even as an outpatient, is appropriate in cases where complications are not apparent. However, with any evidence of complications such as bleeding, infection, or labor, a patient would be treated. Inducing delivery can be immediately initiated with evidence of infection, for example, prior to a point that could threaten her life. Because infections can escalate quickly, an abortion may be justified in these situations, as there is significant potential for a threat to life if no intervention occurs. Furthermore, although in rare cases, infections progress so rapidly a patient's life becomes endangered very rapidly, there is almost invariably time to act before a woman's condition would progress to threaten her life. In these cases, Idaho's laws would allow for induced delivery or an abortion if that was the preferred or necessary means.

87. I interpret the "necessary to prevent the death" of the woman exception to be inclusive of pre-existing medical conditions known to significantly increase a pregnant woman's risk of morbidity and mortality in pregnancy, such as pulmonary hypertension, cardiomyopathy, or significant underlying end organ damage in cases of diabetes, chronic hypertension, or

autoimmune disease, among many potential examples. The timing of intervention is not specified by the law, allowing for physician deference about when the point of necessity exists to prevent her death.

**Abortions Are Not Without Risk of Harm to the Woman**

88. Inducing delivery, medical termination of pregnancy, and surgical termination of pregnancy are all considered to be safe options for a pregnant patient in the United States.[109] However, any direct termination of pregnancy is a medical intervention, and therefore carries with it associated risks. These risks generally include bleeding, damage to nearby structures, infection, and failure of the intervention to successfully treat the clinical situation.[110, 111] In medication-induced abortions, there is a higher chance of having a retained placenta, which can increase the duration of care, need for further procedures, and hemorrhage, though current medication protocols have had better outcomes.[112] In surgical abortions, where the cervix is dilated and the fetus removed with forceps, there are increased risks of cervical injury and uterine perforation compared with induced delivery or medication-induced abortions.[113] If these complications occur, it can have a significant impact on the management and outcome of future pregnancies. A prior surgical abortion has been shown to increase a woman's risk of cervical insufficiency, preterm birth, placental abnormalities, including placenta accreta spectrum, and postpartum hemorrhage in subsequent pregnancies.[114] Some data suggests that

[109] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6): 1394-406.
[110] ACOG Practice Bulletin No. 225: Medication Abortion Up to 70 Days of Gestation. Obstet Gynecol. 2020; 136(4):e31-e47.
[111] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6): 1394-406.
[112] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6): 1394-406.
[113] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6): 1394-406.
[114] Brenda L Scholten, Godelieve C M L Page-Christiaens, Arie Franx, Chantal W P M Hukkelhoven, Maria P H Koster. "The Influence of Pregnancy Termination on the Outcome of Subsequent Pregancncies: A Retrospective Cohort Study." BMJ Open 3 (2013).

dilation-and-extraction procedures are safer and more effective for second-trimester abortion.[115] However, to my knowledge, there are no adequately powered prospective trials that indicate that D&E is better than induction in the second trimester. Furthermore, if fetal autopsy is desired, an induction is preferable to have an intact fetus to examine. The availability of physicians capable and comfortable with providing second trimester and later D&E may also be limited, depending on specific gestational age and location. Also not considered is the experience of D&E for the patient. The most significant difference is that during a D&E procedure, there is usually fetal disarticulation (dismemberment) as fetal parts are grasped by the physician and pulled through the cervix.[116] As a result, parents are unable to see and hold a baby after this procedure.

89. What is often not considered, and was not addressed by the plaintiff's expert reports, is the difference in the psychological effect of termination of pregnancy versus remaining pregnant. This difference is significant, important, and, troublingly, entirely ignored by plaintiff's experts. Aside from the objective medical risks and outcomes of induced abortion, there is also a body of research evaluating potential psychologic implications, which are often delayed and life-long. Induced abortion at any time or with medical and surgical means has been increasingly understood as a potential trauma, and women who have had abortions are more likely to suffer mental illness during their lives.[117] Anxiety symptoms are most commonly seen as an adverse psychologic outcome, as well as ongoing feelings of guilt, regret, and depression.[118] In my experience, women often feel regret, and the decision is often clouded in shame, further

[115] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013; 121(6): 1394-406.
[116] ACOG Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. Jun 2013 ;121(6): 1394-1406. doi:10.1097/01.AOG.0000431056.79334.cc
[117] Reardon DC. The abortion and mental health controversy: A comprehensive literature review of common ground agreements, disagreements, actionable recommendations, and research opportunities. SAGE Open Med. 2018; 6:2050312118807624. doi:10.1177/2050312118807624
[118] Bradshaw Z, Slade P. The effects of induced abortion on emotional experiences and relationships: a critical review of the literature. Clin Psychol Rev. Dec 2003; 23(7): 929-58. doi:10.1016/j.cpr.2003.09.001

effecting relationships, limiting acknowledgement of the pregnancy, and the potential psychologic and emotional effects of such a difficult experience. It is difficult to weigh these potential outcomes with other potential risks of continuing a pregnancy.

90. I disagree with Dr. Dahl, that it "is safer to have an abortion than it is to remain pregnant" (Paragraph 6). This is a misleading and inaccurate statement for a multitude of reasons.

    a. First, the only reference Dr. Dahl provided for this sweeping conclusion was an "Abortion Access Fact Sheet" from ACOG.[119] This web page only references one peer-reviewed article to substantiate this claim. The study ACOG references compared nationally reported statistics on mortality rates for legal abortions and childbirth, concluding that abortion is fourteen times safer than childbirth.[120] This study by Raymond and Grimes has several methodological flaws, including a reliance on nationally reported data without medical record linkage, and making direct comparisons of different mortality rates that have been demonstrated in other studies to be unreliable.[121] Even Dr. Julie Gerberding, former director of the U.S. Centers for Disease Control and Prevention (CDC) and current CEO of the Foundation for the National Institutes of Health, commented on the appropriateness of comparing maternal mortality rates and abortion rates using the CDC data in a letter in 2004. She wrote that these mortality rates "are conceptually different and are used by the CDC

---

[119] *Abortion Access Fact Sheet*, ACOG (last visited April 23, 2025), https://www.acog.org/advocacy/abortion-is-essential/come-prepared/abortion-access-fact-sheet; Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012 Feb; 119(2 Pt 1):215-9. doi: 10.1097/AOG.0b013e31823fe923. PMID: 22270271.

[120] Elizabeth G Raymond, David A Grimes. "The Comparative Safety of Legal Induced Abortion and Childbirth in the United States." Obstet Gynecol 199, no. 2 (2012): 215-19.

[121] M Gissler, R Kauppila, J Merilainen, H Toukomaa, E Hemminki. "Pregnancy-Associated Deaths in Finland 1987-1994 — Definition Problems and Benefits of Record Linkage." Acta Obstet Gynecol Scand. 76, no. 7 (1997):651-57.

for different public health purposes"[122] and as a result, a direct comparison of the two is not methodologically sound.

b. The referenced study by ACOG also fails to recognize several other similar studies that had opposite conclusions when comparing mortality associated with abortion and pregnancy, showing that abortion is related to higher pregnancy-related mortality.[123, 124, 125]

c. Continuing a pregnancy inherently continues the general underlying risks of pregnancy. However, the additional risk imposed by each day, week, or month of pregnancy has not been clearly quantified, and is highly variable depending on the specific clinical situation.

d. Dr. Dahl does not specify the timing or type of abortion she considers safer than pregnancy. The risks of pregnancy, delivery, and surgical abortion procedures are highly variable depending on the gestational age, the health of the patient, and multiple other clinical characteristics. Her blanket statement concluding that abortion is safer does not capture or even acknowledge the wide variety of situations encountered.

e. Assessing maternal risk in situations where there are diagnosed fetal conditions is known to be challenging. There is a lack of data on maternal outcomes due to a focus on the fetus in research, and the fact that these conditions are rare.[126]

---

[122] Julie Louise Gerberding, MD. "Letter to Walter Weber, American Center for Law & Justice, Responding to Weber's April 30, 2004 Letter to Tommy G. Thompson, U.S. Department of Health and Human Services." Atlanta, GA: Centers for Disease Control and Prevention (CDC), 2004.

[123] David C Reardon, Thomas W Strahan, John M Thorp Jr, Martha W Shuping, "Deaths Associated with Abortion Compared to Childbirth— a Review of New and Old Data and the Medical and Legal Implications." J Contemp Health Law Policy 20, no. 2 (2004): 279-327.

[124] Elizabeth M. Shadigian, Samuel T. Bauer. "Pregnancy-Associated Death: A Qualitative Systematic Review of Homicide and Suicide." Obstetrical & Gynecological Survey 60, no. 3 (2005): 183-90.

[125] Mika Gissler, Cynthia Berg, Marie-Helene Bouvier-Colle, Pierre Buekens, "Pregnancy-Associated Mortality after Birth, Spontaneous Abortion, or Induced Abortion in Finland, 1987-2000." American Journal of Obstetrics & Gynecology 190, no. 2 (2004): 422-27.

[126] Lappen JR, Pettker CM, Louis JM. Society for Maternal-Fetal Medicine Consult Series #54: Assessing the risk of maternal morbidity and mortality. Am J Obstet Gynecol. Apr. 2021; 224(4): B2-B15. doi: 10.1016/j.ajog.2020.12.006

f. There are a multitude of both medical and nonmedical factors that contribute to maternal morbidity and mortality. Quantifying the risk is complex, and there is a lack of validated tools for assessing risk, particularly prospectively.[127] Both physicians and patients have different tolerance of risk in any given situation. In my experience, patients generally choose to tolerate very high medical risks to themselves if it means the baby's chances of survival are improved.

91. I am concerned by the general tone of the plaintiff's medical experts in generally characterizing pregnancy as inherently higher risk for one's health than termination of pregnancy. It further creates concern that their conception of what "medically indicated" includes would encompass any situation where there is a perceived increased risk in pregnancy. There are a number of concerns with the described threshold. First, the difference of risk tolerance and perception of risk is influenced strongly by whether the pregnancy is desired or not. Second, many cases of serious morbidity and mortality occur in patients who are not considered at increased risk for bad outcomes.

