UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | Case No. 1:24-cv-00244-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, | |
| Defendants. | |

## INTRODUCTION

Some rights are so essential that our Constitution enshrines them even though they are not mentioned in its text. These unenumerated rights are fundamental but rare. When asked to recognize one, courts must proceed with great caution and humility, lest unelected judges usurp the role of our democratic branches of government. Thus, to receive protection, a right must be objectively "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Examples include the right to marry, to procreate, and to raise one's children.

In *Dobbs v. Jackson's Women's Health Organization*, the U.S. Supreme Court explained that the right to elective abortion, recognized in *Roe v. Wade*, fails this test. The Supreme Court returned the issue of abortion to the states, triggering a wave of experimentation. Some states have sought to drastically expand access, while others, including Idaho, have criminalized abortion in virtually all circumstances. The present case tests how far Idaho may go when a woman's pregnancy severely endangers her health. At issue is not the general right to abortion—definitively rejected in *Dobbs*—but the right to self-preservation.

In Idaho, the Defense of Life Act makes abortion a felony except when necessary to save the life of the mother (unless her death would be due to self-harm) and for a small subset of rape and incest victims. The law does not contain an exception for pregnancies that will cause serious and permanent harm short of death. Essentially, pregnant women are required to sacrifice their health for the sake of the fetus—even if the fetus will, tragically, not survive past birth.

Plaintiff Stacy Seyb, M.D., is a doctor who cares for such women. He brought this lawsuit against the Members of the Idaho Board of Medicine to argue that the Due Process Clause of the Fourteenth Amendment protects the right to abortion when termination of the pregnancy is necessary to preserve the woman's health. He also challenges Idaho's exclusion of life-threatening mental health conditions when an abortion is otherwise necessary to prevent death.

Defendants have moved for summary judgment, arguing that Dr. Seyb has failed to produce evidence sufficient to establish the right to a medically indicated abortion. But the record before the Court provides significant evidence that such a right is deeply rooted in our nation's history, bound up with traditional and fundamental principles such as self-defense and necessity. For centuries, a range of legal and medical authorities have recognized that abortion is not a crime when performed to protect a woman's health and safety. Based on this record, Plaintiff has established a genuine dispute of material fact, which must be resolved at trial. Accordingly, Defendants' Motion for Summary Judgment is denied.

## BACKGROUND

The State of Idaho prohibits nearly all abortions. Under the Idaho Defense of Life Act, performing an abortion is a felony punishable by two to five years in prison except in two narrow situations: to save the life of the mother, and for a limited subset of rape and incest victims. Idaho Code § 18-622.[1] The life-of-the-mother exception applies when the physician determines in his or her "good faith medical judgment . . . that the abortion was necessary to prevent the death of the pregnant woman." § 18-622(2)(a)(i). Abortions are not permitted when necessary

---

[1] Separately, under the Fetal Heartbeat Preborn Protection Act, Idaho prohibits abortions performed after the detection of a fetal heartbeat, except in cases of "medical emergency" and some cases of rape. Idaho Code § 18-8804. It is not necessary to separately analyze this statute because all abortions that it prohibits also fall under the Defense of Life Act.

to prevent substantial physical harm short of death, or to prevent the woman's death through self-harm. *Id.*

The Idaho Supreme Court clarified the scope of the life-of-the-mother exception in *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023). The state court held that application of the exception is subjective and rooted in the physician's "good faith medical judgment" about the necessity of the abortion. *Id.* at 445. Thus, "the statute does not require *objective* certainty, or a particular level of immediacy" and "there is no 'certain percent chance' requirement that death will occur under the term 'necessary.'" *Id.* at 445-46. Nonetheless, the court noted that prosecutors could use evidence that the threat of death was relatively low against the physician in a criminal trial. *Id.* at 446.

