Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine St., No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Tanya Pellegrini*
LAWYERING PROJECT
584 Castro St., No. 2062
San Francisco, CA 94114
Phone: (646) 480-8973
tpellegrini@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., | )    Case No.: 1:24-cv-00244-BLW |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **PLAINTIFF'S PROPOSED** |
| | )    **FINDINGS OF FACT AND** |
| MEMBERS OF THE IDAHO BOARD OF | )    **CONCLUSIONS OF LAW** |
| MEDICINE, in their official capacities; *et al*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| ATTORNEY GENERAL RAÚL LABRADOR, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ........................................................................................... 1

I.      Idaho's Abortion Bans ............................................................................................. 1

    A. The Total Abortion Ban ......................................................................................... 1

    B. The Fetal Heartbeat Act ......................................................................................... 4

    C. State Court Declaratory Judgment Concerning the Abortion Bans ....................... 6

    D. Federal Court Injunctions Against Enforcement of the Total Abortion Ban ........ 6

II.     Parties and Witnesses .............................................................................................. 8

III.    The Physiology of Pregnancy ................................................................................ 13

IV.     Maternal Morbidity and Mortality ........................................................................ 17

V.      Maternal-Fetal Medicine ....................................................................................... 20

VI.     Medical Indications for Abortion ........................................................................... 21

VII.    Shared Decision-Making ....................................................................................... 27

VIII.   The Abortion Bans' Impact on Dr. Seyb's Practice ............................................. 29

    A. Patients Facing a Risk of Death From Self-Harm .............................................. 30

        1.  Patients With Substance Use Disorder ........................................................ 30

        2.  Patients With Other Mental Health Conditions .......................................... 32

        3.  Comparability to Patients Facing a Risk of Death from Other Medical Causes ............ 37

    B. Patients Facing a Risk of Serious Morbidity That is Not Necessarily Life-Threatening .. 40

        1.  Patients Who Develop Pregnancy-Related Complications ........................... 40

        2.  Patients with Underlying Conditions That Are Complicated by Pregnancy ......... 44

    C. Patients With Fetal Indications for Abortion ...................................................... 49

        1.  Patients Carrying an Embryo or Fetus With a Life-Limiting Condition ........ 49

        2.  Patients Seeking a Multi-Fetal Pregnancy Reduction .................................. 54

    D. Chilling Effect ..................................................................................................... 56

IX.     Historical Treatment of Therapeutic Abortion in American Law and Society ........ 58

    A. Fundamental Rights to Life and Health .............................................................. 58

    B. Abortion and Related Medical Treatments During the Medieval and Early Modern Periods .. 61

    C. Abortion Under the Common Law ...................................................................... 63

    D. Statutory Regulation of Abortion in the Nineteenth Century ............................ 78

        1.  In England ..................................................................................................... 78

        2.  In the United States ...................................................................................... 82

PROPOSED CONCLUSIONS OF LAW ................................................................. 108

I.  Standing ..................................................................................................... 108

   A. Article III Standing ............................................................................... 108

   B. Third-Party Standing............................................................................. 110

II.  Statutory Jurisdiction, Venue, and Right of Action ................................... 112

III.  Substantive Due Process ............................................................................ 112

   A. Access to Therapeutic Abortion is a Fundamental Right ..................... 112

   B. As Applied to Therapeutic Abortions, Idaho's Abortion Bans Fail Strict Scrutiny ........ 128

   C. As Applied to Therapeutic Abortions, Idaho's Abortion Bans Fail Rational Basis
      Scrutiny ................................................................................................. 129

IV.  Equal Protection ......................................................................................... 132

   A. Pregnant People with Life-Threatening Mental Health Conditions Are Similarly
      Situated to Pregnant People with Other Life-Threatening Medical Conditions ........ 132

   B. The Statutory Classification Fails Strict Scrutiny................................. 135

   C. The Statutory Classification Fails Rational Basis Scrutiny .................. 137

V.  Remedy ....................................................................................................... 138

**PROPOSED FINDINGS OF FACT**

### I.    Idaho's Abortion Bans

1. Two Idaho statutes banning abortion are currently in effect:  a ban on abortion throughout pregnancy, Idaho Code § 18-622 ("Total Abortion Ban"), and a ban on abortion when embryonic or fetal cardiac activity has been detected, Idaho Code §§ 18-8801 to 18-8808 ("Fetal Heartbeat Act"), (collectively, the "Abortion Bans").[1]

#### A. The Total Abortion Ban

2. The Total Abortion Ban was enacted in 2020 as a trigger ban.  *See Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1152 (Idaho 2023).  It took effect on August 25, 2022, thirty days after the Supreme Court issued judgment in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).  *See* Act of Mar. 24, 2020, ch. 284, § 1, 2020 Idaho Sess. Laws 827, 827 (S.B. No. 1385); *United States v. Idaho*, 623 F. Supp. 3d 1096, 1103 (D. Idaho 2022), *cert. before judgment granted sub nom. Moyle v. United States*, 144 S. Ct. 540 (2024) (mem.), *cert. dismissed as improvidently granted by* 603 U.S. 324 (2024) (per curiam), *appeal dismissed by* 131 F.4th 798, 804 (9th Cir. 2025).

3. In its original form, the Total Abortion Ban "ma[de] all 'abortions' a crime and include[d] a provision directing the appropriate professional licensing board to implement certain penalties against 'any health care professional' who violates it."  *Planned Parenthood Great Nw.*, 522 P.3d at 1152 (citations omitted).  Instead of exceptions, it allowed for "*legally justified abortions* through affirmative defenses to prosecution."  *Id.* at 1152-53.

---

[1] For the sake of clarity and consistency, Plaintiff uses the designations given to these statutes by the Idaho Supreme Court.  *See Planned Parenthood Great Nw., Hawaii, Alaska, Ind., Ky. v. State*, 522 P.3d 1132, 1152-53 (Idaho 2023).

4.      "The two affirmative defenses, stated generally, [we]re:  (1) "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman"; and (2) in the case of rape or incest, prior to the abortion, the woman provided the physician with a copy of her report of rape or incest to law enforcement." *Id.* at 1153.

5.      In 2023, the Idaho Supreme Court rejected a State constitutional challenge to the Abortion Bans, which included a claim that the first affirmative defense was unconstitutionally vague on its face. *Id.* at 1203-04.  In construing that provision for purposes of its vagueness analysis, the Idaho Supreme Court held that:

> [T]he statute does not require *objective* certainty, or a particular level of immediacy, before the abortion can be "necessary" to save the woman's life. Instead, the statute uses broad language to allow for the "clinical judgment that physicians are routinely called upon to make for proper treatment of their patients."

*Id.* at 1203 (citation omitted).  The Idaho Supreme Court further held that:  "Of course, a prosecutor may attempt to prove that the physician's subjective judgment that an abortion was 'necessary to prevent the death of the pregnant woman' was not made in 'good faith' by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary." *Id.* at 1204.

6.      Later in 2023, the Idaho Legislature amended the Total Abortion Ban and the statutory definition of abortion applicable to it.  Act of Apr. 4, 2023, ch. 298, §§ 1–2, 2023 Idaho Sess. Laws 906, 906-09 (H.B. No. 374).  Those amendments took effect on July 1, 2023.  *Id.* at 909.

7.      As amended, the definition of abortion applicable to the Total Abortion Ban provides that:

> "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for purposes of this chapter, abortion shall not mean:  (a) The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus; (b) The removal of a dead unborn child; (c) The removal of an ectopic or molar pregnancy; or (d) The treatment of a woman who is no longer pregnant.

Idaho Code § 18-604(1).

8.      As amended, the operative language in the Total Abortion Ban states that: "[E]very person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion."  *Id.* § 18-622(1).

9.      The 2023 statutory amendments converted the affirmative defenses to exceptions. The first exception currently exempts from liability a physician who "determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman" provided that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith judgment, termination of the pregnancy would have posed a greater risk of the death of the pregnant woman" from a cause other than self-harm.  *Id.* § 18-622(2)(a).  This exception does not apply when the pregnant person faces a risk of death from self-harm.  *Id.*

10.     The second exception now applies to survivors of rape or incest, but only if the survivor (or their parent or guardian if the survivor is a minor) reported the crime to a government agency and can furnish documentation of the report to the abortion provider.  *See id.* § 18-622(2)(b).

3

11.     Additionally, the Total Abortion Ban provides that criminal abortion does not encompass medical treatment that results in the accidental death of an embryo or fetus and does not "subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty."  *Id.* § 18-622(4)-(5).

12.     Criminal abortion constitutes a felony punishable by two to five years in prison. *Id.* § 18-622(1).  Further, the license of any licensed healthcare provider who performs or attempts a criminal abortion or assists with such action "shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense."  *Id.* § 18-622(1).

### B.  The Fetal Heartbeat Act

13.     The Fetal Heartbeat Act was originally enacted in 2021 as a trigger ban containing both a criminal enforcement provision and a private right of action for specified individuals.  *See* Fetal Heartbeat Preborn Child Protection Act, ch. 289, § 1, 2021 Idaho Sess. Laws 867, 867-69 (H.B. No. 366).

14.     In 2022, the Idaho Legislature amended the statute to, among other things, move the trigger language to the criminal enforcement provision and give the private right of action immediate effect.  *See* Fetal Heartbeat Preborn Child Protection Act, ch.152, § 4, 2022 Idaho Sess. Laws 532, 534-35 (S.B. No. 1309) (codified as amended at Idaho Code § 18-8805); *Planned Parenthood Great Nw.*, 522 P.3d at 1153.  The criminal enforcement provision was triggered by the Eleventh Circuit's decision in *SisterSong Women of Color Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320 (11th Cir. 2022).  It took effect thirty days after the judgment issued in that case.  *See* Idaho Code § 18-8805(1); *Planned Parenthood Great Nw.*, 522 P.3d at 1154.

15.     In its current form, the Fetal Heartbeat Act prohibits abortion care when embryonic or fetal cardiac activity is detectable, subject to narrow exceptions for certain medical emergencies and survivors of rape or incest.  *See* Idaho Code §§ 18-8801 to 18-8808.

16.     For purposes of the Fetal Heartbeat Act, "'[a]bortion' means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the preborn child," and "does not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus."  *Id.* § 18-8801(1).

17.     The operative language in the Fetal Heartbeat Act provides that:  "A person may not perform an abortion on a pregnant woman when a fetal heartbeat has been detected …."  *Id.* § 18-8804(1).  The statute defines "fetal heartbeat" to mean "embryonic or fetal cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac."  *Id.* § 18-8801(2).

18.     The statute contains an exception for cases of "medical emergency," *id.* § 18-8804(1), defined as "a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function," *id.* § 18-8801(5).

19.     The statute also contains an exception for survivors of rape or incest, but only if the survivor (or their parent or guardian if the survivor is a minor) reported the crime to a law enforcement agency or child protective services and can furnish documentation of the report to the abortion provider.  *See id.* § 18-8804(1).

5

20.     Under the criminal enforcement provision, violation of the Fetal Heartbeat Act constitutes a felony punishable by two to five years in prison.  Idaho Code § 18-8805(2).  The Idaho Board of Medicine may also suspend or revoke a healthcare provider's professional license.  *Id.* § 18-8805(3).

21.     The Fetal Heartbeat Act's criminal enforcement provision states that:  "Nothing in this section shall be construed to conflict with the effectiveness of [the Total Abortion Ban] …. In the event both this section and [the Total Abortion Ban] are enforceable, [the Total Abortion Ban] shall supersede this section."  *Id.* § 18-8805(4).

### C.  State Court Declaratory Judgment Concerning the Abortion Bans

22.     Last year, an Idaho district court issued a declaratory judgment that the Abortion Bans

> do not make it a crime to perform an 'abortion' as defined in [Idaho Code § 18-604(1)] if, in the performing physician's good faith medical judgment (based on the facts known to the physician at the time of the abortion), the patient—because of an existing medical condition or pregnancy complication that would be alleviated by an abortion—faces a non-negligible risk of dying sooner without an abortion (even if her death is neither imminent nor assured), so long as (i) the risk of her death doesn't arise from a risk of self-harm, and (ii) the manner of pregnancy termination is the one that, without … increasing the risk of her death, best facilitates the unborn child's survival outside the uterus, if feasible.

*Adkins v. State*, No. CV01-23-14744, slip op. at 39 (Idaho 4th Dist. Ct. Apr. 11, 2025).  The defendants, including the State of Idaho, the Idaho Attorney General, and the Idaho State Board of Medicine, did not appeal this judgment.

### D.  Federal Court Injunctions Against Enforcement of the Total Abortion Ban

23.     On August 24, 2022, one day before the Total Abortion Ban took effect generally, this Court preliminarily enjoined its enforcement "to the extent that [the] statute conflicts with" care mandated by the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(a), in a case brought by the federal government.  *Idaho*, 623 F. Supp. 3d at 1102.  The

6

U.S. Supreme Court subsequently stayed that injunction. *Moyle v. United States*, 144 S. Ct. 540 (2024) (mem.). The Supreme Court treated the stay applications as petitions for a writ of certiorari before judgment and granted the petitions, *id.*, but it later dismissed them as improvidently granted and vacated the stays it had entered, *Moyle v. United States*, 603 U.S. 324, 325 (2024) (per curiam). After President Trump took office, the Government dismissed the case. *See* Stip. of Dismissal, *United States v. Idaho*, No. 1:22-cv-329-BLW (D. Idaho Mar. 5, 2025), ECF No. 182.

24.     Following entry of a temporary restraining order on March 4, 2025, this Court on March 20, 2025, again entered a preliminary injunction barring enforcement of the Total Abortion Ban in circumstances that conflict with EMTALA's mandates, this time in a case brought by St. Luke's Health System. *St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953, 964, 987 (D. Idaho 2025). That preliminary injunction, which remains in effect, provides that:

> The Court orders that Attorney General Raúl Labrador—and his officers, employees, and agents—are preliminarily enjoined from enforcing Idaho Code § 18-622 against St. Luke's or any of its medical providers as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. Specifically, the Attorney General, including his officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, St. Luke's or any of its medical providers based on their performance of conduct that is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to "stabilize" a patient presenting with an "emergency medical condition" as required by EMTALA pursuant to 42 U.S.C. § 1395dd(e)(1)(A), (3)(A).

*Id.* at 987.

25.     On July 31, 2023, this Court entered a preliminary injunction barring the Idaho Attorney General from enforcing the Total Abortion Ban against licensed healthcare providers who refer patients to out-of-state abortion providers or otherwise provide information that

7

facilitates out-of-state abortion care. *Planned Parenthood Greater Nw. v. Labrador*, 684 F. Supp. 3d 1062, 1070, 1095 (D. Idaho 2023). The Ninth Circuit affirmed that preliminary injunction. *Planned Parenthood Gr. Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 833 (9th Cir. 2024). The Court subsequently entered a consent decree, which provides in relevant part:

> It is hereby ordered that the Attorney General of Idaho, the Ada County Prosecuting Attorney, and the Valley County Prosecuting Attorney shall not enforce Idaho Code § 18-622 against Plaintiffs for the conduct of referring a woman across state lines to an abortion provider, which includes, but is not limited to, informing about, counseling about, recommending, providing a referral for, scheduling an appointment for, informing about sources of funding for, or otherwise advising or assisting an individual in learning about or obtaining, an abortion or out-of-state consultation for abortion pills where that abortion will be performed or the out-of-state prescription will be filled outside the borders of Idaho where it is legal to obtain such abortion or prescription for abortion pills.

Consent Decree ¶ 22, *Planned Parenthood Gr. Nw., Haw., Alaska, Ind., Ky. v. Labrador*, No. 1:23-cv-142-BLW (D. Idaho July 17, 2025), ECF No. 193.

## II.    Parties and Witnesses

26.    Stacy Seyb, M.D., is the Plaintiff in this action. He is qualified to provide expert testimony about the treatment of patients with high-risk pregnancies. Dr. Seyb has served as an Attending Physician in maternal-fetal medicine for St. Luke's Health System since April 2000. *Anticipated Seyb Test.* He is board certified in obstetrics and gynecology and maternal-fetal medicine, and he is licensed to practice medicine in Idaho. *Id.* Dr. Seyb served on Idaho's Maternal Mortality Review Committee ("MMRC") from 2019 to 2023, and he chaired the committee during the final two years of his tenure. *Id.*; Pl. Ex. 1011 at 2 (2020 MMRC Report); Pl. Ex. 1012 at 2 (2021 MMRC Report). He currently serves as Idaho's State Liaison to the Society for Maternal Fetal Medicine ("SMFM"). *Anticipated Seyb Test.* During his time at St. Luke's, Dr. Seyb has delivered thousands of babies, and he has provided over 500 abortions, all

of which were medically indicated. *Id.* He would like to be able to offer abortion care to all pregnant patients with serious medical needs, and he stands ready, willing, and able to do so should the Court grant him the relief he is seeking in this case. *Id.*

27. The Members of the Idaho Board of Medicine ("Medical Board") are Defendants in this action. The Medical Board is the State agency responsible for overseeing the practice of medicine in Idaho, including the licensure of physicians. *See* Idaho Code §§ 54-1801 to 54-1821; Pl. Ex. 1018 at 11 (Medical Board Dep. at 19:19-23). It is required to suspend or revoke the license of any physician who violates the Total Abortion Ban or the Fetal Heartbeat Act. *See* Idaho Code §§ 18-622(1), 18-8805(3), 54-1806, 54-1806A. For a first violation of either statute, the Medical Board must impose a suspension "for a minimum of six (6) months" and has discretion to impose a longer suspension. *Id.* at §§ 18-622(1), 18-8805(3). In exercising that discretion, the Medical Board's disciplinary process generally includes multiple investigatory and adjudicatory steps to determine the appropriate length of the suspension. Pl. Ex. 1018 at 14-22 (Medical Board Dep. at 47:5-49:18; 72:20-80:22). The Medical Board has eleven members. Idaho Code § 54-1805. Plaintiff sues each member in the member's official capacity.

28. The Ada County Prosecuting Attorney is a Defendant in this action. Idaho's County Prosecuting Attorneys have primary responsibility for "enforcing all the penal provisions of any and all statutes of [Idaho]," Idaho Code § 31-2227(1), including the Abortion Bans, *id.* §§ 18-622, 18-8805. Plaintiff sues the Ada County Prosecuting Attorney in the attorney's official capacity.

29. Plaintiff named additional County Prosecuting Attorneys as Defendants, Compl. ¶¶ 18-60, Dkt. No. 1, but the Court dismissed Plaintiff's claims against them, Mem. Decision & Order 18-19, 41, Dkt. No. 54.

9

30.     The Attorney General of Idaho intervened in this case as a Defendant.  Mem. Decision & Order 5, Dkt. No. 66.

31.     Patricia Cline Cohen, Ph.D., is a witness for Plaintiff.  She is qualified to provide expert testimony about the law's treatment of abortion—and the social context for that treatment—throughout American history as well as the historical literature concerning abortion and abortion regulation in the United States.  She earned a Ph.D. in history from the University of California, Berkeley.  Pl. Ex. 1001 at 1 (Cohen CV).  She currently serves as the Edward A. Dickson Emerita Professor of History at the University of California, Santa Barbara ("UCSB"), and she previously served as a historian at UCSB from 1976 to 2014.  *Id.*  During 2012-2013, she was President of the Society for Historians of the Early American Republic ("SHEAR").  *Id.* at 2.  She has conducted extensive research on the history of abortion and abortion regulation in the United States, and in 2025, she convened a research conference at the Huntington Library titled "Abortion in American History:  Intimate Decisions, Medical Knowledge, and Legal Decrees in the Two Centuries Before *Roe v. Wade*."  *Id.*

32.     Carly Dahl, M.D., is a witness for Plaintiff.  She is qualified to provide expert testimony about the treatment of patients with high-risk pregnancies.  She is board certified in obstetrics and gynecology, board eligible in maternal-fetal medicine, and licensed to practice medicine in Utah and Wyoming.  Pl. Ex. 1002 at 1-2 (Dahl CV); *Anticipated Dahl Test.*  In addition to her M.D., Dr. Dahl holds a Master of Science in Clinical Investigation ("M.S.C.I.").  *Id.* at 1.  She also serves as an Adjunct Assistant Professor of Maternal-Fetal Medicine at the University of Utah.  *Id.*

33.     Alexandra Grosvenor Eller, M.D., is a witness for Plaintiff.  She is qualified to provide expert testimony about the treatment of patients with high-risk pregnancies.  She is

board certified in obstetrics and gynecology; maternal-fetal medicine; and complex family planning, and she is licensed to practice medicine in Utah.  Pl. Ex. 1003 at 1-2 (Eller CV).  Dr. Eller serves as an Assistant Professor of Obstetrics and Gynecology at the University of Utah School of Medicine.  *Id.* at 1.  In addition to her M.D., Dr. Eller holds a Master of Public Health ("M.P.H.") degree.  *Id.*

34.     Monica Eppinger, J.D., Ph.D., is a witness for Plaintiff.  She is qualified to provide expert testimony about the law's treatment of abortion—and the social context for that treatment—in the United States and England from medieval times through the twentieth century.  She earned a J.D. from Yale Law School and a Ph.D. in Anthropology from the University of California, Berkeley.  Pl. Ex. 1004 at 1 (Eppinger CV).  She serves as a Professor of Law and Anthropology at Saint Louis University School of Law.  *Id.* at 1.  She has conducted extensive research about Anglo-American law's treatment of abortion, and she authored *The Health Exception*, 17 Geo. J. of Gender & L. 665 (2016).  *Anticipated Eppinger Test.*

35.     Jennifer Payne, M.D., is a witness for Plaintiff.  She is qualified to provide expert testimony about reproductive psychiatry and the treatment of patients with perinatal psychiatric disorders.  She is board certified in psychiatry and neurology, and she is licensed to practice medicine in Maryland and Virginia.  Pl. Ex. 1005 at 1-2 (Payne CV).  At the University of Virginia ("UVA"), Dr. Payne serves as Director of the Perinatal Mental Health Clinic; Vice Chair of Research for Psychiatry and Neurobehavioral Sciences; and Director of the Reproductive Psychiatry Research Program.  *Id.* at 1, 5, 12.  She also serves as a Professor in the Psychiatry and Neurobehavioral Sciences Department, Division of Psychiatric Medicine, and she supervises UVA's Resident's Clinic.  *Id.* at 6, 12.  Prior to joining UVA, Dr. Payne was the founding Director of the Johns Hopkins Women's Mood Disorders Center, now called the Johns

11

Hopkins Reproductive Mental Health Center. *Id.* at 12. She has authored dozens of articles in peer-reviewed journals, and she serves as the principal investigator for several ongoing clinical studies, including the Prospective Study of Pregnant Women With and Without Mood Disorders. *Id.* at 5-6.

36.     Danielle Prentice, D.O., is a witness for Plaintiff. She is qualified to provide expert testimony about the treatment of pregnant patients with diabetes. She is board certified in obstetrics and gynecology and board eligible in maternal-fetal medicine, and she is licensed to practice medicine in Oregon and Washington State. Pl. Ex. 1006 at 1 (Prentice CV). Dr. Prentice serves as the Co-Director of the Diabetes and Pregnancy Program at Oregon Health & Science University ("OHSU"). *Id.* She also serves as an Assistant Professor of Obstetrics and Gynecology at the OHSU School of Medicine. *Id.* In addition, she serves as the Director of the Diabetes and Pregnancy Program at PeaceHealth Southwest Medical Center. *Id.* at 4.

37.     Diana Romero, Ph.D., is a witness for Plaintiff. She is qualified to provide expert testimony about medical sociology and public health. At the City University of New York ("CUNY"), Dr. Romero is a Professor in the Department of Community Health and Social Sciences at the Graduate School of Public Health and Health Policy as well as the Director of the Maternal, Child, Reproductive, and Sexual Health Specialization. Pl. Ex. 1007 at 4 (Romero CV). She earned a doctorate in Sociomedical Sciences from Columbia University and an M.A. in Scientific Journalism from New York University. *Id.* at 3.

38.     Marcela Smid, M.D., is a witness for Plaintiff. She is qualified to provide expert testimony about the treatment of patients with high-risk pregnancies and about substance use disorder. She is board certified in obstetrics and gynecology; maternal-fetal medicine; complex family planning; and addiction medicine, and she is licensed to practice medicine in Nevada;

12

North Carolina; Utah; and Wyoming.  Pl. Ex. 1008 at 1 (Smid CV).  At the University of Utah, Dr. Smid serves as the Director of Perinatal Addiction Service; Medical Director of the Substance Use & Pregnancy—Recovery, Addiction, Dependence (SUPeRAD) Clinic; and Medical Director of the Obstetric AirMed service.  *Id.* at 4.  At the University of Utah School of Medicine, Dr. Smid serves as an Associate Professor in the Department of Obstetrics and Gynecology, Division of Maternal-Fetal Medicine; as an Adjunct Assistant Professor in the Department of Psychology; and as an Adjunct Associate Professor in the Department of Psychiatry.  *Id.* at 1-2.  Dr. Smid also serves on the Steering Committee of the Utah Department of Health Opioid Safety Bundle, and she chairs the State of Utah's Maternal Mortality Review Committee.  *Id.* at 4-5.  In addition to her M.D., Dr. Smid holds an M.S. in Health & Medical Science and an M.A. in Medical Anthropology.  *Id.* at 1.

### III.    The Physiology of Pregnancy

39.    When a person becomes pregnant, their body rapidly undergoes various physiological changes to accommodate the growing fetus, support fetal development, and prepare for delivery and postpartum needs.  *Anticipated Smid Test.*  In fact, almost every organ system in the body changes during pregnancy.  *Id.*

40.    Starting with the cardiovascular system, blood volume increases by 30% to 100% in order to supply oxygen and nutrients to the developing embryo or fetus and support the pregnant person's body.  *Anticipated Smid Test.*  This means the heart must pump more blood each minute, increasing cardiac output.  *Id.*  For twins and higher-order gestations (e.g., triplets), the rate of increase is even higher.  *Id.*  Blood pressure changes throughout pregnancy.  *Id.*  Further, the growing uterus can compress the inferior vena cava—the large vein that returns blood from the lower body to the heart.  *Id.*  Immediately post-partum, the body must transform

13

again.  *Id.*  The uterus size decreases dramatically to prevent bleeding and the blood that was previously in the uterus returns into maternal circulation.  *Id.*

41.    With respect to the respiratory system, pregnancy increases the body's demand for oxygen, and the breathing rate often rises to meet the demand.  *Anticipated Smid Test.*  The expansion of the uterus pushes upward against the diaphragm, causing a feeling of shortness of breath.  *Id.*  The amount of air inhaled and exhaled with each breath increases, circulating more air through the lungs.  *Id.*  The oxygen disassociation curve causes a patient's entire pH (acid/base status) to change.  *Id.*

42.    The renal system is impacted by pregnancy because the kidneys must work harder than before to filter the increased volume of blood flowing through the body and excrete waste products from both the developing fetus and the pregnant person.  *Anticipated Smid Test.*  This increased filtration rate leads to increased urine output.  *Id.*

43.    The endocrine system changes as pregnancy dramatically increases certain hormones in the body, fundamentally altering the neurobiology of a pregnant person.  *Anticipated Smid Test.*  The placenta produces human chorionic gonadotropin, which supports embryonic and fetal development by triggering the production of increased progesterone and estrogen levels.  *Id.*  Progesterone levels increase significantly to maintain the uterine lining, suppress uterine contractions, and support pregnancy.  *Id.*  Estrogen levels rise steadily throughout pregnancy, contributing to uterine growth, breast tissue development, and increased blood flow to the uterus.  *Id.*  Prolactin levels rise to prepare for lactation after birth.  Pregnancy typically increases thyroid hormone production to help with metabolic changes.  *Id.*  To ensure that the developing embryo or fetus receives adequate glucose, pregnancy can also induce insulin resistance.  *Id.*  Additionally, because hormones function as neuro-steroids, these dramatic

fluctuations can affect neurotransmitter signaling including dopamine, serotonin, and GABA receptor modulation. *Id.*

44. In the gastrointestinal system, progesterone relaxes the smooth muscles, including those inside the gastrointestinal tract. *Anticipated Smid Test.* The liver increases its production of certain proteins, and there may be a slowing or cessation of bile acids moving from the liver to the gallbladder. *Id.*

45. In the musculoskeletal system, hormones like relaxin soften ligaments and joints. As the uterus grows, the center of gravity shifts and the body compensates by altering posture. *Anticipated Smid Test.* Weight gain increases the stress on the musculoskeletal system, especially the spine and lower limbs, resulting in increased pain. *Id.*

46. In the integumentary system, changes occur to the skin and hair. *Anticipated Smid Test.* Hormonal changes increase sweating. *Id.* Dark pigmentation may appear on the forehead and cheeks, and a dark vertical line may appear on the abdomen from the pubic area to the belly button. *Id.* The skin stretches rapidly, particularly around the abdomen, breasts, and thighs. *Id.* Estrogen prolongs the hair's growth phase. *Id.*

47. In the reproductive system, the uterus grows from the size of a pear to the size of a watermelon. *Anticipated Smid Test.* The cervix shortens and increases vascularity, and mucus plugs may form to protect a developing fetus from infections. *Id.*

48. Pregnancy causes a complex modulation of the immune system to protect the pregnant person from disease while preventing the rejection of the fetus. This can change the body's response to infection. *Anticipated Smid Test.*

49. In addition, pregnant people experience numerous physical changes that profoundly impact their daily lives. *Anticipated Eller Test.* For example, many pregnant people

15

experience frequent nausea and vomiting, especially during the first trimester. *Id.* Because pregnancy causes weight gain, over time, a pregnant person's regular clothes will no longer fit, and they will have to buy new ones. *Id.* Pregnancy causes a pregnant person's feet and ankles to swell, which in turn causes discomfort and limits their choice of footwear. *Id.* As pregnancy progresses, a pregnant person's abdomen expands and takes on a characteristic shape, announcing the pregnancy to others and making it difficult for the pregnant person to maintain privacy concerning their condition. *Id.* Abdominal weight gain often causes back pain and impairs balance and stability. *Id.* Further, as the uterus expands, it presses on the bladder, which may cause urinary incontinence. *Id.* The hormonal changes of pregnancy affect a pregnant person's emotions, memory, and concentration. *Id.* It is common for pregnant people to experience mood swings, increased emotional sensitivity, forgetfulness, and diminished ability to concentrate. *Id.*

50. A person cannot remain pregnant indefinitely. *Anticipated Eller Test.* Absent a spontaneous or induced abortion, a pregnant person must give birth. *Id.* Labor and delivery are extraordinarily painful processes. *Id.* Although there are medications that can help to manage the pain, some people cannot utilize them due to contraindications or the circumstances of their labor. *Id.* Vaginal childbirth has long-term impacts on a pregnant person's body. *Id.* These may include chronic pelvic floor dysfunction and chronic back pain. *Anticipated Eller Test.* Vaginal childbirth sometimes requires a clinician to perform an episiotomy—a painful surgical incision in the tissue between the vaginal opening and the anus—to facilitate delivery. *Id.* The alternative to vaginal childbirth is C-section. *Id.* This is a major abdominal surgery that entails significant risk of infection, hemorrhage, blood clots, and injury to the bladder or bowels. *Id.* A

16

C-section causes scarring, requires a weeks- or months-long recovery, and creates increased risk of complications in future pregnancies. *Id.*

### IV.    Maternal Morbidity and Mortality

51.    The physiological changes brought about by pregnancy sometimes lead to serious complications that result in maternal morbidity or mortality. *Anticipated Smid Test.*

52.    Maternal morbidity refers to a health condition or disability resulting from pregnancy or childbirth. *Anticipated Seyb Test.*; *Anticipated Smid Test.* Maternal morbidity can have serious, life-long impacts on a person's health. *Anticipated Smid Test.*

53.    Maternal mortality refers to the death of a pregnant or recently pregnant person. *Anticipated Seyb Test.*; *Anticipated Smid Test.*

54.    The United States has the highest rate of maternal mortality among high-income nations. *Anticipated Smid Test.*; 2019 Idaho Sess. Laws 336, § 1, 336 (H.B. No. 109).

