UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STACY SEYB, M.D., <br><br> Plaintiff, <br><br> v. <br><br> MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*, <br><br> Defendants. | Case No. 1:24-cv-00244-BLW <br><br> **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

## INTRODUCTION

The Constitution does not protect the right to elective abortion. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In general, legislatures are free to restrict abortion as they wish, just as they may regulate other facets of health and welfare. But in the four years since *Dobbs* returned the issue to the states, courts have continued to grapple with difficult questions about the boundaries of this authority.

The present case tests those boundaries by forcing the Court to consider three different questions about abortion access under extraordinary medical circumstances. First, does a woman have the right to terminate a pregnancy—

almost always a much-wanted pregnancy—that threatens to permanently damage her health? Second, in crafting an exception to an abortion prohibition for life-threatening pregnancy complications, may the state exclude mental health conditions that will cause the woman to take her own life if she remains pregnant? Finally, may the state compel a woman to carry a fetus to term when the fetus has a medical condition that will cause it to die almost immediately after birth?

Before explaining how the Court resolves these questions, it is important to understand what this case is and is not about. It is not an attempt to relitigate *Dobbs*. It is not about bodily autonomy or reproductive choice or a woman's "ultimate control over her destiny." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 869 (1992). Rather, it is about a pregnant woman's ability to seek necessary obstetric care under the most difficult and tragic circumstances. It is about whether the state may pick and choose which life-threatening conditions can justify an abortion. It is about self-preservation and the limit of the state's power to make a woman suffer for the sake of an unborn child. As the remainder of this decision will explain, the Due Process and Equal Protection Clauses of the Fourteenth Amendment establish a narrow but fundamental right to abortion when a pregnancy threatens the woman's life or health.

Idaho's Defense of Life Act and Fetal Heartbeat Act together impose a near-total ban on abortion. The ban creates a narrow exception for certain abortions

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 2

"necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). Plaintiff Dr. Stacy Seyb, a maternal-fetal medicine specialist, challenges Idaho's ban as it applies to three extraordinary situations: (1) pregnancies that pose serious long-term risks to the woman's health; (2) pregnancies that threaten the woman's life due to the possibility of self-harm; and (3) pregnancies with severe fetal complications which will result in the death of the fetus shortly after birth. The Court will briefly summarize its holding as to each of Dr. Seyb's claims before moving on to an extensive discussion of its findings of fact and conclusions of law.

The question at the heart of Dr. Seyb's first claim is whether the Due Process Clause of the Fourteenth Amendment protects the right to abortion when necessary to prevent profound and lasting harm to the pregnant woman's health. The Due Process Clause safeguards substantive rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty."[1] *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotations omitted).

---

[1] As the Supreme Court recently noted, the history-and-tradition test can pose challenges when civil rights intersect with rapid scientific advances. *See United States v. Rahimi*, 602 U.S. 680, 691-92 (2024). Although history must always ground constitutional meaning, the Framers of our nation intended the Constitution "to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819) (emphasis omitted). Thus, our nation's past provides an enduring guide to the scope of modern constitutional rights, but the law is not "trapped in amber." *Rahimi*, 602 U.S. at 691.

*Dobbs* held that elective abortion fails this test. Here, to the contrary, the historical record shows that our legal tradition has consistently shielded health-preserving abortions from prosecution since the early days of the common law. When the Fourteenth Amendment was ratified in 1868, the states and territories that restricted abortion universally recognized some version of a therapeutic exception. Although these laws varied in form, courts in the nineteenth century consistently interpreted statutory language to permit abortion when deemed medically appropriate by a doctor acting in good faith. And that general consensus has endured for the past 150 years.

In light of this history, Idaho's failure to permit a health-of-the-mother exception to the abortion ban represents an outlier position that contravenes basic principles of our constitutional order. "Both the life and limbs of a man are of such high value," wrote Blackstone, that the law "pardons even homicide if committed . . . in order to preserve them." 1 William Blackstone, *Commentaries* at *130. This right to self-protection is foundational to our legal tradition. For example, a state could not prohibit a mother from shooting a dangerous intruder in her home or require her to donate an organ to save her toddler's life. By banning health-preserving abortion, Idaho attempts to deny this fundamental right on the basis that the threat of harm comes from a fetus, which depends on the woman for survival. But a pregnant woman's health is not a state resource to be allocated at the

legislature's whim. The Fourteenth Amendment exists precisely to prevent subjugation like this.

The Court thus holds that the right to a health-preserving abortion is one of the liberties guaranteed by the Due Process Clause. Idaho may not criminalize abortions deemed medically necessary to save the pregnant woman's life or prevent serious and long-term impairments to her health unless the restriction is narrowly tailored to a compelling state interest. A blanket ban on health-preserving abortions is not narrowly tailored.

In light of this fundamental right to a life- and health-preserving abortion, Idaho also may not criminalize abortions that are necessary to prevent the death of the woman from self-harm. The Equal Protection Clause of the Fourteenth Amendment restricts states' authority to privilege or disadvantage different classes of citizens. A classification that impacts a fundamental right survives only if narrowly tailored to a compelling state interest. No such interest justifies Idaho's refusal to allow life-saving abortions necessitated by psychiatric conditions. The brain is an organ of the body, and healthcare providers use empirical tools to reliably assess the risk of suicidality and the most effective treatments. It is an affront to human dignity to bar pregnant women from receiving life-saving care on the basis that the threat comes from a mental health condition rather than a physical health condition.

The final question concerns Idaho's ban on abortion when the fetus will die shortly after birth and for high-order pregnancies where the termination of one fetus increases the chance that the others will survive. Pregnancy under these circumstances often poses a threat to the health of the woman, who would then have the right to a health-preserving abortion. But for women without an elevated health risk, no fundamental right is at stake. Under these circumstances, the state remains free to prohibit abortion as long as the restriction is rationally related to a legitimate state interest. Here, Idaho's policy forces women to remain pregnant for weeks or months knowing that the outcome will be to watch their child die, often within minutes of birth. Nonetheless, the law is rationally related to the state's interests in, for example, preventing abortions based on mistaken fetal diagnoses and affirming the dignity of people with profound disabilities. This aspect of Idaho's abortion ban passes constitutional muster.

## FINDINGS OF FACT

### A. The Parties

1. Plaintiff Dr. Stacy Seyb is a board-certified maternal-fetal medicine specialist practicing at St. Luke's Health System in Ada County, Idaho. Until Idaho's abortion ban went into effect in 2022, he provided medically necessary abortions to women whose pregnancies endangered their lives and their health. Dr. Seyb also testified as an expert witness.

2. Defendant Ada County Prosecuting Attorney is responsible for prosecuting violations of Idaho law in Ada County.

3. Defendant Members of the Idaho Board of Medicine regulate the licensure and discipline of medical practitioners in Idaho. The Board of Medicine is statutorily mandated to suspend or revoke a physician's medical license upon a criminal conviction for the violation of Idaho's abortion ban.

4. Defendant Raúl Labrador is the Idaho Attorney General. He has intervened as a defendant to represent the interests of the State of Idaho in defending the constitutionality of the abortion ban.

## B. Expert Witnesses

5. Plaintiff presented testimony from eight expert witnesses: Patricia Cline Cohen, a professor of history at the University of California, Santa Barbara; Dr. Carly Dahl, a physician board-certified in obstetrics and gynecology; Dr. Alexandra Grosvenor Eller, a physician board-certified in obstetrics and gynecology, maternal-fetal medicine, and complex family planning; Monica Eppinger, a professor of law and anthropology at Saint Louis University School of Law; Dr. Jennifer Payne, a psychiatrist board-certified in psychiatry and neurology; Dr. Danielle Prentice, a physician board-certified in obstetrics and gynecology and maternal-fetal medicine; Diana Romero, a professor of community health and social sciences at the City University of New York; and Dr. Marcella Smid, a

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 7

physician board-certified in obstetrics and gynecology, maternal-fetal medicine, complex family planning, and addiction medicine.

6. Defendants presented testimony from three expert witnesses: Dr. Dustan Hughes, a retired physician board-certified in obstetrics and gynecology; Dr. Elena Kraus, director of the Mercy Birthing Center Midwifery Care and a physician board-certified in obstetrics and gynecology and maternal-fetal medicine; and Joseph William Dellapenna, a retired law professor at Villanova University. Defendants also presented testimony from one fact witness: Dr. Guillermo Guzman, Chair of the Idaho Board of Medicine.

**C. The Abortion Ban**

7. In June 2022, *Dobbs v. Jackson*, 597 U.S. 215, overruled *Roe v. Wade*, 410 U.S. 113 (1973), and eliminated constitutional protections for elective abortions. As a result, state legislatures became generally free to regulate abortion.

8. In Idaho, two "trigger laws" took effect in August 2022 in response to *Dobbs*: the Defense of Life Act, Idaho Code § 18-622, and the Fetal Heartbeat Act, Idaho Code § 18-8804. The Court refers to these laws jointly as Idaho's "abortion ban."

9. The Defense of Life Act prohibits all abortions at any stage of pregnancy, unless the abortion is "deemed necessary to prevent the death of the pregnant

woman."[2] Idaho Code § 18-622(2)(a)(i). This death exception is limited to physical threats—"[n]o abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself." *Id.* The abortion ban also provides a limited exception in the first trimester for a woman who "has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion." *Id.* § 18-622(2)(b).

10. Violations of the Defense of Life Act are punishable by a prison sentence of at least two years, but not more than five years. The law further requires the suspension of a physician's medical license upon the first violation and permanent revocation upon subsequent violations. *Id.* § 18-622(1).

11. The Fetal Heartbeat Act bans abortions after a fetal heartbeat has been detected. *Id.* § 18-8804. The law provides an exception for "a medical emergency," rape, and incest. *Id.* A medical emergency is defined as:

---

[2] The Defense of Life Act has been intermittently subject to a limited injunction since August 2022. In a lawsuit initially brought by the U.S. Department of Justice, this Court held that the law is partly preempted by the federal Emergency Medical Treatment and Labor Act (EMTALA), which requires emergency rooms receiving federal funding to provide stabilizing care. The injunction, which currently applies only to St. Luke's Health System, allows emergency medical providers to perform abortions "necessary to stabilize a patient presenting with an emergency medical condition as required by EMTALA." *St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953, 987 (D. Idaho 2025).

> a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Id.* § 18-8801(5). However, the stricter terms of the Defense of Life Act supersede this medical exception. *Id.* § 18-8806(2).

12. Like the Defense of Life Act, violations of the Fetal Heartbeat Act trigger a prison term of two to five years and the revocation or suspension of the healthcare professional's medical license. *Id.* § 18-8805. The Fetal Heartbeat Act additionally provides a private right of action to sue abortion providers, with damages set at a minimum of $20,000. *Id.* § 18-8807(b).

13. In 2023, in *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132, the Idaho Supreme Court addressed the scope of the death-of-the-mother exception in the Defense of Life Act. The court held that the statute does not impose a requirement "of *objective* certainty, or a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life." *Id.* at 1203 (emphasis in original). Further, the law does not require a "medical consensus" about the necessity of the abortion and there is "no certain percent chance requirement that death will occur." *Id.* at 1204. The court acknowledged, however, that this latitude does not alleviate the risk of prosecution: "[o]f course, a prosecutor may attempt to prove the physician's subjective judgment . . . was not made in

good faith by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary." *Id.* (internal citations omitted).

14. Subsequently, the District Court of the Fourth Judicial District of the State of Idaho further clarified the scope of the death exception. *Adkins v. State*, No. CV01-23-14744 (Idaho Dist. Ct. 4th Jud. Dist. Ada Cnty. Apr. 11, 2025). In a declaratory judgment, the court held that the death exception permits abortion whenever the denial or delay of abortion care could shorten the patient's lifespan. Specifically, the exception applies when:

> in the performing physician's good faith medical judgment, the patient faces a non-negligible risk of dying sooner without an abortion (even if her death is neither imminent nor assured), so long as (i) the risk of her death doesn't arise from a risk of self-harm, and (ii) the manner of pregnancy termination is the one that, without . . . increasing the risk of her death, best facilitates the unborn child's survival outside the uterus, if feasible.

*Id.* at 39. Neither party appealed the declaratory judgment, which remains binding on the Attorney General.

15. The Attorney General has not published any enforcement guidance regarding the Defense of Life Act or Fetal Heartbeat Act. Seyb Test., Tr. 142.

16. Since Idaho's abortion ban took effect in 2022, thirty-five percent of OB/GYN physicians practicing obstetrics have left the state. J. Edward McEachern et al., *Change in Number of OB/GYN Physicians Practicing Obstetrics After the* Dobbs *Decision*, JAMA Network Open, July 31, 2025, at 1-2, P.'s Ex. 1025.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 11

### D. The Physiology of Pregnancy

17. Even a healthy pregnancy alters every aspect of the body. These effects include immense changes to blood volume, kidney filtration, the respiratory system, the gastrointestinal system, the musculoskeletal system, the immune system, and hormone production. Smid Test., Tr. 14-18. For a typical, healthy pregnancy, these changes are temporary. *See* Seyb Test., Tr. 153.

18. A fetus usually reaches viability at around twenty-four weeks of gestation, though viability is not determined by a specific fetal age. Smid Test., Tr. 36.

19. Fetal movements usually become perceptible to the pregnant woman at sixteen to twenty weeks of gestation. These first fetal movements were historically referred to as "quickening." Eppinger Test., Tr. 465, 484.

20. Fetuses likely do not have a subjective experience of pain before the twenty-four-week mark. Susan J. Lee et al., *Fetal Pain*, 294 JAMA, Aug. 24, 2005, at 947, P.'s Ex. 1045. However, there is no complete scientific consensus as to when fetuses become capable of feeling pain, and they may react to noxious stimuli earlier in gestation. Eller Test., Tr. 391-93; Kraus Test., Tr. 1099-1101.