92. Maternal morbidity is carefully tracked, but generally only in severe categories ("severe maternal morbidity"), which has a rate of approximately 1.8% in admissions related to delivery.[128] Although severe maternal morbidity and mortality are more likely in women that have medical comorbidities or are otherwise considered "high-risk" for such outcomes, they also occur in pregnancies that have no specific factors that would put them in a category of increased risk. Therefore, the argument exists that any pregnancy puts a woman at risk for irreversible harm to a major bodily function, and even death. Truly, risk is a difficult entity to

[127] Lappen JR, Pettker CM, Louis JM. Society for Maternal-Fetal Medicine Consult Series #54: Assessing the risk of maternal morbidity and mortality. Am J Obstet Gynecol. Apr 2021; 224(4): B2-B15. doi:10.1016/j.ajog.2020.12.006

[128] Fink DA, Kilday D, Cao Z, et al. Trends in Maternal Mortality and Severe Maternal Morbidity During Delivery-Related Hospitalizations in the United States, 2008 to 2021. JAMA Netw Open. Jun 1, 2023; 6(6):e2317641. doi:10.1001/jamanetworkopen.2023.17641

estimate as it is affected by so many different variables and circumstances. There are organizations, like the Society of Maternal Fetal Medicine, that describe ways to assess risks due to pregnancy in individual patients with the purpose of reducing maternal morbidity and mortality.[129, 130]

93. I question the significance of attempts to highlight the relatively high rates of maternal morbidity and mortality in the United States, and even more so data showing unfortunate racial and ethnic disparities in maternal mortality to arguments about abortion (See Complaint ¶ 111). We have observed concerning increases in maternal mortality in the United States over the past several decades that disproportionately affect non-white populations,[131, 132] and abortions have been offered as an intervention to ameliorate these trends.[133] Racial and ethnic disparities in maternal mortality exist. They similarly exist in abortion care, where black women have the highest rates of abortion, almost 5 times that of white women.[134] Furthermore, these trends of morbidity and mortality have existed *despite* the (now reversed) federal protection of abortion, and studies attempting to link more restrictive abortion laws with maternal mortality

---

[129] Lappen JR, Pettker CM, Louis JM. Society for Maternal-Fetal Medicine Consult Series #54: Assessing the risk of maternal morbidity and mortality. Am J Obstet Gynecol. Apr 2021; 224(4): B2-B15. doi:10.1016/j.ajog.2020.12.006

[130] Blackwell S, Louis JM, Norton ME, et al. Reproductive services for women at high risk for maternal mortality: a report of the workshop of the Society for Maternal-Fetal Medicine, the American College of Obstetricians and Gynecologists, the Fellowship in Family Planning, and the Society of Family Planning. *Am J Obstet Gynecol*. Apr 2020; 222(4): B2-B18. doi:10.1016/j.ajog.2019.12.008.

[131] MacDorman M, Declercq E, Cabral H, Morton C. Recent increases in the U.S. maternal mortality rate. Obstetrics and Gynecology. 2016; 128(3):447-55.

[132] Centers for Disease Control and Prevention (CDC). Pregnancy Mortality Surveillance System: U.S. Department of Health and Human Services; 2024 [updated March 23, 2023. Available from: https://www.cdc.gov/reproductivehealth/maternal-mortality/pregnancy-mortality-surveillance-system.htm.

[133] Blackwell S, Louis JM, Norton ME, Lappen JR, Pettker CM, Kaimal A, et al. Reproductive services for women at high risk for maternal mortality: a report of the workshop of the Society for Maternal-Fetal Medicine, the American College of Obstetricians and Gynecologists, the Fellowship in Family Planning, and the Society of Family Planning. Am J Obstet Gynecol. 2020; 222(4):B2-B18.

[134] Stephanie Ramer, Antoinette T. Nguyen, Lisa M. Hollier, Jessica Rodenhizer, Lee Warner, Maura K. Whiteman, "Abortion Surveillance — United States, 2022." Surveillance Summaries 73, no. 7 (2024): 1-28.

are speculative and not based on the results of well-executed empirical studies.[135] There is currently no available evidence to substantiate any claim that increased abortion rates will significantly change either our country's rates of maternal morbidity and mortality, nor the racial and ethnic disparities in maternal mortality present.

94. Abortion as an intervention fails to address the primary contributor to maternal morbidity and mortality in the United States – an increasing rate of maternal medical comorbidities such as obesity, hypertension, and diabetes, which have been clearly associated with worse outcomes in pregnancy.[136, 137] Abortion in no way treats or cures underlying health conditions or a woman's control of them, it simply removes pregnancy as a possible complicating factor.

95. Pregnancy is considered to be an overall safe endeavor. Although morbidity and mortality may occur, most pregnancies are uncomplicated. The benefits of having a child are difficult to quantify, but I can safely say my patients generally see it as one of the most impactful and positive experiences in their lives. This remains true even when the pregnancy is difficult and/or complicated from a medical standpoint.

96. To be clear, pregnancy is overall extremely safe in the United States, with a mortality rate associated with pregnancy of approximately 18.6 per 100,000 live births, or 0.0186% in 2023. This rate has decreased since evaluation in 2022.[138] Idaho's calculated Pregnancy-Related

---

[135] Kheyfets A, Dhaurali S, Feyock P, Khan F, Lockley A, Miller B, Amutah-Onukagha N. The impact of hostile abortion legislation on the United States maternal mortality crisis: a call for increased abortion education. Front Public Health. 2023; 11:1291668.

[136] Fridman M, Korst LM, Chow J, Lawton E, Mitchell C, Gregory KD. Trends in maternal morbidity before and during pregnancy in California. Am J Public Health. 2014; 104 Suppl 1:S49-57.

[137] Gawron LM, Sanders JN, Sward K, Poursaid AE, Simmons R, Turok DK. Multi-morbidity and Highly Effective Contraception in Reproductive-Age Women in the US Intermountain West: a Retrospective Cohort Study. Journal of General Internal Medicine. 2019; 35:637-42.

[138] CDC. Pregnancy Mortality Surveillance System. U.S. Department of Health and Human Services. Updated November 24, 2024. Accessed April 23, 2025. https://www.cdc.gov/maternal-mortality/php/pregnancy-mortality-surveillance/?CDC_AAref_Val=https://www.cdc.gov/reproductivehealth/maternal-mortality/pregnancy-mortality-surveillance-system.htm#cdc_survey_profile_purpose-pregnancy-related-deaths-data

Mortality Ratio is 22.6 maternal deaths per 100,000 live births, indicating pregnancy is also safe in the state of Idaho and comparable to national rates, with a mortality rate of 0.0226%.[139]

97. I reject the plaintiff's claim that "The Abortion Bans increase the likelihood that pregnant people in Idaho will die from preventable causes" (Complaint ¶ 117). In fact, recent data from the Maternal Mortality Review Committee (MMRC) of the state of Idaho indicate that the rate of pregnancy-associated deaths and pregnancy-related deaths has actually decreased since the Supreme Court's decision in Dobbs v. Jackson Women's Health Organization, which was issued on June 24, 2022, leading to a national changeover to existing individual state laws to regulate abortion. When the most recent data analyzed from 2023 is compared to data from 2021, there has been a 44.4% decrease in pregnancy-related deaths and a 31.25% decrease in pregnancy-associated deaths.[140] These statistics would not support the argument that reduced access to abortions has had a damaging impact on maternal mortality in the state.

98. In my experience, pregnancy is a special time that provides access to excellent health care. Patients who receive prenatal care generally receive excellent care for their underlying health conditions, further improving their health status. I regularly see patients with long-standing health conditions, like Type 1 or Type 2 diabetes, who have never really achieved control of their condition, able to access significant resources of healthcare support as well as devices (such as insulin pumps and continuous glucose monitors) as a result of their pregnancy, thereby improving their understanding of and control of their condition for pregnancy and beyond.

[139] Idaho Division of Occupational & Professional Licenses Board of Medicine. "Idaho MMRC Annual Report 2023." Boise, Idaho: Division of Occupational & Professional Licenses, 2025.
[140] Idaho Division of Occupational & Professional Licenses Board of Medicine. "Idaho MMRC Annual Report 2023." Boise, Idaho: Division of Occupational & Professional Licenses, 2025.

99. In the cases where abortion is desired but not allowable by the Idaho law, a pregnant patient can pursue an abortion in a nearby state where it is available. By definition, the ability to pursue this care would mean remaining pregnant for the time between the decision to terminate the pregnancy and the termination itself would not create a significant medical threat to the life of the mother. In cases where the pregnancy truly threatens the life of the pregnant woman, abortion would be possible under Idaho's abortion laws.

100. Necessitating travel for some medical services is not unique in healthcare, despite the fact that it may lead to burdens on the patient due to travel, cost, or other factors. There are many situations where, due to the lack of access to certain therapies (most commonly due to the absence of trained medical providers), patients need to travel for specific care. In MFM, one example that regularly necessitates patient travel in my practice is Twin-Twin Transfusion syndrome. This is a serious condition that complicates approximately 15% of monochorionic/diamniotic twin pregnancies. Once diagnosed, it can progress quickly, and if left untreated, the mortality rate for both babies is as high as 70-100%.[141] In both the states I have practiced, the nearest trained providers of treatment for this condition were out of state. In these cases, relationships are built with providers to allow for urgent consultation and treatment if needed, and the care is provided quickly. However, in order to access the best possible care and ensure the best outcomes, the patients are required to travel to other facilities. I would argue that this condition is much more threatening to life than any condition that would fall outside the boundaries of Idaho's laws on abortion. Furthermore, it is a medically necessary treatment in order to preserve the lives of the babies. By definition, pregnant patients forced to pursue abortions outside of the state of Idaho would be doing so

[141] Society for Maternal-Fetal Medicine (SMFM), Russell S. Miller, Jena L. Miller, Martha A. Monson, Sarah G. Obican T. Flint Porter, Lynn L. Simpson. "Society for Maternal-Fetal Medicine Consult Series #72: Twin-Twin Transfusion Syndrome and Twin Anemia-Polycythemia Sequence." Am J Obstet Gynecol 231, no. 4 (2024): pB16-B37.

in situations where their life is not threatened. This would allow for medical consultation and travel in order to avail themselves of those services, and would not be treating them differently than people seeking healthcare services that in many cases are truly necessary and emergent. Dr. Eller even notes in her expert report that "if a patient chooses pregnancy termination, then they travel to Utah for these services with me or a colleague." (Eller ¶ 42).