Plaintiff Stacy Seyb, M.D., is a Maternal Fetal Medicine Specialist at St. Luke's Health System, where he treats women with high-risk pregnancies. *Pl.'s App.* at 276 ¶ 1, Dkt. 83-2. Until Idaho's abortion ban took effect, he regularly performed abortions for patients with serious medical needs, procedures known as medically indicated abortions or therapeutic abortions. *Id.* at 276 ¶ 7. He and his colleagues now must refer these patients out of state—sometimes via airlift, when the threat to the woman's health is particularly acute. *Id.* at 286-90 ¶¶ 41, 50, 56. He has not historically provided abortions when the pregnancy put the patient at risk of death from self-harm, but he intends to do so now because the procedure is

no longer generally available at outpatient clinics following the Supreme Court's decision in *Dobbs*. *Id.* at 491-92.

Dr. Seyb filed this lawsuit against the Members of the Idaho Board of Medicine and the Prosecuting Attorneys of every county in Idaho. He argues that (1) Idaho's ban on medically indicated abortions violates the Due Process Clause, and (2) the exclusion of life-threatening mental health conditions from the life-of-the-mother exception violates the Equal Protection Clause. This Court dismissed the Prosecuting Attorneys except the Ada County Prosecuting Attorney and allowed the Attorney General of Idaho to intervene as a defendant. The remaining Defendants have now moved for summary judgment, and the Court held oral argument on February 5, 2025.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims" and thereby prevent these matters "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076

(9th Cir. 2001) (en banc). This does not require the introduction of affirmative evidence, but merely the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the non-moving party to produce evidence sufficient to support a favorable verdict. *Devereaux*, 263 F.3d at 1076. The non-moving party must show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. All evidence must be viewed in the light most favorable to the non-moving party. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

Defendants' summary judgment motion presents three issues. As a threshold matter, Defendants say—again—that Dr. Seyb lacks standing. On the merits of the due process claim, they argue that he has failed to produce sufficient historical evidence supporting the right to a medically indicated abortion. On the equal protection claim, they contend that Idaho's exclusion of self-harm from the life-of-the-mother exception is a rational classification. The Court will address each of these matters in turn.

### A.    Standing

Defendants begin by disputing, for the second time, Dr. Seyb's standing to bring this case. Because the Court has already addressed a nearly identical issue,

the analysis here will be relatively brief. Dr. Seyb has shown that he intends to perform medically indicated abortions and abortions necessary to prevent the pregnant woman's death from self-harm. This suffices to establish standing.

The federal judiciary may decide only "actual cases or controversies." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). The doctrine of standing reflects this fundamental constitutional principle by requiring the party invoking standing to establish three elements: "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)). The "injury in fact" requirement is at issue here.

Dr. Seyb brings a pre-enforcement challenge to Idaho's criminalization of medically indicated abortions, meaning that he has not yet experienced direct harm from the statute. But a plaintiff need not wait to suffer "an actual arrest, prosecution, or other enforcement action" before he can challenge an allegedly unconstitutional policy. *Driehaus*, 573 U.S. at 158. Rather, he must merely show that circumstances "render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. This requires the plaintiff to establish that (1) he intends "to engage in a course of conduct arguably affected with a constitutional

interest"; (2) the intended conduct is "arguably proscribed by the challenged statute"; and (3) the threat of future enforcement is "substantial." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).

Defendants contend that the Defense of Life Act does not prohibit Dr. Seyb's intended course of conduct because all the abortions that he seeks to perform fall within the life-of-the-mother exception. This argument focuses on his answers to deposition questions about his understanding of the Defense of Life Act, particularly *Planned Parenthood*'s clarification of the law. When questioned about several pregnant women airlifted to other states, Dr. Seyb testified that he believed those patients faced "some risk" of death. *Seyb Dep. Tr.* at 111:15-116:23, Dkt. 79-4. Dr. Seyb also said that he had not received "legal training" on the Defense of Life Act but that he believed it allowed an abortion "only if you know that the mother is going to die." *Id.* at 48:24-52:10. This, according to Defendants, means that he "cannot prove whether any of these referrals . . . were 'necessary' under Idaho law." *D.'s Mem.* at 8, Dkt. 79-1.