55.    MMRCs are multidisciplinary groups that convene at the state or local level in the United States to systematically review deaths that occur during or within one year of the end of a pregnancy. *Anticipated Smid Test.* The Centers for Disease Control and Prevention ("CDC") provides technical assistance to MMRCs and operates a data system, the Maternal Mortality Review Information Application ("MMRIA" or "Maria"), that is designed to assist MMRCs across the country by providing a common data language. Pl. Ex. 1009 at 11 (2018 MMRC Report).

56.    In 2019, the Idaho legislature enacted a law that created a state-level MMRC in Idaho for the first time. 2019 Idaho Sess. Laws 336, 336-37 (codified at Idaho Code §§ 39-9601 to 39-9605). It was housed in the Idaho Department of Health and Welfare ("Health Department"). *Id.* That MMRC reviewed maternal mortality data for the years 2018 to 2021 and issued an annual report for each year summarizing its findings. Pl. Exs. 1009-1012 (2018-2021

17

MMRC Reports).  During that time, the MMRC was comprised of fourteen to sixteen members, including Dr. Seyb.  Pl. Ex. 1010 at 1-2 (2019 MMRC Report); Pl. Ex. 1011 at 1-2 (2020 MMRC Report); Pl. Ex. 1012 at 1-2 (2021 MMRC Report at 1-2); *Anticipated Seyb Test.*  The act that created this MMRC sunset on July 1, 2023, and the committee disbanded.  2019 Idaho Sess. Laws 336, 338; *Anticipated Seyb Test.*

57.     In 2024, the Idaho Legislature gave the Medical Board the power to "[c]ollect and review data and information concerning maternal mortality in the state of Idaho" and directed the Medical Board to "provide an annual summary report no later than January 31 each year to the legislature on the number of instances of maternal mortality and other information as determined by the board."  2024 Idaho Sess. Laws 333, 334 (H.B. No. 399).  The Medical Board used this authority to create a new MMRC that operates within the Idaho Division of Occupational and Professional Licenses.  Pl. Ex. 1014 at 10 (2023 MMRC Report); Pl. Ex. 1018 at 26-30 (Medical Board Dep. at 99:14-101:7; 106:23-107:9).  The new MMRC has only eleven members, and Dr. Seyb was excluded from participation.  Pl. Ex. 1013 at 2 (2022 MMRC Report); Pl. Ex. 1014 at 5 (2023 MMRC Report); Pl. Ex. 1015 at 2 (2024 MMRC Report); Pl. Ex. 1018 at 35 (Medical Board Dep. at 130:14-18); *Anticipated Seyb Test.*  The new MMRC first reviewed maternal deaths during 2023 and issued a report concerning its findings in 2025.  Pl. Ex. 1014 at 10 (2023 MMRC Report); Pl. Ex. 1018 at 31-33, 36 (Medical Board Dep. at 154:7-20; 109:9-111:8).  Subsequently, it reviewed maternal deaths during 2022 and 2024, and it issued reports concerning each of those years on January 27, 2026.  Pl. Ex. 1013 at 2, 9 (2022 MMRC Report); Pl. Ex. 1015 at 2 (2024 MMRC Report); Pl. Ex. 1018 at 31-32 (Medical Board Dep. at 109:23-110:5).

58.     Consistent with the CDC's MMRIA system, both Idaho MMRCs have distinguished between pregnancy-associated deaths and pregnancy-related deaths. Pl. Ex. 1009 at 5 (2018 MMRC Report); Pl. Ex. 1013 at 3 (2022 MMRC Report). A pregnancy-associated death is the death of a woman while pregnant or within one year of the end of the pregnancy, regardless of the cause. Pl. Ex. 1009 at 5 (2018 MMRC Report); Pl. Ex. 1013 at 3 (2022 MMRC Report). A pregnancy-related death is the death of a woman during pregnancy or within one year of the end of pregnancy from a pregnancy complication, a chain of events initiated by pregnancy, or the aggravation of an unrelated condition by the physiologic effects of pregnancy. Pl. Ex. 1009 at 5 (2018 MMRC Report); Pl. Ex. 1013 at 3 (2022 MMRC Report).[2]

59.     During the period 2018 to 2024, the leading underlying cause of pregnancy-related death in Idaho was mental health conditions, which includes both substance use disorders and other mental health conditions. Pl. Ex. 1016 (Summary of 2018-2024 MMRC Reports); Pl. Ex. 1011 at 18, 39 (2020 MMRC Report); Pl. Ex. 1012 at 21, 22 (2021 MMRC Report); Pl. Ex. 1013 at 17 (2022 MMRC Report); Pl. Ex. 1014 at 19 (2023 MMRC Report); Pl. Ex. 1015 at 6 (2024 MMRC Report). In its 2023 Report, the Medical Board's MMRC noted that: "Idaho's 2023 Pregnancy-Related Death (PRD) findings highlight that women with pre-existing health conditions have a higher risk of dying during pregnancy and for a year after childbirth …. Three

---

[2] The Medical Board's MMRC admits that Idaho's pregnancy-related mortality ratio is "statistically insignificant" due to the small sample size, Pl. Ex. 1013 at 10, 15 (2022 MMRC Report); Pl. Ex. 1015 at 4 (2024 MMRC Report), which means that no meaningful information can be gained from comparing the ratios in successive years. As the 2022 report notes: "Since the inception of the Idaho MMRC in 2018, total maternal deaths, specifically pregnancy-related deaths, have remained variable. As additional review years are released, gross trends may emerge showing potential gaps in maternal care. Although each death is tragic, the small number of annual deaths relative to total live births is statistically insignificant, making it difficult to rely solely on annual data to draw broad conclusions about healthcare safety and delivery in Idaho." Pl. Ex. 1013 at 10 (2022 MMRC Report).

19

(3) of the five (5) Pregnancy-Related Deaths had a mental health condition as a pre-existing condition."  Pl. Ex. 1014 at 20 (2023 MMRC Report).

60.    Data from the CDC and other state MMRCs shows that mental health conditions are also a leading cause of pregnancy-related death nationwide.  *Anticipated Payne Test.*

61.    After mental health conditions, the next most common causes of pregnancy-related death in Idaho during 2018-2024 were infection/sepsis and hemorrhage.

## V.    Maternal-Fetal Medicine

62.    Maternal-fetal medicine is a subspecialty of obstetrics and gynecology that focuses on the treatment of patients with high-risk pregnancies.  *Anticipated Eller Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.*  All pregnancies entail some risk of morbidity and mortality.  *Anticipated Eller Test.*; *Anticipated Smid Test.*  But some patients face heightened risks because of complications, pre-existing medical conditions, or other factors.  *Anticipated Eller Test.*; *Anticipated Smid Test.*  Maternal-fetal medicine specialists ("MFMs") treat patients facing risks of maternal morbidity and mortality that exceed the typical risks of pregnancy. *Anticipated Eller Test.*; *Anticipated Smid Test.*  Pregnant individuals are usually referred to MFMs by general obstetricians-gynecologists ("OB-GYNs"), other physicians, or midwives after these heightened risks are identified.  *Anticipated Eller Test.*; *Anticipated Smid Test.*

63.    After completing medical school and a residency in obstetrics and gynecology, physicians who want to be MFMs must complete a three-year fellowship.  *Anticipated Smid Test.*

64.    The leading professional organization for physicians in the United States is the American Medical Association ("AMA").  *Anticipated Smid Test.*  The leading professional organization for OB-GYNs in the United States is the American College of Obstetricians & Gynecologists ("ACOG").  *Anticipated Smid Test.*  The leading professional association for MFMs in the United States is the SMFM.  *Anticipated Smid Test.*  Each of these organizations

20

publishes standards and guidelines that help to define the standard of care for treating pregnant patients. *Anticipated Smid Test.*

## VI.    Medical Indications for Abortion

65.    In medicine, an "indication" is a symptom, condition, or factor that makes a particular course of action advisable. *Anticipated Seyb Test.*; *Anticipated Smid Test.*; Pl. Ex. 1018 at 37-38 (Medical Board Dep. at 173:22-174:18). An abortion is "medically indicated" when there is a medical reason for terminating a patient's pregnancy. *Anticipated Seyb Test.*; *Anticipated Smid Test.* Medical indications for abortion can be maternal or fetal in nature. *Anticipated Seyb Test.*; *Anticipated Smid Test.* Maternal indications arise from the pregnant person's condition, whereas fetal indications arise from the condition of the embryo or fetus. *Anticipated Seyb Test.*; *Anticipated Smid Test.*

66.    The term medically indicated abortion is synonymous with the term therapeutic abortion. *Anticipated Seyb Test.* Those terms can be used interchangeably. *Anticipated Seyb Test.*

67.    Given the sheer variety and diversity of patient health circumstances, it is impossible to catalog all maternal indications for abortion. *Anticipated Seyb Test.*; *Anticipated Smid Test.* A wide variety of complications can develop during pregnancy that pose serious threats to a patient's health but will not necessarily result in the patient's death. *Anticipated Seyb Test.*; *Anticipated Smid Test.* It is not possible to provide an exhaustive list of such complications, but some examples (discussed in more detail below) include preterm premature rupture of membranes ("PPROM"); cervical insufficiency; hypertensive disorders in pregnancy ("HDPs"); placental abnormalities; gestational diabetes; and major depressive disorder. *Anticipated Eller Test.*; *Anticipated Prentice Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.* Likewise, pregnancy can exacerbate a wide variety of underlying conditions and/or interfere with

21

their treatment.  It is not possible to provide an exhaustive list of such conditions, but some examples (discussed in more detail below) include heart disease; chronic kidney disease; cancer; Type 1 and Type 2 diabetes; substance use disorder; and other mental health disorders. *Anticipated Eller Test.*; *Anticipated Payne Test.*; *Anticipated Prentice Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.*

68.     Similarly, it is not possible to catalog the wide range of conditions that constitute fetal indications for abortion.  *Anticipated Dahl Test.*; *Anticipated Seyb Test.*  Plaintiff is seeking relief from the Abortion Bans only as to embryonic and fetal conditions that are life-limiting.  In this context, life-limiting is a medical term of art that encompasses fatal fetal conditions as well as conditions for which there is little or no prospect of long-term survival outside the uterus without severe morbidity, and for which there is no cure.  *Anticipated Dahl Test.*  Although it is not possible to provide an exhaustive list of these, some examples (discussed in more detail below) include anencephaly; achondrogenesis; bilateral renal agenesis; Hypoplastic Left Heart Syndrome ("HLHS"); iniencephaly; Limb-Body Wall Complex ("LBWC"); Meckel-Gruber Syndrome; Osteogenesis Imperfecta Type II; sirenomelia; thanatophoric dysplasia; Triploidy; Trisomy 13; Trisomy 16; Trisomy 18; and Trisomy 22.  *Anticipated Dahl Test.*; *Anticipated Seyb Test.*  In addition, Plaintiff is seeking relief from the Abortion Bans as to multi-fetal pregnancy reductions.  *Anticipated Seyb Test.*

69.     According to SMFM, "pregnancies complicated by pre-existing or new medical co-morbidities, including mental health conditions, present an even higher risk for dangerous complications, making access to abortion central to safe obstetric care." *Anticipated Smid Test.* (quoting SMFM, *Society for Maternal-Fetal Medicine Position Statement: Access to Abortion Care*, 231 Am. J. Obstetrics & Gynecology B7 (2024), https://doi.org/10.1016/j.ajog.2024.04.006.

22

70.    The State contends that abortion is never medically indicated because it is unsafe. The Court finds that this position is not supported by the evidence.

71.    In 2018, a Committee of the National Academies of Sciences, Engineering and Medicine ("National Academies") issued a Consensus Study Report on the Safety and Quality of Abortion Care in the United States after systematically reviewing the relevant evidence. *Anticipated Eller Test.* (citing Nat'l Acads. of Scis., Eng'g & Med., *The Safety and Quality of Abortion Care in the United States* (Nat'l Acads. Press 2018) [hereinafter National Academies Report], https://doi.org/10.17226/24950).  It concluded that abortion in the United States is safe; serious complications of abortion are rare; and abortion does not increase the risk of long-term physical or mental health disorders.  *Id.* (citing National Academies Report at 10, 152-53).

72.    A widely cited study published in 2012 compared the mortality rates associated with live births and legal induced abortions in the United States during 1998-2005.  *Anticipated Eller Test.* (citing Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012) [hereinafter Raymond & Grimes]).  It concluded that the risk of death associated with childbirth was approximately fourteen times higher than the risk of death associated with abortion, and the overall morbidity associated with childbirth also exceeded that with abortion.  *Id.* (citing Raymond & Grimes at 1-3).  Recently, a group of researchers conducted a similar analysis using data from 2018-2021.  *Id.* (citing Maria W. Steenland, et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, 9 JAMA Network Open e2554793 (2026) [hereinafter Steenland], https://doi.org/10.1001/jamanetworkopen.2025. 54793).  They found that the ratio of pregnancy- to abortion-related mortality during that period was between 44.3 and 69.6, at least three times higher than the ratio calculated using data from 1998 to 2005, reflecting higher rates

of pregnancy-related mortality and lower rates of abortion-related mortality compared with the earlier study period. *Id.* (citing Steenland at 1, 4-5). These studies demonstrate that abortion does not increase the risks that a pregnant person faces and is medically safer than childbirth. *Id.*

73. The State's contention that abortion poses a heightened risk of long-term mental health conditions is likewise unsupported by the evidence. Leading psychiatric authorities such as the American Psychiatric Association, the American Psychological Association, and the United Kingdom's Royal College of Psychologists have conducted robust scientific reviews of the relevant medical literature and uniformly concluded that there is no reliable evidence that abortion causes mental illness. *Anticipated Payne Test.* The National Academies found that much of the published research on this topic suffers from serious methodological flaws. *Id.* It explained that: "The utility of most of the published research on mental health outcomes is limited by selective recall bias, inadequate controls for confounding factors, and inappropriate comparators. Moreover, systematic reviews and meta-analyses are not reliable if they do not assess the quality of the primary research they include." *Id.* (citing National Academies Report at 149). The studies relied on by Dr. Kraus suffer from these methodological flaws. *Id.* Well-designed studies, like the Turnaway Study, have found that having an abortion does not increase the likelihood that a person will experience depression, post-traumatic stress disorder, or other mental health conditions. *Id.* Further, Dr. Kraus cites no reliable evidence in support of the claim that abortion increases mental health risks for pregnant people carrying an embryo or fetus with a life-limiting condition. *Id.*; *Anticipated Romero Test.*

74. Similarly, the Court finds that the evidence does not support the State's contention that a fetus can feel pain prior to viability. Leading medical authorities including ACOG, SMFM, and the Royal College of Obstetricians and Gynecologists have rejected this

24

claim.  *Anticipated Eller Test.*  While the evidence concerning fetal pain later in pregnancy is inconclusive, anesthesia and analgesics administered to a pregnant patient during an abortion procedure pass from the patient's circulatory system to the fetal circulatory system and would thereby prevent fetal pain if it were possible.  *Id.*

75.     The State's contention that being denied a therapeutic abortion is a net benefit for a patient's health because it enables the patient to maintain Medicaid eligibility for a longer period of time is also unsupported by the record.  The State has presented no evidence that having Medicaid during pregnancy is associated with postpartum improvement of underlying chronic health conditions.  In contrast, Dr. Romero's testimony identified substantial scientific evidence that chronic or worsened health conditions treated during pregnancy persist after a patient gives birth and that patients who are unable to obtain desired abortion care experience adverse social outcomes.  *Anticipated Romero Test.*

76.     Medicaid enrollees face particular challenges in accessing pregnancy-related care. *Anticipated Romero Test.*  National studies have documented reduced access to specialty care for Medicaid enrollees compared to those with private insurance.  *Id.*  A 2023 study examining the wait time for a new patient appointment with an OB-GYN subspecialist, such as an MFM, found a statistically significant difference by type of insurance, with a 44% longer wait time for Medicaid recipients.  *Id.*

77.     A recent analysis of the Nationwide Readmissions Database that included 24,719 patients readmitted within 180 days of delivery found that readmission rates were consistently higher for those with Medicaid than for those with private insurance, and patients covered by Medicaid at the time of delivery were more likely to become uninsured over time.  *Id.*  Thus,

Medicaid coverage at the time of delivery was a significant predictor of being readmitted to a hospital within six months and being uninsured at the time of readmission. *Id.*

78.     Idaho trails other states in Medicaid coverage for pregnant people. Idaho's income eligibility level for pregnant people seeking Medicaid coverage is capped at 138% of the Federal Poverty Line, which ties with South Dakota for last in the nation. *Anticipated Romero Test.* And Idaho patients eligible for Medicaid coverage because of their pregnancy status lose coverage within a year after the pregnancy ends. *Id.* As a result, many pregnant and postpartum people in Idaho lack health insurance and have inadequate access to health care. *Id.*

79.     The federal Office of the Inspector General recently studied maternal health care access in Medicaid Managed Care, focusing on provider coverage rules and network adequacy standards. *Anticipated Romero Test.* It identified forty-one states with comprehensive, risk-based managed care programs covering pregnant and/or postpartum enrollees; Idaho was not among them. *Id.*

80.     Idaho also trails other states in the availability of medical services. *Anticipated Romero Test.* The 2024 report of the American Association of Medical Colleges found that Idaho (and American Samoa) had the lowest number of both active and direct patient care physicians in the country. *Id.* Moreover, the number of practicing OB-GYNs in the State, which was low to begin with, has diminished significantly since the Abortion Bans took effect. *Id.*; *see infra* at ¶ 192.

81.     In 2022, 20% of people who gave birth in Idaho did not receive any prenatal care during the first trimester of pregnancy. *Anticipated Romero Test.* Given the exodus of OB-GYNs from Idaho, that number is likely to be higher today. *Id.*

## VII.    Shared Decision-Making

82.    The dominant model of decision-making in contemporary medical practice is known as shared decision-making. *Anticipated Smid Test.*

83.    Shared decision-making is rooted in the four principles of medical ethics: autonomy, or respecting patients' ability to make their own medical decisions; beneficence, or acting in a way that benefits the patient; nonmaleficence, or avoiding harm to the patient; and justice, or treating all patients in a fair and equitable manner. *Anticipated Smid Test.*

84.    Shared decision-making entails a collaborative process in which physicians and patients engage in a dialogue about key decisions that includes consideration of evidence-based options and the patient's personal values, goals, and preferences. *Anticipated Smid Test.*  Shared decision-making stands in stark contrast to older models of decision-making in which a physician would make a unilateral assessment of the patient's best interests and guide the patient toward the physician's preferred treatment option. *Id.*

85.    According to SMFM:  "Shared decision-making is the optimal counseling approach, and healthcare practitioners should utilize strategies that reduce barriers to informative, unbiased communication, prioritize patient values, and empower patients to make the best reproductive health choices for them." *Anticipated Smid Test.* (quoting Anjali Kaimal, et al., *Society for Maternal-Fetal Medicine Consult Series No. 55:  Counseling women at increased risk of maternal morbidity and mortality*, 224 Am. J. of Obstetrics & Gynecology B16, B21 (2021) [hereinafter SMFM Consult Series No. 55], https://doi.org/10.1016/j.ajog.2020.12.007).

86.    For shared decision-making to be effective, physicians must provide patients with clear, accurate, and unbiased information that informs the patient about their diagnosis, treatment options, potential risks, and expected outcomes. *Anticipated Smid Test.*  Physicians must also

27

inquire about the patient's values, goals, and preferences. *Id.* Even if a patient's decision may conflict with what the physician believes is medically optimal, as long as the patient is competent and fully informed, the physician must respect the patient's decision. *Id.*

87. Idaho's current MMRC recommends use of "shared decision-making to plan for potential complications or emergency situations when a patient's religious, moral, or cultural beliefs may require accommodations to maintain compliance with standard of care." Pl. Ex. 1015 at 7 (2024 MMRC Report); *accord* Pl. Ex. 1013 at 20 (2022 MMRC Report).

88. SMFM advises that a pregnant person at heightened risk of maternal morbidity or mortality "should receive nondirective counseling regarding the potential risks and benefits of pregnancy continuation, including the short- and long-term implications of expectant management or medical intervention for the condition placing her at an increased risk, and the risks and benefits of pregnancy termination." *Anticipated Smid Test.* (quoting SMFM Consult Series No. 55 at B19). It further advises that: "When indicated during pregnancy, counseling regarding pregnancy termination should be performed as expeditiously as possible to optimize choices and outcomes." *Id.* (quoting SMFM Consult Series No. 55 at B19-20).

89. When medical indications for abortion arise during pregnancy, patients face complex and often heart-wrenching decisions about how to proceed. *Anticipated Seyb Test.*; *Anticipated Smid Test.* Patients generally do not take these decisions lightly and give strong consideration to their personal values and religious beliefs. *Anticipated Seyb Test.*; *Anticipated Smid Test.* They take a variety of individualized factors into account, such as the nature and magnitude of the risks to their health; the likelihood that their pregnancy will result in a live birth; the degree to which their child may suffer after birth; the impact that their own death or disability would have on their loved ones, including any current children; their desired family

28

size; risks to their future fertility; the strength of their social and emotional support systems; their financial resources and the medical resources available in their community; and their prior experiences with pregnancy. *Anticipated Seyb Test.*; *Anticipated Smid Test.*

90.    Dr. Seyb engages in shared decision-making with his patients. *Anticipated Seyb Test.* Not all of his patients with medical indications for abortion choose to have an abortion, but many do. *Anticipated Seyb Test.*; *see also Anticipated Dahl Test.*; *Anticipated Payne Test.*; *Anticipated Prentice Test.*; *Anticipated Eller Test.*; *Anticipated Smid Test.*

## VIII.    The Abortion Bans' Impact on Dr. Seyb's Practice

91.    Dr. Seyb is not a high-volume abortion provider. *Anticipated Seyb Test.* Most of the patients he treats have wanted pregnancies. *Id.* Nevertheless, throughout his more than twenty-five-year tenure as an MFM at St. Luke's, he has regularly performed a few dozen therapeutic abortions each year for patients with serious medical needs. *Id.*

92.    Since Idaho's Abortion Bans have been in effect, Dr. Seyb has had to refer some patients with serious medical needs to out-of-state abortion providers. *Anticipated Seyb Test.*[3]

93.    But for the Abortion Bans, Dr. Seyb would continue to offer abortion care in Idaho to all patients with serious medical needs seeking such care, rather than refer them to out-of-state abortion providers. *Anticipated Seyb Test.* That includes patients with serious medical needs arising from physical health conditions; patients with serious medical needs arising from

---

[3] Many of Plaintiff's expert witnesses are MFMs who practice in states bordering Idaho. *See supra* at ¶¶ 32-33, 36, 38. Since the Abortion Bans took effect, they have provided therapeutic abortion care to numerous Idaho patients referred to them by Dr. Seyb or his colleagues in Idaho. For example, Dr. Eller has provided therapeutic abortion care to at least five patients who traveled from Idaho, including one with preexisting heart failure, several with PPROM, and one seeking a multi-fetal pregnancy reduction. *Anticipated Eller Test.* Similarly, Dr. Smid has provided therapeutic abortion care for one to three patients per year who traveled from Idaho, including patients with PPROM, hypertensive disorders of pregnancy, and life-limiting fetal conditions.

mental health conditions; and patients with serious medical needs arising from embryonic and fetal conditions.  *Id.*

### A. Patients Facing a Risk of Death From Self-Harm

94.    The Total Abortion Ban prohibits therapeutic abortion in cases where a patient faces a risk of death from self-harm.  Idaho Code § 18-622(2)(a)(i) ("No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself.").  The Fetal Heartbeat Act prohibits therapeutic abortion in a subset of such cases—when embryonic or fetal cardiac activity is detectable—unless the patient is experiencing a "medical emergency" that necessitates an "immediate abortion."  Idaho Code §§ 18-8801(2), 18-8801(5), 18-8804(1).

95.    But for the Abortion Bans, Dr. Seyb would provide therapeutic abortion care to all patients facing a risk of death from self-harm who sought abortion care from him.  *Anticipated Seyb Test.*

96.    Pregnant patients with certain medical conditions are at a heightened risk of death from self-harm.  *Anticipated Payne Test.; Anticipated Smid Test.*

### 1. Patients With Substance Use Disorder

97.    One such condition is substance use disorder.  *Anticipated Smid Test.*

98.    Substance use disorder is a chronic brain disease that results in the compulsive use of certain substances and negatively affects a patient's health and quality of life.  *Anticipated Smid Test.*  Examples of such substances include alcohol, opioids, cocaine, and methamphetamine.  *Id.*

99.    Using these substances alters how a patient's brain functions.  *Anticipated Smid Test.*  It causes the brain to release the neurotransmitter dopamine, which can lead a patient to

30

temporarily experience a pleasurable feeling or "high." *Id.* Over time, the brain perceives use of the substance as necessary to maintain well-being, and the patient seeks it out compulsively. *Id.*

100. Substance use disorder ranges in severity from mild to severe. *Anticipated Smid Test.* For people with severe substance use disorder, cessation of substance use is extremely difficult. *Id.*

101. Patients with substance use disorder are at risk of death from overdose. *Anticipated Smid Test.* Use of some substances may also lower patient inhibitions and impair motor skills and cognitive abilities, putting patients at higher risk of accidental death. *Id.* In addition, substance use disorder makes it harder for patients with co-morbidities to follow a treatment plan for those morbidities. *Id.* For example, patients may struggle to take medications on schedule or attend regular medical appointments. *Id.*

102. Pregnancy creates a higher risk of overdose and impairment for people with substance use disorder because the physiological changes caused by pregnancy affect the way that substances impact the body. *Anticipated Smid Test.* Further, the stress of pregnancy and caring for a newborn makes it harder for a person with substance use disorder to abstain from using substances. *Id.*

103. Moreover, people with alcohol use disorder face a Catch-22 when they become pregnant. Continuing to use alcohol is harmful to the developing embryo or fetus, but abrupt cessation of alcohol use poses a high risk of morbidity and mortality for the pregnant person. *Anticipated Smid Test.* Supervised withdrawal in a hospital setting is optimal, but there are not enough programs to meet patient need. *Id.* Further, some patients face financial and/or logistical barriers to obtaining in-patient care. *Id.* Accordingly, this option is not available to everyone. *Id.*

104.    Seizure disorders are disproportionately present in people with substance use disorder.  *Anticipated Smid Test.*  Pregnant patients who have both an opioid use disorder and a seizure disorder have a heightened risk of morbidity and mortality during opioid withdrawal.  *Id.*  As with alcohol use disorder, supervised withdrawal in a hospital setting is optimal, but not all patients can access this kind of care.  *Id.*

105.    Terminating a pregnancy reduces the risk that a pregnant person with substance use disorder will die during pregnancy or during the post-partum period from a cause related to the use of substances.  *Anticipated Smid Test.*

### 2.  Patients With Other Mental Health Conditions

106.    Pregnant patients with certain other mental health conditions are also at heightened risk of death from self-harm.  *Anticipated Payne Test.*

107.    Such conditions include major depressive disorder, bipolar disorder, schizophrenia, and schizoaffective disorder.  *Anticipated Payne Test.*  This is not an exhaustive list.  *Id.*

108.    Major depressive disorder is a serious mental health condition that causes a patient, on a persistent or periodic basis, to experience severely low mood that results in functional impairment.  *Anticipated Payne Test.*  Functional impairment refers to a significant difficulty or disruption in one or more areas of life, such as a person's ability to (1) perform daily activities, such as feeding and hydrating oneself, maintaining personal hygiene, conducting daily chores, or managing finances; (2) pursue or fulfill work- or school-related responsibilities; (3) maintain healthy interpersonal relationships; or (4) regulate emotions and engage in cognitive functioning, including processing, keeping memories, concentrating on tasks, or decision-making.  *Id.*  Major depressive disorder is distinct from adjustment disorder, a condition in which people experience low mood due to a stressful or traumatic life event.  *Id.*  Whereas adjustment

32

disorder calls for social support and talk therapy, major depressive disorder calls for psychiatric intervention. *Id.*

109. Bipolar disorder is a serious mental health condition in which patients experience mood fluctuations between periods of abnormally elevated mood and energy and major depressive episodes. *Id.* There are different varieties of bipolar disorder, but all bipolar patients experience symptoms that can significantly impact their work, relationships, ability to carry out daily activities, and personal safety. *Id.*

110. Schizophrenia is a serious mental health condition that is characterized by some or all of the following symptoms: delusions; hallucinations; catatonia; disorganized thought, behavior, or speech; an inability to show emotions; apathy; difficulty talking; and withdrawing from social situations and relationships. *Anticipated Payne Test.*

111. Schizoaffective disorder is a serious mental health condition in which patients prominently exhibit mood symptoms (such as those found in people living with major depressive disorder or bipolar disorder) as well as symptoms found in people living with schizophrenia in between mood episodes. *Anticipated Payne Test.*

112. Some patients with the foregoing conditions experience psychosis, suicidality, nonsuicidal self-injury, and catatonia, all of which create a risk of death. *Anticipated Payne Test.*

113. Psychosis encompasses a range of psychiatric symptoms typically marked by a distorted perception of reality. *Anticipated Payne Test.* Patients experiencing psychosis may present with hallucinations, delusions (including paranoia), disorganized thinking, or disorganized behavior, each indicative of a departure from typical mental function. *Id.* A psychotic patient might act on their false perceptions and beliefs to engage in risky behavior, like running into traffic, injuring themselves, or attempting suicide. *Id.*

114.    Suicidality refers to a heightened risk that a patient will take deliberate action to end their life that typically presents with suicidal ideation (intrusive thoughts or plans about ending one's life).  *Anticipated Payne Test.*

115.    Nonsuicidal self-injury refers to engaging in deliberate conduct with the intent of hurting oneself.  *Anticipated Payne Test.*  It encompasses a spectrum of behavior, including ingesting harmful substances and engaging in behaviors that cause bleeding, bruising, burns, or pain.  *Id.*  Nonsuicidal self-injury is distinct from suicidality; it can serve as a coping mechanism for emotional distress, a signal to others that the individual is distressed, or a reassurance for patients that they are still alive.  *Id.*  Nevertheless, nonsuicidal self-injury may result in a patient's death.  *Id.*