### E. Medically Indicated Abortions

21. Apart from any legal prohibitions, medically indicated abortion—also known as therapeutic abortion—is part of the standard of care when a pregnancy poses a risk to the life or health of the mother, when the fetus has a condition

incompatible with life, and for some high-order pregnancies of three or more fetuses. Smid Test., Tr. 34. The burdens of a normal, healthy pregnancy do not create a medical indication for abortion. Seyb Test., Tr. 153; Eller Test., Tr. 405.

22. Maternal mortality refers to the death of a woman as a direct result of pregnancy or due to the aggravating impact pregnancy has on underlying conditions. Smid Test., Tr. 18, 23-24.

23. Maternal morbidity refers to conditions associated with pregnancy that severely threaten a woman's health. Smid Test., Tr. 18.

24. Maternal-fetal medicine is a subfield of obstetrics and gynecology that treats women with high-risk pregnancies. The Society for Maternal-Fetal Medicine is a professional organization that publishes guidelines establishing the standard of care for maternal and fetal conditions that place pregnant women at risk of mortality or morbidity. Smid Test., Tr. 10, 31.

25. When an abortion is medically indicated, doctors and patients engage in shared decision-making to determine the course of treatment. Through shared decision-making, doctors use their expertise and judgment to counsel the patient about her condition, possible treatment options, and the risks of both abortion and continued pregnancy. The patient ultimately chooses how to proceed. Smid Test., Tr. 44-45.

26. "Expectant management" refers to the decision to forgo abortion and instead monitor for further signs of health complications. Some pregnancy complications, but not all, may be successfully addressed through expectant management. Expectant management is sometimes contraindicated. *See* Kraus Test., Tr. 1147-51; Smid Test., Tr. 42-43, 97-98.

27. Like any medical procedure, abortion is not entirely without risk. However, abortion is statistically much safer than carrying a pregnancy to term. *E.g.,* Smid Test., Tr. 57; Maria W. Steenland et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, JAMA Network Open, Jan. 21, 2026, at 1, P.'s Ex. 1044. The most rigorous studies show that the risk of death associated with childbirth is approximately fourteen times higher than the risk of death associated with abortion. Eller Test., Tr. 373-74; *see* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstet. Gynecol., Feb. 2012, at 215, P.'s Ex. 1043. Evidence that abortion increases the likelihood of premature death is not credible. *See* Nat'l Acad. of Sci., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 152-53 (2018), P.'s Ex. 1038.

### 1.  Medically Indicated Abortion for Physical Health

28. Pregnancy complications can cause severe, lasting physical health consequences without necessarily threatening the woman's life. The physician

expert witnesses testified to numerous examples of the gray area between morbidity and mortality. *See* Smid Test., Tr. 35; Prentice Test., Tr. 218; Kraus Test., Tr. 1208; Eller Test., Tr. 1224. One defense expert acknowledged that there are circumstances where a threat to a woman's health exists, but Idaho's laws would prohibit abortion care. *See* Kraus Test., Tr. 1211.

29. For example, preterm prelabor rupture of membranes (PPROM) occurs when a woman's water breaks before fetal viability, generally before twenty-four weeks. PPROM can cause vaginal bacteria to ascend into the uterus, resulting in a potentially life-threatening infection. This can lead to sepsis, which is sometimes, but not always, fatal. When sepsis is not fatal, it can cause long-term harm, including kidney failure, neurocognitive issues, and recurrent infections. Smid Test., Tr. 37. The American College of Obstetricians and Gynecologists and the Society for Maternal-Fetal Medicine recommend abortion care for patients experiencing PPROM. Smid Test., Tr. 42; Kraus Test., Tr. 1145.

30. Another serious pregnancy complication is gestational diabetes due to increased insulin sensitivity during pregnancy. And for patients with preexisting diabetes, pregnancy can severely exacerbate symptoms. Both gestational diabetes and preexisting diabetes exacerbated by pregnancy can cause chronic kidney disease and kidney failure, loss of vision, and nerve damage leading to

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 15

amputation. Prentice Test., Tr. 217-20, 224-25. As Dr. Prentice testified, pregnant women with diabetes sometimes choose to seek abortion care to preserve their health, unless legally prohibited from doing so. For instance, pregnant patients with diabetes-related retinopathy may receive abortions to prevent the possibility of permanent blindness. Prentice Test., Tr. 229-30.

31. Several pregnancy-related complications can cause a dangerous increase in blood pressure. These hypertensive disorders of pregnancy—such as gestational hypertension, preeclampsia, and eclampsia—can result in strokes, seizures, and organ damage. Some women are at risk of death from these conditions, but death is not the most common outcome. Smid Test., Tr. 51.

32. Pregnancy-related complications can lead to the loss of a woman's future fertility. Dr. Eller, for instance, testified about treating patients with intra-amniotic infections that ultimately required complete removal of the uterus. Eller Test., Tr. 1223. Dr. Smid discussed disseminated intravascular coagulation, which occurs when the placenta separates from the uterus. Even with aggressive treatment, the condition can lead to organ damage and infertility if the woman does not receive an abortion. Smid Test., Tr. 50. Dr. Hughes' testimony that pregnancy complications can never cause infertility is not credible. Eller Test., Tr. 1223 (discussing Hughes Test., Tr. 752).

33. These examples are far from exhaustive. Many other pregnancy-associated conditions can permanently damage a woman's health. Pregnancy can delay or prevent cancer treatment, worsen kidney disease, result in ineligibility for organ transplant, and exacerbate latent cardiac disorders. *See* Eller Test., Tr. 378-85; Smid Test., Tr. 52. Although these complications can be fatal in some instances, not all patients face a significant risk of death, and doctors cannot reliably predict whether a patient will die. Eller Test., Tr. 378-85.

34. Doctors exercising good-faith professional judgment may reasonably disagree as to which abortions are medically necessary. Medical care involves a level of discretion, and such disagreements are accepted within the medical community as a normal aspect of practice. Kraus Test., Tr. 1206.

### 2. Medically Indicated Abortion to Prevent Death from Self-Harm

35. Abortion may be medically indicated for reasons related to both physical health and mental health. In Idaho, mental health conditions were the most frequent underlying cause of pregnancy-related deaths from 2018-2024. Smid Test., Tr. 27-28; *Summary of Idaho Maternal Mortality Review Committee Reports, 2018-2024*, P.'s Ex. 1009.

36. Though mental health disorders manifest behaviorally, they are medical conditions with origins in the physical body. For example, the symptoms of major depressive disorder do not simply result from unhappy life circumstances

and in many cases only improve with medication. Physical health conditions like hepatitis C and thyroid disorders are associated with depression, and the hormonal changes associated with pregnancy can exacerbate mental health disorders. Payne Test., Tr. 254, 259, 274, 315. The Society for Maternal-Fetal Medicine does not distinguish mental health conditions impacted by pregnancy from other pregnancy-related health conditions. Smid Test., Tr. 57-58.

37. Like other medical conditions, mental health conditions can be objectively screened, tested, diagnosed, and treated. The Diagnostic and Statistical Manual (DSM) standardizes criteria for psychiatric diagnoses, allowing different psychiatrists to arrive at the same diagnosis for a patient. Payne Test., Tr. 259. While self-reporting is part of the clinical diagnosis of mental illness, psychiatrists do not rely solely on a patient's self-report to determine whether she is suffering from a psychiatric illness. Payne Test., Tr. 258; *see* Kraus Test., Tr. 1108-09. Other important sources of information include physical symptoms, laboratory imaging, clinically validated scales and instruments, and information from friends and family members. Psychiatrists can also recognize signs that a patient is feigning illness. Payne Test., Tr. 258-59.

38. Certain mental health conditions—such as bipolar disorder, major depressive disorder, psychotic disorders, and substance use disorder—are associated with a substantially increased risk of death from self-harm. Smid Test., Tr. 58; Payne

Test., Tr. 252-56. As with mental health diagnoses more broadly, clinicians use a standardized array of information to objectively evaluate the risk of suicide. Payne Test., Tr. 260-61.

39. The diagnostic criteria and clinical methods used to assess risk of self-harm are generally reliable. Although psychiatrists cannot predict with certainty whether a patient will die without treatment—just as physicians assessing a physical health condition cannot always gauge the risk of mortality—assessment processes are well-supported by empirical evidence. Payne Test., Tr. 261.

40. Treating mental health conditions in pregnant women presents unique challenges. Some psychiatric conditions arise for the first time as a result of pregnancy, and existing mental health conditions may worsen or become treatment resistant. These complications are likely due to the hormone changes associated with pregnancy. Payne Test., Tr. 274-75, 318-19, 323.

41. Further, pregnant women often stop taking psychiatric medication to avoid fetal exposure. While most medications are safe to use during pregnancy, some are strongly discouraged due to potential harmful impacts on fetal development. Payne Test., Tr. 263-65, 292-93; Hughes Test., Tr. 688-89. For instance, two medications for treatment-resistant bipolar disorder, valproic acid and carbamazepine, can cause severe birth defects. Payne Test., Tr. 263. Most

pregnant patients who stop taking their psychiatric medication during pregnancy experience a relapse of psychiatric symptoms. Payne Test., Tr. 263.

42. Many pregnant women with mental health conditions carry their pregnancies to term and are successfully treated through methods including medication changes, electroconvulsive therapy, and hospitalization. However, these methods have their own health risks and may be contraindicated in some circumstances. *See* Payne Test., Tr. 268-70; Smid Test., Tr. 97-98.

43. Abortion does not typically worsen mental health symptoms. The most rigorous study on the psychiatric consequences of abortion found that women who received abortion experienced similar or lower levels of depression and anxiety compared to women who were denied abortions. Payne Test., Tr. 326-28; *see* Nat'l Acad. of Sci., Eng'g, & Med., *supra*, P.'s Ex. 1038. Although one study found that abortion may be associated with increased mental health problems, this evidence is not credible because the study did not properly control for preexisting mental health conditions. Payne Test., Tr. 311, 330-31.

44. For some women with mental health disorders, abortion is the most effective means of preventing death by self-harm. For treatment-resistant patients, abortion may be the only viable treatment strategy. Payne Test., Tr. 273.

### 3. Medically Indicated Abortion for Life-Limiting Fetal Conditions and Multifetal Pregnancies

45. Abortion may also be medically indicated based on fetal indicators. Abortion is

part of the recognized standard of care when a pregnant patient has a fetus with a life-limiting condition. Abortion is also recommended in some cases of high-order pregnancy, where the pregnant woman carries three or more fetuses.

46. Life-limiting conditions are rare, incurable medical conditions that prevent long-term survival after birth. Fatal fetal conditions, also known as grave fetal conditions, are a subset of life-limiting conditions that cause death within minutes, hours, or days of birth. Eller Test., Tr. 402-03; Dahl Test., Tr. 171, 198.

47. Examples of fatal fetal conditions include body stalk anomaly, where organs grow outside of the fetal abdominal cavity; bilateral renal agenesis, where the fetal kidneys do not develop; and anencephaly, where the skull and brain do not form. *Dahl Expert Report* at 5-7, P.'s Ex. 1034. A newborn with anencephaly is pictured below.



*Prentice Expert Report* at 6, P.'s Ex. 1036.

48. Many fetal abnormalities increase health risks to the mother well beyond the ordinary risks of pregnancy. For instance, fetal hydrops, a condition where the fetus develops fluid collections in the body, increases the risk of "mirror syndrome" and preeclampsia, which can cause irreversible organ damage. Triploidy, a genetic condition where the fetus has three of each chromosome, also increases the risk of maternal preeclampsia, as well as placental abruption and postpartum hemorrhage. *Prentice Expert Report* at 5-7, P.'s Ex. 1036; Eller Test., Tr. 366-67.

49. Pregnant women carrying fetuses with life-limiting conditions face an increased risk of cesarean section delivery. Dahl Test., Tr. 192. This can increase the risk of complications in future pregnancies and imperil future fertility. *See* Am. Coll. of Obstet. & Gynecol. & Soc'y for Maternal-Fetal Med., *Periviable Birth*, Obstet. Care Consensus, no. 6, Oct. 2017, P.'s Ex. 1047. Cesarean sections also carry the risk of infection and can permanently damage the surrounding tissue. Eller Test., Tr. 398; Kraus Test., Tr. 1182; *Dahl Expert Report* at 3, P.'s Ex. 1034.

50. High-order pregnancies of three or more fetuses also pose serious risks to both the mother and the fetuses. These pregnancies often result in miscarriage or extremely premature birth which reduces the chance of survival for any of the

fetuses upon delivery. For a woman with preexisting health conditions, high-order pregnancies further increase the risk of pregnancy complications. Eller Test., Tr. 387.

51. Multifetal pregnancy reductions are selective abortions that terminate one or more fetuses to preserve the rest of the pregnancy. The procedure protects maternal health and increases the probability of survival for the remaining fetuses, who would otherwise likely die. Eller Test., Tr. 386.

52. As with other medically indicated abortions, physicians and pregnant patients engage in shared decision-making to determine treatment options for life-limiting fetal conditions and multifetal pregnancies, including abortion or expectant management—unless the law removes abortion from the treatment options. Dahl Test., Tr. 173-74.

**F. Dr. Seyb's Medical Practice**

53. Dr. Stacy Seyb is a board-certified maternal-fetal medicine specialist employed at St. Luke's Health System, where he treats women experiencing high-risk pregnancies. He has practiced at St. Luke's for twenty-six years. Seyb Test., Tr. 105-06.