101. In conclusion, Idaho's laws are not abortion bans, offering exceptions in clinical situations where it is necessary (such as ectopic or molar pregnancies), and where a pregnant woman's life is threatened. There is no evidence these laws have contributed to increased rates of maternal morbidity and mortality related to pregnancy in the state. The plaintiff's experts exaggerate the risks of pregnancy and vaguely define "medically indicated abortion," in an attempt to create a medical necessity for abortion in a wide variety of medical situations where it is not essential to protect the life of the pregnant patient. Abortions have risks that are both physical and psychological, with potential for lasting effects on many aspects of a woman's life. As maternal fetal medicine specialists, our training and experience teach us to consider both the maternal and the fetal patients, supporting clinical decisions that can balance the safety and health of both. Idaho's laws on abortion do not prevent physicians from providing excellent medical care to optimize both maternal and fetal outcomes.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 24, 2025

*/s/ Elena Kraus*
Elena Kraus

RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

AARON M. GREEN, ISB #12397
KYLE D. GRIGSBY, ISB #10709
Deputy Attorneys General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
aaron.green@ag.idaho.gov
kyle.grigsby@ag.idaho.gov

*Attorneys for Defendants Members of the Idaho Board of Medicine and 41 County Prosecutors*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D.<br><br>*Plaintiff*,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>*Defendants*, | Case No. 1:24-cv-00244-BLW<br><br>**DEFENDANTS MEMBERS OF THE IDAHO BOARD OF MEDICINE RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION** |

Defendants Members of the Idaho Board of Medicine, by and through their counsel of record, respond to Plaintiff's First Set of Interrogatories, Requests for Production and Requests for Admission to Defendants. Discovery in this lawsuit is ongoing and pursuant to Federal Rules of Civil Procedure of 26 and 34, Defendant will supplement their Answers and Responses accordingly. If additional relevant non-privileged documents are identified during discovery, Defendant will supplement these answers in accordance with Federal Rules of Civil Procedure. Defendants have made a diligent search for the documents and information requested.

Subject to the foregoing, Defendants respond to Plaintiff's First Set of Interrogatories, Requests for Production, and Requests for Admission to Defendants as follows:

## INTERROGATORIES

**Interrogatory No. 1**: Identify all individuals from whom information was sought or obtained in connection with responding to Plaintiff's First Set of Discovery Requests.

**Answer to Interrogatory No. 1**:

- Russell Spencer, general counsel for the Board of Medicine
- Orin Duffin, executive officer and coordinator of the MMRC
- Berk Fraser, chief investigator, DOPL: Health Professions Bureau
- Bob McLaughlin, public information officer, DOPL

**Interrogatory No. 2**: Identify all discipline actions taken by the Board from January 1, 2015, to the present against licensed physicians in connection with conduct concerning an abortion. For each action, provide the name of the physician, the physician's license number, the case number, the typed of discipline action, and the action date.

**Answer to Interrogatory No. 2**:

Defendants respond and answer that they are aware of no such disciplinary actions.

**Interrogatory No. 3**: Describe the steps that the Board has taken or intends to take to satisfy its obligations under Idaho Code § 54-1806(12).

**Answer to Interrogatory No. 3**:

In 2024, the Board reconstituted the Maternal Mortality Review Committee (MMRC). Staff for the MMRC collected, and continues to receive, data from Health and Welfare's Bureau of Vital Statistics on the incidents of maternal mortality in Idaho. Committee staff then requested medical records for the persons identified in the vital statistics data. These records are abstracted by staff for the review of the MMRC. The MMRC met on November 21 and on December 13, 2024 to review the abstracted cases for 2023 and determine which incidents were related to pregnancy as compared to associated with pregnancy, considering several variables noted as relevant by the CDC. The object was to determine whether the death was pregnancy related, the possible cause of death, whether the death was potentially preventable, factors which potentially contributed to the death, and recommendations, if any, to prevent similar deaths in the future. The committee's analysis of the incidents of maternal mortality in 2023 was reduced to a report, which was approved by both the MMRC and the Board of Medicine. That report was then provided to the legislature on January 28, 2025.

Committee staff also requested the vital statistics for 2022 and 2024, and has collected and abstracted (or is in the process of collecting and abstracting) the medical records for the persons identified in those vital statistic reports to present records to the committee members for their review and analysis. The MMRC met on May 2, 2025, to consider some of these

records, and is scheduled to meet again on September 12 and November 7, 2025, to review the rest of the records. Additional meetings will be called as necessary to allow the committee to produce reports for the legislature of the incidents of maternal mortality recorded in 2022 and 2024.

**Interrogatory No. 4**: Describe the process for selecting people to serve on the Reconstituted MMRC.

**Answer to Interrogatory No. 4**:

The reconstituted MMRC, like its predecessor, requires a wide range of educational and clinical expertise. A public request was made for letters of interest from interested healthcare professionals to serve on the committee, which was published on several boards, including the Board of Medicine, on the public website of the Division of Occupational and Professional Licenses. Additional requests for letters of interest were published through professional associations. This process also facilitated referrals of potentially interested individuals to the Board's staff; staff then reached out and contacted the individuals and provided information on how to submit a letter of interest to serve on the MMRC. Letters of interest were reviewed by the DOPL division administrator with input from the Board of Medicine.

The original announcement was published on June 28, 2024. Active recruitment opened on July 1, 2024, and has generally been ongoing. Each committee member has been selected based on his or her individual qualifications, and all interested parties were provided with equal consideration during the selection process.

**Interrogatory No. 5**: Describe the criteria that Defendants will use to evaluate whether Plaintiff acted in "good faith" when performing an abortion, as that phrase is used in Idaho Code § 18-622(2)(a).

**Answer to Interrogatory No. 5**:

Defendants do not enforce Idaho Code §18-622, other than to impose the mandatory license suspension after there is a conviction, and thus would not be in a position to evaluate whether plaintiff acted in "good faith."

**Interrogatory No. 6**: Describe the criteria that Defendants will use to evaluate whether an abortion performed by Plaintiff "was necessary to prevent the death of the pregnant woman," as that phrase is used in Idaho Code § 18-622(2)(a).

**Answer to Interrogatory No. 6:**

Defendants respond that because they do not enforce Idaho Code § 18-622, other than to impose the mandatory license suspension after a conviction, they will not be in a position to ever evaluate whether Plaintiff performed an abortion necessary to prevent the death of a pregnant woman.

**Interrogatory No. 7**: Identify all state interests served by prohibiting licensed physicians like Plaintiff from providing an abortion when a pregnant patient "may or will take action to harm herself" absent an abortion. Idaho Code § 18-622(2)(a)(i).

**Answer to Interrogatory No. 7:**

Defendants object on the basis that the rational basis standard of review is, as a matter of law, inclusive of all potential state interests whether stated in response to this interrogatory or not and therefore cannot bind Defendants as a matter of law.

Defendants also object on the basis that the question requires them to answer on behalf of the State, which they cannot do.

Notwithstanding that objection, Defendant Members further states that, without waiving any other interests, Idaho Code Section 18-622(2)(a)(i)'s prohibition serves the state interest in protecting unborn children from an abortion. Idaho has a profound interest in preserving the life of preborn children and it is the public policy of the state that all statutes, rules, and constitutional provisions shall be interpreted to prefer, by all legal means, live childbirth over abortion. Further, Idaho Code Section 18-622(2)(a)(i)'s prohibition serves the state interests in regulating abortion, including: "[R]espect for and preservation of prenatal life at all stages of development ...; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." See *Planned Parenthood Great Nw.* v. *State*, 171 Idaho 374, 437, 522 P.3d 1132, 1195 (2023) (quoting *Dobbs* v. *Jackson Women's Health Organization*, 597 U.S. 215, 301 (2022).

**Interrogatory No. 8**: Identify all state interests served by treating pregnant people at risk of death from self-harm differently than pregnant people at risk of death from other causes with respect to their ability to obtain a lawful abortion in Idaho.

**Answer to Interrogatory No. 8:**

Defendants object on the basis that the rational basis standard of review is, as a matter of law, inclusive of all potential state interests whether stated in response to this interrogatory or not and therefore cannot bind Defendants as a matter of law.

Defendants also object on the basis that the question appears to require them to answer on behalf of the State, which they cannot do.

Notwithstanding that objection, Defendant Members state that, without waiving any other interests, the Defendant Members understand Idaho Code Section 18-622(2)(a)(i)'s prohibition serves the state interest in protecting unborn children from an abortion. Idaho has a profound interest in preserving the life of preborn children and it is the public policy of the state that all statutes, rules, and constitutional provisions shall be interpreted to prefer, by all legal means, live childbirth over abortion. Because physical self-harm, by definition requiring action by the pregnant woman, can be prevented by hospitalization and/or treated with appropriate medication there are no circumstances concerning threats of self-harm where a treatment is not available to preserve both the life of the mother and the life of the unborn child. Moreover, because post-partum suicide, by definition, takes place after the birth of a child, an abortion cannot prevent the death of a woman who is at risk of death from self-harm during the post-partum period.

As a general matter, mental health disorders and substance abuse disorders do not increase or worsen during pregnancy, and to the extent that they occur, they can be managed by means other than an abortion to preserve the life of the mother during pregnancy. Also, abortion can worsen mental health outcomes.

Additionally, while other medical conditions that could result in the death of a pregnant woman have objective indicia, no such objective indicia exist for threats of self-harm. Treatment of mental health conditions significantly relies upon a patient's subjective self-

reporting of a mental state that indicates risk, rather than a physical basis on which a doctor can make a good faith medical judgment.