Defendants misunderstand the "arguably proscribed" requirement. Standing does not turn on the counterfactual question of whether Dr. Seyb would have faced prosecution or conviction had he performed those abortions in Idaho. He has the burden only of showing that his "intended conduct" is "arguably proscribed" by the Defense of Life Act. Abortions in those specific emergency contexts may not

have actually been illegal, but they were "arguably proscribed" due to the subjectivity of the law and the nature of prosecutorial discretion.[2]

More broadly, Defendants' position displays a remarkable callousness toward the challenges confronting Idaho doctors under the Defense of Life Act.[3] The Idaho Supreme Court has clarified that a pregnant woman need not be on death's door to justify an abortion, but evidence that death was, say, only 25% likely can be invoked at criminal proceedings, where the doctor faces up to five years in prison if a jury determines that he or she did not determine "in good faith" that the abortion was "necessary" to save the woman. *See Planned Parenthood*, 522 P.3d at 446 ("Of course, a prosecutor may attempt to prove that the physician's subjective judgment that an abortion was 'necessary to prevent the

---

[2] Justice Barrett drew out this point at the oral argument for *Moyle v. United States* in the following exchange:

> Justice Barrett: What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?

> Idaho's Counsel: And -- that, Your Honor, is the nature of prosecutorial discretion, and it may result in a -- a case . . .

Transcript of Oral Argument at 29:3-29:11, *Moyle v. United States*, 603 U.S. 324 (2024) (No. 23-726, No. 23-727).

[3] A July 2025 study found that Idaho lost 35% of its practicing obstetrician doctors after the state's abortion ban went into effect in 2022. J. Edward McEachern et al., *Change in Number of OB/GYN Physicians Practicing Obstetrics After the* Dobbs *Decision*, 8 JAMA Network Open, no. 7, July 31, 2025, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2837058?.

death of the pregnant woman' was not made in 'good faith' by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary."). Even to this Court, the contours of the life-of-the-mother exception remain ambiguous. When does a threat to health cross over to a threat to life? What degree of danger can justify a "good faith" conclusion that an abortion is "necessary"? How close to imminent must the patient's death be? The Idaho Supreme Court has left these questions to prosecutors and juries, forcing physicians to navigate these urgent and heartbreaking medical situations with the threat of criminal prosecution hanging over them.

For these reasons, Dr. Seyb's deposition answers do not undermine his standing to bring this challenge. The patients referred out of state do not obviously fall within the life-of-the-mother exception. And even if the cases he confronted in the early months of 2023 might not have warranted a prosecution, Dr. Seyb has shown that he intends to treat other pregnant women facing health threats short of death. Idaho's law arguably proscribes this course of conduct.

Defendants also dispute Dr. Seyb's standing to bring his equal protection claim regarding Idaho's distinction between life-threatening physical and mental health conditions. Here, Defendants insist that Dr. Seyb does not intend to perform abortions for mental health reasons because he did not perform such abortions in the past. Again, this argument overlooks the nature of a pre-enforcement challenge.

The Ninth Circuit requires that a plaintiff "intends" to engage in arguably proscribed conduct, not that he has already done so. *Peace Ranch*, 93 F.4th at 487. Dr. Seyb testified at a deposition that he would perform an abortion for mental health reasons if he had such a referral from a psychiatrist, and that he has a history of treating pregnant patients at risk of death by self-harm.[4] *Seyb Dep. Tr.* at 158:15-159:2, Dkt. 79-4. These facts suffice to establish standing.