116.    Catatonia refers to a range of psychomotor abnormalities that disrupt how a person processes and reacts to the world around them and interfere with mobility and communication.  *Anticipated Payne Test.*  Catatonia poses risks to a patient's health and life because it impairs their daily functioning.  *Id.*  Patients with catatonia may also develop dehydration and malnutrition; autonomic nervous system instability, which can lead to dangerous fluctuations in body temperature, heart rate, and blood pressure; and blood clots, which can cause stroke or pulmonary embolism.  *Id.*  Catatonia is primarily associated with psychiatric illnesses, but it can also be a symptom of other medical issues.  *Id.*

117.    Pregnancy exacerbates many mental health conditions and complicates their treatment.  *Anticipated Payne Test.*  The dramatic hormonal fluctuations triggered by pregnancy fundamentally change the neurobiology of a pregnant person.  *Id.*  People living with mental health conditions that were well managed before pregnancy may experience recurrence or a worsening course of their condition after becoming pregnant or giving birth.  *Id.*

34

118.    In addition, pregnancy itself may trigger a sudden onset of mental health conditions that present with health- or life-threatening symptoms. *Anticipated Payne Test.* For example, perinatal depression (depression during pregnancy or the postpartum period) is a type of major depressive disorder that is likely related to and caused by hormonal changes that are associated with pregnancy and childbirth. *Id.* Dr. Payne has treated many patients with this condition and has also conducted extensive clinical research about it. *Id.* Her research identified two biomarkers of heightened sensitivity to fluctuations in hormones such as estrogen and progesterone that predict with 80% accuracy which pregnant patients will experience perinatal depression. *Id.* While the cause of this hormonal sensitivity is not yet fully understood, the presence of biomarkers makes clear that it has a biological basis. *Id.*

119.    Compounding the challenges that pregnant patients face, the physiological changes of pregnancy, including increases in blood volume and changes in metabolism, affect the way that the body responds to medications. *Anticipated Payne Test.* For some patients with serious mental health conditions, medications may not be as effective during pregnancy as they were before. *Id.* While some patients respond to an increased dosage, others do not, and they may experience health- or life-threatening psychiatric symptoms. *Id.*

120.    Studies have found that, among women with major depressive disorder managing their condition with medication, approximately 25% experienced relapse during pregnancy despite continuing their medications. *Anticipated Payne Test.* For women living with bipolar disorder, about 30% of those who continued their medications during pregnancy experienced relapse. *Id.*

121.    Furthermore, some medications used to treat serious mental health conditions have teratogenic effects, which means that they can cause profound and lasting harm to a

35

developing embryo or fetus.  *Anticipated Payne Test.*  Such medications include carbamazepine and valproic acid.  *Id.*  Patients who become pregnant while taking these medications must consider the risks to the fetus of continuing to use the medication as well as the risks to themselves of switching to a different medication, which may be less effective or cause greater side effects, or of ceasing medication entirely.  *Id.*

122.    Seventy percent of patients with major depressive disorder and 80%-100% of patients with bipolar disorder or schizoaffective disorder who stop their psychiatric medications for pregnancy experience a relapse of their psychiatric condition and can experience life- or health-endangering symptoms.  *Anticipated Payne Test.*

123.    These patients cannot easily switch to a different psychiatric medication that is not teratogenic.  *Anticipated Payne Test.*  Most pregnant patients who take carbamazepine or valproic acid, for example, have usually failed to respond to other, non-teratogenic mood stabilizing medication.  *Id.*  Given the risks, clinicians are reluctant to prescribe them to women of reproductive age except as a last resort.  *Id.*

124.    When pregnant patients experience a relapse of their mental health condition after stopping a medication or switching to a different one, their symptoms often get worse. *Anticipated Payne Test.*  The more severe the symptoms become, the harder they are to treat.  *Id.* Moreover, restarting the medication after pregnancy may not have the same level of efficacy.  *Id.* Such loss of efficacy is a well-known clinical phenomenon.  *Id.*

125.    Dr. Seyb once treated a patient with bipolar disorder who became pregnant. *Anticipated Seyb Test.*  Before her pregnancy, the patient was taking medication to manage her condition.  *Id.*  She decided to continue the pregnancy and stop taking her medication to avoid

risks to the fetus.  *Id.*  Subsequently, her mental health deteriorated.  *Id.*  She was able to carry the fetus to term and give birth, but she died from suicide during the postpartum period.  *Id.*

126.    Pregnant patients who experienced a serious mental health condition in connection with a prior pregnancy are likely to develop a serious mental health condition during their current pregnancy.  *Anticipated Payne Test.*  For example, women who have experienced perinatal depression have a 75% risk of developing depression in connection with a subsequent pregnancy.  *Id.*

127.    For some patients experiencing the onset, recurrence, or worsening of mental health conditions because of pregnancy, life-threatening symptoms such as psychosis, suicidality, nonsuicidal self-injury, and catatonia cannot be effectively managed through psychotherapy, medication, or other psychiatric treatments.  *Anticipated Payne Test.*  For these patients, terminating the pregnancy is the only way to eliminate the symptoms and corresponding risk to the patient's life.  *Id.*

128.    For example, Dr. Payne treated a patient with well-managed bipolar disorder who had a history of worsening major depressive episodes during pregnancy.  *Anticipated Payne Test.* When she became pregnant for the third time, she experienced life-threatening symptoms, including suicidality and non-suicidal self-injury, that did not improve with medication management and psychotherapy.  *Id.*  The patient ultimately chose to have an abortion to eliminate the threat to her health and life.  *Id.*

### 3.  Comparability to Patients Facing a Risk of Death from Other Medical Causes

129.    The State contends that pregnant people facing a risk of death from self-harm are dissimilar to pregnant people facing a risk of death from other medical causes in four respects: (1) self-harm is not limited to any specific physical condition; (2) determining the risk of self-

harm depends on self-reporting, which is unreliable; (3) whether a person experiences suicidal ideation or attempts suicide can be unpredictable; and (4) unlike risks from other medical conditions, self-harm causes injury only through an affirmative action by the patient. The record does not support these contentions. To the contrary, it demonstrates that the people in each group are similarly situated in all respects.

130.    First, the risk of death from self-harm, like the risk of death from other medical causes, arises from specific, diagnosable medical conditions that have physical causes, such as the impact of neurotransmitters and hormones on brain function. *Anticipated Payne Test.*; *Anticipated Smid Test.* An illustrative list of such medical conditions is provided above. *Supra* at ¶¶ 97, 107.

131.    Second, clinicians do not rely on patient self-reporting to determine whether a patient faces a risk of death from self-harm. *Anticipated Payne Test.*; *Anticipated Smid Test.* As with all health conditions, clinicians identify psychiatric symptoms and diagnose mental health conditions through a comprehensive process. *Anticipated Payne Test.*; *Anticipated Smid Test.* When evaluating patients for mental health conditions, clinicians reference the Diagnostic and Statistical Manual of Mental Disorders, also known as the DSM-5-TR, which provides criteria to define and diagnose psychiatric conditions. *Anticipated Payne Test.*; *Anticipated Smid Test.* In addition, clinicians draw from other medical literature, their training, clinical experience, and professional expertise to assess patients' behavior and demeanor, interactions with others, and communication patterns. *Anticipated Payne Test.*; *Anticipated Smid Test.* Clinicians may also consider a patient's medical history and the results of certain diagnostic tests. *Anticipated Payne Test.*; *Anticipated Smid Test.* A clinician cannot predict with 100% certainty that a patient will die from self-harm if an underlying medical condition is left untreated, just as a clinician cannot

38

predict with 100% certainty that a patient will die from infection or stroke if an underlying medical condition is left untreated. *Anticipated Payne Test.*; *Anticipated Smid Test.* Nevertheless, the diagnostic criteria that clinicians use to determine whether a patient faces a risk of death from self-harm are reliable. *Anticipated Payne Test.*; *Anticipated Smid Test.*

132.    Third, clinicians can make *reasonable* predictions about whether a patient will experience suicidal ideation or attempt suicide based on the patient's diagnosis, prior medical history, and other symptoms, just as clinicians can make *reasonable* predictions about whether a patient will experience hemorrhage or organ failure. *Anticipated Payne Test.* Clinicians can rarely, if ever, make predictions with 100% certainty. *Anticipated Dahl Test.*; *Anticipated Eller Test.*; *Anticipated Payne Test.*; *Anticipated Prentice Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.* Psychiatry is no different than other areas of medicine in that regard. *Anticipated Payne Test.*

133.    Fourth, self-harm is not volitional. *Anticipated Payne Test.*; *Anticipated Smid Test.* It is the result of pathological conditions that affect patients' brain chemistry and function. A patient cannot rely on willpower to overcome a serious mental health condition like major depressive disorder or substance use disorder any more than a patient can rely on willpower to overcome cancer or diabetes. *Anticipated Payne Test.*; *Anticipated Smid Test.* For all of these conditions and many others, a patient's own actions (e.g., diet, physical activity level, adherence to treatment plan) may contribute to the progression of the disease. *Anticipated Payne Test.*; *Anticipated Smid Test.* But none of these mental or physical health conditions are the result of a conscious choice, and none can be effectively managed without medical intervention. *Anticipated Payne Test.*; *Anticipated Smid Test.* The notion that the risk of death from self-harm is a patient's fault or could be eliminated if only the patient exhibited more grit or determination

39

is rooted in stigma against psychiatric illness and a fundamental misunderstanding of mental health. *Anticipated Payne Test.*; *Anticipated Smid Test.*

### B. Patients Facing a Risk of Serious Morbidity That is Not Necessarily Life-Threatening

134.    The Total Abortion Ban prohibits therapeutic abortion in cases where continued pregnancy poses a risk of serious morbidity to the pregnant person that is not necessarily life-threatening. Idaho Code § 18-622(1), (2)(a). The Fetal Heartbeat Act prohibits therapeutic abortion in a subset of such cases—when embryonic or fetal cardiac activity is detectable—unless the patient is experiencing a "medical emergency" that necessitates an "immediate abortion of her pregnancy … for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." Idaho Code §§ 18-8801(2), 18-8801(5), 18-8804(1).

135.    But for the Abortion Bans, Dr. Seyb would provide therapeutic abortion care to all patients who sought abortion care from him for whom continued pregnancy posed a risk of serious morbidity. *Anticipated Seyb Test.*

### 1. Patients Who Develop Pregnancy-Related Complications

136.    As explained above, a wide range of pregnancy-related complications pose a risk of serious morbidity to a pregnant person. *Supra* at ¶ 67. It is not possible to provide an exhaustive list of such complications and conditions. *Id.*

137.    PPROM, cervical insufficiency, HDPs, and placental abnormalities are illustrative examples of pregnancy-related complications that pose a risk of serious morbidity to a pregnant person but are not necessarily life-threatening. *Anticipated Eller Test.*; *Anticipated Prentice Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.* Mental health conditions whose onset is

triggered by pregnancy can also pose such a risk, *supra* at ¶ 118, as can gestational diabetes, *infra* at ¶ 157.

138.    PPROM occurs when a patient's gestational sac ruptures before the pregnancy reaches full term, allowing amniotic fluid to leak out, disrupting the barrier between the fetus and normal bacteria on our bodies. *Anticipated Seyb Test.*; *Anticipated Smid Test.*  A pregnant person who experiences PPROM is at risk of developing an infection, which can lead to sepsis. *Anticipated Seyb Test.*; *Anticipated Smid Test.*  Sepsis is fatal in some cases. *Anticipated Seyb Test.*; *Anticipated Smid Test.*  When it is not fatal, it can cause permanent organ damage, cognitive impairment, and an increased risk of developing future infections. *Anticipated Seyb Test.*; *Anticipated Smid Test.*  PPROM also poses serious risks of fetal impairment. *Anticipated Smid Test.*  The earlier in pregnancy that PPROM occurs, the lower the likelihood of fetal survival. *Id.*  ACOG and SMFM both recommend that, when PPROM occurs prior to fetal viability, patients should be offered the option of immediate pregnancy termination. *Id.* (citing SMFM, *Society for Maternal-Fetal Medicine Consult Series No. 71: Management of previable and periviable preterm prelabor rupture of membranes*, 231 Am. J. Obstetrics & Gynecology B2, B5 (2024), https://doi.org/10.1016/j.ajog.2024.07.016).  Terminating a pregnancy reduces the risk that a pregnant person with PPROM will experience serious morbidity as a result of that condition. *Id.*

139.    After the Abortion Bans took effect but before the St. Luke's EMTALA injunction was in place, Dr. Seyb saw a patient who was approximately eighteen weeks' pregnant and presented with grossly ruptured membranes. *Anticipated Seyb Test.*  She showed early signs of an infection, including an elevated white blood cell count and an elevated heartbeat. *Id.*  Dr. Seyb's assessment led him to conclude that the patient had an early intrauterine infection and,

41

unless her pregnancy was terminated, she would develop a worsening infection.  *Id.*  He could not make a good faith determination that the infection would be fatal, however.  *Id.*  If the patient delayed termination until it became clear that death was inevitable, it might have been too late to save her life.  *Anticipated Seyb Test.*  She wanted to terminate the pregnancy immediately, so Dr. Seyb referred her to an MFM in Utah and arranged for air transport.  *Id.*  By the time the patient arrived in Utah, she met the criteria for sepsis.  *Id.*

140.    Cervical insufficiency is a condition where the cervix dilates prematurely leading to the membranes, and possibly the fetus, beginning to pass through the cervix.  *Anticipated Seyb Test.*  This exposes the uterine contents to the normal bacteria of the body.  *Id.*  It is sometimes possible to replace the contents into the uterus and close the cervix with a cerclage, a procedure in which a stitch or band is placed around the cervix to help keep it closed, but the risks of infection are very high and PPROM is likely to occur.  *Id.*  Terminating a pregnancy reduces the risk that a pregnant person with cervical insufficiency will experience serious morbidity as a result of that condition.  *Id.*

141.    Before the Abortion Bans took effect, Dr. Seyb treated a patient who was admitted to the hospital at twenty weeks of pregnancy after presenting with no pain but feeling that something was wrong.  *Anticipated Seyb Test.*  On examination, Dr. Seyb found that the patient's membranes as well as fetal parts extended beyond the cervix.  *Id.*  Dr. Seyb believed that it would have been nearly impossible for the pregnancy to progress to viability, and prolonging the pregnancy would have placed the patient at risk of infection and complications.  *Id.*  After engaging in shared decision-making with the patient, Dr. Seyb terminated her pregnancy.  *Id.*  If he encountered a patient in the same condition today, he would refer her to an out-of-state physician because of the Abortion Bans.  *Id.*

142.    Placental abnormalities include placenta previa (when the placenta covers the cervix) and placental abruption (when the placenta prematurely detaches from the uterus). *Anticipated Seyb Test.*; *Anticipated Smid Test.*  These conditions may cause hemorrhaging or disseminated intravascular coagulation ("DIC"), a blood clotting disorder, both of which can lead to organ damage, organ failure, loss of future fertility, and in some cases, death.  *Anticipated Seyb Test.*; *Anticipated Smid Test.*  Serious morbidity is a more common outcome than death. *Anticipated Seyb Test.*; *Anticipated Smid Test.*  Terminating a pregnancy reduces the risk that a pregnant person with a placental abnormality will experience serious morbidity as a result of that condition.  *Anticipated Smid Test.*

143.    Before the Abortion Bans took effect, Dr. Seyb treated a patient who started to experience vaginal bleeding from a placental abruption at approximately twelve weeks of pregnancy.  *Anticipated Seyb Test.*  By approximately seventeen weeks of pregnancy, the patient required a blood transfusion for anemia.  *Id.*  The bleeding continued unpredictably, and it was unlikely that the pregnancy would be able to reach viability.  *Id.*  The risks of needing additional transfusions and developing PPROM, infection, or DIC were high.  *Id.*  At approximately nineteen weeks, the patient decided to terminate the pregnancy, and Dr. Seyb performed an abortion procedure for her in Idaho.  *Id.*  If Dr. Seyb encountered a patient in the same situation today, he would refer her out of state to obtain abortion care because of the Abortion Bans.  *Id.*

144.    Hypertensive diseases of pregnancy are common pregnancy-related complications such as pre-eclampsia and eclampsia that entail persistently high blood pressure.  *Anticipated Seyb Test.*; *Anticipated Smid Test.*  They can lead to organ damage, organ failure, stroke, seizures, and in some cases, death.  *Anticipated Seyb Test.*; *Anticipated Smid Test.*  HDPs typically occur after twenty weeks of pregnancy, but some cases of pre-eclampsia have been

43

reported at seventeen to nineteen weeks of pregnancy. *Anticipated Smid Test.* Terminating a pregnancy reduces the risk that a pregnant person with an HDP will experience serious morbidity as a result of that condition. *Id.*

145. Before the Abortion Bans took effect, Dr. Seyb treated a patient at approximately twenty weeks of pregnancy who presented in the emergency department with pre-eclampsia. *Anticipated Seyb Test.* Her blood pressure was in the severe range, her platelets were dropping, and she was starting to develop HELLP Syndrome, a serious complication that entails hemolysis, elevated liver enzymes, low platelet levels, and low red blood cell levels. *Id.* Continued pregnancy would have put her at high risk of liver failure, kidney failure, stroke, and DIC. *Id.* The only way to reverse pregnancy-related hypertension is to remove the placenta. *Id.* The patient chose to terminate the pregnancy through induction of labor. *Id.* Dr. Seyb was able to treat her immediately in Idaho. *Id.* If Dr. Seyb encountered a patient in the same situation today, he would refer her out of state to obtain abortion care because of the Abortion Bans. *Id.* Indeed, since the Abortion Bans took effect, Dr. Seyb's colleagues at St. Luke's have had to refer several patients with HDPs to out-of-state physicians. *Id.*

### 2. Patients with Underlying Conditions That Are Complicated by Pregnancy

146. As explained above, pregnancy can exacerbate a wide range of underlying medical conditions and/or interfere with the treatment of those conditions, posing a risk of serious morbidity to a pregnant person that is not necessarily life-threatening. *Supra* at ¶¶ 67, 117, 146-160. Although it is not possible to provide an exhaustive list of such conditions, illustrative examples include heart disease, chronic kidney disease, cancer, and diabetes. *Anticipated Eller Test.*; *Anticipated Prentice Test.*; *Anticipated Seyb Test.*; *Anticipated Smid Test.* Pre-existing mental health conditions may also be complicated by pregnancy. *Supra* at ¶¶106-128.

147.    For people with preexisting heart disease, the physiological changes of pregnancy can lead to severe cardiac decompensation. *Anticipated Eller Test.* Indeed, pregnancy sometimes "unmasks" a preexisting but previously undiagnosed cardiac condition. *Id.* Pregnant patients with congenital heart disease, valvular heart disease, arrhythmias, pulmonary hypertension, and cardiomyopathy face heightened risks of serious morbidity and mortality during pregnancy. *Id.*

148.    Maternal cardiac conditions are commonly classified according to four levels of risk, known as the World Health Organization Risk Classes I-IV. *Anticipated Eller Test.* These predict the risk of serious cardiovascular complications and death during pregnancy or the post-partum period. *Id.* Class I includes patients with a relatively low risk of serious morbidity or mortality; whereas Class IV includes patients with an extremely high risk of serious morbidity or mortality. *Id.* Some doctors and hospitals use alternative classification systems.

149.    For someone with a preexisting history of cardiac arrhythmia, or irregular heartbeats, pregnancy can prompt more frequent and dangerous arrhythmias to occur. *Anticipated Eller Test.*

150.    For someone with cardiomyopathy, a condition characterized by a weakened heart muscle, pregnancy can exacerbate the condition, potentially causing heart failure. *Anticipated Eller Test.* Heart failure is a progressive condition in which the heart muscle becomes too weak or stiff to pump blood efficiently, failing to meet the body's need for oxygen. *Id.* Heart failure does not mean that the heart has stopped working altogether; rather, it means that the heart is operating sub-optimally. *Id.* As heart failure progresses, fluid can build up in a patient's lungs leading to a condition called pulmonary edema, which causes breathing difficulties and reduced oxygenation. *Id.*

45

151.    In cases where a patient has a serious cardiac condition exacerbated by pregnancy, it is not possible to predict whether the patient will die. *Anticipated Eller Test.* But carrying the pregnancy to term will substantially increase the patient's risk of serious, long-term morbidity. *Id.* In some cases, the progression of heart failure will necessitate surgical implantation of an assistive device or a heart transplant. *Id.* Terminating the pregnancy reduces the risk that a pregnant person with a cardiac condition will experience serious morbidity as a result of that condition. *Id.*

152.    Before the Abortion Bans took effect, Dr. Seyb treated a pregnant patient who suffered from severe heart failure. *Anticipated Seyb Test.* The pregnancy exacerbated her condition, making it harder for her to engage in the activities of daily life. *Id.* Dr. Seyb worked with her cardiologist to assess her level of risk. *Id.* After engaging in a shared decision-making process, the patient ultimately decided to terminate the pregnancy. *Id.* Dr. Seyb provided her abortion in Idaho. *Id.* If he encountered a patient with the same condition today, he would refer her to an out-of-state physician because of the Abortion Bans. *Id.*

153.    For patients with chronic kidney disease, pregnancy poses high risks to both the pregnant person and fetus. *Anticipated Seyb Test.* Moreover, patients are generally not eligible for a kidney transplant while pregnant, and the American Society of Transplantation and the American Society of Transplant Surgeons recommend waiting at least one year after receiving a kidney transplant before becoming pregnant. *Anticipated Eller Test.*; *Anticipated Seyb Test.* For patients with a prior kidney transplant (or other solid organ transplant), many immunosuppressive drugs used to prevent organ rejection are teratogenic. *Anticipated Eller Test.* Continuing use of those drugs during pregnancy poses a serious risk of birth defects, but ceasing use or altering medications poses a serious risk of organ rejection. *Id.*

154.    A recent study examined health outcomes in a cohort of 31,243 pregnant people with chronic kidney disease and found that providing abortion care resulted in 4,837 fewer cases of stage progression, 841 fewer cases of end-stage renal disease requiring dialysis, and nine fewer deaths per year. *Anticipated Romero Test.* (citing Sydney McCarthy, et al., *The impact of denying abortion access to patients with chronic kidney disease: a cost-effectiveness analysis*, 146 Contraception 110863 (2025)).  Thus, terminating a pregnancy reduces the risk that a pregnant person with chronic kidney disease will experience serious morbidity as a result of that condition. *Id.*

155.    Dr. Seyb recently treated a patient with end-stage renal disease who was undergoing peritoneal dialysis and was on the kidney transplant list. *Anticipated Seyb Test.*  She became pregnant unintentionally following a contraceptive failure. *Id.*  After being counseled about the risks of pregnancy and her treatment options, the patient decided that an abortion would be in her best interest. *Id.*  Dr. Seyb could not provide the abortion for her without facing prosecution for violating the Abortion Bans, so he referred her out of state. *Id.*

156.    Pregnancy complicates the treatment of cancer. *Anticipated Smid Test.*  It is a contraindication for many routine cancer treatments, including radiation and some chemotherapies, because those treatments carry a high risk of fetal death or serious birth defects. *Id.*  Alternative treatments are generally far less effective. *Id.*  While delaying radiation and chemotherapy until the conclusion of a pregnancy will not necessarily result in a patient's death, doing so may allow the cancer to progress to a stage that entails more serious morbidity, requires more invasive treatment, or has a diminished likelihood of long-term survival. *Id.*  Terminating the pregnancy reduces the risk that a pregnant person with cancer will experience serious morbidity as a result of that condition. *Id.*

47

157.     Pregnancy complicates the treatment of diabetes, and in some cases may cause the onset of diabetes.  *Anticipated Prentice Test.*  Diabetes refers to a set of chronic conditions causing high blood sugar because the body is unable to produce the hormone insulin or utilize it effectively.  *Id.*  Type 1 diabetes is an autoimmune condition in which the body's immune system attacks and destroys the insulin-producing beta cells in the pancreas.  *Id.*  As a result, the pancreas produces little to no insulin.  *Id.*  People with Type 1 diabetes need to administer exogenous (i.e., laboratory-made) insulin in order to survive.  *Id.*  Type 2 diabetes is a chronic condition in which the body's cells become resistant to insulin; the pancreas may still produce insulin but the body stops responding effectively to it.  *Id.*  Over time, the pancreas may no longer be able to produce enough insulin to keep blood glucose levels in the normal range.  *Id.*  Gestational diabetes is a type of diabetes that occurs during pregnancy when hormones produced by the placenta cause insulin resistance.  *Id.*

158.     When blood sugar levels are not well controlled, patients with diabetes can develop a wide range of serious complications, including hypertension, cardiovascular disease, kidney disease, neuropathy, and retinopathy, which in turn can lead to heart attack, stroke, kidney failure, limb amputation, blindness, and death.  *Anticipated Prentice Test.*  Patients with diabetes, especially those with Type 1, can also develop diabetic ketoacidosis ("DKA") when a lack of insulin prompts the body to begin breaking down fat cells as fuel, causing a buildup of acids, called ketones, in the blood.  *Id.*  Untreated DKA causes cerebral edema, or swelling in the brain, which can lead to coma and death or long-term cognitive impairments.  *Id.*  A patient's level of blood-sugar control is measured by a hemoglobin A1c ("HbA1c") test, a blood test that determines the patient's average blood sugar level over a three-month period.  *Id.*

159.    Poorly controlled blood sugar also has a significant impact on fetal development, creating a risk of pregnancy loss or major congenital abnormalities. *Anticipated Prentice Test.* Spine and heart development are particularly sensitive to increased blood sugar. *Id.* The higher a patient's HbA1c level, the greater the risk of harm to a developing embryo or fetus. *Id.*

160.    Pregnancy makes it harder for people with diabetes to control their blood sugar and increases the risk that a patient will experience serious, long-term morbidity. *Anticipated Prentice Test.* For example, pregnancy has been shown to accelerate the progression of diabetic retinopathy, which is the leading cause of blindness in working-age Americans. *Id.* Some pregnant patients—particularly those who struggle to adequately control their blood sugar or have a history of diabetic complications or hospitalizations—decide to have an abortion after considering the risks that continued pregnancy would pose to their own health as well as the likelihood of miscarriage or severe fetal harm. *Id.* Terminating a pregnancy reduces the risk that a pregnant person with diabetes will experience serious morbidity as a result of that condition. *Id.*

### C. *Patients With Fetal Indications for Abortion*

#### 1. Patients Carrying an Embryo or Fetus With a Life-Limiting Condition

161.    The Total Abortion Ban prohibits therapeutic abortion in cases where a developing embryo or fetus has a life-limiting condition—i.e., a condition that is fatal or for which there is little or no prospect of long-term survival outside the uterus without severe morbidity, and for which there is no cure—unless the abortion is necessary to prevent the death of the pregnant person from a cause other than self-harm. Idaho Code § 18-622(1)-(2); *Anticipated Dahl Test.* (citing ACOG, *Perinatal Palliative Care: ACOG Committee Opinion No. 786*, 134 Obstetrics & Gynecology e84, e85 (2019) (reaffirmed in 2024), https://doi.org/10.1097/aog.000000000003425). The Fetal Heartbeat Act prohibits therapeutic abortion in a subset of

such cases—when embryonic or fetal cardiac activity is detectable—unless the patient is experiencing a "medical emergency" that necessitates an "immediate abortion."  Idaho Code §§ 18-8801(2), 18-8801(5), 18-8804(1).

162.    But for the Abortion Bans, Dr. Seyb would provide therapeutic abortion care to all patients seeking abortion care from him carrying an embryo or fetus with a life-limiting condition.  *Anticipated Seyb Test.*

163.    It is not possible to provide an exhaustive list of life-limiting embryonic and fetal conditions.  *Anticipated Dahl Test.*; *Anticipated Seyb Test.*  Illustrative examples include anencephaly; achondrogensis; bilateral renal agenesis; HLHS; iniencephaly; LBWC; Meckel-Gruber Syndrome; Osteogenesis Imperfecta Type II; sirenomelia; thanatophoric dysplasia; Triploidy; Trisomy 13; Trisomy 16; Trisomy 18; and Trisomy 22.  *Anticipated Dahl Test.*; *Anticipated Seyb Test.*

164.    Anencephaly is a neural tube defect where the fetal skull and scalp fail to fully develop, exposing fetal brain tissue to amniotic fluid, which causes it to degenerate.  *Anticipated Dahl Test.*  It is a fatal condition with no available treatment.  *Id.*

165.    Achondrogenesis is a group of lethal osteochondro dysplasias that cause severe limb abnormalities, deficient spine ossification, a short trunk, and a disproportionately large head.  *Anticipated Dahl Test.*  The abnormalities of skeletal growth in the chest restrict the ability of the fetal lungs to develop, leading to pulmonary hypoplasia.  *Id.*  These conditions are fatal, and there is no available treatment.  *Id.*

166.    Bilateral renal agenesis occurs when the fetus fails to develop kidneys, which causes anhydramnios or the complete absence of amniotic fluid.  *Anticipated Dahl Test.*  Amniotic fluid is essential for fetal lung development as well as appropriate limb development.