54. As a maternal-fetal medicine specialist, Dr. Seyb exclusively treats women with high-risk pregnancies. Seyb Test., Tr. 106. Generalist obstetricians refer

patients to Dr. Seyb after diagnosing conditions that endanger the life or health of the woman or her fetus. Smid Test., Tr. 29; Hughes Test., Tr. 742.

55. Prior to Idaho's abortion ban, Dr. Seyb regularly performed therapeutic abortions for patients with serious medical needs. These include abortions to protect maternal health, abortions of fetuses with life-limiting conditions, and multifetal pregnancy reductions. He has performed approximately 400-500 abortions over the course of his practice, averaging ten to twenty per year. He has never provided elective abortions. Seyb Test., Tr. 105-07, 113-17, 134-35.

56. Since Idaho's abortion ban went into effect, Dr. Seyb has referred patients who require abortion care to out-of-state providers. *Id.* at 118. Several women experiencing severe health complications had to be airlifted to neighboring states. Smid Test., Tr. 62; Seyb Test., Tr. 123. Specific examples of the impact of the abortion ban on Dr. Seyb's practice include the following:

   a. Prior to the abortion ban, Dr. Seyb had a patient developing early preeclampsia. The only cure was to remove the placenta and terminate the pregnancy. If he had a similar patient today, Dr. Seyb would refer her out of state rather than treat her in Idaho. Seyb Test., Tr. 126.

   b. Prior to the abortion ban, Dr. Seyb performed an abortion on a patient experiencing pregnancy-associated heart failure. If he encountered a similar patient today, he would refer her out of state. His colleagues have

already had to refer women experiencing hypertensive disorders of pregnancy to other states to receive care. Seyb Test., Tr. 128.

c.  After the abortion ban went into effect, Dr. Seyb had a young patient experiencing kidney failure. She was on a list to receive a kidney transplant, but if she remained pregnant, she would be removed from the list and rendered ineligible to receive a transplant, so she decided to terminate the pregnancy. Due to the ban, Dr. Seyb had to refer her to an out-of-state provider. Seyb Test., Tr. 129-30.

d.  Following the abortion ban, Dr. Seyb treated a patient with ruptured membranes and a rising white blood cell count. Abortion was medically indicated, but at that point the pregnancy did not necessarily threaten the patient's life. Due to Dr. Seyb's concern about potential prosecution in Idaho, the patient was airlifted to Utah for treatment. By the time she arrived a few hours later, she had developed an infection and sepsis. Seyb Test., Tr. 123-24.

e.  Since the abortion ban, Dr. Seyb has treated multiple patients carrying fetuses with lethal conditions. He must refer these patients to out-of-state providers if they wish to pursue abortion care. For example, one patient had a fetus with anencephaly, which is inevitably lethal. She was forced to travel out of state to receive an abortion. Seyb Test., Tr. 131.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 25

57. Abortion in some of these instances may have fallen within Idaho's death-of-the-mother exception. However, medical providers in Idaho are understandably reluctant to provide abortion under any circumstance due to fear of prosecution. Though the maternal death exception does not require objective certainty or imminence, many doctors take a narrow interpretation of the law to avoid the tremendous consequences of a violation or perceived violation. *See* Smid Test., Tr. 100-02; Seyb Test., Tr. 140.

58. Dr. Seyb reasonably believes that performing some medically necessary abortions would put him at risk of imprisonment, fines, and cumbersome legal proceedings. If not for this legal risk, he would continue to provide abortion care when pregnancy threatens the physical health of his patients. Seyb Test., Tr. 118, 138, 142.

59. If not for this legal risk, Dr. Seyb would provide abortion care to patients who are at risk of death from self-harm. Though he has not previously performed abortions to prevent death from self-harm, he would do so now because the treatment is no longer available at outpatient clinics in Idaho. Seyb Dep. 159:3-12. Indeed, Dr. Seyb has treated numerous women suffering from psychiatric illness, including a patient with bipolar disorder who committed suicide shortly after giving birth. Seyb Test., Tr. 121.

60. If not for the legal risk, Dr. Seyb would provide abortion care to patients carrying fetuses with life-limiting conditions. Instead, these women face a terrible choice: either leave Idaho to receive appropriate treatment or wait months to give birth and watch their baby die.

## CONCLUSIONS OF LAW

This action raises three novel constitutional questions about abortion access in extraordinary medical circumstances. First, does the Due Process Clause create a fundamental right to abortion when necessary to prevent serious and lasting damage to the mother's health? Second, does Idaho's exclusion of self-harm from the death-of-the-mother exception run afoul of the Equal Protection Clause? Third, does Idaho have a rational interest in prohibiting abortion when medically recommended in cases of multifetal pregnancies and life-limiting fetal conditions? The Court will first confirm Dr. Seyb's standing to raise these challenges before considering each question in turn.

### A. Dr. Seyb Has Standing to Challenge the Defense of Life Act as Applied to Medically Indicated Abortions, but the Idaho Board of Medicine Is Not a Proper Defendant.

The doctrine of standing establishes the minimal constitutional requirements for a plaintiff to file suit in federal court. The plaintiff must show (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable" to the defendant's actions; and (3) a

likelihood that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). When the plaintiff seeks to raise a claim on a third party's behalf, two additional requirements apply: the plaintiff must have a close relationship to the third party, and the third party must be hindered from bringing their own claim. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

The Court has previously rejected two challenges to Dr. Seyb's standing, but a plaintiff maintains the burden of showing standing at every stage of the proceeding as new facts come to light. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013). As explained below, Dr. Seyb has established standing for his claim against the Attorney General and the Ada County Prosecuting Attorney but not the Idaho Board of Medicine. He also has third-party standing to raise this action on behalf of his patients, and he may seek injunctive relief against the Attorney General even though he did not explicitly request it in his complaint.

### 1. Injury in Fact

The injury-in-fact requirement ensures that courts do not wade into hypothetical disputes. At the same time, a plaintiff seeking to challenge an allegedly unconstitutional policy need not actually violate the statute before he can bring suit. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). Such a requirement would invite flagrant law-breaking by bolder plaintiffs and ensure that

the more timid simply do not file suit. *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974). The Supreme Court avoids this "Scylla and Charybdis" scenario by permitting pre-enforcement challenges in circumstances that "render the threatened enforcement sufficiently imminent." *Id.*; *Driehaus*, 573 U.S. at 159.

To bring a pre-enforcement challenge, a plaintiff must show that (1) he intends "to engage in a course of conduct arguably affected with a constitutional interest"; (2) the intended conduct is "arguably proscribed by the challenged statute"; and (3) the threat of future enforcement is "substantial." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024); *see Driehaus*, 573 U.S. at 159-63. Dr. Seyb testified at length about his intent to perform medically indicated abortions that are currently unlawful at least under some circumstances. Defendants assert that he simply misunderstands Idaho's abortion ban, which already permits most health-preserving abortions, and that his intent to perform abortions to prevent death from self-harm is purely hypothetical. The Court has repeatedly rejected both arguments, and the facts established at trial do not alter the prior analysis.

The heart of this case is the gap between life-saving abortions, which remain legal in Idaho, and abortions performed to prevent non-lethal harm to the pregnant woman. Dr. Seyb testified that he previously performed an average of ten to twenty medically indicated abortions per year to patients experiencing serious pregnancy

complications. *Seyb Test.*, Tr. 107, 117. He must now refer these patients to other states—and several of his patients experiencing particularly grave complications have been evacuated to Utah by helicopter. *Id.* at 123-30. Defendants argue that he simply misunderstands the meaning of the death-of-the-mother exception as interpreted by *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023). Dr. Seyb acknowledged that he is unfamiliar with that decision, *see* Seyb Test., Tr. 161-62, and Defendants say that any injury to his practice results from his own failure to educate himself rather than the reality of the abortion ban.

Because the Defense of Life Act supersedes the Fetal Heartbeat Act, the Court analyzes standing only under the former. That law provides in relevant part that performing an abortion is a felony unless "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622. *Planned Parenthood Great Northwest* explained that "the statute does not require *objective* certainty, or a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life," nor does it impose a "'certain percent chance' requirement that death will occur." 522 P.3d at 1203-04. Likewise, a "medical consensus" on the necessity of the abortion need not exist. *Id.* at 1204. Prosecutors may, however, use the absence of a consensus as evidence that the physician did not believe in good faith that the abortion was

necessary. *Id.* In short, *Planned Parenthood Great Northwest* grants relatively flexible protections for physicians but does not alleviate the threat of prosecution.

The recent declaratory judgment in *Adkins v. State*, CV01-23-14744 (Idaho Dist. Ct. 4th Jud. Dist. Ada Cnty. Apr. 11, 2025), further clarified and broadened the death-of-the-mother exception. The state trial court for Ada County construed the exception to require only "a non-negligible risk, in the good faith medical judgment of the performing physician, that . . . the patient will die sooner if an abortion isn't performed than she will die if an abortion is performed." *Id.* ¶ 41. *Adkins* rejected, however, the plaintiffs' proposed construction, which would have permitted abortion whenever "it is within the medical standard of care for a high-risk or complicated pregnancy." *Id.* ¶ 31. Neither party appealed the judgment, so this interpretation is binding in Ada County, where Dr. Seyb practices.

*Planned Parenthood Great Northwest* and *Adkins* narrowed the scope of the present dispute, but they did not eliminate it. Indeed, *Adkins* acknowledged that some medically indicated abortions remain criminalized in Idaho even under that court's expansive reading of the death exception. *Id.* ¶ 32 ("[T]he legislature's 'prevent the death' phrasing evinces no concern for maternal-health complications not dire enough to pose a death risk."). For example, conditions that would destroy a woman's reproductive system—rendering her infertile without creating a "non-negligible" risk of death—do not justify an abortion under *Adkins*. *See id.* ¶ 50.

The trial record establishes that such medical conditions do occur, and that Dr. Seyb would offer abortion care to women in these situations if he could. Seyb Test., Tr. 118. Although defense expert Dr. Hughes testified that pregnancy complications never cause irreversible reproductive harm—asserting that "[l]adies are always able to have more kids . . . their bodies actually do recover"—the evidence overwhelmingly contradicts this statement. *See* Hughes Test., Tr. 752-53. Dr. Eller, for example, testified about treating patients who required total hysterectomies—the removal of the uterus—to treat intraamniotic infections. Eller Test., Tr. 1222-23. A woman who has her uterus removed cannot become pregnant again. *Id.*

In short, some health-preserving abortions remain prohibited in Idaho, and Dr. Seyb intends to treat these patients. Defendants' narrow understanding of pre-enforcement standing belies Ninth Circuit precedent and ignores the realities of maternal-fetal medicine. It is true, as Defendants say, that these complications are rare. Following *Adkins*, many medically indicated abortions do now fall within the death exception, and that judgment should mean that Dr. Seyb no longer needs to airlift patients to Utah. But Dr. Seyb's entire practice is dedicated to women experiencing unusual pregnancy risks—that is the nature of maternal-fetal medicine. And prosecutors may still charge him with a felony if they doubt that he believed an abortion in such a situation was necessary to prevent the woman's

death—that is the nature of prosecutorial discretion.[3] His intended conduct is thus "arguably proscribed" by the challenged statutes, and the threat of future enforcement is substantial. This suffices to establish a pre-enforcement injury with regard to his due process claim.

Dr. Seyb has also shown that he intends to perform abortions to prevent the death of pregnant women from self-harm. Defendants correctly point out that he has not previously provided abortion care under these circumstances. But pre-enforcement standing turns on intended conduct, not past actions. And *Dobbs* transformed the landscape of reproductive healthcare in Idaho. Women whose pregnancies put them at risk of suicide or other potentially fatal self-harm—for example, a bipolar woman who cannot take her medication during pregnancy—could previously access abortion at outpatient clinics without relying on specialists like Dr. Seyb. Those outpatient providers no longer exist, and he intends to change

---

[3] Counsel for Idaho conceded this point in oral argument before the Supreme Court in *Moyle v. United States*, 603 U.S. 324 (2024), which involved a preemption challenge to Idaho's abortion ban in the context of emergency medical care. Idaho's counsel and Justice Barrett had the following exchange:

> Justice Barrett: What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?

> Idaho's Counsel: And -- that, Your Honor, is the nature of prosecutorial discretion, and it may result in a -- a case . . .

Transcript of Oral Argument at 29:3-29:11, *Moyle v. United States*, 603 U.S. 324 (2024) (No. 23-726, No. 23-727).

his practice accordingly. *See* Seyb Dep. 159:3-12. Moreover, he has previously treated pregnant women with serious psychiatric conditions, including a patient who killed herself shortly after giving birth. *See* Seyb Dep. 158:15-159:2. Again, this suffices to establish an injury in fact.

### 2. Causality

Dr. Seyb must next show that the prospective enforcement injury is "fairly traceable" to the conduct of each defendant. The Ada County Prosecuting Attorney and Attorney General of Idaho are responsible for enforcing Idaho's abortion ban, the precise harm identified in Dr. Seyb's complaint. He has established causation for these defendants. His injury is not, however, traceable to the conduct of the Members of the Idaho Board of Medicine because the Board does not have independent enforcement authority.

"An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Matsumoto v. Labrador*, 122 F.4th 787, 799 (9th Cir. 2024). The Board of Medicine manages the licensure of physicians in Idaho, including the discipline of physicians and suspension or revocation of medical licenses. *See* Idaho Code §§ 54-1806(3), 54-1814. In general, a doctor "is subject to discipline by the board" for "[p]erforming or procuring an unlawful abortion." *Id.* § 54-1814(6). And the Defense of Life Act and Fetal Heartbeat Act both impose specific licensure

penalties in addition to incarceration. *Id.* §§ 18-622(1), 18-8805(3). Based on these provisions, the Court previously rejected a challenge to Dr. Seyb's standing to sue the Board. *See Mem. Decision & Order*, Dkt. 54 at 19.