**Interrogatory No. 9**: The Members of the Idaho Board of Medicine and 41 County Prosecutors' Memorandum in Support of Motion to Dismiss (Dkt. #25-1) state on page 17 that "a woman who needs an abortion to prevent her death because of a physical ailment that will lead to her death absent an abortion is not similarly situated to a woman who might engage in self-harm, but is physically healthy." Describe each fact that supports this statement.

**Answer to Interrogatory No. 9:**

Defendants object on the basis that the rational basis standard of review is, as a matter of law, inclusive of all potential state interests whether stated in response to this interrogatory or not and therefore cannot bind Defendants as a matter of law.

Defendants also object on the basis that the question appears to require them to answer on behalf of the State, which they cannot do.

Notwithstanding and without waiving the foregoing objections, Defendant Members' state that, without waiving any other interests, the Defendant Members' understand that, in contrast to a woman who suffers from a physical condition necessitating an abortion to avert her death, because physical self-harm, by definition requiring action by the pregnant woman, can be prevented by hospitalization and/or treated with appropriate medication there are no circumstances concerning threats to self-harm where a treatment is not available to preserve both the life of the mother and the life of the unborn child. Idaho has a profound interest in preserving the life of preborn children and it is the public policy of the state that all statutes, rules, and constitutional provisions shall be interpreted to prefer, by all legal means, live

childbirth over abortion. Moreover, because post-partum suicide, by definition, takes place after the birth of a child, an abortion cannot prevent the death of a woman who is at risk of death from self-harm during the post-partum period.

As a general matter, mental health disorders and substance abuse disorders do not increase or worsen during pregnancy, and to the extent that they occur, they can, in all circumstances, be managed by means other than an abortion to preserve the life of the mother during pregnancy. Indeed, evidence suggests that abortion can worsen mental health outcomes.

Additionally, while other medical conditions that could result the death of a pregnant woman have objective indicia, no such objective indicia exist for threats of self-harm. Treatment of mental health conditions significantly relies upon a patient's subjective self-reporting that indicates risk, rather than a basis on which a doctor can make a good faith medical judgment.

**Interrogatory No. 10**: Identify all state interests served by prohibiting licensed physicians like Plaintiff from providing an abortion when a pregnant person has received a diagnosis that their embryo or fetus has a fatal condition.

**Answer to Interrogatory No. 10:**

Defendants object on the basis that the rational basis standard of review is, as a matter of law, inclusive of all potential state interests whether stated in response to this interrogatory or not and therefore cannot bind Defendants as a matter of law.

Defendants also object on the basis that the question appears to require them to answer on behalf of the State, which they cannot do.

Notwithstanding and without waiving the foregoing objections, Defendants respond that the Legislature has enunciated a policy of protecting unborn children whenever there is some chance, however small, of survival. *See* Idaho Code § 18-601; *Planned Parenthood Gr. Nw. v. State*, 171 Idaho 374, 445, 522 P.3d 1132, 1203 (2022).

Additionally, prohibiting discrimination on the basis of genetic information or disability are legitimate and compelling state interests, given that these conditions may, on occasion, be identified or misidentified genetically. These conditions may, if they are not fatal in fact, result in a disability. Unborn children with genetic information indicating a 'fatal' condition or who will be born with a disability remain Idahoans whose lives are inherently valuable.

Further, Idaho has a profound interest in preserving the life of preborn children and it is the public policy of the state that all statutes, rules, and constitutional provisions shall be interpreted to prefer, by all legal means, live childbirth over abortion. Prohibiting discrimination on the basis of genetic information or disability also serves the state interests in regulating abortion, including: "[R]espect for and preservation of prenatal life at all stages of development ...; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." See *Planned Parenthood Great Nw.* v. *State*, 171 Idaho 374, 437, 522 P.3d 1132, 1195 (2023) (quoting *Dobbs* v. *Jackson Women's Health Organization*, 597 U.S. 215, 301 (2022).

**Interrogatory No. 11:** State whether Defendants consider a multifetal pregnancy reduction to constitute an abortion for purposes of Idaho Code § 18-604(1).

**Answer to Interrogatory No. 11:**

Defendants object to the extent that the question seeks an answer on behalf of the State of Idaho which Defendants cannot provide.

Defendants object on the basis that they are not responsible for the enforcement of Idaho Code Section 18-622 or Idaho Code Sections 18-8801 through 18-8808, and the question presumes that they are.

Defendants object on the basis that the question is vague and ambiguous as the question does not identify whether the hypothetical multifetal pregnancy reduction is done to remove a dead unborn child.

Notwithstanding and without waiving those objections, Defendants state that in some circumstances a multi-fetal pregnancy reduction might be considered an abortion pursuant to Idaho Code § 18-604(1).

**Interrogatory No. 12**: Identify all people, other than the attorneys representing the parties in this lawsuit and the court presiding over this lawsuit, with whom any Defendant has communicated concerning plans, guidance, or questions concerning enforcement of Idaho Code § 18-622 and/or Idaho Code §§ 18-8801 to 18-8808.

**Answer to Interrogatory No. 12:**

Defendants object on the basis that they are not responsible for the enforcement of Idaho Code Section 18-622 or Idaho Code Sections 18-8801 through 18-8808, other than to impose a mandatory license suspension in the event of a conviction, and the question presumes that they are.

Defendants object to the extent that the question seeks an answer on behalf of the State of Idaho which Defendants cannot provide.

Notwithstanding and without waiving those objections Defendants respond that the members of the Board in their official capacity have made no such communications.

**Interrogatory No. 13**: Defendants' Consolidated Reply in Support of Defendants' Motions to Dismiss (Dkt. #41) states on page 12 that: "There is a grab bag of medical conditions (some of which are covered by Idaho's exception) and shifting terminology." Identify the medical conditions Defendants consider to be "covered by Idaho's exception."

**Answer to Interrogatory No. 13:**

Defendants object on the basis that Defendants do not administer Idaho Code Sections 18-622 or 18-8801 et seq and the question presumes that they do.

Defendants object on the basis that the question presumes that Defendants can answer on behalf of the State which Defendants may not do.

Notwithstanding and without waiving those objections, Defendants observe that a medical condition in the treatment of which a "physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," is covered by Idaho's exception under the Defense of Life Act. It is impossible to describe every possible medical condition for which the Defense of Life Act could apply. Each health condition, patient, situation, and pregnancy is unique and individualized determinations must be made a physician to determine if "in his good faith medical judgment and based on the facts known to the physician at the time…the abortion was necessary to prevent the death of the pregnant woman." Where such

statutory requirements are met, an abortion can be permitted in many different circumstances, including, but not limited to, preterm premature rupture of membranes (PPROM), placental abruption, preeclampsia, and other medical conditions, as identified by the Complaint.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1**: All documents that Defendants consulted, on which Defendants relied, or to which Defendants referred when formulating their responses to Plaintiff's first set of interrogatories and requests for admissions, other than the documents attached hereto as exhibits.

**Answer to Request for Production No. 1:**

Defendants consulted any document produced by Plaintiff in this action, and Defendants' own expert reports. Additionally, Defendants consulted the letter dated January 31, 2025 disclosed alongside these answers.

## REQUESTS FOR ADMISSION

**Requests for Admission No. 1**: Admit that the document attached hereto as Exhibit A is a genuine copy of the report of the findings of the MMRC concerning maternal deaths in Idaho in 2018.

**Answer to Requests for Admission No. 1:**

Admit.

**Requests for Admission No. 2**: Admit that the document attached hereto as Exhibit B is a genuine copy of the report of the findings of the MMRC concerning maternal deaths in Idaho in 2019.

**Answer to Requests for Admission No. 2:**

Admit.

**Requests for Admission No. 3**: Admit that the document attached hereto as Exhibit C is a genuine copy of the report of the findings of the MMRC concerning maternal deaths in Idaho in 2020.

**Answer to Requests for Admission No. 3:**

Admit.

**Requests for Admission No. 4**: Admit that the document attached hereto as Exhibit D is a genuine copy of the report of the findings of the MMRC concerning maternal deaths in Idaho in 2021.

**Answer to Requests for Admission No. 4:**

Admit.

**Requests for Admission No. 5**: Admit that the document attached hereto as Exhibit E is a genuine copy of the findings of the Reconstituted MMRC concerning maternal deaths in Idaho in 2023.

**Answer to Requests for Admission No. 5:**

Admit.

**Requests for Admission No. 6**: Admit that the most common underlying cause of maternal death in Idaho during 2018-2021 was mental health conditions.

**Answer to Requests for Admission No. 6:**

Deny. In 2018, those deaths identified as having an underlying mental health cause of death were also identified as only "probably" having mental health conditions as a cause. Additionally for 2018, MMRC data reports some deaths as being of unknown underlying

cause, which could—if ascertained—result in equal numbers in 2018 between mental health and traumatic injury.

In 2019, numerically, the most common cause of death was "other non-cardiovascular medical conditions."

In 2020, the most common cause of death identified was neurologic/neurovascular conditions.

In 2021 only, was the most common cause of death identified a mental health condition, with the specific underlying cause being substance abuse disorder in two cases.

Moreover, as the 2018 MMRC articulates, an MMRC report is not "a substitute for existing mortality and morbidity inquiries or reviews" and relies on case narratives and abstractions derived from existing data.

**Requests for Admission No. 7**: Admit that the most common underlying causes of pregnancy-related death in Idaho in 2023 were mental health conditions and hemorrhage, each accounting for 40% of pregnancy-related deaths.

**Answer to Requests for Admission No. 7:**

Admit in part and deny in part. Admit to the extent that the 2023 MMRC associates 40% of pregnancy-related deaths with mental health conditions and hemorrhage, respectively. Deny to the extent that an MMRC report is not "a substitute for existing mortality and morbidity inquiries or reviews" and relies on case narratives and abstractions derived from existing data.

**Requests for Admission No. 8**: Admit that an abortion is not always necessary to save a pregnant person's life in cases where the pregnant person experiences preterm premature rupture of membranes ("PPROM")

**Answer to Requests for Admission No. 8:**

Admit.