## B.    Due Process Right to a Medically Indicated Abortion

The Court now takes up the substance of Defendants' summary judgment motion. The heart of this case is the claim that the Due Process Clause of the Fourteenth Amendment protects the right to abortion when necessary to preserve the health of the pregnant woman. Despite Defendants' protestations, *Dobbs* did not resolve this issue. *Dobbs* answered the question of whether "all pre-viability prohibitions on *elective* abortions are unconstitutional." *Dobbs*, 597 U.S. at 234 (emphasis added). In rejecting the general right to abortion, the Supreme Court did not address states' authority to ban abortions needed to save a pregnant woman's life or health. *See id.* at 393 (Sotomayor, Kagan, Breyer, JJ., dissenting). And

---

[4] Defendants' argument here also overlooks the fact that such abortions would have taken place as legal elective abortions at outpatient clinics before Idaho's abortion ban went into effect. Because all such clinics have closed, a woman seeking an abortion due to a risk of death from self-harm, if such procedures were allowed, would now need to see a hospital provider like Dr. Seyb.

although laws restricting abortion must typically satisfy only the rational basis test, *id.* at 301 (majority opinion), heightened scrutiny applies when a law goes beyond the regulation of abortion to infringe on a constitutional right. *See, e.g.*, *Planned Parenthood Great Northwest v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024).

That is what Dr. Seyb alleges here. His argument is that the right to a medically indicated abortion springs from what is best termed a fundamental right to self-preservation. To survive summary judgment, he must establish a genuine dispute of material fact as to whether such a right is deeply embedded in our nation's tradition and history. The Court will begin by reviewing the history-and-tradition test before considering whether Dr. Seyb has put forward sufficient evidence for the right to a medically indicated abortion.

### 1. The History-and-Tradition Test

The Due Process Clause protects certain unenumerated rights that are so fundamental that "neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 721 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). These substantive due process rights are essential but limited. First, the Due Process Clause protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Id.* at 720-21 (internal quotations omitted). Second, there must be "'a careful description' of the asserted fundamental liberty

interest"—not merely an appeal to broad ideals and principles. *Id.* at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 303 (1993)).

Accordingly, when considering an asserted substantive due process right, the inquiry hinges on "a careful analysis of the history of the right at issue." *Dobbs*, 597 U.S. at 238. Without such constraint, the Fourteenth Amendment's guarantee of "liberty" becomes capacious—a blank slate onto which courts may impose a virtually unlimited range of policy preferences. *Id.* at 239. Reliance on objective historical evidence ensures that judges do not "confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Id.* America's "history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decisionmaking,' that direct and restrain our exposition of the Due Process Clause." *Glucksberg*, 521 U.S. at 721 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

The Supreme Court has modeled this historical inquiry several times in recent years. Most relevantly, in *Dobbs* the core of the analysis was the status of abortion at the time of the Fourteenth Amendment's adoption, though the Court also considered whether such a right might have existed earlier in the American tradition. *Dobbs*, 597 U.S. at 251. Temporally, the Court reviewed American law from the colonial era to the years immediately before *Roe*, along with "eminent common law authorities (Blackstone, Coke, Hale, and the like)" tracing back to the

thirteenth century. *Id.* at 242-50. Substantively, the Court canvassed the historical record for evidence that abortion was affirmatively protected from state intrusion, not merely deemed "permissible" by some authorities. *See id.* at 243, 251. Key sources included state constitutional provisions, statutes, judicial decisions, and scholarly treatises—almost all of which expressed the position that elective abortion was a crime, at least in many circumstances. *Id.* at 249-52.

The Court's recent Second Amendment jurisprudence also provides a useful example, though the burden of the historical inquiry is flipped. Because the right to bear arms is enumerated, the analysis hinges on whether a challenged regulation—not the asserted right—reflects our history and tradition. *See United States v. Rahimi*, 602 U.S. 680, 690-92 (2024). Under this assessment, firearm regulation must remain rooted in history but not "trapped in amber." *Id.* at 691. Thus, "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 692 (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022)). Like with abortion, the relevant history runs from the early days of common law to the years following ratification—though courts must avoid giving either common-law rights or post-enactment practices "more weight than [they] can rightly bear." *Bruen*, 597 U.S. at 35. The core question is the scope that constitutional rights "were understood to have *when the people adopted them*." *Id.* at 34 (quoting *District of Columbia v.*

*Heller*, 554 U.S. 570, 634-35 (2008)).