50

*Id.* Without it, a fetus develops pulmonary hypoplasia and musculoskeletal issues. *Id.* Collectively, the effects of anhydramnios are called "Potter's Sequence." *Id.* Bilateral renal agenesis is fatal, and only experimental treatments are available. *Id.*

167.    HLHS occurs when the left side of a fetal heart does not develop correctly, impairing normal blood flow throughout the body. *Anticipated Dahl Test.* This condition, if untreated, is lethal within days to weeks due to the inability to pump blood from the left side of the heart to the remainder of the brain and body. *Id.* Treatment, which is palliative in nature, entails multiple cardiac surgeries that require extensive hospitalization and medical intervention as well as significant financial and post-surgery resources. *Id.* These surgeries cannot correct the dysfunction of the heart but attempt to improve heart function using one, instead of two, ventricles. *Id.* The mortality rate with palliative treatment is approximately 35-40%. *Id.*

168.    Iniencephaly is a neural tube defect that entails extreme and fixed retroflexion of the neck with the orbits permanently displaced upwards. *Anticipated Dahl Test.* The mandible is contiguous with the chest. *Id.* It is associated with occipital encephaloceles and fused or missing cervical vertebrae. *Id.* Iniencephaly is a fatal condition, and there is no available treatment. *Id.*

169.    LBWC, also known as body stalk anomaly, is a fetal malformation characterized by the attachment of fetal visceral organs to the placenta with a short or absent umbilical cord. *Anticipated Dahl Test.* It is associated with limb defects, deformity of the spine, neural tube defects, craniofacial defects, malformation of the chest wall, pulmonary hypoplasia, and abnormalities of the intraabdominal organs. *Id.* LBWC is a fatal condition, and there is no available treatment. *Id.*

51

170.   Meckel-Gruber Syndrome is a genetic syndrome comprised of renal cystic dysplasia, abnormal brain development outside of the skull or other central nervous system abnormalities, and postaxial polydactyly.  *Anticipated Dahl Test.*  Due to the renal cystic dysplasia, the kidneys do not develop properly, leading to a deficiency in amniotic fluid or complete anhydramnios.  *Id.*  The condition is fatal, and there is no available treatment.  *Id.*

171.   Osteogenesis Imperfecta, also known as brittle bone disease, is a genetic disorder that leads to low bone mineral density, which causes extremely fragile bones that fracture easily.  *Anticipated Dahl Test.*  Type II is most severe form of the disease, causing severe bone deformities, a soft skull, and pulmonary hypoplasia.  *Id.*  Osteogenesis Imperfecta Type II is fatal, and there is no available treatment.  *Id.*

172.   Sirenomelia entails fetal malformation characterized by having a single lower extremity as well as other skeletal, gastrointestinal, and genitourinary abnormalities.  *Anticipated Dahl Test.*  It is commonly associated with bilateral renal agenesis or bilateral cystic dysplastic kidneys, leading to anhydramnios.  *Id.*  Only 1% of babies born with this condition survive beyond the first week of life.  *Id.*

173.   Thanatophoric dysplasia is a severe skeletal disorder that is associated with very short limbs, a small chest cavity leading to underdeveloped lungs, and central nervous system abnormalities.  *Anticipated Dahl Test.*  Typically fatal within the first hours to days of life, this condition causes those who survive beyond infancy to be dependent on a ventilator, have severe cognitive impairments, and experience seizures.  *Id.*

174.   Triploidy is a genetic condition in which an embryo has three complete sets of chromosomes instead of two.  *Anticipated Dahl Test.*  Triploidy is associated with congenital heart conditions, abnormal brain development, cystic kidney disease, growth abnormalities,

52

musculoskeletal abnormalities, facial abnormalities, cognitive impairment, and seizures.  *Id.*  The condition is fatal, and there is no available treatment.  *Id.*

175.    Trisomy 13 is a genetic condition in which an embryo has three copies of chromosome 13, instead of two.  *Anticipated Dahl Test.*  Trisomy 13 is associated with multiple fetal anomalies, including brain anomalies, cardiac defects, renal abnormalities, and fetal growth restriction.  *Id.*  Approximately 50% of cases will result in intrauterine fetal demise if managed expectantly.  *Id.*  Less than 50% of neonates with Trisomy 13 survive one week of life, and there is a 90% mortality rate in the first year of life.  *Id.*

176.    Trisomy 16 is a genetic condition in which an embryo has three copies of chromosome 16, instead of two.  *Anticipated Dahl Test.*  The condition is fatal, often resulting in miscarriage.  *Id.*

177.    Trisomy 18 is a genetic condition in which an embryo has three copies of chromosome 18, instead of two.  *Anticipated Dahl Test.*  Trisomy 18 is associated with multiple fetal anomalies, including cardiac defects, musculoskeletal anomalies, omphalocele, congenital diaphragmatic hernia, spina bifida, and brain and facial anomalies.  *Id.*  Approximately 50% of cases will result in intrauterine fetal demise if managed expectantly.  *Id.*  Ninety percent of babies born with Trisomy 18 die within the first month of life.  *Id.*

178.    Trisomy 22 is a genetic condition in which an embryo has three copies of chromosome 22, instead of two.  *Anticipated Dahl Test.*  The condition is fatal, often resulting in miscarriage.  *Id.*

179.    Before the Abortion Bans took effect, Dr. Seyb regularly provided abortion care to patients diagnosed with life-limiting embryonic or fetal conditions.  *Anticipated Seyb Test.*  Now, he must refer those patients to out-of-state doctors when they want to terminate their

53

pregnancies. *Id.* Last fall, for example, he referred two patients with fatal fetal conditions out of state. *Id.* One was approximately twelve weeks' pregnant and carrying a fetus with anencephaly. *Id.* The other was approximately fourteen weeks' pregnant and carrying a fetus with LBWC. *Id.* Since the start of this year, he and his colleagues have referred approximately ten patients carrying an embryo or fetus with a life-limiting condition out of state, including another patient carrying a fetus with LBWC and one carrying a fetus with HLHS.

### 2. Patients Seeking a Multi-Fetal Pregnancy Reduction

180. The Medical Board takes the position that a multi-fetal pregnancy reduction "might" satisfy the definition of abortion under Idaho Code § 18-604(1). Pl. Ex. 1017 at 9-10 (Medical Board Resps. to Written Disc.). None of the other Defendants have disavowed that multi-fetal pregnancy reduction is prohibited by the Abortion Bans. Accordingly, Dr. Seyb faces a credible threat of enforcement of the Total Abortion Ban for providing a multi-fetal pregnancy reduction unless it is necessary to prevent the death of the pregnant person from a cause other than self-harm. Idaho Code § 18-622(1)-(2). Dr. Seyb faces a credible threat of enforcement of the Fetal Heartbeat Act for providing a multi-fetal pregnancy reduction in a subset of such cases—when embryonic or fetal cardiac activity is detectable—unless the patient is experiencing a "medical emergency" that necessitates an "immediate abortion." Idaho Code §§ 18-8801(2), 18-8801(5), 18-8804(1).

181. But for the Abortion Bans, Dr. Seyb would provide a multi-fetal pregnancy reduction to all patients who sought that care from him. *Anticipated Seyb Test.*

182. Multifetal pregnancies pose serious risks to both the pregnant patient and the developing embryos and fetuses, especially in cases of higher-order multiples. *Anticipated Eller Test.*; *Anticipated Seyb Test.* Performing a pre-viability procedure to reduce the total number of gestations both decreases the risk of serious injury and death for the patient and increases the

likelihood of survival for the remaining embryos or fetuses.  *Anticipated Eller Test.*; *Anticipated Seyb Test.*

183.    Patients sometimes have multi-fetal pregnancies where one or more fetuses are affected by serious anomalies that put the other fetuses at risk.  *Anticipated Eller Test.*; *Anticipated Seyb Test.*  For example, twin pregnancies can be affected by a developmental or genetic anomaly in one twin while the other twin is healthy.  *Anticipated Eller Test.*; *Anticipated Seyb Test.*  Reducing the pregnancy to a single fetus can provide significant benefits to the unaffected fetus, significantly increasing its chance of survival.  *Anticipated Eller Test.*; *Anticipated Seyb Test.*

184.    Over the course of his career, before the Abortion Bans took effect, Dr. Seyb performed several reduction procedures for patients with multiple gestations.  *Anticipated Seyb Test.*  For example, he treated a patient carrying quadruplets and reduced the pregnancy to twins.  *Id.*  The patient subsequently delivered near term without complication.  *Id.*  Dr. Seyb also had a case where he was not able to provide intervention soon enough.  *Id.*  The patient was pregnant with septuplets and wanted to reduce the pregnancy, but she ultimately miscarried all the fetuses at ten weeks of pregnancy, before he was able to perform the procedure.  *Id.*

185.    Recently, Dr. Seyb treated a patient carrying twins.  *Anticipated Seyb Test.*  One twin was healthy and the other had a fatal condition.  *Id.*  Absent intervention, the patient would have faced a heightened risk of miscarriage as well as pre-eclampsia, gestational diabetes, and postpartum hemorrhage.  *Id.*  She wanted to reduce the pregnancy, but the Abortion Bans prevented Dr. Seyb from performing the procedure in Idaho.  *Id.*  Instead, he referred the patient to a practice group in Utah.  *Id.*  Dr. Eller performed a reduction procedure for the patient, who ultimately delivered a healthy baby at full term.  *Id.*  The patient sent Dr. Eller a copy of her birth

55

announcement, which acknowledged both the pain she experienced at the loss of the co-twin and the joy she experienced at welcoming her first child.  *Id.*

### D.  Chilling Effect

186.    The Abortion Bans also have a chilling effect on the provision of abortion care even in cases where continued pregnancy would pose life-threatening risks to the patient. *Anticipated Seyb Test.*  That is because it is often impossible for Dr. Seyb and his colleagues to determine that an abortion is *necessary* to prevent a patient's death.  *Id.*  Medical outcomes are rarely certain.  *Id.*  At best, doctors can assess the probability of an outcome based on clinical evidence and prior experience, but every patient's circumstances are unique, and such assessments are not mathematically precise.  *Id.*

187.    Because of the uncertainty inherent in predicting patient outcomes, it is possible for reasonable doctors to disagree about whether an abortion is necessary to prevent a patient's death.  *Anticipated Seyb Test.*; Pl. Ex. 1017 at 15 (Medical Board Resps. To Written Disc.).  Dr. Seyb fears that, even if he believes that an abortion is necessary to prevent the death of one of his patients, another doctor will second-guess his judgment, and a prosecutor will file charges against him on that basis.  *Id.*  The Idaho Supreme Court has confirmed that this fear is reasonable, holding that:  "a prosecutor may attempt to prove that the physician's subjective judgment that an abortion was 'necessary to prevent the death of the pregnant woman' was not made in 'good faith' by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary."  *Planned Parenthood Great Nw.*, 522 P.3d at 1204.

188.    The State's medical experts in this case have opined that abortion is not necessary to save a patient's life in many circumstances where Dr. Seyb and his medical experts believe that it would be.  For example, in her expert report, styled as a declaration made under penalty of perjury, Dr. Kraus testified that when PPROM occurs, a physician subject to the Abortion Bans

may not terminate the pregnancy immediately but must wait until the patient is no longer medically stable. *Anticipated Kraus Test.* She took this position despite acknowledging that, "infections can escalate quickly," and "in rare cases, infections progress so rapidly a patient's life becomes endangered very rapidly." *Anticipated Kraus Test.* The Medical Board likewise takes the position that "an abortion is not always necessary to save a pregnant person's life in cases where the pregnant person experiences … PPROM." Pl. Ex. 1017 at 15 (Medical Board Resps. To Written Disc.).

189. Moreover, Idaho's Attorney General has openly expressed hostility to abortion and abortion providers in both court filings and public statements. *Anticipated Seyb Test.*; *see* Raúl R. Labrador, *Labrador Letter: Defending Idaho's Pro-Life Laws*, Idaho Off. Att'y Gen. (Oct. 27, 2025), https://www.ag.idaho.gov/newsroom/labrador-letter-defending-idahos-pro-life-laws/ [https://perma.cc/89ZE-6VMT] (criticizing Dr. Seyb in a newsletter for bringing this lawsuit and alleging that "[p]atients suffered" because "Dr. Seyb failed to understand Idaho law and neglected to educate himself on his professional duties and responsibilities"); Br. for Pet'r at 3, 5, *Moyle v. United States*, 603 U.S. 324 (2024) (No. 23-727) (discussing Idaho's 150-year commitment to prohibiting abortion). Additionally, Idaho's legislature has declined to expand or clarify the medical exception in the statute to provide doctors with a manifest safe harbor for providing abortion care to patients with serious medical needs. *Anticipated Seyb Test.*; *see* H.B. 374, 2023 Idaho Sess. Laws 906. These governmental actions and omissions exacerbate the statute's chilling effect on doctors who treat pregnant patients. *Anticipated Seyb Test.*

190. Further, violating either one of the Abortion Bans constitutes a felony that is punishable by two to five years in prison, as well as grounds for a doctor's medical license to be

suspended or revoked.  Idaho Code §§ 18-622(1), 18-8805(2)-(3).  Such high stakes cause doctors to err on the side of denying care to patients.  *Anticipated Seyb Test.*

191.   In recent years, Dr. Eller has provided therapeutic abortion care in Utah for some Idaho patients facing a high risk of pregnancy-related mortality because no doctor in Idaho was willing to do so.  *Anticipated Eller Test.*

192.   Many OB-GYNs, including some of Dr. Seyb's colleagues at St. Luke's, have ceased practicing medicine in Idaho rather than face the risk of criminal prosecution for providing medically indicated care to their patients.  *Anticipated Seyb Test.*  Indeed, on July 31, 2025, the medical journal JAMA Network Open published a study assessing changes in the number of OB-GYNs practicing obstetrics in Idaho after the Abortion Bans took effect.  *Id.* (citing J. Edward McEachern, et al., *Change in Number of OB/GYN Physicians Practicing Obstetrics After the Dobbs Decision*, 2025 JAMA Network Open e2524893 [hereinafter McEachern], https://doi.org/10.1001/jamanetworkopen.2025.24893).  It concludes that, between August 2022 and December 2024, Idaho had a net loss of ninety-four OB-GYNs practicing obstetrics, more than one-third of the total number of such doctors practicing in the state.  *Id.* (citing McEachern at 2).

## IX.   Historical Treatment of Therapeutic Abortion in American Law and Society

### A.   *Fundamental Rights to Life and Health*

193.   The right to therapeutic abortion is an inextricable part of the fundamental rights to life and health, both of which are deeply rooted in this nation's history and tradition and implicit in the concept of ordered liberty.

194.   Blackstone reports that first among the "absolute rights of every Englishman" is the "right of personal security."  1 William Blackstone, *Commentaries on the Laws of England* 127–128 (Thomas M. Cooley ed., Callaghan & Cockcroft, 1871) (1765) (hereinafter 1

Blackstone), https://repository.law.umich.edu/books/100/.  "The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."  *Id.* at 129.  "Both the life and limbs of a man are of such high value, in the estimation of the law of England, that it pardons even homicide if committed *se defendendo*, or in order to preserve them."  *Id.* at 130.  "Besides those limbs and members that may be necessary to a man, in order to defend himself or annoy his enemy, the rest of his person or body is also entitled, by the same natural right, to security from the corporal insults of menaces, assaults, beating, and wounding; though such insults amount not to destruction of life or member."  *Id.* at 134.  Blackstone further says that the "preservation of a man's health from such practices as may prejudice or annoy it" is an established component of the right to personal security."  *Id.*

195.    The right of self-defense is a corollary of the right of personal security described by Blackstone.  The Supreme Court has recognized that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day."  *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).  Further, it is "the *central component*" of the Second Amendment right to bear arms.  *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  Today, every state allows use of deadly force against threats of death or serious bodily injury to oneself or a third party.  Paul H. Robinson et al., *The American Criminal Code: General Defenses*, 7 J. Legal Analysis 37, 49–53 (2015).

196.    The necessity doctrine is closely related to the right of self-defense.  At common law, "the defense of necessity, or choice of evils, . . . covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils."  *United States v. Baily*, 444 U.S. 394, 410 (1980).  Blackstone illustrates this doctrine by recounting a case of two

59

shipwrecked men.  4 William Blackstone, *Commentaries on the Laws of England* 186 (Thomas

M. Cooley ed., Callaghan & Co., 3d ed. rev., 1884) (1769) ("4 Blackstone"),

https://repository.law.umich.edu/books/98/.  They both seek refuge from the sea on the same

piece of driftwood, but it is too small to support both of them, so "one of them thrusts the other

from it, whereby he is drowned." *Id.*  "He who thus preserves his own life at the expense of

another man's is excusable through unavoidable necessity, and the principle of self-defen[s]e:

since their both remaining on the same weak plank is a mutual, though innocent, attempt upon,

and an endangering of each other's life." *Id.*

197.    The right to bodily integrity is likewise a corollary of the right of personal

security.  As the Supreme Court has explained, "[n]o right is held more sacred, or is more

carefully guarded by the common law, than the right of every individual to the possession and

control of his own person, free from all restraint or interference of others, unless by clear and

unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

198.    The fundamental nature of the right to health is reflected in the Eighth

Amendment requirement that the government "provide medical care for those whom it is

punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).[4]  Deliberate

indifference to the "serious medical needs of prisoners" violates the Eighth Amendment

prohibition on cruel and unusual punishment. *Id.* at 104.  The fundamental nature of the right to

health is further reflected in the law's historical treatment of the practice of medicine.  *See infra*

at ¶¶ 219-21.

---

[4] The Due Process Clause likewise requires the government to provide medical care to individuals who are in governmental custody for reasons other than a criminal conviction. *See Gordon v. County of Orange*, 888 F.3d 1118, 1122-23 (9th Cir. 2018).

199.    In accordance with these deeply rooted rights, therapeutic abortion enjoyed consistent legal protection from the medieval period through the early twentieth century. *See infra* at ¶¶ 224-28, 234, 236-41, 248, 250, 252, 263-69, 273-74, 286-87.

### B. Abortion and Related Medical Treatments During the Medieval and Early Modern Periods

200.    During the medieval and early modern periods of history, humoral theory was the prevailing paradigm for understanding health in Europe, and European colonizers carried it to North America. *Anticipated Eppinger Test.* Humoral theory is heavily influenced by the Hippocratic tradition of ancient Greece and the work of Claudius Galen, a physician who practiced in ancient Rome. *Id.*

201.    According to humoral theory, good health depends on maintaining a proper balance of four humors—the sanguine humor, associated with blood; the phlegmatic humor, associated with phlegm; the choleric humor, associated with yellow bile; and the melancholic humor, associated with black bile. *Anticipated Eppinger Test.* An imbalance of the humors causes illness and requires medical intervention. *Id.* Bloodletting, also known as venesection, is a classic example of a humoral intervention aimed at alleviating an excess build-up of the sanguine humor. *Id.*

202.    New paradigms of medicine began to emerge in the nineteenth century, including the recognition of bodily systems, such as the circulatory system and reproductive system, and the advent of germ theory. *Anticipated Eppinger Test.* These new paradigms gradually replaced humoral theory, but humoral theory continued to influence medical practice in Europe and North America through the early twentieth century. *Id.*

203.    In the humoral health regime, menstruation was thought to play an important role in women's health by purging excess blood and thereby regulating the sanguine humor.

*Anticipated Eppinger Test.* Amenorrhea, or the absence of menstruation, was understood to cause a dangerous build-up of waste materials in a woman's body that any responsible medical practitioner would find incumbent to address. *Id.* People generally understood that a connection exists between pregnancy and cessation of menstruation. *Id.* But "retained menses" and "pregnancy" were not synonyms; these two conditions were thought to exist in parallel. *Id.*

204. During this time, precise knowledge of the internal functioning of women's bodies and pregnancy was limited. *Anticipated Eppinger Test.* The duration of human gestation itself was actively debated into the first decades of the 1800s; Karl Ernst von Baer discovered the mammalian ovum only in 1826; and the human ovum was not given detailed description until Edgar Allen's work in 1928. *Id.* The first pregnancy test was pioneered in 1928, and prenatal imaging and pregnancy tests for use in clinical practice did not exist until the 1930s. *Id.* The concept of quickening—the first time a pregnant person feels fetal movement—became a standard, albeit imperfect, tool for diagnosing pregnancy. *Id.*

205. Medical practitioners understood that emmenagogic treatments—medical interventions undertaken for the purpose of restoring menstruation—had the potential to disrupt pregnancy, but they were not typically undertaken for that purpose. *Anticipated Eppinger Test.* Abortion, in contrast, meant an intervention for the purpose of ending a pregnancy, typically after quickening. *Id.*

206. The most commonly prescribed medications for women in medieval medical texts were intended to treat amenorrhea. *Anticipated Eppinger Test.* Although they may not have been safe and effective by contemporary standards, these prescriptions commonly contained ingredients and compounds we now know to have emmenagogic or abortifacient properties. *Id.* They likely succeeded in bringing about the desired effect—restoration of menstruation—in

62

some number of cases. *Id.* Practitioners in early modern England, benefitting from centuries of accumulated experimentation, deployed a remarkable range of uterine-purging measures when faced with amenorrhea in a woman of menstruating age. *Id.* Some were classified as emmenagogues, while others were classified as abortifacients. *Id.* Medical texts admitted the potential for ambiguity, noting that some measures both provoke menstruation and terminate pregnancy. *Id.*

207.    The most common emmenagogic treatments involved the administration of medications either orally or vaginally through use of a pessary, a ball of cotton or other tampon-like object that could be soaked in a medicinal liquid. *Anticipated Eppinger Test.* Some practice manuals from this time period also prescribed emmenagogic treatment by external manipulations ranging from poultice and massage to bleeding by venesection under the arch of the foot. *Id.* Medication was also the most common abortifacient intervention, followed by external manipulations. *Id.* Notably, until the nineteenth century, methods of abortion involving vaginal intrusion, such as using a sharp object to attempt to pierce the amniotic sac, and methods of abortion involving surgical incision through the abdominal wall were generally disfavored because of the risks of injury and death they posed to pregnant women. *Id.*

### C. Abortion Under the Common Law

208.    English common law was not sui generis. *Anticipated Eppinger Test.* Its development, beginning in 1066 with the Norman Conquest of England, was influenced by a wide variety of sources, including ancient cultures and legal traditions. *Id.*

63

209.     In ancient Greece, Aristotle expounded a doctrine known as "mediate animation," which influenced Western thought for centuries.[5] *Anticipated Eppinger Test.*; Joseph W. Dellapenna, *Dispelling the Myths of Abortion History* 158 (Carolina Academic Press, rev. ed. 2023) [hereinafter Dellapenna].  The doctrine holds that a developing embryo and fetus, conceived with a vegetative soul, does not become a sensitive animal until forty days after conception if it is male or eighty to ninety days after conception if it is female, and does not become a rational human being until shortly before birth.  *See* Dellapenna at 158.

210.     Ancient Greek law permitted and sometimes even required infanticide for population control and eugenic purposes.  Dellapenna at 155.  To the extent that Greek law regulated abortion, it did so not out of regard for fetal life, but to protect the health of pregnant women and optimize eugenic practices.  *Id.*

211.     The ancient Romans treated abortion as a legal offense, but only against the husband of a pregnant woman if he neither commanded nor consented to the abortion.  Dellapenna at 156.  In Roman society, a fetus was not viewed as a living person distinct from its mother until it was born.  *Id.*  According to Professor Dellapenna:  "All in all, Roman law appears to disclose a culture in which abortion law was designed to protect the rights of the father rather than the fetus."  *Id.* at 157.

---

[5] Twentieth-century theologian Joseph Doncheel argued that this terminology is misleading and the term mediate or delayed "hominization" would be more apt.  *See, e.g.*, Joseph F. Donceel, S.J., *Immediate Animation and Delayed Hominization*, 31 Theological Studies 76, 76 (1970) ("Animation means that an organism is animated, has a soul (*anima*), is alive.  Thus the term 'delayed animation' seems to imply that the partisans of this theory hold that the embryo is not alive immediately after conception.  Such is not their position.  They claim that the embryo is alive, that it is animated from the very start, but the soul which animates it is not yet a human soul, is a vegetative or animal soul; the human soul comes later.  Animation is immediate, hominization is delayed.").

212.     Early Jewish tradition distinguished between consensual and non-consensual abortion.  It permitted consensual abortion if continued pregnancy "posed a threat to the mother's well-being."  Dellapenna at 154.  It prohibited non-consensual abortion, but similar to Roman law, treated it as an offense against the putative father.  A passage from the Old Testament states:  "When men have a fight and hurt a pregnant woman, so that she suffers a miscarriage, but no further injury, the guilty one shall be fined as much as the woman's husband demands of him, and he shall pay in the presence of the judges."  Exodus 21:22 (New Am. Bible rev. ed. 2011).

213.     Early Canon Law and influential Catholic thinkers in the medieval period such as Augustine of Hippo and Thomas Aquinas adopted Aristotle's view of mediate animation.  Dellapenna at 159.  Medieval Canon Law nevertheless condemned abortion, at least in some circumstances, for reasons unrelated to fetal personhood, just as it condemned contraception.  *Id.* at 154, 158-59.

214.     During the medieval and early modern periods, there was no societal consensus on when a developing embryo[6] or fetus acquired the essential attributes of human personhood nor on what those attributes were.  *Anticipated Eppinger Test.*

215.     The principal evidence concerning the common law's treatment of abortion during the medieval and early modern periods comes from treatises summarizing the common law.  *Anticipated Eppinger Test.*  There are few records of actual court proceedings concerning abortion from this time, and those that do exist are incomplete and ambiguous.  *See* Dellapenna

---

[6] During the medieval period, the Latin term "conceptus" was generally used to describe the products of human conception during the earliest stages of development.  *Anticipated Eppinger Test.*  The term "embryo" began to enter the English lexicon in the early modern period, though conceptus continued to be used.  *Id.*

at 135-36 (describing medieval court records concerning abortion as "terse" and noting that they often lack information about the outcome of a proceeding); *id.* at 137 ("Records finding 'not guilty,' … often contain more detail than records for which we do not know the outcome, yet we still do not know the arguments that were made about the law or the theories that the court relied on in the case."); *id.* at 152 (explaining that most early legal proceedings involving ingestion abortions were actually prosecutions for witchcraft in ecclesiastical courts); *id.* at 170 ("During the fifteenth century, there are almost no records of prosecutions for abortion in the royal courts ….").

216.    Several major treatises contribute to our understanding of English common law. Henry de Bracton's *On the Laws and Customs of England* (1220-1230) is regarded as the authoritative statement of English common law from the medieval period.  *Anticipated Eppinger Test.*  Sir Edward Coke's *Institutes of the Lawes of England* (1628-1644) and Sir Matthew Hale's *The History of the Pleas of the Crown* (1736) are comprehensive statements of English common law written in the seventeenth century.  *Id.*  William Blackstone's *Commentaries on the Laws of England* (1765-1769) is a comprehensive statement of English common law written in the eighteenth century.  *Id.*  Each of these treatises was generally well known by courts and legal practitioners in colonial America and the early American republic.  *Id.*

217.    Four key features of the common law relevant to therapeutic abortion emerge from these treatises:  (1) the common law granted immunity from criminal liability to health practitioners acting with therapeutic intent; (2) the common law never banned abortion per se; rather, it took a nuanced approach to abortion that varied based on the stage of pregnancy, the method employed, and the reason for ending a pregnancy; (3) the common law did not treat the fetus as a person, and it therefore assigned greater value to the well-being of a pregnant woman

than to the well-being of a fetus; and (4) a major concern underlying the common law's

regulation of abortion was protection of pregnant women from violent or otherwise dangerous

practices, but enforcement of religious precepts also played a role.  *See infra* at ¶¶ 219-33.

218.    Bracton's treatise, written in the thirteenth century, contains a complex taxonomy

of homicide.  *See* Henry de Bracton, 2 *On the Laws and Customs of England* 340-42 (Samuel E.

Thorne trans., Harv. Law Sch. Libr. online ed. 2003) (1210-1268) [hereinafter Bracton],

https://amesfoundation.law.harvard.edu/Bracton/Common/SearchPage.htm.  According to

Bracton, homicide may be classified as spiritual or corporal.  *Id.* at 340.  Corporal homicide may

be committed by word or by deed.  *Id.*  Homicide by word may be committed by precept, by

counsel, and by denial or restraint.  *Id.*  Homicide by deed may be committed in the

administration of justice, of necessity, by chance, and by intention.  *Id.*

219.    Of these, homicide by chance is the most relevant to medical practice.

*Anticipated Eppinger Test.*  Bracton reports that a person is liable for homicide by chance if they

unintentionally cause a person's death while (1) engaging in an unlawful activity or (2) failing to

exercise due care while engaging in a lawful activity.  Bracton at 341.  In contrast, a person

engaged in a lawful activity who exercises due care is not liable for unintentional deaths caused

by their actions.  *Id.*  Although Bracton does not expressly discuss this doctrine's application to

medical practice, logically it would have shielded a healthcare provider acting within the

prevailing standard of care from liability for the unintentional death of a patient.  *Id.*

220.    By the time Coke writes in the early seventeenth century, the common law had

evolved to provide explicit protection for healthcare providers.  *Anticipated Eppinger Test.*  Coke

states: "If one that is of the mysterie of a physician take a man in cure and giveth him such

physick as within three days he dye thereof, without any felonious intent, and against his will, it

67

is no homicide." Edward Coke, *The Fourth Part of the Institutes of the Laws England, Concerning the Jurisdiction of Courts* 251 (Leon E. Bloch Law Library, UMKC Sch. Of Law, digital ed.) (1648), https://irlaw.umkc.edu/cgi/viewcontent.cgi?article=1001&context=coke_institutes_lawes. Hale describes the immunity the common law afforded a healthcare provider even more broadly: "If a phy[si]cian gives a person a potion without any intent of doing him any bodily hurt, but with an intent to cure or prevent a di[seas]e, and contrary to the expectation of the physician it kills him, this is no homicide, and the like of a chiurgeon." 1 Matthew Hale, *The History of the Pleas of the Crown* 429 (1736) [hereinafter Hale]. Blackstone writes: "If a physician or surgeon gives his patient a potion or plaster to cure him, which contrary to expectation, kills him, this is neither murder nor manslaughter, but misadventure; and he shall not be punished criminally, however liable he might formerly have been to a civil action for neglect or ignorance".[7] 4 Blackstone at 196-97. Thus, by the eighteenth century, the common law clearly recognized the right of a physician or surgeon to provide treatment to a patient without risk of criminal punishment—at least when acting in accordance with prevailing

---

[7] Blackstone addresses medical malpractice in the section of the Commentaries dealing with civil, rather than criminal wrongs. 3 William Blackstone, *Commentaries on the Laws of England* 122 (Thomas M. Cooley, ed., Callaghan & Co., 3d ed. rev., 1884) (1768) ("3 Blackstone"), https://repository.law.umich.edu/books/98/. He states that "injuries affecting a man's *health*" caused by "the neglect or unskilful management of his physician, surgeon, or apothecary" may serve as the basis for an action to recover damages. *Id.* In the course of this discussion, he notes that "*mala praxis*," Latin for malpractice, *see Mala Praxis*, Black's Law Dictionary (12th ed. 2024), "is a great misdemeanor and offense at common law, whether it be for curiosity and experiment or by neglect; because it breaks the trust which the party had placed in his physician, and tends to the patient's destruction." 3 Blackstone at 122. He does not, however, discuss medical malpractice further in the section of his treatise dealing with crimes, and his discussion of homicide suggests that medical malpractice could not serve as the basis for a manslaughter indictment. *See* 4 Blackstone at 197.

standards of care—as long as the healthcare provider had a good-faith therapeutic intent.[8]

*Anticipated Eppinger Test.*

221.    American courts applied this common law doctrine.  *See, e.g.*, *Rice v. State*, 8 Mo. 561, 563 (1844) (reversing a physician's conviction for manslaughter in connection with the death of a pregnant patient) ("We are not aware of the existence of a law which prohibits any man from prescribing for a sick person with his consent, if he honestly intended to cure him by his prescription, however ignorant he may be of medical science."); *Commonwealth v. Thompson*, 6 Mass. 134, 134 (1809) (acquitting a physician of homicide in connection with the death of a patient) ("If one, assuming the character of a physician, through ignorance administer medicine to his patient, with an honest intention and expectation of a cure, but which causes the death of the patient, he is not guilty of felonious homicide.").  They were open to the possibility of criminal liability, however, in cases where a healthcare provider engaged in extreme

---

[8] There was disagreement in the legal community about whether this right extended only to licensed physicians and surgeons or to unlicensed healthcare providers, such as midwives, as well.  *See* Hale at 429-30.  Hale says:  "And I hold their opinion to be erroneous, that think, if he be no licensed chiurgeon or physician, that occasioneth this mischance, that then it is felony, for physic and salves were before licensed physicians and chirurgeons."  *Id.* at 429; *see also id.* at 430 ("This doctrine therefore, that if any die under the hand of an unlicensed physician, it is felony is apocryphal, and fitted, I fear, to gratify and flatter doctors and licentiates in physic ….").  He takes the view that unlicensed healthcare providers may be subject to statutory penalties for practicing medicine without a license, but not to criminal liability.  *Id.* at 429-30.  And he believes that there are good reasons for the law to take this approach, particularly with respect to midwives:  "And certainly if that opinion should obtain, that is one not licensed a physician should be guilty of felony, if his patient miscarry, we should have many of the poorer sort of people, especially remote from London, die for want of help, lest their intended helpers might miscarry.  *Id.* at 430.  Blackstone notes the disagreement but does not take a position.  4 Blackstone at 197 ("[B]ut it hath been holden, that if it be not a *regular* physician or surgeon, who administers the medicine, or performs the operation, it is manslaughter at the least.  Yet, Sir Matthew Hale very justly questions the law of this determination.").  The tension between—and the relative political power of—*regular* physicians and *irregular* healthcare providers goes on to play a significant role in the regulation of medicine generally and abortion specifically in the nineteenth and early twentieth centuries both in England and the United States. *See infra* at ¶¶ 243-247, 250, 253-262, 277.

recklessness or had reason to know that the treatment they administered was likely to be fatal. *See Rice*, 8 Mo. at 564 ("Although a physician cannot be indicted for murder or manslaughter, if a patient die under his prescriptions when his intentions were honest, yet it has been held that *mala praxis* is a great misdemeanor, and an offense at common law, whether it be for curiosity or experiment, or by neglect." (citing Blackstone and other English authorities)); *Thompson*, 6 Mass. at 140-41 ("The death of a man, killed by voluntarily following a medical prescription, cannot be adjudged felony in the party prescribing, *unless* he, however ignorant of medical science in general, had so much knowledge, or probable information of the fatal tendency of the prescription, that it may be reasonably presumed by the jury to be the effect of obstinate, wilful rashness, at the least, and not of an honest intention and expectation to cure." (emphasis added)).