But more recent developments, including trial testimony, have clarified the nature of the Board's authority. The Chair of the Idaho Board of Medicine, Dr. Guillermo Guzman, testified that the Board believes it has the authority to suspend or revoke a medical license only after the physician is convicted of performing an unlawful abortion. Guzman Test., Tr. 653-56. Moreover, the discipline becomes mandatory upon such a conviction—in other words, the Board has no discretion over whether to impose the penalty. Although the Board's current interpretation of its enforcement role is not necessarily binding, the Court agrees with this reading of the statutes. Both the Defense of Life Act and the Fetal Heartbeat Act use mandatory language when discussing licensure penalties: a medical license "*shall* be suspended" for a first offense and "*shall* be permanently revoked" for a second offense. Idaho Code §§ 18-622(1), 18-8805(3) (emphasis added). The Board's broader disciplinary authority set out in § 54-1814 must be read in the context of the language in these criminal provisions.

Because the Board has no independent authority to enforce Idaho's abortion

ban, it is not responsible for the injury to Dr. Seyb.[4] The language of the statutes and the factual evidence presented at trial indicate that professional discipline depends entirely upon a criminal conviction, which falls squarely under the authority of the Ada County Prosecuting Attorney. At this point, the causal relationship between the Board of Medicine and the injury to Dr. Seyb is merely hypothetical, and a speculative connection cannot establish standing. The Members of the Idaho Board of Medicine are dismissed from this action.

### 3. Redressability

The final standing element, redressability, requires the plaintiff to show "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024). Here, Dr. Seyb's injury is criminal prosecution and the suspension of his medical license. Enjoining enforcement by the Attorney General and Ada County Prosecuting

---

[4] In another abortion case recently before this Court, the Idaho Board of Medicine stipulated that it "will take no action against any licensee coming within their respective jurisdictions upon an alleged violation of Idaho's abortion statutes . . . absent a final judgment of conviction entered against such a licensee." *Joint Stipulation*, *Planned Parenthood Great Nw. v. Labrador*, 1:23-cv-00142, Dkt. 182-1 (D. Idaho Dec. 18, 2024). The Court will not decide the present standing dispute based on a stipulation entered in a different case, but this further indicates that the Board has no independent power to discipline Dr. Seyb.

Attorney would redress both harms.

### 4. Third-Party Standing

Dr. Seyb has therefore established the core constitutional requirements to bring this action against the Ada County Prosecuting Attorney and the Attorney General. The next question is whether he may assert the right to a medically indicated abortion on behalf of his patients.

A plaintiff may bring an action to litigate the rights of a third party "when enforcement of the challenged restriction against the litigant would result indirectly in the violation of" that third party's rights. *Warth v. Seldin*, 422 U.S. 490, 510 (1975). The Ninth Circuit and Supreme Court have "repeatedly held that a physician may 'assert the rights of women patients as against governmental interference' in the abortion context." *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015) (quoting *Singleton v. Wulff*, 428 U.S. 106, 118 (1976)). Indeed, *Dobbs* itself rested on the third-party standing of Mississippi abortion providers.[5] *See Dobbs*, 597 U.S. at 233. In keeping with this precedent, Dr. Seyb may bring

---

[5] Although *Dobbs* criticized the Supreme Court's past abortion cases for "ignor[ing] the Court's third-party standing doctrine," it did not announce any changes in this regard. The Supreme Court alone may overrule its precedents, and its "decisions remain binding precedent until [the Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (quoting *Hohn v. United States*, 524 U.S. 236, 252-53 (1998)). Therefore, this Court will continue to observe the longstanding recognition of abortion providers' standing to assert their patients' rights.

this action because his prosecution would interfere with the asserted right of his patients to receive medically indicated abortions.

### 5. Relief Against the Attorney General

Finally, moving beyond the constitutional realm, Dr. Seyb may seek injunctive relief against the Attorney General, who intervened in this action. Dr. Seyb did not amend his complaint to request relief specifically against the Attorney General. But the substance of the relief he now seeks—a limited injunction of Idaho's abortion ban—mirrors the relief he pleaded with regard to the other defendants. This is enough.

Under Fed. R. Civ. P. 24(a)(2), an intervening party "enter[s] the suit with the status of [the] original parties and [is] fully bound by all future court orders." *United States v. Oregon*, 657 F.2d 1009, 1014 (9th Cir. 1981). "By successfully intervening, a party makes himself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervener and the adverse party." *Id.* (internal citations omitted). Injunctive orders may bind anyone "identified with [the defendants] in interest," and intervenors have "the duty to be bound by the district court's injunction order." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 483 (9th Cir. 2022).

Of course, there must be "a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint."

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). A request for relief cannot stand upon "unpled claims and theories." *L.A. All. for Human Rights v. City of L.A.*, 14 F.4th 947, 952 (9th Cir. 2021). Here, though, the relief Dr. Seyb seeks—and the evidence needed to justify it—are substantively identical to the claims of his complaint. He asks the Court to recognize a constitutional right to abortion to protect a woman's life and health. If Idaho's law is unconstitutional, it would remain so regardless of whether the Attorney General or the Ada County Prosecuting Attorney seeks to enforce it.

The Attorney General asked to intervene in this action. He cannot reap the benefits of being a party to the litigation while disclaiming the liability of being bound by the final judgment.

## B. The Due Process Clause of the Fourteenth Amendment Protects the Fundamental Right to a Health-Preserving Abortion.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Glucksberg*, 521 U.S. at 719. Through the Due Process Clause, the Fourteenth Amendment looks beyond the strict text of the Constitution to safeguard substantive rights that are unenumerated but nonetheless fundamental to the American tradition of justice. *Id.* at 719-20. These protections touch the core of who we are as a people—for example, the right to marry, *Loving v. Virginia*, 388 U.S. 1, 12 (1967); the right to direct the upbringing of one's children, *Pierce v. Society of Sisters*, 268 U.S. 510,

534-35 (1925); and the right to be free from egregious intrusions into one's body, *Washington v. Harper*, 494 U.S. 210, 221-22 (1990).

Substantive due process is central to our constitutional regime. At the same time, "'[l]iberty' is a capacious term." *Dobbs*, 597 U.S. at 239. As *Dobbs* underscored, the ambiguities of substantive due process have at times invited courts to fall into "freewheeling judicial policymaking." *Id.* at 240. To avoid this overreach, courts must "exercise the utmost care whenever we are asked to break new ground in this field." *Id.* (quoting *Glucksberg*, 521 U.S. at 720). A plaintiff claiming a fundamental right thus faces a high bar. The Due Process Clause protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21. This test requires first a precise definition of the asserted right, then "a careful analysis" of that right's history. *Dobbs*, 597 U.S. at 238.

Dr. Seyb asserts the right to an abortion when necessary to prevent serious and lasting harm to the health of the pregnant woman—a procedure that the Court will refer to as a "health-preserving abortion." He has established that this right has deep roots in our history and tradition. The historical evidence includes universal protections among the states for life-preserving abortions, a long practice of extending these protections to health-preserving abortions, and a broader

underlying tradition of permitting the use of force—even lethal force—to prevent both death and serious bodily harm.

### 1.  Defining the Right

An asserted fundamental right or liberty interest must be carefully described. *Glucksberg*, 521 U.S. at 721. Defining a right abstractly or at a high level of generality would allow lawmaking by judicial fiat, nullifying the will of the people based on an individual judge's policy preferences. For example, in *Reach Community Development v. U.S. Department of Homeland Security*, 174 F.4th 1143 (9th Cir. 2026), the plaintiffs' claim hinged on the assertion of a broad right to "bodily integrity," but the Ninth Circuit concluded that they really sought recognition of a "right to be free from exposure to tear-gas chemicals used by law enforcement officers as a means of crowd control." *Id.* at 1146. Precision like this ensures that unenumerated constitutional protections remain concretely tethered to historical understandings. *See Dobbs*, 597 U.S. at 240.

Here, the claimed right is the right to a health-preserving abortion. Dr. Seyb is not entirely consistent in his detailing of this right, and he at times articulates it expansively as, essentially, the right to abortion whenever recommended by a doctor. *See Am. Compl.* ¶¶ 125-26, Dkt. 56; *P.'s Am. Proposed Findings* ¶ 142, Dkt. 145 (discussing a "right to therapeutic abortion"). This is a substanceless definition that would effectively give the medical profession veto power over

abortion policy in Idaho. That conclusion is plainly incompatible with *Dobbs* and too abstract to survive the demands of the *Glucksberg* history-and-tradition test.

But the heart of Dr. Seyb's argument is the assertion of a narrower right to abortion when necessary to prevent a serious and lasting impairment to the health of the mother. The physician experts in this case discussed severe pregnancy complications: hysterectomies performed in response to uterine infections, nerve damage due to gestational diabetes, seizures caused by preeclampsia. *See* Eller Test., Tr. 1222-23; Prentice Test., Tr. 217-20; Smid Test., Tr. 51. These are not the risks of a typical pregnancy—although the Court does not trivialize those burdens—but medical conditions that will permanently alter the woman's life. The fundamental right at issue is access to abortion under these devastating circumstances.

*Dobbs* does not foreclose recognition of such a right. That decision explicitly addressed "elective abortions," and the majority opinion contains no analysis whatsoever of abortions performed out of medical necessity. *Dobbs*, 597 U.S. at 234. Defendants extrapolate from a few uncontextualized remarks to argue for a sweeping resolution of an argument that the Supreme Court did not even consider. To be sure, Dr. Seyb's action presents difficult questions. But Defendants cannot avoid the substance of the case through this disingenuous appeal to *Dobbs*. The medical and legal issues at stake are too profound to permit such a facile

resolution.

## 2. The History and Tradition of the Right to a Health-Preserving Abortion

With the right so defined, the next task is to determine whether the right to a health-preserving abortion is deeply rooted in our history and tradition. The Court approaches this challenging analysis mindful that substantive due process can be a "treacherous field." *Dobbs*, 597 U.S. at 239 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). This country is a democracy, and the decisions of our elected representatives deserve great deference. At the same time, the Framers of the Fourteenth Amendment recognized that the will of the majority can at times trample the rights—including the unenumerated rights—of vulnerable groups. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923). To balance these potential rights against the imperative to avoid judicial overreach, the historical analysis must home in on the precise right asserted, not sweeping principles like personal autonomy or bodily integrity. *See Reach*, 174 F.4th at 1146-47. And that history must show not merely the absence of regulation, but a tradition of affirmatively protecting the right. *See Dobbs*, 597 U.S. at 253 ("[T]he fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so.").

The historical record before the Court establishes a deeply rooted right to a health-preserving abortion. As detailed below, this history includes (i) the common

law doctrine of therapeutic intent; (ii) maternal health exceptions in abortion statutes at the time of the Fourteenth Amendment's ratification; (iii) nineteenth-century court decisions applying those statutes; (iv) nineteenth century medical sources shedding light on the statutes' original public meaning; (v) post-ratification history; and (vi) the underlying right to self-protection.

### i.  The Common Law

The Court's analysis of American legal history begins, as *Dobbs* did, with medieval England. Healthcare practitioners—though that is an anachronistic term—have treated women with plant-based abortifacients for millennia.[6] *See* Monica E. Eppinger, *The Health Exception*, 17 Geo. J. Gender & L. 665, 680, 683 (2016), P.'s Ex. 1048. The legal status of these remedies at the dawn of the common law is fuzzy, to say the least. But the limited evidence in the historical record suggests that abortion was not punished when performed for the wellbeing of the woman, for instance when a pelvic deformity would render delivery especially unsafe. Eppinger Test., Tr. 454, 471. Indeed, the common law's criminalization of abortion after quickening, first articulated in the thirteenth

---

[6] Practitioners in the medieval and early modern period commonly administered substances known as "emmenagogues" to restore women's menstrual cycles. To be clear, amenorrhea—the absence of menstruation—could occur for reasons unrelated to pregnancy, and not all emmenagogues would cause an abortion if the woman were pregnant. But practitioners knew that at least some emmenagogues acted as abortifacients and provided these substances regardless of whether pregnancy was suspected. *See* Eppinger Test., Tr. 466.

century by Henry de Bracton, centered on the harm of abortion to the pregnant woman rather than the fetus. Eppinger Test., Tr. 495-99; *see* 2 Henry de Bracton, *On the Laws and Customs of England* 340 (1569), P.'s Ex. 1051.

Later common law authorities recognized a broad therapeutic exception to a healthcare provider's potential criminal liability. Sir Matthew Hale wrote that, "[i]f a physician gives a person a potion without any intent of doing him any bodily hurt, but with an intent to cure or prevent a disease, and contrary to the expectation of the physician it kills him, this is no homicide." 1 Matthew Hale, *The History of the Pleas of the Crown* 429 (1736), P.'s Ex. 1053. In other words, doctors acting in good faith to treat patients were shielded from liability, no matter the effects of the treatment. *See* 4 William Blackstone, *Commentaries* at *196-97, P.'s Ex. 1056 ("If a physician or surgeon gives his patient a potion or plaster to cure him, which contrary to expectation, kills him, this is neither murder nor manslaughter, but misadventure; and he shall not be punished criminally, however liable he might formerly have been to a civil action for neglect or ignorance."). Consistent with this, Hale distinguished abortifacients administered to "unlawfully destroy the child" from those given "to cure [the pregnant woman] of a disease." Hale, *supra*, at 429-30, P.'s Ex. 1053. Physicians could face prosecution only in the former scenario—what we would now call elective abortion—and only if the woman died as a result. *Id.* at 430 ("[A]nd therefore he that gives a potion to this end, must take

the hazard, and if it kills the mother, it is murder."). As such, abortions performed for legitimate medical reasons did not appear to constitute a crime.