**Requests for Admission No. 9**: Admit that an abortion is not always necessary to save a pregnant person's life in cases where the pregnant person receives a diagnosis that their embryo or fetus has a condition that is likely to result in miscarriage, stillbirth, or infant mortality.

**Answer to Requests for Admission No. 9:**

Admit.

**Requests for Admission No. 10**: Admit that physicians can disagree, when utilizing their good faith medical judgment, as to whether an abortion is necessary to prevent the death of a pregnant patient.

**Answer to Requests for Admission No. 10:**

Admit.

DATED: May 29, 2025

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

/s/ *Aaron M. Green*
AARON M. GREEN
Deputy Attorney General

*Attorney for Defendants Members of the Idaho Board of Medicine and 41 County Prosecutors*

## VERIFICATION

I, David A. McClusky, III, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. David A. McClusky III*
DAVID A. MCCLUSKY III, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Keith Davis, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. Keith Davis*
KEITH DAVIS, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Guillermo Guzman Trevino, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. Guillermo Guzman Trevino*
GUILLERMO GUZMAN TREVINO, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Jared C. Morton, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. Jared C. Morton*
JARED C. MORTON, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Thomas Neal, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. Thomas Neal*
THOMAS NEAL, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Christian G. Zimmerman, M.D., being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

*/s/ Dr. Christian G. Zimmerman*
CHRISTIAN G. ZIMMERMAN, M.D.
Physician Member of the
Idaho Board of Medicine

## VERIFICATION

I, Michele Chadwick, being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

/s/ *Michele Chadwick*
MICHELE CHADWICK
Public Member of the Idaho Board of Medicine

## VERIFICATION

I, Paul E. Anderson, being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

/s/ *Paul E. Anderson*
PAUL E. ANDERSON
Public Member of the Idaho Board of Medicine

**VERIFICATION**

I, Bill Gardiner, being first duly sworn upon oath, depose and state upon personal knowledge as follows:

That I am a Defendant in the above captioned action, and that I have read the Responses to Interrogatories and believe the facts stated therein are true based upon my own information and belief.

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Dated:

/s/ *Bill Gardiner*
BILL GARDINER
Officio Member of the Idaho Board of Medicine

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on May 29, 2025, the foregoing was emailed to the following persons:

Jamila Johnson
jjohnson@lawyeringproject.org

Tanya Pellegrini
tpellegrini@lawyeringproject.org

Paige Suelzle
psuelzle@lawyeringproject.org

Stephanie Toti
stoti@lawyeringproject.org

Wendy S. Heipt
wheipt@legalvoice.org

*Attorneys for Plaintiff*

/s/ *Aaron M. Green*
AARON M. GREEN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) 1:24-cv-00244-BLW |
| vs. | ) |
| | ) |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al., | ) |
| Defendants, | ) |
| ATTORNEY GENERAL RAUL LABRADOR. | ) |
| Intervenor. | ) |

REMOTE DEPOSITION OF PATRICIA COHEN, PhD

July 24, 2025

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR

Q. Sweeping more broadly, did you find any source -- it can be from any category that we've discussed or haven't discussed -- stating that a legal right to abortion existed anywhere before the 20th century?

A. That it did exist, a legal right? A positive statement?

Q. Correct.

A. Right. I have not encountered such a statement. I have my Thomas Nichols statement that it should be a right -- or that he's saying from higher law it is a right, but he's not a lawyer, so...

Q. And he's alone?

A. Hmm?

Q. And he's alone, right?

A. He's a what?

Q. Alone.

A. Alone?

Q. In making that statement.

A. It was picked up by a doctor in Buffalo and reiterated there in a passage in a book that I think was largely, you know, rewritten from Nichols' book. So other people agreed with it.

I would say that the legions of women

who had abortions probably agreed with it, but --

Q. (Indiscernible crosstalk) -- sorry. Go ahead. I interrupted you.

A. I believe that large numbers of women had early-term abortions as a major contributing factor to the fall of birthrates and the decline in fertility in the 19th century. Birth control was also used, periodic abstinence could also have played a role, but abortion as a backup measure of birth control was something that was commonly undertaken by women, and doctors who disapproved of it reported on this and, with shock, said they don't think there's anything wrong with it, you know. So clearly they thought it was something that they were entitled to choose for themselves.

So not writing about it, but that does -- that's not a surprise that people wouldn't have written about it.

Q. Why is it not a surprise?

A. Because it's a private matter that people don't normally talk about. We get coded references to it, perhaps. Again, I'll cite the work of Shannon Withycombe who has written a book called "Lost" about pregnancy loss in the early to mid-19th century, and she finds in her research

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| STACY SEYB, MD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| vs. | ) | 1:24-cv-00244-BLW |
| | ) | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| | ) | |
| ATTORNEY GENERAL RAUL LABRADOR, | ) | |
| | ) | |
| Intervenor. | ) | |
| | ) | |

REMOTE DEPOSITION OF CARLY DAHL, MD

Thursday, August 28, 2025, 10:02 a.m.

BE IT REMEMBERED that the deposition of Carly Dahl, MD, was taken by the attorney for the defendants/intervenor via Zoom, before Jessica Simpson, Court Reporter and Notary Public, in and for the State of Idaho in the above-entitled matter.

THE WITNESS: Again, I don't determine what is meaningful for other people's families.

Q. BY MR. CRAIG: So it's fully dependent upon the parents of that baby in determining whether the life is meaningful?

A. I determine whether something is incompatible with life, i.e., lethal; and families determine what a meaningful life is for their potential future child. And I practice in the confines of Utah state law based on that.

Q. Let's move on to paragraph 19 of your report. Paragraph 19 you write about anencephaly being incompatible with life; is that correct?

A. That's correct.

Q. How often does anencephaly occur in pregnancies?

A. Approximately, probably, 1 in every 1,000 pregnancies, around.

Q. Have you ever treated a mother or baby with anencephaly -- or a mother who was pregnant with a baby with anencephaly, or the baby?

A. The fetal diagnosis being anencephaly, yes, I have.

Q. Okay. How many?

A. Probably -- I don't remember exactly.

Probably around two or three.
Q. Was that in Utah or in Illinois?
A. Both. I believe I had patients who had anencephaly in Illinois, but I don't remember specifically.
Q. And did you perform an abortion in those situations?
A. I have performed an abortion for anencephaly, and I have also supported patients who have not wanted an abortion for anencephaly.
Q. And did you deliver the baby in those situations where they did not want an abortion?
A. I can't remember if I was specifically the delivering provider.
Q. Isn't it true that some babies with anencephaly can be born alive and live for at least some period of time afterward?
A. Some fetuses with a diagnosis can be born alive, although often there will be an intrauterine fetal demise or an intrapartum stillbirth. But some fetuses can be born alive with anencephaly and live for a period of time.
Q. And that period of time could be hours or days or sometimes even years, correct?
A. I don't know any reports of years. I

would say hours to days is the typical span.
Q. And so isn't it true that anencephaly is not universally lethal at the time of birth?
A. Anencephaly is universally lethal, but I don't consider the definition of universally lethal to be death upon, at the time of birth, at that moment of the birth.
Q. Paragraph 20 you write about -- and I'm probably not going to pronounce it right -- craniorachischisis.
A. Craniorachischisis.
Q. Okay. Thank you. And I'm going to spell that for the reporter. C-r-a-n-i-o-r-a-c-h-i-s-c-h-i-s-i-s.
Have you ever treated a baby with that -- or a mother or a baby with that diagnosis?
A. I believe I have seen a patient with this diagnosis, but was not significantly involved in their care.
Q. How often does this occur in pregnancy?
A. This is quite rare. I don't have a numerical incidence for this diagnosis.
Q. When you say you were not significantly involved in the treatment of that one person, what was your role in that one situation where you saw it?

A. I can't remember. We often have a group practice, and so we will often discuss diagnoses as a group. So it can be challenging to remember specifically what your role was, or if you were just, you know, in a diagnostic setting when this diagnosis was made. So I cannot remember.
Q. Do you remember the outcome of that baby?
A. I don't.
Q. Paragraph 21 you write about exencephaly. How often does that occur in pregnancies?
A. Exencephaly is a sequence with anencephaly. So, again, about 1 in 1,000 pregnancies.
Q. Have you ever treated a baby with exencephaly?
A. Because it's a sequence with anencephaly, every fetus that has anencephaly will have, at some point, had exencephaly. So the same information would apply to those with anencephaly.
Q. So the exencephaly is not really different than anencephaly. It's just a, I guess, continued sequence or development of anencephaly?
A. It's a different progression in the

stage of the neurodegeneration and brain degeneration by the amniotic fluid.

Q. All right. Paragraph 22 you talk about triploidy. Have you ever treated a mother with a fetal diagnosis of triploidy?

A. Yes.

Q. How many?

A. I don't remember how many.

Q. More than five?

A. Probably not more than five.

Q. How often does triploidy occur in pregnancies?

A. I don't know the incidence off the top of my head. It's often a cause of spontaneous abortion. So the incidence for all of these fetal diagnoses is really different depending on what numbers are being included.

Q. And in those situations where you were involved in the treatment of the diagnosis of triploidy, did you do abortion in those circumstances?

A. I believe I have performed an abortion for triploidy in the past, although I don't know exactly.

Q. Have you ever delivered a baby with

triploidy?

A. No.

Q. Some babies born with triploidy can survive for some period of time after birth, correct?

A. The survival with triploidy is extremely rare. I can't say for certain that it's impossible, but it's very rare to make it to a stage where you would have a live birth.

Q. But if the baby is born alive, it can survive for at least some period of time, correct?

A. For some period of time, potentially.

Q. In paragraph 23 you write about trisomy 13, correct?

A. Yes.

Q. How often does that occur in pregnancies?

A. Trisomy 13 occurs approximately in 1 in every 10,000 live births, but certainly more frequently in fetal diagnosis in general.