Uncertainties linger about the contours of the history-and-tradition test, at least as applied at the district court level. For instance, this Court has questions about the appropriate level of specificity when considering an asserted due process right. Is a historical "dead ringer" required, or will a looser analogy suffice, like in the context of gun regulation? This Court also has concerns about how to weigh competing historical sources and how much emphasis to place on practices in 1868—the year of the Fourteenth Amendment's ratification—over earlier or later traditions. But these are matters for another day, and perhaps another case. The only issue now is whether Dr. Seyb has established a material question of fact regarding the history and tradition of a right to a medically indicated abortion.

### 2.  Historical Evidence for an Abortion Health Exception

The asserted right to a medically indicated abortion does not arise in a vacuum as a free-standing manifestation of substantive due process. Rather, the right exists within a broader right to self-protection and self-preservation, which is fundamental to the American tradition of justice.

### i.  The Right to Self-Protection

Our legal tradition has always recognized that otherwise unlawful acts can become permissible when necessary to prevent harm to oneself or another. This principle manifests in the fundamental right to self-protection, which traces back to

the earliest days of the common law.

The right to self-defense is so well established that there is no need to linger on it. Blackstone observed that English law pardoned even homicide if done to preserve either life or limb, and St. George Tucker referred to self-defense as "the first law of nature." 1 William Blackstone, *Commentaries* *130, Editor's App. 300 (S. Tucker ed. 1803). Summing up this tradition, the Supreme Court described self-defense as "a basic right, recognized by many legal systems from ancient times to the present." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).

Self-defense is traditionally invoked against interpersonal threats—when necessary to protect "against the use of unlawful force by such other person." Model Penal Code § 3.04. The related doctrine of necessity applies to broader forms of danger—essentially, when a person breaks the law because "they were faced with a choice of evils and chose the lesser evil." *United States v. Schoon*, 971 F.2d 183, 195 (9th Cir. 1991). Like self-defense, necessity has a long pedigree, discussed in English common law and recognized by numerous American courts since the Founding.[5] This deep tradition suggests that the right to self-protection is

---

[5] *See, e.g.*, *Reninger v. Fagossa*, [1551] 1 Plowd. 1, 75 Eng. Rep. 1 ("A man may break the words of the law, and yet not break the law itself... where the words of them are broken to avoid greater inconvenience, or through necessity, or by compulsion."); *The William Grey*, 9 F. Cas. 1300 (No. 17,694) (C.C.D. N.Y. 1810); 24 F. Cas. 873 (No. 14,470) (C.C.D. Mass. (Continued)

properly understood to encompass not just interpersonal violence, but also unintentional—and sometimes tragic—forms of peril to the self.

This fundamental right to self-protection provides a compelling basis for a due process right to a medically indicated abortion.[6] But like any right, the right to self-protection is not absolute. The Court must next consider the scope of the right—specifically, whether evidence suggests that it has historically encompassed the right to medically indicated abortions.

### ii. Medically Indicated Abortion as Self-Preservation

In substantive due process cases, the asserted right must be defined with a high degree of specificity. *See Glucksberg*, 521 U.S. at 721; *Flores*, 507 U.S. at 302-03. Because defining rights in general terms improperly removes issues from the process of democratic deliberation, courts must assess historical support for the

---

1834). For more on this history, see Edward B. Arnolds & Norman F. Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil*, 65 J. Crim. L. & Criminology 289, 291-93 (1974).