222.    Bracton specifically addresses abortion in two sections of his treatise. *Anticipated Eppinger Test.* The first reference to abortion comes in the section on homicide: "If one strikes a pregnant woman or gives her poison in order to procure an abortion, if the foetus is already formed or quickened, especially if it is quickened, he commits homicide." Bracton at 341. The second reference to abortion comes in a section on "woundings committed in breach of the peace": "If anyone forcibly interferes with a woman's internal organs in order to produce abortion, he is liable." Bracton at 406, 408. Thus, under the common law as reported by Bracton, abortion was not unlawful per se. *Anticipated Eppinger Test.* Rather, it was unlawful only in certain circumstances. *Id.*

223.    To properly contextualize Bracton's discussion of abortion, it is important to note two things. First, nonconsensual abortion—and specifically, the practice of beating a pregnant woman to cause her to miscarry against her will—was a cause of concern in the medieval period. *Anticipated Eppinger Test.* The State's expert, Professor Joseph Dellapenna, explains that the

legal system's interaction with abortion during this time was predominantly if not exclusively focused on violent attacks against pregnant women. Dellapenna at 135 ("One … will search in vain during the period before 1400 for a record of a prosecution for abortion that was not also a crime against the mother in the most graphic terms." *Id.* Second, Bracton (as well as other commentators and jurists from this time period) "drew freely from Roman and Canon Law to fill gaps in the common law as they described it." Dellapenna at 152-53.

224.    With these undisputed facts in mind, the best way to interpret Bracton's passage on homicide and abortion is that he is referring to the unintentional death of a pregnant woman from an attempted abortion, even though some have assumed a different meaning. *Anticipated Eppinger Test.*; *but see Roe v. Wade*, 410 U.S. 113, 134 & n.23 (1973), *overruled by Dobbs*, 597 U.S. at 231. With respect to abortion, medieval common law's focus was on nonconsensual violence against pregnant women, which sometimes resulted in their deaths. And subsequent common law authorities that build on Bracton's foundation are unequivocal that a fetus cannot be the victim of a homicide. *See infra* at ¶¶ 226-27, 229-30. Thus, Bracton's discussion of abortion as homicide is best understood as an example of homicide by chance. *Anticipated Eppinger Test.* The upshot is that, when someone beats or poisons a pregnant woman for the purpose of causing her to miscarry and they end up killing her, they are criminally liable for her death. *Id.* In contrast, when a healthcare provider administers a humoral treatment for amenorrhea in accordance with the prevailing standard of care, they would face no liability if their patient died, nor if she lived and miscarried her pregnancy, regardless of quickening. *Id.*

225.    It is notable that Bracton's discussion of abortion as an example of unlawful wounding follows a discussion of castration. Immediately before the sentence about abortion, Bracton states: "But what is to be said where a man cuts off another's testicles and castrates him

71

on account of debauchery or in order to sell him.  He is liable whether he does it with his consent or against his will.  Sometimes capital punishment follows, sometimes permanent exile with the forfeiture of all property."  Bracton at 408.  Subsequently, Bracton notes:  "The jews are allowed to circumcise their sons but those of other religions are not; if they do so the punishment for castration is imposed."  *Id.*  The juxtaposition of castration and abortion and subsequent discussion of immunity from liability when circumcision is performed as a Jewish rite suggests that medieval common law punishment for abortion by wounding was connected to violation of sexual mores or religious law, and not to views about the value of fetal life.  Further, like beating or poisoning a pregnant woman, interfering with her internal organs using a sharp object would have posed a high risk of injury or death and was not part of accepted medical practice at the time.  *Id.*

226.    Coke explains that an essential element of the crime of murder is a victim who is a "reasonable creature in rerum natura."  Edward Coke, *The Third Part of the Institutes of the Laws England Concerning High Treason, and Other Pleas of the Crown and Criminal Causes* 47 (Leon E. Bloch Law Library, UMKC Sch. of Law, digital ed.) (1644) [hereinafter Coke, *Third Institute*], https://irlaw.umkc.edu/cgi/viewcontent.cgi?params=/context/coke_institutes_ lawes/article/1000/&path_info=klc000008.pdf.  He discusses abortion in a passage explaining what this element means:  "If a woman be quick with childe, and by a [p]otion or otherwise killeth it in her wombe; or if a man beat her, whereby the childe dieth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder; but if the childe be born alive, and dieth of the potion, battery, or other cause, this is murder:  for in law it is accounted a reasonable creature, *in rerum natura*, when it is born alive."  *Id.* at 50.  The Latin phrase *in rerum natura* signifies that something is in existence, a part of the real world as opposed to

72

something abstract or fictitious. *Anticipated Eppinger Test.* Thus, Coke reports that a fetus cannot be the object of murder until after it is born because the common law does not recognize its existence as a rational creature—or in other words, because it is not yet a person. *Id.*

227. Hale agrees with Coke that a fetus cannot be the object of murder because it is not a person in the eyes of the common law, but he disagrees that a newborn who dies from injuries sustained in utero can be the object of murder. He states: "If a woman be quick or great with child, if she take, or another give her any potion to make an abortion, or if a man strike her, whereby the child within her is kild, it is not murder nor manslaughter by the law of *England*, because it is not yet *in rerum natura*, tho it be a great crime, and by the judicial law of Moses was punishable with death, nor can it legally be known, whether it were kild or not, so it is, if after such child were born alive, and baptized, and after die of the stroke given to the mother, this is not homicide." Hale at 433 (citations omitted).

228. Both Coke and Hale report that abortion after quickening is a common law crime that does not rise to the level of a felony. Coke, *Third Institute*, at 50; Hale at 433. Hale's reference to the law of Moses suggests that the crime is rooted in the Old Testament discussion of Jewish law. Hale at 433. Given the protection English common law afforded healthcare providers, *supra* at ¶¶ 217, 220, 224, and Jewish law's allowance of abortion in cases where pregnancy posed a threat to the pregnant woman's well-being, *supra* at ¶ 212, it can be inferred that post-quickening abortion was not a crime when performed for therapeutic reasons. *Anticipated Eppinger Test.* Neither Coke nor Hale report any liability for pre-quickening abortion. *Id.* Hale does report, however, that regardless of quickening, if a pregnant woman dies as the result of a non-therapeutic abortion, her death is a murder: "But if a woman be with child, and any gives her a potion to destroy the child within her, and she take it, and it works so

73

strongly, that it kills her, this is murder, for it was not given to cure her of a disease, but unlawfully to destroy her child within her, and therefore he, that gives a potion to this end, must take the hazard, and if it kill the mother, it is murder ….” Hale at 429-30.  This discussion parallels Bracton’s discussion of homicide by chance, and it expressly distinguishes between acts intended to cure a pregnant woman of a disease and acts intended to terminate an unwanted pregnancy.  *Anticipated Eppinger Test.*

229.    Like Coke and Hale, Blackstone emphasizes that, for either murder or manslaughter to occur, “the person killed must be ‘*a reasonable creature in being, and under the king’s peace*,’ at the time of the killing,” and therefore the death of a fetus is “no murder, but a great misprision.”  4 Blackstone at 197-98.  He adopts Coke’s view that “if the child be born alive, and dieth by reason of the potion or bruises it received in the womb, it seems, by the better opinion, to be murder in such as administered or gave them.”  *Id.* at 198.

230.    American courts in the late nineteenth and early twentieth centuries likewise took the view that a fetus was not a person under the common law or state statutes incorporating common law principles.  For example, in an 1876 criminal case, the Iowa Supreme Court reversed the conviction of a physician for manslaughter in connection with the death of a fetus during childbirth.  *State v. Winthrop*, 43 Iowa 519, 523 (Iowa 1876).  The court held that an instruction given to the jury was faulty because it failed to make clear that, for the elements of the crime to be satisfied, the child must have been born alive before it died, establishing independent circulation and an existence separate from its mother.  *Id.* at 519-23.

231.    A line of civil cases beginning with *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14, 17 (1884) (Holmes, J.), held that neither a fetus nor its representative could recover in tort for prenatal injuries or wrongful death *even if* the fetus was born alive.  *See, e.g.*, *Magnolia*

74

*Coca Cola Bottling Co. v. Jordan*, 78 S.W.2d 944, 950 (Tex. Comm'n App. 1935), *overruled by Leal v. C.C. Pitts Sand & Gravel*, 419 S.W.2d 820, 822 (Tex. 1967); *Stanford v. St. Louis-S.F. Ry. Co.*, 108 So. 566, 566 (Ala. 1926) ("The authorities … are unanimous in holding that a prenatal injury affords no basis for an action in damages, in favor either of the child or its personal representative."), *overruled by Huskey v. Smith*, 265 So. 2d 596, 598 (Ala. 1972); *Drobner v. Peters*, 133 N.E. 567, 568 (N.Y. 1921), *overruled by Woods v. Lancet*, 102 N.E.2d 691, 695 (N.Y. 1951); *Lipps v. Milwaukee Elec. Ry. & Light Co.*, 159 N.W. 916, 917 (Wis. 1916); *Buel v. United Rys. Co. of St. Louis*, 154 S.W. 71, 72 (Mo. 1913) ("We have not been able to find any precedent at common law establishing the right of a child injured while en ventre sa mere, but subsequently born alive, to bring an action thereafter for the injuries so received."),[9] *overruled by Steggall v. Morris*, 258 S.W.2d 577, 582 (Mo. 1953); *Gorman v. Budlong*, 49 A. 704, 707 (R.I. 1901), *overruled by Sylvia v. Gobeille*, 220 A.2d 222, 223 (R.I. 1966); *Allaire v. St. Luke's Hosp.*, 76 Ill. App. 441, 450 (1898); *Dietrich*, 138 Mass. at 15 ("Some ancient books seem to have allowed the mother an appeal for the loss of her child by a trespass upon her person.  But no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb." (citations omitted)).[10] Many of these cases distinguished doctrines concerning prenatal property rights, which are rooted in civil rather than common law, on the ground that they embody a legal fiction.  *See, e.g.*, *Jordan*, 78 S.W.2d at 948 ("The decisions which protect unborn children in property and property rights but undertake by the indulgence of a fiction of existence to save to the child

---

[9] "*En ventre sa mere*" means in utero or in the mother's womb.  *En Ventre Sa Mere*, Black's Law Dictionary (12th ed. 2024).

[10] Although today, most American jurisdictions allow recovery for prenatal torts, the law did not begin to change in this respect until after World War II.  *See* 2A Alfred W. Gans, Charles F. Krause & Stuart M. Speiser, American Law of Torts § 9:27 (2025).

property which in fairness belongs to it.  They do not support the imposition of liability upon others for torts indirectly committed against a prospective human being, one unseen and unknown, and who may never have an independent existence.").  A Queen's Bench decision from Ireland in 1890, cited by many of the American cases, likewise denied recovery to a plaintiff for prenatal injuries.  *Walker v. Great N. Ry. Co. of Ir.*, 28 L.R. Ir. 60, 69 (1890); *see id.* at 80 (Harrison, J.) ("When the accident occurred … the plaintiff was still unborn, and had no existence apart from her mother …."); *id.* at 83 (O'Brien, J.) ("There is no person and no duty."); *id.* at 84 (Johnson, J.) ("As a matter of fact, when the act of negligence occurred the plaintiff was not *in esse*, was not a person, or a passenger, or a human being.").

232.    American courts generally recognized abortion as a common law crime only after quickening.  *See, e.g.*, *Mitchell v. Commonwealth*, 78 Ky. 204, 210 (1879) ("The limit of our duty is to determine what the law is, and not to enact or declare it as it should be.  In the discharge of this duty, and after a patient investigation, we are forced to the conclusion that it never was a punishable offense at common law to produce, with the consent of the mother, an abortion prior to the time when the mother became quick with child.  It was not even murder at common law to take the life of the child at any period of gestation, even in the act of delivery."); *Smith v. Gaffard*, 31 Ala. 45, 51 (1857) ("In this case [seeking damages for slander], it does not appear from the words themselves, nor from any part of the complaint, that the imputation of an abortion, procured when the woman was 'quick with child,' was conveyed, or intended to be conveyed.  Unless the words convey that imputation, or were intended to convey that imputation, they do not charge an offense punishable by law under indictment, and, therefore, are not, *per se*, actionable."); *Abrams v. Foshee*, 3 Iowa 274, 279 (1856) ("These authorities agree in holding, that to cause, or procure an abortion, *before* the child is quick, is not a criminal offence at

76

common law, whatever it may be after the child is quick."); *Smith v. State*, 33 Me. 48, 55 (1851) ("At common law, it was no offence to perform an operation upon a pregnant woman by her consent, for the purpose of procuring an abortion, and thereby succeed in the intention, unless the woman was 'quick with child.'"); *State v. Cooper*, 22 N.J.L. 52, 58 (N.J. 1849) ("We are of opinion that the procuring of an abortion by the mother, or by another with her assent, unless the mother be quick with child, is not an indictable offense at the common law, and consequently that the mere attempt to commit the act is not indictable.  There is neither precedent nor authority to support it."); *Commonwealth v. Parker*, 50 Mass. 263, 265-66 (1845) ("And the court are of opinion that, at common law, no indictment will lie, for attempts to procure abortion with the consent of the mother, until she is quick with child.").

233.    Before 1850, no American court recognized abortion as a common law crime before quickening.  In 1850, the Pennsylvania Supreme Court held that abortion was a common law crime throughout pregnancy.  *See Mills v. Commonwealth*, 13 Pa. 631, 633 (1850).  Notably, the court held that abortion was a crime against nature, and not a crime against the developing embryo or fetus.  *Id.* ("It is a flagrant crime, at common law, to attempt to procure the miscarriage or abortion of the woman; because it interferes with and violates the mysteries of nature, in that process by which the human race is propagated and continued.  It is a crime against nature, which obstructs the fountain of life, and therefore it is punished."); *id.* ("It is not the murder of a living child, which constitutes the offence, but the destruction of gestation, by wicked means and against nature.  The moment the womb is instinct with embryo life, and gestation has begun, the crime may be perpetrated.").  Recently, the Pennsylvania Supreme Court acknowledged that its earlier opinion was an outlier, and one that came late in the development of the common law.  *Allegheny Reprod. Health Ctr. v. Penn. Dep't of Human*

77

*Servs.*, 309 A.3d 808, 909 (Pa. 2024) ("[A]t the time our Charter was adopted [in 1776], abortions were available and performed and the government did not interfere in a woman's pregnancy until quickening."). Only one other American court—the North Carolina Supreme Court—held that abortion was a common law crime before quickening, and not until 1880. *See State v. Slagle*, 83 N.C. 630, 632 (1880) ("In some of the states it has been held that in the absence of any statute the offense can only be perpetrated upon a woman so far advanced in gestation as to be quick with child, and this requirement is met in the present bill. But we are not disposed thus to restrict the criminal act, but to hold that it may be committed at any stage of pregnancy."). *Slagle* endorsed *Mills*' reasoning that abortion is a crime against nature and not against the embryo or fetus. *Id.* (quoting *Mills*, 13 Pa. at 633).

234.     The State has not identified any conviction under the common law for a post-quickening abortion—or any abortion—performed in good faith for medical reasons in either England or America.

### D. Statutory Regulation of Abortion in the Nineteenth Century

#### 1. In England

235.     In 1803, Parliament adopted Lord Ellenborough's Act, the first Anglophone statute to regulate abortion.[11] 43 George 3 c. 58 (U.K.) (1803); *Anticipated Eppinger Test.* Unlike the common law, the statute criminalized pre-quickening abortion, but only when done "wilfuly and maliciously." 43 George 3 c. 58 (1803); *Anticipated Eppinger Test.* In another

---

[11] It has been reported that: "Lord Ellenborough was renowned for his strict Christian morality. Contemporaries commended him not only as a wise reformer of the law, but also as 'a [f]earless advocate of religion, and a determined assertor of public and private morals.'" John Keown, *Abortion, Doctors and the Law* 20 (Charles Webster & Charles Rosenberg eds., Cambridge Univ. Press 1988) [hereinafter Keown] (quoting Lord Ellenborough's obituary in *The Courier*, Oct. 18, 1818).

passage about abortion, the statute used the phrase "wilfuly, maliciously, and unlawfully."  43

George 3 c. 58 (1803).  These mens rea elements preserved and incorporated common law

doctrine on therapeutic intent, and they were retained in subsequent revisions of the criminal

statute throughout the nineteenth century.  *Anticipated Eppinger Test.*  For example, sections 58

and 59 of the Offenses Against the Person Act of 1861 provide that, to be punishable, an

abortion or attempted abortion must be done "unlawfully."  24 & 25 Vict. C. 100 §§ 58-59

(U.K.) (1861).

236.    Under the common law, the mens rea elements *unlawful* and *malicious* both

signified an act done without justification.  *Anticipated Eppinger Test.*  For example, Blackstone

explains that unlawfulness and malice aforethought are elements of murder.  4 Blackstone at 194,

200.  He states that "unlawfulness arises from the killing without warrant or excuse."  *Id.* at 194-

95.  Similarly, he states that:

> [A]ll homicide is malicious, and, of course, amounts to murder, unless where
> *justified* by the command or permission of the law; *excused* on the account of
> accident or self-preservation; or *alleviated* into manslaughter, by being either the
> involuntary consequence of some act, not strictly lawful, or if voluntary,
> occasioned by some sudden and sufficiently violent provocation.

*Id.* at 200.  From this, it can be inferred that unlawful or malicious abortion is abortion performed

without justification.  *Anticipated Eppinger Test.*  Abortion performed to preserve a pregnant

woman's life or health would have been justified and therefore not subject to penalty under Lord

Ellenborough's Act.  *Id.*

237.    During the nineteenth and early twentieth centuries, both the legal community and

the medical community in England understood therapeutic abortion to be protected by law at all

stages of pregnancy.  *Anticipated Eppinger Test.*  Lawyers and judges as well as doctors

distinguished between unlawful abortion and therapeutic abortion.  *Id.*

79

238.    English lawyer and bioethicist John Keown conducted an extensive review of obstetrical textbooks published in England between 1794 and 1937, as well as medical journal articles, lectures, and proceedings of medical conferences.  Keown at 59-83; *Anticipated Eppinger Test.*  He concluded that:  "[T]he evidence of obstetrical writings … indicate that therapeutic abortion was performed even before Ellenborough's Act and that, well before [*Rex v. Bourne*, discussed below], was being undertaken for increasingly extensive indications, including the preservation of mental health."  *Id.* at 59.  Although there were some dissenting voices within the medical community, Dr. Keown describes the "orthodox position," reflected in Francis Ramsbotham's 1867 text on obstetrics, as embracing therapeutic abortion for a wide range of medical indications threatening a pregnant woman's health or life.  *Id.* at 61-62 ("Explaining the greater esteem in which the life and health of the mother were held, [Ramsbotham] pointed out that she, unlike her unborn child, was bound to the world by many social, moral and religious ties; had feelings, affections, hopes and fears; and was involved in relationships or interdependency.").

239.    Dr. Keown also surveyed a wide array of English legal documents, including court decisions, transcripts of legal proceedings, formal legal correspondence, and extra-judicial statements in lectures and public meetings.  *Id.* at 52-59; *Anticipated Eppinger Test.*  Regarding the law, he concluded that:  "[E]ven before *Bourne* therapeutic abortion to preserve the woman's life was lawful.  The evidence suggests that the preservation of health would also have constituted a lawful cause, and there is no evidence that health was confined to the patient's physical as opposed to her mental condition."  Keown at 57.  Dr. Keown notes that he could find no evidence of a prosecution for therapeutic abortion prior to *Rex v. Bourne*, *id.* at 78, and the lack of such prosecutions in the face of the open and common practice of therapeutic abortion is

80

further evidence that the legal authorities understood it to be lawful, *id.* at 162 ("The absence of any reported prosecution of a practitioner for the performance of the operation, according to professionally approved criteria, from the late eighteenth century to 1938, suggests the tacit approval of this discretion by the state.").

240.    The landmark English case *Rex v. Bourne*, (1938) 3 All E.R. 615 (Eng.), [1939] 1 K.B. 687 (Macnaghten, J.), confirms that Lord Ellenborough's Act and its successors preserved immunity for therapeutic abortion care. *Anticipated Eppinger Test.*  It concerns a physician charged with unlawful abortion under the Offences Against the Person Act of 1861 in connection with providing an abortion to a fourteen-year-old girl who had been raped.  *Id.*  The reported opinion is comprised of the judge's instructions to the jury, who ultimately acquitted the doctor.  *Id.*  The judge explained that, although the statute did not contain any express exceptions, use of the term "unlawful" implied an exception for acts "done in good faith for the purpose only of preserving the life of the mother." *Bourne*, 3 All E.R. at 617.  ("Those words express what, in my view, has always been the law with regard to the procuring of an abortion, and, although not expressed in sect. 58 of the Act of 1861, they are implied by the word 'unlawful' in that section.").  The judge further instructed the jury that there is not a firm boundary between preserving a person's life and preserving a person's health.  *Id.* ("Life depends upon health, and it may be that health is so gravely impaired that death results.").  He explained that, when a patient faces a risk of death, a physician need not wait until death is imminent to provide an abortion.  *Id.* at 618.  The judge then went a step further and instructed the jury that, if continuing the pregnancy would cause serious harm to the pregnant person's physical or mental health, the implied exception is satisfied.  *Id.* at 619 ("[I]f the doctor is of opinion, on reasonable grounds and with adequate knowledge, that the probable consequence of the continuance of the

81

pregnancy will be to make the woman a physical or mental wreck, the jury are quite entitled to take the view that the doctor, who, in those circumstances, and in that honest belief, operates, is operating for the purpose of preserving the life of the woman."). The judge also instructed the jury to take the risk of suicidal ideation into account. *Id.* at 619-20 ("Here you have the evidence of Dr. Rees, a gentleman of eminence in the profession, that, from his experience and his knowledge, the mental effect produced by pregnancy brought about by the terrible rape which Dr. Gorsky described to you must be most prejudicial …. So far as danger to life is concerned, you cannot, of course, be certain of the result unless you wait until a person is dead. Nobody suggests that the operation only becomes legal when a patient is dead.").

241.    Thus, *Bourne* established that the abortion ban enacted by Parliament in 1861 contained an implied exception for abortions provided in good faith to preserve the life or physical or mental health of the pregnant person, including to mitigate the risk of suicide. *Anticipated Eppinger Test.* Dr. Keown concluded that *Bourne* did not effect a change in the law but simply confirmed what the law had always been. Keown at 79 ("The Bourne case of 1938 did not, therefore, liberate medical discretion from an uncompromising law. In fact, this was recognised by Bourne himself. Writing shortly after his trial he conceded that his aim had not been to reform the law but to ensure its declaration.").

### 2. In the United States

#### a. *Statutes Enacted Before 1857*

242.    In the United States, the codification of abortion law in the nineteenth century occurred in stages. *Anticipated Eppinger Test.* The first stage began in 1821 and focused on patient protection as part of a broader trend of regulating medical practice. *Id.* Historian James C. Mohr, who wrote a seminal account of abortion regulation in nineteenth-century America, explains that: "The first wave of abortion legislation in American history emerged from the

struggles of both legislators and physicians to control medical practice rather than from public pressure to deal with abortion per se." James C. Mohr, *Abortion in America* 43 (Oxford Univ. Press 1978) [hereinafter Mohr]; *Anticipated Eppinger Test.*

243.    The earliest American abortion statutes were enacted against a backdrop of acute change in medical thinking and medical practice. *Anticipated Eppinger Test.*  There was an explosion of new medical schools during the nineteenth century, producing a wave of formally trained "regular" physicians who began to abandon the tenets of humoral health in favor of new theories of medicine and new surgical techniques. *Id.*  The educational rigor of these new medical schools varied greatly, and so did the competence of the doctors they produced.  Mohr at 33.  The regular physicians were almost exclusively male as most medical schools during this period excluded female students. *Anticipated Eppinger Test.*  They competed for patients with "irregular" healthcare providers such as midwives, apothecaries, and people who called themselves doctors but had no formal medical education. *Id.*  The irregulars were more steeped in traditional humoral practices, and their level of competence also varied. *Id.*

244.    Public alarm at the perceived proliferation of "quack" practitioners who lacked fundamental knowledge and skills as well as those who—whether due to incompetence, hubris, or economic motivation—engaged in "rash" practices that subjected patients to unreasonable risks became a recurrent theme in in the first half of the nineteenth century, leading to calls for regulation. *Anticipated Eppinger Test.*; s*ee also Thompson*, 6 Mass. at 142 ("It is to be exceedingly lamented, that people are so easily persuaded to put confidence in these itinerant quacks, and to trust their lives to strangers without knowledge or experience.  If this astonishing infatuation should continue, and men are found to yield to the impudent pretensions of ignorant empiricism, there seems to be no adequate remedy by a crimina[l] prosecution, without the

interference of the legislature, if the quack, however weak and presumptuous, should prescribe, with honest intentions and expectations of relieving his patients."); 3 N.Y. Rev. Stat. Appendix: Revisers' Reports and Notes, pt. 4, ch. 1, tit. 6, § 28, 811, 829-30 (1828-1835) ("The rashness of many young practitioners in performing the most important surgical operations for the mere purpose of distinguishing themselves, has been a subject of much complaint, and we are advised by old and experienced surgeons, that the loss of life occasioned by such practice is alarming.").[12]  As Dr. Mohr explains:  "During the middle decades of the nineteenth century, legislators felt a special obligation to protect the public from an occupational group that was … reaching something of a nadir.  By the late 1820s physicians, with a good deal of justification, were viewed by many Americans as menaces to their society."  Mohr at 31.

245.    Beginning in the 1830s, well publicized accounts of the deaths of young women in connection with nontherapeutic abortions contributed to public concern and increased momentum for regulation.  *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*

246.    Perhaps surprisingly, regular physicians were at the forefront of efforts to regulate medical practice during this time period, perceiving that such regulation would afford them a competitive advantage over their irregular counterparts.  *Anticipated Eppinger Test.*; Mohr at 32-34.  Because regulars tended to have ideological objections to abortion, and nontherapeutic abortion was a financial boon for irregulars, the regulation of abortion became bound up in the regulation of medical practice more generally.  *Anticipated Eppinger Test.*; Mohr at 32-34.  Dr. Mohr reports:

---

[12] Although the New York revisors' commentary concerned a provision criminalizing the performance of unnecessary surgery that was ultimately stricken from the final legislation before its enactment, it shows that concern about changing medical paradigms and the use of risky new techniques was part of the zeitgeist.  *Anticipated Eppinger Test.*; *see* Mohr at 28.

> In the face of such crises many regular physicians in the United States decided to try to defend both their medical theories and their material livelihoods in the best way they could: through state legislatures. The regulars perceived that their generally well-established social backgrounds would, in the long run, give them something of an advantage over their rivals in those public forums. Their ongoing and ultimately successful efforts to influence medical-related legislation of all kinds became crucial to the evolution of abortion policy at the state level because, unlike most of their irregular rivals and unlike a majority of the American people, regular physicians opposed abortion not only after quickening, but before quickening as well.

Mohr at 34; *see also* Dellapenna at 355 ("There is no denying that allopathic physicians were in the lead in the fight for stricter abortion laws, including seeking to foster public recognition that non-allopathic medical practitioners were responsible for a good deal of the growing incidence of abortion."); *id.* at 356 (explaining that statements in committee reports, medical journal articles, and newspaper op-eds "do indicate the allopaths' belief that irregular physicians comprised the bulk of the professional abortionists; similar statements argued that these "irregulars" could exploit this practice to build a relationship that could allow the irregulars to obtain the entire medical business of the patients and their families.").

247.    Dr. Keown describes a similar dynamic at play in England. Keown at 39-47. Discussing the enactment of sections 58-59 of the Offences Against the Person Act of 1861, he explains:

> That the legislature was not influenced by that opinion to the extent of prohibiting all unqualified medical practice reflects, as had the Medical Act, the strength of the prevailing ethos which favoured a *laissez-faire* approach to the regulation of medical practice, and suggests limits to professional influence, particularly when the profession's motives were not wholly disinterested. However, the legislature's enactment of ss. 58 and 59 can be seen as a response to the profession's demand that, if the law was not going to suppress irregular practitioners, then it ought at least to check their growing trade in abortion. Even this more modest response to the problem would, of course, redound to the benefit of the regulars, for while it would not proscribe their competitors it would at least throw a further obstacle in their way by extending the prohibition on a procedure which, according to the regulars, they were finding increasing profitable.

Keown at 46.