This doctrine of therapeutic intent intertwines with the common law right to "self-preservation," discussed further below. A person could not be punished for protecting himself or herself from serious physical harm, and physicians received a related protection when taking action to preserve the health of patients. Despite general criminalization in this period—Blackstone referred to the abortion of a quickened fetus as a "very heinous misdemeanor," 1 Blackstone, *supra*, at *129— there are no known prosecutions of abortions performed for medical reasons in England under the common law. *See* Eppinger Test., Tr. 513, 526-27. To be sure, the exercise of prosecutorial discretion is not enough to establish a fundamental right. *See Dobbs*, 597 U.S. at 253. Here, though, prosecutorial practices shed light on how courts historically understood an ambiguous area of the common law.

### ii.  Ratification-Era Abortion Statutes

After gaining independence from England, American states continued the tradition of protecting medically necessary abortions for the next century. Under *Dobbs*, this facet of the historical record—the status of health-preserving abortions at the time of the Fourteenth Amendment's ratification following the Civil War—is most central to the inquiry. *See Dobbs*, 597 U.S. at 248-49, 260.

America initially followed the common law rule that criminalized abortion

after quickening. *See Dobbs*, 597 U.S. at 245. States began enacting statutory

prohibitions on abortion in the early 1800s as part of a broader push to regulate the

emerging medical profession. James C. Mohr, *Abortion in America* 43 (1978).

Connecticut passed the first such law in 1821, which prohibited the administration

of poison to induce miscarriage if done "willfully and maliciously." *Id.* at 21; *see*

1821 Conn. Pub. Laws pp. 151-53. This *mens rea* element borrowed language

from England's 1803 abortion statute, Lord Ellenborough's Act, which effectively

exempted medically justified abortions. *See* Mohr, *supra*, at 23-24; *Rex v. Bourne*,

3 All E.R. 615, 617 (1938) (explaining that the word "unlawful" in early abortion

statutes implied an exception to "preserv[e] the life of the mother"). As discussed

further below, nineteenth-century courts consistently held that such language

permitted abortions to protect both the life and the health of the mother, effectively

codifying the common law doctrine of therapeutic intent.

 A raft of antiabortion legislation followed over the next forty years.[7] By the

---

[7] The codification of abortion restrictions in the United States occurred in three major waves. The first wave, beginning in 1821, arose out of concern for patient protection as medical training became increasingly formal. The second wave resulted from widespread scandalous press coverage of untrained "irregular" practitioners performing abortions that led to patient deaths. The third wave was spurred by the foundation of the American Medical Association (AMA), which created a "Committee on Criminal Abortion" in 1857 and lobbied state legislatures for more stringent abortion prohibitions. *See* Mohr, *supra*, at 31, 49-50, 145-51; Eppinger Test., Tr. 539, 541-42, 551-52, 561.

time the Fourteenth Amendment was ratified in 1868, twenty-eight out of thirty-seven states had criminal restrictions on abortion. *See Dobbs*, 597 U.S. at 248. Except for Nebraska, every one of these states provided an express or implied exception for maternal health, at least under some circumstances. Nineteen states permitted abortion when necessary to "preserve" or "save" the life of the mother,[8] and eleven of those statutes further allowed abortion when "advised by a physician to be necessary for that purpose."[9] Two states had explicitly broad health exceptions—Maryland for the pregnant woman's "safety" and Illinois for "bona fide medical or surgical purposes."[10] Six states imposed *mens rea* elements—such

---

The AMA's focus on abortion reflected a range of concerns, including the dangers of unqualified medical practice, belief in the sanctity of the unborn child, alarm about the immigrant birthrate outpacing that of white Protestant women, and a desire to promote female domesticity. Dellapenna Test., Tr. 815-16, 883-84, 925-26. But the AMA regarded therapeutic abortion as fundamentally different from the "criminal abortion" that their lobbying targeted. Eppinger Test., Tr. 562.

[8] Alabama, California, Connecticut, Florida, Indiana, Iowa, Kansas, Maine, Michigan, Missouri, Nevada, New Hampshire, New York, Ohio, Oregon, Rhode Island, Virginia, West Virginia, and Wisconsin. *See* 1841 Ala. Acts, p. 143; 1850 Cal. Stats., p. 233; 1860 Conn. Pub. Acts, p. 65; 1868 Fla. Laws, ch. 1637, pp. 64, 97; 1835 Ind. Laws, p. 66; 1858 Iowa Acts, p. 93 (codified in Iowa Rev. Laws § 4221); 1859 Kan. Laws, pp. 233, 237; Me. Rev. Stat., tit. 12, ch. 160, §§ 13-14 (1840); Mich. Rev. Stat., tit. 30, ch. 153, §§ 33-34 (1846); 1835 Mo. Rev. Stat. 165, 168, 172; 1861 Nev. Laws, p. 63; 1849 N.H. Laws, p. 708; N.Y. Rev. Stat., pt. 4, ch. 1, tit. 2, § 9, Tit. 6, § 21 (1828); 1834 Ohio Laws, pp. 20-21; Ore. Gen. Laws, Crim. Code, ch. 43, § 509 (1865); 1861 R.I. Acts & Resolves p. 133; 1848 Va. Acts, p. 96; W. Va. Const., art. XI, § 8 (1862) (incorporating Virginia's laws); Wis. Rev. Stat., ch. 164, § 11, ch. 169, § 58 (1858).

[9] Alabama, California, Florida, Kansas, Nevada, Missouri, Michigan, New Hampshire, New York, Ohio, and Wisconsin. *See supra* n.8.

[10] 1868 Md. Laws p. 315; 1867 Ill. Pub. Laws p. 89.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 48**

as "maliciously," "unlawfully," and "feloniously"—that created an implicit health or life exception.[11] And the lone outlier, Nebraska, created an exception "to preserve" the mother's life when it codified its laws in 1873.[12]

Abortion laws in the territories tell a similar story. Of the six territories with abortion statutes in 1868, Colorado had an express health exception[13]; Washington, Idaho, Montana, and Arizona permitted abortion to "save" or "preserve" the life of the pregnant woman[14]; and Hawaii provided an implicit health exception.[15] A seventh territory, Wyoming, enacted an abortion statute in 1869 and included an express health exception.[16]

The universality of these exceptions shows that states and territories recognized a fundamental limit on their ability to restrict abortion at the time of the Fourteenth Amendment's ratification. At the very least, as Justice Kavanaugh

---

[11] Massachusetts, Louisiana, New Jersey, Pennsylvania, Texas, and Vermont. *See* 1845 Mass. Acts p. 406; La. Rev. Stat. § 24 (1856); 1849 N.J. Laws, pp. 266-67; 1861 Pa. Laws, pp. 404-05; 1854 Tex. Gen. Laws, p. 58; 1846 Vt. Acts & Resolves, pp. 34-35.

[12] Neb. Rev. Stat., ch. 58, pt. 1, ch. 6, § 39 (Brown 1873).

[13] Colo. Rev. Stat. § 42 (1867) (permitting abortion "to prevent serious and permanent bodily injury" to the pregnant woman).

[14] Wash. Terr. Stat., ch. 2, §§ 37-38, p. 81 (1854); 1863-64 Idaho Terr. Laws p. 443; 1864 Mont. Terr. Laws p. 184; Ariz. Howell Code, ch. 10, § 45 (1865).

[15] Haw. Penal Code, ch. 12, §§ 1-2 (1850) (prohibiting abortion performed "maliciously, without lawful justification").

[16] 1869 Wyo. Terr. Gen. Laws, p. 104.

observed in *Dobbs*, "[a]bortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother." *Dobbs*, 597 U.S. at 339 n.2 (Kavanaugh, J., concurring). This is not akin to the history of early-term abortion mentioned in *Dobbs*, where lawmakers prior to the nineteenth century simply chose not to criminalize abortion before the fetus quickened. *See id.* at 253 (majority opinion). Here the record overwhelmingly shows a history of affirmative protections for abortion in at least some medical contexts.

The extent of those protections poses a more difficult question. Most statutes referred to the mother's "life," not her "health," and many others contained implicit exceptions of uncertain scope. If these laws, like Idaho's policy, indeed permitted abortion only when necessary to prevent the mother's death, this history could cut against the existence of a broader right to a health-preserving abortion.[17] The analysis now turns to contemporaneous court decisions that illuminate the meaning of these statutes.

### iii. Contemporaneous Court Decisions

Due to a dearth of prosecutions, courts in the late nineteenth and early twentieth century rarely discussed abortions performed for medical reasons. But

---

[17] Because Idaho permits abortion to prevent the death of the mother, Dr. Seyb's due process claim does not raise the question of the right to a life-saving abortion. The Court will nonetheless discuss this in some detail because it bears on the equal protection challenge to Idaho's exclusion of self-harm from the death-of-the-mother exception.

the cases that do exist, surveyed below, usually portrayed health exceptions in generous terms that emphasized deference to the judgment of physicians.

The Massachusetts Supreme Court appears to be the first to publish a decision concerning a life- or health-preserving abortion. In the 1858 case *Commonwealth v. Wood*, 77 Mass. 85 (1858), the court addressed the conviction of a physician who performed an abortion on his mistress. At the time, Massachusetts criminalized abortions performed "maliciously or without lawful justification." 1845 Mass. Acts, p. 406. The court explained that this language meant that a jury could not convict "if the defendant, a practising physician, in the exercise of his best skill and judgment, honestly believed that the act was necessary to preserve the mother from great peril to life *or health*, and in good faith procured a miscarriage with that view." *Wood*, 77 Mass. at 90 (emphasis added). Subsequent decisions in Massachusetts over the next century consistently affirmed this principle. *See Commonwealth v. Nason*, 148 N.E. 110, 112 (Mass. 1925) ("[A] physician has a right to commit an abortion and if it is done upon the best judgment of that doctor and his judgment corresponds with the average judgment of the doctors in the community in which he practices, that can cease to be illegal and becomes legal. . . ."); *Commonwealth v. Wheeler*, 53 N.E.2d 4, 5 (Mass. 1944) ("[A] physician may lawfully procure the abortion of a patient if in good faith he believes it to be necessary to save her life or to prevent serious impairment of her

health, mental or physical, and if his judgment corresponds with the general opinion of competent practitioners in the community in which he practises.").

In other states with similar statutes, courts echoed Massachusetts's broad exception for health-preserving abortions. Pennsylvania's highest court noted in 1899 that abortion is illegal when done "without any justifiable medical reason." *Wells v. New Eng. Mut. Life Ins. Co.*, 43 A. 126, 126 (Pa. 1899). The Supreme Court of Vermont more floridly explained that the state's abortion statute

> evidently intends to discriminate between the lawful operation of the medical man, in the due course of his legitimate practice in such cases, when it becomes imminently perilous to delay longer to interfere with the due processes of natural growth, and that voluntary interference in such matters which is prompted by no such motive, but originates in a reckless disregard and defiance of the laws of nature, in order to procure an abnormal exemption from those natural results flowing from illicit or unbecoming indulgence, which the law therefore reprobates.

*State v. Howard*, 32 Vt. 380, 401 (1859). No state with an implicit medical exception appears to have limited that exception to strictly life-saving care in the nineteenth century.

For states with an express life-of-the-mother exception, the status of health-preserving abortions is less clear. To this Court's knowledge, there are no nineteenth- or early twentieth-century decisions explicitly discussing this issue. But several cases suggest that these laws treated "life" and "health" interchangeably. In 1899, for instance, the Indiana Supreme Court discussed

whether the two charged abortions were "necessary for the physical *safety* of this plaintiff." *Gunder v. Tibbitts*, 55 N.E. 762, 764 (Ind. 1899) (emphasis added). That case involved a doctor who had helped coerce his wealthy friend's teenage mistress into abortions when she became pregnant. *Id.* at 763. The court upheld the doctor's convictions only because he had clearly lied about the necessity of the abortion: "Why did he represent to her that an operation was necessary to save her life? Because he had her welfare in view? No. He violated the law to aid [the codefendant] in effecting his purposes of concealing the fact of the seduction, and of ridding himself of paternal responsibilities." *Id.* at 766.

In Ohio, on the other hand, a physician's abortion conviction was reversed for insufficient evidence because "[w]hether he intended to do this in order to preserve the health and probably the life of the woman is not clear by the record." *State v. Tippie*, 105 N.E. 75, 76 (Ohio 1913). The doctor in that case had administered anesthesia in preparation for an abortion, but the woman died prior to the procedure. *Id.* The court explained that

> if the doctor was giving the chloroform with the intent to discover whether it would be necessary to operate on the fetus, *for the sake of the mother's health and life*, but without any intent to operate unless the operation would be necessary to preserve her life, then he did not administer the chloroform with an unlawful intent . . . but to do a lawful act if the condition of his patient required the act to be done.