Q. Have you ever treated a diagnosis of trisomy 13?

A. Yes.

Q. About how many?

A. I don't recall specifically.

Q. More than five?

A. Maybe. I don't remember. It happens enough that it's possible.
Q. More than ten?
A. Not more than ten, I don't think.
Q. Did you provide abortions in those situations?
A. I believe I have provided abortion for trisomy 13.
Q. And have you ever delivered a baby with trisomy 13?
A. I believe I have.
Q. How many cases have you delivered?
A. I don't remember.
Q. And babies born with trisomy 13 can live for some period of time after birth, correct?
A. Some can, yes.
Q. Paragraph 24 you talk about trisomy 18. How often does that occur in pregnancies?
A. About 1 in every 2,000 to 3,000 pregnancies.
Q. Have you ever treated trisomy 18?
A. Yes.
Q. About how many?
A. Again, I don't remember. Somewhere in the estimations maybe less or around five.

Q. Did you perform abortions in those situations?

A. I have performed abortions for trisomy 18.

Q. Have you ever delivered any babies that have trisomy 18?

A. I believe I have, yes.

Q. And babies born with trisomy 18 can live for at least some period of time after birth, correct?

A. Any fetus, with any condition, that's born alive, will live for a period of time; that includes trisomy 18 and other lethal diagnoses.

Q. And babies with trisomy 18, there are examples of them living for years after birth, correct?

A. A minority of fetuses born alive -- the significant portions of fetuses, both with trisomy 13 and trisomy 18, will experience an intrauterine fetal demise. Of those that are born alive, there are a minority, less than 10 percent, that can live for a longer period of time.

Q. Paragraph 25 you talk about bilateral renal agenesis. Did I say that right?

A. Yes.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

STACY SEYB, M.D.,

Plaintiff,

vs.

MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al.,

Defendants,

ATTORNEY GENERAL RAUL LABRADOR,

Intervenor.

Case No. 1:24-cv-00244-BLW

REMOTE DEPOSITION OF MONICA EPPINGER,

VOL. I, PAGES 1-162

August 27, 2025

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR

Q. Okay. And I'll just close the loop with this. You might hate the question, but, you know, we'll see how it goes.

Regardless of whether or not it translates or not, is it fair to say that you have not found any primary source stating in explicit terms, not a duty, but a right to an abortion, however conceived, under any circumstances, before the 20th century?

MS. TOTI: Objection; form.

THE WITNESS: So the New York revisors, when they were passing the second law adopted by a state in the United States -- Connecticut was first, New York was second, the New York revisors added an explicit health exception to their regulation of abortion.

Does adding an explicit health exception lead me to an inference that they thought that a person had a right to medical care? It does.

Q. (BY MR. GREEN) I'm not asking for inferences, though. Remember, my question is about explicit statements, not inferences.

A. Right --

MS. TOTI: Objection to form, argumentative.

THE WITNESS: So I did not find in my

reading rights language applied to medical care, receiving medical care as a patient, or medical provision as a doctor in the same way -- and I want to emphasize this as part of the same sentence. I didn't find a right to practice law. I didn't find a right to be a law professor or a right to be a farmer.

There are some things that rights language was not applied to. So it's also -- it's still anachronistic. Even if there was talk about rights as civic rights, there are rights within professional context that we might -- our language would easily adapt to the conception of a right attached to this.

So I'm afraid that I have to rely on inferences, and the inference that can be drawn is that there was a right not to die from an untreated but treatable condition, even under the -- even in the period of rights.

MR. GREEN: Got it.

We've been going for about an hour-and-a-half. I appreciate the long length of time. I think we're good for, say, a 10-minute break?

MS. TOTI: Sounds good.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

- - - - - - - - - - - - - - - -x Case No.
: 1:24-cv-00244-BLW
STACY SEYB, M.D, :
:
Plaintiff, :
:
vs. :
:
MEMBERS OF THE IDAHO BOARD OF:
MEDICINE, in their official :
capacities; et al., :
:
Defendants. :
- - - - - - - - - - - - - - - -x

REMOTE DEPOSITION OF ELENA MARIE KRAUS, M.D., Ph.D.
August 4, 2025

Pages 1 - 184

Reported by
Brooke R. Bohr
IDAHO CSR No. 753
Federal Certified Realtime Reporter
NCRA Registered Professional Reporter

that that -- that mild fever that she has or elevation of white count or, you know, changes in the fetal heart tracing, that's going to -- you know, it is not going to get better, it is going to get worse.

So in those cases, I wouldn't wait for her to be septic. I would say we already have evidence that there's an infection developing. We know where this goes. There's different degrees of certainty in different situations. But in this situation, we know where it is going. And for that reason, we are inducing now instead of, you know, like an acute immediate threat.

Q. In cases where an abortion would prevent a serious risk of substantial and irreversible impairment of a major bodily function, would you say abortion is medically indicated?

A. It may be. It depends on the situation.

Q. Okay. And so you -- you mentioned PPROM a moment ago. Is it your opinion that PPROM, in and of itself, is not a medical indication for abortion?

A. You know, that's a hard one to answer

currently treating them; is that right?
A. Yeah. I think, in general, yes. They make comments about how we're treating them or whatever. But, yeah, in general, it is kind of more like their past experiences.
Q. Okay. Got it.
Is it correct that many lethal fetal conditions are diagnosed in connection with a 20-week ultrasound exam?
A. I would say some are and some aren't. But, yes, there are definitely some percentage that that's the time that we would identify them.
Q. Is 20 weeks about the halfway point of a full-term pregnancy?
A. It is about the halfway mark if you're assuming that they go to 40 weeks, yes.
Q. And so to carry a pregnancy full term and deliver, someone at 20 weeks must remain pregnant for another 3 and a half to 4 months; is that right?
A. I would say that's highly variable. I would never promise that to anybody because so many things can happen between 20 weeks and whenever delivery occurs.
I would say, especially in MFM, if we

are seeing a patient that is like past 39 weeks, we're like, "What the heck?" We don't commonly see patients that are past 39 weeks. You know, again, we deliver -- we very routinely and commonly are going to make recommendations on delivery timing, and it is frequently before 40 weeks, most often.

Q. And so absent a maternal indication for delivery, what is the earliest you would typically induce a patient?

A. It 100 percent depends on the situation.

Q. So in a case where a patient has been diagnosed with a lethal fetal condition, but there's no maternal indication for delivery, what is the range of options there?

A. I would say, again, we follow the -- the pregnancy very carefully. We monitor both the baby and the mother. There may, in fact, be, you know, fetal indications for delivery.

So I guess, for example, you know, yes, if there's a maternal indication, we would deliver. If a patient tells me -- you know, in a lot of those cases of lethal anomalies, the babies have a higher risk of stillbirth. And so there is

a risk of carrying the pregnancy to full term of the baby actually passing away.

In some cases, a mother might want to hold a live baby. You know, if the risk of stillbirth is very high, that would be a consideration in delivery planning because that may mean we deliver a little bit early, knowing the baby's status is good, to optimize chances of having a live birth and the mother being able to meet and spend time with her baby, particularly if they anticipate that their life will be short.

So, again, it is all individualized, based on the situation. But certain -- again, depending on its condition, we can justify early deliveries for those reasons. And also, to facilitate a safe delivery. And I believe I mentioned some examples like that in my report.

Q. And so when you say we might deliver the baby a little bit early, like what does that mean in terms of gestational age?

A. I would say like, again, it 100 percent depends on the specific fetal diagnosis because I can -- I mean, I can see trying to get to 37 weeks and saying, you know, 37 is probably good, if everything else is being equal and baby is fine

and mom is fine, versus arguing for an earlier delivery in cases where there's an abnormality like thanatophoric dysplasia, where the baby is not expected to survive based on respiration issues or like ventilation issues, but the head grows very -- it is large. The head is really large.

So sometimes, you know, we argue for earlier deliveries, maybe closer to 32 weeks, when the head size is about the size of a term baby, to facilitate a vaginal birth so the mom does not have to experience the additional morbidity of a surgery.

So, again, it is all very much individualized, trying to weigh risks to mom, the desires of mom, her goals, and kind of whether she wants -- if, you know, her goal is a live birth, no matter what, that would change our delivery planning versus if that's not the goal. So, again, and many other considerations.

Q. Okay. So -- you know, so we could be talking about, depending on the circumstances, you know, in cases where there's no spontaneous miscarriage or still birth, an additional two months of pregnancy, three months of pregnancy,

four months of pregnancy, just depending on the circumstances; is that accurate?

A. If they choose to continue the pregnancy, yes. I mean, it is highly variable.

Q. And so what --

A. Actually, there's times -- sorry.

Just to note, there's times when it is diagnosed, and we deliver pretty soon after that. It doesn't have to be a month or two. Like I said, there's exceptions to everything. There are just so many possibilities. It could be really anytime, depending on the situation.

Q. Understood.

What physical changes does a pregnant woman typically experience after 20 weeks of pregnancy as the pregnancy continues to progress?

A. You want all of the changes or are you looking for specific types of changes?

Q. You can give me the highlights.

A. I would say, generally, a progressing pregnancy is going to grow bigger. So they will look more pregnant. You know, oftentimes, again, they continue some degree of weight gain. There's physiologic impacts of, you know, like cardiac output is going to maximize at about 32 weeks.

A. You mean that's what you calculate with the difference between 5 and 11, or are you looking at a different column or row?
Q. Pregnancy-related deaths, I think it is between 5 and 3?
A. Okay. Yes.
MS. TOTI: Okay. All right. If it is okay with everyone, I would like to take just a quick break. I'll try to keep it under 10 minutes, and then I think we'll be ready to wrap up.
(Discussion off the record.)
(Recess taken.)
MS. TOTI: I am ready to pass the witness.
Thank you very much, Dr. Kraus, for your time today.
THE WITNESS: Thank you.
MR. CRAIG: All right. Thank you. I'll do cross now. I have just a couple of questions.

EXAMINATION

BY MR. CRAIG:
Q. Dr. Kraus, you were asked some questions about hydrops and Mirror Syndrome. You indicated those are pretty rare.
Do you know how rare those situations

are?