[6] Dr. Seyb also seeks to ground the right to a medically indicated abortion in what he describes as a fundamental right to essential medical treatment. This argument is less compelling. States enjoy a broad police power to pass health and welfare laws, which is why federal courts must typically presume that such laws are valid. *Dobbs*, 597 U.S. at 301. And although states must provide essential medical care to people in custody under the Eighth and Fourteenth Amendment, *Sandoval v. County of San Diego*, 985 F.3d 657, 667-68 (2021), this obligation does not prevent states from restricting the scope of permissible health care, *see United States v. Skrmetti*, 605 U.S. 495, 522-25 (2025). A fundamental right to seek medical treatment would imply that most or all laws regulating the medical field are subject to strict scrutiny, which is obviously not the case.

particular right asserted—not appealing but vague principles like dignity, autonomy, and freedom. *See Dobbs*, 597 U.S. at 257; *Flores*, 507 U.S. at 302-03. Here, the issue at hand is whether the right to self-protection has traditionally encompassed the right of a pregnant woman to terminate a pregnancy that threatens her health. *Cf. Pickup v. Brown*, 740 F.3d 1208, 1235 (9th Cir. 2014) (analyzing the scope of the fundamental right to parent). Dr. Seyb has produced sufficient evidence to establish a genuine and material question of fact.

As a preliminary matter, the Court takes up Defendants' contention that an asserted substantive due process right must be expressly articulated as a "right" by historical sources. This is not the standard set out in *Glucksberg* or *Dobbs*. Particularly in *Glucksberg*, the Supreme Court emphasized the importance of "practices" and looked for historical recognition of a "liberty interest" rather than the declaration of a "right." *Glucksberg*, 521 U.S. at 710, 722-24. Defendants' narrow reading also ignores the Supreme Court's recent caselaw explaining that, despite the paramount importance of history, rights do not remain "trapped in amber." *Rahimi*, 602 U.S. at 691. Thus, this Court is not overly concerned, at least at the present stage, with whether historical authorities spoke in the precise cadence of "rights" that we use today.

Turning to the factual record, the Court will begin with the weighty evidence of a historical right to an abortion when necessary to save the life of a pregnant

woman. At oral argument, Defendants asserted that Idaho may ban even these abortions—in other words, that the Constitution leaves the states free to require a woman to sacrifice her life for the sake of her potential child. Although this is not the question before the Court, it is a helpful baseline for considering the applicability of the right to self-protection in the context of abortion. It also bears on Dr. Seyb's equal protection claim, which the Court will discuss below.

The historical record substantially supports the right to abortion when needed to save the mother's life. Starting with the common law, although early authorities did not explicitly discuss a life-of-the-mother exception, later English caselaw suggests that the principles of self-defense and necessity were understood to justify abortion in such circumstances. *See Rex v. Bourne*, (1938) 3 All E.R. 615 (Eng.). Closer to home, of the 28 states that banned abortion in 1868, 19 included an express life exception[7]; two had an express safety exception[8]; and six applied

---

[7] New York, Ohio, Indiana, Maine, Alabama, Michigan, Virginia, New Hampshire, California, Iowa, Wisconsin, Kansas, Connecticut, Rhode Island, Nevada, West Virginia, Oregon, Florida, and Missouri. Dr. Seyb does not include Missouri in his count, apparently based on the 1825 version of the statute cited in *Dobbs*, but in 1835 Missouri created an exception for abortions performed to preserve the mother's life. Act of Mar. 20, 1835, art. 2, §§ 10, 36, 1835 Mo. Rev. Stat. 165, 168, 172.

[8] Maryland and Illinois. Dr. Seyb apparently does not include Illinois in his count, but the Illinois legislature adopted a law in 1867 providing that its criminal abortion statute did not "apply to any person who procures or attempts to procure the miscarriage of any pregnant woman for *bona fide* medical or surgical purposes." 1867 Ill. Pub. Laws, 25th Gen. Assembly 1st Sess. § § 2, 3, at 89 (Act of Feb. 28, 1867).

only to abortions done "feloniously," "unlawfully," or "without lawful justification"[9]—language understood to create, at minimum, a life exception.[10] *P.'s App.* at 170-71; *Dobbs*, 597 U.S. at 302-24. The single remaining state, Nebraska, adopted a life exception when it codified its laws in 1873. *See* Neb. Rev. Stat. pt. 3, ch. 4, § 42 (Estabrook 1866). Every other criminal abortion law adopted after 1868 likewise contained an express life exception. *See Dobbs*, 597 U.S. at 317-23, 327-30; *see also id.* at 339 n.2 (Kavanaugh, J., concurring) ("Abortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother.").