85

248.     The first statutory regulation of abortion in the United States came in 1821 when the Connecticut legislature amended a section of the state criminal code dealing with death by poison to include a prohibition against "wilfully and maliciously" administering "any deadly poison, or other noxious and destructive substance" with the intent to "cause or procure the miscarriage of any woman, then being quick with child" as part of a comprehensive revision of its criminal code.  Conn. Gen. Stat. tit. 22, §§ 14, 16, at 151-53 (1821); *Anticipated Eppinger Test.*  As in Lord Ellenborough's Act and its successors, the mens rea element served to exempt therapeutic abortion from punishment.  *Anticipated Eppinger Test.*

249.     In 1827, the New York legislature made the unauthorized practice of medicine a misdemeanor.  *Anticipated Eppinger Test.*  The following year, New York adopted abortion legislation as part of a comprehensive revision of its criminal code.  *Id.*  The omnibus statute included three provisions concerning abortion.  *Id.*  The first provision made the "wilful killing" of a quick fetus first-degree manslaughter if accomplished by an injury to the pregnant woman that would constitute murder if it caused her death.  2 N.Y. Rev. Stat. pt. 4, ch. 1, tit. 2, art. 1, § 8, at 659, 661 (1828); *Anticipated Eppinger Test.*  The second provision made any intervention with the intent to "destroy" a quick fetus second-degree manslaughter.  2 N.Y. Rev. Stat. pt. 4, ch.1, tit. 2, art. 1, §9, at 659, 661 (1828); *Anticipated Eppinger Test.*

250.     The third provision contained the first American law to criminalize abortion before quickening as well as the first express therapeutic exception in any Anglophone abortion statute.  *Anticipated Eppinger Test.*  It made intentionally procuring a miscarriage at any stage of pregnancy a misdemeanor "unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose."  2 N.Y.

86

Rev. Stat. pt. 4, ch. 1, tit. 6, § 21, at 689, 694 (1828); *Anticipated Eppinger Test.* Dr. Mohr

explains that the influence of lobbying by regulars is clearly reflected in this provision:

> One of the cardinal points of the New York regulars' code of ethics was the
> principle of mandatory consultation in difficult cases; the regulars had given that
> principle a great deal of attention when they drafted their ethics in 1823. In 1828,
> by persuading the [New York] revisers to make explicit something that might well
> have been left implicit as before, they were able to introduce their cherished
> principle of consultation into the state code. They also, of course, placed
> themselves in the position of deciding when the law would be applied to its letter
> and when it would be bent on behalf of a patient.

Mohr at 38.

251.    New Jersey enacted its first abortion statute in 1849, which like New York's

statute, criminalized abortion before quickening. 1849 N. J. Laws pp. 266-267. Interpreting this

law nine years later, the New Jersey Supreme Court explained that its purpose was to protect the

health and lives of pregnant women:

> The design of the statute was not to prevent the procuring of abortions, so much
> as to guard the health and life of the mother against the consequences of such
> attempts. The guilt of the defendant is not graduated by the success or failure of
> the attempt. It is immaterial whether the *fœtus* is destroyed, or whether it has
> quickened or not. In either case the degree of the defendant's guilt is the same.
> The only gradation recognized by the statute in the defendant's guilt, is made to
> depend upon the effect of the act upon the mother, viz., whether she died in
> consequence of it.

*State v. Murphy*, 27 N.J.L. 112, 114 (N.J. 1858).[13]

252.    Between 1821 and 1857, several other states and territories enacted abortion

statutes aimed at protecting pregnant women from unsafe practices and unscrupulous abortion

providers. *Anticipated Eppinger Test.*; Mohr at 39-45, 145-46. Mohr notes that: "Legislators

had been annoyed at the flagrant commercialization of abortion that arose during the 1840s and

---

[13] At the time of the decision, Daniel Haines, who had signed the legislation at issue into law
when he served as New Jersey's governor, was a justice on New Jersey's Supreme Court. Mohr
at 137.

continued into the 1850s, and were fearful about the possibility of incompetent abortionists wreaking serious harm, even death, to the nation's women. But these factors by themselves had not produced forceful new policies." Mohr at 145. Importantly, all of the statutes enacted during this period contained either mens rea requirements that served to exempt therapeutic abortion from liability or express therapeutic exceptions. *Anticipated Eppinger Test.*

### b. Statutes Enacted After 1857

253. The next stage of abortion regulation followed the formation of the AMA in 1847. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.* The regulars' campaign against nontherapeutic abortion gained steam after the AMA formed a Committee on Criminal Abortion a decade later. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*; Mohr at 154-55. Formation of the committee was the result of organizing by Horatio Robinson Storer, a doctor from Boston who specialized in women's health and was staunchly opposed to abortion, and he became its chair. *Anticipated Cohen Test.*; Mohr at 154-55. It is undisputed that: "Storer was the dominant personality in the early stages of the American Medical Association's campaign against abortion, and thus perhaps the most important leader of the anti-abortion movement in nineteenth-century America." Dellapenna at 358-59.

254. At the AMA's national convention in Louisville in 1859, the organization adopted a committee report and series of resolutions drafted by Dr. Storer opposing criminal abortion and calling on state legislatures to ban it. *Anticipated Cohen Test.*; Mohr at 156-57. Dr. Mohr explains that:

> From the Louisville convention of 1859 through the rest of the nineteenth century, the steadily growing AMA would remain steadfastly and officially committed to outlawing the practice of abortion in the United States, both inside and outside that organization, and the vigorous efforts of America's regular physicians would prove in the long run to be the single most important factor in altering the legal policies toward abortion in this country.

Mohr at 157. The regulars directed their efforts at so-called "criminal abortion," which was distinct in their minds from therapeutic abortion. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*

255. It is undisputed that many regular physicians held sincere moral objections to abortion based on their understanding of fetal development.[14] This does not necessarily mean, however, that they viewed a developing embryo or fetus as a person; many argued that prenatal life deserved protection because of its *potential* for personhood. An 1873 address by an Illinois regular to his county medical society is illustrative of this view:

> Many, indeed, argue, that the practice is not, in fact, criminal, because, they argue, that the child is not viable until the seventh month of gestation, hence there is no destruction of life. The truly professional man's morals, however, are not of that easy caste, because he sees in the germ the probable embryo, in the embryo the rudimentary foetus, and in that, the seven months viable child and the prospective living, moving, breathing men or women, as the case may be.

Mohr at 165-66 (quoting James S. Whitmire, *Criminal Abortion*, 31 Chi. Med. J. 385, 392 (1874)).

256. During the second half of the nineteenth century, the regulars joined their moral objections to abortion and their economic interest in gaining an advantage over the irregulars in the competition for patients with a commitment to enforcing women's traditional roles as wives and mothers and nativist concerns about the increasing abortion rate among married white Protestant women. *Anticipated Cohen Test.*

---

[14] Evidence suggests that most Americans did not share the regulars' views about the value of life at conception, instead ascribing significant value to prenatal life only after it reaches certain developmental milestones, like quickening or viability, later in pregnancy. *See* Mohr at 114-18; Aaron Tang, *After Dobbs: History, Tradition, and the Uncertain Future of a Nationwide Abortion Ban*, 75 Stan. L. Rev. 1091, 1129, 1154 (2023) [hereinafter Tang]; *infra* at ¶ 278. Likewise, most American religious leaders declined to speak out against abortion in the nineteenth century, despite frequent urging by the regulars. Mohr at 182-96.

257.    As a group, regulars were staunchly committed to enforcing women's traditional roles as wives and mothers. *Anticipated Cohen Test.*; Mohr at 168-70.  Professor Dellapenna notes that:  "Physicians and their allies made little secret about their concerns.  They openly stated goals such as promoting proper female behavior in the home and elsewhere.  Supporters of proper female behavior certainly at the time were unashamed of such views."  Dellapenna at 343.  Dr. Storer, for example, "described marriage without children as legalized prostitution."  Dellapenna at 369.

258.    In 1868, AMA members voted down a recommendation of their national committee on ethics to permit female doctors to consult with regulars, and they rejected an 1871 charter amendment that would have permitted delegates from medical schools that admitted women.  Mohr at 169.  Many argued that women's biological attributes made them unfit for higher education or work outside the home.  Dellapenna at 363-64; *id.* at 366 ("The great majority of male physicians on both sides of the Atlantic considered women congenitally unfit to be physicians.").  Dr. Storer, who supported a resolution opposing the admission of women to Harvard Medical School and wrote numerous articles proclaiming the unfitness of women to be medical practitioners, "argued that women are appendages of their reproductive systems, unlike men in whom, according to Storer, the reproductive system was 'merely subsidiary.'"  Dellapenna at 363-64 (quoting Horatio R. Storer, *The Causation, Course and Treatment of Reflex Insanity in Women* 150 (1871), and Horatio R. Storer, *Why Not? A Book for Everywoman* 74-75 (1866) [hereinafter Storer, *Why Not?*]).

259.    Beginning in the mid-nineteenth century, the United States underwent a significant demographic shift.  *Anticipated Cohen Test.*  Birthrates among women born in the United States plummeted; there was a large influx of European immigrants; and the industrial

90

revolution fueled the growth of cities and a decline in rural populations. *Anticipated Cohen Test.* Amplifying nativist anxiety among the upper classes, Dr. Storer and other regulars frequently repeated the claim that abortion was far more common among native-born Protestant women than among Catholic immigrants. *Anticipated Cohen Test.*; Mohr at 167; Dellapenna at 364 ("[Storer] apparently shared the nativist fears that abortion among middle class (*i.e.* white) American women would open the nation to settlement by foreigners (*i.e.* darker skinned southern Europeans …), and in this vein was not above … Catholic-bashing."). Dr. Mohr reports: "There can be little doubt that Protestants' fears about not keeping up with the reproductive rates of Catholic immigrants played a greater role in the drive for anti-abortion laws in nineteenth-century America than Catholic opposition to abortion did." Mohr at 167.

260. In two years, from 1857 to 1859, Dr. Storer built an effective case that abortions by married Protestant women were skyrocketing. *Anticipated Cohen Test.* This was startling news to contemporaries because four out of five cases in news circulation up until then involved single women "hiding their shame." *Id.* Dr. Storer's innovation was to point to married women of the upper classes aborting to keep families small, and doing it, he wrote, out of selfish preference for an easier life with more time for the social activities of the leisured classes. *Id.*

261. The report that Dr. Storer wrote on behalf of the AMA's Committee on Criminal Abortion, dense with numbers and calculations, was derived from official mortality statistics collected in Massachusetts and New York City. *Anticipated Cohen Test.* The numbers appeared to substantiate his shocking claim that abortion was occurring at epidemic levels: one out of every 40.4 births, his initial data showed, soon repeated as one in 4.04 in a misprint. *Id.* There is good reason to believe that the methodology Dr. Storer employed was unreliable and the statistics inaccurate. *Id.* Nevertheless, Dr. Storer's report was effective; the AMA campaign

touched off a wave of statutory revision with ten new laws from 1860 to 1868 and many more after that. *Id.*

262.    Evidence indicates that the legislatures enacting stricter abortion laws in the late nineteenth century shared the regulars' concerns not only about the value of prenatal life, but also about the role of women in society, the relative birthrates of American-born and immigrant women, and the safety of commercial abortion. For example, in 1867, a special committee of the Ohio Senate with three regular-physician members issued a report endorsing abortion legislation that was ultimately enacted by the full legislature. Mohr at 206-10. The report, which echoed language from Dr. Storer's polemics, made five main points: (1) abortion occurred with alarming frequency in Ohio; (2) the Ohio public supported broad abortion access; (3) emerging scientific evidence concerning in utero development demonstrated that quickening was not a biologically significant milestone; (4) abortion was dangerous for pregnant women; and (5) American-born women had abortions much more frequently than immigrant women, shirking their duties both to their husbands and to society at large. *Id.* at 207. On this last point, the committee report stated:

> Do [our native women] realize that in avoiding the duties and responsibilities of married life, they are, in effect, living in a state of legalized prostitution? Shall we permit our broad and fertile prairies to be settled only by the children of aliens? If not, we must, by proper legislation, and by the diffusion of a correct public sentiment, endeavor to suppress a crime which has become so prevalent.

*Id.* at 207-08 (quoting Journal of the Senate of the State of Ohio, 1867, app., 233-25).

263.    All of the state abortion statutes enacted between 1857 and 1919 authorized therapeutic abortions either through express exceptions from criminal liability or mens rea requirements that served to exclude therapeutic abortions. *Anticipated Eppinger Test.*

92

264.    When the Fourteenth Amendment was ratified in 1868, of the twenty-eight states with statutes criminalizing abortion,[15] nineteen statutes contained express exceptions for abortions necessary to preserve the pregnant person's life:  Alabama, 1841 Ala. Acts p. 143; California, 1850 Cal. Stats. p. 233; Connecticut, 1860 Conn. Pub. Acts p. 65; Florida, 1868 Fla. Laws, ch. 1637, pp. 64, 97; Indiana, 1835 Ind. Laws p. 66; Iowa, 1858 Iowa Acts p. 93 (codified in Iowa Rev. Laws § 4221); Kansas, 1859 Kan. Laws pp. 233, 237; Maine, Me. Rev. Stat., Tit. 12, ch. 160, §§ 13–14 (1840); Michigan, Mich. Rev. Stat., Tit. 30, ch. 153, §§ 33–34 (1846); Missouri, Act of Mar. 20, 1835, art. 2, §§ 10, 36, 1835 Mo. Rev. Stat. 165, 168, 172; Nevada, 1861 Nev. Laws p. 63; New Hampshire, 1849 N. H. Laws p. 708; New York, N. Y. Rev. Stat., pt. 4, ch. 1, Tit. 2, § 9, Tit. 6, § 21 (1828), 1829 N. Y. Laws p. 19 (codifying these provisions in the revised statutes); Ohio, 1834 Ohio Laws pp. 20–21; Oregon, Ore. Gen. Laws, Crim. Code, ch. 43, § 509 (1865); Rhode Island, 1861 R. I. Acts & Resolves p. 133; Virginia, 1848 Va. Acts p. 96; West Virginia, W. Va. Const., Art. XI, § 8 (1862); and Wisconsin, Wis. Rev. Stat., ch. 164, § 11, ch. 169, § 58 (1858).  None of these statutes distinguished self-harm from other threats to a pregnant person's life.  Six of these statutes included a safe harbor for physician consultation:  New York, Ohio, Michigan, New Hampshire, Wisconsin, and Florida.

265.    Two statutes had therapeutic exceptions that were worded differently:  Illinois and Maryland.  Illinois's statute exempted from liability "any person who procures or attempts to procure the miscarriage of any pregnant woman for bona fide medical or surgical purposes."

---

[15] Professor Aaron Tang argues that *Dobbs* was incorrect in concluding that all of these statutes banned abortion before quickening.  Tang at 1128 ("Substantial evidence suggests that as many as 12 of the 28 states on the majority's list actually continued the centuries-old common law tradition of permitting pre-quickening abortions."); *contra Dobbs*, 597 U.S. at 248.

1867 Ill. Pub. Laws, 25th Gen. Assembly 1st Sess. §§ 2, 3, at 89 (Act of Feb. 28, 1867).

Maryland's statute provided that

> nothing herein contained shall be construed so as to prohibit the supervision and management by a regular practitioner of medicine of all cases of abortion occurring spontaneously, either as the result of accident, constitutional debility, or any other natural cause, or the production of abortion by a regular practitioner of medicine when, after consulting with one or more respectable physicians, he shall be satisfied that the foetus is dead, or that no other method will secure the safety of the mother.

1868 Md. Laws p. 315.

266.    Six statutes contained mens rea requirements such as "feloniously," "maliciously," or "unlawfully" that excluded therapeutic abortions from the definition of the offense:  Louisiana, La. Rev. Stat. § 24 (1856); Massachusetts, 1845 Mass. Acts p. 406; New Jersey, 1849 N. J. Laws pp. 266–267; Pennsylvania, 1861 Pa. Laws pp. 404–405; Texas, 1854 Tex. Gen. Laws p. 58; and Vermont, 1846 Vt. Acts & Resolves pp. 34–35.

267.    The remaining state, Nebraska, adopted a life exception when it codified its laws in 1873.  Neb. Rev. Stat. pt. 3, ch. 4, § 39 (1873).  As codified, the statute provided:

> Any physician, or other person, who shall wilfully administer to any pregnant woman any medicine, drug, substance, or thing whatever, or shall use any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, *unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose*, shall be punished by imprisonment in the county jail, not more than one year, or by fine, not exceeding five hundred dollars, or by both such fine and imprisonment.

*Id.* (emphasis added).

268.    In 1868, only six of the thirteen territories that would eventually become states had statutes that criminalized abortion in at least some circumstances:  Arizona; Colorado; Hawaii; Idaho; Montana; and Washington.  *See Dobbs*, 597 U.S. at 324-27 app. B.  Five of these statutes included express life exceptions that did not distinguish self-harm from other threats to a

94

pregnant person's life:  Arizona, Howell Code, ch. 10, § 45 (1865); Hawaii, Haw. Penal Code, ch. 12, §§ 1–2 (1850); Idaho, 1863–1864 Terr. of Idaho Laws p. 443; Montana, 1864 Terr. of Mont. Laws p. 184; and Washington, Terr. of Wash. Stat., ch. 2, §§ 37–38, p. 81 (1854). Colorado's statute exempted from liability abortions "procured or attempted by or under the advice of a physician or surgeon, with intent to save the life of such woman, or to prevent serious and permanent bodily injury to her."  Gen. Laws Colo. Terr. ch. 22, § 42, p. 202 (1868).

269.    All criminal abortion statutes enacted between 1868 and 1900 contained express therapeutic exceptions, *see Dobbs*, 597 U.S. at 327-30 app. B, as did a District of Columbia statute enacted in 1901, § 809, 31 Stat. 1322 (1901) (immunizing abortion from liability "when necessary to preserve [a woman's] life or health and under the direction of a competent licensed practitioner of medicine"), and a New Mexico statute enacted in 1919, 1919 N. M. Laws p. 6 ("[A]n abortion may be produced when two physicians licensed to practice in the State of New Mexico, in consultation, deem it necessary to preserve the life of the woman, or to prevent serious and permanent bodily injury.").

270.    As in England, during the nineteenth century, regular physicians in America performed therapeutic abortions for a wide range of medical indications to preserve patient health as well as life.  *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*

271.    Medical journals and textbooks provided outlets for physicians to confer about standards of treatment that might require induced abortion.  *Anticipated Cohen Test.*  In the mid-nineteenth century, hyperemesis gravidarum—severe, persistent vomiting resulting in weight loss and dehydration—was a condition high on the list.  *Id.*  Dr. Gunning Bedford of New York City, a devout Catholic on record as opposing all abortion on religious grounds, was called to an afflicted and wasted patient in 1847 and immediately used an instrument to empty her uterus.  *Id.*

He wrote in detail about his fast-acting decision in a lecture delivered to his medical students and was soon surprised to find the entire lecture printed on the front page of the *New York Herald*, then an irreverent and sensationalist two-penny paper. *Id.* (citing *Medical*, New York Herald, Feb. 13, 1848, at 1). Shocked objections were raised by other doctors in New York and Boston to the public airing of a graphic description of how to perform an abortion, but there was no challenge to Dr. Bedford's medical judgment. *Id.* The doctor reported that hydatids emerged from the woman's uterus, a growth today called a hydatidiform mole, formed when abnormal cells proliferate from a fertilized egg; it can grow into a mass that mimics mid-stage pregnancy. *Id.* (citing Gunning S. Bedford, *A Lecture Introductory to a Course on Obstetrics and the Diseases of Women and Children in the University of New York*, New York University Medical Department, 1847, at 17-18 [hereinafter Bedford]). When he first took action, he could not have known that it would turn out to be a blighted pregnancy. *Id.* (citing Bedford at 17-18). He proudly included it in his lectures for students. *Id.* (citing Bedford at 17-18).

272. Dr. Storer, the architect of the AMA's campaign against criminal abortion, wrote about what he thought were justifiable reasons to take pregnancy-ending medical actions in a professional publication as well as in a book for the general public. *Anticipated Cohen Test.* In the professional publication, he focused on conditions that would make vaginal childbirth difficult or impossible, such as "malformation or monstrosity of the foetus"; pelvic contraction; and uterine cancer, as well as "severe obstetric complications" in the current pregnancy or in prior pregnancies, including "obstinate vomiting"; "puerperal convulsions" (*i.e.*, postpartum seizures caused by eclampsia); "dropsies" (*i.e.*, edema); "irreducible displacements of the uterus" (*i.e.*, permanent descension of the uterus due to pelvic floor weakening); and "varix of the external labial vessels" (*i.e.*, swollen or twisted veins on the labia). *Id.* (citing Horatio R. Storer,

*On Criminal Abortion* 64-65 (Philadelphia, J.B. Lippincott & Co. 1860), https://wellcome
collection.org/works/r37g29ar) [https://perma.cc/W993-7CRW].  In the popular publication, he
emphasized two broader considerations: "cases of insanity, of epilepsy, or other mental lesion,
where there is fear of transmitting the malady to a line of offspring," and "general ill-health,
where there is perhaps a chance of a patient becoming an invalid for life."  *Id.* (quoting Storer,
*Why Not?*, at 25, https://archive.org/details/whynotbookforeve00stor) [https://perma.cc/P65J-
24MD] .

273.    Dr. Storer lived in Massachusetts where the abortion statute criminalized
abortions that were "malicious[]" and "without lawful justification."  *Anticipated Cohen Test.*
The line between malicious and lawful abortion was made apparent in an unusual case appealed
to Massachusetts' highest court in 1858.  *Id.* (citing *Commonwealth v. Wood*, 77 Mass. 85, 90
(1858)).  A physician was charged with violating Massachusetts' 1845 abortion statute.  *Wood*,
77 Mass. at 86-87.  At trial, the judge instructed the jury "that if the defendant, a practising
physician, in the exercise of his best skill and judgment, honestly believed that the act was
necessary to preserve the mother from great peril to life or health, and in good faith procured
a miscarriage with that view, he could not be convicted."  *Id.* at 90.  The jury nonetheless
found him guilty, likely based on evidence that he had an ongoing sexual relationship with the
unmarried abortion patient that was the cause of her pregnancy.  *Id.*; *Anticipated Cohen Test.*
On appeal, the Massachusetts Supreme Court held that the jury instructions were proper and
that, if the jury concluded that the physician performed the abortion "to screen [the patient] or
himself from exposure and disgrace," the statute's mens rea element would be satisfied.
*Wood*, 77 Mass. at 92.  Thus, although the case resulted in a conviction, it shows that

97

terminating a pregnancy for the purpose of preserving a woman's health was understood to be lawful in Massachusetts. *Anticipated Cohen Test.*

274. Subsequent decisions of the Massachusetts Supreme Court confirm this understanding of the law. *See, e.g.*, *Commonwealth v. Wheeler*, 53 N.E.2d 4, 5 & n.1 (Mass. 1944) (citing *Rex v. Bourne*, [1939] 1 K.B. 687) ("[A] physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary to save her life or to prevent serious impairment of her health, mental or physical, and if his judgment corresponds with the general opinion of competent practitioners in the community in which he practices."); *Commonwealth v. Nason*, 148 N.E. 110, 112 (Mass. 1925) (upholding a jury charge that included the following instruction:  "[A] physician has a right to commit an abortion and if it is done upon the best judgment of that doctor and his judgment corresponds with the average judgment of the doctors in the community in which he practices, that can cease to be illegal and becomes legal, just as legal as if he were delivering a woman with forceps five days before the period of gestation"); *Commonwealth v. Brown*, 121 Mass. 69, 76 (1876) (upholding a jury charge that included the following instruction: "[T]he jury are instructed that a physician may lawfully procure the miscarriage of a woman pregnant with child, by any means appropriate and reasonable for that purpose, directly or indirectly applied, if in so doing he acts in good faith for the preservation of the life or health of such pregnant woman").

275. Whereas Dr. Storer contended that, when a pregnant patient suffered from mental illness, abortion was justified on eugenic grounds, *see supra* at ¶ 272, other doctors cited preservation of the patient's life and health as a basis for providing abortion care to those with mental illness.  For example, in 1894, Dr. Robert C. Eve of Augusta, Georgia, wrote that abortion is "justifiable" and "recommended" to preserve a patient's life "in some cases of

pregnancy complicated with insanity." *Anticipated Cohen Test.* (quoting Robert C. Eve, *The Medico-Legal, Legal, and Moral Aspects of Criminal Abortion and Infanticide*, 11 Atlanta Med. & Surgical J., no. 9, Nov. 1894, at 520).  Similarly, a doctor writing in a prominent North Dakota medical journal in 1914 included among a list of cases "in which an abortion is imperative:  the mentally unfit who might become deranged." *Wrigley v. Romanick*, 988 N.W.2d 231, 241 (N.D. 2023) (quoting *Criminal Abortions*, 34 Journal-Lancet 81, 82 (1914)) (citing this as evidence that "it was common knowledge that an abortion could be performed to preserve the life or health of the woman").

276.    Dr. T. Gaillard Thomas delivered lectures at New York City's College of Physicians and Surgeons in 1889-90 urging a broad view of therapeutic abortion to the students. *Anticipated Cohen Test.* (citing T. Gaillard Thomas & P. Brynberg Porter, *Abortion and its Treatment, from the Stand-Point of Practical Experience: A Special Course of Lectures Delivered at the College of Physicians and Surgeons, New York, Session of 1889-90*, at 99-104 (New York: Appleton and Co. 1896) [hereinafter Thomas]).  Anything that threatens "to destroy the life or intellect, or to permanently ruin the health of a patient," is an indication for abortion, he said. *Id.* (quoting Thomas at 99).  The "vomiting of pregnancy," which he believed to be responsible for the death of Charlotte Brontë, topped his list. *Id.* (quoting Thomas at 100). Another danger was a kidney condition called puerperal nephritis; the doctor called it "cruel" to subject a patient to the risk of dying in labor of puerperal convulsions, or surviving it with the doom of chronic Bright's disease. *Id.* (quoting Thomas at 101).  Cardiac disease, cancer, chorea, and contracted pelvis, along with placenta praevia and convulsions rounded out his list of indications for abortion, all of which he had himself encountered. *Id.* (citing Thomas at 101-104).  Dr. Thomas urged the young doctors always to secure a second opinion from a colleague

99

before proceeding. *Id.* (citing Thomas at 98-99). He concluded his last lecture with a detailed description of how to perform an abortion safely (at three months, with tampons, glass plugs, and cervical studs to provoke labor), along with how *not* to do it (with the intrusive tools characteristic of criminal abortionists, *i.e.* uterine probes or tents). *Id.* (quoting Thomas at 104-112).

277.    Even those who believed that therapeutic abortion was justified only in narrow circumstances acknowledged that the law gave physicians broad discretion in the matter. For example, Dr. William H. Parish of Philadelphia reported with apparent dismay that some regulars performed therapeutic abortions for indications he did not think warranted them. *Anticipated Cohen Test.* (citing William H. Parish, *Criminal Abortion*, 14 Proceedings of the Philadelphia County Medical Society, 1893, at 154-55 [hereinafter Parish], https://www.google.com/books/edition/Proceedings_of_the_Philadelphia_County_M/eWweyrg519MC?hl=en&gbpv=0). As an illustration, he discussed a case in which, after he rendered an opinion that a particular patient's abortion would not be justified on therapeutic grounds, a regular physician "in a distant city" reached the opposite conclusion and performed the abortion at three months' gestation, documenting his view of the grounds in a letter. *Id.* (quoting Parish at 155). They centered on the patient's prior experience with pregnancy and childbirth, which filled both her and her husband with "great fear that insanity would develop if her pregnancy was not terminated." *Id.* (quoting Parish at 154-55). Dr. Parish acknowledged that "[t]he law leaves it quite entirely to the medical profession to determine what constitutes justifiable abortion, either early or late [in gestation]." *Id.* (quoting Parish at 154).

278.    In 1907, Dr. Montgomery Russell of Seattle similarly wrote that: "The law leaves it entirely to the judgment of the medical profession to determine when it is necessary and

warrantable to produce abortion." *Anticipated Cohen Test.* (quoting Montgomery Russell, *Criminal Abortion*, 5 Nw. Med., Jan.-Dec. 1907, at 303, https://archive.org/details/northwest medicin5190nort) [https://perma.cc/EUN5-PJJ5].  Dr. Russell noted that even criminal abortionists seldom faced legal consequences, calling the law concerning criminal abortion "practically a dead letter." *Id.* (quoting Russell at 303).  He observed that criminal abortionists are seldom prosecuted or convicted unless their patient dies.  *Id.* (quoting Russell at 303).  He attributed the lack of legal accountability to overly permissive laws and public sympathy for those who seek and provide abortions, stating:  "Abortionists are sheltered by the words of the law and the sympathy of the community." *Id.* (quoting Russell at 303).

279.    The original edition of Williams' *Obstetrics* was published in 1903.  *Anticipated Cohen Test.*  It posited a duty to provide therapeutic abortion prior to fetal viability in the following circumstances:  "(1) as a direct means of saving the life of the mother; (2) to do away with a condition which may threaten her life if gestation continues; and (3) to avoid certain dangers which may supervene if pregnancy is allowed to progress to full term." *Id.* (quoting J. Whitridge Williams, *Obstetrics,* 338 (1st ed. 1903) (https://wellcomecollection.org/works/e7 r6bqzt) [https://perma.cc/8XE2-GXY8]).

280.    In the 1910-20s, journals of state and regional medical societies followed a custom of printing the prior year's board exams for licensing, as a study aid.  *Anticipated Cohen Test.*  In the Northwest Medicine Journal (published jointly by state medical societies in Idaho, Washington and Oregon), an essay exam question in 1911 asked, "[u]nder what circumstances may a physician be justified in producing an abortion, and how is the operation performed." *Id.* (quoting Examination Questions, 3 Nw. Med. 266, 269 (1911), https://archive.org/details/ northwestmedicin1019nort/page/268/mode/2up?q=%22Examination+Questions%22

101

[https://perma.cc/648F-ZA3S]).  This tells us that the distinction between criminal and therapeutic abortions was a standard part of the medical schools' curriculum, along with instruction in how to accomplish a safe abortion.

281.    An article written for the Journal of the Catholic Medical Association in 1952 by a pair of doctors who believed that "[t]herapeutic abortion is legalized murder," Roy J. Heffernan & William A. Lynch, *Is Therapeutic Abortion Scientifically Justified?*, 19 Linacre Q. 11, 25 (1952), https://epublications.marquette.edu/lnq/vol19/iss1/5/, reported that:

> Twenty-five or thirty years ago [1922-1927], therapeutic abortions were performed with deplorable frequency in most of the leading non-Catholic clinics. Tuberculosis, heart disease, diabetes, hyperemesis gravidarum, neoplasms, chronic nephritis, hypertension, various types of anemia, chorea, thyroid disfunction, disturbances of the nervous system and psychiatric disorders, in fact in almost any complication of early pregnancy which did not promptly respond to conservative therapy, evacuation of the uterus would be considered.

*Id.* at 11.  Thus, although these doctors deplored therapeutic abortion, they understood the practice to be "legalized" and widespread in the early decades of the twentieth century.