*Id.* at 77 (emphasis in original). This language suggests that abortions performed "for the sake of the mother's health" were inherently performed to "preserve" her

life—a reading that corresponds to the statute's goal of "protect[ing] women and unborn babies from dangerous criminal practice." *Id.*

Other state supreme courts showed a similar latitude when defining life-preserving abortions. Though courts were harsh on non-professionals who performed abortions,[18] they almost never regarded legitimate medical abortions as potentially criminal. A physician's conviction in Iowa was overturned because the only evidence regarding the pregnant woman's health was that "she walked to the office of defendant two or three times." *State v. Aiken*, 80 N.W. 1073, 1074 (Iowa 1899). "Surely," the court concluded, "this does not prove beyond a reasonable doubt that the miscarriage was not necessary to save the life of the mother." *Id.* The Missouri Supreme Court similarly held that a physician could not be convicted of unlawful abortion if there was any evidence at all of the woman's poor health prior to the procedure. *State v. De Groat*, 168 S.W. 702, 708 (Mo. 1914); *see also State v. Meek*, 70 Mo. 355, 357 (1879) (emphasizing that a physician's advice could render an abortion lawful just as much as actual medical necessity). These cases illustrate a widespread understanding that, no matter the details of the

---

[18] *See Hatchard v. State*, 48 N.W. 380, 382 (Wis. 1891) ("If a person commit an abortion upon a pregnant woman without the advice of two physicians that it is necessary to do so to save the life of the mother, he acts at his peril of the fact."); *Beasley v. People*, 89 Ill. 571 (1878) ("As defendant was not a physician, and did not claim any skill in such matters, there can be no pretense he caused the miscarriage for the preservation of the life of the mother.").

statutory language, doctors could not be prosecuted for performing health-preserving abortions. In the words of the Washington Supreme Court, "[i]f the appellant in performing the operation did something which was recognized and approved by those reasonably skilled in his profession . . . then it cannot be said that the operation was not necessary to preserve the life of the patient." *State v. Powers*, 283 P. 439, 440 (Wash. 1929).

A return to the history of abortion in England provides further evidence for this broad interpretation of life-of-the-mother exceptions in early abortion prohibitions. The first substantive discussion of health-preserving abortion occurs in the 1938 English case *Rex v. Bourne*, 3 All E.R. 615. As a foreign trial court decision handed down seventy years after the Fourteenth Amendment's ratification, the case obviously has limited utility. Still, English and American abortion restrictions during this period remained quite similar and had not changed much since the 1860s. *See* Jon O. Shimabukuro, Cong. Rsch. Serv., R95-274, *Abortion Law Development: A Brief Overview* 1 (2009). For this reason, the case is worth discussing in some detail.

Like most American states, England in 1938 allowed abortion only to

"preserve" the life of the mother.[19] In *Rex v. Bourne*, a doctor performed an abortion on a fourteen-year-old rape victim to test the scope of this exception. *See* 3 All E.R. at 616. The prosecution claimed that the abortion was unlawful because, although the pregnancy might have threatened the victim's health, her life itself was not in danger. *See id.* at 617. The court rejected this distinction, explaining to the jury that "[l]ife depends upon health and it may be that health is so gravely impaired that death results." *Id.* Some conditions do threaten health alone, the court noted, but the ephemeral nature of this line necessitated a "wide and liberal" reading of the exception. *Id.* The court concluded that an abortion could fall within the life exception whenever "the probable consequence of the continuance of the pregnancy will be to make the woman a physical or mental wreck." *Id.* at 619.

Scholars debate the significance of *Rex v. Bourne*, but historical evidence suggests that the case articulated a long-standing principle rather than announcing a new rule. *See* John Keown, *Abortion, Doctors, and the Law* 59-78 (1988); Eppinger Test., Tr. 525-26; P.'s Ex. 1048 at 741. Defendants disagree and contend that American courts have universally rejected the proposition that life-of-the-

---

[19] The first statutory prohibition of abortion in England was Lord Ellenborough's Act of 1803, which replaced the common law criminalization of post-quickening abortion with a prohibition on the practice when done "wilfully, maliciously, and unlawfully." Malicious Shooting or Stabbing Act 1803, 43 Geo. 3 c.58 (Eng.). In 1929, England passed the Infant Life (Preservation) Act, 20 Geo. 5, which removed this *mens rea* language and created the express life exception.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 56**

mother exceptions historically encompassed non-lethal health risks. *Att'y Gen.'s Am. Proposed Findings* at 14 n.4, Dkt. 143. But only a handful of the nearly two dozen cases cited in Defendants' briefing explicitly make this point[20]—and some cut the other way. In *People v. Belous*, 458 P.2d 194, 204 (Cal. 1969), for example, the California Supreme Court emphasized that the point of the state's 1850 abortion ban was to protect pregnant women's health in light of the dangers of abortion at the time. The court concluded that the life exception was unconstitutionally vague, but it did not reject the proposition that the exception could apply to health-preserving abortions. *Id.* at 198 ("The meanings for 'preserve' range from the concept of maintaining the status quo—that is, the woman's condition of life at the time of pregnancy—to maintaining the biological or medical definition of 'life' . . . ."). Moreover, the earliest of Defendants' cases is from 1969, and two did not issue until 2023. The Court will discuss some of these decisions in the subsequent analysis of post-ratification history, but they certainly do not elucidate the status of health-preserving abortions in 1868.

In sum, although history is inevitably ambiguous, court decisions from the late nineteenth and early twentieth century overwhelmingly show that states

---

[20] *See Nelson v. Planned Parenthood Ctr. of Tucson, Inc.*, 505 P.2d 580, 584-85 (Ariz. App. 1973); *Cheaney v. State*, 285 N.E.2d 265, 271 (Ind. 1972); *Sasaki v. Commonwealth*, 485 S.W.2d 897, 901 (Ky. App. 1972); *Rosen v. La. State Bd. of Med. Examiners*, 318 F. Supp. 1217, 1220-21 (E.D. La. 1970); *Steinberg v. Brown*, 321 F. Supp. 741, 744 (N.D. Ohio 1970).

regarded "life" and "health" as synonymous for purposes of abortion regulation during this period. The analysis now shifts from direct legal authority to the broader historical context in which these laws arose.

### iv. Nineteenth-Century Medical Practice

Medical sources from the late nineteenth century further clarify the extent of states' protections for health-preserving abortions. To be sure, these are not legal authorities of any sort. They do, however, provide evidence of the practical reality and public understanding of medical exceptions in abortion laws, which in turn illuminates the original meaning of these statutes. *Cf. Dobbs*, 597 U.S. at 241 (identifying scholarly treatises as relevant historical sources).

Doctors were among the strongest proponents of abortion prohibitions in the late nineteenth century. As medical work professionalized, physicians lobbied for stricter abortion regulations due largely to concerns about unlicensed providers killing women through the procedure.[21] *See* Dellapenna Test., Tr. 882. But even ardent antiabortion advocates believed that abortions performed for legitimate

---

[21] As previously noted, some physician advocates also had less legitimate motives, including concerns with immigrant birthrate and a desire to enforce traditional gender roles. Dellapenna Test., Tr. 883-84, 925-26. More generally, as another district court observed, nineteenth-century abortion statutes were enacted at a time when "women had few rights" and "were wholly excluded from political matters." *Abele v. Markle*, 342 F. Supp. 800, 802 (D. Conn. 1972). Nonetheless, *Dobbs* makes clear that this is the history we must consider when determining the constitutional rights of pregnant women today.

medical purposes were both legal and clinically proper. The Massachusetts physician Horatio Storer, for example, led the American Medical Association's mobilization against abortion. He nonetheless observed in a well-known 1866 book that abortion was permissible "in cases of dangerous organic disease . . . cases of insanity . . . cases of general ill health where there is perhaps a chance of the patient becoming an invalid for life." Horatio Storer, *Why Not? A Book for Every Woman* 25 (Lee & Shepard 1866), P.'s Ex. 1064. Another antiabortion doctor, Montgomery Russell, wrote in 1907 that "the law leaves it entirely to the judgment of the medical profession to determine when it is necessary . . . to produce an abortion." Montgomery Russell, *Criminal Abortion*, 5 Nw. Med. 296, 303 (1907), P.'s Ex. 1068.

During this period, doctors openly performed abortions for the sake of their patients' health without apparent fear of punishment. In New York, where abortions were permitted only to preserve the woman's life, a well-known obstetrician published a detailed description of a health-preserving abortion procedure in a newspaper. Cohen Test., Tr. 949-52; *see* Gunning Bedford, *A Lecture, Introductory to a Course on Obstetrics and the Diseases of Women and Children* (Joseph H. Jennings 1847), P.'s Ex. 1061. Although the decision to publicize this information was controversial under the prevailing norms of the time, he faced no legal or professional consequences, nor did anyone suggest that

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 59

he was wrong to provide the abortion. Cohen Test., Tr. 951-52. Medical textbooks and lectures also widely discussed the circumstances under which abortion should be performed for health purposes, including for women with cardiac disease, cancer, pelvic narrowness, and kidney conditions. *See* Robert C. Eve, *The Medico-Legal, Legal, and Moral Aspects of Criminal Abortion and Infanticide*, 11 Atlanta Med. & Surgical J., Nov. 1894, at 520, P.'s Ex. 1065; T. Gaillard Thomas, *Abortion and Its Treatment, from the Stand-Point of Practical Experience* 101-04 (D. Appleton & Co. 1896), P.'s Ex. 1066. At least one prominent physician stated that the risk of future infertility could justify abortion. *See* Thomas, *supra*, at 102, P.'s Ex. 1066.

Paralleling this medical consensus, state legislatures at the time showed concern not with preventing health-preserving abortions, but with ensuring that those procedures would actually preserve women's health. *See* Eppinger Test., Tr. 559-60; *Belous*, 458 P.2d at 200 (explaining that California's 1850 statute sought to protect women's health "in light of the then existing medical and surgical science" that made abortion much more lethal than childbirth); *Babbitz v. McCann*, 310 F. Supp. 293, 301-02 (E.D. Wis. 1970) (explaining that Wisconsin's 1858 statute "reflected an interest in protecting the life of the mother, for in 1858 any surgical procedure done inside the body was extremely dangerous"). And state courts in the nineteenth century kept this intention in mind when ruling on the

reach of abortion restrictions. *See State v. Murphy*, 27 N.J.L. 112, 114 (1858) (stating that the abortion ban functioned "not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts"); *Dougherty v. People*, 1 Colo. 514, 523 (Colo. 1872) (stating that "the health of the mother is more frequently ruined than the life of the child is destroyed" and the abortion ban was "designed to protect both from injury").

By clarifying the scope of medical exceptions in early abortion statutes, these legislative goals and on-the-ground enforcement patterns shine light upon the applicable history and tradition. At this crucial point in history, even states with strong abortion prohibitions made exceptions for the sake of the pregnant woman's life and health. Medically indicated abortions were subject to a distinct legal regime that shielded legitimate clinicians from prosecution. Naturally, the practical reach of those exceptions has evolved and expanded over time as advances in the medical field make abortion safer.

### v. *Post-Ratification History*

Protections for health-preserving abortions become more explicit in the early- and mid-twentieth century—not as a reflection of changing attitudes, but as a reaction to the growing sophistication of medical practice. By 1972, out of the thirty-two states with statutes banning elective abortion, fifteen included a statutory

health exception.[22] In at least five others, court decisions protected health-preserving abortions.[23] And every state with an abortion ban maintained an exception for the life of the mother.[24]

---

[22] Fourteen states and the District of Columbia expressly allowed abortion when the pregnancy would severely impair the mother's health. *See* Ala. Code, Tit. 14, § 9 (1958); Ark. Stat. Ann. §§ 41-303 to 41-310 (Supp. 1971); Calif. Health & Safety Code §§ 25950-25955.5 (Supp. 1972); Colo. Rev. Stat. Ann. §§ 40-2-50 to 40-2-53 (Cum. Supp. 1967); D.C. Code Ann. § 22-201 (1967); Del. Code Ann., tit. 24, §§ 1790-1793 (Supp. 1972); Fla. Stat. Ann. § 458.22 (1972); Ga. Code §§ 26-1201 to 26-1203 (1972); Kan. Stat. Ann. § 21-3407 (Supp. 1971); Md. Ann. Code, art. 43, §§ 137-139 (1971); N.M. Stat. Ann. §§ 40A-5-1 to 40A-5-3 (1972); N.C. Gen. Stat. § 14-45.1 (Supp. 1971); Ore. Rev. Stat. §§ 435.405 to 435.495 (1971); S.C. Code Ann. §§ 16-82 to 16-89 (1962 and Supp. 1971); Va. Code Ann. §§ 18.1-62 to 18.1-62.3 (Supp. 1972).

Massachusetts prohibited abortions done "unlawfully," an implied exception that the state supreme court had long construed to allow health-preserving abortions. *See Wheeler*, 53 N.E.2d at 5. Statutes in New Jersey and Pennsylvania used similar language, but the scope of those exceptions in the mid-1900s is unclear, so they are not included in this count. *See State v. Brandenberg*, 58 A.2d 709, 710 (N.J. 1948) ("We find it unnecessary to consider whether under our statute and the construction thereof given by our courts threatened impairment of a woman's health, as distinguished from the saving of her life, constitutes lawful justification."); *Commonwealth v. Page*, 54 Pa. D. & C.2d 12, 17, 1970 WL 9090, at *4 (Pa. Ct. Common Pleas, Jan. 1, 1970) ("The act has been enforced as though every abortion were unlawful, yet there has developed in recent years the common belief in Pennsylvania that therapeutic abortions are legal.").

[23] Some of these cases specifically discussed health-preserving abortion while others recognized a right to abortion more generally. *See Abele*, 342 F. Supp. at 804-05; *Doe v. Scott*, 321 F. Supp. 1385, 1390-91 (N.D. Ill. 1971); *YWCA of Princeton, N.J. v. Kugler*, 342 F. Supp. 1048, 1073-75 (D.N.J. 1972); *Beecham v. Leahy*, 287 A.2d 836, 839 (Vt. 1972); *Babbitz v. McCann*, 310 F. Supp. 293, 301-02 (E.D. Wis. 1970). Additionally, several states with statutory health exceptions had those exceptions broadened in judicial decisions. *See Poe v. Menghini*, 339 F. Supp. 986, 993-96 (D. Kan. 1972); *Corkey v. Edwards*, 322 F. Supp. 1248, 1254 (W.D.N.C. 1971); *Doe v. Bolton*, 319 F. Supp. 1048, 1055-56 (N.D. Ga.), *aff'd and modified*, 410 U.S. 179 (1973), *abrogated by Dobbs*, 597 U.S. 215.