A. I think I commented in my report on this. It is generally very rare. Hydrops itself is rare. I think the study that I quoted was like 1 in 1,700 to 1 in 3,000 pregnancies that have hydrops. And of those, which is already a small amount, there's a small fraction that would develop Mirror Syndrome.

So I guess to put in that in context, in 10 years, I may have seen a true Mirror Syndrome maybe three times.

Q. Thank you.

And then you remember you were asked a series of questions on PPROM and several hypotheticals.

Do you recall that line of questioning?

A. Yes.

Q. Okay. I wanted to put in my own hypothetical in front of you related to PPROM.

So assume a patient, 18 weeks gestation, presents to the hospital with grossly ruptured membranes. Assume that the doctor examining her finds early signs of infection, including elevated white blood cell count and an elevated heartbeat. And the doctor determines

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., Plaintiff, vs. MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities, et al., Defendants, ATTORNEY GENERAL RAUL LABRADOR, Intervenor. | Case No. 1:24-cv-00244-BLW |

REMOTE DEPOSITION OF JENNIFER PAYNE

August 14, 2025

Reported by:
Vanessa S. Gosney, CSR #752, RPR

as an option in a few cases where it was clear that the pregnancy was causing severe symptomatology that was not responding to standard treatments.

Q. BY MR. GRIGSBY: And what are some of the other options that you mentioned in those situations that you described in addition to an abortion?

A. So that depended on the case, obviously. But there were medication options, the use of electroconvulsive therapy, hospitalization were other options.

Q. For your patients, you do not generally suggest to patients that they have an abortion, correct?

MS. JOHNSON: Object to form. Vague.

THE WITNESS: I have rarely suggested abortion as an option.

Q. BY MR. GRIGSBY: As an estimate, how many patients have you counseled to obtain an abortion?

A. Well, to be clear, I wouldn't call what I -- listing abortion as an option counseling to have an abortion. But there have been at least three patients that I can recall over the course of my career where we discussed abortion as a

potential option. And two others who obtained -- at least two others who obtained an abortion without my discussing that as an option.

Q. To your knowledge, how many of your patients have received an abortion?

A. A small percentage. Less than ten, to my knowledge.

Q. For the three patients that you mentioned, can you describe their general condition and diagnosis?

A. So that really ranged. One of them had a bipolar diagnosis. And the other two had major depression, along with either anxious features or an anxiety disorder diagnosis.

Q. And for each of them were they pursuing things like medication or other options for treatment?

A. They were.

Q. And was hospitalization one of the options for them, along with medication, hospitalization, and abortion, were those the options you discussed?

MS. JOHNSON: Object to form.

THE WITNESS: Those were all options. And for the patients with bipolar disorder, the options

included many different medications and not just antidepressant medications.

Q. BY MR. GRIGSBY: Was a dosage estimate an option for these three women as well?

A. Yes. For all of them I was actively managing their medications, meaning I was making adjustments and changes.

Q. And part of the adjustments and changes was adjusting dosages?

A. Yes.

Q. And you've had many bipolar patients that you've seen over the years in your practice?

A. Yes. I was considered an expert in bipolar disorder and treatment-resistant depression early in my career.

Q. And for those patients, besides the one that you mentioned as part of the three, you were able to assist them with treatment via medication or hospitalization or whatever the treatment entailed?

A. Yes.

Q. So in your expert report you discuss various conditions. If you could turn to Paragraph 14, I believe there is a discussion of psychosis there?

A. Yes.
Q. What is the treatment for this condition, generally?
A. Well, psychosis is a symptom and it can be seen in multiple different psychiatric illnesses. And so to some extent it depends on what the underlying condition is. But typically, we use antipsychotic medications to treat psychosis. But for example, if we were seeing a patient with major depression with psychotic features, we would, in addition to an antipsychotic medication, would want to make sure we were treating the depressive disorder with an antidepressant.
Q. And for many women the treatment you described can help them effectively manage psychosis?
A. Yes.
Q. In Paragraph 18 you discuss self-harm.
Do you see that?
A. Yes.
Q. What is the treatment for this condition?
A. Well, similar to psychosis, self-harm is a symptom. So it really depends on what the

underlying psychiatric illness is. So the treatment for self-harm when someone has borderline personality disorder is very different than treatment for self-harm from major depression, which is very different from self-harm from a psychotic disorder.

Q. So at a high level, what does treatment look like for those various features you discussed?

A. For a personality disorder the treatment for self-harm in that case is generally from a psychotherapeutic perspective. So there are different types of therapies. The therapy we think most about is dialectical behavioral therapy, but cognitive behavioral therapy, supportive therapy, just from a psychological perspective.

For major depression with self-harm and suicidal ideation, the treatment is alleviation of the major depressive episode. And so that might look like prescribing antidepressants, it might look like using electroconvulsive therapy or transcranial magnetic stimulation or even light box therapy.

With self-harm from psychosis, again, you want to get down to what is the underlying psychiatric diagnosis. For schizophrenia, that

would be an antipsychotic medication. For something like schizoaffective disorder, it would be an antipsychotic medication plus a mood stabilizing medication like Lithium. So it really depends on the underlying diagnosis, the approach.

Just to go back to major depression for a moment. In addition to using medications or ECT for treating the depressive episode, most patients really benefit again from a psychotherapeutic approach. And the literature really shows it is combination of psychotherapy and medication that really helps patients with depression.

Q. So you discussed a range of treatment options related to self-harm. Would you say that with self-harm the treatment is particularly individualized compared to other conditions or no?

A. I think psychiatric care in general is pretty individualized.

Q. In Paragraph 19 I believe you discuss suicidality; is that correct?

A. That's correct.

Q. Sorry to go back briefly. Related to self-harm, through the range of treatment options you discussed, can self-harm be effectively treated for many women you see?

A. It can.
Q. For suicidality, how is suicidality treated?
A. I would say it's essentially the same answer as self-harm. It depends on the underlying psychiatric condition and an individualized approach is important.
Q. There wouldn't be methods of treatment for suicidality that are not present for self-harm?
A. Well, self-harm sometimes is used to describe behavior that is not intending to end one's life. So self-harm can include things like cutting or burning one's self. It is often an expression of underlying psychological pain. So behavioral approaches are used frequently when we're dealing with self-harm.
With suicidality, the intention there, the thought there is to end one's life. So it's a spectrum. But with suicidality it's -- you know, I would say we use fewer behavioral interventions, although we can use some behavioral interventions.
Q. When you say "behavioral interventions," what do you mean?
A. So behavioral interventions mean interventions that are aimed at changing someone's

behavior. So suicidality is kind of a mental experience, right? And self-harm is a physical experience, someone has harmed themselves. So behavioral interventions are used more frequently in self-harm to try to prevent the behavior of harming one's self.

So for example, a therapist might work with someone who experiences self-harm episodes, and work with them to identify things that they could do rather than harm themselves when they have the urge to harm themselves. So that's a behavioral intervention.

Q. And the behavioral intervention regarding things they could do besides harming themselves, is that mostly through conversations between the provider and the patient?

A. Yes. And it has -- there's certain approaches that are used in different types of psychotherapy. I am trying to think of a good example.

But yes, I think the short answer to your question is, yes, that comes about by working with the patient. And I think it is more than a conversation, it's about exploring what leads up to the behavior, what does the patient experience with

the behavior. Essentially what is the patient getting from the behavior. Are they getting relief of strong emotions? Are they feeling the pain is helpful for them? Just really, kind of, understanding what leads to the behavior.

Q. So it's more than just a conversation, it's using medical training to go through this discussion. But it still is a verbal discussion of some sort between provider and patient, if I understand correctly?

A. That's part of it, yes. Yeah.

Q. Okay. And suicidality can be managed effectively for many women you see?

A. It can be.

Q. I believe you discussed catatonia in Paragraph 23; is that right?

A. I do.

Q. Can you describe treatment generally for this condition?

A. So the main treatment for it can be medications. So generally benzodiazepines, and specifically Ativan or lorazepam can be used to treat catatonia. There are a number of other medications that can be tried. And then in severe cases, electroconvulsive therapy can be effective.

be clear. But a lot of patients come into the emergency room in the setting of some dramatic event or fight or interaction that leads them to develop suicidal ideation, for example. And so a brief hospitalization, which allows that situation to calm down, can be helpful.

Psychiatric medications, in general, do not work very quickly, but we are working on developing medications that work more quickly. And so most people end up staying for a number of days, if not weeks, in a psychiatric hospitalization if the situation demands psychiatric medication use.

Q. What are the ways in which you can help a mental health patient while they're hospitalized?

A. So obviously medication changes can be made or started, you can start medications. And we can do that faster and more effectively in an inpatient setting because we can monitor blood pressure and vital signs. And so we can increase medications to a therapeutic level a little faster in the inpatient setting. We can also monitor for things like substance use withdrawal and help mitigate those symptoms in an inpatient setting.

We generally encourage patients to go to groups, and there we try to address various topics

that have to do with education about psychiatric illness and medications. And we can do some individual therapy. We don't do true individual therapy in the way that it's done in the outpatient because it is not an appropriate setting.

We can also do family education, and in the case of a dramatic emotional situation sometimes calm that down by bringing family in and talking through the problem.

Q. If needed, hospitalization is an option for patients with a mental health condition, correct?

A. It is, but there are conditions and situations that might preclude hospitalization. So for example, there are only so many psychiatric beds and some patients come into the emergency room and we will initiate a bed search and a week later we have not found a bed. And so we're not able to hospitalize that particular patient.

Some insurance does not cover psychiatric hospitalization except under very specific circumstances. Patients may have things going on in their life that preclude them from seeking psychiatric hospitalization, even when it would be appropriate.

So it's available, but I wouldn't say that it is 100 percent available to all psychiatric patients.

Q. It's an option, but it is not available in 100 percent of circumstances; is that your testimony?

A. That is.

Q. I believe you mentioned circumstances where the patient may not be willing to be hospitalized. In some of those circumstances a person could be involuntarily hospitalized, correct?