This history shows a narrow but fundamental limit on states' authority to ban abortions. The record, when viewed in the light most favorable to Dr. Seyb, further contains evidence of a deeply rooted right to abortion when necessary to preserve a woman's health. Though only Maryland and Illinois expressly allowed such abortions in 1868, the six states that criminalized abortions done "unlawfully"

---

[9] Massachusetts, Vermont, New Jersey, Texas, Louisiana, and Pennsylvania. Dr. Seyb does not appear to include Texas in his count, but its statute applied only to abortions performed "unlawfully and maliciously." *Dobbs*, 597 U.S. at 310 (quoting 1854 Tex. Gen. Laws p. 58). The evidentiary significance of these ambiguous statutes is not fully clear, but at this stage the Court views them in the light most favorable to the plaintiff.

[10] *See Commonwealth v. Wheeler*, N.E.2d 4, 5 (Mass. 1944); *State v. Brandenburg*, 58 A.2d 709, 710 (N.J. 1948).

arguably also recognized broad health exceptions.[11] There is further historical

evidence that, in practice, the life-of-the-mother exception extended to pregnancies

that would cause the woman permanent and serious harm,[12] and this Court has not

found a single case where a state prosecuted an abortion performed to preserve a

woman's health. Even *Roe* and *Casey* distinguished between elective and

medically indicated abortions, with states free to prohibit the former but not the

latter after viability. *See Stenberg v. Carhart*, 530 U.S. 914, 947-48 (2000)

(O'Connor, J., concurring).

     In this vein, several states that historically recognized only life exceptions

have recently held that the right to a medically indicated abortion is nonetheless

deeply embedded in their history and tradition. The Supreme Court of Indiana held

that the right to self-protection, implicit in the state constitution, prevented the

legislature from "prohibit[ing] an abortion procedure that is necessary to protect a

---

[11] *See Wheeler*, N.E.2d at 5 ("[A] physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary to save her life or to prevent serious impairment of her health, mental or physical."); *Brandenburg*, 58 A.2d at 710 ("We find it unnecessary to consider whether under our statute and the construction thereof given by our courts threatened impairment of a woman's health, as distinguished from the saving of her life, constitutes lawful justification.").

[12] *See, e.g.*, T. Gaillard Thomas, *Abortion and Its Treatment, from the Stand-Point of Practical Experience* 99 (New York, D. Appleton & Co. 1893) ("[W]henever it is felt that the prolongation of pregnancy is going to destroy the life or intellect, or to permanently ruin the health of a patient, abortion should be brought on."); L. Dennis, *Ethics of Abortion*, 5 Am. J. Homeopathic Materia Medica & Rec. Med. Sci. 115, 118–19 (1872); *Criminal Abortions*, 34 J. Lancet 82, 82 (1914).

woman's life or to protect her from a serious health risk." *Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great Northwest*, 211 N.E. 3d 957, 976 (Ind. 2023). The North Dakota Supreme Court similarly explained that the state's "history and traditions . . . establish that the right of a woman to receive an abortion to preserve her life or health was implicit in North Dakota's concept of ordered liberty before, during, and at the time of statehood." *Wrigley v. Romanick*, 988 N.W.2d 231, 242 (N.D. 2023).

Going further back in history, common law sources also provide evidence, albeit indirectly, of a right to a medically indicated abortion. Blackstone condemned post-quickening abortion as "a very heinous misdemeanor"—though not homicide—immediately before explaining that the law of self-defense pardons even homicide if done "to save either life or member." 1 Blackstone, *supra*, at *129-30. Hale distinguished between abortions performed on a woman "to destroy the child within her" and those done "to cure her of a disease." Sir Matthew Hale, *History of Pleas of the Crown* 429-30 (1736). Consistent with this tradition, English courts interpreted the country's 1861 abortion ban to include an implicit exception for the health of the mother. In the landmark case *Rex v. Bourne*, (1938) 3 All E.R. 615 (Eng.), the court first observed that abortion was allowed "for the purpose only of preserving the life of the mother." But, the court explained, a "reasonable" interpretation of those words extended to serious health

impairments—circumstances where "the probable consequence of the continuance of the pregnancy will be to make the woman a physical or mental wreck." *Id.*