282.    In addition to providing therapeutic abortions in the nineteenth and early twentieth centuries, doctors continued to provide emmenagogic treatments that they knew entailed a serious risk of causing miscarriage.  *Anticipated Cohen Test.*  Many engaged in routine use of intra-uterine probes to restore patients with blocked menses to health.  *Anticipated Cohen Test.*

283.    For example, Dr. Henry Miller, a professor in the medical department at the University of Louisville, president of the AMA in 1859-1860, and thus the designated backer of the national lobbying campaign, described making "free use of the uterine sound," an intrauterine probe that initially caused little pain but soon after caused "severe hypogastric suffering" lasting for up to a day.  *Anticipated Cohen Test.* (quoting Henry Miller, *Principles and Practices of Obstetrics* (Blanchard and Lea, 1858), at 96-97, https://www.google.com/books/

102

edition/The_Principles_and_Practice_of_Obstetric/PSE1AQAAMAAJ?hl=en&gbpv=1

[https://perma.cc/M8BA-2JD3]).  Miller believed the humoral theory that "menstruation is, as all

experience testifies, so essential to female health; why, when it is morbidly suppressed, the

whole system suffers, and when it is restored, the flow of health revisits the cheeks."  *Id.*

(quoting Miller, *supra*, at 82).  He acknowledged that using the tool to probe the uterus created a

risk of abortion:  "In truth, this is a misfortune which can only be avoided by perpetual vigilance.

It occurred once in my own hands."  *Id.* (quoting Miller at 98).

284.    Dr. Storer bragged of his prowess with the uterine probe to treat amenorrhea.

*Anticipated Cohen Test.*  In an 1864 article, he warned of "unintentionally, and so far innocently,

committing malpractice, and thereby of adding confirmation to an opinion already but too

prevalent, that the profession directly, or by implication, sanction the induction of criminal

abortion."  *Id.* (quoting Horatio R. Storer, *The Surgical Treatment of Amenorrhea*, 47 Am. J.

Med. Sci., Jan. 1864, at 81, https://library.si.edu/digital-library/book/americanjournalo47thor)

[hereinafter Storer, *Amenorrhea*].  Dr. Storer certainly realized that invading the uterus with a

tool had to be done very carefully; he urged his medical audience to consider the possibility of

pregnancy, even for unmarried women.  *Id.* (citing Storer, *Amenorrhea*, at 83).  The trouble was

that there was no sure way to know if an early pregnancy was in progress.  *Id.* (citing Storer,

*Amenorrhea* at 87).  Candidly, Dr. Storer admitted to having "more than one direct occurrence of

the accident against which I would now guard the profession."  *Id*.

285.    A close compatriot of Dr. Storer was Dr. Henry I. Bowditch of Harvard

University, a firm supporter of the AMA campaign against criminal abortion.  *Anticipated Cohen

Test.*  Yet he worried that tougher laws would eliminate his unchecked prerogative to use the

probe.  *Id.*  In a private letter to Dr. Storer, he wrote:

103

> Are there not cases where a physician would be justified in suggesting a course [of?] med as he would use in Amenorrhoea, even when he might *suspect*, but not be able to *know* of the evidence of pregnancy?  Suppose a mother of several children which she has in rapid succession & the physician feels assured that health & possible life will be endangered if another pregnancy occurs, would he be criminal if he were to use common means for amenorrhoea if the menses have been absent six weeks?  Are the cases always so plain that a man can decide & may he not balance a choice of evils?

*Id.* (quoting Letter from Henry I. Bowditch to H.R. Storer (Apr. 20, 1857) (original at the Countway Library, Harvard University), https://horatiostorer.net/letters-to/) .

286.    Despite the enactment of so many abortion statutes in response to the AMA's campaign, successful prosecutions for criminal abortion in the nineteenth and early twentieth centuries were rare, and successful prosecutions for therapeutic abortion were virtually non-existent.  *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*; Dellapenna at 431 ("Acquittals or dismissals do predominate among reported cases."); *supra* at ¶¶ 261, 273-74, 278, 287-88, 290.

287.    Many jurisdictions afforded doctors a *presumption* that they were acting with therapeutic intent, requiring prosecutors to prove otherwise beyond a reasonable doubt.  *See, e.g.*, *People v. Davis*, 200 N.E. 334, 425-26 (Ill. 1936); *State v. DeGroat*, 168 S.W. 702, 706 (Mo. 1914) (collecting cases); *id.* at 707 ("[W]e conclude that by the great weight of the ruled cases, and from the logic of the case, and for reasons to be deduced from rules on cognate matters, the burden is on the state to prove the nonnecessity of the abortion to save the life of the mother or the life of an unborn child."); *State v. Wells*, 100 P. 681, 686-87 (Utah 1909), *overruled by State v. Crank*, 105 Utah 332 (1943); *State v. Clements*, 14 P. 410, 415 (Or. 1887) ("The experience of mankind shows that cases have often arisen in which such treatment has necessarily been resorted to, and, in the absence of other proof, the law, in its benignity, would presume that it was performed in good faith, and for a legitimate purpose."); *Moody v. Ohio*, 17 Ohio St. 110, 111-12 (1866).  Some jurisdictions afforded the presumption only to regular physicians.  *See,*

104

*e.g.*, *State v. Dunklebarger*, 221 N.W. 592, 594 (Iowa 1928) ("This presumption, as applied to a regular physician, was recognized in [*State v. Rowley*, 198 N.W. 37 (Iowa 1924)], where we refused to recognize such presumption in favor of one who was not a regular physician.").

288.    Few, if any, cases from this time period discuss the scope of express therapeutic exceptions.  The Court is aware of an ambiguous case from 1891 in which the Wisconsin Supreme Court upheld the convictions of a doctor and his wife in connection with an abortion that caused the death of the pregnant woman.  *Hatchard v. State*, 48 N.W. 380, 382 (Wis. 1891). The wife—but not the doctor—alleged that the abortion was therapeutic because the pregnant woman had threatened to commit suicide, and that the jury should have been instructed accordingly.  *Id.*  There was no evidence that the pregnant woman was suffering from a mental illness, and no evidence that the doctor believed that the abortion was necessary to save her life. *See id.* ("[T]here is no testimony tending to show that Dr. Hatchard thought anything of the kind.").  The court held that the wife was not entitled to a jury instruction on therapeutic abortion for three reasons:  (1) there was no evidence that the doctor believed the abortion was therapeutic; (2) the doctor failed to consult with any other physician concerning the patient; and (3) the statute was only intended to apply in cases where a pregnant woman's death was anticipated to result from "natural causes."  *Id.*  It is not clear from the decision whether the court viewed all suicidal ideation as outside the scope of the therapeutic exception or only suicidal ideation not linked to a medical diagnosis.[16]  *Id.*

---

[16] There is evidence that early American law distinguished between suicidal acts by those who are sane and suicidal acts by those who are mentally ill.  *See Washington v. Glucksberg*, 521 U.S. 702, 712-13 (1997) (discussing a colonial Rhode Island law that the Court viewed as representative).

289.    The formalization of the discipline of psychiatry in the United States paralleled that of medicine more broadly, with institutionalization accelerating in the mid-nineteenth century. *Anticipated Eppinger Test.* Benjamin Rush, for example, published his first American textbook on psychiatry in 1812. *Id.* (citing Benjamin Rush, *Medical Inquiries and Observations upon Diseases of the Mind* (1812)). The founding of the American Psychiatric Association in 1844 and Dorothea Dix's post-Civil War campaign for specialized treatment hospitals helped to establish psychiatry as part of the emerging medical mainstream. *Id.* Regulars cited mental illness as an indication for therapeutic abortion, *supra* at ¶¶ 275, 277, 281, but discussion of it in the caselaw is rare, perhaps because there were so few prosecutions.

290.    In the middle decades of the twentieth century, California appellate courts applying the state's 1850 abortion statute, which exempted from liability any physician "who, in the discharge of his professional duties, deems it necessary to produce the miscarriage of any woman in order to save her life," 1850 Cal. Stats. p. 233, held that credible evidence of mental illness satisfied the exception. *See People v. Abarbanel*, 48 Cal. Rptr. 336, 339 (Cal. Dist. Ct. App. 1965) ("[H]ere the record discloses that two qualified psychiatrists recommended the therapeutic abortion and there is no evidence that appellant disbelieved or doubted the validity of these recommendations."); *People v. Ballard*, 335 P.2d 204, 206 (Cal. Dist. Ct. App. 1959) ("It may be well to say at the outset in this case that a great deal of misunderstanding would be avoided in abortion matters if they were considered in the light of the fact that an abortion is not necessarily, in and of itself, an illegal procedure or act. In other words, not all abortions are illegal."); *id.* at 211 ("In this case it is admitted, at the very least, that Mrs. Gresham was *extremely nervous*. She apparently was *upset, had headaches*, was *unable to sleep*, and *thought that she was pregnant*. She was *agitated, disturbed* and *had many problems*

106

…. Such a showing would not seem to prove beyond a reasonable doubt and to a moral certainty that she was in good health and that treatment of some sort was not necessary."). The California Supreme Court had earlier indicated that liability could not be imposed under the statute on a doctor who, "acting in good faith … attempted to empty the uterus in the interest of the health or for the preservation of the life of the patient." *People v. Darrow*, 298 P. 1, 6 (Cal. 1931).

291. After World War II, more interest groups entered the abortion policy debate in the United States, and the issue became more polarizing. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.* During this time, for a variety of reasons, the practice of therapeutic abortion largely moved to hospitals, where review boards were established to weigh the medical justifications for a patient's abortion to determine if they met legal criteria. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*; *see* Reva B. Siegel & Mary Ziegler, *Abortion's New Criminalization: A History-and-Tradition Right to Health-Care Access After* Dobbs, 111 Va. L. Rev. 413, 447 (2025) [hereinafter Siegel & Ziegler] ("After allowing greater access to abortion during the Great Depression of the 1930s, many jurisdictions seemed to have increased prosecutions in the 1940s, targeting not only negligent physicians but also skilled providers. Hospitals seeking to defuse the threat of prosecution and stabilize practice created therapeutic abortion committees that deliberated about the permissibility of abortion in individual cases." (footnotes omitted)). Risk averse institutions, hospitals generally took a narrower view of the permissible indications for therapeutic abortion than individual doctors had a century earlier. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.* This prompted a new campaign to reform abortion laws, this time to broaden rather than narrow the circumstances in which abortions could be performed without criminal liability. *Anticipated Eppinger Test.*; *Anticipated Cohen*

107

*Test.* The Supreme Court's 1973 decision in *Roe v. Wade* interrupted this campaign and rendered it moot. *Anticipated Eppinger Test.*; *Anticipated Cohen Test.*

<strong>PROPOSED CONCLUSIONS OF LAW</strong>

### I.      Standing

#### A.  Article III Standing

292.     "One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).  A plaintiff in a pre-enforcement challenge has Article III standing if (1) the plaintiff has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) the conduct is "arguably proscribed by statute;" and (3) "there exists a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-64 (2014).  Dr. Seyb satisfies this test.

293.     When analyzing the first prong of the *Driehaus* test, "courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Peace Ranch*, 93 F.4th at 488.  "Intention," in this context, is a counterfactual construct: it asks not what the plaintiff has done, but what he would do if the law did not forbid it.  *Id.*  Here, Dr. Seyb's testimony demonstrates that he would like to offer abortion care to all pregnant patients with serious medical needs, and he stands ready, willing, and able to do so should the Court grant him the relief he is seeking in this case.  *Supra* at ¶¶ 93, 135.  This conduct arguably enjoys constitutional protection under the Fourteenth Amendment's Due Process and Equal Protection Clauses, so the first prong of the test is satisfied.  *See infra* at ¶¶ 305-377; *Peace Ranch*, 93 F.4th at 488 (explaining that the inquiry into constitutional interest "does not require [a court] to engage in a mini litigation of the claims" or determine that the plaintiff's claims are meritorious); *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) (holding that the plaintiff physicians

108

satisfied the first *Driehaus* prong in a challenge to abortion restrictions because their claim was rooted in the Due Process Clause).

294.   The second prong of the *Driehaus* test is satisfied because the Abortion Bans prohibit abortion care that Dr. Seyb would like to provide in many circumstances, including when a patient is facing a risk of death from self-harm; when a patient is facing a risk of serious morbidity that is not necessarily life threatening; when a patient is carrying an embryo or fetus with a life-limiting condition, and when a patient is seeking a multi-fetal pregnancy reduction. *Supra* at ¶¶ 93, 95, 135, 162, 181; *cf. Isaacson*, 84 F.4th at 1099 (concluding that the second *Driehaus* factor was satisfied where "many abortions [the plaintiff physicians] would otherwise perform could be deemed violations of the statute").

295.   The third prong of the *Driehaus* test is satisfied because Dr. Seyb would face a credible threat of enforcement were he to provide medically indicated abortions not covered by the Abortion Bans' exceptions.  "This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peach Ranch*, 93 F.4th at 490.  Here, the State has not disavowed enforcement against Dr. Seyb for providing abortions that are prohibited by the Abortion Bans.  This case is therefore distinguishable from *Idaho Federation of Teachers. v. Labrador*, No. 1:23-cv-00353-DCN, 2024 WL 3276835, at *1 (D. Idaho July 2, 2024), where the State had "*specifically and emphatically*" disavowed enforcement of the challenged statute against the plaintiffs for the activities they wished to pursue.  Moreover, in *Isaacson*, a vagueness challenge to Arizona abortion regulations, the Ninth Circuit pointed to statements that Arizona officials had made in other litigation as evidence of a credible threat of enforcement.  *See, e.g.*, 84 F.4th. at 1101 ("Although this was a general statement …, Plaintiffs could reasonably interpret it as a threat to investigate physicians who run afoul of those Regulations.").  Here, the

State of Idaho expressed a general intention to enforce the Total Abortion Ban against physicians providing medically indicated abortions in litigation concerning whether the ban is pre-empted by EMTALA. *See supra* at ¶¶ 23-24; Br. for Pet'r at 39-40, *Moyle v. United States*, 603 U.S. 324 (2024) (No. 23-727) (arguing that Idaho would be irreparably harmed if it could not enforce the Total Abortion Ban); *id.* at 3, 5 (discussing Idaho's 150-year commitment to prohibiting abortion).

296.    Accordingly, Dr. Seyb satisfies the Requirements for Article III standing.

### B. Third-Party Standing

297.    It is well-settled that a plaintiff has "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975); *accord Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Indeed, when this criterion is met, a plaintiff need not demonstrate a close relationship with the third parties at issue nor that they face a hindrance to asserting their own rights. *Kowalski*, 543 U.S. at 130. Thus, the Supreme Court has allowed third-party standing in cases involving a variety of fact patterns and interests. *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that a criminal defendant had third-party standing to assert the rights of potential jurors excluded from jury service); *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (holding that a company selling non-medical contraceptives had third-party standing to assert the rights of potential customers, including minors); *Craig v. Boren*, 429 U.S. 190, 194-95 (1976) (holding that a beer vendor had third-party standing to assert the rights of potential customers where the statute prohibited vendors from distributing beer to young men rather than directly prohibiting young men from drinking beer); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (holding that healthcare providers had third-party standing to assert the rights of patients

110

seeking to use contraception); *Barrows v. Jackson*, 346 U.S. 249, 258 (1953) (holding that white property owners had third-party standing to assert the rights of potential black purchasers).

298.    Consistent with these precedents, the Supreme Court and Ninth Circuit have held that abortion providers have third-party standing to assert the rights of their patients in cases challenging abortion restrictions.  *See, e.g.*, *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318-20 (2020) (plurality opinion) (collecting cases) ("We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations."), *abrogated on other grounds by Dobbs*, 597 U.S. at 215; *accord June Med. Servs. L.L.C.*, 591 U.S. 299 at 354 n.4 (Roberts, C.J., concurring in the judgment) ("For the reasons the plurality explains, I agree that the abortion providers in this case have standing to assert the constitutional rights of their patients." (citation omitted));[17] *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) ("Recognizing the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy, the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients.").

299.    The Supreme Court's decision in *Dobbs* did not overrule these precedents.  *See* 597 U.S. at 233.  To the contrary, the *Dobbs* Court decided constitutional claims asserted by "an abortion clinic, Jackson Women's Health Organization, and one of its doctors" on behalf of their patients.  *Id.*

300.    Accordingly, Dr. Seyb has standing to assert the constitutional rights of his patients.

_____

[17] Because the four-Justice plurality and Chief Justice Roberts agreed on the third-party standing analysis in *June Medical*, it constitutes the opinion of a majority of the Court.

## II.    Statutory Jurisdiction, Venue, and Right of Action

301.    The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because this case is a civil action "arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1343(a)(3) because this case seeks to redress the deprivation of federal constitutional rights under color of state law.

302.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants, who are government officers sued in their official capacities, operate and perform their official duties in this district.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

303.    42 U.S.C. § 1983 grants Plaintiff a right of action to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

304.    Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57.

## III.    Substantive Due Process

### A.  Access to Therapeutic Abortion is a Fundamental Right

305.    Although the Bill of Rights enumerates certain individual rights, the Framers did not intend it to create an exhaustive list.  The Ninth Amendment thus states:  "The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend IX.  The Supreme Court has long recognized that the Due Process Clause of the Fourteenth Amendment provides substantive protection for both enumerated and unenumerated rights against infringement by the states.  *See McDonald*, 561 U.S. at 758.

306.     In recent years, the Supreme Court has favored an originalist approach to identifying the nature and scope of both enumerated and unenumerated rights that focuses on whether a right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty."  *Dobbs*, 597 U.S. at 231 (2022); *accord McDonald*, 561 U.S. at 767; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022) (holding that analysis of Establishment Clause claims must focus on "original meaning and history").  As lower courts have identified challenges in implementing this methodological shift, *see United States v. Rahimi*, 602 U.S. 680, 742 n.1 (Jackson, J., concurring) (collecting cases), the Supreme Court has acknowledged the difficulties inherent in making history the touchstone for constitutional analysis and endeavored to provide guidance, most notably in its recent Second Amendment cases.  *See, e.g.*, *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 25 (2022) ("To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" (citation omitted)).

307.     In *Bruen*, for example, the Supreme Court explained that courts must engage in case-by-case determination of historical questions and may rely on evidence presented by the parties:

> The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies.  That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties.  For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation."  Courts are thus entitled to decide a case based on the historical record compiled by the parties.

597 U.S. at 25 n.6 (citations omitted).

308.     The Supreme Court has also advised courts to take a cautious approach to pre- and post-ratification history.  On one hand, it explained that pre-ratification history—from both

England and the American colonies—is a critical component of history-and-tradition analysis. *See Bruen*, 597 U.S. at 20; *Heller*, 554 U.S. at 595-601.  At the same time, it has cautioned that not all pre-ratification legal authority is probative evidence of the Constitution's meaning.  In *Bruen*, it declared:  "As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights.  The common law, of course, developed over time.  And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution."  597 U.S. at 35 (citations omitted).  "Even 'the words of *Magna Charta*'—foundational as they were to the rights of America's forefathers—'stood for very different things at the time of the separation of the American Colonies from what they represented originally.'"  *Id.* (citation omitted); *see also Rahimi*, 602 U.S. at 694 ("Through these centuries, English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups.  By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic."); *id.* at 722 n.3 (Kavanaugh, J., concurring) ("[R]eflexively resorting to English law or history without careful analysis can sometimes be problematic because America had fought a war—and would soon fight another in 1812—to free itself of tyrannical British rule." (citations omitted)); *id.* at 723 ("The Equal Protection Clause provides another example.  Ratified in 1868, that Clause sought to reject the Nation's history of racial discrimination, not to backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution.").  Similarly, while the Supreme Court has explained that "'examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification' [i]s 'a critical tool of constitutional interpretation,'"  *Bruen*, 597 U.S. at 20 (quoting

114

*Heller*, 554 U.S. at 605), it has also said that litigants and courts must "guard against giving postenactment history more weight than it can rightly bear, *id.* at 35.

309.    Further, the Supreme Court has warned that some historical precedents are simply outliers that should be ignored. *See, e.g.*, *id.* at 65 ("We acknowledge that the Texas cases support New York's proper-cause requirement …. But the Texas statute, and the rationales set forth in [the Texas cases], are outliers.").

310.    To date, the Supreme Court has not addressed the proper role of expert witness testimony in an inquiry concerning constitutional history and tradition, which is best understood as presenting mixed questions of law and fact.  But its treatment of historical evidence in recent cases makes clear that, sometimes, understanding the significance of legal authorities and other evidence from the historical record will depend on understanding the social and legal context in which they arose, matters that an expert witness can help to elucidate.  Other times, sources from the historical record may speak for themselves.

311.    In sum, the Court may base its findings and conclusions on the evidence presented by the parties and their experts.  At the same time, it may conduct its own in camera research and rely on its own assessments of the historical record.

312.    The Court's legal analysis must begin with *Dobbs*.  There, although the Supreme Court held that the Constitution does not confer a "broad right" to obtain a pre-viability abortion in all circumstances, it did not address whether the Due Process Clause of the Fourteenth Amendment confers a right to abortion for the purpose of preserving a pregnant woman's life or health.  *Dobbs*, 597 U.S. at 225, 231; *see id.* at 234 (noting that the Court granted certiorari "to resolve the question whether 'all pre-viability prohibitions on elective abortions are unconstitutional'"); *id.* at 380 (Breyer, Sotomayor, & Kagan, JJ., dissenting) ("The majority does

115

not say … whether a State may prevent a woman from obtaining an abortion when she and her doctor have determined it is a needed medical treatment."); *see also Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 624 F. Supp. 3d 739, 748 (W.D. Ken. 2022) (holding, after *Dobbs*, that the plaintiffs' substantive due process claim against a Kentucky statute restricting abortion access "remains likely to succeed based on the right to a nonelective, emergency abortion, for the life and health of the pregnant woman"), *vacated as moot by* No. 22-5832, 2023 WL 3620977 (6th Cir. May 24, 2023).

313.    Overturning *Roe*, 410 U.S. 113, and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), *Dobbs* held that substantive due process rights must be "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered liberty,'" *id.* at 237 (citations omitted).  Although the Court did not identify a precise test or methodology to determine whether this standard is satisfied, it concluded that the broad right to pre-viability abortion recognized in *Roe* and *Casey* did not qualify because abortion had been a crime in certain circumstances under early English and American common law, and there was a trend toward increased criminalization of abortion in the nineteenth and early twentieth centuries.  *See id.* at 242-50.  In making this historical assessment, the Court relied principally on treatises about the common law from the thirteenth through nineteenth centuries; nineteenth century caselaw holding that post-quickening abortion was a crime under the common law; Lord Ellenborough's Act; nineteenth century American statutes criminalizing abortion to varying degrees; and published works by contemporary scholars examining the history of U.S. abortion laws.  *Id.*

314.    The same authorities demonstrate that abortion was never subject to criminal penalties when performed in good faith for medical reasons.  To the contrary, the law has always

116

distinguished between criminal abortion and therapeutic abortion, affording therapeutic abortion legal protection.

315.    The right to therapeutic abortion is a specific application of broader rights to life and health.

316.    The Due Process Clause of the Fourteenth Amendment, like the Due Process Clause of the Fifth Amendment, expressly protects the right to life.  U.S. Const. amend. XIV, § 1; U.S. Const. amend. V.  This nation's history and traditions show that the right to life is inextricably intertwined with the right to health.

317.    First, Blackstone identifies both life and health as essential components of the right to personal security, which he describes as a natural right on which the law should not encroach without a compelling reason.  1 Blackstone at 125, 129.  He explains that this right informs the doctrine of self-defense, which permits an individual to use lethal force to protect themself not just from death but also from bodily harm.  *Supra* at ¶¶ 194, 196.  The Supreme Court has described self-defense as a "basic right" and explained that it is the central component of the Second Amendment right to bear arms.  Therapeutic abortion can be understood as a means of self-defense.  *See* Siegel & Ziegler at 444-45 (explaining that, in the nineteenth and early twentieth centuries, some medical commentators connected therapeutic abortion with the right of self-preservation).  It would make no sense for the law to permit individuals to protect their lives and bodies with arms but not with medical care.

318.    Second, the importance historically ascribed to the right of bodily integrity, *supra* at ¶ 197, demonstrates that the law attributed great value to the sanctity and well-being of a person's body independent of the value it attributed to a person's life.  In the twentieth century, courts have invoked the right of bodily integrity to deny compelled organ donation, recognizing

117

that the law may not compel an individual to put their body at risk to save the life of another. *See, e.g.*, *Curran v. Bosze*, 566 N.E.2d 1319, 1323 (Ill. 1990) (citing *Botsford*, 141 U.S. at 251); *McFall v. Shimp*, 10 Pa. D & C.3d 90, 90-91 (Pa. Com. Pl. 1978) (holding that society may not infringe on an individual's "absolute right to his 'bodily security'" even to save another person's life). In *McFall*, the court refused to compel a bone marrow donation necessary to save another person's life, explaining that "[o]ur society, contrary to many others, has as its first principle, the respect for the individual, and that society and government exist to protect the individual from being invaded and hurt by another." 10 Pa. D & C.3d at 91. The court held that, even though in its view the defendant's refusal to participate in a life-saving bone marrow transplant was "morally indefensible," it was legally protected. *Id.* ("For our law to *compel* defendant to submit to an intrusion of his body would change every concept and principle upon which our society is founded. To do so would defeat the sanctity of the individual …."). In *Curran*, the court rejected efforts to compel three-and-a-half-year-old twins to undergo a bone marrow harvesting procedure for the benefit of their half-brother, even though, "without the transplant, Jean Pierre will almost certainly die." 566 N.E.2d at 1345. It explained that, despite the sympathy it felt for the half-brother's "tragic situation," "it neither would be proper under existing law nor in the best interests of the 3½–year–old twins for the twins to participate in the bone marrow harvesting procedure." *Id.* These authorities reflect a longstanding legal tradition: the right to protect one's own body from the risk of harm is fundamental and cannot be subordinated to the interests of others.

319. Third, the Eighth Amendment's requirement that the government provide medical care to the people it incarcerates demonstrates that medical care—at least for serious medical needs, *Estelle*, 429 U.S. at 104—is a corollary of the rights to life and health—such that the

118

government cannot prohibit it without a compelling reason.  That is because it cannot constitute "cruel and unusual punishment," U.S. Const. amend. VIII, to deny an incarcerated person access to something that the government could otherwise prohibit.

320.    Fourth, the protection that the common law historically afforded to the practice of medicine did not distinguish between life-saving medical care and care aimed at promoting health more broadly.  *Supra* at ¶¶ 217, 220, 224.

321.    It is true that the law has long regulated the practice of medicine, but that does not undermine the status of medical care as a fundamental right.  "[M]ost rights" are "not unlimited." *Heller*, 554 U.S. at 626.  For example, notwithstanding the Second Amendment right to bear arms, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *Rahimi*, 602 U.S. at 691.  "Some jurisdictions banned the carrying of 'dangerous and unusual weapons.'" *Id.* (citation omitted).  "Others forbade carrying concealed firearms." *Id.* (citation omitted). Similarly, notwithstanding the First Amendment right to free speech, a handful of "well-defined and narrowly limited classes of speech" are exempt from First Amendment protection, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), most notably:  fighting words, *id.* at 572; speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952); obscenity, *Roth v. United States*, 354 U.S. 476, 485 (1957); true threats, *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (per curiam); incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (per curiam); fraud, *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976); and child pornography, *New York v. Ferber*, 458 U.S. 747, 763-64 (1982).  And the government may subject even protected speech to content-neutral time, place, and manner

119

restrictions in appropriate circumstances.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

322.    Historically, medical regulation was limited to ensuring that medical practitioners were competent to provide care and avoided treatments that were unduly risky or far outside prevailing standards of care.  *See supra* at ¶¶ 242-47.  Laws banning competent practitioners from providing safe and accepted treatments are of relatively recent vintage.

323.    *Washington v. Glucksberg*, 521 U.S. 702 (1997), and *United States v. Skrmetti*, 605 U.S. 495 (2025), are not to the contrary.  In *Glucksberg*, the Supreme Court held that there is no fundamental right to physician-assisted suicide.  521 U.S. at 728.  Physician-assisted suicide is not performed for the purpose of preserving life and health, however.  Rather, its goal is to end life, and impairing health is a necessary byproduct of that.  *See id.* at 731 ("[P]hysician-assisted suicide could, it is argued, undermine the trust that is essential to the doctor-patient relationship by blurring the time-honored line between healing and harming.").  Thus, it is distinguishable from medical treatments, like therapeutic abortion, aimed at preserving a pregnant patient's life and health.

324.    Although *Skrmetti* upheld a state statute banning minors from receiving treatment for gender dysphoria, it did not consider whether the statute infringed on a fundamental right. 605 U.S. at 522.  The Supreme Court was "asked" only to decide whether the statute discriminated on the basis of gender in violation of the Equal Protection Clause.  *Id.* at 510-11. Accordingly, it did not reach the issue presented here.

325.    Whereas during the nineteenth century, statutes in both England and the United States took an increasingly restrictive approach to regulating nontherapeutic abortions, these statutes consistently protected therapeutic abortions, exempting them from criminal liability

120

through mens rea requirements or express exceptions.  *See supra* at ¶¶ 263-70.  Many jurisdictions applied a *presumption* that abortion providers acted with therapeutic intent, at least when they were regular physicians, well into the twentieth century, requiring prosecutors to prove beyond a reasonable doubt that they acted with criminal intent instead.  *See supra* at ¶ 287.  Further, it was widely understood in the medical community that physicians had broad discretion to determine what constituted justifiable grounds for performing an abortion.  *See supra* at ¶¶ 277-78.

326.    Unlike the Total Abortion Ban, none of the nineteenth-century abortion statutes expressly excluded the risk of death from self-harm as a legal basis for a therapeutic abortion, *see supra* at ¶¶ 264-69, and the record shows that doctors were openly providing therapeutic abortions for mental health reasons, including suicidal ideation, during the nineteenth and early twentieth centuries without fear of prosecution, *see supra* at ¶¶ 238-39, 241, 275, 289.  One American court questioned whether suicidal ideation could provide a legal justification for abortion, *see supra* at ¶ 288, but that case appears to be an outlier.  Importantly, there was no evidence that the patient's threat to end her life was the result of mental illness, and the doctor who performed the abortion did not claim to have a therapeutic intent.  *Id.*  The Court is aware of no doctor being convicted of criminal abortion in any American jurisdiction where the record demonstrated a good-faith intent to prevent the patient's suicide.  Moreover, the judge in *Rex v. Bourne*, interpreting the English Offences Against the Person Act of 1861, squarely held that a good-faith belief that a pregnant patient was at risk of death by suicide negated the criminal intent element of the statute.  *See supra* at ¶¶ 240-41.

327.    The weight of the evidence, viewed in light of the nation's deeply rooted efforts to discourage suicide—*see Glucksberg*, 521 U.S. at 710-16; *id.* at 730 ("The State has an interest

in preventing suicide … and treating its causes.")—leads the Court to conclude that the prevention of suicide was generally viewed as a lawful reason for providing an abortion in the nineteenth and early twentieth centuries.  Given the primacy that the Anglo-American legal tradition gives to the right of life, *supra* at ¶¶ 194-96, 316, the Court concludes that the Fourteenth Amendment guarantees pregnant people a fundamental right to obtain abortion care to mitigate a risk of death, including in cases where a mental health condition puts the pregnant person at risk of death from suicide, overdose, or other means of self-harm.  The right to therapeutic abortion, and the right to life on which it is grounded, would mean little if it could not be asserted to protect a pregnant person against a leading cause of pregnancy-related death.