[24] Louisiana was the only state that did not explicitly create any form of medical exception in its criminal abortion statute, but another statute provided that physicians would not be professionally sanctioned for performing an abortion to save the woman's life. Courts incorporated this exception into the criminal provision. *See Rosen*, 318 F. Supp. at 1220.

The American Law Institute (ALI) spurred the effort to formally align statutory language with modern medical understandings. In 1962, the ALI promulgated a Model Penal Code section providing that abortion is "justified" if the physician "believes there is substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother," and in cases of rape, incest, and severe fetal abnormalities. Model Penal Code § 230.3(2) (Prop. Off. Draft, 1962). Over the next decade, about a third of the states amended their abortion statutes to incorporate most or all of this proposal. *Shimabukuro*, *supra*, at 2. The speed of this adoption suggests that the prior absence of an express health exception in these states reflected an unintended drafting ambiguity rather than the reality of the law.

To be sure, some authorities took the opposite view. In the years immediately before *Roe*, several decisions in state and federal courts explicitly interpreted life exceptions to exclude non-lethal dangers.[25] But these restrictions on health-preserving abortions were not articulated until the middle of the twentieth century, giving them limited relevance in the historical analysis. Moreover, this represents a distinctly minority view. Courts in only five states appear to have

---

[25] *See Nelson*, 505 P.2d at 584-85; *Cheaney*, 285 N.E.2d at 271; *Sasaki*, 485 S.W.2d at 901; *Rosen*, 318 F. Supp. at 1220-21; *Steinberg*, 321 F. Supp. at 744.

expressly adopted and upheld this interpretation, and just one of those rulings came from a state supreme court.[26]

During the *Roe* years, medically indicated abortions continued to receive special protections. Though states could constitutionally ban elective abortion after fetal viability, they could not prohibit abortions necessary for the woman's life or health, no matter how far along in the pregnancy. *Casey*, 505 U.S. at 879 (affirming that states may freely regulate post-viability abortion "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother"); *Stenberg v. Carhart*, 530 U.S. 914, 947-48 (2000) (O'Connor, J., concurring) ("[E]ven a postviability proscription of abortion would be invalid absent a health exception . . . ."). These distinct legal regimes illustrate the different interests at stake. *Roe* and *Casey* turned on the right to privacy and "the urgent claims of the woman to retain the ultimate control over her destiny and her body." *Casey*, 505 U.S. at 896, 869. The right to a health-preserving abortion simply reflects a woman's prerogative to protect herself from grave harm.

Consistent with this basic principle, the overwhelming majority of states that

---

[26] These rulings came from the Arizona Court of Appeals (*Nelson*, 505 P.2d 580); the Supreme Court of Indiana (*Cheaney*, 285 N.E.2d 265); the Kentucky Court of Appeals (*Sasaki*, 485 S.W.2d at 901); the U.S. District Court for the Eastern District of Louisiana (*Rosen*, 318 F. Supp. 1217); and the U.S. District Court for the Northern District of Ohio (*Steinberg*, 321 F. Supp. 741).

criminalized abortion after *Dobbs* have created an exception for the health of the mother. Currently, thirteen states completely ban elective abortion, and most others impose some degree of gestational limit, ranging from six weeks to the point of fetal viability. Every one of those states includes an exception for the life of the mother, and all but five have some form of broader health exception.[27]

---

[27] For states with a health exception, see Ala. Code § 26-23H-4 ("prevent a serious health risk"); Ariz. Rev. Stat. § 36-2301.01(A)(1) ("preserve the life or health"); Cal. Health & Safety Code § 123466(a) ("protect the life or health"); Conn. Gen. Stat. § 19a-602 ("preserve the life or health"); Del. Code Ann., tit. 24, § 1790(b) ("protection of the woman's life or health"); Fla. Stat. § 390.0111(1)(a) ("serious risk of substantial and irreversible physical impairment of a major bodily function"); Ga. Code Ann. § 16-12-141(a)(3), (b)(1) ("substantial and irreversible physical impairment of a major bodily function"); Haw. Rev. Stat. § 453-16(b)(2) ("protect the life or health"); 775 Ill. Comp. Stat. 55/1-25(a) ("protect the life or health"); Ind. Code. § 16-34-2-1(a)(3)(A) ("any serious health risk"); Iowa Code Ann. §§ 146A.1(6)(a), 146E.2 ("a serious risk of substantial and irreversible impairment of a major bodily function"); Kan. Stat. Ann § 65-6724(a) ("substantial and irreversible physical impairment of a major bodily function"); Ky. Rev. Stat. § 311.772(4)(a) ("serious, permanent impairment of a life-sustaining organ"); La. Rev. Stat. § 14:87.1(1)(b)(v) ("serious, permanent impairment of a life-sustaining organ"); Me. Stat. tit. 22, § 1598(1-B) ("necessary in the professional judgment of a physician"); Md. Code. Ann., Health–Gen. § 20-209(b)(2)(i) ("protect the life or health"); Mass. Gen. Laws ch. 112, § 12N ("preserve the patient's physical or mental health"); Mich. Comp. Laws § 333.26103(c) ("medically indicated to protect the . . . physical or mental health"); Mo. Rev. Stat. § 188.030(1) ("serious risk of substantial and irreversible physical impairment of a major bodily function," including but not limited to "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions"); Mont. Code Ann. § 50-20-603 ("serious health risk"); Neb. Rev. Stat. § 71-6915(3)(a) ("medical emergency"); Nev. Rev. Stat. § 442.250(1)(c) ("preserve the life or health"); N.H. Rev. Stat. Ann. § 329:44(III) ("serious risk of substantial and irreversible impairment of a major bodily function"); N.Y. Pub. Health Law § 2599-bb ("protect the patient's life or health"); N.C. Gen. Stat. § 90-21.81(B)(1) ("medical emergency"); N.D. Cent. Code §§ 12.1-19.1-01(5), 12.1-19.1-03(1) ("substantial physical impairment of a major bodily function"); Ohio Rev. Code Ann. § 2919.201(B)(1)(b) ("serious risk of the substantial and irreversible impairment of a major bodily function"); 18 Pa. Cons. Stat. § 3211(b) ("substantial and irreversible impairment of a major bodily function"); 23 R.I. Gen. Laws § 23-4.13-2 ("preserve the life or health"); S.C. Code Ann. §§ 44-41-640(A) ("medical emergency" or "serious risk of a substantial and irreversible

Most recently, several state supreme courts have recognized a fundamental right to a life- or health-preserving abortion under the state constitution. The Supreme Court of North Dakota held that "North Dakota's history and traditions, as well as the plain language of its Constitution, establish that the right of a woman to receive an abortion to preserve her life or health was implicit in North Dakota's concept of ordered liberty before, during, and at the time of statehood." *Wrigley v. Romanick*, 988 N.W.2d 231, 242 (N.D. 2023). Notably, the court included health-preserving abortions even though North Dakota statutes historically allowed abortion only to preserve the pregnant woman's life. *See id.* at 240-42. Indiana too historically provided only for life-preserving abortions, but the state supreme court held that the "fundamental right of self-protection" encompassed "an abortion procedure that is necessary to protect a woman's life or to protect her from a serious health risk." *Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw.*, 211 N.E.3d 957, 976 (Ind. 2023). And in sixteen other states, the state

---

impairment of a major bodily function"); Tenn. Code Ann. § 39-15-213(c)(1)(A) ("serious risk of substantial and irreversible impairment of a major bodily function"); Tex. Health & Safety Code § 170A.004(b) ("serious risk of substantial impairment of a major bodily function"); Utah Code Ann. § 76-7-302(2)(b)(i)(B) ("serious physical risk of substantial impairment of a major bodily function"); Va. Code Ann. §§ 18.2-74 ("substantially and irremediably impair the mental or physical health of the woman"); Wash. Rev. Code § 9.02.110 ("protect the pregnant individual's life or health"); W. Va. Code. § 16-2R-3(a)(3) ("medical emergency"); Wis. Stat. §§ 253.10(2)(d), 253.107(3)(a) ("serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions").

      For states with only a death exception, see Ark. Code Ann. §§ 5-61-404; Idaho Code § 18-622; Miss. Code Ann. § 41-41-45; Okla. Stat. Ann. § 861; S.D. Codified Laws § 22-17-5.1.

constitution implicitly or expressly provides a general right to abortion—protections that encompass the narrower right to a health-preserving abortion.[28]

Several state courts that declined to adopt a broad constitutional health exception have still recognized the right to a life-preserving abortion. The Supreme Court of Oklahoma determined "that the Oklahoma Constitution creates an inherent right of a pregnant woman to terminate a pregnancy when necessary to preserve her life," though the court avoided deciding whether this right extended to abortion in other circumstances. *Okla. Call for Repro. Just. v. Drummond*, 526 P.3d 1123, 1130 (Okla. 2023). The Supreme Court of Texas rejected the argument that the state constitution protected abortion whenever continuation of the pregnancy was "unsafe," but nonetheless observed that "[t]he history of abortion regulation in Texas demonstrates the Legislature's unmistakable commitment to

---

[28] In eight states, the state supreme court determined that the state constitution implicitly protects the right to abortion, decisions that often specifically addressed medically indicated abortion. *See Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968-69 (Alaska 1997); *Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 818-19 (Cal. 1997); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 486 (Kan. 2019); *Moe v. Sec. of Admin. & Fin.*, 417 N.E.2d 387, 400-01 (Mass. 1981); *Doe v. Gomez*, 542 N.W.2d 17, 19 (Minn. 1995); *Armstrong v. State*, 989 P.2d 364, 379-81 (Mont. 1999); *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 629-31 (N.J. 2000); *Allegheny Repro. Health Ctr. v. Pa. Dep't of Human Servs.*, 309 A.3d 808, 917 (Pa. 2024). Ten states—including two with previously implicit constitutional protections—have adopted constitutional amendments expressly protecting the right to abortion, most of which provide further explicit safeguards for medically indicated abortion. *See* Ariz. Const. tit. II, § 8.1; Cal. Const. art. 1.1; Colo. Const. art. II, § 32; Md. Const., Decl. of Rts., art. 48; Mo. Const. art. I § 36; Mich. Const. art. 1, § 28; Mont. Const. art. II, § 36; N.Y. Const. art. I, § 11; Ohio Const. art. 1 § 22; Vt. Const. ch. I, art. 22.

protecting the lives of pregnant women experiencing life-threatening complications."[29] *Zurawski v. State*, 690 S.W.3d 644, 668 (Tex. 2024); *see id.* at 673 (Lehrmann, J., concurring) ("[I]t should go without saying that . . . a pregnant patient retains a liberty interest in access to medical care, including abortion, to protect her life and health."). Even here in Idaho, the state supreme court acknowledged centuries-long protections for life-preserving abortion when ruling that the right to abortion is not deeply rooted in Idaho's history. *See Planned Parenthood Great Nw.*, 522 P.3d at 1176-88.

In short, state legislatures and state courts have consistently shielded health-preserving abortions from prosecution for the past two centuries—a continuation of the common law's distinction between criminal and medical abortions. Departures from the practice occur only in a handful of states and typically do not begin until the mid-twentieth century. The particularized history of these protections provides strong evidence of a fundamental right to abortion when necessary to prevent serious and lasting harm to the health of the pregnant woman.

---

[29] Texas permits abortion only when the pregnancy "places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function." Tex. Health & Safety Code § 170A.004(b). By allowing abortion to prevent impairment of major bodily functions, the Texas exception is broader on its face than Idaho's death-of-the-mother exception. Further, following *Zurawski*, the Texas Medical Board published a training for physicians on how to apply the exception, a step Idaho has declined to take. *See* Texas Med. Bd., Texas Abortion Law, https://www.documentcloud.org/documents/26781649-texas-medical-boards-texas-abortion-law-education/.

More broadly, as explained below, this right reflects the underlying principle of self-protection, which is undeniably implicit in our scheme of ordered liberty.

### vi. The Right to Self-Protection

These longstanding protections for health-preserving abortions exist within a deeper right to self-protection that is essential to the American tradition of justice. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). In criminal law, the right to lethal self-defense applies equally to threats of death and threats of serious bodily harm. *See, e.g.*, Model Penal Code § 3.04(2)(b). As Blackstone wrote in his *Commentaries*, "[b]oth the life *and limbs* of a man are of such high value… that [the law] pardons even homicide if committed… in order to preserve them." 1 Blackstone, *supra*, at *130 (emphasis added). And the right to "personal security," he said, encompasses "a person's legal and uninterrupted enjoyment of his life, his limbs, [and] his body," as well as "the preservation of a man's health from such practices as may prejudice or annoy it." *Id.* at *125, *130. The American legal tradition has consistently embraced these principles of self-preservation and bodily integrity as fundamental aspects of our constitutional order. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 594-95 (2008) (discussing the "right of self-preservation" in Revolution-era America); *Winston v. Lee*, 470 U.S. 753, 754 (1985) (explaining "the individual's dignitary interests in personal privacy and bodily integrity"); *Union Pac. Ry. Co. v. Botsford*, 141 U.S.

250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person . . . .").