MS. JOHNSON: Object to form. Misstates prior testimony.

THE WITNESS: Not necessarily. So you have to meet very specific criteria to be involuntarily hospitalized. You're taking away a person's rights, and that's when the legal system tends to get involved and decide if you're allowed to take away a person's right to be outside the hospital setting. So it's an option, but it's not an option for all patients. In fact, I would say it's an option for a minority of patients.

Q. BY MR. GRIGSBY: It's an option if a woman meets the definition for being involuntarily

hospitalized, correct?

MS. JOHNSON: Object to form. Vague.

THE WITNESS: Yeah, it could be. Again, that would be up to the judge involved in that situation and if there was a bed.

There was a situation here in Virginia a number of years ago where a patient was brought into the emergency room, it was determined that he should be involuntarily hospitalized, but at that time the law was such that a patient could only be held three days involuntarily in the emergency room. He was let go because they reached that time limit, and even though he met criteria for involuntarily hospitalization, there was not a bed available. And he ended up, I believe, stabbing somebody. And that was a very famous case here in Virginia.

So yes, it's an option, but it's not always available.

Q. BY MR. GRIGSBY: Can you speak to Idaho's requirements for involuntary hospitalization?

A. I have not looked those up.

Q. Can you speak to circumstances regarding the number of available beds in Idaho for

hospitalization of mental health patients?
A. I do not know those. I don't know those for Virginia or Maryland for that matter.
Q. Paragraph 54. Could you read the last sentence?
A. The last sentence, "While some women may respond to an increase in medication dosage, others do not and they may experience life or health endangering psychiatric symptoms."
Q. So Dr. Payne, for some women they respond positively to a change of dosage?
A. Some women do and some women don't.
Q. And a change of dosage can help women better manage their symptoms?
A. It may or it may not.
Q. And oftentimes you'll continue to tinker or adjust the medication to find something that works best for that woman?
A. We do alter the medication dosage. Sometimes it requires switching to a different medication.
One example of this is lamotrigine, which is a mood stabilizing medication. Estrogen actually increases the metabolism of lamotrigine. And you are only able to titrate lamotrigine every

two weeks because there is a danger of a very life-threatening skin condition. And so in pregnancy, it's very hard to titrate lamotrigine because you can only increase it every two weeks and by the time you get to two weeks, estrogen levels have increased, which decreases the amount of lamotrigine that the woman is taking.

So yes, we can adjust medications, and sometimes that helps, but sometimes it doesn't. And it depends on the medication, the woman, the stage of pregnancy, et cetera.

Q. But it's common for your practice that you help women with proper adjustment and dosage of their medications as you see them throughout their pregnancy?

A. Yes. I spend time titrating medications in pregnancy.

Q. And you do that for many of your patients, correct?

A. I do.

Q. In Paragraph 61, do you see the sentence that starts, "These patients cannot easily"? It is about halfway through the paragraph.

A. Yes.

Q. Could you read that sentence?

have experienced in your personal life or the lives of those close to you that impacts your view on when abortion is appropriate?

A. So I am adopted, but I don't think that influences my view on abortion care to be available. My daughter has schizoaffective disorder and is on two teratogenic medications that control her symptoms, and that may have some influence. But I certainly held these views way before that happened.

Q. In your opinion, what should Idaho's law be regarding abortion?

A. Well, in my opinion I think Idaho's law should not be excluding a group of people. From my perspective as a psychiatrist, it's like the law is written and it says persons with gestational diabetes cannot receive abortion care. I think it's discriminatory against mental health conditions. I think if Idaho -- if people in Idaho have said abortion is not appropriate in their state except under limited circumstances, that it should not discriminate against persons with psychiatric conditions.

Q. In your view should abortion be left for the doctor/patient relationship without outside

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., Plaintiff, vs. MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al., Defendants, ATTORNEY GENERAL RAUL LABRADOR. Intervenor. | Case No. 1:24-cv-00244-BLW |

DEPOSITION OF STACY SEYB, M.D.

August 5, 2025

Boise, Idaho

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR

into that type of decision, and I would -- I would suspect that, you know, there certainly are cases where that's, you know, possible, I'm very sure, but I also feel like -- or it would not be the first line of action. I can say that.

Q. Okay. So those are cases -- those are not cases that you treat, then?

MS. TOTI: Objection; misstates testimony.

THE WITNESS: It's just I have never been asked to or -- you know, just in -- you know, in my sphere of where I've been practicing.

I think one of the things to keep in mind is that, you know, what we do is all hospital-based, and anything that would be earlier as far as a termination goes is going to be something that's done as an outpatient clinic.

Q. (BY MR. CRAIG) So I thought you spent about 60 percent of your time in an outpatient clinic.

A. Right. But we don't do those in our clinic.

Q. You don't do what in your clinic?

A. Terminations.

Q. So all the abortions that you would do would be in the hospital setting, not in your

clinic?
A. Correct.
Q. And you would not do an abortion to treat mental health in the hospital setting, then.
Is that what you're saying?
MS. TOTI: Objection; misstates prior testimony.
THE WITNESS: No. What I'm saying is doing an earlier termination is much less expensive to do as an outpatient, and we don't have the equipment and facilities to do that in our office.
Q. (BY MR. CRAIG) Okay. I think I understand.
So you don't do the early-term abortions because those can be done cheaper outside of the hospital?
A. Correct.
Q. And the abortion to treat mental health would need to be done early on in the pregnancy; is that what you're saying?
MS. TOTI: Objection; misstates prior testimony.
THE WITNESS: It would not -- no, it could be done any time probably up through viability. I think you -- we would have -- you know, there's so

but if we could take a break, and then I'll likely be done. So I don't know if you guys want to work on preparing for your cross if you want.

15 minutes? 10 minutes?

MS. TOTI: Yeah, you want to do 15?

MR. CRAIG: Sure.

(A recess was taken from 2:39 p.m. to 3:10 p.m.)

MR. CRAIG: All right. We are done with our questions, so we'll rest.

MS. TOTI: Great. Thank you.

EXAMINATION

BY MS. TOTI:

Q. Dr. Seyb, I have just a few questions for you on cross.

Have you ever treated a pregnant person who died from self-harm?

A. I have.

Q. Is that the patient that you discuss in paragraph 44 of your expert report, which has been marked as Exhibit 5 for this deposition?

A. It is.

Q. If a psychiatrist referred a patient to you with a recommendation to provide an abortion in connection with a mental health condition, would you provide the abortion as part of your current

practice?
A. I would.
Q. Before Dobbs, were there outpatient clinics where a patient could go to obtain an abortion in Idaho?
A. Yes.
Q. Today, are there outpatient clinics in Idaho where a patient could go to obtain an abortion?
A. Not that I'm aware of.
Q. What changed?
A. They all closed.
Q. Does every pregnant person face a risk of death?
A. It's definitely higher than if a person is not pregnant.
Q. And why is that?
A. Because of the changes of pregnancy. You know, as we talked about, hypertension, changes in blood flow that can lead to heavy bleeding, you know, those would be the primary things.
Q. How do you know when the risk of death from pregnancy becomes acute enough to justify an abortion under Idaho's Defense of Life Act?
A. I don't at this point. I think -- as I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

STACY SEYB, M.D.,
Plaintiff,

vs.

MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al.,
Defendants,

ATTORNEY GENERAL RAUL LABRADOR.
Intervenor.

Case No. 1:24-cv-00244-BLW

REMOTE DEPOSITION OF MARCELA SMID, M.D.

July 21, 2025

Reported by:
Rebecca Martin, CSR #1108, RPR, CRR

Q. But if she is at risk of self-harm, regardless of what that underlying condition may be, then is it true that an abortion is medically indicated?

A. It's artificial to separate that out. I mean, self-harm is the symptom of the medical condition, so it cannot be separated out from what -- self-harm is a symptom of something. It doesn't exist in and of itself, and so we would need to understand what that medical condition is, what is the reason that that person is expressing self-harm, and -- in those situations, and if it is related to an underlying medical condition, then it could be a medically indicated abortion.

Q. I want to understand where that line is for you.

So if I understand correctly, woman is at risk for self-harm, then necessarily she would have some kind of underlying condition she's dealing with, and in those circumstances, she -- it's medically indicated for her to have an abortion?

A. What I'm saying is that the definition that I've reviewed multiple times during this testimony is that a medical -- the driver of a

medically indicated abortion is an underlying medical condition, and if self-harm is stemming from that medical condition, then that would be a medically indicated abortion.

Q. Is it your opinion that an abortion is medically indicated for multifetal reductions anytime that an abortion would increase chance of survival for other fetuses?

A. Our -- as outlined in my expert report, multifetal gestations are at higher risk of preterm delivery and a host of other complications. Therefore, according to the guidelines set by the Society of Maternal-Fetal Medicine, a multifetal gestation would be underlying -- is an underlying medical condition, and the goal of improving fetal outcomes for the other fetuses, that would qualify as a medically indicated abortion.

Q. All right. So in paragraph 23, you see the sentence saying "Idaho's abortion bans prohibit doctors"?

A. Yes.

Q. What are the ways that Idaho's Defense of Life Act is profoundly detrimental to patient health?

A. As we discussed, the Idaho Code 18-622

only allows for abortions to be -- to occur in a very limited number of situations, and for maternal indications -- and there really are no fetal indications -- outlined in Idaho's Code 18-622, the only allowable abortion is the death of a -- is necessary to prevent the death of a pregnant woman in the judgment of a physician.

However, as I've outlined this morning, there are a variety of conditions in which both maternal morbidity and fetal morbidity must be considered, and that death is not the only reason for a medically indicated abortion, as referenced by the American College of Obstetricians and Gynecologists and Society for Maternal-Fetal Medicine guidelines.

Q. What is a serious medical need, in your view? I believe you used the term "serious medical need."

A. Serious medical need encompasses any of the number of indications that I've discussed today. An exhaustive list is not possible, but they are -- some of the more common ones that we have discussed today could include previable PPROM, the ones that you have -- you have brought up, hypertensive disorders of pregnancy, placental