More broadly, the right to self-defense through lethal force traditionally applies to threats of serious bodily harm in addition to death—both man's "life" and his "limbs," as Blackstone noted. In this sense, what Defendants are really seeking is a pregnancy exception to the right to self-protection. Normally, a person has the right to kill another person who means to do grave harm. *See, e.g.*, Idaho Code § 19-202A ("No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary . . . ."). In Idaho, however, pregnant women must endure all manner of injuries short of death to avoid compromising the potential life they carry. Perhaps our nation's history and traditions allow Idaho to compel this sacrifice, but Dr. Seyb has produced significant evidence to the contrary. Certainly, the record is mixed, and Defendants have cited sources indicating that states have long prohibited abortions even when medically necessary. To rule on this challenging due process question, the Court will need to carefully weigh nuanced historical evidence. And that is why the case must proceed to trial.

### C.    Equal Protection for Life-Threatening Mental Health Conditions

Finally, the Court considers Dr. Seyb's equal protection claim, which challenges Idaho's refusal to include death from self-harm in the life-of-the-mother

exception. This issue turns on whether the Court finds that a fundamental right is at stake in the due process claim. Therefore, summary judgment is improper.

The Equal Protection Clause of the Fourteenth Amendment restricts states' ability to advantage one class of persons over another. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Most laws, of course, classify in one way or another, and in general these distinctions are presumed constitutional. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). But heightened scrutiny applies when a classification either "proceed[s] along suspect lines" or "involve[s] fundamental rights." *Id.* Pregnant women at risk of death from self-harm are not a suspect class, as all parties acknowledge. If, however, there is a fundamental right to a life-saving abortion, Idaho's exclusion of self-harm impinges on that right. Strict scrutiny would thus apply, meaning that the law survives only if "suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440.

While Defendants' proffered justifications—such as the existence of alternative treatments and the difficulty of verifying the threat of self-harm, which Defendants claim "can be professed by anyone"—likely pass muster under rational basis review, they do not necessarily satisfy strict scrutiny. It remains unclear whether these justifications constitute a compelling state interest, and even if they do, it is not clear whether the categorical self-harm exclusion is narrowly tailored to serve such interests—it applies even when psychiatric interventions have failed,

when the risk of death has been clinically verified through standardized, evidence-based protocols, and when the patient appears in imminent danger. These are questions the Court cannot resolve at summary judgment. The equal protection claim must therefore proceed to trial.

As a closing note, it is true that abortion poses a profound moral question,[13] and that such matters must generally be left to the states rather than the judiciary. But the Fourteenth Amendment exists to circumscribe what the state may force individuals to endure, and how far it may go when prioritizing some lives over others. Idaho could not make a mother undergo a bone marrow transplant to save her child. Can it require a pregnant woman to give up her ovaries or her kidneys in the hopes of saving a fetus? Answering that question will require the Court to weigh the evidence of our nation's history, traditions, and practices. For that reason, this case must go to trial.

---

[13] Defendants begin their brief by pointing to religious traditions that oppose abortion, including the Church of Jesus Christ of the Latter-Day Saints. Although legally irrelevant, it is worth noting that the LDS Church views abortion as permissible when the health of the mother is in serious jeopardy, and in cases of rape and incest or when the fetus will not survive past birth. *See Abortion*, Church of Jesus Christ of the Latter-Day Saints, https://newsroom.churchofjesuschrist.org/official-statement/abortion.

## ORDER

**IT IS ORDERED that:**

1.    Defendants' Motion for Summary Judgment (Dkt. 79) is **DENIED**.

DATED: February 9, 2026

_____
B. Lynn Winmill
U.S. District Court Judge