328.    Likewise, the weight of the evidence leads the Court to conclude that the Fourteenth Amendment guarantees pregnant people a fundamental right to obtain abortion care to mitigate a risk of serious harm to their physical or mental health.  As Judge Macnaghten explained in *Rex v. Bourne*, "[l]ife depends upon health."  3 All. E.R. at 617; *supra* at ¶ 240.  The two are so intertwined that the right to life necessarily encompasses the right to health.  Thus, nineteenth-century statutes authorizing abortion "when necessary to preserve a woman's life" should be understood as authorizing abortion when necessary to preserve a woman's health. That is how a nineteenth-century American would have understood them.  Notably, in *M'Culloch v. Maryland*, Chief Justice Marshall explained that the word "necessary" in the Constitution's Necessary and Proper Clause, does not require "absolute physical necessity," but instead requires a reasonable fit between means and ends.  17 U.S. 316, 413-14 (1819) ("If reference be had to [use of the word necessary] in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another.  To employ the means necessary to an end, is generally

122

understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."). This nineteenth-century understanding of the term "necessary" supports a broad reading of the life exceptions in abortion statutes from that era as encompassing all abortions performed in cases of serious medical need, and not just those that are strictly required to avoid death.

329.    So does the medical literature of the time period. *See supra* at ¶¶ 238, 271-72, 275-85; Siegel & Ziegler at 445 ("In the medical profession's understanding, life exceptions in abortion bans gave regular physicians latitude to respond to a wide array of conditions."). Both the medical literature and the caselaw from this era indicate that doctors had broad discretion to perform medically indicated abortions based on the exercise of their professional judgment. *See supra* at ¶¶ 237-41, 277-78, 287. The most ardent anti-abortion doctors regularly expressed dismay about the broad range of indications for which their peers considered abortion justified. *See supra* at ¶ 277. There is no evidence, at least not on the record before the Court, that regular physicians' judgment about what constituted justifiable abortion was questioned by prosecutors, judges, or juries. Indeed, there is no evidence that any nineteenth-century doctor was ever convicted of criminal abortion on the ground that, although medically indicated, it was not necessary to save the patient's life.

330.    Two state supreme courts—those of Indiana and North Dakota—recently concluded that the life exceptions adopted by their state's respective legislatures in the nineteenth century encompassed all abortions performed to preserve a pregnant woman's health. *Members of the Med. Licensing Bd. of Ind. v. Planned Parenthood Gr. Nw., Haw., Alaska, Ind., Ky.*, 211 N.E. 3d 957, 976 (Ind. 2023) (equating abortions necessary to protect a woman's life with abortions necessary to protect a woman from serious health risks); *Wrigley*, 988 N.W.2d at

241 (finding that, during the late-nineteenth and early twentieth centuries, "North Dakota recognized and approved abortions performed to preserve the life or health of the woman."). The North Dakota Supreme Court noted that: "Medical journals published shortly after statehood indicate it was common knowledge that an abortion could be performed to preserve the life or health of the woman." *Wrigley*, 988 N.W. 2d at 241.

331.    Notably, and contrary to the State's arguments, the law never equated embryonic and fetal life with a woman's life, at any stage of gestation. *See supra* at ¶¶ 217, 226-29.  It clearly and consistently accorded greater value to the woman's life. *See supra* at ¶¶ 211-212, 217, 230. Even as the quickening doctrine began to recede in the face of emerging scientific recognition that an embryo is alive from the start of its development, no societal consensus emerged in favor of prenatal personhood. *See supra* at ¶¶ 214, 255. Instead, the regular physicians who led the campaign for stricter abortion laws, the legislators who enacted the laws, and the judges who enforced them, viewed the embryo or fetus as a life form with the potential to develop into a person. *See supra* at ¶ 255.  This understanding supplied a rationale for prohibiting nontherapeutic abortion, but it did not supply a rationale for subordinating a pregnant woman's health to the well-being of the developing entity. *See supra* at ¶¶ 246, 252, 269.  So too with the other interests motivating the enactment of stricter abortion laws—the desire to enforce traditional gender roles and to prevent the birthrates of immigrant women from outpacing those of American-born women. *See supra* at ¶¶ 259-62. Abortions performed in good faith for medical reasons were simply not the object of the nineteenth-century legislation.

332.    In privileging the pregnant woman's well-being over that of the fetus, nineteenth-century statutes followed the common law tradition. *See supra* at ¶¶ 212, 217.  As explained above, the common law did not treat an embryo or fetus as *in rerum natura* until it was born.

124

*See supra* at ¶¶ 226-27.  Before that, it was simply part of its mother.  *See supra* at ¶¶ 211, 230. This long tradition of prioritizing a pregnant woman's life and health over that of an embryo or fetus supports recognition of a right to abortion in cases of life-limiting embryonic and fetal conditions.  All pregnancies entail health risks and impose significant burdens on pregnant people that impact their quality of life.  *See supra* at ¶¶ 49, 62.  Under our legal history and tradition, the State is not justified in infringing on a pregnant person's right to life and health in that manner when there is little to no chance of fetal survival.  Although diagnosis of life-limiting conditions as we understand them today was not possible in the nineteenth century, doctors of that era did understand that certain conditions made successful delivery of a child unlikely.  *Anticipated Cohen Test.*  In such cases, they believed that early abortion was justified. *Id.*  Dr. Storer himself wrote that, "[i]f the child must necessarily be lost, the [pre-viability induction of] labor should not be long delayed."  *Id.* (quoting Storer, *Criminal Abortion*, at 65). Similarly, Dr. Gaillard wrote that, despite improvements in the safety of C-section and similar procedures, "I still do not believe that, when we can avoid it by inducing abortion, we are justified in subjecting our patient to the great risk attending these operations even under the most favorable conditions."  *Id.* (quoting Thomas at 102-03).

333.     It appears that only two state supreme courts—those of Idaho and Texas—have expressly declined to hold that their respective state constitutions guarantee a right to life-saving abortion care in all circumstances.  *See Planned Parenthood Gr. Nw.*, 522 P.3d at 1193 (rejecting a dissenting Justice's argument that, "because Idaho statutes historically contained an exception to the criminalization of abortion to 'save' (later changed to 'preserve') the life of a mother, this statutory exception warrants the conclusion that there is an implicit fundamental right to abortion to prevent the death of the mother and to protect her health from injury, harm, or destruction.");

*State v. Zurawski*, 690 S.W.3d 644, 653 (Tex. 2024) (holding that a Texas law authorizing life-saving abortion care only when needed to address a "physical condition" is not constitutionally deficient).

334.    The Oklahoma Supreme Court has held that the Oklahoma Constitution "creates an inherent right of a pregnant woman to terminate a pregnancy when necessary to preserve her life," meaning that "continuation of the pregnancy will endanger the woman's life due to the pregnancy itself or due to a medical condition that the woman is either currently suffering from or likely to suffer from during the pregnancy." *Okla. Call for Reprod. Just. v. Drummond*, 526 P.3d 1123, 1130 (Okla. 2023).

335.    Using originalist methodologies, the supreme courts of Indiana and North Dakota have held that their respective constitutions guarantee a right to medically indicated abortion to protect both life and health. *Members of the Med. Licensing Bd. of Ind.*, 211 N.E. 3d at 976 ("Because this fundamental right of self-protection—whether considered as an exercise of the right to life, an exercise of the right to liberty, a limitation on the scope of the police power, or as a matter of equal treatment—is so firmly rooted in Indiana's history and traditions, it is a relatively uncontroversial legal proposition that the General Assembly cannot prohibit an abortion procedure that is necessary to protect a woman's life or to protect her from a serious health risk."); *Wrigley*, 988 N.W.2d at 242 ("After review of North Dakota's history and traditions, and the plain language of article 1, section 1 of the North Dakota Constitution, it is clear the citizens of North Dakota have a right to enjoy and defend life and a right to pursue and obtain safety, which necessarily includes a pregnant woman has a fundamental right to obtain an abortion to preserve her life or her health.").

126

336.    Numerous other state supreme courts have held, in decisions that remain controlling and use an array of methodologies, that their respective state constitutions guarantee a broad right to abortion, at least until viability, or treat restrictions on abortion as gender-based discrimination.  *See, e.g.*, *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 19 (Minn. 1995); *Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 819 (Cal. 1997); *Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968-69 (Alaska 1997); *Armstrong v. State*, 989 P.2d 364, 377 (Mont. 1999); *Right to Choose v. Byrne*, 450 A.2d 925, 934 (N.J. 1982); *Hodes & Nauser*, *MDs, P.A. v. Schmidt*, 440 P.3d 461, 466 (Kan. 2019); *Allegheny Reprod. Health Ctr. v. Pennsylvania Dep't of Hum. Servs.*, 309 A.3d 808, 867 (Pa. 2024); *State v. Johnson*, 582 P.3d 380, 396-97 (Wyo. 2026); *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 855 (N.M. 1999).[18]

337.    In sum, therapeutic abortion is a specific application of the deeply rooted rights to life and health, and it has enjoyed consistent legal protection from the medieval period through the early twentieth century.  The Court concludes that the right to have an abortion for medical reasons is deeply rooted in American history and tradition and essential to the nation's scheme of ordered liberty.

---

[18] Some state supreme courts have held that their state constitutions do not guarantee a broad right to abortion without addressing therapeutic abortion specifically, *see, e.g.*, *Planned Parenthood of Sw. & Cent. Fla. v. State*, 384 So. 3d 67, 71 (Fla. 2024).  And some have issued decisions that were later overruled, *see, e.g.*, *Planned Parenthood of the Heartland v. Reynolds ex rel. State*, 915 N.W.2d 206, 237 (Iowa 2018), *overruled by Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710 (Iowa 2022), or superseded by constitutional amendment, *see, e.g.*, *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 4 (Tenn. 2000), *superseded by constitutional amendment,* Tenn. Const. art. I, § 36 (2014).  For a comprehensive, state-by-state analysis of the current status of state abortion law and state constitutional protection of abortion see *After Roe Fell: U.S. Abortion Laws by State*, Ctr. for Reprod. Rts., https://reproductiverights.org/maps/abortion-laws-by-state/ (last visited May 11, 2026).

### B. As Applied to Therapeutic Abortions, Idaho's Abortion Bans Fail Strict Scrutiny

338.    Laws that burden fundamental rights are generally subject to strict scrutiny. *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) ("When a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest."). Strict scrutiny puts the burden on the State to prove that, as applied to medically indicated abortion, the Abortion Bans are narrowly tailored to serve a compelling state interest. *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). The State has failed to meet this burden.

339.    The State contends that the Abortion Bans serve the following state interests:

> [R]espect for and preservation of prenatal life at all stages of development, … the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

Pl. Ex. 1017 at 5, 9 (Medical Board Resps. to Written Disc.).

340.    But these interests pertain to banning abortion generally, not to banning medically indicated abortions specifically. The State does not have a compelling interest in preserving prenatal life at the expense of a pregnant person's life or health. The State's interest in protecting maternal health and safety is not advanced by denying pregnant people access to medical care that would protect their health and safety. The Abortion Bans are not aimed at "particularly gruesome or barbaric medical procedures"; they ban *all* abortion procedures in cases where pregnant individuals face a risk of death from self-harm, face a risk of serious harm to their health, or are carrying an embryo or fetus with a life-limiting condition. The Abortion Bans are not narrowly tailored to mitigate fetal pain. And terminating a pregnancy in which the embryo or fetus has little to no chance of survival is not discrimination on the basis of disability; it is medical treatment to obviate gratuitous health risks.

341.    Further, to the extent that the State has a compelling interest in preventing abortions that are not provided in good faith, the Total Abortion Ban is not narrowly tailored to serve that interest.  Prohibiting all abortions performed to mitigate a risk of death from self-harm is an overly broad solution to the problem the State is trying to solve, particularly when the leading underlying cause of pregnancy-related death in Idaho—and nationwide—is mental health conditions.  Without opining on the constitutionality of any particular alternative, the Court finds that less restrictive means of furthering the State's interest are possible.  These include requiring a physician to document the indications for an abortion and requiring a physician to consult with another physician or mental health professional before performing an abortion for mental health indications.

342.    Because the Abortion Bans are not narrowly tailored to serve a compelling state interest, they fail strict scrutiny and are therefore unconstitutional.

### C.  As Applied to Therapeutic Abortions, Idaho's Abortion Bans Fail Rational Basis Scrutiny

343.    As an alternative basis for its judgment, the Court concludes that the interests asserted by the State are not rationally advanced in cases where a pregnant person faces a risk of death from self-harm.  First, the leading underlying cause of pregnancy-related death in Idaho is mental health conditions, encompassing deaths related to suicide, substance-use disorder, and other types of self-harm.  *Supra* at ¶ 59.  It is not rational for Idaho to deny life-saving abortions to those most at risk of pregnancy-related death in the interest of preserving life.  This is especially true given that, if a person dies while pregnant, the embryo or fetus they are carrying is likely to die as well.  *Anticipated Smid Test.*  Second, forcing doctors to deny life-saving care to patients at risk of self-harm is not rationally related to preserving the integrity of the medical

profession.  This interest is served by enacting laws that reduce the risk of suicide, not laws that force doctors to turn a blind eye to it.  *See Glucksberg*, 521 U.S. at 731.

344.    Nor are the State's asserted interests advanced in cases where an embryo or fetus does not have a realistic chance of surviving past childbirth.  *See supra* at ¶¶ 160-179.  The State has contended that the Abortion Bans are rational because they permit doctors to remove an embryo or fetus that dies in utero.  This argument misses the point.  The record establishes that weeks or months may elapse between the time when a life-limiting condition is diagnosed and the time when embryonic or fetal death occurs.  *Anticipated Dahl Test.*  It is arbitrary and irrational to force a pregnant person to endure the risks of pregnancy during that interval when the embryo or fetus has little chance of survival.

345.    Likewise, these interests are not rationally advanced in cases where a multifetal pregnancy reduction would give one or more embryos or fetuses a meaningful chance of survival when they would otherwise have none.  *See supra* at ¶¶ 180-185.  The State contends that its interest in preserving prenatal life permits it to condemn all developing embryos and fetuses to death rather than allowing some to have a chance at life.  But this is the very definition of irrational.  Nor is it rational to hope that a miracle will enable some embryos or fetuses to survive when all available evidence demonstrates that a medical intervention is necessary.  *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (explaining that a statute may withstand rational basis scrutiny only if the legislative facts on which it is based "rationally may have been considered to be true by the governmental decisionmaker").  In these heartbreaking cases, the State simply has no legitimate interest in overriding the decision of parents of a wanted pregnancy about how best to maximize the chances of at least one child having a positive outcome.

346.   Finally, the State misses the mark in arguing that the interests cited above support application of the Abortion Bans in cases where an embryo or fetus has a condition that, although incompatible with sustained life, may allow it to live for a brief time after birth.  The State may not advance its interests in a way that differentiates between the welfare of an embryo or fetus and the welfare of a pregnant person because such differentiation is not rational.  For instance, the State's interest in respect for and preservation of prenatal life is a subset of a broader interest in life.  The State cannot rationally advance that interest in a way that disrespects or fails to preserve postnatal life.  Similarly, the State's interest in mitigating fetal pain is a subset of a broader interest in mitigating pain.  The State cannot rationally advance that interest in a way that augments a pregnant person's pain.

347.   The State cannot seriously contest what common sense and the evidentiary record make clear:  When someone with a wanted pregnancy receives the devastating news that their embryo or fetus has a life-limiting condition, forcing them to remain pregnant for weeks or months against their will only to watch their child experience intense suffering and death in infancy subverts the very interests the State seeks to advance.  It disrespects maternal life, undermines maternal health, and imposes extraordinary pain and suffering on those already experiencing loss.  Likewise, it is beyond dispute that forcing doctors to turn their backs on pregnant patients' pain and suffering and ignore their pleas for help is a gruesome and barbaric medical practice that undermines the integrity of the medical profession.  Further, it is undeniable that the practice has a disparate impact on women and gender minorities, compelling them to endure physical and psychological torment because of their gender-specific capacity for pregnancy.

131

348.    In sum, banning abortion in cases where a developing embryo or fetus has a life-limiting condition, or a multifetal pregnancy reduction would give one or more embryos or fetuses a meaningful chance of survival when they would otherwise have none, fails to rationally advance any legitimate state interest.

## IV.    Equal Protection

### A. *Pregnant People with Life-Threatening Mental Health Conditions Are Similarly Situated to Pregnant People with Other Life-Threatening Medical Conditions*

349.    The Total Abortion Ban distinguishes between pregnant people at risk of death from self-harm and pregnant people at risk of death from other causes.  Idaho Code § 18-622(2)(a).

350.    The Equal Protection Clause provides that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

351.    Groups "need not be similar in all respects," but they must be alike in those respects relevant to the State's policy.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014).

352.    The inquiry into whether groups are similarly situated is guided by the State's asserted objective and the characteristics that bear on that objective.  *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (citing *Ariz. Dream Act Coal.*, 757 F.3d at 1063).

353.    Here, the State has defined the relevant category through its own statute: pregnant patients for whom abortion is "necessary to prevent the death" of the patient.  Idaho Code § 18-622(2)(a).  Within that category, the law prohibits physicians from providing life-saving abortion care to patients facing a risk of death from self-harm while authorizing physicians to provide life-saving abortion care to patients facing a risk of death from all other causes.  *Id.*

132

354.    The risk of death from self-harm arises from mental health conditions that cause suicidal ideation, substance use, and/or pathological behaviors that create a risk of accidental death.  *Supra* at ¶¶ 96-133; *see also Glucksberg*, 521 U.S. at 730 ("Those who attempt suicide … often suffer from depression or other mental disorders.").

355.    Patients with life-threatening mental health conditions are similarly situated to patients with other life-threatening medical conditions in the only respect that matters under the statute: both groups face a risk of death that would be mitigated by having an abortion.

356.    In the Eighth Amendment context, the Ninth Circuit and many of its sister circuits have held that serious medical needs arising from mental health conditions are comparable to serious medical needs arising from other medical conditions and must be treated alike.  *See Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("In accordance with the other courts of appeals that have examined this issue, we now hold that the requirements for mental health care are the same as those for physical health care needs."); *see also Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019) ("[A]n Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm, and this is met with deliberate indifference to their condition."); *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) ("The extension of the eighth amendment's protection from *physical* health needs … to *mental* health needs is appropriate because, as courts have noted, there is '[n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.'" (citations omitted)).  Further, the Ninth Circuit has expressly held that the risk of death by suicide constitutes a serious medical need.  *Conn v. City of Reno*, 572 F.3d 1047, 1055 (9th Cir. 2009) ("A heightened suicide risk or an attempted suicide is a serious medical need."), *amended by* 591 F.3d 1081 (9th Cir. 2010), *cert. granted, judgment vacated, and remanded*, 563

133

U.S. 915 (2011), *reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011); *see also Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("[A] 'particular vulnerability to suicide' represents a 'serious medical need.'" (citation omitted)).

357.    The features identified by the State—such as the availability of alternative treatments, the role of patient behavior, and the inherent uncertainty of prediction—do not distinguish these patient groups in a constitutionally meaningful way.  The record demonstrates that all medical risk assessment, whether psychiatric or somatic, relies on individualized clinical judgment, probabilistic evaluation, and evolving treatment options.  *Supra* at ¶¶ 82-90, 186.  None of these features are unique to pregnant patients with life-threatening mental health conditions, and none provides a principled basis for categorically withholding life-saving care.

358.    In particular, the existence of alternative treatments does not render the two groups of patients dissimilar.  Not all treatments are effective for all patients, and every potential treatment requires an individualized assessment of potential risks and benefits.  *Supra* at ¶¶ 130-33.  This is equally true of treatments for physical health conditions as it is of treatments for mental health conditions.  *Anticipated Smid Test.*; *Anticipated Payne Test.*; *compare supra, e.g.*, at ¶ 156, *with supra, e.g.*, at ¶¶ 119, 121, 123.

359.    Further, the record reflects that many physical health conditions involve patient behavior as a component of disease management and risk.  *Supra* at ¶ 133.  The risks faced by patients with diabetes, for example, may vary based on their adherence to medication, diet, and exercise regimens, *Anticipated Prentice Test.*, yet those risks are universally understood as arising from a medical condition requiring clinical treatment, not as grounds for withholding life-saving care.  The presence of a behavioral component in the manifestation or progression of a

134

condition does not distinguish the risk of death by self-harm from the risk of death by other medical causes.

360.    Accordingly, patients facing a risk of death from self-harm and those facing a risk of death from other medical causes are similarly situated with respect to the State's chosen objective, and the differential treatment of the two groups demands scrutiny under the Equal Protection Clause.  *See Ariz. Dream Act Coal.*, 757 F.3d at 1064-65.

### B.  The Statutory Classification Fails Strict Scrutiny

361.    Classifications that burden the exercise of a fundamental right are subject to strict scrutiny.  *City of Cleburne*, 473 U.S. at 432 (explaining that strict scrutiny applies "when state laws impinge on personal rights protected by the Constitution"); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (subjecting a law to strict scrutiny because, in authorizing sterilization for one class of offenders but not another class of offenders with similar culpability, it burdened "one of the basic civil rights of man").

362.    Here, this Court has found that medically indicated abortion is a fundamental right. *Supra* at 337.  Because the Total Abortion Ban classifies patients in a manner that burdens one group's ability to exercise this right, the classification is subject to strict scrutiny.

363.    Under strict scrutiny, the State must demonstrate that the challenged classification is narrowly tailored to serve a compelling governmental interest. *See City of Cleburne*, 473 U.S. at 440.

364.    The interests asserted by the State to justify the challenged classification fall into three categories: (1) an interest in preserving fetal life; (2) an interest in regulating medical practice, including determining when abortion is an appropriate or necessary treatment; and (3) an interest in preventing the performance of abortions in bad faith. *See* Pl. Ex. 1017 at 4-5 (Medical Board Resps. to Written Disc.).

135

365.    Assuming the State has a compelling interest in protecting fetal life, the challenged classification is not narrowly tailored to serve that interest.  The statute is underinclusive with respect to the State's asserted interest because it permits abortion care when necessary to prevent death from some life-threatening conditions, while prohibiting identical care when necessary to prevent death from life-threatening mental health conditions.  Moreover, where the State's interest is the preservation of life, excluding a subset of patients who face a substantial risk of death undermines, rather than advances, that interest.

366.    The statute is also overinclusive because it categorically prohibits physicians from providing abortion care in cases involving risk of death from self-harm, regardless of the severity, imminence, or medical certainty of that risk, and regardless of whether abortion is the only effective means of preventing the patient's death.

367.    Even assuming that regulating the medical profession constitutes a compelling governmental interest in this context, the challenged classification is not narrowly tailored to serve that interest.

368.    As the record establishes, physicians diagnose and assess the risk of death from self-harm using established medical standards, including clinical criteria, diagnostic frameworks, and professional judgment, in the same manner they assess other life-threatening conditions. *Supra* at ¶¶ 131-32.  A law that categorically prohibits physicians from acting on that judgment in one subset of cases is fatally underinclusive.

369.    Finally, for the same reasons expressed above, the classification is not narrowly tailored to serve the State's interest in preventing the performance of abortions in bad faith. *Supra* at ¶ 341.

136

370.    Accordingly, the statute's differential treatment of pregnant patients facing a risk of death from self-harm fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest.

### C.  The Statutory Classification Fails Rational Basis Scrutiny

371.    While strict scrutiny is the appropriate standard to analyze the classification the State imposes on pregnant patients with life-threatening mental health conditions, the classification also fails rational basis review.

372.    Under the Equal Protection Clause, a statutory classification must bear a rational relationship to a legitimate governmental interest.  *See City of Cleburne*, 473 U.S. at 446; *Zobel v. Williams*, 457 U.S. 55, 60–61 (1982); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973).

373.    Although rational basis review is deferential, it is not toothless.  "Deference is not abdication," and rational-basis scrutiny requires that a justification for the challenged classification in fact exist.  *See Silveira v. Lockyer*, 312 F.3d 1052, 1088-89 (9th Cir. 2002) (citations omitted), *abrogated on other grounds by Heller*, 554 U.S. at 570.  A classification fails rational basis review where its relationship to an asserted governmental interest is "so attenuated as to render the distinction arbitrary or irrational."  *See City of Cleburne*, 473 U.S. at 446.

374.    Rational basis review requires a court to ask two questions.  First, "[d]oes the challenged legislation have a legitimate purpose?"; and second, "[w]as it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"  *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668 (1981).

375.    Applying these principles, the challenged classification fails rational basis review. First, disdain for people with mental illness is an improper purpose that cannot serve as a legitimate basis for state action.  *See City of Cleburne*, 473 U.S. at 450 (finding an equal

137

protection violation where state action "appears to us to rest on an irrational prejudice against" people with developmental disabilities).  The State's claim that suicidality can be "professed by anyone" reflects precisely the kind of irrational animus and ignorance of psychiatry condemned in *Cleburne*.

376.    Second, it was not reasonable for lawmakers to believe that the challenged classification is rationally related to any legitimate state interest.  The State's interest in preserving life cannot rationally justify denying life-saving treatment to pregnant people suffering from mental illness.  Idaho's own MMRC found that the most common underlying cause of pregnancy-related death in Idaho in recent years was mental health conditions, encompassing deaths related to suicide, substance-use disorder, and other types of self-harm. *Supra* at ¶ 59.  It is the height of irrationality for Idaho to exclude from the class of people authorized to obtain life-saving abortions those most at risk of pregnancy-related death.  And if a person dies while pregnant, in many cases, the embryo or fetus they are carrying will die as well. *Anticipated Smid Test.*  Moreover, denying life-saving care to patients at risk of self-harm is not rationally related to the State's interest in regulating medicine.  This interest is served by enacting laws that reduce the risk of suicide, not laws that force doctors to turn a blind eye to it. *See Glucksberg*, 521 U.S. at 731.

377.    Accordingly, the Court concludes that the statutory classification is arbitrary and irrational in violation of the Equal Protection Clause.

### V.    Remedy

378.    District courts are not bound by a party's request for relief.  Instead, they have broad discretion to award any relief to which a party is entitled based on the evidentiary record and applicable legal standards.  *See* Fed. R. Civ. P. 54(c) ("Every … final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not

138

demanded that relief in its pleadings."); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329-31 (2010) (holding that a court may grant facial invalidation of a statute even if a party expressly disclaims such relief).

379.    The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," except in circumstances not relevant here, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

380.    Here, Plaintiff is entitled to a declaration that:

    a. The Due Process Clause of the Fourteenth Amendment protects the right to obtain an abortion for the purpose of protecting or preserving one's life or health;

    b. Insofar as the Total Abortion Ban, Idaho Code § 18-622, prohibits abortion in cases where a pregnant person faces a risk of death from self-harm, it violates the Due Process Clause of the Fourteenth Amendment;

    c. Insofar as the Total Abortion Ban, Idaho Code § 18-622, treats pregnant people who face a risk of death from mental health conditions differently than pregnant people who face a risk of death from other medical conditions, it violates the Equal Protection Clause of the Fourteenth Amendment;

    d. Insofar as the Total Abortion Ban, Idaho Code § 18-622, or Fetal Heartbeat Act, Idaho Code §§ 18-8801 to 18-8808, prohibits abortion in cases where a

139

pregnant person faces a risk of serious harm to their physical or mental health, it violates the Due Process Clause of the Fourteenth Amendment;

e.  Insofar as the Total Abortion Ban, Idaho Code § 18-622, or Fetal Heartbeat Act, Idaho Code §§ 18-8801 to 18-8808, prohibits abortion in cases where a pregnant person is carrying an embryo or fetus with a life-limiting condition, it violates the Due Process Clause of the Fourteenth Amendment; and

f.  Insofar as the Total Abortion Ban, Idaho Code § 18-622, or Fetal Heartbeat Act, Idaho Code §§ 18-8801 to 18-8808, prohibits multi-fetal pregnancy reduction when performed for the purpose of improving the chances that at least one embryo or fetus is born with a likelihood of long-term survival, it violates the Due Process Clause of the Fourteenth Amendment.

381.    Plaintiff is further entitled to permanent injunctive relief from unconstitutional applications of Idaho's Abortion Bans.  The Supreme Court has explained that, "when confronting a constitutional flaw in a statute, [federal courts should] try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006) (citations omitted).  "We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Id.* at 328-29.  At the same time, a federal court must avoid rewriting state law to conform it to constitutional requirements because that is quintessentially legislative work. *Id.*

382.    With these principles in mind, the Court will permanently enjoin Defendants and Defendant-Intervenor, as well as their agents and successors in office, from enforcing the Total Abortion Ban, Idaho Code § 18-622, in the following circumstances:

140

   a. When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that an abortion would mitigate a non-negligible risk that a pregnant person will die from self-harm;

   b. When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that an abortion would mitigate a non-negligible risk of serious harm to a pregnant person's physical or mental health;

   c. When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that a pregnant person is carrying an embryo or fetus with a life-limiting condition;

   d. When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that a multi-fetal pregnancy reduction would significantly improve the likelihood that at least one embryo or fetus is born with a likelihood of long-term survival.

383. Further, the Court will permanently enjoin Defendants and Defendant-Intervenor, as well as their agents and successors in office, from enforcing the Fetal Heartbeat Act, Idaho Code §§ 18-8801 to 18-8808, in the following circumstances:

   a. When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that an abortion would mitigate a non-negligible risk of serious harm to a pregnant person's physical or mental health;

141

142

b.  When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that a pregnant person is carrying an embryo or fetus with a life-limiting condition;

c.  When a physician concludes, based on good-faith medical judgment and the facts known to the physician at the time, that a multi-fetal pregnancy reduction would significantly improve the likelihood that at least one embryo or fetus is born with a likelihood of long-term survival.

Dated:  May 11, 2026

/s/ Stephanie Toti
Stephanie Toti*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
stoti@lawyeringproject.org

Jamila Johnson*
LAWYERING PROJECT
900 Camp St., 3rd Fl., No. 1197
New Orleans, LA 70130
Phone: (347) 706-4981
jjohnson@lawyeringproject.org

Tanya Pellegrini*
LAWYERING PROJECT
584 Castro St., No. 2062
San Francisco, CA 94114
Phone: (646) 480-8973
tpellegrini@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
300 Lenora St., No. 1147
Seattle, WA 98121
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Ronelle Tshiela*
LAWYERING PROJECT
1525 S. Willow St., Unit 17, No. 1156
Manchester, NH 03103
Phone: (347) 429-9834
rtshiela@lawyeringproject.org

Kelly O'Neill
Idaho Bar No. 9303
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Phone: (208) 649-4942
koneill@legalvoice.org

Wendy S. Heipt*
LEGAL VOICE
907 Pine Street, No. 500
Seattle, WA 98101
Phone: (206) 954-6798
wheipt@legalvoice.org

*Admitted pro hac vice

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 11, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/ *Stephanie Toti*
Stephanie Toti