In Idaho, the right to self-protection is zealously safeguarded for every population except pregnant women, who must endure all harm short of death to serve the state's goal of forcing their bodies to bear a child. *Compare* Idaho Code § 19-202A ("No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary . . . ."), *with id.* § 18-622(2)(a)(i) (permitting abortion only when "necessary to prevent the death of the pregnant woman"). A fetus, of course, has no intent to do harm. But intent does not matter in a self-protection inquiry. The "right of self-defense" applies when a person reasonably believes that lethal force is necessary to avoid death or serious bodily harm. *See, e.g.*, *Beard v. United States*, 158 U.S. 550, 556, 559-560 (1895). Tragically, this description characterizes life- and health-preserving abortions. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 717-18 (D.C. Cir. 2007) (Rogers, J., dissenting) ("Although the concept of self-defense is most often thought of in terms of the response to an assault by another human being, its premise compels the same response in the face of other forms of aggression against life and limb, whether the aggressor be an animal or a diseased cell within one's

body."); *Steinberg v. Brown*, 321 F. Supp. 741, 747 (N.D. Ohio 1970) (explaining that the state could not prohibit life-saving abortion because "self-preservation is the first law of nature").

To be clear, this right to self-protection on its own would not suffice to establish the right to a health-preserving abortion. The Supreme Court and Ninth Circuit have made clear that a specific due process right cannot be inferred from a broad principle like self-preservation. *See Reach*, 174 F.4th at 1147. At the same time, rights are not grains of sand. *Cf. Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (per curiam) (holding that the right to parent likely encompasses "the right not to be shut out of participation in decisions regarding their children's mental health"). In the context of the Second Amendment, the Supreme Court has recently emphasized that the history-and-tradition test does not require a "dead ringer" or "historical twin" for a firearm regulation to pass constitutional muster. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). For unenumerated rights, "the baseline is 180-degrees different"—history must establish the existence of a right rather than an exception to it—but the same framework applies. *Id.* at 729 n.6 (Kavanaugh, J., concurring). The law is not "trapped in amber," and an "appropriate" historical inquiry considers analogous laws and underlying principles in our nation's past. *Id.* at 691-92 (majority opinion).

The right to self-protection thus provides important context and foundation

for the right to a health-preserving abortion. This is not a situation where the state has chosen how to allocate a resource among competing groups, accepting the inevitable tradeoff of such a decision. Rather, the woman's body itself is conscripted into service and forced to bear permanent damage in service of the potential life she carries. Pregnancy and parenthood can justify many unique legal burdens, but not this level of intrusion. A state may require a mother to feed and clothe her child, to provide essential medical care, to maintain a safe home, and—usually—to remain pregnant against her will. *See Dobbs*, 597 U.S. at 290. A state could not, however, constitutionally compel a mother to suffer serious physical harm to save the life of her toddler—to undergo a kidney transplant, for example. And surely "a fetus cannot have rights in this respect superior to those of a person who has already been born." *In re A.C.*, 573 A.2d 1235, 1244 (D.C. Cir. 1990). Pregnancy does not create an exception to this basic principle of bodily integrity.

The Court thus holds today that the right to a health-preserving abortion is one of the liberties guaranteed by the Due Process Clause of the Fourteenth Amendment.

### 3. Compelling State Interest

A statute that infringes on a fundamental right must satisfy strict scrutiny, meaning that the law survives only if narrowly tailored to a compelling state interest. *See, e.g., Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024). By allowing

only life-saving abortions, Idaho's ban infringes the right of pregnant women to obtain an abortion when necessary to preserve their health. Idaho does not have a compelling interest in prohibiting obstetric care under these circumstances.

Defendants claim that the abortion ban serves Idaho's interests in "protecting unborn children," and in "the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." *D.'s Answer to Interrog.*, P.'s Ex. 1010 at 5. These interests are legitimate. Under *Dobbs*, a state may of course restrict abortion to protect fetal life. But in the context of health-preserving abortions, Idaho's ban is not narrowly tailored to this or any other interest. Abortion is statistically far safer than childbirth, so the ban poses a risk to maternal health and contravenes the consensus of the medical profession.[30] Idaho's interests in preserving the integrity of medical practice and preventing sex-based discrimination can be addressed through targeted legislation rather than a blanket ban. Likewise, Idaho could eliminate "particularly gruesome

---

[30] Guidance from professional medical societies provides that abortion is part of the standard of care whenever a pregnancy places a woman at risk of a serious health impairment. *See, e.g.*, Soc'y for Maternal-Fetal Med., Anjali Kaimal & Mary Norton, *Society for Maternal-Fetal Medicine Consult Series No. 55: Counseling Women at Increased Risk of Maternal Morbidity and Mortality* (2021), P.'s Ex. 1028.

or barbaric" abortions and mitigate fetal pain by regulating specific procedures. In short, the current ban is "broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989).

For centuries, states have protected abortions that are necessary to prevent serious and lasting harm to the health of the pregnant woman. By prohibiting women from obtaining essential medical care when pregnancy poses a severe danger, Idaho contradicts this long tradition and the underlying right to defend oneself from harm. As applied to health-preserving abortions, the Defense of Life Act and Fetal Heartbeat Act are unconstitutional.[31]

### C. Idaho's Exclusion of Self-Harm from the Death-of-the-Mother Exception Violates the Equal Protection Clause of the Fourteenth Amendment.

Idaho's abortion ban creates an exception to prevent the death of the pregnant woman, but it also imposes an exception to the exception. An abortion necessary to prevent death is nonetheless criminal if the threat to the woman's life stems from self-harm. Dr. Seyb argues that this provision violates the Equal

---

[31] The declaratory judgment in *Adkins v. State* currently defines the scope of the death exception, at least in Ada County. In crafting a remedy here, this Court retains as much of that construction as possible. Thus, as set out in the Order below, abortion is permissible "if, in the performing physician's good faith medical judgment (based on the facts known to the physician at the time of the abortion), the patient—because of an existing medical condition or pregnancy complication that would be alleviated by an abortion—faces a non-negligible risk" of serious and lasting harm to her health. *Adkins*, CV01-23-14744, at 39.

Protection Clause of the Fourteenth Amendment. Because life-preserving abortion is a fundamental right, the law survives only if narrowly tailored to a compelling state interest. Idaho's exclusion of self-harm meets neither of these criteria.

A state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV. The Equal Protection Clause constrains the authority of states to privilege or disadvantage different classes of persons. A classification that either "proceed[s] along suspect lines" or "involve[s] fundamental rights" receives heightened scrutiny. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). Neither mental health nor pregnancy is a suspect classification, meaning that pregnant women at risk of death from self-harm do not receive special constitutional protections. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974). But Idaho's exclusion of self-harm infringes the fundamental right to a life-saving abortion for this group, so strict scrutiny applies.

Defendants justify the law based on the difficulties of accurately diagnosing mental health conditions and because pregnant women at risk of death from self-harm have treatment options other than abortion. These are not compelling interests. The brain is an organ of the body, and psychiatric disorders are medical conditions just like PPROM, heart disease, and diabetes. *See* Payne Test., Tr. 254, 259, 274; Smid Test., Tr. 58, 69. Further, the trial record shows that mental

illnesses, like other illnesses, are diagnosed based on standardized factors rooted in objectively verifiable information. Payne Test., Tr. 258-59. Psychiatrists do not rely solely on patient self-reporting, and concerns about women lying about their suicidality to obtain abortions can be addressed through less restrictive legislation. Likewise, the record establishes that abortion is the only effective treatment option for some pregnant patients with psychiatric conditions. Idaho may take steps to ensure that other treatments are prioritized, but the state may not impose an absolute ban on life-saving abortions for this population.[32]

This ruling comports with the approach to mental health treatment in other areas of constitutional law. Under the Eighth Amendment, the state's obligations to provide medical care to prisoners apply equally to physical health and mental health, including efforts to prevent suicide. *See Brown v. Plata*, 563 U.S. 493, 501, 506 (2011). There is no reason to depart from this principle here. In the words of

---

[32] Courts have regularly rejected strict distinctions between mental and physical health in abortion cases. Prior to *Roe*, the Supreme Court concluded that the health exception in a D.C. abortion law clearly encompassed "psychological as well as physical well-being." *United States v. Vuitch*, 402 U.S. 62, 72 (1971). The Sixth Circuit held that a health exception in a post-viability abortion ban must encompass "severe irreversible risks of mental and emotional harm." *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 209 (6th Cir. 1997). Ironically, in the 1990s, the Idaho Attorney General cited the Sixth Circuit's ruling in an opinion advising the state legislature of the likely unconstitutionality of a proposed law to ban post-viability abortion except to save the life of the mother. 1998 Idaho Op. Att'y Gen. 5 (1998). Several recent state supreme courts have reached similar conclusions. *See State v. Johnson*, 582 P.3d 380, 411 (Wyo. 2026); *Access Indep. Health Servs., Inc. v. Wrigley*, 16 N.W.3d 902, 915-16 (N.D. 2025).

the Supreme Court, the denial of such care is "incompatible with the concept of human dignity and has no place in civilized society." *Id.* at 511.

Idaho acknowledges that a pregnant woman normally has the prerogative to obtain an abortion when necessary to prevent her own death. It cannot circumscribe this right simply because that death would be the result of self-harm.

### D. Idaho Has a Legitimate Interest in Prohibiting Abortions That Are Medically Indicated Due to Fetal Conditions.

The above analyses address pregnancies that threaten the life or health of the woman. In these situations, Idaho may not prohibit women from terminating their pregnancies. But Dr. Seyb also challenges Idaho's abortion ban applied to fetal complications that provide a medical indication for abortion. Specifically, he says that Idaho lacks a rational basis for banning abortion for fetuses with life-limiting conditions and for high-order pregnancies, where the abortion of at least one fetus increases the chance that the others will live. In these situations, the pregnancy does not necessarily put the woman's health in jeopardy, but the fetus or fetuses will likely not survive past birth.

A state law that does not infringe a fundamental right or target a protected class must satisfy only rational basis review. This standard is highly deferential: the law survives if rationally related to any legitimate state interest. *See Box v. Planned Parenthood of Ind. & Ky.*, 587 U.S. 490, 491 (2019). The plaintiff must prove that no such interest exists, and "it is entirely irrelevant for constitutional

purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993).

One factual point is important to clarify before proceeding further. Dr. Seyb lumps these fetal indications for abortion together with the broader category of medically indicated abortions, and he sometimes suggests that all such cases fall within the right to a health-preserving abortion articulated above. The record established at trial does show that many pregnancies with fetal indications for abortion pose an exceptional threat to the health of the pregnant woman. *See* Eller Test., Tr. 366-67, 435; *Prentice Expert Report* at 5-7, P.'s Ex. 1036. But the Court cannot conclude that these categories inevitably overlap. Some genetic conditions, for example, might be lethal for the fetus without posing a special danger to the pregnant woman. In these cases, the pregnant woman would not have the right to a health-preserving abortion.[33] Dr. Seyb does not argue for an independent, historically grounded fundamental right to abortion based on fetal indicators, so rational basis review is the governing standard.

------

[33] All pregnancies have some danger and cause substantial pain for the pregnant woman. But, as Dr. Seyb acknowledges, pregnancy itself is not "a medical indicator" for abortion. Seyb Test., Tr. 153. Treating the normal burdens of pregnancy as justification for a health-preserving abortion would obviously contradict *Dobbs*. The baseline principle that states are free to regulate abortion as they wish, subject only to rational basis review, applies unless the pregnancy poses an extraordinary threat to the health of the woman. But to be clear, when a fetal indicator does seriously endanger the woman's health, she has the right to a health-preserving abortion.

Idaho may ban these abortions based on the state's legitimate interests in, for example, protecting potential life and affirming the dignity of children with profound disabilities. *See Dobbs*, 597 U.S. at 301; *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 282 (1990). Misdiagnoses can happen, so Idaho's law prevents needless abortions. And even fetuses with grave conditions may occasionally live for days, weeks, or months after birth. Defendants are correct that this Court may not decide what constitutes a "meaningful" life or wade into the messy ethics of aborting one fetus in the hopes of saving another. These questions are the terrain of the state legislature.

Some may find the law cruel. And the Court fully understands and appreciates that sentiment. Pregnant women faced with a devastating fetal diagnosis must either bear the challenges of pregnancy while waiting to watch their child die or flee the state to receive appropriate medical care. Although some women may certainly wish to continue the pregnancy, Kraus Test., Tr. 1135-37, many others do not. Eller Test., Tr. 435-36. And one might conclude that Idaho regards women in this latter category more as incubators for a fetus who will not survive than as human beings with the capacity to make an extraordinarily difficult decision about their bodies and their families. But the Court's role here is not to express its personal judgment of the wisdom of the legislature's decision. Rather, it is to establish the constitutional boundaries which the Idaho legislature may not

cross. The Court finds that the policy adopted by the legislature, while troubling, does not cross that line. For Idahoans who oppose this law, the solution lies at the ballot box rather than the courthouse.

## ORDER

**THEREFORE, IT IS ORDERED that:**

1.      The Members of the Idaho Board of Medicine are **DISMISSED** as a defendant from this action.

2.      The Ada County Prosecuting Attorney and Attorney General of Idaho are **ENJOINED** from enforcing the Defense of Life Act, Idaho Code § 18-622, and Fetal Heartbeat Act, Idaho Code § 18-8804, in cases where a physician has determined, in his or her good faith medical judgment, that continuation of the pregnancy poses a non-negligible risk of serious and lasting harm to the health of the pregnant woman.

3.      The Ada County Prosecuting Attorney and Attorney General of Idaho are **ENJOINED** from enforcing the Defense of Life Act, Idaho Code § 18-622, and Fetal Heartbeat Act, Idaho Code § 18-8804, in cases where a physician has determined, in his or her good faith medical judgment, that abortion is necessary to prevent a non-negligible risk that continuation of the pregnancy will result in the death of the pregnant woman from self-harm.



DATED: August 13, 2026

B. Lynn Winmill
U.S. District Court Judge